## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

THOMAS J. CAPANO,                    :
                                     :
      Petitioner,                 :
                                     :
   v.                             :     Civ. Act. No. 06-58-KAJ
                                     :
THOMAS L. CARROLL,                   :
Warden, and CARL C. DANBERG,         :
Attorney General for the State       :
of Delaware,                         :
                                     :
      Respondents.                :

### ANSWER

Pursuant to Rule 5 of the Rules Governing Section 2254 Actions, 28 U.S.C. foll. §
2254, respondents state the following in response to the petition for a writ of habeas
corpus:

In December 1997, a Delaware state grand jury indicted petitioner Thomas J.
Capano, charging him with having committed first degree murder in the death of Anne
Marie Fahey.  After a ten-week trial, a Superior Court jury found Capano guilty of first
degree murder.  Following a penalty hearing, the jury recommended by a vote of 10 to 2
that Capano be sentenced to death.  In March 1999, the trial judge sentenced Capano to
death.  On appeal, the Delaware Supreme Court affirmed the conviction and the
sentence, *Capano v. State*, 781 A.2d 556 (Del. 2001), and Capano's ensuing petition for
a writ of certiorari was denied in June 2002.  *Capano v. Delaware*, 536 U.S. 958
(2002).

Capano, in June 2003, applied for state post-conviction relief.  After an
evidentiary hearing and briefing, Superior Court denied the motion in March 2005.

*State v. Capano*, ID 9711006198 (R-1), 2005 Del. Super. LEXIS 69 (Mar. 9, 2005). On January 10, 2006, the state supreme court, on appeal from the denial of Capano's state post-conviction motion, vacated the death sentence and remanded the case for a new penalty hearing. *Capano v. State*, 889 A.2d 968 (Del. 2006). Then, on January 30, 2006, Capano filed the instant petition for a writ of habeas corpus. DI 1. Prosecutors elected not to conduct a new penalty hearing, and on March 2, 2006, a Superior Court judge sentenced Capano to life in prison.

## Facts

Thomas Capano, a prominent local attorney, and Anne Marie Fahey began dating in the spring of 1994. The two kept the relationship a secret from most of their friends and family members. Fahey was in love with Capano, but she knew that she could not expect to marry him. By September 1995, when Fahey met Michael Scanlon, she was attempting to end the relationship with Capano. Capano, however, became very upset and continued to pursue the relationship. On her part, Fahey was concerned that Capano would react badly if he learned of her increasingly close ties to Scanlon, Fahey telling her psychiatrist that she felt Capano was controlling her. By April 1996, Fahey thought that she and Capano had established a friendship that she could manage while increasing her involvement with Scanlon. *Capano*, 781 A.2d at 583, 619, 621.

In the meantime, according to prosecutors, Capano had started to plan Fahey's demise. In February 1996, Capano told two of his brothers, Gerry and Joseph, that he had been threatened by extortionists, and he borrowed $8,000 from Gerry in connection with the extortion effort. Capano later obtained a pistol from Gerry (which Capano returned about a month later) and asked Gerry if he could borrow Gerry's boat if he had to dispose of a body. In April 1996, Capano purchased a 162-quart marine cooler

that was later used to dispose of Fahey's body. The following month, Capano had his mistress of 17 years, Deborah MacIntyre, purchase a handgun for him. *Id.* at 583-84, 599-603.

On Thursday, June 27, 1996, Fahey left work at about 4:30 p.m. and went to an appointment with her psychiatrist. Capano and Fahey later had dinner at a Philadelphia restaurant, and Fahey was never seen alive thereafter. Early the next morning, Capano asked Gerry if he could borrow his boat. According to Gerry, when he asked Capano, "Did you do it?", Capano replied that he had. The two agreed to meet later at Capano's house. *Id.* at 584.

When Gerry arrived at about 8:30 a.m., Capano had secured the cooler with a lock and chain which Gerry told him to remove. The two placed the cooler in the back of Capano's sport utility vehicle, and they drove to Gerry's house in Stone Harbor, New Jersey. There, they put the cooler onto Gerry's boat and proceeded to sea. At about 60 miles from the coast, they pushed the cooler over the side. The cooler, however, simply floated and continued to do so even after Gerry shot a hole in it. Gerry eventually maneuvered the boat alongside the cooler but, after giving Capano two anchors, turned away as Capano wrapped Fahey's body in the chain and weighed it down with the anchors. Gerry looked back in time to see part of a human leg sink into the water. He retrieved the cooler from the water, rinsed out the inside, and removed the lid before tossing the cooler and the lid back into the ocean.[1] Back at Capano's house, the two disposed of a bloodstained love seat and rug from the great room of the house; on Saturday, June 29, Capano bought a new rug. *Id.* at 584, 599, 604.

---

[1] The cooler was later found at sea by a fisherman off the New Jersey coast. *Capano*, 781 A.2d at 599.

That Saturday night, Fahey did not appear at a family dinner, and after contacting some of her friends and entering her apartment, Fahey's family contacted police. Investigators determined that night that Capano might have information about Fahey's whereabouts and questioned him. Police returned on Sunday afternoon and searched Capano's house. A subsequent search found small spots of blood on a wall in the great room of the house. DNA testing of the blood spots, comparing them with blood Fahey had given to a blood bank, showed the spots to be a likely match to Fahey's blood. Federal authorities joined the investigation in the summer of 1996, and several individuals, including Capano's brothers, appeared before a federal grand jury. In October 1997, federal agents executing a search warrant discovered illegal drugs and weapons in Gerry's house, and the following month, Gerry agreed to cooperate with authorities investigating Fahey's disappearance. *Id.* at 582-83, 585.

Capano offered a radically different version of events. Testifying at trial, Capano recounted that after dinner in Philadelphia, he and Fahey stopped at her apartment and from there went to his house to watch television, arriving shortly after 10:00 p.m. About an hour later, with Fahey still there, he spoke with MacIntyre and told her that she should not come to the house. A few minutes later, as he and Fahey sat in the great room, a very agitated MacIntyre walked into the room. Fahey began to put her pantyhose back on, telling Capano that she wanted to leave. MacIntyre then produced a pistol and threatened to shoot herself. Capano explained that he grabbed MacIntyre's arm to prevent her from doing so, but MacIntyre accidentally fired the gun; the bullet hit Fahey behind her right ear, killing her instantly. Capano retrieved the pistol when MacIntyre dropped it, and Capano sent MacIntyre on her way. He then cleaned up the blood and placed Fahey's body in the cooler. At that point, Capano related, he went to

4

Fahey's apartment and arranged it so as to appear that Fahey had been there. The next morning, he enlisted Gerry's help in disposing of Fahey's body off the New Jersey coast. *Id.* at 585-86.

## Discussion

In his federal habeas petition, Capano raises the following claims: (1) the trial court's refusal to instruct the jury on lesser included offenses violated Capano's due process rights under *Beck v. Alabama*, 447 U.S. 625 (1980); (2) the Delaware death penalty statute in effect at the time of Capano's trial and sentencing was facially unconstitutional under *Ring v. Arizona*, 536 U.S. 584 (2002); (3) the Delaware Supreme Court's decision in the post-conviction proceedings to permit a re-trial of the penalty phase violated Capano's rights under the Double Jeopardy Clause of the Fifth Amendment; (4) the admission of the victim's out-of-court statements to her psychotherapists concerning her relationship with Capano and "bad acts" allegedly committed by Capano violated Capano's rights under the Confrontation Clause of the Sixth Amendment; (5) cross-examination of Capano concerning "post-arrest silence" violated Capano's rights under the Fifth Amendment; and (6) Capano's trial attorneys were constitutionally ineffective because they did not request limiting instructions concerning Fahey's out-of-court statements, they agreed to a stipulation that admitted Fahey's out-of-court statements, and they did not object to the prosecutor's cross-examination of Capano about his pre-arrest and post-arrest silence. DI 1 at ¶ 12.

## 1. Lesser included offense instructions

Capano was charged with a single count of first degree murder. The defense asked the trial judge to instruct the jury on the lesser included offenses of second degree murder (Del. Code Ann. tit. 11, §635), manslaughter (Del. Code Ann. tit. 11, §632), and

criminally negligent homicide (Del. Code Ann. tit. 11, §631). The trial judge decided that there was no basis upon which the jury could find Capano guilty of any of the included offenses, and he denied the defense application. *Appendix to Appellant's Opening Brief*, Del. Supr. Ct. Nos. 110 & 149, 1999, at A513-14. The jury, in addition to being instructed on the elements of first degree murder, was told that if they found Fahey's death to be the result of an accident, then the "defendant would not have had the required mental state to commit the offense charged." The judge also instructed the jury to "consider whether the evidence as to accident raises a reasonable doubt of the defendant's guilt." *Id.* at A529.

