# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **THOMAS J. CAPANO,** | : |
|     Petitioner, | : |
| | : |
|     v. | : Civil Action No. 06-58 *** |
| | : |
| **THOMAS CARROLL**, Warden, *et al.,* | : |
|     Respondent. | : |

## PETITIONER'S OPENING BRIEF
## IN SUPPORT OF PETITION FOR HABEAS CORPUS

JOSEPH M. BERNSTEIN (DE Bar #780)
800 N. King Street - Suite 302
Wilmington, DE 19801
302-656-9850
302-656-9836 (Fax)
E-mail: jmbern001@comcast.net
Attorney for Petitioner

Dated: February 20, 2007

# TABLE OF CONTENTS

PAGE

**NATURE AND STAGE OF PROCEEDINGS**      **1**

**SUMMARY OF ARGUMENT**      **3**

**STATEMENT OF FACTS**      **4**

**ARGUMENT**

    **I. THE TRIAL COURT VIOLATED THE DEFENDANT'S RIGHTS UNDER THE FOURTEENTH AMENDMENT, AS ESTABLISHED IN *BECK v. ALABAMA*, 447 U.S. 625 (1980), WHEN IT REFUSED THE DEFENSE'S REQUEST TO INSTRUCT THE JURY ON LESSER INCLUDED OFFENSES TO THE INDICTED CHARGE OF FIRST DEGREE MURDER**      **12**

    **II. THE ADMISSION OF FAHEY'S HEARSAY STATEMENTS TO HER PSYCHOTHERAPISTS AND HER FRIENDS VIOLATED CAPANO'S RIGHTS UNDER THE CONFRONTATION CLAUSE OF THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION**      **31**

    **III. THE PROSECUTION'S CROSS-EXAMINATION OF CAPANO CONCERNING POST-ARREST SILENCE VIOLATED HIS RIGHTS UNDER THE FIFTH AMENDMENT AND DEPRIVED HIM OF A FUNDAMENTALLY FAIR TRIAL**      **55**

**CONCLUSION**      **63**

**CERTIFICATE OF SERVICE**      **64**

# TABLE OF AUTHORITIES

| CASES | PAGE |
|---|---|
| *Albrecht v. Horn*, 471 F.3d 435 (3d Cir. 2006) | 37 |
| *Anderson v. Charles*, 447 U.S. 404 (1980) | 61 |
| *Beck v. Alabama*, 447 U.S. 625 (1980) | *passim* |
| *Brecht v. Abrahamson*, 507 U.S. 619 (1993) | 43,58 |
| *Brown v. Folino*, 179 Fed. Appx. 845 (3d Cir. 2006) | 51 |
| *California v. Green*, 399 U.S. 149 (1970) | 36 |
| *Capano v. State*, 781 A.2d 556 (Del. 2001)*, cert. denied* , 536 U.S. 958 (2002) | *passim* |
| *Capano v. State*, 889 A.2d 968  (Del. 2006) | 2 |
| *Chao v. State*, 604 A.2d 1351 (Del. 1992) | 25 |
| *Chapman v. California*, 386 U.S. 18 (1967) | 49,50 |
| *Cline v. State*, 720 A.2d 891 (Del. 1998) | 29 |
| *Coleman v. Thompson*, 501 U.S. 722 (1991) | 56 |
| *Colon v. State*, 1994 Del. LEXIS 326 (Del. 1994) | 29 |
| *Coppola v. Powell*, 878 F.2d 1562 (1ˢᵗ Cir.), *cert. denied,* 493 U.S. 969 (1989) | 59 |
| *Crawford v. Washington*, 541 U.S. 36 (2004) | 38 |
| *Davis v. Washington*, 126 S.Ct. 2266 (2006) | 38 |
| *Delaware v. Van Arsdall*, 475 U.S. 673 (1986) | 50 |
| *Doyle v. Ohio*, 426 U.S. 610 (1976) | 57 |
| *Duonnolo v. State*, 397 A.2d 126 (Del. 1978) | 24 |
| *Forrest v. State*, 721 A.2d 1271 (Del. 1999) | 37 |
| *Gattis v. State*, 637 A.2d 808 (Del. 1994) | 38,40,41 |
| *Griffin v. California*, 380 U.S. 609 (1965) | 57 |
| *Gutierrez v. State*, 842 A.2d 650  (Del. 2003) | 18 |
| *Hall v. State*, 431 A.2d 1258 (Del. 1981) | 19,20,22 |

**CASES**                                                                    **PAGE**

*Harris v. Reed*, 489 U.S. 255 (1989)                                          56

*Hassine v. Zimmerman*, 160 F.3d 941 (3d Cir. 1998)                           61

*Henry v. State*, 805 A.2d 860 (Del. 2002)                                    *passim*

*Holloway v. Horn*, 355 F.3d 707 (3d Cir. 2004)                               12,31

*Hooks v. Ward*, 184 F.3d 1206, (10th Cir. 1999)                              14

*Hopkins v. Reeves*, 524 U.S. 88 (1998)                                       14

*Hopper v. Evans*, 456 U.S. 605 (1982)                                        15

*Idaho v. Wright*, 497 U.S. 805 (1990)                                        36

*Jenkins v. Anderson*, 447 U.S. 231 (1980)                                    58,60

*Kastigar v. United States*, 406 U.S. 441 (1972)                             57

*Keller v. Larkins*, 251 F.3d 408 (3d Cir. 2001)                             45

*Lesko v. Owens*, 881 F.2d 44 (3d Cir. 1989)                                 45

*Lilly v. State*, 649 A.2d 1055 (Del. 1994)                                  18

*Miranda v. Arizona*, 384 U.S. 436 (1966)                                    57

*Maryland v. Craig*, 497 U.S. 836 (1990)                                     36

*Matteo v. Superintendent, SCI Albion*, 171 F.3d 877 (3d Cir. 1999) (en banc),
*cert. denied*, 528 U.S. 824 (1999)                                          *passim*

*Mitchell v. Esparza*, 540 U.S. 12  (2003)                                   49

*Monroe v. State*, 652 A.2d 560 (Del. 1995)                                  55

*Ohio v. Roberts*, 448 U.S. 56 (1980)                                        37

*O'Sullivan v. Boerckel*, 526 U.S. 838 (1999)                                12,31

*People v. LaLone*, 437 N.W.2d 611 (Mich. 1989)                              47

*Pitts v. Anderson*, 122 F.3d 275 (5th Cir. 1997)                          61

*Pointer v. Texas*, 380 U.S. 400 (1965)                                      36

*Ring v. Arizona,* 536 U.S. 584 (2002)                                       1

*Schad v. Arizona*, 501 U.S. 624 (1991)                                      24

| CASES | PAGE |
|---|---|
| *Slater v. State*, 606 A.2d 1334 (Del. 1992) | 17,18 |
| *Smith v. State*, 1996 Del. LEXIS 330 (Del. 1996) | 18 |
| *Spaziano v. Florida*, 468 U.S. 447 (1984), | 24 |
| *State v. Barone*, 852 S.W.2d 216 (Tenn. 1993) | 47 |
| *State v. Capano*, 1998 Del. Super. LEXIS 377 (Del. Super. 1998) | 4,10,60 |
| *State v. Capano,* 1998 Del. Super. LEXIS 319 (Del. Super. 1998) | 4 |
| *State v. Capano*, 1999 Del. Super. LEXIS 541 (Del. Super. 1999) | 1,4 |
| *State v. Capano*, 2005 Del. Super. LEXIS 69 (Del. Super. 2005) | 1 |
| *State v. Magner*, 1997 Del. Super. LEXIS 45 (Del. Super. 1997) | 40 |
| *State v. MacDonald*, 598 A.2d 1134 (Del. Super. 1991) | 44 |
| *State v. Moyer*, 387 A.2d 194 (Del. 1987) | 24 |
| *State v. Porter*, 587 A.2d 188 (Del. Super. 1990) | 40,41,43 |
| *State v. Wood*, 881 P.2d 1158 (Ariz. 1994), *cert. denied*, 515 U.S. 1147 (1995) | 43 |
| *State v. Zimmerman*, 829 P.2d 861 (Idaho 1992) | 46 |
| *United States v. Brown*, 490 F.2d 758 (D.C. Cir. 1973) | 42,44,54 |
| *United States v. Burson*, 952 F.2d 11961 (10th Cir. 1991), *cert. denied,* 503 U.S. 997 (1992) | 59 |
| *United States v. Lopez*, 340 F.3d 169 (3d Cir. 2003) | 50,51,53 |
| *United States ex rel. Savory v. Lane*, 832 F.2d 1011 (7th Cir. 1987) | 59 |
| *Villot v. Varner*, 373 F.3d 327 (3d Cir. 2004) | 56 |
| *Wainwright v. State*, 504 A.2d 1096 (Del. 1986) | 55 |
| *White v. Illinois*, 502 U.S. 346 (1992) | 36,37 |
| *Williams v. Taylor*, 529 U.S. 36 (2000) | 13,23,31,57 |

**STATUTES AND COURT RULES**

| | |
|---|---|
| *U.S. Const. Amend. V* | 57 |

**STATUTES AND COURT RULES**                      **PAGE**

*U.S. Const. Amend. VI*                                    36

28 *U.S.C.* §2254(d)                                   12

28 U.S.C. §2254(e)(1)                               16

*Delaware Supreme Court Rule* 8                     55

11 *Del.C.* §206                                       15,17

11 *Del.C.* §231(c)                                  22

11 *Del.C.* §231(d)                                  22

11 *Del.C.* §307(a)                                  26

11 *Del. C.* § 631                                     18

11 *Del. C.* § 632                                     18

11 *Del. C.* § 635                                     18

11 *Del.C.* §636(a)                                  4

11 *Del.C.* §4209                                   2

11 *Del.C.* §4209(d)                                29

11 *Del.C.* §4209(e)(1)(u)                       29

D.R.E. 801(c)                                        36

D.R.E. 802                                          36

D.R.E. 803(3)                                        37

D.R.E. 803(4)                                     37,45

**MISCELLANEOUS**

*Delaware Criminal Code with Commentary*, 15-16 (1973)     18

*Delaware Criminal Code With Commentary*, 101 (1973)      20

*Dictionary of Medical Terms*, (Barons 3d ed. 1994)         47

*McCormick On Evidence*, §292 (1984)                   47

Robinson, *Criminal Law Defenses*, §63, pp. 269-271 & n.4 (1984)     20

**MISCELLANEOUS**                                                      **PAGE**

J. Weinstein & M. Berger, *Weinstein's Evidence*, ¶803(4)[02] (4th Ed. 1996)      47

J. Weinstein & M. Berger, *Weinstein's Evidence*, ¶401[10]  (1996)      27

*Weinstein's Federal Evidence*, §803.09[8] (2d Ed. 2001)      46

Weissenberger, *Federal Rules of Evidence*, §803.19      46

v

## NATURE AND STAGE OF PROCEEDINGS

The Petitioner, Thomas J. Capano ("Capano") was indicted in the state court on a single charge of capital First Degree Murder arising from the death of Anne Marie Fahey ("Fahey"). The "guilt phase" of Capano's trial commenced on October 6, 1998 and concluded on January 17, 1999 with a verdict of the jury that Capano was guilty of First Degree Murder. The case then proceeded to the "penalty hearing" phase, which lasted an additional five days. *State v. Capano*, 1999 Del. Super. LEXIS 541, *1 (Del. Super. 1999) ("*Capano I*"). In the penalty phase, the State alleged only one "statutory aggravating circumstance" – that "the murder was premeditated and the result of substantial planning." *Capano I*, at *9-*10. In the penalty hearing, the jury voted 11 to 1 that the State had established the alleged sole statutory aggravating circumstance, and voted 10 to 2 that the aggravating circumstances outweighed the mitigating circumstances. *Capano I*, at *1. In sentencing Capano, the trial judge also found that the State had established the existence of the premeditation/substantial planning statutory aggravating circumstance beyond a reasonable doubt. *Capano I*, at *20-*22. The trial judge also found that the aggravating circumstances outweighed the mitigating circumstances and therefore sentenced Capano to death. *Capano I*, at *25-*29. On August 10, 2001, Capano's conviction and death sentence were affirmed on direct appeal by the Supreme Court of Delaware. *Capano v. State*, 781 A.2d 556, 670 (Del. 2001) ("*Capano II*"). Capano thereafter filed a Petition for Writ of Certiorari to the United States Supreme Court. The Petition was denied on June 28, 2002. See, *Capano v. Delaware*, 536 U.S. 958 (2002).

On June 3, 2003, Capano filed a Motion for Post-Conviction Relief in the Delaware Superior Court under Superior Court Criminal Rule 61 (hereinafter "Rule 61 Motion"). In the Rule 61 Motion, Capano asserted that his death sentence should be vacated based on *Ring v. Arizona,* 536 U.S. 584 (2002). The Rule 61 Motion also contained claims of ineffective assistance of counsel in the trial. An evidentiary hearing was held in the Delaware Superior Court concerning the ineffective assistance of counsel claims. On March 9, 2005, the Superior Court issued its decision, which denied Capano's Rule 61 claims. *State v. Capano*, 2005 Del. Super. LEXIS 69 ("*Rule 61 Decision*").

Capano filed a timely appeal to the Delaware Supreme Court from the *Rule 61 Decision*. On January 10, 2006, the Delaware Supreme Court vacated Capano's death sentence and remanded the case for a new penalty hearing. In all other respects, the *Rule 61 Decision* was affirmed. See, *Capano v. State*, 889 A.2d 968, 968-969 (Del. 2006) ("*Capano III*").[1]

This Petition for Habeas Corpus Relief was filed on January 30, 2006. (A-1). The State has filed an Answer to the Petition (D.I. No. 12) and the parties have agreed that an evidentiary hearing is not required for disposition of the issues raised in the Petition.[2] This is the Petitioner's Brief in support of the Petition.

---

[1] After the case was remanded to the Superior Court for a new penalty hearing, the State elected not to proceed with a new penalty hearing. Capano was thereafter re-sentenced to life imprisonment in accordance with 11 *Del.C.* §4209. (State's Answer, p.2).

[2] In the Habeas Petition, Claim No. 2 involved a claim that Delaware's death penalty statute was unconstitutional and Claim No. 3 involved a claim that a retrial of the penalty phase of the case would violate Capano's rights under the Double Jeopardy Clause of the Fifth Amendment. Petitioner agrees that these claims are now moot in light of the State's decision not to seek a new penalty hearing. Capano is also not pursuing the ineffective assistance of counsel claims set forth in Claim No. 6 in the Habeas Petition.

## SUMMARY OF ARGUMENT

1. In a prosecution for capital murder, a defendant is entitled, under the Due Process Clause of the Fourteenth Amendment, to have the jury instructed on lesser included offenses if there is any evidence presented in the trial to warrant giving such instructions under state law. See, *Beck v. Alabama*, 447 U.S. 625 (1980). The decision in *Capano II* that Capano was not entitled to instructions on lesser included offenses was an unreasonable application of the rule in *Beck*.

2. The rulings in *Capano II* that the admission of Fahey's hearsay statements to her friends, relatives and psychotherapists violated Capano's rights under the Confrontation Clause of the Sixth Amendment and also violated his right to a fair trial under the Fourteenth Amendment.

3. The questioning of Capano on cross-examination concerning his pre-arrest and post-arrest silence violated his rights under the Fifth Amendment to the United States Constitution.

# STATEMENT OF FACTS

## Background Facts

Anne Marie Fahey ("Fahey") was the scheduling secretary for Delaware Governor Thomas Carper. She was last seen alive on Thursday, June 27, 1996, when she went to dinner with Thomas Capano in Philadelphia. Her family reported her missing on June 30, 1996. See, *State v. Capano,* 1998 Del. Super. LEXIS 319, at *5. The defendant, Thomas J. Capano ("Capano") was a prominent Delaware attorney and former managing partner at the Wilmington office of the law firm of Saul, Ewing, Remick and Saul ("Saul Ewing").[3] Capano was married to Kathleen Capano, although they were separated at the time of his arrest. (A91-A92). Capano also had three brothers (Louis Capano, Jr., Gerard "Gerry" Capano and Joseph Capano) and one sister, Marian (Capano) Ramunno.[4] (A144.1-A144.2). After a lengthy investigation that targeted Capano from the outset, the State charged Capano with first degree murder.[5]

## The State's Theory of the Case

The State charged Capano with First Degree Murder[6] even though Fahey's body was never found and even though the State conceded that it was unable to establish how Fahey had died or that her death had come about as a result of Capano's intentional actions. (A-173). With no direct or physical evidence to support its allegation that Capano had intentionally caused Fahey's death, the State constructed a wholly circumstantial theory of the case, which rested on three broad categories

---

[3] Capano's legal career also had included working as a Deputy Attorney General, as City Solicitor for the City of Wilmington, and as legal counsel to former Governor Michael Castle. Sentencing Decision, 1999 Del. Super. LEXIS 541 *2.

