# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **THOMAS J. CAPANO,** | : |
| Petitioner, | : |
| | : |
| v. | : Civil Action No. 06-58 *** |
| | : |
| **THOMAS CARROLL**, Warden, *et al.,* | : |
| Respondent. | : |

**APPENDIX OF UNREPORTED CASES CITED IN
PETITIONER'S OPENING BRIEF
IN SUPPORT OF PETITION FOR HABEAS CORPUS**

JOSEPH M. BERNSTEIN (DE Bar #780)
800 N. King Street - Suite 302
Wilmington, DE 19801
302-656-9850
302-656-9836 (Fax)
E-mail: jmbern001@comcast.net
Attorney for Petitioner

Dated: February 20, 2007

# TABLE OF CONTENTS

Tab #

*Colon v. State*, 1994 Del. LEXIS 326 (Del. 1994)   1

*Smith v. State*, 1996 Del. LEXIS 330 (Del. 1996)   2

*State v. Capano*, 1998 Del. Super. LEXIS 377 (Del. Super. 1998)   3

*State v. Capano,* 1998 Del. Super. LEXIS 319 (Del. Super. 1998)   4

*State v. Capano*, 1999 Del. Super. LEXIS 541 (Del. Super. 1999)   5

*State v. Capano*, 2005 Del. Super. LEXIS 69 (Del. Super. 2005)   6

*State v. Magner*, 1997 Del. Super. LEXIS 45 (Del. Super. 1997)   7

**TAB #1**

SANTO A. COLON, Defendant Below, Appellant, v. STATE OF DELAWARE, Plaintiff Below, Appellee.

No. 374, 1993

SUPREME COURT OF DELAWARE

*1994 Del. LEXIS 326*

August 9, 1994, Submitted
October 27, 1994, Decided

NOTICE: [*1] THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION IN THE PERMANENT LAW REPORTS. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

PRIOR HISTORY:

Court Below: Superior Court of the State of Delaware in and for New Castle County, Cr.A. No. IN92-09-0809

DISPOSITION:

AFFIRMED.

JUDGES: Before WALSH, HOLLAND and BERGER, Justices.

OPINION BY: BY THE COURT; CAROLYN BERGER

OPINION:

ORDER

This 27th day of October, 1994, upon consideration of the briefs of the parties, it appears that:

1. Appellant, Santo A. Colon ("Colon"), was convicted of criminally negligent homicide and leaving the scene of a fatal accident. In this appeal, he argues that his conviction on the first charge should be overturned because: (i) the evidence was insufficient as a matter law; (ii) a witness's testimony as to the speed of Colon's vehicle at the time of the accident was improperly admitted; (iii) the trial court erred in giving a flight instruction to the jury; and (iv) the State failed to establish that the person who was killed in the accident was the victim named in the indictment.

2. During the early morning hours of June 22, 1992, Deborah DeSanto ("DeSanto") was a passenger in a vehicle driven by her friend, David Bond ("Bond"). While traveling south on [*2] Interstate 95 near the Marsh Road exit in Delaware, Bond lost control of the vehicle, hit the guardrail and flipped the vehicle over on its roof. DeSanto was thrown from the vehicle and came to rest approximately 144 feet north of the vehicle in the right lane of the highway. She was still alive. The drivers of several trucks and passenger cars that approached the accident scene slowed down and avoided hitting DeSanto. Colon, who was driving a pickup truck, did not slow down. He ran over DeSanto, hit Bond's overturned vehicle and continued south on Interstate 95. Colon was apprehended by the police after another driver followed Colon off the highway and took down his license plate number.

3. A jury verdict will not be overturned if any rational trier of fact could have the found essential elements of the crime beyond a reasonable doubt. *Williams v. State, Del. Supr., 539 A.2d 164, 168, cert. denied, 488 U.S. 969, 102 L. Ed. 2d 536, 109 S. Ct. 500 (1988).* The State was required to prove that Colon, with criminal negligence, caused the death of DeSanto. *11 Del. C. § 631.* Criminal negligence is [*3] defined as follows:

A person acts with criminal negligence with respect to an element of an offense when he fails to perceive a risk that the element exists or will result from his conduct. The risk must be of such a nature and degree that failure to perceive it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation.

*11 Del. C. § 231(d).* At the time Colon approached the accident scene, two trucks with flashers on were stopped on the shoulder; two vehicles were stopped in the road (Bond's overturned vehicle and another that hit Bond's vehicle after it was disabled); three men, two of whom carried flares, were walking in the road; and DeSanto was lying in the road.

Evidence was presented that other drivers slowed down to speeds of 5 to 20 miles per hour as they approached the accident scene and that all the other drivers were able to avoid hitting DeSanto. There also was evidence that Colon was traveling at or above the speed limit when his pickup ran over DeSanto. From this evidence, the jury could have concluded that Colon's failure to slow down at the accident scene created a risk that someone would be killed and **[*4]** that his failure to recognize that risk constituted a gross deviation from the reasonable person standard.

4. Colon also argues that the Superior Court erred in allowing an eyewitness, George Compton ("Compton"), to estimate that Colon was traveling at about 80 miles per hour at the time his pickup struck DeSanto. Opinion testimony by lay witnesses is permitted pursuant to D.R.E. 701 when:

> (1) The witness cannot readily, and with equal accuracy and adequacy, communicate what he has perceived to the trier of fact without testifying in terms of inferences or opinions, and his use of inferences or opinions will not mislead the trier of fact to the prejudice of the objecting party; and

> (2) The opinions and inferences do not require a special knowledge, skill, experience or training.

The official Comment to this Rule uses a nonexpert's opinion as to the speed of an automobile as an example of the type of opinion testimony that would be admissible under D.R.E. 701. We agree that lay opinions on this subject may be admissible and we find no abuse of discretion in the trial judge's decision to allow Compton's testimony in this case.

5. Colon next argues that the Superior Court erred **[*5]** in instructing the jury that it could use his flight from the accident scene as evidence of his consciousness of guilt. Colon contends that the instruction was improper because he was charged with a negligent, not an intentional, crime. That logic is flawed. The general rule is that evidence of flight can be used in a criminal prosecution to establish consciousness of guilt. *Johnson v. State, Del. Supr., 312 A.2d 630 (1973); Crawford v. State, Del. Supr., 245 A.2d 791(1968).* While it is true that Colon's flight cannot be used to establish his state of mind prior to the time of impact, his flight after hitting DeSanto reasonably could be interpreted as consciousness of guilt regardless of the mens rea required for the crime. Accordingly, the jury instruction was appropriate.

6. Colon's last argument is that the State failed to establish that the person killed in the accident was the victim named in the indictment. Colon did not raise this objection at trial and, after carefull review of the record, we conclude that there was no plain error. *Wainwright v. State, Del. Supr., 504 A.2d 1096, 1100,* **[*6]** cert. denied, *479 U.S. 869 (1986).*

NOW, THEREFORE, IT IS ORDERED that the decision of the Superior Court, be and the same hereby is,

AFFIRMED.

BY THE COURT:

Carolyn Berger

Justice



**TAB #2**

**DAVID D. SMITH, Defendant Below, Appellant, v. STATE OF DELAWARE, Plaintiff Below, Appellee.**

**No. 38, 1996**

**SUPREME COURT OF DELAWARE**

*1996 Del. LEXIS 330*

**August 6, 1996, Submitted**
**September 19, 1996, Decided**

**SUBSEQUENT HISTORY:** [*1]
Released For Publication October 7, 1996.

**PRIOR HISTORY:**

Court Below: Superior Court of the State of Delaware in and for Kent County. Cr. A. Nos IK95-05-0002 and -0003.

**DISPOSITION:**

AFFIRMED.

**JUDGES:** Before VEASEY, Chief Justice, WALSH and HOLLAND, Justices.

**OPINION BY:** E. Norman Veasey

**OPINION:**

**ORDER**

This 19th day of September 1996, upon consideration of the briefs of the parties, it appears to the Court that:

(1) Following a jury trial, defendant below-appellant David Smith ("Smith") was found guilty of assault in the first degree, the lesser included offense for the charge of attempted murder in the first degree, and possession of a deadly weapon during the commission of a felony. Smith appealed the verdict, contending that the Superior Court abused its discretion by denying Smith's request for a jury instruction on assault in the second degree, which Smith claims to be a lesser included offense to attempted murder in the first degree under the facts of this case. Those facts are as follows:

(2) On March 30, 1995, Officers Donald Proctor and Nick Berna responded to a report of domestic violence at the residence [*2] of Smith's father, where Smith was living with his girlfriend, Ethel Clark ("Clark"). Proctor testified that when the officers arrived, they were unable to enter the bedroom because the door was locked. When Smith's father opened the door with a key, the officers discovered that a dresser blocked the doorway. Once they pushed the dresser aside, they found Clark lying on the bed with Smith straddled on top of her. Proctor then testified that he saw "an enormous amount of blood and an open gash on the victim's neck." The officers did not immediately observe a knife, but as they escorted Smith out of the residence, the officer testified that a small penknife fell from Smith's clothing.

(3) Clark was treated at Kent General Hospital by Dr. Hamilton Carter. Dr. Carter testified that he treated three wounds to Clark's throat and a fourth laceration on the jaw. The wounds were sutured with twenty-six stitches. Dr. Carter also testified that none of the wounds was life threatening since they were shallow and pierced only the outer tissue. Furthermore, he stated that if full force had been applied, the wounds would have been deeper, but these types of neck wounds always must be taken seriously [*3] as they can be life threatening due to the location of the veins and arteries in that area.

(4) Clark testified at trial that she and Smith were arguing in the bedroom that night; that when she informed Smith that she wanted to leave, he locked the door and placed a dresser in front of it; that Smith then threatened to kill her, whereupon he took the knife out of her pocketbook and stabbed her; and that she was unaware that there was a baseball bat in the room during the argument.

(5) Smith testified at trial that he and Clark were arguing that night; that he and Clark were intoxicated both during the argument and the events following; that during the argument, Clark picked up a bat and swung it at him; that when Smith blocked the bat, Clark pulled out a knife; and that Smith then threw Clark on the bed and tried to get the knife, during which struggle he cut her neck.

(6) Once at the Delaware Correctional Center, Smith's hand, which was swollen from a blow from the bat, was treated by a nurse. The baseball bat, which was admitted into evidence, had been located in the bedroom by Smith's father. During trial, evidence was also admitted that Clark had previously attacked another [*4] woman with a knife.

(7) We hold that the Superior Court did not abuse its discretion in failing to instruct the jury on assault in the second degree. There was no rational basis in the evidence for acquitting Smith of assault in the first degree and convicting him of assault in the second degree. Thus, the decision by the Superior Court does not constitute reversible error.

(8) A refusal to give jury instructions as

requested by the defendant is within the sound discretion of the trial court. *See Atkins v. State, Del. Supr., 523 A.2d 539, 549 (1987).* This decision may be reversed only if there was an abuse of discretion unless the failure to give an instruction violated the defendant's unqualified right to a correct statement of the law. See *id.*

(9) The Superior Court charged the jury on first degree assault, defined in *11 Del. C. § 613(a).* n1 Smith claims, however, that the jury should have also been instructed on the charge of second degree assault, defined in *11 Del. C. § 612(a),* because he acted recklessly rather than intentionally. n2 Smith argues that the evidence in this case supports a finding that his actions did not create a substantial risk of death **[*5]** to Clark. Thus, he claims that the jury was unable properly to weigh the evidence because they were unable to consider whether the assault resulted solely in a physical injury resulting from reckless conduct.

> n1 The relevant language of *11 Del. C. § 613(a)* follows:
>
> (a) A person is guilty of assault in the first degree when:
>
> (1) The person intentionally causes serious physical injury to another person by means of a deadly weapon or a dangerous instrument; or
>
> * * *
>
> (3) The person recklessly engages in conduct which creates a substantial risk of death to another person, and thereby causes serious physical injury to another person.

> n2 The relevant language of *11 Del. C. § 612(a)* follows:
>
> (a) A person is guilty of assault in the second degree when:
>
> (1) The person recklessly or intentionally causes serious physical injury to another person; or
>
> (2) The person recklessly or intentionally cause physical injury to another person by

means of a deadly weapon or a dangerous instrument.

**[*6]**

(10) "The court is not obligated to charge the jury with respect to an included offense unless there is a rational basis in the evidence for a verdict acquitting the defendant of the offense charged and convicting the defendant of the included offense." *11 Del. C. § 206(c); see Webb v. State, Del. Supr., 663 A.2d 452, 462-63 (1995); Slater v. State, Del. Supr., 606 A.2d 1334, 1338 (1992); Dutton v. State, Del. Supr., 452 A.2d 127, 146 (1982).* The weight of the evidence is for the jury to decide, and thus a defendant is entitled to an instruction on a lesser crime if the evidence sufficiently supports either conclusion. *Ward v. State, Del. Supr., 575 A.2d 1156, 1159 (1990); see Gates v. State, Del. Supr., 424 A.2d 18, 21-22 (1980).* Nevertheless, if "there is no rational evidence supporting the defense theory, no instruction is required." *Goddard v. State, D.C. App., 557 A.2d 1315, 1316 (1989)* (citing *Bowler v. United States, D.C. App., 480 A.2d 678, 682 n.8 (1984)).* Furthermore, if the evidence overlaps, instead of being mutually exclusive, a claim of error in failing to charge the jury with a lesser offense will fail. *Webb v. State, 663 A.2d at* **[*7]** *463.*

(11) The only difference between a charge of first degree assault and second degree assault is the "magnitude of the risk of harm, the former requiring proof of substantial risk of death whereas the latter requires only proof of a substantial risk of physical injury." *Oney v. State, Del. Supr., 397 A.2d 1374, 1376 (1979).* Thus, in the case at bar, it must be determined whether there is a rational basis to conclude that the actions of Smith constituted no substantial risk of death to Clark. If there is no such rational basis, the failure to render instructions in the charge of second degree assault is not error.

(12) In the case at bar, the jury was properly instructed on finding Smith guilty of first degree assault only if a substantial risk of death was created by his actions. The jury convicted Smith of first degree assault despite the conflicting testimony of Smith and Clark. During trial, Smith claimed that he was acting in self-defense against Clark's actions and then accidentally slit her throat. Smith also argues that the wounds were inflicted without full force, with a weapon that cannot pose a substantial risk of death. Dr. Carter testified that the wounds suffered **[*8]** by Clark were not life threatening, but also stated that any wounds to the neck have the potential of being fatal. Thus, even if Smith acted recklessly, his conviction of first degree assault must stand as the jury determined

that a substantial risk of death resulted from his actions.

(13) The State argues that even if this Court determines that evidence supports a finding of an absence of a substantial risk of death by Smith's action, the decision of the trial court is still not reversible since there is no rational basis for concluding that Smith acted recklessly. The State asserts that the jury was instructed on the defenses of justification or, in the alternative, an accident defense. Courts have determined that self-defense and accident defenses are contradictory to reckless conduct. In *State v. Miller, Mo. App., 772 S.W.2d 782, 784 (1989),* the court determined that in self-defense there is no justification of a reckless handling of a weapon. Furthermore, if an act is done recklessly, it cannot be due to an accident. *Id. at 785.* Thus, in the case at bar, Smith fails to establish a rational basis for reckless conduct because this argument is in contradiction to the defenses **[*9]** on which the jury was instructed. Without a rational basis for Smith's theory, the Superior Court properly refused the instruction on second degree assault.

(14) Smith failed to establish a defense of reckless conduct during trial and thus the Superior Court was not required to instruct the jury that Smith's acts may be determined to be intentional or reckless. Thus, even if Smith did not create a substantial risk of death by his actions, as it was not established that Smith acted recklessly, the Superior Court did not err in refusing to instruct the jury on second degree assault.

NOW, THEREFORE, IT IS HEREBY ORDERED that the judgment of the Superior Court be, and the same hereby is,

AFFIRMED.

BY THE COURT:

E. Norman Veasey

Chief Justice

**TAB #3**

**STATE OF DELAWARE v. THOMAS J. CAPANO, DEF. ID # 9711006198**

**CRIMINAL ACTION NO. IN97-11-0720**

**SUPERIOR COURT OF DELAWARE, NEW CASTLE**

*1998 Del. Super. LEXIS 377*

**July 31, 1998, Date Submitted**
**September 21, 1998, Date Decided**

**SUBSEQUENT HISTORY: [*1]**

Released for Publication by the Court October 20, 1998.

**DISPOSITION:**

Motion to Suppress Time-Line Document Denied.

**COUNSEL:** Ferris W. Wharton, Esquire, Department of Justice, Wilmington, Delaware and Colm F. Connolly, Esquire, U.S. Attorney's Office, Wilmington, Delaware, Attorneys for the State.

Eugene J. Maurer, Jr., Esquire, Eugene J. Maurer, Jr., P.A., Wilmington, Delaware; Charles M. Oberly III, Esquire, Oberly, Jennings & Drexler, P.A., Wilmington, Delaware; Joseph S. Oteri, Esquire, Boston, Massachusetts; and John F. O'Donnell, Esquire, Fort Lauderdale, Florida, Attorneys for the Defendant.

**JUDGES:** LEE, J.

**OPINION BY:** LEE

**OPINION:**

MEMORANDUM OPINION

LEE, J.

Pending in this prosecution of defendant Thomas Capano ("defendant") on the charge of murder in the first degree is a motion to suppress as evidence the time-line document which the United States Government seized on or about November 4, 1996 ("motion to suppress"). Defendant and the State of Delaware ("the State") have submitted memoranda in support of their respective positions regarding the motion to suppress. This constitutes my decision thereon.

FACTS

In July, 1996, the United States Attorney's Office for the District of Delaware [*2] began a federal Grand Jury kidnapping investigation into the disappearance of Anne Marie Fahey ("Fahey") who was last seen alive on June 27, 1996. The investigation concluded on November 12, 1997, when the State arrested defendant on the charge of murder in the first degree.

On June 30, 1996, defendant learned he was a suspect in connection with Fahey's disappearance, and he retained Charles M. Oberly, III, Esquire as his lawyer at that time. Defendant is a lawyer himself. He was admitted to the Delaware Bar on March 11, 1975, and he has held jobs as a State prosecutor, City Solicitor for the City of Wilmington, legal counsel for the Governor, and a partner of a major Philadelphia law firm. It was while he was a partner of this law firm that the facts pertinent to this motion occurred.

After his retention, defendant's attorney instructed defendant "to start preparing a time-line of everything he could remember concerning his whereabouts on June 27, 1996, and immediately thereafter." Affidavit of Charles M. Oberly, III, Esquire, dated March 14, 1997, at para. 4. The "purpose in directing the compilation of the aforesaid information was to assist [Mr. Oberly] in providing Mr. Capano [*3] with the legal representation in any future proceedings." Id.

On July 10, 1996, defendant and his attorneys met with J. Clayton Undercofler, Esquire, the current chairman of defendant's law firm. At the beginning of the meeting, the chairman "informed Mr. Capano and his lawyers that because the firm did not represent Mr. Capano, any communications were not privileged or otherwise covered by an attorney-client relationship." Affidavit of J. Clayton Undercofler, Esquire, dated May 1, 1997, at para. 2.

Defendant maintains that in July, 1996, he compiled the information his attorney requested on several sheets of legal paper. n1 Defendant placed some of those documents in a file located at his law office. Because of his concern that, due to intense media interest, someone might go through his office, defendant placed his file in the office of Timothy A. Frey, Esquire, a law partner. Defendant

states in paragraph 5 of his affidavit:

> Mr. Frey was unaware I had placed the file on and among files on his shelves until I advised him of the fact sometime during the month of August or September, 1996. When I spoke with Mr. Frey I advised him that I had placed a confidential file **[*4]** in his office on his shelves so as to keep it from anyone who might enter my office. My [sic] Frey was advised the documents were confidential and were for my attorneys. I did not authorize Mr. Frey to review or disclose the contents of the file.

> n1 Defendant's affidavit dated March 13, 1997 has been submitted in connection with this motion.

Mr. Frey's recollection of events concerning the file differs from that of defendant. Mr. Frey asserts that sometime in July, 1996, defendant told him that if he "saw in [his] office a file which [he] did not recognize, [he] was not to destroy the file or throw it out." Affidavit of Timothy A. Frey, Esquire, dated May 2, 1997, at para. 6. He further asserts:

> I gave Capano a quizzical look to suggest I found his statement odd. In response to my facial expression, Capano said that he was concerned that the media could look at the contents of the file. Capano did not tell me what was in the file; nor did he tell me that the file contained confidential **[*5]** or privileged information. Capano never told me not to look at the contents of the file.

Id. According to Mr. Frey, in July or August, 1996, he saw a noticeable file on a bookshelf in his office. He removed the file, and he saw it contained handwritten notes on white, lined paper. He read through the notes, placed them back in the file, and returned the file to the shelf. He assumed defendant had made the notes and the notes related to Fahey's disappearance; he based these assumptions upon the July conversation he had had with defendant. The notes remained in Mr. Frey's office until November 4, 1996. During this period of time, Mr. Frey never locked the door to the office, and every employee in the firm had access to his office.

On August 5, 1996, the United States Attorney's Office informed defendant he was a target of the investigation.

On November 4, 1996, Assistant United States Attorney Colm F. Connolly called Mr. Undercofler and asked him if he was aware that Mr. Frey possessed a file that defendant had given to him. Mr. Undercofler said that Mr. Frey had described the file to him. Mr. Connolly told Mr. Undercofler that a grand jury subpoena was being issued for **[*6]** the file, the file should be considered under subpoena, and he should tell Mr. Frey that any disposal of the file could be considered an obstruction of justice. Mr. Undercofler was concerned that the documents might contain information regarding the firm's clients. Mr. Connolly and Mr. Undercofler agreed that the firm would produce the file under seal, and firm representatives would screen them for any information relating to the representation of clients before the government reviewed them. Mr. Undercofler called Mr. Frey and told him the substance of his conversation with the government. Mr. Connolly thereafter called Mr. Frey regarding the subpoena.

Mr. Frey removed the file from the shelf, looked through the documents, and confirmed they were the same ones he had examined earlier and they appeared to be in the same condition as when he first examined them. Shortly thereafter, Special Agent Kevin Shannon ("Agent Shannon") arrived at the law firm and presented the subpoena. Mr. Frey placed the file in an envelope and sealed it. Agent Shannon delivered the file to Assistant United States Attorney Patricia C. Hannigan, and Ms. Hannigan retained it.

On or about November 5, 1996, Mr. **[*7]** Undercofler, Mr. Frey, and Ms. Hannigan met, and unsealed the envelope. Mr. Undercofler and Mr. Frey determined there was no information in the file pertaining to the firm's clients. Ms. Hannigan reviewed the documents and decided they were not privileged. She then delivered copies of the documents to Mr. Connolly.

According to Mr. Undercofler, he called Mr. Oberly on November 4, 1996, and told him that the federal government had taken custody of the file and that no copies of the file had been made. Mr. Oberly maintains he did not learn what had occurred until November 6, 1996. On November 7, 1996, Mr. Oberly spoke to Mr. Frey about the federal government's seizure of the file. According to Mr. Oberly, Mr. Frey told him that Mr. Frey "believed the file contained privileged material." Affidavit of Charles M. Oberly, III, Esquire dated

May 28, 1997, at para. 9. Mr. Oberly also asserts that Mr. Frey told him that he believed the file contained privileged material and that he had conveyed this opinion to the federal government.

On November 12, 1996, one of defendant's attorneys sent Mr. Connolly a letter wherein he asserted the attorney-client privilege with regard to the time-line [*8] document and requested its immediate return. By letter dated November 26, 1996, the federal government stated that it did not believe the document fell within either the attorney-client privilege or the work product doctrine. Mr. Connolly advised that to the extent defendant insisted the materials were protected from disclosure, he would have to "take the issue up with the Court."

Between December 30, 1996 and February 1997, Mr. Connolly spoke with Mr. Oberly on at least two occasions regarding the applicability of the attorney-client privilege and the work product doctrine to the seized file and he conveyed to Mr. Oberly that the federal government maintained the privilege and doctrine did not protect the file.

On January 22, 1997, defendant's attorney requested either the return of the documents or something in writing advising him that the federal government was not willing to return the documents to him. By letter dated February 25, 1997, Mr. Connolly informed defendant's attorney that the documents were not protected by the work product doctrine, and in any case, defendant had waived any right to assert the doctrine.

During this time, the government used the time-line document [*9] in connection with the federal Grand Jury investigation.

On March 14, 1997, defendant filed with the United States District Court for the District of Delaware ("the District Court") a motion requesting that the documents be returned to him. The District Court issued a decision wherein it denied the motion. In re Grand Jury Matter, D.Del., Misc. No. 97-20-SLR, Robinson, J. (June 27, 1997). n2 In that decision, the District Court reached the following conclusions. It held the attorney-client privilege did not apply. The District Court found that the file was work product because defendant acted as his attorney's agent in creating the file in preparation of litigation. However, the District Court found defendant waived the work product protection because he disclosed the file and he failed to timely assert the doctrine. With regard to the disclosure aspect, the District Court concluded that since defendant told Mr. Frey about the file and stored it in Mr. Frey's unlocked and easily accessible office, an adversary might obtain the file, which meant that defendant had waived the right to assert the

doctrine. In the alternative, the District Court held that defendant had waived the [*10] privilege by waiting nearly four months to file a motion to compel the return of the file. In a footnote, the District Court noted that the United States had shown sufficient cause to overcome the work product protection even if defendant had not waived it.

> n2 The facts before the District Court were identical to those set forth above. In connection with this motion, the State maintains that there are only three areas of factual disputes and that the disputes do not preclude a decision on the motion. The parties dispute: 1) what defendant's motive was for creating the time-line document; what defendant told Mr. Frey about the file; and when Mr. Undercofler called Mr. Oberly about the file. I agree these disputes do not preclude a resolution of the motion.

