# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

THOMAS J. CAPANO,           :
    Petitioner,            :
                  :
      v.                   :  Civil Action No. 06-58 ***
                  :
THOMAS CARROLL, Warden, *et al.,*  :
    Respondent.           :

### APPENDIX TO
### PETITIONER'S OPENING BRIEF
### IN SUPPORT OF PETITION FOR HABEAS CORPUS

JOSEPH M. BERNSTEIN (DE Bar #780)
800 N. King Street - Suite 302
Wilmington, DE 19801
302-656-9850
302-656-9836 (Fax)
E-mail: jmbern001@comcast.net
Attorney for Petitioner

DATED: February 20, 2007

# TABLE OF CONTENTS

| | PAGE |
|---|---|
| PETITION FOR WRIT OF HABEAS CORPUS | A-1 |
| EXCERPTS FROM TESTIMONY OF BRIAN FAHEY | A-8 |
| EXCERPTS FROM TESTIMONY OF DR. NEIL KAYE | A-10 |
| EXCERPTS FROM TESTIMONY OF KATHY FAHEY | A-22 |
| EXCERPTS FROM TESTIMONY OF DR. GREGORY JOHNSON | A-29 |
| EXCERPTS FROM CONFERENCE  - 10/29/98 | A-35 |
| EXCERPTS FROM SIDEBAR  - 11/2/98 | A-36 |
| EXCERPTS FROM TESTIMONY OF DR. MICHELLE SULLIVAN | A-37.2 |
| EXCERPTS FROM TESTIMONY OF JILL MORRISON | A-48 |
| EXCERPTS FROM TESTIMONY OF SIOBHAN SULLIVAN | A-58.1 |
| EXCERPTS FROM TESTIMONY OF JENNIFER BARTELS-HOUGHTON | A-59 |
| EXCERPTS FROM TESTIMONY OF JACQUELINE STEINHOFF | A-66 |
| EXCERPTS FROM TESTIMONY OF GINNY COLUMBUS | A-72 |
| EXCERPTS FROM TESTIMONY OF KIM HORSTMAN | A-75 |
| EXCERPTS FROM TESTIMONY OF KATHLEEN CAPANO | A-90 |
| EXCERPTS FROM TESTIMONY OF JERRY CAPANO | A-93 |
| EXCERPTS FROM TESTIMONY OF LOUIS CAPANO | A-110 |
| EXCERPTS FROM TESTIMONY OF DAN LYONS, ESQUIRE | A-118 |
| EXCERPTS FROM TESTIMONY OF DEBORAH MacINTYRE | A-121 |
| EXCERPTS FROM TESTIMONY OF BRIAN MURPHY | A-135 |
| EXCERPTS FROM TESTIMONY OF RUTH BOYLAN | A-137 |

|  | PAGE |
|---|---|
| EXCERPTS FROM TESTIMONY OF KENNETH CHUBB | A-138 |
| EXCERPTS FROM TESTIMONY OF JOSEPH CAPANO | A-139 |
| EXCERPTS FROM TESTIMONY OF DR. CAROL TAVANI | A-141 |
| EXCERPTS FROM TESTIMONY OF THOMAS CAPANO | A-144.1 |
| EXCERPTS FROM TESTIMONY OF KIM JOHNSON | A-165 |
| EXCERPTS FROM CONFERENCE - 1/7/99 | A-168 |
| EXCERPTS FROM CONFERENCE - 1/11/99 | A-170 |
| EXCERPTS FROM STATE'S CLOSING ARGUMENT - TRIAL | A-173 |
| EXCERPTS FROM CONFERENCE - 1/26/99 | A-178 |
| EXCERPTS FROM STATE'S CLOSING ARGUMENT - PENALTY PHASE | A-178.1 |
| EXCERPTS FROM JURY INSTRUCTIONS - PENALTY PHASE | A-179 |
| EXCERPTS FROM JURY VERDICT - PENALTY PHASE | A-180 |
| STATE'S EXHIBIT 18 - EXCERPT FROM ANNE MARIE FAHEY DIARY | A-181 |
| EXCERPTS FROM STATE'S EXHIBIT 53 - EMAILS | A-183 |
| DEFENDANT'S EXHIBIT 103 | A-187 |
| STATE'S EXHIBIT 255 | A-189 |

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

**THOMAS J. CAPANO,**
    Petitioner,

           v.

**THOMAS J. CARROLL,** Warden,
Delaware Correctional Center
and **CARL C. DANBERG,** Attorney
General of the State of Delaware,
    Respondents.

Civil Action No.   0 6 - 5 8

## PETITION FOR WRIT OF HABEAS CORPUS
## UNDER 28 U.S.C. §2254

    1. **Name and location of court which entered the judgment of conviction under attack:** Superior Court of the State of Delaware (New Castle County), 500 N. King Street, Wilmington, DE 19801.

    2. **Date of judgment of conviction:** (1) conviction by jury - January 17, 1999; (2) sentencing decision - March 16, 1999.

    3. **Length of Sentence:** A sentence of death was imposed by the trial court. However, that sentence was vacated by the Supreme Court of Delaware on January 10, 2006. *See, Capano v. State*, 2006 Del. LEXIS 1.

    4. **Nature of offense involved:** First Degree Murder

    5. **What was your plea? -** Not Guilty

    6. **If you pleaded not guilty, what kind of trial did you have? -** Jury trial

    7. **Did you testify at the trial? -** Yes

    8. **Did you appeal from the judgment of conviction? -** Yes

    9. **If you did appeal, answer the following:**

        (A) **Name of court -** Supreme Court of Delaware
        (b) **Result -** conviction and death sentence were affirmed
        (c) **Date of result and citation -** August 10, 2001; *Capano v. State*, 781 A.2d 556 (Del. 2001)

        (D) **Grounds raised:**

    (1) At trial, Capano had expressly requested that the jury be charged on lesser included offenses. Since the evidence was also consistent with lesser degrees of homicide, Capano was entitled to jury instructions on the lesser included offenses to the charged offense of Murder First Degree under the Due Process Clause of both the federal and state Constitutions. See, *Beck v. Alabama*, 447 U.S. 625(1980).

(2)The State's theory of the case as to Capano's "motive" and "intent" rested nearly entirely on inadmissible hearsay evidence of the victim's out-of-court statements to her psychotherapists, family and friends. This evidence was inadmissible under D.R.E. 803(3) (state of mind exception) and especially in the State's case-in-chief. See, *Porter v. State*, 587 A.2d 188 (Del. Super. 1990). It was also inadmissible under D.R.E. 803(4) (statements for purpose of medical diagnosis). Admission of this hearsay evidence also violated Capano's Sixth Amendment right to confrontation.

(3)The trial court wrongly admitted evidence of Capano's "bad" character and "bad acts" in violation of *Getz v. State*, 538 A.2d 726 (Del. 1988), and its progeny.

(4) The trial court wrongly allowed the jury to hear evidence that Gerry Capano, the defendant's brother, who was a crucial witness for the State on the question of "planning" and "premeditation," had taken (and presumably passed) a lie detector test.

(5) The trial court wrongly allowed the State to question the defendant on cross-examination about matters that were reasonably intended to provoke Capano to assert the lawyer-client privilege; and to ask him so-called "were they lying?" questions. These lines of questioning amounted to prosecution misconduct under *Hughes v. State*, 437 A.2d 559 (Del. 1981), and its progeny.

(6) The trial court wrongly allowed State's witnesses to express their personal opinion that Capano was "guilty."

(7) The trial court abused its discretion in failing to properly investigate a claim of juror bias or misconduct and in summarily dismissing a juror during the trial.

(8) The defendant's exclusion from "office conferences" where nearly all of the critical rulings in the case were made violated the defendant's Sixth Amendment right to be present at all stages of his trial.

(9) The trial court abused its discretion in refusing to require the State to turn over to the defense admitted "*Brady* material" concerning Gerry Capano's use of drugs.

(10) The trial court improperly limited the scope of the defendant's right of allocution in the penalty hearing in violation of *Shelton v. State*, 744 A.2d 465, 488-497 (Del. 2000).

(11) The trial court's jury instruction on the elements of the statutory aggravating circumstance that the killing was "premeditated and the result of substantial planning" was erroneous as a matter of law.

(12) The defendant's death sentence is invalid because the jury did not unanimously find that the State had established beyond a reasonable doubt that the killing was "premeditated and the result of substantial planning," which was the only statutory aggravating circumstance in the case.

(13) Delaware's death penalty statute was unconstitutional under the Sixth Amendment because it did not require a unanimous finding by the jury as to the existence of statutory aggravating circumstances.

(14) The imposition of the death penalty in this case was "disproportionate" to the penalty imposed in similar cases.

(15) The case should be remanded for an evidentiary hearing to review whether the rulings made by the trial court may have been influenced - consciously or unconsciously - by any motive on the part of the trial judge to use his role in the case, in presiding over a conviction and imposing the death penalty in a highly publicized case, to advance his political career, and all rulings made by the court below must be scrutinized with special care since the trial judge used this case, the conviction and the death penalty, to launch his political career.

(16) The trial court abused its discretion in allowing the State to impeach the defendant by evidence of prior sexual misconduct.

(17) The defendant's Fifth Amendment privilege was violated when the State was permitted to question the defendant concerning his post-arrest silence.

**(e) If you sought further review of the decision on appeal by a higher state court, please answer the following** : Not applicable.

**(f) If you filed a petition for certiorari in the United States Supreme Court, please answer the following with respect to each direct appeal:**

**(1) Name of Court -** United States Supreme Court
**(2) Result -** the petition was denied
**(3) Date of result and citation -** June 28, 2002; *Capano v. Delaware*, 536 U.S. 958 (2002)

**(4) Grounds raised:**

(1) At trial, Capano had expressly requested that the jury be charged on lesser included offenses. Since the evidence was also consistent with lesser degrees of homicide, Capano was entitled to jury instructions on the lesser included offenses to the charged offense of Murder First Degree under the Due Process Clause of both the federal and state Constitutions. See, *Beck v. Alabama*, 447 U.S. 625(1980).

(2) Delaware's death penalty statute was unconstitutional under the Sixth Amendment because it did not require a unanimous finding by the jury as to the existence of statutory aggravating circumstances.

10. **Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications or motions with respect to this judgment in any court, state or federal?** Yes.

11. **If your answer to 10 was "yes," give the following information:**

**(A) (1) Name of Court -** Delaware Superior Court (New Castle County)

**(2) Nature of proceeding -** Petition for post-conviction relief under Superior Court Criminal Rule 61.

**(3) Grounds raised:**

(a) The statutory provisions for imposition of the death penalty that were in effect at the time of Capano's trial and sentencing are facially unconstitutional in that they deprived Capano of his right under the Sixth and Fourteenth Amendments to the United States Constitution and Article 1, §4 and Article 1, §7 of the Constitution of the State of Delaware to have a jury make the final determination, unanimously and

beyond a reasonable doubt, whether Capano was "eligible" to be sentenced to death. See, *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). The decision in *Brice v. State*, 815 A.2d 314 (Del. 2003), which upheld the constitutionality, under *Ring*, of the 1991 Death Penalty Statute, should be overruled.

(b) Even if *Brice* is not overruled, any "*Ring* error" is subject to review under the "harmless error" standard. In this case, the constitutional error was not "harmless" and the Delaware death penalty statute is unconstitutional "as applied to" Capano because the "advisory jury" did not unanimously agree that the State had proved the existence of the only statutory aggravating circumstance alleged — that "the murder was premeditated and the result of substantial planning." See, *Norcross v. State*, 816 A.2d 757, 767 (Del. 2003)

(c) If the 1991 Delaware death penalty statute is facially unconstitutional, the application of the doctrine of "severability" requires that the court vacate Capano's death sentence and impose a sentence of life imprisonment without benefit of probation or parole.

(d) If Capano's death sentence is invalid under *Ring*, *Brice*, or *Norcross*, a retrial of the penalty phase is barred under the Double Jeopardy Clause.

(e) The defendant's trial attorneys were "ineffective" under *Strickland v. Washington*, 466 U.S. 668 (1984), as follows: (a) in agreeing to stipulate to the admissibility of admittedly hearsay statements made by Anne Marie Fahey, and (b) in failing to object to the cross-examination of the defendant concerning pre-arrest and post-arrest silence.

**(4) Did you receive an evidentiary hearing on your petition, application or motion?** Yes.

**(5) Result** - The Rule 61 Motion was denied. *State v. Capano*, 2005 Del. Super. LEXIS 69 (March 9, 2005)

**(b) As to any second petition....** Not applicable

**(c) Did you appeal to the highest state court having jurisdiction the result of action taken on any petition, application or motion?** Yes.

**(d) If you did not appeal......** Not applicable

**12. Grounds for Habeas Corpus Relief**

**Ground One:** At trial, Capano had expressly requested that the jury be charged on lesser included offenses. See, *Capano v. State*, 781 A.2d at 627. Because the evidence was also consistent with lesser degrees of homicide, Capano was entitled to jury instructions on the lesser included offenses to the charged offense of Murder First Degree under the Due Process Clause of both the federal and state Constitutions. See, *Beck v. Alabama*, 447 U.S. 625(1980). The trial court rejected Capano's request. *Capano*, 781 A.2d at 627. In his direct appeal, Capano argued that the refusal to instruct on lesser included offenses violated his Due Process rights under *Beck. Id.*, at 633. Capano's *Beck* claim was also rejected by the Delaware Supreme Court. *Id.*

**Ground Two:** The statutory provisions for imposition of the death penalty that were in effect at the time of Capano's trial and sentencing are facially unconstitutional in that they deprived Capano of his right under the Sixth and Fourteenth Amendments to the United States Constitution to have a jury make the final determination, unanimously and beyond a reasonable doubt, whether Capano was "eligible" to be sentenced to death. *See, Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). In the state court post-conviction proceedings, the Delaware Supreme Court rejected Capano's claim that the Delaware death penalty statute was unconstitutional under *Ring.* See, *Capano v. State,* 2006 Del. LEXIS 1, *16-*19. The Delaware Supreme Court held, however, that "the advisory jury in Capano's case did not unanimously find the element that the 'murder was premeditated and the result of substantial planning.' Without a unanimous jury finding of the statutory aggravating circumstance, the procedure used to sentence Capano to death under the 1991 statute was unconstitutional as applied to him." *Id.,* at *21. The Delaware Supreme Court's conclusion that the Delaware death penalty statute was not facially unconstitutional under *Ring* allowed the court to permit a re-trial of the "penalty phase" of the case. Conversely, if the statute is unconstitutional under *Ring,* then the doctrine of "severability" would have required to court to re-sentence Capano to life imprisonment and would have barred any re-trial of the penalty phase of the case.

**Ground Three:** The decision of the Delaware Supreme Court in the post-conviction proceedings to permit a re-trial of the "penalty phase" of the case violated Capano's rights under the Double Jeopardy Clause of the Fifth Amendment to the United states Constitution. In the "penalty phase of Capano's trial, the jury voted 11 to 1 that the State had established the only statutory aggravating circumstance alleged to exist in the case – that the murder was the result of substantial planning and premeditation. The jury's non-unanimous vote was the functional equivalent of an acquittal on the question of Capano's eligibility to be exposed to a possible death sentence. See, *Sattazahn v. Pennsylvania,* 537 U.S. 101 (2003).

**Ground Four:** In Capano's direct appeal, the decision of the Delaware Supreme Court that the victim's out-of-court statements to her friends, family and psychotherapists concerning her relationship with Capano and "bad acts" allegedly committed by Capano were admissible under state law rules of evidence violated Capano's rights under theConfrontation Clause of the Sixth Amendment to the United States Constitution. See, *Capano v. State,* 781 A.2d at 615 and 627.

**Ground Five:** In Capano's direct appeal, the decision of the Delaware Supreme Court that it was proper for the State to cross-examine Capano concerning "post-arrest silence" violated Capano's rights under the Fifth Amendment to the United States Constitution. See, *Capano v. State,* 781 A.2d at 647-649.

**Ground Six:** Capano's trial attorneys were "ineffective" under *Strickland v. Washington,* 466 U.S. 668 (1984), as follows: (1) they did not request limiting instructions concerning Anne Marie Fahey's out-of-court statements; (2) they agreed to a stipulation that admitted Fahey's out-of-court statements; and (3) they did not object to the prosecutor's cross-examination of Capano about his pre-arrest and post-arrest silence in possible violation of his Fifth Amendment rights. See, *Capano v. State,* 2006 Del. LEXIS 1 at *8-*16.

13. **If any of the grounds listed in 12 were not previously presented in any court, state or federal, state briefly what grounds were not so presented and give your reasons for not presenting them.** Not applicable.

14. **Do you have any petition or appeal now pending in any court, either state or federal, as to the judgment now under attack?** Yes. As a result of the decision of the Delaware Supreme Court in *Capano v. State*, 2006 Del. LEXIS 1, the State is entitled to a retrial of the "penalty phase" of the trial. That retrial has not yet taken place.

15. **Give the names and addresses of each attorney who represented you at each stage of the judgment attacked herein:**

(1) the following attorneys represented the petitioner during all or part of the period from the time of his arrest through conviction and sentence in the trial court.

> Joe A. Hurley, Esquire
> 1215 King Street
> Wilmington, DE 19801

> John F. O'Donnell, Esquire
> 2648 N.E. 26th Place
> Ft. Lauderdale, FL 33306

> Joseph S. Oteri, Esquire
> 20 Park Plaza, Suite 905
> Boston, MA 02116

> Charles M. Oberly, III, Esquire
> Oberly, Jennings & Rhodunda, P.A.
> PO Box 2054
> Wilmington, DE 19899

> Eugene J. Maurer, Jr., Esquire
> 1201-A King Street
> Wilmington, DE 19801

(2) The following attorneys represented petitioner on direct appeal

> Joseph M. Bernstein, Esquire
> 800 N. King Street - Suite 302
> Wilmington, DE 19801

David A. Ruhnke, Esquire
Ruhnke & Barrett
47 Park Street
Montclair, NJ 07042

Paul Shechtman, Esquire
Stillman & Friedman, P.C.
425 Park Avenue
New York, NY 10022

(3) The following attorneys represented the petitioner in state court post-conviction proceedings and on appeal in post-conviction proceedings

Joseph M. Bernstein, Esquire
800 N. King Street - Suite 302
Wilmington, DE 19801

David A. Ruhnke, Esquire
Ruhnke & Barrett
47 Park Street
Montclair, NJ 07042

16. **Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?** No.

17. **Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?** No.

**WHEREFORE,** petitioner prays that the Court grant petitioner all relief to which he may be entitled under this Petition

_Joseph M. B_

JOSEPH M. BERNSTEIN (#780)
800 N. King Street - Suite 302
Wilmington, DE 19801
302-656-9850
Attorney for Petitioner

I declare under penalty of perjury that the foregoing is true and correct.

_Thomas J. Capano_

Dated: _1/13/06_                Thomas J. Capano

A-7

Page 63

1 people she dated?
2      Did she keep you advised of those people?
3 A. Yeah, she did.
4 Q. Not that she had to or anything?
5 A. Right.
6 Q. But were you aware of any of those?
7 A. I was, yeah, in high school and college.
8 Q. And even when she was working for the
9 Governor, whether she dated different people?
10 A. Yeah. Yeah, definitely.
11 Q. And would that be a topic of -- that you
12 talked about on occasion?
13 A. Yeah, she did.
14      And, you know, the more time -- when we would
15 spend time together over an extended period, for
16 instance, it would come up more often than just a
17 phone call, but there were some -- there were -- yeah,
18 there was several guys.
19      There was a guy in Media that she dated for a
20 while.
21      There was someone from the AG's office that
22 she dated.
23      There was another guy who was sort of a blind

Page 61

1 entitled to know that.
2      MR. OTERI: Let's do it, Judge.
3      MR. O'DONNELL: Especially those of us
4 sitting next to him.
5      (End of side bar.)
6      THE COURT: Mr. Oteri, we found a new use for
7 you.
8      Thank you, sir.
9      You may proceed, Mr. Wharton.
10      MR. WHARTON: Thank you, your Honor.
11 BY MR. WHARTON:
12 Q. You -- during your trip to Ireland with her
13 and during the time you spent together when she lived
14 with you and your father, did you notice that Anne
15 Marie, did she have any habits that might be described
16 as a little bit unusual?
17 A. Yeah. When we lived -- I guess when we were
18 living in Wilmington, I didn't really notice it. I
19 know when she moved in with Carol, she -- things sort
20 of changed because she felt like she didn't really
21 belong there and that my grandmother had said to her
22 not to cause Carol any trouble.
23      And so Anne really took that to the extreme

Page 62

1 and so she tried to -- she didn't really feel right
2 about eating Carol's food in her room. She tried to
3 keep it as neat as possible so Carol would never have
4 to clean up after her, and that's when I really saw
5 that change, because I hadn't seen that when we were
6 living together before.
7      So I think it was as a result of living with
8 Carol that that sort of behavior started.
9 Q. And which sort of behavior was that?
10 A. Just being real -- I mean people kidded her,
11 called her anal all the time.
12      It was really -- that's what I mean about
13 being obsessive about cleaning up and having things
14 look just right, and that was the first time I saw her
15 really, you know, control how much she was eating.
16      Like I said, she often said she felt guilty
17 eating Carol's food because she wasn't buying any
18 food, wasn't bringing any into the house, so I would
19 often, on the way home from school when I would pick
20 her up at Brandywine, you know, if I had seen a game
21 or something like that, we would go and eat so she
22 wouldn't have to eat dinner at Carol's house.
23 Q. Did you know about some of the -- some of the

Page 64

1 date through a friend that she dated. And that's --
2 that's after college when she was working for the
3 Governor.
4 Q. Were you aware of any relationship with Tom
5 Capano?
6 A. No. No.
7 Q. She never confided anything to you?
8 A. No.
9 Q. Did she know how -- how you felt about, for
10 example, marital infidelity?
11 A. I don't think we ever really talked about
12 that, so I don't know that we ever had a lot of
13 discussions about that.
14      I -- so, no, I don't -- she may have been
15 able to guess, but we never really got into it, no.
16 Q. Did -- do you know about Mike Scanlon?
17 A. Sure. Yeah.
18      I remember when she had their first date, she
19 called me up and told me about it.
20 Q. Do you know who arranged for that first date?
21 A. Tom Carper had met Mike, I guess, through
22 some business that, you know, he had had with the
23 State and MBNA, and I knew Mike does a lot of

1 community work, so that's probably how the Governor
2 met him, thought he and Anne Marie would make a, you
3 know, good match, so he suggested it.
4     Q. Do you know about when that was? When they
5 first got together, Anne and --
6     A. Yeah, like fall of '95. Yeah.
7     Q. And did she date him regularly or --
8     A. She ended up dating him regularly. Not at
9 first.
10     I know that she called me after their first
11 date and thought that it sort of had been a flop.
12     It was one -- they met at O'Friels, and there
13 were other people there, and he didn't -- there just
14 wasn't a whole lot going on between them and she
15 thought that -- she thought that he had sort of
16 brushed her off.
17     Q. Did she begin to date regularly?
18     A. They started to after that and I don't know
19 how often they saw each other.
20     I know it was, you know, during the week and
21 on weekends.
22     Q. Up until her death, if you had to say whether
23 she had a boyfriend or not, would you say that Mike

1 Scanlon was her boyfriend?
2     A. Yes.
3     Q. Did he come to different family events?
4     A. Yeah, he did, you know, on holidays. He was
5 there on her 30th birthday at my sister's house and
6 on, you know, on -- every once in a while on a
7 weekend, it wasn't a real holiday, just sort of a get
8 together, dinner at somebody's house.
9     Q. That would be something that would happen on
10 a semi-regular basis or what?
11     A. Yeah.
12     Q. I mean your family.
13     A. Right, with the family. And they came to one
14 of my basketball games together.
15     Q. One of your?
16     A. One of my basketball games together.
17     Q. Do you know whether she visited his parents?
18     A. She did. On -- in '96, on Memorial Day
19 weekend.
20     Q. And Mike Scanlon's parents, are they local or
21 not?
22     A. No, they live up in New England.
23     Q. So the trip was up there?

1     A. Right.
2     Q. Would -- would it be fair to say that at
3 least from a somewhat rocky start, you're talking
4 about the relationship picking up steam?
5     A. From appearances, it was, and also from
6 talking to her, I thought that it was, also.
7     Q. Do you know whether -- you alluded to her
8 controlling her food intake while she was living at
9 Carol's or as a result of living at Carol's.
10     Do you know whether she had difficulties with
11 eating disorders later on in life?
12     A. I know she did, yeah.
13     Q. How do you know that?
14     A. Well, I know that in the spring of '96, I
15 talked to her about it.
16     We were -- my sis -- we were at my sister,
17 Kathleen's house and she just -- you know, she didn't
18 look good at all, so I asked her about it.
19     Q. She told you that she had some difficulty in
20 that area?
21     A. She was a little cryptic about it, because my
22 nephews were around, and there was some other people
23 in the house, so she didn't want to talk about it a

1 lot that day.
2     But she told me that she was -- she had, you
3 know -- I asked her if anything was wrong and she
4 said, yes, and I told her it looked like she hadn't
5 been eating. And she said she had a problem, and I
6 asked her who she was -- who she was talking to about
7 it, if she was getting help, and she told me that, you
8 know, she was getting help for it.
9     And that's all we said that day, and then
10 later that night, I talked to her on the phone.
11     Q. I want to move a little bit forward to June
12 of 1996.
13     A. Um-hum.
14     Q. When was the last time you saw her?
15     A. I saw her on a Friday night, the 21st of
16 June.
17     I -- I was leaving to go to Ecuador the next
18 morning, and I had to go into O'Friels to drop some
19 things off for Jimmy Freel, and Anne Marie and Mike
20 were at O'Friels, and I really didn't expect to see
21 them there, but they were there.
22     Q. And what were they doing?
23     A. Just hanging around really. It looked like

CondenseIt™

Page 17

1    And, again, these are people who work with
2  patients, using the techniques with which they are
3  familiar, trained, experienced, and comfortable, and
4  those are often very effective for a person.
5    And what we try to do when we see a new
6  patient is to make a decision about where the best fit
7  will be in terms of medication or of no medication;
8  with or without a talking therapy; if a talking
9  therapy, what type of talking therapy; and delivered by
10  whom.
11    Q. I want to talk with that sort of context now
12  about Anne Marie Fahey.
13    Do you know her?  Did you know her?
14    A. Yes, I did know Anne.
15    Q. Was she a patient in your practice?
16    A. Yes, Anne was my patient as well as a patient
17  in the practice.
18    Q. Okay.  Without getting into the details right
19  now of why she was seeing your practice, can you sort
20  of outline for us the time frame during which she was a
21  patient?
22    A. Anne was a patient in the practice during two
23  different -- three different time periods.

Page 18

1    She was a patient in 1991 for about four
2  months, and during that time, she saw Bob Conner, who
3  is -- I should say who was -- he's deceased, I'm sorry
4  to say, but she saw Bob for talking therapy and she saw
5  Doctor Catherine Clary, who was my partner, but has now
6  moved to New York City, for medication.
7    Then in 1970 -- I'm sorry, in 1993, she again
8  started to see Bob for therapy and he then referred her
9  to me for medication followup.
10    And then after Bob was killed on his way home
11  from the office in a very tragic car accident, she sort
12  of dropped out of treatment with us for reasons that I
13  think I understand and continued her treatment
14  elsewhere.
15    Q. Let me interrupt you just for a second.
16    If you could give us a date of Bob Conner's
17  death?
18    A. Bob Conner was killed January 24th, 1995.
19    Q. And she dropped out of treatment with your
20  practice when?  Approximately.
21    A. January 24th, 1995.  I mean when Bob -- when
22  Bob died.  That was a substantial loss for all of us
23  and certainly for his patients.

Page 19

1    Q. I'm sorry, you were continuing with -- were
2  you aware that she began seeing people outside of your
3  practice?
4    A. Actually, I need to correct that.  That's not
5  that correct.
6    After Bob died, she followed up with Wes
7  Novak, who is a psychologist in our practice, for a
8  short period of time, about two months, and then went
9  elsewhere.
10    Then she reentered treatment with me in June
11  of 1996 shortly before her death.
12    Q. Do you know with whom -- from whom she sought
13  treatment, if anybody, in the period after she left
14  your practice and before she came back to your
15  practice?
16    A. Yes.  I know that she saw two people.  She
17  saw Gary Johnson and she saw Michele Sullivan.
18    Q. Now, when -- when -- and she returned to your
19  practice in June of '96, I think you said.
20    Did you actually see her during that period?
21    A. Oh, yes, I did.
22    I saw her on June 12th for her first revisit,
23  if you would, after having been out of contact for some

Page 20

1  time.
2    Q. And did you see her again?
3    A. Yes, I saw her again -- I saw her June 27th
4  of 1996.  She was my last patient that day.
5    Q. Was -- when she came back to your practice,
6  was she -- did she begin seeing another therapist in
7  your practice besides yourself or was she seeing
8  another therapist outside?
9    A. No, she was seeing Doctor Michele Sullivan, a
10  psychologist, at the time, outside of our practice.
11    Again, very common for the person who has a
12  psychiatrist managing their medications, and Anne was
13  comfortable with me, and we had -- we had worked
14  together before.
15    And to see a psychologist or therapist
16  somewhere else, we don't have any rules that you have
17  to get both services within our -- within our
18  practice.
19    I guess that's restraint of trade in my mind.
20    Q. Okay.  And did you consult with Doctor
21  Sullivan at all about her --
22    A. I did.
23    Doctor Sullivan sent me a letter, sort of

Page 21

1 referring Anne back to me.
2       I, in turn, of course, saw her and started
3 treatment and did a followup letter back to Doctor
4 Sullivan about my thoughts and my treatment plans; that
5 we would be on the same page.
6       Michele is someone with whom I've shared
7 numerous patients and we would tend to speak fairly
8 regularly about patients that we shared in our cases
9 where we were both involved.
10    Q. Let me sort of go back a little bit now that
11 I think we have an idea of how -- what her course was
12 at least as far as when she was seeing people and whom
13 she was seeing.
14    Did -- when she was seeing Bob Conner
15 initially in 1991, I think you said the psychiatrist
16 who was working with her was Doctor Clary?
17    A. That would be correct.
18    Q. Did you have any role in her treatment for
19 those four months or so with Bob Conner initially in
20 1991?
21    A. No, I did not.
22    Q. Would it be fair, then, when she came back in
23 1993, she resumed her therapy with Bob Conner?

Page 22

1    A. That's correct.
2    Q. Did you have any role in her therapy at that
3 point? I mean in conjunction with Bob Conner's --
4    A. Yes. Yes, in the second time when she came
5 back, I had a role both as Bob's direct supervisor as
6 well as I began to treat Anne with medication, so she
7 became my patient directly as well.
8    Q. How did that relationship with you and Bob
9 Conner work in terms of treating Anne Marie Fahey?
10    A. Anne was a well-known patient in the
11 practice, if you would. She was someone who was
12 memorable and -- and just the way she carried herself.
13 She was always friendly, the kind of patient who went
14 in to see Bob, but not have an appointment with me,
15 would stick her head in my door if it was open and say
16 hello or wave at me while checking out, things like
17 that. So a very friendly, polite young woman.
18       She -- her case was complex because of the
19 traumas of her life and the things that she was trying
20 to change and work diligently on and so it was a case
21 that would be discussed pretty regularly.
22       Bob and I were the early morning shift, if
23 you would, at our office. We both start seeing

Page 23

1 patients usually by seven in the morning, and so in the
2 morning, when we'd get in and make coffee, before the
3 secretaries and things like that, there would be a time
4 that he and I would discuss cases or patients on a
5 regular basis in that setting.
6       And then we would also have time set aside as
7 needed for -- for case conferencing a specific case, to
8 go over problems, to talk about treatment approaches,
9 to bounce ideas off each other about what to say or
10 what interventions made sense.
11       Also, when you're working with a therapist,
12 you may see the patient every week or every other week
13 and you, as the physician, are seeing the patient for
14 medication checks much less frequently. The therapist
15 becomes your eyes and ears so the therapist will check
16 and tell you if the patient's doing okay or if they
17 need a refill or they might give you some ideas or say,
18 Gee, doc, I don't think the medicine's doing as much as
19 it's supposed to be. I think we need to get this
20 person in and have you recheck things and readjust.
21       So it's a very intimate working relationship.
22    Q. And was that the type of working relationship
23 you shared with -- with Bob Conner in regards to Anne

Page 24

1 Marie Fahey?
2    A. Absolutely.
3    Q. Well, what -- how frequently was she seeing
4 Bob Conner back when she rejoined --
5    A. Anne was seeing Bob every week or every other
6 week depending on scheduling, but she was in therapy,
7 what we would call an intensive psychotherapy mode,
8 where you're seeing your therapist usually weekly.
9    Q. Well, tell us about what the purpose of the
10 therapy was. What were the issues that she was dealing
11 with and Bob Conner, and you were dealing with, with
12 her?
13    A. The purpose of the therapy was to help reduce
14 her symptoms, to help her feel better about herself, to
15 help her regain power and control in her life, over her
16 life, over bad things that had happened to her in the
17 past.
18       This would include an eating disorder, it
19 would include depressed moods, anxiety, panic attacks,
20 and what we'll call dependency issues or codependency
21 issues.
22       That's very common for someone who's been
23 raised in a traumatic environment. And she was raised

Page 29

1 that she has or wanted to have for her own father. So
2 that would lead her to go towards an older man, a more
3 authoritarian figure, basically to try to help replace
4 what she never had.
5       And that's a pattern, a behavior that I think
6 was clear in this case.
7    Q. Were her adult relationships with, obviously,
8 other people at all relevant or a factor in how you,
9 I'm talking you in the plural, as therapists were
10 trying to treat her?
11    A. Yes. Her adult relationships are critical in
12 understanding her. They're a large part of her
13 problem. They're a large part of her behavior and they
14 influence things, such as the depressive symptoms or
15 the anxiety, the eating disorder, and there's a direct
16 interplay between them. You cannot separate them. So
17 that when you see an eating disorder in a woman,
18 looking at prior traumas in life is standard. It's
19 often seen that an eating disorder in your teens or
20 twenties is predated by abuse or trauma as a child.
21 And so you can't address one without addressing the
22 other.
23       That's like treating an infection with

Page 30

1 aspirin and not trying to get the infection out of the
2 body. You have to treat the whole picture.
3       And, in this case, that would include her
4 psychosocial issues, her behaviors, her relationships,
5 her symptoms, both past and present, because in a
6 person with -- with problems like this, those run
7 together.
8    Q. Were you aware of some of her relationships
9 with other men?
10    A. Yes.
11    Q. Specifically, were you aware of a
12 relationship with the defendant in this case?
13    A. Yes, I am. Yes, I was.
14    Q. Was that a relationship, something that was a
15 component of her therapy?
16    A. Yes.
17    Q. How so?
18    A. Well, it was a significant relationship in
19 her life and her relationship with Mr. Capano was
20 clearly problematic for her. It was a lopsided or
21 unbalanced relationship where instead of that nice,
22 equal power, reciprocal kind of relationship, things
23 were much more one-sided.

Page 31

1       He was older, well-respected in the
2 community, in a position of power and authority, in
3 some ways, a father figure. He was able to provide her
4 with things that were beyond her means, but, also, made
5 it impossible for her to reciprocate. He could buy her
6 gifts and she couldn't buy him gifts in that same way,
7 which leads to guilt.
8       Guilt tends to trap people and is not a
9 healthy thing to be seeing in a relationship.
10       As time went on in that relationship and she
11 realized that it was not healthy, which was part of
12 what therapy was about, was to help her examine her
13 relationships, her behaviors now, how those relate to
14 things from her past, and to put all those pieces
15 together to allow her to then to change.
16       She, in fact, was able to start that process
17 and was trying to do that, but she would find when she
18 tried to break off the relationship that he knew how to
19 push her buttons, if you would, that he would try to
20 reengage or would turn up the intensity and try to keep
21 her involved in coming back.
22       And that could be done both through gifts,
23 cars, TVs, tickets, dinners, presents, clothing, or

Page 32

1 psychologically trying to involve himself in her
2 therapy, give her direction, tell her what to do,
3 threaten her, make her feel that she had no other
4 options.
5       So it was done, I think, both psychologically
6 as well as through direct actions.
7    Q. Now, where was she in -- at least initially
8 -- in recognizing the unhealthy aspects of this
9 relationship?
10    A. At what point in time are you asking me?
11    Q. Prior to her -- prior to the death of Bob
12 Conner.
13    A. Um --
14    Q. Do you know if that relationship was much a
15 factor?
16    A. Yes. At that point in time, she was clearly
17 trying to break off the relationship, wanted it to be
18 over, and had made attempts to end the relationship.
19    Q. By the time she resumed seeing you, where was
20 she with those attempts?
21    A. By the time she resumed seeing me, which
22 would be June of '96, shortly before her death, she was
23 clear in her mind that she did not want to have a

Page 33

1 relationship with Mr. Capano.

2 She was still fearful of him, was not
3 convinced that he was ever going to let go, but in her
4 own mind, she had wanted that to be over a long time
5 ago.

6 Q. Well, now, Doctor, you've -- you know that
7 there was contact between the two on a regular basis,
8 don't you?

9 A. Yes, I do.

10 Q. And what kind of contact do you understand
11 there to have been on a regular basis between the two
12 of them even up to June of '96?

13 A. There was contact in the form of telephone
14 conversations, E-mails, as well as face-to-face visits,
15 or dinners or meetings.

16 That is not surprising.

17 She, in trying to break things off, was, I
18 think, doing a number of things.

19 One is she was genuinely fearful and there's
20 evidence of that in the E-mails that they exchanged as
21 well as in things that she has said to those of us who
22 had the honor and fortune of treating her and working
23 with her. So that she was worried that harm would come

Page 34

1 to her if she broke things off. And she was trying to
2 find a way to let him down easy, to try to temper
3 things because she was worried about rage and anger.

4 And if you're someone who's been abused and
5 been hurt before, you know what that's about, and try
6 to limit it and prevent it for yourself.

7 She, I'm sorry -- could you ask that again?

8 Q. How did she manage that? She's seeing and
9 talking to him regularly, but, yet, she wants to break
10 it off from him. Why not --

11 A. She's trying to break it off and that message
12 gets off clearly by reading the E-mails that I've had a
13 chance to read.

14 You can see that that message was conveyed
15 and was received, but he doesn't want that, so she
16 tries to say, I can't be lovers with you, I don't want
17 a romantic relationship, but let's be friends. I'm
18 willing to try to be friends, but only friends.

19 And that's not uncommon in a relationship to
20 do, partly to let the guy down easy and partly because
21 maybe they really want it. It's very difficult to
22 achieve and I don't think it was achievable in this
23 case.

Page 35

1 At the same time, when you have this
2 dependency need that she had, a real fear of being
3 alone, of being rejected, that no one would ever want
4 you, it's hard to let go of somebody without having
5 something else to go to.

6 I use an expression and it's in my -- I refer
7 to it in my notes. You can't trade for what's behind
8 door number 2 when you're a person like this because,
9 what happens is, although you're traumatized and
10 although you're abused, you know that you can survive
11 it, and because you're traumatized and abused, you're
12 fearful that what's behind that door number 2 will be
13 worse. And so you say, I'll stay with what I've got,
14 even though it's terrible, because I'm so afraid that
15 it actually could be worse and I might not be able to
16 survive it.

17 So until something comes along, another
18 person, another man, another opportunity that lets you
19 go from where you are to that next relationship, it's
20 very hard to give up whatever support or whatever there
21 is in that relationship, even though it's unhealthy,
22 because it's meeting some of your dependency needs.

23 Sort of like swinging on the high-wire act,

Page 36

1 those trapeze artists. They're swinging on one bar,
2 and that other bar is over there, and they have to grab
3 it, but they can't grab it without letting go of the
4 first one and flying through air and worrying that
5 they're going to fall and crash.

6 Well, some people can do that act and some
7 people can't.

8 And if you have this dependency, if you have
9 her kind of background, you can't let go of that first
10 bar very easily until you're sure you can reach that
11 second bar.

12 Q. Did you know about Mike Scanlon?

13 A. Yes, I did.

14 Q. And -- and the relationship she had with Mike
15 Scanlon?

16 A. I knew some of that relationship.

17 Q. Okay. How does -- how, if at all, does that
18 relationship with Mike Scanlon fit into what you've
19 just been telling us about letting go before --

20 A. I guess Mike Scanlon would be that other
21 trapeze bar coming into reach.

22 Mike was a -- younger man with a good
23 background, introduced to her by the Governor, so it

Page 37

1 was sort of had, and, again, the Governor to her was
2 sort of a fatherly figure, if you would, an older,
3 powerful man, well-respected, and he made this
4 introduction, which is a good sign.
5     It's like the Good Housekeeping Stamp of
6 Approval that says this guy should be okay.
7     So he makes the introduction and she sees
8 that there really is a better, healthier relationship.
9     That other bar really is reachable. What's
10 behind door number 2 is safe, it's not going to bite
11 me, and that, I think, becomes her key, her ticket to
12 try to put, you know, to put an end or to try to put a
13 permanent end, a final resting place to the
14 relationship with Mr. Capano.
15     Q. You mentioned that she had an eating
16 disorder?
17     A. Yes.
18     Q. What's an eating disorder?
19     A. Eating disorders are a diagnostic class
20 within mental health, within psychiatry, and there's
21 usual two or three different types.
22     Anorexia, where an individual has a distorted
23 body image, they look in the mirror and they see

Page 38

1 themselves as fat and less attractive than they really
2 are.
3     There's another condition called bulimia,
4 which is where individuals use purging, that would be
5 induced vomiting, binge-eating behaviors, eating large
6 amounts of food in short periods of time and they can't
7 control themselves that way.
8     Anorexics tend to lose more weight than
9 bulimics and there's a fair amount of overlap between
10 the two so that you can see the same kinds of behaviors
11 in an individual at any given point in time.
12     They develop or eating disorders develop
13 frequently in people with a history of trauma. When
14 you're under the strain of trauma, and you don't feel
15 like you have much control over yourself or over what's
16 happening to you or around you, you're a little kid,
17 and you're homeless and there's no water, and you don't
18 have parents, you start to realize that there's not
19 really very much that you can control except for
20 yourself, and so one of the ways or one of the things,
21 the behaviors that people turn to is they turn to
22 regulating their own food intake because that's
23 something that they control.

Page 39

1     It's almost impossible to force someone to
2 eat or to force someone to lose weight for that
3 matter. It's really an ultimate control issue. And
4 when someone with an eating disorder is under stress,
5 they may try to relieve that stress, sort of in a
6 pressure-valve kind of way, by modulating, by
7 controlling their intake. They may do it with
8 excessive exercise, they may do it by just starvation
9 in limiting themselves to a few hundred calories a day,
10 or none at all.
11     So it's a way of trying to assert control.
12     The other thing that you'll often see,
13 particularly in women with eating disorders, is that
14 when you starve yourself, when you lose sufficient
15 weight, you become less attractive, and for many of the
16 women, this actually makes them feel safer.
17     They lose some of what I will call their
18 secondary sexual characteristics. If you have less
19 body fat, your breasts are going to be smaller, you may
20 actually stop having your period if you lose enough
21 weight, and in some ways, that creates a more childlike
22 or regressed kind of appearance.
23     That may be protective because if you're

Page 40

1 worried about being attacked, say, sexually and you've
2 done something to make yourself less attractive, that
3 may make you feel safer.
4     It also, in some ways, it's a cry for help,
5 because if you look more like a little girl, you hope
6 that other people will see you as fragile, as in need
7 of protection and shelter, and so it's a complex
8 behavior with multiple psychological determinants.
9     Q. Now, did Anne Marie Fahey have an eating
10 disorder before she met Tom Capano?
11     A. Yes, she did.
12     Q. Did that relationship that she had with him
13 have any effect on her eating disorder and your
14 treatment of her eating disorder?
15     A. Yes, it did.
16     Q. How so?
17     A. The relationship was exceptionally
18 emotionally taxing. It had all of the power,
19 disequilibrium that made it a troubling relationship.
20 It had risks and threats of physical and psychological
21 damage and harm for her. And it was the kind of stress
22 that would make her more depressed, make her more
23 anxious, and trigger her eating disorder so that if

Page 41

1  things got too hot or his pressures became too great,
2  again, an attempt to try to feel at least she could
3  control something, it would be her own personal
4  intake.
5        So that if he was stalking her, sending her
6  too many E-mails, parking his car in front of her home
7  and she would notice it, not want him there, then you
8  would expect to see -- behaviorally, one of the things
9  you might expect to see, and we did see, was flare-ups
10 in the eating disorder, weight loss, looking gaunt, not
11 taking as good care of herself.
12        She tried to put on a happy face. Again,
13 that was part of her -- her defense system. She didn't
14 want people to know that she was hurt. She was ashamed
15 and humiliated by much of her past and she -- so she
16 tried to cover some of that, and with eating disorders,
17 people get very good at covering things. They learn
18 how to use makeup and clothing to hide the fact that
19 they've dropped too much weight or that they're looking
20 gaunt. And they may use things like laxatives or
21 diuretics which can cause rather large changes in body
22 weight just by fluid loss in very brief periods of
23 time.

Page 42

1        So that it wouldn't be uncommon with someone
2  with an eating disorder to load up some prior to seeing
3  a doctor in an attempt to hide the severity of what was
4  going on, and then go right back out and drop those
5  five pounds which were all water weight within a day or
6  two.
7        Q.  Now, were you aware of whether or not Tom
8  Capano tried to intervene in some fashion in -- in her
9  eating disorder by way of treatment or rehabilitation
10 or commitment to a hospital of some sort?
11        A.  I believe that he did, yes.
12        Q.  And what effect did that have, would that
13 have on her eating disorder?
14        A.  It actually usually made it worse. Although
15 it seems like it's a caring gesture to try to feed
16 someone who's not eating well, because that eating is
17 really representative of the power struggle, the more
18 you try to force someone with an eating disorder to
19 eat, the more difficult that power struggle becomes.
20        And so it's usually a losing battle and not a
21 healthy experience.
22        In addition, she was working on her eating
23 disorder with her therapist, and always had been, and

Page 43

1  she had taken responsibility for it. She did not want
2  to starve to death. She did not want to continue to do
3  this. And so she was aware of what was happening to
4  her and made a commitment to herself to continue in
5  treatment and master this.
6        However, at the same time, or during this
7  treatment, Mr. Capano was trying to get her to change
8  therapists, to go other places, would try to
9  interrogate her about what happened in therapy or what
10 she said to her therapist or what her therapist said to
11 her. Got involved actually so far as in paying for
12 part of her therapy, which, again, sounds like a nice
13 gift, but is really just inappropriate, because it
14 contaminates the therapy, it taints the therapy. It
15 takes away the control that the individual needs to
16 have and also induces guilt, so that when someone else
17 is paying for your treatment, you start to think, well,
18 maybe they do have a right to know about the
19 confidential material that took place between me and my
20 doctor, because, well, they paid for it.
21        Again, sort of like the parent, child thing.
22 If you have a child, and they get medical treatment and
23 you're the parent and you pay for it, well, you're

Page 44

1  entitled to know what the doctor was going to do or
2  did.
3        So you get this situation where she is
4  infantile, made to be more childlike in some ways, with
5  this parental figure who's paying the bill at times.
6        It's just making things worse and is not
7  healthy and just paralyzing things.
8        Q.  Now, obviously, it seems and I think you
9  mentioned that it seems like the right thing to do, if
10 somebody is not eating, you want them to try to eat, if
11 you want to help them with their therapy, that kind of
12 thing, but you tell us that's sort of the exact
13 opposite of what they ought to be doing. Is that what
14 you're saying?
15        A.  In this case, that's the wrong thing.
16        That message, I care about you, you need to
17 eat in and of itself, it's not a bad message, but like
18 any other message, who it comes from, when it's said,
19 how it's delivered are all very important parts of any
20 message.
21        And that message was coming from the wrong
22 person in the wrong way and was having a detrimental or
23 negative effect.

1 would have been in the five o'clock, six o'clock range,
2 probably.
3    Q. And what was the purpose of that session?
4    A. That was scheduled as a medication check,
5 which is how most of her visits with me were scheduled,
6 but I would schedule her usually at the end of the day
7 to enable me to run over, that way, if we spent more
8 time, which was pretty common with her, I wouldn't be
9 running into someone else's time and wouldn't feel
10 rushed.
11      The purpose was to see how she was doing.
12      We had started her back on medications on the
13 12th, basically two weeks before that when I had seen
14 her, after Michele Sullivan referred her back to me.
15 We put her on medication and it's pretty common to see
16 someone a week or two after you do that. Usually, I do
17 it in one week, and, in this case, I did it -- I
18 scheduled it for two weeks because she was familiar to
19 me, I knew her, we had worked together before and I
20 could trust her. I knew that she would follow up, that
21 she would take medication, that she would do what she
22 was supposed to do, that she knew how to call me if
23 there was a problem or a question. And so I went two

1 weeks to give the medication a little bit more time to
2 become effective, also, cognizant that funds were tight
3 for her, and I would sometimes see her and not charge
4 her anything or try to limit the frequency of sessions
5 so that she didn't run up a big bill.
6    Q. What was your medication regimen that you
7 were working on with her?
8    A. On the 12th of June, I had started her on two
9 different medications, both of which she had been on in
10 the past, so that we had some reasonable expectations
11 about these medications.
12      The first is a drug called Alprazolam,
13 A-L-P-R-A-Z-O-L-A-M, commonly known as Xanax,
14 X-A-N-A-X, and that's a minor tranquilizer. It's used
15 to treat anxiety. It's a nice drug because it's well
16 tolerated, very few side effects for people. Comes in
17 a lot of different doses. She wasn't on a whole lot of
18 it. It has a fast onset of actions, so when people
19 take it usually within 20 to 30 minutes, they usually
20 feel calmer and it lasts for most patients four or five
21 hours and then out of the body so it's not something
22 that hangs around and builds up.
23      The other drug that we gave her was Effexor,

1 E-F-F-E-X-O-R. Effexor is one of the newer
2 antidepressant medications. It actually has both
3 antidepressant, antianxiety, antiobsessive,
4 antiirritability, antianger properties, which is a drug
5 that actually does a lot of different things, because
6 it works in three different chemical pathways within
7 the brain. And I gave her that to help with her
8 depressive symptoms, with her anger, irritability, to
9 help increase her appetite some, because one of the
10 things we sometimes do with patients who have eating
11 disorders and have dropped a lot of weight is to give
12 them a medication that will help to stimulate their
13 appetite, to help that turn that part of the neural
14 circuitry of the brain back on.
15      So I put her on those two medications. She
16 had been on both before. I knew she tolerated them,
17 which was also an important issue, and she would trust
18 them. She felt comfortable with them. She was a
19 person, like many people, who really didn't like
20 medication, didn't like to take it, wanted to work only
21 with therapy, and see if talking alone would work, and
22 really turned to medication only as a last resort when
23 she and the therapist basically said, Hey, the talking

1 alone isn't doing it. You need to see a psychiatrist
2 and get some medication supplements here.
3    Q. When did you place her on those two
4 medications?
5    A. I started them both together on June 12th,
6 1996.
7    Q. So she should have already been on them by
8 the 27th?
9    A. Correct. She had been on them for about two
10 weeks, and -- yes, she actually -- she had -- she was
11 taking her medications to the best of my belief. She
12 told me she was.
13      The other is, I had given her samples, and
14 she then needed a prescription called into the pharmacy
15 so she could continue her medication and we called that
16 in and so she was taking her medications.
17    Q. When she left your office that evening, did
18 you know where she was going?
19    A. She told me that she was going to dinner.
20    Q. Did she tell you with whom?
21    A. She did not tell me with whom.
22    Q. Ultimately, we know that she had dinner with
23 the defendant that night.

Page 53

1    A. That's my understanding.
2    Q. Did you ask her about Tom Capano and whether
3  that was the person she was having dinner with?
4    A. I did not ask her that specific question.
5    Q. She didn't volunteer it?
6    A. She didn't volunteer it, nor would I have
7  expected her to volunteer that.
8    Q. Why not?
9    A. It would have been shameful for her to be
10  asked the question and have to either answer it or
11  weasel out of it in some way and it wasn't a necessary
12  question or issue at that moment. She was just
13  starting back in therapy. We know that she is very
14  sensitive to rejection, doesn't want to be left,
15  doesn't want to be alone. That includes by her
16  treaters.
17        She had already had the experience of a
18  therapist being killed on her in a car accident. That
19  was Bob Conner.
20        So the fear of losing a therapist would be a
21  big fear for her. She had trust with me. And if I
22  questioned her or pushed her to tell me something at
23  this point that would be shameful, she might perceive

Page 54

1  that as rejection or worry that I wouldn't approve,
2  because I also was in a position of authority and a
3  position of power, and so when you're in that position,
4  particularly in psychiatry, you need to not misuse that
5  or abuse that.
6        So it would have been the wrong question to
7  ask, because knowing what the answer would have been,
8  it's an impossible situation for the patient. It would
9  have made things worse.
10    Q. Did she schedule another appointment with you
11  at that time or was there another appointment
12  scheduled?
13    A. Yes. She scheduled a followup appointment
14  with me for July 29th.
15    Q. When she left your office on June the 27th of
16  1996, did you have any reason to believe, based on how
17  she was that day or what medication she was receiving,
18  that she would not keep her appointment in July?
19    A. No. She was very good about keeping her
20  appointments. If she was tied up in traffic, she would
21  usually call or if she was in a meeting with the
22  Governor later and got called to Dover, she would
23  usually call and cancel.

Page 55

1        Anne had this obsessive nature.
2        MR. MAURER: Your Honor, the question was did
3  you have any reason to believe, and the answer, I
4  think, was no.
5        This is not responsive to this.
6        MR. WHARTON: He's explaining why he thought
7  that there was no --
8        THE COURT: I'll overrule the objection.
9        Allow him to continue.
10        THE WITNESS: Yes, she was somewhat obsessive
11  by her nature, so being detail oriented or keeping
12  appointments was part of her personality and she
13  wouldn't just not show up.
14        That would be very much out of character.
15        MR. WHARTON: Thank you.
16        Can I have a moment, please?
17        THE COURT: Certainly.
18        MR. WHARTON: Thank you, your Honor.
19        I don't have any other questions.
20        THE COURT: Why don't counsel come to side
21  bar without the court reporter on scheduling.
22        (Side bar discussion not reported.)
23        THE COURT: Would you take the jury out?

Page 56

1        We're going to take our luncheon recess,
2  members of the jury, so -- two o'clock.
3        (The jury left the courtroom.)
4        THE BAILIFF: Please be seated.
5        Court is still in session.
6        THE COURT: Let me explain to those people
7  who are spectators.
8        We're going to adopt a new procedure whereby
9  we remove the jury from the room before we recess the
10  Court.
11        I'd appreciate your cooperation when that --
12  I don't know whether you just heard what I said or not,
13  but the new procedure is to excuse the jurors first
14  before the Court recesses.
15        That eliminates some of the confusion in the
16  courtroom and I would appreciate your cooperation with
17  that procedure.
18        We'll now stand in recess until 2.
19        (At this time, a luncheon recess was taken.)
20
21
22
23

Page 73

1    Q. And you were not involved in any way with
2 what happened, what Bob did with her in 1992?
3    A. Correct, in 1992.
4    Q. Now, she stopped treatment when in '92?
5    A. Her last visit in 1992 is April 16th.
6    Q. All right. And you detected that -- you
7 learned that from reading Bob Conner's notes; correct?
8    A. That's correct.
9    Q. And much of what you said here today came
10 from Bob Conner's notes, did they not?
11    A. Well, what I testified to --
12    Q. Just answer me yes or no. Did it not?
13    A. Well, I can't answer it that way.
14    Q. You can't tell me that much of what you said
15 here today came from Mr. Conner's notes?
16    A. What I testified to this morning comes from
17 the records as well as my own conversations and my
18 experiences with the patient.
19    Q. Your conversations and your experiences with
20 the patient; correct? Is that correct? I don't --
21    A. Yes. That's part of -- it's everything
22 together. My testimony is not based on one single
23 issue.

Page 74

1    Q. All right. Now, the first time you saw the
2 patient was when?
3    A. February 10th, 1994.
4    Q. Okay. So the first time you saw her was in
5 1994. And you found her to be chronically depressed
6 since 1986, continued to get more depressed, agreed to
7 medication evaluation. Taken to bed with 12 hours
8 sleep a day, suicidal ideation of crashing her car,
9 looks for rejection, history of laxative abuse, lost 14
10 pounds in five weeks. She actually reports some mood
11 cycling.
12    That was part of your report on February
13 10th, 1994; is that correct?
14    A. That is part of my report.
15    Q. Another part of your report concerned itself
16 with her psychiatric history; did it not?
17    A. That's correct.
18    Q. And you found that in 1986, she was at the
19 University of Delaware, she was depressed, saw a
20 psychiatrist for six months with no medications.
21    1987, she saw a psychiatrist in Dover for six
22 months.
23    In 1991, she was with Conner for four months

Page 75

1 with a medicine whose name I cannot read. Alion?
2    A. The medication is Ativan.
3    Q. Ativan?
4    A. A-T-I-V-A-N.
5    Q. Okay. Ativan.
6    July '93 started again with Conner. Started
7 abusing laxatives in 1988. Exercising two to three
8 hours a day. Now exercises one to two hours a day five
9 to six days a week.
10    Did you find that was part of your report
11 also -- correct?
12    A. Correct, except that you said she saw a
13 psychiatrist earlier and those were therapists. That
14 would be nonpsychiatrists.
15    Q. Where would that be? What --
16    A. When you say, Saw a psychiatrist for six
17 months, it actually says, Saw a therapist for six
18 months and the same following through that paragraph.
19    Q. Okay, I understand. Then there's some
20 personal history in there, and you say she had a tough
21 childhood, deprived, no money, foster homes; correct?
22    A. Correct.
23    Q. You also said in your report that she still

Page 76

1 calls her grandmother to talk to her, but the woman has
2 been dead for over a year; is that correct?
3    A. Correct.
4    Q. All right. Now, sir, you diagnosed her as
5 having a major depression recurrent -- R/O bipolar
6 disorder; is that correct?
7    A. Yes, sir.
8    Q. And major depression recurrent. What does
9 that mean, Doctor?
10    A. Major depression is a psychiatric condition
11 with specific symptoms and features and she had those.
12 And, in addition, it was recurrent, meaning that she
13 had had episodes of this in the past, had been treated
14 or recovered from them, but they had recurred. It
15 happened again.
16    Q. All right. And bipolar disorder, Doctor, can
17 you tell me what that is?
18    A. Bipolar disorder is the newer terminology for
19 what used to be called manic depressive disorder. It's
20 a cyclical mood disorder, that is, there are episodes
21 of both depression as well as episodes of elevated mood
22 stage, which could be either euphoria or joyfulness or
23 might be just significant irritability, sleeplessness,

Page 89

1  whom you were lauding plaudits on here during the
2  course of your direct examination named Michele
3  Sullivan; correct?
4    A. Correct.
5    Q. Now, between, by the way, March of '95, which
6  was the last time you saw Anne Marie Fahey, the last
7  time anybody in your practice saw Anne Marie Fahey and
8  June 12th, you did not see Anne Marie Fahey at all;
9  correct?
10   A. Correct.
11   Q. And there were no records at your practice
12  which could be gone over by you to learn what had
13  happened in her life span in that thirteen-month
14  period; correct?
15   A. Correct.
16   Q. So you had no knowledge whatsoever of what
17  was happening with Anne Marie Fahey from March of '95
18  -- '95 to June of '96?
19   A. Correct.
20   Q. All right.  Now, you then get a letter from
21  Michele Sullivan; is that correct?
22   A. I did get a letter from Michele Sullivan.
23   Q. Say again.

Page 90

1    A. Yes, I did get that letter.
2    Q. And in that letter, she tells you she's
3  looking forward to working with you on behalf of Anne
4  Marie Fahey; correct?
5    A. Yes.
6    Q. And she tells you she's been working with
7  Anne Marie Fahey for ten weeks so far; correct?
8    A. Yes.
9    Q. And she tells you the woman's history is
10  horrible, alcoholic father who drank the family into
11  poverty, the children were farmed out after the house
12  went up for sheriff's sale when she was in her teens.
13  I can mention many horrible experiences in which she
14  was beaten or shamed.  It's important to know that she
15  survived by putting on a happy face and being quite
16  good at reading situations and accommodating to what
17  was necessary for survival.  She has a very funny sense
18  of humor which can deflect from knowing the underlying
19  pain.  I mention this because she charms me and I keep
20  a watchful eye on how she keeps me from knowing what's
21  going on.  So it won't surprise me if you know nothing
22  of either -- of the eating disorder or the obsessive
23  compulsive behavior.

Page 91

1        That's what was in that letter; correct?
2    A. That is what Michele wrote.
3    Q. All right, and did you know about any of
4  these things?
5    A. Yes, I did.
6    Q. Did you know that Anne tended to conceal her
7  real feelings from people and tell them other things?
8    A. Yes.  That was not new information at all.
9    Q. Did you know she tended to tell people what
10  she thought they wanted to hear, the happy face?
11   A. Yes, very much so.
12   Q. Now, Doctor, you wrote a letter to Michele
13  Sullivan on June 17th and you say, I had a chance to
14  see Miss Fahey for evaluation and followup.  As you
15  know, I've treated her in the past when she was seeing
16  Bob Conner.
17       Are you talking about medical evaluations
18  there -- correct?
19   A. Correct.
20   Q. All right.  She is still clearly grieving his
21  loss and feels guilty and somewhat responsible for his
22  death.
23       You said that; correct?

Page 92

1    A. Yes, I did.
2    Q. Did Anne Marie Fahey feel responsible for the
3  death of Bob Conners?
4    A. Yes.
5    Q. A man killed in an auto accident, coming home
6  from work, which Anne Marie Fahey had nothing to do
7  with?
8    A. That is correct.
9    Q. She is feeling abandoned and somewhat
10  responsible for him and for the others who had died
11  and left her.  As a result, she feels a need to punish
12  herself and is using laxatives to do so.  She is
13  currently using about 15 laxatives a day and has lost
14  about 25 pounds since I last saw her.
15       Correct?
16   A. Correct.
17   Q. And you had a basis for making that statement
18  that she was using 15 laxatives a day on June 17th when
19  you wrote that letter; correct?
20   A. Correct.
21   Q. And the basis was as a result of your
22  medication visit with Anne on the 12th; correct?
23   A. It was mentioned both in Michele's letter and

Page 93

1  in my own evaluation with the patient.
2     Q. Okay. So, Michele told you about the 15
3  laxatives a day and you asked Anne about it?
4     A. Correct.
5     Q. And you put it in your letter; right?
6     A. Correct.
7     Q. All right, now, in your second paragraph, you
8  say, Medication was stopped and she became more
9  severely depressed and acutely suicidal.
10        Acute suicidal means a brief episode, doesn't
11  it? It doesn't mean a long-term chronic kind of
12  condition, does it?
13     A. Correct. In the sentence, I think I used it
14  also for its second definition, meaning more -- more
15  severely, that it was a more acute or more pressing
16  issue.
17     Q. Okay. Now, in the next paragraph, I have
18  asked her to start to taper her use of laxatives, but
19  she does not feel she can stop them abruptly.
20        So you were trying to get her off the
21  laxatives?
22     A. Correct. I don't want somebody who's
23  anorexic abusing laxatives.

Page 94

1     Q. And she told you she couldn't stop abruptly,
2  but she'd try?
3     A. We agreed to try to taper it down to work
4  together on that.
5     Q. Okay. You said in the second-to-last
6  paragraph, she has significant underlying issues that
7  will be reached only through psychotherapy. She
8  continues to grieve Bob's death. I have no problem
9  saying that you'll be trying to fill a rather large
10  transference of shoes.
11        You said that; correct?
12     A. Yes, I did.
13     Q. Now, Doctor, I'm not a psychiatrist, but
14  there is something about transference that occurs
15  between a treating physiotherapist, a psychiatrist and
16  a patient. Is that in many cases?
17     A. Yes, transference is a term used to describe
18  feelings that occur frankly between any two people, but
19  we talk about it particularly in the mental health
20  arena.
21     Q. What you mean is that the patient falls in
22  love with the psychiatrist?
23     A. Well, that would be one example of a

Page 95

1  transference.
2        There could be a negative transference and
3  you could think your therapist is like someone you hate
4  and relate to them quite negatively.
5     Q. Anne Marie did not relate to Bob Conner
6  negatively, did she?
7     A. No. She was very thankful for his support
8  and dedication to her.
9     Q. Seemed like a pretty good guy and did a good
10  job, didn't he?
11     A. Bob was a gifted therapist.
12     Q. Now, he wrote a group -- he wrote notes, did
13  he not?
14     A. Yes.
15     Q. For his meetings; right?
16     A. Yes, he did.
17     Q. Now, you gave opinions today about a number
18  of things relating to Tom Capano.
19        You gave opinions about Anne Marie Fahey
20  being afraid of Tom Capano, about Anne Marie Fahey not
21  going here with him, and all this other Tom Capano
22  stuff; correct?
23     A. I did.

Page 96

1     Q. And those opinions, that opinion did not come
2  from the 65 visits and the notes that Doctor Bob Conner
3  made of Anne Marie Fahey's visits with him, did it?
4     A. Bob makes reference to the issues involving
5  Mr. Capano. He is not mentioned by name in the record
6  to the best of my knowledge.
7     Q. What issues does he mention in his notes that
8  relate to Capano?
9     A. I would be more than happy to go through the
10  notes and describe them.
11     Q. Why don't you do that.
12     A. I guess I'd like to start with the -- with
13  Bob's initial diagnosis, which included a personality
14  disorder, not otherwise specified, with compulsive and
15  dependent traits.
16        So right from the beginning --
17     Q. I can't hear you, Doctor. You'll have to
18  speak up.
19     A. Okay. Right from the beginning, in Bob's
20  initial diagnosis of Anne Marie, he talks about her
21  having a personality disorder with dependent traits.
22     Q. And what date was that diagnosis?
23     A. February of 1992. February 24th, 1992.

1 a person's psychopathology means those parts of the
2 person's mind or psyche that are -- that are ill.
3     Q. And when you read Anne Marie Fahey's E-mails,
4 were you reading them as sort of a layman might read
5 them?
6     A. No, I was reading them as a psychiatrist
7 reads them and trying to understand what's there and
8 what's not there.
9         Part of what psychiatrists do is to learn to
10 listen to what people say, but also to what they don't
11 say, because sometimes what's not said is actually
12 what's most important.
13     Q. Well, would you have -- did you read them
14 with a -- with a -- with being aware of or an eye
15 towards Anne Marie Fahey's psychopathology?
16     A. I've read them a few times and tried to think
17 about them and see them in context, so I would say yes
18 to your question, I tried to look at it a lot of
19 different ways.
20     Q. Now, prior -- prior to reading those E-mails,
21 which you got a week or so ago, I think you testified,
22 did you know whether or believe whether Anne Marie
23 Fahey was afraid of Tom Capano prior to the E-mails?

1     A. Yes, prior to seeing the E-mails last week, I
2 was well aware that she was afraid of Mr. Capano.
3     Q. Now, why -- why were you well aware of that?
4     A. I was aware of it because she had told me she
5 had discussed it in therapy and other treaters had --
6 had talked to me about it.
7         So it was not a secret but, most importantly,
8 she herself had expressed that and had been working to
9 get out of a relationship.
10     Q. Now, Mr. Oteri asked you a lot of questions
11 about your notes and Bob Conner's notes and I think you
12 described some of them as fairly short, a couple of
13 lines, or a line, or a little longer than that; is that
14 right?
15     A. Correct. Some of them are actually only a
16 few words.
17     Q. What is the point -- the purpose of a
18 psychotherapist, what is the point of their notes?
19     A. Well, the main purpose for writing a note is
20 for the therapist to have something, a road map, so to
21 speak, to remind them of key points or issues that
22 they're working and they may be just a word or an image
23 or a theme that a person brings up in a session that

1 you want to follow up on, so you use them to help sort
2 of jog your memory when you see the person the
3 following week. But when you're in a longer term
4 psychotherapy with someone and you're seeing them every
5 week or every other week, you obviously have a
6 different relationship and so you remember all sorts of
7 the details and don't need to write them down. You
8 remember people's names, you remember family
9 relationships and structures, and you don't have to
10 keep writing them down. They're just a guideline for
11 you.
12         I guess they're also used for billing
13 purposes to prove you saw someone, but that's a minor
14 point.
15     Q. So would it be fair to say that actually the
16 more familiar you are with a certain aspect of your
17 therapy, the less need there is to write a note about
18 it?
19     A. That would be correct. If it's -- I think in
20 one of my last notes, I have something along the lines
21 of baseline issues, meaning I know what those are,
22 we're still working on those same -- on those same
23 things.

1         That's shorthand which is all that's
2 necessary for me to know what's going on.
3     Q. Is a consideration that you have when you're
4 making notes or any therapist is making notes, when --
5 is it a situation that they be sufficiently detailed so
6 you can justify them on cross examination?
7     A. No. I think we all hope that our records
8 never come into court, because that usually means
9 malpractice.
10         In this case, it's a criminal matter, but --
11 so notes are not designed to come into court or to be
12 used by anyone really other than the therapist.
13 Perhaps the therapist and the patient together.
14     Q. Well, despite the fact, Doctor, that your
15 notes don't reflect or don't mention or Bob Conner's
16 notes don't reflect or mention Tom Capano, were you
17 aware of that relationship and the dynamics of it or
18 did you just make that up?
19     A. No, I was aware of it. I can't make anything
20 up. I took an oath when I stepped into this -- in
21 front of this jury and onto the witness stand to tell
22 the truth.
23         MR. WHARTON: Thank you.

Page 129

1    A. Yes.

2    Q. Now, would you read --

3        THE COURT: Would you identify each exhibit

4    as you read them, please?

5        THE WITNESS: I will.

6    BY MR. CONNOLLY:

7    Q. Would you please read State Exhibit Number 33

8    for us?

9    A. Dated May 2nd, 1996.

10       Annie, This is not a gift; it is a loan to

11   replace your windshield.  You can repay half of it

12   when you get a check from the insurance company.  The

13   balance can be repaid at the rate of five dollars per

14   week.  Of course, if you default, there is a penalty.

15   You will have to scrub my toilets and iron my boxers.

16       Please accept this.  The windshield stresses

17   you and it is dangerous.  I would do more if you would

18   let me, like replace the Jetta with a Lexus 300ES

19   Coach Edition.  Maybe someday, dot, dot, dot, Tom.

20       P.S. Don't these bills look like Monopoly

21   money?  But I got them from a bank.  Honest.

22   Q. Now, would you skip State's Exhibit 34 and go

23   right to 35, please, and first of all, just describe

Page 130

1    what it is you're about to read.

2    A. It is a note from -- a notepad from Saul,

3    Ewing, from Thomas J. Capano's desk, dated May 29th.

4        Annie, Thanks for sharing this with me.  I

5    don't agree with everything I read, but still find it

6    interesting and enlightening.  It also scared me.  I'd

7    like to talk to you about if that's okay with you.  Te

8    Amo, Tom.

9    Q. And would you read State's Exhibit 34?

10   A. 34, again, is on the same Saul, Ewing

11   notepaper, from Thomas Capano, dated 6-25.

12       Annie, Just add this to the balance.

13   Consider it a consolidation loan.  That's a joke.

14   Kidding aside, you should not be penniless for several

15   days, in case of an emergency, like an overpowering

16   yearning for a latte.  I'd have sent more, but I know

17   you'll have a hard time even accepting this.  Please

18   accept it in the spirit in which it's given.  And

19   don't spend it on Jill.  Tom.

20   Q. Now, when you read those notes in the

21   apartment, did you know who Tom Capano was?

22   A. I knew who Tom Capano was, yes.

23   Q. How did you know him?

Page 131

1    A. I met him in the early eighties through

2    O'Friels and through a man I used to date.

3    Q. Okay, you used to work at O'Friels?

4    A. I did.

5    Q. You were a waitress?

6    A. A waitress and a bartender.

7    Q. And the man that you used to date?

8    A. His name was Bud Freel.

9    Q. And Bud Freel is a brother of Ed Freel, the

10   person you called; correct?

11   A. Correct.

12   Q. Prior to that evening on June 29th, 1996,

13   when was the last time you had seen or met Tom

14   Capano?

15   A. The last time I had seen him, I believe, I

16   was -- I was pregnant with Brendan and it was the

17   closing of Buddy's Bar, so I want to say March of

18   '95.  Around that time.

19   Q. And Buddy's Bar was owned by Bud Freel; is

20   that right?

21   A. Right.

22       He used to be part owner of O'Friels and left

23   and opened up a bar on Lancaster or 4th Street or

Page 132

1    something.

2    Q. Now, as of June 29th, 1996, did you have any

3    knowledge that there had been a relationship between

4    your sister and Tom Capano?

5    A. No, I did not.

6    Q. Did you know that they knew each other?

7    A. I did know they knew each other.

8    Q. How did you know that?

9    A. Wilmington's so small and Anne, working for

10   the Governor and Capano doing bond work, she would

11   mention he might be in now and then because she had

12   known I knew him from before.

13   Q. Had you ever asked Anne Marie whether there

14   was anything between her and Tom Capano?

15   A. No, I did not.

16   Q. Did you find any birth control pills in the

17   apartment that night?

18   A. I found a box of birth control pills.  There

19   were maybe, again, to me, it looked like a sample

20   pack.

21       There may have been like five months worth.

22       They were unopened.

23   Q. They were unopened?

Page 133

1    A. Yes.

2    Q. Was Anne Marie's toothbrush in the apartment?

3    A. I believe it was, yes.

4    Q. Did you, at some point, inventory everything

5  that was in the apartment?

6    A. Yes. I was ordered by the Court to inventory

7  everything that was in the apartment.

8    Q. Was anything missing that you recognized?

9    A. Anne Marie's keys were missing and her

10  Walkman and her blue topaz ring.

11    Q. This is the ring that Paul Columbus had given

12  her?

13    A. It is.

14    MR. CONNOLLY: Your Honor, I'm about to go

15  into something that will take a while.

16    I don't know if you want to break now or

17  break in the middle.

18    THE COURT: Are you inviting me to break

19  now?

20    MR. CONNOLLY: I am.

21    I'm asking.

22    THE COURT: In that case, we'll take a

23  luncheon recess now.

Page 134

1    It's now quarter of 1.

2    We'll break until 2 o'clock -- excuse me.

3    Having announced that, I'll ask the bailiff

4  to remove the jury first.

5    (The jury left the courtroom.)

6    THE COURT: I thank the spectators for their

7  cooperation in this procedure that we've established

8  to allow the jury to leave first.

9    We'll stand in recess until two o'clock.

10    (At this time a luncheon recess was taken.)

11

12

13

14

15

16

17

18

19

20

21

22

23

Page 135

1    October 28, 1998

2    Courtroom No. 302

3    2:00 p.m.

4  PRESENT:

5    As before noted.

6    THE COURT: Please bring the jury in.

7    MR. CONNOLLY: You want the witness on before

8  the jury comes in, Judge?

9    THE COURT: Yes.

10    MR. CONNOLLY: Okay.

11    (Witness, Kathleen Fahey-Hosey resumes the

12  stand.)

13    (The jury returns to the courtroom.)

14    THE COURT: Members of the jury, before we

15  start, I meant to mention something this morning

16  because the attorneys brought it to my attention.

17    One of the really awkward things,

18  particularly, when you're involved in a long trial is

19  the fact that jurors will run into lawyers, and

20  lawyers are not supposed to have conversations with

21  jurors, for obvious reasons, even if they're

22  harmless. It always has the potential to present

23  problems.

Page 136

1    And the lawyers are, of course, concerned if

2  you run into a lawyer and they look away from you, you

3  not consider them to be rude or arrogant.

4    They're simply trying to avoid a potentially

5  bad situation. There's nothing to keep lawyers from

6  speaking, so those who nodded quickly and left were

7  not doing anything wrong, but it is an awkward

8  situation for the lawyers and they wanted you to

9  know.

10    I will vouch that this is a very warm,

11  caring, friendly group of people who would love to

12  chat with you under other circumstances.

13    Mr. Connolly, you may proceed with the

14  witness.

15    MR. CONNOLLY: Thank you, Judge.

16    DIRECT EXAMINATION (Cont.)

17  BY MR. CONNOLLY:

18    Q. You found the diary at the apartment, didn't

19  you?

20    A. I did find Anne Marie's diary.

21    Q. And I'm going to show you State Exhibit 18.

22    This is the diary you found?

23    A. Yes.

Page 139

1  Q. Did you read the diary that night?
2  A. I did not.
3  Q. At some point later, you read portions of the
4  diary; is that right?
5  A. Yes, I have read portions of it.
6  Q. And I'm going to hand you a copy of the
7  translation of the diary which is State Exhibit 19.
8  And I've highlighted some portions of that,
9  and would you read for us some of these portions,
10 beginning with the entry dated March 2nd, or, rather,
11 February 3rd, 1994?
12 A. Wednesday, February 3rd, 1994. A lot has
13 happened since my last entry, 6-90. Spain family
14 members were born. October 22nd, '91, Brian Michael;
15 December 7, '93, Kevin Patrick; February 24th, '94,
16 Liam Michael. Three beautiful new editions to our
17 family. One less fortunate than the other two.
18 Perhaps that's why I feel more (not love) for Brian
19 Michael.
20 Q. Okay, can you stop there just for a second so
21 we can know these people?
22 Liam Michael is who?
23 A. Liam Michael is my brother, Robert's son.

Page 138

1  Q. All right. And Brian Michael, who's that?
2  A. Brian Michael is my brother, Mark's son.
3  Q. Now, did Anne Marie have kind of a unique
4  relationship with Brian Michael?
5  A. She did.
6  Every Monday night, my brother, Brian, and
7  Anne Marie would go to Brian's house for dinner.
8  Q. Because her name will come up later in the
9  case, Brian Michael's mother is who?
10 A. Debby Gioffre.
11 Q. Now, if you pick up again and read slowly for
12 us the remainder of that paragraph.
13 A. My brother, Mark, has been in and out of
14 rehab and is worse now than he ever was. I no longer
15 have a brother, Mark, because that person inflicts too
16 much pain in my life. It's much easier emotionally to
17 leave him out. I spent too much of my life living
18 with an alcoholic. That part of my life is over. Not
19 forgotten, over.
20 Q. Now, that's her older brother, Mark, correct?
21 A. Yes.
22 Q. And he was married to Debby?
23 A. He was.

Page 140

1  Q. You can pick up with the next paragraph,
2  please.
3  A. Nan died last November 2nd, '92. The most
4  tragic part of my life. I always believed Nan's life
5  would be eternal. She was the most reliable, stable,
6  sober adult person in my life. A part of me died with
7  Katie. I still feel numb. The world is a less
8  fortunate place, but heaven is dancing with her
9  arrival.
10 Q. Now, tell us who's Katie?
11 A. Katie -- my grandmother's name was Katherine
12 and we either called her Nan and Annie always called
13 her Katie.
14 Q. So it's the same person in that paragraph?
15 A. It is.
16 Q. All right. You can pick back up, please.
17 A. I am back in therapy. Bob and I have been
18 working together for about 9 months. What a
19 difference!. Bob is great and I am able to trust him
20 100 percent. He is one of the few whom I know beyond
21 a shadow of a doubt that will never judge me. That is
22 pretty great -- that is a pretty great feeling. I
23 started taking Prozac, 3 weeks tomorrow. Still no

Page 140

1  effect. That's not totally true. It's given me a
2  horrific headache -- headaches. Hopefully soon we
3  shall see some results.
4  Q. Now, this is Bob Conner she's talking about?
5  A. Yes.
6  Q. All right, and if you pick up in the next
7  paragraph please?
8  A. My family, along with some of my friends,
9  Jill, GR, are worried about my weight loss. I, on the
10 other hand, am quite pleased. Five more pounds to
11 130, with a smiley face. I am starving myself as well
12 as avoiding situations where food is involved. I now
13 think of food as poisonous. I cannot ever imagine
14 eating a sandwich. Too much food. I'll be okay. I
15 will stop before it gets out of control. More to
16 follow.
17 I have fallen in love with a very special
18 person whose name I choose to leave anonymous. We
19 know who each other are. It happened the night of my
20 28th birthday. We have built an everlasting
21 friendship. I feel free around him, and like he says,
22 he makes my heart smile. He deserves some happiness
23 in his life and it makes me feel good to know that I

1  can provide him with such happiness. Who knows if
2  anything serious will ever happen between the two of
3  us. I only know what I dream. Ciao. AMF.
4      March 7, '94.
5  Q. Right. Can you read that entry for us?
6  A. Well, I survived my mom weekend but with a
7  little trouble. Kevin Patrick was a wee bit fussy,
8  but to no avail. I survived. Jeff came over and was
9  quite a help, however, that boy is definitely not for
10  me. It scares me to think that he is teaching our
11  youth, and what's up with his students calling him on
12  weekends? It was fun flirting with him on Tuesday,
13  but that's all.
14      I suppose it may also have to do with the
15  fact that I am in love with someone else. We, Tomas
16  and I, had lunch on Friday at the Shipley Grill. It
17  was very good. I hope that tonight he will visit me
18  before working in Philadelphia. I am alone in my
19  house tonight drinking a beer and listening to music,
20  When Harry Met Sally. We have problems because he has
21  a wife and children also. I don't want to be in love,
22  but I can't help it. By God, please don't judge me.
23      Kathleen, Patrick, Seymour and I went to

1  A. I did not, because when she came to my house,
2  she usually had very loose clothing on. You know, she
3  was either going to the gym, sweatpants and a T-shirt
4  on. You know, I did not -- I didn't -- I mean I
5  noticed that she was thin, and that day at Talbot's, I
6  believe I reacted because of seeing her that way.
7  Q. All right. And she's got it here that she's
8  around 130 pounds at this point.
9      How tall was Annie?
10  A. Five, ten.
11  Q. How big bone, small bone -- what was her
12  build like?
13  A. She was a small-boned. She was tall, but she
14  had narrow shoulders. She was small-boned.
15  Q. All right, would you please turn to the 24th
16  of March 1994 entry in the diary, and if you could
17  read that for us, please?
18  A. Thursday, March 24th, '94.
19      My boyfriend, Tomas, asked me today if I
20  wanted to be a girlfriend and live alone and he would
21  pay rent for my room. I need to think. I love him,
22  but he has four children, girls, and a wife. I will
23  be a silent girlfriend. Oh, my God.

1  Robert's last Thursday, 3-3, for his birthday. What
2  fun. It's great having such a close, beautiful
3  family. Robert looks beautiful with Liam Michael, the
4  smiley face. He will be such a great dad. He was a
5  great substitute for me.
6      No news on the weight loss. I am stuck at
7  135 pounds and it's pissing me off. I can't starve
8  myself any more than I already am.
9  Q. All right. Now, you told us earlier that
10  when you were in Talbot's and Anne Marie was changing
11  and you noticed that she was very thin.
12      Did you know she had an eating disorder?
13  A. No, I didn't know she was diagnosed with an
14  eating disorder.
15  Q. Do you know if she had any kind of eating
16  problem or did you observe anything?
17  A. When she was at my house on Wednesday, she
18  always ate. I did ask her at one point how she lost
19  so much weight and she replied by eating a lot of
20  pretzels and working like a maniac -- working out like
21  a maniac.
22  Q. Did you notice fluctuations in her weight
23  over time where she lost, gained weight?

1      Today is the day my father died. How sad.
2  My dad was a bad father, but he was the only father I
3  ever had, so therefore I loved him. I do not think
4  that he conscientiously meant to be a bad father. He
5  just had no clue. He really made my life very sad and
6  lonely. I will never forget the pain he caused me.
7  He forced me to lie to protect my identity. Ciao,
8  AMF.
9  Q. Now, did you know that Annie had such
10  feelings toward her father?
11  A. Yes. We shared similar feelings towards my
12  father.
13  Q. Would you look at the next entry, April 24th,
14  Sunday, and would you read the highlighted portion of
15  that entry, please?
16  A. I had a great day on Friday. My friend and I
17  went to his house to eat. What a house! He -- I
18  believe that he enchants me. During my weekend, my
19  thoughts were devoted to Tomas. I am afraid because
20  I'm in love with a man who has a family. I need to
21  realize that our relationship will never be anything
22  other than a secret. I fantasize my life with him all
23  the time. He's very gentle, intelligent, handsome,

1  and very interesting.  Why does he have to be
2  married???
3       More information later.
4    Q. All right, and then if you would turn the
5  page and read the entry, please, for April 26th,
6  1994.
7    A. Tuesday.  Wow.  What a day!  I talked with
8  Tomas last night after he -- something -- dinner.  I
9  can't -- I can't really read it.
10   Q. Oh, so he, something, dinner?
11   A. Right.
12       Here in my house.  Our relationship is
13  finished.  He told me I need to find a man without
14  children who has a lot of time for me, because I am
15  very special and deserve much more.
16       Well, after what he said, I was very sad and
17  I cried all night.  I know it is my problem and my
18  fault because from the beginning I knew what I was
19  getting myself into.
20   Q. Now, do you recall whether Anne Marie was
21  showing any signs of distress or any similar type of
22  demeanor, moods, back in April of 1994 that you
23  remember today?

1  highlighted portions there?
2    A. I would first like to start off by talking
3  about Mike Hines.  We had our first date last Saturday
4  night, June 11, with Robert and Susan in Avalon.
5    Q. Now, do you know who Mike Hines is?
6    A. He's a business associate of my brother,
7  Robert's.
8    Q. And Susan is Robert's wife?
9    A. Yes.
10   Q. Did you know that Anne Marie had any kind of
11  feelings for Mike Hines back in June of 1994?
12   A. I know they dated a couple of times and Anne
13  talked about him, yes.
14   Q. Did you get any sense of her feelings for
15  him?
16   A. I mean I think she liked him.
17   Q. Would you read on -- continuing on in that
18  entry for June 19th of 1994, she's talking about Mike
19  Hines on the next page.
20   A. On Sunday, he came by to say goodbye.  He is
21  so handsome, underlined.
22       On Wednesday, 6-15, he came down and we went
23  to the festival.  All we did was talk all night until

1    A. No, I don't remember.
2    Q. Would you read just the highlighted portion
3  of the next entry, which is also dated April 26, 1994,
4  but has a Thursday next to it?
5    A. Yes.
6       Tomas called today at 10:30 and told me he
7  loved me.  We decided that we will still see each
8  other.
9       My session with Bob today was quite tearful.
10  I cried a lot as well as informed him of my eating
11  disorder.  I realize how poor of an eater I've become
12  and that it's not healthy, however, it feels great
13  every time I get on the scale if the needle has
14  decreased from b-4.  My ideal weight is 125.  I can do
15  it.  I now weigh 133.  8 more pounds.  I could easily
16  do that in a week.  I also feel that my world is so
17  out of control and the only thing I control is my food
18  intake.
19   Q. Okay, now, there's then -- there's a gap,
20  right, between April, and the next entry isn't until
21  June 19th; is that right?
22   A. That's correct.
23   Q. All right, would you just read the first

1  the cops finally kicked us out.  I think I'm falling
2  for him real fast.  I see myself marrying him.
3       I realize how insane this all sounds, but
4  that is how I feel inside, and to be honest, it feels
5  pretty good, underlined.
6    Q. Did you know that she had any thoughts about
7  marriage with Mike Hines on -- following this first
8  date she had with him?
9    A. No.  No.
10   Q. You mentioned earlier that she had talked
11  with you about her aspirations for marrying Mike
12  Scanlon.
13       Had she ever discussed with you those types
14  of sentiments for anybody else?
15   A. Other than Mike Scanlon?
16   Q. Yes.
17   A. No.
18   Q. If you could skip ahead to July 6th of 1994
19  and just read the highlighted portions there.
20   A. Hi, diary.  Well, it's official Michael does
21  not like me.  It's been four days since we talked to
22  each other.
23       I am very sad.  He is charming.  Why?  What's

Page 151

1  wrong with me?
2      Well, I am embarrassed and I don't want to
3  face Robert, because I do not want him to feel bad for
4  me or be upset with Mike. It was my fault, I'm sure.
5      There is still a glimmer of hope that he'll
6  call.
7      There is --
8      Q. Okay, and then just the next day, what does
9  she write?
10     A. The next day she writes, It is 100 percent
11  absolutely official. Mike Hines has blown me off,
12  underlined.
13     Q. Did you have any sense of Anne Marie's
14  confidence or lack of confidence when it came to
15  dating?
16     A. Anne Marie did not have much confidence in
17  herself. As beautiful as she was, she just did not
18  have the confidence in herself. She did not feel --
19  she just was not a confident person.
20     Q. I'd like you to skip ahead in the diary to
21  February 25th, 1995, about six months later.
22     And --
23     A. Sorry.

Page 150

1      Q. That's all right. Take your time.
2      Now, actually, before you read this, though,
3  what is the entry immediately before the February
4  25th, '95 entry?
5      A. January 8th of '94.
6      Q. Okay. Is that January 8th or August 1st,
7  '94?
8      A. Oh, I'm sorry, it's August 1st.
9      Q. Okay. Anne Marie used a European date?
10     A. Yes. It's the first date of the 8th month.
11     Q. There's a gap between August 1st, '94 and
12  February '95; correct?
13     A. Yes.
14     Q. Now, can you pick up with the February 25th
15  entry and read the highlighted portions slowly,
16  please?
17     A. Well, where to begin?
18     I first must start with tragic news. One of
19  the most influential, helpful persons in my life has
20  died. Bob Conner was killed on 1-24-95 by a drunk
21  driver coming home from work. The phone call came
22  from Mary Ellen the next morning at 7:45 a.m. was one
23  of the most lonely, difficult times in my life. I

Page 152

1  loved Bob and he has helped me grow so much, but....
2      We had a lot more work to do -- to do until I
3  got to where I need to be at this point in my life.
4  He was the only person who knew everything. Even a
5  little bit about Tommy, not much, about me, and it
6  felt great to get all this shit inside of me out.
7      Bob was funny, intelligent, had a great
8  smile, voice, and a sense of humor. He believed in me
9  and actually liked me for me. Not many people know
10  the real Annie.
11     Bob was and probably be the only person who
12  really knew me and understood me and my insecurities.
13  This is not a day that -- there is not a day that goes
14  by where I do not think about Bob or hear his voice or
15  envision his smile. I miss him terribly and my life
16  is a bit less fulfilling without him.
17     Q. And then that same entry carries over and if
18  you can pick up with the highlighted portions,
19  February 25th, 1995.
20     A. Now, I need to write about my
21  friend/boyfriend/love, Tomas.
22     Last week, Saturday, 2-18-95, he called at
23  four in the afternoon. We talked and he told me he

Page 152

1  had a party for Buddy in Al Carter's house and then at
2  Buddy's Bar that night. Well, at midnight, Jill,
3  Ginny and I went to the bar and I saw Tomas. Tomas
4  was furious because I was there. I think so.
5      Then the women, we were drinking -- excuse me
6  -- then the women were drinking three beers and a
7  shot of vodka with lemon. I did not say goodbye to
8  Tomas when I left because he was sitting with his
9  wife. I was sad and very sick in my stomach. I am
10  madly in love with him and did not truly realize just
11  how deeply I felt until that night when I could not be
12  near him and I then realized the fact that he is and
13  never will be mine.
14     Sunday, the day after, I thought about Tomas
15  every minute of the day. I had a feeling that he did
16  not want me at the bar, so I stayed clear across the
17  room from him.
18     I am sorry, Tomas, I never wanted to hurt you
19  or make you feel uncomfortable.
20     Monday arrived and I did not hear from
21  Tomas.
22     I finally called him around five o'clock and
23  checked in. He was cold and seemed very disinterested

Page 155

1  in talking with me.
2      I asked, What's up? He said to me, Nothing
3  Anna Maria, my life sucks. I asked him if he was mad
4  at me and he said no, just everything in my life is
5  wrong and sucks.
6      He was eager to get off the phone and he said
7  he had a very busy week.
8      Q. And there's another entry at the bottom of
9  that page.
10     A. Wednesday, 2-22. I wake up feeling sad and
11 depressed. I need to talk to Tommy. If it's over
12 between us, I need to have some closure.
13     Tomas, why won't you talk to me?
14     Jesus, how and why did I allow myself to fall
15 in love with a married man???
16     I know exactly why. Tomas is kind, caring,
17 responsible -- responsive, excuse me, loving and has a
18 beautiful heart, extremely handsome and has been kind
19 and gentle to me. If he ever loves me like he used to
20 say, which I still believe he does, then why is he
21 treating me like this???
22     God, please help me.
23     Like a fool, when I got back to the office

Page 154

1  from VIP, I called T. and asked that he call me.
2  Well, he called and was nasty. It was the first time
3  that T. raised his voice at me. I asked, What is it,
4  you are furious with me, why aren't you talking to
5  me? He said to me, Drop it, Anne -- drop it Annie and
6  quit fucking talking like this to me in the office.
7  We'll talk later.
8      I asked if I would ever hear from him again,
9  he said, Do you want to? And I said, Of course. He
10 said, All right, I will call you later -- I will call
11 later, excuse me.
12     Q. Okay, and then if you can turn to two entries
13 or actually the next entry, Thursday, February 23rd,
14 and read --
15     A. T. called me at five o'clock in the afternoon
16 while I was at the office. The conversation was
17 superficial. We -- do you want me --
18     Q. Go ahead, the highlighted portions.
19     A. Okay.
20     There were so many things I wanted to say to
21 him, but I was afraid that he would fly off the handle
22 again like he did on Wednesday. Why were we talking
23 tears -- while we were talking, tears were rolling

Page 155

1  down my face.
2      I wanted to tell him that he was breaking my
3  heart and ask him to please stop. Instead, I clammed
4  up and let him go. I came home from work, got into
5  bed, and cried myself to sleep.
6      Q. Now, you had no idea that in February of
7  1995, your sister was in love with Tom Capano?
8      A. No, I did not.
9      Q. Now, what is the date of the last entry in
10 the diary?
11     A. Sunday, April 7th, '96.
12     Q. And what is the last entry just before that
13 one?
14     A. March 1st of '95.
15     Q. All right. Now --
16     A. Or -- okay, March 1st.
17     Q. Would you please read us the last entry in
18 the diary, April 7th, 1996?
19     A. Happy Easter. Well, another year has passed
20 by since my last entry and man o' man has a lot
21 happened. I've been through a lot of emotional
22 battles. I finally have brought closure to Tom
23 Capano. What a controlling, manipulative, insecure,

Page 156

1  jealous maniac. Now that I look back on that aspect
2  of my life, I realize just how vulnerable I had
3  become. It hurts me when I think about that year.
4  For one whole year, I allowed someone to take control
5  of every decision in my life. Bob Conner's death hurt
6  me, affected me more than anything. I lost my best
7  friend, mentor and the man with the greatest smile.
8  My being after Bob's death became the little girl
9  growing up in a chaotic world. I lost all sense of
10 trust. I thought it would be easier that way.
11     I have been fortunate enough to find another
12 therapist, Michele Sullivan. No one will ever take
13 the place of Bob, but she's pretty damn close.
14     Five weeks ago, I was diagnosed with
15 bulimia. My weight is currently 125 pounds. Pretty
16 skinny, but I want more.
17     My brother, Robert, is the only sibling that
18 knows anything. Most likely that will remain the
19 case.
20     At this point, I'm afraid to share this news
21 with Michael. I don't want him to run. I truly love
22 him and I'm afraid of what he might think of me.
23     Michael is the most wonderful person. This

Page 5

1 from a program that was approved by the American
2 Psychological Association, and then completed an
3 internship here, and then had two years of supervised
4 work experience before I could sit for the state
5 licensing exam.
6    Q. And how long have you been a licensed
7 psychologist in Delaware?
8    A. 1981.
9    Q. What is a -- what is a psychologist, I guess,
10 may be my next question?
11    A. Well, we're trained in human behavior and
12 trained in terms of problems assessed in behavior, and
13 treating that, sometimes focusing on behavior change,
14 sometimes focusing on psychological understanding of
15 the motives for people's behavior and changing on that
16 basis.
17    Q. What is a clinical psychologist?
18    A. Well, there are a number of subspecialties
19 including clinical and counseling.
20       Psychologists are people who particularly
21 work with a population that comes in with problems that
22 they would like to change.
23       Also, there's experimental psychologists,

Page 6

1 psychologists who specialize in learning and
2 motivation; other more academic degrees.
3       But the clinical psychologists are the ones
4 who do clinical work practice.
5    Q. What kind of work do you do with people in
6 your practice?
7    A. My focus has to do with working with either
8 individuals or couples or families who come in with
9 some sort of problems, typically of depression or
10 anxiety, sometimes substance abuse, sometimes problems
11 with parenting or marital difficulties.
12       And typically I would do some sort of
13 diagnosis by interviews, sometimes by testing, and
14 based on that, try to determine what would be the
15 appropriate treatment, sometimes referring those people
16 for medication, sometimes continuing to see them
17 myself.
18    Q. Anne Marie Fahey, did you know her?
19    A. Yes.
20    Q. And how is it that you know her?
21    A. She was a patient of mine.
22    Q. Can you tell us from when to when she was a
23 patient of yours?

Page 7

1    A. First saw her in July of 1995 and ended my
2 work with her in February of 1996.
3    Q. And your work with her involved dealing with
4 what kinds of difficulties she was having?
5    A. Well, initially, she had come to see me --
6 she was in therapy before. Her therapist was killed in
7 an auto accident, and for several months, she was not
8 consulting with anyone.
9       And when she first came to see me, she was
10 very involved with issues of grieving of his death and
11 the loss of the support and work that they had done.
12       Over time, that -- those issues of grieving
13 tended to resolve and we moved on to some other
14 issues.
15       I think, in large part, it reflected her
16 family background, growing up in an alcoholic family,
17 and with many people in that kind of situation, she had
18 a great deal of difficulty asserting herself. She had
19 a great deal of difficulty with romantic
20 relationships.
21       And at the end of my work with her, what
22 emerged was some other problems that were outside my
23 area of specialty so I referred her on to another

Page 8

1 therapist.
2    Q. How often did you see her during the period
3 of time when you were treating her?
4    A. It was approximately weekly. Sometimes it
5 was every other week if she had work commitments or
6 obligations that kept her out of town.
7    Q. During the course of your treatment of her
8 and your work with her, did the issue of her
9 relationships with -- both dating relationships and
10 interpersonal relationships with other people, was that
11 part of your treatment with her --
12    A. Yes.
13    Q. -- relevant to your treatment of her?
14    A. I'm sorry I interrupted you.
15    Q. Relevant to your treatment of her?
16    A. Yes, it was.
17    Q. And how so?
18    A. Well, again, one of the things, as we spoke,
19 that became apparent to me is that she had a great deal
20 of difficulty finding, maintaining healthy
21 relationships with men.
22       It was very difficult for her to assert her
23 own wishes and desires in those relationships.

**Page 9**

1    It was difficult for her to understand what
2 makes love relationships work and that was a part of
3 the focus of treatment that we had.
4    Q. Did you talk with her about different
5 relationships she had or if she did have different
6 relationships during the course of your treatment with
7 her?
8    A. Yes, I did.
9    Q. And in talking about those relationships, did
10 events in those relationships play a role in your
11 treatment of her?
12    A. We certainly talked about specific events,
13 and, you know, how she might have dealt with them
14 differently, or if they would occur again in the
15 future, how she might deal with them and essentially
16 what was motivating her to act, if she did, in those
17 relationships.
18    Q. Did -- when you began or, excuse me, at some
19 point during your relationship with her, your treatment
20 relationship with her, did she talk to you about a
21 relationship she was having with a married man?
22    A. Yes.
23    Q. How did that become part of your

**Page 10**

1 conversations?  How was that introduced?
2    A. Well, she raised it.  I mean I -- initially,
3 she raised it by talking about a relationship she was
4 having that she was hoping to leave and was having
5 trouble leaving it.
6    When she first talked about it, she did not
7 indicate that it was with a married man, but it was
8 somewhat later she told me that.
9    Q. When she first introduced this relationship
10 into your conversations then, she did not tell you that
11 it was someone who was married?
12    A. That's right.
13    Q. How did she describe it, the relationship?
14    A. Early on?
15    Q. Yes.
16    A. She described it as having gone on for a long
17 period of time; that the relationship was extremely
18 intense.
19    She described it as being characterized by
20 this man pursuing her, having a great -- wanting a
21 great deal of control over her life, having -- and as
22 she began to want to pull away from that relationship,
23 that he was unwilling to let her do so.

**Page 11**

1    Q. What was her attitude towards this
2 relationship?  Did she explain that to you?  I mean how
3 did she feel?
4    A. Well, what I would say is that, initially,
5 she described it in historical terms, that she was
6 quite attracted to this man initially, but by the time
7 I saw her, she described it mostly in terms of feeling
8 very guilty and ashamed about being involved with him.
9 And she described it in terms of it not being a healthy
10 relationship and she particularly described it as one
11 she wanted to get out of in the context of her finding
12 a new and what seemed like a much healthier
13 relationship with a man, a different man.
14    Q. Did -- did she talk to you specifically about
15 who this person was -- this relationship she was in?
16    A. She wouldn't tell me the name.  She -- she --
17 all she said to me was that he was a prominent person
18 and I would know who it was if she told me his name and
19 she wouldn't use his name with me.
20    Q. Okay.  Did you know the name, Thomas Capano?
21    A. Yes.
22    Q. Okay, and how is it that you knew that name?
23    A. Well, I think it was general knowledge in

**Page 12**

1 terms of Wilmington.
2    I also -- they're also not nearby neighbors,
3 but a block or two away from our house.
4    Q. Did she tell you whether she had told this
5 person, this prominent person with whom she was having
6 this relationship, that she wanted to end that
7 relationship?
8    A. She had told me that, yes.
9    Q. And was she having any difficulties in ending
10 it?  Was there any difficulties in doing that for her?
11    A. Yes, there were quite a few difficulties.
12    I mean she would say that she didn't want to
13 see him and find that he would continue to send her
14 E-mail or written notes or suddenly appear at places
15 where he was observing her.  Stalking may be too strong
16 a word, but certainly observing.
17    Q. So this was not an easy -- not easy for her
18 to extricate herself from this relationship?
19    A. That's right.
20    Q. Was extricating herself with this
21 relationship part of your work with her, strategies to
22 do that?
23    A. We certainly talked about, yes, how she might

CondenseIt™

1  do that.
2      And we talked at great length about how this
3  relationship reflected some of the more unhealthy
4  aspects of what she was seeking and how some other
5  current relationships were healthier and, yes, we did
6  talk about how she can get out of this relationship.
7      Q. Could you explain a little bit about the
8  unhealthy aspects of that versus the healthy aspects of
9  what she was seeking?
10     A. This unhealthy -- as we talked about it, this
11 was a relationship where it was very difficult for her
12 to speak up for herself, to affirm what she wanted and
13 desired. She felt very much controlled by this
14 person. She felt that he didn't support her in what
15 she was wanting to do, but, rather, he was trying very
16 much to keep her as someone he wanted her to be,
17 whether that was around attire or work or any number of
18 things.
19     It was also a relationship where she was
20 experiencing a great deal of guilt and shame and that
21 was very painful to her.
22     Q. Guilt and shame because of what?
23     A. Well, when I finally found at the end, I

1  think it had to do with the fact that he was married.
2      At the time, I didn't know what it was when
3  we first talked about this, that is.
4      Q. You -- let me direct your attention to a
5  session you had with her on January the 30th of 1996.
6      A. Right.
7      Q. Was that a -- sort of a revealing session,
8  would you call it?
9      A. It was.
10     It was right at the end -- we had already
11 talked about terminating treatment and her seeing
12 Doctor Sullivan, who I was referring her to.
13     And, at that point, she finally said to me,
14 I'm -- I'm willing to tell you the big secret that I've
15 not been willing to tell you.
16     Q. Let me just stop you there.
17     This was this big secret in your
18 conversations?
19     A. She had said that -- she had told me before
20 that she was not telling me the full story.
21     Q. Okay.
22     A. And she described it as her secret.
23     Q. Okay.

1      A. In shorthand.
2      Q. So she said on this January 30th session that
3  she was willing to tell you the secret?
4      A. That's right.
5      Q. And what was it that she told you?
6      A. She told me that the man with whom she was
7  involved was married and had children and that she was
8  profoundly ashamed about that.
9      Q. What else did you talk about during that
10 session?
11     A. I know that we talked about the process of
12 her switching over to another therapist and some of the
13 termination issues, you know, what territory had we
14 covered, what was the work that we accomplished, and
15 what was she going to be doing with this new therapist.
16     Q. Let me ask you about this in terms of this
17 relationship she had that you now understood was with a
18 married man.
19     A. Right.
20     Q. And who had children.
21     A. Um-hum.
22     Q. And any particular incidents that caused her
23 difficulty in dealing with this, getting herself out of

1  this relationship?
2      A. Well, there was one particular incident that
3  she talked about. It was actually several sessions
4  prior to the date that you mentioned.
5      She described to me being quite terrified in
6  her own apartment, that this man had come to her
7  apartment quite late at night, had come into her
8  apartment and bolted the door shut and kept her inside
9  for, my recollection was, three or four hours during
10 which time he yelled at her, threatened to expose their
11 relationship. Actually took many of the gifts that he
12 had given her out of the apartment and then eventually
13 returned them. There was a period that she was quite
14 trapped in the apartment and felt quite terrified.
15     Q. You said something about exposing this
16 relationship that they had had.
17     Did you know whether or not she was in a new
18 relationship?
19     A. We did talk about that. She was in a new
20 relationship.
21     Q. Did you know who the person was by name?
22     A. Yes, she had told me that name.
23     Q. She had revealed the name to you?

Page 17

1     A. Yeah. It's Mike Scanlon.
2     Q. And what was she concerned about as far as
3 this person in the old relationship and Mike Scanlon?
4     A. She reported to me that the man in the old
5 relationship had threatened on a number of occasions to
6 tell Mike Scanlon about this first relationship and she
7 felt very strongly that if that relationship were
8 revealed, Mike Scanlon would -- would not stay with
9 her. She was very frightened of that.
10     Q. Was that a serious problem for her if Mike
11 Scanlon would not stay with her?
12     A. It was certainly my impression, as we talked
13 about this new relationship, that it was a very
14 important one to her, and, as I talked about it
15 earlier, it seemed a much healthier relationship.
16     Q. Healthier in what respect?
17     A. That he was unmarried, available, same
18 religious background. They shared a lot of interest
19 and values. There seemed to be a very mutual loving
20 relationship where he supported her in her
21 independence. Just many things that were not there in
22 the previous relationship that we had spent much time
23 talking about.

Page 18

1     Q. At some point, did you become aware or did
2 you realize that she had an eating disorder?
3     A. Yes, I did.
4     Q. And tell the jury about that, if you will,
5 please.
6     A. Miss Fahey was very thin. I mean that was
7 very apparent to me when she was in my office.
8         And, in fact, quite early on, she talked with
9 me about having a history of restricting her food
10 intake, and sometimes what we call purging, inducing
11 herself to vomit or using laxatives.
12         And as my treatment with her went on, that
13 became more a topic of a conversation and I began to
14 see that as an important next step for her to address.
15     Q. And how did you prepare her to address that?
16     A. Well, we spoke of anorexia nervosa, what it
17 is.
18         We described -- I described that being a
19 specialty area in which I didn't typically work and I
20 spoke with her about two or three colleagues in the
21 community who specialized in that in the community who
22 she might choose to see and I would recommend.
23     Q. Did you recommend one to her?

Page 19

1     A. I mentioned three people to her and she chose
2 to see Michele Sullivan.
3     Q. Was Michele Sullivan one of the ones you
4 recommended?
5     A. Right.
6     Q. By the way, do you know who referred her to
7 you?
8     A. She got to me because her brother and I are
9 acquaintances. He teaches at Wilmington Friends School
10 and my children attend there.
11     MR. WHARTON: Can I have a moment, please?
12     THE COURT: You may.
13     MR. WHARTON: No other questions.
14     THE COURT: Mr. Oteri.
15         CROSS EXAMINATION
16 BY MR. OTERI:
17     Q. Doctor, my name is Joe Oteri.
18         I'm one of the attorneys for Tom Capano.
19         If you don't understand me or can't hear me,
20 please stop me short and I'll try to straighten it
21 out.
22     A. Fine.
23     Q. Thank you, Doctor.

Page 20

1         You are a clinical psychologist; correct?
2     A. That's right.
3     Q. And you graduated from the University of
4 Delaware with a Ph.D. in psychology; is that correct?
5     A. That's right.
6     Q. Now, Doctor, psychologists, people get Ph.Ds
7 in psychology, do those -- the schools you attend, are
8 they part of a medical school or are they part of a
9 separate branch of an university?
10         What are they?
11     A. They are not a medical school. It's a
12 graduate school.
13     Q. Is it affiliated with the medical school
14 normally?
15     A. Not typically.
16     Q. But there is a department at least at
17 Delaware of psychology?
18     A. That's correct.
19     Q. And if you get a Ph.D. in psychology, you get
20 it from the University of Delaware School of Psychology
21 or Department of Psychology?
22     A. That's right.
23     Q. Okay. Now, are you familiar with a degree

Page 21

1 known as counselor education?
2    A. Yes.
3    Q. And is that a degree that's granted by the
4 School of Psychology?
5    A. I don't -- I don't know.
6    Q. Okay. All right. It's not one you're
7 familiar with that would come from the School of
8 Psychology?
9    A. I don't -- I don't know. I mean I know what
10 counselor education is, but --
11    Q. What is it?
12    A. These are folks who are trained in skills in
13 psychology, also, and a portion of what they do is to
14 learn how to train other people to do counseling also.
15    Q. To do counseling. And what, do they train
16 women for jobs, do they train kids to --
17    A. It can be university settings, it can be
18 school settings, it can be private practice.
19    Q. Okay. Now, you received your certificate in
20 1981; correct?
21    A. I'm going by recollection. I believe it was
22 '81 or '82.
23    Q. Believe me, it was '81.

Page 22

1    And you worked part time from '81 to '88;
2 correct?
3    A. That's right.
4    Q. What were you doing in those seven years in a
5 -- besides being a psychologist?
6    A. Well, I was practicing part time and I was
7 also teaching at the Medical Center of Delaware, it was
8 called then, in the program of Family Medicine.
9    Q. Family Medicine?
10    A. That's right.
11    Q. Okay, so you were teaching and practicing
12 part time, and in '88, you became a full-time
13 practitioner?
14    A. Right. But I think it was '89.
15    Q. Now, Doctor, how many patients do you see a
16 day normally? Just an average day.
17    A. 8 or 10.
18    Q. Take 9 as an average.
19    A. Okay.
20    Q. How many days a week do you see patients?
21    A. I typically work four days a week.
22    Q. Okay, so that's 36. You see about 35, 36
23 patients a week?

Page 23

1    A. Right.
2    Q. It's pretty good work if you can get it four
3 days a week.
4    And what do you give, hour visits?
5    A. Typically, they're 45 minutes.
6    Q. 45 minutes.
7    Okay, so you see, what did we say, about 35
8 patients a week?
9    A. Correct.
10    Q. And how many weeks would you say you work?
11    A. 46 or 47.
12    Q. All right, so we get 35 -- 350 -- 1500, 1600
13 people a year, sessions a year?
14    A. Okay.
15    Q. And you bill for those sessions?
16    A. Um-hum.
17    Q. At what, 85, 95 dollars an hour?
18    A. It depends upon the person.
19    I work with a sliding fee scale, and some
20 people I've charged as little as 10 dollars a visit or
21 as much as 100 dollars.
22    Q. So it slides. About what do you figure you
23 average?

Page 24

1    A. Average?
2    Q. Yes.
3    A. 75.
4    Q. Okay. Fine.
5    And you see about 35 people a week, 46, 47,
6 48 weeks of the year?
7    A. Correct.
8    Q. About 1500 sessions a year.
9    Now, Doctor, during the course of that
10 practice, you treat people for diseases of their mind;
11 correct?
12    A. That's right.
13    Q. And they tell you things; correct?
14    A. That's right.
15    Q. As a psychologist, you don't have a person
16 come in with a bone sticking out of their leg that you
17 can see what the illness is; correct?
18    A. That's right.
19    Q. It's internal and you have to get them to
20 externalize it and tell you what the disease is;
21 correct?
22    A. Yes. They have to talk about it.
23    Q. They have to talk about it.

Page 25

```
 1        And when they talk to you about it, Doctor,
 2   you rarely know if they're telling you the whole truth,
 3   do you?
 4        A. That's true.
 5        Q. Many times, they can be coloring things;
 6   correct?
 7        A. That's right.
 8        Q. Putting a slant on things?
 9        A. (Witness nods in the affirmative.)
10        Q. And they do that, in fact, because they're
11   ill; isn't that correct?
12        A. It can be that reason.  It can be that's the
13   way, in fact, they see the world.
14        Q. They can what?
15        A. It can be, in fact, the way they do see the
16   world.
17        Q. Now, you have no real way of knowing whether
18   they're telling you the truth at that time.
19        You may learn they're not telling you the
20   truth, but when it's being told to you, you don't know
21   whether they're telling you the truth or not, do you?
22        A. That's correct.
23        Q. Okay, now, Doctor, in treating a patient, I
```

Page 26

```
 1   assume it's like many other things, the more knowledge
 2   you have, the more help you can be?
 3        Knowledge is power; correct?
 4        A. You mean the more knowledge about that
 5   individual?
 6        Q. About the individual, yeah.
 7        A. Right.  Right.
 8        Q. I mean the more you know about the patient,
 9   the better a job you can do of reading them and helping
10   them; correct?
11        A. Typically, that's true, yes.
12        Q. And part of that knowledge would consist of
13   speaking to other people about them?
14        A. Not typically, no.
15        Q. How about notes, reading notes of other prior
16   treating psychiatrists or psychologists?
17        A. Sometimes I do that.  Sometimes not.
18        Q. That would be a good thing to do; would it
19   not?
20        A. Sometimes.
21        Q. Okay.  In a case -- did you know Bob Conner?
22        A. I knew him, yes.
23        Q. Do you know he was a highly-competent guy,
```

Page 27

```
 1   well-respected in his field?
 2        A. I certainly respected him, yes.
 3        Q. Do you know Anne Marie Fahey was treated by
 4   him for some 60-odd visits over the course of a couple
 5   of years?
 6        A. I didn't know the number of visits, no.
 7        Q. You know she had great respect for him?
 8        A. I do know she was respectful of him and fond
 9   of him.
10        Q. You know, in fact -- you told her, in fact,
11   she was in love with him?
12        A. I told her that.
13        Q. Yes, did you tell her that?
14        A. No.
15        Q. You never told her that?
16        A. No.
17        Q. Did you, in fact, have a number of
18   discussions over transference and -- between her and
19   Bob Conner?
20        A. Not -- I sure don't recall that.  I mean we
21   talked about it briefly.  I would not say a number of
22   conversations.
23        Q. All right.  Now, she finally resolved her
```

Page 28

```
 1   problems over Bob Conner's death; correct?
 2        A. Yes.  Yes.
 3        Q. Did she ever tell you about Nan, her
 4   grandmother?
 5        A. Not that I remember.
 6        Q. She never told you about her grandmother
 7   dying and she calling her years later, still calling
 8   her up and going by her house?
 9        A. No.
10        Q. Doctor, seeing 35 people a week and they're
11   telling you for 45 minutes -- they're telling you their
12   innermost thoughts and all, do you have some system
13   where you can remember all this?  Do you take notes?
14   Do you have any kind of recording system?  What -- how
15   do you keep it all separated in your mind so you can
16   help each person by knowing their story when you treat
17   them?
18        A. Typically, when I see someone, at the end of
19   the appointment or at the end of the day, I will enter
20   some notes.
21        I used to write them by hand.  I now put them
22   in a computer.
23        Q. And Anne Marie Fahey, you saw from July of
```

Page 25

1    MR. OBERLY: Okay.
2    THE COURT: And I'm satisfied that, normally,
3 I would go ahead and have a hearing and address that,
4 but, quite frankly, I think the testimony of Dr. --
5    MR. WHARTON: Kaye.
6    THE COURT: -- Dr. Kaye pretty well
7 established the basis to say, when we're treating
8 somebody for emotional disorders, their personal life
9 and their personal relationships are a very important
10 part of diagnosis and treatment.
11    So I'm satisfied that there's strong case law
12 on that point.
13    There's a New Hampshire case, I think, is
14 really right on point, but I also think it's pretty
15 well-reasoned if we're going to recognize the mental
16 health field or go so far as to recognize a
17 relationship between counselor and patient, then you
18 have to tell people what's going on in your life to
19 understand the impact it's having on your emotional
20 state.
21    So I'm satisfied that that comes in.
22    And the danger of this is, and I had several
23 instructions when Dr. Kaye was on the stand, is that

Page 26

1 it -- it may well be important in diagnosis and
2 treatment that somebody says, Somebody did this to
3 me.
4    On the other hand, we draw this imaginary and
5 unreal line that says you can consider it for this
6 purpose to understand what her state of mind is, but
7 you can't accept it as being true or reflecting the
8 state of mind of the other person.
9    I'll make such an instruction if you want to
10 work on such an instruction, but I do think, generally
11 speaking, those things come in.
12    Now, to the extent that they get into or
13 there's some vague reference, vague references don't
14 come in. I don't know whether she'll explain what she
15 meant by a vague reference and it doesn't come out so
16 vague, and I know I've already seen the dynamics
17 between notes and testimony, and we're all experienced
18 enough in this field to understand that people who
19 interpret their notes come out with very direct and
20 succinct statements when the notes may not be that
21 way. They may also refer to things which they justify
22 by saying, obviously, I put this here to refresh my
23 memory and my memory is this, and the other side of

Page 27

1 that is, if that was what you wanted to say, why
2 didn't you write it down.
3    But that's a question of fact that -- and I
4 don't see any real way to avoid that. That's part of
5 the dynamics of finding the truth here.
6    MR. OBERLY: Your Honor, I guess I'm not
7 going to argue with the Court, but I think -- I
8 understand that portion, it goes to what Dr.
9 Sullivan's going to say she actually said to me as to
10 certain things.
11    Are you going as far as saying that she can
12 relate specific incidents which are perhaps, you know,
13 prior bad conduct?
14    She relates several incidents that have
15 nothing to do with the medical treatment which she's
16 given or the diagnosis, which we would submit -- and
17 then on top of that, I think the case law we cited in
18 our memorandum asked the Court to be particularly
19 cognizant of the perils of any psychologist because
20 they'll say everything's relevant. They eviscerate
21 the whole concept of a medical diagnosis because
22 they'll never say anything's not relevant. But even
23 if they say statements made to her are relevant,

Page 28

1 there's a difference when she starts giving opinions
2 as to what somebody would do or not. That's not under
3 the 803(4) hearsay rule and that goes into sheer
4 speculation, and whether your Honor wants us to object
5 now to that, what I'm worried about is when the doctor
6 gets up there and says to this jury, Anne Marie would
7 not have gone to Tom Capano's home.
8    THE COURT: Which we anticipate.
9    MR. OBERLY: And that is pure speculation on
10 her part, because I think even on a voir dire, it
11 would be determined she never even asked her that
12 question, and Mr. Oteri can bring it out, but I'm
13 worried about any of that going out and then trying to
14 argue about it later.
15    MR. CONNOLLY: It's not hearsay. It's her
16 opinion. And you have placed into the heart of this
17 case, this matter, that very issue.
18    You've said that a horrible, terrible, tragic
19 accident happened and Dr. Sullivan's opinion, of the
20 patient that she treated, refutes that.
21    So it's completely relevant, it's not
22 hearsay, and it should come in.
23    As far as the specific incidents, I think the

Page 169

think you look like a whore. We don't think it is admissible.

THE COURT: I already know at least half of the State's argument, but I will listen to the whole thing.

I note that some of these things are already before the jury. I mean, they have come in through the psychologist's testimony.

MR. OBERLY: We tried to trigger our objections off of some of that.

MR. WHARTON: That is probably going into the balancing. Obviously, we don't concede the point, but in the interest of collegiality, we will -- unless cross-examination --

THE COURT: Well, obviously, anything we say now is subject to review if we get into more traditional rebuttal situation.

MR. OBERLY: The second matter is on pages 20, 21 and 22 and that has references to apparently at some point in time, I don't know if the date is exactly clear, there was a reference that Anne Marie explained she was going to visit Louie Capano for a possible job interview. And we don't think that is relevant to the proceedings, whether or not she had an interview with

Page 170

Louie, didn't have an interview with Louie had nothing to do with any threats. I suspect the State would argue if Tom said jump she would say, how high? I don't see the relevance of this.

THE COURT: This is May of '95 according to my notes?

MR. OBERLY: Sorry. It says May of '95 so I think there is a remoteness issue. And the fact of the matter is I would note in May '95 they were getting along extremely well. That is indisputable fact as well.

THE COURT: Mr. Wharton?

MR. WHARTON: The conversation about her having a job interview is relevant because what follows from that is it is set up by the defendant and her comments, her feelings about the purpose of that later on on the 21st. I feel like I have to go, the person that got me this interview, I feel like I should go because of that and he is trying to control her in that fashion, and she feels an obligation to do that. The fact of that he got her a job interview would be confirmed by a later witness because the defendant had a conversation with that witness where he acknowledged getting her an

Page 171

interview with Louis Capano.

THE COURT: Is it going to be relevant then?

MR. OBERLY: I don't see what relevance.

MR. WHARTON: Yeah. What it ties into, he wants to control where she works, where she lives, what she does, and that's one of the things that Dr. Sullivan has been dealing with her, the control and breaking away from this man.

THE COURT: Clearly in reading it it was something that I underlined to deal with. It would appear to me that she was asking me questions which clearly dealt with her present state of mind at that time wondering whether or not she wasn't being -- this was not a mechanism by which she was going to control him -- where I work, where I live, and why does he control me? What I'm concerned with is that something that took place a year before this particular offense, so how is it relevant timewise?

MR. CONNOLLY: The witness that we will have that will have the conversation with the defendant will place the time within the last six months prior to the disappearance of Anne Marie Fahey where he talked about trying to set up the job.

Page 172

MR. OBERLY: That witness we can argue, but if it is six months before it makes this woman wrong in its time. She says it was May '95. Now some other witness -- Tom mentioned a job interview in January or February of '96, I don't know the context of what that is going to be.

THE COURT: We ought to have -- again one of the problems you have with any witness is how accurate they are on both recollections and placement of time. What I'm suggesting here is that the State does have evidence which they consider reliable at this stage as to when the job interview took place. That seems to me to be more likely to place when this occurred than the recollections of the person.

MR. WHARTON: Two things, Judge, one of them is the conversation of this incident, and the actual discussion between Jill Morrison and Anne Marie Fahey about the job interview is placed around the time of the Tour DuPont in 1995 which would have been May of 1995. The conversation with the later witness occurs after that, after she had already started seeing Michael Scanlon, which would put it fall-winter 1995, and perhaps later than that.

Page 173

MR. CONNOLLY: So I stand a little corrected. It could be more than six months, Judge.

MR. OTERI: You stand a lot corrected.

MR. WHARTON: I think what we have to look at, Judge, is that we have been talking about a relationship that spanned a considerable period of time and the nuances of that relationship have all been discussed through a great deal. And to say that something is relevant as it related to the relationship that occurred in 1994 and early 1995, but then something occurred later in 1995 is now -- time is not relevant because it is too remote in time doesn't strike me as being too logical. Because we have this entire relationship and the progress of that relationship has been talked about a great deal.

MR. CONNOLLY: Can I add another point? One of the things here that is also relevant is the fact that Jill Morrison had a long going relationship with Anne Marie Fahey and the subject of Tom Capano wasn't just discussed in isolation, this had been ongoing. Even though Jill Morrison didn't know the extent of the relationship, there was a context to which Fahey made in 1996 in that context to statements that go back as far

Page 174

as '94 and '95.

THE COURT: I note in this particular case, again, I think one of the dangers and why we always need a limiting instruction is we are talking about the state of mind of somebody who is not here, that's why we are relying on hearsay. In no way -- it clearly does reflect on the defendant, that is one of the things we need to limit, and that's one of the things we need. I'm inclined to let this in, only because it appears to be a crucial part in their relationship. This is the first time that I'm aware of that there is anything that says I'm being controlled and I'm having second thoughts. And I note this is before there is some other testimony in here that this relationship had cooled before she met Scanlon, that is not altogether clear from what I have heard so far and she met Scanlon within several months of this statement being made. Again, it gets hard to weigh the prejudicial value here because most of this is out now. Most of this is on the table with the testimony of the psychologist.

MR. OBERLY: One point, we did object to the testimony of the psychologist. And to some extent there is a rule that is cumulative. And on top of the hearsay

Page 175

objection I don't want the Court to be under the impression that we wanted the psychologist to testify.

THE COURT: I understand.

MR. OBERLY: So on top of that some of it does become cumulative. So a good bit of it we have objected to trying to limit the number of rulings that the Court would have to make.

THE COURT: I'm inclined at this particular stage to say this particular conversation come in, that it is significant because it represents the first indication of a date in the change of their relationship, that it is 13 months prior to the event. But again we have, at least from the position of the State here, we have a relationship that changed and part of that change led to Mr. Capano viewing the relationship different and taking measures to terminate.

It seems to me, at some stage, I'm not just talking about her state of mind at the time of the tragic accident, but --

MR. WHARTON: I think there were quotes in that weren't there, for the record?

THE COURT: But I'm also talking about her state of mind which led to a change in her relationship,

Page 176

therefore, is a crucial part of the State's explanation of what happened here, so we can start with that particular one in May of '95.

MR. OBERLY: Okay. Next is pages 27, 28 and 29, general conversation from Jill Morrison pertaining to that surrounding the Grand Gala, principally that there were several phone calls that came in. Anne Marie apparently said he's been calling me all day, left rolls from DiFonzo's, discussed prior relationship, devout Catholic.

Again, we think, as you read Porter, I just don't believe that the Porter decision believes open-ended all comments made that relate to what she did or didn't do in relationship to Tom Capano. She obviously went there, there was obviously no problem there, and it is almost put in like we want to get her mental attitude because she thought she might have a problem there and I don't think it pertains to Tom Capano whatsoever.

THE COURT: See, I think I'm approaching this from a different perspective from what you suggest. I think her state of mind becomes important. Her state of mind becomes important for a number of reasons because

somehow we now know she died in his house -- excuse me, we don't know that, although the defense has indicated that in opening argument. There certainly isn't proof of that.

MR. OTERI: It's not believable. I said it.

THE COURT: And we are told that this was a very tragic, ill-defined accident. Now, it seems to me that in order for the State to approach the concept of there being some intentional homicide, because they are not interested in proving an accident occurred in the house, that they have to show a change in their relationship that made it more toxic. And that this pattern of calling her under circumstances that were inconsistent with the e-mails, inconsistent with the portrait of domestic tranquility, which Mr. Oteri has attempted to develop, is important in balancing the emotional condition of their relationship at this time.

MR. OBERLY: Next one I have is on page 30. And perhaps, the best comment I can make on it is line 18, "Anne Marie told me that Tom Capano told her that Mike Scanlon said," that is triple hearsay. The comments that have come in generally under the hearsay exception are at least the declarant's own statements as

is cumulative to come in through this witness and I don't think it meets the test of that present sense of a state of mind exception.

MR. WHARTON: I think, as I recall, when Gary Johnson was being cross-examined there were a lot of attempts to undermine the credibility, not of Gary Johnson, but of Anne Marie Fahey in telling Gary Johnson that this incident occurred. I think I remember Mr. Oteri asking questions like, well, you don't know whether that actually occurred, you weren't there, you didn't verify it, you had no way of verifying that. And I think the fact she told it to another person besides the psychologist corroborates Dr. Johnson.

MR. OTERI: If Ferris is finished I think you ought to let the jury go.

THE COURT: I was making the thought myself. Let me stick my head outside. I almost would like to instruct them, but they have been instructed time and time again.

MR. O'DONNELL: Early on in the break a bunch of the jurors were standing outside of the courthouse.

THE COURT: I gave permission for the bailiff to go outside to smoke.

to her perceptions, her thoughts, here she is repeating that, she says that Mike Scanlon told.

THE COURT: Except it is not coming in for what Mike Scanlon said. Nobody is arguing the truth of it, indeed they are arguing that it is not true.

This was a situation where Mr. Capano was attempting to break up this relationship. And so it is not being introduced for the truth of matter, it is introduced for showing that he is doing certain things, as I describe it, to make the relationship no longer loving and nurturing but toxic. And it is again inconsistent with the e-mails, but puts us in a situation where since Anne Marie is unavailable to tell us what her emotional state was at this time, this remarks to someone who has been called her best friend and confidant under instances which were contemporary to the alleged incident give it the degree or reliability that we let it come in.

The incident relating to the fire escape, while that may be in through Michele Sullivan or Gary Johnson, submit to that under the present sense. One, if it has any clear relevancy as to exactly what was said, it was said to a psychologist and that has already come in. It

MR. O'DONNELL: There were 12 of the 20 and I asked one of the newspaper guys whether they had shot any pictures and he said yes. I told the guy, I said we have taken great pains to keep the identity of these jurors, if their picture appears in the paper Judge Lee is not going to be happy with that. I can't tell you what to do.

THE COURT: I thank you for that. If they intend to put it in the paper my guess is they have disseminated that. I made the decision to let them go outside since they can go to lunch and home at night and some people locked up in small rooms who smoke cigarettes get a little itchy, so I told the bailiff if there were those who wanted to go outside they could.

Thank you for bringing that to my attention. Another lesson, I will find a better place for them to smoke.

MR. OBERLY: You haven't ruled on this, but same objections apply to page 32, the car driving by Scanlon's, which is an attempt to get in prior bad act and alleged harassment that occurs. All three of those made under same objections not being properly in the scope of what the rule would allow in.

1    About the time that Doctor Johnson referred
2 her to me, she was well into another episode of some 14
3 or 16 months. And what I needed to help her do at that
4 point is to talk about, what is this about. And she
5 had not talked to me a great deal about this person,
6 but she did refer -- and, in fact, if you don't mind,
7 I'll look him up in my notes.
8    Okay, I would like to read a section that may
9 be relevant to what we're talking about.
10    On 2-28, as part of my notes, I have that she
11 reported that until August of about '95, she had been
12 in a relationship for two years with a 44-year-old man
13 who's separated and had four kids. She reported him to
14 be incredibly controlling and possessive and felt that
15 he gave gifts to her to be controlled. She reported
16 further that she did not know how to get out of that
17 relationship.
18    When I asked her a little bit more about her
19 eating disorder, the ebbs and flows of that, she
20 indicated it had been worse lately mostly due to him.
21    Now, she's not giving me a name, and I didn't
22 know who him was, but the only other him we talked
23 about was the 44-year-old gentleman.

1    Q. And later on she specifically identified this
2 person; correct?
3    A. Yes.
4    Q. And she identified him as?
5    A. Tom Capano.
6    Q. Now, on February 28th, your notes also
7 indicate that she told you that there had been no
8 violence in the relationship; isn't that right?
9    A. That's right.
10    Q. Did she tell you that she was interested in
11 having a relationship or was in a relationship with any
12 other person?
13    A. As part of that interview, and, frankly, on
14 the heels of her talking about this other difficult
15 relationship, she indicated that she was dating Michael
16 from MBNA. Did not give me a last name.
17    Q. Did she tell you about Michael during that
18 meeting?
19    A. Not much other than just to make reference --
20 no, I think that was about the only reference that was
21 made.
22    Q. If you would turn to the next page of your
23 notes, you've got the words, very ashamed, with very

1 underlined three times.
2    What's that a reference to?
3    A. To explain that, I need to talk a little bit
4 about her history and, that is, some of this you may
5 already know, but I'll tell you what I know.
6    Anne Marie lived in some unusual and
7 extremely difficult circumstances growing up. There
8 were periods of great poverty. She suffered both
9 physical and emotional abuse living at home especially
10 with her alcoholic father. There was so little money
11 in the household that she felt like she had to go to
12 school and have the school pay for her lunches. Very,
13 very often, she felt very frightened about going home
14 for fear that her father would attack her or in some
15 way humiliate her.
16    I mention these things simply because it's
17 not unusual when you have that kind of background that
18 a young person will tend to blame themselves. They'll
19 tend to say, gosh, if I could only get straight A's and
20 maybe dad won't drink or maybe I shouldn't have come in
21 so late and he wouldn't have beaten me that time.
22    And, very sadly, little people blame
23 themselves and become very ashamed.

1    A person, when they feel guilty, will say,
2 Oops, I goofed, I tripped over something and I
3 embarrassed myself, I made a mistake.
4    But a person who feels shame feels a very
5 profound sense that they, as a person, have no reason
6 to live --
7    Q. Now, did Anne Marie feel both shame and guilt
8 or just one or the other?
9    A. She struggled with those back and forth, and
10 what I mean, in terms of feeling like she could not
11 have any reason to live had more to do with kind of an
12 attitude. I had no time -- I, at no time, saw her as
13 having any potential for suicide at all. I'm referring
14 more to the fact that she lived and struggled with a
15 chronic sense that she was unattractive, unacceptable,
16 unworthy, and just not a good person.
17    Q. Well, did she have any shame in relation to
18 the fact that she had been in this adulterous
19 relationship?
20    A. Definitely.
21    Q. Why did she have that shame, and if you could
22 be more specific than the general background?
23    A. I'm not sure we actually talked about that in

**Page 29**

1  Q. You've also got easily intimidated. Did she
2  say who she -- who intimidated her?
3  A. Those were my words, actually, because it
4  became clear to me that she would be a kind of person
5  that would be easily intimidated and manipulated just
6  from the things that she had said to me.
7  Q. All right. Now, you've got down here a
8  reference to enc. I take it that's encouraged?
9  A. Yeah.
10  Q. Would you read the reference, please?
11  A. This reference has to do with how I was
12  encouraging her, what to do in therapy.
13  I was basically encouraging her, knowing her
14  strong commitment to her God, I asked her to ask her
15  God's forgiveness for the things that she felt ashamed
16  about.
17  I encouraged her to acknowledge herself as
18  being a child of God and to do what she could do to
19  affirm that, for her, the sky was really blue.
20  Q. You've also got down here a reference to
21  ambivalence about giving up laxatives.
22  So you were actually discussing with her the
23  idea of just to stop the use of laxatives; correct?

**Page 31**

1  of food that get introduced to the diet have to be
2  chosen carefully. If you flood this person with a lot
3  of milk products, they're going to have a tremendous
4  amount of indigestion, or if you gave them a steak,
5  they will vomit it up because their stomach is not
6  acclimated.
7  So I had asked her to go to Maryann Carter to
8  get a food plan she could graduate into slowly and
9  basically, in so doing, I asked Maryann to supervise
10  that part of our work.
11  Q. I'd like you to turn to April 3rd. Skip
12  ahead to that, please.
13  A. Okay.
14  Q. And would you read -- you've got three lines
15  of notes there; correct?
16  A. Yes.
17  Q. Would you read the notes for us, please?
18  A. Having a very hard time forgiving herself,
19  believes his haunting her is her punishment. How to
20  trust, how to forgive self.
21  Q. Who's the person referred to as haunting
22  her?
23  A. She referred to as Tom Capano.

**Page 30**

1  A. Yes.
2  Q. And her response was?
3  A. You know, basically, when I do this kind of
4  thing, I want to test out what is their readiness to do
5  it, and I sensed that she was a little evasive and
6  changed the topic, and what that said to me is that
7  she's not ready.
8  Q. At some point, did she become more ready?
9  A. Absolutely.
10  Q. There's also some references in here to a
11  Maryann Carter, Ann Battaglia who works with Carter --
12  and who are those people?
13  A. I referred Anne Marie to Maryann Carter who's
14  a registered dietician.
15  When somebody has a long history of eating
16  disorder ways, it's very difficult to come up with an
17  adequate food plan. Anorexics think they know a great
18  deal about food, but what they really know is all of
19  these foods are bad and these one or two are good.
20  When you are working with somebody to
21  encourage them to eat more normally, they need to
22  understand that if they start -- first of all, they
23  have to start eating in small increments and the kinds

**Page 32**

1  Q. And what kind of conduct did she tell you
2  that he was engaging in to haunt her?
3  A. She reported coming over to the house
4  uninvited, wanting to get in, making a scene such that
5  he was allowed in. Surprising her by showing up at
6  places that she was planning to go by herself. Writing
7  an enormous number of E-mails, making a very large
8  number of phone calls every day.
9  Q. How many phone calls did she tell you?
10  A. Well, at one point, I remember with some
11  surprise she talked about 15, 20, 25 phone calls in a
12  day. And the last thing that she mentioned, that she
13  felt trapped by in some ways, was the gifts that she
14  was being given at this point.
15  Q. And did she tell you how she viewed the
16  gifts?
17  A. She viewed them as manipulation to stay in a
18  relationship with Mr. Capano.
19  Q. Now, did she want to completely break off all
20  ties with Mr. Capano?
21  A. I don't think so. I -- I think she was the
22  kind of person who believed that you could move from a
23  romantic relationship to one, hopefully, of

**Page 33**

1 friendship.

2     Q. Well, as a counselor, did you offer her any

3 suggestions as to whether that was a good or a bad

4 idea?

5     A. If I knew that, for instance, a person were

6 relating to somebody who physically abused them or who

7 threatened them bodily harm or whose finances were

8 going to be down the drain if they don't leave, I get

9 very active in talking to these people about doing

10 what's necessary to save themselves.

11       When it comes to these matters, one of the

12 difficult things you have to choose is -- when you're a

13 therapist -- is, what do you do and what do you need to

14 teach them to do.

15       And in this case, it did not appear to me

16 that the kind of things that she was struggling with

17 were risking any kind of danger and so I was -- I

18 continued to suggest to her that she find more specific

19 ways of saying no and being clear about the kind of

20 relationship that she wanted to have.

21     Q. You mentioned a lot of things she said about

22 Mr. Capano, specific acts, manipulation, control.

23       Did she say any good things about Mr. Capano?

**Page 34**

1     A. Sure. She described him as a man who had in

2 the past been extremely supportive of her. He was

3 somebody she could turn to to talk about problems.

4     Q. Did she say she had turned to him in the

5 past?

6     A. Um-hum. That's right. And I think because

7 of his generosity, she was able to feel a sense of

8 security that she probably had never been able to feel

9 in her life and so she felt grateful for those kinds of

10 gifts.

11     Q. Did that, at all, factor into her resolve or

12 lack of resolve to completely sever ties with him?

13     A. Will you reread the question?

14     Q. Well, was she afraid that if she severed

15 ties, it would have some kind of effect on him that she

16 didn't want?

17     A. I think Anne Marie is -- was a person who was

18 excruciatingly aware of the feelings of other people

19 and never ever, ever wanted to hurt anybody. If she

20 perceived she was hurting somebody, she would be

21 incredibly remorseful and probably end up with a

22 tremendous amount of shame. Therefore, even though she

23 reported to me that she did not want a romantic

**Page 35**

1 relationship and she wanted to see Mr. Capano less and

2 less, she did not want to hurt him and I think therein

3 hoped that, somehow, that their relationship could be a

4 platonic friendship.

5     Q. Now, would you look at your notes for April

6 10th? April 10th, she tells you for the first time

7 what about Mr. Capano?

8     A. Now, I used some of this language because I

9 don't like to write other people's names in my files,

10 so I simply said the person continues to contact her.

11 Encouraged her to ask the Attorney General's office for

12 steps in dealing with harassment, to document the

13 calls, to write responses asking to stop -- to stop

14 contact. Just to provide documentation in general to

15 help her reduce the tendency to withdraw and hide and

16 feel so vulnerable.

17     Q. Now, do you recall that around this time in

18 April, she said anything to you about fears she had

19 relative to Mr. Capano?

20     A. Let me see if it was at that time or

21 earlier.

22     Q. I don't mean fears -- I mean fears with

23 respect to physical violence.

**Page 36**

1     A. I'm trying to remember when it was that she

2 began to talk about a possible kidnapping and I'm not

3 sure whether it was -- the possible kidnapping was

4 later.

5       This --

6     Q. I didn't mean to limit you to this, but what

7 I'm saying is do you recall a time when she started to

8 speak with you about a fear of violence from Mr. Capano

9 at any time?

10     A. What she did was she was very concerned about

11 getting kidnapped.

12     Q. And what did she tell you about getting

13 kidnapped?

14     A. Well, she -- she and her friend had been

15 talking about this vaguely, and she came into the

16 office and said, So and so said, gosh, I could get

17 kidnapped, what do you think, Michele? And I said,

18 What is this about, and she said, Well, my friend

19 thinks that somebody could kidnap me. And I said,

20 Well, talk to me more about what this is about. I

21 became extremely distressed and she said, Oh, I don't

22 know, somebody could just take me away or something,

23 and I said, Who would do this, and she said, Well,

**Page 37**

1  probably a third party. And I said, Well, what do you
2  mean, that somebody would hire a third party? She
3  said, Yeah. Who would do that? Mr. Capano. And I
4  said, Well, is there anybody else that might do that,
5  and she thought for a long while and said maybe a
6  boyfriend of three or four years ago.
7     Q. Did she mention a boyfriend's name?
8     A. No.
9     Q. Was she definite that she thought Mr. Capano
10 could be this person?
11    A. The person who would kidnap her?
12    Q. Yes, or get a third party to do so.
13    A. It was clearly an immense worry for her.
14    Q. Now, you mentioned on April 10th that you had
15 advised her to contact the Attorney General's office.
16       Do you know whether she did?
17    A. Yes, because I was -- at this point, this was
18 prior to the talk about being kidnapped. This had to
19 do with a number of phone calls being received and --
20    MR. OTERI: Excuse me, your Honor, could we
21 get some kind of a date background?
22       We're all over the place.
23       THE COURT: All right, Mr. Connolly.

**Page 38**

1     MR. CONNOLLY: All right.
2  BY MR. CONNOLLY:
3     Q. I thought I said it, but you mentioned on
4  April 10, you spoke with her about contact with the
5  Attorney General's office.
6        At some point, did she, and would you give
7  Mr. Oteri a date?
8     A. Yeah. We outlined what I thought she needed
9  to do.
10       The next meeting, I checked with -- let me
11 see. I want to make sure I'm accurate with my notes
12 here.
13       The next session, although it's not
14 documented in here, I remember very clearly talking
15 with her about whether she had followed through either
16 with the police or the Attorney General. She reported
17 to me that she could not do the police. She just felt
18 that that would get too known in the public, and it
19 would just be too embarrassing, and she couldn't take
20 it.
21    Q. Do you know now, specifically, why she was
22 concerned about public exposure with respect to the
23 police?

**Page 39**

1     A. She had a job that was an extremely well -- a
2  very public position with Governor Carper.
3        Is that what you're referring to?
4     Q. Well, I'm asking you, is that what she said?
5     A. Yeah, that is definitely a piece of it, plus,
6  again, her shame and embarrassment that any of this
7  would be found out and it might get into the press and
8  so on. Her -- those kind of fears kept her frozen a
9  lot.
10       I did ask her about the Attorney General's
11 office and she said that she had contacted a friend,
12 and that the way she had done that was to call the
13 friend and to pretend that she was inquiring about a
14 constituent, and she told the friend in the AG's
15 office, Somebody I know is being harassed, what would
16 you tell them in order to keep themselves safe? And
17 this friend answered and provided some questions and
18 she wrote those things down and then we talked about
19 them at the next meeting.
20    Q. Were you surprised that Anne Marie handled a
21 problem that she had by discussing it in terms of a
22 third person?
23    A. I wasn't surprised. I was sorry. But I

**Page 40**

1  wasn't surprised.
2     Q. That was consistent with her whole lack of
3  assertiveness?
4     A. Well, lack of assertiveness, but much more
5  profoundly her shame. You know, imagine going to a
6  policeman, who may or may not know you, and saying, I
7  have had this clandestine affair. I don't want it and
8  I'm afraid of these threats. It's kind of shocking to
9  the man on the street, and who knows who he's going to
10 tell, and it's incredibly embarrassing and it kicks up
11 all kinds of bad feelings about yourself.
12    Q. If you look on the entry for April 24th,
13 1996, this is a week after the Attorney General
14 discussion you had with her. There's a reference here,
15 As she gets closer to Michael, she remembers --
16    A. Disappointment and betrayal from her past.
17    Q. This is Michael Scanlon?
18    A. Yes, that's a reference to Michael.
19    Q. Did she tell you she thought she was getting
20 closer to Michael?
21    A. Absolutely, yes.
22    Q. Is this a trend that continued throughout the
23 time she saw you?

better and better. And so, again, we talked about well what is a small amount that you can do to see what his reaction is, to see if it is safe, to see if you can get the support that you deserve, to see if there is no rejection. And that is essentially what we were doing, is encouraging her to tell a little bit, and in this case, I think it had to do with her eating.

Q. Now, did you ever discuss with her telling Michael about the fact that she had had an affair with Tom Capano?

A. We certainly talked about whether she was going to do that. I don't remember her ever coming back to me and saying I did that. I have to question that. I made an inference that she had. After the grand jury testimony -- I had indicated that I thought that the two of them had spoken and that she had spoken to Michael about Mr. Capano. I think I was wrong. I did not have my notes in front of me. I do remember her talking about speaking to Michael, and it turns out, as I'm now looking at my notes, that it had to do with the eating.

Q. Just so the jury understands, you testified before the grand jury, the Federal Grand Jury way back in March of 1997, correct?

A. Right.

Q. Is that right?

A. Yes, it is.

Q. At that point, there were limitations on what you could or were willing to disclose to the Government, correct?

A. That's right.

Q. And those limitations no longer apply?

A. Exactly.

Q. So now you are telling this jury a lot more than you were able to tell the Government back in March of 1997?

A. Exactly.

Q. And you testified under oath back then, you understand that?

A. Yes, I do.

Q. And in fact, back then you did make a reference to discussions between you and Anne Marie, you thought Anne Marie had said to you she told Michael?

A. I was distressed enough about that, frankly, after that hearing I went back to my notes and very carefully combed them and the reference on 5/8, where it says, "Told Michael. Feeling much better," it became

very clear to me what she told Michael about was her eating. Although, in vague we talked about whether to talk to Michael about Mr. Capano, I can't with certainty say that was accomplished.

Q. Would you look at your notes on May 15th?

A. Okay.

Q. And would you read them for us, please?

A. "How to be compassionate for the little girl who experienced such horrible life experiences."

Basically, I'm going to read a couple sentences here that basically talk about -- it's me talking to me about the themes then we talked about.

In that section we talked about how to be compassionate for the little girl who experienced such horrible life experiences. How to allow herself to have and to assert her needs.

Q. All right. And those are notes you are making to yourself, this is not what Anne Marie says to you?

A. Correct.

Q. And without going into a lot of detail, just the point being when you say the little girl you are talking about Anne Marie growing up?

A. Yes, when she was very little.

Q. And I take it this is part of the overall goal that you testified about, just making her more assertive, in part, due to her upbringing; is that right?

A. Yes. May I say something a little bit more?

Q. Please. Go ahead.

A. She experienced a tremendous amount of abuse, neglect and poverty. And in order to sometimes get out of the line of fire at home she literally would go under a desk and hide and hope nobody would find her. She knew her own terror and she just huddled under there waiting until the chaos blew over and hoping nobody would find her because she might get into the line of fire.

Sadly, with people like that, they blame themselves for the fight that happened, or they say things like if I had gotten home in time dad would not have gotten angry and beaten up one of my siblings. Or if I had gotten all A's this week maybe he wouldn't be drunk. And so at the same time she is trying to hide, she is also blaming herself.

One of the major themes in our work was her profound shame and self blame. And my desire in this

was to help her to begin to realize how really sad it must have been for a little girl to have to hide under a table to keep out of the line of fire in a family system. And my talking with her was to try to develop that compassion for the little girl that had to do that.

Q. The next entry is May 29th. And you reference, quote, "Intense fear, obsessive thinking."

Is the intense fear similar to what you were talking about on May 15th?

A. No. As Anne Marie and I began to talk more concretely about her past and, very specifically, about the kind of changes that she needed to make, she knew she was going to begin to encounter a lot of things that were going to be very scary to her.

If you spent most of your life trying to be compliant so as not to get into trouble, when somebody else is saying to you let's work on your assertion, obviously, you are going to start to get panicky that if you are assertive this other person is going to kick you out of their life or they are going to hate you or try to manipulate you into trying to go backwards.

In facing change, people sometimes start to experience a lot more anxiety, and that's what was

beginning to happen here.

Q. What about the obsessive thinking, what is that?

A. Basically it is things like repetitive thoughts. Some of you as you are driving to work and you carry the same tune going over and over and over, that is a repetitive thought. Having intrusive thinking where you're planning a grocery list and you can't stop doing it. It almost feels like it is out of your control and you can't get rid of that tune.

And when an anxious person, their anxiety increases, they are likely to revert to some of those experiences inside.

Q. Now, was Anne Marie making progress with you, in your opinion?

A. Yes.

Q. On May 29th, there is another reference in your notes here, it says, "intro idea of anti-dep."

I take it that is introduce idea of antidepressants?

A. Right.

Q. So I take it you talk with her about going on antidepressants?

A. Yes.

Q. If she's making progress why are you, in the middle of this overall treatment program, having her go on antidepressants?

A. Again, it relates back to what I was saying before. When you start to make a pretty big change and get really afraid that other people will not like you or will reject you, even though you know it is the right thing, you start to experience a lot of anxiety.

I will use a silly example, but one I think a lot of people can relate to. After a whole winter of having ivory white legs not a whole lot of people have the courage to put on a pair and shorts and parade them in March. And I know that is a trivial example. But if your therapist said it is going to be therapeutically good for you to put those shorts on and parade around in the mall, the person who is going to do that is going to say, oh my God, you want me to be ridiculed? Look at these legs, they are horrible. And that essentially, of course, is a more trivial example. But for her we were beginning to have her do things that were not only terrifying, but for her meant the possibility of the loss of people that she loved.

She had been very compliant. People who got to know her and really loved her were used to saying, oh, you know Anne Marie will go to the show. We will decide and she will just come along, because she was willing to be compliant. And as she got firmer and firmer about what she would do and not do, we both knew that some people wouldn't like it and that resulted in increased anxiety and a little bit more discretion because she was afraid she would be dumped or abandoned as she had felt in the past.

Q. You refer her to Dr. Kaye, I take it, for the medication; is that right?

A. Yes.

Q. And if you turn to the next date in the letter, which is June 5th. Why don't you -- you have got a reference there to EVPB, would you tell us what that is and read it?

A. Do you want me to include the reference about the insurance company?

Q. That would be fine. The jury will see these notes later on, so you can explain them, we will understand what they mean.

A. At the beginning of my entry for June 5th, I

wrote basic notes about Principle Insurance from whom we were receiving some reimbursement for these sessions. I said we had been granted six sessions, gave authorization dates and number of visits until what date.

I also recorded that she had agreed to take the blood test again on 5/31. I don't know if I had mentioned it, but she was a purging anorectic. When you use 15 laxatives in a day, it can really influence your electrolytes, and some very serious things can happen, including heart attack. So I wanted to have her followed medically to make sure that was not getting out of balance. And I already had her do that once and felt it was time to do that again.

I report here that she restricted as early as when she was in 7th grade. At this session reported she was willing to take antidepressants and see Dr. Kaye.

Q. You wrote, "Restricted as early as 7/3."
Restricted refers to what?

A. Restraining her eating.

Q. Then you have got, "Willing to take antidepressants. Will see Kaye."
That is Dr. Kaye?

A. Yes.

Q. Finally, you have another reference.

A. And she and I discussed what it would take for her to change the eating disorder. And she reported to me quite honestly that she was desperately afraid of losing control and gaining weight.

Q. Now, you saw her again the next week June 12th?

A. Yes.

Q. And you have two and a half or three lines of notes. And would you read those and we will talk about them?

A. Okay. Have we talked by any chance about the definition of anorexia? Because some of that may put that in context.

Q. Well, you testified on Friday that there were four main characteristics of anorexia. Do you want to expand on the four elements you talked about?

A. Just very, very briefly. Anorexics are most notably known because they are horribly, horribly thin. What is harder for people to understand is how much they hate themselves and how much they hate especially one part of their body. Typically they focus on one part. And in spite of their being obviously much less weight

than they think they are, they refuse to eat any more food normally. The reason I say that, is because some of the-- the references I'm going to make are going to sound weird to you, but if you understand it in the context of what she is trying to have happen it will make sense.

Q. With that background, if you would read the notes.

A. Okay 6/12 she came in reporting that she felt very weak. We talked about her intake of food and how to deal with her panic about gaining weight. I was also concerned about affirming her goodness so she could eat.

Q. So the affirming her goodness go to what you were just talking about, anorexics often times just hate themselves; is that right?

A. It is a form of self punishment.

Q. You put down here, "Feeling very weak."
Would it surprise you if you were to learn that Anne Marie turned to Tom Capano on this very day, June 12th because she felt faint?

A. No.

Q. Why would that not surprise you?

A. Well, during our conversations it was clear to

me that Anne Marie was spending time, I think, in her movement from a love relationship, she really hoped that she could maintain a friendship. And it was fairly clear from some of the things that she made reference to that he was offering help in a number of areas. And I can imagine that he would offer to come by and take her home.

Q. Well, you have testified that she had these deep feelings for Mike Scanlon?

A. Yes.

Q. She wants to break off the romantic relationship with Tom Capano, why doesn't she turn to Mike Scanlon on June 12th as opposed to Tom Capano?

A. I don't know, frankly.

Q. June 19th, there is more discussion about my medication?

A. Yes.

Q. Do you recall on June 19th asking Anne Marie to complete an exercise?

A. Yes. Actually several.

Q. There was one in particular. You asked her to write a letter, correct?

A. Yes.

Q. Would you tell us about that?

A. Okay. This is going to sound a little weird, because there is a series of techniques that sound strange, but they have their purpose to help people get more connected to themselves.

I knew that Anne Marie loathed her thighs. She absolutely thought they were horrible. So I encouraged her basically to write a letter to her legs as though they were something separate from her.

Q. Now, you realize the average person would raise their eye eyebrows?

A. I told you this would sound weird.

Q. So when she left on June 19th, though, she was charged with that task?

A. Yeah.

Q. You met with her again a week later, correct?

A. Uh-huh.

Q. That would have been June 26, 1996?

A. Yeah.

Q. And you have got some notes there. Could you read us the first three lines of the notes, please?

A. "I must admit that I feel somewhat silly writing a letter to my legs."

Page 42

Q. We will get to the letter in a second. Go to June 26th. So you leave her on June 19th with the task of writing a letter?

A. Yes.

Q. And you meet with her again a week later?

A. Right.

Q. And that, in fact, was June 26, 1996?

A. Correct.

Q. That was the last time you saw her, I take it?

A. Yes.

Q. Would you read the first three lines of your notes for June 26, 1996 for us, please?

A. "Learned to hide under furniture to get away. Sister unbelievably cruel and violent with her."

I want to make a comment about that if I may.

"Cannot say no or set limits with her."

Q. Let's start -- there are three ideas there. Let's start, hide under the furniture. I take it that is a reference to what you have already told us about during childhood?

A. Right.

Q. You have, "Sister unbelievably cruel and violent with her."

What did Anne Marie tell you during this session that caused you to write those notes?

A. She was reporting some early memories in which the sister, and in this case, the memory she told me about they were quarreling about something and the sister took the vacuum cleaner to Anne Marie's hair and sucked it in, and as a result the hair had to be clipped close to the head in order to get it disentangled. That's the story she told me.

Q. How old was she when this happened?

A. Very young is my impression, very little.

Q. Did she say anything to suggest at all that her sister was, at the present time in 1996, unbelievably cruel or violent with her?

A. No. No. No.

Q. You did mention that -- did she view her sister as controlling at all as an adult?

A. Well, I use a different word. The words she used was controlling, the word I used was trying to be helpful.

Q. Did she fear her sister as an adult, I mean physically fear her?

A. Not that I was aware of at all. She never

Page 44

reported that. She might be annoyed, but she didn't fear her.

Q. Now, we have gone through your notes. Do you recall any incidents that Anne Marie related to you about Tom Capano that aren't reflected in your notes?

A. I think we mentioned the one time where he asked her to go see the daughter who was ill.

Q. How about you mentioned a scene in her apartment, you made some reference to that, but can you explain in detail for us?

A. The event had happened probably before I had begun to see her. Where, in other words, I saw it as more historical, where apparently Mr. Capano got into the apartment and he became very angry and he threatened to take away gifts, the air conditioner, things he felt he did not want to be present while she might be dating somebody else. And she reported being very frightened, not only because he was making the kind of loud scene and she was unclear as to what kind of attention it would draw, but she was frankly fearful that he might tear up or destroy things. And more importantly she felt frozen. I spoke with her at that time and I said, did you think about calling for help or calling 911 or

running over to a neighbors? And she basically said she felt too frozen for that, she just felt that overwhelmed.

Q. Did she say anything about him grabbing her during that incident?

A. I remember her saying at one point he grabbed her arm and pushed her against the wall.

Q. Now, you have also mentioned social events. Do you recall an incident about a social event that is not reflected in your notes?

A. Yeah. There was another time we were talking about the number of phone calls that she was getting. And she said as an example, she was preparing to go to a social event with Mr. Scanlon. It was very clear that was Anne Marie's date. And Anne Marie, I believe, said to Mr. Capano I'm going with somebody else. She reported to me that Mr. Scanlon was having a very difficult time accepting that. I'm sorry. Scanlon was having a--

Q. I think you might have misspoke.

A. Sorry. That Mr. Capano was having a difficult time accepting no. So there were a enormous amount of phone calls on the day of the event. And Anne Marie was

Page 46

basically saying how do I deal with this? How do I deal with him at the time once we get to the social event? I fear he might make a scene or I fear that he might do something that I would be horribly embarrassed about.

Q. Did she report to you how this social event went, after it?

A. Indeed. She came back from that and felt some real pride that as Mr. Capano did approach her and guide her into a different room to talk to her that she expressed a great deal of pleasure in being able to say pretty clearly, I don't want to be here, I want to go back to the party. And I believe that she found her own way to escort herself back, so that exchange was brief and she used it as an example of feeling more and more capable of saying no.

Q. Now, this event, I take it, had to occur while you were treating her; is that right?

A. Yeah.

Q. Because you talked to her before and after?

A. That's right.

Q. Do you know the name of the event?

A. No.

Q. Do you know the date of the event?

Page 47

A. No.

Q. Let me switch gears for a second. You billed Anne Marie for your sessions; did you not?

A. Yes.

Q. And at the very beginning of your testimony I asked you, you really had two different types of employment during the treatment of Anne Marie Fahey, in a sense. You were an independent contractor, you testified at one point, and then you worked with a practice; could you review that again?

A. Okay. I have always been a private practitioner since I left the University of Delaware. As a private practitioner you can work for yourself or you can work within a context of other professionals or you can work for another professional. I worked as a private practitioner for myself and then later made a decision that I would be working with a group that had setups with the insurance and managed care and would take better care of the details than I wanted to.

Q. That group was Center for Cognitive and Behavior Therapy?

A. Yes.

MR. CONNOLLY: At this point may I approach?

Page 48

THE COURT: You may.

MR. CONNOLLY: I move for the admission of State's Exhibit 46 and 47. 46 will be a financial statement for Michele Sullivan's practice from February 28th to April 12, 1996. And 47 would be a financial statement for the Center of Cognitive and Behavior Therapy.

MR. MAURER: Without objection.

THE COURT: Thank you, Mr. Maurer. They are admitted as State's Exhibits 46 and 47 as indicated.

BY MR. CONNOLLY:

Q. I'm going to show you State's Exhibits 46 and 47; do you recognize those?

A. Yes.

Q. And even though I have said it, could you tell us what State's Exhibit 46 is?

A. These are records that Center for Cognitive and Behavior Therapy kept. What would happen --

Q. I'm sorry to interrupt you, but let's start with 46.

A. Okay. Oh good. Thank you.

Q. Thank you.

A. These basically are my handwritten notes. I

Page 85

A. My experience with her is that if it is under kind of lives of omission rather than co-mission, in other words things would be left out.

Q. Were you educated by the Jesuits?

A. I was.

Q. I didn't want to bring up lives of omission because I thought you would laugh at me.

But many people effectively and not harmfully lie by just not telling you the whole story, correct?

A. I guess you could put it that way.

Q. And many people sometimes color a story. If they know you want to hear a certain thing they may exaggerate a little bit, not actually lying but exaggerating?

A. I guess the thing I would like to respond to that, because I think it would be very careful to misconstrue what you are saying, Anne Marie was terrified of being rejected. Terrified of being abandoned.

Q. Abandoned?

A. Abandoned. And I think on an interpersonal situation she would accommodate to the other person so that they might not reject her.

Page 86

Q. So the other person many times would be getting false messages from Anne Marie?

A. I have never seen that in my work with her. I saw that she simply didn't talk about some things. It is not like she actively lied. It is not like she had to say I'm going to evilly do this and that to you.

Q. In Anne Marie's condition being like it was, having commenced back in 7th grade with the eating problems, she certainly had long-term deep-seated psychological problems arising from a horrible childhood, correct?

A. I would not use such extreme language as you are using.

Q. Modify it if you can. Go ahead.

A. She began an eating disorder that operated intermittently in her life as various kinds of stresses emerged. I saw her as a incredibly strong survivor that came through extremely difficult circumstances.

Q. No question about that. But the fact of the matter is, the problems she was suffering from had existed for a long period of time?

A. Intermittently.

Q. And if you met Anne Marie you would not know

Page 87

that she had these particular problems?

A. On the street? Normal person?

Q. Right.

A. Probably not.

Q. If I met her in a bar and was talking to her, I would not in any way know that she had problems and could get in trouble by misinterpreting, correct?

A. I guess so.

Q. And if a man meets a woman like Anne Marie and he starts to date her, and the man has money, and he wants to buy her things as a gesture of affection, love, care, he could buy them with no ulterior motive?

A. Generally would mean he was interested in her but, okay.

Q. That is correct?

A. Okay.

Q. And she could accept them because she likes nice things; is that correct?

A. I don't like your line of reasoning, but okay.

Q. I didn't ask you to like it, I asked you to answer the question. I didn't like what you said, but that's okay.

Here we go. The reason is you accepted the

Page 88

fact she could accept them and be happy with them?

A. Are you asking me theoretically or are you asking me about what I know of Anne Marie?

Q. Theoretically, then we will go into Anne Marie.

A. Theoretically it is possible, a woman that takes and gives from a man and not have any connection with him.

Q. And in this particular case, Anne Marie accepted numerous gifts from Tom Capano; did she not?

A. That's my understanding.

Q. And many of those gifts enhanced her lifestyle by making it more pleasant; isn't that correct?

A. It's my understanding.

Q. Those gifts were given by Tom with no quid pro quo in return, correct?

A. I have no way of knowing that.

Q. Anne Marie never said, Tom Capano bought me a new air conditioner and in return I had to go to the dance with him?

A. She did say because of gifts given she felt manipulated and coerced into things.

Q. Isn't that interpersonal relationships. We try to get the other party doing what we want by various and

Dr. M. Sullivan 11/2/98 A-40

## Page 17

1 said nothing more than what is in my letter to you. I
2 would have -- I know I reviewed all the Al Frankey
3 police report materials before I wrote that letter to
4 you and sent it over.
5     MR. MAURER: Because it was not in anything
6 that we have, so I'm asking for it now. And if they say
7 there is nothing I will have to accept it at this point.
8     MR. CONNOLLY: There are no Jencks materials
9 and you have all the material.
10     MR. MAURER: I'm not asking for Jencks
11 materials. I'm asking anything anywhere in writing
12 relating to statement that Anne Marie made to Frankey.
13     MR. WHARTON: What is your basis of
14 entitlement?
15     MR. MAURER: Brady.
16     MR. CONNOLLY: You have got the Brady.
17     THE COURT: All right. You represent there is
18 no Brady and there is no Jencks.
19     MR. CONNOLLY: The Brady Material is that Al
20 Frankey said that.
21     THE COURT: Excuse me. I was inarticulate.
22 There is no undisclosed Brady or Jencks?
23     MR. CONNOLLY: We have a small -- That's right.

## Page 18

1 We have a small issue. The defense has cited
2 to us Milton E. Birdglass as being an expert witness
3 they intend to call. And there was reference, to me, to
4 the substance about which he would testify in Mr.
5 Oteri's opening, and we have received no reports from
6 Mr. Birdglass. And we have a resume that seems somewhat
7 dated. And I just spoke with Mr. Oberly on Friday and
8 was assured at this point that's all they have,
9 although, I believe you anticipate a written report.
10 And what happened that is disturbing about that is again
11 we are in the middle of trial, this guy has been on your
12 list for some time and we do not have a report. We
13 can't go out and retain an expert to counter him until
14 we see a report. So we would like to make a formal
15 request on the record for that.
16     MR. OTERI: At this point I don't know that he
17 could do a report, we are talking to him about that. He
18 has some problems. We have provided him with all the
19 material we have about Gerry and what he says and
20 doesn't say. I want to check with him for sure and I
21 will let you know Wednesday morning or tomorrow if I
22 catch him, if he can do a report. And if he can't I
23 will let you know why. I will also get you, if he has

## Page 19

1 one, an updated CV, I will get it to you as quickly as
2 possible.
3     THE COURT: Nothing on Tuesday or Thursday.
4 So...
5     MR. CONNOLLY: we would also -- within that
6 report -- we want to also, as we are entitled to under
7 the rules of the substance of his testimony, and we will
8 get that?
9     MR. OTERI: If I get it you will get it. Just
10 like if you had Johnson's notes you would have given --
11     MR. CONNOLLY: We didn't call Johnson as an
12 expert. And he shouldn't be allowed to testify if we
13 don't get that.
14     THE COURT: Any other light entertainment,
15 gentlemen? If not, why don't we head in that direction.
16     MR. CONNOLLY: Your Honor, you may recall from
17 the proof positive hearing there was some testimony that
18 Tom Capano had told Anne Marie and some other people
19 that his daughters, or one of his daughters had had
20 brain surgery sometime in the spring of '96. And we
21 learned through the Court's investigation that that was
22 not true. So in order to avoid the uncomfortable
23 situation, I think, for all, of calling the daughters to

## Page 20

1 the stand to bring out this fact we had reached an
2 agreement that the daughters were going to submit
3 affidavits to that effect.
4     Now, Mr. Oberly told me on Friday that we would
5 have them today, and this is not a suggestion that I
6 don't trust Mr. Oberly, but I do not trust the defendant
7 or his family. And what I don't want is to get
8 sandbagged. So I want on the record to place before me
9 my understanding we will have affidavits from all four
10 daughters in which they will aver that they did not have
11 brain surgery in 1996.
12     MR. OBERLY: Your Honor, I thought this was
13 something we could handle off the record. I spoke with
14 Kay Capano the middle of last week. Because during the
15 proof positive hearing there was an issue about that and
16 rather than call the daughters we had affidavits.
17 Somewhere along the lines the affidavits were signed,
18 originally, and I think maybe given back to the family
19 because they weren't used, they were kept by us. So I
20 redid them and had them sent out and Kay Capano, not Tom
21 Capano, is who I'm dealing with them stated she would
22 have them signed. I called her this morning, she said
23 she was sorry, the weekend was hectic and she didn't

have them, but said she could have them for me tomorrow morning and I said that is fine.

When I spoke to Mr. Connolly, I said I will try my best to have them Monday. One daughter is at NYU and might take a couple of days, and we might have them by Thursday, and I will have it by Friday, so we will get the affidavits. And if -- we have an issue on relevancy, whether they are relevant. But we will have the affidavits and we can argue about that at the appropriate time.

MR. CONNOLLY: I wanted that on the record.

November 2, 1998
10:00 a.m.
Courtroom No. 302

PRESENT:
As noted.

- - - - -

THE COURT: Could we have Dr. Sullivan?
You are reminded that the oath you took last week remains in effect.
Please resume the stand.
(Sullivan resumes.)
THE COURT: Are we ready?
We really shouldn't start without the jury.
Please bring the jury in.
(The jury entered the courtroom at 10:10 a.m.)
THE COURT: Good morning. Has any member of the jury come into contact with any information concerning this case since we recessed on Thursday?
There are no affirmative answers.
Now we will try, Mr. Connolly.
BY MR. CONNOLLY:
Q. Good morning.
Good morning, Dr. Sullivan.

A. Good morning.
Q. Dr. Sullivan, last Friday, we talked about some of the notes you made on April 3rd of 1996. And specifically, do you recall a reference in your notes to having a hard time forgiving herself and believing Capano's haunting was her punishment?
A. Yes.
Q. I'm sorry?
A. Yes. Uh-huh.
Q. Now, you outlined a number of types of the haunting behavior that Anne Marie told you about, correct?
A. Yes, I did.
Q. And there were e-mails and telephone calls and other type of behavior?
A. Showing up at times he wasn't expected.
I'm not used to using the mic.
Is that any better?
Q. Yes. And I think since Mr. Oteri couldn't hear you, could you repeat what you said?
A. Surely. You were asking about the kinds of things that Anne Marie described as haunting behaviors by Mr. Capano.

She regarded the large number of phone calls that she was getting, the large number of e-mails, the appearing at times where she wasn't ready to greet him in a public place, the fear that if she went to someplace socially that he might meet her there and persuade her to spend time with him.

Other things had included, in the past, coming to her apartment uninvited, and making his way into the house and making her very frightened about what was going to happen.

Q. Did she tell you how she responded to these forms as what she described as haunting behavior?
A. Well, that was a great deal of what we were working on, frankly.

Initially, she felt too frightened to be assertive, and that was generally true in her life. She had a hard time really speaking up, and speaking on her own behalf. And so, we began to think about some lower level kinds of assertions she could work on and secondary and so on, so we would be building in a stair-step fashion, and she could get more and more confidence.

Specifically, for instance, we worked with

Page 41

Q. Would you tell us about that?

A. Okay. This is going to sound a little weird, because there is a series of techniques that sound strange, but they have their purpose to help people get more connected to themselves.

I knew that Anne Marie loathed her thighs. She absolutely thought they were horrible. So I encouraged her basically to write a letter to her legs as though they were something separate from her.

Q. Now, you realize the average person would raise their eye eyebrows?

A. I told you this would sound weird.

Q. So when she left on June 19th, though, she was charged with that task?

A. Yeah.

Q. You met with her again a week later, correct?

A. Uh-huh.

Q. That would have been June 26, 1996?

A. Yeah.

Q. And you have got some notes there. Could you read us the first three lines of the notes, please?

A. "I must admit that I feel somewhat silly writing a letter to my legs."

Page 42

Q. We will get to the letter in a second. Go to June 26th. So you leave her on June 19th with the task of writing a letter?

A. Yes.

Q. And you meet with her again a week later?

A. Right.

Q. And that, in fact, was June 26, 1996?

A. Correct.

Q. That was the last time you saw her, I take it?

A. Yes.

Q. Would you read the first three lines of your notes for June 26, 1996 for us, please?

A. "Learned to hide under furniture to get away. Sister unbelievably cruel and violent with her."

I want to make a comment about that if I may.

"Cannot say no or set limits with her."

Q. Let's start -- there are three ideas there. Let's start, hide under the furniture. I take it that is a reference to what you have already told us about during childhood?

A. Right.

Q. You have, "Sister unbelievably cruel and violent with her."

Page 43

What did Anne Marie tell you during this session that caused you to write those notes?

A. She was reporting some early memories in which the sister, and in this case, the memory she told me about they were quarreling about something and the sister took the vacuum cleaner to Anne Marie's hair and sucked it in, and as a result the hair had to be clipped close to the head in order to get it disentangled. That's the story she told me.

Q. How old was she when this happened?

A. Very young is my impression, very little.

Q. Did she say anything to suggest at all that her sister was, at the present time in 1996, unbelievably cruel or violent with her?

A. No. No. No.

Q. You did mention that -- did she view her sister as controlling at all as an adult?

A. Well, I use a different word. The words she used was controlling, the word I used was trying to be helpful.

Q. Did she fear her sister as an adult, I mean physically fear her?

A. Not that I was aware of at all. She never

Page 44

reported that. She might be annoyed, but she didn't fear her.

Q. Now, we have gone through your notes. Do you recall any incidents that Anne Marie related to you about Tom Capano that aren't reflected in your notes?

A. I think we mentioned the one time where he asked her to go see the daughter who was ill.

Q. How about you mentioned a scene in her apartment, you made some reference to that, but can you explain in detail for us?

A. The event had happened probably before I had begun to see her. Where, in other words, I saw it as more historical, where apparently Mr. Capano got into the apartment and he became very angry and he threatened to take away gifts, the air conditioner, things he felt he did not want to be present while she might be dating somebody else. And she reported being very frightened, not only because he was making the kind of loud scene and she was unclear as to what kind of attention it would draw, but she was frankly fearful that he might tear up or destroy things. And more importantly she felt frozen. I spoke with her at that time and I said, did you think about calling for help or calling 911 or

running over to a neighbors? And she basically said she felt too frozen for that, she just felt that overwhelmed.

Q. Did she say anything about him grabbing her during that incident?

A. I remember her saying at one point he grabbed her arm and pushed her against the wall.

Q. Now, you have also mentioned social events. Do you recall an incident about a social event that is not reflected in your notes?

A. Yeah. There was another time we were talking about the number of phone calls that she was getting. And she said as an example, she was preparing to go to a social event with Mr. Scanlon. It was very clear that was Anne Marie's date. And Anne Marie, I believe, said to Mr. Capano I'm going with somebody else. She reported to me that Mr. Scanlon was having a very difficult time accepting that. I'm sorry. Scanlon was having a--

Q. I think you might have misspoke.

A. Sorry. That Mr. Capano was having a difficult time accepting no. So there were a enormous amount of phone calls on the day of the event. And Anne Marie was

basically saying how do I deal with this? How do I deal with him at the time once we get to the social event? I fear he might make a scene or I fear that he might do something that I would be horribly embarrassed about.

Q. Did she report to you how this social event went, after it?

A. Indeed. She came back from that and felt some real pride that as Mr. Capano did approach her and guide her into a different room to talk to her that she expressed a great deal of pleasure in being able to say pretty clearly, I don't want to be here, I want to go back to the party. And I believe that she found her own way to escort herself back, so that exchange was brief and she used it as an example of feeling more and more capable of saying no.

Q. Now, this event, I take it, had to occur while you were treating her; is that right?

A. Yeah.

Q. Because you talked to her before and after?

A. That's right.

Q. Do you know the name of the event?

A. No.

Q. Do you know the date of the event?

A. No.

Q. Let me switch gears for a second. You billed Anne Marie for your sessions; did you not?

A. Yes.

Q. And at the very beginning of your testimony I asked you, you really had two different types of employment during the treatment of Anne Marie Fahey, in a sense. You were an independent contractor, you testified at one point, and then you worked with a practice; could you review that again?

A. Okay. I have always been a private practitioner since I left the University of Delaware. As a private practitioner you can work for yourself or you can work within a context of other professionals or you can work for another professional. I worked as a private practitioner for myself and then later made a decision that I would be working with a group that had setups with the insurance and managed care and would take better care of the details than I wanted to.

Q. That group was Center for Cognitive and Behavior Therapy?

A. Yes.

MR. CONNOLLY: At this point may I approach?

THE COURT: You may.

MR. CONNOLLY: I move for the admission of State's Exhibit 46 and 47. 46 will be a financial statement for Michele Sullivan's practice from February 28th to April 12, 1996. And 47 would be a financial statement for the Center of Cognitive and Behavior Therapy.

MR. MAURER: Without objection.

THE COURT: Thank you, Mr. Maurer. They are admitted as State's Exhibits 46 and 47 as indicated.

BY MR. CONNOLLY:

Q. I'm going to show you State's Exhibits 46 and 47; do you recognize those?

A. Yes.

Q. And even though I have said it, could you tell us what State's Exhibit 46 is?

A. These are records that Center for Cognitive and Behavior Therapy kept. What would happen --

Q. I'm sorry to interrupt you, but let's start with 46.

A. Okay. Oh good. Thank you.

Q. Thank you.

A. These basically are my handwritten notes. I

preceded that letter; is that correct?

A. Yes.

Q. And your letter to Dr. Kaye was sent on June 5th, correct?

A. Sixth is what I have.

Q. I'm having trouble finding the letters. Excuse me for a moment. How does that happen? You have everything laid out and suddenly it disappears. Oh well.

Doctor, we are going to get back to these letters in a moment. But before we do --

MR. O'DONNELL: Joe.

MR. OTERI: Do you have them? Thank you.

BY MR. OTERI:

Q. You, on June 6th, Doctor, sent a letter to Dr. Neil Kaye; is that correct?

A. Yes.

Q. And in that letter, you say: "I look forward to working with you on behalf of Anne Marie Fahey. You saw her before when she worked with Bob Conner, and I believe she tried two different antidepressants and discontinued the second. In my 10 weeks working with her, so far, I have concluded that she would benefit

Page 82

continuing with antidepressants and seems more willing to do so."

Correct?

A. Correct.

Q. "In addition to depressive symptoms she has revealed to be a number of obsessive compulsive behaviors including counting, repetitive thoughts, intrusive ideas, considerable fear and dread which she can barely control.

"She is also anorexic, her most recent episode being nearly a year and a half in length. She manages to eat a few hundred calories a day and uses approximately 15 laxatives each night. I don't know how she keeps going.

"In spite of these things, she has a lot of wonderful resources in herself and is a pleasure for me to work with."

A. Yes.

Q. You identified very closely with Anne Marie Fahey, did you not?

A. I don't know what you mean by the word identify.

Q. Doctors and patients in your business get to be

very close, don't they?

A. Part of our work involves building enough of a rapport that the person learns to trust us.

Q. And you had a very close relationship with her, did you not?

A. I would say I worked very well with her.

Q. "The woman's history," continuing your letter, "is horrible. Alcoholic father who drank the family into poverty. The older children were farmed out after the house went for sheriff's sale when she was in her teens.

"I could mention many experiences which she was beaten or shamed. But for this purpose it is important to know she survived by putting on a happy face and being quite good at reading situations and accommodating to what is necessary for survival.

"She has a very funny sense of humor which can deflect from knowing the underlying pain. I mentioned this because she charms me and I keep a watchful eye on how she keeps me knowing from what is going on. So it won't surprise me if you know nothing of either the eating disorder or either the obsessive compulsive behavior. She will feel very awkward if you are very

Page 84

direct in the interview.

"I will appreciate your observations in the interview. Michele."

In that letter you say that Anne Marie survived by putting on a happy face and being quite good at reading situations and accommodating to what was necessary for survival?

A. Uh-huh.

Q. "She has a very funny sense of humor, which can deflect from knowing the underlying pain?"

A. Yes.

Q. In other words, Anne Marie was very good at pretending conditions were what they actually weren't in her heart or soul or mind or whatever phrase you use?

A. I would probably use a very different word than you would. She felt it necessary not to always reveal everything that she was.

Q. Right. And in order not to reveal everything that she was, she would sometimes have to color fact situations or maybe distort the facts a little. She wouldn't come out and tell you, I'm in egregious pain, I can't go to your meeting, she would come up with a reason not to?

A. My experience with her is that if it is under kind of lives of omission rather than co-mission, in other words things would be left out.

Q. Were you educated by the Jesuits?

A. I was.

Q. I didn't want to bring up lives of omission because I thought you would laugh at me.

But many people effectively and not harmfully lie by just not telling you the whole story, correct?

A. I guess you could put it that way.

Q. And many people sometimes color a story. If they know you want to hear a certain thing they may exaggerate a little bit, not actually lying but exaggerating?

A. I guess the thing I would like to respond to that, because I think it would be very careful to misconstrue what you are saying, Anne Marie was terrified of being rejected. Terrified of being abandoned.

Q. Abandoned?

A. Abandoned. And I think on an interpersonal situation she would accommodate to the other person so that they might not reject her.

Page 86

Q. So the other person many times would be getting false messages from Anne Marie?

A. I have never seen that in my work with her. I saw that she simply didn't talk about some things. It is not like she actively lied. It is not like she had to say I'm going to evilly do this and that to you.

Q. In Anne Marie's condition being like it was, having commenced back in 7th grade with the eating problems, she certainly had long-term deep-seated psychological problems arising from a horrible childhood, correct?

A. I would not use such extreme language as you are using.

Q. Modify it if you can. Go ahead.

A. She began an eating disorder that operated intermittently in her life as various kinds of stresses emerged. I saw her as a incredibly strong survivor that came through extremely difficult circumstances.

Q. No question about that. But the fact of the matter is, the problems she was suffering from had existed for a long period of time?

A. Intermittently.

Q. And if you met Anne Marie you would not know

that she had these particular problems?

A. On the street? Normal person?

Q. Right.

A. Probably not.

Q. If I met her in a bar and was talking to her, I would not in any way know that she had problems and could get in trouble by misinterpreting, correct?

A. I guess so.

Q. And if a man meets a woman like Anne Marie and he starts to date her, and the man has money, and he wants to buy her things as a gesture of affection, love, care, he could buy them with no ulterior motive?

A. Generally would mean he was interested in her but, okay.

Q. That is correct?

A. Okay.

Q. And she could accept them because she likes nice things; is that correct?

A. I don't like your line of reasoning, but okay.

Q. I didn't ask you to like it, I asked you to answer the question. I didn't like what you said, but that's okay.

Here we go. The reason is you accepted the

Page 88

fact she could accept them and be happy with them?

A. Are you asking me theoretically or are you asking me about what I know of Anne Marie?

Q. Theoretically, then we will go into Anne Marie.

A. Theoretically it is possible, a woman that takes and gives from a man and not have any connection with him.

Q. And in this particular case, Anne Marie accepted numerous gifts from Tom Capano; did she not?

A. That's my understanding.

Q. And many of those gifts enhanced her lifestyle by making it more pleasant; isn't that correct?

A. It's my understanding.

Q. Those gifts were given by Tom with no quid pro quo in return, correct?

A. I have no way of knowing that.

Q. Anne Marie never said, Tom Capano bought me a new air conditioner and in return I had to go to the dance with him?

A. She did say because of gifts given she felt manipulated and coerced into things.

Q. Isn't that interpersonal relationships. We try to get the other party doing what we want by various and

Q. And she took money from him after this day, correct?

You don't know? Okay.

You know that Anne Marie Fahey at some point took $500 from Tom Capano to pay towards your bill; do you not?

A. I read that here, in the e-mails.

Q. You did read it in the e-mails?

A. Uh-huh.

Q. You know that Tom Capano was telling Anne Marie to take the money and pay Dr. Sullivan with the money?

A. That's what I learned.

Q. And she said she, "gave the dinero to Dr. Sullivan," to you?

A. In the e-mails that's what she said.

Q. Did she say anything different to you?

A. What she reported to me that she was getting financial help from her family.

Q. Did she tell you that Tom gave her money to pay you?

A. No.

Q. So you first found out about that in the e-mails?

---

A. Right.

Q. Anne Marie's response is timed at 3:07?

A. Yes.

Q. Do you have it?

A. Uh-huh.

Q. "Hey, I lef' outta' heer' man. Well my night was pretty rough to say the least. I have been on the phone today with James and Robert more than once. Well the cat is outta' da' bag on this one. I feel a sense of relief and one of sadness. Does that make any sense? I don't think I have made much sense of anything today. Tommy, thanks for your kind note/offer last night. You know what I thought when I first opened up the letter and saw the Monopoly money fall onto the floor, I cannot accept such a gracious gift. But we will talk about that in person. Are you sure that money is real?"

Then she talks on about her evening seeing Kimmie and John; do you remember that?

A. Yes.

Q. That was again a kind of happy congenial e-mail between two people who were obviously friends in helping each other, no fear there?

A. Not as reflected here.

---

A. Correct.

MR. OTERI: Your Honor, do you want to take that break?

THE COURT: We can go a little longer.

MR. OTERI: I can go as long as we want.

THE COURT: Try another 10 minutes, that will be fine.

BY MR. OTERI:

Q. Okay. Now Doctor, if you go to the e-mails for May 3, 1996, have you got it?

A. Uh-huh.

Q. The one dated 3:07 p.m. from Anne Marie Fahey to Tom Capano?

A. 5/3, 2:42 from Tom Capano?

Q. All right. We will go with that one first, from Tom Capano.

"Hey. It's 2:30 and I ain't heard from ya so I was wondering what was up. Please give me a call or e-mail me when you get a chance. Is there a good time for me to call you? Hope you're having a good day, but my guess is that you're not. Think mussels in a white sauce."

That's from Tom to Anne Marie, lighthearted?

---

Q. We can skip over to 5/20, the date of 5/20, an e-mail timed at 11:47 a.m. from Anne Marie Fahey to Tom Capano.

A. What time?

Q. 11:47 a.m. on 5/20. Maybe I got one they didn't.

In this one she tells Tom that: "I am confused about Victor's. We never talked about it. I am leaving on Thursday after work to go to the Cape Cod for Memorial Day. First question, Russia, Spain, Thailand, U.S. two, Sara Lee was real and I believe she is still alive. Mrs. Paul not real. As for Levi Strauss, I'm going to say he was some legend cowboy."

That is an obvious reference to trivia. This is May 28th?

A. Right.

Q. You have no notes that there is mention of Tom Capano in your notes at this time?

A. I could look back.

Q. You said no, in case that refreshes your recollection, but if you want to look back, go ahead.

A. There is no specific reference to his name at this point in time.

**Page 21**

1  probably committed the offense with which he is charged.

2      There is some more when your Honor is done.

3      THE COURT: Sorry. My shorthand is not very

4  good. All right.

5      MR. WHARTON: You may use the evidence only --

6      THE COURT: All right.

7      MR. WHARTON: -- to help you in deciding Anne

8  Marie Fahey's state of mind --

9      THE COURT: All right.

10      MR. WHARTON: -- as it relates to the defendant

11  and the events of 6-27-96.

12      THE COURT: All right.

13      MR. WHARTON: Okay.

14      MR. MAURER: It should be noted, your Honor,

15  that we did discuss that, Mr. Wharton and myself, and

16  also Mr. O'Donnell, and we have agreed to it. And also

17  we do understand that the Court will give the

18  instruction regarding the hearsay that you have

19  mentioned as well.

20      THE COURT: Did you agree on that, by any

21  chance?

22      MR. MAURER: Maybe in return for our agreement

23  on that we can get an agreement on that.

**Page 22**

1      MR. WHARTON: I understood your Honor was going

2  to give something like that, however, our presumption

3  only runs so far.

4      MR. MAURER: I think we should agree that it

5  should be given or do we?

6      MR. WHARTON: Yes.

7      MR. MAURER: We won't dictate that one.

8      THE COURT: Please bring the jury in.

9      (The jury entered the courtroom at 10:20 a.m.)

10      THE COURT: Good morning. Has any members of

11  the jury come into contact with any information from any

12  source whatsoever concerning this case since we recessed

13  on Monday?

14      There are no affirmative answers.

15      Mr. Wharton?

16      MR. WHARTON: Thank you, your Honor. State

17  would call Jill Morrison.

18      THE COURT: Members of the jury, you will

19  recall when we were anticipating Ms. Morrison's

20  testimony on Monday there were objections raised by the

21  defense, and we went into session where I reviewed

22  previous testimony given by Ms. Morrison and previous

23  statements. You should note that the evidence objected

**Page 23**

1  to is what we know was hearsay evidence. That means Ms.

2  Morrison is going to testify what Ms. Fahey said to her.

3  That is admissible under only certain circumstances and

4  under special exceptions created by the law. That is

5  done because a person is not available to be

6  cross-examined in this particular case. You should

7  understand that those hearsay exceptions deal with a

8  number of factors, but for the most part the exceptions

9  are relied on in the case of Ms. Morrison's testimony.

10  It was the defendant's state of mind and those

11  exceptions are admitted because the circumstances give

12  credence to them, and may give them a degree of

13  reliability that allows them to be excepted from the

14  normal rule.

15      You will hear evidence from this witness

16  tending to show that the defendant was involved in

17  certain acts related to Miss Fahey that could be

18  characterized as being of a harassing nature. That

19  evidence is offered or may be considered by you solely

20  for the purpose of determining the state of mind of Miss

21  Fahey at or about the time when the alleged acts

22  occurred. You may not consider the evidence as proof

23  that the defendant is a bad person, and therefore,

**Page 24**

1  probably committed the offense with which he is charged.

2  You may consider the evidence only in determining Anne

3  Marie Fahey's state of mind as it relates to the

4  defendant and the events of June 26, 1996.

5      MR. MAURER: Before you start, we don't need to

6  totally approach the bench, can we come forward just a

7  bit?

8      When you were talking about the hearsay and the

9  reasons for the admissibility I think you inadvertently

10  mentioned that it was offered to show the defendant's

11  state of mind and not Miss Fahey's state of mind.

12      THE COURT: I really apologize. The latter

13  part of that instruction was written down and,

14  therefore, reliable. When I start to ad lib, it is

15  possible for me to make a mistake in this case, a rather

16  dramatic one.

17      It is not introduced to introduce the state of

18  mind of Mr. Capano in this case but solely the state of

19  mind of the declarant, who in this case, is Anne Marie

20  Fahey. So we are dealing with her state of mind rather

21  than the defendant's.

22      Thank you, very much.

23

JILL MORRISON,

the witness herein, having

first been duly sworn on oath,

was examined and testified as

follows:

DIRECT EXAMINATION

BY MR. WHARTON:

Q. Good morning, Ms. Morrison.

A. Good morning.

Q. There is a microphone up there, you may need to speak into that. All the people back here need to hear and sometimes it is difficult in this courtroom.

A. Okay.

Q. How old are you?

A. Thirty-three.

Q. Are you employed?

A. Yes.

Q. And what type of work do you do?

A. I work in corporate financial services at Wilmington Trust.

Q. Prior to that -- how long have you done that job?

A. Since last June, a little over a year.

---

Q. Prior to that what did you do?

A. I worked for Governor Carper.

Q. How long did you work for Governor Carper?

A. About four and a half years.

Q. So you started working for him about when?

A. I started working for him right about when he was inaugurated in January of '93.

Q. What were your responsibilities with the Governor?

A. I worked in constituent services.

Q. And as somebody that worked in constituent services what type of things did you do?

A. I would help resolve problems. Constituents would call in with problems they might have with some of the agencies within State Government and I would help them resolve them.

Q. Direct them to the right people on their behalf?

A. Funnel them to the right people, yeah. Yes.

Q. Did you know Anne Marie Fahey?

A. Yes.

Q. How was it that you got to know her?

A. I met her on my first day in the Governor's

---

office and we just kind of clicked.

Q. She was employed there also?

A. Yes, she was the Governor's scheduler.

Q. And when you say kind of clicked can you describe what you mean?

A. We were both the same age, the same, liked to have fun together and we just really hit it off, had a lot of the same opinions.

Q. Did you live near each other?

A. Shortly after I started at the Governor's office I moved within a block of Anne Marie.

Q. Were you social friends as well as work friends?

A. Yes.

Q. And would you spend time with each other on weekends or after work kind of activities?

A. Sure. We would go to the mall, go shopping take walks, go to the Y. Our friendship which started at work ended up becoming a friendship outside of work.

Q. During work would you have lunch with her?

A. Yes. We had lunch almost everyday.

Q. Did you become aware at some point of a person named Thomas Capano?

---

A. Yes.

Q. Who is the defendant in this case?

A. Yes.

Q. How is it that you became aware there was such a person?

A. Anne Marie and I had gone to a fund raiser in the spring of '93, the Women's Democratic Club was sponsoring it, and as part of our working in the Governor's office we would get tickets to events like this. So we had gone there and Anne Marie recognized -- I'm sorry.

Q. Before you get too far down this road, we will come back to that. This fund raiser, you said it was in the spring of '93?

A. Yes.

Q. Where was it?

A. It was at Jim and Mary Alice Thomas' house which is on Red Oak Road in Wilmington.

Q. Near Rockford Park?

A. Yes.

Q. And it was sponsored by whom?

A. The Women's Democratic Club.

Q. And you said that you and Anne Marie got

---

1 not ask her if there was a relationship at that point?
2    A. Not at that point, no.
3    Q. You knew that I guess -- let me move on.
4       I want to turn your attention -- this is -- the
5 Tour DuPont came up again in 1995, correct?
6    A. Correct.
7    Q. And did you also go to the Tour DuPont that
8 year?
9    A. Yes. We had made plans because we had so much
10 fun the year before.
11    Q. The time you didn't kiss the older man?
12    A. Right. That's correct.
13    Q. You weren't looking for him this time around,
14 were you?
15    A. No, I was not.
16       So we had made plans to go. We were going to
17 meet at Anne Marie's apartment and another friend, a
18 friend of Anne Marie's from the Y, was coming with us
19 and I don't know who that was. So I had gotten there
20 before this other friend and we were talking and I was
21 like, oh, I'm really excited, we will have fun and she
22 said I can't go. And I said what do you mean you can't
23 go? And she said I have a job interview. I said what

1 five hours later when she showed up. And she didn't
2 look good, she had on just jeans and looked like she had
3 been crying. And I asked her how did it go? And she
4 didn't answer. She said she had been very upset because
5 of Bob Connor, her psychologist's death, it had come
6 back and she was having a bad time with it.
7    Q. Where was that meeting?
8    A. That was at the Holiday Inn. We met up there
9 to go the party.
10    Q. Did you meet with her again at the Holiday Inn?
11    A. Yes. Next night we had met over there to have
12 a drink and we were just talking and she was telling me
13 about this job interview and she said that she felt like
14 she didn't want it, but she felt like it was something,
15 a means for Mr. Capano to control her. He could control
16 where she lived, control where she worked. And in the
17 course of this conversation the word control just kept
18 coming up over and over and over again about why does he
19 want to control me?
20    Q. Well, were you beginning to get any more
21 suspicious about whether or not there was more to this
22 relationship between the two of them than she had been
23 letting on?

Page 46

Page 48

1 do you mean you have a job interview? How did this
2 happen? I didn't know you were looking. And she
3 explained -- she told me that it was for a personal
4 assistant for someone in north Wilmington where she
5 would make the same salary and there also would be an
6 apartment provided to her which would have been a good
7 thing financially.
8    Q. So she would have the same salary but also
9 have --
10    A. -- a free apartment.
11    Q. Free place to live?
12    A. Yeah. So we talked about that, and I kept
13 asking her who it was for and she wouldn't say anything.
14 And finally I pulled it out of her that it was for Louie
15 Capano and had been set up by his brother, and she
16 indicated that she didn't -- it sounded like a good
17 thing, wanted to check it out, didn't know if it was
18 something she wanted to do. She felt obligated to check
19 it out because it had been set up by Mr. Capano.
20    Q. Did you talk to her after the interview?
21    A. Yeah. She was supposed to meet us, the other
22 friend and I in a couple hours. She said I will meet
23 with you in a couple hours, and it was about four or

1    A. A lot more. We were supposed to meet -- we
2 were going home to change and we were going to meet back
3 up at the hotel. And I was supposed to pick her up and
4 we were both going home, we were both going to change.
5 So I called her to let her know I was on my way and she
6 didn't answer the phone. And so I kept calling and it
7 got to the point where I was angry but -- I was like we
8 have plans -- but I was concerned and kept calling like
9 every 15 minutes. And I think that was when, I don't
10 know, I just -- I had visions of her and Mr. Capano
11 together and I just -- she never returned any of my
12 messages that night and I never heard from her the next
13 day. And by this point, I had moved from the Governor's
14 office to the campaign office and Mr. Capano was on our
15 fund raising committee. So I called him the next
16 morning. I guess I was trying to be a little detective,
17 and I called him the next morning on a campaign premise
18 and I asked him about have you heard from Anne Marie
19 today? And he said she had left for the beach very
20 early that morning.
21    Q. Did you know of any plans she had to go to the
22 beach that morning?
23    A. No.

1     Q. What happened while you were there at her

2 apartment?

3     A. She had received -- when I got there, she -- I

4 could tell she was upset and angry and so I asked her

5 what was wrong, and she had she said to me that -- she

6 said I wish you wouldn't tell Tom Capano what I'm doing.

7 And I said what are you talking about? And she said he

8 knows I'm going to the Grand Gala with Mike. And I had

9 mentioned that to him in a previous conversation. And

10 she said now he's been calling her all day. He has left

11 rolls from DiFonzo's here. She was very upset to the

12 point where she didn't want to go.

13     Q. Well, were there any phone calls that she

14 received while you were there?

15     A. Yes. When I was there she received five or six

16 phone calls.

17     Q. And did she indicate who they were from?

18     A. She indicated they were from Mr. Capano.

19     Q. What was she concerned about, did she tell you?

20     A. That he made statements. She said that he made

21 statements that he could find a date and show up there.

22 She was just very terrified that -- I should explain at

23 that point she did tell me that there had been a

1 shopping and when I dropped her off, it was about 9:30

2 and I remembered that he had given me his home phone

3 number because he had done legal work for me at one

4 time, so I got on my car phone and I called and I

5 figured if he answers then that means he is not there,

6 so I called.

7     Q. That means he's not --

8     A. Not there at the Grand Gala, that he's at home.

9 So I called and he answered and I hung up. So I was

10 relieved that he was not at the Grand Gala.

11     Q. You made that phone call from your car phone?

12     A. Yes.

13     Q. Is there a bill for that which reflects that?

14     A. Yes.

15     MR. MAURER: No objection to that.

16     MR. WHARTON: We are going to offer that as the

17 next State's exhibit.

18     THE COURT: 55?

19     THE PROTHONOTARY: Correct. So marked.

20     (State's Exhibit No. 55 was admitted into

21 evidence.)

22     MR. WHARTON: Which is a telephone bill for Ms.

23 Morrison.

1 relationship in the past and she was terrified that she

2 would expose this relationship, not just to Mike but to

3 everyone.

4     Q. She did not want Mike Scanlon to know this

5 relationship she had?

6     A. No. She said it was the thing that she was

7 most ashamed in her life.

8     Q. Well, did she ultimately get dressed?

9     A. Yes.

10     Q. Were you there when she got dressed?

11     A. Yes. She got dressed and her hair was done and

12 I was there when Mike got there. And so once Mike got

13 there, I left.

14     Q. Did you still have any concerns about the

15 defendant showing up and putting a damper on the

16 evening?

17     A. Yeah. I was very concerned. I went and picked

18 up my sister because we do a little Saturday shopping

19 thing pretty much every Saturday, and I explained to her

20 that I was nervous about what might happen. So I tried

21 to find his house, Mr. Capano's house, to see if his car

22 was there just to kind of -- so I could reassure myself,

23 but I couldn't find it. So my sister and I went

1 BY MR. WHARTON:

2     Q. Let me show you that.

3     THE COURT: Mr. Maurer, that was without

4 objection?

5     MR. MAURER: It was, your Honor.

6     THE COURT: Thank you.

7 BY MR. WHARTON:

8     Q. Now, if you would be good enough to turn to the

9 second page of that exhibit. Does it indicate the

10 telephone call that you are referring to?

11     A. Yes.

12     Q. And what does it say?

13     A. That it was placed on January 27th of 1996 at

14 9:33 p.m.

15     Q. The number you called?

16     A. Area code 302-426-1131.

17     Q. Now, I think you said at this point -- where

18 were you working?

19     A. I was still with the Governor but was on the

20 campaign.

21     Q. And you weren't working in the Governor's

22 office?

23     A. I was working in the campaign headquarters

**Page 57**

1  which is on Lancaster -- which was on Lancaster Avenue.

2  Q. Do you remember Valentine's Day 1996, any

3  conversation you had with Anne Marie around that time?

4  A. Yes. Anne Marie was going to dinner with Mike

5  that night. And I had stopped over at her house and she

6  was getting ready, couldn't figure out what to wear and

7  it was this whole dilemma.

8  Q. So you were the fashion consultant?

9  A. I was the fashion consultant. She couldn't

10  figure out what to wear and was going back and forth

11  between different things and had finally decided to wear

12  a skirt that was knee length, which was above the knees,

13  which was a big step for Anne Marie who did not like to

14  show her legs.

15  So, she had gone out with Mike and a couple

16  days later she called me. And I remember this call

17  distinctly, because I answered the phone and I

18  couldn't -- no one said hello, I just kind of heard like

19  muffled and it was Anne Marie and she was crying, which

20  is not consistent with the way Anne Marie was. She was

21  not that type of person.

22  I asked her what was wrong and she had told me

23  that she had heard through Mr. Capano that Mike Scanlon

**Page 58**

1  had said that she has a shitty apartment but she looks

2  great in a short skirt, which kind of hit Anne Marie two

3  ways, because first of all she was very embarrassed to

4  wear the short skirt and second of all, although she

5  liked her apartment she didn't like the neighborhood she

6  was in. And it wasn't a big Trolley Square apartment,

7  and something -- and she was very upset that Mike would

8  say something like that.

9  Q. You don't know whether he actually did say

10  that?

11  A. No, I don't.

12  Q. Was this a lengthy conversation at all?

13  A. Yes, it was very long. Because that --

14  starting with that -- I maintained that Mike would never

15  say --

16  MR. MAURER: I'm going to object. The question

17  was, was this a lengthy conversation? She is now giving

18  her own feelings and opinions which are not relevant.

19  MR. WHARTON: I think she was going to say what

20  she said.

21  THE COURT: She needs to make that clear. I

22  will sustain the objection, but I'm not cutting off the

23  conversation to the extent that it represents an

**Page 59**

1  interaction between this witness and Miss Fahey.

2  BY MR. WHARTON:

3  Q. What did you tell her, if anything, about that

4  conversation that she reported to you that she had with

5  the defendant?

6  A. I said to her that I didn't think that was

7  something --

8  MR. MAURER: That's my objection. She doesn't

9  have any idea herself whether that statement was made by

10  Mr. Scanlon or not.

11  THE COURT: I will overrule the objection this

12  time. She is indicating what she said in an effort to

13  elicit a response. And the response is meaningless

14  unless it is put in the context of the statement.

15  BY MR. WHARTON:

16  Q. What did you tell Anne Marie about that?

17  A. That I did not think that was something that

18  Mike would say. At this point I was really distrustful

19  of what Mr. Capano --

20  MR. MAURER: Objection, your Honor.

21  THE COURT: All right. I don't know where we

22  are going. I'm presuming we are eliciting a response.

23  To the extent Ms. Morrison has an opinion about Mr.

**Page 60**

1  Capano, that is not important and you should disregard

2  it. To the extent that she as has an opinion involving

3  Mr. Scanlon, that is not important. Again, we are

4  dealing with the state of mind of Miss Fahey at this

5  particular time, and to the extent that these remarks

6  elicit a response, the response is relative to -- to the

7  state of mind of Miss Fahey. Again, that is what we are

8  trying to ascertain from this testimony.

9  BY MR. WHARTON:

10  Q. Ms. Morrison, did she tell you anything that

11  she feared as far as the defendant and Mike Scanlon?

12  A. Yes. She feared that Mike would find out about

13  her relationship with Mr. Capano.

14  THE COURT: I'm satisfied now, based upon that.

15  The jury should disregard the opinion that Ms.

16  Morrison had concerning whether or not Mr. Capano

17  made -- excuse me, whether or not Mr. Scanlon made these

18  remarks to Mr. Capano or any opinion she might have as

19  to Mr. Capano's use of the remarks.

20  BY MR. WHARTON:

21  Q. Did she tell you about an incident involving

22  her fire escape and the defendant?

23  A. Yes. She indicated to me that at one time she

1 came home and Mr. Capano had -- when she was in her home
2 after she came home he came up the fire escape and they
3 had a fight and he took back the gifts that he had given
4 her. He was upset and this was because she was dating
5 Mike and didn't want -- made comments that no one is
6 going to watch the TV I gave you, watch the movies I
7 gave you on the TV I gave you in the clothes I gave you.
8 And she indicated that he took these gifts back.
9    Q. Did she indicate whether he returned them
10 ultimately?
11    A. Yes, he did.
12    Q. Did she express any concern to you about other
13 things that the defendant was doing in relationship to
14 her and Mike Scanlon --
15    A. Yes. I'm sorry.
16    Q. -- and where he live lived?
17    A. Yes. He, Mr. Capano, would report back to Anne
18 Marie when she had been to Mike's house. And he was
19 angry that her car was in the driveway, not on the
20 street, and how long it had been there. And he would
21 ask her if they were having sex. And it seemed, she
22 said, that she could placate him by saying no.
23    Q. No, what?

1    A. That she and Mike were not having sex.
2    Q. Did she tell you of any other incident which
3 indicated she was having difficulty with the defendant
4 in breaking off the relationship?
5    A. She had mentioned that after February. And the
6 conversation I had mentioned earlier that things had
7 just kind of quieted for a couple of months.
8    Q. Specifically -- maybe I can direct your focus a
9 little bit about whether she had ever been in the garage
10 of his house.
11    A. I'm sorry. Yes. She told me of an incident
12 where he had picked her up and took her back to his
13 house into the garage and locked the doors and would not
14 let her out of the garage while they argued and he made
15 attempts to keep the relationship together. This was
16 extremely frightening to Anne Marie because she had a
17 fear of being locked in small dark places, and it was
18 very upsetting for her.
19    Q. Around St. Patrick's Day, 1996, did you and
20 Anne Marie have any plans about going to mass?
21    A. Yes. I believe it is the Irish Culture Club,
22 somebody sponsors a breakfast and mass and Anne Marie
23 decided we would go because it sounded like a fun thing

1 to do. The tickets were $39 for us, which was expensive
2 for a breakfast, and we had been looking forward to it.
3 The day before she told me she couldn't go, that she
4 didn't want to go because Mr. Capano was on the
5 executive committee and he would be there and she did
6 not want to see him.
7    Q. Did she go?
8    A. No.
9    Q. Also, in March of 1996, did you have an
10 opportunity to go to Washington D.C.?
11    A. Yes.
12    Q. What was the purpose of that trip?
13    A. President Clinton was having a fund raiser on
14 behalf of Governor Carper to raise money for Governor
15 Carper's campaign. And as the Governor's staff I was
16 able to go and Anne Marie came down as well to help out
17 with the event.
18    Q. And what did you do?
19    A. We had the fund raiser. And it went well and
20 afterwards a bunch of the people that were from
21 Wilmington were going back on the train. But before the
22 train left a bunch of people went out to a bar across
23 the street from the train station and just kind of

1 celebrated the fact that it was a good night, a
2 successful night for the campaign.
3    Most of the people left on the 10 or 11 train.
4 And at that point it was just Anne Marie, me, Joe
5 Farley, Brian Murphy and Gary Heinz, so we decided to go
6 to another bar. We just kind of checked out all of the
7 different places, the five of us, and we got home
8 probably about three in the morning. And then I was
9 talking to Anne Marie about it a couple days later about
10 how much fun we had, kind of goofing off and she had
11 said that Mr. Capano had heard about us down there and
12 we should be ashamed of ourselves because we acted like
13 whores.
14    Q. Did you discuss -- were you aware, let me ask
15 you that first, that she had an eating disorder?
16    A. Yes.
17    Q. Could you see that in her weight at all?
18    A. Yes. It began -- it was -- again, it began in
19 the beginning of '96 where she started dropping weight a
20 lot more dramatically than she had before, and --
21    Q. Did you know she was seeking psychological or
22 psychiatric help for the eating disorder?
23    A. Yes. And we talked about it in January, but

1  exposed his relationship with Anne Marie to Michael
2  Scanlon?
3      A. You are asking if Tom Capano exposed their
4  relationship to Michael Scanlon?
5      Q. Yeah, in actuality.
6      A. I was never aware of that, no.
7      Q. So the best your understanding was that he
8  never told Michael Scanlon or never let Michael Scanlon
9  know that he had had this relationship with Anne Marie;
10  is that right?
11      A. Correct.
12      Q. The fire escape incident that you have talked
13  about, do you -- can you put that temporally, let me
14  know when that was?
15      A. I cannot tell you for sure. It came up in a
16  conversation that -- Anne Marie and I would talk on the
17  phone for a long time, several hours at a time, and it
18  came up in a conversation. I don't recall.
19      Q. Do you know when the fire escape incident is
20  supposed to have occurred?
21      A. No.
22      Q. So you don't know whether it was near the time
23  of the Grand Gala, a month before that, whenever?

1      A. No.
2      Q. But you do know that it was after she started
3  to see Mr. Scanlon; is that correct?
4      A. The only thing I can tell you is she told me
5  about that event after the Grand Gala, that's when I was
6  told of the event.
7      Q. But she didn't pin it down in time as to when
8  it was?
9      A. She may have, but --
10      Q. But you don't have a recollection?
11      A. That was several years ago.
12      Q. Sorry. I'm starting to talk over you, and I
13  apologize to both you and the court reporter.
14         It was several years ago and can you say for
15  certain that that incident occurred after she met
16  Michael Scanlon?
17      A. No.
18      Q. Did you know whether she was dating anyone else
19  around that time period?
20      A. What time period?
21      Q. That we have been talking about, '95, '96?
22      A. No.
23      Q. Joe Houghton, does that ring a bell?

1      A. She dated him in '93. When I first met her she
2  was dating him.
3         MR. MAURER: May I have a moment, your Honor,
4  please?
5         THE COURT: You may.
6  BY MR. MAURER:
7      Q. You were familiar with Anne Marie's apartment?
8      A. Yes.
9      Q. You had been in there several times and been up
10  there several times?
11         You indicated that Anne Marie told you that Mr.
12  Capano came up the fire escape.
13      A. Yes.
14      Q. Is there a back door to the apartment?
15      A. Yes.
16      Q. By the fire escape?
17      A. I often came in that way.
18      Q. So that in and of itself coming up the fire
19  escape it was not unusual?
20      A. It was unusual if you showed up and hadn't let
21  her know you were coming.
22      Q. But it's something you have done yourself?
23      A. I'm on my way, yeah.

1      Q. But you said that there was a door and there is
2  a lock on the door; is that right?
3      A. Yes.
4      Q. And do you recall whether Anne Marie ordinarily
5  would keep it locked?
6      A. She would keep it locked. If she knew you were
7  coming she would unlock it.
8      Q. So in order for the person to come in from the
9  outside if this door was locked they would have to break
10  in in some way, shape or form?
11      A. If it was locked.
12      Q. She indicated to you, or your testimony was
13  that she indicated to you Mr. Capano came in the fire
14  escape and took all the gifts he had given her from her;
15  is that correct?
16      A. Correct.
17      Q. And I take it from that that you got the
18  impression speaking with her that he got the gifts and
19  took them away?
20      A. Yes.
21      Q. And among the gifts that we have been talking
22  about is the color television the 27 incher?
23      A. Yes.

1  Q. Did you understand there to be numerous other
2  gifts?
3  A. I knew there were other gifts, yes.
4  Q. Because she told you about them, or you had
5  seen them?
6  A. She told me about them.
7  Q. And your understanding was he had taken the
8  gifts and removed them from the apartment; is that
9  right?
10  A. That was my understanding, yes.
11  Q. It's also your understanding, I take it, that
12  he returned them, right?
13  A. Yes.
14  Q. So I guess the understanding would be that when
15  he returned them she accepted them back; is that right?
16  A. Yes.
17  Q. Did she say when in relation to the time they
18  were taken that they were returned?
19  A. I don't recall.
20  Q. You also talked about another incident where,
21  according to Anne Marie, she told you that Mr. Capano
22  had locked her inside of a garage; is that right?
23  A. Yes.

1  Q. And you understood that Mr. Capano lived at
2  Grant Avenue at that time?
3  A. Yes.
4  Q. Do you know when that incident is supposed to
5  have occurred?
6  A. No.
7  Q. So you can't place that in time at all; is that
8  right?
9  A. When she told me about it -- when someone tells
10  you something like that, and it was very painful for her
11  to talk about because of her fear of dark, small places,
12  I wasn't going to sit there and ask for every detail.
13  Q. I'm not suggesting that you should have.
14  A. She was talking to me as a friend that's how --
15  I'm not going to dissect this because it was very
16  painful for her.
17  Q. Try not to take my questions personally because
18  they are not intended to be that.
19  A. Well, I'm explaining.
20  Q. The question was whether you can place in time
21  when the incident that she told you about supposedly
22  occurred?
23  A. I said I can't.

1  Q. You cannot. Okay. It certainly, however, would
2  be fair to infer, and correct me if I'm wrong, that
3  whatever happened occurred well before April of '96; is
4  that right?
5  A. It would have happened before April of '96.
6  Q. Because the conversation you had with her about
7  it was before April of '96, right?
8  A. Yes.
9  Q. Now, you mentioned a conversation that you had
10  with Anne Marie about her weight problem, and I think
11  you an attributed a statement to her that she said about
12  Mr. Capano, "Doesn't he know I am the way I am because
13  of him?"
14  A. Yes.
15  Q. She did say that?
16  A. Several times.
17  Q. In terms of your relationship with Anne Marie,
18  did you know how far back she had been treating for an
19  eating disorder?
20  A. She had never mentioned it to me, but I had
21  heard from other people that there was an eating
22  disorder issue prior to when I had met her.
23  Q. So that inferentially, or at the same time, you

1  had at least learned at some point that she had had an
2  eating disorder or problem with eating long before the
3  time that you understood that she had first met Mr.
4  Capano, correct?
5  A. Yes. But I was also in these conversations
6  with -- Ginny Columbus had mentioned this to me that
7  there was a problem before. Never before had she gotten
8  as bad as she was now. She never looked as thin and
9  haggard.
10  Q. I understand that. Did you know her in 1988?
11  A. No.
12  Q. Do you know how many laxatives a day she was
13  taking in 1988 to deal with her problem?
14  A. Uh-uh.
15  Q. Do you know she was being treated back then by
16  a doctor for laxatives in 1988? So you didn't know
17  about anything about that; is that correct?
18  A. Correct.
19  Q. So what she was telling you -- Anne Marie --
20  was this eating problem was because of Tom in '96?
21  A. Yes.
22  Q. Now, I'm going to suggest to you, which I think
23  can be borne out in terms of some of the discussions we

**Page 125**

1 bothered her, when you went to the grand jury, was that
2 Dr. Johnson was telling her not to eat and he was fat;
3 is that right?
4    A. No, he was telling her to eat.
5    Q. Sorry, to eat?
6    A. Yes. Because -- yeah.
7    Q. And those were her words to you about him,
8 right?
9    A. Yes.
10   Q. You also stated that before the grand jury that
11 Dr. Johnson had advised her that she should consider
12 getting a restraining order against Tom Capano?
13   A. Yes.
14   Q. And do you remember what Anne Marie's words
15 were in response to that voice from Dr. Johnson?
16   A. I can't recall her exact words, but it was not
17 something that she planned on doing.
18   Q. If I could direct your attention to page 44 of
19 your grand jury transcript. The question was: "Did she
20 tell you," by she that means Anne Marie Fahey,
21 "specifically, something that Gary said to her with
22 respect to Tom Capano?"
23       Your answer was: "Yes, she told me that Gary

**Page 126**

1 told her that she should file a restraining order
2 against Tom Capano."
3       Next question: "Was her reaction," by her,
4 references made to Anne Marie Fahey, "her reaction in
5 the early part of January 1996 to this was what?"
6    A. "That's ridiculous, why would I do that?"
7    Q. Those are in quotation marks; is that correct?
8    A. Correct.
9    Q. And those words are the words that you
10 indicated at the grand jury that Anne Marie said to you
11 about seeking a restraining order, correct?
12   A. Correct.
13   Q. "That is ridiculous, why would I do that?"
14   A. Yes.
15   Q. You had a discussion, I think, with Anne Marie,
16 I guess, in February of '96 where she indicated to you
17 that at one time Tom Capano wanted her to go into a
18 clinic; do you remember that?
19   A. Yes.
20   Q. And Anne Marie indicated to you that Tom had
21 indicated to her that he thought that's what she should
22 do or he was going to do that. I know there is a lot of
23 names, I'm doing my best, do you want me to rephrase?

**Page 127**

1    A. The second part would be good.
2    Q. You stated in reading these materials that
3 February of '96 you had a conversation with Anne Marie
4 about Tom wanting her to go into a clinic; is that
5 right?
6    A. Yes.
7    Q. And the clinic we are talking about that she
8 referenced was an eating disorder clinic?
9    A. Yes.
10   Q. That's something Anne Marie told you?
11   A. Yes.
12   Q. The red and white striped shirt, when did
13 that -- when was this brought up to you by Kathleen
14 Fahey-Hosey?
15   A. I cannot recall when exactly she asked me. She
16 asked me if I remembered anything of Anne Marie's that
17 was red and white.
18   Q. If I could suggest to you that you were
19 questioned about this by the Wilmington Police
20 Department, by Detective Donovan, in April of '98,
21 that's what the report that I have shows, that Detective
22 Donovan -- you tell me if this is right -- came to you
23 and asked you about this shirt; is that right?

**Page 128**

1    A. He may have. The recollection I have is I was
2 asked by Kathleen.
3    Q. I understand she probably would have asked you
4 first, but sometime after that do you remember talking
5 to Detective Donovan about it?
6    A. I had had conversations, yes.
7    Q. Now, what I'm trying to do is, can you remember
8 how soon you talked to Kathleen before you talked to
9 Detective Donovan?
10   A. No.
11   Q. Now, you said that you were taken somewhere or
12 went somewhere in order to view some clothing, right?
13   A. Right.
14   Q. Where were you taken?
15   A. I wasn't taken anywhere I walked across the
16 street to the --
17   Q. I wasn't trying to suggest anything by taken.
18 Where did you go?
19   A. I went over to the US Attorney's Office.
20   Q. And what did you look at there?
21   A. There were several red and white shirts.
22   Q. And the red and white striped shirt that you
23 remember, and you did remember Anne Marie having a red

Case 1:06-cv-00058-B* Document 292 Filed 02/20/2007 Page 228 of 440

1   white striped shirt; did you not?

2      A. Yes.

3      Q. And you explained it in detail to Detective

4   Donovan; did you not?

5      A. Yes.

6      Q. And you indicated to him the outfit that she

7   usually wore it with?

8      A. Yes.

9      Q. Did you have an understanding why you were

10  looking for this red and white shirt?

11     A. I never asked. I was told to think about what,

12  and I'm doing everything I can to be helpful. I have no

13  idea why anyone wanted it.

14     Q. So you don't know why Kathleen Fahey-Hosey

15  asked you in the first place or Detective Donovan?

16     A. No.

17     Q. But in any event you walked over there, you

18  look at the items of clothing that are provided to you

19  or shown to you and the red and white striped shirt that

20  you had seen was not there; is that right?

21     A. Correct.

22        MR. MAURER: If I could have just a minute

23  I'm almost through, we will finish before lunch.

1         THE COURT: All right.

2   BY MR. MAURER:

3      Q. If I could just go back, before finishing, and

4   I am almost finished, to the question about the

5   television, how many televisions were in Anne Marie's

6   apartment?

7      A. Two.

8      Q. The larger one you have talked about?

9      A. Uh-huh.

10     Q. That came from Mr. Capano?

11     A. Correct.

12     Q. And the smaller that you have talked about?

13     A. Correct.

14     Q. Were you aware of the fact there was a third

15  television in the apartment?

16     A. No.

17     Q. If there was you didn't know it was there?

18     A. Right.

19     Q. Do you know whether Anne Marie gave the

20  television back to her siblings, the smaller one?

21     A. That was in her bedroom.

22     Q. They took it back?

23     A. It was my understanding the television in the

1   bedroom was the one from Pat and Kathleen.

2      Q. My question was do you know whether she gave

3   that television back to them or whether they took it

4   back? By that I mean --

5      A. I have no idea.

6      Q. You just don't know? At some point you found

7   that television wasn't there anymore.

8      A. Which television are you talking about?

9      Q. The smaller ?

10     A. The gift television?

11     Q. No, not the one from Mr. Capano.

12     A. I'm talking about the gift television from Pat

13  and Kathleen.

14     Q. No.

15     A. It was my understanding it never left the

16  apartment.

17     Q. You indicated to us earlier that Anne Marie

18  Fahey was confiding with you about Mr. Capano in January

19  of '96; is that right?

20     A. Yes.

21     Q. And you also indicated that it was your

22  understanding that she continued to confide in you, or I

23  guess she continued to confide in you as a friend in the

1   months that followed, April, May, June; is that right?

2      A. Yes.

3      Q. And she talked to you about Mr. Scanlon, we

4   have talked about that already?

5      A. Uh-huh.

6      Q. And I think we have pretty firmly established,

7   have we not, I will pick out a date, say April 15th of

8   1996, the negative incidents that you have told us about

9   by Mr. -- which Anne Marie attributed to Mr. Capano all

10  were talked about as being before that time; is that

11  right, do you follow me?

12     A. I don't want to pick out a date, but I can say

13  yes.

14     Q. Let's say April then, I'm just picking that out

15  of the sky. In other words, Anne Marie did not ever

16  tell you about any bad or negative experiences she had

17  with Mr. Capano May of '96, June of '96 did she?

18     A. I can't put a date on that.

19     Q. Well, you have put on a date on that before.

20     A. You are asking me to make a blanket statement

21  that she never said anything else negative about Tom

22  Capano in April, May or June. I can't put a blanket

23  statement that nothing was said again.

**Page 133**

1 Q. Maybe I didn't phrase my question artfully
2 enough. My question was, although she may have said
3 something negative about him did Anne Marie ever
4 indicate that there had been any negative experiences
5 between herself and Mr. Capano in April, May or June of
6 1996 coming up the fire escape?
7 A. The incidents that we talked about, that have
8 been talked about here, yes, I can say were before that.
9 Q. All of them were earlier?
10 A. But I can't say that she never said anything
11 negative again.
12 Q. She didn't say anything negative about him.
13 You felt you knew her pretty well?
14 A. Yes.
15 Q. And you felt you knew where she was?
16 A. Uh-huh.
17 Q. Did you know April 3, 1996 she had given Mr.
18 Capano a book on anorexia that had been provided by a
19 doctor so Mr. Capano had could better understand the
20 disease?
21 A. I believe I have heard that elsewhere, I was
22 never told that before.
23 Q. Did you know that in May of 1996?

**Page 134**

1 A. I don't think so, no.
2 Q. Pardon me?
3 A. I don't know. I know I have heard that. I
4 don't know.
5 Q. Did she tell you that?
6 A. I can't tell you that for sure.
7 Q. She didn't, did she?
8 A. I don't know. We had a long conversation about
9 her eating disorder. I remember sitting out in front of
10 my house. I don't know, her whole life has been opened
11 up since then. I know that -- I know it occurred, I
12 don't know where I heard that.
13 Q. Had she told you about that in May of '96 would
14 you not have asked her why are you giving Tom Capano a
15 book about your eating disorder, somebody she was not
16 involved with anymore?
17 A. They were supposedly friends again at that
18 point.
19 Q. So your answer is you don't know whether you
20 knew that in May of '96?
21 A. Yes.
22 Q. Did you know that on May 30th of 1996, that
23 Anne Marie Fahey had had dinner at La Famiglia with Mr.

**Page 135**

1 Capano?
2 A. I don't know that.
3 Q. Did you know that on June 6th of 1996 that Anne
4 Marie Fahey had had dinner with Tom Capano at The Saloon
5 in Philadelphia?
6 A. No.
7 Q. She did not share that with you and did not
8 indicate she was seeing him in that fashion at that
9 time?
10 A. Correct.
11 Q. Did you know June 20, 1996 that Anne Marie
12 Fahey had had dinner with Tom Capano at Dilworthtown Inn
13 in Chester County?
14 A. No.
15 Q. Did she tell you that?
16 A. No.
17 Q. She didn't share that with you?
18 A. No.
19 Q. And you, of course, did not know it was her
20 intention to go to dinner with Tom Capano on June 27th
21 at Ristorante Panorama?
22 A. I did not know that.
23 Q. You talked about an incident that occurred back

**Page 136**

1 in 1994, and although I guess there were some changes in
2 Anne Marie, I mean, basically your relationship with her
3 in '94 and '96 was the same; is that right?
4 A. Yes.
5 Q. And although she had been through some things,
6 you had been through things, you were still close with
7 each other; is that right?
8 A. I don't know what you mean by through some
9 things, but --
10 Q. It's not important.
11 A. We were -- yes -- friends.
12 Q. Now, you talked to the grand jury, did you not,
13 about the purchase of this -- was it a peach dress in
14 1994?
15 A. Uh-huh.
16 Q. If I understand correctly you and Anne Marie
17 were shopping and there was a peach dress that she saw
18 in a window that she wanted to purchase or to have to
19 attend this wedding, correct?
20 A. Correct?
21 Q. That was something she wanted at that time,
22 right?
23 A. Yes.

Case 1:00-cv-00841-B   Document 1292   Filed 02/20/2007   Page 30 of 40

1   Jim Florio did not stop by because he had an event
2   to our event that was being hosted by attorneys.
3      Q. Did Mr. Capano's firm at the time sponsor in
4   any way that fund raiser?
5      A. I have no idea.
6      Q. Or a fund raiser for Governor Florio held
7   around the same time?
8      A. For your first question, did you mean did we --
9   did his firm sponsor our event?
10     Q. Yes.
11     A. No, they did not.
12     Q. Did I hear you correctly say you don't recall
13  who introduced you to Tom Capano?
14     A. No.
15     Q. Could it have been one of the Governors, Florio
16  or Carper?
17     A. It's too long ago to remember.
18     MR. O'DONNELL: Well, I won't ask anymore
19  questions about it.
20     MR. CONNOLLY: No further questions. The
21  witness may be excused.
22     MR. WHARTON: State calls Siobhan Sullivan.
23

1         SIOBHAN SULLIVAN,
2         the witness herein, having first
3         been duly sworn on oath, was examined
4         and testified as follows:
5            DIRECT EXAMINATION
6   BY MR. WHARTON:
7      Q. Good afternoon.
8      A. Good afternoon.
9      Q. Who do you work for?
10     A. Delaware State Police.
11     Q. How long have you been with the Delaware State
12  Police?
13     A. Just short of 12 years.
14     Q. Right now what is your assignment with the
15  police?
16     A. Executive protection or for the Governor.
17     Q. How long have you been doing that work?
18     A. Little over five and a half years.
19     Q. When did you begin doing that?
20     A. His first election, '92.
21     Q. Was there interruption in your service?
22     A. Yes, February '98 to September '98.
23     Q. You were doing other work for the State Police

1   at Troop 9 in Odessa.
2      A. Yes. Back at Troop 9 in Odessa.
3      Q. What were your responsibilities with the
4   Executive Security Unit as related to the Governor?
5      A. We protect the family as well as the Governor.
6   But the day I would be working with the Governor, I
7   would pick up the Governor at his residence. Knowing
8   his schedule prior to the day before I would pick up the
9   Governor, I would contact Anne Marie who was the
10  scheduler for the Governor and learn about his schedule.
11  So I would have the Governor's schedule ahead of time
12  through Anne Marie. And I would pick up the Governor
13  that day or I would drive and protect him to every event
14  until his duration that night.
15     Q. When he was not at an event, but rather in one
16  of his offices, would you also be at the office?
17     A. I'm sorry, I didn't hear you.
18     Q. Let's say he was not at an event and he was at
19  an office -- He had an office in Wilmington; is that
20  right?
21     A. Yes.
22     Q. And did he also have an office in Dover?
23     A. Yes. Tatnall Building.

1      Q. When he was at one of those building where were
2   you?
3      A. With him. We have an office in both buildings.
4      Q. So if the Governor is at work in the office you
5   are at that office?
6      A. That's correct.
7      Q. You mentioned Anne Marie. You knew Anne Marie
8   Fahey; is that correct?
9      A. Yes, I did.
10     Q. How is it you got to know her?
11     A. I met Anne Marie the first day I joined the
12  Governor's staff Executive Protection. Like I said she
13  was his right-hand person, his scheduling secretary.
14     Q. How closely did you work with-- I mean, I'm
15  talking about you pleural, like the Executive Security
16  Unit, work with her?
17     A. I would say, to compare it, the Governor looks
18  at us as his right-hand person and know his day is going
19  to go well because we are there. He has a lot of trust
20  in us. I would look at Anne Marie as my right-hand
21  person where she is setting my day so my day would flow
22  correctly to the Governor.
23     Q. You had to have a lot of contact with her?

Case 1:06-cv-00688-B*   Document 2292   Filed 02/20/2007   Page 70 of 40

1    A. Yes. One on one.

2    Q. At some point, would you say that you became

3 friendly with her?

4    A. Yes, I did.

5    Q. At some point -- Well, first of all, let me

6 back up. Did you know the defendant?

7    A. Yes, I did.

8    Q. And how was it that you met him?

9    A. Anne Marie Fahey introduced me on an occasion

10 down at Woodburn, which is a mansion to the Governor.

11 They had an event there and Anne Marie introduced me to

12 Tom Capano.

13    Q. Prior to your introduction by her, did you know

14 that they were friends?

15    A. Yes, I did.

16    Q. How did you know that?

17    A. Anne Marie and I used to always talk when we

18 were in the Governor's office. And she was saying she

19 was going to a concert or possibly going to an event

20 which was a pretty high event with the Governor's

21 office. And I would joke around with her, where did you

22 get tickets? Tell me. And she would say Tom Capano

23 bought her the tickets.

1    Q. Do you know whether she considered him a close

2 friend of hers?

3    A. Yes. Throughout our friendship, prior to Anne

4 Marie disappearing, she would say that she looked at Tom

5 Capano as one of her best friends and she would talk to

6 him occasionally.

7    Q. At some point, did she tell you about perhaps,

8 leaving the Governor's office?

9    A. Yes. That was around spring of '95. She had

10 told me that-- Let me go back. It is very stressful in

11 what our jobs are with the Governor between security and

12 executive scheduler. Mine would be stress would be

13 safety-wise, Anne Marie's stress level would be she had

14 to make sure the schedule went -- flowed correctly for

15 the Governor. And we had a lot of stress. We probably

16 have the most stress of anybody in the office I would

17 say. And she had told me that Tom Capano had offered

18 her a job at Louie Capano's office.

19    Q. When did you say that was?

20    A. Spring of '95.

21    Q. Obviously she didn't take that job?

22    A. No, she did not.

23    Q. Did --

Case 1:06-cv-00688-B*   Document 2292   Filed 02/20/2007   Page 71 of 40

1 Capano take a moment to

2 consult with counsel?

3    THE COURT: Certainly.

4    MR. MAURER: Can we take just a moment, your

5 Honor?

6    THE COURT: Certainly.

7    THE COURT: Mr. Wharton.

8 BY MR. WHARTON:

9    Q. I think what I last asked you about was this

10 job offer Anne Marie told you was being made, or

11 attempted to be made, by the defendant with his brother

12 Louis Capano's business and she did not ultimately

13 accept that job, correct?

14    A. Yes.

15    Q. She stayed with the Governor's office?

16    A. Yes.

17    Q. So you knew she didn't take the job. Did you

18 have a conversation with the defendant himself?

19    A. Yes, I did.

20    Q. How did that conversation get initiated?

21    A. Tom Capano would usually call me on my pager

22 and leave a phone number for me to call him back. And I

23 received a page and returned Tom Capano's call.

1    Q. He had paged you and you returned his call?

2    A. Yes.

3    Q. And what did he tell you?

4    A. He asked me -- there was different times that

5 Mr. Capano had called me over several occasions and a

6 lot of times he would ask if I wanted to get out and get

7 a beer. It was always when I got done work that night

8 with the Governor. And he knew I coached basketball and

9 wanted me to help his kids, coach them in some

10 basketball. And at that time he wanted to know if I

11 wanted to go get a beer and talk about basketball. I

12 said no, I had a long day, I need to get home. At which

13 time he asked if I had spoken to Anne Marie today. And

14 he said, "She's really mad at me."

15    And I said, "You have to just let her be, Tom."

16    And he goes, "You know I left my wife and I'm

17 just really lonely right now."

18    Q. And did he indicate whether or not they had an

19 argument of some sort?

20    A. Yes. He stated that they had a fight that day

21 and Anne Marie was really mad at him.

22    Q. Did he also indicate to you whether he did, in

23 fact, do anything about trying to get her a job with his

brother?

1 
2    A. When I talked-- We talked about the stress
3    level of the Governor's office. And Tom also talked to
4    me that he offered Anne Marie a job at his brother's
5    Louie's office, and Anne Marie refused to take the job.
6        Q. When did you next see Anne Marie Fahey?
7        A. I know I was off that weekend; so it had to be
8    soon after that. We usually work every couple days
9    after, so it had to be the following week.
10       Q. Do you know if that was before Christmas of '95
11   or after?
12       A. It was before Christmas of '95.
13       Q. Did you tell her about your conversation with
14   the defendant?
15       A. Yes. I always told Anne Marie when Tom Capano
16   would call me. And at that certain time Anne Marie
17   became very upset.
18       Q. What did she tell you?
19       A. When I told her Tom Capano called me and paged
20   me and asked if I had talked to her and he told me that
21   Anne Marie was very upset with him, and I told Anne
22   Marie that, she said, "He is a possessive, controlling
23   maniac. I'm just getting tired of him."

1        And stormed out of my office and went back to
2    her office.
3        Q. Were you aware of whether or not she was around
4    Memorial Day of 1996, whether she was going away?
5        A. Yes, I was.
6        Q. Where did you understand she was going?
7        A. She was going to the New England area with her
8    boyfriend, Mike Scanlon.
9        Q. Did you have any-- You knew about Mike Scanlon?
10       A. Yes.
11       Q. Did you have any contact with the defendant
12   around that time?
13       A. Yes, I did.
14       Q. Tell us about that contact.
15       A. Once again, I received another page, at which
16   time Tom Capano had called me.
17       Q. Was this while she was away or before she went
18   away?
19       A. While she was away.
20       Q. And he paged you?
21       A. I returned the page, and he asked me if I had
22   talked to Anne Marie, and I said no. And he asked me if
23   I knew where Anne Marie was and I said no. He kept it

1    basically we
2    ended the phone conversation after how I was doing, what
3    was I doing for the weekend.
4        Q. Now, did you talk with Anne Marie after she
5    came back?
6        A. Yes, I did.
7        Q. And did you report to her that Tom Capano had
8    inquired of you about her whereabouts?
9        A. Yes, I did. I told Anne Marie, once again, in
10   our office that Tom Capano had paged me and was asking
11   if I knew where she was or if I have talked with her.
12       Q. What was her response to you?
13       A. At that time, very adamantly said, "He's
14   fucking stalking me."
15       And I tried to calm Anne Marie down. I said
16   Anne Marie there is a charge, there's a crime against
17   that, we can give you protection. We are here for the
18   Governor, but we are also here for the staff and we can
19   provide protection.
20       Q. What was her response?
21       A. At that time I think she felt she could handle
22   it at that time and repeated that she had to end it with
23   Tom Capano.

1        Q. Do you know when if she got back if she
2    had -- did she tell you she had any concerns when she
3    got back from new England?
4        A. When I told her about him paging me, she stated
5    she was afraid Tom Capano was going to wait for her and
6    she did not want Mike and Tom having a confrontation,
7    she was afraid of that.
8        Q. Did she indicate whether Mike Scanlon knew
9    about her relationship with Tom Capano?
10       A. Throughout our conversations, throughout our
11   relationship with working and Tom Capano came up, she
12   told me she did not tell Mike Scanlon about Tom Capano.
13       Q. Now, did you also talk to her about Mike
14   Scanlon?
15       A. Yes.
16       Q. And what did she tell you about Mike Scanlon
17   how she felt about him?
18       A. She felt very highly of Mike Scanlon. For a
19   time there, the last year, Anne Marie was very down,
20   looked very upset and down. And seemed like when she
21   met Mike Scanlon her life came back into her. She
22   wasn't as down in the office, looking forward to getting
23   together with Mike Scanlon. She felt -- I felt with her

**Page 177**

1   A. Throughout her -- going back through my memory, in the
2   beginning of meeting Anne Marie, that she had a
3   friendship with Tom Capano that -- in the beginning that
4   -- talking with Anne Marie, she said that Tom Capano was
5   her best friend.
6      Q. What about -- I thought you mentioned all the
7   way through June of '96 she indicated he was one of her
8   best friends?
9      A. No. This was just the beginning. I knew her
10   all the way through her disappearance.
11      Q. She didn't say that later on?
12      A. No.
13      Q. And you have no idea of the friendly things
14   they were doing together with each other, the dinners,
15   etcetera, etcetera?
16      A. No, I did not.
17      Q. And you didn't know about the book she gave him
18   to help him understand her eating disorder better on May
19   23rd of '96, did you?
20      A. No, I did not.
21      MR. MAURER: Excuse me, your Honor.
22   BY MR. MAURER:
23      Q. Just one last point, Trooper Sullivan.

**Page 178**

1   Consistent with the general statement you have given,
2   April 19, 1996, there was an e-mail from Tom Capano to
3   her, it starts out, "Hey, you. Welcome home. Thanks
4   for the call last night."
5      See that?
6      A. Uh-huh.
7      Q. Does that suggest to you Mr. Capano is thanking
8   Miss Fahey for calling him last night?
9      A. Yes.
10      Q. May 28th of '96 was the date?
11      A. I didn't see the date, sir. Yes, it is.
12      Q. Right around the time that she is telling you
13   that she's afraid he's going to be there waiting for her
14   when she gets back?
15      A. Yes.
16      MR. MAURER: Thank you.
17      THE COURT: Mr. Wharton?
18      MR. WHARTON: No questions.
19      THE COURT: All right. May Trooper Sullivan be
20   excused?
21      MR. WHARTON: Yes.
22      MR. MAURER: Yes.
23      MR. CONNOLLY: Your Honor, the State calls

**Page 179**

1   Jennifer Bartels-Haughton --
2      JENNIFER BARTELS-HAUGHTON
3   the witness herein, having first
4   been duly sworn on oath, was
5   examined and testified as follows:
6      DIRECT EXAMINATION
7   BY MR. CONNOLLY:
8      Q. Good afternoon, Mrs. Haughton, where do you
9   live?
10      A. I live in Westford, Massachusetts.
11      Q. I'm going to ask you to please to speak into
12   the microphone.
13      A. Westford, Massachusetts.
14      Q. And how long have you lived in Massachusetts?
15      A. Four years.
16      Q. Did you grow up in Delaware?
17      A. Yes.
18      Q. How old are you?
19      A. I'm 33.
20      Q. And you knew Anne Marie Fahey?
21      A. Yes.
22      Q. And when did you first meet Anne Marie?
23      A. In third grade, 1975.

**Page 180**

1      Q. And what kind of relationship did you have with
2   her?
3      A. Very close friends all the way through -- she
4   is my oldest friend.
5      Q. You went to high school with her?
6      A. Yes.
7      Q. Did you go to college together?
8      A. She went to University of Delaware for a short
9   time, but I went to University of Delaware so I visited
10   her at Wesley during college.
11      Q. So you maintained contact?
12      A. Yes.
13      Q. You are married?
14      A. Yes.
15      Q. When did you get married?
16      A. 1991.
17      Q. And at the time you got married were you still
18   close friends with Anne Marie?
19      A. Yes, she was in my wedding.
20      Q. After you got married did you still live in
21   Delaware? Where were you?
22      A. No. I moved to Seattle the same year I was
23   married.

1  Q. While you were in Seattle, did you keep in contact
2  with Anne Marie?
3  A. Yes.
4  Q. What was the frequency of your contact with
5  her?
6  A. We used to talk on the phone about once or
7  twice a month while I was in Seattle. And when I came
8  east to visit my parents who used to live in Wilmington,
9  we always saw each other. And once I moved to
10  Massachusetts, we saw each other a little more often,
11  she came up and we still talked on the phone about twice
12  a month.
13  Q. And you moved to Boston in 1994?
14  A. Yes.
15  Q. So let's say in '95, from September of '95 to
16  June of 1996, how many times did you see Anne Marie?
17  A. September of '95 to June of '96 I saw Anne
18  Marie Christmas time in '95 was the only time I saw her.
19  Q. And how often did you speak with her during
20  that period, September of '95 to June of '96?
21  A. Probably two or three times a month.
22  Q. Now, when you saw her in December, that was
23  down in Delaware?

1  A. Yes.
2  Q. And would you tell us about, you saw her only
3  once that time?
4  A. No. I saw her twice that time.
5  Q. Twice? And the two occasions were what?
6  A. Once, just my parents had a Christmas party and
7  she came to that, and then we went out to dinner at
8  Toscana's was the second time I saw her while I was in
9  town.
10  Q. Who went to dinner at Toscana that night?
11  A. Just me and Anne Marie.
12  Q. Whose idea was it?
13  A. Anne Marie's. She had a gift certificate and
14  took me out to dinner.
15  Q. How did the dinner go? What did you talk
16  about?
17  A. We talked about a lot of things. We talked
18  about Mike, we talked about her childhood, we talked
19  about I don't know, gee.
20  Q. Let's take Mike for starters. Mike is who?
21  A. It was her boyfriend at the time.
22  Q. Mike Scanlon?
23  A. Yes, Mike Scanlon?

1  Q. And did you talk about your dinner
2  around Christmas time in '95?
3  A. Yes.
4  Q. What had Anne Marie told you about Mike
5  Scanlon?
6  A. She had told me in September when she met him
7  and she was real excited about finally meeting someone.
8  And she talked about him every time we talked from that
9  point on, from September on.
10  Q. And you mentioned that you talked about her
11  childhood. You said you grew up with Anne Marie?
12  A. Yes.
13  Q. You understood she had difficult years as a
14  child?
15  A. Yes.
16  Q. And was that kind of something that she shared
17  with you even as an adult, her memories and experiences?
18  A. Oh, yes, uh-huh.
19  Q. Generally, how would you describe her feelings
20  towards her childhood and her referring as a child?
21  A. She thought it was horrible. She had bad
22  feelings about it.
23  Q. Was it something that she liked to share with

1  many people?
2  A. No.
3  Q. After dinner what did you do?
4  A. We sat in her car for a long time. I gave her
5  a Christmas present, and she got very emotional and she
6  cried for a long time in my car.
7  Q. And why was she crying?
8  A. She was crying because she said that she didn't
9  deserve Mike, Mike Scanlon, and there were so many
10  things about her that she hadn't told him and she was
11  really scared she would lose him if she was honest with
12  him.
13  Q. Did she tell you what the things were that she
14  was afraid to share with Mike Scanlon?
15  A. Her anorexia, the fact that she was in therapy,
16  and she told me -- well she had been talking a lot about
17  her dad that night, so I guess I just thought that was
18  the kind of stuff she meant.
19  Q. Is it fair to say that you knew that her
20  relationship with her father was not a good one?
21  A. Yes.
22  Q. Do you recall speaking with her in late January
23  or early February of 1996?

Case 1:06-cv-00688-B* Document 22-2 Filed 02/22/2007 Page 75 of 100

**Page 185**

1     A. Yes.

2     Q. And first of all, what prompted the

3   conversation?

4     A. A specific conversation? Well, her birthday

5   was the end of January, so my husband and I sent her

6   flowers when she turned 30, so she called after that

7   weekend and told me about all the things she had been

8   doing. She had a wonderful weekend. She had the

9   surprise party, she had the gala. She talked about what

10   dresses she was going to wear, and she was thrilled and

11   excited and thought that was the time of her life.

12     Q. From January to May you maintained the two to

13   three times a month contact with her over the telephone?

14     A. Yes.

15     Q. During those conversations did she continue to

16   share with you these confidences about Scanlon and the

17   stresses and problems that you have already alluded to?

18     A. Yeah.

19     Q. And do you recall a conversation in mid may

20   that you had, a rather lengthy conversation?

21     A. Yes.

22     Q. Would you tell us first of all, where was Anne

23   Marie when you had this conversation?

**Page 186**

1     A. She was at work.

2     Q. Tell us about the conversation, what you

3   remember?

4     A. I remember that she got some e-mails from

5   Thomas Capano.

6     Q. This is while she's on the phone?

7     A. While she was on the phone.

8     Q. What did she tell you about the e-mails she got

9   while on the telephone?

10     A. She got upset and she said that this man would

11   not get the hint, that she did not want to be more than

12   friends, and he was bothering her, sending her e-mails

13   and asking her to go out to dinner.

14     Q. Did she describe for you the e-mail at all?

15     A. No.

16     Q. Had she ever spoken with you before about Tom

17   Capano?

18     A. No.

19     Q. Did she tell you that she had had an affair

20   with him?

21     A. No.

22     Q. Did she tell you anything else about him in

23   relation to her?

**Page 187**

1     A. She told me that he had wanted her to leave her

2   job at the Governor's office and go and work for his

3   brother, Louis ,and she had interviewed and that she

4   wasn't going to do it she was going to stay in the job

5   at the Governor's office.

6     Q. Do you recall another subject coming up during

7   this conversation?

8     A. Yes.

9     Q. What was that subject?

10     A. She talked a lot about adultery during that

11   conversation.

12     Q. Now, why would she talk about adultery with

13   you?

14     MR. O'DONNELL: Objection. I don't know how

15   she could know that.

16     MR. CONNOLLY: I will rephrase it. I will

17   rephrase the question.

18   BY MR. CONNOLLY:

19     Q. Did you and Anne Marie -- did you know anybody,

20   who is a member of Anne Marie's family, who had been

21   involved in an adulterous relationship?

22     A. Yes.

23     Q. Had Anne Marie told you about that before?

**Page 188**

1     A. Yes.

2     Q. Did you have a family member whose marriage was

3   affected by an adulterous relationship?

4     A. Yes.

5     Q. And had you and Anne Marie discussed that fact

6   before?

7     A. Yes.

8     Q. Who raised the subject of adultery during this

9   telephone conversation?

10     A. Anne Marie.

11     Q. And describe for us what she said and her

12   demeanor?

13     A. She was almost out of control, furious with a

14   member of her family for being involved in an adulterous

15   relationship and feeling as though lots of people knew

16   about it. And she was just very upset and very verbal

17   about it.

18     Q. Do you recall discussing anything about who is

19   to blame for such kinds of affairs with her?

20     A. Yes, I do.

21     Q. Tell us about that.

22     A. I recall discussing the blame being placed with

23   the person who is married because they take the vows,

Caaee:006cvx000068-B    Dwoounmeent2292    FFiledd0222220007    PPaaggee336600f4410

1 and the other person not being as much to blame and so
2 forth.
3    Q. Did Anne Marie know what your views of adultery
4 were, your convictions?
5    A. I think so.
6    Q. Had you ever expressed to her before this
7 conversation your reaction to your family member
8 situation and what had occurred?
9    A. Yes.
10    Q. And what had you told her?
11    A. Well, my brother's marriage broke up and we
12 hated my sister-in-law for having had an adulterous
13 affair, so she knew that.
14    Q. Did Anne Marie, during this conversation, at
15 all indicate what the views of her other siblings were
16 about the person in her family that had engaged in this
17 behavior?
18    MR. O'DONNELL: Objection. Hearsay.
19    MR. CONNOLLY: Your Honor, it is not submitted
20 for the truth, it is submitted to know what she
21 understood her siblings would react.
22    THE COURT: I'm going to admit it for that
23 purpose, we have done that consistently. Please

1 understand that we are looking at the mental state of
2 Miss Fahey and this is evidence is produced for that
3 limited purpose only.
4 BY MR. CONNOLLY:
5    Q. Go ahead.
6    A. I'm lost.
7 BY MR. CONNOLLY:
8    Q. Did Anne Marie indicate to you during this
9 conversation what her understanding was about her
10 siblings' views of the fact that a family member had
11 been involved in a adulterous affair?
12    A. She said they were all upset about it and very
13 mad.
14    Q. Now, were you aware that soon after this
15 conversation Anne Marie was to travel to New England
16 with Mike Scanlon?
17    A. Yes.
18    Q. She had talked to you about that?
19    A. Uh-huh.
20    Q. And in fact what was one of the plans, as far
21 as you are concerned, with this New England trip?
22    A. My husband's parents have a home on Martha's
23 Vineyard and we were spending Memorial Day there. She

1 and Michael were appropriate to spend time in Falmouth
2 and were going to come over and visit us for a day on
3 the island.
4    Q. What was the purpose of the trip to Martha's
5 Vineyard to meet you?
6    A. She wanted me to meet Mike.
7    Q. You had never met him before?
8    A. No. His family is in New England and we missed
9 each other at Christmas.
10    Q. Did you, in fact, meet Anne Marie or Mike?
11    A. No, our plans fell through.
12    Q. Was there any particular reason they fell
13 through?
14    A. Yeah. The family home that they were supposed
15 to visit in Falmouth was being used by someone else so
16 they visited his sister's instead, and I believe she is
17 in New Hampshire. Anyway, it was too far away for them
18 to come for a day if they were going to be at his
19 sister's.
20    Q. So it was a scheduling problem?
21    A. It was a scheduling problem.
22    Q. When did you last speak with Anne Marie?
23    A. I last spoke to Anne Marie June 7, 1996.

1    Q. You are able to pinpoint the date, why?
2    A. Because my husband's sister was visiting and my
3 niece took the message that she had called.
4    Q. What did she tell you?
5    A. She called to tell me that another friend of
6 ours from high school had just gotten engaged.
7    Q. Did she talk about Mike Scanlon?
8    A. Yeah, she did.
9    Q. What were her feelings about Mike Scanlon that
10 she expressed to you?
11    A. She talked about marrying him. She talked
12 about who she would like to have in her wedding party.
13 And we talked about a lot about weddings during that
14 phone call.
15    MR. CONNOLLY: No further questions, your
16 Honor.
17    THE COURT: Mr. O'Donnell.
18    CROSS-EXAMINATION
19 BY MR. O'DONNELL:
20    Q. Good afternoon, Mrs. Haughton. I'm Jack
21 O'Donnell. We have never had a chance to talk before,
22 have we?
23    A. No.

**Page 193**

1      Q. Prior to your testimony here this afternoon,

2  did you talk to any member of the prosecution team, the

3  Government team over here, Detective Donovan, Mr.

4  Connolly, Mr. Wharton?

5      A. Yes.

6      Q. How many times?

7      A. Once.

8      Q. Pardon?

9      A. Twice.

10     Q. Twice. When was that?

11     A. I talked to Mr. Connolly in September and

12 yesterday.

13     Q. September of '98?

14     A. Yes.

15     Q. On the phone?

16     A. Yes.

17     Q. And yesterday in person?

18     A. Yes.

19     Q. And are you presently living in Westford?

20     A. Yes.

21     Q. Massachusetts?

22     A. Uh-huh.

23     Q. Is that a suburb of Boston?

**Page 194**

1      A. Sort of, yeah, uh-huh.

2      Q. And you came down here yesterday specifically

3  to testify in this trial?

4      A. I came down Saturday.

5      Q. You had a couple days with your family while

6  you were here?

7      A. To testify and have my kids visit with their

8  grandparents.

9      Q. But the sole visit was for your testimony

10 today?

11     A. To have my kids visit with their grandparents

12 and to testify.

13     Q. That's always a good reason. When you talked

14 to Mr. Connolly was Detective Donovan there?

15     A. Yesterday?

16     Q. Yes.

17     A. Yes.

18     Q. Did he take notes?

19     A. I don't remember, I think so.

20     Q. Did he discuss with you what was in the notes

21 at all to make sure he was taking it down right?

22     A. Mr. Donovan?

23     Q. Detective Donovan.

**Page 195**

1      A. No.

2      Q. How about Mr. Connolly, did he?

3      A. Yes.

4      Q. And you verified some information in the notes?

5      A. Yes.

6      Q. I would have an application to make at this

7  time.

8      MR. CONNOLLY: If I could follow-up on redirect

9  I think that will clarify things.

10     THE COURT: Mr. O'Donnell may have a question

11 that needs to be answered now.

12     MR. CONNOLLY: We can go to side-bar.

13     THE COURT: Side-bar.

14     (The following side-bar discussion was held:)

15     MR. O'DONNELL: I think clearly, based on her

16 answers, there ought to be some Jencks material.

17     MR. CONNOLLY: I'm about to produce the one

18 line of notes that Detective Donovan took, which is

19 going to say her name and may say her date of birth.

20 And as far as -- she thinks he took notes because he

21 wrote that down. I'm asking him to get it, he has some

22 other things on the paper that are totally irrelevant.

23 I will show them to the Court in a second.

**Page 196**

1      I think the last question, did he go over the

2  notes? I think what she thinks -- if you would -- I

3  will get them, and if somebody asks her was she shown

4  any notes or asked to affirm that there was anything on

5  paper, I think you will find the answer would be no.

6  But I will get it.

7      MR. O'DONNELL: It is very extensive Jencks

8  material, your Honor.

9      THE COURT: You have received one line.

10     MR. O'DONNELL: With a date and her name on it.

11     MR. CONNOLLY: That's all there is.

12     THE COURT: I'm willing to accept your

13 representation.

14     (Following a side-bar discussion:)

15     THE COURT: Mr. O'Donnell?

16 BY MR. O'DONNELL:

17     Q. Your first contact with the Government was in

18 September, a telephone conference?

19     A. I think so, yes.

20     Q. And that was with Mr. Connolly?

21     A. Yes.

22     Q. Did you call him?

23     A. No.

Case 1:06-cv-00068-HB* Document 282 Filed 02/20/2007 Page 388 of 440

1     Q. He called you?

2     A. Yes.

3     Q. That was the first time anyone came in

4 connection with the Government case, right?

5     A. Yes.

6     Q. Let me start with the end of your testimony.

7 As I understand your testimony, Memorial Day weekend of

8 1996 you were spending with your husband at his parent's

9 cottage on Martha's Vineyard?

10     A. Yes.

11     Q. And based on conversations that you had with

12 Anne Marie Fahey before that weekend, you knew that Mike

13 Scanlon and she were coming up to that area?

14     A. Yes.

15     Q. Specifically coming up to Falmouth?

16     A. Yes.

17     Q. And there is a nice little ferry that runs

18 between Falmouth and Martha's Vineyard?

19     A. Yes.

20     Q. Did you say the reason for the trip was so you

21 could meet Mike Scanlon; did you say that?

22     A. I said the reason for the trip over to Martha's

23 Vineyard would be for me to meet Mike.

1     Q. As opposed to the reason of that trip to that

2 area in general?

3     A. Yes.

4     Q. You were not trying to say the only reason they

5 were coming up there so you could meet Mike Scanlon?

6     A. No.

7     Q. Do you know whether there was any other reason?

8     A. He wanted Anne Marie to meet his parents.

9     Q. In any event, because of scheduling

10 difficulties you never got to meet him?

11     A. Right.

12     Q. On June 7th of '96, you had a telephone

13 conference with Anne Marie Fahey?

14     A. Yes.

15     Q. And that was the last time you spoke to her?

16     A. Yes.

17     Q. Is that right?

18     A. Yes.

19     Q. And at that time she was discussing with you

20 her plans to Mary Michael Scanlon, in essence?

21     A. Yes.

22     Q. You were talking about who might be in the

23 wedding party?

Case 1:06-cv-00068-HB* Document 282 Filed 02/20/2007 Page 388 of 440

1     A. Right.

2     Q. Did you know that at no time did Anne Marie

3 Fahey and Michael Scanlon ever discuss wedding plans;

4 were you aware of that?

5     A. What was the question?

6     Q. Were you aware at no time did Anne Marie Fahey

7 and Mike Scanlon ever discuss these wedding plans you

8 say she was talking about to you?

9     A. I guess.

10     Q. You didn't know that, did you?

11     A. I didn't know one way or the other, no.

12     Q. But can I safely assume that you would have

13 assumed that it was like a done deal if she was having

14 these conversations with you about who is in the wedding

15 party and dresses and stuff like that?

16     A. No. I think girlfriends talk about those

17 things to each other regardless.

18     Q. The impression I got was that you were hearing

19 there was going to be a wedding pretty soon.

20     A. She was hoping.

21     Q. She didn't say that specifically?

22     A. Say what?

23     Q. That she was going to marry him soon?

1     A. She said he was the one she was going to marry.

2     Q. With respect to Thomas Capano, had you ever met

3 him?

4     A. No.

5     Q. Did I understand you to say that you had one

6 conversation with Anne Marie about Thomas Capano?

7     A. Yes.

8     Q. And that conversation occurred about the middle

9 of May of 1996?

10     A. Yes.

11     Q. Okay. She never told you about it before that?

12     A. No, never.

13     Q. You didn't know that Anne Marie Fahey and

14 Thomas Capano had had an affair of some substantial

15 duration?

16     A. No, I did not.

17     Q. Did not know that they had been romantically

18 involved?

19     A. No.

20     Q. Did not know that at one point at least, Anne

21 Marie Fahey considered Thomas Capano her best friend?

22     A. No.

23     Q. Never confided any of that in you, her grade

1   school girlfriend?

2   A. No.

3   Q. You didn't know that Anne Marie Fahey and

4   Thomas Capano -- and I'm not going to go through all

5   this, and the jury has already heard it -- had been

6   exchanging rather pleasant e-mails for months before the

7   middle of May of 1996?

8   A. No, I did not.

9   Q. You didn't know she had been calling his law

10   firm regularly, if not daily, to speak with him during

11   those months, during some of those months?

12   A. No, I did not know that.

13   Q. And you didn't know that she continued to

14   correspond with him both on the telephone and e-mails

15   after the middle of May and up to June 27th, you didn't

16   know that either?

17   A. No.

18   Q. And, of course, you didn't know she had gone

19   out to dinner with him several times in the month of

20   June?

21   A. Right.

22   Q. She didn't call and confide any of that in you?

23   A. Right.

---

Page 202

1   Q. I take it that when Anne Marie Fahey dropped

2   Thomas Capano's name into this telephone conversation,

3   did you ask her questions about him?

4   A. Yes.

5   Q. And the only thing you got out of her was

6   essentially that he wasn't getting the hint that she

7   just wanted to be friends, in essence? I'm sorry. You

8   said one other thing, that he, in addition to that, that

9   he, Thomas Capano, had arranged for an interview for her

10   with his brother, Louis?

11   A. Yes.

12   Q. You said that too, didn't you?

13   A. Yes.

14   Q. Did I miss anything else or basically those two

15   things were all you said? Did I get that right?

16   A. Yes.

17   Q. Do you know for example, whether or not Anne

18   Marie Fahey ever even went on a job interview with Louis

19   Capano?

20   A. Yes.

21   Q. She told you she did?

22   A. Yes.

23   Q. And she decided not to take the job I guess?

---

Page 203

2   Q. Did she tell you she was even offered a job by

3   Louis Capano?

4   A. Yes, and said an apartment with it.

5   Q. Did she say specifically she saw Louis Capano?

6   A. She said she interviewed for the job.

7   Q. With Louis Capano?

8   A. Yeah.

9   Q. You had known Anne Marie Fahey since third

10   grade?

11   A. Yes.

12   Q. Did you know that since at least 1988 she had

13   been on and off battling anorexia?

14   A. Yes.

15   Q. And did you and her have conversation --

16   discussions about that?

17   A. Yes.

18   Q. Did you know that in order for Thomas Capano to

19   better understand the subject that she provided a book

20   on anorexia to him to read?

21   A. What is your question?

22   Q. That she gave Thomas Capano a book on anorexia,

23   a book from her psychologist, a book so he could better

---

Page 204

1   understand the disease?

2   A. Did I know that?

3   Q. Yeah.

4   A. No.

5   Q. And since you didn't know that, I'm sure you

6   didn't know he read it within a few days and they had

7   conversation about it, she didn't share that either?

8   A. No.

9   MR. O'DONNELL: May I have a moment, your

10   Honor?

11   Thank you, very much. Nothing further.

12   THE COURT: Mr. Connolly?

13   MR. CONNOLLY: Nothing further. And I would

14   ask if the Court would please excuse the witness.

15   THE COURT: Mr. O'Donnell?

16   MR. O'DONNELL: That's fine with us, your

17   Honor.

18   THE COURT: You are excused. Thank you for

19   your testimony.

20   It is time for the afternoon recess. If the

21   jury can be escorted out first.

22   (The jury exited the courtroom at 3:35 p.m.)

23   THE COURT: Stand in recess until the call of

**Page 205**

1  the Court.

2      (Following a brief recess:)

3      THE COURT: Please bring the jury in.

4      THE COURT: Mr. Connolly.

5      MR. CONNOLLY: Thank you, your Honor. The

6  State calls Jackie Steinhoff.

7          JACQUELINE STEINHOFF,

8          the witness herein, having

9          first been duly sworn on oath,

10         was examined and testified as

11         follows:

12         DIRECT EXAMINATION

13 BY MR. CONNOLLY:

14     Q. Good afternoon, Mrs. Steinhoff.

15     A. Good afternoon.

16     Q. How old are you?

17     A. Thirty-two.

18     Q. Where do you live?

19     A. In town on Clayton Street.

20     Q. Are you married?

21     A. Yes.

22     Q. When did you get married?

23     A. 1994.

**Page 206**

1      Q. And what was your maiden name?

2      A. Binnersly.

3      Q. Do you work?

4      A. Temporary. I work for Placers Employment

5  Agency, just for a short time.

6      Q. What did you do before that?

7      A. I owned a coffee shop, also in town.

8      Q. What was the name of the coffee shop?

9      A. Java Jack's Cafe.

10     Q. Did you know a person named Anne Marie Fahey?

11     A. Yes, I did.

12     Q. As of June of 1996, how would you characterize

13 your relationship with her?

14     A. Very close. She came into the coffee shop

15 quite frequently. Spoke to her practically everyday.

16 She came into the coffee shop once or twice a week. I

17 did catering with her through the Governor's office. We

18 socialized on weekends.

19     Q. She was your best friend, if not one of your

20 best friends?

21     A. She was my dearest friend, yes.

22     Q. How long had you known her?

23     A. It would have been 20 years, 7th grade, 1979,

**Page 207**

1  approximately.

2      Q. You grew up together?

3      A. Yes.

4      Q. Went to high school together?

5      A. Junior high was when we first met, yes.

6      Q. At some point when you were adults did she live

7  with you?

8      A. Yes. She moved into my house on Clayton Street

9  approximately 1992.

10     Q. And the two of you lived together, was there

11 anybody else?

12     A. We had a third roommate her name was Braunlin.

13     Q. The three of you lived together for how long?

14     A. Together the three of us lived probably a year

15 and a half, approximately.

16     Q. When did Annie move out of your Clayton Street

17 home?

18     A. Just before I was married, which was August of

19 '94, she moved out July of '94.

20     Q. Were you able to observe either through time

21 spent in childhood or when you lived with Annie as an

22 adult any unusual habits that she had?

23     A. Unusual? I would just say her analness, if I

**Page 208**

1  may.

2      Q. She had a nickname?

3      A. Anal Annie. She was very neat, very

4  particular. She did funny things -- well, funny

5  things -- she was -- she kept her room very clean, made

6  her bed as soon as she got up in the morning, dusted her

7  baseboards. She was overly clean and concerned -- not

8  concerned, but involved in being anal.

9      Q. Dirty laundry?

10     A. She folded her dirty laundry which is

11 unusual -- that is unusual, yes.

12     Q. And you kidded her about this?

13     A. Yes.

14     Q. When she moved out of your apartment, she moved

15 to Washington Street; is that correct?

16     A. Yes.

17     Q. Did you maintain frequent contact with her?

18     A. Yes.

19     Q. And you already mentioned that you spoke with

20 her daily as of June of '96?

21     A. Yes.

22     Q. How long had you been speaking with her on a

23 daily basis?

## Page 209

1    A. We didn't socialize as much after I opened the
2  coffee shop but we still spoke quite often, three times
3  a day sometimes, once a day, occasionally we would skip
4  a day, so quite frequently.
5    Q. She confided in you?
6    A. Yes.
7    Q. What kinds of things did she share with you,
8  just general topics?
9    A. Relationships with boyfriends, future plans,
10  her career, problems that she may be experiencing the
11  day of. Just hopes and dreams and just girly chit chat.
12    Q. Do you know the defendant, Tom Capano?
13    A. I do.
14    Q. When did you meet him first?
15    A. When I personally met him was in my house when
16  Annie was a roommate, so it must have been in '92, the
17  first year that she moved in. I believe it was the fall
18  of '92.
19    Q. Fall of '92? When did she move in with you?
20    A. Oh, sorry. Yes, okay, she moved in December of
21  '92, so it was the following fall which would have been
22  '93.
23    Q. So this is the fall of '93. Do you recall this

## Page 210

1  incident when you first met him?
2    A. I do.
3    Q. Would you describe what happened, that you
4  observed?
5    A. I was coming home from the gym and it was
6  approximately 7:00, 8:00 at night and I walked into the
7  first room, which is the family room -- dining room,
8  sorry, living room. And he was there and they were on
9  the couch and they were drinking a bottle of red wine
10  and they were kind of situated facing each other,
11  shoulder to shoulder type thing. I just felt that
12  something was going on. I just thought it was unusual
13  that he was there. It was a weeknight, it was a work
14  night and they were drinking a bottle of wine, it was
15  relatively early, so I just thought it was odd for him
16  to be there. That was the first time that I met him.
17    Q. Did you talk with Anne Marie about him that
18  night or shortly thereafter?
19    A. Yes. After he left I questioned why he was
20  there. Because I heard her speak of him before, I had
21  never met him, but I knew he was married, I knew he was
22  significantly older than her and I just said to myself
23  and my roommate and Annie why is he here? Why are you

## Page 211

1  drinking wine and what is going on? And again I sensed
2  some body language between them when they were situated
3  on the couch.
4    Q. What did Anne Marie say to you?
5    A. We are just friends. He is just over chatting,
6  just a friend of mine from work, they know each other
7  from work somehow, Capano dealt with the Governor's
8  office through work and Annie was the Governor's
9  scheduler, so maybe she received the phone calls,
10  intercept phone calls.
11    Q. Would it be fair to say that you were not so
12  happy that he had been over?
13    A. Yeah. My first impression I thought it was odd
14  and I wasn't very happy that a married man with children
15  was at our house with her.
16    Q. Did you tell Anne Marie that you felt that way?
17    A. Yes. And maybe not that night, soon after I
18  confronted her and I asked her is there a relationship
19  with him and she denied it, she said no there is not, we
20  are just friends.
21    Q. Did you ever see him again at your house?
22    A. I didn't see him at the house. My roommate
23  did, Braunlin.

## Page 212

1    Q. Was it your understanding that he continued to
2  come over to your house for awhile?
3    A. Yes. Three or four times, I recollect, from
4  either my roommate or even Annie may have mentioned that
5  he was there.
6    Q. Do you know why he stopped coming over?
7    A. No.
8    Q. Did you ever know before June 27, 1996 that
9  Anne Marie Fahey had had an affair with Tom Capano?
10    A. No, I did not.
11    Q. You opened your coffee shop when?
12    A. August of '95? I said that in a question.
13  August of '95.
14    Q. During that summer of '95 did and Annie talk
15  about Tom Capano at all?
16    A. We did. She spoke of him on several occasions
17  and he helped me incorporate the business, some legal
18  work that had to be done. And when I was talking to
19  Annie about some of the things I wasn't really sure to
20  do with a business, and I guess she was already talking
21  to Capano about it, and she offered him to help me and
22  thought it would be good idea that he came down to the
23  store and we could sit and talk and get some of this

**Page 213**

1  legal work done. There wasn't a lot of legal work, it
2  was just incorporating the business.
3  Q. He did help you with that, correct?
4  A. Yes.
5  Q. Did he charge you for that?
6  A. Yeah. Charged me the fee to have the papers
7  filed, which is a general fee, so I don't think it was
8  anything additional.
9  Q. He didn't charge you for his own time?
10  A. No.
11  Q. Did he ever take you out to lunch?
12  A. Yes, he did.
13  Q. Where did he take you?
14  A. Two times we went out to lunch. Again, the
15  reasons were to discuss the business, to help me with
16  the business.
17  Q. And this is all before you opened in August of
18  '95?
19  A. Yes.
20  Q. Who went to lunch?
21  A. Annie, Capano, and I.
22  Q. And who paid for lunch?
23  A. He did.

**Page 214**

1  Q. Did you go -- what types of restaurants did you
2  go to?
3  A. The Shipley Grille, which is located, I
4  believe, two blocks from Java Jack's, we went there and
5  then went to the Hotel DuPont.
6  Q. Was he helpful in setting up your business?
7  A. Yes. Uh-uh. He gave me some ideas, talked to
8  me about the menu, talked to me about purchasing
9  equipment, what I would purchase if I had enough money,
10  the risks involved, so, yes, he was helpful.
11  Q. Did you appreciate his help?
12  A. I guess you learn to appreciate everyone's
13  help. You have to open your mind up, when you open a
14  business everybody wants to put their two cents in. So
15  I thought he would be a good contact to have with him
16  being located right next door and working in the law
17  firm, so I was appreciative.
18  Q. Was there anything you did not appreciate?
19  A. As the business opened and progressed I just
20  find this unusual, again, but he was concerned, he asked
21  me when he saw me how the business was doing,
22  financially how am I doing. He wanted to come down and
23  set up a time to go over my books, which I felt that was

**Page 215**

1  a little odd a little invasion of my privacy. But I
2  just said I knew -- I didn't want him to but blew it off
3  and nothing was said from there.
4  Q. Who was your first customer at Java Jack's when
5  you opened?
6  A. Capano wanted to be. I think it actually was
7  the day before we ever officially opened, but he
8  purchased a beverage and he was the first customer rung
9  up on the register.
10  Q. Whose idea was that?
11  A. His.
12  Q. He asked you about it?
13  A. Yes. He was adamant about it. He wanted to be
14  the first customer.
15  Q. And during the first couple of months during
16  your business did you see Mr. Capano on a regular basis?
17  A. Yeah. He came in practically everyday, if not
18  everyday -- there may have been a few days here and
19  there -- at 9:00 and he got coffee.
20  Q. How long was he in on this regular almost daily
21  basis as you set up your business?
22  A. Probably until mid August -- sorry, mid
23  October, a month and a half, couple months.

**Page 216**

1  Q. So from August of '95 until about mid October
2  he is in almost everyday?
3  A. Yes.
4  Q. What frequency after mid October is he in?
5  A. Didn't see much of him. He came in
6  occasionally with I don't know if it was a client or
7  another lawyer and had lunch a couple of times,
8  approximately. And he would still stop in occasionally
9  and get coffee, so not a whole lot.
10  Q. Did you notice any changes in the defendant as
11  the fall of '95 progressed, other than he is not coming
12  in as often?
13  A. Yes. His physical appearance was definitely
14  altered. He began to lose a lot of weight. His cheeks
15  were withdrawn, he just didn't look good. He looked
16  depressed, he looked sad, as I said he lost a lot of
17  weight, he looked like a sad person.
18  Q. Did you ever talk with him about your
19  observations?
20  A. I did. I said what's wrong? You are not
21  eating. He said -- he never went into it he shook his
22  head and tried to put a smile on and said things aren't
23  going good, I'm depressed, we will talk about it. We

Page 217

1 will talk ab out it type of thing, but we never did. He
2 was going to call and come down and talk about his
3 problems but he never did that. I do recall a time he
4 came into the store right before Christmas, second week
5 of December possibly, that he said he wanted to kill
6 himself, that he was suicidal.
7    Q. And I mean, I take it that doesn't happen often
8 in your coffee shop?
9    A. No. And I was very concerned and wanted to
10 talk to him more about it and he turned and just walked
11 away. And I immediately called Anne Marie right away, I
12 was concerned. I said to Annie, Tom was just in, he
13 seemed really depressed, seemed really down and talked
14 about suicide and what is wrong, what can we do type of
15 thing. So her response was oh, he's okay, he's okay,
16 there is nothing wrong and he'll be fine. She didn't
17 seem too concerned and she was closer to him than I was.
18 So whenever I did see him I asked how he was doing or
19 how he was feeling.
20    Q. Do you recall December of '95 around this time
21 discussions you had with the defendant about dinner
22 plans?
23    A. Yes. And I don't know whether it was before or

Page 218

1 after he talked about his depression, I believe it was
2 before. He wanted to take Annie and I out to dinner in
3 Philadelphia, it would just be a good thing to go out
4 and get together. And again, I didn't see Annie
5 socially at that time so I kind of wanted to go too, I
6 thought that would be fun, would go out to dinner to
7 Philadelphia. So he tried to organize that through me.
8    Q. When you say through you, did you call Annie
9 about this?
10    A. Yeah, I called Annie several times.
11    Q. What was her reaction to the idea of having
12 dinner with Tom Capano?
13    A. She did not want to go.
14    Q. Sorry?
15    A. December was a busy time for her and she kept
16 saying I have this to do, I have that to do. And he
17 would come into the store and ask me this and I would
18 call her on the phone pretty much thereafter and every
19 time she was busy, wouldn't commit, had plans. I said
20 let's pick a date, pick a date in January, and she
21 couldn't do it, couldn't commit to it.
22    Q. Did she tell you why she didn't want to commit
23 to dinner?

Page 219

1    A. No. But she seemed like -- kind of hemmed and
2 hawed. She never said why. She just said oh -- she
3 told me she did not want to go, she did say that. And
4 she just said oh, we will get together some time. But
5 she made it sound more of an effort than anything.
6    Q. Did she eventually agree to go?
7    A. She did, I think, under my persuasion, but she
8 did. We ended up going. It was mid January.
9    Q. Do you remember where you went?
10    A. Yes. To, I think, it was an Italian
11 restaurant, La Familia in Philadelphia.
12    Q. Who went?
13    A. The three of us.
14    Q. Before you went did Anne Marie give you any
15 kind of instructions about certain topics that could not
16 be discussed?
17    A. She did. She mentioned Mike Scanlon. She said
18 whatever you do don't talk about Mike tonight, Tom
19 doesn't like him. And I think I may have asked why and
20 she went on to say they have a work relationship that is
21 the reason why they do not get along. I didn't know if
22 they knew each other, and apparently they knew each
23 other through work, I guess, somehow they had contact.

Page 220

1    Q. In fact, you had already talked to Tom Capano
2 about Mike Scanlon?
3    A. I said to myself, oops, it's already been done,
4 but didn't tell her that.
5    Q. Now, before you went to the restaurant in mid
6 January, that evening, where did you go?
7    A. Annie picked me up and we drove to Capano's
8 home on Grant Avenue.
9    Q. And what happened at his house?
10    A. We went in, I believe we went through the
11 garage, walked upstairs and he gave us a tour, gave us a
12 tour of the kitchen. And I brought him a pasta maker
13 that I found in my basement, I remember doing that. And
14 he gave us a tour of the home, each room and he was
15 proud of it, just recently went out and bought some
16 things for the home and he was excited, excited to show
17 us, proud of the house. Showed us the girls' rooms and
18 how he purchased them -- I don't think he purchased each
19 of them one, but wanted the girls to feel comfortable in
20 his home, but they all had a boom box and telephone. He
21 made a point of saying that, I recall.
22    MR. CONNOLLY: Your Honor, if I may at this
23 point move for the admission of two photographs. I

1 believe they are without objection.

2 MR. MAURER: We have seen them, they are not

3 objected to.

4 THE COURT: In that case, they may be admitted.

5 That would be State's Exhibits 58 and 59.

6 THE PROTHONOTARY: So marked.

7 (State's Exhibits 58 and 59 were admitted into

8 evidence.)

9 BY MR. CONNOLLY:

10 Q. Mrs. Steinhoff, I'm going to show you State's

11 Exhibit 58. You have seen this picture before?

12 A. I have.

13 Q. And what is it a picture of?

14 A. The family room of Capano's home.

15 Q. This is the home at Grant Avenue?

16 A. Yes.

17 Q. Now, is it laid out the way you saw that room

18 in mid January, 1996?

19 A. No.

20 Q. What is the significant difference or what are

21 the significant differences in that picture from what

22 you observed in mid January, 1996?

23 A. The situation of the television it was to the

1 MR. CONNOLLY: Your Honor, at this point I

2 would like marked for identification --

3 THE PROTHONOTARY: State's Identification C.

4 MR. CONNOLLY: --State's Identification C.

5 THE COURT: All right. State's C for

6 Identification.

7 (State's Exhibit C was marked for

8 identification.)

9 BY MR. CONNOLLY:

10 Q. Can you see that, Mrs. Steinhoff?

11 A. Yes.

12 Q. What is this?

13 A. It is the layout of the, I believe, that's the

14 dining room and then the family room.

15 Q. This is the layout of the same room you are

16 talking about it?

17 A. That's the way I saw it, yes.

18 Q. This would assist you in testifying here today?

19 A. Yes.

20 Q. The position of -- you see the TV stand, love

21 seat and dining room table, are they positioned the way

22 you saw them approximately in mid January of 1996?

23 A. Yes.

1 left, kitty-corner, actually where those pillows are.

2 Q. Do you recognize this TV and the TV holder?

3 A. TV stand?

4 Q. TV stand, thank you.

5 A. I couldn't identify the actual television, it

6 looked like it.

7 Q. It looked something like this?

8 A. Yes.

9 Q. How was that in position?

10 A. Kitty-corner on an angle.

11 Q. Were there other furniture in this room?

12 A. There was a couch right in front of the

13 television where the television is now.

14 Q. Before we ask you to get to the couch, let me

15 show you State's Exhibit 59, and do you recognize this?

16 A. I do not. I don't remembering these, the

17 pillows.

18 Q. Other than the pillows, do you recognize the

19 room, the TV stand?

20 A. Yes.

21 Q. You talked about the stack of pillows before

22 this TV was in the room when you were in the room?

23 A. Yes.

1 THE COURT: Has Mr. Capano had an opportunity

2 to see that?

3 BY MR. CONNOLLY:

4 Q. Well, after you had the tour of the defendant's

5 home, you went to La Famiglia in Philadelphia?

6 A. Yes.

7 Q. How did the dinner go?

8 A. I enjoyed myself. It was nice. It was a very

9 nice restaurant. Anne Marie wasn't in the best of

10 moods. She wasn't her, as she usually is, very overly

11 happy and just full of life. She was just average that

12 night. She wasn't like real happy or down, she was just

13 average.

14 Q. Do you recall a time during the dinner when

15 Anne Marie went to go to the bathroom?

16 A. Yes.

17 Q. And I take it was just the three of you at

18 this dinner?

19 A. Yes.

20 Q. When she went to the bathroom you had a

21 conversation with the defendant, correct?

22 A. I did.

23 Q. Would you tell us about that conversation?

1    A. He said to me, he asked me why Annie hated him.
2  And I kind of thought -- I just looked at him, what do
3  you mean she hates you?  She doesn't hate you.  And he
4  said yes, she does.  And he kind of shook his head
5  saying, oh, she hates me, she hates me.  And I said she
6  has never said that to me.  Why would she hate you?  I
7  just thought it was odd.
8    Q. And it kind of left unresolved?
9    A. Exactly.  I just asked him why would she hate
10  you?  And he's like I don't know, I don't know, she just
11  hates me.  I just thought those words were strong, hate.
12  That was unusual.
13    Q. Did you ever later tell Annie about this?
14    A. I don't think so.
15    Q. Did you talk that evening at all about her
16  upcoming birthday party?
17    A. I did.  When she was also in the bathroom I
18  mentioned to him, and I assumed he was invited because I
19  knew they were friends, to her surprise birthday,
20  surprise 30th birthday, so I did mention to him, and I
21  realized he wasn't invited and felt awkward for
22  mentioning it.
23    Q. Why do you say you realized he wasn't invited?

1    A. He just seemed shocked.  Well, he didn't know
2  about it apparently.  I felt like I told him, and he
3  kind of looked at me like oh, no, I'm not invited and
4  then kind of back peddled and said it is probably just
5  friends, going to be small.
6    Q. Who paid for dinner?
7    A. He did.
8    Q. And after dinner where did you go?
9    A. We went back to his home.
10    Q. About what time was this?
11    A. Oh boy, it was quite late, 11, 12:00.
12    Q. What happened at his house?
13    A. We went upstairs and he asked if we wanted to
14  see a movie and we didn't want to stay.  Then he
15  offered -- he gave me a movie, Amadeus, to take home
16  thinking my husband and I would like to watch it, so I
17  took that movie home.
18    Q. Have you ever returned that to him?
19    A. No, I have not.
20    Q. After this dinner, did you see Tom Capano
21  again?
22    A. Yeah.  He came into the coffee shop, I believe,
23  with another lawyer for lunch.  I definitely remember

1  one time, he probably was in a couple of times and that
2  was maybe March, April.
3    Q. Do you recall learning at some point anything
4  about Tom Capano's -- one of his daughters?
5    A. Yeah.  I believe it was January.  I think I
6  referred back to when Tom said he was suicidal and Annie
7  went on to explain that it was because of his daughter.
8  She told me not to say anything, but his daughter had a
9  brain tumor and was going into A.I. Institute for
10  surgery and that was one of the reasons he was down in
11  the dumps in December.  She told me that later, I guess
12  it was January time.
13    Q. You mentioned before you went to this dinner
14  you were instructed not to bring up this subject of Mike
15  Scanlon?
16    A. Yes.
17    Q. Had she told you about Mike Scanlon?
18    A. Yes.
19    Q. What had Annie told you?
20    A. She was very excited about him.  When you start
21  dating somebody you don't want to get your hopes up, but
22  she really liked him.  And eventually, I guess it was
23  early, maybe Christmas time, before Christmas, I can't

1  recall exactly when, but I guess it was April time
2  before we went out to dinner she was talking about how
3  she wanted to marry him.  And she was, and I would say
4  to her do you think this is the one?  Do you think this
5  is the one?  And she would have big grin on her face and
6  smile and say, you know, I think so, but didn't want to
7  get too excited because you never know how things go.
8  But she was in love with him.  She said that.  She told
9  me she was in love with him.
10    Q. Had she ever talked about other boyfriends to
11  you?
12    A. Not in that sense, not using love, those are
13  strong words for Annie.
14    Q. At least as far as conversations with you?
15    A. Yes.  And she has had relationships.  He made
16  her happy and she would say that.
17      MR. CONNOLLY:  Your Honor, may I have a moment?
18      Thank you, Judge.
19  BY MR. CONNOLLY:
20    Q. When did you last see Anne Marie?
21    A. Wednesday, before she disappeared.
22    Q. And where did you see her?
23    A. Java Jack's.

1 Q. There was a couch in that room; correct?
2 A. Yes.
3 Q. The color of that couch was?
4 A. I believe it to be neutral.
5 Q. In fact, when you testified before the grand
6 jury I think you indicated that the couch was beige in
7 color?
8 A. Beige. To me, when I say neutral I mean beige
9 or tan like a light color. It wasn't distinct that I
10 recall.
11 Q. Do you recall saying at the grand jury that the
12 couch was beige in color?
13 A. Yes.
14 Q. That was your recollection of the color of the
15 couch and you have given us your recollection of the
16 description of the room; is that correct?
17 A. Yes.
18 MR. MAURER: Thank you. That's all I have.
19 THE COURT: Mr. Connolly.
20 MR. CONNOLLY: No further questions.
21 I ask that the Court excuse the witness.
22 THE COURT: Mr. Maurer?
23 MR. MAURER: That's fine, your Honor.

1 THE COURT: Miss Steinhoff, you are excused.
2 MR. CONNOLLY: If I can have a moment, please?
3 THE COURT: You may.
4 MR. CONNOLLY: Your Honor, at this point I
5 would move to admit State's Exhibit 60, and then a
6 stipulation which I would ask be marked State's Exhibit
7 61. I believe both will be admitted without objection.
8 THE COURT: Mr. Maurer, any objection to the
9 stipulation?
10 MR. MAURER: There is none, your Honor.
11 THE COURT: All right. The exhibit then is
12 admitted as State's Exhibit 60 and the stipulation
13 concerning it is State's Exhibit 61.
14 THE PROTHONOTARY: So marked.
15 (State's Exhibits 60 & 61 were admitted into
16 evidence.)
17 MR. CONNOLLY: May I read the stipulation?
18 THE COURT: Yes.
19 MR. CONNOLLY: Stipulation regarding
20 La Famiglia Restaurant. It is hereby stipulated by and
21 through their respective counsel that one La Famiglia is
22 a restaurant located at 8 South Front Street,
23 Philadelphia. La Famiglia operated as a restaurant

2 State Exhibit 60 is the reservation log book
3 for La Famiglia in 1996.
4 State Exhibit 60 is authentic and all
5 objections to its admissibility, other than relevance or
6 weight are waived.
7 This stipulation shall be read and admitted
8 into evidence at trial and is signed by all counsel.
9 THE COURT: Mr. Wharton?
10 MR. WHARTON: Thank you, your Honor.
11 State calls Virginia Columbus.
12 VIRGINIA COLUMBUS,
13 the witness herein, having first
14 been duly sworn on oath, was
15 examined and testified as follows:
16 DIRECT EXAMINATION
17 BY MR. WHARTON:
18 Q. Good morning, Miss Columbus?
19 A. Good morning.
20 Q. How old are you?
21 A. Twenty-eight.
22 Q. And where do you live?
23 A. 300 Alders Drive.

1 Q. Where is that located?
2 A. Wilmington.
3 Q. Is that where you grew up, basically?
4 A. Yes.
5 Q. Are you employed now?
6 A. Well, currently I'm a full-time student and
7 working.
8 MR. OTERI: Could the witness please speak up?
9 THE COURT: Get as close to the microphone as
10 you can.
11 THE WITNESS: Do you need me to repeat myself?
12 BY MR. WHARTON:
13 Q. Please.
14 A. Currently I'm a full-time student and working
15 part-time.
16 Q. Prior to becoming a full-time student, did you
17 have a full-time job?
18 A. Yes.
19 Q. What was that job?
20 A. I worked for Governor Carper. My last position
21 was in constituent relations.
22 Q. When did you begin working for Governor Carper?
23 A. In August of '93.

Case 1:06-cv-00068-JB    Document 283    Filed 02/28/2007    Page 76 of 400

1  Q. And can you tell us since your last position I
2  was in constituent relations I guess you started out
3  with something else?
4  A. I was the runner for about a year and then I
5  was a receptionist for about three and a half years,
6  then I was in constituent relations.
7  Q. Did you know Anne Marie Fahey?
8  A. Yes.
9  Q. And did you know her before you both worked
10  with the Governor?
11  A. Yes.
12  Q. How long had you known her?
13  A. I met Anne Marie when she began dating my
14  brother, which would have been in '88 or '89.
15  Q. What is your brother's name?
16  A. Paul Columbus.
17  Q. Did you become friends with her?
18  A. Yes.
19  Q. How good of friends did you become with her?
20  A. Annie was like a sister with me, we were very
21  good friends.
22  Q. At some point did Anne Marie live with your
23  family?

1  A. Yes.
2  Q. When was that?
3  A. She lived with us prior to working for Tom
4  Carper in Washington, shortly after she graduated from
5  Wesley.
6  Q. Was she dating your brother then?
7  A. Not at the time. I think it was an on and off
8  thing at that point.
9  Q. You need to speak up.
10  A. It was sort of on and off at that point.
11  Q. When she lived with you was it off, is that
12  what you are saying?
13  A. Yeah.
14  Q. So she was living with your family but not
15  dating your brother at that point?
16  A. That's correct.
17  Q. Was she close to your family as well?
18  A. Yes.
19  Q. Were you living in the household at the time
20  she was living in the household?
21  A. Yes.
22  Q. Were you familiar with some of her personal
23  habits in terms of neatness or lack there of or that

1  kind of thing?
2  A. Yes. She was extremely neat. As far as some
3  of her habits, I mean, her bedroom was always clean,
4  tidy, bed was always made. She used to fold her laundry
5  before she put it in the hamper, things like that.
6  Q. When the clothes were dirty?
7  A. Yeah.
8  Q. How about shoes?
9  A. Her shoes used to go back in the original box
10  with any original packaging that came with it. If there
11  was stuffing in the toes, the stuffing went back in the
12  toes.
13  Q. When you worked for the Governor, as a
14  receptionist I take it that you handled the switchboard;
15  is that right?
16  A. Yes.
17  Q. How, if someone wanted to call Anne Marie from
18  outside the office, how would that phone call be routed?
19  Would it come through you or not?
20  A. Usually it would come through me, and I would
21  let Anne Marie know who was on the line.
22  Q. Was there a way to reach her directly?
23  A. Sue Campbell who was the Governor's executive

1  secretary at the time had her own line that sometimes
2  Anne Marie used. Had her own incoming line that
3  wouldn't go through the receptionist.
4  Q. So Sue Campbell had her own private line, so to
5  speak?
6  A. Yes.
7  Q. You said Anne Marie used that occasionally?
8  What types of occasions would she use it?
9  A. Usually if she was in Dover, because Anne Marie
10  worked in Wilmington, if she was in Dover she would have
11  calls coming through Sue's line.
12  Q. You would not be aware of those calls?
13  A. No.
14  Q. But you would be aware of those incoming calls
15  when Sue Campbell was in Wilmington?
16  A. Yes. And actually if Anne Marie or Sue weren't
17  at the desk then that line would bump up to me. But if
18  the line was answered then I wasn't aware of it.
19  Q. Did you know or do you know the defendant in
20  this case?
21  A. Yes.
22  Q. How is that it you know him?
23  A. I met him through Anne Marie.

Page 25 - Page 28

Case 1:06cv00068-1B Document 1283 Filed 02/22/2007 Page 86 of 400

1 Q. Do you know whether or not he had occasion to
2 call her while you were a receptionist?
3 A. Yes.
4 Q. How frequently would he call her?
5 A. Often. I would say two to three times a week.
6 Q. What did you -- did you know what the status of
7 their relationship was then -- Anne Marie Fahey's and
8 the defendants, or did you ask her about that
9 relationship?
10 A. It was my understanding that they were just
11 friends.
12 Q. Is that what she told you?
13 A. That's what she told me.
14 Q. She didn't tell you that they had had a
15 different kind of relationship?
16 A. No.
17 Q. Were you working in the Governor's office
18 around Valentine's Day of 1996?
19 A. Yes.
20 Q. Do you know whether or not Anne Marie Fahey
21 received any flower deliveries, and Valentine's flower
22 deliveries?
23 A. Yes. She received two that day.

1 Q. Now, I take it that if someone was making a
2 delivery they would have to come to you at least
3 initially in order to make the delivery?
4 A. Yes. Because I was at the front desk which was
5 in the front lobby, so.
6 Q. So you are aware of two floral deliveries?
7 A. Yes.
8 Q. Do you know who sent the first one?
9 A. Michael Scanlon.
10 Q. Do you know Anne Marie Fahey's reaction to
11 that?
12 A. She was happy. She kind of took them back to
13 her office and was smiling.
14 Q. You knew -- did you know about her relationship
15 with Michael Scanlon?
16 A. Yes.
17 Q. Now, did she receive any other -- you said she
18 received two floral deliveries for Valentine's Day?
19 A. Yes. She received roses later that day or
20 morning.
21 Q. Can you describe what happened with the
22 flower -- the roses delivery? I take it the delivery
23 person brought it to the --

1 A. Brought them to the front desk.
2 Q. Can you describe what was brought?
3 A. It was a large box, a box that a dozen long
4 stem roses that would come in. And I called to Anne
5 Marie and let her know there was a delivery for her out
6 front. And she came out front and took the flowers and
7 was annoyed with them and said she didn't want them and
8 went back to her office with them.
9 Q. Took them back to her office?
10 A. Yes.
11 Q. What was her demeanor with respect to when she
12 got that delivery?
13 A. She was angry. I would say, she was annoyed
14 with it.
15 Q. Did you talk to her about that?
16 A. I talked to her later about it, yes.
17 Q. Later, when?
18 A. Later that day.
19 Q. Okay. First of all, do you know or did she
20 tell you who had given her those flowers?
21 A. Yes.
22 Q. Who?
23 A. She said they came from Tom Capano.

1 Q. And what else did she say about them?
2 A. She said he was interested in a relationship
3 and that wasn't something that she would get involved
4 in.
5 Q. Did you see the flowers later?
6 A. Yes. They were in the garbage.
7 Q. In the trash?
8 A. Yes.
9 Q. At some point -- during that time after
10 Valentine's Day did Tom Capano continue to call her?
11 A. There was a period of time, yes, where he
12 continued to call, however, Anne Marie wasn't answering
13 the calls.
14 Q. How did that work?
15 A. Well, usually when he called I would either
16 buzz back to her and let her know that he was on the
17 phone or I would slip her a note and let her know that
18 he was on the phone, and she would usually answer the
19 call. But there was some period of time where she was
20 not answering the calls and she just said to me take a
21 message.
22 Q. And do you know about when that period was?
23 A. Well, it was after the roses incident. So, it

Page 29 - Page 32

Case 1:06-cv-00088-HB* Document 2803 Filed 02/22/2007 Page 9 of 90

**Page 85**

1　Q. Do you have any children?
2　A. Yes, I do.
3　Q. Do you have a daughter?
4　A. Yes, I do.
5　Q. How old is she?
6　A. Four months.
7　Q. What is her name?
8　A. Anne Marie.
9　Q. Did you know Anne Marie Fahey?
10　A. Yes, I did.
11　Q. What kind of relationship did you have with
12　her?
13　A. We were very close friends.
14　Q. And when did you first become friends with her?
15　A. I first met her in 19 -- in the summer of 1988.
16　Q. Where did you meet her?
17　A. At the shore in Sea Isle City, New Jersey.
18　Q. Is Sea Isle near Stone Harbor?
19　A. Yes, it is.
20　Q. Where did you live in 1998?
21　A. I lived in Philadelphia, the city of
22　Philadelphia.
23　Q. And how did you meet Anne Marie in Sea Isle?

**Page 86**

1　A. Through a mutual friend. We had a house at the
2　shore together, about five girls, and I was friends with
3　one of my friends that were in the house at the shore.
4　Q. Did you spend, after that summer of 1988, other
5　summers with Annie at the shore?
6　A. Yes, I did.
7　Q. Always in Sea Isle?
8　A. There was one year we had a house in Avalon,
9　but it was either Sea Isle or Avalon.
10　Q. By the summer of 1994, how would you have
11　characterized your relationship with Annie?
12　A. We were very close friends.
13　Q. You spent that summer together?
14　A. Yes, we did.
15　Q. How often did you see each other then during
16　the summer?
17　A. Every weekend.
18　Q. So every weekend you would meet at the shore?
19　A. Yes.
20　Q. Did you have a house together that summer?
21　A. Yes, we did.
22　Q. Who else was in the house?
23　A. Eileen Duffy, Annie and myself.

**Page 87**

1　Q. Did you maintain contact with her throughout
2　'94 through June 27, 1996?
3　A. Yes, we did.
4　Q. And tell us about the frequency of your contact
5　with Annie.
6　A. During the summers we would talk very
7　frequently because we were planning where to meet and
8　when to go to the shore. I would talk to her almost on
9　a daily basis.
10　In the winter we would probably communicate
11　once a week, sometimes twice a week through the
12　telephone.
13　Q. Were you confidants?
14　A. Yes, we were.
15　Q. What kind of general topics did she confide in
16　you about?
17　A. She told me about her different relationships,
18　we talked about work, we talked about, personally,
19　almost about everything.
20　Q. You knew she had an eating disorder?
21　A. Yes, I did.
22　Q. Did you have discussions about that? Extensive
23　discussions about that?

**Page 88**

1　A. Yes, we discussed it.
2　Q. Do you know the defendant, Tom Capano?
3　A. Yes, I do.
4　Q. When did you first hear about the defendant?
5　A. In the summer of 1994 when I-- when Annie,
6　Eileen and myself had a house at the shore. Annie was
7　mentioning Capano's name and she confided with me that
8　summer that they were involved.
9　Q. Now, before she told you she was involved with
10　him, had she already referred to him?
11　A. Yes.
12　Q. And what was your initial understanding about
13　the relationship between Annie and the defendant?
14　A. My initial understanding is that they were
15　friends. That he would take her out to lunch
16　occasionally. It was somebody that Annie was mentioning
17　in conversation with me.
18　Q. How does she refer to him?
19　A. As Tommy.
20　Q. When you first heard about Tommy in the summer
21　of 1994, based on what you said, was it your
22　understanding that their friendship had, or whatever
23　relationship they had, had been going on for some time?

**Page 89**

1    A. Yes, I thought it had been going on for some

2    time.

3    Q. And you said eventually she acknowledged that

4    she was involved with him?

5    A. Yes.

6    Q. You mean that they had an affair?

7    A. Yes.

8    Q. What did she say about the defendant to you?

9    How did she talk about him that summer of '94?

10    A. That he was a very successful lawyer in

11    Wilmington who was taking her out to dinners and taking

12    her out to lunch and that he was treating her like a

13    princess and pretty much that was it.

14    Q. Other than dinners, did she say why he treated

15    her like a princess? Were there specific things she

16    referred to?

17    A. He was buying her gifts and she was able

18    to-- she felt like she was able to tell him her secrets,

19    and so she was -- I think that she kind of thought of

20    him maybe as a father figure that she could share a lot

21    with him.

22    Q. Did she tell you she loved him?

23    A. Yes.

**Page 91**

1    Philadelphia.

2    Q. Who was at the dinner?

3    A. Annie, Capano and myself.

4    Q. Who arranged the dinner, as far as you knew?

5    A. Well, Annie called to ask me to go to the

6    dinner, but it was Capano's idea, according to Annie.

7    Q. And did she tell you why Capano-- or why the

8    defendant wanted to meet?

9    A. Because Annie had told him a lot about me, and

10    we were very close at that point, and he knew that Annie

11    was telling me about their relationship, so he said that

12    he wanted to meet me.

13    Q. Did you know whether, back then, any of Annie's

14    other friends knew about the fact she was having an

15    affair with the defendant?

16    A. I didn't think anybody else knew.

17    Q. Was it something you talked about a lot?

18    A. Yes, we did.

19    Q. At the dinner at DiLullo's?

20    A. DiLullo's.

21    Q. How did the defendant and Annie behave towards

22    each other?

23    A. They acted very much like a couple, they were

**Page 90**

1    Q. Did she tell you he was married?

2    A. Yes.

3    Q. What did she tell you about that?

4    A. She was very upset about it. It was a very

5    difficult situation for her because he was married with

6    four children, and Annie is a Catholic and committing

7    adultery is something that is against our religion. So

8    it was a very difficult struggle for her.

9    Q. Did she specifically talk about the fact that

10    her Catholic faith did not approve of this type of

11    conduct?

12    A. Yes.

13    Q. Did she have any fears she expressed at that

14    point about the relationship?

15    A. Well, she was afraid that whether it could go

16    somewhere. She was not sure because he was married.

17    But she didn't express any fears then, no.

18    Q. Did you ever meet Tom Capano?

19    A. Yes, I did.

20    Q. When did you meet him?

21    A. It was in the fall of '94.

22    Q. Where?

23    A. At DiLullo's Restaurant in center city

**Page 92**

1    holding hands and, you know, they kissed across the

2    table, so they seemed very much like a couple.

3    Q. You spent the summer of 1995 with Annie?

4    A. Yes.

5    Q. In making arrangements for that summer, did

6    Annie express to you any concerns that she had?

7    A. Yes.

8    Q. Now, tell us what those concerns were.

9    A. We were getting a house at the shore, Annie and

10    myself, with about 10 other people that we did not know.

11    It was arranged through a man at work that Annie worked

12    with, and he had a house at the shore with maybe five

13    other men and three or four other women. So Annie was

14    upset because she didn't think Capano would want her

15    going to the house at the shore where there was going to

16    be other men present, she thought he would be very much

17    against that.

18    Q. Did she tell you she felt that way because of

19    anything that the defendant had said to her?

20    A. Well, he flat out said to her he did not want

21    her going to the house at the shore.

22    Q. Did she end up going to the beach that summer?

23    A. Yes, we did.

**Page 93**

1    Q. Did she go every weekend?

2    A. No, we rarely went to the beach.

3    Q. Why did she only rarely go?

4    A. Because we were not that comfortable in that

5 house because we didn't know any of the other people.

6 And also because there was fights about us, between us,

7 Capano and Annie. They would fight because she was

8 going to this house at the shore and we didn't know

9 where we would be sleeping, if we would be sleeping on

10 the floor. And there was five or six single guys at the

11 house, so it was always a problem for her because she

12 would get-- she was given a hard time from Capano about

13 it.

14    Q. Do you recall a specific incident where you

15 were waiting for her at the beach and she didn't show?

16    A. Yes.

17    Q. Would you tell us what happened?

18    A. I was at a mutual friend of ours house waiting

19 to meet Annie before we went to the house at the shore

20 because we would always go together. And we were

21 supposed to meet at noon at the Ford's house and she

22 wasn't there, and she wasn't there at 1:00, wasn't there

23 at 2:00, so I kept calling her and I would get her

**Page 94**

1 answering machine. And finally at maybe 4:00 or 5:00

2 she called me at the Ford's house to say that Capano had

3 just left and they had had a huge fight because he did

4 not want her going to the shore. And he had brought

5 over wine and salmon, and things for her apartment, and

6 then this fight ensued and she was too exhausted to make

7 the trip to the shore.

8    Q. What did she tell you during the summer of '95

9 about her feelings for the defendant?

10    A. She was in love with him, but she was confused.

11    Q. And did she tell you, specifically, the sources

12 of her confusion?

13    A. Yes.

14    Q. What did she tell had you?

15    A. She didn't think -- because he was married with

16 four children, she didn't think the relationship could

17 really go anywhere. And she was concerned that if they

18 did have a relationship that she would never come first

19 in his mind because he has four children. And also she

20 didn't think he would be able to fit in with our friends

21 socially, because he was much older than she was, so

22 that concerned her very much.

23    Q. Did she ever say anything about what she

**Page 95**

1 anticipated the reaction of her family would be?

2    A. Yes. She thought her family would be extremely

3 upset if they ever found out she was involved with him.

4 That was a very big concern for her, she did not want to

5 upset her family.

6    Q. Were there any characteristics of the defendant

7 that she cited as making her be confused about her love

8 for him and yet her doubts?

9    A. Yes. Well, the defendant was buying her-- was

10 explaining to her what he could offer her in this life.

11 He could offer her anything she wanted, so that confused

12 her, because she was confused about the social status

13 and whether this was something that she really wanted,

14 and having the comfort level of not having to worry

15 about money anymore, that was something that was always

16 kind of out there.

17    Q. Did she say in '95 that she thought the

18 defendant was controlling at all?

19    A. Yes.

20    Q. Was that kind of a recurrent theme that she

21 struck with you?

22    A. Yes.

23    Q. Did she say whether or not there was any

**Page 96**

1 discussion between Annie and the defendant about the

2 possibility that he would leave his wife?

3    A. Yes.

4    Q. What did she tell you about that?

5    A. That he was talking about leaving his wife and

6 Annie was against that because she did not want to be

7 responsible for him leaving his family. And she was

8 very adamant that if he was going to do that it had to

9 do nothing with her.

10    Q. Now, do you know when the affair between Mr.

11 Capano and Annie ended?

12    A. I would say it ended in the fall of 1995.

13    Q. About when?

14    A. About September, August or September.

15    Q. And who ended it?

16    A. Annie.

17    Q. She told you that?

18    A. Yes, she did.

19    Q. What did she tell you about Mr. Capano's

20 reaction about the break up?

21    A. He was very upset.

22    Q. Can you be more specific? Can you trace his

23 reaction chronologically from the August or September

**Page 97**

1  time through the fall of '95, based on what Annie told
2  you?
3      A. Well, it was right around that time, in
4  September, I believe, that he did leave his wife, so he
5  was very angry that she did not want to see him anymore
6  at that point in time. So it was-- she was struggling
7  because he was very angry, and saying that he left his
8  wife and now it was their time to be together, and he
9  was pretty obsessive at that point.
10     Q. You say he became obsessive at that point?
11     A. Yes.
12     Q. About when did she tell you about this
13 obsessive behavior?
14     A. In the fall, October, November.
15     Q. Did she give you specific examples of things
16 she did that she or you viewed as obsessive?
17     A. Yes.
18     Q. Tell us about those things.
19     A. He would call and leave maybe 15 messages on
20 her answering machine in a two-hour period of time, that
21 she had to talk to him, why wasn't she calling him back,
22 that he needed to talk to her.
23         He also, at one point, tried to remove all of

**Page 98**

1  the gifts that he had given Annie from her apartment
2  because he didn't want another man watching the TV that
3  he had given her, the clothes-- seeing Annie wear the
4  clothes that he had given her, so he removed a lot of
5  those things from her apartment.
6      Q. Did she tell you when this apartment incident
7  occurred?
8      A. I believe it was around November.
9      Q. Did she tell you anything about e-mails?
10     A. Yes. He would e-mail her at work all the time,
11 and they were kind of obsessive e-mails.
12     Q. What did she tell you about it that makes you
13 say they were kind of obsessive?
14     A. Would be upset that she wouldn't see him or
15 wouldn't talk to him. At one point he threatened to
16 commit suicide because he said he couldn't live without
17 her. So there was a lot of pressure on Annie because he
18 was saying -- There was a lot of pressure on Annie. He
19 was saying I left my wife so we could be together. So
20 there was a lot about the e-mails.
21     Q. Do you know anything about Mr. Capano
22 purchasing a ticket for Annie to go to Spain around
23 Christmas time in 1995?

**Page 99**

1      A. Yes.
2      Q. What did Annie tell you about that?
3      A. Annie and I had talked about going to Spain
4  together, we had talked about it for a couple of months.
5  So for Christmas Annie said Capano had given her a plane
6  ticket to Spain and said that he was talking about
7  making reservations at all the hotels for her to stay in
8  and it was something she did not want. She did not want
9  to accept that gift from him.
10     Q. In this fall, into winter, how often were you
11 talking about these obsessive types of behavior with
12 Annie?
13     A. Very often.
14     Q. Every week?
15     A. I would say every week.
16     Q. On the e-mails you mentioned, did you ever see
17 any e-mails?
18     A. No.
19     Q. Did she ever read one to you?
20     A. Yes.
21     Q. What was your recollection of it or what is
22 your recollection of the e-mail she read to you?
23     A. I can't mention anything specific that was in

**Page 100**

1  the e-mail. But my recollection of the e-mail is that
2  it sounded very juvenile. It was-- we would both talk
3  about, it is shocking that he won't accept the fact that
4  you don't want to see him anymore. Because it was kind
5  of bantering, going on and on and on, two page e-mails.
6  And Annie and I would discuss it would seem almost
7  juvenile.
8      Q. In the fall and into, let's say, January of
9  '96, did Annie ever tell you she was physically afraid
10 of the defendant?
11     A. No.
12     Q. Did she ever indicate to you at that time
13 anything she was thinking about doing as a result of his
14 conduct?
15     A. Yes. She felt she had to escape. She was very
16 aware that the obsessiveness of it was weighing very
17 heavily on her shoulders. And sometimes she said I feel
18 like I have to move out of the state to get at way from
19 him.
20     Q. You talked a lot with Annie over the years, I
21 take it, about her relationships?
22     A. Yes.
23     Q. And you said eating disorder?

**Page 101**

1    A. Yes.

2    Q. Did you know anything about-- did she talk

3  about her childhood?

4    A. Yes, she did.

5    Q. And how would you have assessed her feelings

6  about her childhood and her difficulties with eating?

7  What did she say to you?

8    A. Her childhood was something -- it was a very

9  difficult childhood. And she felt -- she never wanted--

10  I remember her making a statement that, "If I ever had

11  to live through my childhood again I would slit my

12  wrists."

13    It was a very difficult time for her. And her

14  eating disorder came because she felt it was the one

15  thing in her life that she felt she could control

16  because she felt like her life had been so out of

17  control as a little girl.

18    Q. Do you want to take a moment?

19    A. I'm okay.

20    Her weight was the only thing she felt she

21  could of control. She wouldn't eat. She could control

22  what she put in her mouth and how much she weighed, so

23  that's why it became such an obsession with her.

**Page 102**

1    Q. This is something that you tried to monitor?

2    A. Yes.

3    Q. As your relationship developed?

4    A. Yes.

5    Q. Did she ever talk to you about the effects she

6  thought the defendant had on her eating disorder?

7    A. I'm sorry. Can you repeat the question,

8  please?

9    Q. Did she ever talk to you about what she-- Did

10  she ever say to you whether there was any relationship

11  in her mind between what the defendant would do to her

12  and her eating disorder?

13    A. Not that I recall.

14    Q. She didn't talk to you -- when you said about

15  control, you don't recall any conversation about where

16  she thought his conduct made it worse?

17    MR. OTERI: Objection, your Honor, asked and

18  answered.

19    MR. CONNOLLY: I will withdraw the question.

20  BY MR. CONNOLLY:

21    Q. Did she talk to you about her eating disorder

22  and childhood upbringing?

23    A. Yes.

**Page 103**

1    Q. Did she describe to you any occasions where she

2  thought the defendant played on her insecurities

3  relative to those things?

4    A. Yes.

5    Q. Can you tell us specifically about those?

6    A. She had a problem with her background and the

7  way her childhood was. And she said that the defendant

8  would attack her insecurities and refer to her as white

9  trash, or that she should be lucky that he's even going

10  out with her because of who he is and what he could buy

11  her and where she came from.

12    Q. Now, when she-- Were you aware of any

13  relationships that she was involved in, other than with

14  the defendant?

15    A. Yes.

16    Q. And in, let's start in September of '95, what

17  did you become aware of as far as that?

18    A. She was dating Michael Scanlon.

19    Q. Did she talk to you about Scanlon?

20    A. Yes, she did.

21    Q. What did she tell you?

22    A. She was very excited about the relationship

23  with Michael.

**Page 104**

1    Q. Did she talk about it until the end of June of

2  '96?

3    A. Yes, she did.

4    Q. And did she talk to you about her aspirations

5  with respect to the relationship?

6    A. Yes. She thought that there was definitely

7  marriage potential with Michael. She was very excited

8  about the way it was progressing. The Governor had

9  introduced them and it had started out they would date

10  once a week, or something, but it was becoming more

11  serious as the winter was going on.

12    Q. Did she have any concerns about the

13  relationship with Scanlon?

14    A. No.

15    Q. Well, were there any issues about it she

16  discussed?

17    A. Yes.

18    Q. Can you tell us?

19    A. She was a little bit concerned because she

20  didn't think it was progressing in a physical manner

21  that way she thought maybe it would.

22    Q. She hoped for more physically?

23    A. Yes.

**Page 105**

1  Q. How about emotionally?

2  A. No. The one thing she was afraid of with

3  Michael was she was reluctant to share with him her

4  eating disorder. So, emotionally on that, that was the

5  one thing she was reluctant to share with him. But

6  other than that they were emotionally moving along.

7  Q. Had she ever spoken to you about other men the

8  way she talked about Scanlon?

9  A. Michael was the first one she was referring to

10  as marriage potential, since 1988 with Paul Columbus,

11  was the last time I had heard her talk about the

12  marriage potential.

13  Q. And she had dated Paul Columbus for a number of

14  years?

15  A. Yes.

16  Q. You mentioned that she didn't feel comfortable

17  talking about the eating disorder with Michael Scanlon?

18  A. Yes.

19  Q. She talked to you about that?

20  A. Yes.

21  Q. Did she tell you whether she had told Scanlon

22  about the eating disorder?

23  A. She mentioned it to him, but I don't think she

**Page 106**

1  went into the detail of the disorder.

2  Q. Of this?

3  A. Of this disorder. I don't think she went into

4  the detail, but she might have mentioned it to him.

5  Q. Do you know whether she had talked to Michael

6  Scanlon about the fact that she had had an affair with

7  Tom Capano?

8  A. No, she did not.

9  Q. And she told you that?

10  A. Yes.

11  Q. Did she want to tell Michael?

12  A. No. She was afraid to tell Mike.

13  Q. Why was she afraid. What did she tell you?

14  A. She was afraid he would think less of her

15  because of both of their religions, and she was afraid

16  that he would think less of her for having an affair

17  with a married man.

18  Q. Was she afraid the defendant would expose the

19  fact that they had had an affair to Scanlon?

20  A. Yes, she was very afraid of that.

21  Q. Did she say whether the defendant had ever

22  threatened to do that?

23  A. Yes.

**Page 107**

1  Q. Do you recall a specific incident?

2  A. There was an event in Delaware that Annie was

3  very excited about going to with Michael called -- I

4  think it was called the Grand Gala. And Tom had

5  threatened her that he was going to be there, and she

6  was very afraid that he was going to expose their

7  relationship at this event.

8  Q. Did she ever tell that you Mr. Capano had, in

9  fact, told somebody about the affair?

10  A. Yes.

11  Q. Tell us about that.

12  A. She was very upset, because he told her that he

13  told their parish priest that he had been involved with

14  Annie, and Annie -- they went to the same church, the

15  same parish. And Annie felt she could never go back to

16  that church again because she was humiliated that the

17  priest knew that she had had an affair with him.

18  Q. Annie turned 30 in 1996; is that right?

19  A. That's right.

20  Q. Did you to go her birthday party?

21  A. Yes, I did.

22  Q. Do you recall her talking to you about this

23  birthday party before it happened?

**Page 108**

1  A. Yes.

2  Q. Now, it was supposed to be a surprise party,

3  correct?

4  A. Yes.

5  Q. But she knew?

6  A. Yes.

7  Q. What did she tell you?

8  A. She knew that her sister Kathleen was having a

9  surprise party for her and she was very-- she didn't

10  know who was invited and she was very concerned that

11  there was a possibility Tom would be invited to the

12  party.

13  Q. What did you do as a result of her concern that

14  she expressed?

15  A. I called Ginny Columbus who works in Annie's

16  office, because I knew she knew who the guest list was,

17  and I asked who was on the list.

18  Q. Was Tom Capano on the list?

19  A. No.

20  Q. Did you tell Anne Marie that?

21  A. Yes.

22  Q. At some point, did Annie say things to you to

23  indicate that the relationship or that the obsessive

Page 109

```
 1   behavior of Mr. Capano had subsided?
 2     A. Yes.
 3     Q. About when was that?
 4     A. I would say it was in the early spring.
 5     Q. Of 1996?
 6     A. Yes.
 7     Q. And what did she tell you about this
 8   relationship between the two of them at that point?
 9     A. She felt that they had become, gotten to a
10   common level of friendship, a nice friendship, because
11   she felt that he had known so much about her, and they
12   had been very close and she was comfortable with the
13   friendship she thought had developed.
14     Q. Were you aware that they had stopped contact
15   for awhile just prior to this time?
16     A. Prior to this spring?
17     Q. Prior to when she told you she thought they had
18   come to friendly terms.
19     A. She said there was a quiet time where they were
20   not talking at all.
21     Q. Now, in the later spring, late May of 1996, you
22   saw Tom Capano?
23     A. Yes.
```

Page 110

```
 1     Q. Tell us how it came about.
 2     A. I work in center city Philadelphia. And one
 3   day I was at my desk and Tom Capano appeared in my
 4   office. He does some work for another man in my office
 5   and he appeared at my desk, so I saw him then.
 6     Q. Had you seen him in between the 1994 dinner in
 7   Philadelphia with Anne Marie and this occasion in May of
 8   1996?
 9     A. No.
10     Q. Did he come in unannounced?
11     A. Yes.
12     Q. You had no idea he was coming?
13     A. No.
14     Q. So you were surprised?
15     A. Yes.
16     Q. What happened?
17     A. So I got up and said hello to him. He said he
18   had just been in town and was doing work and maybe we
19   could get together sometime.
20     Q. And did you get together sometime?
21     A. Yes.
22     Q. Who made the arrangements to get together?
23     A. He did.
```

Page 111

```
 1     Q. He called you?
 2     A. Yes.
 3     Q. And where did you work?
 4     A. Smith-Barney.
 5     Q. Did he call you at work?
 6     A. Yes.
 7     Q. And where did you go to dinner with him?
 8     A. At the Ritz-Carlton.
 9     Q. And that's a hotel in Philadelphia?
10     A. Yes.
11     Q. Who was at the dinner?
12     A. Tom Capano and myself.
13     Q. Did he tell you when he made arrangements for
14   the dinner, why he wanted to get together?
15     A. Yes.
16     Q. What did he tell you?
17     A. He said he was in town for a partners meeting
18   and he was very concerned about Annie's health and he
19   wanted to discuss that with me.
20     Q. And how did the dinner go? What was, in fact,
21   let's say the main topic of conversation?
22     A. Annie was the main topic of conversation and
23   her health.
```

Page 112

```
 1     Q. And who raised that?
 2     A. He did.
 3     Q. And what did he tell you?
 4     A. That I was going to be shocked when I saw her
 5   because she has gotten so skinny. And that he was very
 6   concerned that she was in serious danger. And I also
 7   was very concerned that she was in danger, so I wanted
 8   to discuss it with him. And he said that he thought
 9   possibly we should consider some kind of intervention
10   for her to get her into a treatment program or do
11   something before it got any worse.
12     Q. And this treatment intervention program that
13   you talked about was a type of commitment? In other
14   words, she would be committed to the hospital, is that
15   what your understanding was?
16     A. Yes.
17     Q. What was your reaction to that?
18     A. I said to him I was just as concerned. I had
19   been concerned about Annie's health because I knew she
20   was getting very skinny. And I said I thought we should
21   call Robert and bring it to her brother Robert's
22   attention and let him know that we thought that she had
23   a serious problem.
```

Case 1:06-cv-00058-JB    Document 283    Filed 02/20/2007    Page 96 of 90

**Page 113**

1    Q. And what was Mr. Capano's reaction to that?

2    A. He said don't call Robert and let's think about

3    it some more before we do anything.

4    Q. Did he indicate to you or tell you about what

5    he had done with respect to her eating disorder?

6    A. Yes.

7    Q. What did he tell you?

8    A. He said that he had talked to a friend of his

9    who was a doctor who specialized in eating disorders,

10   and she, the doctor, had recommended Michelle Sullivan,

11   who Annie was seeing as a therapist. So, he said he

12   found Michelle for Annie and was paying for

13   Michelle -- for Annie to see Michelle. And he said that

14   Annie had gotten two books on eating disorders, one that

15   she had given to Capano and one that she had given to

16   Robert. And he said that he read the entire book on the

17   first night that Annie gave it to him, and she

18   definitely has the eating disorder.

19   Q. Did he say what Robert had done?

20   A. He said that Robert hadn't even read it.

21   Q. Did he compare his efforts to help Annie with

22   other persons' efforts?

23   A. Yes.

**Page 114**

1    Q. What did he say?

2    A. He said that he was the only one who was doing

3    anything for her. That he was buying her groceries,

4    constantly bringing her Gatorade and bananas to bring up

5    her electrolytes, and tried to keep her fed and tried to

6    make sure she was eating correctly.

7    Q. Did he tell you what his feelings were for Anne

8    Marie at that point?

9    A. Yes, he said that he was in love with her.

10   Q. Did he say anything else?

11   A. He couldn't understand why she wouldn't agree

12   to see him again.

13   Q. Did he say whether they had been sexually

14   involved?

15   A. No. He said he hadn't touched her in months.

16   Q. Did he say anything about what he could provide

17   for her that made it difficult for him to understand why

18   she wouldn't return his love?

19   A. He said he had more money than he could spend

20   in a lifetime and he could provide Annie anything that

21   she wanted, including a Lexus and 10 bedroom house, and

22   he just didn't understand why she was spending time with

23   Michael when she could be with him.

**Page 115**

1    Q. What did he say about Mike Scanlon at dinner?

2    A. He referred to Michael as a geek.

3    Q. Did he-- what did he say about the

4    relationship?

5    A. He said that Annie didn't take him seriously at

6    all, that it was just a front to look good in front of

7    her family and she wasn't in love with him and didn't

8    understand why she was wasting any time with Michael.

9    Q. Was that true?

10   A. No, that wasn't true.

11   Q. And you say that based on what Anne Marie told

12   you?

13   A. Yes.

14   Q. Did he ask you whether he should change his

15   behavior towards Annie?

16   A. He said, "Am I crazy? Should I back away from

17   her?"

18   Q. What did you say?

19   A. I said, "Yes. I think you should back away from

20   her."

21   Q. And what was his reaction to that; do you

22   recall?

23   A. I don't recall.

**Page 116**

1    Q. Did you tell Annie what went on during the

2    dinner, the next day or soon after?

3    A. Yes. I called her first thing the following

4    morning.

5    Q. And what was her reaction?

6    Let me step back. Did you tell her everything

7    he said at dinner?

8    A. No, I didn't tell her everything that he said.

9    Q. What things didn't you tell her?

10   A. I didn't say that he said that Michael was a

11   geek.

12   Q. Why not?

13   A. I didn't want to hurt her or -- I don't know

14   why I didn't, but I didn't tell her that.

15   Q. Did you tell her about the fact that Tom Capano

16   said to you he was crazy bout her and in love with her

17   and couldn't understand why she wouldn't return his

18   love?

19   A. Yes.

20   Q. What was her reaction to that?

21   A. I don't recall her exact reaction.

22   Q. If you don't recall her words, did she-- what

23   did she-- did she express any love for Tom Capano during

**Page 117**

1 the conversation?

2    A. No.

3    Q. You had a second dinner with Tom Capano a week

4 later; is that correct?

5    A. Yes.

6    Q. Who arranged that dinner?

7    A. He did.

8    Q. And where was this dinner?

9    A. The same place, at the Ritz-Carlton.

10    Q. Now, did he tell you why he wanted to have this

11 dinner?

12    A. He said it was, that it was nice going out to

13 dinner with me the week before and he was in town again

14 for another meeting and why don't we get together again.

15    Q. What did he talk about during this dinner?

16    A. He talked -- we talked about his family and the

17 summer was coming up. And he said his daughters were

18 going to Europe. And he mentioned that his daughter had

19 been sick. His one daughter had been sick and had some

20 kind of brain surgery, and it was a very difficult time

21 for him, but she was doing better.

22      We talked about his family, how his father had,

23 I think, been an immigrant and how he made his children

**Page 118**

1 all millionaires, and how successful the family business

2 was. He mentioned his siblings and his mother, he

3 talked about, and we talked about Annie as well.

4    Q. First of all, had Annie ever told you anything

5 about one of Mr. Capano's daughters having brain

6 surgery?

7    A. Yes.

8    Q. And you said you talked about Annie, was it

9 basically the same types of things he said at the first

10 dinner?

11    A. Yes. It was basically the same, that he was

12 concerned for her health and I would be shocked when I

13 saw her. The following week I was going to see her and

14 I would be shocked and it was basically the same.

15    Q. Did he tell you what Annie's feelings were

16 about the fact that he was having dinner with you?

17    A. He said that when he told Annie he was taking

18 me out to dinner again she said, "That's fine, but the

19 next time I want to go with you."

20    Q. And did he say that he thought Annie was

21 jealous of him dating somebody else?

22    A. Well, at that dinner he mentioned he had a date

23 with another a woman who happened to work with

**Page 119**

1 Smith-Barney in Delaware, and Annie said the thought of

2 him being with her made Annie sick to her stomach.

3    Q. Had Annie ever expressed to you jealousy that

4 Tom Capano might see another woman?

5    A. No.

6    Q. At any time after September of '95, when Annie

7 became involved with Mike Scanlon, did she ever say to

8 you that she desired to be in a romantic relationship

9 with the defendant?

10    A. No.

11    Q. Did she ever say she ever desired to be in a

12 romantic relationship with anyone other than Michael

13 Scanlon during that time frame?

14    A. No.

15    Q. You mentioned gifts that the defendant, during

16 one of these dinners, talked about buying, a Lexus for

17 Annie. Did he say he actually offered to buy her a

18 Lexus?

19    A. Yes.

20    Q. Did you talk to Annie about this second dinner?

21    A. Yes.

22    Q. What did she tell you?

23    A. She said that the next-- if we decided to go to

**Page 120**

1 dinner again, if Tom asked me to dinner again she would

2 like to go with us the next time.

3    Q. Was it your understanding that-- I will

4 withdraw that question.

5      When did you next see Annie?

6    A. I saw Annie on June 8th at a wedding.

7    Q. Where was the wedding?

8    A. It was in media.

9    Q. And how did Annie look, physically?

10    A. She did not look well physically, very skinny.

11    Q. Did you speak with her at the wedding about

12 Mike Scanlon?

13    A. Yes.

14    Q. What thoughts did she tell you on June 8th

15 about Mike Scanlon?

16    A. She was very excited about their relationship.

17 She thought it was moving in the right direction. She

18 was falling in love with him.

19    Q. Was there anything in particular that

20 during-- Do you remember anything about a kitchen?

21    A. Yes. That Michael was redoing his kitchen and

22 Annie said it was like we were married because he let

23 Annie pick out the kitchen tiles and Annie was helping

**Page 121**

1 him decorate his house.

2 Q. Was Michael at the wedding?

3 A. No, he was not.

4 Q. And did Annie do anything? Did she try to call

5 Mike, do you remember?

6 A. We went to the hotel before we went to the

7 reception, and as soon as we got to the hotel room she

8 called Michael to wish him luck. He was swimming in a

9 marathon the next day, that's why he didn't go to the

10 wedding because he had this swim. She called to wish

11 him luck and wanted to let him know she was thinking of

12 him.

13 Q. You saw her the next weekend, is that right,

14 June 14th?

15 A. Yes.

16 Q. And that's a Friday?

17 A. That was a Friday.

18 Q. What did you do?

19 A. We, Annie and Michael had fixed me up on a

20 blind date with one of Michael's friends, so we met at

21 Annie's apartment, then we went to the Italian Festival

22 in Delaware.

23 Q. How did it go?

**Page 123**

1 to come pick her up.

2 Q. Do you remember when you last spoke with Annie?

3 A. Yes, I do.

4 Q. When was that?

5 A. It was the Wednesday before she was killed.

6 Q. And how did she sound on the phone?

7 A. She sounded great on the phone.

8 Q. What did she talked about?

9 A. We talked about her eating disorder, and she

10 said that she had gained a couple pounds and she was

11 very happy about that. And that she had cut the number

12 of laxatives she was taking in half, so she felt she was

13 getting better. And we talked about her relationship

14 with Michael, and she felt that was going very well, and

15 she was excited about that. It was a very upbeat

16 conversation.

17 Q. When did you learn that she was missing?

18 A. Saturday night.

19 Q. So would have been June 29th?

20 A. Yes.

21 Q. Where were you?

22 A. I was at my brother Michael's house.

23 Q. And how did you learn that something was wrong?

**Page 122**

1 A. The Italian Festival?

2 Q. How did the blind date go?

3 A. That didn't work out.

4 Q. That's not your husband?

5 A. No, that's not my husband.

6 Q. Do you recall something, in relation to the

7 defendant, happening at the Italian Festival?

8 A. We were walking through the crowd and Annie

9 said, "Oh, my God, there he is."

10 And she was referring to the defendant, and so

11 we quick turned around and walked the other way.

12 Q. Now, on that Friday, June 14th, did Annie tell

13 you about something that had happened that week with the

14 defendant?

15 A. Yes.

16 Q. And what did she tell you?

17 A. She said that she had passed out at work, she

18 was faint at work and she called Capano to come pick her

19 up.

20 Q. What was her reaction-- What was her demeanor

21 when she told you this story?

22 A. She reluctantly shared that with me. She was a

23 little sheepish about it to say she actually called him

**Page 124**

1 A. Susan Fahey called me to ask me if I knew where

2 Annie was.

3 Q. Now Susan Fahey is Robert Fahey's wife; is that

4 correct?

5 A. Yes.

6 Q. But you know her independent of the Faheys?

7 A. Yes. We went to high school together.

8 Q. She tracked you down at your brother's house?

9 A. Yes.

10 Q. What did she ask?

11 A. She asked me if I knew where Annie was, that

12 she hadn't shown up for a dinner at their house and she

13 was wondering if she knew where she was.

14 Q. You said what?

15 A. No, I didn't know where she was.

16 Q. What did you do after you hung up the phone?

17 A. My first thought that she was with Tom, so I

18 called information to get his phone number in Delaware.

19 Q. And did you call the number?

20 A. I was given two numbers, so yes, I called one

21 number.

22 Q. Who answered the phone when you called?

23 A. A young girl.

**Page 173**

1 Q. And you stated that Tom took these gifts from
2 Anne Marie because he didn't want anybody else to watch
3 his TV or see her in clothes that he bought her?
4   A. Correct.
5   Q. But you didn't complete the answer when Mr.
6 Connolly asked you. What happened to these gifts after
7 Tom took them?
8   A. He brought them back.
9   Q. He brought them back. And he brought them back
10 within like 15 minutes?
11   A. Yes.
12   Q. And Anne Marie accepted them back within 15
13 minutes?
14   A. Yes.
15   Q. Now, you also testified that Anne Marie Fahey
16 was not afraid of Tom Capano physically; is that
17 correct?
18   A. That's correct.
19   Q. She had never told you that Tom Capano had
20 abused her in any physical manner?
21   A. Correct.
22   Q. She thought he was a perfect gentleman; isn't
23 that correct?

**Page 175**

1 Q. And many, many -- most times people kiss and
2 make up and it is better than ever?
3   A. Right.
4   Q. And in these particular cases that you talk
5 about Tom playing on her insecurities, Anne Marie never
6 left Tom, did she?
7   A. She tried to.
8   Q. She never stopped taking gifts from Tom?
9   A. She tried to.
10   Q. She didn't stop taking them, did she?
11   A. In the end I think she did.
12   Q. When?
13   A. The tickets to Spain she didn't accept.
14   Q. That was in December. Do you know she took
15 gifts in January, February, March, April, May, June?
16   A. The only gifts I heard about was from the
17 defendant.
18   Q. So Anne Marie never told you about the gifts
19 she took?
20   A. Told me about the air conditioner.
21   Q. Never told you about the other gifts, $460
22 windshield?
23   A. No.

**Page 174**

1   A. Yes.
2   Q. When you mentioned Tom wanted to take you to
3 dinner she told you to go because he was a perfect
4 gentleman; correct?
5   A. Yes.
6   Q. And perfect gentlemen don't abuse women;
7 correct?
8   A. Not that I know of.
9   Q. Good. You said today, that Tom Capano played
10 on Anne Marie Fahey's insecurities; is that correct?
11   A. Yes.
12   Q. Now, you-- you are married. You, I'm sure,
13 have had relationships with other men that have broken
14 up. Isn't it fair to say that in the human interplay
15 between a man and a woman, when things get a little bit
16 tough, people often say and do harmful, hurtful things?
17   A. Is that fair to say?
18   Q. Yeah.
19   A. Yes.
20   Q. People call each other names that they are
21 sorry they ever call each other, say things about each
22 other they wish they had never said?
23   A. Correct.

**Page 176**

1 Q. The peach dress she wore to the wedding, the
2 pant suit she got from Talbots?
3   A. She didn't wear a peach dress to the wedding.
4   Q. Sorry. We are talking about a different
5 wedding. I apologize.
6   A. Oh.
7   Q. The money to take to dinner when she was up
8 here from Washington?
9   A. She didn't tell me.
10   Q. How about the money to go to the saloon with
11 her family when she wanted to go and couldn't afford it?
12   Thirty bucks when she was broke, because she
13 went to Kid Sheleen's and was broke until payday, never
14 told you about that?
15   A. No.
16   Q. Okay. Were you present at Anne Marie Fahey's
17 house at any time on the weekend of her-- this search
18 and report her disappearance?
19   A. The weekend that she disappeared?
20   Q. Yeah.
21   A. No, I wasn't there that weekend.
22   Q. Did you ever see any notes that Anne Marie
23 Fahey had written to Tom Capano or Tom had written to

1  Anne Marie? Has anyone ever showed you those notes?
2      A. No. I have seen notes in the paper.
3      Q. In the paper. But the prosecution has never
4  shown them to you?
5      A. No.
6      Q. You also said that Michael Scanlon was the
7  first guy she had talked about with marriage potential
8  since Paul Columbus; correct?
9      A. Yes.
10      Q. Did you know that she dated a man down the
11  beach in the summer of '94 or '95 named Michael Lyons?
12      A. Yes.
13      Q. And did you know in her diary -- She met him
14  June 11th. Did you know in her diary June 15th she was
15  talking about marrying him?
16      A. I didn't know she wrote that in the diary. I
17  knew she was excited about Michael.
18      Q. Did she tell you she was thinking about
19  marrying him four days after she met him?
20      A. No. She did not tell me that.
21      Q. Now, you told us that Anne Marie Fahey had not
22  told Michael Scanlon about her relationship with Tom
23  Capano; correct?

1      she was afraid that Tom Capano would expose her to
2  Michael?
3      A. Correct.
4      Q. And to the best of your knowledge, she never
5  told you that Tom Capano exposed her to Michael?
6      A. No. He threatened to do that.
7      Q. He never did it, did he?
8      A. No.
9      Q. You also talked about a Grand Gala; do you
10  remember that?
11      A. Yes.
12      Q. And she was afraid that Tom Capano would tell
13  Michael about her-- their affair at the Grand Gala?
14      A. Correct.
15      Q. Tom Capano never went to the Grand Gala, did
16  he?
17      A. I don't know the answer to that.
18      Q. You know he never exposed her that evening,
19  don't you?
20      A. Yes.
21      Q. Tom Capano, you know, never exposed her to
22  anyone at any time?
23      A. I was told he exposed her to the parish priest.

Page 178

1      A. Yes.
2      Q. And she had also not told Michael Scanlon about
3  her anorexia?
4      A. She had mentioned it to Michael, but I don't
5  think she went into the detail.
6      Q. She told you she had mentioned to Michael about
7  her anorexia?
8      A. Yes.
9      Q. Now, you told the grand jury that, "Anne Marie
10  Fahey was afraid to death of Michael finding out her
11  relationship with Tom because Michael also is a devout
12  Catholic and if he found out she had been involved with
13  a married man that would be horrible in his eyes. He
14  would judge her and it would definitely affect their
15  relationship. She was very afraid of his finding out
16  about her relationship with Tom;" do you remember that?
17      A. Yes.
18      Q. In fact, her fear wasn't of Tom Capano, her
19  fear was of Michael Scanlon finding out about Tom
20  Capano; is that correct?
21      A. She was afraid Tom Capano was going to expose
22  her relationship to Michael.
23      Q. So she was afraid of Michael finding out and

Page 180

1      Q. Excuse me. I excluded the seal of the
2  confessional from that. Anyone other than a priest who
3  cannot repeat because he learns things under the seal of
4  confessional?
5      A. As far as I know.
6      Q. Now, she also told you that, "She was
7  comfortable that things got to a normal level with Tom."
8      This is towards the end of their relationship,
9  you say.
10      "She didn't think he was a threat anymore, as
11  far as telling Michael or exposing her. She thought
12  that they had come to a mutual agreement, and that they
13  were good friends and she was very comfortable with the
14  him at the end;" is that what you said?
15      A. Yes.
16      Q. And that's what you knew; isn't that correct?
17  That Anne Marie and Tom, at least during May and June,
18  had a comfortable relationship going?
19      A. Yes.
20      Q. You didn't know they were going out on dinner
21  dates Thursday nights?
22      A. No.
23      Q. Anne Marie didn't tell you that, did she?

**Page 181**

1   A. No, she did not.

2   Q. You didn't know she was still accepting gifts

3   from Tom?

4   A. No. Besides the air conditioner.

5   Q. Now, Tom Capano did business with a man in your

6   office; did he not?

7   A. Yes, he did.

8   Q. Tom Capano had a stock account from a broker in

9   your office?

10  A. I'm not aware that he had a stock account.

11  Q. But he did do business with a man in your

12  office?

13  A. It was corporate business.

14  Q. And he would see you in the office?

15  A. He did see me in the office.

16  Q. And at one point he asked you if you would have

17  dinner with him to discuss Annie's condition; is that

18  correct?

19  A. That's correct.

20  Q. And he called you in May; is that correct?

21  A. Yes.

22  Q. Early May, late April he called you?

23  A. Yes.

**Page 182**

1   Q. About a dinner?

2   A. Yes.

3   Q. He wanted to talk to you. He was concerned

4   about Annie and the weight she was losing and if you

5   would consider getting together with him to discuss this

6   with him after work, and you said yes, correct?

7   A. Correct.

8   Q. And you called Annie and told her, correct?

9   A. Correct.

10  Q. And Annie told you to go?

11  A. Yes.

12  Q. Told you he would be a perfect gentleman?

13  A. Yes.

14  Q. And he took you to the Ritz in Philly?

15  A. Yes.

16  Q. Pretty nice place?

17  A. Very nice place.

18  Q. You had dinner, few drinks, wine, nice dinner?

19  A. Yes.

20  Q. And the entire gist of this entire thing was

21  Tom Capano was scared that Annie was going to die from

22  this anorexia?

23  A. Yes.

**Page 183**

1   Q. And he talked about you and he getting her into

2   a treatment program, 30 or 60 day program, where they

3   would stop her from doing what she was doing to her

4   body; do you remember that?

5   A. Yes, do I.

6   Q. And he said that Annie had gotten a book on

7   anorexia and given it to Tom, correct?

8   A. Yes.

9   Q. And Tom had read the book and given it back to

10  her and she had all the symptoms that were described in

11  the book?

12  A. Yes.

13  Q. And he was afraid she would die and wanted you

14  to do something to help her?

15  A. Yes.

16  Q. Now, when you talked to him about this, didn't

17  you say or he say to you that if we do this Annie will

18  never talk to either one of us again?

19  A. I honestly don't recall.

20  Q. But that is certainly something that was very

21  possible, that Annie would be extremely incensed with

22  you?

23  A. Yes.

**Page 184**

1   Q. May not talk to either you of you again?

2   A. Correct.

3   Q. Tom was willing to risk that?

4   A. If that's-- Yes.

5   Q. Now, he told you about buying her groceries;

6   did he not?

7   A. Yes.

8   Q. And told you about buying Gatorade to get her

9   electrolytes up -- I guess its electrolytes that they

10  call them -- and bananas to get her potassium up, the

11  things you do to keep people from dying from starvation.

12  He was doing all the right things for her?

13  A. Yes.

14  Q. And he also told you he was paying for her

15  treatment?

16  A. Yes.

17  Q. He didn't tell you he was only paying for part

18  of it, not all of it?

19  A. No. He said he was paying for all of it.

20  Q. Okay. Now, at this second dinner -- you two

21  had a second dinner a week or two later?

22  A. A week later.

23  Q. And it was more of the same, was it not, that

1 he was concerned about her and we ought to have a
2 intervention and we have to do something, and he wanted
3 to talk about getting a hold of Robert and perhaps doing
4 something?
5     A. He didn't want me to get a hold of Robert.
6     Q. He thought you two should do it?
7     A. No.  I wanted to get in touch with Robert and
8 he said we shouldn't do that yet.
9     Q. Not yet.  But he said not to do it, yes?
10    A. No.  He said let's think about it some more.
11    Q. Now, at some point you told Annie about the
12 second dinner with Tom Capano; did you not?
13    A. Yes, I did.
14    Q. And Annie said something to you to the effect
15 that the next time you do it, I want to come, correct?
16    A. Correct.
17    Q. So she indicated to you that the next time you
18 and Tom Capano were going to have dinner, she wanted to
19 be there; is that correct?
20    A. That's correct.
21    Q. I'm advised that the jury couldn't hear me.  I
22 find that hard believe.
23        The next time you were going to have dinner

1 in Italy?
2     A. Pardon me?
3     Q. Couple of the girls being in Europe?
4     A. Yes.
5     Q. Told you that their rich Uncle Louie had taken
6 them?
7     A. Yes.
8     Q. When Tom Capano was talking, did he say he has
9 more money or did he say Louie?
10    A. He said I have more money.
11    Q. I, not Louie?
12    A. No.
13    Q. You are positive of that?
14    A. I am positive.  Because I thought to myself why
15 was he telling me that.
16    Q. Make more sense-- Well, never mind.
17        Now, at some point, you were at an Italian
18 Festival; is that correct?
19    A. That's correct.
20    Q. Where is that Italian Festival?
21    A. It is in Wilmington.
22    Q. In Wilmington.  And you were with a blind date?
23    A. Yes.

Page 186

1 with Tom she wanted to be present; correct?
2     A. Correct.
3     Q. Now, did she ever tell you, your best friend,
4 that on May 23, at 3:28 p.m. she sent an e-mail to Tom
5 Capano and said the following: "As for rescheduling
6 with Kimmie for Thursday, please do not.  I suppose that
7 is selfish of me, but I don't feel like sharing.  I will
8 call before I leave.  TC is running late, imagine that.
9 Smile, Capano, I will get better, I promise."
10       Did she ever tell you she told Tom not to
11 invite you?
12    A. No.  She just told me the next time she wanted
13 to be with us.
14    Q. And you didn't know that the next time you
15 weren't with them?
16    A. No, I didn't know that.
17    Q. Now, Tom Capano, when he was with you, talked
18 about his children, constantly?
19    A. Yes.
20    Q. He was very close to his four girls?
21    A. Yes.
22    Q. And at one time, at one of your dinners, he was
23 talking about the girls being-- a couple of them being

Page 188

1     Q. And Anne Marie Fahey was with Michael Scanlon?
2     A. Yes.
3     Q. And you saw Tom Capano there?
4     A. I didn't see him.
5     Q. Anne Marie Fahey saw him?
6     A. Yes.
7     Q. And Tom Capano was with his kids; was he not?
8     A. Yes.
9     Q. And nothing happened.  Tom Capano didn't come
10 up and talk to you or bother you or anything else, did
11 he?
12    A. No.
13    Q. Yet Anne Marie Fahey-- this was on the 15th of
14 June or the 14th?
15    A. It was a Friday night.
16    Q. And she told you the prior Wednesday she had
17 taken ill at work and she had called Tom Capano to come
18 and pick her up; correct?
19    A. Correct.
20    Q. She had not called Michael Scanlon?
21    A. Correct.
22    Q. She had not called Kathleen Hosey.  She hadn't
23 called anyone but Tom Capano; correct?

Condensed!

1    A. Correct.

2    Q. And Tom Capano came and picked her up and

3 brought her home and bought her groceries and things to

4 help her get her strength back?

5    A. I don't know if he did that on that day or not.

6    Q. But he was doing it fairly constantly?

7    A. According to him, yes.

8    Q. And according to Anne Marie, she told you that,

9 didn't she?

10    A. I don't recall her saying he brought groceries.

11    Q. You do recall she fainted at work, got sick,

12 called Tom Capano to come get her to take her home and

13 he did?

14    A. Yes.

15    Q. Now, you testified before this grand jury --

16 you were asked, why didn't Michael Scanlon -- why didn't

17 she call Michael Scanlon to pick her up. And your

18 answer was, "She was afraid to death of Michael ever

19 finding out that she had this problem. She didn't want

20 him to think that she was sick. She was aware that she

21 was taking too many laxatives at night and she wasn't

22 eating, but she did not want Michael to know because it

23 would make her look weak in his eyes. She was afraid it

---

**Page 190**

1 might make him think less of her if she had this

2 problem. Tom, she felt was, I guess, more like a father

3 figure to her because they had this friendship and she

4 could confide in him because she had the eating

5 disorder." You answered that way?

6    A. I did say that.

7    Q. Yes?

8    A. Yes, I did.

9    Q. And you said that based on what she told you?

10    A. No. She didn't tell me that.

11    Q. So that was just what you assumed from your

12 relationship with her, knowing her and seeing how she

13 worked?

14    A. Yes.

15    Q. So she was scared to death that Michael would

16 find out about her eating disorder?

17    A. She didn't want Michael to know the extent of

18 it.

19    Q. If I quote you, "She was afraid to death of

20 Michael ever finding out that she had this problem;" is

21 that correct?

22    A. The seriousness of the problem, yes.

23    Q. You did say she was afraid to death of Michael

---

**Page 191**

1 ever finding out about this problem; did you not?

2    A. In my grand jury testimony, yes.

3    Q. So you said it?

4    A. I did say that, yes.

5    Q. Good. Now, did you know that Anne Marie had a

6 dispute with her sister Kass, or Kathleen at one point

7 in around this time period of May and June?

8    A. Yes.

9    Q. And you knew that the dispute was over a pant

10 suit?

11    A. Yes.

12    Q. And as a friend of Anne Marie's, you were aware

13 of the fact that she and her sister, although they

14 certainly loved each other, had personality problems.

15 They conflicted with each other on a number of occasions

16 and number of different subjects; did they not?

17    A. Yes.

18    Q. It was kind of a contentious relationship

19 between them?

20    A. At times it was contentious.

21    Q. You talked to Anne Marie Fahey on June 26th;

22 isn't that correct?

23    A. Yes.

---

**Page 192**

1    Q. And during that conversation, you were told

2 that Anne Marie had gained a couple of pounds and she

3 had cut the amount of laxatives she was taking in half;

4 is that correct?

5    A. Yes.

6    Q. And she told you everything was going good.

7 There was a certain peace in her relationship with Tom;

8 correct?

9    A. I don't think we discussed Tom in that

10 conversation.

11    Q. Is it fair to say that that is a true

12 statement, that there was a certain peace in her

13 relationship with Tom?

14    A. Well, I didn't discuss that with Annie.

15    Q. Let me read to you from the grand jury

16 testimony to see if you remember saying this: Question,

17 "When did you last speak with Annie?"

18    Answer, "On the Wednesday before she

19 disappeared."

20    Question, "That's Wednesday, June 26th?"

21    Answer, "Right.

22    "Where were you?

23    "At work.

```
 1        Q.    When did you become separated?

 2        A.    Three years ago, over three years ago.

 3        Q.    Can you give us an approximate month?

 4        A.    September.

 5        Q.    That would be 1995?

 6        A.    '95.

 7        Q.    And the person from whom you are

 8   separated is?

 9        A.    Thomas Capano.

10        Q.    He's the defendant in this case?

11        A.    Yes.

12        Q.    How long, including the time you've been

13   separated, how long have you been married?

14        A.    Including the time that we were

15   separated?

16        Q.    You're not divorced, are you?

17        A.    No.  26 years.

18        Q.    Where do you live?

19        A.    17th Street, West 17th Street.

20        Q.    Okay.  And the address?

21        A.    25 hundred West 17th Street.

22        Q.    Is that a --

23        A.    That's in Wilmington.
```

1      Q.    -- corner?

2      A.    Right on the corner of Greenhill and 17th

3  Street.

4      Q.    How long have you lived there

5  approximately?

6      A.    Twenty years.

7      Q.    Do you have any children?

8      A.    Yes.

9      Q.    How many children?

10      A.    Four.

11      Q.    What are their names and -- if you know

12  the ages.  I know it gets hard sometimes.

13      A.    Christine is 18, Katie is 16, Jenny will

14  be 15 next week, and Alex is 13.

15      Q.    Do they all live at home with you?

16      A.    Yes, they do.  My oldest daughter is in

17  college, but she still comes home on holidays.

18      Q.    She's away?

19      A.    She started college this past September.

20      Q.    Okay.  And she's not local in college?

21      A.    No, she's in New York.

22      Q.    When you and the defendant became

23  separated, did he leave the marital residence on 17th

1    Street?

2        A.    Yes.

3        Q.    Do you know where he went to live?

4        A.    Um, he eventually ended up on Grant

5    Avenue, the house at Grant Avenue.

6        Q.    Was there a period where he was between

7    the 17th Street address and Grant Avenue?

8        A.    Yes.

9        Q.    With whom did he stay then?

10       A.    He stayed with his brother, Louis.

11       Q.    Have you been to the house on Grant

12   Avenue?

13       A.    Just a couple of times.

14       Q.    Did you go inside, or --

15       A.    I went inside, yes.

16       Q.    Did you have any particular arrangements

17   as far as visitation with your children?

18       A.    Um, we didn't have anything formalized.

19   It was essentially he would see them on the weekend

20   or he would drop by frequently to see them.  It was a

21   very informal arrangement.

22       Q.    When he would see them on weekends, would

23   that be at your residence, or would they have a --

1  this -- or the Supreme Court has ruled on this
2  specifically.
3        Mr. Maurer, as long as -- do I understand
4  the State intends to introduce the statement and then
5  examine the witness?
6        MR. CONNOLLY: Yes. I was going to play
7  the tape he's authenticated. He said it was fair and
8  accurate, that the transcript was. I was going to
9  play the tape at this point.
10       MR. MAURER: We feel that gives a witness
11  an added benefit on the witness stand to listen to
12  his prior statements, although we certainly
13  understand he's reviewed them in detail before
14  testimony. But we think the law requires that he
15  should be examined first about the events.
16       MR. CONNOLLY: Could I ask this? If we
17  proceed that way, I presume I can ask him about the
18  substantive statements that he gave, in other words.
19       THE COURT: Certainly.
20       MR. CONNOLLY: And then we could play the
21  tape. But then I can ask him about the taped
22  statement. For instance, if he wanted to clarify
23  something he said on tape.

Page 10

1        THE COURT: Absolutely.
2        MR. CONNOLLY: I can do that. I'll just
3  do that.
4        THE COURT: Because I'm inclined to go
5  with Mr. Maurer. I think there is some validity in
6  saying that sitting and listening to your statement
7  on the stand is probably -- prior to testifying about
8  it, its contents, is probably reinforcing the
9  testimony of the witness, and that is a procedure
10  that the Court would not at this time like to
11  sanction.
12       (Sidebar discussion concluded.)
13       MR. MAURER: I haven't had our -- having
14  had our discussion at sidebar, there is no objection
15  to the admissibility of these documents and tapes.
16       THE COURT: All right. They are admitted
17  as State's Exhibits 77, 78, and 79.
18       THE CLERK: So marked.
19       (Whereupon State's Exhibit Nos. 77, 78
20  and 79, tape, transcript of statement, grand jury
21  proceeding, were received into evidence.)
22       THE COURT: Thank you. Mr. Connolly.
23  BY MR. CONNOLLY:

1    Q. Mr. Capano, what name do you go by?
2    A. Gerry.
3    Q. And do you have any siblings?
4    A. Yes.
5    Q. How many siblings do you have?
6    A. I have three brothers and a sister.
7    Q. And what are their names?
8    A. Thomas, Louis, Joey, and Marion.
9    Q. And Mr. Capano, I just ask, if you would,
10  to please speak into the microphone.
11   A. Okay.
12   Q. Who is your oldest sibling?
13   A. My sister Marion..
14   Q. And who is next?
15   A. Then Tom.
16   Q. And how much older is Thomas Capano than
17  you are?
18   A. I believe he's 13, 14 years older than I
19  am.
20   Q. Now, I want to turn your attention to
21  February 1996. Do you recall a conversation you had
22  with your brothers -- your brother Thomas in February
23  of 1996, or around February of 1996?

Page 12

1    A. I do.
2    Q. What did your brother Thomas say to you
3  during this conversation?
4    A. He asked to borrow money.
5    Q. How much money?
6    A. Eight thousand.
7    Q. Did he tell you why he wanted $8,000?
8    A. He told me that two people were extorting
9  him.
10   Q. Did he tell you anything about these two
11  people that were extorting him?
12   A. There was a guy and a girl.
13   Q. Did he tell you what they were
14  threatening to do for the money?
15   A. They were threatening to hurt his kids,
16  ruin his career.
17   Q. Did you give him the money?
18   A. I did.
19   Q. Did you give him the money around the
20  time of the conversation?
21   A. If not then, within the next couple of
22  days.
23   Q. How did you get the money?

Page 13

1    A.   I wrote a check and went to the bank.
2    Q.   Why didn't you give him a check?
3    A.   He wanted cash.
4    Q.   Did he pay you back?
5    A.   He did.
6    Q.   When?
7    A.   Within a week or so afterwards.
8         MR. CONNOLLY:  Your Honor, at this point,
9    I would move to admit State Exhibits 80 and 81.
10        THE COURT:  Is there agreement on the
11   admission of these?
12        MR. MAURER:  I believe so, Your Honor.
13   Just one second.
14        THE COURT:  All right.
15        MR. MAURER:  Without objection, Your
16   Honor.
17        THE COURT:  Without objection, State's
18   Exhibits 80 and 81 are admitted into evidence.
19        (Whereupon State's Exhibit Nos. 80 and
20   81, check and deposit slip, were received into
21   evidence.)
22        MR. CONNOLLY:  Your Honor, may I
23   approach?

Page 15

1    A.   2-13-96.
2    Q.   And for how much?
3    A.   Eight thousand.
4    Q.   And it references a check number, isn't
5    that right?
6    A.   That's right.
7    Q.   What check number does it reference?
8    A.   1666.
9    Q.   And then the first document on this State
10   Exhibit is a check from your brother, correct?
11   A.   That's right.
12   Q.   What's the check number?
13   A.   The same.  1666.
14   Q.   And to whom is this check made out to?
15   A.   Me.
16   Q.   For how much?
17   A.   Eight thousand.
18   Q.   And whose the signature on the bottom
19   line of the check?
20   A.   Tom's signature.
21   Q.   And the date of that check is what?
22   A.   I don't know if that's a four or not,
23   2-9-96.

Page 14

1         THE COURT:  You may.
2    BY MR. CONNOLLY:
3    Q.   Mr. Capano, I'm going to show you State
4    Exhibit 80.  Do you recognize that?
5    A.   That's my check.
6    Q.   It's your signature?
7    A.   Yes.
8    Q.   What's the date of the check?
9    A.   2-8-96.
10   Q.   And the check is written to what?
11   A.   Cash.
12   Q.   For how much?
13   A.   Eight thousand three hundred.
14   Q.   What did you do with the other $300?
15   A.   Probably just used it for pocket money.
16   Q.   I'm going to show you State Exhibit 81.
17   Do you recognize -- there are two documents on this,
18   is that right?
19   A.   Yeah -- yes.
20   Q.   And the bottom document is a deposit slip
21   from your account?
22   A.   That's correct.
23   Q.   And what's the date of the deposit?

Page 16

1    Q.   Now, sometime after this conversation
2    that you've told us about, did your brother talk
3    again about anything related to this extortion?
4    A.   Yes.
5    Q.   What did he ask you?
6    A.   He asked me if he could borrow a gun.
7    Q.   Did he tell you why he wanted the gun?
8    A.   He said he was scared that the guy was
9    going to hurt him.  He was afraid that the guy was
10   going to beat him up or hurt him, come to his house
11   and hurt him.
12   Q.   What did you tell him?
13   A.   I originally told you you should call the
14   police.
15   Q.   Did you have any guns at that time?
16   A.   Quite a few.
17   Q.   What kind of gun did your brother ask to
18   borrow?
19   A.   A handgun.
20   Q.   What was your response to that?
21   A.   I told him he should take a shotgun.
22   Q.   Why did you tell him that?
23   A.   Because it's better home protection.

**Page 17**

1  Q.  Why?

2  A.  Because you don't have to aim.

3  Q.  Was your brother familiar with guns?

4  A.  Not at all, that I know of.

5  Q.  And is a shotgun easier to use for

6  somebody who is not familiar with guns, in terms of

7  hitting their target?

8  A.  Yes.

9  Q.  When you suggested to your brother that

10  he should use a shotgun, what was his response?

11  A.  He didn't want it.  He wanted the

12  handgun.

13  Q.  Did you give him a gun?

14  A.  I did.

15  Q.  What kind of gun?

16  A.  Ten millimeter Colt.

17  Q.  What kind of gun is that?

18  A.  It's a big handgun.

19  Q.  Where did you give it to him?

20  A.  In the room that my gun safe was in at

21  that particular time.

22  Q.  And that's at your home?

23  A.  Yes.

**Page 19**

1  Q.  How long had he kept the gun from when he

2  took it from you until when he returned it,

3  approximately?

4  A.  I would think a month or a month and a

5  half.

6  Q.  What was the condition of the gun when

7  your brother returned it to you?

8  A.  It was the exact same as I had given it

9  to him.

10  Q.  Were you able to tell -- when you say

11  that, were you able to determine whether or not the

12  gun had been used?

13  A.  The gun had not been used.

14  Q.  And you say because it was in the same

15  condition?

16  A.  Yes.

17  Q.  What about the condition?

18  A.  I clean guns and it was clean, very very

19  clean, like I would have cleaned it myself, and all

20  of the bullets were still in the clip.

21  Q.  When you gave it to him, had the clip

22  been full?

23  A.  The clip was full but not in the gun.

**Page 18**

1  Q.  Is there any particular reason why you

2  gave him that handgun?

3  A.  No.

4  Q.  Did you show him how to use the gun?

5  A.  I did.

6  Q.  What did he do with it?

7  A.  He put it in the case that I gave him and

8  that was it.

9  Q.  When did you next see the gun?

10  A.  When he gave it back to me.

11  Q.  About how long had he held it for?

12  A.  It was somewhere between February and May

13  because he gave it to me before I went to the beach

14  for the summer.  I always go to the beach for the

15  summer right around the middle of May.

16  Q.  So he gave you the gun back sometime

17  before May?

18  A.  Yes.

19  Q.  Or before the middle of May?

20  A.  Excuse me?

21  Q.  Before the middle of May, before you went

22  to the beach?

23  A.  Yes.

**Page 20**

1  Q.  So it hadn't -- the top bullet had not

2  been put into the barrel of the gun, is that right?

3  A.  That's right.

4  Q.  And it was that way when he returned it

5  to you?

6  A.  It was.

7  Q.  What did you do with this gun?

8  A.  I put it back in the safe then.

9  Q.  Do you still have it?

10  A.  No.

11  Q.  Where is it?

12  A.  I gave it to a guide friend of mine that

13  I went hunting with, as a tip, which is not uncommon.

14  Q.  This is a guide who took you bear

15  hunting?

16  A.  I've gone grizzly bear hunting with him

17  and moose hunting.

18     MR. OTERI:  I didn't hear that last part.

19     THE WITNESS:  Grizzly bear and moose

20  hunting.

21  BY MR. CONNOLLY:

22  Q.  Now, did your brother ever talk to you

23  about the possibility of using your boat?

**Page 21**

1  A. He did.

2  Q. And when did that occur?

3  A. It was either when he gave me the gun

4 back, or when he borrowed the gun from me. I'm not

5 real clear exactly.

6  Q. What did he say to you about a boat?

7  A. He said that if either one of these

8 persons that was threatening to hurt his kids were to

9 hurt one of his kids and he was to do something to

10 them, could he use the boat.

11  Q. Well, what was this "to do something"?

12  A. If they had hurt his kids and he was to

13 kill them, could he use the boat.

14  Q. And what boat was he talking about?

15  A. 25 Hydra-Sport.

16  Q. Who owned that boat?

17  A. I did.

18  Q. Did your brother own a boat?

19  A. My brother, Thomas? No.

20  Q. Did you report this conversation you had

21 with your brother to the police at the time?

22  A. No, I didn't tell the police because I

23 didn't think he was serious, he was just blowing off

**Page 22**

1 steam. You know, I didn't think -- I didn't take

2 anything from it.

3  Q. Did your brother ever ask you during this

4 time if you could arrange for a person to be hurt?

5  A. He was afraid that the guy was going to

6 hurt him and he asked me if I knew somebody that

7 could break legs or, you know, beat this guy up, and

8 I said that I might.

9  Q. Did you ever talk to anybody?

10  A. I did, but nothing ever came out of it.

11  Q. Who is the person you talked to about

12 getting somebody's legs broken?

13  A. John. My friend, John.

14  Q. What's John's last name?

15  A. Burris. John told me he didn't know

16 people like that anymore at that particular time.

17  Q. And you didn't report that to the police?

18  A. No, I didn't.

19  Q. And why not?

20  A. I didn't think he was serious. I just

21 didn't think he was --

22  Q. I'd like to turn your attention to June

23 28, 1996. First of all, all of the conversations

**Page 23**

1 that you've talked about, or the statements that your

2 brother made to you, your brother Thomas, did all of

3 those occur before June 28, 1996?

4  A. Yes.

5  Q. And where were you on the morning of June

6 28, 1996?

7  A. Would that be the Friday?

8  Q. Friday, June, 28, 1996.

9  A. I came out of my house at quarter of six

10 to go to work.

11  Q. And where were you?

12  A. In the driveway, at 7 Emma.

13  Q. What did you see when you walked out on

14 your driveway that morning?

15  A. My brother was in his black jeep in the

16 driveway.

17  Q. This is your brother Thomas?

18  A. That's right.

19  Q. Now, were you normally up that early?

20  A. Yes.

21  Q. Why?

22  A. Well, you usually start between six and

23 six-thirty.

**Page 24**

1  Q. What kind of work were you doing at the

2 time?

3  A. I was part owner of a landscaping

4 business, maintenance business.

5  Q. Now, what did you do when you saw your

6 brother Thomas?

7  A. I walked over to him.

8  Q. And he was sitting in his car?

9  A. Yes, he was.

10  Q. Was the car running?

11  A. I think -- I believe it was, but I'm not

12 sure about that.

13  Q. And how were you positioned in relation

14 to him when you went up to him?

15  A. I leaned in the passenger side window.

16  Q. The front passenger side window?

17  A. Yes.

18  Q. And he was in the driver's seat?

19  MR. MAURER: Objection. Leading, Your

20 Honor.

21  BY MR. CONNOLLY:

22  Q. Where was he?

23  A. He was in the driver's seat.

**Page 25**

1    Q. What happened?

2    A. He asked me if I could get ahold of the

3 boat.

4    Q. What did you say?

5    A. I asked him why, that, you know -- I

6 believe I said, "Did you do it?" And then he nodded

7 at me, and then he said, "Can you help me?" And I

8 said, no, I didn't want to get involved.

9       And then he said he had nowhere else to

10 turn to, and had nobody else -- nowhere else to go,

11 and I eventually agreed to help him.

12    Q. Did you say anything else besides simply

13 you didn't want to be involved?

14    A. Yes, I said I had a great life and I

15 didn't want to ruin my life, and I believe that's it.

16 I -- I'm sorry.

17    Q. You said that when you said, "Did you do

18 it?" he nodded. In what way, in what fashion, did he

19 nod?

20    A. Yes.

21    Q. And what specifically did he say to you

22 when you said you had a great life and you didn't

23 want to get involved?

**Page 26**

1    A. He said he had nowhere else to go. He

2 said, "Don't leave me flat. Don't leave me hanging.

3 I need you, bro," and that was it.

4    Q. And what did you understand when he asked

5 if he could go for a boat ride?

6    MR. MAURER: Objection, Your Honor;

7 relevancy as to what he understood. He can testify

8 as to what was told him.

9    MR. CONNOLLY: I think it's relevant.

10 He's going to explain his conduct, Your Honor. It

11 explains the context of the conversation.

12    THE COURT: All right. I'll allow the

13 question. The jury should not infer that at this

14 particular stage the defendant had told this witness

15 anything more than he has testified to. The witness

16 is going to respond in a certain way. Mr. Connelly

17 is exploring the reasons for that response.

18 BY MR. CONNOLLY:

19    Q. What did you understand when your brother

20 asked you if you could go for a boat ride that

21 morning?

22    A. That he had hurt one of the people that

23 was extorting him or threatening his kids.

**Page 27**

1    Q. Did you agree to go with him?

2    A. Not at first.

3    Q. Eventually you did?

4    A. I did.

5    Q. And where were you when you agreed to go

6 with him?

7    A. In the driveway, in my driveway.

8    Q. About how long did this conversation take

9 on your driveway?

10    A. Couple minutes.

11    MR. OTERI: I'm sorry, I didn't hear

12 that.

13    THE WITNESS: Couple minutes.

14 BY MR. CONNOLLY:

15    Q. Once you agreed to go with him on the

16 boat ride --

17    A. Excuse me.

18    Q. Once you agreed to go with him on the

19 boat ride, what did you discuss?

20    A. I told him I had to get my men set up and

21 that, excuse me, that he asked me to meet him.

22    Q. Where did he ask you to meet him?

23    A. At his Grant Avenue house.

**Page 28**

1    Q. Did he leave at that point?

2    A. Yes.

3    Q. What did you do?

4    A. I went and picked up one of my employees

5 and went out to the job and got them all started, and

6 then I left to go meet Tom.

7    Q. Now, who is the employee that you went to

8 pick up?

9    A. Tommy Pitts.

10    Q. Thomas Pitts?

11    A. Yes.

12    Q. Where did Thomas Pitts live that summer?

13    A. The apartments on Foulk Road. I'm not

14 real clear of the name -- they're right across from

15 my brothers' offices.

16    Q. This is your brother Louis' offices?

17    A. Louis and Joseph.

18    Q. And what road is it on?

19    A. Foulk Road.

20    Q. Now, did you have -- had you picked up

21 Tom Pitts before that morning?

22    A. Just about every other morning.

23    Q. And do you recall today specifically

**Page 29**

1   picking him up and speaking with him on June 28th,
2   Friday, 1996?
3      A. Yeah, I remember calling his apartment,
4   because he was late, and he wasn't down there, and,
5   yeah -- yes.
6      Q. And what phone would you use to call him?
7      A. My cell.
8      Q. Your cell phone?
9      A. Yes.
10     Q. Is this a portable phone?
11     A. It is.
12     Q. And when would you call him?
13     A. On my way to his place to make sure that
14   he would be sitting down there waiting.
15     Q. And then you would pick him up?
16     A. That's correct.
17     Q. Where did you bring him?
18     A. Cavalier's, I believe, that day. Yes,
19   Cavalier's. We were trimming bushes.
20     Q. Cavalier's is an apartment complex?
21     A. That's correct.
22     Q. Who owns it?
23     A. My family.

**Page 30**

1     Q. Where is it located?
2     A. Churchman's Road.
3     Q. About how far away from Foulk Road is it,
4   minutes-wise?
5     A. Minute-wise?
6     Q. Approximately.
7     A. Ten, fifteen, tops.
8     Q. When you got to Cavalier's Apartments
9   with Tom Pitts, what did you do?
10     A. I -- I saw the other men already working,
11   and I dropped Tom off, and I may have told Terry that
12   I had to go, and I left.
13     Q. Now, Terry is who?
14     A. One of my business partners, Terry
15   Hannig.
16     Q. And when you left Cavalier's, where did
17   you go?
18     A. To meet Tom.
19     Q. And this is Tom, your brother?
20     A. Yes.
21     Q. Where did you meet him?
22     A. Grant Avenue.
23     Q. And had you been to Grant Avenue before?

**Page 31**

1     A. Yes.
2     Q. This is his house at Grant Avenue you'd
3   been to?
4     A. Correct.
5     Q. How did you get inside the house that
6   morning?
7     A. Through the garage.
8     Q. Did you -- where did you park?
9     A. On the left side of the garage.
10     Q. Were any garage doors open?
11     A. Yes.
12     Q. Which?
13     A. I believe it was the right one. Kay's
14   Suburban was backed up to it.
15     Q. Now, you said Kay's Suburban. Who is
16   Kay?
17     A. My brother's wife.
18     Q. And had you seen the Suburban before?
19     A. Yes.
20     Q. What color was it?
21     A. Blue, dark blue.
22     Q. Where was the jeep; do you know?
23     A. Tom's jeep? No, I don't know.

**Page 32**

1     Q. Are you certain when he picked you up
2   that morning he was in his jeep?
3     A. He didn't pick me up. He was in the jeep
4   at my driveway, and then when I went to Grant Avenue,
5   the Suburban was there.
6     Q. And how is the Suburban positioned in the
7   driveway?
8     A. It was backed up.
9     Q. What did you do after you parked your
10   car, or your truck?
11     A. Got out and went in through the garage.
12     Q. What did you see in the garage?
13     A. I saw a cooler with a chain wrapped
14   around it and a rolled-up rug, and that's -- just
15   normal garage stuff.
16     Q. Now, what kind of condition was this
17   cooler in?
18     A. Looked to be new.
19     Q. What size was it?
20     A. It was a big Igloo cooler, approximately
21   160 some quarts, fishing cooler kind of deal.
22     Q. You said a fishing cooler. Are you a
23   fisherman?

Page 29 - Page 32

**Page 33**

1    A. Yes.

2    Q. Tell us, what did you mean by this, a
3  fishing-type cooler?

4    A. Just a big cooler. Just a big square
5  cooler.

6    Q. Have you ever owned a cooler that size?

7    A. Yes.

8    Q. What did you use it for?

9    A. Bait or fish.

10    Q. What kind of condition was the chain that
11  was wrapped around the cooler?

12    A. Looked to be new.

13    Q. How about the lock, the --

14    A. The same.

15    Q. How long was this rug?

16    A. Excuse me?

17    Q. How long was the rug, the carpet?

18    A. I don't know. It was rolled up.

19    Q. How long was it when it was rolled up?

20    A. I would say ten to 15 feet long.

21    Q. Were you able to tell what color of a rug
22  the carpet was?

23    A. No. It was rolled up.

**Page 34**

1    Q. Was anybody at the house when you
2  arrived?

3    A. I didn't see anybody.

4    Q. At some point, did you see your brother?

5    A. Oh, I saw my brother Tommy, yes.

6    Q. So was anybody at the house when you
7  walked in the garage?

8    A. Yes, my brother Tommy was there.

9    Q. Do you recall how he was dressed?

10    A. He had a T shirt on and a pair of shorts.

11    Q. At that time did your brother have any
12  facial hair?

13    A. Yeah, I believe he had a beard at that
14  time.

15    Q. What did your brother Tom say to you when
16  you saw him at Grant Avenue?

17    A. He wanted to put the cooler in my truck,
18  and I said no.

19    Q. Why?

20    A. Because I just didn't want to do it.

21    Q. This was a pick-up truck that you had?

22    A. That's right.

23    Q. But what did you do with the cooler?

**Page 35**

1    A. Put it in the back of the Suburban?

2    Q. How did you lift the cooler from the
3  garage into the Suburban?

4    A. It has handles on it, big handles.

5    Q. Who carried it?

6    A. The both of us.

7    Q. About how heavy was it?

8    A. I don't know. I mean it was heavy enough
9  where two people carried it.

10    Q. Were there any noises coming from the
11  cooler?

12    A. Sounded like ice was inside the cooler.

13    Q. What about the rug, was anything done
14  with it?

15    A. No.

16    Q. Was anything said about the rug?

17    A. He wanted me to take the rug with him,
18  and I told him no, we couldn't take the rug out on
19  the boat because it would float.

20    Q. Can you say that again, please. I didn't
21  hear you.

22    A. He asked if we -- can we move this thing
23  up? Can we move it up a little bit?

**Page 36**

1      He asked to take the rug -- he asked to
2  take the rug with us, and I said no, because it would
3  float. I just didn't want to take the rug on the
4  boat.

5    Q. What happened after you put the cooler in
6  the car, in the Suburban?

7    A. I drove over to the Acme, over on, excuse
8  me, on -- the one across from Logan House, I believe
9  it is, would be Delaware Avenue, and --

10    Q. Is this near Trolley Square?

11    A. Yes, near Trolley Square. And then Tom
12  picked me up there.

13    Q. Had you agreed to meet at this Acme?

14    A. We did.

15    Q. Whose idea was that?

16    A. It was Tom's.

17    Q. And about how long after you left the
18  Grant Avenue home in your truck, until the time you
19  parked and met Tom at the Acme parking lot, about how
20  long was that?

21    A. It wasn't long, five, maybe ten minutes.

22    Q. Do you know where he went during that
23  five or ten minutes?

**Page 37**

1    A.  I do now, but I didn't then.

2    Q.  What did you do once he arrived at the

3  Acme parking lot?

4    A.  Locked my truck and got in the Suburban.

5    Q.  And where did you go?

6    A.  We went to Stone Harbor.

7    Q.  Did you have a home in Stone Harbor at

8  that point?

9    A.  I did.

10    Q.  Where did you keep your boat?

11    A.  Behind my home.

12    Q.  Which home?

13    A.  It's 10607 Third Avenue.

14    Q.  And that's in Stone Harbor?

15    A.  Yes.

16    Q.  On the way to Stone Harbor, what did your

17  brother Tom say to you?

18    A.  He didn't talk very much.  He was telling

19  me that it was going to be okay, because I was real

20  scared, and that's pretty much it.

21    Q.  What did you say to him?

22    A.  I told him that I was scared.  I told him

23  that this wasn't right, and that's it.

**Page 38**

1    Q.  Did he ever make any reference to the

2  extortion or his kids during the conversation in the

3  car?

4    A.  I believe that he said if somebody was

5  threatening to hurt your kids -- I am unclear on that

6  one.  I'm unclear on that one.

7    Q.  Did you drive directly to Stone Harbor?

8    A.  We did.

9    Q.  Who drove?

10    A.  He did.

11    Q.  What happened when you got to Stone

12  Harbor?

13    A.  He backed up in the driveway and I

14  believe we both went inside.  And I think I went to

15  the bathroom first and I think he used the phone, and

16  then I got a couple fishing rods and put them on the

17  boat and started the boat up.

18         And then he came outside, and then we

19  both carried the cooler down to the boat and then put

20  the chain and the lock in a plastic bag and I carried

21  that down to the boat.  And then he moved the car, I

22  think a block away.  And we left in the boat.

23    Q.  Now, why did you take fishing rods with

**Page 39**

1  you in the boat?

2    A.  So it would look like we were going

3  fishing.

4    Q.  Were you worried that this cooler looked

5  unusual on a boat?

6    A.  No.

7    Q.  Why not?

8    A.  It's your typical fishing cooler.

9    Q.  Was your brother Tom a fisherman?

10    A.  No.

11    Q.  Where did you go once you had the cooler,

12  and the fishing rods, and the bag on the boat?

13    A.  We went to get fuel, which is right on

14  the other side of the Stone Harbor Bridge on the

15  left.  I think it's a Texaco.  It changes yearly, the

16  gas station does.  It may have been a Texaco at that

17  time.  And then went back underneath the Stone Harbor

18  Bridge and underneath the free bridge, and took a

19  left out past the Stone Harbor cut.

20    Q.  All right.  Let's back up.  This Texaco

21  station, is that located at Stone Harbor Marina?

22    A.  Pardon me?

23    Q.  Is that at the Stone Harbor Marina?

**Page 40**

1    A.  It may be called Stone Harbor Marina now,

2  yes.

3    Q.  Did you normally go to that gas station?

4    A.  No.

5    Q.  And where did you normally go?

6    A.  Smuggler's Cove.

7    Q.  Had you been to this gas station, the

8  Texaco one before?

9    A.  Probably.

10    Q.  How much gas do you get; do you recall?

11    A.  It was somewhere around a hundred and

12  fifty, a hundred and eighty dollars worth of fuel.  I

13  honestly don't remember.

14    Q.  Who paid for the gas?

15    A.  Tom did.

16    Q.  How did he pay for it?

17    A.  Cash.

18    Q.  Once you had the gas, what did you do?

19    A.  Went out underneath the bridge,

20  underneath the free bridge, and out the cut.

21    Q.  And the cut, for those of us who aren't

22  familiar with the water, is what?

23    A.  The cut is before the Hereford's Inlet,

Page 41

| | |
|---|---|
| 1 and there's -- Stone Harbor way of keeping to the | 1 the front of the boat? |
| 2 ocean. | 2     A. I had my back to him. It sounded like he |

1 and there's -- Stone Harbor way of keeping to the
2 ocean.
3     Q. It's a shortcut, is that right?
4     A. Yes.
5     Q. Once you went out and you hit the inlet,
6 on what course did you go?
7     A. Due east.
8     Q. And how did you know you were going due
9 east?
10     A. Towards the sun.
11     Q. Who was driving the boat?
12     A. I was.
13     Q. Did you have any navigational equipment
14 on your boat?
15     A. I did.
16     Q. What did you have in that way?
17     A. I had radar, Lowrance, VHF radio, depth
18 finder.
19     Q. Let's talk about this. It's a Lowrance?
20     A. Yes, it's a Lowrance, it's a plotter, you
21 know -- it's also a depth finder, a speed depth
22 finder. It's a charter.
23     Q. Was your Lowrance on that morning?

Page 43

1 the front of the boat?
2     A. I had my back to him. It sounded like he
3 was putting the cooler in the water, and rustling
4 around with the anchors, and throwing up, because it
5 was kind of rough, whatever else.
6     Q. Now, let's take a step back. When you
7 first turned off the engine of the boat, where was
8 the cooler?
9     A. The back -- the back starboard side,
10 which would be the right side. The back starboard
11 side.
12     Q. All right. How did the cooler get into
13 the water?
14     A. He put it in. He put the cooler in the
15 water.
16     MR. OTERI: Excuse me, I didn't get that.
17     THE WITNESS: I'm sorry.
18 BY MR. CONNOLLY:
19     Q. How did the cooler -- when you turned the
20 engine off, how did the cooler get into the water?
21     A. I'm unclear on whether or not I helped
22 him pick it up and put it in the water and then
23 walked to the front of boat or if he did it himself.

Page 42

1     A. The Lowrance was on, and it was on the
2 depth finder mode.
3     Q. And so was it able to indicate longitude
4 and latitude of the course that you were pursuing?
5     A. It may have, but I didn't have it on that
6 mode.
7     Q. Okay. You only had it on the depth mode?
8     A. That's right.
9     Q. How far out did you go due east?
10     A. For about two and a half hours, which
11 would probably put you out there between 60 and 70
12 miles. It was 198 feet of water.
13     Q. Are you certain it was 198 feet of water?
14     A. Yeah.
15     Q. Excuse me?
16     A. I am.
17     Q. What did you do when you reached 198 feet
18 of water?
19     A. Stopped. Turned the boat off.
20     Q. And then what?
21     A. Told him he was on his own and I went to
22 the front of the boat.
23     Q. What did your brother do when you were at

Page 44

1     Q. Do you know whether the cooler sank?
2     A. The cooler did not sink.
3     Q. How do you know?
4     A. Because I shot it with the gun, tried to
5 make it sink.
6     Q. What gun did you use to shoot the cooler?
7     A. I had a shotgun that I used to keep on
8 the boat for killing big sharks and it's a 12 gauge
9 Mossberg, stainless steel.
10     Q. And you shot the cooler?
11     A. I did, with a deer slug.
12     Q. And what happened?
13     A. Nothing. The cooler didn't sink.
14     Q. Did you see anything come out where the
15 bullet had gone in?
16     A. It was 30, 40 yards away, floating,
17 looked to be something red coming out, but I'm unsure
18 of that.
19     Q. Are you unsure that it looked to be red,
20 or are you unsure what it was?
21     A. I'm unsure what it was.
22     Q. Are you sure it was red?
23     A. Yes.

Page 45

1    Q. When the cooler didn't sink, what did you
2  do?
3    A. We pulled the boat up next to it, up next
4  to the cooler, and then I shut the boat off and went
5  back up to the front of the boat. I believe that's
6  when I went to the front of the boat, and I think I
7  did help him pick the cooler up and put it over the
8  water the first time.
9    Q. Okay. So, now, the first time you helped
10 him. The second time you pulled alongside the
11 cooler?
12   A. Right. That's when I told him he was on
13 his own and I went to the front of the boat.
14   Q. Did you give him anything at that point?
15   A. I laid two anchors down next to him, and
16 that was before I went to the front of the boat.
17   Q. Why did your boat have two anchors?
18   A. I always carry two anchors. If you take
19 the boat to the island where people go and anchor up
20 and, you know, bring their kids and whatnot, you can
21 anchor the front of the boat and the back of the boat
22 so it stays still.
23   Q. When you pulled alongside of the cooler,

Page 47

1  came back and I saw a foot going down.
2    Q. A human foot?
3    A. Yes.
4    Q. Were you able to determine what gender
5  this human foot was?
6    A. No. No.
7    Q. How much did you see of the foot?
8    A. Little bit of the shin and the foot.
9  Mostly just the bottom of the foot and the ankle.
10   Q. Where was the cooler?
11   A. The cooler was floating.
12   Q. Where were the anchors?
13   A. They were gone.
14   Q. What did you do at that point?
15   A. I believe we jockeyed the boat around
16 again to pick the cooler up, and then we dipped the
17 cooler in the water to clean out anything that was in
18 there, ice or whatever, and then we pulled it in the
19 boat and we headed for home.
20   Q. What happened to the bag with the chain
21 and the lock in it?
22   A. It got thrown in. I didn't see the lock
23 and the chain get thrown in. I saw the keys get

Page 46

1  what side did you come up next to on the cooler?
2    A. Same side, starboard side.
3    Q. That's the right side of the boat?
4    A. Yes.
5    Q. And after you put the anchors down, and
6  said to your brother you're on your own, where did
7  you go?
8    A. To the front of the boat. I leaned
9  against the bow rails.
10   Q. Which way were you looking?
11   A. Forward.
12   Q. Were you saying anything?
13   A. I was telling him this was not right.
14 This was wrong.
15   Q. Could you hear anything from the back of
16 the boat?
17   A. I could hear him throwing up and I could
18 hear rustling of chains and the anchors, that's it.
19   Q. At some point did you turn around?
20   A. I did.
21   Q. What did you see?
22   A. I asked him, I said, "Are you done? Are
23 you done?" And he finally answered, "Yes." And I

Page 48

1  thrown in to the lock.
2    Q. Who threw the keys to the lock in the
3  ocean?
4    A. Tom did.
5    Q. So when you turned around and the anchors
6  were gone, at that point did you see the chain or the
7  lock?
8    A. No.
9    Q. They were gone?
10   A. Yes.
11   Q. Now, when you headed back to the shore,
12 did you pursue a certain course?
13   A. Yeah, I turned around and headed 310.
14   Q. That's 310 degrees?
15   A. That's right.
16   Q. So you were looking at your navigational
17 equipment?
18   A. Just the compass.
19   Q. Compass. Who was driving the boat as you
20 started back?
21   A. I believe I was.
22   Q. What did you do with the cooler?
23   A. Pulled it in and I took the hinges off,

**Page 49**

1  unscrewed the hinges, and threw the top of the cooler
2  in the water, and Tom was driving slowly when I did
3  that. And then about five minutes later, we just
4  threw the cooler in too, and we just kept heading
5  home.
6      Q. Why did you take the lid off the cooler?
7      A. So it would look like it was broken, just
8  abandoned.
9      Q. Do you recall what kind of screws were on
10 the hinges?
11     A. Philips head.
12     Q. On the way back to Stone Harbor, what did
13 your brother say to you?
14     A. We didn't talk very much. He just said
15 it was going to be all right; that he would never let
16 anything happen to me, because I was telling him this
17 was wrong, and I was scared. And he said it was
18 going to be all right, that nothing would happen, and
19 that he would never let anything happen to me.
20     Q. Now, would you tell us what the first
21 sight of land you saw was as you returned back from
22 dumping the cooler?
23     A. It was the water to your -- to the left

**Page 51**

1  before you returned home, did you see any other
2  boats?
3      A. I did.
4      Q. When?
5      A. I saw a small boat out the same area we
6  were in with a dive flag.
7      Q. You said the same area. Is this when you
8  stopped your boat?
9      A. Yes.
10     Q. Did you see any people?
11     A. No.
12     Q. About how far away was this other boat?
13     A. Quarter mile.
14     Q. Weren't you afraid if you fired a shotgun
15 you might draw attention to yourself?
16     A. No.
17     Q. Why not?
18     A. People are always firing guns out there
19 trying to kill sharks, catch a big shark. You have
20 to kill it before you bring it in the boat.
21     Q. After you arrived at your house in Stone
22 Harbor, you said you may or may not have gone in the
23 house, is that right?

**Page 50**

1  of Cape May. Probably Ocean City or Rehoboth water
2  tower.
3      Q. Was this south of Cape May, New Jersey?
4      A. It was south of Cape May.
5      Q. When you saw that, what did you do as far
6  as your course?
7      A. Went hard right.
8      Q. Hard right would be north?
9      A. Hard right would be north, follow the
10 beach line up.
11     Q. Did you go back to your house at Stone
12 Harbor?
13     A. I'm sorry?
14     Q. Did you return to your home in Stone
15 Harbor?
16     A. Yes.
17     Q. And what happened when you arrived back
18 at your Stone Harbor house?
19     A. I don't remember if we went in and went
20 to the bathroom or if we just got in the car and
21 left. I would think that we went in, because I would
22 have to put the fishing rods away.
23     Q. Now, when you were out on the ocean,

**Page 52**

1      A. I'm sure I went in to put the fishing
2  rods away.
3      Q. And at that point, what did you do? Did
4  you go anywhere in Stone Harbor?
5      A. No. I believe we just came right home.
6      Q. Who drove home?
7      A. Tommy did.
8      Q. And on the way home, did he ask you
9  anything?
10     A. He said -- he told me what to say if I
11 was ever to be questioned.
12     Q. What did he tell you to say?
13     A. That he had met me in the morning at my
14 house to talk about a property that my mother was
15 giving him and myself, and that I left, excuse me,
16 and went to the beach, and then that he left and went
17 over to my brother Louis' to talk to Louis about the
18 property, and then he met me down to the beach later,
19 and we had lunch down at the beach. And then I think
20 it was to -- we went and walked a new piece of
21 property that I was buying down there, or had already
22 bought, and he either -- he either said he was going
23 to go over to my sister's in Stone Harbor, or my

**Page 53**

1  mother's in Stone Harbor, but, you know, I left
2  first.
3      Q.  This would have been your sister Marion
4  or your mother?
5      A.  Right.
6      Q.  Did he ask you to do anything else for
7  him as you drove back?
8      A.  He asked me to help throw a love seat
9  away that was at Grant Avenue.
10     Q.  Did you agree to throw the love seat
11  away?
12     A.  I did.
13     Q.  Did you go straight to Grant Avenue or
14  did you go to pick up your truck first?
15     A.  I went to pick up my truck.
16     Q.  And then what?
17     A.  Then went to Grant Avenue, carried the
18  love seat out --
19     Q.  Let's -- did you go inside the house?
20     A.  Yes.
21     Q.  And what room did you go in?
22     A.  The room with the TV, the room upstairs
23  with the TV in it, off the kitchen.

**Page 54**

1      Q.  When you went into this room, what
2  furniture did you see?
3      A.  Saw a love seat.
4      Q.  And what color was it?
5      A.  Dark maroon.
6      Q.  Would you describe this love seat for us,
7  what you saw?
8      A.  It had a stain on it, on the right, if
9  you were sitting on it, on the right side about
10  shoulder height.
11     Q.  How big was the stain?
12     A.  About the size of a basketball.
13     Q.  What color was the stain?
14     A.  I couldn't tell.  The couch was maroon.
15     Q.  What did you do with the couch?
16     A.  We carried it out the double doors of
17  that room, and down the steps, which would be in the
18  front of the house, and around to the garage, and at
19  that point I cut the stained piece off of it, and
20  tried to break the couch up so that it looked like it
21  was just an old broken up couch, and we threw it in
22  the dumpster.
23     Q.  You say you cut up the stain --

**Page 55**

1      A.  Yes.
2      Q.  What did you cut it with?
3      A.  I always carry a pocket knife.
4      Q.  When you cut off -- or when you cut into
5  the couch, what did you see in the foam underneath
6  the covering?
7      A.  Looked to be something red.
8      Q.  I'm sorry?
9      A.  Looked to be something red.
10     Q.  What did you do with the pieces that you
11  had cut out of the couch?
12     A.  Tom put them in a bag, a garbage bag.
13     Q.  Where was that?
14     A.  In the garage.
15     Q.  Had you seen those garbage bags that
16  morning, when you first went into the garage?
17         MR. MAURER:  That's a leading question,
18  Your Honor.  Objection.
19         THE COURT:  Sustained.
20  BY MR. CONNOLLY:
21     Q.  Had you seen those garbage bags before?
22     A.  I'm not sure if it was garbage or there's
23  bags next to the rug or near the rug in the garage.

**Page 56**

1      Q.  Well, what did you do with the couch once
2  you had cut out the pieces from it?
3      A.  Tried to break it up, so that -- excuse
4  me, so that it looked like it was just an old busted
5  up couch, and we stuck it in the Suburban and we
6  drove it up to the office building on Foulk Road and
7  put it in the dumpster.
8      Q.  Whose office building was this at Foulk
9  Road?
10     A.  My brother Louie's.
11     Q.  Whose idea was it to bring the couch
12  there?
13     A.  It was mine, because I knew there was a
14  dumpster there.
15     Q.  And where was the dumpster located on the
16  site?
17     A.  In between the big -- in between the
18  big -- I don't know how to explain it.  It's in
19  between two office buildings, but there's four office
20  buildings up there.
21     Q.  Could you see the dumpster from Route 202
22  if you were driving by?
23     A.  I don't think so.

Page 59

1   Q. How did you get the couch into the
2 dumpster?
3   A. Picked it up and threw it in there.
4   Q. By yourself?
5   A. No; Tom helped me.
6   Q. What did you do then?
7   A. Got inside the dumpster and put some
8 stuff on top of it.
9   Q. What did you do once you had left the
10 couch in the dumpster?
11   A. I went home.
12   Q. Were there any plans made between you and
13 your brother at that point as to where to meet or
14 what to do next?
15   A. No.
16     MR. CONNOLLY: Your Honor, I can stop
17 here.
18     THE COURT: All right. Please take the
19 jury out.
20     (The jury left the courtroom at 11:30
21 a.m.)
22     THE COURT: Stand in recess until the
23 Call of the Court.

Page 58

1     (Recessing at 11:30 a.m.)
2     (Reconvening at 11:55 a.m.)
3     THE COURT: Please bring the jury in.
4     (The jury entered the courtroom at 12:00
5 p.m.)
6     THE COURT: Mr. Connelly, you may
7 proceed.
8     MR. CONNOLLY: Thank you, Your Honor.
9     Your Honor, at this point I would move
10 into admission, without objection, State Exhibits 82
11 through 93. They're various photographs.
12     MR. MAURER: Without objection.
13     THE COURT: Thank you, Mr. Maurer. The
14 Exhibits will be admitted as indicated 82 through 93.
15     THE CLERK: So marked.
16     (Whereupon State's Exhibit Nos. 82
17 through 93, photographs, were received into
18 evidence.)
19     THE COURT: Thank you.
20     MR. CONNOLLY: Your Honor, if I could
21 have the televisions turned on.
22 BY MR. CONNOLLY:
23   Q. Mr. Capano, I'm going to show you State

Page 59

1 Exhibit 82. Do you recognize that?
2   A. My house.
3   Q. That's the house at Emma Court?
4   A. Yes.
5   Q. And this is State Exhibit 83.
6   A. My driveway.
7   Q. That's to the left of the front of the
8 home?
9   A. Yes.
10   Q. Who's your neighbor to the left of the
11 driveway?
12   A. Jeff Stape.
13   Q. I'm going to show you State Exhibit 84.
14 Do you know what kind of car that is?
15   A. Excuse me?
16   Q. Do you know what type of car that is?
17   A. Jeep Grand Cherokee.
18     THE COURT: We're having a little trouble
19 with this monitor up here.
20     Excuse the interruption.
21     MR. CONNOLLY: That's all right.
22     THE COURT: If it's fixable, we should.
23     MR. CONNOLLY: I know they tried very

Page 60

1 hard to fix that and haven't gotten anywhere.
2     THE COURT: All right. Thank you.
3 BY MR. CONNOLLY:
4   Q. This is a black Grand Cherokee, is that
5 what you said?
6   A. Yes.
7   Q. Is this the type of car that you
8 identified that your brother was in on your driveway
9 that morning?
10   A. Yes.
11   Q. I'm going to show you State Exhibit 85.
12 Do you recognize that?
13   A. It looks like the house on Grant Avenue.
14   Q. You have a monitor in front of you?
15   A. It's not on.
16   Q. All right. Can you see that photo, that
17 TV over there?
18   A. Yes.
19   Q. Looking at that TV, I'm going to point
20 to -- do you see this set of doors here?
21   A. The double doors.
22   Q. The double doors.
23     Tell us about those doors.

Page 121

1    MR. CONNOLLY: Your Honor, at this point
2 I would like to play the tape, State Exhibit 77.
3    THE COURT: Mr. Maurer, I note that
4 previously there was an objection to whether this
5 evidence could be submitted to the jury.
6    MR. MAURER: Correct, Your Honor, but I
7 have no objection at this point in time since we're
8 at this stage.
9    THE COURT: All right. Thank you very
10 much.
11    You may proceed, Mr. Connolly.
12    MR. CONNOLLY: Your Honor, if I could
13 just instruct the jury. If you place this on mono,
14 you'll get better reception. And then the transcript
15 is on tab 17.
16    THE COURT: Again, I should inform the
17 jury that the purpose of the transcript is to help
18 you understand the recording itself. The recording
19 is the best evidence of what was said, and to the
20 extent that your ears disagree with your eyes, you
21 are to rely on what you hear rather than what you
22 read.
23    (Tape played of Gerard Capano.)

Page 122

1 BY MR. CONNOLLY:
2    Q. Mr. Capano, when you made that statement
3 we just heard, do you recall approximately when
4 during the day you made that statement?
5    A. I believe it was mid-morning. In the
6 morning -- it was before noon, wasn't it?
7    Q. Had you spoken with the agents before the
8 tape was made to tell them about what you described
9 in the tape?
10    A. No, sir.
11    Q. Had you spoken with them that day, in the
12 conference room?
13    A. Yes, sir.
14    Q. Was the tape made as soon as you walked
15 in the door or was it made after you had debriefed
16 the agents?
17    A. It was made afterwards.
18    Q. And on that day, before you made the
19 statement, you said in the tape, and even earlier
20 today, that you had signed a plea agreement, is that
21 right?
22    A. I did.
23    MR. CONNOLLY: Your Honor, at this point

Page 123

1 I would move to admit State Exhibit --
2    THE COURT: 101.
3    MR. CONNOLLY: -- 101.
4    THE COURT: Is there an objection?
5    MR. MAURER: No, Your Honor.
6    THE COURT: Thank you, Mr. Maurer.
7    THE CLERK: So marked.
8    THE COURT: Thank you.
9    (Whereupon State's Exhibit No. 101, plea
10 agreement, was received into evidence.)
11 BY MR. CONNOLLY:
12    Q. Mr. Capano, I'm going to hand you State's
13 Exhibit 101, and I'm going to ask you, do you
14 recognize that?
15    A. Yes.
16    Q. What is it?
17    A. It's a plea agreement.
18    Q. Who signed the plea agreement?
19    A. I did, and Mr. Lyons, and you did.
20    Q. Now, I'd like you to turn to page one of
21 the plea agreement. What did you agree to plead
22 guilty to?
23    A. Misprision of a felony, which means that

Page 124

1 I knew somebody did something wrong and didn't tell
2 them.
3    Q. And what was the main benefit for you to
4 sign the plea agreement?
5    A. That I didn't go to jail.
6    Q. Now, you mentioned that agents had raided
7 your home?
8    A. They did.
9    Q. Was it your understanding that -- well,
10 what did they find when they raided your home?
11    A. Small amounts of cocaine, some marijuana,
12 some guns.
13    Q. Were you aware that you could go to jail
14 for that?
15    A. I am now. I suppose I was.
16    Q. Before you entered the plea agreement,
17 had you discussed with your attorney the possibility
18 that you could go to jail?
19    A. After he raided the house?
20    Q. Yes.
21    A. Yes.
22    Q. What was your understanding as far as how
23 much jail time you could look at?

**Page 125**

1    A. I could look at up to ten.
2    Q. Now, if you turn to page two of the plea
3  agreement, and there's a paragraph that begins
4  "fifth". Do you see that? It's on the typed page
5  two.
6    A. Yes, I see it.
7    Q. Would you read that paragraph, please?
8    A. "Government agrees that the statement" --
9       MR. OTERI: I can't hear him.
10    A. "The Government agrees that the
11  statements, information, evidence and testimony that
12  your client provides pursuant to this agreement
13  cannot be used either directly or indirectly against
14  his brother Joseph Capano or his sister Marion."
15    Q. Why did you ask for that term to be put
16  in the plea agreement?
17    A. Because I didn't know if they had said
18  anything or not said anything to get them in trouble,
19  and I was just trying to protect everybody.
20    Q. Then paragraph six, or right after that,
21  it says "The Government will not prosecute Edward
22  Delcollo for unlawful possession of firearms."
23       Who is Edward Delcollo?

**Page 127**

1  with?
2    A. My friend Rudy, Rudy Dryden.
3    Q. Had you discussed them with any family
4  members?
5    A. I told my brother Louis.
6    Q. Do you recall when you told your brother
7  Louis?
8    A. I know it was around the holidays. It
9  was chilly out. I remember it was at my house at 7
10  Emma.
11    Q. What holiday season are you talking
12  about?
13    A. I'm not real sure, Mr. Connolly. I know
14  it was chilly out. I can remember what he was
15  wearing. I'm not real sure on the exact dates.
16    Q. Have you ever used cocaine?
17    A. Yes.
18    Q. Have you ever used marijuana?
19    A. Yes.
20    Q. Did you use cocaine and marijuana on a
21  frequent basis in 1995 and '96?
22    A. I did.
23    Q. Has the amount of cocaine you used

**Page 126**

1    A. He's my best friend.
2    Q. Why did you want the Government not to
3  prosecute him?
4    A. Because of me they raided his house.
5    Q. And why would that cause him to be in any
6  harm?
7    A. They found all his hunting guns.
8    Q. Do you know who purchased one of those
9  guns?
10    A. I may have.
11    Q. Are you aware it's illegal to purchase a
12  gun for a convicted felon?
13    A. Yes.
14    Q. Now, other than your attorney, had you
15  discussed -- did you discuss before November 8, 1996,
16  the conversations that you've testified about that
17  you had with your brother Tom? Had you discussed
18  that with anybody other than your attorney?
19    A. Not in detail. I did with my attorney.
20    Q. But had you discussed them with anybody
21  else?
22    A. Yes.
23    Q. Who was the person you discussed them

**Page 128**

1  affected -- strike that. I'm sorry, I'll withdraw
2  the question.
3       Did the amounts you used change after
4  June 28, 1996?
5    A. It did. I used more.
6    Q. Why?
7    A. Excuse me?
8    Q. Why?
9    A. For me it relieves a lot of stress.
10    Q. About how much cocaine on average were
11  you using in '95 and '96, before June 28, 1996?
12    A. Gram or two a week. Sometimes I would do
13  more; some weeks I would do less. Some weeks I
14  wouldn't do any at all. But on an average, one or
15  two grams a week.
16    Q. How about after June 28th?
17    A. Two to four. But, again, sometimes I
18  would do it; sometimes I wouldn't do it. Sometimes I
19  would do more. Sometimes I would do less. On an
20  average, it increased.
21    Q. Do you know whether you were high on
22  cocaine or any other substance when your brother Tom
23  had the conversations with you that you've testified

**Page 109**

1  had it written down, did you?
2      A. Excuse me, I never told Tom that I had
3  it --
4      Q. That you had written down this alibi?
5      A. I don't know if I did or I didn't.
6      Q. All right. Now, sir -- now, sir, your
7  brother Tom, when was the last time you talked to him
8  before June 28th, that Friday?
9      A. I don't know.
10     Q. Okay. You had not had any meetings set
11 up for June 28th with Tom in advance?
12     A. Oh, no.
13     Q. And Tom had not called you at any time
14 and said be there on the 28th, I'm going to be there?
15     A. No.
16     Q. Matter of fact, Tommy knew you spent most
17 of your time down at the beach during the summer,
18 correct?
19     A. That's correct.
20     Q. He had no way of knowing you were going
21 to be home, correct?
22     A. Yes.
23     Q. Okay. And on the drive down to Stone

**Page 110**

1  Harbor -- by the way, Tommy was driving at about 80
2  miles an hour?
3      A. He was driving fast.
4      Q. And you had to slow him down?
5      A. I think so. I'm not real sure. I'm not
6  real sure about that.
7      Q. He was very agitated and very upset, he
8  was very high strung?
9      A. Yes, at that point I think we both were
10 agitated and upset.
11     Q. He was not the calm, reasoned, rational
12 lawyer that you know?
13     A. That's correct.
14     Q. He was a guy running around like a nut?
15     A. He was very nervous.
16     Q. Now, sir, when you were driving down to
17 Stone Harbor with Tom in the car, you asked Tom what
18 happened and he wouldn't tell you, correct?
19     A. I don't know if that -- I don't remember
20 that. I mean --
21     Q. You don't remember that?
22     A. No.
23     Q. You do remember --

**Page 111**

1      A. Tom has never told me what happened.
2      Q. You do remember that Tom never told you
3  what happened?
4      A. Yes, I do remember that.
5      Q. And you do remember, and you have
6  testified in the past, that you don't know what the
7  motive was for what happened with that lady?
8      A. Yes, that's true.
9      Q. You don't know if there was a weapon
10 involved?
11     A. That's true.
12     Q. You don't know whether her death was
13 intentional?
14     A. That's true.
15     Q. You don't know whether it was just a
16 reckless act that resulted in her death?
17     A. That's true.
18     Q. You don't know whether it was a negligent
19 act?
20     A. That's true.
21     Q. And you don't know whether it was an
22 accident?
23     A. I don't know what happened, Mr. Oteri.

**Page 112**

1      Q. Now, when Mr. Connolly asked you
2  yesterday if Tommy told you that her death was the
3  result of an accident, you said he hadn't told you?
4      A. He did not tell me.
5      Q. He didn't tell you anything?
6      A. That's right. He didn't tell me
7  anything.
8      Q. All right. Now, sir, when you came back
9  in on the 28th from the ocean, you ended up going bar
10 hopping that night, correct?
11     A. Yes, sir.
12     Q. Did you go out with Eddie Delcollo?
13     A. Excuse me?
14     Q. Did you go out with Eddie Delcollo?
15     A. Delcollo.
16     Q. Delcollo?
17     A. Yes, sir.
18     Q. And you did some drinking?
19     A. Excuse me?
20     Q. You did some drinking?
21     A. A lot.
22     Q. You did some drugs?
23     A. I may have.

1    A. I think Tom was more mad about it than I
2 was.
3    Q. But you were pretty mad, were you not, to
4 suddenly find yourself in the papers accused of being
5 an unfit parent?
6    A. That's a joke. I'm not an unfit parent.
7    Q. But you were upset by it, were you not?
8    A. You would be too, I think.
9    Q. Gerry, you are absolutely right. I would
10 be. But you were upset?
11    A. Sure, it's fair to say.
12    Q. Now, Gerry, do you remember making a
13 phone call and leaving this message on February 9th,
14 1998, to your mother:
15      Mom, this is your son Gerry. I called
16 you but Katie hung up on me. Then I called again,
17 and her little asshole boyfriend hung up on me. You
18 have ten minutes to call me back. If you don't, you
19 can go fuck yourself.
20      Do you remember making that call to your
21 mother?
22    A. I was drinking that day, and I remember
23 apologizing afterwards.

1    Q. But you did make the call?
2    A. I'm not saying I didn't.
3    Q. And you apologized for it afterwards,
4 correct?
5    A. It's not nice to talk to my mother like
6 that. I was drinking and very upset.
7    Q. And you do things when you're drinking
8 and upset?
9    A. I made a mistake.
10    Q. How about the second call, Gerry. Do you
11 remember this? Do you remember saying this?
12      Mom, this is your son. Mom, your son
13 Gerry. You better fucking call me. I'm tired of
14 being the bad guy. If you don't fucking call me,
15 you'll never fucking see me or my wife or my kids
16 again. What, are you pissed because I told the
17 truth? Because Joe fucking Hurley couldn't break me
18 down? As far as I'm concerned, you have three sons.
19 One is a murderer in jail for fucking life, one you
20 hate and that's Louie, and Joey. Like I said, you
21 can go fuck yourself. Did you really think that I
22 would go to jail for 12 fucking years? If you
23 thought I was bad on the stand, God fucking help you

1 if this goes to trial. I'll think up even more shit
2 to keep my ass out of fucking jail. And I'll make up
3 fucking shit as I go along to keep Tommy in there for
4 fucking life. I hate him. You got ten fucking
5 minutes to call me back or you'll never see my kids
6 again. I'm not threatening you, but if you don't
7 call me back in ten minutes, you can go fuck
8 yourself. My number is 561 361-4145.
9      Did you make that call and make that
10 statement, Gerry?
11    A. I'm sure I did, if you have it on tape.
12    MR. OTERI: Thank you. I have no further
13 questions, Your Honor.
14    MR. CONNOLLY: I have a few questions,
15 Your Honor.
16      First of all, I'd like to at this point
17 move to admit the entire proof positive hearing
18 transcript into evidence.
19    MR. MAURER: Your Honor, during the lunch
20 hour, could I review it again and take a position?
21    THE COURT: All right. Do we need to do
22 that at this time?
23    MR. CONNOLLY: I'm happy to wait until

1 after lunch.
2    THE COURT: Do you have redirect of this
3 particular witness?
4    MR. CONNOLLY: I have. I do have
5 redirect.
6    THE COURT: And how long do you
7 anticipate it will take?
8    MR. CONNOLLY: More than five minutes.
9    THE COURT: All right. Then we'll take
10 the luncheon recess. You can take the jury out. We
11 will reconvene, hopefully, at two o'clock.
12    (The jury left the courtroom at 12:52
13 p.m.)
14    THE COURT: Would everybody in the
15 courtroom, except the jury, please be seated. Anyone
16 who is up will be not be admitted back into the
17 courtroom again.
18      Counsel want to make argument on this
19 issue before the luncheon break or afterwards?
20    MR. MAURER: I'd like, assuming I'm the
21 one, afterwards, Your Honor.
22    THE COURT: Then I would suggest we meet
23 in chambers at quarter of two.

Page 7

1   A. Yes, I have.

2   Q. And you signed a document?

3   A. Yes, I have.

4   Q. Have you actually gone into court and

5 entered your plea yet?

6   A. No, I have not.

7   MR. WHARTON: Your Honor, I think,

8 without objection, we would offer as the State's next

9 exhibit Mr. Capano's written plea agreement.

10   MR. MAURER: It is without objection,

11 Your Honor.

12   THE COURT: All right. It may be so

13 marked and admitted as State's Exhibit 124.

14   THE CLERK: So marked.

15   (Whereupon State's Exhibit No. 124, Louis

16 Capano's plea agreement, was received into evidence.)

17   THE COURT: Thank you.

18 BY MR. WHARTON:

19   Q. Mr. Capano, let me show you State's

20 Exhibit 124 and ask you to take a look at that. Is

21 that, in fact, the agreement in which you entered

22 with the Federal Government?

23   A. Yes, it is.

Page 6

1   Q. And it indicates that you're going to be

2 entering a guilty plea to a particular crime, does it

3 not?

4   A. Yes, it does.

5   Q. What is that crime to which you're going

6 to be entering a guilty plea?

7   A. Tampering with a witness.

8   Q. Is there a sentence which you -- which

9 the Federal Government is going to recommend that you

10 receive as a result of entering that guilty plea?

11   A. Yes, there is.

12   Q. What is that sentence?

13   A. One year probation.

14   Q. Now, do you have any obligations yourself

15 under that plea agreement?

16   A. Just to tell the truth.

17   Q. And you're required to testify truthfully

18 if called upon by the Government?

19   A. Yes, that's correct.

20   Q. Now, if you do not testify truthfully

21 when called upon to do so by the Government, what do

22 you understand the consequences of that failure to

23 be?

Page 7

1   A. That my agreement would be severed, I

2 suppose, and I could be prosecuted for other crimes.

3   Q. You have testified in front of a Federal

4 Grand Jury, have you not?

5   A. Yes, I have.

6   Q. In connection with this case?

7   A. Yes, I have.

8   Q. How many times have you testified?

9   A. Three times.

10   Q. Was the first one on August the 29th of

11 1996?

12   A. Yes, it was.

13   Q. And the second one was that on October

14 the 8th of 1996?

15   A. Yes.

16   Q. And the last one, was that on November

17 12th of 1997?

18   A. Yes, it was.

19   Q. And each time you testified, did that

20 testimony relate in some fashion to your brother

21 Thomas?

22   A. Yes, it did.

23   Q. Now, is he -- how does he fit in in the

Page 8

1 chronological range of your family, of your siblings?

2   A. He's the oldest brother, the second

3 sibling, second child.

4   Q. Second child. You have a sister who is

5 older than he is?

6   A. My sister Marion is the oldest, then Tom,

7 then myself, my brother Joseph, and my brother

8 Gerard.

9   Q. What is the age difference between you

10 and your brother Thomas?

11   A. Tom and I are two years apart.

12   Q. And between you and Joseph?

13   A. One year apart to the day.

14   Q. How about that.

15   Between Joseph and Gerard?

16   A. I think ten years.

17   Q. How about you and Gerard?

18   A. Eleven years.

19   Q. Okay. He's sort of the baby of the

20 family?

21   A. Yes, he is.

22   Q. I want to direct your attention to July

23 the 30th of 1996. Do you recall -- I misspoke, I saw

Page 5 - Page 8

**Page 9**

1 the look on your face. I meant June the 30th. My
2 fault. June the 30th of 1996. I'll ask you if you
3 had a conversation or any communication with your
4 brother Thomas on that date?
5    A. Sunday?
6    Q. Yes, that would be a Sunday.
7    A. Tom called me mid-morning at my house and
8 asked me to go over to his house on Grant Avenue,
9 that he wanted to talk to me about something.
10    Q. Did you do that?
11    A. I did.
12    Q. When you got there, who was there?
13    A. Tom was there and his four daughters
14 and -- my four nieces.
15    Q. Did you have a conversation with him?
16    A. Yes, Tom and I went back to an enclosed
17 porch in the back of the house and he then told me
18 about his relationship with Anne Marie Fahey.
19    Q. Did you know that he had had a
20 relationship with Anne Marie Fahey --
21    A. No, I did not.
22    Q. -- before he told you on that date?
23    A. No, I did not.

**Page 10**

1    Q. Did you know that he had had -- had or
2 was having a relationship with anyone at that point?
3    A. No, I did not.
4    Q. You were aware of his marital status at
5 that time?
6    A. I knew he was separated from his wife
7 Kay, but I wasn't aware of any -- any extramarital
8 affairs at all.
9    Q. Did you know Debbie MacIntyre?
10    A. Yes.
11    Q. And how did you know her?
12    A. I'm sorry?
13    Q. How did you know her?
14    A. I've known her for years. She teaches
15 at, or taught at, Tatnall School, and my son Louis
16 the third went there, and I've known her.
17    Q. And you did not know of any relationship
18 between your brother and Debbie MacIntyre?
19    A. None whatsoever.
20    Q. What did he tell you about this
21 relationship with Anne Marie Fahey on June the 30th?
22    A. He told me he had been seeing her for a
23 couple of years, that she was anorexic and bulemic

**Page 11**

1 and suicidal, and that he had ended the relationship,
2 and that he was seeing a psychiatrist with his wife,
3 Kay, and that he had taken her for dinner on Thursday
4 night in Philadelphia and that the police had gone to
5 his house on Saturday in the morning, I guess, Sunday
6 morning, two a.m. or three a.m.
7    Q. During the middle of the night?
8    A. During the middle of the night. And had
9 questioned him about her whereabout's. And since he
10 was the last one to be seen with her, he was
11 concerned that they suspected of him some wrongdoing.
12    Q. Now, this relationship with Anne Marie
13 Fahey, I think you indicated that he said that they
14 had -- they had broken up, or they were not seeing
15 each other?
16    A. Yes, he told me that.
17    Q. But they had dinner on Thursday night
18 previous?
19    A. Right.
20    Q. Did he describe to you what the nature of
21 that relationship with her was at that time?
22    A. He said at that point they were good
23 friends and he had even given her money to seek help

**Page 12**

1 for bulemia, or whatever, and that was the extent of
2 their relationship at that point.
3    Q. Okay. That help that he was referring
4 to, was that psychological help?
5    A. Yes.
6    Q. Did he tell you whether or not his wife
7 Kay knew of this relationship he had with Anne Marie
8 Fahey?
9    A. No, he told me that she did not know, and
10 he did not want her to know. He was seeing a
11 psychiatrist with Kay and they were trying to
12 reconcile their marriage.
13    Q. Well, did he tell you -- you've told us
14 that he told you that he was questioned by the police
15 about Anne Marie Fahey's disappearance?
16    A. Yes, he told me that.
17    Q. What did he tell you -- and then that he
18 told you they had had dinner on Thursday night?
19    A. That's correct.
20    Q. What did he tell you about his activities
21 that night with Anne Marie Fahey?
22    A. He told me that after dinner they had
23 gone to his house, and that while he was upstairs

**Page 13**

1  using the men's room that when he went downstairs
2  that Anne Marie Fahey had slit her wrists and got
3  blood on the sofa. And I asked him if he had taken
4  her to the hospital, and he said they were
5  superficial wounds and that he had bandaged them up
6  and took her home.
7      Q. Do you recall if he told you when he
8  returned from Philadelphia or when he took her home;
9  either of those two?
10     A. I don't think he ever told me when he
11  returned from Philadelphia. I believe he told me he
12  took her home nine or ten o'clock.
13     Q. Now, these wounds that she sustained, did
14  he tell you whether or not she bled, as a result of
15  those wounds?
16     A. Yes, he said she bled.
17     Q. And where did he tell you that she bled?
18     A. On the sofa.
19     Q. Were you familiar with that sofa?
20     A. No, I was not.
21     Q. To your knowledge -- did you know what
22  room in the house it was in?
23     A. No, I had never been in the house before

**Page 14**

1  on Grant Avenue. That was the first time.
2      Q. What did he tell you he did with the
3  sofa?
4      A. He told me that he and my brother Gerry
5  put the sofa in one of our dumpsters on Foulk Road
6  and Concord Pike where we were building the First USA
7  space.
8      Q. Where is that in relation to your office?
9      A. We're in the same office complex. It's a
10  hundred yards away from my particular building.
11     Q. And were you familiar with what he was
12  talking about when you refer to those dumpsters?
13     A. Yes, I was.
14     Q. Was there more than one dumpster at that
15  site?
16     A. I believe there were two or three.
17  Probably three.
18     Q. Did he tell you at that time whether or
19  not he had put any other things in the dumpster
20  besides the couch?
21     A. He told me he put some of her personal
22  belongings, like a nightgown and a hair brush,
23  something like that.

**Page 15**

1      Q. And that he had done this with your
2  brother Gerry?
3      A. Yes.
4      Q. Now, as of Sunday, he told you that the
5  police told him that Anne Marie Fahey was missing?
6      A. That's correct.
7      Q. Did he tell you whether or not he
8  expected Anne Marie Fahey to appear?
9      A. Yes, he told me that he had given her
10  money and she was planning to take Friday off and
11  that he suspected that she was just away for the
12  weekend at the beach and that she would show up on
13  Monday.
14     Q. Now, this meeting that you had with him
15  on Sunday, who initiated that?
16     A. He did. He called my house.
17     Q. He told you that he expected that Anne
18  Marie Fahey would be back to work on Monday?
19     A. I'm sorry, I was confused. I thought you
20  meant who initiated the meeting at his house on
21  Sunday.
22     Q. That's right.
23     A. He initiated that.

**Page 16**

1      Q. And he told you that Anne Marie Fahey
2  would be at work on Monday?
3      A. Yes. At the meeting on Sunday he told me
4  that.
5      Q. Right. After that conversation concluded
6  with your brother at his house, did you actually go
7  look at the dumpster?
8      A. Yes, I went up to the job site and I was
9  curious enough to look in the dumpster, and I saw
10  something that could have been a sofa or a chair. It
11  was turned upside down and mostly covered with
12  construction debris, but I did see two legs
13  upside-down, like the leg of a chair, or the leg of a
14  sofa, just about this much.
15     MR. WHARTON: Your Honor, I think without
16  objection, the State would offer this photograph as
17  the next State's Exhibit.
18     MR. MAURER: Agreed, Your Honor. No
19  objection.
20     THE COURT: Thank you, Mr. Maurer. That
21  would be State's Exhibit Number 125. It is admitted
22  without objection.
23     THE CLERK: So marked.

**Page 17**

1    (Whereupon State's Exhibit No. 125,
2  photograph, was received into evidence.)
3      THE COURT:  Thank you.
4  BY MR. WHARTON:
5    Q.  Mr. Capano, let me show you State's
6  Exhibit 125.  Do you recognize what's depicted in the
7  photograph?
8    A.  Yes, I do.
9    Q.  What is it in the photograph?
10    A.  They're the office buildings that First
11  USA occupies.
12    Q.  The actual dumpsters, the location of the
13  dumpsters, is that visible in the photograph?
14    A.  No.
15    Q.  Where, if you could orient the dumpsters,
16  are they?
17    A.  Well, there was a dumpster in the front
18  of this one building on the left side of the picture,
19  but there were -- there were -- there was at least a
20  dumpster or two dumpsters behind the building.
21    Q.  The dumpster you looked in, where was
22  that?
23    A.  It was behind the building on the left.

**Page 18**

1    Q.  You said you saw something in there.  How
2  much of a piece of furniture did you see?
3    A.  I really only saw two legs, about this
4  long.
5    Q.  Okay.
6    A.  And the sofa was upside-down.
7    Q.  And you saw two legs.  What prevented you
8  from seeing anymore of what was attached to the legs?
9    A.  The sofas were covered by construction
10  debris, drywall, things like that.
11    Q.  Did you speak with your brother anymore
12  that day?
13    A.  Yes, Tom called me later in the day,
14  later in the afternoon, to tell me that when he took
15  his children home to 17th Street where his wife
16  Kay -- where they live, that the police were waiting
17  for him there when he dropped the girls off, and that
18  they wanted to go back to his Grant Avenue house and
19  look through the house and search the house, and he
20  called me, and I recommended at that time that he
21  hire an attorney.
22    Q.  Now, did he tell you what he -- what, if
23  anything, to do about that dumpster where he had told

**Page 19**

1  you he and your brother Gerry had placed the couch?
2    A.  He told me to have it dumped on Monday
3  morning.
4    Q.  What's that process, I mean when you dump
5  a dumpster?
6    A.  Usually the superintendent or somebody
7  who is running the construction job would call the
8  company that -- the garbage company, and they would
9  just come with a truck and basically pull the
10  dumpster out, take it to the landfill, I guess.
11    Q.  These dumpsters that we're talking about,
12  I guess dumpsters come in different shapes and sizes.
13  Can you describe this particular type of dumpster?
14    A.  I would say that this dumpster was about
15  five feet tall on three sides and opened -- and long
16  and narrow and opened at one end of it.
17    Q.  Long and narrow, kind of like, where
18  they're sitting, and open here?
19    A.  Right.  Up about five feet.
20    Q.  Not one of those with the top that sort
21  of --
22    A.  No.  No.
23    Q.  Monday morning did you recall what he

**Page 20**

1  wanted you to do?  Did you have the dumpster pulled?
2    A.  Frankly, I had forgotten all about it.
3  It really wasn't a priority.  I didn't really see
4  the -- I didn't see the urgency in any of it at all.
5  And Tom called me mid-morning, I don't know, nine or
6  ten o'clock, I don't remember exactly, and told me
7  that she had not shown up for work.
8    Q.  "She" would be?
9    A.  Anne Marie had not shown up for work, and
10  asked me if I had dumped the dumpsters, and I said,
11  No.  He said, Could you get the dumpsters dumped?
12  And I said, Sure, and I did.
13    Q.  How did you arrange for that to be done?
14    A.  Well, I called Chris Nolan who works for
15  me, and he called Karen Feeney, and Karen Feeney
16  called Shaw Taylor, and Shaw Taylor told Dick
17  Armstrong, and Dick Armstrong told my son Louis the
18  third, who happened to be working there for his
19  college break, and that's what happened.
20    Q.  Okay.  After you had the dumpster dumped
21  with that chain of people involved in having it
22  done -- is everything that complicated in the
23  developing business?

**Page 21**

1   A. Well, the dumpsters --

2   Q. That's okay.

3   A. The dumpsters weren't full.

4     MR. MAURER: Maybe I should object, so we

5 don't have to get into it.

6     THE WITNESS: I'm sorry.

7 BY MR. WHARTON:

8   Q. You said the dumpsters weren't full?

9   A. Yes.

10   Q. Okay. Now, after, or at some point, did

11 you become aware of any significant publicity

12 regarding this dinner your brother had had with Anne

13 Marie Fahey and the fact that she was missing?

14   A. Yes, within a couple of days publicity

15 was rather great.

16   Q. And did you have any more conversations

17 with your brother about whether Anne Marie Fahey

18 would appear shortly or soon, or if at all?

19   A. Yes, Tommy always told me that -- he

20 swore to me that he took her home, that she was

21 probably away. She used to work in Washington, D.C.

22 with congressmen and that she had friends from all

23 over the country, and that he was sure that she was

**Page 22**

1 just an unhappy, troubled woman, and that she was

2 just away, maybe even getting help for her bulimia,

3 whatever, and that she would show up sooner or later.

4   Q. Did he report to you any purported

5 sightings of Anne Marie Fahey?

6   A. Yes, one time in particular he told me

7 that she was spotted at the Newark International

8 Airport.

9   Q. That's in Newark, New Jersey?

10   A. Newark, New Jersey.

11   Q. Do you recall going to a meeting with

12 your brother Thomas attended by a number of other

13 people at Mr. Oberly's office?

14   A. Actually, I think it was at Bart Dalton's

15 office.

16   Q. Okay. I'm sorry. And do you remember

17 some of the people who were there?

18   A. I believe Bart Dalton was there and Mike

19 Harkins was there, and a fellow named Parkins I think

20 was there, and maybe Brian Murphy, myself.

21   Q. Mike Harkins is -- who is he?

22   A. He's a former Secretary of State, and I

23 think he is, I guess his title is -- has something to

**Page 23**

1 do with the bridges, the Delaware Memorial Bridges.

2   Q. Delaware Bay Authority?

3   A. Yeah, I think he's head of the River and

4 Bay Authority.

5   Q. Who is Bob Harkins? You may have said

6 Parkins. I call him Bob.

7   A. I don't know what he does now. He used

8 to work with Tommy when Tom worked for the governor's

9 office.

10   Q. Would it be fair to say that at least one

11 of the reasons for this meeting was to discuss a

12 public relations strategy for dealing with the bad

13 publicity your brother was getting?

14   A. That was the purpose of the meeting at

15 the time, yes.

16   Q. Now, at any time during this meeting did

17 your brother say to the group that had been assembled

18 there that this was an accident?

19   A. No, he did not.

20   Q. How long did the meeting last?

21   A. It lasted an hour or so.

22   Q. Did you become aware that your brother's

23 home on Grant Avenue had been the subject of a search

**Page 24**

1 warrant, the execution of a search warrant?

2   A. Yes.

3   Q. Where did your brother live after the

4 institution of that search warrant?

5   A. He lived at my house.

6   Q. Did he move in directly after the search

7 warrant?

8   A. Yes, he did. I believe he moved in that

9 same night.

10   Q. Did you also become aware that there were

11 searches being conducted of several dump sites?

12   A. Yes.

13   Q. Did your brother ever tell you any

14 objects that might be found during these searches of

15 the dump sites?

16   A. Well, when they were searching the dump,

17 he told me that he had thrown a gun in the dumpster

18 and that he -- and that he hoped they found it in the

19 dump because it would prove that it had never been

20 shot.

21   Q. Now, did you know your brother to be

22 someone who possessed guns?

23   A. No.

**Page 153**

1    Jim Florio did a stop by because he had an event prior
2    to our event that was being hosted by attorneys.
3        Q. Did Mr. Capano's firm at the time sponsor in
4    any way that fund raiser?
5        A. I have no idea.
6        Q. Or a fund raiser for Governor Florio held
7    around the same time?
8        A. For your first question, did you mean did we --
9    did his firm sponsor our event?
10       Q. Yes.
11       A. No, they did not.
12       Q. Did I hear you correctly say you don't recall
13   who introduced you to Tom Capano?
14       A. No.
15       Q. Could it have been one of the Governors, Florio
16   or Carper?
17       A. It's too long ago to remember.
18       MR. O'DONNELL: Well, I won't ask anymore
19   questions about it.
20       MR. CONNOLLY: No further questions. The
21   witness may be excused.
22       MR. WHARTON: State calls Siobhan Sullivan.
23

**Page 154**

1            SIOBHAN SULLIVAN,
2        the witness herein, having first
3        been duly sworn on oath, was examined
4        and testified as follows:
5        DIRECT EXAMINATION
6    BY MR. WHARTON:
7        Q. Good afternoon.
8        A. Good afternoon.
9        Q. Who do you work for?
10       A. Delaware State Police.
11       Q. How long have you been with the Delaware State
12   Police?
13       A. Just short of 12 years.
14       Q. Right now what is your assignment with the
15   police?
16       A. Executive protection or for the Governor.
17       Q. How long have you been doing that work?
18       A. Little over five and a half years.
19       Q. When did you begin doing that?
20       A. His first election, '92.
21       Q. Was there interruption in your service?
22       A. Yes, February '98 to September '98.
23       Q. You were doing other work for the State Police

**Page 155**

1    at that time?
2        A. Yes. Back at Troop 9 in Odessa.
3        Q. What were your responsibilities with the
4    Executive Security Unit as related to the Governor?
5        A. We protect the family as well as the Governor.
6    But the day I would be working with the Governor, I
7    would pick up the Governor at his residence. Knowing
8    his schedule prior to the day before I would pick up the
9    Governor, I would contact Anne Marie who was the
10   scheduler for the Governor and learn about his schedule.
11   So I would have the Governor's schedule ahead of time
12   through Anne Marie. And I would pick up the Governor
13   that day or I would drive and protect him to every event
14   until his duration that night.
15       Q. When he was not at an event, but rather in one
16   of his offices, would you also be at the office?
17       A. I'm sorry, I didn't hear you.
18       Q. Let's say he was not at an event and he was at
19   an office -- He had an office in Wilmington; is that
20   right?
21       A. Yes.
22       Q. And did he also have an office in Dover?
23       A. Yes. Tatnall Building.

**Page 156**

1        Q. When he was at one of those building where were
2    you?
3        A. With him. We have an office in both buildings.
4        Q. So if the Governor is at work in the office you
5    are at that office?
6        A. That's correct.
7        Q. You mentioned Anne Marie. You knew Anne Marie
8    Fahey; is that correct?
9        A. Yes, I did.
10       Q. How is it you got to know her?
11       A. I met Anne Marie the first day I joined the
12   Governor's staff Executive Protection. Like I said she
13   was his right-hand person, his scheduling secretary.
14       Q. How closely did you work with-- I mean, I'm
15   talking about you pleural, like the Executive Security
16   Unit, work with her?
17       A. I would say, to compare it, the Governor looks
18   at us as his right-hand person and know his day is going
19   to go well because we are there. He has a lot of trust
20   in us. I would look at Anne Marie as my right-hand
21   person where she is setting my day so my day would flow
22   correctly to the Governor.
23       Q. You had to have a lot of contact with her?

Page 157

```
1    A. Yes.  One on one.
2    Q. At some point, would you say that you became
3  friendly with her?
4    A. Yes, I did.
5    Q. At some point -- Well, first of all, let me
6  back up.  Did you know the defendant?
7    A. Yes, I did.
8    Q. And how was it that you met him?
9    A. Anne Marie Fahey introduced me on an occasion
10  down at Woodburn, which is a mansion to the Governor.
11  They had an event there and Anne Marie introduced me to
12  Tom Capano.
13    Q. Prior to your introduction by her, did you know
14  that they were friends?
15    A. Yes, I did.
16    Q. How did you know that?
17    A. Anne Marie and I used to always talk when we
18  were in the Governor's office.  And she was saying she
19  was going to a concert or possibly going to an event
20  which was a pretty high event with the Governor's
21  office.  And I would joke around with her, where did you
22  get tickets?  Tell me.  And she would say Tom Capano
23  bought her tickets.
```

Page 158

```
1    Q. Do you know whether she considered him a close
2  friend of hers?
3    A. Yes.  Throughout our friendship, prior to Anne
4  Marie disappearing, she would say that she looked at Tom
5  Capano as one of her best friends and she would talk to
6  him occasionally.
7    Q. At some point, did she tell you about perhaps,
8  leaving the Governor's office?
9    A. Yes.  That was around spring of '95.  She had
10  told me that-- Let me go back.  It is very stressful in
11  what our jobs are with the Governor between security and
12  executive scheduler.  Mine would be stress would be
13  safety-wise, Anne Marie's stress level would be she had
14  to make sure the schedule went -- flowed correctly for
15  the Governor.  And we had a lot of stress.  We probably
16  have the most stress of anybody in the office I would
17  say.  And she had told me that Tom Capano had offered
18  her a job at Louie Capano's office.
19    Q. When did you say that was?
20    A. Spring of '95.
21    Q. Obviously she didn't take that job?
22    A. No, she did not.
23    Q. Did --
```

Page 159

```
1    MR. MAURER:  Can I interrupt for a moment to
2  consult with counsel?
3    THE COURT:  Certainly.
4    MR. MAURER:  Can we take just a moment, your
5  Honor?
6    THE COURT:  Certainly.
7    THE COURT:  Mr. Wharton.
8  BY MR. WHARTON:
9    Q. I think what I last asked you about was this
10  job offer Anne Marie told you was being made, or
11  attempted to be made, by the defendant with his brother
12  Louis Capano's business and she did not ultimately
13  accept that job, correct?
14    A. Yes.
15    Q. She stayed with the Governor's office?
16    A. Yes.
17    Q. So you knew she didn't take the job.  Did you
18  have a conversation with the defendant himself?
19    A. Yes, I did.
20    Q. How did that conversation get initiated?
21    A. Tom Capano would usually call me on my pager
22  and leave a phone number for me to call him back.  And I
23  received a page and returned Tom Capano's call.
```

Page 160

```
1    Q. He had paged you and you returned his call?
2    A. Yes.
3    Q. And what did he tell you?
4    A. He asked me -- there was different times that
5  Mr. Capano had called me over several occasions and a
6  lot of times he would ask if I wanted to get out and get
7  a beer.  It was always when I got done work that night
8  with the Governor.  And he knew I coached basketball and
9  wanted me to help his kids, coach them in some
10  basketball.  And at that time he wanted to know if I
11  wanted to go get a beer and talk about basketball.  I
12  said no, I had a long day, I need to get home.  At which
13  time he asked if I had spoken to Anne Marie today.  And
14  he said, "She's really mad at me."
15    And I said, "You have to just let her be, Tom."
16    And he goes, "You know I left my wife and I'm
17  just really lonely right now."
18    Q. And did he indicate whether or not they had an
19  argument of some sort?
20    A. Yes.  He stated that they had a fight that day
21  and Anne Marie was really mad at him.
22    Q. Did he also indicate to you whether he did, in
23  fact, do anything about trying to get her a job with his
```

Page 161

1    brother?
2        A. When I talked-- We talked about the stress
3    level of the Governor's office. And Tom also talked to
4    me that he offered Anne Marie a job at his brother's
5    Louie's office, and Anne Marie refused to take the job.
6        Q. When did you next see Anne Marie Fahey?
7        A. I know I was off that weekend, so it had to be
8    soon after that. We usually work every couple days
9    after, so it had to be the following week.
10       Q. Do you know if that was before Christmas of '95
11   or after?
12       A. It was before Christmas of '95.
13       Q. Did you tell her about your conversation with
14   the defendant?
15       A. Yes. I always told Anne Marie when Tom Capano
16   would call me. And at that certain time Anne Marie
17   became very upset.
18       Q. What did she tell you?
19       A. When I told her Tom Capano called me and paged
20   me and asked if I had talked to her and he told me that
21   Anne Marie was very upset with him, and I told Anne
22   Marie that, she said, "He is a possessive, controlling
23   maniac. I'm just getting tired of him."

Page 163

1    very short, asked how I was doing. And basically we
2    ended the phone conversation after how I was doing, what
3    was I doing for the weekend.
4        Q. Now, did you talk with Anne Marie after she
5    came back?
6        A. Yes, I did.
7        Q. And did you report to her that Tom Capano had
8    inquired of you about her whereabouts?
9        A. Yes, I did. I told Anne Marie, once again, in
10   our office that Tom Capano had paged me and was asking
11   if I knew where she was or if I have talked with her.
12       Q. What was her response to you?
13       A. At that time, very adamantly said, "He's
14   fucking stalking me."
15           And I tried to calm Anne Marie down. I said
16   Anne Marie there is a charge, there's a crime against
17   that, we can give you protection. We are here for the
18   Governor, but we are also here for the staff and we can
19   provide protection.
20       Q. What was her response?
21       A. At that time I think she felt she could handle
22   it at that time and repeated that she had to end it with
23   Tom Capano.

Page 162

1            And stormed out of my office and went back to
2    her office.
3        Q. Were you aware of whether or not she was around
4    Memorial Day of 1996, whether she was going away?
5        A. Yes, I was.
6        Q. Where did you understand she was going?
7        A. She was going to the New England area with her
8    boyfriend, Mike Scanlon.
9        Q. Did you have any-- You knew about Mike Scanlon?
10       A. Yes.
11       Q. Did you have any contact with the defendant
12   around that time?
13       A. Yes, I did.
14       Q. Tell us about that contact.
15       A. Once again, I received another page, at which
16   time Tom Capano had called me.
17       Q. Was this while she was away or before she went
18   away?
19       A. While she was away.
20       Q. And he paged you?
21       A. I returned the page, and he asked me if I had
22   talked to Anne Marie, and I said no. And he asked me if
23   I knew where Anne Marie was and I said no. He kept it

Page 164

1        Q. Do you know when if she got back if she
2    had -- did she tell you she had any concerns when she
3    got back from new England?
4        A. When I told her about him paging me, she stated
5    she was afraid Tom Capano was going to wait for her and
6    she did not want Mike and Tom having a confrontation,
7    she was afraid of that.
8        Q. Did she indicate whether Mike Scanlon knew
9    about her relationship with Tom Capano?
10       A. Throughout our conversations, throughout our
11   relationship with working and Tom Capano came up, she
12   told me she did not tell Mike Scanlon about Tom Capano.
13       Q. Now, did you also talk to her about Mike
14   Scanlon?
15       A. Yes.
16       Q. And what did she tell you about Mike Scanlon
17   how she felt about him?
18       A. She felt very highly of Mike Scanlon. For a
19   time there, the last year, Anne Marie was very down,
20   looked very upset and down. And seemed like when she
21   met Mike Scanlon her life came back into her. She
22   wasn't as down in the office, looking forward to getting
23   together with Mike Scanlon. She felt -- I felt with her

Case 1:06-cv-00088-JJF* Document 281-4 Filed 02/20/2007 Page 22 of 40

1 you don't transfer it to anyone. You just hold on to
2 it, and if the F.B.I. shows up with a search warrant,
3 then they're going to seize that anchor, but we're
4 not going to play games with it.
5      There came a time when Gerry told me that
6 he didn't have the anchor; that he had been requested
7 by Tom to turn the anchor over to him or his lawyers
8 so that Tom's lawyers could take a picture of the
9 anchor, and from the memo I guess this was when I
10 learned that Gerry didn't have the anchor even though
11 I had told him to keep the anchor.
12      When I realized that Gerry had turned the
13 anchor over to Tom, I told him in no uncertain terms
14 to get that anchor back, put it right back in the
15 garage where it was he was keeping it and leave it
16 there.
17   Q. Now, between that meeting in June and
18 October of 1997, what was the status of your strategy
19 with Gerry as far as whether you were coming in to
20 speak to the government or whether you were not
21 coming in to speak to the government?
22   A. We went back and forth.
23   Q. You had not made a final decision one way

1 or another?
2   A. Well, Gerry had not made a final
3 decision. In my own mind --
4     MR. O'DONNELL: Objection. I don't know
5 that that's relevant at this point.
6     THE COURT: All right. I'll sustain the
7 objection.
8   Q. You had not committed -- at any rate
9 Gerry Capano had not committed to you unequivocally
10 that he was going to come in.
11   A. True.
12   Q. Were you aware in October that his house
13 was searched?
14   A. I got a rather -- I was told in rather
15 dramatic fashion.
16   Q. How did you become aware?
17   A. I was at my home. It was probably 7:30,
18 8:00 at night. I think I was sitting down to dinner.
19     I got a phone call from Gerry at home
20 which is not necessarily unusual and not that big a
21 deal. I said -- Gerry was on the other end of the
22 line.
23     I said, "How ya doing."

1 he said, "I'm doing great except I'm
2 lying on the floor of my garage with my hands
3 handcuffed behind my back, a gun pointed at my head
4 and thirty F.B.I. agents rummaging through my house."
5     I said, "Oh". That's how I found out.
6   Q. Now, did you meet with him and talk about
7 the ramifications of that search warrant being
8 executed on his house?
9   A. Sure.
10   Q. Were you aware of whether or not any
11 drugs were found during the execution of that search
12 warrant?
13   A. I had been told that, if I have this
14 straight, a small amount of marijuana was found, and
15 perhaps a small amount of cocaine was found in his
16 home or garage, but a very small amount, and that a
17 little bit more, about two grams of cocaine had been
18 found in his truck outside of the home. And we
19 discussed that.
20   Q. Was he arrested?
21   A. He was not arrested. He was detained.
22   Q. Were you aware of whether that publicity,
23 excuse me, whether that discovery of the cocaine and

1 marijuana in his house precipitated any investigation
2 by child protective agencies working for the State of
3 Delaware?
4   A. Yes, I was.
5     I don't remember how quickly, but fairly
6 shortly after the search took place, and the
7 search -- my recollection is there was an article in
8 the newspaper, but I'm not sure about that, but the
9 bottom line is that Child Protective Services became
10 aware that there had been that amount of controlled
11 substances found in and around the home of Gerry and
12 Michele, and they wanted to interview the family to
13 determine whether or not the children were at risk.
14   Q. And were you representing him in that
15 process?
16   A. Yes, sir.
17   Q. Do you know whether they interviewed the
18 family?
19   A. Did they?
20   Q. Child Protective people.
21   A. They did. In my presence, two folks came
22 out from Child Protective and interviewed Gerry and
23 Michele in their home sometime in mid-October or so.

Case 1:96-cv-00068-B* Document 231-4 Filed 02/20/2007 Page 133 of 40

1 No other questions at this time.

2 THE COURT: In view of the voir dire,

3 does the State have any questions on this issue to

4 ask this witness?

5 MR. WHARTON: No.

6 THE COURT: In that case, we can bring

7 the jury in.

8 (The jury returned to the courtroom)

9 THE COURT: Members of the jury, again

10 let me offer my apologies. We have been in session

11 and have been addressing issues that needed to be

12 dealt with outside of the jury's hearing.

13 My apologies for not being able to

14 explain those matters, but those are questions of the

15 law that needed to be resolved.

16 Mr. Wharton, you may continue.

17 CONTINUED DIRECT EXAMINATION

18 BY MR. WHARTON:

19 Q. When we left before the luncheon recess,

20 you told us that initially Gerry told you that maybe,

21 possibly the defendant could have said something like

22 he needed to borrow a boat if he killed someone or

23 something like that. Is that a reasonably accurate

1 paraphrase?

2 A. Yes. The only thing more accurate would

3 be if I read it directly from my memo. But it's

4 something like that.

5 Q. And you also testified that you did not

6 press him at that time.

7 A. I did not press him.

8 Q. But at a later occasion you talked to him

9 about that comment.

10 A. A short time later; not the same day.

11 Q. Within a couple of days?

12 A. Probably.

13 Q. And at that time there were no

14 conditions, if you will.

15 A. I said something first, and I then asked

16 him again where are we on this issue, and the

17 response was without condition.

18 Q. Without condition. Were there any

19 maybe's?

20 A. Any what?

21 Q. Maybe's.

22 A. No.

23 Q. Possible's?

1 A. No.

2 Q. Were there any could have's?

3 A. No.

4 Q. Was there any "something like it"?

5 A. No.

6 Q. Was it in any way equivocal?

7 A. No.

8 Q. When was it that you and Gerry decided

9 that you were going to come in and talk to the

10 authorities?

11 A. Pretty much by the end of late October.

12 Q. When did you actually do that?

13 A. Gerry and I came in on a Saturday which I

14 think was the 8th of November.

15 Q. Now, had you had a --

16 A. If I can finish though, two days prior to

17 that on the 6th --

18 Q. That's what I was going to ask you.

19 A. I myself had spoken with Mr. Connolly

20 face to face but without Gerry. I think it was two

21 days before that.

22 Q. That's what I was going to ask you,

23 whether you had had a meeting with Mr. Connolly or

1 anybody else prior to Gerry and you coming in.

2 A. Yes, I think it was Thursday the 6th.

3 Q. Did you and he discuss the terms of a

4 plea agreement --

5 A. We did.

6 Q. -- that Gerry was prepared to enter into.

7 A. Yes.

8 Q. Or was contemplating entering into.

9 A. Yes.

10 Q. Let me show you State's Exhibit 101 and

11 ask you to take a look at that.

12 A. Yes.

13 Q. Is that the agreement that you and the

14 client and the federal government ultimately entered

15 into?

16 A. Yes, it is.

17 Q. When did you enter into that agreement?

18 A. On the 8th.

19 Q. When you brought your client in with you?

20 A. That's when we signed off on it, on the

21 8th.

22 Q. Now, what does paragraph two require him

23 to do?

Case 1:96-cv-00088-B* Document 231-4 Filed 02/20/2007 Page 14 of 40

1     A. On the first page?
2     Q. Yes.
3     A. The paragraph that begins "second"?
4     Q. Yes.
5     A. It required an admission that Gerry was
6 guilty of a technical offense called misprision of a
7 felony. It means knowing about a felony, not
8 disclosing it and concealing it in violation of
9 federal law. He agreed to plead guilty to a
10 violation of the statute that prohibits that.
11        He also agreed not to contest the
12 forfeiture of his white pick-up truck and certain
13 firearms that were seized from his home at the time
14 of the search a month earlier.
15        He agreed that the truck was forfeitable
16 because there was a small amount of drugs found in
17 the truck. He agreed to cooperate fully with the
18 government's investigation into Anne Marie Fahey's
19 death.
20        He agreed to provide complete and
21 truthful statements, information and testimony at
22 trial and other legal proceedings when requested by
23 the government.

1        If he did all of that, the government
2 agreed that a sentence of three years probation was
3 the appropriate disposition of his case, meaning if
4 he pled guilty when he pled guilty to the misprision
5 offense, the government would recommend three years
6 probation.
7     Q. What else is in that paragraph?
8     A. Say again?
9     Q. Is there anything else in that paragraph?
10     A. I don't think so. I think I read the
11 whole thing.
12     Q. Paragraph labeled "eighth", what does
13 that agreement require?
14     A. Paragraph eight on the second page, in
15 the event -- this is directed to me. In the event --
16 right?
17     Q. Right.
18     A. If my client Gerry offers testimony
19 materially different from any statements made or
20 information provided to the government by him, in
21 other words, if Gerry were to tell the government
22 A-B-C on one day and later say no, A-B-C isn't true,
23 it's D, E and F, the statements, testimony and

1 information given pursuant to the agreement, meaning
2 the first set of statements, may be used to
3 cross-examine him and may be introduced as rebuttal
4 evidence.
5     Q. How about paragraph nine?
6     A. This is a stipulation that Gerry
7 understood that if he made materially false
8 statements to the government or testified falsely at
9 trial or any other legal proceeding, including grand
10 jury proceedings, he would be subject to perjury and
11 obstruction of justice charges.
12     Q. Who is it that determines whether or not
13 his obligations to testify truthfully are met?
14     A. If there was a dispute about whether or
15 not Gerry had testified truthfully --
16     Q. For example, if there was an allegation
17 that he did not testify truthfully at trial or at any
18 other hearings including up to trial.
19     A. If the government were to make that
20 allegation, and in effect, to say to me, "Your deal
21 is off because Gerry didn't do what he promised to
22 do," unless Gerry were to say to me, "That's true, I
23 didn't testify truthfully," if Gerry were to say,

1 "No, I did," so there was a dispute there, that
2 dispute would be decided by a judge, either a federal
3 or -- probably a federal judge, but by a judge.
4     Q. Does that determination of whether he
5 testified truthfully ultimately rest with Mr.
6 Connolly?
7     A. No.
8     Q. When you entered into that agreement and
9 he signed that agreement to plead guilty to the
10 misprision of a felony charge, was Gerry then
11 de-briefed by investigators?
12     A. Yes, he was.
13     Q. Was that a lengthy process?
14     A. It started at about 10:00 in the morning
15 and went until about 3:30 or four in the afternoon
16 with a short break for lunch.
17     Q. Were you present for that?
18     A. Yes, I was.
19     Q. At the conclusion of that, in other
20 words, after that multiple hour de-briefing, was
21 there a taped statement made?
22     A. Yes, it was.
23     Q. Let me show you State's Exhibit 78. Do

**Page 49**

1     A. I believe it was February 20th.

2     Q. Were you present at that meeting?

3     A. No, I was not.

4     Q. Did you ultimately meet with

5 Mr. Connolly, myself and some other investigators?

6     A. Yes, I did.

7     Q. When was that?

8     A. Friday, February 27th.

9     Q. Was Mr. Bergstrom present?

10     A. Yes, he was.

11     Q. During that meeting and prior to — at

12 the beginning of that meeting I guess, did you reach

13 any agreement with the government about whether or

14 not you were going to face any criminal charges as a

15 result of what you said was your lie under oath on

16 January 28th in the interview and your false

17 statements when you purchased the gun?

18     A. Yes, I did.

19     Q. Was that a written document?

20     A. Yes, it was.

21     Q. Did you sign that document?

22     A. Yes, I did.

23     MR. WHARTON: I would offer this as the

**Page 50**

1 next State's Exhibit, Your Honor.

2     MR. MAURER: Without objection, Your

3 Honor.

4     THE COURT: Without objection, it will be

5 admitted as State's Exhibit 148.

6     THE CLERK: So marked.

7     THE COURT: Thank you.

8     (AGREEMENT, State's Ex. 148 in Evid.

9 received and marked)

10 BY MR. WHARTON:

11     Q. Miss MacIntyre, let me show you State's

12 Exhibit 148 and ask you to take a look at that. Is

13 that the agreement you entered into with law

14 enforcement?

15     A. Yes, it is.

16     Q. It's dated when?

17     A. February 27th, 1998.

18     Q. By whom is it signed?

19     A. It's signed by Colm Connolly, Ferris

20 Wharton, Thomas Bergstrom and me.

21     Q. Now, as a result of that agreement, are

22 you going to be prosecuted for any crime —

23     A. No, I am not.

**Page 51**

1     Q. — that you had committed prior to the

2 date of the agreement.

3     A. That is correct.

4     Q. Specifically, are you going to be

5 prosecuted for any lies that you told to the federal

6 grand jury when you testified before that grand jury

7 in September of 1996?

8     A. Correct.

9     Q. Are you going to be prosecuted for any

10 lies in that testimony?

11     A. No, I am not.

12     Q. Are you going to be prosecuted for any

13 lies or false statements you made under oath in the

14 January 28th, 1998 interview?

15     A. No, I am not.

16     Q. Are you going to be prosecuted for any

17 false statements you made under oath in conjunction

18 with your gun purchase?

19     A. No, I am not.

20     Q. As a condition I guess of this — let me

21 put it this way. Could you read the first paragraph

22 of the agreement or at least the one labeled "first"?

23     A. The paragraph that begins with "first"?

**Page 52**

1     Q. Yes.

2     A. "First, your client represents that she

3 did not kill or conspire to kill or aid or abet the

4 killing of Anne Marie Fahey. If that representation

5 proves to be false, the government would not be bound

6 by the terms of this agreement."

7     Q. Are those representations true that you

8 made?

9     A. Yes, they are.

10     Q. And if they were not true, could you be

11 prosecuted for anything and everything that you've

12 done?

13     A. Yes, I could.

14     Q. Did you also agree to cooperate with the

15 federal and state authorities in the investigation of

16 Anne Marie Fahey's death?

17     A. Yes, I did.

18     Q. If you could read paragraph fifth?

19     A. "Fifth, your client understands that any

20 statement she makes pursuant to this agreement

21 are —"

22     Q. This letter is addressed to your

23 attorney, Mr. Bergstrom, right?

**Page 65**

1  employed?

2  A. Most recently I worked at the Tatnall

3  School.

4  Q. How long did you work at Tatnall School?

5  A. About twelve and a half years.

6  Q. When did that employment end?

7  A. In February of this year.

8  Q. What did you do at the Tatnall School?

9  A. I was an administrator. I ran the before

10 and after-school program. It was called the extended

11 day program, and I also ran the summer program for

12 about five years of that period.

13 Q. Do you know the defendant, Thomas Capano?

14 A. I do.

15 Q. How long have you known him?

16 A. Since about 1977.

17 Q. How did you meet him?

18 A. I believe I met him at a law firm

19 function.

20 Q. Were you married then?

21 A. Yes, I was.

22 Q. To whom were you married?

23 A. David H. Williams.

**Page 66**

1  Q. When you say law firm function, what law

2  firm are you referring to?

3  A. Morris, James, Hitchens and Williams.

4  Q. Was your husband employed by that law

5  firm?

6  A. Yes, he was.

7  Q. He was not the Williams at the end of

8  that?

9  A. No; that was his father.

10 Q. Was the defendant employed by that law

11 firm?

12 A. Yes.

13 Q. At some point did you begin a relation-

14 ship with the defendant?

15 A. I did.

16 Q. Was that a sexual relationship?

17 A. Yes, it was.

18 Q. When did that sexual relationship begin?

19 A. In May of 1981.

20 Q. Were you married at the time?

21 A. I was.

22 Q. Was he married at the time?

23 A. He was.

**Page 67**

1  Q. Did that relationship continue for a

2  period of time?

3  A. Yes, it did.

4  Q. Would it be fair to say that it continued

5  up through 1996 and 1997?

6  A. Yes, 1997.

7  Q. When you would get together while you

8  were married, where would you get together?

9  A. In a motel usually.

10 Q. Was there any particular motel?

11 A. There was a motel on Route 9 near the

12 Delaware Memorial Bridge. I believe it's called

13 Motel 6.

14 Q. Was there any particular time or routine

15 day when you would get together at Motel 6?

16 A. At that time I'm not sure what day it

17 was, but it was usually the same evening every time.

18 Q. Did it evolve into a particular day of

19 the week?

20 A. Yes. I don't remember what day it would

21 have been; maybe a Wednesday or a Thursday.

22 Q. What were your — how long -- as this

23 relationship continued, were there any break-up's in

**Page 68**

1  the relationship?

2  A. Yes.

3  Q. How many?

4  A. One in particular I recall. I cannot

5  recall the year. It would have been in the fall,

6  maybe October. October.

7  Q. How long did that last?

8  A. About five weeks.

9  Q. Who wanted to end it when it ended?

10 A. Tom Capano did.

11 Q. Who wanted to get back together when it

12 got back together?

13 A. I did.

14 Q. Did you and he talk during this time

15 period, talking about pre-1995, did you and Tom

16 Capano talk about the future of your relationship?

17 A. Not really, no.

18 Q. Did he ever talk to you about whether or

19 not he would leave his wife?

20 A. No.

21 Q. Did he have children?

22 A. Yes.

23 Q. Was your relationship public?

**Page 69**

1 there's him to contend with? Afraid, you said of
2 what? Pointless, groundless, hollow noises from
3 Connolly? I've told you a hundred times you have
4 nothing to worry about.
5     "Do I now have to worry about you? I can
6 feel myself getting angry and again feeling the sense
7 of betrayal I felt when you abandoned me at the bail
8 hearing. Do you love me or not? Do you know what
9 love is, Debby?"
10    Q. Skip down to a third of the way from the
11 bottom.
12    A. "You must now prove your love to me.
13 Everything you've done for nearly a month sends the
14 message you don't love me and perhaps never did. I
15 cannot survive with that uncertainty. Ambivalence
16 would be worse than knowing you no longer love me.
17     "There is only one way now for you to
18 prove your love clearly, completely and
19 unequivocally, and also to demonstrate that your act
20 abandoning me when I most needed you was not
21 something you will ever do again.
22     "This is my ultimatum and this is your
23 choice. Me or your lawyer. You cannot straddle the

**Page 70**

1 fence. You must choose between us. If you choose
2 him, please return all my letters for the sake of
3 whatever you once thought of me and write me to
4 explain why you chose him.
5     "I don't really care if you like him.
6 There are other lawyers who will not try to drive a
7 wedge between us. If you choose me, I will gain the
8 strength to survive and endure. I will know your
9 betrayal was an isolated act. I will protect and
10 stand by you forever.
11     "This does not seem to be any big deal.
12 In fact, it should be a no brainer. Lawyers are a
13 dime a dozen. True love is rare. I need you now.
14 He doesn't. And you don't need him. Plus it will
15 take Dave Williams out of the equation which has
16 caused me more pain than you know. To prove that
17 this is no monetary flash of a broken heart —"
18    Q. I think that has "momentary".
19    A. "To prove take this is no momentary flash
20 of a broken heart, I make the same offer to prove my
21 love for you. I will fire Charlie, Joe and Gene to
22 prove you mean more to me than any stranger. In
23 fact, in my case, they are all friends, not

**Page 71**

1 strangers.
2     "I'm imprisoned and will soon be on trial
3 for my life. You have been the victim of rumor and
4 negative press and have no legal concerns and a zero
5 chance of any future legal problems.
6     "What I just said is true regardless of
7 any empty noises Connolly may spread to the press or
8 your new lawyer. Debby, you know Connolly is a liar
9 and cannot be trusted or believed.
10     "So I will sacrifice the services of
11 friends who have been my attorneys for eighteen
12 months, Charlie, thirteen months, Joe four months,
13 Gene, to — eighteen months Charlie, thirteen months
14 Joe, four months Gene, to demonstrate my devotion and
15 relieve you of any concerns you may have about them,
16 although you have never expressed any.
17     "And Debby, they have never asked me to
18 give them letters I received from you. We talked
19 about you Wednesday night as I told you, and for the
20 second week in a row about your legal situation, at
21 my insistence. After those three experienced
22 Delaware lawyers who are my friends assured me for
23 the second —"

**Page 72**

1    Q. Let me stop you there. Tom Bergstrom,
2 your new lawyer at that time, where did he have his
3 office?
4    A. In Malvern, Pennsylvania.
5    Q. So after he said "those three experienced
6 Delaware lawyers," would you continue reading please?
7    A. "After those three experienced Delaware
8 lawyers who are my friends assured me for the second
9 week in a row that you were in no danger with a teeny
10 tiny possibility that Connolly would threaten you
11 with perjury because of the date we first had sex,
12 after all that, Gene looked at me and said 'you
13 really do love her, don't you,' and I told him I
14 loved you with all my heart despite everything and
15 that I would never let anything happen to you, even
16 if I had to swear under oath that we never had sex
17 until whatever date you needed me to say.
18     "I will give them all up. I will
19 sacrifice the huge amount of money I've already
20 spent. I ask only that you give up someone who is a
21 stranger, not a friend, someone you've known for only
22 a few weeks and met only a few times, someone who
23 cannot have cost you much yet, someone somehow

**Page 73**

1 connected to Dave Williams, someone who wants you to
2 refuse my calls and turn over my letters so he can do
3 whatever he wants with them, someone who doesn't care
4 and probably didn't ask if you loved me, someone who
5 doesn't care about me as my present lawyers care
6 about you.
7     "I'm willing to give up a hundred dollar
8 bill and ask only that you give up a penny. There is
9 no reason for you to decline if you care about me
10 since this guy obviously wants to cause me harm. My
11 lawyers mean you no harm and have even done things to
12 help you.
13     "And as a practical matter, if the one in
14 a million possibility happens and Connolly tries to
15 charge you with lying to the grand jury because of
16 your characterization of our relationship, a judge
17 would dismiss the charge even before a jury threw it
18 out.
19     "Your new lawyer could not even represent
20 you because he's not a Delaware lawyer. The only way
21 he could be involved is if you hire a Delaware lawyer
22 to work with him and thus pay for two lawyers. We
23 will both find new Delaware lawyers. You should not

**Page 75**

1 I doubt I ever will because I will then know that you
2 have lied to me all these years and never truly loved
3 me. Dave Williams?"
4   Q. Tab 16. This is dated when?
5   A. Thursday, February 26th.
6   Q. This is the third letter of that date?
7   A. Correct.
8   Q. When did you go in to see the government?
9   A. Friday, February 27th.
10   Q. Turn to page two and read the highlighted
11 portions which begins at the second paragraph.
12   A. "Since you know better than anyone the
13 fragile condition of the man you love, I have to hope
14 the choice I asked you to make to give me heart and
15 reassurance was an easy one for you.
16     "I hope you understand why it had to
17 happen now and how utterly crucial it was to me and
18 to us. It may help me avoid a nervous breakdown. It
19 may be the tie that truly binds us together.
20     "As I said, I asked you to sacrifice a
21 penny compared to my sacrifice of a hundred dollar
22 bill. I know it didn't mean much to you or cost you
23 any emotional capital, but it means a great deal to

**Page 74**

1 even have to think about this for all the reasons
2 I've listed.
3     "And more important than the reasons is
4 the simple fact that the man you profess to love has
5 asked you to do it because he needs reassurance. I
6 can't believe you will decline to do it, but if you
7 do, I'll know for certain you do not love me.
8     "What will haunt me, of course, is the
9 question of whether you ever did. This relationship
10 has not cost you anything. It demanded something of
11 you."
12   Q. I'm sorry?
13   A. "This relationship has never cost you
14 anything."
15   Q. I think that says "the first time".
16   A. "The first time it demanded something of
17 you, you were not willing to pay the price. Now it's
18 demanding something again, and this time with damn
19 good reason, which is of insignificant cost to you.
20     "I've offered to pay a great cost in
21 exchange although you have absolutely no reason to
22 need reassurance. Do you love me? If you don't,
23 then I need to know so I may try to recover, although

**Page 76**

1 me and inspires me to fight for us and our future.
2     "Because I am so confident that you chose
3 me, my sanity and my health, my heart, my love, that
4 I'm going to thank you now for your devotion and
5 unconditional love. I thank you for trusting me
6 again and making your love tangible. We will win
7 this, Deb. We will have a future."
8   Q. If you could turn to the last page of
9 that letter, the PPPS.
10   A. "Remind me to tell you about my friend
11 Nick Perillo, the guy who has tried to call you for
12 me a few times and may again depending on what
13 punishment I receive.
14     "He has the paper that got confiscated
15 when he slid it back under my door around 9:00 last
16 night when he tried to call but got the machine. Do
17 you get those messages?"
18   MR. WHARTON: Your Honor, I notice the
19 time, Your Honor.
20   THE COURT: We'll take our morning recess
21 at this time and I'll ask the bailiff to remove the
22 jury. I'll ask the people in the audience to remain
23 seated.

**Page 77**

1    (The jury left the courtroom)

2    THE COURT: Court will stand in recess.

3    (At this time a short recess was taken).

4    MR. WHARTON: Your Honor, I think counsel

5    would like to speak with the court at side bar.

6    THE COURT: All right. On the record?

7    MR. WHARTON: Yes.

8    (Side bar conference):

9    MR. WHARTON: Your Honor will recall this

10    morning Mr. Maurer suggested there might be an issue

11    to discuss at side bar prior to the cross-

12    examination, and winding down the direct, I expect we

13    will start the cross-examination before lunchtime.

14    So this is an appropriate time now I guess to bring

15    that up.

16    MR. MAURER: I had a conversation

17    actually with Mr. Wharton and Mr. Connolly about

18    this, and during the course of my examination of Miss

19    MacIntyre, I intend to ask her specifically whether

20    when she went to Grant Avenue in June, the 27th, 28th

21    of '96, whether she had a firearm with her when she

22    went over there and whether she discharged the

23    firearm.

**Page 78**

1    I had wanted to bring that up initially.

2    I anticipated at that time the State might object to

3    that line of questioning and argue that if the

4    defendant doesn't testify I don't have a good faith

5    basis for asking that question.

6    We flushed that out. I don't think that

7    there is an objection to my asking the question and

8    an additional basis which thought I had the basis to

9    ask the question about was the immunity agreement

10    where she makes specific representations that she did

11    not kill, conspire to kill or assist in the killing.

12    MR. CONNOLLY: Judge, just to further

13    flush it out somewhat, as Mr. Maurer just alluded to,

14    we just want it clear that in order for Mr. Maurer to

15    have a good faith basis to ask this question, his

16    client must have provided some kind of account such

17    that if the client were to take the stand at some

18    point and testify differently it would raise ethical

19    concerns.

20    We're very comfortable with Mr. Maurer's

21    ethics, so I just wanted to put it order record to

22    protect ours, not because of anything we think about

23    Mr. Maurer.

**Page 79**

1    MR. MAURER: Thank you, Mr. Connolly.

2    I'm pretty comfortable with my ethics for the most

3    part at this point.

4    MR. CONNOLLY: I think it's fair for us

5    to put it there.

6    MR. MAURER: I didn't mean to be

7    pejorative when I said that.

8    MR. WHARTON: There are a couple of other

9    issues that may get broached during cross-

10    examination. She has testified or actually she has

11    read some letters in which she makes and breaches

12    some what would otherwise be confidential

13    communications with her lawyer Adam Balick, and

14    perhaps that could be viewed as a waiver of

15    confidential communications to go beyond what is in

16    the letters.

17    I don't know what Mr. Maurer intends to

18    do. I don't think he intends to go into that, but I

19    do think that if that's the case, that reciprocity

20    ought to follow inasmuch as the defendant has made

21    also breaches of confidentiality in his

22    correspondence to Debby so that if we stray beyond

23    what is in the letters with respect to Adam Balick

**Page 80**

1    and Debby MacIntyre, we should be given license to

2    stray beyond communications between the defendant and

3    his lawyers beyond which what appear in the letters.

4    MR. MAURER: I understand the State's

5    position on that and obviously Tom's breached our

6    attorney-client privilege considerably already with

7    the letters that are in. It's not really my intent

8    to cross-examine in that area.

9    THE COURT: That's a substantial issue,

10    and I don't want to make a superficial ruling here

11    because I think there are a lot of problems as to

12    whether you can make a partial disclosure and whether

13    that can be compartmentalized or not, and I'd prefer

14    not to make a decision in that area, but it seems to

15    me at this particular stage -- clearly I hate to fall

16    back on trite sayings, but what's sauce for the goose

17    is sauce for the gander, we know that.

18    MR. WHARTON: It's getting close to

19    Thanksgiving so that may be an appropriate reference.

20    The other issue involves communications

21    she had with Joe Hurley. As the Court is aware, he

22    was the lawyer for Mr. Capano. If we get into -- I

23    understand Mr. Maurer may ask about those

Page 77 - Page 80

1 communications.
2     That raises a similar sort of related
3 issue in terms of if Mr. Hurley testifies as a
4 defense witness, the scope of cross-examination
5 there. We're not looking for a resolution of that
6 right now but simply to say that this is out there,
7 and I wanted to put our concerns on the record about
8 whether they lead to the waiver of certain work
9 product information.
10     THE COURT: I thought you were going to
11 tell me that Miss MacIntyre was a part of the Capano
12 team and therefore all those communications were
13 privileged.
14     MR. MAURER: If I can just add to that,
15 Joe Hurley interviewed her when he became involved in
16 the case, and he took a statement from her and we
17 have a memorandum of what she told him and that's in
18 some respects inconsistent with what she's testified
19 to here today, and that's the purpose that I want to
20 ask her those questions. We plan to call Joe Hurley
21 as a witness.
22     MR. CONNOLLY: There's another point
23 which I just thought of. We would take the position

1 not only that we get Joe Hurley's interviews of her
2 but Charlie interviewed her too, and we would want
3 Charlie's notes and any notes.
4     It's attorney work product relating to
5 interviews of her, and once you waive it with Joe
6 Hurley, you waive it for everybody.
7     MR. OTERI: That's an expansive
8 interpretation.
9     MR. MAURER: We don't agree with that.
10 There also was an interview that Charlie had with her
11 on August 16th of 1996 when Mr. Vaulles was present,
12 an investigator who will also be called to testify.
13 I don't think we have any problem in turning those
14 notes over.
15     MR. OBERLY: In fact, Your Honor, I was
16 the stenographer. I did not conduct the interview.
17 I wrote the notes. Somebody else did.
18     THE COURT: I'm proud that you have that
19 talent.
20     MR. CONNOLLY: You interviewed her first
21 week of July as well.
22     MR. OBERLY: On the telephone.
23     MR. CONNOLLY: If you have notes for

1 that.
2     MR. MAURER: I'm not going to question
3 her about that interview.
4     MR. WHARTON: I'm just saying that that
5 topic raises some work product waiver issues and
6 cross-examination issues if Mr. Hurley testifies.
7     MR. MAURER: We'll see what we are.
8     THE COURT: They have a lot of issues out
9 there.
10     MR. MAURER: I can't not cross-examine
11 her.
12     (Side bar conference ended)
13     THE COURT: Please bring the jury in.
14     (The jury returned to the courtroom)
15     THE COURT: Mr. Wharton.
16     MR. WHARTON: Thank you, Your Honor.
17     CONTINUED DIRECT EXAMINATION
18 BY MR. WHARTON:
19   Q. Miss MacIntyre, the defendant wrote you
20 three letters dated Thursday, February 26th of 1998,
21 the day before you went in to speak to the
22 government. You also wrote him a letter on February
23 26th of 1998, did you not?

1   A. Yes, I did.
2   Q. Would you turn to tab forty please. The
3 first paragraph that's highlighted, could you read
4 that?
5   A. "About me not testifying, yes, it made me
6 look bad and the media took shots at me. What else
7 is new? Yes, my self is damaged, and I may (no did)
8 have lost my job as a result of the publicity.
9     "But I must be open with you. I never
10 could lie, never can lie well about anything and
11 that's been so evident in our relationship. Any
12 little thing you picked up, and that's okay because I
13 think it's a good thing to be honest.
14     "I know you wanted to tell me what to
15 say, but no amount of practice could make it seem
16 real. I knew it when it came out, I didn't blow it,
17 I just didn't lie well".
18   Q. What were you talking about?
19   A. I was talking about the story about the
20 gun.
21   Q. Was that in the January 28th interview?
22   A. Correct.
23   Q. Would you turn to the next page please.

Case 1:06-cv-00068-HB   Document 23-4   Filed 02/20/2007   Page 21 of 40

| | |
|---|---|
| 1 About the middle of the page there's a highlighted | 1     A. Yes, I did. |
| 2 paragraph. | 2     Q. What did you tell us about the gun? |
| 3     A. "Tomorrow will be a big day for me. I | 3 Whose idea was it to get the gun? |
| 4 know you called me tonight while I was out. I got | 4     A. It was Tom Capano's idea to get the gun, |
| 5 home at 10:30 p.m. and your last attempt was 10:24 | 5 for me to purchase the gun. |
| 6 p.m. " | 6     Q. Is that what you told us on February |
| 7     Q. "Tomorrow will be a big day for me," what | 7 27th? |
| 8 are you referring to? | 8     A. Yes. |
| 9     A. The meeting that I had with you on | 9     Q. And what you testified on direct |
| 10 Friday, February 27th. | 10 examination earlier about the gun, and what you did |
| 11     Q. Go ahead. | 11 with it, is that essentially the story you told us on |
| 12     A. "I know you called me -- I am wondering | 12 February 27th? |
| 13 if you knew of the media news then. If I had talked | 13     A. That is correct. |
| 14 with you, I would have told you I was going to be | 14     Q. The next day and into a couple of days |
| 15 truthful, that is the only way. I don't know what | 15 later, you continued that letter, did you not? |
| 16 the truth will do. Will it hurt you? I don't know | 16     A. Yes, I did. |
| 17 what the defense case is nor do I know what the | 17     Q. There is a portion after you concluded |
| 18 prosecution case is. | 18 the February 26th segment it dated Saturday, |
| 19     "Today I received a letter from you that | 19 February 28th to Monday, March 2nd, 1998. |
| 20 was written from the heart and it made me cry for | 20     Would you look at the last page there |
| 21 both of us who can't hold onto each other. You think | 21 please and there is a highlighted portion. Would you |
| 22 I have betrayed you. I have not. I have told the | 22 read that? |
| 23 truth and we must both live with the truth. | 23     A. "It has been good to hear your voice |

| | |
|---|---|
| 1     "I know completely for sure without a | 1 again. Truthfully, I never expected to hear from you |
| 2 doubt you love me. I never doubted your love. Some | 2 again and am curious but pleased that you have called |
| 3 letters were horrible and I could not read them. But | 3 me. I have also been advised to not write to you, but |
| 4 some of it was true. I had been walked over most of | 4 I have been wanting to do so for a long time. |
| 5 my life and by you for sure. I guess I let the man | 5     "Our conversation of last night bothered |
| 6 of my life walk over me more than anyone else. | 6 me and I know we got cut off in the end. I spent |
| 7     "You can build me up and point out my | 7 most of the night thinking about it. I am serious in |
| 8 strengths better than anyone. When down, I have been | 8 writing that I really don't understand why you would |
| 9 encouraged by you, but you can trash me like no other | 9 change your lawyers to prove your love for me. |
| 10 as well. I'd like to think that I know you better | 10     "Tom, that does not make sense to me, but |
| 11 than anyone, but maybe I don't. Yes, we are one, | 11 worries me as I think you believe that's how you show |
| 12 soul mates. For me there is no way that can be taken | 12 your love. That shouldn't be. For me, changing |
| 13 away regardless." | 13 lawyers is not proving to you that I love you. I |
| 14     "Often I wonder why all this tragedy had | 14 have endured too much emotional torture in the past |
| 15 to happen. What happened and why are you involved? | 15 eighteen months and know I could not mentally or |
| 16 Will you ever be able to tell me? I think not, and | 16 physically make another change without compromising |
| 17 that will always keep us apart. Tom, I hope you are | 17 my health. |
| 18 still reading this." | 18     "I am tapped out and can take little |
| 19     Q. On Friday, February 27th, you testified | 19 more. Besides, I like him and believe in him. As |
| 20 you came in and spoke to Mr. Connolly and me and | 20 you don't know him, you cannot see that. But if you |
| 21 other investigators, correct? | 21 love me, you will support me for the choices I have |
| 22     A. Correct. | 22 made. |
| 23     Q. Did you tell us about the gun? | 23     "You have said or written that you are a |

D. MacIntyre 11/18/98 A-126

1 drowning man and I can really identify with that. I
2 feel like I am drowning too, but not with you. I
3 want so much to preserve in my mind and heart what we
4 have had together.
5 "What has been difficult for me is that
6 few have been able to understand that despite all
7 that has surpassed that I still love you. My
8 therapist asked me today why I feel that way, and I
9 told him that you have always been there for me in
10 times of trouble.
11 "You respect me and my openness and
12 honesty. You are my best friend. You listen well
13 and you love me completely. If all of this is true,
14 then you must understand deep in your heart why I
15 have been so truthful and honest. That is me.
16 "It doesn't mean I don't love you. It
17 hurts more than anything to read some of your words
18 that are written right along with your words of love.
19 I am more than a little confused but know you are way
20 beyond that.
21 "There is nothing I can say or write to
22 you that will convince you that I love you now and
23 forever. If you do love me as you say you do, you

1 for identification, thank you.
2 (PHOTOGRAPH, State's Ex. 149 in Evid.
3 received and marked).
4 (DOCUMENT, State's Ex. G for I.D.
5 received and marked).
6 BY MR. WHARTON:
7 Q. Miss MacIntyre, let me show you State's
8 Exhibit 149 and ask you do you recognize what is
9 depicted in that photograph?
10 A. Yes, I do.
11 Q. What is depicted in that photograph?
12 A. That is my house.
13 Q. Let me show you what's been marked as
14 State's for identification G and ask you to take a
15 look at that. First of all, do you recognize on the
16 front page of that the printing?
17 A. Yes, I do.
18 Q. Whose printing do you recognize it to be?
19 A. Tom Capano's.
20 Q. Would you turn the page please? Do you
21 recognize what's depicted on the second page?
22 A. Yes, I do.
23 Q. What do you recognize that to be?

1 must trust and believe my words. I have nothing to
2 gain or lose by writing about my feelings for you now
3 as I believe I have lost you too.
4 "I want to believe more than anything
5 that we will both go to our eventual destinies in the
6 future knowing that both of us have been loved and
7 have loved completely."
8 Q. Miss MacIntyre, you told us that you
9 lived on Delaware Avenue. What is the address there?
10 A. 2425 Delaware Avenue.
11 MR. WHARTON: Your Honor, I want to offer
12 this as next State's exhibit and have this next item
13 marked for identification.
14 MR. MAURER: No objection to either
15 document.
16 THE COURT: Thank you, Mr. Maurer. It
17 will be admitted without objection as State's Exhibit
18 149.
19 THE CLERK: So marked.
20 MR. WHARTON: The other item is to be
21 marked for identification.
22 THE CLERK: State's identification G.
23 THE COURT: Whatever you say. State's G

1 A. It's a map to my house.
2 Q. From where to where? Coming from what
3 direction?
4 A. Coming from town to out of town towards
5 Rockford Park.
6 Q. Does that depict the various streets to
7 where your house?
8 A. Yes.
9 Q. Turn to page — is it accurate?
10 A. It is very accurate.
11 Q. Can you turn to the next page please? Do
12 you recognize what's depicted on that page?
13 A. Yes, I do.
14 Q. What do you recognize that page to be?
15 A. A floor plan of the first floor of my
16 home, and a diagram of my alarm box.
17 Q. Is it an accurate diagram of the floor
18 plan of the first floor of your home?
19 A. That is correct.
20 Q. Does it detail — there are certain
21 details on that.
22 MR. MAURER: Your Honor, I understand
23 this is for purposes of identification at this point

**Page 5**

1  after that, whether it was early summer, spring, late

2  summer, whenever?

3    A  That is correct.

4    Q  But whenever you did it - and I'll show

5  you both of those documents and, I guess,

6    MR. MAURER:  Is there any objection to

7  them?  Admissibility?  Okay.

8  BY MR. MAURER:

9    Q  If I could show you both those documents

10  and ask you if in fact if they are the documents you

11  prepared?  And take a minute to look at them.

12    A  Yes, they are.

13    Q  Are they?

14    A  Yes.

15    Q  Thank you.

16    MR. MAURER:  Your Honor, I would like to

17  move both those documents into evidence as --

18    THE CLERK:  1 and 2.

19    THE COURT:  Defendant's Exhibits 1 and 2;

20  is there objection?

21    MR. WHARTON:  No, Your Honor.

22    THE COURT:  Without objections defendant's

23  Exhibits 1 and 2 may be admitted.

**Page 6**

1    THE CLERK:  So marked.

2    THE COURT:  Thank you.

3    MR. MAURER:  Thank you, Your Honor.

4    (WHEREUPON, documents are received and

5  marked Defendant's Exhibits 1 and 2 in evidence)

6    MR. MAURER:  Thank you, Your Honor.  I

7  apologize; something we needed to discuss.

8  BY MR. MAURER:

9    Q  When is the first time you spoke with

10  the authorities after, according to your testimony,

11  now, as to the purchase of the firearm at Miller's?

12    A  My attorney or --

13    Q  You?

14    A  When I spoke with anybody?

15    Q  I'm sorry.  To the government.

16    A  February 27th, 1998.

17    Q  And when you spoke to the individuals for

18  the government as opposed to your attorney, - and

19  what I'll try to do, if I ask you a question about

20  your attorney I'll refer to him specifically.  Okay?

21  But when you spoke to the government February 27th,

22  that was the first time you did that.  Is that

23  correct?

**Page 7**

1    A  That's correct.

2    Q  And when you talked to them, in

3  particular, the person who is a witness in the case,

4  and not going to be a witness, was Det. Donovan, is

5  that right?  He was there?

6    A  Yes, he was.

7    Q  He was there?

8    A  Yes, he was.

9    Q  And other individuals were there as well?

10    A  Yes.

11    Q  But I'm focusing primarily on Det.

12  Donovan.  Did you tell Det. Donovan everything that

13  had occurred with regard to the purchase of this

14  firearm?

15    A  Perhaps some specifics had evolved later

16  and I could add them later, but I cannot tell you

17  exactly that I did at that time.

18    Q  Okay.  For example, Mrs. MacIntyre, did

19  you reveal to Det. Donovan at that time that you had

20  gone to the Sports Authority on a prior occasion to

21  purchase a firearm?

22    A  I don't recall.

23    Q  By you don't recall, if you are going to

**Page 8**

1  use that term, could you tell me exactly what you

2  mean by that?

3    A  I don't know if I had said anything to him

4  about going to Sports Authority at that time, or if I

5  told him later.

6    Q  Why, if you didn't tell him something

7  about that at that time, why would you not have told

8  him that?

9    A  I wasn't asked.

10    Q  You weren't asked?

11    A  Perhaps.

12    Q  You were asked about the purchase of the

13  firearm.  I can represent that to you, on February

14  27th, and you have already indicated to me that you

15  talked about that on February 27th.  Did you not?

16    A  Correct.

17    Q  Okay.  And what you're saying is that if

18  you didn't mention to Det. Donovan on February 27th

19  when you first spoke with him about this purchase,

20  that you had previously gone to Sports Authority, the

21  reason you didn't mention it is because you weren't

22  asked?

23    A  Perhaps if I could see a document about

**Page 9**

1  that meeting I could tell you for sure whether I said
2  anything or not. I don't really remember, Mr.
3  Maurer.
4  MR. MAURER: Your Honor, I don't know if
5  the state will have any objection to this, if I could
6  just take a moment?
7  THE COURT: You may.
8  (WHEREUPON, there is a discussion off the
9  record)
10  BY MR. MAURER:
11  Q  Mrs. MacIntyre, what I'm going to do at
12  this point, with consent, is show you a police report
13  dated February 27 of 1998, prepared by Det. Donovan.
14  First of all, with the understanding you
15  probably have not seen this before, right?
16  A  That is correct.
17  Q  And this police report purports to discuss
18  what you discussed with him on that date. Okay? So,
19  if you would like to take a moment and look through
20  there, first, and then I'll have some questions to
21  ask of you.
22  A  (Witness complies)
23  Q  Have you had an opportunity to read

**Page 10**

1  through those four pages?
2  A  Yes, I have.
3  Q  And would you agree, understanding these
4  are someone else's notes prepared based on your
5  interview, that there is no mention whatsoever in
6  those notes of your trip to the Sports Authority?
7  A  No, there is not.
8  Q  Okay. So, do you think now, having looked
9  at those notes and having thought about it a little
10  bit that you never mentioned that to Det. Donovan
11  when you spoke him on February 27th?
12  A  That's probable.
13  Q  Okay. And isn't the reason that you
14  didn't mention it at that time because, later, when
15  you talked to Det. Donovan about the purchase of the
16  gun, which I believe was on April 25 of 1998, you
17  told him that you didn't even look at these forms
18  that you signed until after you got out in the car,
19  after the gun purchase.
20  Do you remember saying that to Det.
21  Donovan, later?
22  A  No, I do not.
23  Q  You don't recall saying that to him?

**Page 11**

1  A  I remember signing them in the store, and
2  yes, looking at the one form very clearly when I got
3  out of the store.
4  Q  But the point of the matter is that when
5  you were talking to Det. Donovan on February 27th
6  about the gun purchase, and the signing of the forms,
7  you knew before you ever went to Miller's, that it
8  was illegal to purchase a gun for someone else,
9  didn't you?
10  A  That is correct.
11  Q  Okay. And today you're saying that.
12  Correct?
13  A  That is correct.
14  Q  Now when you talked to Det. Donovan,
15  however, on the 27th of February, you didn't mention
16  the fact that you had been to the Sports Authority
17  and you didn't mention the fact that the person
18  behind the register told you at that time that it was
19  illegal?
20  A  That is correct.
21  Q  Now, is the reason that you didn't mention
22  it still that you weren't asked? Or did you have
23  some other motive for not mentioning that when you

**Page 12**

1  spoke with him on the 27th of February?
2  A  No. Many things evolved in this case.
3  Information -- I was very nervous on
4  February 27th.
5  I answered the questions that I was asked,
6  and I was not thinking about the Sports Authority.
7  I was thinking about Miller's Gun Shop.
8  Q  Okay. So, you completely forgot about
9  another trip that you had made to a store in order to
10  purchase a firearm.
11  Is that what you're saying?
12  Or you didn't think about mentioning that?
13  A  I was not thinking about Sports Authority.
14  No.
15  Q  And you weren't asked, so, you didn't
16  bring it up. Is that right?
17  A  That's probable.
18  Q  Now, you testified, or you indicated to
19  Det. Donovan, or did you indicate to Det. Donovan on
20  February 27th, in your interview, that you didn't
21  read the paperwork saying it was illegal to purchase
22  the firearm until after lunch?
23  A  I don't understand the question.

**Page 13**

1  Q  All right.  Let me repeat it it.
2  You spoke to Det. Donovan on February
3  27th.  Did you say to Det. Donovan, that you didn't
4  read the paperwork regarding the purchase of the
5  firearm saying that it was illegal, until after you
6  and Tom had had lunch?
7  A  I pulled the paper out of the bag and
8  showed it to him.  I thought I did it as soon as I
9  came out of the store.  I recall that, If I did it
10  after lunch, that's possible as well.  But I remember
11  that specifically.
12  Q  I'm not asking you at this point when you
13  did it or if you didn't do it.  What I'm asking you
14  is whether you have a recollection of telling Det.
15  Donovan that the first time that you looked at the
16  paperwork was after lunch.
17  Do you remember telling him that?
18  A  No, I do not.
19  Q  How many people were in the store at the
20  Miller's purchase?
21  A  I could not tell you that.
22  Q  By the way, back up for just a minute.
23  You did go to Sports Authority.

**Page 14**

1  You do concede that now?
2  A  I did go to Sports Authority.
3  Q  Do you remember when you went there?
4  A  I believe it was some time in April.
5  Q  April of '96, is that correct?
6  A  Correct.
7  Q  All right.  And when you went to the
8  Sports Authority, did Tom go with you?
9  A  No, he did not.
10  Q  So, you went on your own?
11  A  I went at his request - on my own.
12  Q  Do you understand my question to you was,
13  did you go on your own?
14  A  I did.
15  Q  Okay.  Now, before you went to Sports
16  Authority and you had every intention to make a
17  purchase if that was appropriate at the time, you
18  indicated that you went at Tom's request and he had
19  asked you to do this.  Is that right?
20  A  Yes.
21  Q  Now, and, did you discuss with him how
22  this purchase was going to be made in terms of paying
23  for it?

**Page 15**

1  A  No.
2  Q  Did he say to you, - make the purchase in
3  cash?
4  A  No.
5  Q  Did he tell you not to use your credit
6  card?
7  A  No.
8  Q  Did he tell you not to use a check?
9  A  No.
10  Q  All right.  Did he tell you specifically
11  what type of gun you were to purchase?
12  A  No.
13  Q  .25 caliber?  .22 caliber?  .38 caliber?
14  None of that?
15  A  No.
16  Q  You said that you purchased bullets at
17  Miller's, correct?
18  A  Yes.
19  Q  Did Tom ask you to buy the bullets?
20  A  No.
21  Q  That was something that you did when the
22  store person suggested that to you, is that right?
23  A  That is correct.

**Page 16**

1  Q  So, you discussed none of these things
2  according to you before the purchase was made, with
3  Tom?
4  A  Could you say that again, please.
5  Q  You discussed none of the things we just
6  talked about, before the purchase was made, with Tom.
7  How to pay, what to pay with, - cash, check, credit
8  card, what type of gun, what type of bullets.  None
9  of that stuff was discussed.  Is that right?
10  A  We spoke about a type of gunm but not
11  specifically.
12  Q  So the answer to my question then is that
13  none of those things I just asked you were discussed
14  beforehand?
15  A  That is correct.
16  Q  Actually, Mrs. MacIntyre, you were
17  required to sign three documents when you made your
18  purchase of May 13, of 1996.  Is that right?
19  A  That is correct.
20  Q  Okay, and there were three separate
21  documents submitted to you by the salesman that
22  required your signature; is that right?
23  A  Yes.

D. MacIntyre 11/19/98 A-130

Case 1:06-cv-00688-JJF Document 23-4 Filed 02/20/2007 Page 20 of 40

1  Q  And you've seen these in direct
2  examination, correct?
3  A  Yes, I have.
4  Q  And, if I could first go over with you
5  number 136.
6      That is your signature, is it not?
7  A  Yes, it is.
8  Q  Okay.  Now when you made this purchase,
9  it's you and a salesman, right?
10  A  Yes.
11  Q  Talking to each other.  Is that right?
12  A  Correct.
13  Q  Okay.  And the salesman is I guess asking
14  you questions and talking to you about things, and in
15  particular for whom you're purchasing the firearm,
16  right?
17  A  Correct.
18  Q  And he just like you and I are except he
19  is a lot closer to you than at this point, just the
20  two of you are discussing this transaction; is that
21  right?
22  A  That's right.
23  Q  All right.  The salesman gives you the

1  A  Yes, that is correct.
2  Q  The second document states, and this is
3  Exhibit 137, with the same date.  Which is a State
4  Bureau of Identification Criminal History Record
5  Check.
6      Now in that document you're told that the
7  making of any false oral or written statement with
8  respect to this transaction is a crime punishable as
9  a feloy.
10     Did you read that in the store?
11  A  Yes.
12  Q  And, nevertheless, that's your signature
13  there.  Is that right?
14  A  That is correct.
15  Q  And you are saying you committed that
16  crime today because today you're saying you bought
17  the gun to give to Mr. Capano is that correct?
18  A  That is correct.
19  Q  And as you're there talking to the
20  beguiled store owner, if you are to be believed now,
21  did you tell that store owner, what you're telling us
22  now, that the words you're putting down on these
23  documents as you spoke face-to-face with him, were

1  form.  And the first one says, "I, Deboray MacIntyre,
2  residing at 2625 Delaware Avenue, hereby affirms,
3  under the penalties of perjury" - and you understood
4  at that time what perjury was, did you not?
5  A  Yes.
6  Q  Just like you understand today what
7  perjury is, right?
8  A  That is correct.
9  Q  And that's basically lying after you take
10  an oath and promise that you won't lie, right?
11  A  Yes.
12  Q  You then say that you're purchasing the
13  following firearm for "my personal, recreational,
14  sporting, target and/or self-defense use; it is not
15  my intention to give this firearm to another person".
16     Is that right?
17  A  That is correct.
18  Q  And on May 13th of 1996 that's what you
19  swore to.  Is that right?
20  A  I did.
21  Q  You now say that that was a lie.  That you
22  weren't buying this gun for yourself but that you
23  were buying it to give to Tom Capano, right?

1  lies?
2  A  I did not tell him they were lies.
3  Q  So basically talking face-to-face with the
4  store owner about this transaction, you lied to his
5  face?
6  A  I did lie to him, yes.
7  Q  How far was he away from you when you told
8  him this lie?
9  A  Three, four, feet.  Close.
10  Q  Third document.  Again dated May 13th of
11  1998.  By the way, had you ever met this store owner
12  before?
13  A  No.
14  Q  No.  Did you have anything against him?
15  A  No.
16  Q  He was just doing his job, right?
17  A  I suppose so, yes.
18  Q  Once again, on this document which is
19  State's Exhibit 138, you again are advised that you
20  must answer the questions correctly and if you are
21  buying the gun for somebody else you can't do it.
22  Right?
23  A  Yes.

D. MacIntyre 11/19/98 A-131

**Page 21**

1    Q   Okay.  And once again you signed yet a
2    third document in which you say that you're buying
3    the pistol for, who?
4    A   For Tom Capano.
5    Q   No, no, you didn't say that on this
6    document did you?
7    A   Oh I'm sorry; I said I was buying it for
8    myself, yes.
9    Q   You swore three times May 13, 1996 that
10   the gun that you were buying was being bought for
11   whom?
12   A   Myself.
13   Q   And you told us on Thursday, that the
14   reason you would do this for him is because you loved
15   him and you wanted basically to do what he asked you
16   to do.  Is that right?
17   A   That's correct.
18   Q   And you loved him so much that you were
19   willing to commit perjury, according to your
20   testimony now, in order to, - and which would
21   jeopardize yourself and your family.  Is that right?
22   A   Yes.
23   Q   That's how strong your love for him was,

**Page 22**

1    right?
2    A   Yes.
3    Q   When is the first time, Mrs. MacIntyre,
4    that you began to think, - I think we talked about
5    this last week, that this gun might have something to
6    do with this case?
7    A   In the January 28, 1998 interview.
8    Q   Now that is not, is it, what you
9    previously told Det. Donovan?
10   A   Excuse me?
11   Q   I said that's not what you told Det.
12   Donovan when you spoke with him before, is it?
13   A   I was questioned as to why I never
14   connected the two.  And I struggled why my thoughts
15   to come up with why I had not, and I believe I've
16   given the reason as to why I did not.
17   Q   Okay; I think my question was, is that
18   what you told Det. Donovan?
19   A   Again, I don't remember.  I met with Det.
20   Donovan so many times, I cannot tell you
21   specifically.
22   Q   Let me be very specific.  You started
23   again, your cooperation on February 27th, right?

**Page 23**

1    A   That is correct.
2    Q   And then you met with Det. Donovan on
3    March 13th, you may not know the dates, but they're
4    in the police reports, and again on April 25th okay.
5    On April 25 you were asked by Det. Donovan, okay, the
6    same questions that I just asked you.  All right?
7    And do you recall telling him at that time that the
8    first time you spoke with the police, you were
9    thinking about the gun and the possibility it had
10   something to do with the case.
11        Do you remember telling him that?
12   A   I don't recall that.  That's possible.
13   Q   The first time you spoke with the police
14   was on July 23rd of 1996.  Was it not?
15   A   I believe it was.
16   Q   Or thereabouts?
17   A   I believe that's correct, yes.
18   Q   And you don't have a recollection today
19   that that's something that you spoke with him about,
20   or said to him?
21   A   It's possible, yes.
22   Q   All right.  Do you remember the day that
23   Tom Capano's house was searched?

**Page 24**

1    A   Yes, I do.
2    Q   All right.  Did you speak with federal
3    agents on that day?
4    A   Yes, I did.
5    Q   In particular, do you recall speaking with
6    Agents Cobb and Desderio?
7    A   Yes.
8    Q   That would have been July 31st of 1996?
9    A   Right.
10   Q   You then spoke with Det. Donovan again
11   before you went before the grand jury, right?
12   A   That is correct.
13   Q   And that would have been according to the
14   police records that we have, September 6th of 1996.
15   A   Correct.
16   Q   You went before the grand jury, September
17   10th of 1996, did you not?
18   A   I did.
19   Q   Okay.  And then after going before the
20   grand jury, you met again I think with Agent Alpert
21   and others, on 2/4/97.
22        Do you remember that?
23   A   Yes.

**Page 101**

1  document was made at the exact same time, well, not
2  the exact same time but during that same minute.
3  Right?
4  A  Yes.
5  Q  So that it would be fair to conclude that
6  the conversation that you had with Tom, on June 28,
7  was in fact less than a minute?
8  A  Yes.  Could have been, yes.
9  Q  Not two- to five?
10  A  Could have been a minute, could have been
11  two to five.  I couldn't give you an exact time until
12  you showed me that.
13  Q  When I asked you before, you said it could
14  are been two- to five minutes.  You didn't mention a
15  minute, did you?
16  A  No, I did not.
17  Q  All right.  You have that conversation at
18  approximately 10:31.  And when is the next time you
19  hear from Tom?
20  A  I believe when he arrived at my home that
21  evening.
22  Q  Okay.  Did you talk to him at all in the
23  meantime?

**Page 102**

1  A  I don't recall that, no.
2  Q  Okay.  But, in any event, he came to your
3  house that evening at about 11 p.m., right?
4  A  Correct.
5  Q  He stayed overnight at your house, right?
6  A  Yes, he did.
7  Q  And he left the next day at about what
8  time?
9  A  I believe it was noon.
10  Q  That's Friday.  Saturday.
11  So at noon Tom leaves.
12  Now we're on Saturday, June 29th.
13  Now, after seeing him on Saturday and his
14  departing at around noon, you spoke with him next,
15  again, when?
16  A  I believe the next day.
17  Q  So, you don't recall speaking with him
18  again on Saturday?
19  A  I do not.
20  Q  And we then move to Sunday.  And this is
21  when you indicate that he comes to the house at 1
22  o'clock.  Right?
23  A  That is correct.

**Page 103**

1  Q  Now, you say that you had not heard of
2  Anne Marie Fahey as of that time.  Is that right?
3  A  That is correct.
4  Q  But when you did find out about her, you
5  were very upset, weren't you?
6  A  Yes, I was.
7  Q  Basically, you say you learned on July 2nd
8  that the man that you waited for, for all those
9  years, and who you wanted to marry, was involved with
10  a younger attractive woman?
11  A  I don't know if those were my words; but.
12  Q  But you learned that?
13  A  Pardon me?
14  Q  But you learned that?
15  A  I learned that.
16  Q  How upset were you?
17  A  I was upset.
18  Q  Angry?
19  A  I was upset.
20  Q  Extremely upset, weren't you?
21  A  Yes, I was.
22  Q  Didn't you in fact find out about Anne
23  Marie Fahey, not on July 2nd, but on June 27th and

**Page 104**

1  June 28th?
2  A  No, Mr. Maurer, I never heard of Anne
3  Marie Fahey until July 2nd.
4  Q  Didn't you go to 2302 Grant Avenue on June
5  27th or June 28th with a firearm to visit Tom?
6  A  Mr. Maurer, I never left my property from
7  the time I returned home from the Ardens Swim Club
8  until the next morning when I went to the Tatnall
9  School.
10  Q  Very strenuous about that, aren't you?
11  A  I am.
12  Q  Didn't you have your firearm at Tom
13  Capano's house on June 28th of 1996, where you first
14  learned about him and Anne Marie Fahey?
15  A  No, I did not.
16  Q  And you deny that your firearm discharged
17  that night inside that house, striking her?
18  A  I don't know what happened with that
19  firearm.  I gave that firearm to Tom Capano on May
20  13th.
21  Q  You deny that you discharged that firearm?
22  A  I deny that I discharged that time,.
23  Q  Are you absolutely certain about that?

D. MacIntyre 11/19/98 A-133

1    A   I'm certainly about that.
2    Q   Are you absolutely certain?
3    A   I'm absolutely certain.
4    Q   Is that what you say when you're sure of
5   something?
6    A   Mr. Maurer, I did not know of Anne Marie
7   Fahey until July 2nd of 1996.
8    Q   Listen to my question, please.
9        You just said that you were absolutely
10  certain that you were not at Grant Avenue on June
11  27th and June 28th, didn't you?
12   A   Correct.
13   Q   And when you say you're absolutely
14  certain, you're telling the truth and it's true,
15  right?
16   A   I'm telling the truth about this, yes, I
17  am.
18   Q   Do you have your statement to the police
19  dated January 28th of 1998, in front of you?
20   A   No, I do not.
21   Q   Okay.  Do we have that here.  Yes, we do,
22  it's with the tape.
23       Would you turn to page 24, please.

Page 106

1        Now, you had told this jury that basically
2   your January 28th statement is a complete lie.
3   Right?
4    A   A lot of it is, yes.
5    Q   And on page 24 you used certain language
6   there to describe things that you talked about.  Did
7   you not?
8    A   Correct.
9    Q   Mr. Connolly said to you, "Did you discuss
10  with Tom Capano your intention to dispose of the gun
11  prior to when you got rid of it?"
12       What was your answer?
13   A   "No".
14   Q   Next question was, "You're very certain
15  about that?"
16       What was your answer?
17   A   "Yes".
18   Q   Mr. Connolly said, "Absolutely certain?"
19       And what was your answer?
20   A   "I am absolutely certain about it".
21   Q   So even though you indicated there that
22  you were absolutely certain about that, it was a lie,
23  wasn't it?

Page 107

1    A   Yes, this was a lie.
2    Q   You were then asked some additional
3   questions, talking about your security system.  Mr.
4   Connolly says where you said, he says, "When did you
5   first tell him," by, "him" I think you meant Tom,
6   "that you had gotten rid of the gun?"
7        Your answer was, "Probably shortly
8   thereafter.  I mean, I did it right away, probably
9   the next day I told him, say Sunday, right"?
10   A   Correct.
11   Q   Mr. Connolly's next question was, "And
12  what was his reaction?"
13       And your answer was what?
14   A   "Got to update your security system."
15   Q   Mr. Connolly then reminded you that you
16  were under oath.  Did he not?
17   A   Yes, he did.
18   Q   And he said, "Are you -- and I want to
19  remind you that you're under oath."
20       Your answer was?
21   A   "Yes".
22   Q   He then asked you, "Are you absolutely
23  certain that Tom Capano never touched that gun?"

Page 108

1        And your answer was, what?
2    A   "Yes, to the best of my knowledge."
3    Q   You're also I take it then, -- strike
4   that.  Let me back up.
5        You were familiar with the furnishings at
6   Grant Avenue, were you not, having been there?
7    A   Yes.
8    Q   And in deed, you had been in that great
9   room several times, had you not?
10   A   Correct.
11   Q   You were familiar with the rug that was on
12  the floor of the great room prior to, sometime in
13  July, when you first noticed it was missing, right?
14   A   That is correct.
15   Q   How big is the great room?
16   A   (No response).
17   Q   Estimate?
18   A   Twenty by twenty, maybe.
19   Q   Did the rug cover the entire room of the
20  twenty by twenty room?
21   A   Most of it.
22   Q   Okay.  Decent size room, decent
23  size rug, correct?

**Page 133**

1  Q. I asked you if you recalled the defendant said
2  he would not be surprised if we found blood in his
3  house. Since -- At some point, you became a member of
4  the defense team for the defendant. Isn't that right?
5  A. From a legal standpoint, I guess that's
6  correct, yes.
7  Q. Okay. Now, I'm going to show you -- You also
8  testified in front of the Grand Jury March of 1997,
9  didn't you?
10  A. Yes, I did.
11  Q. You testified under oath?
12  A. Yes, I did.
13  Q. I'll show you what I'll have marked as State's
14  for Identification I, and I would ask you to read Lines
15  2 through 5 to yourself, please.
16  Okay. Now I'm going to ask you again. Did
17  the defendant tell you in the summer of '96 that he
18  would not be surprised if blood was found in his house?
19  A. Yes, he did, according to that testimony,
20  which I would stand by.
21  Q. You would stand by this testimony?
22  A. Yes.
23  Q. Now, did he tell you what he thought might

**Page 134**

1  account for blood in the house?
2  A. Yes, he did.
3  Q. What did he tell you?
4  A. He said, like me, we have four kids, and the
5  kids run around all the time and always get banged up,
6  and that could be a reason for blood. Or Annie had
7  been over there a number of times cooking dinner, could
8  have cut her finger, or hanging pictures up on the
9  wall.
10  Q. This is Annie, Anne Marie Fahey?
11  A. Yes, it is.
12  Q. What else did he tell you could account for
13  the blood in the house?
14  A. That's all.
15  Q. Didn't he say that Anne Marie Fahey was a
16  heavy menstrual bleeder and that would account,
17  possibly, for the blood in his home?
18  A. Yes, he did.
19  Q. Didn't he say she was such a heavy menstrual
20  bleeder she had bled through her clothes on occasion at
21  work and had to leave?
22  A. Yes, he did.
23  Q. Did you discuss the fact that you were going

**Page 135**

1  to testify in front of the Grand Jury with the
2  defendant before you testified?
3  A. Yes. We had lunch on a weekly basis.
4  Q. So he knew you were going into the Grand Jury?
5  A. Yes, he did.
6  Q. And he knew he had told you all these things
7  that would account for blood. Isn't that right?
8  A. Yes, he did.
9  Q. And he knew you were going to be under oath
10  when you testified before the Grand Jury, didn't he?
11  A. Yes, he did.
12  Q. Now, you testified in March of 1997. Do you
13  recall meeting the defendant on July 9, 1996 in your
14  office?
15  A. Yes, I do.
16  Q. What did the defendant say to you when he
17  entered your office?
18  A. We had prearranged the meeting, and he came in
19  to tell me what his side of the story was.
20  Q. How did he appear when he came in?
21  A. He was a little upset.
22  Q. Well, do you recall telling the Grand Jury
23  that he was distraught?

**Page 136**

1  A. If that's the word I used, said, distraught,
2  yes.
3  Q. What was he?
4  A. Upset.
5  Q. And what did he tell you?
6  A. He recounted the --
7  Q. Let's go to the beginning of the conversation.
8  What did he say to you?
9  A. He asked me if I wanted to -- If I recall, he
10  asked me if I wanted to know what had happened and what
11  the history of their relationship was, his relationship
12  with Anne Marie.
13  Q. And did he tell you then what happened on June
14  27?
15  A. Yes.
16  Q. Now, what did you do when he's telling you
17  this?
18  A. Listened.
19  Q. And after he told you, what did you do?
20  A. I suggested that we prepare some kind of
21  statement because it had been eight, nine days, and he
22  had not said anything or had not contacted the family,
23  and that we should do those two things. So I prepared

State v. Thomas J. Capano    Condenselt!    November 30, 1998

Case 1:06-cv-00688-HB*    Document 23-4    Filed 02/20/2007    Page 33 of 40    Page 139

**Page 137**

1  a one-page statement based on what he told me.

2  Q. Did you type it in your computer?

3  A. Yes.

4  Q. Was he in the office when you did it?

5  A. Yes, he was.

6  Q. Did you print it out?

7  A. Yes.

8  Q. Did you give him a copy of it?

9  A. Yes.

10  Q. Did he look at it?

11  A. Yes.

12  Q. Did he appear to read it?

13  A. Yes.

14  Q. What did he tell you about the statement?

15  A. He said it looked pretty good to him, and he

16  would take it to his lawyers and get back to me in the

17  afternoon.

18  Q. By "looked pretty good," what did you

19  understand that to mean?

20  A. That it was accurate.

21  MR. CONNOLLY: Your Honor, at this point, I

22  would move to introduce State's Exhibit 179.

23  MR. MAURER: Without objection, Your Honor.

**Page 138**

1  THE COURT: Without objection, State's Exhibit

2  179 is admitted.

3  (State's Exhibit No. 179 was admitted into

4  evidence.)

5  THE COURT: You don't have a smaller copy of

6  the exhibit?

7  MR. CONNOLLY: I do. First I'm going to show

8  it to the witness.

9  BY MR. CONNOLLY:

10  Q. Mr. Murphy, I'm going to show you State's

11  Exhibit 179. Do you recognize that?

12  A. Yes, I do.

13  Q. What is it?

14  A. It's the statement I prepared.

15  Q. In fact, you've signed it on the bottom.

16  Isn't that right?

17  A. That's correct.

18  Q. So it's a true and accurate copy of what you

19  prepared?

20  A. Yes.

21  Q. And this is the same statement Mr. Capano

22  looked at and said "looked pretty good"?

23  A. That's correct.

**Page 139**

1  Q. Did you ever release the statement to the

2  public?

3  A. I'm sorry?

4  Q. Did you ever release the statement to the

5  public?

6  A. No.

7  Q. Now, I'm going to show you State's for

8  Identification -- Let me get it marked State's for

9  Identification J. This is a blow-up of the same

10  statement, isn't it?

11  A. Yes, it is.

12  (State's J was marked for identification.)

13  Q. Now, Mr. Murphy, I'm going to give you back

14  State's Exhibit 179, and I would like you, if you

15  would, to read this slowly for us into the record.

16  A. "Statement by Thomas J. Capano in the

17  disappearance of Anne Marie Fahey, July 9, 1996.

18  "The disappearance of Anne Marie Fahey remains

19  as much a mystery to me as it does to her family and

20  friends. I can only say I share the gut-wrenching

21  emotions of Anne Marie's family, and pray for her safe

22  return.

23  "While I can do nothing to end the speculation

**Page 140**

1  of the public and press, I can state for the record the

2  pertinent facts of my last meeting with Anne Marie.

3  "I did have dinner with Anne Marie in

4  Philadelphia on the evening of Thursday, June 27. We

5  returned to Wilmington. We drove to her apartment at

6  approximately 10:00 p.m. I walked Anne Marie into her

7  apartment, stayed a few moments, said good night and

8  left. I noticed nothing unusual as I left. That was

9  the last time I saw or spoke to Anne Marie. I then

10  drove home, where I remained until I left for the

11  office the next morning.

12  "While Anne Marie had some problems, there was

13  nothing out of the ordinary in either her conversation

14  or behavior that would lead me to believe anything was

15  amiss. I am at a complete loss to explain what caused

16  her disappearance.

17  "It is difficult to respond as to how others

18  may characterize our relationship. Frankly, the nature

19  of our relationship is and will remain a matter between

20  Anne Marie and myself. What is relevant and important

21  is that Anne Marie and I are good friends and parted

22  company good friends that evening.

23  "I was informed of Anne Marie's potential

1 Car... ...
2 Q. I'm going to show you what's been marked or
3 introduced, rather, as State's Exhibit 210. Do you
4 recognize that?
5 A. Yes. That's the invoice for the carpeting
6 that we bought.
7 Q. All right. And now I'm going to show you
8 State's Exhibit 215. Do you recognize that?
9 A. Yes. That's the sample of the carpeting that
10 we gave to you when you called us up and asked us about
11 it.
12 Q. Okay. And basically, you were contacted by
13 the investigators. Right?
14 A. Yes.
15 Q. And you gave that sample to whom?
16 A. To Detective Donovan, I believe.
17 Q. The gentleman seated there?
18 A. That gentleman right over there.
19 MR. CONNOLLY: No further questions,
20 Your Honor.
21 THE COURT: Mr. Oberly?
22 MR. OBERLY: I have no questions.
23 THE COURT: All right. I presume Mr. Marks

1 may be excused also.
2 MR. CONNOLLY: I don't think we'll be
3 recalling him.
4 THE COURT: Thank you very much, Mr. Marks.
5 You're excused.
6 MR. CONNOLLY: Your Honor, the State calls
7 Ruth Boylan.
8 RUTH BOYLAN, having been called on the part
9 and behalf of the State as a witness, being first duly
10 sworn under oath, testified as follows:
11 DIRECT EXAMINATION
12 BY MR. CONNOLLY:
13 Q. Good morning, Mrs. Boylan.
14 A. Good morning.
15 Q. Mrs. Boylan, in 1996, did you work as a
16 housekeeper for Thomas Capano?
17 A. Yes, I did.
18 Q. How often would you go to clean his home?
19 A. Every other week.
20 Q. And was his home located at 2302 Grant Avenue?
21 A. Yes.
22 Q. What day of the week would you go?
23 A. Monday.

1 ... ...you go to his home on June 24, 1996?
2 A. Yes, I did.
3 Q. You're checking your calendar in front of you,
4 I take it.
5 A. Yes.
6 Q. Did you go on July 22, 1996?
7 A. Yes, I did.
8 Q. And that would have been four Mondays later
9 from June 24. Is that right?
10 A. Yes.
11 Q. Now, did you go on July 8, 1996?
12 A. No.
13 Q. Why didn't you go on Monday, July 8, 1996?
14 A. Because Mr. Capano called and said that they
15 had been away for the holiday weekend, and the house
16 did not need to be cleaned.
17 Q. Now, when you went to the house the next time,
18 on July 22, was anything different?
19 A. Yes.
20 Q. What was different?
21 A. The sofa was missing and the carpet had been
22 taken up, and an area rug was there.
23 Q. And in what room were these changes made?

1 A. Excuse me?
2 Q. In what room of the house were these changes
3 made?
4 A. Well, I would call it a den, and it had a
5 dining area.
6 Q. Was there a dining room table in this room?
7 A. Yes.
8 Q. And was it kind of off of the kitchen?
9 A. Yes.
10 Q. Was it above the garage, if you remember?
11 A. Yes. Well, I don't know that it was over the
12 garage, but it was a floor above the garage.
13 Q. The couch that you said was missing, what did
14 that couch look like?
15 A. It was a deep rose with a pineapple print or
16 motif.
17 Q. And was the motif a different color or was it
18 kind of a solid color?
19 A. Might have been a little lighter.
20 Q. And was the -- What kind of condition was the
21 couch in when you had seen it, let's say, on June 24,
22 1996?
23 A. Very good.

State v. Thomas J. Capano                    Condensed!                    December 2, 1998

Case 1:06-cv-00068-B*    Document 25-4    Filed 02/20/2007    Page 33 of 40

Page 121

1    Q. And you can't tell us whether the shot that
2 was fired came from the bottom, out the side, or from
3 the side through the bottom. Correct?
4    A. No, sir.
5    Q. You can tell us that it was a bullet that
6 caused it?
7    A. A projectile, bullet, or slug of some sort.
8    MR. OTERI: Nothing else, Your Honor.
9    MR. WHARTON: Nothing further, Your Honor.
10    THE COURT: Mr. Ennis, thank you for your
11 testimony. You're excused.
12    THE WITNESS: Thank you, Your Honor.
13    MR. WHARTON: Kenneth Chubb.
14    KENNETH CHUBB, having been called on the part
15 and behalf of the State as a witness, being first duly
16 sworn under oath, testified as follows:
17    DIRECT EXAMINATION
18 BY MR. WHARTON:
19    Q. Mr. Chubb, good afternoon.
20    Where do you live, sir?
21    A. Elmertown, Pennsylvania.
22    Q. Where is that located?
23    A. Right near Hershey.

Page 122

1    Q. Do you have any connection to Delaware?
2    A. Yes. We've been going to Delaware since
3 1981. We have a place down there and a boat.
4    Q. Where is your place?
5    A. The mailing address is Millsboro, Delaware.
6 It's off of Long Neck Road, in a park called Bay City.
7    Q. That would be near Rehoboth Bay?
8    A. Right off Rehoboth Bay, near Indian River.
9    Q. I think you said you had a boat.
10    A. Yes.
11    Q. Are you a fisherman?
12    A. Yes, I am.
13    Q. How long have you going down to Bay City?
14    A. We've been at Bay City since 1986.
15    Q. Do you know a fellow by the name of Ronald
16 Smith?
17    A. Yes, I do. He has his boat right next to
18 mine.
19    Q. I want to ask you if you can go back to the
20 July 4th weekend of 1996. Were you down at your place
21 during that weekend?
22    A. Yes, we were.
23    Q. Did you go out fishing that weekend?

Page 123

1    A. Yes, we did.
2    Q. You say "we." Who are you talking about?
3    A. I'm talking about my son, his wife, and three
4 children, and my wife and I.
5    Q. Did you all go out fishing?
6    A. We all went fishing, right.
7    Q. Let me ask you if, when you were out, over
8 that weekend, you found anything out in the water.
9    A. Yes, I did. In the afternoon, we were
10 finished fishing, and we started back in. I started
11 the engines up, and started to head for home, and my
12 boy said, "I see something floating over there, Dad."
13 He said, "What is that?" I said, "Let's go over and
14 take a look."
15    Q. Where were you? About how far out were you?
16    A. Between 8 and 10 miles.
17    Q. Off Indian River?
18    A. Off Indian River, correct.
19    Q. After your son called your attention to
20 whatever it was that was floating over there, what did
21 you do?
22    A. I pulled alongside this, and he said, "It's a
23 cooler." And I said, "Well, grab ahold of it and pull

Page 124

1 it in the boat."
2    Q. Did he do that?
3    A. Yes, he did. He dumped the water out and
4 pulled it in. It didn't have a lid, and it was missing
5 a handle.
6    Q. What else did you notice about it?
7    A. It had two bullet holes in it. And this sort
8 of amazed us all. We were questioning, wondering why
9 anybody would shoot it. Looked like a brand new
10 cooler.
11    Q. What did you do with it?
12    A. I put it on board the boat, because I had an
13 old one sitting there with the fish in it that was all
14 beat up. It was real old and the bottom was smashed.
15 And I thought, Well, I can take the top off of mine and
16 the handle, and I'll convert this one, and patch them
17 two holes, and I can make myself a nice cooler.
18    Q. Did you bring it into shore?
19    A. Yes, I did. Brought it back into Bay City and
20 docked the boat.
21    Q. Did you see Mr. Smith when you came back in?
22    A. When I docked the boat, I put this cooler over
23 on the dock, and Ron was working on his boat. I said,

1   subjects that we discussed?

2       A    Yes.

3       Q    And were you under oath at that time as

4   well?

5       A    I'm not sure we discussed anything about

6   Gerry -- or anything else but the cooler.

7       Q    And his interest in boats?

8       A    I'm not sure we discussed that either.  We

9   may have.

10      Q    Whatever is in the transcript is what is

11  there?

12      A    Yes.

13      Q    You were under oath then too?

14      A    Yes.

15      Q    Let's talk a little bit about the cooler.

16  Did you have any conversations in the spring of 1996

17  with your brother Tom relating to his desire to buy a

18  present for Gerry?

19      A    Yes.

20      Q    Tell us about those conversations.

21      A    March, April of '96, I was at my mother's

22  home.  Tom was there.  He expressed a desire to get

23  something for Gerry, a multiple gift, if you would,

1    something that expressed his appreciation for Gerry

2    treating his daughters as well as he had the previous

3    summer, and the anticipation of spending a lot of

4    time at the shore the coming summer.  He wanted to

5    get Gerry something because he assumed his children

6    would be spending a lot of time at Gerry's house,

7    using all Gerry's water toys.

8         Q    Did Tom have anything in particular in mind

9    at that time?

10        A    No.

11        Q    Did you make any suggestions to him?

12        A    Yes.

13        Q    What did you suggest that he buy for Gerry?

14        A    Well, at the time I was involved with the

15   possibility of the construction at the Sports

16   Authority, so I had been on the 202 job where they

17   have the store and looking at their inventory, and we

18   were deciding whether or not we were going to do this

19   job.  And I noticed that they have quite a bit of

20   fishing equipment there, and I suggested to Tom that

21   he go there and purchase something, and a cooler was

22   one of the things that I suggested because Tom has no

23   knowledge of fishing or boating and couldn't possibly

Page 33

```
 1    THE COURT:  Has any member of the jury come
 2 into contact with any information concerning this case
 3 since we recessed last week?
 4    (No response.)
 5    THE COURT:  There are no affirmative answers.
 6    Again, I assure you we have been working this
 7 morning.
 8    Mr. Oteri.
 9    MR. OTERI:  Thank you, your Honor.
10    Defense calls Dr. Carol Tavani.
11    ------
12    CAROL A. TAVANI, M.D., having been called on
13 the part and behalf of the Defendant, having been duly
14 sworn according to law, was examined and testified as
15 follows:
16    ------
17       DIRECT EXAMINATION
18    ------
19 BY MR. OTERI:
20    Q.  Would you state your full name, please?
21    A.  Dr. Carol A. Tavani.
22    Q.  And where do you practice, Doctor?
23    A.  I practice at Christiana Hospital.
```

Page 34

```
 1    Q.  And that's in?
 2    A.  That's in Newark, Delaware.
 3    Q.  All right.
 4    And are you a doctor of -- medical doctor?
 5    A.  Yes.
 6    Q.  All right.  And where did you receive your
 7 education?
 8    A.  I went to Cabrini College in Radnor,
 9 Pennsylvania; then Villanova University, Jefferson
10 Medical College, the Medical Center of Delaware, now
11 Christiana Care Health Systems, and then Jefferson
12 again for residency.
13    Q.  All right.  And you became a physician in
14 what year, Doctor?
15    A.  1979.
16    Q.  And are you licensed in any state?
17    A.  Delaware.
18    Q.  What year were you licensed in?
19    A.  1979 --
20    Q.  Might I suggest '80?
21    A.  -- or '80.
22    Q.  Okay.
23    A.  Internship.
```

Page 35

```
 1    Q.  Are you certified by any specialty boards?
 2    A.  Yes.  By the American Board of Psychiatry and
 3 Neurology.
 4    Q.  That's board certification?
 5    A.  That's board certification.  I got that in
 6 '85.
 7    Q.  And how do you get that?
 8    A.  Well, that consists of a two-day examination,
 9 first written, and then after the written exam is
10 passed, there's an oral examination which is given.
11    Q.  And you received that in 1985?
12    A.  Yes.
13    Q.  And are you a Fellow of any kind of --
14    A.  Yes.  I'm a Life Fellow of the American
15 Psychiatric Association.
16    Q.  What does that include?  What does that mean?
17    A.  That is a distinction.  It's rather simple to
18 become a member of one's professional organization,
19 but fellowship demands that you've met certain
20 criteria, that you've had certain honors or
21 distinctions.
22    Q.  All right.  And are you a Diplomate of any
23 particular organization?
```

Page 36

```
 1    A.  Diplomate of, again, the APA, the American
 2 Psychiatric Association, National College of Forensic
 3 Examiners.  Several organizations.
 4    Q.  You are not a forensic psychiatrist, are you?
 5    A.  No, I'm not.
 6    Q.  You are a -- what kind of psychiatrist?
 7    A.  I am an in-the-trenches physician.  What I
 8 mainly do and what my major expertise is
 9 neuropsychiatric difficulties in people who have some
10 disorder of the brain in people who are hospitalized,
11 have medical or surgical problems, problems after
12 surgery, problems after trauma, after head injuries,
13 some insult to the brain, and the pharmacology
14 therein.  That's my area.
15    Q.  And you -- as you told us you practice at
16 Christiana.  Do you practice anywhere else?
17    A.  Yes.  I spend a good 15 hours a week in the
18 correctional system with Prison Health Services
19 treating the inmates both at Gander Hill and at the
20 women's prison.
21    Q.  And you are employed there by an organization
22 that has a contract with Gander Hill?
23    A.  I'm employed there by Prison Health Systems.
```

Page 113

1 was in his own best interests. His thought processes
2 just were not on target.
3     MR. OTERI: Thank you, Doctor.
4     Judge, this may be an appropriate time for
5 lunch.
6     THE COURT: All right. We will take the
7 luncheon recess. According to my watch it's five
8 minutes to 1:00. We will come back at 2:00 o'clock.
9 We will start on time.
10     Please take the jury out.
11     (Thereupon, the jury was excused for lunch.)
12     THE COURT: Court will stand in recess until
13 2:00 o'clock.
14     ------
15     (Thereupon, the luncheon recess was taken at
16 12:55 p.m., and then the proceedings continued as
17 follows at 2:10 p.m.)
18     ------
19     THE COURT: Please bring the jury in.
20     (Thereupon, the jury returned to the
21 courtroom.)
22     THE COURT: Dr. Tavani should resume the
23 stand.

Page 114

1     (Dr. Tavani resumed the stand at 2:10 p.m.)
2     MR. OTERI: Your Honor, may we approach?
3     MR. O'DONNELL: Regarding scheduling.
4     THE COURT: Concerning scheduling?
5     MR. O'DONNELL: Yes, sir.
6     THE COURT: You may come forward.
7     (The following proceedings were held at the
8 bench, out of the hearing of the jury.)
9     MR. OTERI: Your Honor, defendant offers Dr.
10 Tavani's notes subject to a redaction of sorts after I
11 go through them.
12     THE COURT: All right.
13     Mr. Wharton.
14     MR. WHARTON: We don't object to that.
15     THE COURT: All right. So this will be
16 admitted as Defense Exhibit 28 subject to a review by
17 the parties concerning any redactions that need to be
18 made before it goes to the jury.
19     MR. OTERI: Thank you, your Honor.
20     ------
21     (Evidence was marked for identification by
22 the Prothonotary as Defendant's Exhibit Number 28.)
23     ------

Page 115

1     MR. OTERI: Your Honor, the record may
2 indicate that I had to move the podium. My rear end
3 was blocking the witness from the view of the press.
4 I've done what they asked by moving the podium.
5     (Pause.)
6 BY MR. OTERI:
7     Q. All right. Now, Dr. Tavani, are you familiar
8 with a psychiatric term called "confabulation"?
9     A. Yes, I am.
10     Q. And can you tell us what that term means?
11 Define it, if you will.
12     A. Okay. Confabulation is really a rather
13 well-known neuropsychiatric symptom wherein you have a
14 brain that --
15     THE COURT: Just a second. We lost your
16 voice.
17     THE WITNESS: It's falling off.
18     (Pause.)
19     THE WITNESS: Can I be heard?
20     THE COURT: Yes.
21     THE WITNESS: Thank you.
22     MR. OTERI: Can you hear her back there?
23     THE WITNESS: Confabulation is a situation

Page 116

1 that is seen in diffuse organic brain disease or
2 malfunction wherein gaps occur in the memory. Spaces
3 occur almost like holes in Swiss cheese. And what the
4 mind does when these gaps occur is that it -- it tries
5 to fill these gaps in to make some sort of sense out
6 of reality. And the way it does this is, it inserts
7 things that either the person thinks must have been
8 what happened or maybe the person has heard that these
9 things happened or it might have been suggested to the
10 person or even asked as a question. But the person
11 who has these gaps in memory then takes this
12 understanding of what must have been or what was asked
13 of him or her, and the person inserts this into the
14 spaces to fill the gaps. And then this hybrid, if you
15 will, becomes the person's new truth. It becomes the
16 person's new memory.
17     I think that would be a simple explanation of
18 confabulation.
19 BY MR. OTERI:
20     Q. Do alcohol and illicit drugs -- how do they
21 affect the brain and this condition?
22     A. Well, confabulation historically is -- was
23 best known to occur in alcoholics. We have almost 100

1  even said. He doesn't remember most of what he said
2  and he either admits to what he doesn't remember or he
3  says it must have been; I'll believe you if you say
4  so.
5      This is a generality of those three pages,
6  without being -- putting you through the whole
7  recitation, if that's okay.
8      Q. Doctor, is it fair to say you have
9  approximately two more pages of these kinds of
10 examples?
11     A. I couldn't hear the beginning.
12     Q. Is it fair to say that you have approximately
13 two more pages --
14     A. Yes.
15     Q. -- of this kind of --
16     A. Yes. There are two more pages of these
17 kinds.
18     Q. Doctor, after reading these transcripts and
19 making these lists up, do you have an opinion as to
20 whether or not Gerry suffers from confabulation and
21 amnestic disorder?
22     A. He does suffer from confabulation, and he
23 unquestionably suffers from a serious amnestic

Page 155

1      Q. All right. What is that opinion?
2      A. Well, in general it can be said that -- with
3  regard to the relationship I assume you're asking me.
4      Q. Go ahead.
5      A. His state of mind, the e-mails indicate a
6  very warm, affectionate, cordial relationship really
7  throughout. The letters that I have date from 7/21/95
8  to 6/27.
9      Q. I would appreciate, Doctor, if you don't
10 refer to the e-mails as letters because we have other
11 letters in this case.
12     A. I'm sorry. The e-mails. The e-mails.
13 They're friendly. They're jocular. They're mutually
14 solicitous. There's mutual caring and concern
15 evident. There's a desire to please each other
16 throughout them. They both express frequent thoughts
17 of each other as well as love which will last forever.
18 There's interest expressed in each other's lives as
19 well as sharing of various intimacies of each other's
20 daily life events. There's mutual solicitation to see
21 each other. There's a statement of Miss Fahey asking
22 like if Mr. Capano is free, 2/1 correspondence.
23     On 2/7 there's a statement wherein she

Page 154

1  disorder. In fact, he may actually suffer from
2  dementia. I could not definitively say that because I
3  have not personally examined Gerry. I would have to
4  know a little bit more about his mental status
5  specifically. I didn't want to go as far as to say
6  this had progressed into dementia, but it is
7  certainly, at the very least, a severely amnestic
8  disorder with confabulation.
9      Q. Okay. And, Doctor, you had -- in preparing
10 for your testimony here, you had provided to you by
11 the defense team a series of e-mails. Can you take
12 those e-mails out, please, Doctor?
13     A. Sure.
14     (Pause.)
15     I have the e-mails.
16     Q. Okay.
17     Now, Doctor, based upon your study of the
18 e-mails between Anne Marie Fahey and Tom Capano, and
19 vice versa, do you have an opinion based upon a
20 reasonable psychiatric certainty about Tom Capano's
21 states of mind during that period of time, January 1
22 through June 27th?
23     A. Yes, I do.

Page 156

1  expresses her wish that the relationship be platonic.
2  She wants to be just friends. He accepts the limits
3  that she sets and says he will continue to be there
4  for her on her terms.
5      On 2/12 there was one -- there was one
6  negative one. She references an incident where he had
7  been calling very, very frequently, and the details of
8  that are unclear, but it clearly caused her to feel
9  distance since she was able to tell him that.
10 However, then in the same letter she apologizes for
11 her own behavior and she asks where he was the
12 previous night.
13     There's a jocular, affectionate letter on
14 2/13, and then these communications -- the e-mails
15 come to an abrupt halt until the 29th of April and
16 then pick up with the same affectionate tone and
17 poking fun at each other, essentially with resumption
18 of the same dynamics, I would say, and patterns as in
19 the earlier set.
20     And the letters continue through May and
21 those of June '96 begin, on 6/3, with his asking her
22 to dinner and reminding her about matters of self-care
23 and self-nurturance, which did he frequently in these

Page 109

Page 111

| | |
|---|---|
| 1  MR. OTERI:  Okay.  Thank you. | 1  Q.  Okay.  In any event, baseboard and radiator |
| 2  (The following proceedings were held within | 2  cover are not typical places you would expect to find |
| 3  the hearing of the jury.) | 3  menstrual blood having been shed as a result of |
| 4  MR. O'DONNELL:  Based on that, we withdraw | 4  intercourse; correct? |
| 5  the objection. | 5  A.  I suppose, unless you had it on your hands |
| 6  THE COURT:  Thank you. | 6  and you touched something. |
| 7  BY MR. WHARTON: | 7  Q.  Now, also you were aware, were you not, that |
| 8  Q.  All right.  Now, you're aware, are you not, | 8  he told Dr. Bryer that he took Anne Marie Fahey back |
| 9  Doctor, from having reviewed Dr. Bryer's notes that | 9  to his apartment after their night together on the |
| 10  there are things in there that the patient told his | 10  27th and he heard nothing further from her? |
| 11  doctor, Dr. Bryer, within the context of his | 11  A.  Yes.  I saw that. |
| 12  psychiatrist/patient relationship which are | 12  Q.  That he initially believes she left for the |
| 13  inconsistent with the notion that Anne Marie Fahey | 13  weekend to collect her thoughts and he now believes |
| 14  died on June the 27th of 1996? | 14  she may have been a victim of random violence in her |
| 15  A.  Yes. | 15  neighborhood or perhaps isolating herself somewhere? |
| 16  Q.  Okay.  Specifically when was the first time | 16  A.  Correct. |
| 17  that Dr. Bryer and the defendant met? | 17  Q.  And that he recognizes that suicide is a |
| 18  A.  It was -- I'll just flip to the date -- | 18  possibility but can't explain why her body hasn't |
| 19  8/16/96. | 19  turned up. |
| 20  Q.  Okay.  And in that 8/16/96 note, doesn't he | 20  A.  Correct. |
| 21  say about halfway down the page there that he denied | 21  Q.  Okay.  And this is a meeting -- this was the |
| 22  any involvement in her disappearance as well as any | 22  first meeting he had with Dr. Bryer -- |
| 23  violence towards her? | 23  A.  Correct. |

Page 110

Page 112

| | |
|---|---|
| 1  A.  Yes, he does. | 1  Q.  -- which was on August the -- |
| 2  Q.  Okay.  And do you know, do you not, from the | 2  A.  16th. |
| 3  representations that have been made in court that he | 3  Q.  -- 16th of 1996? |
| 4  did at least have a role in her disappearance? | 4  A.  Correct. |
| 5  A.  Yes, I do. | 5  Q.  Correct? |
| 6  Q.  You also know that he attempted to provide | 6  A.  Correct. |
| 7  Dr. Bryer with an explanation for blood in his | 7  Q.  Correct? |
| 8  apartment or house? | 8  A.  Correct. |
| 9  A.  Yes, I do. | 9  Q.  Okay.  Now, on August the 23rd of 1996, once |
| 10  Q.  And that states that they would only have | 10  again he's in this conversation with Dr. Bryer and he |
| 11  intercourse, he and Anne Marie Fahey, while she was | 11  is the patient and Dr. Bryer is the psychiatrist? |
| 12  menstruating? | 12  A.  Yes. |
| 13  A.  Yes. | 13  Q.  And he's -- he tells Dr. Bryer that he feels |
| 14  Q.  And that the menstrual blood of Anne Marie | 14  grief over her disappearance, slash, loss? |
| 15  Fahey resulting from their intercourse would be what | 15  A.  Yes. |
| 16  the FBI would find in his house? | 16  Q.  Of someone that he cared for deeply about? |
| 17  A.  Yes, he said that. | 17  A.  Correct. |
| 18  Q.  And are you aware that blood matching Anne | 18  Q.  Okay.  Well, he also complains about an |
| 19  Marie Fahey's, at least to the odds of one in 11,000 | 19  intensive interrogation of his 73-year-old mother? |
| 20  that could be anyone else's, was found on a baseboard | 20  A.  Yes. |
| 21  and radiator cover? | 21  Q.  Do you know if his mother was ever |
| 22  A.  I'm not certain whether I knew that or not to | 22  interviewed? |
| 23  be honest. | 23  A.  Do I know if his mother was ever |

Case 1:06-cv-00068-B* Document 231-4 Filed 02/20/2007 Page 40 of 40

1  next witness is.
2      Please bring the jury in at this time.
3      (Jury entered the courtroom at 11:55 a.m.)
4      THE COURT: Mr. Oteri, would you call your
5  next witness?
6      MR. OTERI: Thank you, your Honor.
7      The defense calls Thomas Capano.
8      THOMAS J. CAPANO, having been called on the
9  part and behalf of the Defendant, having been duly
10  sworn according to law, was examined and testified as
11  follows:
12      ------
13      DIRECT EXAMINATION
14      ------
15  BY MR. OTERI:
16  Q. State your name, please, sir.
17  A. Thomas Joseph Capano.
18  Q. Thirty seconds and you wreck things.
19  A. Yeah, I know.
20  Q. How are you feeling? Are you all right?
21  A. No. I don't mean that in any way. I'm
22  perfectly competent to testify. I'm just -- I just
23  mean I'm nervous.

1  Q. Are you on medications?
2  A. Yes, I am.
3  Q. What did you take today?
4  A. Um, Wellbutrin, Xanax, Lomotil and Tylenol.
5  I took that once. I'll take it again at two o'clock.
6  Q. Tom, you heard Dr. Tavani testify here for a
7  couple of days, did you not?
8  A. Yes, I did.
9  Q. You heard her description of you having
10  scattered thoughts and trouble concentrating.
11      Do you have that condition right now?
12  A. Yes.
13  Q. Are you having trouble concentrating
14  answering questions?
15  A. I will.
16  Q. Okay. So that I will take my time and you
17  take your time answering. Don't feel upset at all.
18  If you can't grab a word, just take your time. Okay?
19  A. Yeah.
20  Q. All right?
21  A. I ramble.
22  Q. Okay. We will give you all the time in the
23  world to get concentrated.

2  Q. Tom, I would like you to tell the jury about
3  your background as it concerns your family, your
4  parents. As a kid growing up, what was it like?
5  A. Okay. This is kind of important to me,
6  Ladies and Gentlemen.
7  Q. Tom, can you pick the mike up a little so
8  they can hear you?
9  A. That way (indicating)?
10  Q. Yes.
11  A. I started to say that this part is pretty
12  important to me because I've been portrayed as a
13  spoiled rich kid born with a silver spoon in my mouth.
14      MR. CONNOLLY: Your Honor, we're going to
15  object. We're not going through his life history.
16      MR. OTERI: The defendant is on trial for his
17  life. The Government has painted a saintly picture of
18  Anne Marie Fahey and a demonic picture of the
19  defendant.
20      THE COURT: Background information. I'm not
21  interested in a complete life story.
22      Certainly take that information that you
23  think is relevant and I'll overrule the objection to

1  that extent.
2      I would expect, again, Mr. Capano's responses
3  be in answer to your inquiries, rather than simply an
4  unimpeded presentment to the jury.
5  BY MR. OTERI:
6  Q. Please continue, Tom.
7  A. I come from a blue-collar background. My
8  father was a carpenter. All my uncles were in the
9  building trades. Both of my grandfathers were
10  immigrants. One was a stonemason. One was a
11  bricklayer. Most of my first cousins were in the
12  building trades. I come from a background of people
13  who worked with their hands. My brother Louis did.
14  My dad did go into the business not long before I was
15  born. He said he was always proud of the fact his
16  first job was to build an outhouse. But he, you know,
17  ultimately was fairly successful. I was educated in
18  the local parochial school.
19  Q. Excuse me, Tom. Before you get to that. Do
20  you have brothers and sisters?
21  A. Yeah.
22  Q. Tell us.
23  A. Yes. I have an older sister Marian. And I'm

1 the oldest. ~~Gerard 100 or 900 888-8~~ is ~~Document 1125~~
2 younger than I am. Joey is three years younger than I
3 am. And then Gerry is 13 years younger than I am.
4     Q. All right. And those children were all
5 raised in your home with your parents with you?
6     A. Yes. Because of the age difference between
7 Marian and Gerry, Marian was off to college when Gerry
8 was born. That sort of thing.
9     Q. Now, what about your education?
10     A. Okay. I attended the local parochial school
11 and then Archmere for high school, Boston College, and
12 then Boston College Law School.
13     Q. And you graduated, I take it, from both of
14 those schools?
15     A. Yes.
16     Q. Okay.
17     A. Do you want the years?
18     Q. What?
19     A. Do you want the years?
20     Q. Doesn't really matter. Long time ago?
21     A. Long time ago.
22     Q. '74; correct, you graduated from law school?
23     A. From law school, yes.

1     Q. Okay. The rest of your family, are there any
2 other college degrees in your family?
3     A. In my immediate family?
4     Q. No.
5     A. Just my sister has a Master's degree in
6 counselling. Other than that, no. And among my first
7 cousins on my -- on the Capano side anyway, the first
8 generation born in this country, I think that there
9 are no other college educations except for I have an
10 aunt who was born in this country and she herself is
11 educated and so are her children.
12     Q. Just like the typical Italian family: the
13 rest go out and make money and one goes for an
14 education?
15     A. That's exactly right.
16     Q. Okay. Talk to us -- by the way, at some
17 point you married, did you not?
18     A. Can I --
19     Q. Go ahead.
20     A. Yes, I did. I was going to mention about
21 working.
22     Q. Go ahead.
23     A. My father believed in putting the boys to

1 work at a ~~Filed 02/20/2003 Page 1 of 2~~ bably started
2 about the age of 13 doing not-so-difficult stuff along
3 with my brothers.
4     As we grew older into our teens we literally,
5 you know, did pick-and-shovel work. I dug a lot of
6 ditches. I pushed a lot of concrete, moved a lot of
7 lumber and we all did that. Those are the kinds of
8 jobs that I held.
9     Q. You didn't sit in an office with an adding
10 machine?
11     A. No. Not hardly. If you knew my father you
12 would know that.
13     Q. Okay. Now, sir, at some point you married,
14 did you not?
15     A. Yes, I did.
16     Q. Can you tell us about your marriage and your
17 family?
18     A. Okay. Kay and I met in college. I'm a year
19 older than she is. She said when she was here she was
20 in the nursing school at Boston College and when
21 that -- you know, just basically dated each other
22 until she was finished school and got married in 1972.
23     Q. When she finished school, Tom, where were

1 you? She finished and graduated in '71?
2     A. Yeah. I just -- it's the reason I decided to
3 stay and go to BC Law School. I just finished my
4 first year of law school and she had just graduated
5 from college.
6     Q. And what happened then?
7     A. We were married in 1972 on the day of the
8 Watergate break-in.
9     Q. And what happened after that, do you
10 remember?
11     A. We stayed in Boston. I had two more years of
12 law school. Kay worked as a public-health nurse out
13 on the streets and I went to school. My parents, you
14 know, supported us, paid my tuition.
15     Q. All right.
16     Now, after you graduated from law school, you
17 came back to Wilmington?
18     A. Yes, I did.
19     Q. Correct?
20     A. Yes, I did.
21     Q. Before we talk about your career, your legal
22 career in Wilmington, let's take your family.
23     What happened in your -- with the family

**Page 45**

1    A. A few.

2    Q. A few. I don't want you to list them all.

3 List three, four, five of them.

4    A. I've been on the Board of Trustees at

5 St. Mark's High School, of Ursuline Academy, of

6 Padua Academy, and Archmere Academy. Very involved in

7 Catholic education.

8        Let's see. I was appointed to two

9 commissions, one by Governor Castle, one by Governor

10 Carper to investigate prisons both after major

11 escapes.

12       I was a board member of the National

13 Conference of Christians and Jews.

14       I was chairman of the Wilmington Parking

15 Authority.

16       I had a lot of activities with the Delaware

17 Bar Association. I was on the executive committee

18 there.

19       I was in charge of what's called the Bench

20 and Bar Committee which arranges meetings of lawyers

21 and judges.

22       I've been a member of -- appointed by the

23 Supreme Court of Delaware to what's called the Supreme

**Page 46**

1 Court Long-Range Planning Committee.

2        I was also picked to be one of only two

3 laymen -- two lawyers -- excuse me -- who -- on the

4 Ad Hoc Committee about a new courthouse. Of course,

5 what we recommended was ignored.

6        I've been -- I've been in innumerable

7 political committees. I guess I'm required to

8 probably stop here. And -- well, I was very active

9 both in my high school and college alumni

10 associations.

11   Q. Tom, you've heard testimony in this courtroom

12 concerning these coolers that are here (indicating).

13   A. Yes.

14   Q. Is it your testimony concerning --

15   A. I'm sorry. I can't hear you.

16   Q. You've heard testimony as to when and where

17 you purchased them; correct?

18   A. Yes.

19   Q. Can you tell us, Tom, when and where you did

20 buy them?

21   A. Well, I know I bought it at Sports

22 Authority. And the only reason I know the date is

23 because it's been talked about so often. It was

**Page 47**

1 sometime in April.

2    Q. All right. That's of 1996?

3    A. Correct.

4    Q. Where is the Sports Authority which you

5 bought this cooler located in relation to the home you

6 were living in?

7    A. It's fairly close. It's on Route 202.

8 Across from the Concord Mall on Route 202. It's

9 basically the closest shopping area to where I lived.

10   Q. Okay. And how did you pay for it?

11   A. With my credit card.

12   Q. And when you paid for it with a credit card,

13 you certainly knew that there would be a record of

14 that purchase if you were thinking about that at all?

15   A. Yes.

16   Q. Okay.

17   A. And I heard earlier that I purchased it on a

18 Saturday. Somebody testified to that.

19   Q. Yeah.

20   A. Yeah. Okay.

21   Q. But I mean, Saturday is what?

22   A. I heard the man say it's their busiest day.

23   Q. Okay.

**Page 48**

1        You went to buy this at a place in the

2 vicinity of the same area where you lived?

3    A. Yes.

4    Q. Paid for it with a credit card?

5    A. Yes.

6    Q. Okay.

7        Did you drive your own car -- your own

8 automobile, car? Did you drive your own automobile?

9    A. I can still understand most of the accent.

10 Yes, I drove my own car.

11   Q. Okay. The car you drove was what?

12   A. A jeep.

13   Q. That's a Jeep Wagoneer type of thing, not the

14 little --

15   A. Jeep Grand Cherokee.

16   Q. Okay. And it's registered to you or one of

17 your corporations?

18   A. No. It was registered -- it was registered

19 just to me, or me and Kay. And her Suburban -- I

20 don't know whether --

21   Q. It wasn't a jeep registered to some mythical

22 corporation?

23   A. No. My name and probably Kay's name.

**Page 49**

1 Q. Okay. You didn't cover the license plates or
2 anything else?
3 A. No.
4 Q. You didn't wear a disguise?
5 A. No. I was in ordinary clothes.
6 Q. Now, sir, is it fair to say that you made no
7 effort to conceal this purchase?
8 A. Extremely fair.
9 Q. All right.
10 Now, sir, who did you buy -- why you buy
11 this cooler?
12 A. I'm going to repeat basically my brother Joe.
13 My kids -- Gerry is, among other things, just
14 an overgrown kid. And he was very good -- had been
15 very good to my kids in Stone Harbor, in terms of
16 boating and various things with them. And I was very
17 grateful for that. And his kids and my kids, although
18 there's a big age gap, they're particularly close.
19 And so I wanted to do something for them. Like when
20 he first built his house down there I bought something
21 as a house gift. I thought, well, I'm going to have
22 the kids give him this for the 4th of July weekend,
23 which is when we typically start the season. It was

**Page 50**

1 just for the kids to give him as a thank you and also
2 because Joe had told me and I also knew -- I mean,
3 everybody in the family knew that Gerry was always
4 looking at the next bigger and better thing. In fact,
5 we argued about it.
6 Q. About what bigger and better thing?
7 A. A boat. I mean, a conversation that my
8 brother Joe described at my mother's house, we both
9 lamented the fact that the way he's a spendthrift, and
10 buys all toys nonstop, and I know Joe did and I
11 separately. I think probably even my brother Louis
12 did. We all preached to him, "Stop this. Stop this.
13 You don't need eight or nine jet skis or a collection
14 of six antique Corvettes. Just stop it."
15 Q. Now, I take it that you said you knew he was
16 looking to buy a boat?
17 A. Yeah. I'm sorry. I --
18 Q. It's all right.
19 A. -- apologize for rambling. I do. Yes.
20 Because I knew that he was looking for a new boat.
21 But it really didn't much matter because the boat he
22 had he could also use it there. It was big enough for
23 that.

**Page 51**

1 Q. Did you know that he had a cooler at that
2 time, smaller, but he had a cooler?
3 A. I'm sure he had coolers, but I don't know
4 how -- I figured, as Joey told me, you can't have too
5 many coolers. He was really into fishing. He was in
6 all these tournaments all the time.
7 Q. Now, sir, in your family, tell us about your
8 tradition of giving or not giving gifts on birthdays.
9 A. My siblings and I do not exchange gifts on
10 birthdays.
11 Q. All right.
12 A. My -- just don't.
13 Q. Okay. Now, you had this cooler from April?
14 A. Yes.
15 Q. You put it in your vehicle and drove it to
16 your home, I take it?
17 A. Yes, I did.
18 Q. Okay. What did you do with it when you got
19 it home?
20 A. I think that I first left it in the half of
21 the garage that I did not use for parking, but I soon
22 moved it because of reasons I'll explain I guess
23 later.

**Page 52**

1 I put it in the crawl space of the house.
2 The house I was renting at the time again was an older
3 home and it had a crawl space you could almost stand
4 up in. So I put it in the crawl space. It was a
5 finished basement.
6 Q. And how long did you leave it in the crawl
7 space or did you subsequently move it?
8 A. I'm sorry. I didn't hear.
9 Q. Did you subsequently move it from the crawl
10 space?
11 A. Yes.
12 Q. And can you tell us where you put it?
13 A. I didn't move this until June 27th.
14 Q. All right, sir. I obviously misunderstood
15 you.
16 Could you describe for me how far -- the
17 access to the crawl space?
18 A. The crawl space, the owner of the house who
19 was renting it had redone the basement basically on
20 his own and there was a rec room down there and
21 bathroom and laundry and the crawl space was across
22 from the laundry closet. It had louvered doors.
23 You'd just open the door and you would have to jump up

Page 53

1 or step up on something. Actually, it didn't come all
2 the way down. Once inside you had to stoop -- not
3 stoop like in a modern crawl space.
4    Q. It was in that crawl space for the next three
5 months?
6    A. Yes, as were a lot of other things.
7    Q. That was my next question.
8        Are there other things stored in the crawl
9 space?
10    A. Yes. Screens. Again, older homes often have
11 encasement windows. You have to take screens in and
12 out. Screens were down there. And the owner of the
13 home is the real handyman. I'm not. So he had a full
14 workbench with all sorts of tools and even cans of
15 paint to match what color the different rooms are.
16    Q. All right.
17        Now, at some point, sir, did you intend to
18 give this cooler to your brother?
19    A. Yes.
20    Q. And when did you intend to give it to him?
21    A. When we went to Stone Harbor 4th of July
22 weekend.
23    Q. Can you tell me, sir, does the 4th of July

Page 54

1 weekend have some particular significance to the
2 Capanos as it relates to Stone Harbor?
3    A. Yes. That's basically when summer starts for
4 us. I mean, yes.
5    Q. Okay. Tell us what that significance is.
6    A. The significance is the 4th of July weekend
7 is -- that's when we begin using the home in Stone
8 Harbor.
9    Q. Okay. That's --
10    A. And we also -- before that we had a house in
11 Wildwood, which is one town over. And it was the same
12 thing there: 4th of July we really got started at the
13 beach. Gerry was an exception to that.
14    Q. Is there some sort of a party that's held
15 there?
16    A. Yes, yes, yes, yes. We always have a 4th of
17 July party. I'm sorry.
18    Q. That kicks off the summer for you people
19 normally --
20    A. Yes.
21    Q. -- with the exception of Gerry?
22    A. Gerry is down much earlier, but he
23 participates in the 4th of July thing. And we usually

Page 55

1 do it at my mother's home because, you know, my mother
2 is on the beach side and Gerry is on the bay side. So
3 there are fireworks.
4    Q. Now, sir, at some point you borrowed some
5 money from your brother Gerry?
6    A. Yes.
7    Q. Can you tell us how much money you borrowed?
8    A. I borrowed $8,000. I've heard him reference
9 to the fact in here that the check he wrote was for
10 $8,300. But I borrowed $8,000.
11    Q. Okay. And can you tell us, sir, how that
12 conversation took place? Was it in person? On a
13 phone? How did it take place?
14    A. It was on the phone.
15    Q. Tell us what happened.
16    A. I called him up and said, "How are you fixed
17 for cash?"
18        He said, "Fine."
19        I said, "I need eight thousand bucks for" --
20 "I'll pay you back within a day or two."
21        And he said, "Sure." And he brought me a
22 check, I'd say maybe the next day.
23    Q. Brought you a what?

Page 56

1    A. A check.
2    Q. No. He didn't bring you a check.
3        MR. CONNOLLY: Your Honor, this is leading.
4        MR. OTERI: Strike that. You're absolutely
5 right. I apologize.
6        THE WITNESS: You know what? Yeah. I get
7 confused, too.
8 BY MR. OTERI:
9    Q. You called your brother?
10    A. He gave me the cash. He brought me $8,000 in
11 cash and I paid him back with a check.
12    Q. Let me ask you, sir, this: You called him
13 one day?
14    A. Yes.
15    Q. And your best memory of how soon did you get
16 the money from him?
17    A. It was no more than two days later, possibly
18 one day.
19    Q. How was the money delivered? Where did you
20 meet to get it? Did you pick it up?
21    A. Um, Gerry I guess called me from the phone he
22 had in his truck and I -- he pulled over and
23 double-parked, or whatever he did, in front of the

**Page 57**

1 office building I worked in. And I went downstairs,
2 out into the street, jumped in his truck -- I
3 remember it was freezing cold -- and got the $8,000.
4 Q. And when you got the $8,000 from Gerry in his
5 truck --
6 A. Yes.
7 Q. -- was there a conversation?
8 A. Yes, surprisingly.
9 Q. All right. Tell us what the conversation was
10 about.
11 A. He was being nosey. Normally if one of us
12 went to the other one we wouldn't ask any questions.
13 We'd just do it.
14 Q. Had you ever done that before, borrowed
15 money, lent money to each other?
16 A. Yes. Sure.
17 Q. Okay.
18 A. And, you know, would always say, "Is there
19 anything, you know, you need? Is there any problem or
20 you need me for anything else?"
21 We'd just say, "No. Thanks for the loan.
22 I'll give it back to you as soon as possible."
23 But in any event, Gerry did ask me that

**Page 58**

1 question -- the basic question of: "Are you okay?
2 You know, are you having any problems?"
3 Then I said, "No, it's fine. I just need the
4 money." And then Gerry being Gerry got into his
5 tough-guy mold and --
6 Q. What did he say to you?
7 A. Well, you know, all sorts of things. I mean,
8 he raised issues of, was I threatened, was I being
9 blackmailed, was I -- did I have gambling debts, was
10 somebody, you know, as I said, blackmailing me. All
11 sorts of possibilities, you know, and I just kept
12 saying, "no," and he kept saying -- you know, Gerry
13 does picture himself as a very tough guy. And to some
14 extent a phrase my brother Joey used -- I don't
15 know -- "a wise-guy wannabe."
16 And so, finally, just to make him stop, I
17 said, "Yeah, yeah, yeah." And I got out of the truck
18 and left, but having told him I would pay him back
19 within a day or two, which I did.
20 Q. Is it fair to say that you never told him you
21 were being extorted?
22 A. Absolutely not. I never told him why I
23 wanted the money. I never told him why.

**Page 59**

1 Q. Now, is that behavior unusual concerning
2 Gerry and your perception of him?
3 A. No. It was typical of Gerry.
4 Q. Okay.
5 Now, at some point your brother Gerry
6 testified he gave you a gun?
7 A. Yes.
8 Q. Okay. Strike that.
9 Before we get to that, at that same
10 conversation when you were talking when you borrowed
11 the money from Gerry --
12 A. Yes.
13 Q. -- did he ever mention anything about
14 bringing people in to straighten a problem out for
15 you?
16 A. Yes.
17 Q. What did he say?
18 A. I mean, he had said often before, you know,
19 "If somebody is bothering you, I'll get somebody to
20 break his legs." It's like a line out of a movie.
21 Q. He said that that day?
22 A. Yeah, but he said it all the time.
23 Q. What did you do when he said it?

**Page 60**

1 A. I laughed.
2 Q. You did not ask him to obtain leg breakers
3 for you?
4 A. No, I did not.
5 Q. Now, at some subsequent time it was that
6 Gerry testified he gave you a gun.
7 A. Yes.
8 Q. Okay. Can you tell us about this gun? What
9 happened?
10 A. Well, first off, it was his idea. Not my
11 idea. I didn't ask for it. But I went along with
12 it.
13 Q. Where were you when this occurred?
14 A. Gerry and his family came to our home for
15 dinner an awful lot on Sundays. And it was just
16 always a lot of fun. Gerry -- my family has a
17 tradition of making homemade wine. Gerry has kept the
18 tradition up, although he doesn't do it the way my
19 grandfather did it.
20 He always brings a gallon of his homemade
21 wine. If anybody is familiar with Dego Red, it packs
22 a wallop. And Gerry would inevitably get very
23 inebriated. His wife always drove home. And at some

**Page 61**

1 point two of us -- I had a pool table in the house.
2 We'd go in and shoot with some people and it was after
3 dinner and, you know, I was usually half hit and he
4 was 100-percent hit and that's when it came up,
5 because he raised with me again the issue about the
6 money. And then he told me that I ought to -- you
7 know, I ought to have some protection. I do admit I
8 did tell Gerry it was kind of strange living in a very
9 big house by myself. I mean, I rented a house. It
10 was big enough for all my kids but, you know, I was
11 there most of the time all alone. And unlike the
12 house on 17th Street, it didn't have an alarm system
13 and all I had was a baseball bat. But, you know, I
14 just -- I had told him that once in a while it gave me
15 the creeps and that's when he started on me that I
16 ought to have a gun. I believe my other brothers do
17 and I never owned one and --
18    Q. Have you ever fired a gun?
19    A. You mean --
20    Q. Have you ever fired a handgun?
21    A. No. Never fired one. I had one gun one time
22 in my life.
23    Q. A long gun?

**Page 62**

1    A. Shotgun. It was with a Judge of this
2 Court. We almost got bagged by the wildlife people,
3 too. That was a good 20 years ago.
4    Q. So it's fair to say you're not familiar with
5 the use of handguns?
6    A. No. I've always been afraid of them. I
7 remember when I was a kid, like most kids go rooting
8 around at some point in your -- in places where you
9 shouldn't be, but you're bored. I remember finding a
10 gun that -- a handgun that belonged to my father. And
11 ever since then remembering that fact I never wanted
12 anything like that around my house. First of all, I'd
13 probably shoot myself with it rather than anybody I
14 was aiming at. And, secondly, you know, I had four
15 daughters in the house. I think this is significant
16 enough for me to mention. The house was -- the house
17 on 17th Street was a meeting place. It was a
18 crossroads. I mean, that's why Kay had that Suburban,
19 had to move up from the minivans because it had -- has
20 eight seat belts. Our kids are never alone. It
21 wasn't unusual to come home and find ten kids in the
22 house. It's still that way. So anyhow, I didn't want
23 a gun in the house when there was so many kids

**Page 63**

1 around.
2    Q. Now, at some point Gerry had a conversation
3 with you about taking a gun, didn't he?
4    A. I'm sorry. I rambled again.
5       Yes. And he was pretty insistent. And so
6 partly to shut him up and partly because maybe it's
7 not a good idea not to have one, I went up to his
8 house.
9       Gerry, as you heard, is a big game hunter.
10 Shoots everything. And he did. He did not -- it's
11 funny, but you had to be there. I mean, he was
12 insistent I take a shotgun for the reasons that he
13 said. And I said -- and for the exact reasons he said
14 because he didn't want to take anyone but me, the
15 little one you got and he gave me this thing.
16       He said, "This thing ain't going to take
17 anybody down."
18       I said, "Gerry, I don't want no cannon in my
19 house." I don't want one of these other big things
20 that he had. "You know, I want the smallest thing
21 that you got." And he was upset. That's what I
22 took. That's what I took.
23    Q. Did you know how to use that gun?

**Page 64**

1    A. Yeah. He showed me and then -- I mean, once
2 it's got bullets in it, you pull the trigger.
3    Q. He showed you how to do that, though?
4    A. He -- well, yeah. He showed me how to --
5 where this -- it had like a clip where you would --
6 you know, told me how to put that in and then how to
7 take the safety off and how to shoot it and whatever
8 else he showed me, because I didn't have any
9 experience.
10    Q. You took that gun with you?
11    A. Yes, I did.
12    Q. Do you remember approximately when this was?
13    A. Oh, I'd say it was around -- it was cold. It
14 was around the time of the conversations in the pool
15 room after dinner when the issue he raised with me, if
16 I was in trouble, and then we got talking about things
17 that could possibly -- terrible things that could
18 possibly happen to you to protect yourself against.
19       I should mention here, if I may, that I did
20 have the conversation with him about my children that
21 he described.
22    Q. What conversation?
23    A. Gerry testified that we had a conversation

Case 1:06-cv-00088-JJF   Document 285   Filed 02/20/2007   Page 76 of 235

1  about my kids that, you know, if anybody hurt them
2  that I would kill them.
3       Q. Tell us about that.
4       A. Well, we had that conversation. I mean, I
5  said that frequently. If I've said it once I said it
6  1,000 times. I mean it. Anybody hurts my kids I kill
7  them.
8       Q. That's an expression that you use?
9       A. No. I mean it.
10      Q. Do you have a specific intent to kill anyone?
11      A. No. That's the way I feel. I feel most
12  fathers feel that way.
13      Q. You did say that to Gerry?
14      A. Sure.
15      Q. You said that to many other people?
16      A. Sure. Gerry said it, too. I mean, it's...
17      Q. Back to the gun.
18      A. Yeah. Sorry.
19      Q. The gun you received sometime either --
20      A. Either February or March.
21      Q. Okay. What did you do with the gun when you
22  received it?
23      A. I hid it.

---

1       Q. Where did you hide it?
2       A. I put it inside one -- sort of like a carry
3  bag and then I put that inside of a suitcase which
4  was -- the house was a three-story house. And so the
5  third floor was a walk-in attic where a lot of things
6  were stored, including the luggage, and that's where I
7  put it.
8       Q. If somebody broke in, it would take you a
9  week to go get the gun, wouldn't it?
10      A. Right.
11      Q. So you stashed it away?
12      A. I didn't really want it. I figured I've
13  always been told that, you know, usually if you don't
14  bother them, they don't bother you and just let them
15  take the televisions and whatnot.
16      Q. At some point did you do something with the
17  gun?
18      A. Yeah. I gave it back to Gerry.
19      Q. And can you give us an idea approximately
20  when that was?
21      A. I know I had the gun for less than a month.
22  I can't tell you whether it was two weeks, three weeks
23  or three-and-a-half weeks. But I know it was pretty

---

1  quickly I gave it back to him.
2       Q. Was there something that precipitated the
3  return of the gun?
4       A. Yeah. Again, kids in my house. You know, it
5  was even, you know, when the kids were with me, it
6  wasn't unusual for me to have eight girls spending the
7  night at the house. Sometimes even ten. A lot of
8  children traffic. And I thought uncomfortable with
9  it. I also felt a little more kind of embarrassed
10  about being so afraid like that. So I figured my
11  baseball bat would do.
12      Q. Okay. So you returned the gun to Gerry?
13      A. Yes.
14      Q. Okay. By the way, when you received the gun,
15  how was it packaged, or was it packaged?
16      A. It was not packaged.
17      Q. He handed you a gun?
18      A. No. Wait a minute.
19         (Pause.)
20         I know I was holding it in his house where he
21  keeps his safe. And I still don't understand how the
22  second floor holds that safe. But, anyway, where all
23  his weapons are stored. And I don't -- I don't

---

1  honestly remember whether he gave me something that it
2  would sit in that I then carried out and I just -- my
3  best memory is that it did not, that I just had a
4  handgun. Knowing Gerry it probably sat inside of
5  something. He's very careful with his guns.
6       Q. And when you returned the gun to Gerry, did
7  you tell him you had no further need for it?
8       A. I'm sorry. I didn't hear you.
9       Q. When you returned the gun to Gerry, did you
10  tell him you had no further need for it?
11      A. Correct.
12      Q. What do you mean by that?
13      A. I was -- I never should have taken it in the
14  first place. It was a dumb idea. Too many kids in
15  the house. So I gave it back to him.
16         MR. OTERI: Your Honor, may we break here?
17         THE COURT: All right. We can take the
18  luncheon recess.
19         Please take the jury out.
20         (Jury excused at 1:00 o'clock p.m.)
21         THE COURT: Court will stand in recess until
22  two o'clock.
23         (Thereupon, the luncheon recess was taken at

---

1 room, which was a signal that Robert hadn't read it.
2 She was quite disappointed about that.
3   Q. Now --
4   A. We talked about her travel plans for the
5 upcoming weekend.
6   Q. Now, sir, at some point, if you can give me a
7 time frame, when did you become sufficiently concerned
8 about her condition to start contemplating an
9 intervention?
10   A. In February.
11   Q. Of what year?
12   A. 1996.
13   Q. And what did you do in conjunction with that
14 intervention?
15   A. I went to her apartment. I was as serious as
16 I could. I put my foot down. And I gave her $25,000
17 in cash, because she said she could never afford it,
18 and she would never bother her family for that and her
19 insurance wouldn't cover it. And I thought, well,
20 this is going to shock her, I mean, you know, if I do
21 something like this.
22   Q. All right. Now, you gave her $25,000 cash?
23   A. Yes.

1     THE COURT: Sustained.
2     MR. OTERI: I withdraw it.
3 BY MR. OTERI:
4   Q. Why were you trying to get this cash?
5   A. Well, I did want it to be confidential and I
6 figured showing Anne Marie a check for $25,000 and --
7 you know, I don't know the 25 -- I just figured a
8 hospital is so many bucks a day, 30-day treatments.
9 Why I didn't give her 30 instead of 25, I don't know.
10 But I thought it would, you know, shock her and let
11 her know how serious this was that I was willing to do
12 this because she needed that treatment that badly.
13   Q. And what did Anne do with the $25,000?
14   A. Threw it in my face.
15   Q. What did she say when she threw it at you?
16   A. Well, she was angry at first. And she's just
17 insisting she wasn't going and then she cooled off and
18 I said, "Annie, you have got to do this. You're
19 killing yourself. You know, nobody knows about this."
20 I mean, Robert knew about it and I think Brian, to
21 some extent. But no one else in the family. I said,
22 "This has got to stop. This has absolutely -- I
23 mean, I see you're wasting in front of my eyes."

1   Q. And --
2   A. Do you want to know what she did with it?
3   Q. I was going to ask: Where did you get it?
4   A. Oh, yes. I had made a cash withdrawal for
5 $8,000 and then one for $9,000, and I just felt stupid
6 doing that three days in a row at the same bank with
7 the same lady. That's why I asked Gerry for the
8 $8,000 in cash.
9   Q. You had $8,000, $9,000 and $8,000?
10   A. Right. I also knew there was something about
11 reporting over $10,000.
12   Q. I was about to say you may have felt stupid,
13 but you also knew that if you took more than $10,000
14 they report it to the IRS?
15   A. Yes. I had written a check for $25,000 or
16 something -- I mean, that was going to be a big deal
17 in the bank. I didn't want to draw too much attention
18 to myself.
19   Q. You were actually trying to get cash so your
20 wife and nobody else would know about it and give it
21 to Anne Marie Fahey --
22     MR. CONNELLY: Objection. Leading.
23     MR. OTERI: I'll withdraw the question.

1     She admitted to me that she needed the
2 residential treatment program. But the thing that
3 drove me nuts was she was very concerned about what
4 people would think of her; her co-workers and her
5 friends and even her family. So I said, "That's
6 ridiculous. You know your family loves you. They're
7 going to support you in this and you know who cares
8 about you."
9   Q. Did you take the money back, the $25,000?
10   A. Not all of it. I took most of it back. I
11 made her keep some of it because she was always broke.
12   Q. How much did you make her keep?
13   A. Probably about 1,000 bucks.
14   Q. So basically she rejected your gift?
15   A. Yes. She rejected the offer to go -- I mean,
16 I left on good terms. She wasn't angry at me at that
17 point. This was -- this was my attempt at shock
18 value.
19   Q. All right.
20     MR. OTERI: Your Honor, this may be a good
21 time to break.
22     THE COURT: All right. We will take the
23 afternoon recess at this time.

Page 170

1  A  Yes.  Depending on the occasion, it might be
2  two bottles of wine.
3  Q  This night you only had one?
4  A  Yes.  That was standard.
5  Q  All right.  And --
6  A  Excuse me.  Anne Marie actually had another
7  glass of wine after dinner while I had the liqueur.
8  That's what her choice was.
9  Q  All right.  Now, at some point the check was
10  brought to you by this waitress, correct?
11  A  Yes.
12  Q  What did you do?  How did you pay the check?
13  A  By credit card.
14  Q  That credit card was made out to whom in whose
15  name?
16  A  It was in my name.
17  Q  And what did do you with the credit card when
18  the check was presented?
19  A  I put it -- the check came in a little
20  booklet, so I put the credit card in there with it and
21  passed it over to Annie as I had been doing for quite
22  some time.
23  Q  Why did you pass it to Annie?

Page 171

1  left there?
2  A  Yes.  Something like 9:15 or thereabouts.
3  Something like that.
4  Q  Like 9:12?
5  A  Whatever was said.
6  Q  You left there and what did you do?  You
7  walked the length of the restaurant to go out?
8  A  Correct.
9  Q  And what happened?  Where did you go?  What
10  did you do?
11  A  As soon as we came out of the restaurant door
12  we turned to the right.  My car was unblocked so all we
13  had to do was get the keys from the valet.  And, you
14  know, I let her in the car.  And then I got in the car
15  and quite literally the entrance to 95 south is right
16  there.  There's only -- just jumped right on 95 south
17  and drove home.
18  Q  Okay.  And you drove from the restaurant to
19  where?
20  A  To Anne Marie's apartment.  Yes.  Directly to
21  Anne Marie's apartment.
22  Q  Do you have any idea as to about approximately
23  what time you arrived there?

Page 169

1  A  Because I'm not real quick in math and she is,
2  again, especially because of all her years working in a
3  restaurant.  What I always tried to do was I wanted to
4  leave a 20 percent tip but I wanted to round it up.  I
5  mean, I wanted to round it off so it was two zeros at
6  the end of the charge.
7  Q  Did you want to leave a 20 percent tip to a
8  waitress who had been a klutz?
9  A  We talked about that.  The reason we did, we
10  figured that we would be punishing the other people who
11  worked there because the tips went into a pool.  So we
12  decided that we'd leave the regular 20 percent.
13  Q  All right.
14  A  And she figured the tip, she signed my name
15  and that was not unusual.  That often happened.
16  Q  That had been done in the past on numerous
17  occasions by Anne Marie for you?
18  A  Yes.  It was even done by Kim Hortsman for me
19  at the Ritz.
20  Q  Now, you left there at some point in the
21  evening, did you not?
22  A  Yes, we did.
23  Q  You had subsequently learned what time you

Page 171

1  A  I wasn't watching the clock.  I just figured
2  roughly a half an hour from Philadelphia.  I mean, I
3  know I wasn't driving as fast as usual because we were
4  involved in a very energetic conversation.
5  Q  Tell us what the conversation was on the way
6  home.
7  A  She, Anne Marie, as I said before was a big
8  sports fan.  She was particularly -- Atlanta Olympics
9  were coming up.  She had talked about, boy, if she could
10  only go because she had friends who lived in Atlanta.
11  She would live with them and go to the Olympics.
12     I'm not into the Olympics, but I told her that
13  one of the bond underwriters I knew who worked in
14  Atlanta, he actually worked for a guy named Maynard Turk
15  who used to be the mayor of Atlanta and still had a lot
16  of connections, and my friend had told me and a couple
17  others that, you know, he could get tickets to the
18  Olympics, not necessarily to the premiere events but,
19  you know, to some of that some place.  And I told Anne
20  Marie that and she got all animated and she, you know,
21  she said -- it was typical of her to say when you told
22  her something that was good and instead of saying you're
23  kidding, she'd say, you lie.  And so we talked mostly

**Page 172**

1 about the Olympics on the way home. And, you know, I
2 said I'd call my friend, you know, the next day and she
3 would check -- she said she would check with her friends
4 who lived down there. So it was mostly a discussion
5 about the Olympics. She was pretty excited.
6     Q How would you describe her mood?
7     A She was up. She was animated.
8     Q Okay. When you got to her apartment --
9     A Yes.
10     Q -- you drove directly down 95?
11     A Yes.
12     Q Got off at what exit, seven?
13     A I don't know the number of the exit. I would
14 have gotten off at 202 south. And you come out on
15 Concord Avenue and turn right on Broom Street, go up to
16 Sallies, turn left at 18th Street and to Washington.
17 That was our typical route.
18     Q And that took you as you say about 30 minutes?
19     A I suppose.
20     Q When you got to Anne Marie Fahey's house, what
21 did you do?
22     A She went inside the house. We had talked
23 about she was awake enough we decided to watch ER

**Page 173**

1 together. And we decided to do it at my house because
2 my house was cool and her house was hot as blazes.
3 She's on the third floor. No insulation. The sun beats
4 down on it all day long. So she ran upstairs, took the
5 doggy bag from the restaurant with her, I want to
6 mention that, and said she was probably going to change.
7 She brought something else upstairs. I think she
8 brought some of the -- she was used to me every week
9 giving her her food supply, the things that I learned
10 she would eat. And so I think I had a little Acme bag,
11 plastic bag with some soups and grains and things like
12 that in it and she brought that up as well.
13     Q Were there any perishables in that bag?
14     A No. Perishables were in my refrigerator on
15 Grant Avenue.
16     Q She went up to the apartment with the bag of
17 groceries?
18     A Right.
19     Q And the doggy bag?
20     A Correct.
21     Q What was she to do in the apartment if you
22 know?
23     A She was going to change clothes but she

**Page 174**

1 didn't. The apartment was so hot she just came right
2 back down again. It was getting closer, you know, to ER
3 starting and we had to -- she kept clothes at my house.
4 If she didn't want to wear her dress she could take it
5 off and put on a -- especially this time of year -- a
6 t-shirt, and I made sure I had a pair of I would call
7 gym shorts that were small, men's smalls she could get
8 into them.
9     Q If you know, did she turn on the air
10 conditioner in her apartment?
11     A Yes.
12     Q All right. Did she tell you?
13     A Well, excuse me. No. I don't believe she
14 did. I don't believe she did.
15     Q Now, how long was she up in the apartment, do
16 you know?
17     A It was a very short period of time, excuse me.
18 It was a very short period of time.
19     Q Did she tell you why she didn't change her
20 clothing?
21     A Because it was late, later than we thought.
22 She wanted to get settled in comfortably to watch the
23 show and also she knew she could change at my house.

**Page 175**

1     Q What was the show you wanted to watch?
2     A ER.
3     Q She was up in her apartment for approximately
4 how long would you say?
5     A Certainly no more than ten minutes.
6     Q Now, she came down from her apartment --
7     A Uh-huh. Yes.
8     Q -- dressed as she was when she went up there
9 originally?
10     A Yes.
11     Q Got back into your car?
12     A Yes.
13     Q What happened from there?
14     A We drove to my house on Grant Avenue.
15     Q And about how long did that ride take?
16     A Well, if you obey all the lights and stop
17 signs it's maybe three minutes, four minutes.
18     Q Approximately what time did you arrive at your
19 house on Grant Avenue?
20     A ER had started but just barely.
21     Q Okay. So that would place it at shortly after
22 ten o'clock?
23     A That is correct.

**Page 176**

```
 1   Q  What happened?  What did you do and what did
 2  Anne Marie do when you got back to your house, or you
 3  got to your house at Grant Avenue?
 4   A  My house was cool enough that --
 5   Q  Excuse me, Tom.  Where did you park your car?
 6  I'm sorry.  Where did you place your
 7  automobile?
 8   A  In the garage.
 9   Q  Okay.
10   A  And on that point, my garage was so narrow
11  that if I pulled in it was almost impossible for
12  somebody on the passenger seat to get out.  So Anne
13  Marie would get out of the car, as my kids did and
14  anybody did, before I pulled in and then I pull in and
15  she walked in after me.
16   Q  So Anne Marie got out of the car.  You pulled
17  into the garage?
18   A  Yes.
19   Q  And you did what then?
20   A  Then we went up those stairs that were
21  depicted and into the great room.
22   Q  All right.  What happened when you were in the
23  great room?  What did you do?
```

**Page 177**

```
 1   A  Well, my air conditioner had been on all day.
 2  It was very cool.  And we watched ER.  We watched ER.
 3   Q  Did anyone change their clothing or --
 4   A  Actually Anne Marie took off her pantyhose
 5  just for the sake of being more comfortable.  She did
 6  not bother changing into any other clothes because it
 7  was cool enough.  She was comfortable enough.
 8       I just took off my suit coat and tie.  I
 9  didn't need to change into shorts either.  We both took
10  off our shoes.
11   Q  Where were you situated while you were
12  watching ER?  Who was where?
13   A  We were seated, situated a couple different
14  spots.  I typically would sit in the daddy chair.
15   Q  That's the recliner?
16   A  The recliner.  I will call it that from now
17  on.  And Annie would stretch out as best she could on
18  the love seat.  It was a love seat.  It was not a sofa.
19  It was not a sleeper couch as some people have said.  It
20  was not -- it was big enough for her to lie down on but
21  only with her knees pulled up.  You could not stretch
22  out the length of your body.  It was not that big.
23       Now, during the course of the TV show, you
```

**Page 178**

```
 1  know, at one point I went off and sat on the couch with
 2  her and she might lay her head on my shoulder or
 3  something like that.  And we definitely did do that.  It
 4  was pretty much how it was going at the end of the show.
 5   Q  All right.  And you watched the entire show
 6  with her?
 7   A  Yes.  Although Anne Marie, as Anne Marie
 8  always did, well, most of the time did, Anne Marie often
 9  falls asleep in front of television and never sees the
10  end of an eleven o'clock show because she wakes up so
11  early in the morning.  At one point Anne Marie fell
12  asleep and I didn't wake her up.  So I saw the entire
13  show and she did not.  I did wake her up for the end.
14   Q  Could you move without waking her up?  Could
15  you get up or down without waking her up?
16   A  Yes.  Yes.
17   Q  The show ends, correct, at eleven o'clock?
18   A  Yes.
19   Q  After the show ends, what did you do?
20   A  Well, I heard the phone ringing some time
21  during the show.  I didn't bother answering.  I
22  suspected it was Debby because I had told Debby I would
23  probably see her later that evening.  And it was not at
```

**Page 179**

```
 1  all unusual for Debby to come over say eleven o'clock at
 2  night and spend the night, especially during the summer
 3  when her kids were out of school.  And so at the end of
 4  the show, and I remember how that show ended, but at the
 5  end of the show, I got up to use the powder room and
 6  there was a small study across from the powder room, so
 7  I checked my voice mail and, sure enough, there was a
 8  message from Debby.
 9   Q  I'm sorry.  Go ahead.  Weren't you concerned
10  she would come over?
11   A  No.  Because I think -- I mean, what I figured
12  was that, you know, Anne Marie and I might, you know,
13  hang out to the end of the news.  Then I might take her
14  home.  Sometimes we would both fall asleep.  There were
15  literally times when she would wake up at 1;30, two
16  o'clock in the morning and we were both sound asleep,
17  and she would come over and kick me and say come on,
18  Capano, you got to drive me home.  Sometimes she did
19  spend the night.
20       Where was I?
21   Q  Talking about the phone call.  You went into
22  the --
23   A  I called -- I checked the voice mail, and as I
```

**Page 180 (top-left column)**

1  suspected it was a call from Debby, and I did call her
2  back from the study. And we had a brief and not
3  pleasant conversation. She started on her normal
4  Tatnall subject, which was something that always was a
5  red flag before my eyes. And she said, can I come over
6  now? And I said not right now, you know. I've got
7  company. It will have to be later or something like
8  that. And I just hung up.
9      Q  About what time was that, Tom?
10     A  The end of ER. I mean, ER ends at 11. I went
11  to the men's room and, you know, maybe five after 11,
12  and the call lasted a couple of minutes.
13     Q  And after you made that phone call to Debby,
14  what did you do?
15     A  I went back into the great room and made sure
16  Annie was awake, hadn't fallen asleep again, and we both
17  sort of stretched out on the love seat, and we were
18  actually -- we were just talking about a few things.
19     I knew we both had off the next day and we
20  were talking about that. And she really did tell me she
21  might be going to the beach with Kim or going to the
22  outlets and talking about my potential golf game, and
23  then I figured I'd be taking her home in the next --

**Page 181 (bottom-left column)**

1  probably by the end of the news, let's say, or she might
2  decide to stay as long as the beginning of Letterman.
3  But, you know, I was just -- we were winding down the
4  evening.
5      Q  You say you were off the next day?
6      A  Yes.
7      Q  Tell us about that.
8      A  I had planned to take off at least from Monday
9  on, maybe even I decided before that because I had such
10  a rough week, and I knew that I had gotten the bulk of
11  my work done, that, although there were follow-up things
12  to do, I could get other people to do them for me in the
13  office on Friday, and, well, I felt like I deserved and
14  needed a day off.
15     And I first tried to schedule a golf game with
16  Keith Brady and he was going to lawyer school. And
17  then, as Kathy Dewechter said, I think Dave McBride, who
18  coincidentally called me on Thursday, that Thursday, and
19  she came into the conference room where I was closing
20  this deal for the city and said that he was on the phone
21  about playing golf the next day. So we made -- Dave and
22  I made tentative arrangements to play golf the next day.
23     Q  If you know, had Anne Marie made plans to take

**Page 182 (top-right column)**

1  the following day off, Friday off?
2      A  Yes. She clearly had made plans to take the
3  day off, and in so far as what she told me there were
4  two options, either going to the shore with Kimmy or
5  going to the outlets and going shopping.
6      Q  Okay. Now, it's now five past 11?
7      A  About.
8      Q  You and Anne Marie are in the great room?
9      A  Yes.
10     Q  You're on the love seat?
11     A  Yes. Actually, yes.
12     Q  And did you see -- you said you stretched out
13  on the love seat?
14     A  No. Well, we didn't lie down next to each
15  other. I don't mean to give that impression. We were
16  sitting right next to each other and stretched out. Our
17  legs were stretched out straight.
18     Q  Okay. She had her head on your shoulder?
19     MR. CONNOLLY: Your Honor, this is very
20  critical. I don't think itr is appropriate to lead.
21     MR. OTERI: I understand.
22  BY MR. OTERI:
23     Q  What was her position in relation to you on

**Page 183 (bottom-right column)**

1  that couch?
2      A  She was to my left.
3      Q  To your left?
4      A  And adjacent to my body.
5      Q  Any parts of her body touch with your body?
6      A  Yes.
7      Q  Describe that for us.
8      A  Pretty much her entire right side.
9      Q  And where was her head if you remember?
10     A  At that point I think she had awakened enough
11  that she was -- her head was just up in a sort of a
12  normal position, and sometimes she would lean over on my
13  shoulder and sometimes look straight.
14     Q  You were not -- were you engaged in any form
15  of --
16     A  No. No.
17     Q  -- kissing or anything?
18     A  No. No. Not that way.
19     Q  All right. What happened next, sir?
20     A  Well, the next thing I knew Debby MacIntyre
21  was in the room. She must have entered the front door.
22  She had a key to my house as I had a key to her house.
23  I even had a garage door opener for her house. And she

**Page 184**

1 was pretty ballistic at the time.

2 Q Where did she come from do you know?

3 A I found out later.

4 Q How did she come in, do you know, the front

5 door?

6 A Through the front door with the key she had to

7 my house.

8 Q She came in through the front door. Where

9 would you have to go through to get to the great room?

10 A Come in the front door, down a couple of

11 steps, turn left, go through that narrow hallway through

12 the kitchen, and then into the great room.

13 Q So do you remember, if you know, where Debby

14 came from then?

15 A Yes. I'm sorry. I didn't understand the

16 other question. She came -- she had come through the

17 kitchen and had entered the great room from that area.

18 Q When she came in from the kitchen to the great

19 room --

20 A Yes.

21 Q -- where were you?

22 A On the love seat with Anne Marie.

23 Q And where did Debby come to, or where did she

**Page 185**

1 go to?

2 A We didn't even hear her come in because of the

3 noise of the air conditioner.

4 Q Did you have the TV on?

5 A Yes. And Debby also has a very soft tread.

6 She's a very small lady, and we didn't realize she was

7 there until she started yelling.

8 Q Where was she standing when first you saw her?

9 A I heard her before I saw her. She was yelling

10 as she got closer to the love seat. And then I saw her

11 standing more or less at the end of the love seat. And

12 yelling.

13 Q Okay. So as she came in, your back would be

14 to her?

15 A Correct. Then she came up, came up along my

16 side.

17 Q What side of the love seat did she come to, if

18 you remember, the right or the left?

19 A The right side if you're looking at the

20 television.

21 Q Right. And what happened when she arrived at

22 that right side of the love seat?

23 A She got very upset. She was yelling, who's

**Page 186**

1 this? What is this all about? Is this why you couldn't

2 see me? And she was, as I kind of noticed during the

3 eleven o'clock call -- Debby held two full-time jobs at

4 Tatnall, which again was a red flag for me -- and she

5 was under an incredible amount of stress. She had no

6 support at all from the headmaster. She was -- she also

7 had some other pressures around that time, but

8 particularly from her job. And so she was snapping out

9 about why I was there with another woman, because as far

10 as she was concerned, you know, basically I was spending

11 all my romantic time with her. So all this is sort of

12 coming out and I'm trying to say, relax. Let's slow

13 down. I mean, Anne Marie and I are friends.

14 Q Let me interrupt you for a second.

15 A I'm sorry.

16 Q That's okay. When Debby came in, do you

17 remember what she was wearing?

18 A I know she had on a t-shirt and some kind of

19 shorts and carrying a little something.

20 Q Was she carrying something?

21 A Yes.

22 Q What was that? Was that something a purse or

23 do you know what it was?

**Page 187**

1 A I wouldn't call it a purse. It was a little

2 -- I don't know if it's straw or what it's made of,

3 something that, you know, a woman might carry around in

4 the summertime for personal stuff.

5 Q Okay. And where were you when she got to the

6 right end of the love seat and was hollering? What did

7 you do?

8 A Well, first I just was shocked and I turned to

9 her and I said whatever I said, and then I thought to

10 myself, oh, boy, what a situation.

11 And then I was listening to Anne Marie saying

12 to me, you know, Capano, what the hell is this? And I

13 said -- I was turning to Anne Marie to try to explain,

14 you know, hold up. And I got up. I stood up and to

15 face Debby. And Anne Marie in the background was

16 muttering about, you know, I don't want to put up with

17 garbage like this. And she actually had gotten her

18 pantyhose from wherever she had thrown them or put them

19 on the table, and she said I want to go and I want to go

20 now. And she started to put -- I was glancing back and

21 forth between Anne Marie and Debby. And Annie was in

22 the process of pulling her pantyhose up and getting her

23 shoes.

1  Q  You were standing?

2  A  Yes.

3  Q  And Annie was --

4  MR. CONNOLLY: Objection.  Leading.

5  THE COURT:  sustained.

6  BY MR. OTERI:

7  Q  What was your position, sir, at this time?

8  A  I was standing.

9  Q  Where was Anne Marie in relation to you?

10  A  Anne Marie was to my right and Debby was more

11  or less in front of me, maybe off to the left a little

12  bit.

13  Q  Now, what was Anne Marie doing, if anything,

14  if you know at this time?

15  A  As I said, she was pulling on her pantyhose

16  and, you know, she wasn't screaming at me but she was

17  making it quite clear whatever was going on here was,

18  you know, ridiculous and she wanted no parts of it and

19  she wanted to go home immediately.

20  Q  What was Debby doing?

21  A  Debby was off the wall.  Debby, I had known

22  Debby a long time.  Debby was completely snapped.  She

23  was all red from the neck up.  She was not coherent.

Page 189

1  She was -- I'm trying to explain to her, you know, look.

2  This is not what you're trying to make it out to be.

3  Anne Marie and I are friends.  You know I have female

4  friends.  Stuff like that.

5  She wasn't listening to anything I said.  And

6  she was -- she was starting to cry and she was saying,

7  you know, all these years I've waited for you and things

8  that were -- just didn't need to be said.  I mean, that

9  was the nature of the conversation.

10  Q  How long did this incident take?

11  A  Which incident?  I mean, what part of the

12  incident?

13  Q  From the time she came in until the time

14  you're just telling us about this hollering and --

15  A  From the time she started hollering as soon as

16  she came in into the great room.  Again, it was before I

17  even saw her.  I could hear her, as could Anne Marie.

18  Q  All right.  Did something happen after you

19  stood up and there was --

20  A  Yes.

21  Q  -- this conversation?  Tell the jury what

22  happened?

23  A  Debby shot Anne Marie.  And it was absolutely,

Page 190

1  positively, and certainly accidental.

2  Q  Tell the jury what happened, Tom?

3  A  She had bought this gun which she claims she

4  gave to me, but she had bought this gun in May for

5  self-protection.  And she particularly made a point of

6  having it with her if she went any place at night.

7  Debby frightened very easily.  And so she must have had

8  the damned thing in her little carry thing, and the next

9  thing I know I see the gun in her left hand.  Debby is

10  left-handed.

11  And she's -- Anne Marie even saw it and said,

12  oh my God, like making fun of it.  I couldn't even take

13  it seriously.  She never threatened me; she never

14  threatened Anne Marie.  She basically said things that

15  were suicidal.  You know, that after all this time if I

16  can't have you and if you want somebody younger and

17  prettier and all that sort of stuff, she said I have

18  nothing to live for.  I might as well shoot myself.

19  This is all the talk of somebody who had lost it.  So --

20  Q  Where was the gun while she was doing this?

21  A  The gun was in her left hand which was down.

22  I didn't think it was in any kind of threatening

23  position.

Page 191

1  Q  Not pointed at you or Anne Marie?

2  A  No, no.  Excuse me.  No.  It was not.  And

3  again, I looked in Anne Marie's direction to see how far

4  she was getting, and when I looked back to Debby, the

5  left arm was coming up and I thought, oh my God, she's

6  going to shoot herself.  And so I reached out with my

7  right hand to grab her left hand to pull the gun away

8  from herself.  And as I did that, a shot went off.  And

9  I couldn't believe it.  And she couldn't believe it

10  either.

11  Because, as she told me later, she was really,

12  although she had snapped, she didn't have any -- she

13  didn't have any ammunition in the gun.  She didn't have

14  a clip in the gun.  But she had something, obviously had

15  something someplace in the gun because it came out.  But

16  I know because I looked.  The clip part was empty.

17  Well, you know, after the shot we were both

18  just sort of couldn't believe it.  And, you know, and I

19  didn't hear anything from Anne Marie.  So I looked back

20  to Anne Marie and she was motionless on the sofa.  And I

21  said, no.  This can't be possible.  And I checked her

22  and sure enough she had a head wound on the right side

23  of her head near her ear.  And I thought -- I thought,

Page 194

1 my own life flashed before my eyes, and I always thought
2 I was a guy with some guts and I wasn't. And I'm just
3 being selfish too to protect myself and also to protect
4 Debby. And so since I knew the paramedics could not do
5 anything, I knew Anne Marie was dead, I chose not to
6 call the paramedics or the police but to protect myself
7 and to the extent that I could and to protect Debby.
8     Q  So I understand this, Debby had the gun in her
9 left hand?
10     A  Yes.
11     Q  You reached up your right hand, grabbed the
12 gun?
13         MR. CONNOLLY:  Your Honor, again, leading.
14         MR. OTERI:  Just repeating.
15 BY MR. OTERI:
16     Q  Tell us again, if you would, what happened?
17     A  Debby is left-handed. She was facing me and
18 she put this little thing down. There were tables at
19 each end of the love seat. She put this little thing
20 down again on the table, a round table my sister had
21 given me, and at some point, I didn't see her pull the
22 thing out but I know it's obviously where she got it
23 from. And I don't know.

Page 193

1 well -- then I became a wreck. Debby became a wreck
2 too.
3         And I started what I knew of CPR, I know the
4 basics, of Anne Marie. I started on the love seat and
5 then I pulled her down to the floor and I tilted her
6 head. I made sure her tongue wasn't blocking anything
7 and at first I couldn't believe that. I mean, I thought
8 she was just going -- sort of like smacked her a little
9 bit in the face, Annie come to, come to. I was acting
10 like she just fainted. And but then I did start CPR.
11         I'm not certified but I think I know the
12 basics of breathing into her mouth and pumping her
13 chest, the heart area. And there wasn't any -- I
14 checked for a pulse; there was none. I checked for
15 breaths; there was none. I checked her eyes. Her eyes
16 were open. There was no reaction. I even got Debby
17 involved in the CPR efforts. You know, that she was
18 straddling Anne Marie and doing what you do in the heart
19 area, and I was the one that was doing the breathing
20 part where you pinch the nose and breathe in.
21         At some point I know I put one of the small
22 pillows under Anne Marie's head, and while Debby was
23 continuing, I jumped up and got the flashlight that was,

Page 195

1         What was the rest of the question?
2     Q  What did she do after she pulled this thing
3 out in her left hand?
4     A  Well, what I just described in terms of I mean
5 she was talking about killing herself. I reached with
6 my right arm, you know, to grab her so at least to stop
7 the arm movement and, well, although as I said before,
8 it's true, Debby is very strong, to try to get it down
9 to the ground or at least make her try to drop it
10 altogether. At that time I did not realize that the
11 clip was not in the gun.
12     Q  Did you succeed in gripping her arm?
13     A  I succeeded in gripping her arm but then the
14 shot went off.
15     Q  Now, sir, after you performed the CPR on Anne
16 Marie --
17     A  Yes.
18     Q  -- and you determined she was dead, what did
19 you do next? What time was this if you can give us an
20 estimate?
21     A  This is probably around 11:30, 11:35.
22     Q  What did you do next?
23     A  That half hour seemed like a lifetime. It was

Page 193

1 you know, very handy in the kitchen. Brought it back
2 because the lights -- the only -- we didn't have a lot
3 of light in the room at the time. And I used a
4 flashlight to see if there's any reaction, if her pupils
5 would dilate -- or were they opposite of dilate? No.
6 Dilate. And they didn't.
7         Now, I'm in a state of shock. So you got two
8 people in a state of shock and one person who is dead.
9 And we worked on -- we worked on the CPR part as long as
10 we thought there was any chance and came to the
11 realization that there wasn't any chance.
12     Q  Did you call 911 or anybody else?
13     A  No. Most cowardly, horrible thing I've ever
14 done in my life.
15     Q  What did you do after you determined that Anne
16 Marie was dead?
17     A  It was like my whole life flashed before me.
18 If you're in a situation like that you just start --
19 everything is, oh my God. You know you're dealing with
20 the shock of what's happening and you don't believe it.
21 You really and truly don't believe it.
22         And Debby is crying and she's hysterical, and
23 I want to calm her down, and I'm thinking of, as I said,

**Page 196**

1  roughly about a half an hour. Debby had dropped the gun
2  and I got possession of the gun. And I also -- I also
3  tried to comfort her. I also got later, when I walked
4  her to her car, I got the clip that went to the gun.
5  Q  Where was the clip that went to the gun?
6  A  I'm sorry?
7  Q  Where was the clip that went to the gun?
8  A  In the car.
9  Q  In Debby's car?
10  A  Yes.
11  Q  Go ahead. How did you get it?
12  A  Well, I told her to give it to me, and while
13  she was willing to carry the gun around, she didn't want
14  it loaded. Again, because of kids and she was most
15  concerned when she was out at night alone. So anyway
16  that's the decision she had come to keep them separate.
17  Keep them close enough so if she needed them she could
18  use them.
19  Q  And you put Debby in her car?
20  A  I tried to comfort Debby. I told her that,
21  you know, obviously it was an accident, and I told her
22  it was all my fault. It wasn't her fault. That if I
23  had been honest with her and told her that I was seeing

**Page 197**

1  Anne Marie, and the basis on which I was seeing her,
2  that she would not have reason to snap.
3       But, you know, I also knew that Debby had said
4  earlier she had been dating other people. She had not
5  dated anybody since the summer of '95 when it was clear
6  that Kay and I were going to separate, at least up to
7  this point and then even after that.
8  Q  Speak into the mike.
9  A  She had not been dating anyone. She had been
10  expecting our relationship to become more permanent in
11  nature. And she had been expecting that since the
12  summer of '95.
13  Q  Now, it's approximately 11:30. Is that
14  correct? Debby has left?
15  A  Approximately.
16  Q  Right. Debby has left. What do you do?
17  A  I break down.
18  Q  All right. And when you say you break down,
19  describe what happened to you?
20  A  I fell apart, and I cried and I screamed at
21  myself, and I punched the wall, and after about five
22  minutes of that, I did something I'm capable of doing.
23  I compartmentalized. And then just I said I have to do

**Page 198**

1  something. What am I going to do? What am I going to
2  do? And the first thing I have to do is take care of
3  Anne Marie's body.
4       And I went downstairs and I did get the cooler
5  and it was where I said it was. I also had the choice
6  of a brand new -- which was bigger -- the brand new
7  garbage can but that didn't -- I couldn't bring myself
8  to, even though we're talking about a corpse, I couldn't
9  bring myself to do that. So I brought -- instead of
10  carrying Anne Marie downstairs, I brought the cooler
11  upstairs, and I also brought and I put Anne Marie in the
12  cooler and I wrapped her in a -- we had blankets, cotton
13  blankets in the great room, and I wrapped her in one of
14  those.
15  Q  What was she wearing when you put her in the
16  cooler?
17  A  The same outfit she had worn to dinner. And
18  she and her shoes were in there and eventually I put the
19  gun in there but not after the lunacy of what happened
20  over the next 15 minutes or so.
21  Q  All right. How long do you estimate that this
22  took you to get the cooler, put the body in, put her
23  body in it?

**Page 199**

1  A  Five to ten minutes.
2  Q  Did you eventually leave your Grant Avenue?
3  A  Yes.
4  Q  About approximately what time did you do that
5  do you know?
6  A  Well, all I know is that the star 69 call that
7  I've read and you guys told me was at 11:52 I made from
8  Anne Marie's apartment. And for some insane reason, I
9  actually had the gun in my possession, and I put the gun
10  underneath the front seat of my car.
11       And, well, I'd forgotten to mention that I had
12  -- despite what was said on the witness stand, Anne
13  Marie had seen the gift from Talbots. Once she saw the
14  box from Talbots she knew exactly what it was. She was
15  very happy. And she opened it up and she didn't break
16  the gold seal. She never broke the gold seal. She
17  looked and confirmed what it was and just gave me a very
18  big smile. Showed she was very happy. And I imposed
19  one condition on her. But I guess I'm beyond that about
20  that outfit.
21       But for some reason I went on. I think I said
22  I can compartmentalize things. If you want to call it
23  on automatic --

Page 202

1    Q  Will you speak up, please?

2    A  Automatic pilot, that idiot automatic pilot.

3  I felt as though, which in retrospect I didn't need to

4  do of course, I felt as though I had to go to her

5  apartment and bring over the gift and bring over the

6  perishables that were in my refrigerator like the

7  strawberries and the bananas and what else.  Anyway, I

8  had something else I thought to bring over with me.

9       I did make that star 69 call.  I wanted to

10  find out if I was the last one she had spoken to.  And,

11  you know, I forgot star 69.  My confusion -- star 69

12  used to tell you a number.  Now it just connects you

13  automatically.  And I heard a man's voice answer that I

14  didn't recognize, so I realized I was not the last one

15  that had called her, so I put the phone down, put the

16  perishables in the refrigerator.

17       I did go into her room.  I did turn her air

18  conditioner on.  I did not touch her bed.  I did not go

19  through her closet.  And her closet, if in fact it was

20  in the condition that some people have described, it's

21  probably because when she got home from the doctor, who

22  was gauging her financially, and going out with me,

23  knowing Anne Marie, she probably wanted to take a shower

Page 201

1  first and change outfits is my guess.  So she was

2  probably in a hurry.  I left the gift there.  I left the

3  food there.  Then I left and went back to Grant Avenue.

4    Q  Was there any kind of a horrible smell in the

5  apartment?

6    A  No.  In Anne Marie's apartment?  No, not at

7  all.  The only thing you could possibly smell was some,

8  you know, good smells from the doggy bag.

9       MR. OTERI:  Your Honor, this may be an

10  appropriate time.

11       THE COURT:  All right.  Members of the jury,

12  you've heard the defendant testify in part today about

13  the incident.  I want to again caution you not to

14  discuss this case with anyone, including yourselves,

15  until you've heard all of the evidence in this case,

16  until you've heard the arguments of counsel, and you've

17  been instructed concerning the law.

18       I'm going to excuse you.  Again, if you come

19  into contact with any information, please notify the

20  bailiff when you come in tomorrow.  Come in at ten

21  o'clock.

22       Please take the jury out.

23       (The jury left the courtroom at 4:59 p.m.)

1       THE COURT:  Counsel in chambers at 9:30

2  tomorrow morning.

3            We'll stand in recess until ten.

4            (Court recessed at 4:59 p.m.)

Page 203

1  NEW CASTLE COUNTY

2  STATE OF DELAWARE

3

4            C E R T I F I C A T E

5       We, Alexis B. Finlan and Jeanne Cahill,

6  Official Court Reporters of the Superior Court, State of

7  Delaware, do hereby certify that the foregoing is an

8  accurate transcript reported by us in the Superior Court

9  of the State of Delaware, in and for New Castle County,

10  in the case herein stated, as the same remains of record

11  in the Office of the Prothonotary at Wilmington,

12  Delaware, and that we are neither of counsel nor kin to

13  any party or participant in said action, nor interested

14  in the outcome thereof.

15

16       WITNESS my hand this      day of

17  1998.

18

19  _____      _____

20  Jeanne Cahill           Alexis B. Finlan

21  Official Court Reporter   Official Court Reporter

22

23

1 something, so that's why I asked Gerry if he could
2 give me the 8,000 in cash, which he did on the 14th
3 of February.
4       No, no, no, I'm sorry. I wrote him --
5 this is just -- as I understand this sheet of paper,
6 I wrote a check to Gerry payable to Gerry for $8,000
7 apparently dated February 14th. I think that's what
8 this says.
9       MR. OTERI: May we have this marked
10 please?
11      MR. CONNOLLY: No objection, Your Honor.
12      THE COURT: Since there is no objection,
13 it will be marked as Defendant's Exhibit Number 98.
14      THE CLERK: So marked.
15      THE COURT: Thank you.
16      (CHECK, Defendant's Ex. 98 in Evid.
17 received and marked)
18 BY MR. OTERI:
19      Q. Now, Tom, after June 27th, 1996, did you
20 ever tell anyone the truth about what happened that
21 night prescinding from attorneys and attorney-client
22 privileged conversations?
23      A. And prescinding from any other kind of

Page 153

1 privilege too, right?
2      Q. Right.
3      A. No, I never told anyone.
4      Q. Did you ever tell a partial truth about
5 what happened to anyone after that time?
6      A. Around the time of June 27th?
7      Q. No, about what happened on June 27th.
8 Did you ever tell --
9      A. At any time all the way up to now?
10      Q. Right.
11      A. Only in terms of hypotheticals, with
12 theories or alternatives.
13      Q. Did you ever have conversations with your
14 brother-in-law Lee and your sister Marion concerning
15 what happened that night?
16      A. Yes.
17      Q. Did you tell them the total truth?
18      A. No; I only told them basically one thing.
19      Q. What was that?
20      A. Now, this is in Stone Harbor, and I
21 walked up to the house --
22      Q. When is that, do you know, time frame-
23 wise?

1      A. Time frame-wise it's what I would call
2 the 4th of July weekend.
3      Q. Of '96?
4      A. Yes. Their house is about ten blocks
5 away from my mother's in Stone Harbor, so I walked
6 up, and we were sitting I remember on the second
7 floor deck, and Marion was making a very lot of wise
8 observations, as she often does, and Lee was talking
9 to me about talking to the police.
10      I just said, "Well, I don't think I can
11 do that right now." And he said, "Well, you really
12 should." And I told them both that there was someone
13 I was protecting, and I left it at that.
14      Q. You did not tell them who?
15      A. No, I did not, and I did not tell them
16 there were two people. I just said there's someone
17 I'm protecting.
18      Q. You did not tell them what had happened
19 to Anne Marie Fahey?
20      A. Absolutely not.
21      Q. You merely stated that there was someone
22 you were protecting.
23      A. Yes.

Page 155

1      Q. Now, sir, from the time of this incident
2 occurring on the 27th, up until today, again
3 prescinding from your attorney-client privilege and
4 other privileged conversations, have you told anybody
5 the whole truth about this matter?
6      A. No.
7      The closest I've done is write things to
8 friends in a hypothetical manner or this is a theory
9 that I've heard, tell me what you think of it. I've
10 never, never, never said to anyone before testifying
11 in this courtroom exactly what happened that was not
12 a privileged conversation.
13      Q. Do you use hypotheticals to mask, to
14 protect the people you're writing to from the --
15      A. That's exactly why I do it, and I even, I
16 think, if not all, in some of the letters I said
17 "Look, I do not want to turn you into a witness about
18 anything, so, you know, please assume that anything I
19 say here is just hypothetical and has nothing at all
20 to do with the real facts of the case."
21      Q. By hypothetical, you mean pretend or make
22 believe?
23      A. Yeah, and I'm asking your opinion about

1   Identification M and ask you to take a look at it. Do
2   you recognize that?
3       A. No.
4       Q. Can you read it?
5       A. I see what it says, but I don't recognize it.
6   I have never seen it.
7       Q. That's the trial transcript from the Squeaky
8   Saunders case; correct?
9       A. Sure.
10      Q. And if you would look to page two.
11      A. Page two. This first one starts D-143.
12      Q. Correct. If you would look to line 20, it
13  says, Mr. Capano, the State calls Special Agent Bobby
14  D. Blackburn; correct?
15      A. That's what it says.
16      Q. And then on line 22 it indicates that Special
17  Agent Bobby D. Blackburn began his testimony; correct?
18      A. Yes, it does.
19      Q. And if you turn to page D-144, the next
20  page --
21      A. Yes.
22      Q. -- you are asking the questions during this
23  examination; correct?

Page 18

1       A. Yes, I am.
2       Q. And you asked on line nine of page D-144,
3   question, what are your duties with the Federal Bureau
4   of Investigation; correct?
5       A. Correct.
6       Q. And then Special Agent Blackburn answered on
7   line 11, answer, I'm assigned to the FBI Laboratory,
8   which I am presently assigned as instructor in
9   firearms identification at the FBI Academy; correct?
10      A. That's right.
11      Q. And then on the next page, D-145, line 20, in
12  response to one of your questions, Sergeant -- or
13  rather Special Agent Blackburn indicated what firearms
14  identification involves, including the ability to
15  identify bullets, cartridges as having been fired by a
16  particular weapon to the exclusion of all weapons;
17  correct?
18      A. Yes.
19      Q. So having refreshed your recollection, do you
20  recall now whether or not you have, in fact, examined
21  a firearms expert in the past?
22      A. Based on reading that transcript, it is
23  obvious that I have.

Page 19

1       Q. So does it make sense to you that a firearms
2   expert could corroborate or establish whether or not a
3   particular weapon had a hair trigger?
4       A. Yes, that makes sense to me.
5       Q. Does it make sense to you that a firearms
6   expert could determine whether or not a particular gun
7   had a defect in it?
8       A. Yes, that makes sense.
9       Q. And so if somebody was claiming that an
10  accidental shooting occurred, a firearms expert could
11  corroborate whether or not a particular gun might have
12  discharged accidentally; correct?
13      A. Yes, but none of those thoughts entered my
14  mind on June 27th. I was in a panic.
15      Q. Well, you were in such a panic that within 20
16  minutes of Anne Marie Fahey dying in your great room,
17  you were sufficiently thinking in a clear fashion to
18  go to her apartment and to leave a gift box and
19  groceries to establish that she had been to her
20  apartment; correct? You testified to that yesterday?
21      A. No, I didn't. I testified that I did those
22  things and that was not clear thinking. That was not
23  the thinking of a clearheaded person. That was a very

Page 20

1   stupid thing to do.
2       Q. Well, let's stay away from adjectives for a
3   second. How about you were thinking that you could
4   leave a box and groceries in her apartment and that
5   would corroborate any claim that she had been to her
6   apartment; correct?
7       A. Yes.
8       Q. So at least within 20 minutes of her death,
9   you were thinking that?
10      A. Thinking what?
11      Q. That you could corroborate the claim she had
12  been to her apartment by putting groceries and a
13  Talbots gift box in her apartment.
14      A. Yes.
15      Q. And within 30 minutes of her death or 35
16  minutes, give or take a few minutes, according to your
17  testimony, you were thinking that you could create a
18  false alibi by dialing an 800 number to your voice
19  mail system at work; correct?
20      A. That's right.
21      Q. But you weren't thinking that if you got rid
22  of the firearm, it might make it impossible to
23  corroborate or disprove whether or not that gun

Frances White

**Page 21**

1  discharged accidentally or not?

2    A. I don't understand the question.

3    Q. Well, you were thinking of creating a false

4  alibi.

5    A. Yes.

6    Q. You were thinking of putting Anne Marie into

7  her apartment if the police came and questioned you.

8    A. Yes.

9    Q. And you were also thinking that if you got

10  rid of the gun, you would make it impossible to

11  disprove or corroborate what occurred in that

12  apartment; correct?

13    A. No, I don't believe that's the case. I mean,

14  any thinking I was doing that night, as I said, was

15  unclear, the result of panic. And I also have said

16  that it was cowardly and reprehensible. But I wasn't

17  so specific that -- with respect to the gun that I was

18  going through the analysis that you just went through,

19  because that indicates -- you know, that's a clear,

20  very rational analysis. And I was in no condition to

21  do that that night. Basically I wanted to get rid of

22  the gun because I wanted to get rid of the gun.

23    Q. You got rid of the gun for the same reason

**Page 22**

1  Squeaky Saunders got rid of the gun?

2    A. I have no idea if that's the case.

3    Q. Because you knew that without the gun, it

4  would make it a lot more difficult to prosecute you?

5    A. I knew without the gun it would -- it would

6  make it a lot more difficult to prosecute me or

7  Debbie.

8    I would like to clarify something you asked

9  me yesterday.

10    Q. Well, I haven't asked you a question yet.

11  You'll have an opportunity to do that on redirect when

12  your attorney asks you questions.

13    A. Okay, fine.

14    MR. CONNOLLY: Your Honor, at this point I

15  would move into evidence the closing argument from the

16  Squeaky Saunders' case. That has been provided to the

17  defense.

18    THE COURT: Is there an objection?

19    MR. MAURER: Can I have a minute to consult

20  with Mr. Connolly? May I have a moment?

21    THE COURT: You may.

22    MR. MAURER: Your Honor, could we, in fact --

23  it has been provided prior to trial. Could we, in

**Page 23**

1  fact, take the same position with regard to this that

2  we took with regard to the other exhibit and have an

3  opportunity to review it? We did not know it was

4  being offered today.

5    THE COURT: Is there any objection to

6  proceeding that way, Mr. Connolly?

7    MR. CONNOLLY: I'm fine with that, Your

8  Honor.

9    THE COURT: Then we will mark it as State's N

10  For Identification. And you may proceed with it and

11  offer it for evidence at a subsequent time.

12    MR. CONNOLLY: Thank you.

13    MR. MAURER: Thank you.

14    (Volume G, State versus Robert Saunders,

15  marked State's For Identification N.)

16  BY MR. CONNOLLY:

17    Q. Now, yesterday you testified that after Anne

18  Marie threw this $24,000 in cash in your face --

19    A. No. Excuse me. She threw it all at my face,

20  the entire amount.

21    Q. After she threw the entire amount in your

22  face, you took approximately $24,000 of it home;

23  correct?

**Page 24**

1    A. That's right.

2    Q. And you kept it in your closet at Grant

3  Avenue?

4    A. That's right.

5    Q. And you had some of this money on your person

6  when you were arrested on November 12th, 1997. Is

7  that your testimony?

8    A. Money is fungible, Mr. Connolly. I'm not

9  sure whether it was that money or other money. I had

10  money on me, yes.

11    Q. What was your testimony yesterday?

12    A. About?

13    Q. About whether or not you had that money or

14  part of that money in your pocket when you were

15  arrested.

16    A. I don't remember talking about the money in

17  my pocket yesterday.

18    Q. Well, what did you do with the $24,000 then?

19    A. I kept it. I did not put it in the bank. I

20  used it over the course of the next -- until the time

21  of my arrest. I would use it as needed. And there

22  was still -- I hadn't spent it all by the time I was

23  arrested.

**Page 100**

1    Q.   Yet you didn't?

2    A.   No, because the Feds were running the

3  show as of that time.

4    Q.   That letter is dated July 24th, correct?

5    A.   Yeah, which means I probably got it on

6  the 26th, 27th.

7    Q.   It was in your briefcase on July 31st

8  when the FBI searched your house, correct?

9    A.   I don't remember.

10    Q.   Will you accept my word on that?

11    A.   I'll accept your representation on that.

12    Q.   The letter doesn't talk about the

13  involvement of the federal agencies, does it?

14    A.   The letter didn't have to talk about the

15  involvement of the federal agencies. I knew you were

16  in. I knew it was a farce. I knew there was -- you

17  were using this kidnapping, you know, cover, as to

18  why you were in, and the only reason you're in is

19  because the Governor had spoke to the President.

20    Q.   Can you name one person who told you

21  before July 31st that the Feds were involved?  Name

22  one person.

23    A.   I cannot tell you anyone who isn't

**Page 101**

1  privileged. It was in the paper, I believe,

2  Mr. Connolly.

3    Q.   We've already discussed what was in the

4  paper, right?  July 6th it says Clinton offers

5  assistance. July 9th it says the FBI is going to

6  provide assistance but that Wilmington was in charge.

7    You knew the Feds participated in state

8  investigations all of the time, right?

9    A.   I knew that when the Feds were asked, but

10  you guys weren't asked. You know, you blasted your

11  way in and you took over, and you started talking

12  about kidnapping, which was incredulous and stupid to

13  the point where, I mean, you know, we're not sitting

14  in a Federal Court because there obviously never was

15  any kidnapping. So it was a screen because you're

16  not allowed legally to get involved in local

17  investigation, to take it over in such a fashion.

18    Q.   Now, as of late July then, you have

19  refused to go in, notwithstanding an unconditional

20  offer to hear what you have to say?

21    A.   I would have nothing to do with you, or

22  your office, or your agents. Boom. Period. At any

23  time.

**Page 102**

1    Q.   And meantime, your world is getting

2  devastated, right?

3    A.   Right, my world was collapsing, yes.

4    Q.   Your daughters were facing horrible

5  circumstances with all of the publicity, correct?

6    A.   Oh, yes, and you --

7    Q.   Your career took a hit, correct?

8    A.   Yes.

9    Q.   And you remained quiet the whole time?

10    A.   Yes.

11    Q.   And then -- and you have never mentioned

12  at that point that Debbie MacIntyre shot Anne Marie

13  Fahey, correct?

14    A.   Of course not. I was protecting her.

15    Q.   And then February 27th, 1998, after you

16  are arrested, Debbie MacIntyre signs a cooperation

17  agreement with the Government, right?

18    A.   Yes, she does. I didn't hear the date

19  you said.

20    Q.   February 27th, 1998?

21    A.   Yeah, I don't know if that's the date she

22  signed. I know that's the date she went in. For all

23  I know she had signed it the day before.

**Page 103**

1    Q.   You kept quiet at the bail hearing which

2  preceded this, right?  There was a bail hearing in

3  February to decide whether you would stay in jail.

4  You never said she did it, right?

5    A.   I never testified.

6    Q.   But you never said it through any means.

7  You never told your attorneys, you never did

8  anything?

9    A.   No, I was true to my word. I was

10  protecting her.

11    Q.   You were protecting her. February 27th

12  she signs a cooperation agreement with the State?

13    A.   Yes.

14    Q.   And you're in jail?

15    A.   Yes.

16    Q.   You have -- according to your testimony,

17  it's been horrible conditions that you've endured in

18  jail, right?

19    A.   Very terrible.

20    Q.   And you don't do anything until March

21  8th, and on March 8th, you write Brian Murphy and you

22  run by him a hypothetical, right?

23    A.   Yes, because I would never write to

1  Q. Okay. And when you indicate that the
2  portion of Debby's driveway that was obscured to your
3  view from your second floor, you indicated that it was
4  what portion of the driveway?
5     A. It was the entrance to the driveway going
6  maybe halfway up.
7     Q. Okay. All right.
8        Now, we've depicted generally the garage that
9  you've discussed about. Was your view of the garage
10 unimpeded?
11    A. Yes, it was.
12    Q. And did you have any knowledge at that time
13 as to whether or not there were any floodlights
14 illuminating the driveway as one would drive in?
15    A. Debby has lights in -- on her garage door, at
16 the top of her garage door, in the middle.
17    Q. And as far as the street itself is concerned,
18 I'm just going to use this to put L, as far as the
19 street is concerned, are there any street lights?
20    A. There's a street light in front of our house,
21 I would say, to the left of our -- or to the right of
22 our house.
23    Q. Looking out --

1     A. Yes.
2     Q. -- somewhere in this vicinity?
3     A. Yes.
4     Q. So I guess the bottom line of my questioning
5  is, as you looked out your bedroom window in June of
6  1996, do you have any difficulty -- not that it's
7  something that you do normally -- but do you have any
8  difficulty seeing the upper portion of the driveway,
9  the garage and those areas?
10    A. No difficulty.
11    Q. Now, do you recall an incident involving Ms.
12 MacIntyre of a somewhat unusual nature that occurred
13 sometime in June of 1996?
14    A. Yes, I do.
15    Q. Okay. Now, before I ask you about that, I
16 think I already asked you a question -- did you know
17 what type of vehicle she drove back then.
18    A. Um, she drove a black Jeep.
19    Q. Okay. And by the way, did you or did you not
20 know whether Mr. Capano had any relationship with
21 Debby at that time?
22    A. I did not know.
23    Q. Okay. Now, you already indicated that you

1  had, with regard to
2  placing her Jeep in the garage; is that right?
3     A. That's right.
4     Q. Okay. Had you ever witnessed an evening, in
5  terms of your observations, where the Jeep had not
6  been placed into the garage?
7     A. No.
8     Q. You also indicated that you believe Debby had
9  a garage door opener?
10    A. It must be a remote from her car.
11    Q. On what do you base that belief?
12    A. Sometimes Mike and I would be sitting on our
13 front porch and we would see the garage open before we
14 could see Debby's car so we figured it was a remote.
15    Q. All right.
16       Now, the incident that we're about to talk
17 about, can you give us a -- a time of day, if you
18 will, approximately, when the incident we're about to
19 discuss occurred?
20    A. I would say that, to the best of my
21 recollection, it was somewhere between 11:40 and 11:45
22 in the evening.
23    Q. Okay. And how do you place that particular

1  time?
2     A. I had watched the evening news, and when it
3  was over, shut off the lights downstairs, went
4  upstairs to the bathroom, got ready for bed, washing
5  face and normal things people do, and, at that point,
6  I went into our second-floor bedroom.
7     Q. Now, you already indicated you had children;
8  is that right?
9     A. Yes.
10    Q. Your children were how old back in June of
11 1996?
12    A. Seven and a half.
13    Q. Okay. Had you made any internal changes in
14 the house with regard to the children that caused you
15 some concern about the traffic on the roadway?
16    A. Yes.
17       In the fall of '95, when the boys had started
18 first grade, we moved them from a second-floor bedroom
19 that they shared to a two -- third-floor bedrooms
20 separating them for the first time.
21       My son, Danny, got the back bedroom, facing
22 19th Street and my son, Reed, was in the front bedroom
23 facing Delaware Avenue.

1    Q. Did that cause you any concerns in terms of
2  the placement in particular of your son, Reed?
3    A. Yes. At times, Delaware Avenue's traffic can
4  become noisy, especially in the early mornings with
5  the buses, and maybe on the weekends.
6    Q. All right. Now, we just talked about the
7  timing of the incident. You advised that the best
8  you've been able to pinpoint is somewhere between
9  11:40 and 11:45; is that correct?
10   A. That's correct.
11   Q. And that is in the evening that we're talking
12 about?
13   A. Yes.
14   Q. Okay. And you were in the process of going
15 to bed; is that correct?
16   A. In the process of getting ready to go to
17 bed.
18      The next thing I would do as a habit is shut
19 our bedroom windows and then shut the blinds.
20   Q. Okay. And your bedroom, again, is in the
21 front of your home almost facing directly into this
22 driveway; is that right?
23   A. Yes, it is.

1    Q. Could you, and we're going to go back on the
2  timing of this, but right now, as far as the incident
3  itself is concerned, could you relate to the ladies
4  and gentlemen of the jury what you heard and what you
5  observed with respect to Deborah MacIntyre and her
6  vehicle on that evening?
7    A. As I approached the second-floor window to
8  close it, um, I heard a very -- the sound of a very
9  loud vehicle coming up Delaware Avenue from the area
10 of Trolley Square and I remember feeling two things.
11 One thing was annoyance that it wasn't even July 4th
12 yet and already the street was noisy in the evening,
13 and I wondered if it would awaken my son, Reed,
14 worrying a little bit that maybe we shouldn't have
15 moved him upstairs -- pretty young.
16      Then I saw Debby's black Jeep for a brief
17 moment before the tree in front of our house obscured
18 my view and I heard the car turning, it must have been
19 the tires screeching, and Debby pulled into the
20 driveway very quickly, put on her brakes very hard so
21 that the tires squealed and ended up right in front of
22 her garage.
23   Q. Now, can I stop you for just one second

2      Had you observed her drive in that fashion
3  previous to this incident?
4    A. I have never seen Debby drive like that at
5  all.
6    Q. And I interrupted you at the point where you
7  indicated that the car stopped.
8      Could you proceed?
9    A. The car stopped, like I said, very quickly in
10 front of her garage. The garage door did not open.
11 Debby kind of stumbled out of the car in real quick
12 motion.
13   Q. Let me stop you for just a second, too.
14      When you say she stumbled out of the car,
15 were you in a position at that point to be certain
16 that it was Debby?
17   A. Yes.
18   Q. Any question in your mind about that?
19   A. No.
20   Q. Was there anyone else in the car with her?
21   A. No one else got out of the Jeep.
22   Q. And when Debby got out of the Jeep, did she
23 get out of the driver's side or the passenger's side?

1    A. She got out of the driver's side of the car.
2    Q. All right. Now, as she pulls into the
3  driveway, as the squeal comes up immediately in front
4  of the garage, she then leaves the vehicle; is that
5  right?
6    A. Yes.
7    Q. Okay. Now, prior to her leaving the vehicle
8  that you indicated, did she, as was the normal
9  practice, have the garage door come up?
10   A. Yes, and it did not.
11   Q. So on that particular evening, the garage
12 door did not go up you're saying?
13   A. That's right.
14   Q. Okay. Now, you say that she left the
15 vehicle, sort of stumbled out of the car?
16   A. Yes.
17   Q. Could you see what she was wearing?
18   A. I could see from the light, um, a flash of
19 her hair.
20      I do not recall what she was wearing.
21   Q. Could you ascertain or were you able to tell
22 at that point whether she had anything in her hands?
23   A. No, I could not.

Case 1:06-cv-00084-???  Document 23-5  Filed 02/26/2007  Page 24 of 25

1   Q. All right. Did you do anything at that --

2   A. When Debby got out of the car in the manner

3 that she did, she, um -- I heard her kind of issue a

4 terrible kind of an anguished sob as she kind of fell

5 out of the car, and then she quickly ran to the side

6 door of her house. And I waited for a couple of

7 moments because I thought something terrible had

8 happened to her, and even though I didn't know her

9 that well, I wanted to make sure no one was following

10 her or that she would come back out. I just waited

11 for a few moments and everything seemed quiet again.

12   Q. Did you remain at the window any further?

13   A. No. I shut the windows and shut the blinds.

14   Q. Okay. Did anything else of significance

15 occur at that time?

16   A. No, not that evening.

17   Q. Did you just go to bed at that point?

18   A. Um, basically, when my husband came in, I

19 related to him that Debby had just come in really

20 upset and, you know, didn't know what had happened to

21 her, but, um, I let him know that it was very

22 upsetting to me to hear her cry like that.

23   And then we did, yes, go to bed.

1   Q. Now, you referred to this as a -- as a cry of

2 some sort. Could you tell us in terms of loudness or

3 muffled or --

4   A. It was loud, and I don't know if this is

5 going to explain it, when somebody has that wrenching

6 sob, that's how I thought of it.

7   Q. Now, you indicated that you mentioned that to

8 your husband; is that right?

9   A. Yes, I did.

10   Q. Okay. And before I go back again to this

11 subject matter, let me just try to ask you a few more

12 questions about the timing, okay?

13   A. Okay.

14   Q. First of all, how did, if you will, how did I

15 or my office become aware of your existence?

16   A. I called you a couple of days before

17 Christmas.

18   Q. Okay. And did -- without getting into the

19 contents of our conversation, did we thereafter have a

20 conversation?

21   A. We spoke twice by phone and then, um, once in

22 a personal interview at my home.

23   Q. Okay. Did you also speak with someone else

Case 1:06-cv-00084-???  Document 23-5  Filed 02/26/2007  Page 24 of 25

2   A. An associate, yes.

3   Q. Okay. All right. And as a result of our

4 conversations, did you do any checking yourself to try

5 to pin down the timing of when your observation took

6 place?

7   A. I knew that it was in June of 1996.

8   Q. Okay. Let me ask you some specific questions

9 maybe to move things along.

10   You said you knew it was in June of 1996; is

11 that correct?

12   A. Yes.

13   Q. Did you find out when your children were -- I

14 won't say released, but when they got out of school

15 that year?

16   A. Yes. Red Clay finished that year late on

17 June 14th.

18   Q. So you were able to determine and we were

19 able to determine that June 14th was the date your

20 children were released; is that right?

21   A. Yes.

22   Q. Now, you've indicated that you're able to

23 pinpoint this incident that you're testifying about as

1 having occurred in June; is that right?

2   A. Yes.

3   Q. All right. How are you able to do that?

4   A. Well, I thought of it in terms of summer, and

5 if you're a mother, you think in terms of summer when

6 your kids are out of school.

7   Q. Okay.

8   A. I also thought of it in terms of having moved

9 my son, Reed, up to the second-floor bedroom the fall

10 before. This would have been his first summer

11 upstairs in the bedroom.

12   Q. All right. Now, as it relates to the first

13 week in July, okay, and I've drawn up something here,

14 which I think is accurate, let me just fill in some

15 dates here.

16   Would you say that this incident occurred

17 closer to the July 4th time frame or closer to the

18 June 14th when the kids got out of school?

19   A. Closer to July 4th.

20   Q. Now, was there something that was done with

21 your children the first week in July that caused you

22 to be able to say that it was or it wasn't that week?

23   A. Yes. The first week of July would have been

State rests...

1    MR. OBERLY: I would prefer -- I don't know
2 how it works. I didn't put anything -- legal advice
3 in there. It's just biographical information which I
4 assume they have. I don't have any real objection.
5    THE COURT: We're a little past the legal
6 advice stage now.
7    MR. OBERLY: There is nothing of that in
8 there.
9    THE COURT: We're, hopefully, winding down.
10    MR. OBERLY: I have no objection. If he has
11 written something there, I guess it's a legitimate
12 concern.
13    MR. OTERI: We would be provided with copies
14 also?
15    THE COURT: Yes. Charlie -- certainly both
16 sides. I think Charlie indicates he already has
17 copies.
18    MR. OBERLY: It should be 50 pages of stuff.
19    MR. OTERI: There is 49 pages. That would be
20 about right.
21    THE COURT: How close to finishing will we
22 get today?

1    MR. CONNOLLY: We will be short today.
2    MR. WHARTON: We have a number of brief
3 witnesses, but we won't be able to complete our case
4 today, unfortunately, because we have a witness or two
5 not available.
6    THE COURT: You'll complete Monday?
7    MR. WHARTON: Yes.
8    THE COURT: I'm trying to look ahead to
9 prepare for jury sequestration. That's my concern.
10    MR. WHARTON: I think we will finish early
11 today and finish our case early Monday.
12    MR. O'DONNELL: Will there be any reason for
13 surrebuttal?
14    MR. WHARTON: Have you seen any yet?
15    MR. O'DONNELL: No. Maybe a little bit, but
16 not much.
17    THE COURT: There may be some surrebuttal is
18 what you're telling me?
19    MR. OBERLY: Possibly. Very short, but there
20 could be.
21    MR. WHARTON: I think all of our witnesses
22 are designed to respond to things clearly that were
23 raised in the defendant's testimony or the defendant's

case.

1    THE COURT: Well, but there is always that
2 possibility when you bring a witness in to do that
3 they step into some new area. So that possibility is
4 to be kept open. I will presume then we will try and
5 go to arguments on Tuesday.
6    MR. OTERI: May we have a day, Wednesday,
7 just to kind of pull everything together?
8    MR. WHARTON: We will have a short day
9 today. I don't know what you think about that, but we
10 will have a short day Monday. We will finish
11 certainly I imagine well before lunch.
12    MR. O'DONNELL: We got a charge conference to
13 do at some point, too.
14    MR. OTERI: If we could do it Wednesday,
15 Judge, have a day.
16    THE COURT: The problem is waiting till
17 Thursday to do it. That means it may carry into
18 Friday. And that's a long holiday weekend. That
19 means everybody will have to stand by with beepers
20 waiting for the jury. If they choose to deliberate,
21 they -- they don't even have to deliberate on the
22 weekend. They could just check into a hotel and have

1 a good time. That would be my vote.
2    MR. OBERLY: That would be their vote, too.
3    THE COURT: But there will be bailiffs
4 available at all times and a conference room available
5 for them to -- what I'm saying is I would prefer to
6 put them in a situation where they got brought to the
7 courthouse every day and were asked to deliberate a
8 full day. And that's not going to happen if we go out
9 Thursday or Friday.
10    MR. OTERI: If we get Thursday and Friday
11 in -- oh, no.
12    THE COURT: What I'm saying is that if we can
13 complete Monday, take Tuesday off, I'll let you -- can
14 we do argument and charge in one day? The charge
15 doesn't look long to me. Anybody arguing for lessers
16 here?
17    MR. OTERI: Quite frankly, Judge, that's a
18 problem. We have to resolve it. We think we should
19 be arguing for lessers.
20    THE COURT: What's your basis? I mean, the
21 defense theory is that she shot her.
22    MR. O'DONNELL: I don't have the folder with
23 me. Gene and I looked at the cases last week. It

1  seems to be pretty clear there is a basis in the
2  record for lessers if it's requested. The only
3  question I had is whether the Court is obligated to
4  give it if nobody asks for it. That's the law in some
5  states.
6      THE COURT: I don't think that is the law in
7  Delaware, but I'm also at a stage if -- if you don't
8  ask for it and persuade me, I believe the testimony is
9  that she had the gun, the gun discharged in her hand,
10 and his only participation was to reach down and hit
11 the gun. I see no criminal culpability to trying to
12 disarm an armed person. And, therefore, if they find
13 it was an accident, they should acquit.
14     MR. MAURER: Unless we can disabuse you of
15 that, then there will be no lessers.
16     THE COURT: That's really where I am.
17     MR. OTERI: We also have to get his
18 permission. He is -- on the record we should state he
19 advised us on numerous occasions we aren't to ask for
20 lessers. So unless we can get his permission to even
21 make that argument, it's -- it's kind of a waste of
22 time.
23     THE COURT: My belief is if the jury believes

1  his story and finds Deborah MacIntyre was there and
2  possessed the gun and was raising the gun and he
3  reached out to hit it, he is entitled to an acquittal,
4  that he committed no crime in attempting to disarm an
5  armed woman, indeed, because he didn't have anything
6  to do with the aiming of the gun or the discharge of
7  the gun. It was totally in her possession at the
8  time. But if you have -- if you wish to make an
9  argument and can persuade me otherwise, then I'm
10 prepared to hear that.
11     MR. MAURER: Okay.
12     MR. WHARTON: As far as I think who -- what
13 the law is in Delaware about who -- the Court's
14 obligation to give lesser included offenses, if either
15 party wants it or doesn't want it, I think there is a
16 couple cases that deal with that. One of them is
17 Roland Daniels I think.
18     MR. MAURER: Roland.
19     MR. WHARTON: Old friend. And just my -- my
20 recollection of it, because it came up in a case I had
21 not all that long ago, was that whichever -- I mean,
22 either side had veto power. Either side gets
23 automatic lesser includeds upon request. It's based

1  upon whether there is a rational basis in the evidence
2  for it.
3      MR. MAURER: I think I agree with that.
4      THE COURT: I'm just making you aware of my
5  view of the evidence now. And I have given some
6  thought to this. The testimony of the defendant was
7  that she had the gun in her possession. And he
8  reached down and tried to stop her from raising the
9  hand -- there is no evidence that he in any way
10 precipitated the discharge of the weapon -- and -- and
11 that she discharged the gun, that it was an accident.
12 And he has no criminal culpability.
13     Again, that's my view of the evidence. And
14 so I have no intention of giving a lesser included
15 offense unless there is a request and a basis for that
16 request.
17     MR. MAURER: Understood.
18     THE COURT: Are there other areas of specific
19 instruction?
20     MR. MAURER: I'm sure, you know, we will be
21 talking about instructions about accomplices and
22 people given immunity. I read your charge a while
23 ago, but I haven't reread it. The main thing I did

1  note was your preliminary finding was murder first
2  degree was the only crime you would charge on. We may
3  request a charge on abuse of a corpse if we can find
4  some authority, to ask you to consider that.
5      THE COURT: As a lesser included?
6      MR. MAURER: As a lesser included.
7      There are a couple interesting cases over the
8  last year or two where there was actually a charge
9  given not in the indictment. I'm trying to remember
10 the name of the case. I'll find it.
11     MR. WHARTON: It expanded the concept of
12 lesser includeds a little bit.
13     MR. MAURER: They really have. It was
14 against my view of what the courts always did, where
15 they charged a charge not actually in the indictment
16 itself. It was a different charge. I'll pull that
17 case before making that request. You're looking at me
18 quizzically, but I know I read that case.
19     THE COURT: I'm looking at you quizzically
20 because somebody ruled that way.
21     MR. MAURER: Actually the Supreme Court.
22     THE COURT: Oops.
23     MR. MAURER: It wasn't Moorehead.

Case 1:06-cv-00058-SLR Document 236 Filed 02/01/2007 Page 226 of 277

1     MR. O'DONNELL: Young and the first Document 236
2     THE COURT: It's going to read, You must not
3 allow your findings to be influenced by the possible
4 consequences of a given verdict. In our system, the
5 duty of the jury is limited to determination of guilt or
6 innocence except as to the charge of murder in the first
7 degree. Your verdict should not be influenced by
8 reflection upon the result thereof. You should not
9 allow the nature of the punishment, or absence thereof,
10 to enter into your judgment.
11     MR. WHARTON: That doesn't make any sense.
12 Result thereof is the result of the hearing which you
13 just referenced and taken out.
14     THE COURT: Well, except they've already been
15 instructed in the beginning. They know that. We're
16 just not dwelling on.
17     MR. CONNOLLY: Just what I would suggest, I
18 think we can all -- well, is just we have the very first
19 sentence. But we delete, In our system the duty of the
20 jury, we delete that sentence as well. We pick up with,
21 Your verdict should not be influenced upon the result
22 thereof.
23     MR. WHARTON: Result thereof doesn't refer to

1 anything now because we've taken out the antecedent to
2 that.
3     MR. CONNOLLY: It would refer to your verdict.
4 If you leave out -- my point would be, to correct the
5 issue Mr. Wharton has spotted, if we have only the first
6 sentence followed by, Your verdict should not be
7 influenced by the reflection of the result thereof,
8 thereof now refers to verdict.
9     THE COURT: Verdict alone.
10     MR. CONNOLLY: Right. No confusion, and we
11 don't bring in the duty of the jury sentence.
12     THE COURT: What about the last sentence in
13 also?
14     MR. CONNOLLY: Yes.
15     MR. MAURER: Yes.
16     THE COURT: First sentence and the last two?
17     MR. O'DONNELL: Right.
18     MR. CONNOLLY: Yes.
19     THE COURT: All right. Have complied with
20 your agreement.
21     MR. MAURER: Thank you, Your Honor.
22     THE COURT: I always like that.
23     MR. O'DONNELL: Then --

1 particularly when it shortens the
2 instruction.
3     Now, are we ready to address the issue of
4 proposed lessers? Anything we have now is ready to go
5 to the printer.
6     MR. O'DONNELL: We can do that.
7     MR. MAURER: My friend from Florida is going
8 to argue this argument.
9     MR. O'DONNELL: Yes. This is a little bit
10 complicated. And hopefully, I think I can present it in
11 about five minutes if I'm not interrupted. If that
12 helps at all.
13     THE COURT: I'll try not to interrupt you,
14 Jack.
15     MR. O'DONNELL: Okay. It seems to me that,
16 well, we know that the indictment charges first degree
17 murder, which is intentional killing as defined by the
18 instructions committed by a voluntary act of the
19 defendant.
20     We know what his testimony is, which is
21 essentially that he did not do that. There's very
22 little direct evidence in this case concerning the
23 events of June 27. State got a few things but, frankly,

1 most of the strength of their case goes more to
2 substantial planning, the premeditation part which is
3 not something the jury decides now than it does to the
4 question of intent.
5     And conversely, we have evidence that falls on
6 the other side. For example, some of the evidence in
7 favor of the State: Debby MacIntyre says she purchased
8 the gun for him; he denies that; the testimony
9 concerning the extortion that comes from various
10 witnesses and has come in different packages; the
11 cooler, whether it was bought for the purpose the State
12 intends or whether it was bought at Joe Capano's
13 suggestion; whether Tom was a jealous maniac or not.
14     We believe that there's substantial evidence
15 in the record to refute the issue of an intentional
16 killing; namely, the purchase of the Jackson Brown
17 tickets, e-mail connecting -- or asking her to save that
18 date in August; that came out in April or May; the fact
19 that Kay Ryan was surprised to see Tom that morning; the
20 fact that there was no plan to see Gerry and, in fact,
21 Gerry and Louie both say it was only pure luck that
22 Gerry was there; normally, he's at Stone Harbor in late
23 June; Susan testified Tom was fine when she saw him

1 5:30, six o'clock; testimony of various witnesses
2 earlier in the week and on the 27th; Tom was trying to
3 set up a golf game for the 28th; Henry Supinski's
4 testimony that he expected to walk with Tom Capano on
5 the 28th -- all of this evidence cuts against the grain
6 of an intentional killing.
7 We know that under Ward versus State there
8 must be a rational basis in the evidence for you to give
9 lessers. What the Court indicated last week is that the
10 Court is under the belief at this point that either the
11 jury will come back with a verdict of murder in the
12 first degree or, if they accept Tom's explanation, it
13 was an accident for which he has no criminal
14 culpability.
15 It seems to us, and we are specifically making
16 a request that the Court charge in the following
17 lessers; second degree murder, manslaughter, criminally
18 negligent homicide, and abuse of a corpse.
19 THE COURT: I don't believe abuse of a corpse
20 is a lesser, and for that reason, I mean, I don't think
21 you can find anything within intentional -- within the
22 definition of intentional homicide that involves abuse
23 of a corpse. This is a separate offense and therefore

1 I'm not going to charge on that as a lesser.
2 Let's address the others. Excuse the
3 interruption. I didn't want to waste time on that
4 because I wasn't going to buy it.
5 MR. O'DONNELL: At the end, I would like to
6 throw in two cents to complete the record for appellate
7 purposes on that.
8 It seems to me that the jury could well
9 conclude that Tom Capano's action -- if Tom Capano was
10 to be believed, then his reaching out for the arm of
11 Debby MacIntyre is in fact what caused that gun to
12 discharge, which then becomes the proximate cause of
13 Anne Marie Fahey's death. It seems that the jury could
14 conclude under the circumstances as he described them it
15 was reckless, that he had an indifference to the risk of
16 what his action might do, which would support second
17 degree murder, or it was plain and simple reckless which
18 would support manslaughter, or that he simply was
19 unaware of the risk of death by doing that because he
20 didn't see a clip in the gun and, therefore, it was
21 negligently culpable.
22 There is one case that's not exactly on point.
23 Well, I've done most of the research. Gene has given me

1 those cases. In researching those, I tried, couldn't
2 find anything directly on point. I don't know. This
3 state has one case, Zebrowski versus State, that is
4 analogous in a way. I got the cite here.
5 Is the Court familiar with that case?
6 THE COURT: No.
7 MR. O'DONNELL: 715 A.2d 75.
8 MR. OBERLY: What page?
9 MR. O'DONNELL: Seventy-five. In that case,
10 two guys decided to take a semi-automatic handgun after
11 doing drugs and drinking all day and rob the gas
12 station. One of the defendants, Sarro, S-A-R-R-O, was
13 cut a deal with the State, testified against Zebrowski.
14 He never testifies. The opinion doesn't tell you
15 exactly what he said. But the inference there, certain
16 testimony presented in the record comes from his
17 agreement that was admitted with both side's consent.
18 And that is that Zebrowski goes and points the gun at
19 the attendant. The attendant doesn't move. Doesn't
20 really comply. The gun is fired. The attendant dies.
21 At trial, Zebrowski testifies that Sarro, the
22 other co-defendant, punched the attendant in the mouth
23 which caused him to flinch and the gun accidentally

1 discharged. That was his defense at trial.
2 There was evidence also presented by an ATF
3 expert that the trigger pull on that particular gun was
4 12 and a half pounds, substantially more than what we
5 have here, and that Zebrowski was intimately familiar
6 with the use of firearms based on his background and
7 experience, which is the direct opposite of what we have
8 here. The evidence in the record here I think rather
9 conclusively is that Tom Capano didn't know a damn thing
10 about guns. That comes from Gerry. The only
11 distinguishing facts between the two cases was the
12 pointing of the gun.
13 Now, in Zebrowski, the trial court gave
14 instructions on second degree murder and manslaughter,
15 and the issue on appeal was whether it was error to not
16 give criminally negligent homicide. And the Supreme
17 Court agrees with the trial court that it was not error
18 to do that because of the intentional pointing of the
19 gun which in fact we don't have in this case. But it
20 seems to me that under those circumstances where the
21 defendant testifies essentially that there was an
22 accident, the Delaware Supreme Court has agreed that it
23 was proper, and I'm requesting the charge for second

1  degree murder. I don't see any distinction—
2  It seems to me because of the dissimilarity in
3  the facts in this case, the reason for not charging
4  criminally negligent homicide in this case is not
5  present in this case. And therefore, it would be proper
6  for the Court to charge on criminally negligent homicide
7  here as well.
8      The last argument I would make is, although
9  this case I'm not citing for any other reason than the
10  language, is Gates versus State, 424 A.2d 18. It relies
11  on Keeble versus United States, one of the first U.S.
12  Supreme Court decisions along with Beck versus Alabama
13  on lessers; Keeble 412 U.S. 205, that due process, and I
14  would argue under both Delaware and United States
15  Constitution, guarantees a defendant instructions on
16  lesser includeds if the evidence, under any stretch of
17  the evidence, warrants it. And the reason for that is
18  if there's any evidence in the record the jury should
19  not be required to have to choose only between the
20  extremes. And there's an implication that the due
21  process clause of fundamental fairness jumps in at that
22  point.
23      MR. MAURER: Just a moment to consult.

1      MR. O'DONNELL: One last point is this. Since
2  the State has not presented any direct evidence of what
3  happened that night, including no direct evidence as to
4  whether or not the killing was intentional, the jury is
5  entitled to infer from that that any killing that
6  occurred in that room was not intentional and therefore
7  could have been recklessly indifferent, whatever all the
8  words are in the standard for second degree murder, or
9  reckless pursuant to the manslaughter standard, or
10  criminally negligent pursuant to the criminally
11  negligent homicide standard.
12      You want to jump in here?
13      MR. MAURER: No. I was just going to say that
14  last argument is something we discussed earlier very
15  briefly. We argue that the absence of any direct
16  evidence of what occurred in that room allows the jury
17  to reach a conclusion that if in fact they believe that
18  Tom Capano killed her, evidence of recklessness or
19  criminal negligence is equally plausible to that of
20  intent. And on that basis, which is a separate basis I
21  think than the other request, we're saying if they reach
22  the conclusion that Tom killed her, while there's no
23  direct evidence as to what occurred in the room, and

1  those are—the reason for one or the other of those conclusions
2  are equally plausible.
3      THE COURT: I understand that argument and
4  I'll give the State a chance to respond to it. My
5  concern here is that there's no question that intent is
6  being proffered by the State in this particular case
7  based upon circumstantial evidence of prior preparation,
8  which, although it is an aggravating circumstance in
9  this case, is a showing of planning and, therefore, the
10  intent to carry out the plan which you've created and
11  the subsequent acts which tend to give some indication
12  of guilt as to what is of course subject to argument.
13  The fact of the matter is that the State's theory
14  produces some evidence of intent, but there isn't any
15  evidence of recklessness or negligence in this
16  particular case. That's not there. And Jack's basic
17  argument is that it may have been reckless or negligent
18  to try and disarm a woman with a gun.
19      I'm sorry, folks. I'll never let that go to
20  the jury. If that's what the State was relying on,
21  you'd have an acquittal right here. If I was going to
22  acquit on it, I sure as heck can't charge it as a lesser
23  included. I don't think there's anything there. If all

1  we had now was his statement and there was no other
2  evidence to be considered, that's an acquittal. If I
3  accept his testimony, there's no way I'd let that go to
4  a jury. I think if I wouldn't let it as a matter of law
5  — I would rule he was not guilty under those
6  circumstances, there's no way I could charge as a lesser
7  included, gentlemen.
8      MR. WHARTON: Just thought of something we'd
9  like to clear up. And that when we sort of broached
10  this topic before, there was a concern that there may be
11  a division between counsel and the defendant.
12      THE COURT: I was going to get to that. Does
13  that still exist?
14      MR. O'DONNELL: He authorized yesterday us to
15  make a request for lessers.
16      THE COURT: Thank you.
17      MR. WHARTON: That answers that question.
18      At the risk of arguing once the point is won
19  —
20      MR. O'DONNELL: Is this Mr. Oberly or Mr.
21  Wharton or Mr. O'Donnell this afternoon?
22      MR. WHARTON: I only wanted to suggest that I
23  think a fair synopsis of his testimony was that not only

**Page 13**

1  corroborated the details of his brother Gerry, the
2  defendant realized that he could not credibly dispute
3  all of that evidence. So he contorted his defense. He
4  tailored it to dispute as little of the evidence as
5  possible. And what we are left with is the ludicrous
6  account of what he gives of what happened on June 27th.
7  And the fact that it is so ludicrous, the fact that it
8  is not credible lends credence to the State's argument
9  that this was a planned killing.
10      Now, this is a murder case. The defendant has
11  been charged with First Degree Murder. Intentional
12  murder. You have to decide whether he intentionally
13  killed Anne Marie Fahey on June 27, 1996.
14      Mr. Wharton, in his opening statement, did not
15  tell you how physically Anne Marie died on June 27th,
16  and we have never tried to prove that to you, and I'm
17  not going to stand here today and tell you we know
18  exactly how Anne Marie Fahey physically died that
19  evening. What we did say we would prove, what we have
20  proved beyond a reasonable doubt is that starting at
21  least as early as February 1996 the defendant took steps
22  to prepare himself for the possibility that he would
23  kill Anne Marie Fahey. And as the months progressed

**Page 14**

1  from February to June he took further steps and
2  ultimately insured that that was not a possibility. He
3  planned to kill her. It was not a perfect plan. He
4  needed somebody to help him dispose of the body in the
5  ocean, and he thought the cooler would sink. It didn't.
6  And that cooler is the ultimate corroboration of Gerry
7  Capano. But despite those two imperfections, he
8  nonetheless planned the killing, and the evidence, as I
9  will discuss it with you, establishes that.
10      Now, I need to review with you some three
11  months of evidence. And we appreciate your patience to
12  date, and I trust that I can rely on that patience as we
13  proceeded this morning. It is important that we
14  discuss -- that we review the evidence. And when you
15  consider all of the evidence in its totality you will
16  see it is an amount of evidence which demands only one
17  verdict, and that's a verdict that I will ask that you
18  return at the end of my closing, a verdict of guilty.
19      Now, I'm a list person and I find it helpful to
20  categorize things in examining them. I suggest to you
21  when you look at the evidence it is very helpful to
22  consider the five categories. These five categories
23  represent the major pieces of evidence that the State

**Page 15**

1  has introduced to show that this was a planned killing.
2  The most important piece of evidence is Gerry's
3  testimony. Gerry's testimony, as we will discuss, is
4  corroborated on virtually every detail that could either
5  be proved or disproved. The only details of Gerry's
6  testimony that could not be corroborated with direct
7  evidence are the conversations he had with the
8  defendant. So you ultimately will have to decide is
9  Gerry or the defendant telling the truth about those
10  conversations. And you will see that the evidence we
11  did introduce makes the defendant's versions of those
12  conversations not believable.
13      The second area of evidence concerns the
14  cooler, the lock and the chain. As I said the cooler is
15  the ultimate corroboration of Gerry. When Gerry came
16  into the Government on November 8th he didn't know we
17  would find the cooler, no one knew, no one expected it.
18  He told a tale that might at first hearing sound beyond
19  the realm of, well, a fantasy, a fantastic tale. He and
20  his brother dumped the cooler out in the ocean and he
21  shot a bullet through that cooler. But it wasn't a
22  fantastic tale. Ken Chubb found the cooler and
23  corroborates what Gerry said. The lock on the cooler --

**Page 16**

1  chain on the cooler, given no background found in his
2  home in 1996.
3      The third area of testimony concerns Deborah
4  MacIntyre's testimony about purchasing the gun.
5      The fourth area, I suggest to you, is the
6  defendant's demeanor on June 28th. We know this from a
7  variety of witnesses and ultimately it was confirmed by
8  the defendant's own testimony. This was a man who was
9  very calm, collected on June 28th after Anne Marie Fahey
10  was killed. That belies any claim that this was an
11  accidental shooting. It belies any claim that the woman
12  he loved threatened to commit suicide on the evening
13  before. It is consistent with somebody who planned a
14  killing and executed it according to his plan.
15      The final area of evidence is really the
16  defendant's testimony itself. It is not credible. His
17  demeanor on the stand is consistent with the person Anne
18  Marie Fahey described to her psychiatrist and
19  psychologist and friends. It is consistent with the
20  person who wanted to control every aspect of Debbie
21  MacIntyre, and it is consistent with the person who
22  would not lie still as Anne Marie Fahey embraced Michael
23  Scanlon.

Case 1:06-cv-00068-JJF Document 12-36 Filed 02/20/2007 Page 66 of 227

1  evidence, what I would like to do is start where we
2  began this trial. We started by learning about Anne
3  Marie Fahey as she existed on June 27, 1996. Then we
4  traced her relationship with Michael Scanlon from 1995
5  through 1996. We looked at the fact that she had broken
6  off the relationship with the defendant in 1995. It is
7  important to start with Anne Marie Fahey because
8  although this is a murder case it is ultimately about
9  control. It is about the defendant wanting to control
10  others. And it is important to understand that Anne
11  Marie Fahey, like Deborah MacIntyre, was especially
12  susceptible to control. If you recall, her psychiatrist
13  testified that in part she sought treatment because she
14  had great difficulty in asserting herself in personal
15  relationships. Her psychiatrist and psychologist
16  described her as an empathetic person who could feel
17  hurt when others were hurt. Who felt guilty and shame
18  for things she wasn't responsible for. This is the type
19  of person who was especially susceptible to a person
20  like the defendant.
21      Anne Marie Fahey was not a perfect person, the
22  State never suggested she was. She had her flaws like

1  everybody. She wanted to live beyond her means. She
2  had a troubled childhood. She was immature at times.
3  She suffered from an eating disorder. She was carrying
4  on an adulterous affair with the defendant. As I said,
5  she was easily intimidated, she was not assertive. And
6  Tom Capano offered her financial security that she did
7  not have, had never known. He was very generous to her.
8  She confided in him. She appreciated the fact that she
9  could confide in him.
10      But in 1995 things changed. In 1995 she met
11  Michael Scanlon and the change in her views towards the
12  defendant, the fact that she embraced Michael Scanlon
13  are juxtaposed in that April 7, 1996 diary entry. At
14  that point you see where Anne Marie Fahey has come from
15  and where she is going. Whereas she had been with the
16  defendant, she no longer was willing to tolerate what
17  she viewed as his manipulations and control. She saw
18  Michael Scanlon as the first normal healthy relationship
19  she had and expressed in the diary entry her love for
20  him.
21      To get a good view of the overall picture from
22  both Gary Johnson and Michele Sullivan as to Anne Marie
23  Fahey's relationship with Scanlon and with the

Case 1:06-cv-00068-JJF Document 12-36 Filed 02/20/2007 Page 66 of 227

1  defendant, if you recall, Dr. Johnson testified that he
2  had seen Anne Marie in '95 up through January of 1996.
3  Dr. Johnson told us how Anne Marie described a
4  relationship with the defendant, quote, as being
5  characterized by this man pursuing her. Having a
6  great -- wanting a great degree -- deal of control over
7  her life. And as she began to want to pull away from
8  that relationship he was unwilling to let her do so.
9      Doctor Johnson was asked: "What was her
10  attitude towards this relationship?"
11      And his response was: "Well, I would say
12  initially she described it in historical terms that she
13  was quite attracted to this man, but by the time I saw
14  her she described it mostly in terms of feeling very
15  guilty and ashamed of being involved with him. And
16  described it in terms of not being a healthy
17  relationship. And particularly described it as one she
18  wanted to get out of in the context of her finding a new
19  and what seemed like a much healthier relationship with
20  a different man."
21      This is what Anne Marie Fahey told her
22  psychologist.
23      Dr. Johnson was asked: "Was she having any

1  difficulties in ending it? Was there any difficulties
2  in doing that for her?"
3      Answer: "Yes, there were quite a few
4  difficulties. I mean, she would say she didn't want to
5  see him and find he would continue to send her e-mail or
6  written notes or suddenly appear at places where he was
7  observing her, stalking may be too strong a word but
8  certainly observing."
9      This is from Dr. Johnson so this pre-dates
10  January of 1996.
11      How about Dr. Sullivan? Well, Anne Marie told
12  her that she regarded the large number of phone calls
13  that she was getting, the large number of e-mails,
14  appearing at times where she wasn't ready to greet him
15  in a public place, the fear if she went to someplace
16  socially he might meet her there and persuade her to
17  spend time with him.
18      Other things included, in the past, coming to
19  her apartment uninvited and making his way into the
20  house and making her very frightened in what was going
21  to happen.
22      Anne Marie told Dr. Sullivan that she viewed
23  the defendant's gifts, his references to his daughters

the deceased Case 1:06-cv-000688-B* Document 236 Filed 06/20/2007 Page 76 of 277

1  the death of Anne Marie Fahey.

2    If you remember Mr. Oteri when he

3  cross-examined Dr. Sullivan. He asked if people give in

4  order to get? That is a fair credo for Tom Capano's

5  generosity. He is giving and he is hurt when Anne

6  Marie rejects his gifts. And the reason why she rejects

7  the plane ticket is she does view it as manipulation and

8  doesn't want the conditions he attaches.

9    New Year's Eve on the calendar, we know, and we

10  know from Michael Scanlon's testimony, Anne Marie spends

11  time with him. And in January things start to really

12  look bad for the defendant. If you look on January

13  17th, there is an e-mail -- actually on tab four of the

14  book you have. Now I'm not going to go through all of

15  the e-mails, I know we have done a lot of that during

16  trial. But if you have any doubt that these e-mails do

17  not show the manipulation, the refusal to stop pursuing

18  Anne Marie Fahey, I encourage you to read all of the

19  e-mails. Read them in their entirety, because it is

20  subtle. Look at the January e-mails and you will see

21  the defendant asking Anne Marie to have dinner with him.

22  He is relentless, he is suffocating, he will not stop.

23  Look at her responses, she doesn't say no, doesn't say

---

1  apologized to him because she

2  resented the fact that he was rubbing her tummy and she

3  told him so. That is January 15th.

4    Three days later the defendant has dinner with

5  Anne Marie Fahey and Jackie Steinhoff. Remember how

6  that dinner was set up? Anne Marie Fahey kept on saying

7  to Jackie, I'm really not interested. She wouldn't say

8  no directly she just kept putting it off. Finally she

9  gave in and they had dinner. During the dinner Anne

10  Marie Fahey goes to the bathroom and the defendant turns

11  to Jackie Steinhoff and says: "Why does she hate me?"

12  This is a 47 year old man turning to a 30 year old woman

13  asking why her good friend hates him. I suggest to you

14  that is the first sign where we see kind of an

15  obsession. Direct evidence of an obsession on the

16  defendant's part for Anne Marie Fahey, that is January

17  20th.

18    On January 26th, Anne Marie has her surprise

19  birthday party, the defendant is not invited. And you

20  can see in the e-mails when you back to the jury room,

21  you can see him pressing her for what is going on in the

22  upcoming weekend. He wants to have this birthday dinner

23  with her. And she doesn't point-blank reject him.

---

1  yes, she ignores the request, that is her way of dealing

2  with things.

3    In January she hadn't started seeing Michele

4  Sullivan, she is still struggling with assertiveness.

5  Her way to deal with Tom Capano is not responding

6  directly to the overtures she doesn't want. Once in a

7  while she does respond directly and she feels bad. And

8  if you see this January 17th e-mail, she writes the

9  defendant: "Good morning, Tommy. I want to apologize

10  for my outbreak last night. I am sure it must have

11  scared, amongst other feelings, you. Quite honestly I

12  scared myself last night. Tommy I had a lot on my mind

13  last night regarding my appointment with Gary Johnson.

14  I know I only talked very briefly about my meeting but

15  it obviously was on my mind. Right now I need a friend

16  more than anything else. There was a part of me that

17  just wanted to be alone to think things out clearly. So

18  when I asked you not to rub my stomach and you responded

19  by saying how much I hurt you, I couldn't take feeling

20  guilty about what had happened along with everything

21  else that I am feeling. It is my fault, because I was

22  not communicating with you and you didn't know how to

23  respond. I am sorry for my behavior."

---

1    On January 27th she has the Grand Gala with

2  Michael Scanlon and we heard from Jill Morrison that the

3  defendant -- and the defendant confirmed with his string

4  of calls that he was pestering Anne Marie with a string

5  of phone calls that Saturday. Anne Marie was distraught

6  by these phone calls, but she had the best night of her

7  life, according to what she told her friends, with

8  Michael Scanlon later that night. So you can see where

9  this triangle is going. Anne Marie is going with

10  Michael Scanlon and the defendant is not happy.

11    On February 4th, a week later, we know that

12  Anne Marie Fahey point-blank finally told the defendant

13  she just wanted to be friends. And remember, we know

14  that was a Sunday, February 4th, we know it because of

15  the later e-mail that we read when the defendant was on

16  the stand. The next day after she tells him this, he

17  has his daughter send Anne Marie an e-mail. She has to

18  remind him three days later I just want to be friends,

19  and this is February 7th. What does he do on February

20  8th? He again e-mails her, again makes a reference to

21  children, to his being distressed about, if you recall,

22  the events at the Ursuline School on February 8th. And

23  that's the day he gets $8000 from Gerry Capano.

---

**Page 29**

1 Capano for $8000 in cash? This is a man who had
2 $156,000 in his checking account that day. There is
3 nothing illegal with cashing a check for $25,000. And
4 you heard the defendant get tripped up on the timing of
5 the checks. He said that he called Gerry after he had
6 cashed the first two checks, but in fact, as we showed
7 with the bank records, he had Gerry cash the check after
8 he had cashed the first check, before the third check
9 came along. So his recollection, or rather his story,
10 about the timing of the checks just doesn't make sense.
11 There is no legitimate reason to try to disguise the
12 money transactions that he did. So why? It just
13 doesn't make sense that he would try to give Anne Marie
14 Fahey $25,000 in cash. He didn't need to give her that
15 kind of money in cash to shock her. Doesn't make sense
16 that he would take $24,000 back from her not deposit it
17 in the bank but keep it in this Grant Avenue house, the
18 security of which he is very concerned about, we are
19 told. Doesn't make sense that he would have $24,000 in
20 cash on him and yet during the next 12 months go to the
21 bank and take out $12,000 in cash during those next 12
22 months. That story doesn't make sense. The only thing

**Page 30**

1 that makes sense is getting the $8,000 in cash, as far
2 as it concerns us, is that Gerry now believes that the
3 defendant is being extorted. Gerry believes that there
4 is a legitimate, if you will, reason why the defendant
5 might need a gun, might need a boat, might have to kill
6 somebody. And I say legitimate in quotes. But Gerry
7 thinks now that there is some explanation as to why the
8 defendant is coming to him asking him for the gun,
9 asking if him if he knows somebody who can break some
10 legs, asking him if he could use his boat if he killed
11 somebody.
12     Four days after the defendant approaches Gerry
13 and says I'm being extorted, I need $8000, four days
14 later we have the February 12th e-mail. And if you
15 would look at that. This is on page 40. Anne Marie
16 writes: "Good morning, Tommy." If you go down about
17 five lines, second paragraph she says: "Tommy, you
18 scared me this weekend, starting with Friday and all the
19 calls you placed. It really freaks me out when you call
20 every half hour. I truly understand how fragile you are
21 these days and I feel the same way. But when you keep
22 calling that way it makes me turn the other way and,
23 quite frankly, shut down."

**Page 31**

1 direct evidence that she finds his
1 string of calls, to use her euphemism, harassing. The
3 harassment in her mind. And look what her response is,
4 go a little bit further down. She says: "I'm sorry
5 that I am nothing but a constant disappointment to you
6 these days, it is not fair to you."
7     She is apologizing for him harassing her with
8 phone calls. Just like with the stomach.
9     But it is soon after this call that she begins
10 her counseling sessions with Michele Sullivan and they
11 start working on her ability to be assertive. Two days
12 after this e-mail, she, Anne Marie, celebrates
13 Valentine's Day with Mike Scanlon. And you saw the card
14 in evidence, you can see how moved she was by the
15 flowers he sent, the fact that she kept these
16 memorabilia from Mike Scanlon in the drawer, the
17 tickets, the cards. And we know from Ginny Columbus
18 that a day after Valentine's Day Anne Marie throws the
19 defendant's dozen roses into the trash can. Now we also
20 know that sometime around Valentine's Day, sometime
21 between February 13th and February 16th, the defendant
22 saves in the permanent file, the archives of his
23 computer, all of these e-mails. Why? I submit to you

**Page 32**

1 again, this is just like the January 20th comment to
2 Jackie Steinhoff. This is evidence of his obsession.
3 To save all of those e-mails on this day, two to three
4 days after Anne Marie Fahey says please stop, I can't
5 take the harassing calls, you are scaring me. A week
6 after he first approaches Gerry, this is the beginning
7 of the plan.
8     MR. CONNOLLY: Your Honor, I think it would be
9 good to break here.
10     THE COURT: All right.
11     Please take the jury to the jury room.
12     (The jury exited the courtroom at 10:10 a.m.)
13     THE COURT: Court will stand in recess for 15
14 minutes.
15     (Following a brief recess:)
16     (The jury entered the courtroom at 10:25 a.m.)
17     THE COURT: Please bring the jury in.
18     Counsel, I should note while totally entranced
19 by Mr. Connolly's argument, I was reviewing the charge.
20 And I note in the First Degree Murder charge the last
21 line indicated that, "you should find the defendant not
22 guilty" and it should read, "you must find." And I have
23 made that change and that will be in the charges that go

**Page 37**

1  you have read.  And on April 7th, four days after she
2  tells Michele Sullivan about his haunting behavior, she
3  writes in her diary that the defendant -- she has
4  finally been able to bring closure to that relationship.
5  That he is jealous, manipulative, controlling maniac
6  and she is in love with Michael Scanlon.  Three days
7  after writing that entry she meets with Dr. Sullivan,
8  this is April 10th.  It is April 10th -- it is in the
9  April 10th session when Dr. Sullivan first hears of this
10  kidnapping, that Anne Marie has some fear which she
11  expresses in very vague ways.  But she has a fear of
12  being kidnapped by a third party and Dr. Sullivan
13  presses her on this point, by who?  And the only name
14  that she gives is Tom Capano.  And Dr. Sullivan even
15  presses her for another name.  She said could it be
16  somebody else?  And she said maybe it is an old
17  boyfriend, but it is a third person hired by somebody
18  else.
19      Now, it is true that Anne Marie point-blank
20  didn't go to Dr. Sullivan and say I believe Tom Capano
21  is trying to kidnap me.  But that is consistent with
22  what Dr. Sullivan says about Anne Marie's general way of
23  approaching issues.  That if you remember she said she

**Page 38**

1  was giving a little wisp, give you a little bit and wisp
2  away and you would have to come back to it.  But it was
3  enough that Dr. Sullivan recalled it, and asked Anne
4  Marie to act on it.  She asked Anne Marie on April 10th
5  to contact the Attorney General's office and report the
6  harassment, the harassing phone calls.  So that is April
7  10th.
8      April 15th, if you look in the calenders you
9  will see that Anne Marie wrote for the first time that
10  there was a monthly anniversary, if you will, with Mike
11  Scanlon, April 15th she writes seven month anniversary.
12  She hadn't done that for the first six months.  It
13  suggests at this point her feelings for Michael are
14  growing stronger, that she is attaching more
15  significance to the relationship than before, and, in
16  fact, if you follow that calender from seven months
17  until September 15, 1996, you will see that she marks in
18  her calender every month on the 15th that is the
19  anniversary with Michael or Miguel.  She is
20  forward-looking in this relationship.  So that's April
21  15th.
22      Two days later she meets with Dr. Sullivan.
23  This is April 17th, now we are only 10 days after the

**Page 39**

1  diary entry.  This is an important time.  They again
2  talk about the kidnapping issue.  They talk about Anne
3  Marie failing to report anything to the Attorney
4  General's office, but at least she did make a phone call
5  to inquire about it.  And then three days later, the
6  defendant buys the cooler.  I submit to you the timing
7  is not an accident.  Although, we do not have the e-mail
8  so we cannot directly show you harassing behavior on the
9  part of the defendant in March and April, that is what
10  Anne Marie was reporting to her psychologist.  She is
11  talking about a kidnapping.  Her diary entry which makes
12  crystal clear her views towards the defendant.  Mike
13  Scanlon is in this time frame.  And this is the time
14  when he purchases the cooler.  It is also around the
15  time when he has obtained the gun from Gerry and is
16  returning it.  Again, we don't have servitude about that
17  timing, but it is sometime in March that he borrows the
18  gun and sometime around mid April to late April that he
19  returns the gun to Gerry.
20      If you look in Dr. Sullivan's notes, you will
21  see on April 24th Anne Marie indicates she is, quote,
22  unquote, getting closer to Michael.  And you can look at
23  her calender and you can again see the events they

**Page 40**

1  attended in early May, consistent with what Dr.
2  Sullivan's notes indicate.
3      Then on May 8th the defendant takes Debbie
4  MacIntyre to Washington.  Now he has been seeing this
5  woman for 15 years.  He says he deeply loves her.  He
6  has taken her on two trips, both of which are business
7  trips.  He is going to legal conferences in Canada and
8  even this May trip is to Washington.  But they are
9  clearly a big deal to Debbie MacIntyre, as indicated by
10  her testimony.  And if you have any doubt about her
11  feelings look at the letters.  The defendant knows that
12  she attached great import to her trip to Canada with him
13  and her trip to Washington.  Remember, this is something
14  to think about.  Anne Marie Fahey gets The Homestead
15  ritzy resort in West Virginia.  Debbie MacIntyre gets to
16  tagalong to a legal conference in Washington and Canada.
17  Anne Marie Fahey gets the Hotel DuPont for lunch, she
18  gets La Famiglia, Villa Di Roma, Panorama.  Debbie gets
19  Arners.  These are examples of how the defendant vastly
20  treats these women.  He is absolutely correct when he
21  refers to Debbie MacIntyre in his letter as a doormat.
22  She is his doormat.  And I submit to you it is no
23  mistake that he took her to Washington that weekend,

## Page 153

1 been in keeping with my dealings with the press, I
2 will release that, but mask the jury's signature and
3 seal the actual interrogatories. We've kept their
4 names secret this long. If they choose to disclose
5 them, that's up to them, but I'm not going to do it.
6     MR. O'DONNELL: Do you want me to raise it?
7     MR. MAURER: That part's a good starting
8 point.
9     MR. O'DONNELL: With respect to the
10 interrogatories, it's our position that unless the
11 jury unanimously answers yes to question 1, the Court
12 may not impose the death penalty; and the jury should
13 not be required to answer question 2, because the jury
14 would not have found, beyond a reasonable doubt, the
15 existence of a required statutory aggravating factor.
16     MR. WHARTON: I think that's the statute.
17     THE COURT: I think I have to go through the
18 same process and I make the final determination.
19     I'll simply tell you as a practical matter,
20 if they come back with a no there, then I'm certainly
21 not going to overrule their finding, but I think they
22 have to go through the whole process and I have to go
23 through the whole process separately.

## Page 154

1     MR. MAURER: What if two of them say no?
2     MR. OBERLY: Suppose there's a 10 to 2 vote;
3 is that beyond a reasonable doubt?
4     MR. WHARTON: That's not what the jury is
5 supposed to do.
6     The jury is supposed to report their vote as
7 to how each one of them thinks that question ought to
8 be answered. They don't have to be unanimous on
9 that. There's no requirement of unanimity. Beyond a
10 reasonable doubt is merely the standard by which they
11 judge whether that has been proven. It doesn't say
12 unanimously find.
13     MR. OTERI: The question says, does the
14 evidence show, beyond a reasonable doubt, the
15 existence of the following.
16     MR. WHARTON: Right. Right.
17     MR. OTERI: That's what they're voting on.
18     THE COURT: Yes, but it does not have to be
19 unanimous. It is not the verdict here.
20     MR. OTERI: It's beyond a reasonable doubt.
21 What is that? You've got to assign a numerical value
22 to it.
23     THE COURT: No, I've instructed them what it

## Page 155

1 is, and that's the same standard they've used in
2 deriving guilt or innocence, but if for some reason
3 the vote came out 10 to 2, then the statute still
4 gives me authority to go ahead and make my own
5 determination. It would be a lovely question on
6 appeal and --
7     MR. MAURER: That's why we're taking this
8 position.
9     THE COURT: Well, I note it, but I think the
10 statute suggests that I have to go through the same
11 process that the jury does and that their findings are
12 only a recommendation to me even on that.
13     I've simply told you that certainly if they
14 found there was no reasonable doubt, that would
15 probably mean it for me, although I don't know what I
16 would do if the vote was 11 to 1. I would love to
17 have this answer sheet come back so I don't have to
18 make any decisions at all and I hope that's the way it
19 comes back. But there are a lot -- the way our law is
20 written, the ultimate authority to answer both of
21 these questions rests with the Judge although they
22 should take it into consideration, the findings of the
23 jury, and give great weight to it.

## Page 156

1     MR. OBERLY: I understand.
2     MR. WHARTON: No, the statute says the jury
3 is to report to the Court its final vote, stating the
4 number of affirmative and negative votes on each
5 question. If the jury is split on one question, on
6 the first question, that is not a preclusion to going
7 ahead to the next question. That merely tells the
8 Judge that the jury is split on that and makes that
9 recommendation as to the appropriate answer. They
10 don't have to be unanimous on that, on any -- on any
11 question. There is no -- it's not like the old
12 statute where you had to -- the jury had to
13 unanimously agree beyond a reasonable doubt that there
14 was a presence of a statutory aggravator before they
15 could go on to balancing aggravating and mitigating
16 and then going on to unanimously recommending the
17 death. That was the old statute.
18     THE COURT: But I think Charlie and Gene both
19 understand that's what the statute says.
20     The question is whether that may meet
21 constitutional muster, and they've raised that issue.
22     MR. MAURER: I don't know whether that's been
23 resolved by the Supreme Court decisions and we don't

Page 69

1 indicated to you, could speak and not be subject to
2 cross examination. There was nothing to permit him or
3 to -- excuse me -- there was nothing to keep him from
4 taking the stand and testifying on broader issues in the
5 penalty phase; however, had he done that, he would have
6 subjected himself to cross examination. So when he
7 indicated that there were things that he could not talk
8 about, he was right because the allocation is very
9 limited, but had a different form been chosen, those
10 limitations would not have been the same.
11 Mr. Connolly.
12 MR. CONNOLLY: Thank you, Your Honor. Good
13 afternoon.
14 At the outset, I would like to thank you on
15 behalf of the State, Detective Donovan, Mr. Wharton and
16 myself for the extraordinary service that you've
17 performed these last few months. We are mindful, the
18 Court is mindful, defense counsel is mindful of the
19 burdens that you endured, the marathon closing
20 arguments, the scheduling problems. Things don't always
21 go smoothly, and it's really not necessarily anybody's
22 fault, but we do all appreciate what you've done, and I
23 do promise you I will not take up your time for very

Page 70

1 long. I hope to be done in about 30 minutes. And the
2 reason why is because of course we've covered so much
3 already and you have been very attentive, and I don't
4 think it's worthwhile delving into the minutia that you
5 have heard and seen.
6 I want to begin by just recognizing that what
7 is obvious to us today in the late 20th century in
8 America, but really was a novel concept when this
9 country was formed, and that is we are a state, a
10 country that's governed by the rule of law. We're not
11 governed by the decrees of monarchs, we're not governed
12 by the whims of dictators, we're governed by principles,
13 by laws. And the laws are enacted in this state by a
14 legislature which represents the will of the people of
15 the State of Delaware. And your job today is to apply
16 the rules of law as seen fit by the legislature. The
17 fact that we're governed by law is a good thing because,
18 of course, laws apply equally to all, regardless of
19 whether you're poor or rich, what color you are, what
20 gender you are. And that is why we impose so much trust
21 to the form of democracy that we have.
22 Now, you were selected as jurors because both
23 sides and the Court believed that you were capable of

Page 71

1 applying the law without vengeance, not through
2 sympathy, or compassion, but to apply the rule of the
3 law to the facts as you found them.
4 And the law that you have to apply at this
5 stage of the proceeding is really two-fold, two part
6 analysis, which Judge Lee has talked about, both sides
7 have, but I think because everybody is new to this it's
8 good to just quickly review it.
9 The first part of the analysis that you will
10 be conducting is to determine whether the State has
11 proven beyond a reasonable doubt what is called the
12 statutory aggravator. And in this case that is to show
13 that the murder of Anne Marie Fahey was the result of
14 substantial planning and premeditation. That's the
15 first question. And unlike your verdict, as you've been
16 told, you don't have to be unanimous on that. Although
17 you'll be instructed, I'm sure based on what we've all
18 observed, you will discuss the facts, the inferences
19 that would make your analysis for that question or that
20 you would -- you would have to do to analyze that
21 question.
22 Now, the second question you have to answer
23 is, do all of the aggravating factors, including that

Page 72

1 one statutory aggravating factor, outweigh the
2 mitigating factors by what we call a preponderance of
3 the evidence?
4 And that means basically you've got -- if
5 you've got a scale with aggravators and mitigators, the
6 question is do the aggravators just barely outweigh the
7 mitigators? They have to outweigh the mitigator, but
8 they could outweigh them by this. It's not a standard
9 of proof that is as high as beyond a reasonable doubt.
10 And your answers to that question do not have to be
11 unanimous.
12 You'll report your answers to both questions
13 by a tally of the votes. And you represent the
14 conscience of the community in looking at the facts and
15 the law as it applies to those facts. And as Judge Lee
16 explained, and will explain again, the ultimate decision
17 as to what the penalty will be in this case rests with
18 Judge Lee, but he will give great weight to your
19 opinions as expressed through your votes on those two
20 questions.
21 Now, the first question, has the State proven
22 beyond a reasonable doubt that the murder of Anne Marie
23 Fahey was committed as a result of substantial planning

Closing Penalty Hrng A-178.1

Page 73

1 and premeditation, I'm barely going to touch upon,
2 because it was rather unusual about this case, because
3 we did not have a body, because the only living person
4 who knows exactly what happened at the instant of Anne
5 Marie Fahey's death is Tom Capano. As a result of the
6 absence of all the forensic evidence, the State proved
7 intent by showing the planning that the defendant had
8 engaged in beginning at least as early as February of
9 1996 when he approached Gerry the first time and he
10 continued.
11      So what I'll do is just remind you of some of
12 the categories that I discussed in the closing argument
13 of the guilt phase. The things to look at.
14      First, Gerry's testimony; the conversations
15 with Gerry, making up this extortion in order to make
16 Gerry ultimately not raise questions as to why a boat
17 was needed or why a gun needed to be borrowed, because
18 Gerry was under the impression that there was some
19 extortionist out there threatening his brother, so he
20 was much more understanding as far as providing him with
21 the weapon and as far as at least even entertaining the
22 idea that if some boat was needed to dispose of a body
23 he would.

Page 74

1      Then there was the cooler, the lock, and the
2 chain. We have not heard any -- your verdict
3 establishes this -- we have not heard any rational
4 explanation as to why the defendant bought that cooler,
5 locker, chain other than what the State has submitted to
6 you which is of course he did it because he was planning
7 a murder and he needed to dispose of a body.
8      Then you heard Deborah MacIntyre about
9 purchasing the gun. That again is one of the main
10 things we discussed about planning. We talked about the
11 defendant's behavior on June 28, how calm he was. Think
12 about -- think about the presence of mind to hit star 69
13 from Anne Marie's apartment to place her in the
14 apartment. Somebody was thinking. Think about the
15 planning that had to go into that. Think about the
16 planning that had to go into hitting the 800 number
17 thirteen minutes later back at the defendant's home to
18 create a false alibi. And then think again, the final
19 category I spoke to you in closing was how ludicrous the
20 defendant's story was, how it defies common sense. The
21 fact that it is so irrational, it is so ludicrous points
22 to the fact that there's no rational explanation to
23 account for all the mounds and pieces of evidence that

Page 75

1 we gave you except for the idea that the defendant
2 planned and premeditated this crime. They can't come up
3 with a rational explanation to fit all the pieces of
4 evidence.
5      Now, in his closing during the guilt phase Mr.
6 Oteri suggested to you that whatever plan there was
7 would look like a village idiot, and he raised, for
8 example, the issue of you'd never commit a murder in
9 your own house. But you would. If you really planned
10 something, you would. Because if you take somebody in a
11 car, you run the risk that somebody else may be there.
12 You take them out to the woods, you don't know who is
13 going to be around. The only environment Tom Capano
14 controlled absolutely on June 27th, 1996, was the
15 environment at 2302 Grant Avenue.
16      And think about how close he came to getting
17 away with murder. That shows you how well planned this
18 execution was. Think about it. The only forensic
19 evidence left in the room were pin drop size blood
20 stains. That's how close he came. Think about if we
21 weren't lucky enough to have traced Anne Marie's blood
22 down to the Atlantic Ocean, think about if we had not
23 found the cooler. He thought he was going to get away

Page 76

1 with this. He had a good plan. He thought that he
2 could control the local law enforcement people like he
3 had controlled or had benefited from the Henry Herndons
4 of this world, the Dan Frawleys.
5      Remember, Henry Herndon was the managing law
6 partner of the defendant's firm when that tape that you
7 heard, that tape that had to do with Linda Marandola,
8 that tape was played for Henry Herndan and nothing
9 happened. Now, you heard the tape. How could anybody
10 listen to that tape and not think something horrible was
11 going on?
12      Four years later the tape was played for Dan
13 Frawley before the defendant was made city solicitor,
14 nothing happened. He had a track record of getting away
15 with things. It makes sense that he would assume
16 Wilmington police would be involved. You don't have to
17 assume it. He admitted that Wilmington police would
18 have the case. He thought that he could control
19 Wilmington police. Remember, he talked about the daily
20 reports he had. He had his contacts with Harry
21 Manelski.
22      So you need to think, A, that he almost got
23 away with this. But for a lot of luck he wouldn't have

Case 1:06-cv-00688-JJB*   Document 125-6   Filed 02/20/2007   Page 130 of 27

1 your role as jurors in the sentencing procedure is,
2 nevertheless, important. You will provide the Court, as
3 the conscience of the community, with an advisory
4 opinion on what the jury believes the evidence has shown
5 with regard to the appropriate penalty in this case.
6 Your answers to the questions provided will be given
7 great weight by the Court in its final determination of
8 the appropriate sentence.
9       Delaware law specifies certain statutory
10 aggravating circumstances, at least one of which must be
11 found to exist beyond a reasonable doubt in order to
12 render death an available punishment. The law also
13 permits you to consider any other aggravating factors
14 not set forth in the statute which may exist in this
15 case. The defense may offer evidence relating to any
16 mitigating circumstances which it contends exists in a
17 particular case.
18       An aggravating circumstance is any factor
19 relating to the crime or to the offender which tends to
20 make the defendant's conduct more serious or the
21 imposition of a penalty of death appropriate, including,
22 but not limited to, the statutory aggravating
23 circumstance. A mitigating circumstance is any factor

1 aggravating circumstance beyond a reasonable doubt.
2       Reasonable doubt is a practical standard.
3       On the one hand, in criminal cases the law
4 imposes a greater burden of proof than in civil cases.
5 Proof that the required statutory aggravating
6 circumstance probably exists is not sufficient.
7       On the other hand, there are very few things
8 in this world that we know with absolute certainty.
9 Therefore, you are not required to find proof that
10 overcomes every possible doubt.
11       Proof beyond a reasonable doubt is proof that
12 leaves you firmly convinced that the circumstance
13 exists. Therefore, based upon your conscientious
14 consideration of the evidence, if you are firmly
15 convinced that -- excuse me -- that the murder was
16 premeditated and the result of substantial planning, you
17 should answer the first question affirmatively. If, on
18 the other hand, you think there is a real possibility
19 for or, in other words, a reasonable doubt that the
20 murder was not premeditated and the result of
21 substantial planning, you must give the defendant the
22 benefit of the doubt by answering the question in the
23 negative.

1 relating to the crime or to the offender which tends to
2 make the defendant's conduct less serious, or the
3 imposition of a death penalty inappropriate. It is
4 within your province as the jury to determine the
5 aggravating and mitigating circumstances which exist in
6 this case and the weight they should be individually
7 accorded.
8       In this case, the State contends the following
9 statutory aggravating circumstance exists:
10       The murder was premeditated and the result of
11 substantial planning.
12       This statutory aggravating circumstance
13 requires a finding of premeditation. In order for a
14 murder to be premeditated, the defendant must have
15 thought about it, considered it, or deliberated about it
16 beforehand. The design to kill must arise from the
17 sedate, deliberative process and not a rash or
18 impulsive, though intentional, act. This statutory
19 aggravating factor also requires a finding that the
20 murder was a result of substantial planning.
21 Substantial planning is planning which is considerable
22 or ample for the commission of the crime.
23       The State has the burden of establishing this

1       You must then weigh and consider the
2 mitigating circumstances and the aggravating
3 circumstances, including, but not limited to, the
4 statutory aggravating circumstance. You must weigh all
5 relevant evidence in aggravation or mitigation which
6 bears upon the particular circumstances or details of
7 the commission of the offense and the character and
8 propensities of the offender. Weighing the aggravating
9 and mitigating circumstances is not a mere counting --
10 excuse me -- is not a mere counting process of X number
11 of aggravating circumstances and Y number of mitigating
12 circumstances, but rather a reasoned judgment as to what
13 factual situations require the imposition of death and
14 which can be satisfied by life imprisonment in light of
15 the totality of the circumstances present. You must
16 then determine whether, based upon a preponderance of
17 the evidence, the aggravating factors outweigh the
18 mitigating factors. The side on which the greater
19 weight of the evidence is found is the side on which the
20 preponderance of the evidence exists, a mere tipping of
21 the balanced scales in favor of one side or the other.
22       You are reminded that you are to base your
23 answers to the questions set forth in the special

Page 137

1 and of course that in and of itself provides support for
2 the argument I made to the jury.
3     THE COURT: Gentlemen, we are where we are. I
4 overruled the objection. The jury is now deliberating.
5 Therefore, this becomes an academic discussion and it's
6 too late in the day for that.
7     We'll stand in recess until the call of the
8 court.
9     (Court recessed at 3:25 p.m.)
10    (Court reconvened at 7:00 p.m.)
11    THE COURT: Please bring in the jury. While
12 we're waiting for Mel to get the jury, it gives me an
13 opportunity to say on the record what I have said
14 privately in chambers. I really appreciate the
15 professionalism of the lawyers on both sides, the aura
16 of cooperation that is allowing this case to flow
17 smoothly in the courtroom for the most part, and we have
18 confined our differences to sidebar and to chambers.
19 The truth of the matter is that I've grown quite fond of
20 all of you and, though I'm relieved to see this case
21 come to a conclusion, I truly will miss working with you
22 on a regular basis. You've represented the best in
23 professionalism, in ethics, in everything that is good

Page 138

1 about a profession that is often maligned. Again, I was
2 proud to have worked with you.
3     (The jury came into the courtroom at 7:02
4 p.m.)
5     THE COURT: Mr. Foreman, have you completed
6 your recommendation to the Court in the penalty phase?
7     THE FOREMAN: Yes, sir, we have.
8     THE COURT: Would you please -- Mel, would you
9 please bring that recommendation to me?
10    Thank you very much. The interrogatory to the
11 jury are as follows:
12    Does the evidence show beyond a reasonable
13 doubt the existence of the following statutory
14 aggravating circumstance?
15    The murder was premeditated and the result of
16 substantial planning?
17    The yes votes were 11; the no votes were 1.
18    Two, Does the jury find by a preponderance of
19 the evidence, after weighing all the relevant evidence
20 in aggravation or mitigation which bears upon the
21 particular circumstances or details of the commission of
22 the offense and the character and propensities of the
23 offender, that the aggravating circumstances found to

Page 139

1 exist outweigh the mitigating circumstances found to
2 exist?
3     The answers are yes, ten votes; no, two votes.
4 The signature of the jurors are included on this
5 document.
6     Members of the jury, I want to thank you.
7 You've given over three months of your life to this
8 case. There's no real way to express the gratitude of
9 this court and the people of the State of Delaware.
10 You're underpaid and overworked. Welcome to state
11 employment.
12    I want to particularly thank the alternates
13 because you've been here the whole time, shared in the
14 camaraderie that occurred with the jury but did not
15 participate in either of the major decisions made by
16 this jury. As a group you not only have fulfilled your
17 civic duty but you've made a personal contribution to
18 the concept of justice in the State of Delaware.
19    You may have some questions about the
20 confidentiality of the proceedings. Because the case is
21 over, you are free to discuss the case with any person
22 you choose. However, you do not have to talk with
23 anyone about this case if you do not want to. If you

Page 140

1 tell somebody you do not wish to talk about it and they
2 continue to bother you, please inform the Court and we
3 will take measures to protect your privacy. If you do
4 decide to discuss the case with anyone, I would suggest
5 that you treat it with a degree of solemnity so that
6 whatever you say you would be willing to say in the
7 presence of your fellow jurors or under oath in open
8 court in the presence of all of the parties involved.
9 Also, if you do decide to discuss the case, please
10 respect the privacy of the views of your fellow jurors.
11 Your fellow jurors fully and freely stated their
12 opinions in deliberations with the understanding that
13 they were being expressed in confidence.
14    The press has made a request that those jurors
15 who would like to talk to them go outside on the
16 courthouse steps where an area has been prepared. We
17 will see that the appropriate security goes with you.
18 And you don't have to make that decision right now.
19    It's my understanding that I'm going to be
20 meeting with you for a brief period of time after we
21 recess and at that time you can decide what course of
22 action you wish to follow. Understand that for better
23 or worse, your ordeal is not completely over because

STATE'S EX. 18

39

Sunday
   4·7·96

Happy Easter! Well,.. another yr.. has passed since my last entry. and man o'man has a lot happened. I've been through a lot of emotional battles. I finally have brought closure to Tom Capano. What a controlling, manipulative, insecure, jealous maniac. now that I look back on that aspect of my life; — I realize just how vulnerable I had become. It hurts me when I think about that year. For one whole year, I allowed someone to take control of every decision in my life. Bob Conner's death hurt me / affected me more than anything. I lost my best friend, mentor, the man w/ the greatest smile ☺ My being after Bob's death became the little girl growing up in a chaotic world. I lost all sense of trust. I thought it would be easier that way.

        I have been fortunate enough to find another therapist, Michelle Sullivan. No one will ever take the place of Bob, — but ... she's pretty damn close. 5 weeks ago I was diagnosed w/ Bulemia. My weight is currently 125 pounds. Pretty skinny, but I

Page 33

want more. My brother Robert is the only sibling that knows anything. most

State's Ex. 18  A-181

most likely that will remain the
case. At this point, I'm afraid
to share this news with Michael.
I don't want him to run. I
truly love him, — + I'm afraid
of what he might think of me.
Michael is the most wonderful
person. This is the first "normal"
relationship I've ever had, and
I can't screw it up!

Subject: re: Monday
Author: afahey@gov.state.de.us at Internet
Date: 5/20/96 11:47 AM


I am confused about Victor's. We never talked about it. I am leaving on
Thursday after work to go the Cape Cod for Memorail day. 1st question,
Russia, Spain, Thailand, U.S. 2. Sara Lee was real and I believe she is
still alive. Mrs. Paul not real. As for Levi Strauss, I am going to say
that he was some legend cowboy. How am I doin' so far? I have had a
pretty bad last 2 days. My weight has dropped 6 pounds, and I nearly
fainted in Chuch yesterday. I am starting to get scared. I'll talk to ya
later, someone is here working on my machine. amf

52

State's Ex. 53  A-183

From tcapano@saul.com, on 5/20/96 2:53 PM:

I thought we had talked about doing dinner again on Thursday but obviously misunderstood. What's up with the Cape? How about dinner on Wednesday? You're wrong on the first question. In order: U.S., Russia, Thailand, Spain. (I'm not sure I believe it). You're right about Sara Lee and Mrs. Paul but wrong about Levi Strauss (little old Jewish guy). You did well enough to win in my book. I did hear from one Fahey this morning; Robert called me but I haven't returned the call yet. Did you make it to Radnor on Saturday? Who you taking to the Blue Rocks tomorrow night? Annie, I'm trying to be light but it ain't working. I'm real worried about the bad couple of days you've had, the weight loss and nearly fainting in Church. Maybe you should call Michelle today. Please call me this afternoon or email to let me know we can talk tonight after Brian Michael's.

State's Ex. 53   A-184

From tcapano@saul.com, on 5/21/96 10:54 AM:

Good Morning Annie,

Glad you enjoyed the fax and that you ate well at Debbie's. Don't worry about the game tonight but remember you have the tickets for next Tuesday as well. I guess Brian did not get your air conditioner in for you last night. Your apartment must be unbearable. I'd be glad to put it in for you today; just let me know when. I'm worried about you. Don't tell me not to because you know I do. Did you call Michelle? Probably not. I assume you have an appointment with her tomorrow morning and that you intend to keep it. Please be sure you give her the $500 tomorrow since you're out of credit. Since you're not going to go to the game and won't be here Thursday, could we have dinner tonight? It would be good for me and, at the risk of sounding pompous, I think you might get something out of it too under the circumstances. By the way, I just got in because of the dentist. Please call when you can or let me know when I can call you. I'll wait to hear from you.

State's Ex. 53   A-185

Author: THOMAS CAPANO at Sers-Wilmington
Date:    6/3/96  12:19 PM
Priority: Normal
Receipt Requested
TO: afahey@state.de.us at Internet
Subject: Monday
-------------------------------- Message Contents ----------------------------

Hey you. You'll get this after I'm gone but I didn't want the day to
go by without saying hi. I know you're having a rough day and hope it
doesn't make you crazy. Keep your fingers crossed that the rain stops
so we get our round in today. Enjoy your nephew tonight and remember
to tell me tomorrow what Debbie cooked. Please be careful at the gym
and give me a ring if you feel like it tonight. If not, I'll talk to
you tomorrow. How's about dinner Thursday night? Lobster at the
Dilworthtown? You did a great job with Mark yesterday and should be
proud of the way you handled it. AND TAKE YOUR VITAMINS!!!!

State's Ex. 53  A-186

# OBERLY, JENNINGS & DREXLER, P.A.

### ATTORNEYS AT LAW
800 DELAWARE AVENUE
SUITE 901
P.O. BOX 2054
WILMINGTON, DELAWARE 19899-2054



Charles M. Oberly, III
Kathleen M. Jennings
Lawrence S. Drexler

Lisa B. Borin
Ann-Marie P. Sheely

(302) 576-2000
Fax (302) 576-2004
E-Mail OJD@de-law.com

July 9, 1997

Colm F. Connolly
Assistant United States Attorney - DE
Chase Manhattan Centre
1201 Market Street, Suite 1100
P. O. Box 2046
Wilmington, DE 19899-2046

Re: **Thomas J. Capano**

Dear Colm:

I am in receipt of three letters from you dated June 23, 1997. Each deals with a separate issue. I would like to address them as follows:

It is somewhat unclear to me why you have, again, raised the issue of Mr. Capano giving a statement. As you well know, Mr. Capano gave two statements to the Delaware State Police/Wilmington Department of Police during the early stage of the investigation. Mr. Capano also called Anne Marie Fahey's brother, the transcript of which was printed in its entirety by the News Journal on Sunday, June 29, 1997. In addition to that offer, which was rejected by the family at that time, Mr. Capano made two offers to give additional statements. Each was rejected by the Attorney General's Office.

Prior to the FBI or anyone from your office seeking to obtain a statement from Mr. Capano, Federal authorities executed a search warrant on his home. When the contents of the search warrant were made public, it was apparent that the conclusionary statements made in that affidavit precluded any chance for a further interview. The FBI clearly stated its conclusion that it believed Mr. Capano was responsible for a crime. Under these circumstances, no attorney that I have ever met would recommend the client come in and give a statement. Mr. Capano gave two statements, attempted to contact the family, and attempted on two additional occasions to give a statement, which could have been video-taped. His efforts were rejected and, he has

Colm F. Connolly
July 9, 1997
Page 2


been designated as a murderer by the FBI and had his life essentially destroyed. To suggest that
he should come in and speak with you under these circumstances is completely unacceptable and
unrealistic.

Very truly yours,

CHARLES M. OBERLY, III

CMO,III/dq

P.S. I would have responded to these letters sooner, but as you are aware, I was on vacation from
June 20 thru July 2, 1997.

Defendant Ex. 103  A-188

# OBERLY, JENNINGS & DREXLER, P.A.

ATTORNEYS AT LAW

800 DELAWARE AVENUE

SUITE 901

P.O. BOX 2054

WILMINGTON, DELAWARE 19899-2054

1996

Charles M. Oberly, III
Kathleen M. Jennings
Lawrence S. Drexler

(302) 576-2000
Fax (302) 576-2004
E-Mail OJD@de-law.com

Lisa B. Borin
Ann-Marie P. Sheely

July 22, 1996

Ferris W. Wharton
Deputy Attorney General
c/o Stephen M. Walther, State Prosecutor
Department of Justice
820 N. French Street - 8th Flr.
Wilmington, DE 19801

Dear Ferris:

As you know, I represent Tom Capano, who came to me as a friend of many years. Tom has been a political, professional, and social friend since our days together in the Attorney General's Office in the mid-1970's. Unfortunately, with the single exception of the Philadelphia Inquirer, there has never been a reference to our close relationship and the fact that it would be quite expected for him to seek me out for advice. Tom has been devastated by Anne Marie Fahey's disappearance and the suspicion and innuendo surrounding the fact that he took her to dinner on June 27th and is, as far as anyone knows, the last person to see her.

Contrary to media reports, Tom has been completely cooperative in trying to solve the mystery of Anne Marie's disappearance. On Sunday morning, June 30, 1996 at approximately 3:00 a.m., Tom was awakened at his home by four police officers inquiring about Anne Marie's failure to attend a dinner and her apparent disappearance. Tom spoke to the investigators at length, volunteering detailed information concerning their June 27th dinner. Subsequently, on the same day in the afternoon, the same four police officers confronted Tom as he was returning his children to their mother's home and asked to speak with him again. Tom again complied with the request and returned to his home on Grant Avenue. More questioning ensued along with a request to inspect his residence and his Jeep Cherokee. Tom answered all the questions and without hesitation permitted the officers to walk throughout his house and to inspect his vehicle. He put no limitation on their questions or their search.

STATE'S EX. 255



**009381**

State's Ex. 255 A-189

Ferris W. Wharton
July 22, 1996
Page 2

Only after two conversations with the police, a search of his home and vehicle and a telephone conversation with Kim Horstmann, wherein she indicated the police were acting like Tom was a suspect, did he come to see me. Since that time, Tom has tried to offer further assistance to help find Anne Marie. On July 8, 1996, Bart Dalton informed you that Tom was, in fact, again willing to speak with the police regarding Anne Marie. He was not, however, willing to violate any privacy interest he justifiably felt existed between Anne Marie and him and believed that nothing occurring before 1996 had any relevance to Ms. Fahey's current whereabouts. Bart also communicated that questions regarding Tom's marital relationship and other relationships he may or may not have had are totally irrelevant to any search for Ms. Fahey. In wanting to protect the privacy of people close to him who can add absolutely nothing to help find Ann Marie , but motivated by his desire to assist the police in locating her, Tom asked that we relay to you his request to speak again to the police.

For reasons unknown, Tom's offer to speak to the police was rejected with the statement that there can be no pre-conditions to areas of inquiry. We were all shocked and dismayed by that decision. Nevertheless, he then reached out and called Robert Fahey, Anne Marie's brother, and left a message for him. Mr. Fahey never returned the call and the News Journal reported erroneously that Tom had made no effort to contact the family. Moreover, Tom has also spoken at length to Bud Freel and Kim Horstmann, which I am sure you are fully aware, as well as to a third mutual friend in an effort to establish contact with the family. All of his efforts have gone unanswered.

Despite news leaks and comments that have harmed Tom's reputation and mischaracterized the rejection of his offer to talk to the police, Tom insisted Bart contact you again on July 16th to renew his offer to cooperate, a course of action we advised against. Tom had learned that the Fahey family was willing to waive any privacy interest Tom felt existed regarding his relationship with Anne Marie. With this thought in mind, Tom asked that you be advised that he was willing to talk about any aspect of their relationship from its inception to the night of June 27th when he took her home, including any confidences reposed in him by Anne Marie or insights he had gained into her character and state of mind. Again, Bart stated that Tom was not willing to discuss unrelated aspects of his private life and subject loved ones, especially his four daughters, to embarrassing and/or personal matters having nothing to do with Anne Marie's disappearance. There were no other pre-conditions that would prevent the taking of another statement. We agreed to appear at any location you chose and to have it taped. You stated there was no need to use a video tape since Michael Scanlon was not video-taped. Again, you rejected Tom's offer to speak, stating that every aspect of his life was subject to inquiry, and he could decline to answer specific questions if he so desired.

**009382**

Ferris W. Wharton
July 22, 1996
Page 3

It is now beyond question that Tom's continued cooperation is sought not to find or learn anything that may be helpful in locating Anne Marie, but for other purposes. Under these circumstances, I am sure you can appreciate the advice we have given Tom. We have advised him in the strongest possible terms that in light of the second rejection, he should not make any further statements, and I request that he not be asked to do so again. Nevertheless, Tom will search his memory regarding Anne Marie, and I will forward to you any information that can provide further insight into this bizarre mystery, including a chronology of their recent contacts.

In closing, I want to state that leaks and comments to the press have unfairly pummeled Tom's reputation and damaged his professional career. He told the police he brought Anne Marie home around 10:00 p.m. or shortly thereafter. Connie Blake, an unbiased witness, told the police that she heard footsteps in Anne Marie's apartment around that time, thus verifying Tom's statement. You already know he was in Philadelphia as late as 9:15 p.m. when the restaurant check was stamped.

We certainly appreciate the pressure placed upon law enforcement in a case such as this. On the other hand, we hope you can appreciate the damage caused to Tom by leaks to the press, unfounded comments, and rumors circulating in the community. Since June 30th, Tom has cooperated and, as noted above, will continue to do so.

Very truly yours,

*Charlie*

CHARLES M. OBERLY, III

CMO,III/dq

State's Ex. 255  A-191

## CERTIFICATE OF SERVICE

The Law Office of Joseph M. Bernstein hereby certifies that on _2/20/07_, a copy of

the attached _Appendix to Brief_ was served by

( ) First Class Mail

(X) Hand Delivery

on the following:

Loren C. Meyers, Esquire
Elizabeth R. McFarlan, Esquire
Department of Justice
Carvel State Building
820 N. French Street
Wilmington, DE 19801

_Joseph M Bernstein_
Joseph M. Bernstein

## CERTIFICATE OF SERVICE

The Law Office of Joseph M. Bernstein hereby certifies that on  *2/20/07* , a copy of

the attached  *Opening Brief*  was served by

    ( ) First Class Mail

    (✗) Hand Delivery

on the following:

Loren C. Meyers, Esquire
Elizabeth R. McFarlan, Esquire
Department of Justice
Carvel State Building
820 N. French Street
Wilmington, DE 19801

*Joseph M Bernstein*
_____
Joseph M. Bernstein