**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **THOMAS J. CAPANO,** Petitioner, | : | |
| | : | |
| v. | : | Civil Action No. 06-58 *** |
| | : | |
| **THOMAS CARROLL**, Warden, *et al.*, Respondent. | : | |

# APPENDIX TO PETITIONER'S OPENING BRIEF IN SUPPORT OF PETITION FOR HABEAS CORPUS

JOSEPH M. BERNSTEIN (DE Bar #780)
800 N. King Street - Suite 302
Wilmington, DE 19801
302-656-9850
302-656-9836 (Fax)
E-mail: jmbern001@comcast.net
Attorney for Petitioner

DATED: February 20, 2007

# TABLE OF CONTENTS

|  | PAGE |
|---|---|
| PETITION FOR WRIT OF HABEAS CORPUS | A-1 |
| EXCERPTS FROM TESTIMONY OF BRIAN FAHEY | A-8 |
| EXCERPTS FROM TESTIMONY OF DR. NEIL KAYE | A-10 |
| EXCERPTS FROM TESTIMONY OF KATHY FAHEY | A-22 |
| EXCERPTS FROM TESTIMONY OF DR. GREGORY JOHNSON | A-29 |
| EXCERPTS FROM CONFERENCE - 10/29/98 | A-35 |
| EXCERPTS FROM SIDEBAR - 11/2/98 | A-36 |
| EXCERPTS FROM TESTIMONY OF DR. MICHELLE SULLIVAN | A-37.2 |
| EXCERPTS FROM TESTIMONY OF JILL MORRISON | A-48 |
| EXCERPTS FROM TESTIMONY OF SIOBHAN SULLIVAN | A-58.1 |
| EXCERPTS FROM TESTIMONY OF JENNIFER BARTELS-HOUGHTON | A-59 |
| EXCERPTS FROM TESTIMONY OF JACQUELINE STEINHOFF | A-66 |
| EXCERPTS FROM TESTIMONY OF GINNY COLUMBUS | A-72 |
| EXCERPTS FROM TESTIMONY OF KIM HORSTMAN | A-75 |
| EXCERPTS FROM TESTIMONY OF KATHLEEN CAPANO | A-90 |
| EXCERPTS FROM TESTIMONY OF JERRY CAPANO | A-93 |
| EXCERPTS FROM TESTIMONY OF LOUIS CAPANO | A-110 |
| EXCERPTS FROM TESTIMONY OF DAN LYONS, ESQUIRE | A-118 |
| EXCERPTS FROM TESTIMONY OF DEBORAH MacINTYRE | A-121 |
| EXCERPTS FROM TESTIMONY OF BRIAN MURPHY | A-135 |
| EXCERPTS FROM TESTIMONY OF RUTH BOYLAN | A-137 |

| | PAGE |
|---|---|
| EXCERPTS FROM TESTIMONY OF KENNETH CHUBB | A-138 |
| EXCERPTS FROM TESTIMONY OF JOSEPH CAPANO | A-139 |
| EXCERPTS FROM TESTIMONY OF DR. CAROL TAVANI | A-141 |
| EXCERPTS FROM TESTIMONY OF THOMAS CAPANO | A-144.1 |
| EXCERPTS FROM TESTIMONY OF KIM JOHNSON | A-165 |
| EXCERPTS FROM CONFERENCE - 1/7/99 | A-168 |
| EXCERPTS FROM CONFERENCE - 1/11/99 | A-170 |
| EXCERPTS FROM STATE'S CLOSING ARGUMENT - TRIAL | A-173 |
| EXCERPTS FROM CONFERENCE - 1/26/99 | A-178 |
| EXCERPTS FROM STATE'S CLOSING ARGUMENT - PENALTY PHASE | A-178.1 |
| EXCERPTS FROM JURY INSTRUCTIONS - PENALTY PHASE | A-179 |
| EXCERPTS FROM JURY VERDICT - PENALTY PHASE | A-180 |
| STATE'S EXHIBIT 18 - EXCERPT FROM ANNE MARIE FAHEY DIARY | A-181 |
| EXCERPTS FROM STATE'S EXHIBIT 53 - EMAILS | A-183 |
| DEFENDANT'S EXHIBIT 103 | A-187 |
| STATE'S EXHIBIT 255 | A-189 |

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

2006 JAN 30 AM 9: 42

**THOMAS J. CAPANO,**
Petitioner,

v.

**THOMAS J. CARROLL**, Warden, Delaware Correctional Center and **CARL C. DANBERG,** Attorney General of the State of Delaware,
Respondents.

: Civil Action No. 06 - 58 -

**PETITION FOR WRIT OF HABEAS CORPUS UNDER 28 U.S.C. §2254**

1. **Name and location of court which entered the judgment of conviction under attack:** Superior Court of the State of Delaware (New Castle County), 500 N. King Street, Wilmington, DE 19801.

2. **Date of judgment of conviction:** (1) conviction by jury - January 17, 1999; (2) sentencing decision - March 16, 1999.

3. **Length of Sentence:** A sentence of death was imposed by the trial court. However, that sentence was vacated by the Supreme Court of Delaware on January 10, 2006. *See, Capano v. State*, 2006 Del. LEXIS 1.

4. **Nature of offense involved:** First Degree Murder

5. **What was your plea?** - Not Guilty

6. **If you pleaded not guilty, what kind of trial did you have?** - Jury trial

7. **Did you testify at the trial?** - Yes

8. **Did you appeal from the judgment of conviction?** - Yes

9. **If you did appeal, answer the following:**

**(A) Name of court** - Supreme Court of Delaware
**(b) Result** - conviction and death sentence were affirmed
**(c) Date of result and citation** - August 10, 2001; *Capano v. State*, 781 A.2d 556 (Del. 2001)

**(D) Grounds raised:**

(1)At trial, Capano had expressly requested that the jury be charged on lesser included offenses. Since the evidence was also consistent with lesser degrees of homicide, Capano was entitled to jury instructions on the lesser included offenses to the charged offense of Murder First Degree under the Due Process Clause of both the federal and state Constitutions. See, *Beck v. Alabama*, 447 U.S. 625(1980).

(2)The State's theory of the case as to Capano's "motive" and "intent" rested nearly entirely on inadmissible hearsay evidence of the victim's out-of-court statements to her psychotherapists, family and friends. This evidence was inadmissible under D.R.E. 803(3) (state of mind exception) and especially in the State's case-in-chief. See, *Porter v. State*,587 A.2d 188 (Del. Super. 1990). It was also inadmissible under D.R.E. 803(4) (statements for purpose of medical diagnosis). Admission of this hearsay evidence also violated Capano's Sixth Amendment right to confrontation.

(3)The trial court wrongly admitted evidence of Capano's "bad" character and "bad acts" in violation of *Getz v. State*,538 A.2d 726 (Del. 1988), and its progeny.

(4) The trial court wrongly allowed the jury to hear evidence that Gerry Capano, the defendant's brother, who was a crucial witness for the State on the question of "planning" and "premeditation," had taken (and presumably passed) a lie detector test.

(5) The trial court wrongly allowed the State to question the defendant on cross-examination about matters that were reasonably intended to provoke Capano to assert the lawyer-client privilege; and to ask him so-called "were they lying?" questions. These lines of questioning amounted to prosecution misconduct under *Hughes v. State*,437 A.2d 559 (Del. 1981), and its progeny.

(6) The trial court wrongly allowed State's witnesses to express their personal opinion that Capano was "guilty."

(7) The trial court abused its discretion in failing to properly investigate a claim of juror bias or misconduct and in summarily dismissing a juror during the trial.

(8) The defendant's exclusion from "office conferences" where nearly all of the critical rulings in the case were made violated the defendant's Sixth Amendment right to be present at all stages of his trial.

(9) The trial court abused its discretion in refusing to require the State to turn over to the defense admitted "*Brady* material" concerning Gerry Capano's use of drugs.

(10) The trial court improperly limited the scope of the defendant's right of allocution in the penalty hearing in violation of *Shelton v. State*,744 A.2d 465, 488-497 (Del. 2000).

(11) The trial court's jury instruction on the elements of the statutory aggravating circumstance that the killing was "premeditated and the result of substantial planning" was erroneous as a matter of law.

(12) The defendant's death sentence is invalid because the jury did not unanimously find that the State had established beyond a reasonable doubt that the killing was "premeditated and the result of substantial planning," which was the only statutory aggravating circumstance in the case.

(13) Delaware's death penalty statute was unconstitutional under the Sixth Amendment because it did not require a unanimous finding by the jury as to the existence of statutory aggravating circumstances.

(14) The imposition of the death penalty in this case was "disproportionate" to the penalty imposed in similar cases.

(15) The case should be remanded for an evidentiary hearing to review whether the rulings made by the trial court may have been influenced - consciously or unconsciously - by any motive on the part of the trial judge to use his role in the case, in presiding over a conviction and imposing the death penalty in a highly publicized case, to advance his political career, and all rulings made by the court below must be scrutinized with special care since the trial judge used this case, the conviction and the death penalty, to launch his political career.

(16) The trial court abused its discretion in allowing the State to impeach the defendant by evidence of prior sexual misconduct.

(17) The defendant's Fifth Amendment privilege was violated when the State was permitted to question the defendant concerning his post-arrest silence.

**(e) If you sought further review of the decision on appeal by a higher state court, please answer the following** : Not applicable.

**(f) If you filed a petition for certiorari in the United States Supreme Court, please answer the following with respect to each direct appeal:**

**(1) Name of Court -** United States Supreme Court
**(2) Result -** the petition was denied
**(3) Date of result and citation** - June 28, 2002; *Capano v. Delaware*, 536 U.S. 958 (2002)

**(4) Grounds raised:**

(1)At trial, Capano had expressly requested that the jury be charged on lesser included offenses. Since the evidence was also consistent with lesser degrees of homicide, Capano was entitled to jury instructions on the lesser included offenses to the charged offense of Murder First Degree under the Due Process Clause of both the federal and state Constitutions. See, *Beck v. Alabama*, 447 U.S. 625(1980).

(2) Delaware's death penalty statute was unconstitutional under the Sixth Amendment because it did not require a unanimous finding by the jury as to the existence of statutory aggravating circumstances.

10. **Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications or motions with respect to this judgment in any court, state or federal?** Yes.

11. **If your answer to 10 was "yes," give the following information:**

**(A) (1) Name of Court -** Delaware Superior Court (New Castle County)

**(2) Nature of proceeding -** Petition for post-conviction relief under Superior Court Criminal Rule 61.

**(3) Grounds raised:**

(a) The statutory provisions for imposition of the death penalty that were in effect at the time of Capano's trial and sentencing are facially unconstitutional in that they deprived Capano of his right under the Sixth and Fourteenth Amendments to the United States Constitution and Article 1, §4 and Article 1, §7 of the Constitution of the State of Delaware to have a jury make the final determination, unanimously and

beyond a reasonable doubt, whether Capano was "eligible" to be sentenced to death. *See, Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). The decision in *Brice v. State,* 815 A.2d 314 (Del. 2003), which upheld the constitutionality, under *Ring,* of the 1991 Death Penalty Statute, should be overruled.

(b)Even if *Brice* is not overruled, any "*Ring* error" is subject to review under the "harmless error" standard. In this case, the constitutional error was not "harmless" and the Delaware death penalty statute is unconstitutional "as applied to" Capano because the "advisory jury" did not unanimously agree that the State had proved the existence of the only statutory aggravating circumstance alleged — that "the murder was premeditated and the result of substantial planning." *See, Norcross v. State*, 816 A.2d 757, 767 (Del. 2003)

(c)If the 1991 Delaware death penalty statute is facially unconstitutional, the application of the doctrine of "severability" requires that the court vacate Capano's death sentence and impose a sentence of life imprisonment without benefit of probation or parole.

(d) If Capano's death sentence is invalid under *Ring, Brice,* or *Norcross*, a retrial of the penalty phase is barred under the Double Jeopardy Clause.

(e) The defendant's trial attorneys were "ineffective" under *Strickland v. Washington*, 466 U.S. 668 (1984), as follows: (a) in agreeing to stipulate to the admissibility of admittedly hearsay statements made by Anne Marie Fahey, and (b) in failing to object to the cross-examination of the defendant concerning pre-arrest and post-arrest silence.

**(4) Did you receive an evidentiary hearing on your petition, application or motion?** Yes.

**(5) Result** - The Rule 61 Motion was denied. *State v. Capano*, 2005 Del. Super. LEXIS 69 (March 9, 2005)

**(b) As to any second petition....** Not applicable

**(c) Did you appeal to the highest state court having jurisdiction the result of action taken on any petition, application or motion?** Yes.

**(d) If you did not appeal......** Not applicable

12. **Grounds for Habeas Corpus Relief**

**Ground One**: At trial, Capano had expressly requested that the jury be charged on lesser included offenses. See, *Capano v. State*, 781 A.2d at 627. Because the evidence was also consistent with lesser degrees of homicide, Capano was entitled to jury instructions on the lesser included offenses to the charged offense of Murder First Degree under the Due Process Clause of both the federal and state Constitutions. See, *Beck v. Alabama*, 447 U.S. 625(1980). The trial court rejected Capano's request. *Capano*, 781 A.2d at 627. In his direct appeal, Capano argued that the refusal to instruct on lesser included offenses violated his Due Process rights under *Beck*. *Id.*, at 633. Capano's *Beck* claim was also rejected by the Delaware Supreme Court. *Id.*

**Ground Two**: The statutory provisions for imposition of the death penalty that were in effect at the time of Capano's trial and sentencing are facially unconstitutional in that they deprived Capano of his right under the Sixth and Fourteenth Amendments to the United States Constitution to have a jury make the final determination, unanimously and beyond a reasonable doubt, whether Capano was "eligible" to be sentenced to death. *See, Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). In the state court post-conviction proceedings, the Delaware Supreme Court rejected Capano's claim that the Delaware death penalty statute was unconstitutional under *Ring*. See, *Capano v. State*, 2006 Del. LEXIS 1, *16-*19. The Delaware Supreme Court held, however, that "the advisory jury in Capano's case did not unanimously find the element that the 'murder was premeditated and the result of substantial planning.' Without a unanimous jury finding of the statutory aggravating circumstance, the procedure used to sentence Capano to death under the 1991 statute was unconstitutional as applied to him." *Id.*, at *21. The Delaware Supreme Court's conclusion that the Delaware death penalty statute was not facially unconstitutional under *Ring* allowed the court to permit a re-trial of the "penalty phase" of the case. Conversely, if the statute is unconstitutional under *Ring*, then the doctrine of "severability" would have required to court to re-sentence Capano to life imprisonment and would have barred any re-trial of the penalty phase of the case.