On appeal, Capano argued that under state law, the trial judge erred in declining to instruct the jury on the lesser included offenses. *Amended Appellant's Opening Brief* at 22-40, Del. Supr. Ct. Nos. 110 & 149, 1999. In addition, Capano argued that his conviction was invalid under *Beck v. Alabama*, 447 U.S. 625 (1980). *Amended Appellant's Opening Brief* at 40-42, Del. Supr. Ct. Nos. 110 & 149, 1999. The state supreme court thought otherwise. Based on its review of the evidence, the state court concluded that there was "no rational basis in the evidence to support a charge on any of the lesser included offenses" requested by Capano. *Capano*, 781 A.2d at 628. *See id.* at 630-32. In addition, Capano's account that Fahey's death was the result of an accident did not support an instruction on any of the lesser included offenses. *Id.* at 632-33. Because there was no basis in the evidence for the instructions on the lesser included offenses, the federal Constitution did not require that the jury be so instructed. *Id.* at 633-34.

Capano now charges that the failure to instruct the jury on the lesser included offenses, as he requested, violates the rule set out in *Beck*. DI 1 at ¶12. Having

6

presented the claim to the state supreme court on direct appeal, Capano has exhausted state remedies. *See Smith v. Digmon*, 434 U.S. 332 (1978). However, Capano can not show that the decision of the state supreme court is either contrary to or unreasonably applies Supreme Court precedent, and he therefore is not entitled to relief.

a. In *Beck*, the Supreme Court held that a death sentence cannot be imposed after a jury verdict of guilt of a capital offense, when the jury was not allowed to consider a lesser included non-capital offense and when the evidence would have supported such a verdict. 447 U.S. at 627, 642, 645. Two years later, the Court reiterated in *Hopper v. Evans*, 456 U.S. 605 (1982), that lesser included offense instructions were only mandated when supported by the evidence. Conversely, if there is no lesser included offense, as the greater and lesser offenses are defined in state law, the defendant has no constitutional entitlement to a lesser included instruction. *Hopkins v. Reeves*, 524 U.S. 88 (1998); *Spaziano v. Florida*, 468 U.S. 447 (1984).

Capano does not suggest that the state court applied an incorrect legal standard. Indeed, the standard for determining whether the jury must be instructed as to a lesser included offense under Delaware law is identical to that employed by the federal courts. *Compare Keeble v. United States*, 412 U.S. 205, 208 (1973) *with Ward v. State*, 575 A.2d 1156, 1158-59 (Del. 1990) and Del. Code Ann. tit. 11, §206(c). *See Hopper*, 456 U.S. at 611-12 (noting parallel between Alabama state law and federal standard). Moreover, the state court engaged in the correct analysis:  it considered whether there was a rational basis in the evidence to acquit Capano of first degree murder *and* to convict him of one of the lesser included offenses. *Capano*, 781 A.2d at 630-33. *Compare Hogan v. Gibson*, 197 F.3d 1297, 1305 (10th Cir. 1999) (state court holding that defendant did not make out *Beck* claim was incorrectly based on conclusion that evidence was sufficient to

convict defendant of greater offense). Thus, the decision of the state supreme court is not contrary to Supreme Court precedent.

   b.    Capano's complaint must therefore be that the state supreme court unreasonably applied *Beck* in his case.[2] As Capano's argument went in the state court, the evidence presented by the prosecution could have created a reasonable doubt as to the commission of the charged offense, and the jury should have been allowed to consider whether Capano acted with some lesser degree of culpability. *See Capano*, 781 A.2d at 630. But as the prosecution argued on appeal[3] and as the state supreme court agreed,[4] the prosecution had presented no evidence of recklessness or criminal negligence. The jury in turn was not free to infer from nothing that Capano acted with a less culpable mental state. *Id.* If the jury rejected the prosecution's evidence, e.g., the purchase of the cooler and the pistol, that Capano had planned Fahey's death, the jury could have acquitted him. "But, conviction on any other theory would require pure speculation by the jury concerning the manner of Fahey's death," especially because "there is no evidence" on the point. *Id.* at 631. Because the possibilities that Capano killed Fahey as the result of "some other reckless or negligent act" were only "speculative," there was no basis in the evidence for any lesser included offense instructions on this theory. *Id.*

---

[2]There is some question whether "an examination of the sufficiency of the evidence for a lesser included offense instruction" is the resolution of a factual issue or a legal conclusion. *Hogan*, 197 F.3d at 1306. *See Robertson v. Johnson*, 234 F.3d 890, 898 (5th Cir. 2000).  Respondents will assume "that the correct approach" is to treat the question "as a conclusion of law." *Hogan*, 197 F.3d at 1306 (citing *Bryson v. Ward*, 187 F.3d 1193, 1210-13 (10th Cir. 1999) (Briscoe, J., concurring)).

[3] *State's Answering Brief* at 24-25, Del. Supr. Ct. Nos. 110 & 149, 1999.

[4] *Capano*, 781 A.2d at 630-31.

This view of the state supreme court was entirely consistent with the approach of the federal courts of appeals. *See Price v. Vincent*, 538 U.S. 634, 643 n.2 (2003) (citing lower federal and state court decisions to show that state court decision at issue was not unreasonable); *Chadwick v. Janecka*, 312 F.3d 597, 613 (3d Cir. 2002).

> [W]hen the government has made out a compelling case, uncontroverted on the evidence, on an element required for the charged offense but not for the lesser-included offense, there is a duty on defendant to come forward with some evidence on that issue if he wishes to have the benefit of a lesser-included offense charge. To put it another way, while a judge cannot prevent a jury from rejecting the prosecution's entire case, he is not obligated, under these circumstances, to assist a jury in coming to an irrational conclusion of partial acceptance and partial rejection of the prosecution's case by giving a lesser-included offense instruction.

*Driscoll v. United States*, 356 F.2d 324, 327 (1st Cir. 1966), *vacated on other grounds sub nom. Piccioli v. United States*, 390 U.S. 202 (1968). *Accord Dowthitt v. Johnson*, 230 F.3d 733, 757 (5th Cir. 2000) (quoting *Jones v. Johnson*, 171 F.3d 270, 274 (5th Cir. 1999)); *United States v. Cady*, 495 F.2d 742, 748 (8th Cir. 1974). *See United States v. Moore*, 108 F.3d 270, 274 (10th Cir. 1997); *State v. Fowler*, 785 P.2d 808, 813-14 (Wash. 1990).

The other reason advanced by Capano in the state courts in support of his request for lesser included offense instructions was "that based on his testimony alone there is a rational basis in the evidence for finding recklessness or criminal negligence." *Capano*, 781 A.2d at 632. Capano's version of events was that he prevented MacIntyre from killing herself. When MacIntyre brandished the pistol, he grabbed MacIntyre's arm, but MacIntyre accidentally fired the gun; the bullet hit Fahey behind her right ear, killing her instantly. *Id.* at 585, 632. According to the state supreme court, "an accident defense is incompatible with recklessness or criminal negligence." *Id.* at 633 & n.255

9

(citing cases). That is a question of state law which is beyond the scope of federal habeas review. *See Hooks v. Ward*, 184 F.3d 1206, 1231 (10th Cir. 1999). In turn, Capano's testimony failed to set out a rational basis for convicting him of a lesser included offense: as a matter of state substantive criminal law, his account did not establish a culpable mental state. *Capano*, 781 A.2d at 633. Under *Hopkins* and *Spaziano*, therefore, Capano had no constitutional right to lesser included offense instructions on the theory that his version of events provided evidence of recklessness or criminal negligence. The state supreme court accordingly reasonably applied *Beck* when it held that there was no basis to instruct the jury on lesser included offenses.

## 2. Severability of section 4209

Capano argued in the state courts that if the 1991 death penalty statute was invalid under *Ring v. Arizona*, 536 U.S. 584 (2002), his sentence, by default, became one of life imprisonment without parole. As Capano presented the issue, the invalidity of the statute would only require that the death penalty provisions in the 1991 statute be stricken, leaving the rest of the statute standing. In his view, the severability provisions in the state Code (Del. Code Ann. tit. 1, §308) required that result. *Appellant's Opening Brief* at 41-45, Del. Supr. Ct. No. 131, 2005. *See State's Answering Brief* at 29-32, Del. Supr. Ct. No. 131, 2005. The state supreme court, however, decided that in light of the 2002 amendment to section 4209,[5] Capano could be subject to a new penalty hearing. *Capano*, 889 A.2d at 973, 985.

In his petition, Capano argues that if the 1991 version of section 4209 is invalid under *Ring*, "then the doctrine of 'severability' would have required [the] court to re-sentence [him] to life imprisonment and would have barred any re-trial of the penalty

---

[5]*See Brice v. State*, 815 A.2d 314, 320 (Del. 2003); 73 Del. Laws ch. 423, §6 (2002).

phase of the case." DI 1 at ¶12. The issue was presented to the state supreme court, and Capano has perforce exhausted state remedies. The problem is that severability is a question of state law. *E.g., Trade Waste Mgmt. Ass'n, Inc. v. Hughey*, 780 F.2d 221, 230 (3d Cir. 1985) (citing *Fox Film Corp. v. Muller*, 296 U.S. 207 (1935)); *New Jersey State Chamber of Commerce v. Hughey*, 774 F.2d 587, 596 (3d Cir. 1985) (citing *Watson v. Buck*, 313 U.S. 387, 395-96 (1941)). In turn, questions of state law are beyond the scope of federal habeas review. *E.g., Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Priester v. Vaughn*, 382 F.3d 394, 402 (3d Cir. 2004). Capano's challenge to the state court's decision on this point thus makes out no claim for relief under the federal habeas statute.