[4] Two of Capano's brothers, Louis and Gerry, also became ensnared in the investigation of Fahey's disappearance. Ultimately, they both entered into plea agreements with the federal government and provided the critical information that led to Thomas Capano's arrest.

[5] In July 1996, the Federal Bureau of Investigation ("FBI") and a federal Grand Jury in Delaware began a kidnaping investigation into Fahey's disappearance. On August 5, 1996, Capano was formally notified that he was a "target" of that investigation. See, *State v. Capano*, 1998 Del. Super. LEXIS 377 *1-*2.

[6] First Degree Murder is defined as "intentionally causing the death of another person". 11 *Del.C.* §636(a).

of evidence: (a) evidence of an alleged "motive;" (b) evidence of an alleged "plan;" and © evidence of "consciousness of guilt."

### (a) Evidence of Motive

Fahey began dating Capano in March 1994. (A24-A25). She kept this relationship, or at least its intimate nature, hidden from most of her friends and her family, and even from the psychotherapist she was seeing at the time. (A-8); (A-22); (A-117); (A-64). Her personal diaries, which were discovered by her sister, Kathleen Fahey-Hosey, in her apartment after her disappearance, reflected that, throughout most of 1994 and 1995, Fahey was very much in love with Capano, whom she then characterized as "kind, caring and responsible." (A23-A25); (A-27); (A-76). The State's "motive" evidence consisted entirely of statements Fahey allegedly made to her family, friends and psychotherapists. This largely hearsay testimony was designed to establish that Capano had a "bad" character — that he was, as Fahey had written in her diary, (State's Ex. 18) (A181-A182), a "controlling, manipulative, insecure [and] jealous" man, whose reaction to her attempts to end their relationship, and to seeing her involved in a serious relationship with another man, Michael Scanlan, somehow culminated in a premeditated murder.

In September 1995, Fahey was introduced to Michael Scanlan by Governor Carper. (A8-A9). Fahey's friends and family testified that, after a rocky beginning, she fell in love with Scanlan. (A-79). But there were problems in the relationship. (A79-A80). Fahey suffered from a serious eating disorder. Although Capano knew about Fahey's illness, and was actively trying to get her help, Fahey hid her disorder from Scanlan. (A-80). She also was terribly afraid that Scanlan would learn of her relationship with Capano, a married man, and kept this a secret from him as well. (A-52).

The State's witnesses testified that, after Fahey began dating Scanlan, she broke off her relationship with Capano, who then became upset with Fahey and continued to pursue her. (A115-A117). One of Fahey's psychotherapists, Dr. Michelle Sullivan, who was seeing Fahey in connection with her eating disorder, testified that, in the period between February and early April, 1996, Fahey spoke to her often about how she felt "controlled" by Capano. (A-42). An entry in

Fahey's diary, dated April 7, 1996, was relied on by the State as its most pivotal piece of evidence reflecting Fahey's feelings towards Capano during this period. In her diary, Fahey wrote that "I have finally brought closure to Tom Capano...what a controlling, manipulative, insecure jealous maniac." (State's Ex. 18) (A-181).

Although that diary entry was made just four months before Fahey disappeared, there was also extensive evidence that subsequent to that diary entry, the relationship between Fahey and Capano had changed dramatically. The e-mails introduced into evidence during this period of time reflect, in the words of the defense psychiatric expert, Dr. Carol Tavani, "a very warm, affectionate, cordial relationship," (A-143), with frequent mention of dinner dates, chatty conversations about trivia and family, and much discussion of Fahey's eating disorder.[7] Several of Fahey's friends admitted that Fahey and Capano had settled down and resolved the tension in their relationship. (A-58). According to Fahey's best friend, Kim Horstmann, they had "gotten to a common level of friendship, a nice friendship. And she was comfortable with the friendship she thought had developed." (A-81) The relationship was so close that, on June 12, 1996, just two weeks before her death, when Fahey passed out at work, she called Capano, not Scanlan, to come pick her up and take her home. (A-84); (A 88-A89).

Although the State contended that Capano had been planning Fahey's murder from as early as February, 1996, there was substantial contradictory evidence showing that, throughout the Spring of 1996, Capano was deeply concerned about Fahey's eating disorder and was actively trying to get her help. During this period, Fahey was seeing Dr. Sullivan, the eating disorder specialist, and Capano helped Fahey pay Dr. Sullivan's bills. (A-47). E-mails from this period show that Capano

---

[7] The State introduced e-mails between Capano and Fahey, recovered from Capano's hard drive, that reflected the intensity of their relationship during January and February 1996. These e-mails are reproduced in the Appendix to Appellant's Brief in the direct appeal, pp. 149-233. (D.I. 16). Although Capano and Fahey continued to see each other, Fahey was conflicted in her feelings and Capano was distressed by her efforts to distance herself from him. Capano was not invited to Fahey's surprise birthday party on January 27, 1996, and there are e-mails reflecting that he pressed her about her birthday plans. He was also upset that she attended the Grand Gala with Scanlan on January 27, 1996. (A-52).

became increasingly concerned about this problem.[8] Jill Morrison, another of Fahey's good friends, testified to Capano's concern over Fahey's deteriorating condition. (A-56). Kim Horstmann testified that, late in May, Capano met with her twice, very distressed over Fahey's condition, and urged her to help him intervene in getting Fahey treatment. (A81-A82).

Those of Fahey's friends and the psychotherapists who knew of her relationship with Capano also acknowledged that Capano had never physically abused Fahey. Horstmann testified that Fahey never told her that she was afraid of Capano. (A-78). In fact, Fahey called him a "perfect gentleman." (A-85). Dr. Sullivan's notes began with an indication of "no violence" in the relationship with Capano. (A-37.2). Dr. Sullivan also acknowledged that Fahey said many good things about Capano – that he was "generous" and "supportive" and made her feel "secure." (A-37.4).

### (b) Evidence of Planning and Premeditation

Because the State had no evidence that would circumstantially establish Capano's state of mind on the night of June 27, it set out to prove that Capano had planned Fahey's murder well before that night. Here, the State's key witness was Capano's brother, Gerry Capano. During the course of its investigation, the FBI searched Gerry's house and car and had seized marijuana, cocaine and an arsenal of weapons. (A-118). The Division of Child Protective Services had initiated an investigation to determine if Gerry's children were at risk. (A-118). That threat, and the related threat of federal prosecution on drug and weapons charges, induced Gerry to enter into a guilty plea to federal criminal charges and to agree to cooperate with the federal government. (A119-A120).

---

[8] See generally, (D.I. 16), Appendix to Appellant's Opening Brief - Direct Appeal (State's Ex. 53). For example, on May 20, 1996, Fahey confided to Capano that her "weight ha[d] dropped 6 pounds," and that she "nearly fainted in Church yesterday." (A-183). Capano responded the same day, expressing alarm and recommending that she call Dr. Sullivan. (A-184). The very next day, Capano again urged Fahey to call Dr. Sullivan. (A-185). On June 3, 1996, he ended his e-mail with a reminder to Fahey to "take your vitamins." (A-186). These are hardly the words of a man planning a murder.

At trial, Gerry testified that, in February 1996, his brother Tom asked if he could borrow $8,000 because he was being extorted by "a guy and a girl," who were threatening to ruin his career and hurt his children. Gerry lent his brother the money, which Tom paid back within several days. According to Gerry, Tom also asked him if he could use his boat if he ever had to "do something" to these people. (A95-A96). Sometime after that, according to Gerry, Tom asked to borrow a handgun for protection. At trial, Gerry admitted that Tom had returned the gun, without it having been fired, well before Fahey's disappearance. (A93-A95).

Thomas Capano, who testified in his own behalf, disputed Gerry's version of what had taken place in February 1996. Although Capano admitted that he borrowed $8,000 in cash from Gerry, he gave the money back to him a few days later. (A-161). According to Tom, he had borrowed the $8,000 from Gerry as part of $25,000 in cash he had offered to Fahey to go into a residential treatment program for her eating disorder. (A-151). Capano also testified that he never told Gerry why he needed the money and that it was Gerry who speculated that Tom was in some kind of trouble and offered to get a "leg breaker" to help him. Moreover, according to Tom Capano, it was Gerry's idea that he needed a gun, which he reluctantly took, but returned to Gerry about a month later. (A145-A150).

Gerry also testified that, on the morning of June 28, 1996, Tom asked him to help dispose of a body that was in a large cooler at his residence.[9] They drove to Avalon, New Jersey, where Gerry kept his boat, loaded the cooler onto the boat, sailed east into the Atlantic Ocean some 60-70 miles, and then Tom pushed the cooler over the side of the boat. The cooler, however, did not sink, so Gerry shot at it with a gun that he kept on the boat. Gerry also claimed to have seen part of a

---

[9] Capano had purchased the cooler in April, 1996, and paid for it with his credit card. (A-145). He testified that he bought the cooler as a present for his brother Gerry, intending to give it to him over the July 4th holiday. (A 145-A146). Joseph Capano testified that sometime during March-April 1996, he had a conversation with Tom about Tom wanting to buy a gift for Gerry and suggested that Tom buy a cooler for Gerry's boat. (A139-A140).

human foot sinking into the ocean while the cooler, with the lid open, drifted away from the boat. (A96-A103).[10]

Gerry conceded that in the days preceding June 28, 1996, he had not spoken to or met with Tom about whether he would be available to assist him in disposing of a body. Gerry testified that his meeting with Tom on June 28 was not prearranged and that Tom did not know if Gerry would even be home that morning. (A-108) In addition, Gerry admitted, on cross-examination, to a message he had left on his mother's answering machine, after he had testified at the Proof Positive Hearing, in which he stated that he would make up testimony against his own brother in order to avoid prison:

> Do you really think that I would go to jail for 12 fucking years. If you thought I was bad on the stand, God fucking help you if this goes to trial. I'll think up even more shit to help my ass out of fucking jail. And I'll make up fucking shit as I go along to keep Tommy in there for fucking life. I hate him.

(A-109).

The other evidence of a "plan" was provided by Debby MacIntyre, whose apparent suicide attempt, Capano testified, had precipitated Fahey's death. Capano had known MacIntyre for twenty years and they had been involved in a romantic relationship for 17 years, including the time period when Capano was involved with Fahey. (A121.1). In September, 1996, before Capano was arrested, MacIntyre testified before a federal grand jury investigating Fahey's disappearance, but she did not incriminate Capano. (State's Ex. 144).[11]

MacIntyre was interviewed again by the police on January 28, 1998, just a few days before Capano's Proof Positive Hearing. During that interview, MacIntyre was asked if she owned any handguns. She stated that she had purchased a small handgun "a few years ago," in the Spring of

---

[10] There was evidence that a cooler with what appeared to be bullet holes was found by a man fishing off the Jersey shore on the July 4th weekend of 1996. (A-138).

[11] Excerpts from MacIntyre's Grand Jury testimony are reproduced in the Appendix to Appellant's Opening Brief (D.I. 16) in the direct appeal, pp. 86, *et seq.*

1995, for self-defense, but had subsequently taken it apart and thrown it away. (State's Ex 147).[12]
She denied that Capano was with her when she bought the gun, denied ever having fired it, and
denied ever showing or giving the gun to Capano. (State's Ex 147).[13]

After the Proof Positive Hearing, at which MacIntyre did not testify, she hired a new attorney,
Thomas Bergstrom. On February 27, 1998, MacIntyre and Bergstrom met with prosecuting
authorities and entered into an agreement whereby the government agreed not to prosecute her in
exchange for her cooperation in the Fahey investigation. See, *State v. Capano, supra*, 1998 Del.
Super. LEXIS 377, at *3-*6. After signing the immunity agreement, MacIntyre told the police that,
on May 13, 1996, at Capano's request, she had accompanied Capano to Miller's Gun Shop,
purchased a handgun, and gave the gun to Capano, who had been waiting outside the store. (A-124);
(A128-A132). There was no evidence, however, that the gun purchased by MacIntyre was the
murder weapon.

### (c) Evidence of Consciousness of Guilt

This final category of evidence, which was largely undisputed by the defense at trial, related
the steps taken by Capano after the killing to dispose of physical evidence that might link him to
Fahey's disappearance. This evidence included Gerry's testimony about the disposal of Fahey's
body, (A 96-A103), and of removing a loveseat from Capano's house and placing it in a dumpster.
(A-105). Louis Capano, another brother who testified pursuant to a cooperation agreement, (A-
110), testified that, on June 30, 1996, Capano told him that he and Gerry had disposed of a loveseat,
which had Fahey's blood on it. According to Louis, Capano told him that Fahey had slit her wrists
at his house, but that he took her home afterwards. (A111-A112). Louis testified that Capano asked

---

[12] Excerpts from MacIntyre's interview with the police are reproduced in the Appendix to
Appellant's Opening Brief (D.I. 16) in the direct appeal, pp. 114, *et seq.*

[13] During this interview, MacIntyre was shown a receipt for a gun purchase which indicated
that she had bought a gun at Miller's Gun Shop in May 1996. She then agreed that she had
purchased a gun from Miller's at that time. (State's Ex 147).

him to have the dumpster emptied, which he did.[14] (A-113). There was also evidence that Capano had purchased a new carpet for his rented house on June 29, 1996. Capano's housekeeper testified that when she cleaned his house on July 22, 1996, she noticed a new rug and different furniture. (A-137). Finally, there was testimony from a number of sources, including Louis Capano, that Capano never told anyone about Fahey's death and denied knowing of her whereabouts until the trial. (A-114) (A-136).[15] Additional facts relevant to the issues raised in this proceeding, are set forth in the Arguments which follow.

---

[14] Louis Capano also testified that, some time later, Capano told him he had thrown out a gun in the dumpster and he hoped the police would find it because it had never been fired. (A-114). This gun was never recovered and there was no evidence linking it to the killing or to the gun purchased by MacIntyre.

[15] For example, Brian Murphy, a friend of Capano's, testified that, during the summer of 1996, Capano told him that he would not be surprised if the police found Fahey's blood in his house since she was at his home frequently. (A-135). Dr. Tavani testified that Capano had told a prison psychiatrist that he had no involvement in Fahey's disappearance. (A- 143).

# ARGUMENT

## I. THE TRIAL COURT VIOLATED THE DEFENDANT'S RIGHTS UNDER THE FOURTEENTH AMENDMENT, AS ESTABLISHED IN *BECK v. ALABAMA*, 447 U.S. 625 (1980), WHEN IT REFUSED THE DEFENSE'S REQUEST TO INSTRUCT THE JURY ON LESSER INCLUDED OFFENSES TO THE INDICTED CHARGE OF FIRST DEGREE MURDER

---

### Exhaustion of State Court Remedies and Procedural Bars to Relief

Before the Court can consider Capano's *Beck* claim on the merits, the Court must first determine whether that claim was "fairly presented" in the State court. See, *O'Sullivan v. Boerckel*, 526 U.S. 838, 844-45 (1999) (The exhaustion requirement is satisfied only if the petitioner can show that he fairly presented the federal claim at each level of the established state-court system for review); *Holloway v. Horn*, 355 F.3d 707, 714 (3d Cir. 2004) (accord). In this case, the State agrees that the *Beck* claim was presented to and considered on the merits in the trial court and by the Delaware Supreme Court. (State's Answer, pp. 6-7). Therefore, Capano has satisfied the exhaustion requirement. Also, the State does not claim, in its Answer, that any other procedural bars to relief exist in the case concerning this claim.

### Entitlement to Relief Under 28 U.S.C. §2254: Unreasonable Application of Clearly Established Federal Law

Capano's Habeas Petition was filed on January 30, 2006. Therefore, the provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA") apply, and the standard of review is controlled by 28 *U.S.C.* §2254(d), which states:

> (d) An application for a writ of habeas corpus on behalf of a person
>
> in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -- (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

In *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), Justice O'Connor wrote in her controlling opinion that a state court ruling is "contrary to" clearly established Supreme Court precedent for the purposes of §2254(d)(1) "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [its] precedent." A state court decision is an "unreasonable application" of Supreme Court precedent if it "identifies the correct governing legal rule from [the Supreme] Court's cases, but unreasonably applies it to the facts of the particular state prisoner's case." *Id.,* 529 U.S. 362, 407 (O'Connor, J., concurring) (controlling opinion). When making the "unreasonable application" inquiry, the federal habeas court should ask "whether the state court's application of clearly established federal law was *objectively* unreasonable." *Id.* at 409 (emphasis added). A court that unreasonably extends a rule in a new context or, in the alternative, unreasonably fails to extend a rule may also be deemed to unreasonably apply the correct rule. *Id.,* 529 U.S. at 407.