Defendant appealed this decision to the Third Circuit Court of Appeals ("Court of Appeals"). The Court of Appeals issued a decision wherein it affirmed the District Court on the ground that defendant had waived the doctrine by waiting four months to seek [*11] to obtain the file. *In re Grand Jury (Impounded), 3rd Cir., 138 F.3d 978 (1998).* The Court stated at page 982:

> In short, when a party's adversary has obtained possession of a party's work product and refuses to recognize the work product privilege, the party asserting the privilege must move expeditiously for relief particularly where, as here, the party asserting the privilege does not even claim that he had reason to believe that the adversarial party was not making use of the work product.

The Court went on to conclude: "Capano acted unreasonably in waiting nearly four months to seek a judicial vindication of his assertion of the privilege." Id.

In this case, defendant seeks to suppress the seized time-line document. Defendant argues that the document was seized in violation of Super. Ct. Crim. Rule 16, and consequently, it should be suppressed. In opposition to this motion, the State argues that defendant is collaterally estopped from asserting the work product doctrine does not apply. The State argues, in the alternative, that the work product doctrine does not apply. Finally, it argues that once defendant waived the doctrine, that waiver continues throughout [*12] all proceedings.

DISCUSSION

I will, without deciding, assume that defendant is not collaterally estopped from asserting that the work product doctrine protects the time-line document from discovery. Defendant argues that the State could not obtain the time-line document pursuant to Rule 16, and consequently, the document should be suppressed.

In Super. Ct. Crim. R. 16 ("Rule 16"), it is provided in pertinent part:

(b) Disclosure of evidence by the defendant. ***

(2) Information not subject to disclosure. Except as to scientific or medical reports, this subdivision does not authorize the discovery or inspection of reports, memoranda, or other internal defense documents made by the defendant, or the defendant's attorneys or agents in connection with the investigation or defense of the case, or of statements made by the defendant, or by state or defense witnesses, or by prospective state or defense witnesses, to the defendant, the defendant's agents or attorneys.

If the State had not obtained the time-line document before this prosecution began, then Rule 16 would preclude the State from obtaining it now. n3 However, this matter cannot be resolved in a vacuum. What occurred [*13] before the present prosecution is relevant and impacts on defendant's assertion of the work product doctrine in these proceedings, and the decisions of the District Court and Third Circuit Court of Appeals are compelling.

n3 The District Court held that Rule 16's federal counterpart was inapplicable to Grand Jury proceedings. In re Grand Jury Matter, supra at 11-12 n.9

In this case, I find, as did the District Court, that the document constituted attorney work product. I adopt the portion of the District Court's opinion in In re Grand Jury Matter, supra at 12, which pertains to this issue:

The documents are alleged to contain information about movant's relationship with the woman who disappeared and his whereabouts during the period when she was first reported missing. It is undisputed that

the documents were created by movant after he had retained counsel. Furthermore, the government does not argue that the documents were prepared by movant in anticipation of litigation. Given these facts, [*14] the court finds that movant acted as his attorney's agent in creating the documents.

I also find, as did the District Court, that leaving the documents in Mr. Frey's office constituted disclosure of the documents. Defendant, an attorney with a working knowledge of the law, had to know that anyone, including Mr. Frey, could have reviewed the documents. Defendant did not have an attorney-client privilege with anyone in his firm, and consequently, once someone other than defendant or his attorney reviewed the documents, then they were subject to disclosure to defendant's adversary. Defendant could not have had any reasonable expectation that Mr. Frey or others would not review the documents, even if he told Mr. Frey not to look at them. Consequently, defendant "consciously disregarded the possibility that an adversary might obtain them." In re Grand Jury Matter at 13. By doing so, defendant waived the right to assert the applicability of the work product doctrine. Id.

In addition, defendant did not seek to compel the return of the documents until four months after its seizure. In effecting such a delay, defendant waived his right to protection of the work product doctrine. In re Grand Jury Matter at 14; [*15] In re Grand Jury (Impounded), supra. See United States v. De La Jara, 9th Cir., 973 F.2d 746 (1992).

Once defendant waived his right to assert the protection of the doctrine, he waived it with respect to subsequent proceedings. Westinghouse Electric Corporation v. Republic of the Philippines, 3rd Cir., 951 F.2d 1414 (1991); In re Subpoenas Duces Tecum, D.C.App., 238 U.S. App. D.C. 221, 738 F.2d 1367 (1984); In re Sealed Case, D.C.App., 219 U.S. App. D.C. 195, 676 F.2d 793 (1982); In re Worlds of Wonder Securities Litigation, N.D.Cal., 147 F.R.D. 208 (1992). See Tackett v. State Farm Fire & Cas. Ins. Co., Del. Supr., 653 A.2d 254, 266 (1995). Defendant lost the right to assert the privilege though his own action and inaction. n4 Rule 16 would prevent the State from obtaining the document if defendant had not previously provided it to the State by way of his disclosure and waiver. However, where, as here, defendant's disclosure and inaction gave the federal government access to the document, Rule 16 does not came into play. See State v. MacDonald, Del. Super., 1993 Del. Super. LEXIS 8, *11, Cr.A. No. IN90-10-1063, Barron, J. (January 20, 1993) at 9 (Rule 16 does not preclude

the State **[*16]** from obtaining materials, within that rule's scope, to which it is entitled by another means).

n4 The Court rejects defendant's attempts to place the blame on the State for defendant's predicament.

In conclusion and for the foregoing reasons, defendant's motion to suppress the time-line document is denied.

IT IS SO ORDERED.

**Tab #4**

## STATE OF DELAWARE v. THOMAS J. CANPANO. DEF. ID # 9711006198

## CRIMINAL ACTION NO. IN97-11-0720

## SUPERIOR COURT OF DELAWARE, NEW CASTLE

### *1998 Del. Super. LEXIS 319*

### September 30, 1998, Date Decided

**SUBSEQUENT HISTORY: [*1]**

Released for Publication by the Court October 19, 1998.

**DISPOSITION:**

Defendant's motion to Suppress of May 1, 1998, Abuse Motion, and Suppression Motion of July 15, 1998 denied.

**COUNSEL:** Ferris W. Wharton, Esquire, Department of Justice, Wilmington, Delaware and Colm F. Connolly, Esquire, U.S. Attorney's Office, Wilmington, Delaware, Attorneys for the State.

Eugene J. Maurer, Jr., Esquire, Eugene J. Maurer, Jr., P.A., Wilmington, Delaware; Charles M. Oberly III, Esquire, Oberly, Jennings & Drexler, P.A., Wilmington, Delaware; Joseph S. Oteri, Esquire, Boston, Massachusetts; and John F. O'Donnell, Esquire, Fort Lauderdale, Florida, Attorneys for the Defendant.

**JUDGES:** LEE, J.

**OPINION BY:** LEE

**OPINION:**

MEMORANDUM OPINION

LEE, J.

Pending in this first degree murder case are several motions of defendant Thomas Capano ("defendant") which are based upon the premise that the federal government had no right to investigate the disappearance of Anne Marie Fahey ("Fahey"). I address these motions in this decision.

PROCEDURAL POSTURE

I first address the procedural aspect of these motions. As discussed below, two of the three motions are procedurally barred.

The first motion is defendant's Motion to Suppress **[*2]** Evidence dated May 1, 1998 (hereinafter referred to as "May 1, 1998 Motion"). In that motion, defendant seeks to suppress all evidence seized and all testimony relating to evidence seized from his residence and motor vehicles on or about July 31, 1996. The May 1, 1998 Motion attacks the search warrants executed on July 31, 1996 whereby evidence was seized from defendant's residence and motor vehicles. This motion contains only a conclusory allegation that:

> the affidavit in support of the issuance of the search warrant ... omits references to certain materials which should have been considered by the magistrate in determining whether or not there was probable cause to believe that evidence of criminal activity would be found in the aforementioned locations.

The defendant requests that the Court suppress the evidence seized pursuant to *Franks v. Delaware, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978)* ("Franks"). The State of Delaware ("the State") asks the Court to deny the May 1, 1998 motion because defendant's allegations do not entitle him to a Franks hearing, much less the suppression of the evidence. In section III of the Motion of Defendant Thomas **[*3]** J. Capano to Suppress Evidence Derived from Abuse of the Federal Grand Jury and Investigative Processes, for a Hearing pursuant to Franks v. Delaware, for a Hearing to Determine the Evidence Which the State Intends to Use at Trial Which was Obtained, Directly or Derivatively, from the Abuse of the Federal Grand Jury Process in this Case, and to Disqualify Colm Connolly, Assistant United States Attorney, from Further Participation in this Case (hereinafter referred to as "Abuse Motion"), defendant sets forth details to support this May 1, 1998 Motion. However, the State has not responded to these allegations because it sought to dismiss the Abuse Motion as untimely filed. I find the May 1,

1998 Motion is barred because defendant failed to timely present allegations sufficient to support it.

In his second motion, defendant seeks leave of the Court to file the Abuse Motion because it was not filed before the May 1, 1998 deadline which this Court set for the filing of motions. Defendant maintains that when Joseph S. Oteri, Esquire joined the defense team after May 1, 1998, he realized that this Abuse Motion should be filed. However, as the State shows and as Mr. Oberly acknowledged **[*4]** in his letter dated July 28, 1998, defendant was aware of the issue this motion raises during the period when the Federal Grand jury was investigating this case. Even though the issue appears more thoroughly researched than it did when it was presented in the federal forum, it is clear that defendant recognized the issue long before May 1, 1998. Consequently, the motion is barred as not timely filed.

Defendant also filed a Motion to Suppress Evidence Seized During Searches of His Jeep Cherokee, His Chevrolet Suburban, and His Residence At 2302 Grant Avenue, Wilmington, Delaware, Pursuant To Federal Search Warrants On July 31, 1996; Any Evidence Derived From The Seizure From Him Of Blood And Hair Samples Pursuant To A Federal Search-Warrant Issued On August 16, 1996; And Any And All Evidence Derived From A Search Of the Thaw Firm Of Saul, Ewing, Remick & Saul Pursuant To A Federal Search Warrant Issued On September 4, 1997 (hereinafter, referred to as "Suppression Motion dated July 15, 1998"). The State objects to this motion as untimely filed. The Court previously allowed the motion because it thought it was a supplement to the May 1, 1998 Motion. However, a closer review of it shows **[*5]** it is not a supplement and it is untimely filed since the issue upon which it is based was known to defendant during the proceedings which occurred in the United States District Court for the District of Delaware. But, because I previously deemed this motion timely filed, I will consider it.

The Court considers all the motions on their merits despite the procedural defects. n1 Before considering the motions on their merits, I set forth the facts necessary to such a consideration.

> n1 Due to the procedural posture of the case, the State did not address these motions on their merits, nor did the Court expect it to do so.

## FACTS

Fahey was last seen alive on June 27, 1996. That evening she had dinner with defendant.

Fahey's family reported her missing on June 30, 1996. Fahey was the scheduling secretary to Delaware's Governor, Thomas Carper. The President of the United States knew Fahey through business dealings with Governor Carper, and when he learned about Fahey's disappearance, he offered, in early July, the **[*6]** help of the federal government. The Federal Bureau of Investigation ("FBI") joined the investigation on or about July 8, 1996. The United States Attorney's Office joined the investigation no later than July 25, 1996. In July, 1996, the United States Attorney's Office for the District of Delaware, the FBI, and the Wilmington Police Department began a federal Grand Jury kidnapping investigation into the disappearance of Fahey.

According to defendant, the FBI took over the investigation with a plan that included pressuring defendant's inner circle to reach defendant.

In an affidavit dated July 30, 1996, Special Agent Eric J. Alpert of the FBI ("Agent Alpert") stated facts in support of three search warrants. These warrants were to search defendant's home at 2302 Grant Avenue, Wilmington, Delaware 19806; a 1993 Jeep Grand Cherokee, which defendant drove as his primary vehicle; and a 1993 Chevrolet Suburban, which was registered to defendant and his wife. The allegations appearing in this affidavit which are pertinent to a decision on these motions are set forth below.

On June 30, 1996, members of Fahey's family called the police about Fahey's disappearance. The Wilmington police and **[*7]** the Delaware State Police responded to the call. Fahey had worked on June 27, 1996. She had an appointment with her psychiatrist at 5:00 p.m. that date.

Fahey had been dating Michael Scanlan ("Scanlan"). He called her Thursday night and left a message, but he never heard from her. He called on Friday and got no response. He and Fahey had plans to have dinner with Fahey's brother that Saturday evening. On Saturday, he drove by Fahey's home and saw her car sitting out front. He thought she was home and was upset with him. When Fahey's brother called later that evening to find out where they were, Scanlan said he had no idea of her whereabouts.

Fahey's brother called his sister, Kathleen Fahey-Hosey. Ms. Fahey-Hosey went to the apartment with others. They saw Fahey's car out front. The deadbolt on the door was locked. Fahey's landlord let the group into the apartment. There, they found her pocketbook with all of its contents. The only things that seemed to be missing were her car and house keys. In the apartment, some items were in disarray, which was contrary to Fahey's

habit of neatness.

There were twelve unanswered/unsaved messages on the answering machine; the first was Scanlan's [*8] message from Thursday night. The group told the police that she would have checked her messages if she had returned home Thursday night and that she would not have left the mess in the apartment if she had been there.

Discovered in the apartment were letters from defendant. Finding the letters and Fahey's diary provided the family members and Scanlan with the first news of defendant and Fahey's affair. Fahey's diary entry, dated April 7, 1996 states "I finally have brought closure to Tom Capano." "What a controlling, manipulative, insecure jealous maniac."

At 3:39 a.m., Wilmington police went to defendant's home and talked with him about Fahey. Defendant told them that he had picked up Fahey on Thursday night and they had gone to dinner at Panorama Restaurant in Philadelphia, Pennsylvania. After dinner, they went back to his home on Grant Avenue, Wilmington, Delaware, where he gave her a dress and groceries; both the dress and groceries were found in Fahey's apartment. He then took her home, went into the apartment for a few minutes, and left. He said he left at approximately 10:00 p.m., and stopped at the Getty Station on Lovering Avenue for cigarettes. However, further investigation [*9] showed the service station closed at 9:30 p.m. that night. Defendant said he was unaware of Fahey's whereabouts, although he did speculate on such.

The next day the police sought to interview defendant again, but he seemed agitated and he "stated that he wished he had not said some of the things he told the officers earlier that were private in nature."

The police interviewed Kim Horstman, one of Fahey's friends. She explained that Fahey and Capano had had an affair for about two years. Fahey had tried to break off the relationship several times before, but defendant was obsessed with her. He had taken back gifts he had given her. Ms. Horstman had lunched with defendant twice, and he told her how much he loved Fahey and how he did not understand how she could date Scanlan.

Fahey's hairdresser, Lisa D'Amico, told the police that defendant scared Fahey, they argued constantly, and defendant waited outside Fahey's apartment but he would not let him inside the apartment. She also told them that during a May hair appointment:

Anne Marie told her that Capano recently went crazy and grabbed her.

He told Anne Marie that she has ruined his life because he left his wife for her and [*10] now she is rejecting him. She told (her) that she planned to tell him the relationship was over. Anne Marie was nervous and frightened that he might harm her.

She additionally told the police:

Fahey told her that on one occasion in May of this year Capano and Fahey were sitting in Capano's car and Fahey told Capano that she wanted to end their affair, that Capano started screaming and yelling at her and called Fahey a slut and bitch, grabbed her by the neck and Fahey jumped out of the car and ran into her apartment.

Jill Morrison, a friend of Fahey, told the police:

Fahey had told her that she was having an affair with Capano and that Capano was possessive, controlling, psychotic, and needs counseling. ... Fahey had told her that sometime in 1996, Capano picked Fahey up in his car for a drive, that Capano locked the doors of the car and refused to let Fahey out of the car, that Capano then drove to his house without Fahey's consent, drove the car into the garage, locked the garage doors and refused to let Fahey out of the garage until after she had listened to what he had to say about her attempts to dissolve their relationship.

Al Franke, another of Fahey's [*11] friends, told the police that about six to eight weeks before June 27, Fahey told him that defendant had climbed the fire escape, broke into her apartment, yelled and screamed at her in a rage, and taken back all his gifts.

One of defendant's neighbors saw defendant cleaning out a Suburban on Sunday, June 30, 1996.

Further investigation showed that Capano purchased a new rug and padding from Airbase Carpets on June 29, 1996. The rug cost $ 249, which Agent Alpert considered inconsistent with his spending habits and lifestyle.

The police learned that defendant's house cleaner had last cleaned on June 24, and was scheduled to clean on July 8, but defendant called on July 5th or 6th and canceled that cleaning session. When the cleaner went to the house on

July 22, 1996, she observed in the den area a rug and two new chairs which had not been there previously. Missing were the wall-to-wall carpet and a sofa which had been there on June 24, 1996.

The police interviewed the waitress who served defendant and Fahey on June 27 at Panorama Restaurant. She identified Fahey from her picture, and she told them that the gentleman ordered everything. She also told them "that the two did not **[*12]** seem very happy and that the lady looked 'solemn' and had a 'forced smile' whenever she approached the table. Neither of the two touched much of their dinner and they did not appear to have much of a conversation." The gentleman had Fahey sign his credit card.

On July 29, 1996, Agent Alpert interviewed Michele Sullivan, a practicing psychologist who was treating Fahey. Fahey had told Sullivan that defendant stalked her and that she was frightened of him. Sullivan was working with Fahey to help her end the relationship. Agent Alpert further stated:

Sullivan thought the only reason Fahey would have accompanied Capano to Philadelphia for dinner on June 27th would be to break off the relationship. I then described what (the Panorama waitress) had told me about the setting and circumstances of Capano's dinner with Fahey at Panorama on June 27th. Sullivan said that my description was consistent with her belief that Fahey was trying to end the relationship. Sullivan also said that based on her knowledge of the relationship between Capano and Fahey, Fahey's intent to end the relationship, and the restaurant scene at Panorama, Sullivan did not believe that Fahey would have willingly **[*13]** gone to Capano's house that night. Sullivan also said that Fahey was not suicidal and was looking forward to the future.

Agent Alpert then stated:

I believe that there is probable cause to believe that Thomas Capano took Anne Marie Fahey without her consent from the Panorama Restaurant in Philadelphia to his home at 2302 Grant Avenue in Wilmington, Delaware and that he killed her at his residence.

He also stated that he believed that a search of

defendant's residence would reveal evidence of the federal offense of kidnapping. The United States Magistrate ("Magistrate") authorized the warrant.

Agent Alpert submitted an affidavit dated August 16, 1996, in connection with the seeking of a search warrant to compel defendant to produce blood and hair samples. This affidavit contained the same information as that submitted on July 30, 1996, plus additional information. The additional information consisted of a listing of what the searches of defendant's house and vehicles on July 31, 1996 produced. During the searches, the police found blood stains in the house and an apparent blood stain in the back seat of defendant's Jeep Cherokee. They also found hairs and fibers in the **[*14]** vehicles and house. Agent Alpert then stated:

Based on the foregoing, I believe there is probable cause to believe that Thomas Capano took Anne Marie Fahey without her consent from the Panorama Restaurant in Philadelphia to his home at 2302 Grant Avenue in Wilmington, Delaware, that he killed her at his residence and then attempted to clean evidence relating to the cause of her death in his laundry room and then removed at least some of that evidence from the residence in his black Jeep Grand Cherokee. I also believe that a comparison of the blood and hair samples found in the defendant's residence and jeep with the defendant's blood and head and pubic hair will result in evidence of the federal offense of kidnapping *(18 U.S.C. § 1201)*.

The Magistrate issued the warrant.

Agent Alpert also sought a search warrant for the law firm of Saul, Ewing, Remick & Saul ("Saul Ewing") for specified e-mail and voice mail. The affidavit dated September 4, 1997 which Agent Alpert submitted in support of the search warrant contained the information set forth in the June 30, 1996 affidavit. In addition, he alleged facts concerning a relationship between defendant and another woman in **[*15]** the early 1980's where defendant allegedly committed various crimes to retaliate against that woman for ending a relationship with him. Agent Alpert set forth other information regarding this woman, whom he referred to as VW. VW and defendant had contact before Fahey's disappearance. Defendant arranged for her to obtain a job in his firm, and she rejected the job on the day she was to begin to work. Defendant sued her for money she owed him on

June 14, 1996, 13 days before Fahey was last seen alive. Agent Alpert also submitted information regarding the e-mail and voice mail at Saul Ewing, which is where defendant was working during all pertinent times.

Agent Alpert then stated:

42. Based on the foregoing and the assertions in Affidavit B (a sealed affidavit attached to the warrant applications), I believe there is probable cause to believe that Thomas Capano took Anne Marie Fahey without her consent from the Panorama Restaurant in Philadelphia to his home at 2302 Grant Avenue in Wilmington, Delaware, that he killed her at his residence and then attempted to clean evidence relating to the cause of her death in his laundry room and then removed at least some of that evidence **[*16]** from the residence in his black Jeep Grand Cherokee. I believe that VW's rejection of Capano contributed to his reaction to Fahey's attempt to end her relationship with him on June 27, 1996.

43. I also believe that any e-mail and voice-mail messages between Thomas Capano and Anne Marie Fahey may provide evidence of an affair between them and the fact that Anne Marie Fahey was attempting to end the affair and being harassed and intimidated by Thomas Capano. Such evidence would be relevant to Capano's motive and intent to harm Fahey. I also believe, based on the information contained in Affidavit B ... that the voice mail disk may contain evidence of violations of *18 U.S.C. § 3* (accessory after the fact).

The Magistrate issued the warrant.

DISCUSSION

In his Abuse Motion as well as his Suppression Motion dated July 15, 1998, defendant bases all of his arguments upon the premise that the federal government had no business investigating Fahey's disappearance because the federal government had no probable cause to believe that the federal offense of kidnapping had been committed. Defendant argues that Agent Alpert's affidavit did not provide any facts to support his assertion **[*17]**

that there was "probable cause to believe that Thomas Capano took Anne Marie Fahey without her consent from the Panorama Restaurant in Philadelphia to his home at 2302 Grant Avenue in Wilmington, Delaware, and that he killed her at his residence." In particular, defendant argues that there were no facts showing that Fahey was taken from Pennsylvania against her will. n2

n2 I am basing this discussion on the assumption that it is appropriate to attack the warrants and the federal grand jury proceedings in this Court.

The standard for reviewing the Magistrate's finding of probable cause is set forth in *Jones v. Town of Seaford, Delaware, D.Del., 661 F. Supp. 864, 870-71 (1987)*:

In reviewing a Magistrate's finding Of probable cause, the Court is guided by the premise that in a marginal case a search conducted pursuant to a warrant "may be sustainable where without one it would fall." [Citation omitted.] A reviewing court's function is "simply to insure that the Magistrate had a 'substantial basis for... **[*18]** concluding' that probable cause existed." [Citation omitted.] The court should resist the impulse to engage in a de novo determination of probable cause. Rather, the task of a district court is merely to determine whether, in light of the totality of the circumstances known to the Magistrate, the record contains substantial evidence to support the issuance of the warrant. [Citation omitted.]

The issue here is whether the affidavits of Agent Alpert provided evidence of probable cause to believe that defendant had kidnapped Fahey in violation of *18 U.S.C. § 1201*. In that statute, it is provided in pertinent part:

(a) Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person, except in-the case of a minor by the parent thereof, when --

(1) the person is willfully transported in interstate ... commerce;

* * *

shall be punished by imprisonment for any term of years or for life and, if the death of any person results, shall be punished by death or life imprisonment.

(b) With respect to subsection (a)(1), above, the failure to release the victim within twenty-four **[*19]** hours after he shall have been unlawfully seized, confined, inveigled, decoyed, kidnapped, abducted or carried away shall created a rebuttable presumption that such person has been transported in interstate ... commerce.

In order for there to be federal jurisdiction over the matter, Fahey must have been held against her will at the time the state line was crossed. *United States v. Toledo, 10th Cir., 985 F.2d 1462 (1993)*, cert. den., *510 U.S. 878, 126 L. Ed. 2d 174, 114 S. Ct. 218 (1973)*.

The facts alleged in the affidavit provide support for three scenarios consisting of substantial evidence to support the issuance of the warrant.

First, there are the alleged facts that Fahey was attempting to end her relationship with defendant; that he previously had responded in rages when Fahey attempted to end their relationship; that Fahey's psychiatrist believed that Fahey was ending the relationship on June 27; and that defendant had previously confined Fahey against her will while she was in the car with him. Fahey was last seen by someone other than defendant in Philadelphia and there was tension between her and defendant at that time. There was probable cause to believe that **[*20]** Fahey ended the relationship during dinner at the restaurant; defendant acted as he allegedly had before (he held her against her will); and defendant formed the intent to kill her in Philadelphia and took her to his home to kill her.

There also is probable cause to believe that defendant inveigled Fahey to accompany him that evening for the purpose of killing her. *United States v. Boone, 11th Cir., 959 F.2d 1550 (1992); United States v. Hughes, 4th Cir., 716 F.2d 234 (1983); United States v. Hoog, 8th Cir., 504 F.2d 45 (1974)*, cert. den., *420 U.S. 961, 43 L. Ed. 2d 437, 95 S. Ct. 1349 (1975); Davidson v. United States, 8th Cir., 312 F.2d 163 (1963)*. The alleged facts support the theory that defendant knew Fahey was attempting to end the relationship, he formed an intent to kill her, he took her to dinner knowing

he planned to kill her, and he crossed the Pennsylvania/Delaware border after forming this intent.

The third basis for probable cause is the twenty-four hour presumption set forth in *18 U.S.C. § 1201*(b). *United States v. Rees, D.Md., 193 F. Supp. 861 (1961)*. But see *State v. Moore, 2d Cir., 571 F.2d 76 (1978)*. n3 Since Fahey had been missing **[*21]** more than twenty-four hours, the presumption came into play and provided probable cause to believe that the federal government had jurisdiction to investigate this matter.