**Ground Three:** The decision of the Delaware Supreme Court in the post-conviction proceedings to permit a re-trial of the "penalty phase" of the case violated Capano's rights under the Double Jeopardy Clause of the Fifth Amendment to the United states Constitution. In the "penalty phase of Capano's trial, the jury voted 11 to 1 that the State had established the only statutory aggravating circumstance alleged to exist in the case – that the murder was the result of substantial planning and premeditation. The jury's non-unanimous vote was the functional equivalent of an acquittal on the question of Capano's eligibility to be exposed to a possible death sentence. See, *Sattazahn v. Pennsylvania,* 537 U.S. 101 (2003).

**Ground Four:** In Capano's direct appeal, the decision of the Delaware Supreme Court that the victim's out-of-court statements to her friends, family and psychotherapists concerning her relationship with Capano and "bad acts" allegedly committed by Capano were admissible under state law rules of evidence violated Capano's rights under theConfrontation Clause of the Sixth Amendment to the United States Constitution. See, *Capano v. State*, 781 A.2d at 615 and 627.

**Ground Five:** In Capano's direct appeal, the decision of the Delaware Supreme Court that it was proper for the State to cross-examine Capano concerning "post-arrest silence" violated Capano's rights under the Fifth Amendment to the United States Constitution. See, *Capano v. State*, 781 A.2d at 647-649.

**Ground Six:** Capano's trial attorneys were "ineffective" under *Strickland v. Washington*, 466 U.S. 668 (1984), as follows: (1) they did not request limiting instructions concerning Anne Marie Fahey's out-of-court statements; (2) they agreed to a stipulation that admitted Fahey's out-of-court statements; and (3) they did not object to the prosecutor's cross-examination of Capano about his pre-arrest and post-arrest silence in possible violation of his Fifth Amendment rights. See, *Capano v. State*, 2006 Del. LEXIS 1 at *8-*16.

13. **If any of the grounds listed in 12 were not previously presented in any court, state or federal, state briefly what grounds were not so presented and give your reasons for not presenting them.** Not applicable.

14. **Do you have any petition or appeal now pending in any court, either state or federal, as to the judgment now under attack?** Yes. As a result of the decision of the Delaware Supreme Court in *Capano v. State*, 2006 Del. LEXIS 1, the State is entitled to a retrial of the "penalty phase" of the trial. That retrial has not yet taken place.

15. **Give the names and addresses of each attorney who represented you at each stage of the judgment attacked herein:**

(1) the following attorneys represented the petitioner during all or part of the period from the time of his arrest through conviction and sentence in the trial court.

Joe A. Hurley, Esquire
1215 King Street
Wilmington, DE 19801

John F. O'Donnell, Esquire
2648 N.E. 26th Place
Ft. Lauderdale, FL 33306

Joseph S. Oteri, Esquire
20 Park Plaza, Suite 905
Boston, MA 02116

Charles M. Oberly, III, Esquire
Oberly, Jennings & Rhodunda, P.A.
PO Box 2054
Wilmington, DE 19899

Eugene J. Maurer, Jr., Esquire
1201-A King Street
Wilmington, DE 19801

(2) The following attorneys represented petitioner on direct appeal

Joseph M. Bernstein, Esquire
800 N. King Street - Suite 302
Wilmington, DE 19801

David A. Ruhnke, Esquire
Ruhnke & Barrett
47 Park Street
Montclair, NJ 07042

Paul Shechtman, Esquire
Stillman & Friedman, P.C.
425 Park Avenue
New York, NY 10022

(3) The following attorneys represented the petitioner in state court post-conviction proceedings and on appeal in post-conviction proceedings

Joseph M. Bernstein, Esquire
800 N. King Street - Suite 302
Wilmington, DE 19801

David A. Ruhnke, Esquire
Ruhnke & Barrett
47 Park Street
Montclair, NJ 07042

16. **Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?** No.

17. **Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?** No.

**WHEREFORE,** petitioner prays that the Court grant petitioner all relief to which he may be entitled under this Petition

Joseph M Bernstein

JOSEPH M. BERNSTEIN (#780)
800 N. King Street - Suite 302
Wilmington, DE 19801
302-656-9850
Attorney for Petitioner

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 1/13/06

Thomas J. Capano

Page 61

entitled to know that.

MR. OTERI: Let's do it, Judge.

MR. O'DONNELL: Especially those of us sitting next to him.

(End of side bar.)

THE COURT: Mr. Oteri, we found a new use for you.

Thank you, sir.

You may proceed, Mr. Wharton.

MR. WHARTON: Thank you, your Honor.

BY MR. WHARTON:

Q. You -- during your trip to Ireland with her and during the time you spent together when she lived with you and your father, did you notice that Anne Marie, did she have any habits that might be described as a little bit unusual?

A. Yeah. When we lived -- I guess when we were living in Wilmington, I didn't really notice it. I know when she moved in with Carol, she -- things sort of changed because she felt like she didn't really belong there and that my grandmother had said to her not to cause Carol any trouble.

And so Anne really took that to the extreme

Page 62

and so she tried to -- she didn't really feel right about eating Carol's food in her room. She tried to keep it as neat as possible so Carol would never have to clean up after her, and that's when I really saw that change, because I hadn't seen that when we were living together before.

So I think it was as a result of living with Carol that that sort of behavior started.

Q. And which sort of behavior was that?

A. Just being real -- I mean people kidded her, called her anal all the time.

It was really -- that's what I mean about being obsessive about cleaning up and having things look just right, and that was the first time I saw her really, you know, control how much she was eating.

Like I said, she often said she felt guilty eating Carol's food because she wasn't buying any food, wasn't bringing any into the house, so I would often, on the way home from school when I would pick her up at Brandywine, you know, if I had seen a game or something like that, we would go and eat so she wouldn't have to eat dinner at Carol's house.

Q. Did you know about some of the -- some of the

Page 63

people she dated?

Did she keep you advised of those people?

A. Yeah, she did.

Q. Not that she had to or anything?

A. Right.

Q. But were you aware of any of those?

A. I was, yeah, in high school and college.

Q. And even when she was working for the Governor, whether she dated different people?

A. Yeah. Yeah, definitely.

Q. And would that be a topic of -- that you talked about on occasion?

A. Yeah, she did.

And, you know, the more time -- when we would spend time together over an extended period, for instance, it would come up more often than just a phone call, but there were some -- there were -- yeah, there was several guys.

There was a guy in Media that she dated for a while.

There was someone from the AG's office that she dated.

There was another guy who was sort of a blind

Page 64

date through a friend that she dated. And that's -- that's after college when she was working for the Governor.

Q. Were you aware of any relationship with Tom Capano?

A. No. No.

Q. She never confided anything to you?

A. No.

Q. Did she know how -- how you felt about, for example, marital infidelity?

A. I don't think we ever really talked about that, so I don't know that we ever had a lot of discussions about that.

I -- so, no, I don't -- she may have been able to guess, but we never really got into it, no.

Q. Did -- do you know about Mike Scanlon?

A. Sure. Yeah.

I remember when she had their first date, she called me up and told me about it.

Q. Do you know who arranged for that first date?

A. Tom Carper had met Mike, I guess, through some business that, you know, he had had with the State and MBNA, and I knew Mike does a lot of

community work, so that's probably how the Governor met him, thought he and Anne Marie would make a, you know, good match, so he suggested it.

Q. Do you know about when that was? When they first got together, Anne and --

A. Yeah, like fall of '95. Yeah.

Q. And did she date him regularly or --

A. She ended up dating him regularly. Not at first.

I know that she called me after their first date and thought that it sort of had been a flop.

It was one -- they met at O'Friels, and there were other people there, and he didn't -- there just wasn't a whole lot going on between them and she thought that -- she thought that he had sort of brushed her off.

Q. Did she begin to date regularly?

A. They started to after that and I don't know how often they saw each other.

I know it was, you know, during the week and on weekends.

Q. Up until her death, if you had to say whether she had a boyfriend or not, would you say that Mike

Scanlon was her boyfriend?

A. Yes.

Q. Did he come to different family events?

A. Yeah, he did, you know, on holidays. He was there on her 30th birthday at my sister's house and on, you know, on -- every once in a while on a weekend, it wasn't a real holiday, just sort of a get together, dinner at somebody's house.

Q. That would be something that would happen on a semi-regular basis or what?

A. Yeah.

Q. I mean your family.

A. Right, with the family. And they came to one of my basketball games together.

Q. One of your?

A. One of my basketball games together.

Q. Do you know whether she visited his parents?

A. She did. On -- in '96, on Memorial Day weekend.

Q. And Mike Scanlon's parents, are they local or not?

A. No, they live up in New England.

Q. So the trip was up there?

A. Right.

Q. Would -- would it be fair to say that at least from a somewhat rocky start, you're talking about the relationship picking up steam?

A. From appearances, it was, and also from talking to her, I thought that it was, also.

Q. Do you know whether -- you alluded to her controlling her food intake while she was living at Carol's or as a result of living at Carol's.

Do you know whether she had difficulties with eating disorders later on in life?

A. I know she did, yeah.

Q. How do you know that?

A. Well, I know that in the spring of '96, I talked to her about it.

We were -- my sis -- we were at my sister, Kathleen's house and she just -- you know, she didn't look good at all, so I asked her about it.

Q. She told you that she had some difficulty in that area?

A. She was a little cryptic about it, because my nephews were around, and there was some other people in the house, so she didn't want to talk about it a

lot that day.

But she told me that she was -- she had, you know -- I asked her if anything was wrong and she said, yes, and I told her it looked like she hadn't been eating. And she said she had a problem, and I asked her who she was -- who she was talking to about it, if she was getting help, and she told me that, you know, she was getting help for it.

And that's all we said that day, and then later that night, I talked to her on the phone.

Q. I want to move a little bit forward to June of 1996.

A. Um-hum.

Q. When was the last time you saw her?

A. I saw her on a Friday night, the 21st of June.

I -- I was leaving to go to Ecuador the next morning, and I had to go into O'Friels to drop some things off for Jimmy Freel, and Anne Marie and Mike were at O'Friels, and I really didn't expect to see them there, but they were there.

Q. And what were they doing?

A. Just hanging around really. It looked like

And, again, these are people who work with patients, using the techniques with which they are familiar, trained, experienced, and comfortable, and those are often very effective for a person.

And what we try to do when we see a new patient is to make a decision about where the best fit will be in terms of medication or of no medication; with or without a talking therapy; if a talking therapy, what type of talking therapy; and delivered by whom.

Q. I want to talk with that sort of context now about Anne Marie Fahey.

Do you know her? Did you know her?

A. Yes, I did know Anne.

Q. Was she a patient in your practice?

A. Yes, Anne was my patient as well as a patient in the practice.

Q. Okay. Without getting into the details right now of why she was seeing your practice, can you sort of outline for us the time frame during which she was a patient?

A. Anne was a patient in the practice during two different -- three different time periods.

She was a patient in 1991 for about four months, and during that time, she saw Bob Conner, who is -- I should say who was -- he's deceased, I'm sorry to say, but she saw Bob for talking therapy and she saw Doctor Catherine Clary, who was my partner, but has now moved to New York City, for medication.

Then in 1970 -- I'm sorry, in 1993, she again started to see Bob for therapy and he then referred her to me for medication followup.

And then after Bob was killed on his way home from the office in a very tragic car accident, she sort of dropped out of treatment with us for reasons that I think I understand and continued her treatment elsewhere.

Q. Let me interrupt you just for a second.

If you could give us a date of Bob Conner's death?

A. Bob Conner was killed January 24th, 1995.

Q. And she dropped out of treatment with your practice when? Approximately.

A. January 24th, 1995. I mean when Bob -- when Bob died. That was a substantial loss for all of us and certainly for his patients.

Q. I'm sorry, you were continuing with -- were you aware that she began seeing people outside of your practice?

A. Actually, I need to correct that. That's not that correct.

After Bob died, she followed up with Wes Novak, who is a psychologist in our practice, for a short period of time, about two months, and then went elsewhere.

Then she reentered treatment with me in June of 1996 shortly before her death.

Q. Do you know with whom -- from whom she sought treatment, if anybody, in the period after she left your practice and before she came back to your practice?

A. Yes. I know that she saw two people. She saw Gary Johnson and she saw Michele Sullivan.

Q. Now, when -- when -- and she returned to your practice in June of '96, I think you said.

Did you actually see her during that period?

A. Oh, yes, I did.

I saw her on June 12th for her first revisit, if you would, after having been out of contact for some

time.

Q. And did you see her again?

A. Yes, I saw her again -- I saw her June 27th of 1996. She was my last patient that day.

Q. Was -- when she came back to your practice, was she -- did she begin seeing another therapist in your practice besides yourself or was she seeing another therapist outside?

A. No, she was seeing Doctor Michele Sullivan, a psychologist, at the time, outside of our practice.

Again, very common for the person who has a psychiatrist managing their medications, and Anne was comfortable with me, and we had -- we had worked together before.

And to see a psychologist or therapist somewhere else, we don't have any rules that you have to get both services within our -- within our practice.

I guess that's restraint of trade in my mind.