### 3. Double jeopardy preclusion of new penalty hearing

In his post-conviction appeal, Capano contended that if his death sentence was vacated, the Double Jeopardy Clause barred a new penalty hearing. As Capano argued it, the jury's 11 to 1 vote in the original penalty hearing, regarding the statutory aggravator, constituted an "acquittal" in the context of the penalty proceedings, and an acquittal precluded any retrial on sentencing. *Appellant's Opening Brief* at 46-54, Del. Supr. Ct. No. 131, 2005. Reading *Poland v. Arizona*, 476 U.S. 147 (1986), and *Sattazahn v. Pennsylvania*, 537 U.S. 101 (2003), the state supreme court concluded otherwise. According to the state court, under the 1991 statute, the jury's 11 to 1 vote regarding the statutory aggravator was only a recommendation, not the final determination. Instead, the trial judge under the 1991 statute was the decisionmaker, and the trial judge, by virtue of his imposition of the death sentence, had not "acquitted" Capano of the death penalty. As a result, a new penalty hearing was not prohibited by the Double Jeopardy Clause. *Capano*, 889 A.2d at 980-84.

In his federal habeas petition, Capano repeats his contention that the Double Jeopardy Clause operates to bar any new penalty hearing. DI 1 at ¶12. The issue having been presented to the state supreme court, Capano has exhausted state remedies as to this claim. *See Smith v. Digmon*, 434 U.S. 332 (1978). However, Capano is not entitled to relief for two reasons: his double jeopardy claim is not ripe and the decision of the state supreme court is neither contrary to nor an unreasonable application of Supreme Court precedent.

a. Article III of the Constitution requires that there be an actual "controversy" for a federal court to have jurisdiction. Related to the Article III requirement that there be a "controversy" is the ripeness doctrine. *Wyatt, Virgin Islands, Inc. v. Gov't of Virgin Islands*, 385 F.3d 801, 806 (3d Cir.2004); *Peachlum v. City of York*, 333 F.3d 429, 433 (3d Cir. 2003) (ripeness requirement is based on Article III limitations and on prudential limitations) (citing cases); *Philadelphia Federation of Teachers v. Ridge*, 150 F.3d 319, 323 n.3 (3d Cir. 1998) (doctrine based in case or controversy requirement of Article III and on prudential limitations). The ripeness inquiry turns on "'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *Wyatt, Virgin Islands, Inc.*, 385 F.3d at 806 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967). *See Artway v. Attorney General of State of New Jersey*, 81 F.3d 1235, 1247 (3d Cir. 1996); *Pic-A-State PA, Inc. v. Reno*, 76 F.3d 1294, 1298 (3d Cir. 1996).[6] "The majority view is that both prongs of the test must ordinarily be satisfied in order to establish ripeness. . . ." *Philadelphia Federation of Teachers*, 150

---

[6]The Third Circuit "sometimes employ[s] a three-part test for ripeness in the declaratory judgment context. . . ." *Artway*, 81 F.3d at 1247 n.7 (citing *Step-Saver Data Systems, Inc. v. Wyse Technology*, 912 F.2d 643, 647 (3d Cir. 1990)). *See Philadelphia Federation of Teachers*, 150 F.3d at 323 n.4; *Pic-A-State*, 76 F.3d at 1298.

F.3d at 325 n.7.  In turn, the "fitness for review" analysis considers "whether the claim involves uncertain and contingent events that may not occur as anticipated or at all; the extent to which a claim is bound up in the facts; and whether the parties to the action are sufficiently adverse." *Id.* at 323 (citing *Riva v. Massachusetts*, 61 F.3d 1003, 1009-10 (1st Cir. 1995)).  *See Artway*, 81 F.3d at 1249.  The hardship inquiry "turns on whether the challenged action creates a 'direct and immediate' dilemma for the parties," putting the plaintiff "to costly choices" if review is postponed. *Philadelphia Federation of Teachers*, 150 F.3d at 323 (citing *Abbott Labs.*, 387 U.S. at 152; *W.R. Grace & Co. v. EPA*, 959 F.2d 360, 364 (1st Cir. 1992)).  *See Artway*, 81 F.3d at 1247 (hardship factor asks if threat of prosecution is credible, instead of merely speculative).

Capano's case fails both the fitness and the hardship tests.  At the time Capano filed his federal habeas petition (in January 2006), the Attorney General had not decided whether to proceed with a new penalty hearing in the case.  On February 6, the Attorney General announced that state prosecutors would not proceed with a new penalty hearing in the case.[7]  On March 2, a Superior Court judge sentenced Capano to life imprisonment without parole.  For Capano to face a realistic prospect of a new penalty hearing, two events would have to happen:  a state or federal court would have to order a new trial in the case *and* the Attorney General would have to conclude that the interests of justice required the State to seek the death penalty.  Those events are simply too uncertain to justify adjudication of the issue now. *See Wyatt, Virgin Islands, Inc.*, 385 F.3d at 807-08 (no realistic chance of enforcement action). *See generally Artway*, 81 F.3d at 1248 (explaining principle).  And in the double jeopardy context, a

---

[7]*See* http://www.newsjournal.com/apps/pbcs.dll/article?AID=/20060207/NEWS/602070364 (*News Journal* article attached).

double jeopardy defense is premature until the government makes clear its intent to proceed with a second trial. *See Juvenile Male v. Gov't of N. Mariana Islands*, 255 F.3d 1069, 1072-73 (9th Cir. 2001); *United States v. Stephenson*, 924 F.2d 753, 762 (8th Cir. 1991); *United States v. Winkle*, 587 F.2d 705, 710 (5th Cir. 1979); *United States v. Wilson*, 534 F.2d 76, 78 (6th Cir. 1976) (noting government had already indicated its intent to retry defendant if possible).   Along similar lines, the Attorney General's decision not to proceed with a new penalty hearing means that this Court's resolution of the double jeopardy issue would not have a material effect on the parties:  if Capano were to prevail on his double jeopardy argument, he would be in the same position as he is now -- serving a life sentence without parole. *Compare Pic-A-State*, 76 F.3d at 1300 (plaintiff, if successful, would resume its business activities).   The claim should accordingly be dismissed without prejudice.

   b.  Under the Double Jeopardy Clause, an acquittal of a substantive criminal charge finally disposes of the case and bars retrial. *See, e.g., United States v. Martin Linen Supply Co.*, 430 U.S. 564, 571 (1972).  Because the Double Jeopardy Clause has not been historically applied to sentencing decisions, however, the imposition of a particular sentence generally is not viewed to be an "acquittal" of a greater sentence. *See Monge v. California*, 524 U.S. 721, 728-29 (1998); *United States v. DiFrancesco*, 449 U.S. 117, 129-30 (1980).  The Court recognized a narrow exception to that principle in *Bullington v. Missouri*, 451 U.S. 430 (1981).  *Bullington* holds that if the jury in the penalty phase of a capital trial in effect "acquits" the defendant of a death sentence by sentencing him to life imprisonment, the defendant cannot, if the conviction is reversed on appeal, be sentenced to death on retrial.  Although reversal of a conviction normally wipes the slate clean, leaving no double jeopardy constraint on the sentence imposed on

retrial, reversal because the evidence was insufficient amounts to an acquittal and precludes further proceedings. *See Bullington*, 451 U.S. at 442-43 (citing *Burks v. United States*, 437 U.S. 1 (1978)). The same exception, the Court decided, should apply to the unanimous jury verdict Bullington received for a life sentence. Because that verdict resulted from "a capital sentencing procedure that resembles a trial on the issue of guilt or innocence," the jury had effectively "acquitted the defendant of whatever was necessary to impose the death sentence." *Bullington*, 451 U.S. at 444-45. Thus when a life sentence amounts to a trial-like "acquittal" of the death penalty, the Double Jeopardy Clause precludes the prosecution from seeking the death penalty on retrial. *Id.* at 446.

Later decisions make clear that "*Bullington* established a 'narrow exception,'" *Monge*, 524 U.S. at 730, which arises only when the imposition of a life sentence amounts to an "acquittal on the merits" on whether a sentence of death is appropriate for the offense. In *Arizona v. Rumsey*, 467 U.S. 203 (1984), the trial judge, who under Arizona law was the sentencer in a capital case, entered a sentence of life imprisonment on finding that the State had failed to establish the existence of any aggravating circumstances. The Court explained that the "double jeopardy principle" that governed was "the same as that invoked in *Bullington*: an acquittal on the merits by the sole decisionmaker in the proceeding is final and bars retrial on the same charge." 467 U.S. at 211 (emphasis added). The trial court's decision in *Rumsey* to impose a sentence of life imprisonment "was undoubtedly an acquittal on the merits" on "whether death was the appropriate punishment," because it was based on findings of fact denying the existence of any aggravating circumstances. *Id.* "That judgment, based on findings

15

sufficient to establish legal entitlement to the life sentence," prohibited a "retrial of the appropriateness of the death penalty." *Id.*

In *Poland v. Arizona*, 476 U.S. 147 (1986), the Court again stressed that *Bullington* requires an acquittal on the merits of the death penalty. There, the trial judge sentenced the defendant to death based on one aggravating circumstance. The Arizona Supreme Court found the evidence insufficient to support that aggravating circumstance, but ordered a new sentencing hearing on remand because the trial judge had erred in his interpretation of a different aggravating circumstance. *See* 476 U.S. at 149-50. The Court held that *Bullington* did not bar a new sentencing hearing on remand, because neither the trial judge nor the reviewing court had "acquitted" the defendant of the death penalty. The trial judge had imposed the death penalty, and the reviewing court had held that it might be warranted based on a different aggravating circumstance. *Id.* at 154. Although the reviewing court had found the evidence insufficient to support the particular aggravating circumstance relied on by the trial judge, *Bullington*, the Court explained, requires an "acquittal" on whether "the death penalty is appropriate." *Id.* at 155. A contrary understanding "would push the analogy on which *Bullington* is based past the breaking point." *Id.* at 156. In the case before it, no court had found "the evidence. . . legally insufficient to justify imposition of the death penalty," and there was no "acquittal." *Id.* at 157.