The standard of review established in *Williams* was explained by the Third Circuit Court of Appeals in *Matteo v. Superintendent, SCI Albion*, 171 F.3d 877, 888-891 (3d Cir. 1999) (en banc), *cert. denied*, 528 U.S. 824 (1999):

> [W]e hold that the "contrary to" provision of AEDPA requires a federal habeas court first to identify the applicable Supreme Court precedent and determine whether it resolves the petitioner's claim. Like the First Circuit, we believe this analysis requires "something more than a recognition that the Supreme Court has articulated a general standard that covers the claim." (internal citation omitted). Instead, the inquiry must be whether the Supreme Court has established a rule that determines the outcome of the petition... In other words, it is not sufficient for the petitioner to show merely that his interpretation of Supreme Court precedent is more plausible than the state court's; rather, the petitioner must demonstrate that Supreme Court precedent requires the contrary outcome. This standard precludes granting habeas relief solely on the basis of simple disagreement with a reasonable state court interpretation of the applicable precedent.
>
> * * * *
>
> If the federal habeas court determines that the state court decision was not "contrary to" the applicable body of Supreme Court law -- either because the state court decision complies with the Supreme Court

rule governing the claim, or because no such rule has been established -- then the federal habeas court should undertake the second step of analyzing whether the decision was based on an "unreasonable application of" Supreme Court precedent. We agree with the First Circuit's observation that "the 'unreasonable application' clause does not empower a habeas court to grant the writ merely because it disagrees with the state court's decision, or because, left to its own devices, it would have reached a different result." (internal citations omitted). To hold otherwise would resemble de novo review, which we believe is proscribed by the statute.

* * * *

**[W]e hold the appropriate question is whether the state court's application of Supreme Court precedent was objectively unreasonable. The federal habeas court should not grant the petition unless the state court decision, evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent.** In making this determination, mere disagreement with the state court's conclusions is not enough to warrant habeas relief.

### Entitlement to Lesser Included Offense Instruction under *Beck*

More than twenty years ago, in *Beck v. Alabama*, 447 U.S. 625 (1980), the Supreme Court held that where a defendant is tried for capital murder, the Due Process Clause of the Fourteenth Amendment requires that the jury be permitted to consider a verdict of guilty of lesser included non-capital offenses, when the evidence would have supported such a verdict.[16] As the Court explained:

[W]hen the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense – but leaves some doubt with respect to an element that would justify conviction of a capital offense – the failure to give the jury the "third option" of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction. Such a risk cannot be tolerated in a case in which the defendant's life is at stake.

---

[16] *Beck* is applicable even though the state law allows for jury discretion to impose or recommend a sentence less than death following conviction of a capital offense. *Hooks v. Ward*, 184 F.3d 1206, 1223-1229 & n.13-14 (10th Cir. 1999). Conversely, the Supreme Court has not recognized a constitutional right to instructions on lesser included offenses in non-capital cases. See, *Hopkins v. Reeves*, 524 U.S. 88, 118 S.Ct. 1895, 141 L.Ed.2d 76 (1998).

*Id.* at 637. Two years later, in *Hopper v. Evans*, 456 U.S. 605, 611 (1982), the Court reaffirmed, at least in a capital case, that "due process requires that a lesser offense instruction be given when the evidence warrants such an instruction."

<strong>The Delaware Supreme Court's Ruling on the <em>Beck</em> Claim</strong>

In the direct appeal, the Delaware Supreme Court conducted a *de novo* review of the evidence to determine if Capano was entitled to have the jury instructed on lesser included offenses under state law.[17] *Capano II*, 781 A.2d 628. Utilizing the Delaware Criminal Code's "rational basis in the evidence" standard, the court then went on to consider and reject all of the arguments advanced by Capano to support his claim that the trial court should have instructed the jury on lesser included offenses. *Id.*, at 628-633. Capano's argument that he was entitled to lesser offense instructions based on *Beck* met the same fate:

> Capano argues that the refusal to instruct on lesser included offenses violated Capano's due process rights. Relying principally on the 1980 United States Supreme Court decision in *Beck v. Alabama*, and Delaware authority as well, Capano argues that because he is a defendant in a capital case he has a constitutional right to a lesser included offense instruction in this case. Capano's argument fails because the right to a lesser included offense instruction depends on there being a rational evidentiary basis for that instruction. Beck is consistent with that rule.[18]

> \* \* \* \*

> In *Hopper v. Evans*, the United States Supreme Court stated:

>> *Beck* held that due process requires that a lesser included offense instruction be given when the evidence warrants such an instruction. But Due process requires that a lesser included offense instruction be given only when the evidence warrants such an instruction.

>> *Hopper* explicitly upheld Alabama's requirement that there be a "reasonable theory from the evidence" to support a lesser included

---

[17] See, 11 *Del.C.* §206© ("the court is not obligated to charge the jury with respect to an included offense unless there is a rational basis in the evidence for a verdict acquitting the defendant of the offense charged and convicting the defendant of the included offense").

[18] *Capano II*, 781 A.2d at 633 (footnotes omitted).

offense and held that none was required on the facts of that capital case. We have concluded that in this case there is no "rational basis in the evidence for a verdict acquitting the defendant of the offense charged and convicting the defendant of the included offense." Neither Delaware law nor the Due Process Clause requires the lesser included instructions requested by Capano. Nothing in *Beck* or its progeny supports Capano's argument.[19]

### Was the State Court Decision an "Unreasonable Application" of the Rule Established in *Beck* and *Hopper*?

In its Answer, the State agrees that *Beck* and *Hopper* clearly establish that a capital defendant may be entitled to have the jury instructed on lesser included offenses under the Due Process Clause. (State's Answer, p.7). The State argues, however, that the requirement in *Beck/Hopper* "that a lesser offense instruction be given when the evidence warrants such an instruction," is identical to the requirement under state law that a defendant is entitled to have the jury instructed on lesser included offenses only "if there is a rational basis in the evidence" to warrant such instructions. (State's Answer, pp.7-8). For purposes of federal Habeas review, the State's argument is that if Capano was not entitled to have the jury instructed on lesser included offenses under state law, then *Beck/Hopper* was correctly applied by the Delaware Supreme Court and Habeas relief should be denied.[20] Of course, conversely, if Capano was entitled to lesser offense instructions under state law, then a *Beck/Hopper* violation has been established and Capano is entitled to Habeas relief. Capano thus agrees with the State that §2254"s "unreasonable application" inquiry is resolved by determining whether the Delaware Supreme Court was correct, as a matter of law, in concluding that Capano was not entitled to lesser offense instructions under state law.

---

[19] *Id.*, at 634 (footnotes omitted).

[20] In its Answer, the State questions whether review of a claim that the evidence was sufficient to instruct the jury on lesser included offenses is the resolution of a factual issue or is legal conclusion. Capano submits that the Delaware Supreme Court, by engaging in a *de novo* review of the evidence, determined that Capano's entitlement to lesser offense instructions was a legal issue and not an issue of fact. Thus, for purposes of federal Habeas review, any "findings" made by the Delaware Supreme Court on the issue should not be accorded any deference. See 28 U.S.C. §2254(e)(1).

### (a) Overview of the Defense Case

The defense case was that Fahey's death was an "accident." According to Capano, who testified in his own defense at trial, after they left the Panorama Restaurant in Philadelphia, they decided to go to Capano's house to watch TV. After they arrived, they sat on a love seat in the great room, and watched "ER," which began at 10:00 p.m. During the show, Capano heard the phone ring, but did not answer it. He thought it might be MacIntyre, who frequently came to his house around 11:00 p.m., and would sometimes spend the night. Capano found an opportunity to phone MacIntyre and told her he had company. (A153-A155)

Sometime after the phone call, Capano and Fahey were still seated on the love seat when Capano heard a noise, looked up, and saw MacIntyre standing in the kitchen. MacIntyre appeared to be distraught and yelled, "Who's this?" According to Capano, MacIntyre had completely "snapped." She was holding a gun at her side and was saying that she was going to kill herself. As MacIntyre began to raise her left arm, which was holding the gun, Capano grabbed her arm and the gun went off, striking Fahey behind her right ear and killing her instantly. The shooting, Capano testified, was "accidental." (A155-158)[21]

### (b) Overview of Delaware Law

Under Delaware law, a court must charge the jury with respect to a lesser included offense if "there is a rational basis in the evidence for a verdict acquitting the defendant of the offense charged and convicting the defendant of the included offense." 11 *Del.C.* §206. See, e.g., *Slater*

---

[21] In her testimony, MacIntyre denied that she had gone to Capano's house at all on June 27th, let alone with a gun. (A133-A134). To contradict her testimony, the defense called Kim Johnson, who lived across the street from MacIntyre. Johnson testified that sometime during the last two weeks of June, 1996 (she was unable to pinpoint the exact date), at approximately 11:45 p.m., she heard a car engine racing and a screech of brakes. She then looked out of her bedroom window, which faces directly onto MacIntyre's driveway, and saw MacIntyre "stumble out of the car." She heard MacIntyre "issue a terrible kind of anguished sob," and then saw her run inside her house. (A 165-A167). Capano had testified that MacIntyre left his house at approximately 11:45 p.m. on June 27th and that MacIntyre's house was only a few minutes drive away. (A-159).

*v. State*, 606 A.2d 1334, 1338 (Del. 1992) ("a defendant is entitled to an instruction on a lesser included offense if the evidence would permit a jury rationally to acquit him of the greater offense and to convict him of the lesser"); *Henry v. State*, 805 A.2d 860, 865 (Del. 2002) ("This requirement usually is satisfied by the presentation of conflicting testimony on the element distinguishing the greater offense from the lesser offense.... A defendant is entitled to an instruction on a lesser included offense if there is any evidence fairly tending to bear upon the lesser included offense, 'however weak' that evidence may be").[22]  See, *Smith v. State*, 1996 Del. LEXIS 330, at *6 (In deciding whether the evidence meets Section 206(c)'s "rational basis" requirement, the trial court is not permitted to weigh the evidence, because "the weight of the evidence is for the jury to decide...The question is whether a jury **could have** convicted on the lesser offense") (emphasis added).  Also see, *Gutierrez v. State*, 842 A.2d 650, 652-653 (Del. 2003) (defendant's uncorroborated testimony that killing was in "self-defense" was sufficient under "credible evidence" standard for entitlement to self-defense instruction, "even when the defendant's affirmative defense evidence was not very believable"); *Henry, supra*, 805 A.2d at 865-866 ("the trial judge may not intrude upon the province of the jury 'which may find credibility in testimony that the judge may consider completely overborne by the simply overwhelming evidence of the prosecutor'").

### (c) Capano's Testimony Provided a "Rational Basis in the Evidence" to Instruct on Lesser Included Offenses

At trial, based on Capano's testimony, the defense argued that a rational jury could conclude that Capano had acted "recklessly" or with "criminal negligence" in reaching out for MacIntyre's arm, and that Capano's testimony, standing alone, could support a verdict of either Murder Second Degree, Manslaughter, or Criminally Negligent Homicide. (A170-172).  The trial court disagreed, reasoning that if Capano was trying to prevent MacIntyre from firing the gun, but it fired anyway,

---

[22]  In a homicide case, the difference between the degrees of homicide is the requisite "state of mind" of the defendant.  Thus,  Murder Second Degree (11 *Del. C.* § 635), Manslaughter (11 *Del. C.* § 632) and Criminally Negligent Homicide (11 *Del. C.* § 631) are all "included offenses" to the charge of murder first degree.  *Delaware Criminal Code with Commentary*, 15-16 (1973); *Lilly v. State*, 649 A.2d 1055, 1060-62 (Del. 1994).

killing Fahey, then it was a pure accident and Capano had no "criminal culpability." (A168-A169). In the direct appeal, the Delaware Supreme Court agreed with the trial court's analysis. *Capano II*, 781 A.2d at 633 and n. 255 ("[Capano's] testimony was confined to an accident scenario that involved no crime on his part").

The Delaware Supreme Court's rejection of Capano's "accident" evidence as being a "rational basis in the evidence" to instruct on lesser included offenses was entirely incompatible with established Delaware law and therefore establishes a *Beck* violation. To understand why that is so, it is necessary to understand the interrelationship, and indeed interchangeability, between the degrees of culpability for a "homicide" and the claim that a homicide was an "accident." This interrelationship was clearly acknowledged in *Hall v. State*, 431 A.2d 1258 (Del. 1981). In *Hall*, the defendant shot his mother between the eyes, according to expert testimony, from a distance of approximately six inches. Although a witness heard the defendant say "I'll kill you" just before the gun went off, the defendant testified that during a discussion with his mother, the gun, which he had obtained from an upstairs closet, had "accidentally" discharged. *Id.* at 1258-1259. The trial court instructed the jury on the charged offense of Murder First Degree and the lesser included offenses of Murder Second Degree, Manslaughter and Criminally Negligent Homicide. *Id.* at 1258. It also instructed that the defendant's contention "that the shooting was accidental" required the jury to "consider whether the evidence raises a reasonable doubt as to the existence of the state of mind required for the offense in question, that is, whether the defendant acted intentionally, recklessly or with criminal negligence." *Id.*, at 1260. On appeal, the defendant argued that the jury instructions were inadequate because the trial court had not specifically defined the concept of "accident" for the jury. *Id.* That argument was rejected by the Delaware Supreme Court:

> The language above, we believe, adequately explains...implicitly by its posture in the charge, that the defense of accident, if believed, **could negate either or both the culpable state of mind or the voluntariness of the act**. The failure to define accident, which definition would have been preferable, caused no prejudice in this case. The jury could not fail to understand the accident contention of the defendant, which was emphasized throughout the trial.

*Id.* (emphasis added).[23]

In holding that the "defense" of "accident" could negate a defendant's "culpable state of mind," *id.*, the Court recognized that a defendant's claim, as in *Hall*, that a shooting was an "accident" was also a claim that the defendant had a lesser degree of culpability than that required for conviction of the charged offense.[24] Thus, under *Hall*, it is the state of mind specified in the statutory definition of an offense that determines precisely which "accidents" will constitute a defense. See, Robinson, *Criminal Law Defenses*, §63, pp. 269-271 & n.4 (1984) (citing *Hall* and noting that courts often deal with "accident" in terms of culpability requirements, which render special provisions concerning "accident" unnecessary or redundant). Thus, if the required state of mind is "intentional," as in Murder First Degree, then evidence of a "reckless accident," a "criminally negligent accident," or a "faultless accident" can all support a charge on lesser included offenses. See, Robinson, *supra*, at §62(b), p. 248.

Another case, decided approximately one year after the decision in *Capano II*, also serves to illustrate that a claim of "accident" will entitle a defendant to instructions on lesser included offenses. In *Henry v. State*, *supra*, the defendant shot his fiancee, Siobhan Canty ("Canty") three times and killed her in the small bathroom of the house they shared. The three bullets struck Canty's body in the head, chest, and back. The gunshots to the head and chest entered at downward angles, indicating that the shots were discharged at close range. The following day, Henry placed the body into a suitcase and loaded it into the trunk of his car. He dumped the suitcase in an area off of Route

---

[23] In a footnote, the Court explained, "although accident is not expressly a 'defense' in the Delaware Criminal Code, because it is not defined in Chapter 4 of Title 11, or by any other statute...evidence of accident may be produced **to negate the existence of any element of the offense charged.**" *Id.* 431 A.2d at 1259 n.1 (emphasis added).

[24] Parenthetically, *Hall's* treatment of "accident," as a "defense" which can negate a defendant's culpable state of mind, parallels the codification of the defenses of "ignorance or mistake of fact" in 11 *Del.C.* §441. In the Commentary to Section 441, it was noted, "[F]rom the wording of §441, it is clear that even such a mistake as would make a man guilty of another crime is a defense if it negatives the culpable mental state required for commission of the crime with which he is charged." *Delaware Criminal Code With Commentary*, 101 (1973).