> n3 Whether that presumption is unconstitutional is not to be determined until a trial on the kidnapping charge. *United States v. Callahan, D.Minn., 434 F. Supp. 1203 (1977)*.

For the foregoing reasons, I conclude that there was probable cause for the federal government to believe that the federal crime of kidnapping had occurred. Consequently, the grand jury investigation and the search warrants are valid. Because the premise of defendant's Abuse Motion and his Suppression Motion dated July 15, 1998, fail, the motions are denied.

The final motion I address is defendant's May 1, 1998 Motion to Suppress. Defendant sets forth in paragraph 20 of his Abuse Motion allegations in support of the May 1, 1998 Motion to Suppress, and I incorporate those allegations by reference. Therein, he states that Agent Alpert omitted information, and consequently, **[*22]** he is entitled to a Franks hearing. In *Franks, 438 U.S. at 155-56, 98 S. Ct. at 2676,* it is provided:

> Where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that, at that hearing the allegation of perjury or reckless disregard is established by the defendant by the preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant

must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking On the face of the affidavit.

I have reviewed these omissions which defendant contends were made, and I find that defendant has not made any substantial preliminary showing that Agent Alpert did not present the truth in his affidavit. Defendant seeks to interpret the alleged facts in his own [*23] way and he bases much of his argument upon speculation and defense hypotheses. There is no requirement that a police officer place a defendant's interpretation of the facts, particularly speculative ones, into the affidavit seeking probable cause. Since defendant has not made any substantial preliminary showing that Agent Alpert was not truthful in his affidavit, there is no need for a Franks hearing, and consequently, the evidence seized pursuant to the warrants issued will not be suppressed.

In conclusion, I find defendant's May 1, 1998 Motion to Suppress, his Abuse Motion, and his Suppression Motion dated July 15, 1998 are either procedurally barred or lack substantive merit and I deny them.

IT IS SO ORDERED.

**TAB #5**

## STATE OF DELAWARE v. THOMAS J. CAPANO, DEF. ID # 9711006198

## CRIMINAL ACTION NO. IN97-11-0720

## SUPERIOR COURT OF DELAWARE, NEW CASTLE

### 1999 Del. Super. LEXIS 541

### March 16, 1999, Decided

**SUBSEQUENT HISTORY:** Subsequent civil proceeding at *Fahey-Hosey v. Capano, 1999 Del. Super. LEXIS 351* (Del. Super. Ct., Aug. 31, 1999) Motion denied by, Request denied by *State v. Capano, 1999 Del. Super. LEXIS 324* (Del. Super. Ct., Sept. 1, 1999)
*Affirmed by, Remanded by Capano v. State, 781 A.2d 556, 2001 Del. LEXIS 349* (Del., 2001)

**PRIOR HISTORY:** *Gannett Co. v. State, 723 A.2d 396, 1998 Del. LEXIS 428* (Del., 1998)

**DISPOSITION:** [*1]

Court concludes sentence for defendant's commission of murder of Anne Marie Fahey shall be death by lethal injection.

**COUNSEL:** Ferris W. Wharton, Esquire, Department of Justice, Wilmington, Delaware and Colm F. Connolly, Esquire, U.S. Attorney's Office, Wilmington, Delaware, Attorneys for the State.

Eugene J. Maurer, Jr., Esquire, Eugene J. Maurer, Jr., P.A., Wilmington, Delaware; Charles M. Oberly III, Esquire, Oberly, Jennings & Drexler, P.A., Wilmington, Delaware; Joseph S. Oteri, Esquire, Boston, Massachusetts; and John F. O'Donnell, Esquire, Fort Lauderdale, Florida, Attorneys for the Defendant.

**JUDGES:** William Swain Lee, Judge.

**OPINION BY:** William Swain Lee

**OPINION:**

MEMORANDUM OPINION

LEE, J.

On January 17, 1999, defendant Thomas J. Capano ("defendant") was convicted of murder in the first degree for the death of Anne Marie Fahey. On January 28, 1999, after completion of a penalty phase hearing, eleven (11) of the jurors found a statutory aggravating circumstance existed, while one (1) found it did not. The jury, in finding the

aggravating circumstances outweigh mitigating ones, also recommended that the death penalty be imposed by a vote of ten (10) to two (2). This Court considers [*2] the jury's recommendation; however, it must make the ultimate determination of whether to impose a sentence of death or of life in prison without probation, parole or any other reduction. This is that decision.

## I. BACKGROUND

Defendant is an attorney who was admitted to the Delaware Bar in 1975. n1 He was married for twenty-six (26) years, and this marriage produced four daughters. He has performed public service over the years, working as a Deputy Attorney General, as City Solicitor during the administration of Mayor Daniel Frawley, and as legal counsel to Governor Michael Castle. At the time of the crime, he was managing partner at the Wilmington office of the law firm of Saul, Ewing, Remick & Saul, L.L.P. He has performed charity work and been a source of strength for his mother and his siblings, which include three brothers and a sister. By all accounts, defendant appeared to be an upstanding member of Delaware's community. However, there was another life defendant led which was hidden from virtually everyone. That life included affairs with numerous mistresses. One of the affairs was with Anne Marie Fahey ("Fahey").

> n1 Defendant's license to practice law has been suspended pending the outcome of these proceedings.

[*3]

Fahey last was seen alive on June 27, 1996. That evening she had dinner in Philadelphia, Pennsylvania with defendant. Fahey's family reported her missing on June 30, 1996.

Fahey was the scheduling secretary to Delaware's Governor, Thomas Carper. The President of the United States knew of Fahey through dealings with Governor Carper, and when he learned about her disappearance, he offered, in early July, the help of the federal government. The Federal Bureau of Investigation ("FBI") joined an

investigation into Fahey's disappearance on or about July 8, 1996. The United States Attorney's Office joined the investigation no later than July 25, 1996. In July, 1996, the United States Attorney's Office for the District of Delaware, the FBI, and the Wilmington Police Department began a federal Grand Jury kidnapping investigation into the disappearance of Fahey.

Until he testified at his trial, defendant maintained that he had not seen Fahey since he dropped her off at her apartment on the evening of June 27, 1996. Even though he knew that Fahey was dead and that he had disposed of her body in the Atlantic Ocean, defendant suggested over the next two years other theories for her disappearance: [*4] she might be at the Jersey Shore, she might have gone off to another country, she was suicidal, someone else might have killed her. Despite his knowledge that many were looking for her, even keeping a vigil at her apartment, he never bothered to tell anyone that she was dead.

Breaks in the case came from defendant's brothers. Defendant's brother Gerard Capano ("Gerard") told investigators that he had helped defendant dispose of a body in the Atlantic Ocean on June 28, 1996. The body had been in a cooler, and, when the cooler would not sink, the body and the cooler were separately thrown into the ocean. Fishermen found a cooler, and it was shown that defendant purchased an identical cooler on April 20, 1996. Additionally, Defendant's brother Louis Capano ("Louis") told investigators that at the end of June, 1996, he instructed employees to dispose of items in a dumpster owned by his company. Defendant had told Louis he had thrown into the dumpster personal items of Fahey as well as a sofa which had Fahey's blood on it. n2

> n2 Defendant told Louis that Fahey had slit her wrists on the evening of June 27, 1996 and had bled on the sofa; that he had thereafter taken Fahey home, never to see her again.

[*5]

The information gathered during the federal investigation was turned over to the State of Delaware ("the State"). On November 12, 1997, defendant was arrested on the charge of Murder in the First Degree in the death of Fahey. A Delaware Grand Jury indicted defendant on that charge on December 22, 1997. Defendant has been incarcerated since his arrest.

Defendant's proof positive hearing pursuant to *11 Del. C. § 2103(b)* took place from February 2 through February 6, 1998. Defendant hoped to

obtain bail, and in connection with that hearing, defendant attempted to manipulate another of his lovers to testify on his behalf. This lover was Deborah MacIntyre ("MacIntyre"). MacIntyre and defendant, who had been lovers since May, 1981, continued to have contact during defendant's incarceration through letters and telephone calls. Meanwhile, MacIntyre was having problems with the government in connection with her story concerning her purchase and disposal of a gun before the murder of Fahey. Ultimately, MacIntyre did not testify on behalf of defendant. Instead, she hired a new attorney and entered into an agreement with the government that required her to testify truthfully concerning [*6] the gun in exchange for not being prosecuted for her prior lies concerning it.

The story concerning the gun which defendant did not want told is as follows. In April, 1996, defendant told MacIntyre he wanted her to buy a gun for him because someone was trying to extort him. On May 13, 1996, defendant met MacIntyre at a gun store. MacIntyre went in and purchased the gun at defendant's request. MacIntyre then gave the gun to defendant. She never saw the gun after she gave it to him, and during the investigation into Fahey's disappearance, defendant asked her to lie about the gun. He also told her the gun was gone "deep in the water."

Armed with the evidence noted above as well as other evidence, the State proceeded to prosecute defendant.

## II. THE CRIME

The guilt phase of the trial in this matter began on October 26, 1998. At that trial, along with much of the evidence noted above, the following evidence was established pertaining to the murder of Fahey and the disposal of her body thereafter.

Fahey had been trying to end the relationship with defendant. She had begun a new relationship, and this relationship had potential to be meaningful and long-term. About the time Fahey [*7] was working on her new relationship, defendant had separated from his wife. When Fahey began pulling away from defendant, defendant became extremely angry at Fahey and he expressed his rage at her during several violent episodes. Defendant continued to pursue Fahey. It appears that near the time of her death, Fahey hoped that they had established a friendship and she attempted to deal with defendant on that basis.

Around February, 1996, defendant concocted a story which he told Gerard and another brother, Joseph Capano ("Joseph"). The story was that an extortionist or extortionists was/were threatening him. n3 He asked Gerard for help should he have to

kill the extortionist(s). Specifically, he asked to borrow Gerard's boat to dispose of the body(ies).

> n3 The number of extortionists changed and the reason for the threat never was clarified.

On April 20, 1996, defendant purchased a cooler identical to the one in which Fahey's body was disposed.

On May 13, 1996, defendant had MacIntyre purchase a gun for him. **[*8]**

On June 27, 1996, defendant took Fahey to dinner in Philadelphia. After dinner, they returned to his home. He killed her that evening in his home.

Defendant testified that he did not kill her, but instead, MacIntyre killed her. According to him, MacIntyre came to his house. She had a gun with her. When MacIntyre saw Fahey with defendant, she threatened to shoot herself. As MacIntyre went to shoot herself, defendant grabbed MacIntyre's arm; MacIntyre shot Fahey directly behind the right ear, killing her instantly. After a few moments of panic, he pulled himself together, sent MacIntyre home, and cleaned up. He put Fahey's body in the cooler, which according to him, he had bought as a present for Gerard.

The jury found defendant's testimony to be incredible. n4 The jury obviously believed MacIntyre's testimony that she was not present at defendant's house that night and did not kill Fahey.

> n4 In March, 1998, defendant sent a letter to another ex-lover, Susan Louth, wherein he asked her to tell people that MacIntyre had killed Fahey and he indicated his hope that this story would influence the jury pool.

**[*9]**

Defendant is the only person who knows exactly how he killed Fahey.

The next day, defendant and Gerard took Fahey's body to Gerard's boat, which was docked at the New Jersey shore. The two of them put the cooler on the boat and took it approximately sixty miles out to sea. Defendant then threw the cooler overboard. It would not sink. Gerard took a shotgun used for killing sharks and shot the cooler in an attempt to make it sink. It still would not sink. Defendant pulled the body from the cooler and wrapped it with the chain and anchor, finally causing it to sink. Gerard saw a human foot as the body sunk below surface. n5 Gerard subsequently threw the cooler overboard. n6

> n5 Gerard testified he did not see anything else because he purposefully would not look.

> n6 As noted earlier, fishermen later found a cooler, which verified Gerard's story.

### III. PENALTY PHASE

The testimony presented at the penalty phase is summarized below.

### IV. THE PARTIES' CONTENTIONS

The State contended that one **[*10]** statutory aggravating circumstance existed: that the murder was premeditated and was the result of substantial planning. *11 Del. C. § 4209(e)(1)*u. n7

> n7 In *11 Del. C. § 4209(e)(1)*u., it is provided in pertinent part:
>
> > Aggravating circumstances. - (1) In order for a sentence of death to be imposed, the judge must find that the evidence established beyond a reasonable doubt the existence of at least 1 of the following aggravating circumstances . . . .:
> >
> > ***
> > u. The murder was premeditated and the result of substantial planning. Such planning must be as to the commission of the murder itself and not simply as to the commission or attempted commission of any underlying felony.

The State also contended that the following non-statutory aggravating circumstances existed:

1) Evidence of the impact of the murder upon

friends, family and co-workers of Fahey;

2) Evidence of past actions of defendant seeking to harm an ex-lover;

3) Evidence of defendant's vindictiveness;

4) Evidence of **[*11]** defendant's criminal conspiracies during the investigation and while in prison;

5) Evidence of defendant's continuing manipulative behavior;

6) Evidence of defendant's lack of remorse;

7) Evidence of defendant's disdain for authority.

8) Evidence that the defendant remains a threat to direct crimes of vengeance while incarcerated.

Defendant disputed the existence of any elements which would establish the statutory aggravating circumstance of a premeditated murder which was substantially planned.

Defendant contended that the following mitigating circumstances existed in his case:

    1) The lack of any prior criminal record;

    2) The need for his daughters to have him in their lives;

    3) The need for his mother to have him in her life;

    4) The need of other family members to have him in their lives;

    5) The intense guilt which Louis and, particularly, Gerard would feel for their part in participating in these proceedings which might result in defendant's death;

    6) Defendant's community service;

    7) Defendant's ability to help others in prison.

## V. THE STATE'S EVIDENCE

The State contended that defendant substantially planned the murder, and it argued this was evidenced **[*12]** by a number of his actions. In late winter, early spring, 1996, defendant made inquiries to Gerard to use his boat in order to dump the body. n8 These arrangements were made by cover of the extortionist story which defendant told in February, 1996. In April, 1996, defendant purchased a cooler identical to that which became Fahey's coffin. Finally, in May, 1996, defendant had MacIntyre purchase a gun for him.

    n8 Interestingly, while working as a deputy attorney general, defendant prosecuted a case where the victim was shot behind the ear and the defendant in that case disposed of the murder victim's body by throwing it into the water.

The rest of the State's evidence dealt with non-statutory aggravating circumstances.

Fahey's family testified to the impact of the murder on their lives. They testified to what a positive influence Fahey had on their lives. She was a best friend to her sister, an integral part of the close-knit Fahey family which consisted of her siblings, their spouses and their children. She **[*13]** was an attentive aunt to her nephews. She was troubled, but there was a joie de vivre about her that infected others around her. She was loved by her family and by many friends and will be forever missed.

Family and friends still have a difficult time dealing with her death. For over two years, they did not know for certain what happened to Fahey or her body. They learned during the trial that she had been killed and her body tossed into the ocean. Family members continue to have a most difficult time dealing with her body's disposal and the fact that they never will have the opportunity to properly bury her.

The evidence showed defendant is manipulative, controlling, vindictive. His need for control over those around him is overwhelming. If someone breaks away from him or disobeys him, he lashes out with anger and violence. Not only does he take action on his own, but he conspires with others to help him in his schemes to punish that person for their disloyalty. For example, in the early 1980's, defendant conspired to have an ex-lover injured because she had rejected him. Ultimately, this ex-lover had to leave town in order to avoid the harassment he either was committing or was **[*14]** having committed against her. Because she rejected him, defendant ran her out of town and conspired to have her harmed. When defendant learned that MacIntyre refused to continue lying about the gun, he conspired with another inmate to have her house burglarized. His purpose was to intimidate her into continuing to lie for him and to not testify truthfully regarding the gun. He did not want his brothers Louis and Gerard to testify on his behalf in the penalty phase because he would rather they have suffered guilt than speak to save his life. He pressured his mother and sister to ostracize Gerard and Louis for their disloyalty to him. He killed Fahey when she sought to terminate

their relationship and he involved MacIntyre, Gerard and Louis in this murder.

The State presented evidence showing that defendant has no regard for rules. He has violated the prison rules numerous times. He conspires with other inmates to beat the prison system. He has done nothing constructive while in prison.

It also is noteworthy that defendant breached many rules the Court imposed during these proceedings. The Court, directly, and through counsel, on numerous occasions set forth rules to defendant which **[*15]** it expected him to follow, and defendant consistently violated those rules. He openly defies authority.

Finally, defendant has shown no remorse. He has not shown remorse for the death of a woman he claimed to love or for the impact of his actions on his long-term mistress, his family, the Faheys or friends whose lives have been forever damaged by his actions. Defendant's brother-in-law stated that defendant's medications have precluded him from showing any emotions. However, throughout this trial, defendant has shown a plethora of emotions: anger, defiance, contempt, and concern for some members of his family. He just has not shown the appropriate emotions: remorse, sadness, guilt, horror at his actions.

## VI. DEFENDANT'S EVIDENCE

Defendant's position regarding the substantial planning requirement is that none of the elements required to establish substantial planning existed. First, defendant maintained that he purchased the cooler as a present for Gerard, not for use as a coffin. Second, he testified that he never told Gerard or Joseph any stories about extortionists. Finally, he testified that he never went with MacIntyre to purchase a gun and he never saw her with a gun **[*16]** until she appeared at his house on the evening of Fahey's death.

Defendant produced the following evidence regarding mitigating circumstances.

First and foremost, he is the father of four wonderful daughters who need him. These girls have regular contact with their father, they love him very much, they support him, and they want him in their lives forever.

Second, other members of the family want defendant to continue to be a part of their lives. Defendant has been a strong presence in his family over the years, providing his mother, his siblings and their children emotional support, advice, guidance. They need him and want him to continue being a part of their lives.

Third, defendant led a good life and performed much public service. Defendant worked as a Deputy Attorney General, as City Solicitor during the administration of Mayor Daniel Frawley, and as legal counsel to Governor Michael Castle. He was active in his parish and he performed much work for the Catholic Church. He was on the Board of Directors and active in the affairs of several parochial schools. He participated in his daughters' lives and activities. He performed charity work. By all accounts, defendant appeared **[*17]** to be an upstanding member of Delaware's community. However, that good, even model, life is tainted by the private life he led, the life that was private even from his family.

The fourth mitigating circumstance is the impact of a death sentence on Louis and Gerard. Of most concern to this Court is the likelihood that a death sentence would debilitate Gerard. Gerard feels tremendous guilt for having "betrayed" the defendant by telling the truth. He would feel great responsibility and remorse for any death sentence imposed.

The fifth mitigating circumstance is that defendant could help others in prison such as by teaching them to read or providing legal advice if he is allowed to live, a possibility he, himself, did not choose to explore in his allocution.

## VII. THE COURT'S SENTENCING DETERMINATIONS

### A. THE PROCEDURE

The procedure which is to be followed in the penalty phase of a first degree murder case is set forth in *11 Del. C. § 4209*. Where there is trial by jury, the jury hears evidence pertaining to aggravation and mitigation and it hears argument from counsel for both sides. Then, the Court gives instructions and directs the jury to decide whether the **[*18]** evidence shows beyond a reasonable doubt that a least one statutory aggravating circumstance exists and whether the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt. *11 Del. C. § 4209(d)*.

In connection with its sentencing recommendation, the jury in this case had to respond to two questions. The first question was whether the evidence showed beyond a reasonable doubt the existence of the statutory aggravating circumstance, i.e., that the murder was premeditated and the result of substantial planning. The second question was whether the jury found by a preponderance of the evidence, after weighing all relevant evidence in aggravation or mitigation which bears upon the particular circumstances or details of the commission of the offense and the

character and propensities of the offender, that the aggravating circumstances found to exist outweighed the mitigating circumstances found to exist. The jury found by a vote of eleven (11) to one (1) the existence of the enumerated statutory aggravating circumstance. The jury found by a vote of ten (10) to two (2) that the aggravating circumstances outweighed the mitigating circumstances.

After **[*19]** the jury has made its determination and recommendation, this Court must decide the same questions. *Wright v. State, Del. Supr., 633 A.2d 329, 335 (1993),* cert. den., *517 U.S. 1249, 116 S. Ct. 2509, 135 L. Ed. 2d 198 (1996).* The Court may reject the jury's recommendation. *Lawrie v. State, Del. Supr., 643 A.2d 1336, 1346 (1994),* cert. den., *513 U.S. 1048, 115 S. Ct. 646, 130 L. Ed. 2d 551 (1994).* However, the Court does not ignore the jury's findings; instead, it considers the jury's recommendation when deciding what sentence to impose. *11 Del. C. § 4209(d).* But, in any case, the Court renders the final decision on the sentencing. *Shelton v. State, Del. Supr., 652 A.2d 1, 5 (1995).* If the Court does not find a statutory aggravating circumstance exists beyond a reasonable doubt, then a life sentence must be imposed. *11 Del. C. § 4209(d).* If it does find the existence of a statutory aggravating circumstance beyond a reasonable doubt, then it undertakes the weighing process set forth in *11 Del. C. § 4209(d)(1)*b.

I follow the statutory procedure below.

## B. STATUTORY AGGRAVATING **[*20]** CIRCUMSTANCE

I conclude that the State has proven beyond a reasonable doubt the existence of the following statutory aggravating circumstance: the murder was premeditated and the result of substantial planning. *11 Del. C. § 4209(e) (1)*u. Within the same time frame, defendant had MacIntyre buy a gun; he purchased the cooler; he made plans to borrow Gerard's boat; by creating the story of the possible need to kill extortionist(s), he laid the groundwork for a cover story which would allow his brother to help him dispose of a body; and he lulled Fahey into a false sense of security by pretending that he would settle for being her friend. Defendant took these steps during and after Fahey rejected him as her lover. Defendant had a plan and he worked on that plan for months before he ultimately murdered Fahey when it became clear to him that she had rejected him as her lover.

The defense has argued that if defendant had a plan, he would not have been so sloppy. His plan was not sloppy. Instead, a number of circumstances occurred which defendant obviously did not anticipate, and these circumstances helped to expose defendant as the murderer. These circumstances were the recovery **[*21]** of the cooler by the fishermen which verified Gerard's story; the recovery of a blood donation by Fahey which led to the ability to compare that blood to blood spots found in defendant's house; and the intervention of the federal government into the investigation which gave the investigating authorities access to a wider range of resources than the State or the City of Wilmington might otherwise have had. The involvement of Federal and State agencies outraged the defendant who suffered from the delusion that he and his friends were so powerful within the City of Wilmington that murder could be "worked out" with the Wilmington Police Department. n9

> n9 Defendant indicated in his trial testimony that he thinks there are some rules of fair play which would have precluded the federal government's participation in the criminal investigation, thereby resulting in his ability to escape conviction and punishment for murdering Anne Marie Fahey.

The Court is satisfied that the State proved beyond a reasonable doubt that **[*22]** defendant premeditated the murder of Anne Marie Fahey and he substantially planned that murder.

## C. NON-STATUTORY AGGRAVATING CIRCUMSTANCES

The Court is satisfied that the State has proved by substantial and reliable evidence the existence of the following non-statutory aggravating circumstances:

1) Substantial impact of the murder upon friends, family and co-workers of Fahey;

2) Past actions of defendant seeking to harm an ex-lover;

3) Defendant's vindictiveness;

4) Defendant's criminal conspiracies;

5) Defendant's continuing manipulative behavior;

6) Defendant's lack of remorse;

7) Defendant's disdain for authority.

8) Defendant remains a threat to direct crimes of vengeance while incarcerated.

This murder has had and will continue to have a long-lasting, profound impact on the Fahey

family, on Fahey's friends and on her co-workers. They have been deprived, respectively, of a beloved sister, aunt, and friend. Defendant brought pain and heartache on many innocent people, and destroyed the lives of many.

Defendant is manipulative, vindictive, and disdainful of authority. It is unlikely that he will adjust well to prison life and he probably will continue to defy **[*23]** prison authorities. It is likely that he will continue to involve other inmates in conspiracies to break prison rules or to mete out punishments to those he considers deserving of such.

Defendant is not remorseful for his actions resulting in the death of Fahey or in the disposal of her body. He only is angry that the Government was able to catch him, and that MacIntyre, Gerard and Louis were disloyal when required to tell the truth.

## D. MITIGATING CIRCUMSTANCES

I find the following mitigating circumstances exist in this case:

> 1) Defendant's lack of any prior criminal record;
>
> 2) The need for his daughters to have him in their lives;
>
> 3) The need for his mother to have him in her life;
>
> 4) The need of other family members to have him in their lives;
>
> 5) The intense guilt which Louis and, particularly, Gerard would feel for their part in participating in these proceedings which might result in defendant's death;
>
> 6) Defendant's community service.

I do not find that defendant is likely to help others while in prison. He has not yet undertaken to help others in a positive manner and it is likely that if he befriends anyone, it will be with the purpose of having that **[*24]** person do something for him.

## VIII. GUIDELINES TO FOLLOW IN WEIGHING AGGRAVATING AND MITIGATING CIRCUMSTANCES

The Court does not merely weigh the number of aggravating circumstances against the number of mitigating circumstances.

> The procedure to be followed by the trial judges ... is not a mere

> counting process of X number of aggravating circumstances and Y number of mitigating circumstances, but rather a reasoned judgment as to what factual situations require the imposition of death and which can be satisfied by life imprisonment in light of the totality of the circumstances present.