Q. Okay. And did you consult with Doctor Sullivan at all about her --

A. I did.

Doctor Sullivan sent me a letter, sort of

Page 21

referring Anne back to me.

I, in turn, of course, saw her and started treatment and did a followup letter back to Doctor Sullivan about my thoughts and my treatment plans; that we would be on the same page.

Michele is someone with whom I've shared numerous patients and we would tend to speak fairly regularly about patients that we shared in our cases where we were both involved.

Q. Let me sort of go back a little bit now that I think we have an idea of how -- what her course was at least as far as when she was seeing people and whom she was seeing.

Did -- when she was seeing Bob Conner initially in 1991, I think you said the psychiatrist who was working with her was Doctor Clary?

A. That would be correct.

Q. Did you have any role in her treatment for those four months or so with Bob Conner initially in 1991?

A. No, I did not.

Q. Would it be fair, then, when she came back in 1993, she resumed her therapy with Bob Conner?

Page 22

A. That's correct.

Q. Did you have any role in her therapy at that point? I mean in conjunction with Bob Conner's --

A. Yes. Yes, in the second time when she came back, I had a role both as Bob's direct supervisor as well as I began to treat Anne with medication, so she became my patient directly as well.

Q. How did that relationship with you and Bob Conner work in terms of treating Anne Marie Fahey?

A. Anne was a well-known patient in the practice, if you would. She was someone who was memorable and -- and just the way she carried herself. She was always friendly, the kind of patient who went in to see Bob, but not have an appointment with me, would stick her head in my door if it was open and say hello or wave at me while checking out, things like that. So a very friendly, polite young woman.

She -- her case was complex because of the traumas of her life and the things that she was trying to change and work diligently on and so it was a case that would be discussed pretty regularly.

Bob and I were the early morning shift, if you would, at our office. We both start seeing

Page 23

patients usually by seven in the morning, and so in the morning, when we'd get in and make coffee, before the secretaries and things like that, there would be a time that he and I would discuss cases or patients on a regular basis in that setting.

And then we would also have time set aside as needed for -- for case conferencing a specific case, to go over problems, to talk about treatment approaches, to bounce ideas off each other about what to say or what interventions made sense.

Also, when you're working with a therapist, you may see the patient every week or every other week and you, as the physician, are seeing the patient for medication checks much less frequently. The therapist becomes your eyes and ears so the therapist will check and tell you if the patient's doing okay or if they need a refill or they might give you some ideas or say, Gee, doc, I don't think the medicine's doing as much as it's supposed to be. I think we need to get this person in and have you recheck things and readjust.

So it's a very intimate working relationship.

Q. And was that the type of working relationship you shared with -- with Bob Conner in regards to Anne

Page 24

Marie Fahey?

A. Absolutely.

Q. Well, what -- how frequently was she seeing Bob Conner back when she rejoined --

A. Anne was seeing Bob every week or every other week depending on scheduling, but she was in therapy, what we would call an intensive psychotherapy mode, where you're seeing your therapist usually weekly.

Q. Well, tell us about what the purpose of the therapy was. What were the issues that she was dealing with and Bob Conner, and you were dealing with, with her?

A. The purpose of the therapy was to help reduce her symptoms, to help her feel better about herself, to help her regain power and control in her life, over her life, over bad things that had happened to her in the past.

This would include an eating disorder, it would include depressed moods, anxiety, panic attacks, and what we'll call dependency issues or codependency issues.

That's very common for someone who's been raised in a traumatic environment. And she was raised

that she has or wanted to have for her own father. So that would lead her to go towards an older man, a more authoritarian figure, basically to try to help replace what she never had.

And that's a pattern, a behavior that I think was clear in this case.

Q. Were her adult relationships with, obviously, other people at all relevant or a factor in how you, I'm talking you in the plural, as therapists were trying to treat her?

A. Yes. Her adult relationships are critical in understanding her. They're a large part of her problem. They're a large part of her behavior and they influence things, such as the depressive symptoms or the anxiety, the eating disorder, and there's a direct interplay between them. You cannot separate them. So that when you see an eating disorder in a woman, looking at prior traumas in life is standard. It's often seen that an eating disorder in your teens or twenties is predated by abuse or trauma as a child. And so you can't address one without addressing the other.

That's like treating an infection with

aspirin and not trying to get the infection out of the body. You have to treat the whole picture.

And, in this case, that would include her psychosocial issues, her behaviors, her relationships, her symptoms, both past and present, because in a person with -- with problems like this, those run together.

Q. Were you aware of some of her relationships with other men?

A. Yes.

Q. Specifically, were you aware of a relationship with the defendant in this case?

A. Yes, I am. Yes, I was.

Q. Was that a relationship, something that was a component of her therapy?

A. Yes.

Q. How so?

A. Well, it was a significant relationship in her life and her relationship with Mr. Capano was clearly problematic for her. It was a lopsided or unbalanced relationship where instead of that nice, equal power, reciprocal kind of relationship, things were much more one-sided.

He was older, well-respected in the community, in a position of power and authority, in some ways, a father figure. He was able to provide her with things that were beyond her means, but, also, made it impossible for her to reciprocate. He could buy her gifts and she couldn't buy him gifts in that same way, which leads to guilt.

Guilt tends to trap people and is not a healthy thing to be seeing in a relationship.

As time went on in that relationship and she realized that it was not healthy, which was part of what therapy was about, was to help her examine her relationships, her behaviors now, how those relate to things from her past, and to put all those pieces together to allow her to then to change.

She, in fact, was able to start that process and was trying to do that, but she would find when she tried to break off the relationship that he knew how to push her buttons, if you would, that he would try to reengage or would turn up the intensity and try to keep her involved in coming back.

And that could be done both through gifts, cars, TVs, tickets, dinners, presents, clothing, or

psychologically trying to involve himself in her therapy, give her direction, tell her what to do, threaten her, make her feel that she had no other options.

So it was done, I think, both psychologically as well as through direct actions.

Q. Now, where was she in -- at least initially -- in recognizing the unhealthy aspects of this relationship?

A. At what point in time are you asking me?

Q. Prior to her -- prior to the death of Bob Conner.

A. Um --

Q. Do you know if that relationship was much a factor?

A. Yes. At that point in time, she was clearly trying to break off the relationship, wanted it to be over, and had made attempts to end the relationship.

Q. By the time she resumed seeing you, where was she with those attempts?

A. By the time she resumed seeing me, which would be June of '96, shortly before her death, she was clear in her mind that she did not want to have a

relationship with Mr. Capano.

She was still fearful of him, was not convinced that he was ever going to let go, but in her own mind, she had wanted that to be over a long time ago.

Q. Well, now, Doctor, you've -- you know that there was contact between the two on a regular basis, don't you?

A. Yes, I do.

Q. And what kind of contact do you understand there to have been on a regular basis between the two of them even up to June of '96?

A. There was contact in the form of telephone conversations, E-mails, as well as face-to-face visits, or dinners or meetings.

That is not surprising.

She, in trying to break things off, was, I think, doing a number of things.

One is she was genuinely fearful and there's evidence of that in the E-mails that they exchanged as well as in things that she has said to those of us who had the honor and fortune of treating her and working with her. So that she was worried that harm would come

to her if she broke things off. And she was trying to find a way to let him down easy, to try to temper things because she was worried about rage and anger.

And if you're someone who's been abused and been hurt before, you know what that's about, and try to limit it and prevent it for yourself.

She, I'm sorry -- could you ask that again?

Q. How did she manage that? She's seeing and talking to him regularly, but, yet, she wants to break it off from him. Why not --

A. She's trying to break it off and that message gets off clearly by reading the E-mails that I've had a chance to read.

You can see that that message was conveyed and was received, but he doesn't want that, so she tries to say, I can't be lovers with you, I don't want a romantic relationship, but let's be friends. I'm willing to try to be friends, but only friends.

And that's not uncommon in a relationship to do, partly to let the guy down easy and partly because maybe they really want it. It's very difficult to achieve and I don't think it was achievable in this case.

At the same time, when you have this dependency need that she had, a real fear of being alone, of being rejected, that no one would ever want you, it's hard to let go of somebody without having something else to go to.

I use an expression and it's in my -- I refer to it in my notes. You can't trade for what's behind door number 2 when you're a person like this because, what happens is, although you're traumatized and although you're abused, you know that you can survive it, and because you're traumatized and abused, you're fearful that what's behind that door number 2 will be worse. And so you say, I'll stay with what I've got, even though it's terrible, because I'm so afraid that it actually could be worse and I might not be able to survive it.

So until something comes along, another person, another man, another opportunity that lets you go from where you are to that next relationship, it's very hard to give up whatever support or whatever there is in that relationship, even though it's unhealthy, because it's meeting some of your dependency needs.

Sort of like swinging on the high-wire act,

those trapeze artists. They're swinging on one bar, and that other bar is over there, and they have to grab it, but they can't grab it without letting go of the first one and flying through air and worrying that they're going to fall and crash.

Well, some people can do that act and some people can't.

And if you have this dependency, if you have her kind of background, you can't let go of that first bar very easily until you're sure you can reach that second bar.

Q. Did you know about Mike Scanlon?

A. Yes, I did.

Q. And -- and the relationship she had with Mike Scanlon?

A. I knew some of that relationship.

Q. Okay. How does -- how, if at all, does that relationship with Mike Scanlon fit into what you've just been telling us about letting go before --

A. I guess Mike Scanlon would be that other trapeze bar coming into reach.

Mike was a -- a younger man with a good background, introduced to her by the Governor, so it

Page 37

was sort of had, and, again, the Governor to her was sort of a fatherly figure, if you would, an older, powerful man, well-respected, and he made this introduction, which is a good sign.

It's like the Good Housekeeping Stamp of Approval that says this guy should be okay.

So he makes the introduction and she sees that there really is a better, healthier relationship.

That other bar really is reachable. What's behind door number 2 is safe, it's not going to bite me, and that, I think, becomes her key, her ticket to try to put, you know, to put an end or to try to put a permanent end, a final resting place to the relationship with Mr. Capano.

Q. You mentioned that she had an eating disorder?

A. Yes.

Q. What's an eating disorder?

A. Eating disorders are a diagnostic class within mental health, within psychiatry, and there's usual two or three different types.

Anorexia, where an individual has a distorted body image, they look in the mirror and they see

Page 38

themselves as fat and less attractive than they really are.

There's another condition called bulimia, which is where individuals use purging, that would be induced vomiting, binge-eating behaviors, eating large amounts of food in short periods of time and they can't control themselves that way.

Anorexics tend to lose more weight than bulimics and there's a fair amount of overlap between the two so that you can see the same kinds of behaviors in an individual at any given point in time.

They develop or eating disorders develop frequently in people with a history of trauma. When you're under the strain of trauma, and you don't feel like you have much control over yourself or over what's happening to you or around you, you're a little kid, and you're homeless and there's no water, and you don't have parents, you start to realize that there's not really very much that you can control except for yourself, and so one of the ways or one of the things, the behaviors that people turn to is they turn to regulating their own food intake because that's something that they control.

Page 39

It's almost impossible to force someone to eat or to force someone to lose weight for that matter. It's really an ultimate control issue. And when someone with an eating disorder is under stress, they may try to relieve that stress, sort of in a pressure-valve kind of way, by modulating, by controlling their intake. They may do it with excessive exercise, they may do it by just starvation in limiting themselves to a few hundred calories a day, or none at all.

So it's a way of trying to assert control.

The other thing that you'll often see, particularly in women with eating disorders, is that when you starve yourself, when you lose sufficient weight, you become less attractive, and for many of the women, this actually makes them feel safer.

They lose some of what I will call their secondary sexual characteristics. If you have less body fat, your breasts are going to be smaller, you may actually stop having your period if you lose enough weight, and in some ways, that creates a more childlike or regressed kind of appearance.

That may be protective because if you're

Page 40

worried about being attacked, say, sexually and you've done something to make yourself less attractive, that may make you feel safer.

It also, in some ways, it's a cry for help, because if you look more like a little girl, you hope that other people will see you as fragile, as in need of protection and shelter, and so it's a complex behavior with multiple psychological determinants.

Q. Now, did Anne Marie Fahey have an eating disorder before she met Tom Capano?

A. Yes, she did.

Q. Did that relationship that she had with him have any effect on her eating disorder and your treatment of her eating disorder?

A. Yes, it did.

Q. How so?

A. The relationship was exceptionally emotionally taxing. It had all of the power, disequilibrium that made it a troubling relationship. It had risks and threats of physical and psychological damage and harm for her. And it was the kind of stress that would make her more depressed, make her more anxious, and trigger her eating disorder so that if

Page 41

things got too hot or his pressures became too great, again, an attempt to try to feel at least she could control something, it would be her own personal intake.

So that if he was stalking her, sending her too many E-mails, parking his car in front of her home and she would notice it, not want him there, then you would expect to see -- behaviorally, one of the things you might expect to see, and we did see, was flare-ups in the eating disorder, weight loss, looking gaunt, not taking as good care of herself.

She tried to put on a happy face. Again, that was part of her -- her defense system. She didn't want people to know that she was hurt. She was ashamed and humiliated by much of her past and she -- so she tried to cover some of that, and with eating disorders, people get very good at covering things. They learn how to use makeup and clothing to hide the fact that they've dropped too much weight or that they're looking gaunt. And they may use things like laxatives or diuretics which can cause rather large changes in body weight just by fluid loss in very brief periods of time.

Page 42

So that it wouldn't be uncommon with someone with an eating disorder to load up some prior to seeing a doctor in an attempt to hide the severity of what was going on, and then go right back out and drop those five pounds which were all water weight within a day or two.

Q. Now, were you aware of whether or not Tom Capano tried to intervene in some fashion in -- in her eating disorder by way of treatment or rehabilitation or commitment to a hospital of some sort?