The most recent Supreme Court decision in the field was *Sattazahn v. Pennsylvania*, 537 U.S. 101 (2003). In *Sattazahn*, after the guilt phase of the trial, a trial for the penalty phase was held. The jury could not reach a decision, and Sattazahn moved under Pennsylvania law that the jury be discharged and the court enter a sentence of life imprisonment; the judge did so. On appeal, the conviction was reversed

16

for a new trial. On retrial, prosecutors sought the death penalty again; this time, Sattazahn was convicted and sentenced to death. 537 U.S. at 103-05. The Supreme Court rejected Sattazahn's contention that because of the unique treatment given capital sentencing proceedings under *Bullington v. Missouri*, 451 U.S. 430 (1981), double jeopardy protections were raised when the jury deadlocked at his first sentencing proceedings and the court imposed a sentence of life imprisonment under Pennsylvania law. The Court determined that the automatic life sentence was not an acquittal, and there was no state court ruling to the contrary. 537 U.S. at 109-10. *See id.* at 117-18 (O'Connor, J., concurring in part and concurring in judgment).

According to Capano, the 11 to 1 vote in his case constituted an "acquittal" of the statutory aggravator. The state supreme court, however, thought otherwise. Instead, the 1991 statute was clear that the jury's role in the decision-making process at the penalty phase was entirely advisory. *Capano*, 889 A.2d at 983-84. And that conclusion was also consistent with prior Delaware decisions. The state supreme court in *Brice* held that a statutory aggravator established by virtue of section 4209(e)(2) will satisfy *Ring*: "the jury's verdict of guilt establishes the fact which increases the punishment and such finding, necessarily, was made unanimously and beyond a reasonable doubt." 815 A.2d at 323. It is because the jury's verdict convicting a defendant of first degree murder under section 636(a)(2) through (6) establishes the statutory aggravator under section 4209(e)(2) that a conviction for felony murder, for example, satisfies *Ring*. The decision in *Norcross v. State*, 816 A.2d 757 (Del. 2003), is no more than an application of the precise holding in *Brice* that a statutory aggravator established by virtue of section 4209(e)(2) satisfies *Ring*. Along similar lines, the verdicts in *Reyes v. State*, 819 A.2d 305 (Del. 2003) and *Cabrera v. State*, 840 A.2d 1256 (Del. 2004), convicting the

17

defendants of killing two men in the same incident, established the existence of the particular statutory aggravator. *See Reyes*, 819 A.2d at 316-17; *Cabrera*, 840 A.2d at 1273.

There is no reason to think that *Sattazahn* alters the principle enunciated in *Bullington* and applied in *Rumsey* and *Poland*. The jury's vote on the statutory aggravator in Capano's case, being unconnected to the verdict on the murder charge, had no relevance for double jeopardy purposes. The jury's verdict as to statutory aggravating circumstances under the 1991 statute was advisory. *Capano*, 889 A.2d at 983-84; *Brice*, 815 A.2d at 320, 321, 323-24. The only relevant determination for the double jeopardy question was that made by the trial judge, because under the 1991 statute, only the trial judge could decide whether the State had established, beyond a reasonable doubt, the existence of a statutory aggravator. Certainly, the trial judge determined that the State had shown the existence of the alleged statutory aggravator, a determination upheld on appeal. *Capano*, 781 A.2d at 675. Moreover, the trial judge decided that death was the appropriate sentence, a decision that was also affirmed on appeal. *Id.* at 675-77. The trial judge thus did not reject the aggravator alleged by the prosecution or the death sentence sought by the prosecution, and the state supreme court did not find the evidence legally insufficient to justify imposition of the death penalty upon Capano. Under *Bullington*, as applied in *Poland*, there was therefore no double jeopardy bar to the prosecution seeking the death penalty if Capano's sentence was vacated on appeal. The decision of the state supreme court, as a result, was not contrary to Supreme Court precedent, and the state court reasonably applied that precedent. Capano has thus failed to establish that he is entitled to federal habeas relief on this claim. *See* 28 U.S.C. §2254(d).

#### 4. Fahey's out-of-court statements

At trial, the judge allowed the admission into evidence of statements made by the victim, Anne Marie Fahey, to a psychiatrist, two psychologists, friends, acquaintances, and, in one instance, her diary. The trial judge admitted the statements pursuant to two exceptions to the rule against hearsay, D.R.E. 803(3) (state of mind) and D.R.E. 803(4) (medical diagnosis and treatment). On direct appeal, the Delaware Supreme Court found that Fahey's statements to her psychotherapists and friends concerning her state of mind were admissible under the state of mind exception and the Confrontation Clause. *Capano*, 781 A.2d at 607-17. Fahey's statements to her psychotherapists were also found to be admissible under the medical diagnosis exception in D.R.E. 803(4) and, once again, under the Confrontation Clause. *Id.* at 623-27. The court found that although Fahey's statements to her friends regarding facts remembered or believed should not have been admitted, their admission was harmless beyond a reasonable doubt because the statements were largely cumulative of evidence admitted pursuant to stipulation. *Id.* at 617-23. Capano now asserts that the state courts erred, having incorrectly found the admission of Fahey's out-of-court statements did not violate the Confrontation Clause. DI 1 at ¶ 12. Capano presented this claim to the state supreme court on direct appeal, thus exhausting state remedies as to this claim. *See Smith v. Digmon,* 434 U.S. 332, 333-34 (1978); *Swanger v. Zimmerman,* 750 F.2d 291, 295 (3d Cir. 1984).

Capano's claim, however, does not provide a basis for relief. Under 28 U.S.C. § 2254(d), a habeas petitioner is not entitled to relief unless he can establish that the decision of the state court was contrary to, or involved an objectively unreasonable application of, clearly established federal law, as determined by the Supreme Court of

the United States, or the state court's decision was an unreasonable determination of the facts based on the evidence presented in the state court proceedings. *See Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001). Moreover, factual determinations by state trial and appellate courts are presumed correct absent clear and convincing evidence to the contrary, and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding. *See* 28 U.S.C. §§ 2254(d)(2), (e)(1). *See also Williams,* 529 U.S. at 402-13; *Affinito v. Hendricks*, 366 F.3d 252, 256-57 (3d Cir. 2004); *Campbell v. Vaughn*, 209 F.3d 280, 286 (3d Cir. 2000), *cert. denied*, 531 U.S. 1084 (2001). Thus, this Court need only inquire whether the state courts' determination that the hearsay statements were admissible (or harmless beyond a reasonable doubt) is either contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

The relevant clearly established law governing whether the Confrontation Clause of the Sixth Amendment barred admission of Fahey's hearsay statements at Capano's trial is *Ohio v. Roberts*, 448 U.S. 56 (1980) and its progeny. *See, e.g., McCandless v. Vaughn,* 172 F.3d 255, 264-65 (3d Cir. 1999). In *Roberts*, the Supreme Court held that the Confrontation Clause allows the admission of hearsay evidence against criminal defendants if it falls within a "firmly rooted hearsay exception" or possesses "particularized guarantees of trustworthiness." 448 U.S. at 66; *see also Lilly v. Virginia*, 527 U.S. 116, 124-25 (1999); *Idaho v. Wright*, 497 U.S. 805, 815 (1990). A hearsay exception is "firmly rooted" if, in light of "longstanding judicial and legislative experience," *Wright*, 497 U.S. at 817, the exception "rest[s] upon such solid foundations

that admission of virtually any evidence within [it] comports with the 'substance of the constitutional protection.'" *Roberts*, 448 U.S. at 66 (quoting *Mattox v. United States*, 156 U.S. 237, 244 (1895)). "Established practice, in short, must confirm that statements falling within a category of hearsay inherently 'carr[y] special guarantees of credibility' essentially equivalent to, or greater than, those produced by the Constitution's preference for cross-examined trial testimony." *Lilly*, 527 U.S. at 127 (quoting *White v. Illinois*, 502 U.S. 346, 356 (1992)). In this case, the Delaware state courts correctly identified the *Roberts* standard applicable to Capano's Confrontation Clause claim. Thus the state supreme court's denial of the claim was not contrary to clearly established federal law. *See Williams*, 529 U.S. at 406.