9, south of New Castle. *Id.*, 805 A.2d at 862. At trial, Henry testified that on the day of the killing, Canty had taken a shower and started yelling at him. According to Henry, when he entered the bathroom, Canty was standing with a handgun pointed at him. Henry attempted to wrestle the gun away from her. Henry testified that "[they] got in a screaming match. [He] accidentally shot [himself] in the foot, and [he] got extremely upset and just a wave of emotion took over and [he] shot her." Henry testified that he did not intentionally kill Canty. He stated that in pulling the trigger "a total rage of emotions just came over [him], [he] had no control." *Id.*, at 863.

Henry requested the trial judge to instruct the jury on Murder in the Second Degree, as a lesser included offense of Murder in the First Degree. Henry argued that his testimony provided an evidentiary basis for the jury to find that his shooting of Canty was reckless. In refusing to instruct the jury on Murder in the Second Degree, the trial judge stated "three different parts of the body within a very short period of time. It seems to me that reckless is absurd under those conditions. I'm not going to give it." *Id.* Henry's conviction for First Degree Murder was reversed on appeal.

Even though Henry was not a capital murder case, the Delaware Supreme Court concluded that *Beck* provided a well established foundation to instruct the jury on lesser included offenses:

> The United States Supreme Court has recognized that "providing the jury with the 'third option' of convicting on a lesser included offense ensures that the jury will accord the defendant the full benefit of the reasonable-doubt standard." This fundamental principle was developed in recognition that the extension of the full benefit of the concept of reasonable doubt may be compromised if the jury had no alternative but to set free a defendant accused of a particularly heinous crime.

*Id.*, at 864 (internal citations omitted).

Turning to Henry's version of the killing, which was entirely uncorroborated, the court stated:

> Henry asserts that the jury could have held him responsible for the reckless killing of Canty in view of the unknown sequence of the shooting. He contends the jury could infer from his testimony that he fired the gun wildly in the bathroom.

> * * * *

> Despite the trial judge's belief that Henry's contention of recklessness was "absurd," it is well settled that the jury is the sole judge of the

credibility of witnesses and is responsible for resolving conflicts in the testimony. In ruling upon a request to instruct the jury on a lesser included offense, the trial judge "must give full credence to [the] defendant's testimony."

\* \* \* \*

Henry's testimony presented evidence from which the jury could find the elements of the lesser included offense of Murder in the Second Degree...We hold that the trial judge erred in taking the issue of Henry's *mens rea* away from the jury by refusing to instruct on the lesser included offense of Murder in the Second Degree. That error resulted in a violation of Henry's due process rights under the United States Constitution...

*Id.*, at 865-866.

In this case, however, unlike the decisions in *Hall* and *Henry*, the trial court and the Delaware Supreme Court somehow concluded that Capano's jury should not have been given *Beck's* " third option." While in Capano's own mind, the shooting may have been a "pure accident" because he did not fire the gun and did not intend to shoot Fahey, the trial court and the Delaware Supreme Court court failed to recognize that the jury could have viewed Capano's conduct – grabbing the arm of a hysterical woman brandishing a gun and threatening suicide – as either a "reckless accident," i.e. Murder Second Degree or Manslaughter,[25] or as a "criminally negligent accident," i.e. Criminally Negligent Homicide.[26] See, *Hall*, 431 A.2d at 1259 (noting "this State's strong policy favoring the submission of factual issues to the jury" in criminal cases); *Plass v. State*, 457 A.2d 362, 368 (Del. 1983) (issue of defendant's state of mind in a homicide case is "peculiarly for the jury" where evidence supports more than one conclusion). Moreover, the jury was free to disbelieve some or most of Capano's testimony without rejecting all of it. In other words, the jury could reasonably

---

[25] A person acts recklessly "with respect to an element of an offense when the person is aware of and consciously disregards a substantial and unjustifiable risk that the element exist and will result from the conduct. The risk must be of such a nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation." 11 *Del.C.* §231©.

[26] A person acts with criminal negligence "with respect to an element of an offense when the person fails to perceive a risk that the element exists or will result from the conduct. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation." 11 *Del.C.* §231(d).

have concluded that Capano was trying to put the best light on an accident that was in fact reckless conduct by making it seem entirely non-culpable. See, *Henry*, 805 A.2d at 866 ("A defendant is entitled to a lesser included offense instruction even if it 'depends on an inference of a state of facts that is ascertained by believing defendant as to part of his testimony and [State's] witnesses on the other points in dispute'").

### (d) "Gaps" in the State's Evidence Concerning Capano's State of Mind at the Time of the Homicide Required That the Jury Be Instructed as to Lesser Included Offenses

In the direct appeal, Capano also argued that "gaps" in the State's evidence concerning his state of mind when Fahey was killed independently provided a "rational basis in the evidence" to instruct the jury on lesser included offenses. *Capano II*, 781 A.2d at 630. This argument, too, was rejected by the court:

> The possibility that Capano killed Fahey by an act that was reckless, criminally negligent, or under the influence of extreme emotional disturbance is based entirely on speculation. Although there is evidence of the disposal of Fahey's body, the parties concede that apart from the accident defense offered in Capano's testimony, there is no evidence concerning the manner of Fahey's death. Her body was not recovered and neither was any murder weapon. Putting aside Capano's accident defense, no one gave eyewitness testimony bearing on the circumstances under which Fahey died. **If the State's planning evidence and Capano's accident defense are rejected, it is possible that Capano killed Fahey in some kind of jealous rage, or some other reckless or negligent act. But these possibilities are only speculative. They are not supported by any rational basis in the evidence.**

*Id.*, at 631.

As previously explained herein, a state court decision is an "unreasonable application" of Supreme Court precedent if it "identifies the correct governing legal rule from [the Supreme] Court's cases, but unreasonably applies it to the facts of the particular state prisoner's case." *Williams v. Taylor, supra,* 529 U.S. at 407 (O'Connor, J., concurring) (controlling opinion). As the discussion which follows will explain, *Beck* and its progeny clearly stand for the proposition that "gaps" in the

State's case, especially where the gap involves the critical element of the defendant's state of mind, will entitle a defendant to instructions on lesser included offenses.

In order to convict for First Degree Murder, the State was required to prove not only that a killing occurred, but also must prove that the killing was "intentional." See, *State v. Moyer*, 387 A.2d 194, 195 (Del. 1987). As previously noted, it is the defendant's state of mind that is the critical element which distinguishes murder first degree from its lesser included offenses. *Duonnolo v. State*, 397 A.2d 126, 130 (Del. 1978). Even if Capano had not testified concerning the "accident," he would nevertheless have been entitled to have the jury instructed on lesser included offenses under *Beck* and its progeny because there were "gaps" in the State's case concerning proof of Capano's state of mind.[27] This aspect of *Beck* was explained by the Court in *Schad v. Arizona*, 501 U.S. 624, 646-647 (1991):

> Our fundamental concern in in *Beck* was that a jury convinced that the defendant had committed **some** violent crime, but not convinced that he was guilty of a capital crime, might nonetheless vote for a capital conviction if the only alternative was to set the defendant free with no punishment at all.
>
> * * * *
>
> [In *Beck*], we repeatedly stressed the all-or-nothing nature of the decision with which the jury was presented (citations omitted). As we later explained in *Spaziano v. Florida*, 468 U.S. 447, 455, 82 L. Ed. 2d 340, 104 S. Ct. 3154 (1984), "the absence of a lesser included offense instruction increases the risk that the jury will convict . . . simply to avoid setting the defendant free. . . .The goal of the *Beck* rule, in other words, is to eliminate the distortion of the factfinding process that is created when the jury is forced into an all-or-nothing choice between capital murder and innocence."

---

[27] Indisputably, something happened inside Capano's house that resulted in Fahey's death. In finding Capano guilty of First Degree Murder, the jury clearly rejected Capano's claim that the death was a "pure accident." In the direct appeal, the State argued that Capano's exculpatory testimony that Fahey's death was an "accident" barred Capano from having the jury consider lesser included offenses. That argument, however, was squarely rejected by the Delaware Supreme Court as a matter of state law. *Capano II*, 781 A.2d at 629-630.

The concern in *Beck* that the fact-finding process is distorted when the jury is forced into an all-or-nothing choice was recognized by the Delaware Supreme Court in *Chao v. State*, 604 A.2d 1351, 1359 (Del. 1992):

> By according defendants the procedural safeguard of providing jurors with the additional option of convicting a person of a lesser included offense, the defendant is more likely to receive the full benefit of the reasonable doubt standard. *Beck*, 447 U.S. at 634. In other words, by limiting a jury's choice of convicting or acquitting a defendant of the charged offense alone, jurors who have determined that a serious crime was committed may convict a person simply because they believe he or she deserves to be punished, although not necessarily for the crime with which the defendant was charged. The third option of convicting on a lesser included offense reduces the risk of unwarranted convictions [for capital murder].

This "fundamental concern" in *Beck* was also echoed by the Delaware Supreme Court in *Henry*:

> "At common law the jury was permitted to find the defendant guilty of any lesser offense necessarily included in the offense charged." (footnote omitted). That rule originally developed as "an aid to the prosecution in cases in which [its evidence] failed to establish some element of the crime charged." (footnote omitted). Such instructions provide the jury with a less dramatic alternative than the sharp choice between conviction of the offense charged and acquittal.

*Id.*, 805 A.2d at 863-864.

The Delaware Supreme Court's conclusion in Capano's direct appeal that giving the jury the "third option" of convicting Capano of a lesser degree of homicide than First Degree Murder would allow the jury to "speculate" concerning Capano's state of mind is an unreasonable interpretation and application of *Beck* because it does not address *Beck's* concern "that a jury convinced that the defendant had committed **some** violent crime, but not convinced that he was guilty of a capital crime, might nonetheless vote for a capital conviction if the only alternative was to set the defendant free with no punishment at all. *Id.*, 501 U.S. at 646. As discussed in detail below, the conflicting and largely inconclusive evidence concerning Capano's state of mind, and especially the lack of any evidence concerning the manner or means of Fahey's death makes this case a paradigmatic *Beck/Chao* scenario – a factual scenario that required instructions on lesser included offenses.

This was an extraordinary case to be tried as a capital murder. There was evidence of a killing, the first element of a first degree murder, but no evidence that established the killer's state of mind. At trial, the State conceded that it did not know, and did not prove, "exactly how Ann Marie [Fahey] physically died." (A-173). In many cases, a jury can infer the defendant's intent from physical evidence present at the crime scene – from the number or placement of the wounds, or from the type of weapon used, or from the condition of the victim's body.[28] In this case, however, there were no "circumstances surrounding the act" from which the jury could infer the defendant's state of mind. There was no evidence that Capano had ever expressed an intention to murder Fahey. The State had no eyewitnesses to the killing. It had no body. There was no weapon recovered. There was no forensic evidence that could circumstantially establish the state of mind of the killer. The State could not prove whether Fahey had been shot, stabbed, bludgeoned, or strangled. It could not prove whether Fahey died as a result of one wound or several. Because the State had no evidence "from the circumstances surrounding the act" from which a jury could infer Capano's state of mind, the State sought to prove that Capano intentionally killed Fahey by proving a motive, plan and "consciousness of guilt."

The evidence that provided the alleged motive for the killing was, at best, inconclusive. That a person is viewed by a former lover as "controlling" does not mean that he has plotted a murder. This is not a case where a long history of domestic violence can be viewed as a prelude to murder. However tense the relationship between Fahey and Capano may have been in the months after she began seeing Scanlan, by the Spring of 1996 - in the weeks actually preceding her death - virtually everyone agreed that the relationship had settled down. (A-58); (A-81). There was no evidence to suggest that, in late June, Capano was still angry over Fahey's change of heart. Indeed, there was overwhelming evidence to the contrary. Fahey did not tell her therapists or friends that she had been

---

[28] Since the State will rarely have direct evidence of the defendant's state of mind, the law recognizes that state of mind may be "inferred by the jury from the circumstances surrounding the act [the defendant] is alleged to have done." 11 *Del.C.* §307(a).

physically abused by Capano. In fact, there was **no** direct evidence that Capano had ever hurt or threatened Fahey at or around the time of the incident. And there was extensive evidence demonstrating that in the months preceding the killing, Fahey and Capano had developed a warm and affectionate friendship. They often dined together, conversed frequently, and shared confidences. Fahey continued to rely on Capano, even calling him from work on June 12, 1996, when she became sick and needed a ride home. (A-84); (A88-A89). And there was compelling evidence, much closer to the date of the killing itself, demonstrating that, rather than planning to kill Fahey, Capano was desperately trying to keep her alive, paying her therapist's bills, urging her to seek help for her eating disorder, even meeting with her friends in an effort to get her treatment. (A-151).

The "plan" evidence also was weak and remote in time. The alleged conversation with Gerry Capano about borrowing a gun and using Gerry's boat preceded the killing by four months. There was also good reason for the jury to disbelieve Gerry's testimony on that issue – testimony which he acknowledged he had a motive to fabricate after he was threatened with federal prosecution for drug possession and with the loss of his children. (A 106-A107). The jury heard Gerry's hostile phone call to his mother after the proof positive hearing where he admitted that he would "make [things] up as I go along to "keep Tommy [in jail] for life." (A-109). Moreover, the defense put on expert testimony by Dr. Carol Tavani, a psychiatrist with a specialty in neuropsychiatric difficulties, (A-141), who explained that Gerry's heavy cocaine use could have resulted in a condition known as "confabulation" – a memory disorder that results in a person filling in memory gaps with what the person believes is the truth, but, in fact, is not. (A-142). Gerry's testimony was also contradicted by Capano, who testified that he never told Gerry why he needed the $8,000; that it was Gerry who speculated that he was in some kind of trouble; and, that it was Gerry's idea to give him the gun because he had no alarm system at his home. (A145-A149 ).

The State's argument that the cooler was purchased as a prelude to murder was also rebutted by the defense. Capano purchased the cooler in April, with his credit card. Capano testified that he

bought the cooler as a present for his brother, intending to give it to him over the July 4th holiday (A 145-146). This testimony was corroborated by Joseph Capano. (A139-A140). Likewise, the jury was entitled to reject MacIntyre's trial testimony - a story that she proffered only after receiving complete immunity for all crimes she may have committed but contingent upon her non-involvement in Fahey's death. (A-121). At trial, MacIntyre testified that in May 1996, Capano persuaded her to buy a handgun for him. (A122-A127). Prior to the trial, however, MacIntyre had told investigators a completely different story. She stated that she had purchased a small handgun "a few years ago" for self-defense, but had subsequently taken it apart and thrown it away. She also denied that Capano was with her when she bought the gun or that she had ever given it to him. (State's Ex. 147). Even if the jury believed that MacIntyre had purchased a gun for Capano, there was no evidence, apart from Capano's testimony, that Fahey was killed by a gun or that MacIntyre's gun was the homicide weapon. And even if it turned out to be the homicide weapon -- a speculative leap at best -- MacIntyre did not testify that Capano told her why he wanted her to purchase a gun. Based on the evidence, a jury could infer that Capano purchased the gun, as do millions of Americans, for self-protection, and not because of a "plan" to kill his girlfriend.

There was no evidence that Capano had made no arrangements with Gerry to use his boat and no evidence that Capano even knew whether Gerry was even available to assist him on the day after Fahey was killed. At trial, Gerry conceded that he had not spoken or met with his brother about whether he would be available to assist in disposing of a body in the days preceding June 28, 1996; that Capano did not know if he would be home that morning; and that they did not have a prearranged meeting for use of his boat. (A-108).

Lastly, to prove the killing was intentional, the State introduced evidence of "consciousness of guilt," which included Capano's denial of any involvement in Fahey's disappearance and his disposing of all forensic evidence that would shed light on how Fahey had died. See, *Capano II*, 791 A.2d at 603-604. "Consciousness of guilt" evidence is generally considered relevant, but problematic, evidence on the question of whether a defendant has committed a wrongful act. J.

Weinstein & M. Berger, *Weinstein's Evidence*, ¶401[10] at 401-72-78 (1996). Here, the "consciousness of guilt" evidence suggested that Capano had committed **some** wrongful act, but it shed no light on his state of mind at the time of the commission of the act. See, *Colon v. State*, 1994 Del. LEXIS 326, at *5 (Del. 1994) (consciousness of guilt evidence cannot be used to establish state of mind **prior** to criminal misconduct); *Cline v. State*, 720 A.2d 891, 893 n.8 (Del. 1998) (defendant's flight reflected consciousness of guilt, but was not probative of an intent to deliver drugs, as opposed to lesser included offense of possession).

Any homicide is a serious crime. A person who was involved in **any** homicide, regardless of his mental state, would have a powerful motivation to cover up his involvement, create an alibi, and dispose of incriminating evidence. A person who has caused the death of another is also likely to panic, just as Capano testified that he panicked. (A162-A163). Indeed, Capano's actions after the homicide were just as consistent with an unplanned homicide as with a premeditated murder. A jury could certainly have concluded that Capano's actions after the killing were the actions of a person who had unintentionally killed someone and was terrified of facing the consequences.