*Delaware v. Cohen, Del. Supr., 604 A.2d 846, 849 (1992)* (citing *State v. Dixon, Fla. Supr., 283 So. 2d 1, 10 (1973))*. In determining the appropriate punishment, the Court weighs qualitatively rather than quantitatively. *State v. Manley & Stevenson, 1997 Del. Super. LEXIS 5,* *49, Del. Super., ID Nos. 9511007022, 9511006992, Barron, J. (January 10, 1997), aff'd., Stevenson v. State, Del. Supr., 709 A.2d 619 (1998); Manley v. State, Del. Supr., 709 A.2d 643 (1998).*

## IX. THE WEIGHING PROCESS

Defendant planned, over a period of **[*25]** time, to kill Anne Marie Fahey and to dispose of her body so that it could not be found. He then blamed the murder on an ex-lover who had testified against him. The crime defendant committed was horrific. The crime epitomized the makeup of his character: vindictive and controlling.

As was the case in *State v. Gattis, 1992 Del. Super. LEXIS 474,* Del. Supr., Cr. A. Nos. IN90-05-1017 - 1019; IN90-05-1106 & 1107, Barron, J. (October 29, 1992), aff'd, *Del. Supr., 637 A.2d 808 (1994),* cert. den., *513 U.S. 843, 115 S. Ct. 132, 130 L. Ed. 2d 75 (1994),* some may argue that a defendant should not receive the death penalty for a domestic homicide. It is appropriate to quote from Judge Barron in response to such a contention.

> There are those who would consider less heinous and, therefore, more amendable to sentencing leniency, a murder committed against a spouse, paramour or girlfriend (i.e., a domestic homicide), as compared with a murder for pecuniary gain or a murder committed during the commission of a robbery or rape of a stranger. Conceptually, such a distinction is arguably supportable. Firstly, there is likely to be no statutory aggravating circumstance with regard to the former as opposed to the latter. **[*26]** See: *11 Del. C., § 4209(e)(1)j.* and (e)(1)o.; *11 Del. C., § 4209(e) (2).* Secondly, it is common with regard to domestic homicides that the perpetrator was under the

influence of extreme emotional distress or that his capacity to appreciate the criminality of his conduct or conform his conduct to the law was substantially impaired, while the latter class of homicides are normally perceived to be more callous and cold-blooded. Thirdly, the victim of a domestic homicide is often looked upon with less sympathy than a victim of, for example, a robbery-murder for the reason that the domestic homicide victim could have changed her living arrangement but opted not to do so, a rather twisted concept akin to consent.

As stated, this case is not a typical domestic homicide case. Here, two statutory aggravating circumstances were proven beyond a reasonable doubt. Moreover, the murder was committed in a callous manner without moral or legal justification. It was planned beforehand with adequate time for the defendant to contemplate the consequences of carrying out his intent. Further, the victim, tired of her relationship with the defendant, had endeavored to start a new life on her **[*27]** own.
Footnotes omitted.

*State v. Gattis, 1992 Del. Super. LEXIS 474, * 43-46.*

The circumstances of the murder here are similar to those in Gattis. No one, except the defendant, ever will know exactly how or why Anne Marie Fahey died. What is certain is that it was not a crime of passion but, rather, a crime of control. By all accounts, she had ceased to be defendant's lover but had never escaped his sphere of influence, control and manipulation. Defendant's premeditation and planning was for a contingency that, perhaps, he hoped would never happen, but did, on the evening of June 27, 1996. He chose to destroy a possession rather than lose it; to execute an escaping chattel.

The only mitigating circumstances of

significance to this Court concern defendant's daughters and the impact of the crime on Gerard. Defendant's daughters' love for their father is deep and genuine and they want him in their lives. However, during this trial, defendant has shown that he will take advantage of his daughters to accomplish an end which benefits himself. Their love for him is great. However, since defendant's past history is a prime indicator of his future behavior, it is clear that defendant poses **[*28]** a threat of harm to his daughter's well-being.

Gerard does not want defendant sentenced to death; he will feel great responsibility for it. Gerard bears no blame; instead, the blame goes directly to defendant. Defendant involved Gerard in his murder plans. Defendant committed the murder. Defendant is the one who must accept all blame, but does not because of his flawed character. Gerard should understand that defendant is reacting in his normal way: to strike out at the disloyal subject and punish that person who attempts to do what is right and not immoral.

Absent the harm to his daughters and to Gerard, there is nothing in defendant's life which would call for the imposition of a life sentence. Defendant will not adjust well in prison; he will constantly scheme to by-pass prison rules; he will defy prison authority; he will continue to manipulate those who love him from within the prison walls. He poses a threat of harm even while incarcerated. He committed a horrific crime. That crime and his antisocial behavior outweigh any mitigating circumstances. The sentence of death is warranted in this case.

## X. CONCLUSION

The Court concludes that the sentence for defendant's commission **[*29]** of the murder of Anne Marie Fahey shall be death by lethal injection.

IT IS SO ORDERED.

Sentencing Order is to follow.

William Swain Lee

Judge

**TAB # 6**

# STATE OF DELAWARE v. THOMAS J. CAPANO

## Def. ID # 9711006198 (R-1)

## SUPERIOR COURT OF DELAWARE, NEW CASTLE

### 2005 Del. Super. LEXIS 69

### December 17, 2004, Submitted
### March 9, 2005, Decided

**NOTICE:** [*1] THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**SUBSEQUENT HISTORY:** Affirmed in part and reversed in part by, Remanded by *Capano v. State, 2006 Del. LEXIS 1 (Del., Jan. 10, 2006)*

**PRIOR HISTORY:** *Capano v. State, 781 A.2d 556, 2001 Del. LEXIS 349 (Del., 2001)*

**DISPOSITION:** Defendant's motion for postconviction is denied.

**COUNSEL:** For Thomas J. Capano, defendant: Joseph M. Bernstein, Esquire, Wilmington, DE; David A. Ruhnke, Esquire, Ruhnke and Barrett, Montclair, N.J.

Attorneys for the State of Delaware: [*2] Loren C. Myers, Esquire, Department of Justice, Wilmington, DE; Ferris W. Wharton, Esquire, U.S. Attorney's Office, Wilmington, DE.

**JUDGES:** Graves, Judge.

**OPINION BY:** Graves

**OPINION:**

Pending before the Court is the motion for postconviction relief which defendant Thomas J. Capano ("defendant" or "Capano") has filed pursuant to Superior Court Criminal Rule 61 ("Rule 61"). This is the Court's decision on defendant's motion.

## PROCEDURAL HISTORY

Following a lengthy jury trial, Capano was found guilty of murder in the first degree for the murder of Anne Marie Fahey. Following a penalty hearing, the jury, by a vote of 11 to 1, found beyond a reasonable doubt the statutory aggravating circumstance that the murder was premeditated and the result of substantial planning. The jury recommended, by a vote of 10 to 2, that the trial judge find the aggravating circumstances outweighed the mitigating circumstances. The trial judge, William Swain Lee, n1 imposed a sentence of death on March 16, 1999.

> n1 Judge Lee retired from the bench and the case was reassigned.

[*3]

The Delaware Supreme Court affirmed defendant's conviction and sentence on August 10, 2001. *Capano v. State, 781 A.2d 556, 669 (Del. 2001)* ("Capano II"). n2 Defendant sought certiorari to the United States Supreme Court. That Court held defendant's petition and did not act upon it until it released its decision in *Ring v. Arizona, 536 U.S. 584, 153 L. Ed. 2d 556, 122 S. Ct. 2428 (2002)*. It then denied the petition. *Capano v. Delaware, 536 U.S. 958, 153 L. Ed. 2d 835, 122 S. Ct. 2660 (2002)*. The case was returned to Delaware. Subsequently, defendant filed his present motion for postconviction relief. Defendant's arguments fell into two categories which were briefed separately and likewise, are decided in two parts of this decision. Part One will deal with all issues involving claims that defendant's trial counsel were ineffective. Part Two deals with claims that the imposition of the death penalty is unconstitutional as to the facts and events underlying his conviction and sentence.

> n2 The parties refer to this decision as Capano II because they refer to the Superior Court's decision on a motion for new trial as Capano I. For ease of reference, I, too, refer to the decision on appeal as Capano II.

[*4]

This Court has had the benefit of evidentiary hearings and substantial briefing which the parties completed on December 17, 2004.

## FACTUAL BACKGROUND

No point exists to recite the entire factual basis of the State's case and defendant's case, as the Delaware Supreme Court provided a complete accounting of the relevant facts in its decision affirming the conviction and sentence of defendant for the intentional murder of Ms. Fahey. I adopt the Supreme Court's factual recitation herein.

## PART ONE -- INEFFECTIVE ASSISTANCE OF COUNSEL

Originally defendant based his ineffective assistance of counsel claims on thirty-six (36) separate grounds. The Court, noting the conclusory pleadings, directed that the claims be reconstituted under the requirement that they contain substantive allegations together with allegations of prejudice. On August 4, 2003, defendant filed his amended motion for postconviction relief as to ineffective assistance of counsel. He raised eleven (11) claims, with some claims involving multiple issues.

### THE STRICKLAND STANDARD

Shortly after Ms. Fahey's disappearance, Capano began to assemble his defense team. Ultimately, he chose four attorneys to **[*5]** represent him at trial. Each was known to defendant and each was a seasoned criminal defense attorney.

Defendant's allegations against these attorneys are based on claims of ineffective assistance of counsel. Therefore, defendant has the burden of establishing a deficient performance by his defense team (ii) which actually caused defendant prejudice. *Strickland v. Washington, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984)* ("Strickland"). Deficient performance means that the attorneys' representation of Capano fell below an objective standard of reasonableness. *Id. at 688.* In considering post-trial attacks on counsel, Strickland cautions judges to review the counsels' performances from the defense counsels' perspective at the time decisions were being made. *Id. at 689.* Second guessing or "Monday morning quarterbacking" should be avoided. Id.

A finding of counsels' deficient performance needs to be coupled with a showing of actual prejudice. Actual prejudice is not potential or conceivable prejudice. "Defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been **[*6]** different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id. at 694.* Strickland establishes that "the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result." *Id. at 686.*

An additional and notable aspect of this case is that Capano is not the normal defense client. He was a successful attorney. He was active in all phases of the decision-making process. n3 The testimony establishes that he was a strong-willed person who was very involved in his case. His attorneys all testified that at times there were difficulties in representing Capano due to differences of opinion between them and Capano as to the approach the defense should take on some issues. Regardless of the friction which may have arisen in having an attorney as a client and having that client actively participating in his defense, including strategy and tactics, I do not find any of Capano's attorneys to have been ineffective.

> n3 I am not applying a different standard to defense counsel because their client was an attorney, but Capano's legal knowledge and his degree of involvement in practically all matters is noteworthy when considering his present allegations.

**[*7]**

## PROCEDURAL BARS

Generally, claims of ineffective assistance of counsel are raised for the first time in a postconviction motion filed pursuant to Rule 61 following a direct appeal as to the trial outcome. Therefore, the procedural bars of Rule 61 would not be applicable. But if issues raised in the Rule 61 motion could have been raised on the direct appeal, but were not, then the defendant must comply with Rule 61 (i)(3) by showing cause for not raising the issue on appeal and actual prejudice. If any issue is procedurally barred it will be addressed in the consideration of that issue.

## CLAIM 1

Defendant alleges his attorneys were ineffective by (a) failing to renew a request for a change of venue following jury selection, (b) failing to seek a gag order, and (c) failing to request sequestration of the jury for the entire trial.

Prior to jury selection, defense counsel made a unique change of venue request. Defense counsel asked that the case be tried in another state. In denying the change of venue motion, Judge Lee noted "if the atmosphere created by media coverage has become so pervasive that it is impossible to obtain an appropriate number of qualified jurors and alternates **[*8]** that will become apparent at the time of jury selection." There was no application for either a gag order or for jury sequestration

during the trial.

Based upon the Rule 61(g) affidavits and the hearing testimony, I am satisfied that these claims fail.

The defense engaged an expert to poll the citizens of Sussex, Kent and New Castle Counties to gauge the public attitude concerning this case and Capano individually. The results of this inquiry yielded no significant difference between the counties as to perceptions about Capano. Additionally, Capano expressed a preference to have the case tried in New Castle County. These results, as well as Capano's preference of New Castle County as a forum, were reasonable factors to consider in accepting New Castle County, Delaware as a trial forum.

During jury selection, Capano was involved actively in the selection of jurors. Capano expressed a strong desire to select young women as jurors. His attorneys disagreed with the tactic. The defense team believed it was unwise to seat young women on the jury since the victim of the alleged murder was a young woman. Nevertheless, Capano thought having young women would be helpful and that Capano and [*9] his defense might persuade them. Regardless of these differences, a jury and alternates were selected. Counsel reported that Capano was "happy" with the jury. Venue was no longer an issue.

I find, based upon the thorough *voir dire* conducted by the Court and the fact that the Court was able to obtain an impartial jury, that if the venue motion had been renewed, it would have been denied.

I find the decision not to seek a change of venue to Kent or Sussex County to have been reasonable based on the information counsel had available to them and defendant's own preference. I find that defendant has not established that the New Castle County venue prejudiced him.

Capano's defense team did not seek a gag order at any point in the proceedings. I find Capano's objection to this decision to be disingenuous. Capano directed his attorneys to generate publicity so that his version of events would reach the public and essentially put his "spin" on the story. Counsel followed his directions.

No evidence exists that a publicity battle ensued with the State that prejudiced defendant's rights. It would appear the State did not get drawn into a media campaign. The trial judge carefully warned [*10] the jury to avoid media coverage of the trial and methodically quizzed the jury about any potential media influence. Defendant has not established that his attorneys should have sought a "gag" order and he has not established prejudice.

Finally, I do not fault trial counsel for not seeking to sequester the jury for the entire trial, which was forecast to consume several months' time and the holiday season. Sequestering a jury for such a lengthy period of time would have been unreasonable. The trial judge regularly monitored the jury. Defendant has not shown any prejudice arising from the jury not being sequestered during the trial.

In defendant's final memorandum of law, he acknowledges that trial counsels' decisions were reasonable as to each of the above claims when viewed as to the time these decisions were made.

The complaints raised in Claim 1 are denied.

CLAIM 2

Defendant alleges trial counsel were ineffective when they failed to inform the Court that the prescription medications administered to defendant during trial affected his ability to assist his attorneys.

The Court, State and defense counsel were all aware that Capano was being given medications, including, [*11] but not limited to, anti-anxiety and anti-depressant prescriptions. He voluntarily took these medications. His doctor prescribed the medicines for him. Judge Lee quickly addressed all concerns related to the administration of medicine when it was alleged the Department of Correction was not being cooperative as to when Capano should receive his medications.

During the course of the trial, defendant was examined by his own psychiatrist as well as the State's expert. Both doctors reported that Capano was capable of assisting his attorneys. Nothing in the record indicates that Capano was hindered in any way by the medications he was taking during the trial. Mr. Oberly, who has known Capano for decades, noticed no changes in his personality before, during, or after the trial. Mr. Oberly had no concerns that the medications were affecting Capano's ability to participate in his defense. He felt that throughout the proceedings, Capano was "alert, attentive and in control of his defense".

This is not a case where defendant was forced to take anti-psychotic medications. Capano took the medications his doctors prescribed because he wanted them.

Capano's allegations concern his inefficacy [*12] at trial due to the influence of the medications. The Court finds it noteworthy that Capano's argument is void of any medical or expert testimony discussing the effect of the medications. Nor has Capano suggested a better course of action

by his attorneys in regard to his medication.

Capano has failed to show his attorneys did anything wrong. He has not met his burden of establishing that whatever medication he might have consumed during the trial had a significant, perceptible, negative effect upon his ability to testify and/or communicate effectively with his attorneys. *Albrecht v. Horn, 314 F. Supp. 2d 451, 479 (E.D. Pa. 2004)*. This claim is dismissed.

### CLAIMS 3 and 4

### CLAIM 3

Defendant alleges that trial counsel were ineffective when they failed to request a limiting instruction concerning out-of-court statements attributed to Ms. Fahey.

### CLAIM 4

Defendant alleges that trial counsel were ineffective when they agreed to stipulate to the admissibility of hearsay testimony from several sources: (a) Ms. Fahey's diary, (b) e-mails between defendant and Ms. Fahey, and (c) the testimony of Kim Lynch-Horstman.

Since the defense and the State consider Claim 3 and Claim **[*13]** 4 collectively, I will rule upon them together.

It is necessary to review the hearsay issues raised and decided on appeal because defendant now is renewing his attack on this hearsay evidence. The pertinent portions of the Supreme Court decision on these issues appear *at pages 605-627 of its opinion in Capano II.*

On direct appeal, the Supreme Court considered the hearsay attacks comprehensively and exhaustively. The Supreme Court held that the hearsay statements of Ms. Fahey reflecting her fear of Capano were admissible under D.R.E. 803(3) because they focused on her state of mind. But the Court ruled that the trial court erred in permitting the jury to hear the reasons, memories or beliefs giving rise to Ms. Fahey's state of mind. To include descriptions of the events which give rise to a person's state of mind improperly opens this hearsay exception to historical events.

The Supreme Court also considered defendant's argument that Ms. Fahey's state of mind evidence concerning her fear of Capano should not have been presented in the State's case-in-chief. Capano argued that Ms. Fahey's state of mind evidence only should have been presented by the State in its rebuttal phase **[*14]** of the trial and then only after it was considered relevant based on the defense testimony.

Noting that similar evidence usually becomes relevant based upon the defense evidence and therefore is usually admissible in rebuttal, the Supreme Court held that under the facts of this case, testimony relevant to Ms. Fahey's state of mind helped to prove "(1) that Fahey sought to end her romantic involvement with Capano, and (2) that Capano was a spurned lover, who therefore had a motive to kill her." *Capano II, 781 A.2d at 615*. This evidence properly was admitted in the State's case-in-chief for that reason.

The Supreme Court also held that Ms. Fahey's hearsay statements to psychotherapists were admissible under the medical diagnosis or treatment exception to D.R.E. 803(4). In the Supreme Court's analysis of this issue, it noted that what Ms. Fahey reported as to historical events was admissible under D.R.E. 803(4). In other words, the restrictions on the usage of past events to explain one's state of mind under D.R.E. 803(3) are not applicable to D.R.E. 803(4).

The Supreme Court also conducted a harmless error analysis of the admission of the Fahey hearsay as to past events. Ms. **[*15]** Fahey's hearsay testimony was presented by her psychiatrist, the psychologists, several of Ms. Fahey's friends, e-mails written by Ms. Fahey, and portions of her diary. The Supreme Court's harmless error analysis included an assumption n4 that past events testimony admitted under D.R.E. 803(4), as discussed above, should not have been admitted.

    n4 This assumption put the harmless error analysis in a more favorable perspective as to defendant's argument.

The harmless error analysis the Supreme Court conducted therefore was based upon the stipulation the State and the defense reached that portions of the e-mails between Ms. Fahey and Capano, portions of Ms. Fahey's diary and the testimony of Kim Lynch-Horstman would be admitted regardless of that evidence being hearsay.

The Supreme Court determined that any possible error arising from the admission of hearsay evidence involving past events under D.R.E. 803(3) or D.R.E. 803(4) was harmless because it was cumulative of, or more of the same as, the hearsay evidence **[*16]** the jury heard due to the stipulation.

As noted earlier, the Supreme Court's harmless error analysis gave defendant the benefit of the Supreme Court's assumption that past events testimony would not be admissible under the medical diagnosis and treatment exception contained in D.R.E. 803(4). Under this best case scenario for defendant, the Supreme Court found

harmless error. Defendant failed to convince the Supreme Court, and he has failed here as well. My analysis of the prejudice prong must track that of the Supreme Court, but I cannot give defendant the benefit of the assumption the Supreme Court considered. In my analysis of prejudice to defendant, I must apply the Supreme Court's decision that the past events maybe considered under D.R.E. 803(4). Capano was unable to convince the Supreme Court even with a favorable assumption. I must apply the actual evidentiary rulings, including the Supreme Court's finding with regard to D.R.E. 803(4). As would be expected, if he did not prevail on this issue at the Supreme Court, he will not prevail here.

In summary, for Rule 61 purposes, the introduction of past events hearsay caused no prejudice to defendant because (i) it is the same as **[*17]** was admitted by stipulation of both parties to use as they chose, and/or (ii) it is the same as was found to be admissible under D.R.E. 803(4). n5

    n5 Thus it would appear that Ground 3 should be procedurally barred as the issue has been previously adjudicated. Superior Court Criminal Rule 61(i)(4). I have reviewed the merits of the argument because of its tie-in to the argument that the stipulation was unnecessary.

With this background, Capano now complains that his lawyers made a huge mistake in agreeing to the stipulation which allowed the jury to be exposed to the e-mails, the diary, and the testimony of Kim Lynch-Horstman.

Both parties acknowledge that this stipulation cut both ways. The hearsay has been categorized as the "bad" hearsay and the "good" hearsay based on its impact on the respective parties' positions.

Capano argues that his attorneys were ineffective for their failure to recognize that he could have kept out the "bad" hearsay while introducing the "good" hearsay through D.R.E. 807 **[*18]** (formerly D.R.E. 803(24)).

Capano relies upon *Demby v. State, 695 A.2d 1152 (Del. 1997)* ("Demby") to support his argument that the "good" hearsay would have been admissible. Capano's argument fails because he attempts to push Demby well beyond its holding. In Demby, the Supreme Court ruled that the defendant should have been permitted to use D.R.E. 807 to permit hearsay testimony that another person had admitted to committing the homicide for which Demby was on trial. The Supreme Court found that this inculpatory statement of a third party should have been presented to the jury. What evidence is more important and relevant to a defendant on trial for murder than evidence that another person bragged about shooting the victim? Demby does not stand for the proposition that any and all favorable evidence is admissible under D.R.E. 807. Rather, there is a qualitative difference in self-inculpatory statements by a third party as opposed to Capano's desire to have reconciliation and good relations hearsay evidence put before the jury. The defense would not have obtained a favorable ruling had they tried this tactic. The defense attorneys were mindful of the difficulty and **[*19]** remoteness of independently getting the "good" hearsay introduced. Therefore, with Capano's knowledge and agreement, they entered into the stipulation.

I also note that even if the defense somehow got the "good" hearsay introduced without the stipulation, then D.R.E. 106 may have permitted "bad" hearsay evidence to be introduced in order that it be placed in proper "context" for the trier of the facts. A strong argument could be made that "cherry picking" portions of the communications relating to the "good" hearsay, while trying to keep the "bad" hearsay under wraps, would have permitted a presentation of evidence which was misleading, leading to the same result as the stipulation.

Therefore, I do not find that Capano's trial counsel were ineffective for not employing D.R.E. 807 and Demby to introduce the "good" hearsay while keeping out the "bad" hearsay involving the ongoing relationship between Capano and Ms. Fahey.

Was the stipulation objectively unreasonable based upon what defense counsel knew at the time of the stipulation? No. Capano played his cards very close to his chest. He refused to discuss the events of the evening culminating in Ms. Fahey's death with his attorneys. **[*20]** It was not until the night before opening statements that Capano told the opening attorney, Mr. Oteri, that he should inform the jury that Ms. Fahey's death was an accident.

Capano's attorneys also knew that the State planned to present the testimony of defendant's brother who aided Capano in disposing of Ms. Fahey's body at sea and helped him conceal other evidence. Capano's lawyers knew the State would be able to corroborate much of this testimony.

To get the jury to accept the theory that Ms. Fahey's death was an accident and that Capano had no reason to kill her, based on their recent rapprochement, defense counsel felt it was necessary to present the jury with Ms. Fahey's positive comments and feelings about Capano.

Also, defense counsel knew that if they were able to get the "good" hearsay introduced and the "bad" hearsay followed, it might appear to the jury that they were not being "up front" with the jury.

Finally, Capano claims that if trial counsel had conducted his defense effectively, the "bad" hearsay would have come out in rebuttal as opposed to the State's case-in-chief. Perhaps, but when the jury hears testimony is not as important as the substance of evidence. **[*21]** Whether the defense preferred to have "bad" evidence get before the jury in the State's case and then address it in the defense or force the State to introduce it in rebuttal is a trial decision and either tactic can be argued to be reasonable. Defendant can show no prejudice as to this timing complaint.

At the evidentiary hearing, Capano's defense counsel testified that the decision to stipulate to the hearsay evidence was discussed in great detail with Capano. Mr. Oteri noted it was his opinion that a judge never would allow the defense to keep out the "bad" hearsay and admit only "good" hearsay. Mr. Oberly considered and researched this very issue and concluded the same.

Capano was in full agreement with the decision. Trial counsel testified that Capano specifically wanted to enter the stipulation, to allow the admission of positive hearsay, especially the diary evidence and Kim Horstman's testimony. Capano and his defense team entered into the stipulation after weighing the "good" against the "bad". This was a trial strategy decision and Capano was included in this decision.

For all the aforementioned reasons, I find that Capano's attorneys were not deficient in the representation **[*22]** of Capano when they, with Capano's full understanding and agreement, entered into the hearsay stipulation with the State. Also, as aforestated, Capano was unable to show any material prejudice that resulted from the stipulation.

As to the claim that the limiting instruction was insufficient and should have been given after each witness, I note the following: (1) defense counsel discussed the limiting instruction with each other and defendant; (2) the instruction was given after the testimony of Dr. Kaye and after Jill Morrison, indicating that it was considered on a witness-by-witness basis; n6 (3) Cross-examination was recognized as an effective alternative to a limiting instruction for each witness' testimony; (4) Capano and the defense team wanted the jury to consider this hearsay evidence because the up and down relationship was going well and they were reconciling.

n6 The Judge instructed the jury that the hearsay evidence was limited to Ms. Fahey's state of mind. He also informed the jury that evidence of any act that could be considered harassing in nature could not be used as evidence that Capano was a bad person and therefore probably committed the offense with which he is charged. Defendant's Appendix Claim 3, pp. 22, 23, 24 [Jill Morrison]; p.136 [Dr. Kaye].

**[*23]**

The defense wanted the jury to consider Ms. Fahey's hearsay statements, not just to reveal her state of mind, but also to conclude that based on their positive feelings for each other, Capano would not have set out to kill her. It would have been counterproductive for defendant to pursue a more stringent limiting instruction as to her state of mind.