A. I believe that he did, yes.

Q. And what effect did that have, would that have on her eating disorder?

A. It actually usually made it worse. Although it seems like it's a caring gesture to try to feed someone who's not eating well, because that eating is really representative of the power struggle, the more you try to force someone with an eating disorder to eat, the more difficult that power struggle becomes.

And so it's usually a losing battle and not a healthy experience.

In addition, she was working on her eating disorder with her therapist, and always had been, and

Page 43

she had taken responsibility for it. She did not want to starve to death. She did not want to continue to do this. And so she was aware of what was happening to her and made a commitment to herself to continue in treatment and master this.

However, at the same time, or during this treatment, Mr. Capano was trying to get her to change therapists, to go other places, would try to interrogate her about what happened in therapy or what she said to her therapist or what her therapist said to her. Got involved actually so far as in paying for part of her therapy, which, again, sounds like a nice gift, but is really just inappropriate, because it contaminates the therapy, it taints the therapy. It takes away the control that the individual needs to have and also induces guilt, so that when someone else is paying for your treatment, you start to think, well, maybe they do have a right to know about the confidential material that took place between me and my doctor, because, well, they paid for it.

Again, sort of like the parent, child thing. If you have a child, and they get medical treatment and you're the parent and you pay for it, well, you're

Page 44

entitled to know what the doctor was going to do or did.

So you get this situation where she is infantile, made to be more childlike in some ways, with this parental figure who's paying the bill at times.

It's just making things worse and is not healthy and just paralyzing things.

Q. Now, obviously, it seems and I think you mentioned that it seems like the right thing to do, if somebody is not eating, you want them to try to eat, if you want to help them with their therapy, that kind of thing, but you tell us that's sort of the exact opposite of what they ought to be doing. Is that what you're saying?

A. In this case, that's the wrong thing.

That message, I care about you, you need to eat in and of itself, it's not a bad message, but like any other message, who it comes from, when it's said, how it's delivered are all very important parts of any message.

And that message was coming from the wrong person in the wrong way and was having a detrimental or negative effect.

Page 49

would have been in the five o'clock, six o'clock range, probably.

Q. And what was the purpose of that session?

A. That was scheduled as a medication check, which is how most of her visits with me were scheduled, but I would schedule her usually at the end of the day to enable me to run over, that way, if we spent more time, which was pretty common with her, I wouldn't be running into someone else's time and wouldn't feel rushed.

The purpose was to see how she was doing.

We had started her back on medications on the 12th, basically two weeks before that when I had seen her, after Michele Sullivan referred her back to me. We put her on medication and it's pretty common to see someone a week or two after you do that. Usually, I do it in one week, and, in this case, I did it -- I scheduled it for two weeks because she was familiar to me, I knew her, we had worked together before and I could trust her. I knew that she would follow up, that she would take medication, that she would do what she was supposed to do, that she knew how to call me if there was a problem or a question. And so I went two

Page 50

weeks to give the medication a little bit more time to become effective, also, cognizant that funds were tight for her, and I would sometimes see her and not charge her anything or try to limit the frequency of sessions so that she didn't run up a big bill.

Q. What was your medication regimen that you were working on with her?

A. On the 12th of June, I had started her on two different medications, both of which she had been on in the past, so that we had some reasonable expectations about these medications.

The first is a drug called Alprazolam, A-L-P-R-A-Z-O-L-A-M, commonly known as Xanax, X-A-N-A-X, and that's a minor tranquilizer. It's used to treat anxiety. It's a nice drug because it's well tolerated, very few side effects for people. Comes in a lot of different doses. She wasn't on a whole lot of it. It has a fast onset of actions, so when people take it usually within 20 to 30 minutes, they usually feel calmer and it lasts for most patients four or five hours and then out of the body so it's not something that hangs around and builds up.

The other drug that we gave her was Effexor,

Page 51

E-F-F-E-X-O-R. Effexor is one of the newer antidepressant medications. It actually has both antidepressant, antianxiety, antiobsessive, antiirritability, antianger properties, which is a drug that actually does a lot of different things, because it works in three different chemical pathways within the brain. And I gave her that to help with her depressive symptoms, with her anger, irritability, to help increase her appetite some, because one of the things we sometimes do with patients who have eating disorders and have dropped a lot of weight is to give them a medication that will help to stimulate their appetite, to help that turn that part of the neural circuitry of the brain back on.

So I put her on those two medications. She had been on both before. I knew she tolerated them, which was also an important issue, and she would trust them. She felt comfortable with them. She was a person, like many people, who really didn't like medication, didn't like to take it, wanted to work only with therapy, and see if talking alone would work, and really turned to medication only as a last resort when she and the therapist basically said, Hey, the talking

Page 52

alone isn't doing it. You need to see a psychiatrist and get some medication supplements here.

Q. When did you place her on those two medications?

A. I started them both together on June 12th, 1996.

Q. So she should have already been on them by the 27th?

A. Correct. She had been on them for about two weeks, and -- yes, she actually -- she had -- she was taking her medications to the best of my belief. She told me she was.

The other is, I had given her samples, and she then needed a prescription called into the pharmacy so she could continue her medication and we called that in and so she was taking her medications.

Q. When she left your office that evening, did you know where she was going?

A. She told me that she was going to dinner.

Q. Did she tell you with whom?

A. She did not tell me with whom.

Q. Ultimately, we know that she had dinner with the defendant that night.

A. That's my understanding.

Q. Did you ask her about Tom Capano and whether that was the person she was having dinner with?

A. I did not ask her that specific question.

Q. She didn't volunteer it?

A. She didn't volunteer it, nor would I have expected her to volunteer that.

Q. Why not?

A. It would have been shameful for her to be asked the question and have to either answer it or weasel out of it in some way and it wasn't a necessary question or issue at that moment. She was just starting back in therapy. We know that she is very sensitive to rejection, doesn't want to be left, doesn't want to be alone. That includes by her treaters.

She had already had the experience of a therapist being killed on her in a car accident. That was Bob Conner.

So the fear of losing a therapist would be a big fear for her. She had trust with me. And if I questioned her or pushed her to tell me something at this point that would be shameful, she might perceive

that as rejection or worry that I wouldn't approve, because I also was in a position of authority and a position of power, and so when you're in that position, particularly in psychiatry, you need to not misuse that or abuse that.

So it would have been the wrong question to ask, because knowing what the answer would have been, it's an impossible situation for the patient. It would have made things worse.

Q. Did she schedule another appointment with you at that time or was there another appointment scheduled?

A. Yes. She scheduled a followup appointment with me for July 29th.

Q. When she left your office on June the 27th of 1996, did you have any reason to believe, based on how she was that day or what medication she was receiving, that she would not keep her appointment in July?

A. No. She was very good about keeping her appointments. If she was tied up in traffic, she would usually call or if she was in a meeting with the Governor later and got called to Dover, she would usually call and cancel.

Anne had this obsessive nature.

MR. MAURER: Your Honor, the question was did you have any reason to believe, and the answer, I think, was no.

This is not responsive to this.

MR. WHARTON: He's explaining why he thought that there was no --

THE COURT: I'll overrule the objection.

Allow him to continue.

THE WITNESS: Yes, she was somewhat obsessive by her nature, so being detail oriented or keeping appointments was part of her personality and she wouldn't just not show up.

That would be very much out of character.

MR. WHARTON: Thank you.

Can I have a moment, please?

THE COURT: Certainly.

MR. WHARTON: Thank you, your Honor.

I don't have any other questions.

THE COURT: Why don't counsel come to side bar without the court reporter on scheduling.

(Side bar discussion not reported.)

THE COURT: Would you take the jury out?

We're going to take our luncheon recess, members of the jury, so -- two o'clock.

(The jury left the courtroom.)

THE BAILIFF: Please be seated.

Court is still in session.

THE COURT: Let me explain to those people who are spectators.

We're going to adopt a new procedure whereby we remove the jury from the room before we recess the Court.

I'd appreciate your cooperation when that -- I don't know whether you just heard what I said or not, but the new procedure is to excuse the jurors first before the Court recesses.

That eliminates some of the confusion in the courtroom and I would appreciate your cooperation with that procedure.

We'll now stand in recess until 2.

(At this time, a luncheon recess was taken.)

Page 73

Q. And you were not involved in any way with what happened, what Bob did with her in 1992?
A. Correct, in 1992.
Q. Now, she stopped treatment when in '92?
A. Her last visit in 1992 is April 16th.
Q. All right. And you detected that -- you learned that from reading Bob Conner's notes; correct?
A. That's correct.
Q. And much of what you said here today came from Bob Conner's notes, did they not?
A. Well, what I testified to --
Q. Just answer me yes or no. Did it not?
A. Well, I can't answer it that way.
Q. You can't tell me that much of what you said here today came from Mr. Conner's notes?
A. What I testified to this morning comes from the records as well as my own conversations and my experiences with the patient.
Q. Your conversations and your experiences with the patient; correct? Is that correct? I don't --
A. Yes. That's part of -- it's everything together. My testimony is not based on one single issue.

Page 74

Q. All right. Now, the first time you saw the patient was when?
A. February 10th, 1994.
Q. Okay. So the first time you saw her was in 1994. And you found her to be chronically depressed since 1986, continued to get more depressed, agreed to medication evaluation. Taken to bed with 12 hours sleep a day, suicidal ideation of crashing her car, looks for rejection, history of laxative abuse, lost 14 pounds in five weeks. She actually reports some mood cycling.
That was part of your report on February 10th, 1994; is that correct?
A. That is part of my report.
Q. Another part of your report concerned itself with her psychiatric history; did it not?
A. That's correct.
Q. And you found that in 1986, she was at the University of Delaware, she was depressed, saw a psychiatrist for six months with no medications.
1987, she saw a psychiatrist in Dover for six months.
In 1991, she was with Conner for four months

Page 75

with a medicine whose name I cannot read. Alion?
A. The medication is Ativan.
Q. Ativan?
A. A-T-I-V-A-N.
Q. Okay. Ativan.
July '93 started again with Conner. Started abusing laxatives in 1988. Exercising two to three hours a day. Now exercises one to two hours a day five to six days a week.
Did you find that was part of your report also -- correct?
A. Correct, except that you said she saw a psychiatrist earlier and those were therapists. That would be nonpsychiatrists.
Q. Where would that be? What --
A. When you say, Saw a psychiatrist for six months, it actually says, Saw a therapist for six months and the same following through that paragraph.
Q. Okay, I understand. Then there's some personal history in there, and you say she had a tough childhood, deprived, no money, foster homes; correct?
A. Correct.
Q. You also said in your report that she still

Page 76

calls her grandmother to talk to her, but the woman has been dead for over a year; is that correct?
A. Correct.
Q. All right. Now, sir, you diagnosed her as having a major depression recurrent -- R/O bipolar disorder; is that correct?
A. Yes, sir.
Q. And major depression recurrent. What does that mean, Doctor?
A. Major depression is a psychiatric condition with specific symptoms and features and she had those. And, in addition, it was recurrent, meaning that she had had episodes of this in the past, had been treated or recovered from them, but they had recurred. It happened again.
Q. All right. And bipolar disorder, Doctor, can you tell me what that is?
A. Bipolar disorder is the newer terminology for what used to be called manic depressive disorder. It's a cyclical mood disorder, that is, there are episodes of both depression as well as episodes of elevated mood stage, which could be either euphoria or joyfulness or might be just significant irritability, sleeplessness,

Page 89

whom you were lauding plaudits on here during the course of your direct examination named Michele Sullivan; correct?

A. Correct.

Q. Now, between, by the way, March of '95, which was the last time you saw Anne Marie Fahey, the last time anybody in your practice saw Anne Marie Fahey and June 12th, you did not see Anne Marie Fahey at all; correct?

A. Correct.

Q. And there were no records at your practice which could be gone over by you to learn what had happened in her life span in that thirteen-month period; correct?

A. Correct.

Q. So you had no knowledge whatsoever of what was happening with Anne Marie Fahey from March of '95 -- '95 to June of '96?

A. Correct.

Q. All right. Now, you then get a letter from Michele Sullivan; is that correct?

A. I did get a letter from Michele Sullivan.

Q. Say again.

Page 90

A. Yes, I did get that letter.

Q. And in that letter, she tells you she's looking forward to working with you on behalf of Anne Marie Fahey; correct?

A. Yes.

Q. And she tells you she's been working with Anne Marie Fahey for ten weeks so far; correct?

A. Yes.

Q. And she tells you the woman's history is horrible, alcoholic father who drank the family into poverty, the children were farmed out after the house went up for sheriff's sale when she was in her teens. I can mention many horrible experiences in which she was beaten or shamed. It's important to know that she survived by putting on a happy face and being quite good at reading situations and accommodating to what was necessary for survival. She has a very funny sense of humor which can deflect from knowing the underlying pain. I mention this because she charms me and I keep a watchful eye on how she keeps me from knowing what's going on. So it won't surprise me if you know nothing of either -- of the eating disorder or the obsessive compulsive behavior.

Page 91

That's what was in that letter; correct?

A. That is what Michele wrote.

Q. All right, and did you know about any of these things?

A. Yes, I did.

Q. Did you know that Anne tended to conceal her real feelings from people and tell them other things?

A. Yes. That was not new information at all.

Q. Did you know she tended to tell people what she thought they wanted to hear, the happy face?

A. Yes, very much so.

Q. Now, Doctor, you wrote a letter to Michele Sullivan on June 17th and you say, I had a chance to see Miss Fahey for evaluation and followup. As you know, I've treated her in the past when she was seeing Bob Conner.

Are you talking about medical evaluations there -- correct?

A. Correct.

Q. All right. She is still clearly grieving his loss and feels guilty and somewhat responsible for his death.

You said that; correct?

Page 92

A. Yes, I did.

Q. Did Anne Marie Fahey feel responsible for the death of Bob Conners?

A. Yes.

Q. A man killed in an auto accident, coming home from work, which Anne Marie Fahey had nothing to do with?

A. That is correct.

Q. She is feeling abandoned and somewhat responsible for him and for the others who have died and left her. As a result, she feels a need to punish herself and is using laxatives to do so. She is currently using about 15 laxatives a day and has lost about 25 pounds since I last saw her.