Moreover, the state courts reasonably applied the rule to the specific facts of Capano's case. *See* 28 U.S.C. § 2254(d)(1). The Delaware Supreme Court found that Fahey's statements "reflecting her fear of the defendant (that is, her state of mind), but not the memories or beliefs giving rise to that fear" were properly admitted under Delaware Rule of Evidence 803(3). *Capano*, 781 A.2d at 611. Having determined under state law that these statements of Fahey's were admissible under a state of mind exception, the court then looked to "longstanding judicial precedent" to determine that the state of mind exception is "'firmly rooted' for purposes of the Confrontation Clause." *Id.* at 616. The Delaware Supreme Court noted that the state of mind exception was discussed by the United States Supreme Court as early as 1892 in *Mutual Life Ins. Co. of New York v. Hillmon*, 145 U.S. 285; the exception first appeared in Delaware in 1923. 781 A.2d at 617 n.163; *see State v. Long*, 123 A. 350 (Del. Ct. O. & T. 1923). Further, the court considered that the state of mind exception was "recognized in at least forty-four states." 781 A.2d at 617 n.163. *See White*, 502 U.S. at 743 n.8 (finding two hearsay

exceptions to be "firmly rooted" where one exception was two centuries old and the other was recognized in nearly four-fifths of the states). Thus, the state courts' determination that Fahey's statements relating to her then state of mind were admissible at trial under a firmly rooted hearsay exception was not an unreasonable application of relevant United States Supreme Court precedent.[8] *See, e.g., Hayes v. York*, 311 F.3d 321, 324-27 (4th Cir. 2002) (finding state of mind exception that also includes factual assertions was not contrary to Supreme Court precedent).

In addition, the Delaware Supreme Court held that any error in admitting Fahey's out-of-court statements of facts remembered or believed was harmless error beyond a reasonable doubt. *Capano*, 781 A.2d at 617-23. The United States Supreme Court established, in *Chapman v. California*, 386 U.S. 18 (1967), the federal standard for evaluating whether a constitutional error can be held harmless. Under *Chapman*, a constitutional error is harmless only if "there is no reasonable possibility that the evidence complained of might have contributed to the conviction." 386 U.S. at 24 (quoting *Fahy v. State of Connecticut*, 375 U.S. 85, 86-87 (1963)) (internal quotes omitted). Here, the Delaware Supreme Court, referring to *Dowling v. United States*, 493 U.S. 342 (1990) and *Chapman*, concluded that the admission of the disputed statements was "harmless beyond a reasonable doubt because it is cumulative of the stipulated testimony and therefore had minimal prejudicial impact." 781 A.2d at 618-19 & nn.173 & 175. Having correctly identified the relevant United States Supreme Court

---

[8] The Delaware Supreme Court also noted that Fahey's statements concerning her fear of Capano also possessed "such 'particularized guarantees of trustworthiness' that their admission does not violate Capano's rights under the Confrontation Clause." *Capano*, 781 A.2d at 617 n.165 (citing *Lilly*, 527 U.S. at 124-25; *Wright*, 497 U.S. at 820-21).

precedent, the state court's finding of harmless error was not contrary to clearly established federal law. *See Williams*, 529 U.S. at 406.

In applying *Chapman*'s harmless error analysis to the facts of this case, the Delaware Supreme Court looked to the substance of the testimony stipulated as admissible by both parties before trial. 781 A.2d at 619. Finding that the stipulated testimony included depictions of Capano as manipulative, controlling and obsessive, as well as descriptions of specific incidents in which Capano exhibited these characteristics, the court determined that the disputed testimony was "largely cumulative of the stipulated testimony." *Id.* at 620. The trial court also instructed the jury to consider Fahey's statements only as to Fahey's emotional state, not as evidence of any actions or state of mind of Capano. *See id.* at 622 n. 202 (quoting the trial court's limiting instructions). Ultimately, the state supreme court concluded that any possible error in the admission of Fahey's out-of-court statements could not have affected the outcome of the trial in view of the extensive hearsay evidence to which Capano stipulated at trial. *Id.* at 622. Given this set of facts, a finding of harmless error by the state courts was a reasonable application of the *Chapman* rule.

In an alternative holding, the Delaware Supreme Court also found Fahey's statements to her psychotherapists were admissible under the medical diagnosis or treatment exception set forth in D.R.E. 803(4). *Capano*, 781 A.2d at 623. The court noted that "[a]lthough the medical diagnosis or treatment exception of D.R.E. 803(4) has been recognized in its generic form as 'firmly rooted' for purposes of the Confrontation Clause, the exception has not historically been extended to psychotherapists in Delaware." *Id.* at 626 (citations omitted). Relying instead on *Lilly*'s "residual trustworthiness test" (527 U.S. at 136), the court found that Fahey's statements

to her psychotherapists possessed "'indicia of reliability' and 'guarantees of trustworthiness' sufficient to satisfy the Confrontation Clause." 781 A.2d at 627. The state court found that Fahey made the statements in a natural manner during therapy sessions with nothing to indicate that she had sinister motives. *Id.* Fahey made similar statements to several psychotherapists and friends with whom she regularly confided. *Id.* & n.219; *see Wright*, 497 U.S. at 821-22 (finding spontaneity and consistent repetition to be relevant factors in considering the reliability of hearsay statements) (citations omitted). Thus, the state courts' conclusion that Fahey's statements, including those facts remembered or believed, were admissible as having particularized guarantees of trustworthiness was not an unreasonable application of the *Roberts* standard. Because the state courts correctly identified and applied relevant United States Supreme Court precedent, this claim must be dismissed.

### 5. Post-arrest silence

Capano asserts that the decision of the Delaware Supreme Court that it was proper for Capano to be cross-examined by prosecutors concerning his post-arrest silence violated his Fifth Amendment right to a fair trial. DI 1 at ¶ 12. Capano presented his claim of improper cross-examination to the Delaware Supreme Court on appeal direct appeal, thus exhausting his state court remedies. *See Digmon*, 434 U.S. at 333-34; *Swanger*, 750 F.2d at 295. After finding that a petitioner has exhausted state remedies, however, this Court "must then assure itself that a habeas petitioner has complied with relevant state procedural requirements before it can delve into the claim of constitutional error in a state conviction." *Bond v. Fulcomer*, 864 F.2d 306, 310 (3d Cir. 1989). Where "the highest state court 'clearly and expressly' refused to review the merits of the claim due to an independent and adequate state procedural rule, the claim

is exhausted but procedurally defaulted." *Winters v. Williams*, 2006 WL 1788487, *2 (D. Del. June 27, 2006) (citing *Coleman v. Thompson*, 501 U.S. 722, 750 (1991) and *Harris v. Reed*, 489 U.S. 255, 260-64 (1989)).

In this case, Capano failed to object at trial to being cross-examined regarding post-arrest silence. In Delaware, a defendant must timely object to alleged errors during the actual trial in order to preserve the right to raise the issues on appeal. *Trump v. Kearney*, 2003 WL 22769598, *5 (D. Del. Nov. 14, 2003) (citing Delaware cases). Failure to object to alleged errors constitutes a waiver of the defendant's right to raise the issue on appeal, and the reviewing court is thereafter limited to reviewing the alleged error for plain error. *Id.*; *Wainwright v. State*, 504 A.2d 1096, 1100 (Del. 1986). In Capano's case, the Delaware Supreme Court clearly explained that "[b]ecause no objection was raised at trial, we review this claim for plain error." *Capano*, 781 A.2d at 646 (citing *Wainwright*, 504 A.2d at 1100). This Court has consistently held that Delaware Supreme Court Rule 8, permitting review only for those questions fairly presented to the trial court, is an independent and adequate state procedural rule which precludes federal review. *See, e.g., Lawrie v. Snyder*, 9 F. Supp. 2d 428, 452-53 (D. Del. 1997); *Dawson v. Snyder*, 988 F. Supp. 783, 825 (D. Del. 1997). Thus, Capano's claim of improper cross-examination concerning post-arrest silence is exhausted but procedurally defaulted. *See Winters*, 2006 WL 1788487 at *4-5.

Federal habeas review of Capano's procedurally defaulted claim is barred unless he establishes cause for his procedural default in the state courts and actual prejudice, or that a miscarriage of justice will result if the Court refuses to hear his claim. *See Coleman*, 501 U.S. at 750-51; *McCandless v. Vaughn*, 172 F.3d 255, 260 (3d Cir. 1999); *Caswell v. Ryan*, 953 F.2d 853, 861-62 (3d Cir. 1992); *McLaughlin v. Carroll*, 270 F.

Supp. 2d 490, 513 (D. Del. 2003). To demonstrate cause for a procedural default, a petitioner must show that "some objective factor external to the defense" precluded his compliance with state procedural rules. *McCleskey v. Zant*, 499 U.S. 467, 493 (1991); *Murray v. Carrier*, 477 U.S. 478, 487 (1986); *Dawson*, 988 F. Supp. at 805. To establish prejudice under the cause and prejudice standard, a petitioner must show "not merely that the errors at . . . trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Carrier*, 477 U.S. at 493-94 (quoting *United States v. Frady*, 456 U.S. 152, 179 (1982)); *Dawson*, 988 F. Supp. at 804-05.