Finally, the verdict of the jury in the "penalty phase" of Capano's trial itself provides compelling evidence that the "fundamental concern" expressed in *Beck* is valid, i.e., when a jury is forced into an all-or-nothing choice between capital murder and setting the defendant free, the jury will vote to convict even if they harbor a reasonable doubt that the defendant committed an intentional killing. In the penalty hearing, in order for Capano to be eligible to be sentenced to death, the jury had to find, unanimously and beyond a reasonable doubt, the existence of at least one "statutory aggravating circumstance." 11 *Del.C.* §4209(d). In this case, the **only** statutory aggravating circumstance alleged by the State was that the murder was "premeditated and the result of substantial planning." See, 11 *Del.C.* §4209(e)(1)(u). (A-179). The evidence relied upon by the State to prove this statutory aggravating factor was the very same evidence of motive, planning and cover-up that the State had relied on in the "guilt phase' of the trial to prove that the killing was "intentional." (A178.1-A178.2). In the guilt phase, all twelve jurors agreed that Capano was guilty

of "intentional murder." Yet, in the penalty phase, where the same jury was confronted with the same question, based on the same evidence that had been presented in the trial, only eleven members of the jury believed that the State had established the "substantial planning/premeditation" statutory aggravator. (A-180). These seemingly inconsistent verdicts provide telling evidence that the "fundamental concern" expressed by the Supreme Court in *Beck* is very real. In the penalty phase, one member of the jury was **not** convinced beyond a reasonable doubt that Capano had "planned" to kill Fahey. Yet, when faced with the choice of either convicting Capano of intentional murder, based on the same evidence of motive, planning and cover-up, or setting Capano free, that same juror opted to convict. That juror's inconsistent verdicts suggest that at least one juror, and maybe more, may have convicted Capano of first degree murder, not because the juror believed that Capano had "intentionally" killed Fahey, but because that juror believed, in the words of *Chao*, that Capano committed "some violent crime" and "deserve[d] to be punished," where the only other option available to the jury was to set Capano free.

## II. THE ADMISSION OF FAHEY'S HEARSAY STATEMENTS TO HER PSYCHOTHERAPISTS AND HER FRIENDS VIOLATED CAPANO'S RIGHTS UNDER THE CONFRONTATION CLAUSE OF THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION

---

### Exhaustion of State Court Remedies and Procedural Bars to Relief

Before the Court can consider Capano's Confrontation Clause claim claim on the merits, the Court must first determine whether that claim was "fairly presented" in the State court. See, *O'Sullivan v. Boerckel, supra*, 526 U.S. at 844-45 (The exhaustion requirement is satisfied only if the petitioner can show that he fairly presented the federal claim at each level of the established state court system for review); *Holloway v. Horn, supra*, 355 F.3d at 714 (accord). In this case, the State agrees that the Confrontation Clause claim claim was presented to and considered on the merits in the trial court and by the Delaware Supreme Court. (State's Answer, p. 19). Therefore, Capano has satisfied the exhaustion requirement.

### Entitlement to Relief Under 28 U.S.C. §2254: Unreasonable Application of Clearly Established Federal Law

Capano agrees with the State (State's Answer, pp. 19-20) that he is entitled to habeas relief only if he can establish that the Delaware Supreme Court's rejection of his Confrontation Clause claim was either contrary to, or involved an objectively unreasonable application of clearly established federal law. See, *Williams v. Taylor, supra*, 529 U.S. at 405-409 (O'Connor, J., concurring) (controlling opinion); *Matteo v. Superintendent, SCI Albion, supra,* 171 F.3d at 888-891 (accord).

### The Hearsay Evidence

### (a) Overview

In the trial, the court allowed a parade of witnesses, including Fahey's friends and acquaintances and three psychotherapists, to testify in great detail about out-of-court statements alleged to have been made by Fahey. Through that testimony, the jury heard witness after witness testify to Fahey's mixed and confused feelings about Capano, including her belief, at times, that he

was overly controlling, or that he was harassing her, or that he was jealous and possessive. Much of this testimony was not even Fahey's own out-of-court statements, but the interpretation placed on those statements by these witnesses. Worse still, the trial court did not limit admission of Fahey's statements to her statements about Capano. Witnesses were also allowed to testify about Fahey's out-of-court statements relating to her allegedly traumatic childhood and her emotional frailty, all of which served no purpose other than to garner sympathy for the victim and contrast her character with the depictions she gave concerning Capano's character. This hearsay evidence made Fahey an unsworn prosecution witness whose out-of-court statements not only portrayed her as a vulnerable victim, but cast Capano as a jealous, controlling and possessive man who, if the State's theory were to be believed, would exact severe retribution if Fahey broke off their relationship.

### (b) The Testimony of the Psychotherapists

During the State's case in chief, three of Fahey's psychotherapists were permitted to testify concerning their treatment of Fahey. These therapists were permitted to relate not only Fahey's out-of-court statements concerning her relationship with Capano, but also concerning her eating disorders and alleged childhood traumas. Finally, the therapists were also permitted to provide their own, often speculative, assessments of both Fahey's and Capano's character.

### Dr. Neil Kaye

Dr. Kaye, a psychiatrist, had six "med check" sessions with Fahey in 1994, at a time when, according to Fahey's diaries (also introduced during the State's case-in-chief), she was madly in love with Capano. He was not Fahey's therapist during the Fall of 1995, when she began dating Scanlan, and he saw Fahey again only twice in June 1996, for fifteen minute "med checks." (A-10). Despite the brevity of their professional relationship, Dr. Kaye, like the other psychotherapists, offered testimonials to Fahey's character, describing her as "very friendly," and "polite" -- a "memorable" woman, who had suffered a very traumatic childhood. According to Dr. Kaye, Fahey had never experienced "unconditional love" from her parents and had been physically, emotionally and verbally abused by her father. (A11-A12). Although Dr. Kaye had virtually no contact with Fahey after her

-32-

relationship with Capano had cooled, and although he did not have a single note indicating that he ever spoke with Fahey about Capano, he opined that Fahey was "genuinely fearful" of Capano and was worried about his "rage and anger" – an assessment based largely on e-mails between Capano and Fahey that he had read a week before trial. (A12-A13); (A-21). According to Dr. Kaye, in his opinion, the e-mails were "threatening." He went so far as to attribute the severity of Fahey's eating disorder, from which she had suffered since she was a teenager, to her relationship with Capano, who was somehow "contaminating" Fahey's therapy. (A-15).

### Dr. Michelle Sullivan

Dr. Sullivan, a psychologist, began treating Fahey in late February 1996. At trial, Dr. Sullivan testified at length about Fahey's eating disorder, her allegedly abusive childhood, her previous relationships, and her character. She told the jury that Fahey was a "devout Catholic," who suffered from a chronic sense that she was unacceptable (A-37.2); that she "never wanted to hurt anybody" and was "incredibly remorseful" (A-37.4); that she had a "tremendous compassion for children"; and that she was an "incredibly generous and warm and giving person." (A-37.4). In contrast to this glowing portrayal, Capano was "incredibly controlling and possessive." (A-37.2). Dr. Sullivan related that Fahey told her that she did not know how to get out of the relationship, (A-37.2), and that she believed that Capano was "haunting" her by following her, showing up at her house uninvited, constantly phoning and sending her e-mails, and giving her gifts. (A-37.3).

Dr. Sullivan admitted that Capano had been very supportive and generous to Fahey, but suggested that he was being manipulative since Fahey was "highly vulnerable to receiv[ing] generosity." (A-37.3). Although she admitted that there were no accounts of violence in the relationship, Dr. Sullivan told the jury that Fahey had expressed fears of violence. (A 37.4-A37.5). In a prime example of hearsay gone wild, Dr. Sullivan related that Fahey had told her that a friend of Fahey's had told Fahey that she "could" be kidnaped, and that Fahey became frightened by this and began to consider whether a former boyfriend or Capano could hire a third person to kidnap her. (A 37.4-A37.5). Dr. Sullivan also testified that Fahey told her that Capano had come to her

apartment, very angry, wanted to take back gifts that he had given to her, and had supposedly grabbed her arm and pushed her against a wall. (A40.1-A40.2).

### Dr. Gary Johnson

Dr. Gary Johnson, another psychologist, treated Fahey from July 1995 through February 1996. (A-29). He, too, testified about Fahey's growing up with an alcoholic father and her difficulty maintaining healthy relationships with men. (A-29). He testified that Fahey told him that the "prominent" man she was seeing (she never identified Capano to Dr. Johnson) wanted to "control" her life, and had "trapped" her in her apartment for several hours yelling at her and threatening to expose their relationship to Scanlan. (A-31). Johnson admitted he could not judge whether a patient was telling him the truth and that patients often "color" or "slant" things. (A-34).

### (c) The Testimony of Fahey's Friends and Family

### Kathleen Fahey-Hosey

During the State's case-in-chief, Kathleen Fahey-Hosey, Fahey's sister, was asked to read several excerpts from Ann Marie Fahey's diary. Among the many excerpts she read was an entry dated April 7, 1996, the last entry in the diary: "I finally have brought closure to Tom Capano. What a controlling, manipulative, insecure, jealous maniac ... For one whole year, I allowed someone to take control of every decision in my life." (State's Ex. 18) (A-181).

### Jill Morrison

Jill Morrison worked with Fahey in Governor Carper's office and was also her close friend. (A-49).[29] At trial, Morrison testified that Fahey had told her that, in the Spring of 1995, Capano had arranged a job interview for her with his brother Louis, but that she did not want to go because Capano was trying to "control" where she worked and lived. (A-50). Morrison also testified that, in January 1996, Fahey told her that Capano had harassed her with phone calls when he learned that

---

[29] Before Morrison testified, the court instructed the jury that her testimony could be considered only for "determining the state of mind of Ms. Fahey at or about the time when the alleged acts occurred," and not as proof that "the defendant [was] a bad person." (A-48).

she was going to the "Grand Gala" with Scanlan. She told Morrison that she was "terrified" Capano would expose their relationship to Scanlan -- a theme repeated by most of the other "hearsay" witnesses. (A-51). In yet another hearsay on hearsay pile up, Morrison testified that Fahey called her and told her that Capano had said that Scanlan had said that Fahey had a "shitty" apartment but looked "great in a short skirt." (A-52). Morrison also told the jury that Fahey told her that Capano knew that she had been to Scanlan's house because he had seen her car parked there. (A-53).

Morrison testified that Fahey had told her that Capano had entered her apartment by the fire escape and taken back gifts he had given her because he was jealous of her relationship with Scanlan. (A-53). Morrison also testified that Fahey told her that Capano had once locked her inside his garage while they argued about their relationship and that she found this "extremely frightening." (A-53). Morrison did not know when either of these incidents had actually occurred, but knew that they pre-dated April 1996. (A54-A55); (A-58).

### Siobhan Sullivan

Siobhan Sullivan was a State Police officer who worked with Fahey in Governor Carper's office and became her friend. (A58.1-A58.2). Sullivan testified that when she told Fahey that Capano had talked with her about Fahey's rejection of his brother's job offer, Fahey became very angry and called Capano a "possessive, controlling maniac." (A58.2-A58.3). Sullivan also testified that, around Memorial Day 1996, Capano called the Governor's office to ask Sullivan if she knew where Fahey was or had talked to her. When she told Fahey about these calls, Fahey responded, "He's fucking stalking me." (A-58.3).

### Kim Horstman

Kim Horstman was a close friend and confidant of Fahey's for several years. (A-75). At trial, she testified in considerable detail concerning the ups and downs of Fahey's relationship with Capano, spanning the two years prior to her disappearance. (A75-A82).[30] Nearly all of Horstman's

---

[30] Horstman presented the most extensive and detailed hearsay account of Fahey's relationship with Capano. Other witnesses, who were close friends or co-workers of Fahey's and who testified concerning the same subject matters were: Jennifer Bartels-Houghton (A59-A65);

testimony was based on conversations that she had with Fahey. Like the other witnesses, Hortsman related Fahey's accounts of her difficult childhood and claimed that Fahey had told her that Capano was "controlling." (A-78).

## Admission of Hearsay Testimony and the Confrontation Clause

A criminal defendant in state court has a Sixth and Fourteenth Amendment right to be "confronted with the witnesses against him." *U.S. Const. Amend. VI.* See, *Pointer v. Texas*, 380 U.S. 400, 406 (1965) (applying Sixth Amendment to the States). As the Supreme Court has explained, "the central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig*, 497 U.S. 836, 845 (1990). When hearsay[31] evidence is admitted in a criminal trial, the Sixth Amendment's Confrontation Clause is implicated because the defendant is not afforded the opportunity to confront the out-of-court declarant. See, *California v. Green*, 399 U.S. 149, 158 (1970) (When hearsay statements by an unavailable witness are offered against the accused, he is deprived of the right to cross-examination, the "greatest legal engine ever invented for the discovery of truth").

Nevertheless, the Confrontation Clause is not implicated if the out-of-court statement falls within a "firmly rooted" exception to the Hearsay Rule. See, *Idaho v. Wright*, 497 U.S. 805, 817 (1990) (An exception to the hearsay rules is "firmly rooted" if it has had such a "longstanding judicial and legislative experience" that experience has shown that a statement admitted pursuant to the exception inherently carries special guarantees of trustworthiness essentially equal to those produced by cross-examination); *White v. Illinois*, 502 U.S. 346, 355 n.8 (1992) ("'firmly rooted' exceptions carry sufficient indicia of reliability to satisfy the reliability requirement imposed by the

---

Jacqueline Steinhoff (A66-A71); and Ginny Columbus (A72-A74).

[31] "Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. See, D.R.E. 801(c). In general, hearsay is not admissible unless it falls within a recognized "exception" to the Hearsay Rule. See. D.R.E. 802.

Confrontation Clause"). Additionally, even if a hearsay statement does not fall within the "firmly rooted" exception, the statement may nonetheless satisfy the Confrontation Clause if the statement has "particularized guarantees of trustworthiness" such that adversarial testing through cross-examination would be expected to add little, if anything, to the statement's reliability. See, *Ohio v. Roberts*, 448 U.S. 56, 66 n.9 (1980).[32] Capano agrees with the State that *Roberts, White* and *Wright* constitute the relevant "clearly established law" to decide whether the Delaware Supreme Court applied that law in an objectively reasonable manner in deciding Capano's Confrontation Clause claims. (State's Answer, pp. 20-21).

### Analysis of Confrontation Clause Rulings in Capano's Direct Appeal

In the direct appeal, the Delaware Supreme Court approached the Hearsay/Confrontation Clause issues by first determining whether Fahey's out of court statements were admissible under D.R.E. 803(3)[33] or, alternatively, under D.R.E. 803(4).[34] See, *Capano II*, 781 A.2d at 607.

---

[32] In *Crawford v. Washington*, 541 U.S. 36, 68-69 (2004), the Supreme Court partially overruled *Roberts* and held that the admission of out-of-court statements that were "testimonial" violated the Confrontation Clause. If, however, the out-of-court statement is not "testimonial," then the Confrontation Clause inquiry is still governed by *Roberts*. See, *Davis v. Washington*, 126 S.Ct. 2266, 2273 (2006) ("It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause"); *Albrecht v. Horn*, 471 F.3d 435, 463 (3d Cir. 2006) (*Roberts* still controls non-testimonial statements). Capano agrees that the out-of-court statements at issue here do not involve alleged "testimonial" statements.

[33] D.R.E. 803(3) provides an exception to the hearsay rule for out-of-court statements concerning the declarant's "then existing state of mind, emotion, sensation or physical condition." The Delaware Supreme Court has held that Rule 803(3)'s state of mind exception is "firmly rooted" for Confrontation Clause purposes. See, *Forrest v. State*, 721 A.2d 1271, 1277 (Del. 1999).

[34] D.R.E. 803(4) provides an exception to the hearsay rule for out-of-court statements made "for purposes of medical diagnosis or treatment." In *White*, the Court noted that this hearsay exception was "firmly rooted." *Id.*, 502 U.S. at 355 n.8.