The limiting instructions adequately circumscribed the nature of the evidence and the proper use of that evidence by the jury. There is no reason to believe the jury would not have considered all of the instructions as a whole and applied the instruction to similar testimony.

I do not find counsel ineffective for not seeking a limiting instruction for each of these witnesses. Constantly telling the jury that they cannot use the evidence as proof that the defendant is a bad person may become counterproductive.

Finally, Capano's claim lacks a showing of actual prejudice.

I find that Capano has not shown his attorneys to be ineffective as to Claims 3 and 4 nor has he shown any actual prejudice that resulted from their trial decisions. These claims are denied.

CLAIM 5

Capano alleges trial counsel were ineffective because they failed **[*24]** to make a timely objection to the State's use of letters sent to defendant, in prison custody, which the Department of Correction intercepted and later turned over to the prosecution.

When the history of this issue is explored, one can only conclude that this is a baseless claim. Based upon the transcripts, affidavits and the hearing testimony, it is reasonable to make the following conclusions.

The Department of Correction informs new residents or inmates of its policy that incoming mail may be inspected. There is legal authority permitting the Department of Correction to screen incoming mail, n7 but my resolution of this issue is

made on the facts.

n7 *Thornburgh v. Abbott, 490 U.S. 401, 104 L. Ed. 2d 459, 109 S. Ct. 1874 (1989); Turner v. Safley, 482 U.S. 78, 79, 96 L. Ed. 2d 64, 107 S. Ct. 2254 (1987).*

The defense was aware that the State had copies of the incoming mail from Ms. MacIntyre to Capano. The State also had several letters from Capano to Ms. MacIntyre that came into the State's possession [*25] when she mailed these letters back to Capano.

The State made the defense aware that these letters had been intercepted, but had not been examined by the prosecution. The defense wanted copies of the letters. Discussion ensued as to whether, or if, the State turned over the letters to the defense, that could constitute a waiver by the defense of any use of the letters by the State.

This issue was mooted then and remains moot by Ms. MacIntyre's decision to cooperate with the State. With the exception of a few handwritten letters, she provided the State with copies of her correspondence to Capano.

Although the defense filed a motion to suppress the MacIntyre correspondence, it did not pursue it. After the letters were introduced into evidence, there was some discussion about the motion. It is reasonable to surmise that the suppression motion was not pursued because the defense knew the letters would come in regardless of any objection due to Ms. MacIntyre's cooperation. Also, the defense intended to use her correspondence, hopefully to its advantage.

I do not need to decide if the defense should have pursued the suppression motion because defendant has not pointed to a single letter [*26] which is claimed to have been seized in violation of defendant's constitutional rights, which (1) could and should have been suppressed and (2) caused defendant any prejudice.

This claim fails.

CLAIMS 6 and 7

CLAIM 6

Defendant alleges trial counsel were ineffective in the direct and re-direct examination of defendant.

CLAIM 7

Defendant alleges that trial counsel were ineffective in the cross-examination of defendant.

These claims involve both the preparation for defendant's testimony and issues that arose during his testimony. They are best discussed together.

Defendant generally complains that there was such a breakdown in the client-attorney relationship that a de facto dissolution of the relationship occurred, and trial counsel effectively abandoned Capano. Capano argues this breakdown caused his direct examination and cross-examination to be a "disaster".

Based upon the transcripts, the Rule 61(g) affidavits and the Rule 61 evidentiary hearing, it is clear Capano has a forceful personality. Sometimes accepting, sometimes rejecting the advice of his attorneys, Capano made it clear to his defense team that it was his case, that "It's my life", and that he [*27] was going to be involved.

Capano's failure to communicate candidly with his attorneys caused most, if not all, of the problems of which he now complains. He refused to give his attorneys his account of Ms. Fahey's death until the eve of trial. They had great difficulty in getting their client to open up. His communications with them were in the form of hypotheticals and "what if's". I can find no error on counsels' part for any of the problems in Capano's direct examination or cross-examination. The evidence leads to but one conclusion. They continuously strived to fulfill their responsibility to zealously defend Capano. It was not due to their lack of effort or a de facto abandonment of their client that created the alleged poor showing by Capano. Capano's piecemeal cooperation with his defense team set the stage for any dissatisfactory showing on his part. He insisted on maintaining control, letting his attorneys know only what he chose to reveal, and setting his own imprudent timeline to make such revelations. His attorneys cannot be blamed for their client's failure to heed their advice or his failure to cooperate with them in a more meaningful way.

Capano knew what he was [*28] doing. His attorneys advised him constantly of the consequences of an unprepared cross-examination. As they expected, Capano's refusal to prepare resulted in a withering cross-examination. His attorneys did not fail him, he failed himself.

Now I shall proceed to the specific allegations of ineffective assistance of counsel arising during Capano's testimony.

(a) Earlier in his career, Capano successfully prosecuted a first degree murder case against "Squeaky" Saunders. The prosecutor questioned Capano about his recollection of matters the prosecutor labeled as similarities between the Saunders' case and his case. He was asked about the cause of death in the Saunders' case -- a rear-entry

gunshot about two inches from the ear. He also was asked about the closing argument he gave in that case which referenced the disposal of the victim's body in a tributary of the Delaware River and, but for a set of sluice gates, the body would have disappeared into the ocean, not been located or not found as quickly as it was.

Defense counsel objected to this line of questioning on relevancy grounds. The transcript reflects a discussion that the relevancy was related to the prosecution contention **[*29]** that there were similarities in the cases. The defense team withdrew the objection.

It would appear that the relevance objection and the Judge's response to the "similarities" adequately addressed the relevancy objection. I am satisfied that the similarities between the two cases made the prosecutor's questions relevant and had the objection not been withdrawn, it would have been denied. I also find that defendant cannot show legal prejudice stemmed from this testimony. The testimony comprised part of the State's argument that Capano knew the importance of forensics and the lack of a body in a murder prosecution.

(b) There was testimony that defendant provided a twenty-five thousand dollar ($ 25,000) loan to Theopalis Gregory, Esquire. There was no objection to this question at trial and Capano now insists that the loan's admission should have prompted an objection. Capano believes the evidence created an inference that Capano was a "political insider" who used his wealth to gain unfair advantages. To the contrary, defense counsel saw this evidence as helpful to show a specific act of kindness by Capano. I agree that the relevancy of the State's inquiry is remote, but I also note **[*30]** that this information was helpful in painting Capano as a person who helped his friends. He helped Mr. Gregory. There was testimony he helped Ms. Fahey through numerous acts of generosity. I find no prejudice to defendant in the jury's hearing about the Gregory loan.

(c) Defendant makes a forceful legal argument that his attorneys were ineffective in failing to object to the prosecutor's questioning about his pre-trial silence. The defense notes the differing standards applicable to questions to a testifying defendant about his pre-arrest, pre-Miranda silence, *Jenkins v. Anderson, 447 U.S. 231, 65 L. Ed. 2d 86, 100 S. Ct. 2124 (1980)*, and a defendant's silence post-arrest, *Doyle v. Ohio, 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976)*. The applicable law is not at issue. Capano's present complaints must be denied on the facts. Defense counsel testified defendant's direct testimony opened the door to the State's questions, including pre-arrest and post-arrest silence.

What were the "door opening" responses given in Capano's direct examination that led to the aforementioned cross-examination? That portion of defendant's direct examination is found in the State's **[*31]** Appendix B34, p. 169, beginning at Line 7.

Q. You've told us you lied to everybody right up until now. Is that correct?

A. Yes, other than privileged conversations.

Q. Tell us why you have persisted in this lie for so long.

A. Well, in the beginning because I believed my state of mind was that I'd be out of jail after the bail hearing, and that serving three months in jail I deserved it, you know, for what I had done afterwards.

I knew, you know, that eventually I would be charged with some crimes for what happened afterwards.

But as my attorneys, we were all quite confident that I was going to get out on bail, and when it didn't happen, that changed my view, and so I needed to recover from that.

And I had barely recovered from that when I realized, you know, when Debbie MacIntyre started lying about me, and once that happened, I was crushed emotionally, mentally and acting crazy for a couple of weeks.

By that time we're getting close to the end of April -- excuse me, the end of March. If anybody believes me, after all this publicity and everything else, you know, they were going to believe me now if they weren't going to believe me back in April.

Q. But you --

A. Plus **[*32]** we were going through -- you didn't get into the case until May, for example. I mean we were going through some switches in attorneys.

Q. You had not told anybody the truth though prior to your arrest for that eighteen months prior to your arrest, correct?

A. Say that again please.

Q. Prior to your arrest on

November 12th of 1997, and subsequent to the incident on June 27th, 1996, a period of approximately eighteen months --

A. You mean from the time of the incident until I was arrested. And everything you're asking me is excluding anything that's a privileged conversation.

Q. Right.

A. No, I had not told anyone the truth.

Q. And can you tell us why you had not told anybody the truth during that period of time, sir?

A. Well, I was hoping -- I was selfish, and I was hoping to keep myself from any ramifications, and I was also being true to my word to protect Debbie.

Q. Was there anyone else you were protecting?

A. Gerry.

Q. Now, sir --

A. Tom, please.

Q. In February of 1998, you learned that Deborah MacIntyre did something, is that correct?

A. Yes.

Q. And what was it you learned that she did?

A. I learned that she had agreed to become a witness for the government. **[*33]**

Q. Did you, subsequent to learning that, go to anyone and tell them the story you've told this jury here?

A. No one who wasn't privileged. n8

Q. Right.

A. Correct.

Q. Is there a reason -- tell the jury the reason why you didn't tell anyone this story prior to this trial.

A. Well, I'm kind of a confidential person, and I didn't think it was, you know -- it would just sound like sour grapes frankly at the time.

I mean she -- not she, but the slickster from Philadelphia had outwitted us, and I never -- to this day, I still can't believe that Debbie would lie so much. I mean that's not really Debbie who came in here. So --

Q. But sir, you've just been betrayed by a woman you have been protecting for two years.

A. A woman I'm in love with.

Q. Would you not, at that point, go on a roof top and scream, "I'm taking the fall for something she did"?

A. Well, initially as I think I tried to indicate, I was basically out of my mind for a couple of weeks and not thinking rationally.

Then there were the issues regarding changing attorneys and just my mental status and condition. That's when they really had to jack the drugs up.

And so I -- I wasn't going to be making any calls then. **[*34]** I was just going to be looking to put together a final -- the final legal team and follow the advice of the four chiefs.

Q. Which was to trust the jury?

A. Yes, which was trust the jury; if you say something now, it will get all just twisted around in the media; just talk to the jury directly.

Q. All right.

Now, sir, you made two statements to the police at the time they came to your house on Sunday morning and again on Sunday afternoon when they searched your house, is that correct?

A. That's correct.

Q. Did you make any subsequent statements to the police?

A. I attempted to.

Q. Can you tell us, sir, when you attempted to?

A. In the month of July.

Q. Tell us what you did and when.

A. My attorneys, like most

attorneys, didn't want me to say anything to anybody. I tried twice to communicate that I really did want to speak to the authorities.

At that point it was still a state matter, state and city, and initially the responses were -- and I had certain limitations. I wasn't willing to talk about, you know --

Q. Speak to the mike please, Tom.

A. I was not willing to talk about Anne Marie's confidences, and I wanted to limit the conversation to Thursday night and anything [*35] about that weekend.

That was rejected. Then I wanted to -- I forget who told me this, but the Fahey family got word to me that they were not concerned about -- not that they were not concerned, but that it was okay with them if I disclosed private matters about Anne Marie if I spoke to the police.

And my response was I'll do that, but I'm not going to get into -- and I rattled off such things as I'm not going to talk about my marriage, I'm not going to talk about other people I've seen, I'm not going to talk about my taxes, you know.

Just -- I was not going to open myself to a free-wheeling interrogation that had nothing at all to do with what was at hand. And that offer was also rejected.

And then I tried other things as well during the month of July.

Q. What else did you try to do?

A. When Bud Friel came to see me, I asked him to find out if I could call Robert Fahey, and the answer came back no.

I also was still speaking to then Kim Horstman, now Mrs. Lynch, and I asked her to intervene so that I could attempt to speak to again Robert.

I even asked Kim one weekend she was going to the shore, close by to Stone Harbor, maybe Avalon, and I tried to talk her into coming to our [*36] house in Stone Harbor and spending, say, Sunday night going in late on Monday so that the two of us could talk.

I phrased it in terms of -- I wasn't about to say anything over the phone. I phrased it in terms of so we could put our heads together since we were the two people closest to her, and you know, my hope was to begin to establish some communication at least on that personal level before it became the law enforcement level.

And I also -- did I say that I called Robert and left a message?

Q. No, you did not say that.

A. I called Robert Fahey's -- I don't know whether it was his work number or not, I called his number and I left a long rambling message and that I wanted to speak to him, and I never heard back.

I never heard back from Robert or from any of them in that matter. They wrote me a letter at one point, but it was a letter to me that was clearly written by someone else, probably an attorney.

Q. Now, sir, you told us that your attorneys had told you not to speak to anyone.

A. Yes, they did.

Q. Did you, despite that good advice, attempt to speak with a law enforcement official?

A. Yes, I did.

Q. Can you tell us about that, sir?

A. Well, despite what I've already [*37] told you, I also attempted to speak to -- he was a retired law enforcement official . . .

n8 It is noteworthy that while Capano may have had privileged communications with others, he did not tell the four attorneys representing him at his trial "the story you've told this jury" until the trial.

Having chosen to address the "silence" issue in his direct examination, the limited cross-examination by the State that followed was not unfair or a breach of Capano's constitutional rights to remain silent, nor did the State create any unfair inferences in its line of questioning. The State's

attack went to the credibility of the factual issues Capano raised.

Defendant had a problem with which he was going to have to deal if he testified, and any defense attorney worth his salt knew it. The jury learned that following Ms. Fahey's disappearance, Capano was communicating that he knew nothing about her whereabouts. The jury also learned that he had known about her disappearance and personally had disposed of her body [*38] at sea Once he revealed the accidental shooting of Ms. Fahey and his subsequent conduct, it would have been devastating to his case not to have attempted to explain his initial denials and silence. The decision to raise this issue on direct was a reasonable trial tactic. Defendant does not specifically attack this decision.

Having opened the door to the silence issue, the Defendant can not then have his cake and eat it, too. He can not testify about his silence on direct and then expect his attorneys to successfully object to the limited cross-examination on the same subject.

The defense attorneys were not ineffective for not objecting. No prejudice exists because the jury heard the same subject from defendant on direct.

These claims are denied.

CLAIM 8

Defendant alleges his trial counsel were ineffective when they failed to request a mistrial based on defendant's removal from the courtroom during cross-examination.

During cross-examination, Capano was asked several questions about whether he "used" family members to protect himself. The thrust of the questions was that he used family members to assist him in his concealment of the shooting incident. The prosecutor asked [*39] questions about his sister, his brother Gerry, and his brother Louis.

When the prosecutor asked a similar question about his daughters, defense counsel objected and moved for a mistrial on the grounds that the question implicated Capano's constitutional right not to talk with the authorities. The Court ruled Capano had opened the door on his direct testimony.

When asked the question again, it is apparent even from the cold record that Capano lost his temper in front of the jury.

A. Absolutely incorrect. You heartless, gutless, souless, disgrace for a human being.

Q. You not only had the opportunity by agreeing --

A. Why don't you explain what you did to my mother. Let's include that as well.

MR. CONNOLLY: Okay, Your Honor, I mean we did nothing to his mother.

THE WITNESS: You did nothing to my mother? That's a lie right there in front of the Court.

THE COURT: Please take Capano out of the courtroom.

THE WITNESS: He's a liar.

(Defendant left the courtroom.)

THE COURT: Well, it just got a little warmer in the courtroom, so we're going to quit early today. I ask the jury to discuss the case with no one, to avoid any contact with any information, [*40] whether it be personal or through the media, and I'll ask you to be back here and ready to go at ten a.m. tomorrow morning.

(The jury left the courtroom at 4:45 pm.)

Defendant now criticizes his defense team for not seeking any relief from the Court since it was obvious that the prosecutor provoked the incident. But the trial judge did not make any findings establishing that the prosecutor deliberately provoked defendant. Judge Lee commented to counsel that he was not "terribly surprised" because matters dealing with Capano's family have "been sensitive to him and brought him close to anger several times, and I'm sure that's not a fact lost on the State. I was surprised that he totally lost it up there, but that just meant it was a good time to stop." (State's Appendix B45/ p. 252). Discussions then took place about a potential apology by Capano to the jury and an appropriate time to do that.

In the Rule 61 motion and the subsequent briefs, Capano does not suggest what "relief" his attorneys were ineffective for not seeking.

At the evidentiary hearing, his attorneys noted that a mistrial would have been difficult to obtain since it was their client who chose to behave badly [*41] in front of the jury. Typically, mistrials are

granted for instances of misconduct outside of defendant's control.

Faced with what had occurred, counsel thought the trial judge did the right thing by getting their client out of the courtroom before it got worse.

Finally, the candid comments of his trial counsel are relevant as it appears that Capano was not truly goaded into his bad behavior. One defense attorney testified he told Capano he was "pre-determined to explode". He told Capano that it would happen.

Another of Capano's attorneys testified that "Tom hated Colm [the prosecutor] more than the devil." He also testified Capano knew the State might try to purposely upset him. Capano then used the same words to his trial attorney in describing the prosecutor as he later used on the stand. It would appear that Capano has no one to blame but himself as to his intent to take a swipe at the prosecutor. I am satisfied the attorneys did the best they could to prepare their client and counseled him to maintain his composure.

Counsel were not ineffective for not seeking a mistrial or "failing to seek any relief" to remedy Capano's explosion in front of the jury. This claim is denied. **[*42]**

CLAIM 9

Defendant claims trial counsel were ineffective in failing to call certain witnesses to rebut the State's "planning" evidence.

(a) Defendant complains that he told trial counsel that Vincent Mondarno gave him a gun in the spring of 1996 and that defendant retained the gun until sometime after Ms. Fahey's disappearance. The relevance of this information is it raises the issue of why would he have to put Ms. MacIntyre up to buying him a gun if he already had a gun. It would have provided a means of attacking Ms. MacIntyre's testimony.

By affidavit, trial counsel reported as follows: "On 10/22/98 at 8:15 a.m., counsel interviewed Mondarno and was told this was a lie, he never gave Capano a gun."

Counsel reiterated this at the evidentiary hearing. Mr. Oteri testified that Capano told him Vinnie gave him a gun, but Vinnie denied any such transfer.

In his final submission to the Court, Capano now agrees his attorneys were not ineffective. in the decision not to call Mr. Mondarno.

(b) Capano complained that trial counsel should have called James Green and Joseph Riley as witnesses to establish that in the spring of 1996,

Mr. Riley threatened to expose defendant's relationship **[*43]** with Linda Marandola and planned to extort money from Capano. Capano alleges this would have offered an explanation as to Gerry Capano's extortion testimony and Capano's need for the boat if he had to "do something" to these people.

Linda Marandola was a person with whom Capano was alleged to have had a romantic relationship. Defense counsel purposely avoided informing the jury of anything involving Ms. Marandola. The attorneys feared that opening the door to that relationship would expose a similarly unhealthy relationship with her as he had had with Ms. Fahey. Defense counsel commented at the evidentiary hearing that the incidents of control and harassment were "eerily similar". One of Capano's attorneys testified that "if Ms. Marandola got in front of the jury, we were dead".

To have called Mr. Green and Mr. Riley to testify about a possible extortion plot concerning Ms. Marandola would have put the entire Marandola episode before the jury.

In his final submission, Capano now agrees his attorneys were not ineffective in their decision not to call Mr. Green and Mr. Riley as witnesses. The Court agrees. This claim is denied.

CLAIM 10

Defendant alleges trial counsel were ineffective **[*44]** in failing to make a timely objection to the rebuttal testimony of Robert Fahey as his testimony did not "rebut" anything.

The complaint centers on the testimony of Robert Fahey wherein he read a letter he had sent defendant on July 24, 1996, weeks after his sister's disappearance. The letter sought Capano's cooperation and help in locating Ms. Fahey.

During Capano's direct testimony, he stated that he was making attempts to communicate with the Fahey family during the summer of 1996. He testified as to leaving a long message on Robert Fahey's telephone answering machine. He testified as to receiving a letter but that it "was clearly written by someone else, probably an attorney". (State's Appendix B37/ p. 176)

Therefore, Capano's direct testimony did touch upon his attempted communications with Ms. Fahey's family and he did voice his opinion as to Mr. Fahey's letter. To the extent Capano's testimony was relevant, the Fahey rebuttal testimony was relevant and I find no deficient performance on the part of trial counsel for not making an objection. The motion does not address at all the prejudice necessary to establish under Strickland. This claim is denied.

CLAIM 11

Defendant **[*45]** alleges his defense counsel were ineffective in failing to argue certain alleged "mitigating circumstances" to the jury and in failing to request that the jury instructions contain a list of the specific mitigating circumstances upon which the defense relied.

As to the jury instructions, the defense acknowledges in its motion that the penalty phase instructions were nearly identical to the penalty phase instructions which the Delaware Supreme Court formerly approved in *Dawson v. State, 637 A.2d 57, 64-5 (Del. 1994)*. Defendant now complains that the instructions should have listed the alleged "mitigating circumstances". Whether the instructions specifically list the mitigators or not is more an argument of form as opposed to substance. Defense counsel did present substantial evidence over a three-day period which went to mitigation and which addressed why a life sentence was more appropriate than a death sentence. I am satisfied the instructions were legally sound. Defense counsel was not deficient in not seeking more detailed instructions.

Acknowledging substantial mitigation evidence was put before the jury, Capano argues that defense counsel insufficiently argued mitigation **[*46]** to the jury.

Attacks based on allegations that the attorneys could have "done better" are difficult for Capano to prove. Moreover, Capano must then show that a better performance would have made a difference in the outcome. Closing arguments involve the craft of communication to the jury and the selection of those points that may best influence the jury as to a party's position. In this case, the thrust of the defense was two-fold. First, the defense strongly attacked the statutory aggravator of substantial planning and premeditation. Then the defense presented evidence "humanizing" Capano by highlighting his good works in the community, his good works in his church, and his service to the public. Counsel also covered his close relationship with his family and the impact upon them if a death sentence was to be imposed. Defense counsel, over Capano's objection, also discussed the impact of a possible death sentence on Gerry and Louis, whose testimony proved integral in the guilt phase. These are all examples of effective representation. To get into "Monday morning quarterbacking" in such an area as the quality of a closing argument is indeed a slippery slope. Overturning a trial **[*47]** court's outcome on such a subjective issue without clear instances of ineffective lawyering would be wrong.

I am satisfied the legal instructions provided to the jury were proper. I am satisfied that Capano has failed to establish that his attorneys' performances in the presentation of evidence and arguments to the jury during the penalty phase were deficient when applying the Strickland standard of an objective reasonable standard. Finally, Capano has not established any actual prejudice. He has not shown how better instructions and/or a better closing argument would have changed the outcome of his trial. This claim fails.

In summary, Capano has failed to establish any grounds that his attorneys' performances were objectively deficient in a manner that caused him actual prejudice. All claims based upon ineffective assistance of counsel are denied.

PART TWO -- VALIDITY OF DEATH PENALTY

Defendant argues the death sentence imposed on him is unconstitutional under the *Sixth* and *Fourteenth Amendments of the United States Constitution* and *Article 1, § 4* and *Article 1, § 7 of the Constitution of the State of Delaware*. n9 More specifically, he argues as follows. The Supreme **[*48]** Court's decision in *Ring v. Arizona, 536 U.S. 584, 153 L. Ed. 2d 556, 122 S. Ct. 2428 (2002)* ("Ring") clarifies that the version of the death penalty under which defendant was sentenced is unconstitutional because the judge and not the jury made the requisite factual finding that a statutory aggravating circumstance existed. This error was structural, and consequently, the death penalty decision was invalid per se. However, even if the error were to be considered harmless rather than structural, the decision must be reversed because a unanimous jury did not render a decision that a statutory aggravating circumstance existed beyond a reasonable doubt.

n9 The pertinent portions of the constitutional provisions are set forth below.

The *Sixth Amendment of the United States Constitution* provides:

In all criminal prosecutions, the accused shall enjoy the right to a . . . public trial, by an impartial jury of the State and district wherein the crime shall have been committed. . . . .

The *Fourteenth Amendment of the United States Constitution* provides:

No State shall make or enforce

any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

In *Article 1, § 4 of the Delaware Constitution*, it is provided:

Trial by jury shall be as heretofore.

In *Article 1, § 7 of the Delaware Constitution*, it is provided:

In all criminal prosecutions, the accused hath a right to . . . a . . . public trial by an impartial jury, . . . nor shall he or she be deprived of life, liberty or property, unless by the judgment of his or her peers or by the law of the land.

**[*49]**

What is at issue in this decision is how the evolving death penalty jurisprudence of the United States Supreme Court as shown in Ring impacts Capano's case. It is not the Delaware Constitution that requires the jury involvement as the Delaware Supreme Court's rulings consistently have recognized the distinction between the guilt phase and the sentencing phase. Therefore, my analysis will be to focus on how the United States Supreme Court's decision in Ring impacts the death penalty sentence of Capano.