Correct?

A. Correct.

Q. And you had a basis for making that statement that she was using 15 laxatives a day on June 17th when you wrote that letter; correct?

A. Correct.

Q. And the basis was as a result of your medication visit with Anne on the 12th; correct?

A. It was mentioned both in Michele's letter and

in my own evaluation with the patient.
Q. Okay. So, Michele told you about the 15 laxatives a day and you asked Anne about it?
A. Correct.
Q. And you put it in your letter; right?
A. Correct.
Q. All right, now, in your second paragraph, you say, Medication was stopped and she became more severely depressed and acutely suicidal.
Acute suicidal means a brief episode, doesn't it? It doesn't mean a long-term chronic kind of condition, does it?
A. Correct. In the sentence, I think I used it also for its second definition, meaning more -- more severely, that it was a more acute or more pressing issue.
Q. Okay. Now, in the next paragraph, I have asked her to start to taper her use of laxatives, but she does not feel she can stop them abruptly.
So you were trying to get her off the laxatives?
A. Correct. I don't want somebody who's anorexic abusing laxatives.

Q. And she told you she couldn't stop abruptly, but she'd try?
A. We agreed to try to taper it down to work together on that.
Q. Okay. You said in the second-to-last paragraph, she has significant underlying issues that will be reached only through psychotherapy. She continues to grieve Bob's death. I have no problem saying that you'll be trying to fill a rather large transference of shoes.
You said that; correct?
A. Yes, I did.
Q. Now, Doctor, I'm not a psychiatrist, but there is something about transference that occurs between a treating physiotherapist, a psychiatrist and a patient. Is that in many cases?
A. Yes, transference is a term used to describe feelings that occur frankly between any two people, but we talk about it particularly in the mental health arena.
Q. What you mean is that the patient falls in love with the psychiatrist?
A. Well, that would be one example of a

transference.
There could be a negative transference and you could think your therapist is like someone you hate and relate to them quite negatively.
Q. Anne Marie did not relate to Bob Conner negatively, did she?
A. No. She was very thankful for his support and dedication to her.
Q. Seemed like a pretty good guy and did a good job, didn't he?
A. Bob was a gifted therapist.
Q. Now, he wrote a group -- he wrote notes, did he not?
A. Yes.
Q. For his meetings; right?
A. Yes, he did.
Q. Now, you gave opinions today about a number of things relating to Tom Capano.
You gave opinions about Anne Marie Fahey being afraid of Tom Capano, about Anne Marie Fahey not going here with him, and all this other Tom Capano stuff; correct?
A. I did.

Q. And those opinions, that opinion did not come from the 65 visits and the notes that Doctor Bob Conner made of Anne Marie Fahey's visits with him, did it?
A. Bob makes reference to the issues involving Mr. Capano. He is not mentioned by name in the record to the best of my knowledge.
Q. What issues does he mention in his notes that relate to Capano?
A. I would be more than happy to go through the notes and describe them.
Q. Why don't you do that.
A. I guess I'd like to start with the -- with Bob's initial diagnosis, which included a personality disorder, not otherwise specified, with compulsive and dependent traits.
So right from the beginning --
Q. I can't hear you, Doctor. You'll have to speak up.
A. Okay. Right from the beginning, in Bob's initial diagnosis of Anne Marie, he talks about her having a personality disorder with dependent traits.
Q. And what date was that diagnosis?
A. February of 1992. February 24th, 1992.

a person's psychopathology means those parts of the person's mind or psyche that are -- that are ill.

Q. And when you read Anne Marie Fahey's E-mails, were you reading them as sort of a layman might read them?

A. No, I was reading them as a psychiatrist reads them and trying to understand what's there and what's not there.

Part of what psychiatrists do is to learn to listen to what people say, but also to what they don't say, because sometimes what's not said is actually what's most important.

Q. Well, would you have -- did you read them with a -- with a -- with being aware of or an eye towards Anne Marie Fahey's psychopathology?

A. I've read them a few times and tried to think about them and see them in context, so I would say yes to your question, I tried to look at it a lot of different ways.

Q. Now, prior -- prior to reading those E-mails, which you got a week or so ago, I think you testified, did you know whether or believe whether Anne Marie Fahey was afraid of Tom Capano prior to the E-mails?

A. Yes, prior to seeing the E-mails last week, I was well aware that she was afraid of Mr. Capano.

Q. Now, why -- why were you well aware of that?

A. I was aware of it because she had told me she had discussed it in therapy and other treaters had -- had talked to me about it.

So it was not a secret but, most importantly, she herself had expressed that and had been working to get out of a relationship.

Q. Now, Mr. Oteri asked you a lot of questions about your notes and Bob Conner's notes and I think you described some of them as fairly short, a couple of lines, or a line, or a little longer than that; is that right?

A. Correct. Some of them are actually only a few words.

Q. What is the point -- the purpose of a psychotherapist, what is the point of their notes?

A. Well, the main purpose for writing a note is for the therapist to have something, a road map, so to speak, to remind them of key points or issues that they're working and they may be just a word or an image or a theme that a person brings up in a session that

you want to follow up on, so you use them to help sort of jog your memory when you see the person the following week. But when you're in a longer term psychotherapy with someone and you're seeing them every week or every other week, you obviously have a different relationship and so you remember all sorts of the details and don't need to write them down. You remember people's names, you remember family relationships and structures, and you don't have to keep writing them down. They're just a guideline for you.

I guess they're also used for billing purposes to prove you saw someone, but that's a minor point.

Q. So would it be fair to say that actually the more familiar you are with a certain aspect of your therapy, the less need there is to write a note about it?

A. That would be correct. If it's -- I think in one of my last notes, I have something along the lines of baseline issues, meaning I know what those are, we're still working on those same -- on those same things.

That's shorthand which is all that's necessary for me to know what's going on.

Q. Is a consideration that you have when you're making notes or any therapist is making notes, when -- is it a situation that they be sufficiently detailed so you can justify them on cross examination?

A. No. I think we all hope that our records never come into court, because that usually means malpractice.

In this case, it's a criminal matter, but -- so notes are not designed to come into court or to be used by anyone really other than the therapist. Perhaps the therapist and the patient together.

Q. Well, despite the fact, Doctor, that your notes don't reflect or don't mention or Bob Conner's notes don't reflect or mention Tom Capano, were you aware of that relationship and the dynamics of it or did you just make that up?

A. No, I was aware of it. I can't make anything up. I took an oath when I stepped into this -- in front of this jury and onto the witness stand to tell the truth.

MR. WHARTON: Thank you.

Page 129

A. Yes.
Q. Now, would you read --
THE COURT: Would you identify each exhibit as you read them, please?
THE WITNESS: I will.
BY MR. CONNOLLY:
Q. Would you please read State Exhibit Number 33 for us?
A. Dated May 2nd, 1996.

Annie, This is not a gift; it is a loan to replace your windshield. You can repay half of it when you get a check from the insurance company. The balance can be repaid at the rate of five dollars per week. Of course, if you default, there is a penalty. You will have to scrub my toilets and iron my boxers.

Please accept this. The windshield stresses you and it is dangerous. I would do more if you would let me, like replace the Jetta with a Lexus 300ES Coach Edition. Maybe someday, dot, dot, dot, Tom.

P.S. Don't these bills look like Monopoly money? But I got them from a bank. Honest.
Q. Now, would you skip State's Exhibit 34 and go right to 35, please, and first of all, just describe

Page 130

what it is you're about to read.
A. It is a note from -- a notepad from Saul, Ewing, from Thomas J. Capano's desk, dated May 29th.

Annie, Thanks for sharing this with me. I don't agree with everything I read, but still find it interesting and enlightening. It also scared me. I'd like to talk to you about if that's okay with you. Te Amo, Tom.
Q. And would you read State's Exhibit 34?
A. 34, again, is on the same Saul, Ewing notepaper, from Thomas Capano, dated 6-25.

Annie, Just add this to the balance. Consider it a consolidation loan. That's a joke. Kidding aside, you should not be penniless for several days, in case of an emergency, like an overpowering yearning for a latte. I'd have sent more, but I know you'll have a hard time even accepting this. Please accept it in the spirit in which it's given. And don't spend it on Jill. Tom.
Q. Now, when you read those notes in the apartment, did you know who Tom Capano was?
A. I knew who Tom Capano was, yes.
Q. How did you know him?

Page 131

A. I met him in the early eighties through O'Friels and through a man I used to date.
Q. Okay, you used to work at O'Friels?
A. I did.
Q. You were a waitress?
A. A waitress and a bartender.
Q. And the man that you used to date?
A. His name was Bud Freel.
Q. And Bud Freel is a brother of Ed Freel, the person you called; correct?
A. Correct.
Q. Prior to that evening on June 29th, 1996, when was the last time you had seen or met Tom Capano?
A. The last time I had seen him, I believe, I was -- I was pregnant with Brendan and it was the closing of Buddy's Bar, so I want to say March of '95. Around that time.
Q. And Buddy's Bar was owned by Bud Freel; is that right?
A. Right.
He used to be part owner of O'Friels and left and opened up a bar on Lancaster or 4th Street or

Page 132

something.
Q. Now, as of June 29th, 1996, did you have any knowledge that there had been a relationship between your sister and Tom Capano?
A. No, I did not.
Q. Did you know that they knew each other?
A. I did know they knew each other.
Q. How did you know that?
A. Wilmington's so small and Anne, working for the Governor and Capano doing bond work, she would mention he might be in now and then because she had known I knew him from before.
Q. Had you ever asked Anne Marie whether there was anything between her and Tom Capano?
A. No, I did not.
Q. Did you find any birth control pills in the apartment that night?
A. I found a box of birth control pills. There were maybe, again, to me, it looked like a sample pack.
There may have been like five months worth.
They were unopened.
Q. They were unopened?

A. Yes.
Q. Was Anne Marie's toothbrush in the apartment?
A. I believe it was, yes.
Q. Did you, at some point, inventory everything that was in the apartment?
A. Yes. I was ordered by the Court to inventory everything that was in the apartment.
Q. Was anything missing that you recognized?
A. Anne Marie's keys were missing and her Walkman and her blue topaz ring.
Q. This is the ring that Paul Columbus had given her?
A. It is.
MR. CONNOLLY: Your Honor, I'm about to go into something that will take a while.
I don't know if you want to break now or break in the middle.
THE COURT: Are you inviting me to break now?
MR. CONNOLLY: I am.
I'm asking.
THE COURT: In that case, we'll take a luncheon recess now.

It's now quarter of 1.
We'll break until 2 o'clock -- excuse me.
Having announced that, I'll ask the bailiff to remove the jury first.
(The jury left the courtroom.)
THE COURT: I thank the spectators for their cooperation in this procedure that we've established to allow the jury to leave first.
We'll stand in recess until two o'clock.
(At this time a luncheon recess was taken.)

October 28, 1998
Courtroom No. 302
2:00 p.m.
PRESENT:
As before noted.
THE COURT: Please bring the jury in.
MR. CONNOLLY: You want the witness on before the jury comes in, Judge?
THE COURT: Yes.
MR. CONNOLLY: Okay.
(Witness, Kathleen Fahey-Hosey resumes the stand.)
(The jury returns to the courtroom.)
THE COURT: Members of the jury, before we start, I meant to mention something this morning because the attorneys brought it to my attention.
One of the really awkward things, particularly, when you're involved in a long trial is the fact that jurors will run into lawyers, and lawyers are not supposed to have conversations with jurors, for obvious reasons, even if they're harmless. It always has the potential to present problems.

And the lawyers are, of course, concerned if you run into a lawyer and they look away from you, you not consider them to be rude or arrogant.
They're simply trying to avoid a potentially bad situation. There's nothing to keep lawyers from speaking, so those who nodded quickly and left were not doing anything wrong, but it is an awkward situation for the lawyers and they wanted you to know.
I will vouch that this is a very warm, caring, friendly group of people who would love to chat with you under other circumstances.
Mr. Connolly, you may proceed with the witness.
MR. CONNOLLY: Thank you, Judge.
DIRECT EXAMINATION (Cont.)
BY MR. CONNOLLY:
Q. You found the diary at the apartment, didn't you?
A. I did find Anne Marie's diary.
Q. And I'm going to show you State Exhibit 18.
This is the diary you found?
A. Yes.

Q. Did you read the diary that night?
A. I did not.
Q. At some point later, you read portions of the diary; is that right?
A. Yes, I have read portions of it.
Q. And I'm going to hand you a copy of the translation of the diary which is State Exhibit 19.
And I've highlighted some portions of that, and would you read for us some of these portions, beginning with the entry dated March 2nd, or, rather, February 3rd, 1994?
A. Wednesday, February 3rd, 1994. A lot has happened since my last entry, 6-90. Spain family members were born. October 22nd, '91, Brian Michael; December 7, '93, Kevin Patrick; February 24th, '94, Liam Michael. Three beautiful new editions to our family. One less fortunate than the other two. Perhaps that's why I feel more (not love) for Brian Michael.
Q. Okay, can you stop there just for a second so we can know these people?
Liam Michael is who?
A. Liam Michael is my brother, Robert's son.

Q. All right. And Brian Michael, who's that?
A. Brian Michael is my brother, Mark's son.
Q. Now, did Anne Marie have kind of a unique relationship with Brian Michael?
A. She did.
Every Monday night, my brother, Brian, and Anne Marie would go to Brian's house for dinner.
Q. Because her name will come up later in the case, Brian Michael's mother is who?
A. Debby Gioffre.
Q. Now, if you pick up again and read slowly for us the remainder of that paragraph.
A. My brother, Mark, has been in and out of rehab and is worse now than he ever was. I no longer have a brother, Mark, because that person inflicts too much pain in my life. It's much easier emotionally to leave him out. I spent too much of my life living with an alcoholic. That part of my life is over. Not forgotten, over.
Q. Now, that's her older brother, Mark, correct?
A. Yes.
Q. And he was married to Debby?
A. He was.