Capano has alleged ineffective assistance of counsel as cause for his procedural default in the state courts. *See infra*. It is well-settled that an attorney's alleged ineffective assistance can only constitute cause for a procedural default if the ineffectiveness "rise[s] to the level of a Sixth Amendment violation." *Cristin v. Brennan*, 281 F.3d 404, 420 (3d Cir. 2002) (citing *Carrier*, 477 U.S. at 488). As addressed below, Capano cannot establish that his trial counsel was constitutionally ineffective by failing to object to cross-examination of Capano regarding post-arrest silence where Capano himself had raised the issue during direct examination. Because Capano cannot establish cause, this Court need not address the issue of prejudice. *See Coleman*, 501 U.S. at 752; *Murray*, 477 U.S. at 533; *McLaughlin*, 270 F. Supp. 2d at 501.

Moreover, the miscarriage of justice does not apply because Capano has not alleged any facts to establish his actual innocence. *See, e.g., White v. Carroll*, 416 F. Supp. 2d 270, 282 (D. Del. 2006). The miscarriage of justice exception applies only in extraordinary cases. *Smith v. Murray*, 477 U.S. 527, 496 (1986). To establish a miscarriage of justice, a petitioner must show that a "constitutional violation has

probably resulted in the conviction of one who is actually innocent." *Id.* A petitioner establishes actual innocence by proving that no reasonable juror would have voted to find him guilty beyond a reasonable doubt. *Sweger v. Chesney*, 294 F.3d 506, 522-24 (3d Cir. 2002). Capano has not alleged that he is actually innocent, nor has he presented any evidence of his actual innocence. Thus, he has not demonstrated that a fundamental miscarriage of justice would result from this Court's failure to review this claim. As a result, this claim must be dismissed.

**6. Ineffective assistance of trial counsel**

In his final ground for relief, Capano contends that his trial attorneys provided ineffective assistance under *Strickland v. Washington*, 466 U.S. 668 (1984). DI 1 at ¶ 12. Specifically, Capano complains that his trial counsel: failed to request limiting instructions concerning Fahey's out-of-court statements; should not have agreed to a stipulation admitting Fahey's out-of-court statements; and failed to object to the prosecutor's cross-examination of Capano about his pre-arrest and post-arrest silence. *Id.* Capano presented these claims to the state supreme court in his appeal from the denial of his state post-conviction motion, thus exhausting his state court remedies. *See Digmon*, 434 U.S. at 333-34; *Swanger,* 750 F.2d at 295. The Delaware Supreme Court addressed and rejected the claims on the merits. *See Capano*, 889 A.2d at 974-77. Consequently, Capano is not entitled to relief unless he can establish that the decision of the state court was contrary to, or involved an objectively unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or the state court's decision was an unreasonable determination of the facts based on the evidence presented in the state court proceedings. *See Williams*, 529 U.S. at 412; *Appel*, 250 F.3d at 210.

The clearly established federal law which governs ineffective assistance of counsel claims is the two-pronged test announced in *Strickland v. Washington*, 466 U.S. 668 (1984) and its progeny. *See Wiggins v. Smith*, 539 U.S. 510 (2003). Under *Strickland*, the petitioner must demonstrate that counsel's performance at trial or on appeal fell below "an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. In evaluating whether counsel performed reasonably, a court "must be highly deferential." *Id.* at 689. Therefore, a petitioner "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (quotation omitted). Under the second part of the standard, a petitioner must illustrate that counsel's ineffective performance caused prejudice. *See Strickland*, 466 U.S. at 687. In order to demonstrate prejudice, the petitioner must show that but for counsel's unprofessional errors, there is a reasonable probability that the outcome of the trial would have been different. Here, the Delaware state courts correctly identified *Strickland* as establishing the applicable legal standard. Thus the state supreme court's denial of the claims was not contrary to clearly established federal law. *See Williams*, 529 U.S. at 406; *Jacobs v. Horn*, 395 F.3d 92, 100 (3d Cir. 2005). Moreover, the state courts reasonably applied the rule to the specific facts of Capano's case. *See* 28 U.S.C. § 2254(d)(1).

## A. Limiting instructions

In response to a defense objection that Dr. Kaye (Fahey's psychiatrist) was testifying beyond the scope of Fahey's perceptions, the trial judge instructed the jury to beware that "this particular witness can[not] speak to the intent of Mr. Capano or to anyone else." *Appendix to State's Answering Brief*, Del. Supr. Ct. No. 131, 2005, at B4.

At the conclusion of Dr. Kay's testimony, the judge reiterated:

> Members of the jury, I want to remind you of a warning I gave you earlier in response to an objection that was made by the defense.
>
> The purpose of this evidence is to examine the mental state, the emotional state of Anne Marie Fahey, and you are not – it in no way reflects as evidence of any actions or any state of mind on behalf of the defendant.
>
> This deals solely with Miss Fahey, not with Mr. Capano.

*Id.* at B5. Again, prior to the testimony of Jill Morrison, the trial judge gave a lengthy instruction at the request of defense counsel regarding the limited use of her testimony of Fahey's out-of-court statements. *Id.* at B6. The judge specifically instructed the jury that they "may be considered by you solely for the purpose of determining the state of mind of Miss Fahey at or about the time when the alleged acts occurred." *Id.* Capano now complains that his trial counsel were ineffective because they did not request limiting instructions concerning Fahey's out-of-court statements.

In the first instance, the record clearly reveals that defense counsel did request limiting instructions concerning Fahey's out-of court statements. *Id.* The trial court also found that defense counsel had discussed the limiting instruction with each other and Capano. *Capano*, 2005 Del. Super. LEXIS 69 at *21-22. Moreover, as noted above, the jury was twice provided with limiting instructions concerning the hearsay testimony. Defense counsel made a strategic decision not to request limiting instructions after each witness, but rather to rely on the instructions already given by the court. *Capano*, 889 A.2d at 976. It was a reasonable strategic choice not to prolong an already lengthy trial with repetitive jury instructions. Moreover, the defense wanted the jury to hear Fahey's hearsay statements, to demonstrate that she and Capano were in a friendly relationship such that he would not have planned to kill her. *Capano*, 2005 Del. Super. LEXIS 69 at *23. "Tactical decisions, whether wise or unwise, successful or unsuccessful, cannot

ordinarily form the basis of a claim of ineffective assistance." *United States v. Ortiz Oliveras*, 717 F.2d 1, 3 (1st Cir. 1983). And "[w]here it is shown that a particular decision was, in fact, an adequately informed strategic choice, the presumption that the attorney's decision was objectively reasonable becomes 'virtually unchallengeable.'" *United States v. Nguyen* 413 F.3d 1170, 1181 (10th Cir. 20050 (citing *Bullock v. Carver*, 297 F.3d 1036, 1044 (10th Cir. 2002)); *see also Thomas v. Varner*, 428 F.3d 491, 500 (3d Cir. 2005). Thus, because the defense case relied in part on the very hearsay statements to which the limiting instructions at issue relate, it was not unreasonable for Capano's trial counsel to decide not to emphasize the limitations on consideration of Fahey's out-of-court statements. As a result, the state courts properly found that Capano failed to establish that his trial counsel's performance in this regard was objectively unreasonable under *Strickland*. Capano, as noted by the state courts, also failed to demonstrate actual prejudice, there being nothing to indicate that the jury did not apply the limiting instructions to similar testimony by other witnesses. *See Capano*, 2005 Del. Super. LEXIS 69 at *23; *Capano*, 889 A.2d at 976. Capano having failed to meet either prong of the *Strickland* test, the state courts' decision to reject this claim was a reasonable application of clearly established federal law.

## B. Stipulation

Prior to trial, Capano's defense counsel stipulated to the admission of Fahey's diary, date book, e-mails and statements Fahey made to Kim Lynch-Horstmann. *See Appendix to State's Answering Brief*, Del. Supr. Ct. No. 131, 2005, at B1-3. In state post-conviction proceedings, Capano alleged that his trial counsel were ineffective for entering into these pre-trial stipulations. The state courts found, however, that Capano's defense attorneys, as a professionally reasonable strategy, "stipulated with the

prosecutors that they would not object to the prosecution's hearsay evidence, provided the prosecutors would not object to the defense's hearsay evidence." *Capano*, 889 A.2d at 975. The state court decision was a reasonable application of the *Strickland* standard.