-37-

### (a) Admissibility under D.R.E. 803(3)

In *Gattis v. State*, 637 A.2d 808, 818 (Del. 1994), the court stated, "in a prosecution for homicide arising out of a marital or romantic relationship, evidence of ... discord between the victim and the defendant is clearly material to the issues of motive and intent." In *Capano II*, however, the court drew a clear distinction between Fahey's out-of-court statements that she "feared" Capano and wanted to end their relationship, on the one hand, and Fahey's out-of-court descriptions of alleged historical events that engendered those states of mind:

> In view of the wide range of untested, and potentially unreliable, out-of-court statements that would be admissible under the State's broad interpretation of the state of mind exception, we conclude that Rule 803(3) authorizes the admission of hearsay statements by Fahey to her friends and psychotherapists reflecting her fear of the defendant (that is, her state of mind), but not the memories or beliefs giving rise to that fear.
>
> Applying the above analysis to the present case, we conclude that Fahey's description of specific events involving Capano and her opinion of Capano reflect not on Fahey's "state of mind," but on her beliefs and memories of facts as she expressed them to her friends and psychotherapists.

*Id.*, at 611.

Thus, under the above analysis, "Fahey's statements that she was upset, that she was afraid of Capano, or that she intended to break off her relationship with Capano are admissible as statements revealing Fahey's emotional or mental state." *Id.*, at 612. Conversely, the court acknowledged that Rule 803(3)'s "state of mind" exception to the Hearsay Rule specifically excluded "statements of memory or belief to prove the fact remembered or believed..." *Id.*, at 608-609. Accordingly, the court held that "Fahey's description of specific events involving Capano and her opinion of Capano" were inadmissible under Rule 803(3). *Id.*[35] The court then went on to

---

[35] Nearly all of what the jury heard from Fahey, as presented through the testimony of her friends and psychotherapists, was inadmissible under Rule 803(3), under the distinction thus drawn by the court. See, *Capano II*, 781 A.2d at 619-622 (summarizing the inadmissible evidence). That error, however, did not result in a reversal of Capano's conviction. The court concluded that the erroneous admission of those statements was "harmless error" because the statements were cumulative of statements that had been admitted in evidence by stipulation of the parties. See, *Id.*, at 622 ("in view of the extensive and damaging hearsay evidence to which Capano stipulated at trial,

consider whether it was error for the trial court to have admitted Fahey's out-of-court statements concerning her "fear" of Capano in the State's case-in-chief.[36]  See, *id*., at 612-615.  The court concluded:

> Applying this rule to the present case, we find that testimony describing Fahey's state of mind was relevant to prove (1) that Fahey sought to end her romantic involvement with Capano and (2) that Capano, as the spurned lover, therefore had a motive to kill her. Since this theory of admissibility is material to a disputed element of the State's prima facie case for first degree murder (that is, intent and/or premeditation), the State could properly present this evidence in its case-in-chief.

*Id.*, at 615.

### (b) Admissibility of Rule 803(3) Statements Under the Confrontation Clause

The court also concluded that because Fahey's "fear" statements were admissible under Rule 803(3)'s state of mind exception, then there was no violation of the Confrontation Clause:

> Based on the longstanding judicial precedent establishing the propriety of admitting statements under the state of mind exception, this Court declared the state of mind exception, as defined in Derrickson, to be "firmly rooted" for purposes of the Confrontation Clause.  Following this established jurisprudence, we find that D.R.E. 803(3) is a firmly rooted hearsay exception under the Confrontation Clause. We therefore conclude that the admissible hearsay testimony concerning Fahey's emotional state is admissible under a firmly rooted hearsay exception and satisfies the requirements of the Confrontation Clause.

*Id.*, at 617.

---

we conclude that the erroneously admitted evidence was largely cumulative and that the trial court's error was harmless beyond a reasonable doubt").  Whether or not the court in *Capano II* applied the "harmless error" rule in an objectively unreasonable manner is separately discussed herein.

[36] The trial court had ruled that such statements were admissible and relevant to show motive and also because Capano had raised an "accident defense" in the opening statements that the State needed to rebut. *Id.*, 781 A.2d at 608.

### The Rulings of the Delaware Supreme Court Amounted to an
### "Unreasonable Application" of Rule 803(3)'s Hearsay Exception

The question whether the rulings discussed above on the Rule 803(3) issues were an unreasonable application of clearly established Hearsay/Confrontation Clause jurisprudence turns entirely on whether the Delaware Supreme Court's application of D.R.E 803(3) to the statements at issue was itself "unreasonable." Those issues are discussed herein.

As a general matter, Petitioner does not quarrel with the ruling in *Capano II* that Fahey's "fear" statements fell within the "state of mind" exception in D.R.E. 803(3). Petitioner's quarrel is with the court's holding that the "fear" statements were admissible in the State's case-in-chief to prove that the murder was intentional and premeditated. See, *Capano II*, 781 A.2d at 615. That holding was contrary to and virtually ignored clearly established law.

The seminal Delaware decision on the question of the admissibility of out-of-court statements of a homicide victim concerning the victim's alleged fear of the defendant, or threats made by the defendant towards the victim, is *State v. Porter*, 587 A.2d 188 (Del. Super. 1990). In *Porter*, the court addressed a defense motion *in limine* to exclude a murder victim's out-of-court statements that the defendant had threatened to kill her. The defendant had raised the possibility that the killing was an accident or self-defense and the State argued that the statements were therefore admissible under Rule 803(3). *Id*. The significance of *Porter*, in the context of the holding in *Capano II* that Fahey's out-of-court statements concerning her "fear" of Capano were admissible in the State's case-in-chief is the holding in *Porter* that if evidence of a homicide victim's fear of the defendant is to be admitted at all, **the evidence may be admitted only in rebuttal after evidence of accident, self-defense, suicide or extreme emotional distress has been presented by the defense.** *Id*., at 193 (emphasis added). *Porter's* "timing requirement" was subsequently adopted by the Delaware Supreme Court in *Gattis, supra,* 637 A.2d at 818 (the proper approach in such cases is to permit discussion of the general characteristics of the relationship in opening statements and the case-in-chief, but to allow evidence of specific conduct "only in rebuttal if the defendant testified concerning accident or lack

of intent."). Also see, *State v. Magner*, 1997 Del. Super. LEXIS 45, at *16 (citing *Porter* and *Gattis*, the court held that "since defendant has no duty to present a particular defense or, for that matter, to present any defense at all, it would be premature and of questionable constitutionality for the state to attack a defense until defendant has presented **evidence** of that defense").

The concern , best expressed in *Porter*, in admitting "fear" evidence in the State's case-in-chief is that "the jury is likely to misuse it to form conclusions about the defendant's intentions rather than the victim's state of mind." *Id.* 587 A.2d at 192-193.[37] That concern suggests that *Porter's* "timing requirement" – that such evidence may be admitted only in rebuttal – is a prophylactic rule, which is designed to minimize the risk that the jury will simply use such evidence to infer propensity and guilt. That conclusion is also supported by *Gattis*. In *Gattis*, the trial court had granted a defense motion *in limine* concerning statements made by the victim to third parties regarding her fear of the defendant and her intention to terminate their relationship. The trial court ruled that the State could present evidence, in its case-in-chief, concerning the general characteristics of the relationship by those who observed it, but not specific acts of violence or other evidence of the defendant's jealously or possessive nature. On appeal, the defendant claimed that the State had exceeded the trial court's pretrial ruling. *Id.*, at 818. In rejecting the defendant's claim, the Court noted that "in a prosecution for homicide arising out of a marital or romantic relationship, evidence of previous discord between the victim and the defendant is clearly material to the issues of motive and intent." *Id.* Nevertheless, the Court held that the "**[trial] court correctly ruled that evidence of prior bad acts directed to the victim could be presented only in rebuttal if the defendant testified concerning accident or lack of intent.**" *Id.* (emphasis added).

This "timing requirement," established in *Porter* and approved in *Gattis*, was totally ignored by the trial court. In the trial, the court made no particularized inquiry into the relevance of the proffered "fear" testimony. Rather, it mechanically ruled that the defense's opening – which referred

---

[37] As discussed herein, those concerns were acknowledged, but ignored, by the court in *Capano II*. See, *id*, at 612-614.

to Fahey's death as a "tragic, ill-defined accident" – opened the door wide to the admission of the hearsay testimony described above. The trial court stated:

> Now it seems to me that in order for the State to approach the concept of there being some intentional homicide, because they are not interested in proving an accident occurred in the house, they have to show a change in their relationship that made it more toxic.

(A-37.1).

In the direct appeal, the Delaware Supreme Court duly noted the questionable relevance and potential for prejudice that will arise when out-of-court statements of a homicide victim's "fear" of the defendant are admitted in the State's case-in-chief:

> Due to concerns over relevancy and prejudice, however, courts limit the admissibility of such statements by victims. The concern is that a victim's statement that "I fear Defendant" leads to an inference that the defendant deserves to be feared. Courts are wary of allowing jurors to draw this inference because it may be based on subjective impressions but have great impact.

*Capano II*, 781 A.2d at 612-613.

The Court also acknowledged that *Porter's* "timing requirement" represented the majority rule:

> In light of these concerns, courts have developed limitations on the admissibility of statements describing the victim's state of mind. *United States v. Brown*,[38] the leading case on this issue, requires that the trial court must find a "substantial degree of relevance to a material issue" or a "manifest need for such evidence" before the court may admit statements describing the victim's fear of the defendant. While not limiting admissibility to any predetermined set of facts, *Brown* observed that statements of the victim's mental state are generally admissible only to rebut the defendant's claim of self-defense, suicide, or accidental death. The majority of courts have adopted this rebuttal requirement in one form or another. **The holding of the Superior Court in *State v. Porter* that a victim's statements of fear of the defendant could come in under 803(3) "only . . . in rebuttal after evidence of accident, self-defense, suicide or extreme emotional distress has been presented by the defense" is broadly in line with this prevailing view.**

*Id.*, at 613-614 (footnotes omitted) (emphasis added).

---

[38] 490 F.2d 758 (D.C. Cir. 1973).

Having thus paid lip service to controlling Delaware law, which clearly had been ignored by the trial court, the Delaware Supreme Court reached out to a decision of the Arizona Supreme Court in *State v. Wood*,[39] and concluded that Fahey's "statements of fear of the defendant are admissible in the State's case-in-chief to prove the State's *prima facie* case." *Capano II*, at 615. See, *Capano II*, 781 A.2d at 614.[40] Even though *Gattis* and *Wood* are virtually indistinguishable on their facts, the Court in *Capano II* provided no explanation for such an inexplicable departure from clearly established Delaware law. For purposes of habeas relief, the conclusion by the Delaware Supreme Court that Fahey's statements concerning her "fear" of the defendant were admissible in the State's case-in-chief was therefore an "unreasonable application" of D.R.E. 803(3).

### Capano's "Accident" Evidence Did Not Open the Door to Admit Fahey's Statements Concerning Her "Fear" of the Defendant

It is anticipated that the State will respond the the above argument with the assertion that even if Fahey's "fear" statements were inadmissible in the State's case-in-chief, they became admissible to rebut Capano's "accident" evidence, and therefore any error in admitting the statements in the case-in-chief was "harmless error."[41] Petitioner submits that such an argument should be rejected because Capano's "accident" evidence would not have opened the door for the admission of Fahey's out-of-court statements concerning her "fear' of the defendant.

*Porter* and *Gattis* emphasize that the mere invocation of an "accident defense" is not a talisman that allows the unrestrained admission of hearsay statements of the victim's state of mind.

---

[39] *State v. Wood*, 881 P.2d 1158 (Ariz. 1994), *cert. denied*, 515 U.S. 1147 (1995). In *Wood*, the court held that the victim's statements of fear and desire to end her relationship with the defendant were admissible in the state's case-in-chief "because they showed her intent to end the relationship, which in turn provided a plausible motive for intentional murder." *Id.*, at 1167-1168.

[40] What is noteworthy about the court's quite thorough discussion of the "timing" issue, *id.,* at 612-615, is that *Wood* is the only case cited by the court which even arguably supports the trial court's ruling that the "fear" statements were admissible in the State's case-in-chief. All of the other decisions on the "timing" issue cited in *Capano II* are squarely contrary to *Wood*.

[41] See, *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (harmless error question on collateral review is whether a constitutional error had a "substantial and injurious effect or influence in determining the jury's verdict").

*Porter*, 587 A.2d at 193 (deferring ruling on state of mind evidence pending hearing on nature of the defense and State's demonstration that foundational requirements for admission have been met); *Brown*, 490 F.2d at 767 (this evidence may be admitted only if it allows an inference of the decedent's future conduct that "tend[s] to rebut [the accident] defense"). The example in *Brown* itself reflects the need for a close connection between the particulars of the decedent's fear and the particulars of the accident defense: statements of the victim's fear of guns or of the defendant would be relevant to rebut a defense that the victim accidentally shot herself. In such a case, a jury reasonably could infer from those fears that the victim would not have placed herself in a position that would allow the defendant's version of events to occur. *Brown*, 490 F.2d at 767. See also, *State v. MacDonald*, 598 A.2d 1134, 1136 (Del. Super. 1991) (where defense of accident is raised, "courts have generally allowed the admission of evidence of the victim's fears, **as probative of the question whether that person would have been likely to do the acts claimed by the defendant**")(emphasis added).

In this case, the trial court's failure to adhere to *Porter's* timing requirement resulted in the admission of irrelevant and highly prejudicial hearsay evidence. Although the defense's opening statement alluded to a "tragic accident," there was no way to know the specific contours of the defense claim until the defense actually presented its case. By allowing the State to present Fahey's hearsay statements in its case-in-chief, the trial court thereby deprived itself of the opportunity to evaluate the relevancy of Fahey's out-of-court statements to Capano's "accident" defense. If the trial court had followed *Porter*, and deferred making any ruling until **after** Capano had presented his "accident" evidence, it would have been clear that Fahey's statements about her "fear" of Capano were simply not relevant to the "accident" evidence.

Although Capano himself admitted that Fahey died inside his house, there was no evidence that Fahey's presence in his house was involuntary. There was substantial evidence that Fahey and Capano frequently saw each other in the weeks prior to her death. Conversely, there was no evidence that Capano had "forced" Fahey to go to dinner with him in Philadelphia, and there was

-44-

no evidence that he "forced" her to return to his house after dinner. Furthermore, the specifics of Capano's "accident" evidence did not call into question any conduct by Fahey upon which **her** state of mind might be relevant. Capano did not claim, as in the example in *Brown*, that Fahey had accidentally shot herself. Nor did he claim that they had fought or struggled that evening – a defense that would have allowed proof that her fear of him made it unlikely she would have engaged in such behavior. According to Capano's testimony, any struggle was with MacIntyre, who barged into his house with a gun that accidentally discharged, causing Fahey's death. Capano's "accident evidence" made his state of mind, but not Fahey's state of mind, an issue for the jury. Therefore her out-of-court statements concerning her "fear" of Capano were simply irrelevant and should not have been admitted in evidence.[42]

### (c) Admissibility of Rule 803(4) Statements Under the Confrontation Clause

In *Capano II*, the court held that Fahey's out-of-court statements to the three psychotherapists were admissible under D.R.E. 803(4).[43] *Id.*, 781 A.2d at 623-626. The court then addressed Capano's claim that the admission of the out-of-court statements to the psychotherapists violated Capano's rights under the Confrontation Clause. The court acknowledged that the "medical diagnosis or treatment" exception to the hearsay rule in D.R.E. 803(4) "has been recognized in its generic form as 'firmly rooted' for purposes of the Confrontation Clause, [but] the exception has not

---

[42] Petitioner acknowledges that not every error by a state court in admitting or excluding evidence rises to the level of a federal constitutional violation. See, *e.g. Lesko v. Owens*, 881 F.2d 44, 51-52 (3d Cir. 1989). However, an evidentiary error will rise to the level of a constitutional violation if the error is "of such a magnitude as to undermine the fundamental fairness of the entire trial." *Keller v. Larkins*, 251 F.3d 408, 413 (3d Cir. 2001). Whether or not the error in admitting Fahey's out-of-court statements amounted to a constitutional violation is included in the discussion of the "harmless error" issues.