In the 1970s, *Florida enacted a death penalty statute* which gave an advisory role to the jury with respect to the sentencing phase and assigned the role for determining the sentence on the trial judge. *Proffitt v. Florida, 428 U.S. 242, 247-48, 49 L. Ed. 2d 913, 96 S. Ct. 2960 (1976)*. This type of system is referenced as a "hybrid" system. *Ring, 536 U.S. at 608 n. 6.* The United States Supreme Court addressed this system in *Proffitt v. Florida, supra.* Defendant therein argued that the imposition of the death penalty under Florida's law constituted cruel and unusual punishment in violation of the *Eighth* and *Fourteenth Amendments.* **[*50]** The Supreme Court held that Florida's statute met the constitutional deficiencies identified in *Furman v.*

*Georgia, 408 U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726 (1972). Proffitt v. Florida, 428 U.S. at 253.* In addressing the system's aspect which allowed for the trial judge to determine the sentence, the Supreme Court stated:

This Court has pointed out that jury sentencing in a capital case can perform an important societal function, *Witherspoon v. Illinois, 391 U.S. 510, 519 n. 15, 20 L. Ed. 2d 776, 88 S. Ct. 1770 (1968)*, but it has never suggested that jury sentencing is constitutionally required. And it would appear that judicial sentencing should lead, if anything, to even greater consistency in the imposition at the trial court level of capital punishment, since a trial judge is more experienced in sentencing than a jury, and therefore is better able to impose sentences similar to those imposed in analogous cases.

[Footnote omitted.]

*Id. at 252.*

The Supreme Court addressed Florida's hybrid system again in the case of **[*51]** *Spaziano v. Florida, 468 U.S. 447, 82 L. Ed. 2d 340, 104 S. Ct. 3154 (1984).* In that case, the jury recommended a life sentence, but the trial judge imposed a death sentence. Defendant appealed, arguing that the judge's imposition of the death sentence violated the *Eighth Amendment*, the *Double Jeopardy Clause* and the *Sixth Amendment* based on the premise that the capital sentencing decision is one that a jury should make in all cases. The Court ruled:

In light of the facts that the *Sixth Amendment* does not require jury sentencing, that the demands of fairness and reliability in capital cases do not require it, and that neither the nature of, nor the purpose behind, the death penalty requires jury sentencing, we cannot conclude that placing responsibility on the trial judge to impose the sentence in a capital case is unconstitutional.

. . . We are not persuaded that placing the responsibility on a trial judge to impose the sentence in a capital case

is so fundamentally at odds with contemporary standards of fairness and decency that Florida must be required to alter its scheme and give final authority to the jury to make the life-or-death decision. **[*52]**

*Spaziano v. Florida, 468 U.S. at 464-65*.

In *Hildwin v. Florida, 490 U.S. 638, 104 L. Ed. 2d 728, 109 S. Ct. 2055 (1989)*, the Supreme Court again faced the issue of whether the *Sixth Amendment* requires a jury to specify the aggravating factors that permit the imposition of capital punishment in Florida. It held:

The existence of an aggravating factor here is not an element of the offense but instead is "a sentencing factor that comes into play only after defendant has been found guilty." [Citation omitted.] Accordingly, the *Sixth Amendment* does not require that the specific findings authorizing the imposition of the sentence of death be made by the jury.

*Hildwin v. Florida, 490 U.S. at 640-41*.

The next pertinent examination of the death penalty the Supreme Court made was in the case of *Walton v. Arizona, 497 U.S. 639, 111 L. Ed. 2d 511, 110 S. Ct. 3047 (1990)*. The *death penalty statute in Arizona*, unlike in Florida, did not allow the jury to participate in any manner in the decision of whether life or death should be imposed; only the judge made findings of aggravating or mitigating circumstances, and the judge was required to impose **[*53]** the death penalty if he or she found that one or more aggravating circumstances existed and that no mitigating circumstance(s) existed to call for leniency. The Supreme Court held that no Sixth Amendment violation occurred with regard to the fact that the jury did not impose the death sentence or make the findings prerequisite to imposing such a sentence. Referring to the Florida decisions discussed above, the Court ruled that the Constitution does not require a jury rather than a judge to make findings of fact with regard to the aggravating factors.

In 1991, Delaware enacted the death penalty statute pursuant to which defendant was sentenced. 68 Del. Laws, ch. 181 (1991) (codified at *11 Del. C. § 4209*)(" 1991 statute"). This new statute, which was modeled after Florida's, differed significantly from the old in that it changed the roles of the judge and jury. If a person was convicted of first degree murder, then the process required participation by the jury to determine if any statutory aggravating circumstances existed. The process of determining if a statutory aggravating circumstance exited is referenced as "the narrowing phase"; it was determined during that phase if a **[*54]** defendant was death eligible. *Brice v. State, 815 A.2d 314, 320 (Del. 2003)*. The jury was not required to be unanimous nor was the jury's decision binding on the judge, who had the final decision as to the sentence. The jury also was to make a recommendation as to the appropriateness of the death sentence by determining whether the aggravating circumstances outweighed the mitigating circumstances. Likewise, this decision by the jury did not have to be unanimous. The sentencing judge, giving all of the jury's findings great weight, then sentenced defendant to life imprisonment without parole or death. The jury's function in the sentencing phase became advisory only, while the judge was given "the ultimate responsibility for determining whether defendant will be sentenced to life imprisonment or death." *State v. Cohen, 604 A.2d 846, 849 (Del. 1992)* ("Cohen").

In Cohen, the Court examined whether Delaware's hybrid statute violated the right to a jury trial under the United States or the Delaware Constitutions. Defendants conceded "that there is no federal right to the determination of punishment by a jury in a capital case." **[*55]** *Id. at 851*. The Court then addressed whether such a right exists under the Delaware Constitution. It ruled as follows *at page 852*:

By clear historic and legal precedent this [*Article 1, § 4*] guarantees the right to trial by jury only as it existed when the common law was imported from England in 1776. *Fountain v. State, Del. Supr., 275 A2d 251, 251 (1971)*; *Claudio v. State, 585 A.2d [1278], . . . 1290-91, 1297 [(1991)]*. Thus, the jury's historic role was limited to that of a trier of facts, determining guilt or innocence. It had no function in passing sentence. Indeed, any consideration of punishment by the jury was improper. As is obvious, that principle is so deeply rooted in precedent as to be immutable, since this Court has consistently held that, absent express statutory authorization, the jury should not even consider the sentencing consequences which flow

from a guilty verdict. [Citations omitted.] Accordingly, defendants are not guaranteed the right under the Delaware Constitution to have a jury determine punishment in a capital case.

The United States Supreme Court rendered another pertinent decision before the Delaware Supreme Court examined **[*56]** the constitutionality of the death penalty on Capano's appeal in *Apprendi v. New Jersey, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000)*. Therein, the Court examined a New Jersey "hate crime" law which authorized an increase in the maximum prison sentence if the sentencing judge found by a preponderance of the evidence that defendant acted with "'a purpose to intimidate an individual or group of individuals because of race, color, gender, handicap, religion, sexual orientation or ethnicity.'" *Apprendi v. New Jersey, 530 U.S. at 469*. The majority ruled that the United States Constitution required any fact, other than a prior conviction, which increases the penalty for a crime beyond the prescribed statutory maximum to be submitted to a jury and proved beyond a reasonable doubt. *Id. at 490*. The Court specifically noted that it was rejecting "the argument that the principles guiding our decision today render invalid state capital sentencing schemes requiring judges, after a jury verdict holding a defendant guilty of a capital crime, to find specific aggravating factors before imposing a sentence of death. **[*57]** *Walton v. Arizona, 497 U.S. 639, 647-649, 111 L. Ed. 2d 511, 110 S. Ct. 3047 . . . (1990)*." *Id. at 496*.

In defendant's case, the jury, by a vote of 11 to 1, found beyond a reasonable doubt the statutory aggravating circumstance that the murder was premeditated and the result of substantial planning. The jury recommended, by a vote of 10 to 2, that the trial judge find the aggravating circumstances outweighed the mitigating circumstances. Judge Lee, giving the jury's verdict great weight, imposed a sentence of death.

On appeal, defendant raised two issues with regard to the constitutionality of the statute. He first argued that his right to a jury trial under the Delaware Constitution was violated because the jury did not unanimously find the existence of a statutory aggravating factor. He also argued the sentencing process violated the *Fourteenth Amendment's Due Process Clause* because the trial judge could find a statutory aggravating factor without being bound by a jury verdict on the underlying issues of fact.

The Court framed the first argument as whether *Article 1, § 4 of the Delaware Constitution* "necessarily implies a right to a unanimous jury

verdict on all facts. **[*58]** " *Capano II, 781 A.2d at 669*. The Court ruled as follows *at pages 669-70*:

> The Delaware Constitution guarantees that "trial by jury shall be as heretofore." n490 This phrase incorporates by reference the common law right to trial by jury, and "any analysis of the right to a trial by jury, as it is guaranteed by the Delaware Constitution, requires an examination of the common law." n491 Based on a common law analysis, this Court has previously found that under the Delaware Constitution, "unanimity of the jurors is . . . required to reach a verdict." n492 This jurisprudence relates to the determination of guilt. Undertaking a similar inquiry in State v. Cohen, n493 however, we held that the right to trial by jury under the Delaware Constitution does not guarantee "the right . . . to have a jury determine punishment in a capital case." n494 Instead, the Cohen Court found that "the jury's historic role was limited to that of a trier of facts, determining guilt or innocence." n495
>
> We therefore conclude that the jury is not required to return a unanimous finding of an aggravating factor in its advisory role during the penalty phase. **[*59]** Although a jury's advisory report on statutory aggravating circumstances necessarily requires the jury to resolve factual disputes, this exercise is fundamentally different from a jury's fact-finding role in the guilt phase under the common law. n496
>
> First, as noted earlier, a jury at common law was charged with finding facts only in connection with a determination of guilt or innocence. n497 Here, the jury unanimously determined Capano's guilt beyond a reasonable doubt. By contrast, under Delaware's death penalty statute, a jury makes only recommendations relevant to punishment. Second, a jury's verdict at common law is binding-rather than advisory-as long as its conclusions are rational. n498 Under the Delaware death penalty statute, however, a jury in the penalty

phase "functions only in an advisory capacity" and as the "conscience of the community." n499 Put differently, *Section 4209* assigns to the trial judge "the ultimate responsibility for determining whether defendant will be sentenced to life imprisonment or death." n500

Based on these considerations, we conclude that a jury's advisory report under the Delaware death penalty statute does not fit within the jury's [*60] common law role as fact-finder. As a result, the jury's recommendations under *Section 4209* are not subject to the unanimity requirement, and Capano is therefore not entitled to a unanimous jury finding as to the existence of a statutory aggravating factor before the trial judge imposes a death sentence.

[*61]

638, 640-41, 104 L. Ed. 2d 728, 109 S. Ct. 2055 (1989)), endorses the position that, in making a sentencing recommendation under a death penalty statute similar to Delaware's statute, a jury "necessarily engag[es] in the fact finding required for imposition of a higher sentence." Yet Jones also discusses a more recent case finding that, under the *Sixth Amendment*, a statute may confer on the trial judge the authority to determine the presence of aggravating factors and to sentence a defendant to death without the benefit of a jury verdict or recommendation. See *Walton v. Arizona, 497 U.S. 639, 647-48, 111 L. Ed. 2d 511, 110 S. Ct. 3047 (1990).* If a trial judge can make sentencing determinations under Walton and can disregard a jury's recommendation under *Spaziano, 468 U.S. at 464-65*, there is no reason to think that the jury's recommendation under the Delaware statute constitutes "factfinding required for imposition of a higher sentence." *Jones, 526 U.S. at 250* (emphasis added).

n490 *Del. Const, art I, § 4.*

n491 *Claudio v. State, Del. Supr., 585 A.2d 1278, 1298 (1991).*

n492 *Fountain v. State, Del. Supr., 275 A.2d 251, 251 (1971).*

n493 *Del. Supr., 604 A.2d 846, 851-52 (1992).*

n494 *Cohen, 604 A.2d at 852.*

n495 Id. (emphasis added); see also *Apprendi v. New Jersey, 530 U.S. 466, 478-79 & n. 4, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000)* (noting that, at common law, "'after trial and conviction are past,' defendant is submitted to judgment' by the court") (quoting 4 W. Blackstone, Commentaries on the Laws of England 368 (1769)).

n496 Cf. *Spaziano v. Florida, 468 U.S. 447, 459, 82 L. Ed. 2d 340, 104 S. Ct. 3154 (1984)* ("The fact that a capital sentencing is like a trial in the respects significant to the *Double Jeopardy Clause* . . . does not mean that it is like a trial in respects significant to the Sixth Amendment's guarantee of a jury trial."). Capano suggests that *Jones v. United States, 526 U.S. 227, 250-51, 143 L. Ed. 2d 311, 119 S. Ct. 1215 (1999)* (discussing *Hildwin v. Florida, 490 U.S.*

n497 See *Cohen, 604 A. 2d at 852.*

n498 A trial court may never disregard a jury's acquittal and it may disregard a jury's conviction only if no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 99 S. Ct. 2781 (1979)*, quoted in *Davis v. State, Del. Supr., 453 A. 2d 802, 803 (1982)* (per curiam); *443 U.S. at 318 n.10* ("The factfinder in a criminal case has traditionally been permitted to enter an unassailable but unreasonable verdict of not guilty.'").

n499 *Cohen, 604 A. 2d at 849, 856.*

n500 *604 A. 2d at 849.* The United States Supreme Court has held that this arrangement is permissible under the *Sixth Amendment*. See *Hildwin v. Florida, 490 U.S. 638, 640-41, 104 L. Ed. 2d 728, 109 S. Ct. 2055 (1989)* ("The *Sixth Amendment* does not require that the specific findings authorizing the imposition of the sentence of death be made by the jury."). Similarly, the *Eighth Amendment to the federal constitution* does not require that the statute "'define the weight the sentencing judge must accord to an advisory jury verdict.'" *Dawson v. State, Del. Supr., 673 A. 2d 1186, 1196 (1996)* (quoting *Harris v. Alabama,*

*513 U.S. 504, 512, 130 L. Ed. 2d 1004, 115 S. Ct. 1031 (1995).*

[*62]

The second issue defendant advanced was based upon the decision in *Apprendi v. New Jersey, supra.* Defendant argued that Delaware's statute violates the *Due Process Clause* because it permits the trial judge to find a statutory aggravating factor without being bound by a jury verdict on the underlying issues of fact and it "'removes from the jury the assessment of facts that increase the prescribed range of penalties to which defendant is exposed.' *Apprendi v. New Jersey, 530 U.S. at 490*(emphasis added)." *Capano II, 781 A.2d at 670.* The Court concluded there was no violation, and stated as follows, *at pages 670-73,* in reaching this conclusion:

> But here, the penalty phase did not "increase" Capano's "exposure" to the "prescribed range of penalties." His exposure to the death penalty had already been determined when the jury unanimously returned the verdict of guilt beyond a reasonable doubt of first degree murder.
>
> The New Jersey statute at issue in Apprendi was not a death penalty statute, and the holding in Apprendi does not bear on any issue involved in this case. * * *
>
> * * *
>
> In our view, Apprendi neither explicitly nor implicitly [*63] invalidates the Delaware death penalty statute. First and most important, the Apprendi Court explicitly preserved the line of cases upholding death penalty procedures similar to *Section 4209.* . . .
>
> * * *
>
> The New Jersey statute that was struck down in Apprendi is also distinguishable from Delaware's death penalty statute. The aggravating factors described in Delaware's *Section 4209* do not constitute additional elements needed to establish guilt of a "capital murder" offense that a jury must unanimously find beyond a reasonable doubt.

These aggravating factors relate only to the penalty phase where the jury acts as an advisory body to the sentencing judge. The Apprendi Court distinguished an "element" of a crime from a "sentencing factor" according to whether "the required finding exposes defendant to a greater punishment than that authorized by the jury's guilty verdict." n512 As we noted earlier, a conviction at the guilt phase by a unanimous jury under the first degree murder statute constitutes the authorization for the later imposition of the death penalty. n513 Because the finding of an aggravating factor does not "expose defendant to a greater punishment [*64] than that authorized" by a first degree murder conviction, the aggravating factor is not an additional element of the first degree murder offense. n514 In addition, the Delaware statute requires that the trial judge find aggravating circumstances beyond a reasonable doubt. n515 The New Jersey hate crime statute, by contrast, required a finding by a preponderance of the evidence that the underlying crime was motivated by a desire to intimidate. n516

Accordingly, we conclude that the death penalty process in *11 Del. C. § 4209* does not violate the right to a trial by jury under the Delaware Constitution and does not violate the *Due Process Clause of the Fourteenth Amendment.*

n512 *Apprendi, 530 U.S. at*494.

n513 See *11 Del. C. § 636(b)* (referring to *11 Del. C. § 4209*).

n514 *Apprendi, 530 U.S. at 494* (emphasis added).

n515 See *11 Del. C. § 4209(d)(1)(a).*

n516 See *Apprendi, 530 U.S. at 468-69, 491.*

[*65] Defendant filed with the United States Supreme Court a petition seeking a writ of

certiorari. While his petition was pending, the Supreme Court issued its decision in Ring. Defendant in Ring, as did defendant in *Walton v. Arizona, supra*, attacked Arizona's death penalty statute which allowed for a sentence of death to be imposed only if a judge, conducting a separate sentencing hearing, made findings regarding the existence of statutorily enumerated aggravating circumstances. The Arizona statute provided for a judge only procedure, with no jury input at all. Defendant argued this scheme violated "the Sixth Amendment's jury trial guarantee by entrusting to a judge the finding of a fact raising defendant's maximum penalty." *Ring v. Arizona, 536 U.S. at 595*.

In *footnote 4 at page 597*, the Supreme Court explains the limited issue before it:

> Ring's claim is tightly delineated: He contends only that the *Sixth Amendment* required jury findings on the aggravating circumstances against him. No aggravated circumstance related to past convictions in his case; Ring therefore does not challenge **[\*66]** *Almendarez-Torres v. United States, 523 U.S. 224, 118 S. Ct. 1219, 140 L. Ed. 2d 350 (1998)*, which held that the fact of prior conviction maybe found by the judge even if it increases the statutory maximum sentence. He makes no Sixth Amendment claim with respect to mitigating circumstances. See *Apprendi v. New Jersey, 530 U.S. 466, 490-91, n.16, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000)* (noting "the distinction the Court has often recognized between facts in aggravation of punishment and facts in mitigation" (citation omitted)). Nor does he argue that the *Sixth Amendment* required the jury to make the ultimate determination whether to impose the death penalty. See *Proffitt v. Florida, 428 U.S. 242, 252, 96 S. Ct. 2960, 49 L. Ed. 2d 913 (1976)* (plurality opinion) ("It has never [been] suggested that jury sentencing is constitutionally required."). He does not question the Arizona Supreme Court's authority to reweigh the aggravating and mitigating circumstances after court struck one aggravator. See **[\*67]** *Clemons v. Mississippi, 494 U.S. 738, 745, 110 S. Ct. 1441, 108 L. Ed. 2d 725 (1990)*. Finally, Ring does

not contend that his indictment was constitutionally defective. See *Apprendi, 530 U.S. at 477, n. 3, 120 S. Ct. 2348* (*Fourteenth Amendment* "has not . . . been construed to include the Fifth Amendment right to presentment or indictment of a Grand Jury'").

The Court determined no reason existed to differentiate capital crimes from all other crimes where a jury must find facts increasing punishment beyond the maximum authorized by a guilty verdict standing alone. It stated: "Capital defendants, no less than non-capital defendants, we conclude, are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." *Id. at 589*. It held *Walton* and Apprendi to be irreconcilable, and ruled:

> We overrule Walton to the extent that it allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty. [Citation omitted.] Because Arizona's enumerated aggravating factors operate as "the functional equivalent of an element of a **[\*68]** greater offense," *Apprendi, 530 U.S. at 494, n. 19*, the *Sixth Amendment* requires that they be found by a jury.
>
> * * *
>
> The right to trial by jury guaranteed by the *Sixth Amendment* would be senselessly diminished if it encompassed the factfinding necessary to increase a defendant's sentence by two years, but not the factfinding necessary to put him to death. We hold that the *Sixth Amendment* applies to both.

*Id. at 609*.

The Supreme Court issued the Ring decision on June 24, 2002. Capano's pending petition for writ of certiorari included the question of "whether [Delaware's] statutory scheme . . . violates the *Sixth Amendment* and the *Due Process Clause of the Fourteenth Amendment* . . . as interpreted by the Court in Apprendi . . . [and] whether Walton . . . should be overruled in light of Apprendi." Defendant's Memorandum in Support of Application to Vacate Death Sentence and Impose Sentence of Life Imprisonment at 2-3. On June 28,

2002, the Supreme Court denied certiorari in Capano's case. *Capano v. Delaware, 536 U.S. 958, 153 L. Ed. 2d 835, 122 S. Ct. 2660 (2002)*.

The Supreme Court has clarified the scope of Ring in a few subsequent **[\*69]** decisions. In *Schriro v. Summerlin, 542 U.S. 348, 159 L. Ed. 2d 442, 124 S. Ct. 2519 (2004)*, the Court explained that Ring developed a procedural rather than substantive rule. "Ring altered the range of permissible methods for determining whether a defendant's conduct is punishable by death, requiring that a jury rather than a judge find the essential facts bearing on punishment." *Schriro v. Summerlin, 124 S. Ct. at 2523*. The Court further explained at *page 2524*:

> Ring held that, *because* Arizona's statutory aggravators restricted (as a matter of state law) the class of death-eligible defendants, those aggravators *effectively* were **elements for federal constitutional purposes**, and so were subject to the procedural requirements the Constitution attaches to trial of elements. [Citation omitted.] This Court's holding that, *because Arizona* has made a certain fact essential to the death penalty, that fact must be found by a jury, is not the same as *this Court's* making a certain fact essential to the death penalty. The former was a procedural holding; the latter would be substantive. [Italics in original; underlined bold added.]

**[\*70]**

The Court also stated that it did not rule in Ring that juries are more accurate factfinders and thereby implicate the fundamental fairness and accuracy of the criminal proceeding. *Id. at 2523-24, 2525*.

In *Blakely v. Washington, 542 U.S. 296, 159 L. Ed. 2d 403, 124 S. Ct. 2531 (2004)* and in *United States v. Booker, 160 L. Ed. 2d 621, 125 S. Ct. 738, 2005 U.S. LEXIS 628 (2005)*, the Supreme Court applied the principles set forth in Apprendi and Ring in situations where judges imposed sentences on defendants after the judges, and not the juries, found the existence of facts which called for an increase in prison terms beyond those terms which the juries' decisions authorized.

In *United States v. Booker, 160 L. Ed. 2d 621, 125 S. Ct. 738, 2005 U.S. LEXIS 628 (2005)*, which addressed Federal Sentencing Guidelines, the Court explained its decision in Blakely v. Washington *2005 U.S. LEXIS 629 at \*28*:

> . . . Our precedents . . . make clear "that the statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by defendant." [Citation omitted. **[\*71]** ] \* \* \*
>
> \* \* \*
>
> \* \* \* We have never doubted the authority of a judge to exercise broad discretion in imposing a sentence within a statutory range. [Emphasis in original.]

The Supreme Court distinguished Delaware's capital sentencing scheme from Arizona's by referring to it, as well as the systems in Florida, Indiana, and Alabama, as "hybrid" systems. *Ring, 536 U.S. at 608 n.6*. Although many legal analysts felt comfortable that Ring would not render Delaware's capital scheme unconstitutional, the Delaware Legislature took a conservative approach and modified the statute in order to preclude repeated attacks based on that issue by enacting 73 Del. Laws, c. 423 (2002). The synopsis to Senate Bill 449 explains the nature of the amendment:

> This Act will conform Delaware's death penalty sentencing procedures to the new rule announced by the United States Supreme Court in Ring v. Arizona. It is unclear as to whether the Court's opinion in Ring will be found to be applicable to Delaware's statutory system. However, the uncertainty created by the Supreme Court's ruling in Ring must be resolved promptly to ensure that all pending death penalty case **[\*72]** [sic] will be finally resolved in a constitutional and timely fashion.
>
> This Act will bar the Court from imposing a death sentence unless a jury (unless waived by the parties) first determines unanimously and beyond a reasonable doubt that at least one statutory aggravating circumstance exists. If a statutory aggravating circumstance is found by the jury to exist, the procedures set forth in Delaware's current death penalty sentencing statute will apply.

The Court will continue to be responsible for ultimately determining the sentence to be imposed, after weighing all relevant evidence presented in aggravation or mitigation which bears upon the particular circumstances or details of the commission of the offenses and the character and propensities of the offender. The provisions of the Act will apply to all cases and defendants tried, re-tried, sentenced or re-sentenced after its effective date.