Q. You can pick up with the next paragraph, please.
A. Nan died last November 2nd, '92. The most tragic part of my life. I always believed Nan's life would be eternal. She was the most reliable, stable, sober adult person in my life. A part of me died with Katie. I still feel numb. The world is a less fortunate place, but heaven is dancing with her arrival.
Q. Now, tell us who's Katie?
A. Katie -- my grandmother's name was Katherine and we either called her Nan and Annie always called her Katie.
Q. So it's the same person in that paragraph?
A. It is.
Q. All right. You can pick back up, please.
A. I am back in therapy. Bob and I have been working together for about 9 months. What a difference! Bob is great and I am able to trust him 100 percent. He is one of the few whom I know beyond a shadow of a doubt that will never judge me. That is pretty great -- that is a pretty great feeling. I started taking Prozac, 3 weeks tomorrow. Still no

effect. That's not totally true. It's given me a horrific headache -- headaches. Hopefully soon we shall see some results.
Q. Now, this is Bob Conner she's talking about?
A. Yes.
Q. All right, and if you can pick up in the next paragraph please?
A. My family, along with some of my friends, Jill, GR, are worried about my weight loss. I, on the other hand, am quite pleased. Five more pounds to 130, with a smiley face. I am starving myself as well as avoiding situations where food is involved. I now think of food as poisonous. I cannot ever imagine eating a sandwich. Too much food. I'll be okay. I will stop before it gets out of control. More to follow.
I have fallen in love with a very special person whose name I choose to leave anonymous. We know who each other are. It happened the night of my 28th birthday. We have built an everlasting friendship. I feel free around him, and like he says, he makes my heart smile. He deserves some happiness in his life and it makes me feel good to know that I

can provide him with such happiness. Who knows if anything serious will ever happen between the two of us. I only know what I dream. Ciao. AMF.

March 7, '94.

Q. Right. Can you read that entry for us?

A. Well, I survived my mom weekend but with a little trouble. Kevin Patrick was a wee bit fussy, but to no avail. I survived. Jeff came over and was quite a help, however, that boy is definitely not for me. It scares me to think that he is teaching our youth, and what's up with his students calling him on weekends? It was fun flirting with him on Tuesday, but that's all.

I suppose it may also have to do with the fact that I am in love with someone else. We, Tomas and I, had lunch on Friday at the Shipley Grill. It was very good. I hope that tonight he will visit me before working in Philadelphia. I am alone in my house tonight drinking a beer and listening to music, When Harry Met Sally. We have problems because he has a wife and children also. I don't want to be in love, but I can't help it. By God, please don't judge me.

Kathleen, Patrick, Seymour and I went to

Robert's last Thursday, 3-3, for his birthday. What fun. It's great having such a close, beautiful family. Robert looks beautiful with Liam Michael, the smiley face. He will be such a great dad. He was a great substitute for me.

No news on the weight loss. I am stuck at 135 pounds and it's pissing me off. I can't starve myself any more than I already am.

Q. All right. Now, you told us earlier that when you were in Talbot's and Anne Marie was changing and you noticed that she was very thin.

Did you know she had an eating disorder?

A. No, I didn't know she was diagnosed with an eating disorder.

Q. Do you know if she had any kind of eating problem or did you observe anything?

A. When she was at my house on Wednesday, she always ate. I did ask her at one point how she lost so much weight and she replied by eating a lot of pretzels and working like a maniac -- working out like a maniac.

Q. Did you notice fluctuations in her weight over time where she lost, gained weight?

A. I did not, because when she came to my house, she usually had very loose clothing on. You know, she was either going to the gym, sweatpants and a T-shirt on. You know, I did not -- I didn't -- I mean I noticed that she was thin, and that day at Talbot's, I believe I reacted because of seeing her that way.

Q. All right. And she's got it here that she's around 130 pounds at this point.

How tall was Annie?

A. Five, ten.

Q. How big bone, small bone -- what was her build like?

A. She was a small-boned. She was tall, but she had narrow shoulders. She was small-boned.

Q. All right, would you please turn to the 24th of March 1994 entry in the diary, and if you could read that for us, please?

A. Thursday, March 24th, '94.

My boyfriend, Tomas, asked me today if I wanted to be a girlfriend and live alone and he would pay rent for my room. I need to think. I love him, but he has four children, girls, and a wife. I will be a silent girlfriend. Oh, my God.

Today is the day my father died. How sad. My dad was a bad father, but he was the only father I ever had, so therefore I loved him. I do not think that he conscientiously meant to be a bad father. He just had no clue. He really made my life very sad and lonely. I will never forget the pain he caused me. He forced me to lie to protect my identity. Ciao, AMF.

Q. Now, did you know that Annie had such feelings toward her father?

A. Yes. We shared similar feelings towards my father.

Q. Would you look at the next entry, April 24th, Sunday, and would you read the highlighted portion of that entry, please?

A. I had a great day on Friday. My friend and I went to his house to eat. What a house! He -- I believe that he enchants me. During my weekend, my thoughts were devoted to Tomas. I am afraid because I'm in love with a man who has a family. I need to realize that our relationship will never be anything other than a secret. I fantasize my life with him all the time. He's very gentle, intelligent, handsome,

and very interesting. Why does he have to be married???

More information later.

Q. All right, and then if you would turn the page and read the entry, please, for April 26th, 1994.

A. Tuesday. Wow. What a day! I talked with Tomas last night after he -- something -- dinner. I can't -- I can't really read it.

Q. Oh, so he, something, dinner?

A. Right.

Here in my house. Our relationship is finished. He told me I need to find a man without children who has a lot of time for me, because I am very special and deserve much more.

Well, after what he said, I was very sad and I cried all night. I know it is my problem and my fault because from the beginning I knew what I was getting myself into.

Q. Now, do you recall whether Anne Marie was showing any signs of distress or any similar type of demeanor, moods, back in April of 1994 that you remember today?

A. No, I don't remember.

Q. Would you read just the highlighted portion of the next entry, which is also dated April 26, 1994, but has a Thursday next to it?

A. Yes.

Tomas called today at 10:30 and told me he loved me. We decided that we will still see each other.

My session with Bob today was quite tearful. I cried a lot as well as informed him of my eating disorder. I realize how poor of an eater I've become and that it's not healthy, however, it feels great every time I get on the scale if the needle has decreased from b-4. My ideal weight is 125. I can do it. I now weigh 133. 8 more pounds. I could easily do that in a week. I also feel that my world is so out of control and the only thing I control is my food intake.

Q. Okay, now, there's then -- there's a gap, right, between April, and the next entry isn't until June 19th; is that right?

A. That's correct.

Q. All right, would you just read the first

highlighted portions there?

A. I would first like to start off by talking about Mike Hines. We had our first date last Saturday night, June 11, with Robert and Susan in Avalon.

Q. Now, do you know who Mike Hines is?

A. He's a business associate of my brother, Robert's.

Q. And Susan is Robert's wife?

A. Yes.

Q. Did you know that Anne Marie had any kind of feelings for Mike Hines back in June of 1994?

A. I know they dated a couple of times and Anne talked about him, yes.

Q. Did you get any sense of her feelings for him?

A. I mean I think she liked him.

Q. Would you read on -- continuing on in that entry for June 19th of 1994, she's talking about Mike Hines on the next page.

A. On Sunday, he came by to say goodbye. He is so handsome, underlined.

On Wednesday, 6-15, he came down and we went to the festival. All we did was talk all night until

the cops finally kicked us out. I think I'm falling for him real fast. I see myself marrying him.

I realize how insane this all sounds, but that is how I feel inside, and to be honest, it feels pretty good, underlined.

Q. Did you know that she had any thoughts about marriage with Mike Hines on -- following this first date she had with him?

A. No. No.

Q. You mentioned earlier that she had talked with you about her aspirations for marrying Mike Scanlon.

Had she ever discussed with you those types of sentiments for anybody else?

A. Other than Mike Scanlon?

Q. Yes.

A. No.

Q. If you could skip ahead to July 6th of 1994 and just read the highlighted portions there.

A. Hi, diary. Well, it's official Michael does not like me. It's been four days since we talked to each other.

I am very sad. He is charming. Why? What's

wrong with me?

Well, I am embarrassed and I don't want to face Robert, because I do not want him to feel bad for me or be upset with Mike. It was my fault, I'm sure.

There is still a glimmer of hope that he'll call.

There is --

Q. Okay, and then just the next day, what does she write?

A. The next day she writes, It is 100 percent absolutely official. Mike Hines has blown me off, underlined.

Q. Did you have any sense of Anne Marie's confidence or lack of confidence when it came to dating?

A. Anne Marie did not have much confidence in herself. As beautiful as she was, she just did not have the confidence in herself. She did not feel -- she just was not a confident person.

Q. I'd like you to skip ahead in the diary to February 25th, 1995, about six months later.

And --

A. Sorry.

Q. That's all right. Take your time.

Now, actually, before you read this, though, what is the entry immediately before the February 25th, '95 entry?

A. January 8th of '94.

Q. Okay. Is that January 8th or August 1st, '94?

A. Oh, I'm sorry, it's August 1st.

Q. Okay. Anne Marie used a European date?

A. Yes. It's the first date of the 8th month.

Q. There's a gap between August 1st, '94 and February '95; correct?

A. Yes.

Q. Now, can you pick up with the February 25th entry and read the highlighted portions slowly, please?

A. Well, where to begin?

I first must start with tragic news. One of the most influential, helpful persons in my life has died. Bob Conner was killed on 1-24-95 by a drunk driver coming home from work. The phone call came from Mary Ellen the next morning at 7:45 a.m. was one of the most lonely, difficult times in my life. I

loved Bob and he has helped me grow so much, but....

We had a lot more work to do -- to do until I got to where I need to be at this point in my life. He was the only person who knew everything. Even a little bit about Tommy, not much, about me, and it felt great to get all this shit inside of me out.

Bob was funny, intelligent, had a great smile, voice, and a sense of humor. He believed in me and actually liked me for me. Not many people know the real Annie.

Bob was and probably be the only person who really knew me and understood me and my insecurities. This is not a day that -- there is not a day that goes by where I do not think about Bob or hear his voice or envision his smile. I miss him terribly and my life is a bit less fulfilling without him.

Q. And then that same entry carries over and if you can pick up with the highlighted portions, February 25th, 1995.

A. Now, I need to write about my friend/boyfriend/love, Tomas.

Last week, Saturday, 2-18-95, he called at four in the afternoon. We talked and he told me he

had a party for Buddy in Al Carter's house and then at Buddy's Bar that night. Well, at midnight, Jill, Ginny and I went to the bar and I saw Tomas. Tomas was furious because I was there. I think so.

Then the women, we were drinking -- excuse me -- then the women were drinking three beers and a shot of vodka with lemon. I did not say goodbye to Tomas when I left because he was sitting with his wife. I was sad and very sick in my stomach. I am madly in love with him and did not truly realize just how deeply I felt until that night when I could not be near him and I then realized the fact that he is and never will be mine.

Sunday, the day after, I thought about Tomas every minute of the day. I had a feeling that he did not want me at the bar, so I stayed clear across the room from him.

I am sorry, Tomas, I never wanted to hurt you or make you feel uncomfortable.

Monday arrived and I did not hear from Tomas.

I finally called him around five o'clock and checked in. He was cold and seemed very disinterested

in talking with me.

I asked, What's up? He said to me, Nothing Anna Maria, my life sucks. I asked him if he was mad at me and he said no, just everything in my life is wrong and sucks.

He was eager to get off the phone and he said he had a very busy week.

Q. And there's another entry at the bottom of that page.

A. Wednesday, 2-22. I wake up feeling sad and depressed. I need to talk to Tommy. If it's over between us, I need to have some closure.

Tomas, why won't you talk to me?

Jesus, how and why did I allow myself to fall in love with a married man???

I know exactly why. Tomas is kind, caring, responsible -- responsive, excuse me, loving and has a beautiful heart, extremely handsome and has been kind and gentle to me. If he ever loves me like he used to say, which I still believe he does, then why is he treating me like this???

God, please help me.

Like a fool, when I got back to the office

from VIP, I called T. and asked that he call me. Well, he called and was nasty. It was the first time that T. raised his voice at me. I asked, What is it, you are furious with me, why aren't you talking to me? He said to me, Drop it, Anne -- drop it Annie and quit fucking talking like this to me in the office. We'll talk later.

I asked if I would ever hear from him again, he said, Do you want to? And I said, Of course. He said, All right, I will call you later -- I will call later, excuse me.

Q. Okay, and then if you can turn to two entries or actually the next entry, Thursday, February 23rd, and read --

A. T. called me at five o'clock in the afternoon while I was at the office. The conversation was superficial. We -- do you want me --

Q. Go ahead, the highlighted portions.

A. Okay.

There were so many things I wanted to say to him, but I was afraid that he would fly off the handle again like he did on Wednesday. Why were we talking tears -- while we were talking, tears were rolling

down my face.

I wanted to tell him that he was breaking my heart and ask him to please stop. Instead, I clammed up and let him go. I came home from work, got into bed, and cried myself to sleep.

Q. Now, you had no idea that in February of 1995, your sister was in love with Tom Capano?

A. No, I did not.

Q. Now, what is the date of the last entry in the diary?

A. Sunday, April 7th, '96.

Q. And what is the last entry just before that one?

A. March 1st of '95.

Q. All right. Now --

A. Or -- okay, March 1st.

Q. Would you please read us the last entry in the diary, April 7th, 1996?

A. Happy Easter. Well, another year has passed by since my last entry and man o' man has a lot happened. I've been through a lot of emotional battles. I finally have brought closure to Tom Capano. What a controlling, manipulative, insecure,

jealous maniac. Now that I look back on that aspect of my life, I realize just how vulnerable I had become. It hurts me when I think about that year. For one whole year, I allowed someone to take control of every decision in my life. Bob Conner's death hurt me, affected me more than anything. I lost my best friend, mentor and the man with the greatest smile. My being after Bob's death became the little girl growing up in a chaotic world. I lost all sense of trust. I thought it would be easier that way.