At the post-conviction evidentiary hearing, Capano's attorneys consistently testified that Capano wanted Fahey's diary and Kin Lynch-Horstmann's testimony in front of the jury. *See Appendix to Appellant's Opening Brief*, Del. Supr. Ct. No. 131, 2005, at A106-07, A110. Although the admitted hearsay contained much that put Capano in a bad light, Capano believed that the testimony would also show how well he treated Fahey. *Id.* at A110; *Appendix to State's Answering Brief*, Del. Supr. Ct. No. 131, 2005, at B12. Capano, an experienced attorney and a former prosecutor, made it clear to his counsel that he wanted that evidence before the jury. At the time the stipulation was entered into, Capano's counsel did not yet know the theory of the defense. *See* Capano, 2005 Del. Super. LEXIS 69 at *19-20. What the attorneys did know, however, was that the prosecutors planned to present evidence that Capano's brother had helped to dispose of Fahey's body at sea and he had helped his brother to conceal evidence. *Id.* at *20. Establishing that Capano had no motive to kill Fahey was critical to any defense theory in light of Capano's apparent involvement in the disposal of her body. Fahey's out-of-court statements indicating an ongoing friendly relationship would help to dissipate any possible motive presented by the prosecutors. Moreover, if Capano's attorneys were successful in having Fahey's positive statements admitted at trial, the prosecution would then be allowed to counter that with her negative statements in rebuttal. It was certainly a reasonable strategic decision to have the negative hearsay come in during the State's case-in-chief; to have the jury hear it in rebuttal would make Capano appear to be disingenuous about the volatile nature of his relationship with

Fahey. *See* F. Lee Bailey & H. Rothblatt, SUCCESSFUL TECHNIQUES FOR CRIMINAL TRIALS § 122, at 120-21 (1971) ("No matter how damaging the evidence against the accused is, expose it. You can be sure that the prosecutor will!"). Capano agreed with this strategy, *Capano*, 2005 Del. Super. LEXIS 69 at \*21, and he can hardly then complain that his own strategy was unreasonable simply because it was unsuccessful.

The state courts, in addition to finding that Capano had failed to demonstrate that his trial attorneys were not deficient in their representation, also noted that Capano was unable to show any prejudice resulting from the stipulation. *Capano*, 889 A.2d at \*976. Defense counsel used many of Fahey's out-of-court statements to establish that Fahey remained in contact with Capano despite her budding romance with Michael Scanlon. In addition, defense counsel used the hearsay evidence to show that Capano and Fahey were friendly and that Capano was generous and caring in their relationship. None of this would have been before the jury if the hearsay evidence had been kept out of trial, and the negative aspects would have come in during rebuttal if this evidence had come in during the defense case. Thus, the state courts properly found that Capano could not show prejudice from his counsel's stipulation to admit Fahey's out-of-court statements at trial.

In light of the clear evidence of Capano's desire to have the jury hear about his relationship with Fahey through her out-of-court statements, the state courts reasonably found that Capano did not succeed in establishing either prong of the *Strickland* test. The defense strategy of showing that Capano was devoted to Fahey and would not have killed her was a reasonable defense considering the limited information available to Capano's lawyers before trial, and their client's insistence on presenting this evidence to the jury. The state courts reasonably applied clearly established federal law to the

specific facts of Capano's case. *See* 28 U.S.C. § 2254(d)(1).

## C. Pre-arrest and post-arrest silence

Prior to trial, Capano never informed authorities that Fahey's killing was an accident as he described at trial. On direct examination at trial, Capano explained that he had kept silent for more than two years since Fahey's death because he wanted to protect his longtime mistress, Deborah MacIntyre, and his brother, Gerald. *See Capano*, 2005 Del. Super. LEXIS 69 at *31-37 (setting forth relevant portion of direct examination). Capano testified at length, on direct examination, about why he kept silent before his arrest, during his bail hearing, and during his time in jail awaiting trial. In response to this testimony, the prosecutor, without objection, cross-examined Capano about his pre-arrest and post-arrest silence. Capano now complains that the state courts should have found his trial counsel to be constitutionally ineffective for failing to object to the cross-examination. The state courts, finding that Capano had opened the door to this line of questioning, found no deficiency in defense counsel's tactical decision not to raise any objection to this line of questioning. *Capano*, 889 A.2d at 976. Moreover, having found the prosecutor's questions were proper impeachment, the Delaware Supreme Court found that "Capano did not satisfy his burden under either *Strickland* prong for his counsel's failure to object to the questions regarding his pre-trial silence." 889 A.2d at 976. That determination was a reasonable application of the *Strickland* two-prong test.

In *Jenkins v. Anderson*, 447 U.S. 231 (1980), and *Doyle v. Ohio*, 426 U.S. 610 (1976), the United States Supreme Court set out the standards for the questioning of a testifying defendant about his pre-arrest and post-arrest silence. The Court held that a prosecutor's use of a testifying defendant's pre-arrest silence to impeach his credibility

did not violate the Constitution. *Jenkins*, 447 U.S. at 240; *accord Fletcher v. Weir*, 455 U.S. 603, 604 n.1 (1982). In *Doyle*, the Court held that the use for impeachment purposes of a defendant's post-arrest and post-*Miranda* warnings silence violates the Due Process Clause. 426 U.S. at 619. The Court also noted, however, that use of post-arrest silence to challenge the defendant's testimony as to his behavior following arrest would be permissible because such a use would not be an impeachment of the exculpatory story itself. 426 U.S. 620 n.11. This was the case here.

Capano testified during his direct examination about his desire to protect MacIntyre by not revealing her role in Fahey's death. *See Capano*, 781 A.2d at 647. He tried to demonstrate how he was helping her through the introduction of letters he had written her from jail advising her how to handle herself during the criminal investigation. The state courts found that the prosecutor's questions regarding Capano's post-arrest silence were proper to impeach Capano's testimony that he was protecting MacIntyre, as she had entered into an agreement to cooperate with prosecutors. *Id.* at 648-49. In light of the testimony regarding Capano's pre-arrest silence, a proper subject for impeachment, defense counsel's decision not to challenge the prosecutor's questions about post-arrest silence was a reasonable tactical decision. Capano elected to discuss the reason for his lengthy silence, and any attempt to limit the scope of the cross-examination regarding the same subject could have appeared disingenuous to the jury. Moreover, as noted by the state courts, Capano failed to establish any prejudice from a limited inquiry into a subject he raised during his direct testimony. *Capano*, 889 A.2d at 976-77; *Capano*, 2005 Del. Super. LEXIS 69 at 38. *Cf. United States v. Delk*, 586 F.2d 513, 516 (5th Cir. 1978) ("[I]f the defendant opens the door to the line of testimony, he cannot successfully object to the prosecution accepting the challenge and

attempting to rebut the proposition asserted.") (internal quotations marks and citation omitted).    Thus, the Delaware Supreme Court's finding that Capano failed to demonstrate either deficient performance or actual prejudice was a reasonable application of the *Strickland* standard, and this claim should be dismissed.

## Conclusion

On the basis of the Superior Court docket, it appears that the entire transcript of Capano's trial has been prepared, as has the transcript of the state post-conviction hearing.  In the event that the Court directs the production of any transcript of the state court proceedings, respondents reasonably anticipate that such transcript could be produced within 90 days of any order by the Court.

The petition should accordingly be dismissed without further proceedings.


/s/ **LOREN C. MEYERS**
Loren C. Meyers
Chief of Appeals Division
Del. Bar ID 2210
loren.meyers@state.de.us

/s/ **ELIZABETH R. McFARLAN**
Elizabeth R. McFarlan
Deputy Attorney General
Del. Bar ID 3759
elizabeth.mcfarlan@state.de.us

Department of Justice
820 N. French Street
Wilmington, DE  19801
(302) 577-8500

July 28, 2006



http://www.newsjournal.com/apps/pbcs.dll/article?AID=/20060207/NEWS/602070364

# State won't seek Capano's execution

Killer expected to serve life without parole; prosecutors and Fahey family satisfied

BY SEAN O'SULLIVAN
THE NEWS JOURNAL
02/07/2006

STORYCHAT: Post Comment

WILMINGTON -- Barring any last-minute twists, Thomas J. Capano's story will now end "not with a bang but a whimper," according to one legal expert.

Delaware Attorney General Carl C. Danberg announced Monday that his office will not seek a second death penalty hearing against the man convicted of murdering Anne Marie Fahey in 1996.

"This decision means that Thomas Capano will spend the remainder of his natural life in prison," Danberg said in a statement. "Every criminal case has a natural end. We have reached that point in this case. I am satisfied that justice is served."

Danberg said changes in the law by the U.S. Supreme Court, the passage of time and the wishes of the Fahey family all contributed to his decision.

He also said it was "unlikely" a second penalty phase would be able to recapture the particularly effective way that evidence was introduced to the jury at the first trial in 1999, including Capano's angry outbursts under cross-examination by prosecutor Colm F. Connolly.

And one key witness who testified for prosecutors in 1999 has died.

Attorneys are expected to meet with Superior Court Judge T. Henley Graves later this week to discuss Capano's case. Graves probably will then schedule a hearing to formally sentence Capano to life in prison without parole.

Monday's decision was supported by all the prosecutors and investigators involved in the case, including now-U.S.

Attorney Connolly, Danberg said. It also was supported by the Fahey family.

"When Anne Marie was murdered, we maintained that the most important thing for us was that her murderer would be convicted and sent to prison," the Fahey family said in a joint statement. "We are satisfied."

In October, Kathleen Fahey-Hosey, Anne Marie's sister, said she did not want to relive the

> Special report
**Capano Archive**

**FACTS and DATES of the ANNE MARIE FAHEY MURDER CASE**

**1996**

**June 27:** Anne Marie Fahey, 30-year-old scheduling secretary for then-Gov. Tom Carper, dines with attorney Thomas J. Capano at a Philadelphia restaurant. They leave about 9:30 p.m. It is the last time Fahey is seen in public.