[43] D.R.E. 803(4) provides an exception to the Hearsay Rule for "Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms or sensations, or the inception or general character of the cause or external causes thereof insofar as reasonably pertinent to diagnosis or treatment."

historically been extended to psychotherapists in Delaware." *Id.*, at 626 (footnote omitted).[44] Nevertheless, the Court held the admission of the statements did not violate the Confrontation Clause because the statements "possessed 'indicia of reliability' and 'guarantees of trustworthiness' sufficient to satisfy the Confrontation Clause." *Id.*, at 627.[45]

Petitioner respectfully submits that the above holding is an "unreasonable application" of *Roberts, Wright,* and *Lilly.* Statements made for the purposes of medical diagnosis or treatment are inherently reliable and are classified as a "firmly rooted" exception to the hearsay rule under the Confrontation Clause because the person seeking medical care has no motive to falsify when describing his or her symptoms or condition to the doctor. The medical relationship is more formal,

---

[44] The language employed in D.R.E. 803(4) and the federal Advisory Committee Notes strongly support the conclusion that Rule 803(4) was not intended to embrace statements to psychotherapists. By its terms, the rule embraces only statements for the purposes of "**medical** diagnosis or treatment," a description that would exclude most mental health practitioners. See, *State v. Zimmerman*, 829 P.2d 861, 864 (Idaho 1992) ("a psychologist does not provide 'medical' treatment as contemplated by the rule"). Statements that are admissible under the rule are also limited to statements "reasonably pertinent to diagnosis or treatment." This pertinency requirement "generally operates to preclude expansion of the Rule beyond its underlying rationale by excluding statements which are clearly self-serving narrations of past events." See, Weissenberger, *Federal Rules of Evidence*, §803.19 at p. 473. As explained in the Advisory Committee Notes, "statements as to fault would not ordinarily qualify under this ... language." In contrast, experts in the mental health field "view any statements, regardless of their content, as relevant to diagnosis or treatment." See, *Weinstein's Federal Evidence*, §803.09[8], pp. 803-47 (2d Ed. 2001). Indeed, narrations of past events and statements ascribing fault are the very stuff of psychotherapy.

[45] In a footnote, the Court characterized the inquiry as "the residual trustworthiness test." *Id.*, 626 n. 216. In another footnote, the Court went on to state:

> [Under *Wright v. Idaho*], a determination that a statement possesses "particularized guarantees of trustworthiness" requires an examination of the circumstances "that surround the making of the statement and that render the declarant particularly worthy of belief."). Courts have significant leeway in determining the factors that provide the indicia of reliability necessary for hearsay testimony to satisfy the Confrontation Clause. (citation omitted). Essentially, the State must demonstrate that the statements are as reliable as those admitted pursuant to a "firmly rooted" exception (citation omitted).

*Id.*, at 628 n. 217.

often short-lived, and the patient communicates facts that the doctor can then empirically review and verify. In a traditional medical setting, the patient understands that the "effectiveness of the treatment he receives may depend largely upon the accuracy of the information he provides,"[46] and will therefore speak frankly about his or her medical condition.

On the other hand, the psychotherapist-patient relationship bears little resemblance to the traditional doctor-patient relationship and the same assumptions cannot be said to apply to statements made by a patient to a psychotherapist. In contrast to a medical patient, the psychological patient does not relate physical symptoms, but rather feelings that cannot be empirically validated. As Dr. Johnson acknowledged, a patient may withhold facts, slant them, or simply remember them falsely. (A-34). The very notion that a patient under a psychiatrist's treatment, whose perception of reality may be distorted by a mental ailment or colored by "transference,"[47] is a reliable declarant is inherently contradictory. See, J. Weinstein & M. Berger, *Weinstein's Evidence*, ¶803(4)[02] (4th Ed. 1996) ("The statements may be extremely unreliable as evidence of the facts related, since the condition for which the patient is consulting the psychiatrist may have impaired the patient's perception, memory or veracity"). As Dr. Johnson himself admitted, patients often slant or color the truth when speaking to their therapists. It can be "the way they do see the world." (A-34). Furthermore, a patient who is in counseling may not believe that truthfulness is necessary to an effective diagnosis or treatment of her psychological ailment. See, *State v. Barone*, 852 S.W.2d 216, 220 (Tenn. 1993) (need for truth telling to obtain effective treatment "is not always as clear to patients in a psychological setting"); *People v. LaLone*, 437 N.W.2d 611, 613 (Mich. 1989) ([W]hile medical patients may fabricate descriptions of their complaints and the general character of the causes of these complaints, . . . fabrications of physical complaints would seem to be far easier to

---

[46] *McCormick On Evidence*, §292, at 839 (1984).

[47] Transference refers to a "a patient's assignment of qualities, emotions and attitudes of a person significant in his or her early life, usually a parent, to the therapist." *Dictionary of Medical Terms*, (Barons 3d ed. 1994)

discover through empirical tests than are fabrications which might be heard by an examining psychologist").

The Delaware Supreme Court's application of *Lilly's* "residual trustworthiness test" to admit Fahey's out-of-court statements to the psychotherapists was objectively unreasonable for the very same reason that the Delaware Supreme Court itself declined to conclude that statements to psychotherapists in general are not "firmly rooted" exceptions to the hearsay rule – because such statements are inherently unreliable. Even more to the point, the conclusion in *Capano II* that Fahey's out-of-court statements met *Lilly's* "residual trustworthiness test"[48] is simply unsupportable under the facts of this case. Fahey herself was hardly a reliable or unimpeachable reporter. She suffered from chronic depression, recurrent bipolar disorder, exhibited "obsessive compulsive behavior," and was prone to anxiety and panic attacks. (A-18); (A-11); (A-18) (A-45). She was also anorexic and bulemic, and subsisted on a few hundred calories a day. She was taking tranquilizers and an antidepressant and had abused laxatives for many years, often taking 15 a day. (A-40). Her own psychotherapists described her as a person who tended "to tell people what she thought they wanted to hear," (A-19), and who often "left out" things when it suited her needs. (A-40.3). For example, she did not tell Dr. Kaye that she was seeing Capano for dinner because it would be "shameful for her." (A- 17). She tried to hide her eating disorder. (A- 15). She never told Dr. Johnson that the "prominent" man she was seeing was married. (A-31). Finally, the statements themselves were not made under circumstances which suggest reliability. She had ample time to reflect before making the statements and to distort what had occurred.

### (d) Review of Delaware Supreme Court's "Harmless Error" Determination

The conclusion in *Capano II* that Fahey's out-of-court statements which recounted "facts remembered or believed" including the statements made to the psychotherapists, were inadmissible[49] did not result in a reversal of Capano's conviction:

---

[48] See, *Capano II*, 781 A.2d at 627.

[49] See, *Id.*, at 622.

> We have concluded that the admission of the testimony was harmless beyond a reasonable doubt because it is cumulative of the stipulated testimony and therefore had minimal prejudicial impact.[50]

> \* \* \* \*

> We conclude that the trial court erroneously admitted under the state of mind exception hearsay testimony from Fahey's psychotherapists and friends concerning specific incidents and beliefs described by Fahey. But, in view of the extensive and damaging hearsay evidence to which Capano stipulated at trial, we conclude that the erroneously admitted evidence was largely cumulative and that the trial court's error was harmless beyond a reasonable doubt.[51]

The conclusion in *Capano II* that any error in admitting Fahey's out-of-court statements was "harmless error" appears to rest entirely on the court's finding that the inadmissible evidence was "cumulative of the stipulated testimony":

> But, crucially, some of Fahey's hearsay statements were also presented through testimony to which Capano stipulated. Specifically, Capano stipulated to the admission of three sets of evidence: (1) Fahey's diary, (2) emails between Capano and Fahey, and (3) the testimony of Kim Lynch-Horstmann. **Of course, the admission of this evidence is not an issue in this appeal, but the *effect* of the admission of this evidence by stipulation is critical to our harmless error analysis.**

*Id.*, at 618 (emphasis added).

It is also clear that the "harmless error" formulation employed by the court in *Capano II* appears to be based on the test established in *Chapman v. California*, 386 U.S. 18, 24 (1967). *Capano II*, 781 A.2d at 618 n. 173; *id*, at 619 n.175.[52] Petitioner agrees with the State that Capano is entitled to habeas relief only if the Delaware Supreme Court applied *Chapman* in an "objectively unreasonable" manner. See, *Mitchell v. Esparza*, 540 U.S. 12, 18 (2003) (habeas relief is appropriate

---

[50] *Capano II*, 781 A.2d at 619 (footnotes omitted)

[51] *Id.*, at 622-623 (footnotes omitted).

[52] See, State's Answer, pp. 22-23 (finding of harmless error in *Capano II* was "a reasonable application of the *Chapman* rule").

-49-

only if the state court applied harmless error review in an "objectively unreasonable" manner).[53] That issue will now be addressed.

### "Unreasonable Application" of the *Chapman* Standard

Under the rule established in *Chapman*, a federal constitutional error is deemed to be "harmless error" if the State can show "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.*, 386 U.S. at 24. As the Supreme Court explained, "[t]he inquiry . . . is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error." *Id.*

It is perfectly clear that the "harmless error" finding in *Capano II* rested entirely on the court's belief that the inadmissible evidence did not prejudice Capano because "it [was] cumulative of the stipulated testimony." *Capano II*, 781 A.2d at 619 and n.175. Petitioner submits that the *Chapman* analysis undertaken in *Capano II* was "objectively unreasonable" because the *Chapman* inquiry does not turn on whether Capano was "prejudiced" by the erroneous admission of Fahey's out-of-court statements. Put another way, the inquiry under *Chapman* is whether the tainted evidence contributed to the guilty verdict irrespective of whether the untainted evidence, i.e. the "stipulated evidence" was sufficient to sustain the guilty verdict. This critical distinction was recognized by the court in *United States v. Lopez*, 340 F.3d 169 (3d Cir. 2003). In *Lopez*, the defendant, a prisoner, was charged with heroin possession after heroin was found concealed in his cell. No physical evidence or eyewitness testimony connected Lopez to the drugs, and his defense was that because the cells were open during the day, the drugs could have been hidden in his cell by any of the more than one hundred inmates on the cell block who had access to the cell. *Id.*, at 176. To rebut this defense, two prison guards testified that they searched Lopez's cell because they had "received information that Lopez was in possession of heroin," *id.* at 175, either on his person or in

---

[53] Capano agrees that Confrontation Clause errors are subject to *Chapman* harmless error analysis. See, *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986).

his cell. Lopez objected on hearsay grounds, and the district court ruled that the testimony was admissible as background explanation for the officers' conduct. *Id.* Lopez appealed his conviction and the Third Circuit Court of Appeals held that the testimony of the guards that they had "received information that Lopez was in possession of heroin" was inadmissible hearsay. *Id.*, at 171. The court then proceeded to address the Government's claim that the hearsay error was "harmless error":

> Having concluded that the District Court erred in overruling defense counsel's hearsay objection, we now inquire whether that error nevertheless was harmless. "The inquiry cannot be merely whether," notwithstanding the error, "there was enough to support the [conviction]." (internal citations omitted). Rather, "if one cannot say . . . that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected." In the case at bar, the government did introduce substantial evidence apart from the improperly admitted hearsay that Lopez possessed heroin, foremost among which was the fact that Lopez tested positive for morphine shortly after the heroin, which is broken down into morphine in the body, was discovered in his cell. **The dispositive question, however, is not whether, in the absence of the inadmissible hearsay evidence, the jury nevertheless could have convicted Lopez. Rather, the question is whether the improperly admitted statements may have helped to "cement" the government's case by adding an invisible, presumably disinterested witness" to corroborate the government's position.**[54]

If the Court of Appeals in *Lopez* had employed the "cumulative evidence" approach taken by the court in *Capano II*, the fact that Lopez had tested positive for heroin would no doubt have resulted in a conclusion that the erroneous admission of the prison guards' hearsay testimony was "harmless error." Petitioner submits that *Lopez* is relevant, if not controlling, authority for the proposition that the court in *Capano II* applied the *Chapman* standard in an "objectively unreasonable" manner. See, *Matteo*, 171 F.3d at 890 ("we do not believe federal habeas courts are precluded from considering the decisions of the inferior federal courts when evaluating whether the state court's application of the law was reasonable"); *Brown v. Folino*, 179 Fed. Appx. 845, 849 (3d Cir. 2006) ("Although federal court decisions below the Supreme Court level cannot serve as the legal benchmark against which to compare a state court's decision, our cases state that decisions of

---

[54] *Id.*, at 177.

other federal courts are relevant in ascertaining the reasonableness of a state court's application of Supreme Court precedent").

If the Delaware Supreme Court had employed the same approach employed by the court in *Lopez*, there is substantial reason to believe that Fahey's inadmissible hearsay statements had a powerful influence on the jury's verdict. While it was undisputed that Capano had disposed of Fahey's body (a fact he admitted to), there was no evidence whatsoever (apart from Capano's "accident evidence") to prove Capano's state of mind, let alone any evidence that Capano had "intentionally" killed Fahey. To fill that void, the State used Fahey's out-of-court statements that Capano was violently jealous of her relationship with Scanlan, and that Capano was "stalking" her, to convince the jury that Capano was prepared to exact retribution were she to break off their relationship. All told, fifteen prosecution witnesses repeated Fahey's hearsay statements to the jury and their testimony became the centerpiece of the State's case for intentional murder. These out-of-court statements cast Fahey as a sympathetic, emotionally fragile woman, who had endured a traumatic childhood only to be victimized by a "controlling, manipulative, insecure, jealous maniac,"[55] who she feared might kidnap her or worse. In the words of *Lopez*, Fahey's hearsay statements provided the "cement" that held together the State's theory of the case. In the closing argument, the jury was told by the State that the case was "about the defendant wanting to control others." (A-174). To support that claim, in the closing argument, the State emphasized the testimony of the witnesses who recounted inadmissible hearsay testimony that "[Capano had] come to [Fahey's] apartment, uninvited, and made his way into her house"; that he was bombarding her with "the large number of phone calls ... the large number of e-mails, appearing at times when she wasn't ready to greet him in a public place." (A-174). To undermine Capano's credibility concerning his relationship with Fahey, the State told the jury that "[Capano's] demeanor on the witness stand [was] consistent with the person that Fahey had described [in her out-of-court statements] to the psychotherapists and to her friends. (A-173).

---

[55] State's Ex. 18 (A-181).

-52-

The conclusion that the erroneous admission of the "fear" and "bad act" evidence influenced the jury's verdict and resulted in a fundamentally unfair trial is illustrated by the "kidnaping evidence." This "evidence" consisted of a friend's off-hand remark to Fahey ("gosh, you could get kidnaped"), which was then honed by Dr. Sullivan's leading questions to Fahey ("who would do that? Mr. Capano."), and then presented to the jury at trial through the testimony of Dr. Sullivan as proof that Capano was capable of such wrongdoing. See, *Capano II*, 781 A.2d 621 n. 198. This "kidnaping evidence" was then used by the State in its closing argument as proof that Capano intended to kidnap Fahey:

> Anne Marie point blank didn't go to Dr. Sullivan and say I believe Tom Capano is trying to kidnap me, [but] that is consistent with what Dr. Sullivan says about Anne Marie's general way of approaching issues ... [And] Dr. Sullivan asked Anne Marie on April 10th to contact the Attorney General's Office and report the harassment, the harassing phone calls ... [On] April 17 ... they again talk about the kidnaping issue ... and then, three days later, the defendant buys the cooler. I submit to you the timing is not an accident. Although we do not have the e-mail so we cannot directly show you harassing behavior on the part of the defendant in March and April, that is what Anne Marie was reporting to her psychologist. She is talking about a kidnaping.[56]

In sum, the State used the hearsay evidence in its closing to convince the jury that Capano was manipulative and controlling, and therefore capable of intentionally killing Fahey, because Fahey said so. *Cf.*, *Lopez*, 340 F.3d at 177 ("the government's emphatic invocation of the officers' [hearsay] testimony during closing argument could only have served to strengthen the jury's perception that the officers' 'information that Albert Lopez was in possession of heroin' was itself a datum in the construction of the government's substantive case").

Furthermore, Fahey's hearsay statements were not only the State's most powerful evidence - they were evidence that the defense was powerless to rebut or cross-examine. The erroneous admission of the "fear" statements in the State's case-in-chief and the acknowledged erroneous admission of the incidents of alleged "bad acts" by Capano, in combination, powerfully suggested

---

[56] (A-177).

to the jury the very inference that *Porter* was designed to avoid – that the jury would use Fahey's out-of-court statements of "fear" and of Capano's "bad acts" to conclude that Capano possessed the state of mind required to convict him of First Degree Murder.

It is inconceivable that this hearsay testimony did not sway the jury and undermine the fairness of the trial. See, *Brown*, 490 F.2d at 766 ("[T]he principal danger is that the jury...considered the victim's statement[s] of fear as somehow reflecting on the **defendant's state of mind rather than the victim's -- i.e., as a true indication of the defendant's intentions, actions, or culpability**") (emphasis added). It was but a short step for the jury to conclude, based on her hearsay statements, that when she was killed, Capano possessed the state of mind required to convict for First Degree Murder.