Two defendants facing the death penalty who had been indicted before the issuance of the Ring decision and the enactment of the amendment to the death penalty certified questions of law regarding this amended statute to the Delaware Supreme Court in **[\*73]** *Brice v. State, 815 A.2d 314 (Del. 2003)* ("Brice"). In Brice, the Supreme Court addressed four legal issues posed to it and then went on "to address the issue of structural error, as it relates to both the 1991 version of *Section 4209* and the 2002 Statute to the extent the argument has been made that both statutes suffer from that constitutional defect. In essence it is argued that viewed from Ring's perspective, structural error existed in the 1991 statute and the 2002 amendment did not correct it." *Brice, 815 A.2d at 323.*

The Delaware Supreme Court examined the United States Supreme Court's approach to structural error, noting *at page 324*:

> The presence of a structural defect invalidates the proceeding and requires reversal. See, e. g., *Sullivan [v. Louisiana], 113 S. Ct. at 2081, 2083.* This is so because structural errors are not subject to a harmless error analysis. n10

> n10 Before an error is deemed harmless, however, the State must demonstrate "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman v. California, 386 U.S. 18, 24, 87 S. Ct. 824, 828, 17 L. Ed. 2d 705 (1967).*

**[\*74]**

The Supreme Court stated that prior to Ring, the 1991 statute comported with the United States and Delaware constitutions, as explained in

*Capano v. State, 781 A.2d at 669-673.* The Court then undertook its analysis:

> The United States Supreme Court has identified only six instances where structural error exists. See *Lucero v. The State of Texas, 91 S.W.3d 814, 816, 2002 Tex. App. LEXIS 7452, at \*6 (October 16, 2002)* (citing *Gideon v. Wainwright, 372 U.S. 335, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963)* (total deprivation of the right to counsel); *Tumey v. Ohio, 273 U.S. 510, 47 S. Ct. 437, 71 L. Ed. 749, 5 Ohio Law Abs. 159, 25 Ohio L. Rep. 236, 5 Ohio Law Abs. 185 (1927)* (an impartial judge); *Vasquez v. Hillery, 474 U.S. 254, 106 S. Ct. 617, 88 L. Ed. 2d 598 (1986)* (unlawful exclusion of defendant's race from a grand jury); *McKaskle v. Wiggins, 465 U.S. 168, 177-78, n. 8, 104 S. Ct. 944, 950-51, n. 8, 79 L. Ed. 2d 122 (1984)* (the right to self-representation); *Waller v. Georgia, 467 U.S. 39, 49, n. 9, 104 S. Ct. 2210, 2217, n. 9, 81 L Ed. 2d 31 (1984)* (the right to public trial); and **[\*75]** *Sullivan v. Louisiana 508 U.S. 275, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993)* (defective reasonable doubt instruction). Indeed, it appears that the United States Supreme Court employs structural error analysis only when reviewing constitutional errors that occurred during the guilt/innocence phase of the trial. See *Arizona v. Fulminante, 499 U.S. 279, 306-307, 111 S. Ct. 1246, 1263, 113 L. Ed. 2d 302* (listing cases where harmless error analysis was appropriate despite the existence of constitutional errors); see also, *Neder, 119 S. Ct. at 1836-37* (holding that failure to instruct on an element of the offense is not structural error; but see *Satterwhite v. Texas, 486 U.S. 249, 256-258, 108 S. Ct. 1792, 1797-1798, 100 L. Ed. 2d 284 (1988)* (discussing structural error analysis in the course of reviewing a constitutional error that occurred during capital sentencing phase, but ultimately determining that harmless error analysis was appropriate). In other words, there is a difference between the guilt/innocence phase and the sentencing phase in a structural error analysis. **[\*76]**

*Lockhart v. McCree 476 U.S. 162, 183, n. 18, 90 L. Ed. 2d 137, 106 S. Ct. 1758 (1986)* ("The majority in Adams rejected the dissent's claim that there was no plausible distinction between the role of the jury in the guilt/innocence phase of the trial and its role [. . .] in the sentencing phase.'") (quoting *Adams v. Texas, 448 U.S. 38, 54, 100 S. Ct. 2521, 2531, 65 L. Ed. 2d 581 (1980))*. This Court has also recognized such a distinction. See *Capano, 781 A.2d at 669* (citing *State v. Cohen, 604 A.2d 846, 851-52 (Del. 1992))*.

The argument that there was a structural defect in Delaware's capital sentencing scheme under the 1991 Statute is not supported by Ring. Indeed, implicit in Ring is the finding that the constitutional defect in Arizona's capital sentencing scheme did not amount to structural error. The United States Supreme Court declined to address Arizona's harmless error argument, but in doing so it implicitly suggested that harmless error analysis would be an appropriate inquiry for the Arizona Supreme Court. **[*77]** *Ring, 122 S. Ct. at 2443 n. 7*. Moreover, the United States Supreme Court designated Delaware's capital sentencing scheme as a "hybrid system," *Ring, 122 S. Ct. at 2442 n. 6*, and thus distinguished our system from Arizona's. The holding of Ring is quite simple: Walton is overruled "to the extent it allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty." *Ring, 122 S. Ct. at 2443* (citation omitted) (emphasis supplied). Under the 1991 Statute, the jury was involved in the narrowing phase, albeit in an advisory capacity. Therefore, to find structural defect in the 1991 Statute would arguably extend the holding in Ring well beyond its intended scope.

If Ring does not provide the basis for a finding of structural defect, then we must look to the precedent in this area to resolve the issue. As noted above, there are six sets of constitutional errors that amount to structural error, and thus are not susceptible of a harmless error analysis. Therefore, in order to demonstrate that there was a structural defect in Delaware's capital sentencing scheme under the 1991 Statute, one must fit **[*78]** the purported defect into one of the six categories. For purposes of analogy, the closest analytical category is the defective reasonable doubt instruction at issue in Sullivan v. Louisiana.

In Sullivan, defendant was charged with first-degree murder in the course of committing a robbery. *113 S. Ct. at 2080*. Although there was circumstantial evidence connecting defendant to the murder, Defense counsel argued in closing that reasonable doubt existed as to identity and intent. Id. While instructing the jury, the trial judge gave what the State of Louisiana later conceded was an unconstitutional definition of reasonable doubt. Id. Defendant was subsequently convicted and sentenced to death. Id.

The United State Supreme Court began its analysis by noting that "the jury verdict required by the *Sixth Amendment* is a jury verdict of guilty beyond a reasonable doubt." *Sullivan, 113 S. Ct. at 2081* ("It is self-evident, we think, that the Fifth Amendment requirement of proof beyond a reasonable doubt and the Sixth Amendment requirement of a jury verdict are interrelated."). Accordingly, the defective reasonable doubt instruction had the effect of denying defendant **[*79]** his constitutional right to a jury determination of guilty beyond a reasonable doubt. *Id. 113 S. Ct. at 2081-2082* ("T o hypothesize a guilty verdict that was never in fact rendered -- no matter how inescapable the findings to support that verdict might be -- would violate the jury-trial guarantee.") (emphasis supplied). Because "there [was] no jury verdict within the meaning of the *Sixth Amendment* . . . there [was] no object . . . upon which harmless-error scrutiny [could] operate." *Id. 113 S. Ct. at 2082* (emphasis original). This amounted to structural error because it was impossible to quantify the effect of the constitutional error. *Id.*

*113 S. Ct. at 2083.*

Sentences rendered under the 1991 Statute do not suffer from the same constitutional defect. First, defendants sentenced under Delaware's 1991 scheme were not denied a jury verdict of guilty beyond a reasonable doubt. Second, the advisory jury made specific numerical findings as to the existence of statutory aggravating circumstances. We need not hypothesize findings of aggravating factors that were never rendered; rather, the jury's numerical finding is the "object" upon which we may cast the lens of harmless **[*80]** error review. Because any error under the 1991 Statute does not fit into any of the structural error categories delineated by the United States Supreme Court, n12 harmless error analysis is appropriate. n13

n12 The other categories are similarly unavailing and do not lend themselves to meaningful analysis here: total deprivation of the right to counsel at trial, the unlawful exclusion of members of defendant's race from a grand jury, improper interference with the right to self-representation at trial, and unlawful infringement upon the right to a public trial.

n13 It has been argued that a potential *Caldwell v. Mississippi, 472 U.S. 320, 105 S. Ct. 2633, 86 L. Ed. 2d 231 (1985)*, problem exists in that juries under the 1991 Statute were improperly mislead into believing that the ultimate decision on the existence of statutory aggravating circumstances rested with the court. If this argument were accepted, the "object" upon which harmless error analysis would operate -- the numerical vote representing a finding of statutory aggravators -- would arguably be tainted because the jury may have been mislead into believing that its finding on the issue was ultimately meaningless. The holding in Caldwell, however, rested on Eighth Amendment grounds, *105 S. Ct. at 2639*, and not upon a finding of structural error. Further, it could be argued that where the jury is instructed that it found a statutory aggravator by its verdict at the guilt stage, such a "finding" during the narrowing phase

is meaningless and thus not a proper "object" upon which to apply harmless error scrutiny. This "what if" scenario premised upon *Sandstrom v. Montana, 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979)* is too speculative to require comment.

**[*81]**

*Brice, 815 A.2d at 324-26.*

This history provides the background for defendant's arguments in this motion. Since Capano's case was pending on direct review at the time Ring was decided and since Ring announced a new procedural rule, *Schriro v. Summerlin, 124 S.Ct. 2526*, defendant is able to raise these issues in his postconviction motion pursuant to the miscarriage of justice or fundamental fairness exception set forth in Superior Court Criminal Rule 61(i)(5). n10

n10 As explained in State v. McKamey, Del. Super., Def. ID # 9406017814, Ableman, J. (Nov. 26, 2003) at 15, aff'd, Del. Supr., No. 613, 2003, Holland, J. (April 14, 2004):

The "miscarriage of justice" or "fundamental fairness" exception contained in Rule 61 (i)(5) is "a *narrow one* and has been *applied only in limited circumstances*, such as when the right relied upon has been recognized for the first time after a direct appeal." [Footnote and citation omitted; emphasis in original.]

Capano argues **[*82]** that the 1991 statute as applied in his case does not pass constitutional muster under Ring. He argues the jury's verdict is not a verdict at all, but an advisory report as to the statutory aggravating factors. He argues that since the sentencing judge ultimately must find a statutory aggravating circumstance before defendant becomes death eligible, then our sentencing scheme is akin to Arizona's, where the judge, sitting without a jury, makes all of the decisions. Therefore, for the same reasons noted in Ring, our statute is unconstitutional.

As will be more fully explored below, the Delaware Supreme Court has considered the impact

of Ring on Delaware's 1991 version of the death penalty statute numerous times. The only new issue raised in Capano's case is whether the 11-1 finding of a statutory aggravator is unconstitutional. Since the Delaware Legislature has the authority to establish standards for jury involvement in the sentencing phase as opposed to the constitutional requirements of the guilt phase, since that same body has authorized a non-unanimous jury verdict in the narrowing phase, and since neither the United States nor Delaware Constitutions prohibit a non-unanimous **[*83]** verdict in the sentencing phase, I conclude the jury's finding of a statutory aggravator does not have to be unanimous and the death penalty imposed is constitutionally valid.

Our Delaware Supreme Court noted in *Brice, 815 A.2d at 324 n. 11* that "it could be argued that the constitutionality of the 1991 statute was unchanged by Ring." The Court cites to Florida cases as well as an Indiana case in support of this contention. Id. n11

n11 Therein, Justice Walsh opined:

Despite the General Assembly's response to Ring, it could be argued that the constitutionality of the 1991 Statute was unchanged by Ring. *Ring, 122 S. Ct. at 2442 n.6* (distinguishing the statutes of Delaware, Alabama, Florida, and Indiana from the process utilized in Arizona, and at issue in Ring), and *[122 S. Ct. at] 2450* (O'Connor, dissenting) (noting that death row inmates may improperly seize on the Court's decision in Ring and attempt to extend the reasoning to the "hybrid sentencing schemes" of Delaware, Alabama, Indiana and Florida); Cf. *Bottoson v. Moore, 833 So. 2d 693, 2002 Fla. LEXIS 2200, *(Fla. October 24, 2002)* (upholding death sentence imposed under Florida's pre-Ring statute); *King v. Moore, 831 So. 2d 143, 2002 Fla. LEXIS 2199, *(Fla. October 24, 2002)* (same); *Wrinkles v. State of Indiana, 776 N.E.2d 905, 2002 Ind. LEXIS 802, *Ind. October 15, 2002)* (holding that "Ring is not implicated in petitioner's case

under any view that the Court might find plausible.").

**[*84]**

Delaware modeled its statute after Florida's, and the courts of this state look to Florida's death penalty jurisprudence in interpreting our death penalty. *Garden v. State. 844 A. 2d 311, 314 (Del. 2004)*.

Florida consistently has concluded its death penalty statute is constitutional and Ring did not render it unconstitutional. The seminal cases of the Florida Supreme Court so concluding are *Bottoson v. Moore, 833 So. 2d 693 (Fla. 2002)*, cert. den., *537 U.S. 1070, 154 L. Ed. 2d 564, 123 S. Ct. 662 (2002)* and *King v. Moore, 831 So.2d 143 (Fla. 2002)*, cert. den., *537 U.S. 1069, 154 L. Ed. 2d 563, 123 S. Ct. 662 (2002)*. Therein, the Florida Supreme Court held its death penalty statute constitutional for several reasons. First, certiorari proceedings in both cases were pending before the United States Supreme Court at the time it decided Ring and that Court did not instruct Florida to reconsider the cases in light of its Ring decision. n12 Second, the United States Supreme Court repeatedly has reviewed and upheld Florida's capital sentencing statute, and it did not overrule any of these prior decisions in reaching its decision in Ring. **[*85]**

n12 Similarly, defendant's case was pending before the Court at the time it issued Ring and that Court, being well aware of the nature of Delaware's death penalty statute, *Ring, 536 U.S. at 608 n.6*, denied Capano's writ of certiorari.

Since rendering those decisions, Florida repeatedly has upheld its statute. The following is a non-exclusive list of some cases where the Florida Supreme Court has considered its statute in light of Ring and where the United States Supreme Court did not thereafter grant certiorari: *Chavez v. State, 832 So.2d 730 (Fla. 2002)*, cert. den., *539 U.S. 947, 156 L. Ed. 2d 637, 123 S. Ct. 2617 (2003)*; *Kormondy v. State, 845 So.2d 41 (Fla. 2003)*, cert. den., *540 U.S. 950, 157 L. Ed. 2d 283, 124 S. Ct. 392 (2003)*; *Lawrence v. State, 846 So.2d 440 (Fla. 2003)*, cert. den., *540 U.S. 952, 157 L. Ed. 2d 286, 124 S. Ct. 394 (2003)*; **[*86]** *Duest v. State, 855 So.2d 33 (Fla. 2003)*, cert. den., *541 U.S. 993, 124 S.Ct. 2023, 158 L. Ed. 2d 500 (2004)*.

Two other Florida cases are noteworthy. In *Butler v. State, 842 So.2d 817 (Fla. 2003)*, the trial court instructed the jury that the statutory

aggravating circumstance of heinous, atrocious, or cruel had been established by the evidence. The jury recommended death by a vote of 11-1. The judge found one statutory aggravator, that the homicide was especially heinous, atrocious, or cruel. Defendant argued that the jury was deprived of its decision-making role on the issue, but the Florida Supreme Court ruled that since no objection was made, defendant did not preserve the issue for review and it refused to address the issue of whether the jury unanimously found an aggravator. The Court went on to deny relief on the basis of Ring. In *Davis v. State, 859 So. 2d 465, 481, 485-6 (Fla. 2003)*, the dissenting Justice clarified that the jury did not unanimously find the existence of any of the aggravating circumstances. The trial judge found the existence of three aggravating circumstances and imposed the death penalty. Again, Florida's Supreme Court upheld the **[*87]** statute.

I agree with the Florida Supreme Court's conclusions that *Ring* did not render the hybrid death penalty statutes invalid, and I conclude the above-referenced decisions provide support for upholding Delaware's death penalty statute. Moreover, even without Florida's case law, I agree with Justice Walsh's opinion in *Brice* that *Ring* had no impact on Delaware's 1991 version of the death penalty statute.

It is helpful at this point to delineate what Ring held and what it did not hold. It held that a judge, "sitting without a jury", could not find an aggravating circumstance making a defendant death eligible. It held that a jury must be involved in the process of considering whether a defendant is death penalty eligible, and that the standard to be applied is beyond a reasonable doubt. Ring did not otherwise define the jury's role. It did not hold that the jury's decision must be unanimous. By considering a statutory aggravator as an element of a greater offense for punishment purposes, the Supreme Court did not make it part of the crime tried in the guilt phase. For example, there is no requirement in the Ring decision that indictments contain the "statutory **[*88]** aggravating circumstances". It did not rule that the holding was substantive rather than procedural nor did it rule that the jury members were more accurate fact finders and thereby implicate the fundamental fairness and accuracy of the criminal proceedings. *Schriro v. Summerlin, 124 S. Ct. at 2524-25.*

The United States Supreme Court allowed for the states to legislate their own statutory death penalty so long as those statutes fall within the constitutional parameters established by the United States Supreme Court. See *id. at 2524*. The process in Delaware allows a judge, sitting with a jury, to

impose a penalty of death. In Brice, the Delaware Supreme Court again recognized a difference exists between the jury's role in the guilt/innocence portion of a trial and its role in the sentencing phase in conducting a structural error analysis. *Brice, 815 A.2d at 325*. See *Capano v. State, 781 A.2d at 669*. Simply put, the jury's involvement or role in the penalty phase does not have to mirror the jury's involvement or role in the guilt phase. The Delaware Supreme Court held in Brice that the participation of the jury in the narrowing phase, "albeit in an **[*89]** advisory capacity", precluded a conclusion there was structural defect in the 1991 statute. *Brice, supra*. Thus, the Supreme Court already considered, and rejected, Capano's structural error argument. *Id. at 323-26*. Neither Ring nor other precedent allows for the conclusion that structural error existed in the 1991 statute.

Since Brice found no structural error and since I agree with Justice Walsh that Ring did not impact the constitutionality of the 1991 statute, I conclude the death penalty imposed in defendant's case is valid. However, as the Delaware Supreme Court recognized in Brice, there exists the possibility that Ring may be read to extend the jury's role to the finding of aggravating circumstances during the sentencing phase. Thus, alternatively, I will employ the harmless error analysis Justice Walsh decreed in Brice and "cast the lens of harmless error review" on the specific numerical findings of aggravating factors which the advisory jury made. *Brice, 815 A.2d at 326.* n13

> n13 Since Brice, the Supreme Court has had several opportunities to consider death sentences under the 1991 statute and has upheld them all, without harmless error analysis. *Cabrera v. State, 840 A.2d 1256 (Del. 2004)*; *Taylor v. State, 822 A.2d 1052 (2003)*, cert. den., *540 U.S. 931, 157 L. Ed. 2d 237, 124 S. Ct. 345 (2003)*; *Zebroski v. State, 822 A.2d 1038 (Del. 2003)*, cert. den., *540 U.S. 933, 157 L. Ed. 2d 240, 124 S. Ct. 352 (2003)*; *Swan v. State, 820 A.2d 342 (Del. 2003)*, cert. den., *540 U.S. 896, 157 L. Ed. 2d 174, 124 S. Ct. 252 (2003)*; *Reyes v. State, 819 A.2d 305 (Del. 2003)*, cert. den., *540 U.S. 862, 157 L. Ed. 2d 113, 124 S. Ct. 170 (2003)*; *Norcross v. State, 816 A.2d 757 (Del. 2003)*, cert. den., *540 U.S. 833, 157 L. Ed. 2d 60, 124 S. Ct. 80 (2003)*. That is reasonable because all of the post-Brice decisions had jury findings that were unanimous as to the statutory aggravators and/or had verdicts in the guilt phase which found the statutory aggravator. In each case, the jury's numerical finding was unanimous and therefore, in each, no need existed to

undergo a harmless error analysis on the specific numerical findings of aggravating factors.

**[*90]**

Capano argues that since the jury was not unanimous in finding the existence of a statutory aggravating circumstance, then the error was not harmless. This argument is and will be unique to Capano's case because all other defendants sentenced to the death penalty under the 1991 statute involved a unanimous jury determination as to the statutory aggravating circumstance(s) and/or the jury's unanimous verdict in the guilt phase which, de facto, established a statutory aggravator, such as a guilty verdict involving the death of two people. The 2002 change to the death penalty requires jury unanimity in any finding of a statutory aggravator before a defendant becomes death eligible.

Capano's strongest argument is dicta in *Cabrera v. State, 840 A.2d 1256, 1272 (2004)* ("Cabrera"), that "in Brice . . . [the Court] had held that the Supreme Court's decision in Ring requires a jury to find unanimously and beyond a reasonable doubt the existence of a statutory aggravating circumstance that renders a defendant death eligible'. [Footnotes omitted.]"

First, I emphasize that this statement is dicta; the case did not involve a situation where the Court was addressing **[*91]** whether a less than unanimous finding of an aggravating factor was constitutional. In Cabrera, the jury convicted defendant, unanimously and beyond a reasonable doubt, of the intentional murder of two people during a single course of conduct. Thus, the nature of the jury's guilty verdict established the statutory aggravating circumstance and consequently, comported with Ring. *Cabrera, 840 A.2d at 1273.*

Second, the comment is overstated. There is no ruling in Brice or Ring that a unanimous jury is required. In fact, Brice acknowledges the situation where there is no unanimous verdict when it says that the Court "casts the lens of harmless error review" on the specific numerical findings of aggravating factors which the advisory jury made. n14

n14 The recent decision of the Supreme Court in Ortiz v. State, Del. Supr. Nos. 494/528, 2003, Holland, J. (January 25, 2005), addressed Ring's impact on the 2002 version of the death penalty. At page 40 of that opinion, the Court inserts the words "jury's unanimous" in the following quote from Brice:

The maximum punishment is increased by the [jury's unanimous] finding [beyond a reasonable doubt] of the statutory aggravator.

That insertion is of no significance because the Court merely is clarifying what the 2002 statute required: a finding beyond a reasonable doubt by a unanimous jury. The Court was not examining the 1991 statute.

**[*92]**

In the cases of *Taylor v. State, 822 A.2d 1052 (2003)*, cert. den., *540 U.S. 931, 157 L. Ed. 2d 237, 124 S. Ct. 345 (2003)*; *Zebroski v. State, 822 A.2d 1038 (Del. 2003)*, cert. den., *540 U.S. 933, 157 L. Ed. 2d 240, 124 S. Ct. 352 (2003)*; *Swan v. State, 820 A.2d 342 (Del. 2003)*, cert. den., *540 U.S. 896, 157 L. Ed. 2d 174, 124 S. Ct. 252 (2003)*; *Reyes v. State, 819 A.2d 305 (Del. 2003)*, cert. den., *540 U.S. 862, 157 L. Ed. 2d 113, 124 S. Ct. 170 (2003)*; and *Norcross v. State, 816 A.2d 757 (Del. 2003)*, cert. den., *540 U.S. 833, 157 L. Ed. 2d 60, 124 S. Ct. 80 (2003)*, the Supreme Court referenced a finding of a statutory aggravator by a unanimous jury because in each case, the statutory aggravating circumstance which made defendant death eligible also was made by the jury unanimously and beyond a reasonable doubt during the guilt phase.

Similarly, in all the other post-Brice decisions, except for the statement in Cabrera, the Supreme Court merely made a statement of fact: where the jury made a unanimous finding as to an aggravator because that finding was made in the guilt phase, then Ring was satisfied.

Since neither Cabrera **[*93]** , nor Brice nor Ring provide authority for requiring a unanimous jury, I look to whether any other law requires it.

The United States Supreme Court has left the decision whether to require unanimous juries to the states. *Maxwell v. Dow, 176 U.S. 581, 604-05, 44 L. Ed. 597, 20 S. Ct. 448 (1900)*. Neither the *Sixth Amendment* nor the *Due Process Clause* require a unanimous jury in a criminal case if a state allows for less than a unanimous jury. *Apodaca v. Oregon, 406 U.S. 404, 32 L. Ed. 2d 184, 92 S. Ct. 1628 (1972)* (*Sixth Amendment* does not require a unanimous jury); *Johnson v. Louisiana, 406 U.S. 356, 32 L. Ed. 2d 152, 92 S. Ct. 1620 (1972)* (unanimity is not a federal due process requirement where state law permits agreement of a lesser number of jurors).

In Delaware, a defendant is entitled to a unanimous jury with regard to the guilt phase of the

trial. *Claudio v. State, 585 A.2d 1278 (Del. 1991)*; *Fountain v. State, 275 A.2d 251 (1971)*. However, the jury's roles differ between the guilt phase and the sentencing phase. **[*94]** *Capano v. State, 781 A.2d at 669-70*; *Shelton v. State, 652 A.2d 1, 5-6 (Del. 1995)*; *State v. Cohen, 604 A.2d at 852*; *Claudio v. State, 585 A.2d at 1305*; Gattis v. State, Del. Super., Cr.A. Nos. IN90-05-1017, et al., Barron, J. (Dec. 28, 1995), at 45-8, aff'd, *697 A.2d 1174 (Del. 1997)*. n15 In Delaware, there is no right to a jury determining punishment, except as provided by statute. *State v. Cohen, supra*; Gattis v. State, supra. Pursuant to Delaware's death penalty statute, a jury finds the existence of aggravating factors beyond a reasonable doubt in the sentencing phase; however, that finding does not have to be unanimous. *Capano v. State, supra*. The Legislature put the jury into the sentencing process in the 1991 statute, and thereby gave the jury a role in determining the aggravating factors. The Legislature desired to have the input of the jury members and their communities in this most important of all sentencing decisions but the Legislature concluded the death penalty could be imposed without a unanimous jury finding the existence of a statutory aggravator.

n15 The Superior Court initially issued its decision in the matter on August 24, 1995. It reissued the decision on December 28, 1995. The reissued decision is identical to the first plus it includes the Court's decision on defendant's motion to reargue.

**[*95]**

In this case, the statutory aggravator the jury found to exist, beyond a reasonable doubt, by a vote of 11-1 was "premeditation and substantial planning" as set forth in *11 Del. C. § 4209(e)u*. There was evidence that over a period of months before murdering Anne Marie Fahey, defendant obtained a firearm, purchased a large cooler and a chain, and made arrangements with his brother to dispose of the body at sea. This constituted strong, substantial evidence to support the premeditation and substantial planning aggravator.

The question then becomes: What number is permissible to constitute a finding by the jury regarding a statutory aggravator? For example, what if the jury had found the existence of the statutory aggravator by a vote of 7-5? Would that have passed constitutional muster? I look to the law addressing the "numbers" requirement in the guilt phase for guidance.