I have been fortunate enough to find another therapist, Michele Sullivan. No one will ever take the place of Bob, but she's pretty damn close.

Five weeks ago, I was diagnosed with bulimia. My weight is currently 125 pounds. Pretty skinny, but I want more.

My brother, Robert, is the only sibling that knows anything. Most likely that will remain the case.

At this point, I'm afraid to share this news with Michael. I don't want him to run. I truly love him and I'm afraid of what he might think of me.

Michael is the most wonderful person. This

from a program that was approved by the American Psychological Association, and then completed an internship here, and then had two years of supervised work experience before I could sit for the state licensing exam.

Q. And how long have you been a licensed psychologist in Delaware?

A. 1981.

Q. What is a -- what is a psychologist, I guess, may be my next question?

A. Well, we're trained in human behavior and trained in terms of problems assessed in behavior, and treating that, sometimes focusing on behavior change, sometimes focusing on psychological understanding of the motives for people's behavior and changing on that basis.

Q. What is a clinical psychologist?

A. Well, there are a number of subspecialties including clinical and counseling.

Psychologists are people who particularly work with a population that comes in with problems that they would like to change.

Also, there's experimental psychologists,

psychologists who specialize in learning and motivation; other more academic degrees.

But the clinical psychologists are the ones who do clinical work practice.

Q. What kind of work do you do with people in your practice?

A. My focus has to do with working with either individuals or couples or families who come in with some sort of problems, typically of depression or anxiety, sometimes substance abuse, sometimes problems with parenting or marital difficulties.

And typically I would do some sort of diagnosis by interviews, sometimes by testing, and based on that, try to determine what would be the appropriate treatment, sometimes referring those people for medication, sometimes continuing to see them myself.

Q. Anne Marie Fahey, did you know her?

A. Yes.

Q. And how is it that you know her?

A. She was a patient of mine.

Q. Can you tell us from when to when she was a patient of yours?

A. First saw her in July of 1995 and ended my work with her in February of 1996.

Q. And your work with her involved dealing with what kinds of difficulties she was having?

A. Well, initially, she had come to see me -- she was in therapy before. Her therapist was killed in an auto accident, and for several months, she was not consulting with anyone.

And when she first came to see me, she was very involved with issues of grieving of his death and the loss of the support and work that they had done.

Over time, that -- those issues of grieving tended to resolve and we moved on to some other issues.

I think, in large part, it reflected her family background, growing up in an alcoholic family, and with many people in that kind of situation, she had a great deal of difficulty asserting herself. She had a great deal of difficulty with romantic relationships.

And at the end of my work with her, what emerged was some other problems that were outside my area of specialty so I referred her on to another

therapist.

Q. How often did you see her during the period of time when you were treating her?

A. It was approximately weekly. Sometimes it was every other week if she had work commitments or obligations that kept her out of town.

Q. During the course of your treatment of her and your work with her, did the issue of her relationships with -- both dating relationships and interpersonal relationships with other people, was that part of your treatment with her --

A. Yes.

Q. -- relevant to your treatment of her?

A. I'm sorry I interrupted you.

Q. Relevant to your treatment of her?

A. Yes, it was.

Q. And how so?

A. Well, again, one of the things, as we spoke, that became apparent to me is that she had a great deal of difficulty finding, maintaining healthy relationships with men.

It was very difficult for her to assert her own wishes and desires in those relationships.

Page 9

It was difficult for her to understand what makes love relationships work and that was a part of the focus of treatment that we had.

Q. Did you talk with her about different relationships she had or if she did have different relationships during the course of your treatment with her?

A. Yes, I did.

Q. And in talking about those relationships, did events in those relationships play a role in your treatment of her?

A. We certainly talked about specific events, and, you know, how she might have dealt with them differently, or if they would occur again in the future, how she might deal with them and essentially what was motivating her to act, if she did, in those relationships.

Q. Did -- when you began or, excuse me, at some point during your relationship with her, your treatment relationship with her, did she talk to you about a relationship she was having with a married man?

A. Yes.

Q. How did that become part of your

Page 10

conversations? How was that introduced?

A. Well, she raised it. I mean I -- initially, she raised it by talking about a relationship she was having that she was hoping to leave and was having trouble leaving it.

When she first talked about it, she did not indicate that it was with a married man, but it was somewhat later she told me that.

Q. When she first introduced this relationship into your conversations then, she did not tell you that it was someone who was married?

A. That's right.

Q. How did she describe it, the relationship?

A. Early on?

Q. Yes.

A. She described it as having gone on for a long period of time; that the relationship was extremely intense.

She described it as being characterized by this man pursuing her, having a great -- wanting a great deal of control over her life, having -- and as she began to want to pull away from that relationship, that he was unwilling to let her do so.

Page 11

Q. What was her attitude towards this relationship? Did she explain that to you? I mean how did she feel?

A. Well, what I would say is that, initially, she described it in historical terms, that she was quite attracted to this man initially, but by the time I saw her, she described it mostly in terms of feeling very guilty and ashamed about being involved with him. And she described it in terms of it not being a healthy relationship and she particularly described it as one she wanted to get out of in the context of her finding a new and what seemed like a much healthier relationship with a man, a different man.

Q. Did -- did she talk to you specifically about who this person was -- this relationship she was in?

A. She wouldn't tell me the name. She -- she -- all she said to me was that he was a prominent person and I would know who it was if she told me his name and she wouldn't use his name with me.

Q. Okay. Did you know the name, Thomas Capano?

A. Yes.

Q. Okay, and how is it that you knew that name?

A. Well, I think it was general knowledge in

Page 12

terms of Wilmington.

I also -- they're also not nearby neighbors, but a block or two away from our house.

Q. Did she tell you whether she had told this person, this prominent person with whom she was having this relationship, that she wanted to end that relationship?

A. She had told me that, yes.

Q. And was she having any difficulties in ending it? Was there any difficulties in doing that for her?

A. Yes, there were quite a few difficulties.

I mean she would say that she didn't want to see him and find that he would continue to send her E-mail or written notes or suddenly appear at places where he was observing her. Stalking may be too strong a word, but certainly observing.

Q. So this was not an easy -- not easy for her to extricate herself from this relationship?

A. That's right.

Q. Was extricating herself with this relationship part of your work with her, strategies to do that?

A. We certainly talked about, yes, how she might

Page 13

do that.

And we talked at great length about how this relationship reflected some of the more unhealthy aspects of what she was seeking and how some other current relationships were healthier and, yes, we did talk about how she can get out of this relationship.

Q. Could you explain a little bit about the unhealthy aspects of that versus the healthy aspects of what she was seeking?

A. This unhealthy -- as we talked about it, this was a relationship where it was very difficult for her to speak up for herself, to affirm what she wanted and desired. She felt very much controlled by this person. She felt that he didn't support her in what she was wanting to do, but, rather, he was trying very much to keep her as someone he wanted her to be, whether that was around attire or work or any number of things.

It was also a relationship where she was experiencing a great deal of guilt and shame and that was very painful to her.

Q. Guilt and shame because of what?

A. Well, when I finally found at the end, I

Page 14

think it had to do with the fact that he was married.

At the time, I didn't know what it was when we first talked about this, that is.

Q. You -- let me direct your attention to a session you had with her on January the 30th of 1996.

A. Right.

Q. Was that a -- sort of a revealing session, would you call it?

A. It was.

It was right at the end -- we had already talked about terminating treatment and her seeing Doctor Sullivan, who I was referring her to.

And, at that point, she finally said to me, I'm -- I'm willing to tell you the big secret that I've not been willing to tell you.

Q. Let me just stop you there.

This was this big secret in your conversations?

A. She had said that -- she had told me before that she was not telling me the full story.

Q. Okay.

A. And she described it as her secret.

Q. Okay.

Page 15

A. In shorthand.

Q. So she said on this January 30th session that she was willing to tell you the secret?

A. That's right.

Q. And what was it that she told you?

A. She told me that the man with whom she was involved was married and had children and that she was profoundly ashamed about that.

Q. What else did you talk about during that session?

A. I know that we talked about the process of her switching over to another therapist and some of the termination issues, you know, what territory had we covered, what was the work that we accomplished, and what was she going to be doing with this new therapist.

Q. Let me ask you about this in terms of this relationship she had that you now understood was with a married man.

A. Right.

Q. And who had children.

A. Um-hum.

Q. And any particular incidents that caused her difficulty in dealing with this, getting herself out of

Page 16

this relationship?

A. Well, there was one particular incident that she talked about. It was actually several sessions prior to the date that you mentioned.

She described to me being quite terrified in her own apartment, that this man had come to her apartment quite late at night, had come into her apartment and bolted the door shut and kept her inside for, my recollection was, three or four hours during which time he yelled at her, threatened to expose their relationship. Actually took many of the gifts that he had given her out of the apartment and then eventually returned them. There was a period that she was quite trapped in the apartment and felt quite terrified.

Q. You said something about exposing this relationship that they had had.

Did you know whether or not she was in a new relationship?

A. We did talk about that. She was in a new relationship.

Q. Did you know who the person was by name?

A. Yes, she had told me that name.

Q. She had revealed the name to you?

A. Yeah. It's Mike Scanlon.
Q. And what was she concerned about as far as this person in the old relationship and Mike Scanlon?
A. She reported to me that the man in the old relationship had threatened on a number of occasions to tell Mike Scanlon about this first relationship and she felt very strongly that if that relationship were revealed, Mike Scanlon would -- would not stay with her. She was very frightened of that.
Q. Was that a serious problem for her if Mike Scanlon would not stay with her?
A. It was certainly my impression, as we talked about this new relationship, that it was a very important one to her, and, as I talked about it earlier, it seemed a much healthier relationship.
Q. Healthier in what respect?
A. That he was unmarried, available, same religious background. They shared a lot of interest and values. There seemed to be a very mutual loving relationship where he supported her in her independence. Just many things that were not there in the previous relationship that we had spent much time talking about.

Q. At some point, did you become aware or did you realize that she had an eating disorder?
A. Yes, I did.
Q. And tell the jury about that, if you will, please.
A. Miss Fahey was very thin. I mean that was very apparent to me when she was in my office.
And, in fact, quite early on, she talked with me about having a history of restricting her food intake, and sometimes what we call purging, inducing herself to vomit or using laxatives.
And as my treatment with her went on, that became more a topic of a conversation and I began to see that as an important next step for her to address.
Q. And how did you prepare her to address that?
A. Well, we spoke of anorexia nervosa, what it is.
We described -- I described that being a specialty area in which I didn't typically work and I spoke with her about two or three colleagues in the community who specialized in that in the community who she might choose to see and I would recommend.
Q. Did you recommend one to her?

A. I mentioned three people to her and she chose to see Michele Sullivan.
Q. Was Michele Sullivan one of the ones you recommended?
A. Right.
Q. By the way, do you know who referred her to you?
A. She got to me because her brother and I are acquaintances. He teaches at Wilmington Friends School and my children attend there.
MR. WHARTON: Can I have a moment, please?
THE COURT: You may.
MR. WHARTON: No other questions.
THE COURT: Mr. Oteri.

CROSS EXAMINATION

BY MR. OTERI:
Q. Doctor, my name is Joe Oteri.
I'm one of the attorneys for Tom Capano.
If you don't understand me or can't hear me, please stop me short and I'll try to straighten it out.
A. Fine.
Q. Thank you, Doctor.

You are a clinical psychologist; correct?
A. That's right.
Q. And you graduated from the University of Delaware with a Ph.D. in psychology; is that correct?
A. That's right.
Q. Now, Doctor, psychologists, people get Ph.Ds in psychology, do those -- the schools you attend, are they part of a medical school or are they part of a separate branch of an university?
What are they?
A. They are not a medical school. It's a graduate school.
Q. Is it affiliated with the medical school normally?
A. Not typically.
Q. But there is a department at least at Delaware of psychology?
A. That's correct.
Q. And if you get a Ph.D. in psychology, you get it from the University of Delaware School of Psychology or Department of Psychology?
A. That's right.
Q. Okay. Now, are you familiar with a degree

known as counselor education?
A. Yes.
Q. And is that a degree that's granted by the School of Psychology?
A. I don't -- I don't know.
Q. Okay. All right. It's not one you're familiar with that would come from the School of Psychology?
A. I don't -- I don't know. I mean I know what counselor education is, but --
Q. What is it?
A. These are folks who are trained in skills in psychology, also, and a portion of what they do is to learn how to train other people to do counseling also.
Q. To do counseling. And what, do they train women for jobs, do they train kids to --
A. It can be university settings, it can be school settings, it can be private practice.
Q. Okay. Now, you received your certificate in 1981; correct?
A. I'm going by recollection. I believe it was '81 or '82.
Q. Believe me, it was '81.

And you worked part time from '81 to '88; correct?
A. That's right.
Q. What were you doing in those seven years in a -- besides being a psychologist?
A. Well, I was practicing part time and I was also teaching at the Medical Center of Delaware, it was called then, in the program of Family Medicine.
Q. Family Medicine?
A. That's right.
Q. Okay, so you were teaching and practicing part time, and in '88, you became a full-time practitioner?
A. Right. But I think it was '89.
Q. Now, Doctor, how many patients do you see a day normally? Just an average day.
A. 8 or 10.
Q. Take 9 as an average.
A. Okay.
Q. How many days a week do you see patients?
A. I typically work four days a week.
Q. Okay, so that's 36. You see about 35, 36 patients a week?