**June 30:** Police go to Capano's Wilmington home at 2302 Grant Ave. about 3:30 a.m. and again at 2:30 p.m. to question him and look through his house and Jeep Grand Cherokee. He says he took Fahey to his house after dinner June 27, then to her apartment and left about 10 p.m.

**July 31:** Investigators, led by Assistant U.S. Attorney Colm F. Connolly, find two spots of Fahey's blood during an 11-hour search of Capano's home, Jeep and his wife's Chevy Suburban.

**Aug. 5:** Connolly sends Capano's attorneys a "target" letter, notification he is under investigation by a federal grand jury.

**1997**

**Jan. 3:** A probable-cause affidavit – used to search Capano's home – is unsealed, revealing that the FBI suspects Capano killed Fahey in his home June 27 and disposed of evidence.

**Nov. 8:** Capano's brother Gerard "Gerry" Capano tells prosecutors he helped his brother Thomas dump a body, weighted with an anchor, into the Atlantic Ocean off Stone Harbor, N.J., on June 28, 1996. Gerard says the body was first tossed overboard in a

trauma of Anne Marie's death in a second penalty hearing and would be content with Capano's spending the rest of his days behind bars.

Robert Fahey, who refused to call Capano by name, said Monday his sister's killer has just traded "death by execution for death by incarceration."

"The death penalty never really mattered to us," said Fahey, a commercial real estate broker in Philadelphia. "So the reality is that this news is of no consequence to us. The conviction stands, and he'll never be able to hurt anybody again. Our only goal was to obtain justice. We got the first-degree murder conviction and that can't go away. We're fine."

**Prosecutor concurs**

Connolly, who won the conviction of Capano without a body, without a murder weapon and without a direct witness to the crime, agreed.

"This was never about the death penalty," he said Monday, adding he "fully supported" Danberg's decision.

Lee Ramunno, a Wilmington attorney and Capano's brother-in-law, said he was relieved to hear of Danberg's decision. "I think it is best for everyone. I commend the attorney general," he said.

Capano's attorney, Joseph M. Bernstein, said he too welcomed the news.

"Now we will just move on to federal court," Bernstein said. "He may get a new trial. I don't know."

Danberg, however, said he is confident that the convictions will stand. Part of his reason for not pursuing a second penalty hearing was to limit Capano's federal appeal options, he said.

Legal experts said some of the strongest arguments in Capano's federal appeal all related to the death penalty. A federal judge may now consider those arguments moot because Capano no longer faces execution.

Department of Correction officials said Danberg's decision will not have any immediate effect on Capano's incarceration.

Spokeswoman Beth Welch said although Capano may leave death row, officials could continue to hold him in the Secure Housing Unit. Or, they may move him to a lower-security unit after the department receives official word of a new sentence from the court and re-evaluates his status.

Until Capano serves at least 10 years of his sentence, Welch said, he will not be eligible for anything below medium security at the Delaware Correctional Center near Smyrna.

At Capano's 1999 trial, prosecutors charged the one-time political insider and former prosecutor murdered Fahey, the scheduling secretary to then-Gov. Tom Carper, because she was about to break off an affair with him.

At trial, Capano admitted that he dumped Fahey's body in the ocean, with the help of his brother Gerard, though he maintained someone else shot her.

cooler that wouldn't sink, even after he pierced it with a gunshot. The cooler was later tossed into the ocean, he says. Gerard also says he helped Thomas throw a blood-stained sofa in a trash bin at a construction site of brother Louis Capano on June 28.

**Nov. 12:** FBI agents pull over Thomas Capano on I-95. Louis and Gerard testify before a federal grand jury. That night, Thomas Capano is arraigned on a state murder charge and ordered held without bail at Gander Hill prison.

**Dec. 22:** A New Castle County grand jury indicts Capano.

**1998**

**Jan. 8:** Capano pleads innocent and asks for bail, which is later denied. Prosecutors oppose bail and Superior Court Judge William Swain "Bill" Lee says it appears the state will seek the death penalty.

**Oct. 6:** Trial begins.

**Oct. 26:** Defense attorney admits Capano dumped Fahey's body at sea, but says her death was a "horrible, tragic accident."

**Dec. 16:** Capano takes stand. In testimony that lasts nearly two weeks, he describes his various affairs, claims his longtime mistress Deborah A. MacIntyre accidentally shot Fahey in the head in a jealous rage and describes how he disposed of Fahey's body.

**1999**

**Jan. 17:** Capano convicted of Fahey's murder.

**Jan. 28:** Jury votes 11-1 that the death penalty applies to the case, and 10-2 to recommend that Capano be executed.

**March 16:** Lee sentences Capano to death.

**2000**

**October:** Capano appeals conviction and seeks a new trial, saying errors were made.

**2001**

**August:** Delaware Supreme Court upholds conviction and death sentence, rejecting 16 challenges. Capano appeals to U.S. Supreme Court.

**2002**

Capano's weeks-long trial was a media sensation, with national news organizations attracted by the millionaire murderer storyline.

And at the conclusion, following the conviction, then-Superior Court Judge William Swain "Bill" Lee followed the jury's 10-2 recommendation and sentenced Capano to death.

The case was later recounted in several books and one made-for-TV movie.

In January, however, the Delaware Supreme Court overturned Capano's death sentence, citing recent rulings by the U.S. Supreme Court.

Those rulings required that a jury be unanimous in its finding that a case qualified for the death penalty, and Capano's jury split 11-1 on that.

**Decision turned out to be 'easy'**

Danberg said Monday that the choice to forgo a second penalty hearing took time, but ultimately was "easy" because prosecutors, investigators and family members all agreed it was the right thing to do.

Danberg said he believed that it would have been possible to get a death recommendation from a jury a second time, but a number of factors weighed against it.

These included changes in federal law making it more difficult to get a death penalty qualification from a jury, the difficulty of essentially retrying the entire case in order to properly convince a jury of the death penalty, and the death of witness Linda J. Marandola.

Marandola, a one-time lover of Capano's, testified he later stalked her and harassed her until she left the state.

While her testimony could be read into the record at a second penalty hearing, Danberg said it would not have the same impact with a jury. "It just isn't as compelling," he said.

He added that the "circumstances of several witnesses" have also changed. Among those are Capano's two brothers, Gerard and Louis, whom prosecutors would have no leverage over this time. Both originally testified as part of plea agreements.

Jules Epstein, a visiting associate professor at Widener University School of Law, said depending on what the two say at a second penalty hearing -- for instance, recanting their earlier trial testimony -- they could open up additional appeal options for Tom Capano to try to overturn his original conviction.

Finally, Danberg cited the wishes of the Fahey family. Given all the other factors, he said, "We simply could not justify putting the Fahey family through that again."

Epstein said he believes the decision was "incredibly smart because it will reduce the number of appeals in this case. It will go to federal court and be over with."

"This one will end not with a bang but a whimper," he said.

Danberg said that was his intention: to bring finality to the case. "The suspense is over," he said.

**June 24:** In Ring v. Arizona, U.S. Supreme Court holds that juries must have the final say on whether the facts in a capital case qualify a defendant for the death penalty. Capano's lawyers say this ruling calls into question Capano's sentence because the jury was not unanimous on that question.

**2004**

**October:** Oral arguments are held in Delaware Supreme Court in Capano's appeal on grounds of ineffective defense.

**2005**

**March:** State Supreme Court rejects Capano's ineffective defense appeal.

**June:** Capano again appeals death sentence on grounds that jurors did not unanimously agree there was an aggravating circumstance that qualified Capano for execution.

**2006**

**Jan. 10:** The Delaware Supreme Court overturns Capano's death sentence. The justices leave it up to prosecutors to decide whether to pursue a new penalty hearing or have a judge impose a life sentence.

**Jan. 30:** Capano files a petition for a new trial in U.S. District Court in Wilmington, alleging errors at his state trial.

**Feb. 6:** Delaware Attorney General Carl C. Danberg decides not to pursue a second penalty hearing, meaning Capano will automatically be sentenced to life without possibility of parole. Connolly and the Fahey family support the decision.

Robert Fahey said that he expects interest in the case will soon flame out and his sister's killer, the one-time millionaire resident of death row who attracted national attention, will become just "another lifer, just a dime a dozen."

*Senior reporter Cris Barrish contributed to this article. Contact Sean O'Sullivan at 324-2777 or sosullivan@delawareonline.com.*

---

## STORYCHAT

⬭ Post a Comment

This article does not have any comments associated with it

---

**Copyright © 2006, The News Journal. Use of this site signifies your agreement to the Terms of Service and Privacy Policy (updated 10/3/2005)**

## CERTIFICATE OF SERVICE

The undersigned, being a member of the Bar of the United States District Court

for the District of Delaware, hereby certifies that on July 28, 2006,

1. He electronically filed the attached document (Answer) with the Clerk of the

District Court using CM/ECF which will send notification of the filing to the following

registered participants:

Joseph M. Bernstein, Esq.
Suite 302
800 N. King St.
Wilmington, DE 19801
jmbern001@comcast.net.

/s/ **Loren C. Meyers**
Loren C. Meyers
Chief of Appeals Division
Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 577-8500
Del. Bar ID 2210