### III. THE PROSECUTION'S CROSS-EXAMINATION OF CAPANO CONCERNING POST-ARREST SILENCE VIOLATED HIS RIGHTS UNDER THE FIFTH AMENDMENT AND DEPRIVED HIM OF A FUNDAMENTALLY FAIR TRIAL

**Exhaustion of State Court Remedies and Procedural Bars to Relief**

In the direct appeal, Capano claimed that questions by the State during cross-examination concerning his silence at his bail hearing violated his due process rights. See, *Capano II*, 781 A.2d at 647. In its Answer, the State points to the fact that the defense did not object to the cross-examination at trial. Because there was no objection at trial, the State argues that the claim was procedurally defaulted in the state court, which precludes habeas review. (State's Answer, p. 25). Petitioner submits that the State's procedural default argument should be rejected.

In *Capano II*, the court correctly noted that because the above claim was not presented to the trial court, "we review this claim for plain error." *Id.*, at 647. In general, under state procedural rules, the failure to "fairly present" a claim to the trial court ordinarily will result in a waiver of that claim on direct appeal. See, *Delaware Supreme Court Rule* 8; *Monroe v. State*, 652 A.2d 560, 563 (Del. 1995) ("a claim of insufficiency of evidence is reviewable only if the defendant first presented it to the trial court"). However, *Supreme Court Rule 8* also contains an "escape clause," to wit: "provided, however, that when the interests of justice so require, the court may consider and determine any question not so presented." Rule 8's "escape clause" has been interpreted to allow the Delaware Supreme Court to "**excuse a waiver**...i**f it finds that the trial court committed plain error requiring review in the interests of justice**. *Monroe*, 652 A.2d at 563 (emphasis added). Furthermore, Rule 8's "escape clause" has been consistently applied to allow for review on the merits of "claims of error implicating basic constitutional rights of a defendant...notwithstanding their nonassertion at trial. *Wainwright v. State*, 504 A.2d 1096, 1100 (Del. 1986). That is precisely what occurred in Capano's direct appeal. Even though the cross-examination claim was not presented to

the trial court, it is clear from the court's review and discussion of the claim that the claim was nevertheless reviewed on the merits in the direct appeal. See, *Capano II*, 781 A.2d at 647-649.

The State's "procedural default" argument would be correct if the Delaware Supreme Court had simply invoked *Rule 8* and declined to review the claim on the merits. Conversely, there is no procedural default if the state court "waives the waiver rule" and actually hears and decides the issue on the merits. In *Harris v. Reed*, 489 U.S. 255, 263 (1989) the Supreme Court established a "plain statement" rule that there would be no procedural default, for purposes of federal habeas review, unless "the last state court rendering judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar." *Harris*'s "plain statement rule" was subsequently explained in *Coleman v. Thompson*, 501 U.S. 722, 735 (1991):

> In habeas, if the decision of the last state court to which the petitioner presented his federal claims fairly appeared to rest primarily on resolution of those claims, or to be interwoven with those claims, and did not clearly and expressly rely on an independent and adequate state ground, a federal court may address the petition.

The procedural default rules established in *Harris* and *Coleman* were explained by the Court of Appeals in *Villot v. Varner*, 373 F.3d 327, 336 (3d Cir. 2004):

> Thus, if the [state court] had barred review of some or all of Villot's claims on the basis of [a procedural default] rather than, or in addition to, its ruling based on [the merits of the claim], it could be argued that the procedurally barred claims were defaulted for purposes of federal habeas review. However, **"a federal claimant's procedural default precludes federal habeas review . . . only if the last state court rendering a judgment in the case rests its judgment on the procedural default."** *Harris v. Reed*, 489 U.S. 255 (1989) (emphasis added). **If the state court does not actually enforce the procedural rule in question, the "federal court implies no disrespect for the state by entertaining the claim."** *County Court of Ulster County, N.Y. v. Allen*, 442 U.S. 140, 154 (1979); see also *Smith v. Freeman*, 892 F.2d 331, 336 (3d Cir. 1989) (relying on *Harris* and *Ulster* to hold that a claim was not procedurally barred under a certain state procedural rule where the Pennsylvania courts did not rely on this rule and addressed the merits of the petition instead).

(emphasis added).

-56-

In this case, it is clear from the face of the court's decision in *Capano II*, that the Delaware Supreme Court did not invoke *Rule 8*, let alone base its decision on *Rule 8*. Therefore, based on the holding in *Villot*, the court should reject the State's procedural default claim.

### Entitlement to Relief Under 28 U.S.C. §2254: Unreasonable Application of Clearly Established Federal Law

Capano acknowledges that he is entitled to habeas relief only if he can establish that the Delaware Supreme Court's rejection of his improper cross-examination claim was either contrary to, or involved an objectively unreasonable application of clearly established federal law. See, *Williams v. Taylor, supra*, 529 U.S. at 405-409 (O'Connor, J., concurring) (controlling opinion); *Matteo v. Superintendent, SCI Albion, supra,* 171 F.3d at 888-891 (accord).

### The Fifth Amendment Privilege: Prosecution Questions and Comment on Post-Arrest Silence

The right to remain silent, guaranteed under the Fifth Amendment, attaches before the institution of formal criminal proceedings and is not limited to persons in custody or charged with a crime. *U.S. Const. Amend. V* ("No person shall...be compelled in any criminal case to be a witness against himself"); *Kastigar v. United States*, 406 U.S. 441, 444-445 (1972) (the privilege "can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory..."). Clearly, the privilege can be asserted by a suspect who is questioned by police during the investigation of a crime. *Miranda v. Arizona*, 384 U.S. 436, 467-468 (1966).

In *Griffin v. California*, 380 U.S. 609, 613-614 (1965), the Court held that the Fifth Amendment was violated by prosecution arguments that the jury could draw an inference that the defendant was guilty from his decision to exercise his Fifth Amendment right not to testify at his trial. In *Doyle v. Ohio*, 426 U.S. 610, 616-617 (1976), the Court held that a prosecutor could not impeach a defendant's exculpatory story, brought out for the first time at trial, by cross-examining the defendant about his failure to have told that story to the police after he had received *Miranda* warnings:

> The warnings mandated by [*Miranda*] require that a person taken into custody be advised immediately that he has a right to remain

> silent....Silence in the wake of these warnings is insolubly
> ambiguous...In such circumstances, it would be fundamentally unfair
> and a deprivation of due process to allow the arrested person's silence
> to be used to impeach an explanation subsequently offered at trial.

*Id*; *Brecht v. Abrahamson*, *supra,* 507 U.S. at 628 (the rule in *Doyle* "rests on the fundamental

unfairness of implicitly assuring a suspect that his silence will not be used against him and then using

his silence to impeach an explanation subsequently offered at trial").

In *Jenkins v. Anderson*, 447 U.S. 231 (1980), the Court held that *Doyle* does not bar the State

from using a defendant's pre-arrest, pre-Miranda silence to impeach a defendant's trial testimony.

In *Jenkins*, the defendant, after allegedly murdering the victim, left the scene and was not arrested

until he turned himself in to the police two weeks later. Taking the stand at his trial, the defendant

claimed that he had stabbed the victim in self-defense, a story he had not previously told the police.

During cross-examination and in the closing statement, the prosecutor used the defendant's silence

between the time of the murder and his arrest to impeach the defendant's credibility. The prosecutor

argued if the defendant acted in self-defense, then why didn't he tell his exculpatory story earlier?

*Id*,. 100 S.Ct. 2126-2127. In affirming his conviction, the Court held that *Doyle* does not bar the

State from using a defendant's pre-arrest, pre-Miranda silence to impeach a defendant's trial

testimony. In explaining why *Doyle* did not apply in that situation, the Court stated:

> In this case, no governmental action induced
> petitioner to remain silent before arrest. The failure to
> speak occurred before petitioner was taken into
> custody and given Miranda warnings. Consequently,
> the fundamental unfairness present in *Doyle* is not
> present in this case. We hold that impeachment by
> use of pre-arrest silence does not violate the
> Fourteenth Amendment.

*Id*., at 2130. *Jenkins*, however, addressed only the use pre-arrest, pre-Miranda silence **for**

**impeachment purposes**. The Court specifically declined to rule on the constitutionality of the use

of such silence as substantive evidence of guilt. *Id*., at 2128 n.2 ("Our decision today does not

consider whether or under what circumstances pre-arrest silence may be protected by the Fifth

Amendment"). Although *Griffin* itself did not specifically address the substantive use of pre-arrest

silence, a logical extension of *Griffin* would bar a prosecutor from commenting on a defendant's decision to remain silent whenever such comment could penalize the defendant for exercising his Fifth Amendment right. Thus, relying on *Griffin*, the First, Seventh and Tenth Circuits have held that prosecution comment on pre-arrest silence violates *Griffin*. See, *Coppola v. Powell*, 878 F.2d 1562, 1565-1568 (1st Cir.), *cert. denied,* 493 U.S. 969 (1989) (citing *Griffin* and explaining that the admission in evidence of the defendant's refusal to answer police questions prior to arrest "is essentially the same as those addressed in cases defining the boundaries for prosecution comment on a defendant's exercise of his Fifth Amendment privilege"); *United States ex rel. Savory v. Lane*, 832 F.2d 1011, 1017 (7th Cir. 1987) (explaining that *Griffin* "applies equally to a defendant's silence before trial, and indeed, even before arrest"); *United States v. Burson*, 952 F.2d 1196, 1200-1201 (10th Cir. 1991), *cert. denied,* 503 U.S. 997 (1992) (citing *Griffin* to prohibit substantive use of pre-arrest silence by defendant when questioned by IRS criminal investigators).

### The Ruling in *Capano II* on the *Doyle* Claim:
### An Objectively Unreasonable Application of *Doyle*

During Capano's cross-examination, the following colloquy took place:

> Q. And then, February 27, 1998, after you get arrested, Debbie MacIntyre signs a cooperation agreement with the Government, right?
>
> A. Yes she does. I didn't hear the date you said.

* * * *

> Q. **You kept quiet at the bail hearing which preceded this, right? There was a bail hearing in February to decide whether you would stay in jail. You never said she did it, right?**
>
> A. I never testified.
>
> Q. **But you never said it through any means. You never told your attorneys, you never did anything?**
>
> A. No, I was true to my word. I was protecting her.
>
> Q. You were protecting her. February 27th, she signs a cooperation agreement with the State?
>
> A. Yes.

Q. And you're in jail?

A. Yes.

Q. You have -- according to your testimony, it's been horrible conditions that you've endured in jail, right?

A. Very terrible.

(A-164) (emphasis added).[57]

In *Capano II*, the court concluded that the above colloquy did not amount to a *Doyle* violation because "the questioning excerpted above does not run afoul of *Doyle* because it did not 'impeach the exculpatory story.'" *Id.*, at 648. That application of *Doyle* is objectively unreasonable.

The authorities cited above suggest that the following rules are applicable in cases where a defendant is questioned on cross-examination concerning either pre-arrest **or** post-arrest silence: (1) although *Doyle* is not applicable in pre-arrest silence situations, *Griffin* is applicable if "governmental action induced petitioner to remain silent before arrest." *Jenkins*, 100 S.Ct. at 2130; (2) a defendant may be cross-examined concerning either pre-arrest **or** post-arrest silence if the silence is used to **impeach** the defendant's trial testimony, and not to infer or suggest that such silence was a sign of guilt. See, *Jenkins*, 100 S.Ct. at 2128 n.2 and 2129 (concluding that Fifth Amendment is not violated by he use of pre-arrest silence to impeach a defendant's credibility, but declining to decide whether pre-arrest silence may be used as substantive evidence of guilt).

In this case, as noted above, the State was permitted to cross-examine Capano about pre-arrest, pre-Miranda silence **and** post-arrest, post-indictment silence. In those instances, described below, where the questions related to pre-arrest silence, defendant submits that *Griffin* is directly applicable. Furthermore, in this case, in contrast to *Jenkins*, there was "governmental action [which] induced [Capano] to remain silent before arrest." Within weeks after Fahey disappeared, Capano was formally notified that he was a "target" of the federal grand jury's inquiry into her disappearance. See, *State v. Capano*, 1998 Del. Super. LEXIS 377 *1-*2. Furthermore, as early as

---

[57] The above colloquy is also reproduced in *Capano II* at p. 648.

July, 1996, the police were informed by Capano's attorneys that they should not attempt to question him.[58] Thus, like the defendants in *Coppola, Savory* and *Burson*, Capano had affirmatively made a **pre-arrest** assertion of his Fifth Amendment rights.

In *Hassine v. Zimmerman*, 160 F.3d 941, 948-949 (3d Cir. 1998), the court found that the prosecutor's cross-examination of the defendant concerning his post-arrest silence violated *Doyle* and rejected the State's argument that the questioning was proper under *Doyle*'s "footnote 11" exception:

> The *Doyle* footnote applies when a witness testifies on the stand to a version of events and indicates that he previously **told** that version to law enforcement. The government can then pursue its position that the story was not previously **told**, and may bring out on cross-examination the fact that the defendant was silent following arrest.
>
> * * * *
>
> In the present case, rather than simply asking Hassine if he had told his story to the police after arrest, the prosecutor asked incredulously: "you sat for seven months in prison with the knowledge of what was really involved in regard to the gun, and you just kept it to yourself, because your attorney said to keep it to yourself?" We believe questions like this clearly invite the jury - in violation of *Doyle* - to reject Hassine's story and to infer that Hassine's post arrest silence was a sign of his guilt.

The distinction between a prosecutor's use of a defendant's post-arrest silence to impeach his credibility (which is permissible),[59] and the use of such silence to infer guilt (which violates the Fifth Amendment) is subtle, but real. In *Pitts v. Anderson*, 122 F.3d 275, 280 (5th Cir. 1997), a case involving an alleged *Doyle* violation, that distinction was parsed as follows:

> Where prosecutorial comments are "designed to draw meaning from silence," *Anderson v. Charles*, 447 U.S. at 409, they remain subject to the rule in *Doyle*. In other words, prosecutorial statements that are

---

[58] See, Defendant's Ex. 103 ((A187-A188); State's Ex. 255 (A189-A191).

[59] See, *Anderson v. Charles*, 447 U.S. 404, 408 (1980) (per curiam).

either intended to or have the necessary effect of raising a negative inference simply because of a defendant's exercise of his right to remain silent are prohibited. However, where prosecutor's questions and comments are aimed at eliciting an explanation for an arguably prior inconsistent statement, no *Doyle* violation occurs.

The questions put to Capano concerning his post-arrest silence were clearly not designed to impeach Capano's "accident evidence." The questions were a direct comment on Capano's exercise of of his Fifth Amendment privilege. In fact, the colloquy in this case is a virtual carbon copy of the *Doyle* violation found in *Hassine*. Therefore, the court should conclude that the application of *Doyle* by the court in *Capano II* was "objectively unreasonable."

In *Capano II*, the court alternatively held that "even assuming there was a *Doyle* violation, permitting the isolated questioning was not plain error." *Id.*, at 649. The court concluded that Capano could not have been prejudiced by "two isolated references to Capano's failure to speak at a bail hearing," *id*, because "his **pre-arrest** silence and his persistent efforts to conceal her death and hide his involvement were central issues before the jury." *Id.* The court's rationale here is puzzling. If Capano's silence, whether pre-arrest or post arrest, was a "central issue," then how is it possible that questioning which clearly violated Capano's Fifth Amendment privilege and which clearly was designed to infer guilt from his silence could be anything but highly prejudicial to Capano's right to a fair trial?

## Conclusion

For the reasons set forth herein, the Court should conclude that Petitioner is entitled to habeas relief. The Court should vacate the defendant's conviction and direct that the State of Delaware either grant the Petitioner a new trial or release the Petitioner from custody.

                    /s/ Joseph M. Bernstein
JOSEPH M. BERNSTEIN (#780)
800 N. King Street - Suite 302
Wilmington, DE 19801
302-656-9850
302-656-9836 (Fax)
E-mail: jmbern001@comcast.net
Attorney for Petitioner

Dated: February 20, 2007

## CERTIFICATE OF SERVICE

I hereby certify that on February 20, 2007, I electronically filed the foregoing Petitioner's Opening Brief in Support of Petition for Habeas Corpus with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

> Loren C. Meyers, Esquire
> Elizabeth R. McFarlan, Esquire
> Department of Justice
> 820 N. French Street
> Wilmington, DE 19801

> */ s/ Joseph M. Bernstein*
> JOSEPH M. BERNSTEIN (Bar #780)
> 800 N. King Street - Suite 302
> Wilmington, DE 19801
> 302-656-9850
> E-mail: jmbern001@comcast.net