In Apodaca v. Oregon, the Supreme Court upheld a statute which allowed for 10-2 verdicts and in Johnson v. Louisiana, it upheld a statute which allowed for 9-3 verdicts. In **[*96]** *Apodaca v. Oregon, 406 U.S. at 410-11*, the Court explained:

> Our inquiry must focus upon the function served by the jury in contemporary society. . . . . As we said in Duncan, the purpose of trial by jury is to prevent oppression by the Government by providing a "safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge." "Given this purpose, the essential feature of a jury obviously lies in the interposition between the accused and his accuser of the commonsense judgment. As we said in Williams, a jury will come to such a judgment as long as it consists of a group of laymen representative of a cross section of the community who have the duty and the opportunity to deliberate, free from outside attempts at intimidation, on the question of a defendant's guilt. In terms of this function we perceive no difference between juries required to act unanimously and those permitted to convict or acquit by votes of 10 to two or 11 to one. Requiring unanimity would obviously produce hung juries in some situations where nonunanimous juries will convict or acquit. But in either case, the interest of defendant in having the **[*97]** judgment of his peers interposed between himself and the officers of the State who prosecute and judge him is equally well served. [Citations and footnote omitted.]

The same rationale applies to a non-unanimous finding of aggravating factors in the sentencing phase of a Delaware death penalty case. Since here, a jury found, beyond a reasonable doubt, the existence of the aggravator of premeditation and substantial planning by a vote of 11-1, the verdict falls within these constitutional rulings, and I conclude that the 11-1 verdict was harmless error.

Ring requires a jury to participate as to the narrowing phase of sentencing. If the jury declares defendant to be death eligible by finding beyond a reasonable doubt a statutory aggravator, then a judge may consider the death penalty. If the jury does not so find, then life imprisonment without parole must be imposed. Yet, even if the jury declares defendant death eligible, the judge still may find a life sentence appropriate. Thus, while

the practical impact of Ring is to require the finding of an additional element (statutory aggravator) by the jury beyond a reasonable doubt, the fact remains that there is a recognition **[*98]** that Delaware is a hybrid sentencing state and distinctions remain between the guilt phase and the sentencing phase. There is no requirement that due to Ring's comment of the finding of an aggravator being an element of the offense that the distinction between guilt and sentencing should not continue, and Brice so notes.

Labeling a "statutory aggravator" as an element does not require that it be treated the same as the statutory elements of an offense for the finding of guilt.

In a hybrid system such as Delaware's, the jury is involved and the standard of proof is beyond a reasonable doubt. As noted in Brice at footnote 11, it is logical to argue that Ring did not change the constitutionality of the 1991 statute. Nothing in the Federal Constitution or State Constitution requires a unanimous jury verdict as to the jury's finding of a statutory aggravator. In 1991, the legislature intentionally moved away from the requirement that the jury be unanimous.

Where the 1991 statute and Ring might collide is if a non-unanimous jury verdict was by a vote that fell below a threshold which the United States Supreme Court has determined to be appropriate. In other words, **[*99]** a jury verdict is not constitutionally required to be unanimous but there is a floor. *Apodaca v. Oregon, 406 U.S. 404, 32 L. Ed. 2d 184, 92 S. Ct. 1628 (1972)*; *Johnson v. Louisiana, 406 U.S. 356, 32 L. Ed. 2d 152, 92 S. Ct. 1620 (1972)*. Thus, the harmless error analysis must focus on the federal constitutional requirements of a jury. In this case, where the jury found the existence of an aggravating factor by a vote of 11-1, that floor was met, and there was no error. The death penalty stands. This claim fails.

CONCLUSION

For the foregoing reasons, I deny defendant's motion for postconviction relief.

IT IS SO ORDERED.

**TAB #7**

**STATE OF DELAWARE v. THOMAS MAGNER, Defendant. Def. ID # 9509007746**

**[NO NUMBER IN ORIGINAL]**

**SUPERIOR COURT OF DELAWARE, NEW CASTLE**

*1997 Del. Super. LEXIS 45*

**February 3, 1997, Submitted; February 5, 1997, Argued**
**February 18, 1997, Decided**

**SUBSEQUENT HISTORY: [*1]**

Released for Publication by the Court March 21, 1997.

**DISPOSITION:**

DEFENDANT'S MOTION IN LIMINE GRANTED IN PART AND DENIED IN PART. THE STATE'S MOTION IN LIMINE GRANTED IN PART AND DENIED IN PART.

**COUNSEL:**

Stephen Wood, Esq., and Charles F. Walker, Esq., Deputy Attorneys General, Department of Justice, Wilmington, Delaware, Attorneys for the State.

Thomas Foley, Esq., and Sheryl Rush-Milstead, Esq., Wilmington, DE. Attorneys for Defendant.

**JUDGES:** Haile Alford, J.

**OPINION BY:** Haile Alford

**OPINION:**

UPON DEFENDANT'S MOTION IN LIMINE AND THE STATE'S MOTION IN LIMINE

OPINION

Alford, J.

This matter is presently before the Court on Defendant's Motion *in Limine* filed on January 31, 1997, seeking to exclude certain evidence from the State's case-in-chief and the State's Motion *in Limine* filed on February 3, 1997, moving the Court to admit certain evidence at trial in the State's case-in-chief. This is the Court's decision on the motions.

BACKGROUND

Defendant is charged with two counts of Murder First Degree, Burglary First Degree, three counts of Possession of a Deadly Weapon During the Commission of a Felony and Felony Theft. The charges arise from Thomas Hedrick's death on September 8, 1995. **[*2]** Mr. Hedrick and Thomas Magner ("Defendant") were periodically living together at Mr. Hedrick's residence for two to three years. A few weeks prior to September 8, 1995, Defendant moved out of the residence at Mr. Hedrick's request. When the incident occurred, the parties were not living together.

The State alleges that on the night Mr. Hedrick was murdered, Defendant entered or remained in Mr. Hedrick's residence with the intent to commit theft and/or assault. The State further alleges that after forcing his way into the residence, Defendant cut Mr. Hedrick's throat with a knife, mortally wounding him. Defendant does not deny that he caused Mr. Hedrick's death, but he intends to prove that he committed the crimes while under the influence of extreme emotional distress. Defendant also contends that the reason he went to Mr. Hedrick's residence the night of the murder was to talk to Mr. Hedrick about why he was accusing Defendant of burglarizing his home and also to retrieve his belongings Mr. Hedrick had packed in plastic bags and put on the porch.

By letter dated January 30, 1997 and its Motion *in Limine* filed on February 3, 1997, the State notified Defendant of its intention **[*3]** to introduce certain evidence in its case-in-chief. The State moves the Court to admit the following evidence: (1) evidence relating to two recent burglaries of Mr. Hedrick's home and evidence implicating Defendant in the burglaries; (2) statements made by Mr. Hedrick that indicate Mr. Hedrick was fearful of Defendant; and (3) evidence that Defendant had assaulted Mr. Hedrick on prior occasions. In Defendant's Motion *in Limine,* Defendant agrees that the State may introduce statements made by Mr. Hedrick "fingering" Defendant as the one who committed the burglaries to provide context to the events surrounding the murder but contends that the intricate facts relating to the burglaries are inadmissible. The Defendant further contends that the other proffered evidence is not admissible in the State's case-in-chief.

The Court held a hearing on the motions on February 4, 1997. The Court rendered a decision from the bench but informed the parties that a written decision would follow. This is the Court's written recapitulation of its February 4, 1997 bench ruling.

DISCUSSION

The State contends that the proffered evidence is admissible under Delaware Rule of Evidence 404(b) as proof **[*4]** of Defendant's intent and motive to commit the crimes charged; to establish

Defendant's identity as the perpetrator of the crimes; and to show the absence of mistake or accident. The State also argues that the evidence demonstrates the common scheme or plan underlying Defendant's actions regarding the burglaries of Mr. Hedrick's residence and the assaults on Mr. Hedrick. The evidence will be discussed in *seriatim.*I.

*The Burglaries*

Mr. Hedrick's residence was burglarized twice in the weeks preceding his murder. Although Mr. Hedrick believed that Defendant was responsible for the burglaries, Defendant was never charged. The State proffered the following information regarding the burglaries.

On August 18, 1995, Mr. Hedrick reported to the New Castle County Police Department that he believed Defendant had burglarized his house that day while he was at work. Two television sets and two video cassette recorders ("VCRs") were said to have been removed from the home. The police detected no sign of a forced entry and it was concluded that the perpetrator entered through a side door that was left unlocked so Defendant could have access to the residence. The night before the burglary, **[*5]** Mr. Hedrick allowed Defendant to borrow his black Dodge Shadow to visit his mother. Defendant did not return with the car prior to 3:40 a.m. when Mr. Hedrick left for work. At 6:00 a.m., Mr. Hedrick's brother saw the vehicle parked in the driveway of the residence. When Mr. Hedrick's brother drove past the home again at 7:00 a.m., the vehicle was no longer there. At 2:00 p.m., after Mr. Hedrick had returned home from work, he received a call from Defendant's sister and she advised him that she had the keys to the vehicle. Mr. Hedrick reported that he received many calls from Defendant that day but refused to speak to him. Mr. Hedrick also stated that he received a call from Melissa Kulmaczeski, Defendant's girlfriend, and she relayed a message from Defendant that if Mr. Hedrick accused Defendant of the burglaries, Defendant would "break your neck." The State explained that this burglary occurred on a Friday and Defendant knew that Mr. Hedrick was paid on Thursdays.

On August 28, 1995, Mr. Hedrick reported to the New Castle County Police Department that while he was sleeping, someone entered his residence and removed a pair of pants, a dress shirt and his wallet from his bedroom. Although **[*6]** Mr. Hedrick was sleeping at the time of the burglary and saw nothing, he told the police that he believed Thomas Magner was responsible for the crime. Mr. Hedrick called to have his credit cards and automated teller machine ("ATM") cards canceled. He was told that his ATM card was used twice. Mr. Hedrick told a family member that he previously had given Defendant his ATM personal identification number. A video surveillance photograph of the person using the ATM card indicates that the person who made the unauthorized withdrawals was not Defendant. The police found no sign of a forced entry and concluded that the perpetrator entered the residence through an unlocked basement window. The State explained that this crime occurred on a Sunday.

**Uncharged Misconduct Evidence**
**A. D.R.E. 404(b) and Getz**

Delaware Rule of Evidence 404(b) provides:

> Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.

**[*7]**

The State contends that evidence of the two prior burglaries can be used as affirmative evidence in its case-in-chief to establish Defendant's identity, show his motive and intent, the absence of mistake or accident and to show defendant's common scheme' or plan. Before evidence is admissible in the State's case-in-chief pursuant to 404 (b), the State must satisfy the five factors enumerated in *Getz v. State, Del. Supr., 538 A.2d 726 (1988).* The five criteria are:

> (1) The evidence of other crimes must be material to an issue or ultimate fact in dispute in the case. If the State elects to present such evidence in its case-in-chief it must demonstrate the existence, or reasonable anticipation, of such a material issue.

> (2) The evidence of other crimes must be introduced for a purpose sanctioned by Rule 404(b) or any other purpose not inconsistent with the basic prohibition against evidence of bad character or criminal disposition.
> (3) The other crimes must be proved by evidence which is "plain, clear and conclusive."

(4) the other crimes must not be too remote in time from the charged offense. (5) The Court must balance the probative value of such evidence **[\*8]** against unfairly prejudicial effect, as required by D.R.E. 403.

*Getz, 538 A.2d at 734* (citations omitted)

The Court finds that evidence of the prior burglaries is not admissible under D.R.E. 404(b) and Getz since the State has not met its burden of offering plain, clear and conclusive evidence that Defendant committed the prior burglaries. See *Diaz v. State, Del. Supr., 508 A.2d 861, 865 (1986); Renzi v. State, Del. Supr., 320 A.2d 711, 712-13 (1974)* . The State's evidence largely consists of statements made by Mr. Hedrick involving his suspicion that Defendant was responsible for the burglaries. In addition to filing the police reports, Mr. Hedrick told a number of his neighbors and a family member about the burglaries and stated his belief that Defendant was the perpetrator. Without independent evidence that supports Mr. Hedrick's statements to the police, neighbors and his family member, a victim's suspicion does not constitute plain, clear and conclusive evidence. The circumstantial evidence offered by the State fails to add to the necessary quantum of proof. For instance, the fact that the first burglary occurred on a Friday, arguably because Defendant **[\*9]** was aware that Mr. Hedrick was paid on Thursdays, adds little to the State's case when no cash was taken but rather two televisions and two VCRs. Additionally, evidence that the vehicle was in the driveway on the morning of the first burglary does not point to Defendant as the person who committed the crime since Mr. Hedrick stated that the side door was left unlocked so that Defendant could have access to home. It is a reasonable conclusion that it was not abnormal for Defendant to be at the residence. The lack of a forced entry does not implicate Defendant since anyone, not just Defendant, could walk through an unlocked door or climb through an unlocked window. The State has not offered proof that there was an eyewitness to the burglaries or that there exists any physical evidence that implicates Defendant as the burglar. Defendant was neither charged for the burglaries nor has Defendant at any time admitted to the burglaries. The Court finds that considering all of the proffered evidence, the State has failed to produce plain, clear and conclusive evidence that Defendant committed the prior burglaries.

## B. "Inextricably Intertwined" Doctrine

While the underlying facts **[\*10]** of the burglaries may not be introduced in the State's case-in-chief, the State may refer to the prior burglaries pursuant to the "inextricably intertwined" doctrine. This doctrine provides that evidence of uncharged misconduct may be admissible by the trial judge if it constitutes "'inextricably intertwined' evidence of uncharged misconduct which if excluded, would create a 'chronological and conceptual void' in the State's presentation of its case to the jury that would likely result in significant confusion." *Pope v. State, Del. Supr., 632 A.2d 73, 76 (1993)*. Both the State and Defendant agree that discussion of the burglaries is necessary to explain the events of September 8, 1995. The Court agrees but, in balancing the prejudicial effects of the evidence, narrowly limits the purpose of admitting evidence of the prior burglaries as follows. See D.R.E. 105; D.R.E 403.

The narrow purpose for allowing evidence of the burglaries is to set the context of the incident. See Ashley v. State, Del. Supr., No. 182, 1992, Walsh, J. (Sept. 30, 1993) (ORDER). The context that the State may set is that Mr. Hedrick's residence was burglarized on two prior occasions and that Mr. Hedrick **[\*11]** suspected and accused Defendant as the perpetrator of the burglaries. The State may also show that Defendant apparently was upset that Mr. Hedrick was accusing him of the burglaries. Accordingly, the State may introduce evidence for the limited purposes of showing: (1) that Mr. Hedrick's residence was burglarized on the aforementioned dates; (2) that Mr. Hedrick accused Defendant of the crimes; and (3) that Defendant was angry and upset that he was accused of the burglaries and contends that he went to Mr. Hedrick's residence to discuss why Mr. Hedrick was accusing Defendant of committing the burglaries. The State may not attempt to prove that Defendant did in fact commit the burglaries by discussing the intricate details in the police reports or any other evidence implicating Defendant to the burglaries. The jury will be instructed that evidence of the burglaries is admitted for the limited purpose of providing a context and background for the September 8, 1995 encounter between Defendant and Mr. Hedrick and that the evidence of the uncharged "inextricably intertwined" misconduct should be not considered by it for any substantive purpose or as indicative of Defendant's character. **[\*12]** See *Pope, 632 A.2d at 77; Getz, 538 A.2d at 734.*

## II. *Threat by Defendant to "Break [Victim's] Neck"*

The State intends to introduce evidence that Defendant's girlfriend, Melissa Kulmaczeski, telephoned Mr. Hedrick after the August 17, 1995 burglary and stated that Defendant had instructed her to call and inform Mr. Hedrick that if Mr.

Hedrick accused him of the burglary Defendant would "break [Mr. Hedrick's] neck." The State contends that this threat constitutes a bad act under D.R.E. 404(b) but is admissible in the State's case-in-chief to show motive and intent, plan and the absence of mistake or accident.

The Court finds that evidence of the threat is admissible in the State's case-in-chief pursuant to D.R.E. 404(b) and the five Getz criteria. First, evidence of the threat is material to an issue or ultimate fact in the case. *Getz, 538 A.2d at 734.* The threat is material to whether Defendant possessed the intent to kill. Although Defendant concedes that he intended to kill Mr. Hedrick, the State still has a duty to prove each element of the charged offense. See Steedley v. State, Del. Supr., No. 377, 1991, Walsh, J. (Sept. 21, 1992) (ORDER). Second, **[*13]** evidence of the threat is being introduced for a sanctioned D.R.E. 404(b) purpose. The threat is probative of Defendant's motive, intent and plan to kill Mr. Hedrick. Third, the fact that Defendant made the threat is documented with evidence that is plain, clear and conclusive. Not only did Mr. Hedrick report the threat to the police but the State has asserted that Ms. Kulmaczeski confirmed that the threats were made and that she called Mr. Hedrick and relayed the threats to him. Accord Gitsham v. State, Del. Supr., No. 193, 1993, Veasey, C.J. (Aug. 5, 1994) (ORDER) (finding that a witness's statement that she heard a threat made satisfied the plain, clear and conclusive evidence requirement); Wooters v. State, Del. Supr., No. 258, 1992, Holland, J. (1993) (ORDER) (admitting evidence of a threat pursuant to D.R.E. 404(b) through testimony of the person who received the threat). Fourth, the threat was made less than three weeks before Mr. Hedrick's death and was therefore not too remote to the charged offense. Lastly, the Court finds that the probative value of the threat outweighs any danger of unfair prejudicial effect. The threat indicates that Defendant was upset by Mr. **[*14]** Hedrick's accusations. Since Defendant concedes that he intentionally killed Mr. Hedrick and that he was upset by the accusations tying him to the burglaries, evidence of the threat is of minimal prejudice to Defendant. Pursuant to the last Getz guideline, the Court will issue an instruction to the jury concerning the limited purpose of admitting evidence of the threat.

### III. *Statements of Fear*

The State intends to offer statements made by Mr. Hedrick that indicate he was afraid of Defendant. The statements include:

1) A statement made by Mr. Hedrick to the police officer who investigated the August 28, 1995 burglary that Mr. Hedrick was afraid of Defendant;

2) Statements made by Mr. Hedrick to neighbors asking the neighbors to keep an eye out for Defendant and to notify the police and/or other family members if Defendant was seen in the area;

3) Statements made by Mr. Hedrick to neighbors and family members indicating his fear of Defendant; and

4) A statement made to a family member that Mr. Hedrick expected Defendant to kill him.

Hearsay statements relating to a victim's fear of a defendant may be admissible under D.R.E. 803(3) as a "statement of declarant's then **[*15]** existing state of mind." *Rev. State, Del. Supr., 540 A.2d 423, 430 (1988)* . However, before the evidence is admissible, the relevance of the victim's fears must be established. See *Derrickson v. State, Del. Supr., 321 A.2d 497 (1974)* (discussing five foundational requirements before a trial court may admit such evidence). In the instant case, the State argues that the victim's state of mind is at issue and is relevant since Defendant intends to raise extreme emotional distress as a mitigating factor to First Degree Murder. Since Defendant has ostensibly "raised" the defense in pre-trial motions and by submitting psychiatric reports, n1 the State contends that the victim's state of mind is at issue at the beginning of trial and the State may therefore use the victim's statements of fear in its opening statements and its case-in-chief. The Court does not find this argument persuasive.

n1 The defendant in a criminal trial is required to notify the State of his or her intention to introduce expert testimony relating the defendant's mental condition that may bear upon the issue of guilt. Superior Court Criminal Rule 12.2(b) provides in pertinent part:

> If a defendant intends to introduce expert testimony relating to a mental illness, defect, psychiatric disorder or any other mental or emotional condition of the defendant bearing upon the issue of guilt, the defendant shall, within the time provided for the filing of pretrial motions or at such later time as the court may direct, notify the attorney general in writing of such intention and file a copy of such notice with the prothonotary.

**[*16]**

These statements are not admissible in the State's case-in-chief. In *State v. Porter, Del. Super., 587 A.2d 188, 193 (1990),* this Court discussed the admissibility of statements of fear pursuant to D.R.E. 803(3). In addition to the five admissibility requirements enunciated in Derrickson, n2 three further requirements were found to be necessary to ensure a fair trial. n3 The requirement relevant to the State's contention is that evidence relating to the victim's fear "may only be admitted in rebuttal *after evidence* of accident, self-defense, suicide or extreme emotional distress *has been presented by the defense.*" *Porter, 587 A.2d at 193* (emphasis added). Since Defendant has no duty to present a particular defense or for that matter, to present any defense at all, it would be premature and of questionable constitutionality for the State to attack a defense until Defendant has presented evidence of that defense.

n2 As enunciated in Derrickson, the five basis for admitting a statement that shows an existing state of mind of the deceased are:

> 1. The statement must be relevant and material;
>
> 2. It must relate an existing state of mind when made;
>
> 3. It must be made in a natural manner;
>
> 4. It must be made under circumstances dispelling suspicion;
>
> 5. It must contain no suggestion of sinister motives.

*Derrickson, 321 A.2d at 503.*

**[*17]**

n3 The three additional requirements announced in Porter are:

> 1. This evidence may only be admitted in rebuttal after evidence of accident, self-defense, suicide or extreme emotional distress has been

presented by the defense;

> 2. It may only then be admitted if the trial court makes, upon balance, a determination on the record that its probative value is not substantially outweighed by the danger of unfair prejudice;
>
> 3. The deceased's statement, when made, must not have been too remote in time from the charged offense.

*Porter, 587 A.2d at 193* (citations omitted)

The Court finds no merit in the State's reliance on Steedley v. State, No. 377, 1991, Walsh, J. (Sept. 21, 1992) (ORDER), to support its position that the statements are admissible in the State's case-in-chief under D.R.E. 404(b) to show Defendant's lack of extreme emotional distress. In Steedley, the Supreme Court of Delaware found that evidence of prior bad acts was admissible under Rule 404(b) as proof of motive, intent or plan. The Court also found that the same evidence was probative of **[*18]** the absence of extreme emotional distress and was therefore proper rebuttal evidence. The Court held that the trial court did not abuse its discretion in admitting evidence of the prior bad acts in the State's case-in-chief, since [w]hen the same evidence is properly admissible in both the State's case-in-chief and its rebuttal the defense cannot dispute its introduction in the case-in-chief." Id., order at 4. In the instant case, Mr. Hedrick's statements of fear are clearly not admissible under D.R.E. 404(b). Accordingly, the State is precluded from using evidence of statements relating to Mr. Hedrick's fear of Defendant in its opening statements and its case-in-chief. See *Gattis v. State, Del. Supr., 637 A.2d 808, 818 (1994).*

### IV. *Prior Assaults*

The State intends to offer proof that Defendant has assaulted Mr. Hedrick on prior occasions. The State contends that evidence of the prior assaults is appropriate under D.R.E. 404(b) for a purpose other than to show Defendant's propensity to commit the offense charged. The State contends that "in a prosecution for homicide arising out of a marital and romantic relationship, evidence of previous discord between the victim **[*19]** and the defendant is clearly material to issues of motive and intent." *Gattis, 637 A.2d at 818* (quoting *Hutchins v. State, Del. Supr., 52 Del. 98, 153 A.2d 204, 207*

*(1959))*. While it is conceded by both parties that Mr. Hedrick and Defendant were involved in a sexual relationship, the State has failed to satisfy the Getz criteria which control the admission of such evidence. See *Getz, 538 A.2d at 734.*

The only evidence the State has proffered is that Mr. Hedrick, after being questioned by a family member about facial bruises, first stated that he walked into a door and then admitted that Defendant had hit him. While the State cannot place the date of the assaults, the State contends that they occurred sometime in 1995 and the above discussion occurred in the three months prior to Mr. Hedrick's death. The Court finds that the assaults have not been proven with evidence which is plain, clear and conclusive.

### CONCLUSION

Based upon the foregoing, Court grants Defendant's motion *in limine* to preclude the State from offering evidence seeking to show that Defendant burglarized Mr. Hedrick's residence on two prior occasions in the weeks preceding Mr. Hedrick's death. **[*20]** The Court denies the State's motion to introduce in its case-in-chief evidence implicating Defendant in the two prior burglaries of Mr. Hedrick's residence. While the State may not discuss intricate details of the burglaries in its case-in-chief, pursuant to the inextricable intertwined doctrine, the State may introduce evidence that Mr. Hedrick's residence was reported to have been burglarized and that he accused Defendant of the crimes.

The Court finds that evidence of the threat Defendant communicated to Mr. Hedrick by Ms. Kulmaczeski is admissible under D.R.E 404(b) and Getz. Therefore, the State's motion to introduce evidence of the threat in its case-in-chief is granted. The Court denies Defendant's motion to preclude evidence of the threat from the State's case-in-chief.

The Court grants Defendant's motion to preclude the State from introducing in its case-in-chief, hearsay statements made by Mr. Hedrick which indicate that he feared Defendant. Conversely, the Court denies the State's motion to introduce statements of fear made by Mr. Hedrick in its case-in-chief. Should evidence of extreme emotional distress be raised by Defendant, the Court on the State's application, **[*21]** will revisit the issue outside of the jury's presence and after Defendant has rested. If the Court finds that the State's proffer of evidence satisfies the admissibility standards set forth in Derrickson and Porter, such evidence may come in during the State's presentation of rebuttal evidence.

The Court grants Defendant's motion to preclude evidence of prior assaults since the State has failed to proffer plain, clear and conclusive evidence that Defendant did assault Mr. Hedrick. Accordingly, the Court denies the State's motion to introduce evidence of prior assaults in its case-in-chief.

### IT IS SO ORDERED.

Haile Alford, J.

## CERTIFICATE OF SERVICE

I hereby certify that on February 20, 2007, I electronically filed the foregoing Petitioner's Appendix of Unreported cases Cited in Opening Brief in Support of Petition for Habeas Corpus with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

Loren C. Meyers, Esquire
Elizabeth R. McFarlan, Esquire
Department of Justice
820 N. French Street
Wilmington, DE 19801

*/ s/ Joseph M. Bernstein*
JOSEPH M. BERNSTEIN (Bar #780)
800 N. King Street - Suite 302
Wilmington, DE 19801
302-656-9850
E-mail: jmbern001@comcast.net