A. Right.
Q. It's pretty good work if you can get it four days a week.
And what do you give, hour visits?
A. Typically, they're 45 minutes.
Q. 45 minutes.
Okay, so you see, what did we say, about 35 patients a week?
A. Correct.
Q. And how many weeks would you say you work?
A. 46 or 47.
Q. All right, so we get 35 -- 350 -- 1500, 1600 people a year, sessions a year?
A. Okay.
Q. And you bill for those sessions?
A. Um-hum.
Q. At what, 85, 95 dollars an hour?
A. It depends upon the person.
I work with a sliding fee scale, and some people I've charged as little as 10 dollars a visit or as much as 100 dollars.
Q. So it slides. About what do you figure you average?

A. Average?
Q. Yes.
A. 75.
Q. Okay. Fine.
And you see about 35 people a week, 46, 47, 48 weeks of the year?
A. Correct.
Q. About 1500 sessions a year.
Now, Doctor, during the course of that practice, you treat people for diseases of their mind; correct?
A. That's right.
Q. And they tell you things; correct?
A. That's right.
Q. As a psychologist, you don't have a person come in with a bone sticking out of their leg that you can see what the illness is; correct?
A. That's right.
Q. It's internal and you have to get them to externalize it and tell you what the disease is; correct?
A. Yes. They have to talk about it.
Q. They have to talk about it.

Page 25

And when they talk to you about it, Doctor, you rarely know if they're telling you the whole truth, do you?
A. That's true.
Q. Many times, they can be coloring things; correct?
A. That's right.
Q. Putting a slant on things?
A. (Witness nods in the affirmative.)
Q. And they do that, in fact, because they're ill; isn't that correct?
A. It can be that reason. It can be that's the way, in fact, they see the world.
Q. They can what?
A. It can be, in fact, the way they do see the world.
Q. Now, you have no real way of knowing whether they're telling you the truth at that time.
You may learn they're not telling you the truth, but when it's being told to you, you don't know whether they're telling you the truth or not, do you?
A. That's correct.
Q. Okay, now, Doctor, in treating a patient, I

Page 26

assume it's like many other things, the more knowledge you have, the more help you can be?
Knowledge is power; correct?
A. You mean the more knowledge about that individual?
Q. About the individual, yeah.
A. Right. Right.
Q. I mean the more you know about the patient, the better a job you can do of reading them and helping them; correct?
A. Typically, that's true, yes.
Q. And part of that knowledge would consist of speaking to other people about them?
A. Not typically, no.
Q. How about notes, reading notes of other prior treating psychiatrists or psychologists?
A. Sometimes I do that. Sometimes not.
Q. That would be a good thing to do; would it not?
A. Sometimes.
Q. Okay. In a case -- did you know Bob Conner?
A. I knew him, yes.
Q. Do you know he was a highly-competent guy,

Page 27

well-respected in his field?
A. I certainly respected him, yes.
Q. Do you know Anne Marie Fahey was treated by him for some 60-odd visits over the course of a couple of years?
A. I didn't know the number of visits, no.
Q. You know she had great respect for him?
A. I do know she was respectful of him and fond of him.
Q. You know, in fact -- you told her, in fact, she was in love with him?
A. I told her that?
Q. Yes, did you tell her that?
A. No.
Q. You never told her that?
A. No.
Q. Did you, in fact, have a number of discussions over transference and -- between her and Bob Conner?
A. Not -- I sure don't recall that. I mean we talked about it briefly. I would not say a number of conversations.
Q. All right. Now, she finally resolved her

Page 28

problems over Bob Conner's death; correct?
A. Yes. Yes.
Q. Did she ever tell you about Nan, her grandmother?
A. Not that I remember.
Q. She never told you about her grandmother dying and she calling her years later, still calling her up and going by her house?
A. No.
Q. Doctor, seeing 35 people a week and they're telling you for 45 minutes -- they're telling you their innermost thoughts and all, do you have some system where you can remember all this? Do you take notes? Do you have any kind of recording system? What -- how do you keep it all separated in your mind so you can help each person by knowing their story when you treat them?
A. Typically, when I see someone, at the end of the appointment or at the end of the day, I will enter some notes.
I used to write them by hand. I now put them in a computer.
Q. And Anne Marie Fahey, you saw from July of

MR. OBERLY: Okay.

THE COURT: And I'm satisfied that, normally, I would go ahead and have a hearing and address that, but, quite frankly, I think the testimony of Dr. --

MR. WHARTON: Kaye.

THE COURT: -- Dr. Kaye pretty well established the basis to say, when we're treating somebody for emotional disorders, their personal life and their personal relationships are a very important part of diagnosis and treatment.

So I'm satisfied that there's strong case law on that point.

There's a New Hampshire case, I think, is really right on point, but I also think it's pretty well-reasoned if we're going to recognize the mental health field or go so far as to recognize a relationship between counselor and patient, then you have to tell people what's going on in your life to understand the impact it's having on your emotional state.

So I'm satisfied that that comes in.

And the danger of this is, and I had several instructions when Dr. Kaye was on the stand, is that

it -- it may well be important in diagnosis and treatment that somebody says, Somebody did this to me.

On the other hand, we draw this imaginary and unreal line that says you can consider it for this purpose to understand what her state of mind is, but you can't accept it as being true or reflecting the state of mind of the other person.

I'll make such an instruction if you want to work on such an instruction, but I do think, generally speaking, those things come in.

Now, to the extent that they get into or there's some vague reference, vague references don't come in. I don't know whether she'll explain what she meant by a vague reference and it doesn't come out so vague, and I know I've already seen the dynamics between notes and testimony, and we're all experienced enough in this field to understand that people who interpret their notes come out with very direct and succinct statements when the notes may not be that way. They may also refer to things which they justify by saying, obviously, I put this here to refresh my memory and my memory is this, and the other side of

that is, if that was what you wanted to say, why didn't you write it down.

But that's a question of fact that -- and I don't see any real way to avoid that. That's part of the dynamics of finding the truth here.

MR. OBERLY: Your Honor, I guess I'm not going to argue with the Court, but I think -- I understand that portion, it goes to what Dr. Sullivan's going to say she actually said to me as to certain things.

Are you going as far as saying that she can relate specific incidents which are perhaps, you know, prior bad conduct?

She relates several incidents that have nothing to do with the medical treatment which she's given or the diagnosis, which we would submit -- and then on top of that, I think the case law we cited in our memorandum asked the Court to be particularly cognizant of the perils of any psychologist because they'll say everything's relevant. They eviscerate the whole concept of a medical diagnosis because they'll never say anything's not relevant. But even if they say statements made to her are relevant,

there's a difference when she starts giving opinions as to what somebody would do or not. That's not under the 803(4) hearsay rule and that goes into sheer speculation, and whether your Honor wants us to object now to that, what I'm worried about is when the doctor gets up there and says to this jury, Anne Marie would not have gone to Tom Capano's home.

THE COURT: Which we anticipate.

MR. OBERLY: And that is pure speculation on her part, because I think even on a voir dire, it would be determined she never even asked her that question, and Mr. Oteri can bring it out, but I'm worried about any of that going out and then trying to argue about it later.

MR. CONNOLLY: It's not hearsay. It's her opinion. And you have placed into the heart of this case, this matter, that very issue.

You've said that a horrible, terrible, tragic accident happened and Dr. Sullivan's opinion, of the patient that she treated, refutes that.

So it's completely relevant, it's not hearsay, and it should come in.

As far as the specific incidents, I think the

think you look like a whore. We don't think it is admissible.

THE COURT: I already know at least half of the State's argument, but I will listen to the whole thing.

I note that some of these things are already before the jury. I mean, they have come in through the psychologist's testimony.

MR. OBERLY: We tried to trigger our objections off of some of that.

MR. WHARTON: That is probably going into the balancing. Obviously, we don't concede the point, but in the interest of collegiality, we will -- unless cross-examination --

THE COURT: Well, obviously, anything we say now is subject to review if we get into more traditional rebuttal situation.

MR. OBERLY: The second matter is on pages 20, 21 and 22 and that has references to apparently at some point in time, I don't know if the date is exactly clear, there was a reference that Anne Marie explained she was going to visit Louie Capano for a possible job interview. And we don't think that is relevant to the proceedings, whether or not she had an interview with

Louie, didn't have an interview with Louie had nothing to do with any threats. I suspect the State would argue if Tom said jump she would say, how high? I don't see the relevance of this.

THE COURT: This is May of '95 according to my notes?

MR. OBERLY: Sorry. It says May of '95 so I think there is a remoteness issue. And the fact of the matter is I would note in May '95 they were getting along extremely well. That is indisputable fact as well.

THE COURT: Mr. Wharton?

MR. WHARTON: The conversation about her having a job interview is relevant because what follows from that is it is set up by the defendant and her comments, her feelings about the purpose of that later on on the 21st. I feel like I have to go, the person that got me this interview, I feel like I should go because of that and he is trying to control her in that fashion, and she feels an obligation to do that. The fact of that he got her a job interview would be confirmed by a later witness because the defendant had a conversation with that witness where he acknowledged getting her an

interview with Louis Capano.

THE COURT: Is it going to be relevant then?

MR. OBERLY: I don't see what relevance.

MR. WHARTON: Yeah. What it ties into, he wants to control where she works, where she lives, what she does, and that's one of the things that Dr. Sullivan has been dealing with her, the control and breaking away from this man.

THE COURT: Clearly in reading it it was something that I underlined to deal with. It would appear to me that she was asking me questions which clearly dealt with her present state of mind at that time wondering whether or not she wasn't being -- this was not a mechanism by which she was going to control him -- where I work, where I live, and why does he control me? What I'm concerned with is that something that took place a year before this particular offense, so how is it relevant timewise?

MR. CONNOLLY: The witness that we will have that will have the conversation with the defendant will place the time within the last six months prior to the disappearance of Anne Marie Fahey where he talked about trying to set up the job.

MR. OBERLY: That witness we can argue, but if it is six months before it makes this woman wrong in its time. She says it was May '95. Now some other witness -- Tom mentioned a job interview in January or February of '96, I don't know the context of what that is going to be.

THE COURT: We ought to have -- again one of the problems you have with any witness is how accurate they are on both recollections and placement of time. What I'm suggesting here is that the State does have evidence which they consider reliable at this stage as to when the job interview took place. That seems to me to be more likely to place when this occurred than the recollections of the person.

MR. WHARTON: Two things, Judge, one of them is the conversation of this incident, and the actual discussion between Jill Morrison and Anne Marie Fahey about the job interview is placed around the time of the Tour DuPont in 1995 which would have been May of 1995. The conversation with the later witness occurs after that, after she had already started seeing Michael Scanlon, which would put it fall-winter 1995, and perhaps later than that.

MR. CONNOLLY: So I stand a little corrected. It could be more than six months, Judge.

MR. OTERI: You stand a lot corrected.

MR. WHARTON: I think what we have to look at, Judge, is that we have been talking about a relationship that spanned a considerable period of time and the nuances of that relationship have all been discussed through a great deal. And to say that something is relevant as it related to the relationship that occurred in 1994 and early 1995, but then something occurred later in 1995 is now -- time is not relevant because it is too remote in time doesn't strike me as being too logical. Because we have this entire relationship and the progress of that relationship has been talked about a great deal.

MR. CONNOLLY: Can I add another point? One of the things here that is also relevant is the fact that Jill Morrison had a long going relationship with Anne Marie Fahey and the subject of Tom Capano wasn't just discussed in isolation, this had been ongoing. Even though Jill Morrison didn't know the extent of the relationship, there was a context to which Fahey made in 1996 in that context to statements that go back as far

as '94 and '95.

THE COURT: I note in this particular case, again, I think one of the dangers and why we always need a limiting instruction is we are talking about the state of mind of somebody who is not here, that's why we are relying on hearsay. In no way -- it clearly does reflect on the defendant, that is one of the things we need to limit, and that's one of the things we need. I'm inclined to let this in, only because it appears to be a crucial part in their relationship. This is the first time that I'm aware of that there is anything that says I'm being controlled and I'm having second thoughts. And I note this is before there is some other testimony in here that this relationship had cooled before she met Scanlon, that is not altogether clear from what I have heard so far and she met Scanlon within several months of this statement being made. Again, it gets hard to weigh the prejudicial value here because most of this is out now. Most of this is on the table with the testimony of the psychologist.

MR. OBERLY: One point, we did object to the testimony of the psychologist. And to some extent there is a rule that is cumulative. And on top of the hearsay

objection I don't want the Court to be under the impression that we wanted the psychologist to testify.

THE COURT: I understand.

MR. OBERLY: So on top of that some of it does become cumulative. So a good bit of it we have objected to trying to limit the number of rulings that the Court would have to make.

THE COURT: I'm inclined at this particular stage to say this particular conversation come in, that it is significant because it represents the first indication of a date in the change of their relationship, that it is 13 months prior to the event. But again we have, at least from the position of the State here, we have a relationship that changed and part of that change led to Mr. Capano viewing the relationship different and taking measures to terminate.

It seems to me, at some stage, I'm not just talking about her state of mind at the time of the tragic accident, but --

MR. WHARTON: I think there were quotes in that weren't there, for the record?

THE COURT: But I'm also talking about her state of mind which led to a change in her relationship,

therefore, is a crucial part of the State's explanation of what happened here, so we can start with that particular one in May of '95.

MR. OBERLY: Okay. Next is pages 27, 28 and 29, general conversation from Jill Morrison pertaining to that surrounding the Grand Gala, principally that there were several phone calls that came in. Anne Marie apparently said he's been calling me all day, left rolls from DiFonzo's, discussed prior relationship, devout Catholic.

Again, we think, as you read Porter, I just don't believe that the Porter decision believes open-ended all comments made that relate to what she did or didn't do in relationship to Tom Capano. She obviously went there, there was obviously no problem there, and it is almost put in like we want to get her mental attitude because she thought she might have a problem there and I don't think it pertains to Tom Capano whatsoever.

THE COURT: See, I think I'm approaching this from a different perspective from what you suggest. I think her state of mind becomes important. Her state of mind becomes important for a number of reasons because