somehow we now know she died in his house -- excuse me, we don't know that, although the defense has indicated that in opening argument. There certainly isn't proof of that.

MR. OTERI: It's not believable. I said it.

THE COURT: And we are told that this was a very tragic, ill-defined accident. Now, it seems to me that in order for the State to approach the concept of there being some intentional homicide, because they are not interested in proving an accident occurred in the house, that they have to show a change in their relationship that made it more toxic. And that this pattern of calling her under circumstances that were inconsistent with the e-mails, inconsistent with the portrait of domestic tranquility, which Mr. Oteri has attempted to develop, is important in balancing the emotional condition of their relationship at this time.

MR. OBERLY: Next one I have is on page 30. And perhaps, the best comment I can make on it is line 18, "Anne Marie told me that Tom Capano told her that Mike Scanlon said," that is triple hearsay. The comments that have come in generally under the hearsay exception are at least the declarant's own statements as

to her perceptions, her thoughts, here she is repeating that, she says that Mike Scanlon told.

THE COURT: Except it is not coming in for what Mike Scanlon said. Nobody is arguing the truth of it, indeed they are arguing that it is not true.

This was a situation where Mr. Capano was attempting to break up this relationship. And so it is not being introduced for the truth of matter, it is introduced for showing that he is doing certain things, as I describe it, to make the relationship no longer loving and nurturing but toxic. And it is again inconsistent with the e-mails, but puts us in a situation where since Anne Marie is unavailable to tell us what her emotional state was at this time, this remarks to someone who has been called her best friend and confidant under instances which were contemporary to the alleged incident give it the degree or reliability that we let it come in.

The incident relating to the fire escape, while that may be in through Michele Sullivan or Gary Johnson, submit to that under the present sense. One, if it has any clear relevancy as to exactly what was said, it was said to a psychologist and that has already come in. It

is cumulative to come in through this witness and I don't think it meets the test of that present sense of a state of mind exception.

MR. WHARTON: I think, as I recall, when Gary Johnson was being cross-examined there were a lot of attempts to undermine the credibility, not of Gary Johnson, but of Anne Marie Fahey, in telling Gary Johnson that this incident occurred. I think I remember Mr. Oteri asking questions like, well, you don't know whether that actually occurred, you weren't there, you didn't verify it, you had no way of verifying that. And I think the fact she told it to another person besides the psychologist corroborates Dr. Johnson.

MR. OTERI: If Ferris is finished I think you ought to let the jury go.

THE COURT: I was making the thought myself. Let me stick my head outside. I almost would like to instruct them, but they have been instructed time and time again.

MR. O'DONNELL: Early on in the break a bunch of the jurors were standing outside of the courthouse.

THE COURT: I gave permission for the bailiff to go outside to smoke.

MR. O'DONNELL: There were 12 of the 20 and I asked one of the newspaper guys whether they had shot any pictures and he said yes. I told the guy, I said we have taken great pains to keep the identity of these jurors, if their picture appears in the paper Judge Lee is not going to be happy with that. I can't tell you what to do.

THE COURT: I thank you for that. If they intend to put it in the paper my guess is they have disseminated that. I made the decision to let them go outside since they can go to lunch and home at night and some people locked up in small rooms who smoke cigarettes get a little itchy, so I told the bailiff if there were those who wanted to go outside they could.

Thank you for bringing that to my attention. Another lesson, I will find a better place for them to smoke.

MR. OBERLY: You haven't ruled on this, but same objections apply to page 32, the car driving by Scanlon's, which is an attempt to get in prior bad act and alleged harassment that occurs. All three of those made under same objections not being properly in the scope of what the rule would allow in.

1    About the time that Doctor Johnson referred
2 her to me, she was well into another episode of some 14
3 or 16 months. And what I needed to help her do at that
4 point is to talk about, what is this about. And she
5 had not talked to me a great deal about this person,
6 but she did refer -- and, in fact, if you don't mind,
7 I'll look him up in my notes.
8    Okay, I would like to read a section that may
9 be relevant to what we're talking about.
10   On 2-28, as part of my notes, I have that she
11 reported that until August of about '95, she had been
12 in a relationship for two years with a 44-year-old man
13 who's separated and had four kids. She reported him to
14 be incredibly controlling and possessive and felt that
15 he gave gifts to her to be controlled. She reported
16 further that she did not know how to get out of that
17 relationship.
18   When I asked her a little bit more about her
19 eating disorder, the ebbs and flows of that, she
20 indicated it had been worse lately mostly due to him.
21   Now, she's not giving me a name, and I didn't
22 know who him was, but the only other him we talked
23 about was the 44-year-old gentleman.

1    Q. And later on she specifically identified this
2 person; correct?
3    A. Yes.
4    Q. And she identified him as?
5    A. Tom Capano.
6    Q. Now, on February 28th, your notes also
7 indicate that she told you that there had been no
8 violence in the relationship; isn't that right?
9    A. That's right.
10   Q. Did she tell you that she was interested in
11 having a relationship or was in a relationship with any
12 other person?
13   A. As part of that interview, and, frankly, on
14 the heels of her talking about this other difficult
15 relationship, she indicated that she was dating Michael
16 from MBNA. Did not give me a last name.
17   Q. Did she tell you about Michael during that
18 meeting?
19   A. Not much other than just to make reference --
20 no, I think that was about the only reference that was
21 made.
22   Q. If you would turn to the next page of your
23 notes, you've got the words, very ashamed, with very

1 underlined three times.
2    What's that a reference to?
3    A. To explain that, I need to talk a little bit
4 about her history and, that is, some of this you may
5 already know, but I'll tell you what I know.
6    Anne Marie lived in some unusual and
7 extremely difficult circumstances growing up. There
8 were periods of great poverty. She suffered both
9 physical and emotional abuse living at home especially
10 with her alcoholic father. There was so little money
11 in the household that she felt like she had to go to
12 school and have the school pay for her lunches. Very,
13 very often, she felt very frightened about going home
14 for fear that her father would attack her or in some
15 way humiliate her.
16   I mention these things simply because it's
17 not unusual when you have that kind of background that
18 a young person will tend to blame themselves. They'll
19 tend to say, gosh, if I could only get straight A's and
20 maybe dad won't drink or maybe I shouldn't have come in
21 so late and he wouldn't have beaten me that time.
22   And, very sadly, little people blame
23 themselves and become very ashamed.

1    A person, when they feel guilty, will say,
2 Oops, I goofed, I tripped over something and I
3 embarrassed myself, I made a mistake.
4    But a person who feels shame feels a very
5 profound sense that they, as a person, have no reason
6 to live --
7    Q. Now, did Anne Marie feel both shame and guilt
8 or just one or the other?
9    A. She struggled with those back and forth, and
10 what I mean, in terms of feeling like she could not
11 have any reason to live had more to do with kind of an
12 attitude. I had no time -- I, at no time, saw her as
13 having any potential for suicide at all. I'm referring
14 more to the fact that she lived and struggled with a
15 chronic sense that she was unattractive, unacceptable,
16 unworthy, and just not a good person.
17   Q. Well, did she have any shame in relation to
18 the fact that she had been in this adulterous
19 relationship?
20   A. Definitely.
21   Q. Why did she have that shame, and if you could
22 be more specific than the general background?
23   A. I'm not sure we actually talked about that in

Page 29

1    Q. You've also got easily intimidated. Did she
2  say who she -- who intimidated her?
3    A. Those were my words, actually, because it
4  became clear to me that she would be a kind of person
5  that would be easily intimidated and manipulated just
6  from the things that she had said to me.
7    Q. All right. Now, you've got down here a
8  reference to enc. I take it that's encouraged?
9    A. Yeah.
10    Q. Would you read the reference, please?
11    A. This reference has to do with how I was
12  encouraging her, what to do in therapy.
13        I was basically encouraging her, knowing her
14  strong commitment to her God, I asked her to ask her
15  God's forgiveness for the things that she felt ashamed
16  about.
17        I encouraged her to acknowledge herself as
18  being a child of God and to do what she could do to
19  affirm that, for her, the sky was really blue.
20    Q. You've also got down here a reference to
21  ambivalence about giving up laxatives.
22        So you were actually discussing with her the
23  idea of just to stop the use of laxatives; correct?

Page 31

1  of food that get introduced to the diet have to be
2  chosen carefully. If you flood this person with a lot
3  of milk products, they're going to have a tremendous
4  amount of indigestion, or if you gave them a steak,
5  they will vomit it up because their stomach is not
6  acclimated.
7        So I had asked her to go to Maryann Carter to
8  get a food plan she could graduate into slowly and
9  basically, in so doing, I asked Maryann to supervise
10  that part of our work.
11    Q. I'd like you to turn to April 3rd. Skip
12  ahead to that, please.
13    A. Okay.
14    Q. And would you read -- you've got three lines
15  of notes there; correct?
16    A. Yes.
17    Q. Would you read the notes for us, please?
18    A. Having a very hard time forgiving herself,
19  believes his haunting her is her punishment. How to
20  trust, how to forgive self.
21    Q. Who's the person referred to as haunting
22  her?
23    A. She referred to as Tom Capano.

Page 30

1    A. Yes.
2    Q. And her response was?
3    A. You know, basically, when I do this kind of
4  thing, I want to test out what is their readiness to do
5  it, and I sensed that she was a little evasive and
6  changed the topic, and what that said to me is that
7  she's not ready.
8    Q. At some point, did she become more ready?
9    A. Absolutely.
10    Q. There's also some references in here to a
11  Maryann Carter, Ann Battaglia who works with Carter --
12  and who are those people?
13    A. I referred Anne Marie to Maryann Carter who's
14  a registered dietician.
15        When somebody has a long history of eating
16  disorder ways, it's very difficult to come up with an
17  adequate food plan. Anorexics think they know a great
18  deal about food, but what they really know is all of
19  these foods are bad and these one or two are good.
20        When you are working with somebody to
21  encourage them to eat more normally, they need to
22  understand that if they start -- first of all, they
23  have to start eating in small increments and the kinds

Page 32

1    Q. And what kind of conduct did she tell you
2  that he was engaging in to haunt her?
3    A. She reported coming over to the house
4  uninvited, wanting to get in, making a scene such that
5  he was allowed in. Surprising her by showing up at
6  places that she was planning to go by herself. Writing
7  an enormous number of E-mails, making a very large
8  number of phone calls every day.
9    Q. How many phone calls did she tell you?
10    A. Well, at one point, I remember with some
11  surprise she talked about 15, 20, 25 phone calls in a
12  day. And the last thing that she mentioned, that she
13  felt trapped by in some ways, was the gifts that she
14  was being given at this point.
15    Q. And did she tell you how she viewed the
16  gifts?
17    A. She viewed them as manipulation to stay in a
18  relationship with Mr. Capano.
19    Q. Now, did she want to completely break off all
20  ties with Mr. Capano?
21    A. I don't think so. I -- I think she was the
22  kind of person who believed that you could move from a
23  romantic relationship to one, hopefully, of

**Page 33**

1 friendship.

2    Q. Well, as a counselor, did you offer her any

3 suggestions as to whether that was a good or a bad

4 idea?

5    A. If I knew that, for instance, a person were

6 relating to somebody who physically abused them or who

7 threatened them bodily harm or whose finances were

8 going to be down the drain if they don't leave, I get

9 very active in talking to these people about doing

10 what's necessary to save themselves.

11      When it comes to these matters, one of the

12 difficult things you have to choose is -- when you're a

13 therapist -- is, what do you do and what do you need to

14 teach them to do.

15      And in this case, it did not appear to me

16 that the kind of things that she was struggling with

17 were risking any kind of danger and so I was -- I

18 continued to suggest to her that she find more specific

19 ways of saying no and being clear about the kind of

20 relationship that she wanted to have.

21    Q. You mentioned a lot of things she said about

22 Mr. Capano, specific acts, manipulation, control.

23      Did she say any good things about Mr. Capano?

**Page 34**

1    A. Sure. She described him as a man who had in

2 the past been extremely supportive of her. He was

3 somebody she could turn to to talk about problems.

4    Q. Did she say she had turned to him in the

5 past?

6    A. Um-hum. That's right. And I think because

7 of his generosity, she was able to feel a sense of

8 security that she probably had never been able to feel

9 in her life and so she felt grateful for those kinds of

10 gifts.

11    Q. Did that, at all, factor into her resolve or

12 lack of resolve to completely sever ties with him?

13    A. Will you reread the question?

14    Q. Well, was she afraid that if she severed

15 ties, it would have some kind of effect on him that she

16 didn't want?

17    A. I think Anne Marie is -- was a person who was

18 excruciatingly aware of the feelings of other people

19 and never ever, ever wanted to hurt anybody. If she

20 perceived she was hurting somebody, she would be

21 incredibly remorseful and probably end up with a

22 tremendous amount of shame. Therefore, even though she

23 reported to me that she did not want a romantic

**Page 35**

1 relationship and she wanted to see Mr. Capano less and

2 less, she did not want to hurt him and I think therein

3 hoped that, somehow, that their relationship could be a

4 platonic friendship.

5    Q. Now, would you look at your notes for April

6 10th? April 10th, she tells you for the first time

7 what about Mr. Capano?

8    A. Now, I used some of this language because I

9 don't like to write other people's names in my files,

10 so I simply said the person continues to contact her.

11 Encouraged her to ask the Attorney General's office for

12 steps in dealing with harassment, to document the

13 calls, to write responses asking to stop -- to stop

14 contact. Just to provide documentation in general to

15 help her reduce the tendency to withdraw and hide and

16 feel so vulnerable.

17    Q. Now, do you recall that around this time in

18 April, she said anything to you about fears she had

19 relative to Mr. Capano?

20    A. Let me see if it was at that time or

21 earlier.

22    Q. I don't mean fears -- I mean fears with

23 respect to physical violence.

**Page 36**

1    A. I'm trying to remember when it was that she

2 began to talk about a possible kidnapping and I'm not

3 sure whether it was -- the possible kidnapping was

4 later.

5      This --

6    Q. I didn't mean to limit you to this, but what

7 I'm saying is do you recall a time when she started to

8 speak with you about a fear of violence from Mr. Capano

9 at any time?

10    A. What she did was she was very concerned about

11 getting kidnapped.

12    Q. And what did she tell you about getting

13 kidnapped?

14    A. Well, she -- she and her friend had been

15 talking about this vaguely, and she came into the

16 office and said, So and so said, gosh, I could get

17 kidnapped, what do you think, Michele? And I said,

18 What is this about, and she said, Well, my friend

19 thinks that somebody could kidnap me. And I said,

20 Well, talk to me more about what this is about. I

21 became extremely distressed and she said, Oh, I don't

22 know, somebody could just take me away or something,

23 and I said, Who would do this, and she said, Well,

Page 37

1 probably a third party. And I said, Well, what do you
2 mean, that somebody would hire a third party? She
3 said, Yeah. Who would do that? Mr. Capano. And I
4 said, Well, is there anybody else that might do that,
5 and she thought for a long while and said maybe a
6 boyfriend of three or four years ago.
7 Q. Did she mention a boyfriend's name?
8 A. No.
9 Q. Was she definite that she thought Mr. Capano
10 could be this person?
11 A. The person who would kidnap her?
12 Q. Yes, or get a third party to do so.
13 A. It was clearly an immense worry for her.
14 Q. Now, you mentioned on April 10th that you had
15 advised her to contact the Attorney General's office.
16    Do you know whether she did?
17 A. Yes, because I was -- at this point, this was
18 prior to the talk about being kidnapped. This had to
19 do with a number of phone calls being received and --
20    MR. OTERI: Excuse me, your Honor, could we
21 get some kind of a date background?
22    We're all over the place.
23    THE COURT: All right, Mr. Connolly.

Page 38

1    MR. CONNOLLY: All right.
2 BY MR. CONNOLLY:
3 Q. I thought I said it, but you mentioned on
4 April 10, you spoke with her about contact with the
5 Attorney General's office.
6    At some point, did she, and would you give
7 Mr. Oteri a date?
8 A. Yeah. We outlined what I thought she needed
9 to do.
10    The next meeting, I checked with -- let me
11 see. I want to make sure I'm accurate with my notes
12 here.
13    The next session, although it's not
14 documented in here, I remember very clearly talking
15 with her about whether she had followed through either
16 with the police or the Attorney General. She reported
17 to me that she could not do the police. She just felt
18 that that would get too known in the public, and it
19 would just be too embarrassing, and she couldn't take
20 it.
21 Q. Do you know now, specifically, why she was
22 concerned about public exposure with respect to the
23 police?

Page 39

1 A. She had a job that was an extremely well -- a
2 very public position with Governor Carper.
3    Is that what you're referring to?
4 Q. Well, I'm asking you, is that what she said?
5 A. Yeah, that is definitely a piece of it, plus,
6 again, her shame and embarrassment that any of this
7 would be found out and it might get into the press and
8 so on. Her -- those kind of fears kept her frozen a
9 lot.
10    I did ask her about the Attorney General's
11 office and she said that she had contacted a friend,
12 and that the way she had done that was to call the
13 friend and to pretend that she was inquiring about a
14 constituent, and she told the friend in the AG's
15 office, Somebody I know is being harassed, what would
16 you tell them in order to keep themselves safe? And
17 this friend answered and provided some questions and
18 she wrote those things down and then we talked about
19 them at the next meeting.
20 Q. Were you surprised that Anne Marie handled a
21 problem that she had by discussing it in terms of a
22 third person?
23 A. I wasn't surprised. I was sorry. But I

Page 40

1 wasn't surprised.
2 Q. That was consistent with her whole lack of
3 assertiveness?
4 A. Well, lack of assertiveness, but much more
5 profoundly her shame. You know, imagine going to a
6 policeman, who may or may not know you, and saying, I
7 have had this clandestine affair. I don't want it and
8 I'm afraid of these threats. It's kind of shocking to
9 the man on the street, and who knows who he's going to
10 tell, and it's incredibly embarrassing and it kicks up
11 all kinds of bad feelings about yourself.
12 Q. If you look on the entry for April 24th,
13 1996, this is a week after the Attorney General
14 discussion you had with her. There's a reference here,
15 As she gets closer to Michael, she remembers --
16 A. Disappointment and betrayal from her past.
17 Q. This is Michael Scanlon?
18 A. Yes, that's a reference to Michael.
19 Q. Did she tell you she thought she was getting
20 closer to Michael?
21 A. Absolutely, yes.
22 Q. Is this a trend that continued throughout the
23 time she saw you?

Page 29

better and better. And so, again, we talked about well what is a small amount that you can do to see what his reaction is, to see if it is safe, to see if you can get the support that you deserve, to see if there is no rejection. And that is essentially what we were doing, is encouraging her to tell a little bit, and in this case, I think it had to do with her eating.

Q. Now, did you ever discuss with her telling Michael about the fact that she had had an affair with Tom Capano?

A. We certainly talked about whether she was going to do that. I don't remember her ever coming back to me and saying I did that. I have to question that. I made an inference that she had. After the grand jury testimony -- I had indicated that I thought that the two of them had spoken and that she had spoken to Michael about Mr. Capano. I think I was wrong. I did not have my notes in front of me. I do remember her talking about speaking to Michael, and it turns out, as I'm now looking at my notes, that it had to do with the eating.

Q. Just so the jury understands, you testified before the grand jury, the Federal Grand Jury way back in March of 1997, correct?

Page 30

A. Right.

Q. Is that right?

A. Yes, it is.

Q. At that point, there were limitations on what you could or were willing to disclose to the Government, correct?

A. That's right.

Q. And those limitations no longer apply?

A. Exactly.

Q. So now you are telling this jury a lot more than you were able to tell the Government back in March of 1997?

A. Exactly.

Q. And you testified under oath back then, you understand that?

A. Yes, I do.

Q. And in fact, back then you did make a reference to discussions between you and Anne Marie, you thought Anne Marie had said to you she told Michael?

A. I was distressed enough about that, frankly, after that hearing I went back to my notes and very carefully combed them and the reference on 5/8, where It says, "Told Michael. Feeling much better," it became

Page 31

very clear to me what she told Michael about was her eating. Although, in vague we talked about whether to talk to Michael about Mr. Capano, I can't with certainty say that was accomplished.

Q. Would you look at your notes on May 15th?

A. Okay.

Q. And would you read them for us, please?

A. "How to be compassionate for the little girl who experienced such horrible life experiences."

Basically, I'm going to read a couple sentences here that basically talk about -- it's me talking to me about the themes that we talked about.

In that section we talked about how to be compassionate for the little girl who experienced such horrible life experiences. How to allow herself to have and to assert her needs.

Q. All right. And those are notes you are making to yourself, this is not what Anne Marie says to you?

A. Correct.

Q. And without going into a lot of detail, just the point being when you say the little girl you are talking about Anne Marie growing up?

A. Yes, when she was very little.

Page 32

Q. And I take it this is part of the overall goal that you testified about, just making her more assertive, in part, due to her upbringing; is that right?

A. Yes. May I say something a little bit more?

Q. Please. Go ahead.

A. She experienced a tremendous amount of abuse, neglect and poverty. And in order to sometimes get out of the line of fire at home she literally would go under a desk and hide and hope nobody would find her. She knew her own terror and she just huddled under there waiting until the chaos blew over and hoping nobody would find her because she might get into the line of fire.

Sadly, with people like that, they blame themselves for the fight that happened, or they say things like if I had gotten home in time dad would not have gotten angry and beaten up one of my siblings. Or if I had gotten all A's this week maybe he wouldn't be drunk. And so at the same time she is trying to hide, she is also blaming herself.

One of the major themes in our work was her profound shame and self blame. And my desire in this

was to help her to begin to realize how really sad it must have been for a little girl to have to hide under a table to keep out of the line of fire in a family system. And my talking with her was to try to develop that compassion for the little girl that had to do that.

Q. The next entry is May 29th. And you reference, quote, "Intense fear, obsessive thinking."

Is the intense fear similar to what you were talking about on May 15th?

A. No. As Anne Marie and I began to talk more concretely about her past and, very specifically, about the kind of changes that she needed to make, she knew she was going to begin to encounter a lot of things that were going to be very scary to her.

If you spent most of your life trying to be compliant so as not to get into trouble, when somebody else is saying to you let's work on your assertion, obviously, you are going to start to get panicky that if you are assertive this other person is going to kick you out of their life or they are going to hate you or try to manipulate you into trying to go backwards.

In facing change, people sometimes start to experience a lot more anxiety, and that's what was

Page 34

beginning to happen here.

Q. What about the obsessive thinking, what is that?

A. Basically it is things like repetitive thoughts. Some of you as you are driving to work and you carry the same tune going over and over and over, that is a repetitive thought. Having intrusive thinking where you're planning a grocery list and you can't stop doing it. It almost feels like it is out of your control and you can't get rid of that tune.

And when an anxious person, their anxiety increases, they are likely to revert to some of those experiences inside.

Q. Now, was Anne Marie making progress with you, in your opinion?

A. Yes.

Q. On May 29th, there is another reference in your notes here, it says, "intro idea of anti-dep."

I take it that is introduce idea of antidepressants?

A. Right.

Q. So I take it you talk with her about going on antidepressants?

A. Yes.

Q. If she's making progress why are you, in the middle of this overall treatment program, having her go on antidepressants?

A. Again, it relates back to what I was saying before. When you start to make a pretty big change and get really afraid that other people will not like you or will reject you, even though you know it is the right thing, you start to experience a lot of anxiety.

I will use a silly example, but one I think a lot of people can relate to. After a whole winter of having ivory white legs not a whole lot of people have the courage to put on a pair and shorts and parade them in March. And I know that is a trivial example. But if your therapist said it is going to be therapeutically good for you to put those shorts on and parade around in the mall, the person who is going to do that is going to say, oh my God, you want me to be ridiculed? Look at these legs, they are horrible. And that essentially, of course, is a more trivial example. But for her we were beginning to have her do things that were not only terrifying, but for her meant the possibility of the loss of people that she loved.

Page 36

She had been very compliant. People who got to know her and really loved her were used to saying, oh, you know Anne Marie will go to the show. We will decide and she will just come along, because she was willing to be compliant. And as she got firmer and firmer about what she would do and not do, we both knew that some people wouldn't like it and that resulted in increased anxiety and a little bit more discretion because she was afraid she would be dumped or abandoned as she had felt in the past.

Q. You refer her to Dr. Kaye, I take it, for the medication; is that right?

A. Yes.

Q. And if you turn to the next date in the letter, which is June 5th. Why don't you -- you have got a reference there to EVPB, would you tell us what that is and read it?

A. Do you want me to include the reference about the insurance company?

Q. That would be fine. The jury will see these notes later on, so you can explain them, we will understand what they mean.

A. At the beginning of my entry for June 5th, I

Page 37

wrote basic notes about Principle Insurance from whom we were receiving some reimbursement for these sessions. I said we had been granted six sessions, gave authorization dates and number of visits until what date.

I also recorded that she had agreed to take the blood test again on 5/31. I don't know if I had mentioned it, but she was a purging anorectic. When you use 15 laxatives in a day, it can really influence your electrolytes, and some very serious things can happen, including heart attack. So I wanted to have her followed medically to make sure that was not getting out of balance. And I already had her do that once and felt it was time to do that again.

I report here that she restricted as early as when she was in 7th grade. At this session reported she was willing to take antidepressants and see Dr. Kaye.

Q. You wrote, "Restricted as early as 7/3."
Restricted refers to what?

A. Restraining her eating.

Q. Then you have got, "Willing to take antidepressants. Will see Kaye."
That is Dr. Kaye?

Page 38

A. Yes.

Q. Finally, you have another reference.

A. And she and I discussed what it would take for her to change the eating disorder. And she reported to me quite honestly that she was desperately afraid of losing control and gaining weight.

Q. Now, you saw her again the next week June 12th?

A. Yes.

Q. And you have two and a half or three lines of notes. And would you read those and we will talk about them?

A. Okay. Have we talked by any chance about the definition of anorexia? Because some of that may put that in context.

Q. Well, you testified on Friday that there were four main characteristics of anorexia. Do you want to expand on the four elements you talked about?

A. Just very, very briefly. Anorexics are most notably known because they are horribly, horribly thin. What is harder for people to understand is how much they hate themselves and how much they hate especially one part of their body. Typically they focus on one part. And in spite of their being obviously much less weight

Page 39

than they think they are, they refuse to eat any more food normally. The reason I say that, is because some of the-- the references I'm going to make are going to sound weird to you, but if you understand it in the context of what she is trying to have happen it will make sense.

Q. With that background, if you would read the notes.

A. Okay 6/12 she came in reporting that she felt very weak. We talked about her intake of food and how to deal with her panic about gaining weight. I was also concerned about affirming her goodness so she could eat.

Q. So the affirming her goodness go to what you were just talking about, anorexics often times just hate themselves; is that right?

A. It is a form of self punishment.

Q. You put down here, "Feeling very weak."
Would it surprise you if you were to learn that Anne Marie turned to Tom Capano on this very day, June 12th because she felt faint?

A. No.

Q. Why would that not surprise you?

A. Well, during our conversations it was clear to

Page 40

me that Anne Marie was spending time, I think, in her movement from a love relationship, she really hoped that she could maintain a friendship. And it was fairly clear from some of the things that she made reference to that he was offering help in a number of areas. And I can imagine that he would offer to come by and take her home.

Q. Well, you have testified that she had these deep feelings for Mike Scanlon?

A. Yes.

Q. She wants to break off the romantic relationship with Tom Capano, why doesn't she turn to Mike Scanlon on June 12th as opposed to Tom Capano?

A. I don't know, frankly.

Q. June 19th, there is more discussion about my medication?

A. Yes.

Q. Do you recall on June 19th asking Anne Marie to complete an exercise?

A. Yes. Actually several.

Q. There was one in particular. You asked her to write a letter, correct?

A. Yes.

Page 41

Q. Would you tell us about that?

A. Okay. This is going to sound a little weird, because there is a series of techniques that sound strange, but they have their purpose to help people get more connected to themselves.

I knew that Anne Marie loathed her thighs. She absolutely thought they were horrible. So I encouraged her basically to write a letter to her legs as though they were something separate from her.

Q. Now, you realize the average person would raise their eye eyebrows?

A. I told you this would sound weird.

Q. So when she left on June 19th, though, she was charged with that task?

A. Yeah.

Q. You met with her again a week later, correct?

A. Uh-huh.

Q. That would have been June 26, 1996?

A. Yeah.

Q. And you have got some notes there. Could you read us the first three lines of the notes, please?

A. "I must admit that I feel somewhat silly writing a letter to my legs."

Page 42

Q. We will get to the letter in a second. Go to June 26th. So you leave her on June 19th with the task of writing a letter?

A. Yes.

Q. And you meet with her again a week later?

A. Right.

Q. And that, in fact, was June 26, 1996?

A. Correct.

Q. That was the last time you saw her, I take it?

A. Yes.

Q. Would you read the first three lines of your notes for June 26, 1996 for us, please?

A. "Learned to hide under furniture to get away. Sister unbelievably cruel and violent with her."

I want to make a comment about that if I may.

"Cannot say no or set limits with her."

Q. Let's start -- there are three ideas there. Let's start, hide under the furniture. I take it that is a reference to what you have already told us about during childhood?

A. Right.

Q. You have, "Sister unbelievably cruel and violent with her."

Page 43

What did Anne Marie tell you during this session that caused you to write those notes?

A. She was reporting some early memories in which the sister, and in this case, the memory she told me about they were quarreling about something and the sister took the vacuum cleaner to Anne Marie's hair and sucked it in, and as a result the hair had to be clipped close to the head in order to get it disentangled. That's the story she told me.

Q. How old was she when this happened?

A. Very young is my impression, very little.

Q. Did she say anything to suggest at all that her sister was, at the present time in 1996, unbelievably cruel or violent with her?

A. No. No. No.

Q. You did mention that -- did she view her sister as controlling at all as an adult?

A. Well, I use a different word. The words she used was controlling, the word I used was trying to be helpful.

Q. Did she fear her sister as an adult, I mean physically fear her?

A. Not that I was aware of at all. She never

Page 44

reported that. She might be annoyed, but she didn't fear her.

Q. Now, we have gone through your notes. Do you recall any incidents that Anne Marie related to you about Tom Capano that aren't reflected in your notes?

A. I think we mentioned the one time where he asked her to go see the daughter who was ill.

Q. How about you mentioned a scene in her apartment, you made some reference to that, but can you explain in detail for us?

A. The event had happened probably before I had begun to see her. Where, in other words, I saw it as more historical, where apparently Mr. Capano got into the apartment and he became very angry and he threatened to take away gifts, the air conditioner, things he felt he did not want to be present while she might be dating somebody else. And she reported being very frightened, not only because he was making the kind of loud scene and she was unclear as to what kind of attention it would draw, but she was frankly fearful that he might tear up or destroy things. And more importantly she felt frozen. I spoke with her at that time and I said, did you think about calling for help or calling 911 or

running over to a neighbors? And she basically said she felt too frozen for that, she just felt that overwhelmed.

Q. Did she say anything about him grabbing her during that incident?

A. I remember her saying at one point he grabbed her arm and pushed her against the wall.

Q. Now, you have also mentioned social events. Do you recall an incident about a social event that is not reflected in your notes?

A. Yeah. There was another time we were talking about the number of phone calls that she was getting. And she said as an example, she was preparing to go to a social event with Mr. Scanlon. It was very clear that was Anne Marie's date. And Anne Marie, I believe, said to Mr. Capano I'm going with somebody else. She reported to me that Mr. Scanlon was having a very difficult time accepting that. I'm sorry. Scanlon was having a--

Q. I think you might have misspoke.

A. Sorry. That Mr. Capano was having a difficult time accepting no. So there were a enormous amount of phone calls on the day of the event. And Anne Marie was

basically saying how do I deal with this? How do I deal with him at the time once we get to the social event? I fear he might make a scene or I fear that he might do something that I would be horribly embarrassed about.

Q. Did she report to you how this social event went, after it?

A. Indeed. She came back from that and felt some real pride that as Mr. Capano did approach her and guide her into a different room to talk to her that she expressed a great deal of pleasure in being able to say pretty clearly, I don't want to be here, I want to go back to the party. And I believe that she found her own way to escort herself back, so that exchange was brief and she used it as an example of feeling more and more capable of saying no.

Q. Now, this event, I take it, had to occur while you were treating her; is that right?

A. Yeah.

Q. Because you talked to her before and after?

A. That's right.

Q. Do you know the name of the event?

A. No.

Q. Do you know the date of the event?

A. No.

Q. Let me switch gears for a second. You billed Anne Marie for your sessions; did you not?

A. Yes.

Q. And at the very beginning of your testimony I asked you, you really had two different types of employment during the treatment of Anne Marie Fahey, in a sense. You were an independent contractor, you testified at one point, and then you worked with a practice; could you review that again?

A. Okay. I have always been a private practitioner since I left the University of Delaware. As a private practitioner you can work for yourself or you can work within a context of other professionals or you can work for another professional. I worked as a private practitioner for myself and then later made a decision that I would be working with a group that had setups with the insurance and managed care and would take better care of the details than I wanted to.

Q. That group was Center for Cognitive and Behavior Therapy?

A. Yes.

MR. CONNOLLY: At this point may I approach?

THE COURT: You may.

MR. CONNOLLY: I move for the admission of State's Exhibit 46 and 47. 46 will be a financial statement for Michele Sullivan's practice from February 28th to April 12, 1996. And 47 would be a financial statement for the Center of Cognitive and Behavior Therapy.

MR. MAURER: Without objection.

THE COURT: Thank you, Mr. Maurer. They are admitted as State's Exhibits 46 and 47 as indicated.

BY MR. CONNOLLY:

Q. I'm going to show you State's Exhibits 46 and 47; do you recognize those?

A. Yes.

Q. And even though I have said it, could you tell us what State's Exhibit 46 is?

A. These are records that Center for Cognitive and Behavior Therapy kept. What would happen --

Q. I'm sorry to interrupt you, but let's start with 46.

A. Okay. Oh good. Thank you.

Q. Thank you.

A. These basically are my handwritten notes. I

A. My experience with her is that if it is under kind of lives of omission rather than co-mission, in other words things would be left out.

Q. Were you educated by the Jesuits?

A. I was.

Q. I didn't want to bring up lives of omission because I thought you would laugh at me.

But many people effectively and not harmfully lie by just not telling you the whole story, correct?

A. I guess you could put it that way.

Q. And many people sometimes color a story. If they know you want to hear a certain thing they may exaggerate a little bit, not actually lying but exaggerating?

A. I guess the thing I would like to respond to that, because I think it would be very careful to misconstrue what you are saying, Anne Marie was terrified of being rejected. Terrified of being abandoned.

Q. Abandoned?

A. Abandoned. And I think on an interpersonal situation she would accommodate to the other person so that they might not reject her.

Page 86

Q. So the other person many times would be getting false messages from Anne Marie?

A. I have never seen that in my work with her. I saw that she simply didn't talk about some things. It is not like she actively lied. It is not like she had to say I'm going to evilly do this and that to you.

Q. In Anne Marie's condition being like it was, having commenced back in 7th grade with the eating problems, she certainly had long-term deep-seated psychological problems arising from a horrible childhood, correct?

A. I would not use such extreme language as you are using.

Q. Modify it if you can. Go ahead.

A. She began an eating disorder that operated intermittently in her life as various kinds of stresses emerged. I saw her as a incredibly strong survivor that came through extremely difficult circumstances.

Q. No question about that. But the fact of the matter is, the problems she was suffering from had existed for a long period of time?

A. Intermittently.

Q. And if you met Anne Marie you would not know

that she had these particular problems?

A. On the street? Normal person?

Q. Right.

A. Probably not.

Q. If I met her in a bar and was talking to her, I would not in any way know that she had problems and could get in trouble by misinterpreting, correct?

A. I guess so.

Q. And if a man meets a woman like Anne Marie and he starts to date her, and the man has money, and he wants to buy her things as a gesture of affection, love, care, he could buy them with no ulterior motive?

A. Generally would mean he was interested in her but, okay.

Q. That is correct?

A. Okay.

Q. And she could accept them because she likes nice things; is that correct?

A. I don't like your line of reasoning, but okay.

Q. I didn't ask you to like it, I asked you to answer the question. I didn't like what you said, but that's okay.

Here we go. The reason is you accepted the

Page 88

fact she could accept them and be happy with them?

A. Are you asking me theoretically or are you asking me about what I know of Anne Marie?

Q. Theoretically, then we will go into Anne Marie.

A. Theoretically it is possible, a woman that takes and gives from a man and not have any connection with him.

Q. And in this particular case, Anne Marie accepted numerous gifts from Tom Capano; did she not?

A. That's my understanding.

Q. And many of those gifts enhanced her lifestyle by making it more pleasant; isn't that correct?

A. It's my understanding.

Q. Those gifts were given by Tom with no quid pro quo in return, correct?

A. I have no way of knowing that.

Q. Anne Marie never said, Tom Capano bought me a new air conditioner and in return I had to go to the dance with him?

A. She did say because of gifts given she felt manipulated and coerced into things.

Q. Isn't that interpersonal relationships. We try to get the other party doing what we want by various and

**Page 19**

1  said nothing more than what is in my letter to you. I
2  would have -- I know I reviewed all the Al Frankey
3  police report materials before I wrote that letter to
4  you and sent it over.
5      MR. MAURER: Because it was not in anything
6  that we have, so I'm asking for it now. And if they say
7  there is nothing I will have to accept it at this point.
8      MR. CONNOLLY: There are no Jencks materials
9  and you have all the material.
10     MR. MAURER: I'm not asking for Jencks
11  materials. I'm asking anything anywhere in writing
12  relating to statement that Anne Marie made to Frankey.
13     MR. WHARTON: What is your basis of
14  entitlement?
15     MR. MAURER: Brady.
16     MR. CONNOLLY: You have got the Brady.
17     THE COURT: All right. You represent there is
18  no Brady and there is no Jencks.
19     MR. CONNOLLY: The Brady Material is that Al
20  Frankey said that.
21     THE COURT: Excuse me. I was inarticulate.
22  There is no undisclosed Brady or Jencks?
23     MR. CONNOLLY: We have a small -- That's right.

**Page 18**

1     We have a small issue. The defense has cited
2  to us Milton E. Birdglass as being an expert witness
3  they intend to call. And there was reference, to me, to
4  the substance about which he would testify in Mr.
5  Oteri's opening, and we have received no reports from
6  Mr. Birdglass. And we have a resume that seems somewhat
7  dated. And I just spoke with Mr. Oberly on Friday and
8  was assured at this point that's all they have,
9  although, I believe you anticipate a written report.
10  And what happened there is disturbing about that is again
11  we are in the middle of trial, this guy has been on your
12  list for some time and we do not have a report. We
13  can't go out and retain an expert to counter him until
14  we see a report. So we would like to make a formal
15  request on the record for that.
16     MR. OTERI: At this point I don't know that he
17  could do a report, we are talking to him about that. He
18  has some problems. We have provided him with all the
19  material we have about Gerry and what he says and
20  doesn't say. I want to check with him for sure and I
21  will let you know Wednesday morning or tomorrow if I
22  catch him, if he can do a report. And if he can't I
23  will let you know why. I will also get you, if he has

**Page 20**

1  one, an updated CV, I will get it to you as quickly as
2  possible.
3     THE COURT: Nothing on Tuesday or Thursday.
4  So...
5     MR. CONNOLLY: We would also -- within that
6  report -- we want to also, as we are entitled to under
7  the rules of the substance of his testimony, and we will
8  get that?
9     MR. OTERI: If I get it you will get it. Just
10  like if you had Johnson's notes you would have given --
11     MR. CONNOLLY: We didn't call Johnson as an
12  expert. And he shouldn't be allowed to testify if we
13  don't get that.
14     THE COURT: Any other light entertainment,
15  gentlemen? If not, why don't we head in that direction.
16     MR. CONNOLLY: Your Honor, you may recall from
17  the proof positive hearing there was some testimony that
18  Tom Capano had told Anne Marie and some other people
19  that his daughters, or one of his daughters had had
20  brain surgery sometime in the spring of '96. And we
21  learned through the Court's investigation that that was
22  not true. So in order to avoid the uncomfortable
23  situation, I think, for all, of calling the daughters to

**Page 20**

1  the stand to bring out this fact we had reached an
2  agreement that the daughters were going to submit
3  affidavits to that effect.
4     Now, Mr. Oberly told me on Friday that we would
5  have them today, and this is not a suggestion that I
6  don't trust Mr. Oberly, but I do not trust the defendant
7  or his family. And what I don't want is to get
8  sandbagged. So I want on the record to place before me
9  my understanding we will have affidavits from all four
10  daughters in which they will aver that they did not have
11  brain surgery in 1996.
12     MR. OBERLY: Your Honor, I thought this was
13  something we could handle off the record. I spoke with
14  Kay Capano the middle of last week. Because during the
15  proof positive hearing there was an issue about that and
16  rather than call the daughters we had affidavits.
17  Somewhere along the lines the affidavits were signed,
18  originally, and I think maybe given back to the family
19  because they weren't used, they were kept by us. So I
20  redid them and had them sent out and Kay Capano, not Tom
21  Capano, is who I'm dealing with them stated she would
22  have them signed. I called her this morning, she said
23  she was sorry, the weekend was hectic and she didn't

Page 21

have them, but said she could have them for me tomorrow

morning and I said that is fine.

When I spoke to Mr. Connolly, I said I will try

my best to have them Monday. One daughter is at NYU and

might take a couple of days, and we might have them by

Thursday, and I will have it by Friday, so we will get

the affidavits. And if -- we have an issue on

relevancy, whether they are relevant. But we will have

the affidavits and we can argue about that at the

appropriate time.

    MR. CONNOLLY: I wanted that on the record.

Page 22

    November 2, 1998
    10:00 a.m.
    Courtroom No. 302

PRESENT:
    As noted.
    - - - - -
    THE COURT: Could we have Dr. Sullivan?
    You are reminded that the oath you took last
week remains in effect.
    Please resume the stand.
(Sullivan resumes.)
    THE COURT: Are we ready?
    We really shouldn't start without the jury.
    Please bring the jury in.
    (The jury entered the courtroom at 10:10 a.m.)
    THE COURT: Good morning. Has any member of
the jury come into contact with any information
concerning this case since we recessed on Thursday?
    There are no affirmative answers.
    Now we will try, Mr. Connolly.
BY MR. CONNOLLY:
    Q. Good morning.
    Good morning, Dr. Sullivan.

Page 23

    A. Good morning.
    Q. Dr. Sullivan, last Friday, we talked about some
of the notes you made on April 3rd of 1996. And
specifically, do you recall a reference in your notes to
having a hard time forgiving herself and believing
Capano's haunting was her punishment?
    A. Yes.
    Q. I'm sorry?
    A. Yes. Uh-huh.
    Q. Now, you outlined a number of types of the
haunting behavior that Anne Marie told you about,
correct?
    A. Yes, I did.
    Q. And there were e-mails and telephone calls and
other type of behavior?
    A. Showing up at times he wasn't expected.
    I'm not used to using the mic.
    Is that any better?
    Q. Yes. And I think since Mr. Oteri couldn't hear
you, could you repeat what you said?
    A. Surely. You were asking about the kinds of
things that Anne Marie described as haunting behaviors
by Mr. Capano.

Page 24

    She regarded the large number of phone calls
that she was getting, the large number of e-mails, the
appearing at times where she wasn't ready to greet him
in a public place, the fear that if she went to
someplace socially that he might meet her there and
persuade her to spend time with him.
    Other things had included, in the past, coming
to her apartment uninvited, and making his way into the
house and making her very frightened about what was
going to happen.
    Q. Did she tell you how she responded to these
forms as what she described as haunting behavior?
    A. Well, that was a great deal of what we were
working on, frankly.
    Initially, she felt too frightened to be
assertive, and that was generally true in her life. She
had a hard time really speaking up, and speaking on her
own behalf. And so, we began to think about some lower
level kinds of assertions she could work on and
secondary and so on, so we would be building in a
stair-step fashion, and she could get more and more
confidence.
    Specifically, for instance, we worked with

Page 21 - Page 24

Q. Would you tell us about that?

A. Okay. This is going to sound a little weird, because there is a series of techniques that sound strange, but they have their purpose to help people get more connected to themselves.

I knew that Anne Marie loathed her thighs. She absolutely thought they were horrible. So I encouraged her basically to write a letter to her legs as though they were something separate from her.

Q. Now, you realize the average person would raise their eye eyebrows?

A. I told you this would sound weird.

Q. So when she left on June 19th, though, she was charged with that task?

A. Yeah.

Q. You met with her again a week later, correct?

A. Uh-huh.

Q. That would have been June 26, 1996?

A. Yeah.

Q. And you have got some notes there. Could you read us the first three lines of the notes, please?

A. "I must admit that I feel somewhat silly writing a letter to my legs."

Q. We will get to the letter in a second. Go to June 26th. So you leave her on June 19th with the task of writing a letter?

A. Yes.

Q. And you meet with her again a week later?

A. Right.

Q. And that, in fact, was June 26, 1996?

A. Correct.

Q. That was the last time you saw her, I take it?

A. Yes.

Q. Would you read the first three lines of your notes for June 26, 1996 for us, please?

A. "Learned to hide under furniture to get away. Sister unbelievably cruel and violent with her."

I want to make a comment about that if I may. "Cannot say no or set limits with her."

Q. Let's start -- there are three ideas there. Let's start, hide under the furniture. I take it that is a reference to what you have already told us about during childhood?

A. Right.

Q. You have, "Sister unbelievably cruel and violent with her."

What did Anne Marie tell you during this session that caused you to write those notes?

A. She was reporting some early memories in which the sister, and in this case, the memory she told me about they were quarreling about something and the sister took the vacuum cleaner to Anne Marie's hair and sucked it in, and as a result the hair had to be clipped close to the head in order to get it disentangled. That's the story she told me.

Q. How old was she when this happened?

A. Very young is my impression, very little.

Q. Did she say anything to suggest at all that her sister was, at the present time in 1996, unbelievably cruel or violent with her?

A. No. No. No.

Q. You did mention that -- did she view her sister as controlling at all as an adult?

A. Well, I use a different word. The words she used was controlling, the word I used was trying to be helpful.

Q. Did she fear her sister as an adult, I mean physically fear her?

A. Not that I was aware of at all. She never

reported that. She might be annoyed, but she didn't fear her.

Q. Now, we have gone through your notes. Do you recall any incidents that Anne Marie related to you about Tom Capano that aren't reflected in your notes?

A. I think we mentioned the one time where he asked her to go see the daughter who was ill.

Q. How about you mentioned a scene in her apartment, you made some reference to that, but can you explain in detail for us?

A. The event had happened probably before I had begun to see her. Where, in other words, I saw it as more historical, where apparently Mr. Capano got into the apartment and he became very angry and he threatened to take away gifts, the air conditioner, things he felt he did not want to be present while she might be dating somebody else. And she reported being very frightened, not only because he was making the kind of loud scene and she was unclear as to what kind of attention it would draw, but she was frankly fearful that he might tear up or destroy things. And more importantly she felt frozen. I spoke with her at that time and I said, did you think about calling for help or calling 911 or

running over to a neighbors? And she basically said she felt too frozen for that, she just felt that overwhelmed.

Q. Did she say anything about him grabbing her during that incident?

A. I remember her saying at one point he grabbed her arm and pushed her against the wall.

Q. Now, you have also mentioned social events. Do you recall an incident about a social event that is not reflected in your notes?

A. Yeah. There was another time we were talking about the number of phone calls that she was getting. And she said as an example, she was preparing to go to a social event with Mr. Scanlon. It was very clear that was Anne Marie's date. And Anne Marie, I believe, said to Mr. Capano I'm going with somebody else. She reported to me that Mr. Scanlon was having a very difficult time accepting that. I'm sorry. Scanlon was having a--

Q. I think you might have misspoke.

A. Sorry. That Mr. Capano was having a difficult time accepting no. So there were a enormous amount of phone calls on the day of the event. And Anne Marie was

basically saying how do I deal with this? How do I deal with him at the time once we get to the social event? I fear he might make a scene or I fear that he might do something that I would be horribly embarrassed about.

Q. Did she report to you how this social event went, after it?

A. Indeed. She came back from that and felt some real pride that as Mr. Capano did approach her and guide her into a different room to talk to her that she expressed a great deal of pleasure in being able to say pretty clearly, I don't want to be here, I want to go back to the party. And I believe that she found her own way to escort herself back, so that exchange was brief and she used it as an example of feeling more and more capable of saying no.

Q. Now, this event, I take it, had to occur while you were treating her; is that right?

A. Yeah.

Q. Because you talked to her before and after?

A. That's right.

Q. Do you know the name of the event?

A. No.

Q. Do you know the date of the event?

A. No.

Q. Let me switch gears for a second. You billed Anne Marie for your sessions; did you not?

A. Yes.

Q. And at the very beginning of your testimony I asked you, you really had two different types of employment during the treatment of Anne Marie Fahey, in a sense. You were an independent contractor, you testified at one point, and then you worked with a practice; could you review that again?

A. Okay. I have always been a private practitioner since I left the University of Delaware. As a private practitioner you can work for yourself or you can work within a context of other professionals or you can work for another professional. I worked as a private practitioner for myself and then later made a decision that I would be working with a group that had setups with the insurance and managed care and would take better care of the details than I wanted to.

Q. That group was Center for Cognitive and Behavior Therapy?

A. Yes.

MR. CONNOLLY: At this point may I approach?

THE COURT: You may.

MR. CONNOLLY: I move for the admission of State's Exhibit 46 and 47. 46 will be a financial statement for Michele Sullivan's practice from February 28th to April 12, 1996. And 47 would be a financial statement for the Center of Cognitive and Behavior Therapy.

MR. MAURER: Without objection.

THE COURT: Thank you, Mr. Maurer. They are admitted as State's Exhibits 46 and 47 as indicated.

BY MR. CONNOLLY:

Q. I'm going to show you State's Exhibits 46 and 47; do you recognize those?

A. Yes.

Q. And even though I have said it, could you tell us what State's Exhibit 46 is?

A. These are records that Center for Cognitive and Behavior Therapy kept. What would happen --

Q. I'm sorry to interrupt you, but let's start with 46.

A. Okay. Oh good. Thank you.

Q. Thank you.

A. These basically are my handwritten notes. I

preceded that letter; is that correct?

A. Yes.

Q. And your letter to Dr. Kaye was sent on June 5th, correct?

A. Sixth is what I have.

Q. I'm having trouble finding the letters. Excuse me for a moment. How does that happen? You have everything laid out and suddenly it disappears. Oh well.

Doctor, we are going to get back to these letters in a moment. But before we do --

MR. O'DONNELL: Joe.

MR. OTERI: Do you have them? Thank you.

BY MR. OTERI:

Q. You, on June 6th, Doctor, sent a letter to Dr. Neil Kaye; is that correct?

A. Yes.

Q. And in that letter, you say: "I look forward to working with you on behalf of Anne Marie Fahey. You saw her before when she worked with Bob Conner, and I believe she tried two different antidepressants and discontinued the second. In my 10 weeks working with her, so far, I have concluded that she would benefit

continuing with antidepressants and seems more willing to do so."

Correct?

A. Correct.

Q. "In addition to depressive symptoms she has revealed to be a number of obsessive compulsive behaviors including counting, repetitive thoughts, intrusive ideas, considerable fear and dread which she can barely control.

"She is also anorexic, her most recent episode being nearly a year and a half in length. She manages to eat a few hundred calories a day and uses approximately 15 laxatives each night. I don't know how she keeps going.

"In spite of these things, she has a lot of wonderful resources in herself and is a pleasure for me to work with."

A. Yes.

Q. You identified very closely with Anne Marie Fahey, did you not?

A. I don't know what you mean by the word identify.

Q. Doctors and patients in your business get to be

very close, don't they?

A. Part of our work involves building enough of a rapport that the person learns to trust us.

Q. And you had a very close relationship with her, did you not?

A. I would say I worked very well with her.

Q. "The woman's history," continuing your letter, "is horrible. Alcoholic father who drank the family into poverty. The older children were farmed out after the house went for sheriff's sale when she was in her teens.

"I could mention many experiences which she was beaten or shamed. But for this purpose it is important to know she survived by putting on a happy face and being quite good at reading situations and accommodating to what is necessary for survival.

"She has a very funny sense of humor which can deflect from knowing the underlying pain. I mentioned this because she charms me and I keep a watchful eye on how she keeps me knowing from what is going on. So it won't surprise me if you know nothing of either the eating disorder or either the obsessive compulsive behavior. She will feel very awkward if you are very

direct in the interview.

"I will appreciate your observations in the interview. Michele."

In that letter you say that Anne Marie survived by putting on a happy face and being quite good at reading situations and accommodating to what was necessary for survival?

A. Uh-huh.

Q. "She has a very funny sense of humor, which can deflect from knowing the underlying pain?"

A. Yes.

Q. In other words, Anne Marie was very good at pretending conditions were what they actually weren't in her heart or soul or mind or whatever phrase you use?

A. I would probably use a very different word than you would. She felt it necessary not to always reveal everything that she was.

Q. Right. And in order not to reveal everything that she was, she would sometimes have to color fact situations or maybe distort the facts a little. She wouldn't come out and tell you, I'm in egregious pain, I can't go to your meeting, she would come up with a reason not to?

Page 85

A. My experience with her is that if it is under kind of lives of omission rather than co-mission, in other words things would be left out.

Q. Were you educated by the Jesuits?

A. I was.

Q. I didn't want to bring up lives of omission because I thought you would laugh at me.

But many people effectively and not harmfully lie by just not telling you the whole story, correct?

A. I guess you could put it that way.

Q. And many people sometimes color a story. If they know you want to hear a certain thing they may exaggerate a little bit, not actually lying but exaggerating?

A. I guess the thing I would like to respond to that, because I think it would be very careful to misconstrue what you are saying, Anne Marie was terrified of being rejected. Terrified of being abandoned.

Q. Abandoned?

A. Abandoned. And I think on an interpersonal situation she would accommodate to the other person so that they might not reject her.

Page 86

Q. So the other person many times would be getting false messages from Anne Marie?

A. I have never seen that in my work with her. I saw that she simply didn't talk about some things. It is not like she actively lied. It is not like she had to say I'm going to evilly do this and that to you.

Q. In Anne Marie's condition being like it was, having commenced back in 7th grade with the eating problems, she certainly had long-term deep-seated psychological problems arising from a horrible childhood, correct?

A. I would not use such extreme language as you are using.

Q. Modify it if you can. Go ahead.

A. She began an eating disorder that operated intermittently in her life as various kinds of stresses emerged. I saw her as a incredibly strong survivor that came through extremely difficult circumstances.

Q. No question about that. But the fact of the matter is, the problems she was suffering from had existed for a long period of time?

A. Intermittently.

Q. And if you met Anne Marie you would not know

Page 87

that she had these particular problems?

A. On the street? Normal person?

Q. Right.

A. Probably not.

Q. If I met her in a bar and was talking to her, I would not in any way know that she had problems and could get in trouble by misinterpreting, correct?

A. I guess so.

Q. And if a man meets a woman like Anne Marie and he starts to date her, and the man has money, and he wants to buy her things as a gesture of affection, love, care, he could buy them with no ulterior motive?

A. Generally would mean he was interested in her but, okay.

Q. That is correct?

A. Okay.

Q. And she could accept them because she likes nice things; is that correct?

A. I don't like your line of reasoning, but okay.

Q. I didn't ask you to like it, I asked you to answer the question. I didn't like what you said, but that's okay.

Here we go. The reason is you accepted the

Page 88

fact she could accept them and be happy with them?

A. Are you asking me theoretically or are you asking me about what I know of Anne Marie?

Q. Theoretically, then we will go into Anne Marie.

A. Theoretically it is possible, a woman that takes and gives from a man and not have any connection with him.

Q. And in this particular case, Anne Marie accepted numerous gifts from Tom Capano; did she not?

A. That's my understanding.

Q. And many of those gifts enhanced her lifestyle by making it more pleasant; isn't that correct?

A. It's my understanding.

Q. Those gifts were given by Tom with no quid pro quo in return, correct?

A. I have no way of knowing that.

Q. Anne Marie never said, Tom Capano bought me a new air conditioner and in return I had to go to the dance with him?

A. She did say because of gifts given she felt manipulated and coerced into things.

Q. Isn't that interpersonal relationships. We try to get the other party doing what we want by various and

Page 85 - Page 88

Dr. M. Sullivan 11/4/98 A-46

Q. And she took money from him after this day, correct?

You don't know? Okay.

You know that Anne Marie Fahey at some point took $500 from Tom Capano to pay towards your bill; do you not?

A. I read that here, in the e-mails.

Q. You did read it in the e-mails?

A. Uh-huh.

Q. You know that Tom Capano was telling Anne Marie to take the money and pay Dr. Sullivan with the money?

A. That's what I learned.

Q. And she said she, "gave the dinero to Dr. Sullivan," to you?

A. In the e-mails that's what she said.

Q. Did she say anything different to you?

A. What she reported to me that she was getting financial help from her family.

Q. Did she tell you that Tom gave her money to pay you?

A. No.

Q. So you first found out about that in the e-mails?

A. Correct.

MR. OTERI: Your Honor, do you want to take that break?

THE COURT: We can go a little longer.

MR. OTERI: I can go as long as we want.

THE COURT: Try another 10 minutes, that will be fine.

BY MR. OTERI:

Q. Okay. Now Doctor, if you go to the e-mails for May 3, 1996, have you got it?

A. Uh-huh.

Q. The one dated 3:07 p.m. from Anne Marie Fahey to Tom Capano?

A. 5/3, 2:42 from Tom Capano?

Q. All right. We will go with that one first, from Tom Capano.

"Hey. It's 2:30 and I ain't heard from ya so I was wondering what was up. Please give me a call or e-mail me when you get a chance. Is there a good time for me to call you? Hope you're having a good day, but my guess is that you're not. Think mussels in a white sauce."

That's from Tom to Anne Marie, lighthearted?

A. Right.

Q. Anne Marie's response is timed at 3:07?

A. Yes.

Q. Do you have it?

A. Uh-huh.

Q. "Hey, I lef' outta' heer' man. Well my night was pretty rough to say the least. I have been on the phone today with James and Robert more than once. Well the cat is outta' da' bag on this one. I feel a sense of relief and one of sadness. Does that make any sense? I don't think I have made much sense of anything today. Tommy, thanks for your kind note/offer last night. You know what I thought when I first opened up the letter and saw the Monopoly money fall onto the floor, I cannot accept such a gracious gift. But we will talk about that in person. Are you sure that money is real?"

Then she talks on about her evening seeing Kimmie and John; do you remember that?

A. Yes.

Q. That was again a kind of happy congenial e-mail between two people who were obviously friends in helping each other, no fear there?

A. Not as reflected here.

Q. We can skip over to 5/20, the date of 5/20, an e-mail timed at 11:47 a.m. from Anne Marie Fahey to Tom Capano.

A. What time?

Q. 11:47 a.m. on 5/20. Maybe I got one they didn't.

In this one she tells Tom that: "I am confused about Victor's. We never talked about it. I am leaving on Thursday after work to go to the Cape Cod for Memorial Day. First question, Russia, Spain, Thailand, U.S. two, Sara Lee was real and I believe she is still alive. Mrs. Paul not real. As for Levi Strauss, I'm going to say he was some legend cowboy."

That is an obvious reference to trivia. This is May 28th?

A. Right.

Q. You have no notes that there is mention of Tom Capano in your notes at this time?

A. I could look back.

Q. You said no, in case that refreshes your recollection, but if you want to look back, go ahead.

A. There is no specific reference to his name at this point in time.

Page 21

1 probably committed the offense with which he is charged.
2     There is some more when your Honor is done.
3     THE COURT: Sorry. My shorthand is not very
4 good. All right.
5     MR. WHARTON: You may use the evidence only --
6     THE COURT: All right.
7     MR. WHARTON: -- to help you in deciding Anne
8 Marie Fahey's state of mind --
9     THE COURT: All right.
10     MR. WHARTON: -- as it relates to the defendant
11 and the events of 6-27-96.
12     THE COURT: All right.
13     MR. WHARTON: Okay.
14     MR. MAURER: It should be noted, your Honor,
15 that we did discuss that, Mr. Wharton and myself, and
16 also Mr. O'Donnell, and we have agreed to it. And also
17 we do understand that the Court will give the
18 instruction regarding the hearsay that you have
19 mentioned as well.
20     THE COURT: Did you agree on that, by any
21 chance?
22     MR. MAURER: Maybe in return for our agreement
23 on that we can get an agreement on that.

Page 22

1     MR. WHARTON: I understood your Honor was going
2 to give something like that, however, our presumption
3 only runs so far.
4     MR. MAURER: I think we should agree that it
5 should be given or do we?
6     MR. WHARTON: Yes.
7     MR. MAURER: We won't dictate that one.
8     THE COURT: Please bring the jury in.
9     (The jury entered the courtroom at 10:20 a.m.)
10     THE COURT: Good morning. Has any members of
11 the jury come into contact with any information from any
12 source whatsoever concerning this case since we recessed
13 on Monday?
14     There are no affirmative answers.
15     Mr. Wharton?
16     MR. WHARTON: Thank you, your Honor. State
17 would call Jill Morrison.
18     THE COURT: Members of the jury, you will
19 recall when we were anticipating Ms. Morrison's
20 testimony on Monday there were objections raised by the
21 defense, and we went into session where I reviewed
22 previous testimony given by Ms. Morrison and previous
23 statements. You should note that the evidence objected

Page 23

1 to is what we know was hearsay evidence. That means Ms.
2 Morrison is going to testify what Ms. Fahey said to her.
3 That is admissible under only certain circumstances and
4 under special exceptions created by the law. That is
5 done because a person is not available to be
6 cross-examined in this particular case. You should
7 understand that those hearsay exceptions deal with a
8 number of factors, but for the most part the exceptions
9 are relied on in the case of Ms. Morrison's testimony.
10 It was the defendant's state of mind and those
11 exceptions are admitted because the circumstances give
12 credence to them, and may give them a degree of
13 reliability that allows them to be excepted from the
14 normal rule.
15     You will hear evidence from this witness
16 tending to show that the defendant was involved in
17 certain acts related to Miss Fahey that could be
18 characterized as being of a harassing nature. That
19 evidence is offered or may be considered by you solely
20 for the purpose of determining the state of mind of Miss
21 Fahey at or about the time when the alleged acts
22 occurred. You may not consider the evidence as proof
23 that the defendant is a bad person, and therefore,

Page 24

1 probably committed the offense with which he is charged.
2 You may consider the evidence only in determining Anne
3 Marie Fahey's state of mind as it relates to the
4 defendant and the events of June 26, 1996.
5     MR. MAURER: Before you start, we don't need to
6 totally approach the bench, can we come forward just a
7 bit?
8     When you were talking about the hearsay and the
9 reasons for the admissibility I think you inadvertently
10 mentioned that it was offered to show the defendant's
11 state of mind and not Miss Fahey's state of mind.
12     THE COURT: I really apologize. The latter
13 part of that instruction was written down and,
14 therefore, reliable. When I start to ad lib, it is
15 possible for me to make a mistake in this case, a rather
16 dramatic one.
17     It is not introduced to introduce the state of
18 mind of Mr. Capano in this case but solely the state of
19 mind of the declarant, who in this case, is Anne Marie
20 Fahey. So we are dealing with her state of mind rather
21 than the defendant's.
22     Thank you, very much.
23

Page 25

1    JILL MORRISON,
2        the witness herein, having
3        first been duly sworn on oath,
4        was examined and testified as
5        follows:
6            DIRECT EXAMINATION
7    BY MR. WHARTON:
8        Q. Good morning, Ms. Morrison.
9        A. Good morning.
10       Q. There is a microphone up there, you may need to
11   speak into that. All the people back here need to hear
12   and sometimes it is difficult in this courtroom.
13       A. Okay.
14       Q. How old are you?
15       A. Thirty-three.
16       Q. Are you employed?
17       A. Yes.
18       Q. And what type of work do you do?
19       A. I work in corporate financial services at
20   Wilmington Trust.
21       Q. Prior to that -- how long have you done that
22   job?
23       A. Since last June, a little over a year.

Page 26

1        Q. Prior to that what did you do?
2        A. I worked for Governor Carper.
3        Q. How long did you work for Governor Carper?
4        A. About four and a half years.
5        Q. So you started working for him about when?
6        A. I started working for him right about when he
7    was inaugurated in January of '93.
8        Q. What were your responsibilities with the
9    Governor?
10       A. I worked in constituent services.
11       Q. And as somebody that worked in constituent
12   services what type of things did you do?
13       A. I would help resolve problems. Constituents
14   would call in with problems they might have with some of
15   the agencies within State Government and I would help
16   them resolve them.
17       Q. Direct them to the right people on their
18   behalf?
19       A. Funnel them to the right people, yeah. Yes.
20       Q. Did you know Anne Marie Fahey?
21       A. Yes.
22       Q. How was it that you got to know her?
23       A. I met her on my first day in the Governor's

Page 27

1    office and we just kind of clicked.
2        Q. She was employed there also?
3        A. Yes, she was the Governor's scheduler.
4        Q. And when you say kind of clicked can you
5    describe what you mean?
6        A. We were both the same age, the same, liked to
7    have fun together and we just really hit it off, had a
8    lot of the same opinions.
9        Q. Did you live near each other?
10       A. Shortly after I started at the Governor's
11   office I moved within a block of Anne Marie.
12       Q. Were you social friends as well as work
13   friends?
14       A. Yes.
15       Q. And would you spend time with each other on
16   weekends or after work kind of activities?
17       A. Sure. We would go to the mall, go shopping
18   take walks, go to the Y. Our friendship which started
19   at work ended up becoming a friendship outside of work.
20       Q. During work would you have lunch with her?
21       A. Yes. We had lunch almost everyday.
22       Q. Did you become aware at some point of a person
23   named Thomas Capano?

Page 28

1        A. Yes.
2        Q. Who is the defendant in this case?
3        A. Yes.
4        Q. How is it that you became aware there was such
5    a person?
6        A. Anne Marie and I had gone to a fund raiser in
7    the spring of '93, the Women's Democratic Club was
8    sponsoring it, and as part of our working in the
9    Governor's office we would get tickets to events like
10   this. So we had gone there and Anne Marie recognized --
11   I'm sorry.
12       Q. Before you get too far down this road, we will
13   come back to that. This fund raiser, you said it was in
14   the spring of '93?
15       A. Yes.
16       Q. Where was it?
17       A. It was at Jim and Mary Alice Thomas' house
18   which is on Red Oak Road in Wilmington.
19       Q. Near Rockford Park?
20       A. Yes.
21       Q. And it was sponsored by whom?
22       A. The Women's Democratic Club.
23       Q. And you said that you and Anne Marie got

1  not ask her if there was a relationship at that point?
2     A. Not at that point, no.
3     Q. You knew that I guess -- let me move on.
4        I want to turn your attention -- this is -- the
5  Tour DuPont came up again in 1995, correct?
6     A. Correct.
7     Q. And did you also go to the Tour DuPont that
8  year?
9     A. Yes. We had made plans because we had so much
10 fun the year before.
11    Q. The time you didn't kiss the older man?
12    A. Right. That's correct.
13    Q. You weren't looking for him this time around,
14 were you?
15    A. No, I was not.
16       So we had made plans to go. We were going to
17 meet at Anne Marie's apartment and another friend, a
18 friend of Anne Marie's from the Y, was coming with us
19 and I don't know who that was. So I had gotten there
20 before this other friend and we were talking and I was
21 like, oh, I'm really excited, we will have fun and she
22 said I can't go. And I said what do you mean you can't
23 go? And she said I have a job interview. I said what

Page 46

1  do you mean you have a job interview? How did this
2  happen? I didn't know you were looking. And she
3  explained -- she told me that it was for a personal
4  assistant for someone in north Wilmington where she
5  would make the same salary and there also would be an
6  apartment provided to her which would have been a good
7  thing financially.
8     Q. So she would have the same salary but also
9  have --
10    A. -- a free apartment.
11    Q. Free place to live?
12    A. Yeah. So we talked about that, and I kept
13 asking her who it was for and she wouldn't say anything.
14 And finally I pulled it out of her that it was for Louie
15 Capano and had been set up by his brother, and she
16 indicated that she didn't -- it sounded like a good
17 thing, wanted to check it out, didn't know if it was
18 something she wanted to do. She felt obligated to check
19 it out because it had been set up by Mr. Capano.
20    Q. Did you talk to her after the interview?
21    A. Yeah. She was supposed to meet us, the other
22 friend and I in a couple hours. She said I will meet
23 with you in a couple hours, and it was about four or

Page 47

1  five hours later when she showed up. And she didn't
2  look good, she had on just jeans and looked like she had
3  been crying. And I asked her how did it go? And she
4  didn't answer. She said she had been very upset because
5  of Bob Connor, her psychologist's death, it had come
6  back and she was having a bad time with it.
7     Q. Where was that meeting?
8     A. That was at the Holiday Inn. We met up there
9  to go the party.
10    Q. Did you meet with her again at the Holiday Inn?
11    A. Yes. Next night we had met over there to have
12 a drink and we were just talking and she was telling me
13 about this job interview and she said that she felt like
14 she didn't want it, but she felt like it was something,
15 a means for Mr. Capano to control her. He could control
16 where she lived, control where she worked. And in the
17 course of this conversation the word control just kept
18 coming up over and over and over again about why does he
19 want to control me?
20    Q. Well, were you beginning to get any more
21 suspicious about whether or not there was more to this
22 relationship between the two of them than she had been
23 letting on?

Page 48

1     A. A lot more. We were supposed to meet -- we
2  were going home to change and we were going to meet back
3  up at the hotel. And I was supposed to pick her up and
4  we were both going home, we were both going to change.
5  So I called her to let her know I was on my way and she
6  didn't answer the phone. And so I kept calling and it
7  got to the point where I was angry but -- I was like we
8  have plans -- but I was concerned and kept calling like
9  every 15 minutes. And I think that was when, I don't
10 know, I just -- I had visions of her and Mr. Capano
11 together and I just -- she never returned any of my
12 messages that night and I never heard from her the next
13 day. And by this point, I had moved from the Governor's
14 office to the campaign office and Mr. Capano was on our
15 fund raising committee. So I called him the next
16 morning. I guess I was trying to be a little detective,
17 and I called him the next morning on a campaign premise
18 and I asked him about have you heard from Anne Marie
19 today? And he said she had left for the beach very
20 early that morning.
21    Q. Did you know of any plans she had to go to the
22 beach that morning?
23    A. No.

## Page 53

1   Q. What happened while you were there at her
2   apartment?
3       A. She had received -- when I got there, she -- I
4   could tell she was upset and angry and so I asked her
5   what was wrong, and she had she said to me that -- she
6   said I wish you wouldn't tell Tom Capano what I'm doing.
7   And I said what are you talking about? And she said he
8   knows I'm going to the Grand Gala with Mike. And I had
9   mentioned him to him in a previous conversation. And
10  she said now he's been calling her all day. He has left
11  rolls from DiFonzo's here. She was very upset to the
12  point where she didn't want to go.
13      Q. Well, were there any phone calls that she
14  received while you were there?
15      A. Yes. When I was there she received five or six
16  phone calls.
17      Q. And did she indicate who they were from?
18      A. She indicated they were from Mr. Capano.
19      Q. What was she concerned about, did she tell you?
20      A. That he made statements. She said that he made
21  statements that he could find a date and show up there.
22  She was just very terrified that -- I should explain at
23  that point she did tell me that there had been a

## Page 54

1   relationship in the past and she was terrified that he
2   would expose this relationship, not just to Mike but to
3   everyone.
4       Q. She did not want Mike Scanlon to know this
5   relationship she had?
6       A. No. She said it was the thing that she was
7   most ashamed of in her life.
8       Q. Well, did she ultimately get dressed?
9       A. Yes.
10      Q. Were you there when she got dressed?
11      A. Yes. She got dressed and her hair was done and
12  I was there when Mike got there. And so once Mike got
13  there, I left.
14      Q. Did you still have any concerns about the
15  defendant showing up and putting a damper on the
16  evening?
17      A. Yeah. I was very concerned. I went and picked
18  up my sister because we do a little Saturday shopping
19  thing pretty much every Saturday, and I explained to her
20  that I was nervous about what might happen. So I tried
21  to find his house, Mr. Capano's house, to see if his car
22  was there just to kind of -- so I could reassure myself,
23  but I couldn't find it. So my sister and I went

## Page 55

1   shopping and when I dropped her off, it was about 9:30
2   and I remembered that he had given me his home phone
3   number because he had done legal work for me at one
4   time, so I got on my car phone and I called and I
5   figured if he answers then that means he is not there,
6   so I called.
7       Q. That means he's not --
8       A. Not there at the Grand Gala, that he's at home.
9   So I called and he answered and I hung up. So I was
10  relieved that he was not at the Grand Gala.
11      Q. You made that phone call from your car phone?
12      A. Yes.
13      Q. Is there a bill for that which reflects that?
14      A. Yes.
15          MR. MAURER: No objection to that.
16          MR. WHARTON: We are going to offer that as the
17  next State's exhibit.
18          THE COURT: 55?
19          THE PROTHONOTARY: Correct. So marked.
20          (State's Exhibit No. 55 was admitted into
21  evidence.)
22          MR. WHARTON: Which is a telephone bill for Ms.
23  Morrison.

## Page 56

1   BY MR. WHARTON:
2       Q. Let me show you that.
3          THE COURT: Mr. Maurer, that was without
4   objection?
5          MR. MAURER: It was, your Honor.
6          THE COURT: Thank you.
7   BY MR. WHARTON:
8       Q. Now, if you would be good enough to turn to the
9   second page of that exhibit. Does it indicate the
10  telephone call that you are referring to?
11      A. Yes.
12      Q. And what does it say?
13      A. That it was placed on January 27th of 1996 at
14  9:33 p.m.
15      Q. The number you called was?
16      A. Area code 302-426-1131.
17      Q. Now, I think you said at this point -- where
18  were you working?
19      A. I was still with the Governor but was on the
20  campaign.
21      Q. And you weren't working in the Governor's
22  office?
23      A. I was working in the campaign headquarters

**Page 57**

1  which is on Lancaster -- which was on Lancaster Avenue.

2  Q. Do you remember Valentine's Day 1996, any

3  conversation you had with Anne Marie around that time?

4  A. Yes. Anne Marie was going to dinner with Mike

5  that night. And I had stopped over at her house and she

6  was getting ready, couldn't figure out what to wear and

7  it was this whole dilemma.

8  Q. So you were the fashion consultant?

9  A. I was the fashion consultant. She couldn't

10  figure out what to wear and was going back and forth

11  between different things and had finally decided to wear

12  a skirt that was knee length, which was above the knees,

13  which was a big step for Anne Marie who did not like to

14  show her legs.

15  So, she had gone out with Mike and a couple

16  days later she called me. And I remember this call

17  distinctly, because I answered the phone and I

18  couldn't -- no one said hello, I just kind of heard like

19  muffled and it was Anne Marie and she was crying, which

20  is not consistent with the way Anne Marie was. She was

21  not that type of person.

22  I asked her what was wrong and she had told me

23  that she had heard through Mr. Capano that Mike Scanlon

**Page 58**

1  had said that she has a shitty apartment but she looks

2  great in a short skirt, which kind of hit Anne Marie two

3  ways, because first of all she was very embarrassed to

4  wear the short skirt and second of all, although she

5  liked her apartment she didn't like the neighborhood she

6  was in. And it wasn't a big Trolley Square apartment,

7  and something -- and she was very upset that Mike would

8  say something like that.

9  Q. You don't know whether he actually did say

10  that?

11  A. No, I don't.

12  Q. Was this a lengthy conversation at all?

13  A. Yes, it was very long. Because that --

14  starting with that -- I maintained that Mike would never

15  say --

16  MR. MAURER: I'm going to object. The question

17  was, was this a lengthy conversation? She is now giving

18  her own feelings and opinions which are not relevant.

19  MR. WHARTON: I think she was going to say what

20  she said.

21  THE COURT: She needs to make that clear. I

22  will sustain the objection, but I'm not cutting off the

23  conversation to the extent that it represents an

**Page 59**

1  interaction between this witness and Miss Fahey.

2  BY MR. WHARTON:

3  Q. What did you tell her, if anything, about that

4  conversation that she reported to you that she had with

5  the defendant?

6  A. I said to her that I didn't think that was

7  something --

8  MR. MAURER: That's my objection. She doesn't

9  have any idea herself whether that statement was made by

10  Mr. Scanlon or not.

11  THE COURT: I will overrule the objection this

12  time. She is indicating what she said in an effort to

13  elicit a response. And the response is meaningless

14  unless it is put in the context of the statement.

15  BY MR. WHARTON:

16  Q. What did you tell Anne Marie about that?

17  A. That I did not think that was something that

18  Mike would say. At this point I was really distrustful

19  of what Mr. Capano --

20  MR. MAURER: Objection, your Honor.

21  THE COURT: All right. I don't know where we

22  are going. I'm presuming we are eliciting a response.

23  To the extent Ms. Morrison has an opinion about Mr.

**Page 60**

1  Capano, that is not important and you should disregard

2  it. To the extent that she as has an opinion involving

3  Mr. Scanlon, that is not important. Again, we are

4  dealing with the state of mind of Miss Fahey at this

5  particular time, and to the extent that these remarks

6  elicit a response, the response is relative to -- to the

7  state of mind of Miss Fahey. Again, that is what we are

8  trying to ascertain from this testimony.

9  BY MR. WHARTON:

10  Q. Ms. Morrison, did she tell you anything that

11  she feared as far as the defendant and Mike Scanlon?

12  A. Yes. She feared that Mike would find out about

13  her relationship with Mr. Capano.

14  THE COURT: I'm satisfied now, based upon that.

15  The jury should disregard the opinion that Ms.

16  Morrison had concerning whether or not Mr. Capano

17  made -- excuse me, whether or not Mr. Scanlon made these

18  remarks to Mr. Capano or any opinion she might have as

19  to Mr. Capano's use of the remarks.

20  BY MR. WHARTON:

21  Q. Did she tell you about an incident involving

22  her fire escape and the defendant?

23  A. Yes. She indicated to me that at one time she

1    came home and Mr. Capano had -- when she was in her home
2    after she came home he came up the fire escape and they
3    had a fight and he took back the gifts that he had given
4    her. He was upset and this was because she was dating
5    Mike and didn't want -- made comments that no one is
6    going to watch the TV I gave you, watch the movies I
7    gave you on the TV I gave you in the clothes I gave you.
8    And she indicated that he took these gifts back.
9        Q. Did she indicate whether he returned them
10   ultimately?
11       A. Yes, he did.
12       Q. Did she express any concern to you about other
13   things that the defendant was doing in relationship to
14   her and Mike Scanlon --
15       A. Yes. I'm sorry.
16       Q. -- and where he live lived?
17       A. Yes. He, Mr. Capano, would report back to Anne
18   Marie when she had been to Mike's house. And he was
19   angry that her car was in the driveway, not on the
20   street, and how long it had been there. And he would
21   ask her if they were having sex. And it seemed, she
22   said, that she could placate him by saying no.
23       Q. No, what?

1        A. That she and Mike were not having sex.
2        Q. Did she tell you of any other incident which
3    indicated she was having difficulty with the defendant
4    in breaking off the relationship?
5        A. She had mentioned that after February. And the
6    conversation I had mentioned earlier that things had
7    just kind of quieted for a couple of months.
8        Q. Specifically -- maybe I can direct your focus a
9    little bit about whether she had ever been in the garage
10   of his house.
11       A. I'm sorry. Yes. She told me of an incident
12   where he had picked her up and took her back to his
13   house into the garage and locked the doors and would not
14   let her out of the garage while they argued and he made
15   attempts to keep the relationship together. This was
16   extremely frightening to Anne Marie because she had a
17   fear of being locked in small dark places, and it was
18   very upsetting for her.
19       Q. Around St. Patrick's Day, 1996, did you and
20   Anne Marie have any plans about going to mass?
21       A. Yes. I believe it is the Irish Culture Club,
22   somebody sponsors a breakfast and mass and Anne Marie
23   decided we would go because it sounded like a fun thing

1    to do. The tickets were $39 for us, which was expensive
2    for a breakfast, and we had been looking forward to it.
3    The day before she told me she couldn't go, that she
4    didn't want to go because Mr. Capano was on the
5    executive committee and he would be there and she did
6    not want to see him.
7        Q. Did she go?
8        A. No.
9        Q. Also, in March of 1996, did you have an
10   opportunity to go to Washington D.C.?
11       A. Yes.
12       Q. What was the purpose of that trip?
13       A. President Clinton was having a fund raiser on
14   behalf of Governor Carper to raise money for Governor
15   Carper's campaign. And as the Governor's staff I was
16   able to go and Anne Marie came down as well to help out
17   with the event.
18       Q. And what did you do?
19       A. We had the fund raiser. And it went well and
20   afterwards a bunch of the people that were from
21   Wilmington were going back on the train. But before the
22   train left a bunch of people went out to a bar across
23   the street from the train station and just kind of

1    celebrated the fact that it was a good night, a
2    successful night for the campaign.
3        Most of the people left on the 10 or 11 train.
4    And at that point it was just Anne Marie, me, Joe
5    Farley, Brian Murphy and Gary Heinz, so we decided to go
6    to another bar. We just kind of checked out all of the
7    different places, the five of us, and we got home
8    probably about three in the morning. And then I was
9    talking to Anne Marie about it a couple days later about
10   how much fun we had, kind of goofing off and she had
11   said that Mr. Capano had heard about us down there and
12   we should be ashamed of ourselves because we acted like
13   whores.
14       Q. Did you discuss -- were you aware, let me ask
15   you that first, that she had an eating disorder?
16       A. Yes.
17       Q. Could you see that in her weight at all?
18       A. Yes. It began -- it was -- again, it began in
19   the beginning of '96 where she started dropping weight a
20   lot more dramatically than she had before, and --
21       Q. Did you know she was seeking psychological or
22   psychiatric help for the eating disorder?
23       A. Yes. And we talked about it in January, but

Page 101

1  exposed his relationship with Anne Marie to Michael
2  Scanlon?
3      A. You are asking if Tom Capano exposed their
4  relationship to Michael Scanlon?
5      Q. Yeah, in actuality.
6      A. I was never aware of that, no.
7      Q. So the best your understanding was that he
8  never told Michael Scanlon or never let Michael Scanlon
9  know that he had had this relationship with Anne Marie;
10 is that right?
11     A. Correct.
12     Q. The fire escape incident that you have talked
13 about, do you -- can you put that temporally, let me
14 know when that was?
15     A. I cannot tell you for sure. It came up in a
16 conversation that -- Anne Marie and I would talk on the
17 phone for a long time, several hours at a time, and it
18 came up in a conversation. I don't recall.
19     Q. Do you know when the fire escape incident is
20 supposed to have occurred?
21     A. No.
22     Q. So you don't know whether it was near the time
23 of the Grand Gala, a month before that, whenever?

Page 102

1      A. No.
2      Q. But you do know that it was after she started
3  to see Mr. Scanlon; is that correct?
4      A. The only thing I can tell you is she told me
5  about that event after the Grand Gala, that's when I was
6  told of the event.
7      Q. But she didn't pin it down in time as to when
8  it was?
9      A. She may have, but --
10     Q. But you don't have a recollection?
11     A. That was several years ago.
12     Q. Sorry. I'm starting to talk over you, and I
13 apologize to both you and the court reporter.
14         It was several years ago and can you say for
15 certain that that incident occurred after she met
16 Michael Scanlon?
17     A. No.
18     Q. Did you know whether she was dating anyone else
19 around that time period?
20     A. What time period?
21     Q. That we have been talking about, '95, '96?
22     A. No.
23     Q. Joe Houghton, does that ring a bell?

Page 103

1      A. She dated him in '93. When I first met her she
2  was dating him.
3          MR. MAURER: May I have a moment, your Honor,
4  please?
5          THE COURT: You may.
6  BY MR. MAURER:
7      Q. You were familiar with Anne Marie's apartment?
8      A. Yes.
9      Q. You had been in there several times and been up
10 there several times?
11         You indicated that Anne Marie told you that Mr.
12 Capano came up the fire escape.
13     A. Yes.
14     Q. Is there a back door to the apartment?
15     A. Yes.
16     Q. By the fire escape?
17     A. I often came in that way.
18     Q. So that in and of itself coming up the fire
19 escape it was not unusual?
20     A. It was unusual if you showed up and hadn't let
21 her know you were coming.
22     Q. But it's something you have done yourself?
23     A. I'm on my way, yeah.

Page 104

1      Q. But you said that there was a door and there is
2  a lock on the door; is that right?
3      A. Yes.
4      Q. And do you recall whether Anne Marie ordinarily
5  would keep it locked?
6      A. She would keep it locked. If she knew you were
7  coming she would unlock it.
8      Q. So in order for the person to come in from the
9  outside if this door was locked they would have to break
10 in in some way, shape or form?
11     A. If it was locked.
12     Q. She indicated to you, or your testimony was
13 that she indicated to you Mr. Capano came in the fire
14 escape and took all the gifts he had given her from her;
15 is that correct?
16     A. Correct.
17     Q. And I take it from that that you got the
18 impression speaking with her that he got the gifts and
19 took them away?
20     A. Yes.
21     Q. And among the gifts that we have been talking
22 about is the color television the 27 incher?
23     A. Yes.

1    Q. Did you understand there to be numerous other
2  gifts?
3    A. I knew there were other gifts, yes.
4    Q. Because she told you about them, or you had
5  seen them?
6    A. She told me about them.
7    Q. And your understanding was he had taken the
8  gifts and removed them from the apartment; is that
9  right?
10    A. That was my understanding, yes.
11    Q. It's also your understanding, I take it, that
12  he returned them, right?
13    A. Yes.
14    Q. So I guess the understanding would be that when
15  he returned them she accepted them back; is that right?
16    A. Yes.
17    Q. Did she say when in relation to the time they
18  were taken that they were returned?
19    A. I don't recall.
20    Q. You also talked about another incident where,
21  according to Anne Marie, she told you that Mr. Capano
22  had locked her inside of a garage; is that right?
23    A. Yes.

Page 106

1    Q. And you understood that Mr. Capano lived at
2  Grant Avenue at that time?
3    A. Yes.
4    Q. Do you know when that incident is supposed to
5  have occurred?
6    A. No.
7    Q. So you can't place that in time at all; is that
8  right?
9    A. When she told me about it -- when someone tells
10  you something like that, and it was very painful for her
11  to talk about because of her fear of dark, small places,
12  I wasn't going to sit there and ask for every detail.
13    Q. I'm not suggesting that you should have.
14    A. She was talking to me as a friend that's how --
15  I'm not going to dissect this because it was very
16  painful for her.
17    Q. Try not to take my questions personally because
18  they are not intended to be that.
19    A. Well, I'm explaining.
20    Q. The question was whether you can place in time
21  when the incident that she told you about supposedly
22  occurred?
23    A. I said I can't.

Page 107

1    Q. You cannot. Okay. It certainly, however, would
2  be fair to infer, and correct me if I'm wrong, that
3  whatever happened occurred well before April of '96; is
4  that right?
5    A. It would have happened before April of '96.
6    Q. Because the conversation you had with her about
7  it was before April of '96, right?
8    A. Yes.
9    Q. Now, you mentioned a conversation that you had
10  with Anne Marie about her weight problem, and I think
11  you an attributed a statement to her that she said about
12  Mr. Capano, "Doesn't he know I am the way I am because
13  of him?"
14    A. Yes.
15    Q. She did say that?
16    A. Several times.
17    Q. In terms of your relationship with Anne Marie,
18  did you know how far back she had been treating for an
19  eating disorder?
20    A. She had never mentioned it to me, but I had
21  heard from other people that there was an eating
22  disorder issue prior to when I had met her.
23    Q. So that inferentially, or at the same time, you

Page 108

1  had at least learned at some point that she had had an
2  eating disorder or problem with eating long before the
3  time that you understood that she had first met Mr.
4  Capano, correct?
5    A. Yes. But I was also in these conversations
6  with -- Ginny Columbus had mentioned this to me that
7  there was a problem before. Never before had she gotten
8  as bad as she was now. She never looked as thin and
9  haggard.
10    Q. I understand that. Did you know her in 1988?
11    A. No.
12    Q. Do you know how many laxatives a day she was
13  taking in 1988 to deal with her problem?
14    A. Uh-uh.
15    Q. Do you know she was being treated back then by
16  a doctor for laxatives in 1988? So you didn't know
17  about anything about that; is that correct?
18    A. Correct.
19    Q. So what she was telling you -- Anne Marie --
20  was this eating problem was because of Tom in '96?
21    A. Yes.
22    Q. Now, I'm going to suggest to you, which I think
23  can be borne out in terms of some of the discussions we

**Page 125**

1  bothered her, when you went to the grand jury, was that
2  Dr. Johnson was telling her not to eat and he was fat;
3  is that right?
4      A. No, he was telling her to eat.
5      Q. Sorry, to eat?
6      A. Yes. Because -- yeah.
7      Q. And those were her words to you about him,
8  right?
9      A. Yes.
10     Q. You also stated that before the grand jury that
11  Dr. Johnson had advised her that she should consider
12  getting a restraining order against Tom Capano?
13     A. Yes.
14     Q. And do you remember what Anne Marie's words
15  were in response to that voice from Dr. Johnson?
16     A. I can't recall her exact words, but it was not
17  something that she planned on doing.
18     Q. If I could direct your attention to page 44 of
19  your grand jury transcript. The question was: "Did she
20  tell you," by she that means Anne Marie Fahey,
21  "specifically, something that Gary said to her with
22  respect to Tom Capano?"
23     Your answer was: "Yes, she told me that Gary

**Page 126**

1  told her that she should file a restraining order
2  against Tom Capano."
3      Next question: "Was her reaction," by her,
4  references made to Anne Marie Fahey, "her reaction in
5  the early part of January 1996 to this was what?"
6      A. "That's ridiculous, why would I do that?"
7      Q. Those are in quotation marks; is that correct?
8      A. Correct.
9      Q. And those words are the words that you
10  indicated at the grand jury that Anne Marie said to you
11  about seeking a restraining order, correct?
12     A. Correct.
13     Q. "That is ridiculous, why would I do that?"
14     A. Yes.
15     Q. You had a discussion, I think, with Anne Marie,
16  I guess, in February of '96 where she indicated to you
17  that at one time Tom Capano wanted her to go into a
18  clinic; do you remember that?
19     A. Yes.
20     Q. And Anne Marie indicated to you that Tom had
21  indicated to her that he thought that's what she should
22  do or he was going to do that. I know there is a lot of
23  names, I'm doing my best, do you want me to rephrase?

**Page 127**

1      A. The second part would be good.
2      Q. You stated in reading these materials that
3  February of '96 you had a conversation with Anne Marie
4  about Tom wanting her to go into a clinic; is that
5  right?
6      A. Yes.
7      Q. And the clinic we are talking about that she
8  referenced was an eating disorder clinic?
9      A. Yes.
10     Q. That's something Anne Marie told you?
11     A. Yes.
12     Q. The red and white striped shirt, when did
13  that -- when was this brought up to you by Kathleen
14  Fahey-Hosey?
15     A. I cannot recall when exactly she asked me. She
16  asked me if I remembered anything of Anne Marie's that
17  was red and white.
18     Q. If I could suggest to you that you were
19  questioned about this by the Wilmington Police
20  Department, by Detective Donovan, in April of '98,
21  that's what the report that I have shows, that Detective
22  Donovan -- you tell me if this is right -- came to you
23  and asked you about this shirt; is that right?

**Page 128**

1      A. He may have. The recollection I have is I was
2  asked by Kathleen.
3      Q. I understand she probably would have asked you
4  first, but sometime after that do you remember talking
5  to Detective Donovan about it?
6      A. I had had conversations, yes.
7      Q. Now, what I'm trying to do is, can you remember
8  how soon you talked to Kathleen before you talked to
9  Detective Donovan?
10     A. No.
11     Q. Now, you said that you were taken somewhere or
12  went somewhere in order to view some clothing, right?
13     A. Right.
14     Q. Where were you taken?
15     A. I wasn't taken anywhere I walked across the
16  street to the --
17     Q. I wasn't trying to suggest anything by taken.
18  Where did you go?
19     A. I went over to the US Attorney's Office.
20     Q. And what did you look at there?
21     A. There were several red and white shirts.
22     Q. And the red and white striped shirt that you
23  remember, and you did remember Anne Marie having a red

1  white striped shirt; did you not?

2      A. Yes.

3      Q. And you explained it in detail to Detective

4  Donovan; did you not?

5      A. Yes.

6      Q. And you indicated to him the outfit that she

7  usually wore it with?

8      A. Yes.

9      Q. Did you have an understanding why you were

10  looking for this red and white shirt?

11      A. I never asked.  I was told to think about what,

12  and I'm doing everything I can to be helpful.  I have no

13  idea why anyone wanted it.

14      Q. So you don't know why Kathleen Fahey-Hosey

15  asked you in the first place or Detective Donovan?

16      A. No.

17      Q. But in any event you walked over there, you

18  look at the items of clothing that are provided to you

19  or shown to you and the red and white striped shirt that

20  you had seen was not there; is that right?

21      A. Correct.

22      MR. MAURER:  If I could have just a minute

23  I'm almost through, we will finish before lunch.

---

1  bedroom was the one from Pat and Kathleen.

2      Q. My question was do you know whether she gave

3  that television back to them or whether they took it

4  back?  By that I mean --

5      A. I have no idea.

6      Q. You just don't know?  At some point you found

7  that television wasn't there anymore.

8      A. Which television are you talking about?

9      Q. The smaller ?

10      A. The gift television?

11      Q. No, not the one from Mr. Capano.

12      I'm talking about the gift television from Pat

13  and Kathleen.

14      Q. No.

15      A. It was my understanding it never left the

16  apartment.

17      Q. You indicated to us earlier that Anne Marie

18  Fahey was confiding with you about Mr. Capano in January

19  of '96; is that right?

20      A. Yes.

21      Q. And you also indicated that it was your

22  understanding that she continued to confide in you, or I

23  guess she continued to confide in you as a friend in the

---

1      THE COURT:  All right.

2  BY MR. MAURER:

3      Q. If I could just go back, before finishing, and

4  I am almost finished, to the question about the

5  television, how many televisions were in Anne Marie's

6  apartment?

7      A. Two.

8      Q. The larger one you have talked about?

9      A. Uh-huh.

10      Q. That came from Mr. Capano?

11      A. Correct.

12      Q. And the smaller that you have talked about?

13      A. Correct.

14      Q. Were you aware of the fact there was a third

15  television in the apartment?

16      A. No.

17      Q. If there was you didn't know it was there?

18      A. Right.

19      Q. Do you know whether Anne Marie gave the

20  television back to her siblings, the smaller one?

21      A. That was in her bedroom.

22      Q. They took it back?

23      A. It was my understanding the television in the

---

1  months that followed, April, May, June; is that right?

2      A. Yes.

3      Q. And she talked to you about Mr. Scanlon, we

4  have talked about that already?

5      A. Uh-huh.

6      Q. And I think we have pretty firmly established,

7  have we not, I will pick out a date, say April 15th of

8  1996, the negative incidents that you have told us about

9  by Mr. -- which Anne Marie attributed to Mr. Capano all

10  were talked about as being before that time; is that

11  right, do you follow me?

12      A. I don't want to pick out a date, but I can say

13  yes.

14      Q. Let's say April then, I'm just picking that out

15  of the sky.  In other words, Anne Marie did not ever

16  tell you about any bad or negative experiences she had

17  with Mr. Capano May of '96, June of '96 did she?

18      A. I can't put a date on that.

19      Q. Well, you have put on a date on that before.

20      A. You are asking me to make a blanket statement

21  that she never said anything else negative about Tom

22  Capano in April, May or June.  I can't put a blanket

23  statement that nothing was said again.

**Page 133**

1  Q. Maybe I didn't phrase my question artfully

2  enough. My question was, although she may have said

3  something negative about him did Anne Marie ever

4  indicate that there had been any negative experiences

5  between herself and Mr. Capano in April, May or June of

6  1996 coming up the fire escape?

7  A. The incidents that we talked about, that have

8  been talked about here, yes, I can say were before that.

9  Q. All of them were earlier?

10  A. But I can't say that she never said anything

11  negative again.

12  Q. She didn't say anything negative about him.

13  You felt you knew her pretty well?

14  A. Yes.

15  Q. And you felt you knew where she was?

16  A. Uh-huh.

17  Q. Did you know April 3, 1996 she had given Mr.

18  Capano a book on anorexia that had been provided by a

19  doctor so Mr. Capano had could better understand the

20  disease?

21  A. I believe I have heard that elsewhere, I was

22  never told that before.

23  Q. Did you know that in May of 1996?

**Page 134**

1  A. I don't think so, no.

2  Q. Pardon me?

3  A. I don't know. I know I have heard that. I

4  don't know.

5  Q. Did she tell you that?

6  A. I can't tell you that for sure.

7  Q. She didn't, did she?

8  A. I don't know. We had a long conversation about

9  her eating disorder. I remember sitting out in front of

10  my house. I don't know, her whole life has been opened

11  up since then. I know that -- I know it occurred, I

12  don't know where I heard that.

13  Q. Had she told you about that in May of '96 would

14  you not have asked her why are you giving Tom Capano a

15  book about your eating disorder, somebody she was not

16  involved with anymore?

17  A. They were supposedly friends again at that

18  point.

19  Q. So your answer is you don't know whether you

20  knew that in May of '96?

21  A. Yes.

22  Q. Did you know that on May 30th of 1996, that

23  Anne Marie Fahey had had dinner at La Famiglia with Mr.

**Page 135**

1  Capano?

2  A. I don't know that.

3  Q. Did you know that on June 6th of 1996 that Anne

4  Marie Fahey had had dinner with Tom Capano at The Saloon

5  in Philadelphia?

6  A. No.

7  Q. She did not share that with you and did not

8  indicate she was seeing him in that fashion at that

9  time?

10  A. Correct.

11  Q. Did you know June 20, 1996 that Anne Marie

12  Fahey had had dinner with Tom Capano at Dilworthtown Inn

13  in Chester County?

14  A. No.

15  Q. Did she tell you that?

16  A. No.

17  Q. She didn't share that with you?

18  A. No.

19  Q. And you, of course, did not know it was her

20  intention to go to dinner with Tom Capano on June 27th

21  at Ristorante Panorama?

22  A. I did not know that.

23  Q. You talked about an incident that occurred back

**Page 136**

1  in 1994, and although I guess there were some changes in

2  Anne Marie, I mean, basically your relationship with her

3  in '94 and '96 was the same; is that right?

4  A. Yes.

5  Q. And although she had been through some things,

6  you had been through things, you were still close with

7  each other; is that right?

8  A. I don't know what you mean by through some

9  things, but --

10  Q. It's not important.

11  A. We were -- yes -- friends.

12  Q. Now, you talked to the grand jury, did you not,

13  about the purchase of this -- was it a peach dress in

14  1994?

15  A. Uh-huh.

16  Q. If I understand correctly you and Anne Marie

17  were shopping and there was a peach dress that she saw

18  in a window that she wanted to purchase or to have to

19  attend this wedding, correct?

20  A. Correct?

21  Q. That was something she wanted at that time,

22  right?

23  A. Yes.

1 Jim Florio did not stop by because he had a conflict prior
2 to our event that was being hosted by attorneys.
3    Q. Did Mr. Capano's firm at the time sponsor in
4 any way that fund raiser?
5    A. I have no idea.
6    Q. Or a fund raiser for Governor Florio held
7 around the same time?
8    A. For your first question, did you mean did we --
9 did his firm sponsor our event?
10    Q. Yes.
11    A. No, they did not.
12    Q. Did I hear you correctly say you don't recall
13 who introduced you to Tom Capano?
14    A. No.
15    Q. Could it have been one of the Governors, Florio
16 or Carper?
17    A. It's too long ago to remember.
18    MR. O'DONNELL: Well, I won't ask anymore
19 questions about it.
20    MR. CONNOLLY: No further questions. The
21 witness may be excused.
22    MR. WHARTON: State calls Siobhan Sullivan.
23

2    A. Yes. Back at Troop 9 in Odessa.
3    Q. What were your responsibilities with the
4 Executive Security Unit as related to the Governor?
5    A. We protect the family as well as the Governor.
6 But the day I would be working with the Governor, I
7 would pick up the Governor at his residence. Knowing
8 his schedule prior to the day before I would pick up the
9 Governor, I would contact Anne Marie who was the
10 scheduler for the Governor and learn about his schedule.
11 So I would have the Governor's schedule ahead of time
12 through Anne Marie. And I would pick up the Governor
13 that day or I would drive and protect him to every event
14 until his duration that night.
15    Q. When he was not at an event, but rather in one
16 of his offices, would you also be at the office?
17    A. I'm sorry, I didn't hear you.
18    Q. Let's say he was not at an event and he was at
19 an office -- He had an office in Wilmington; is that
20 right?
21    A. Yes.
22    Q. And did he also have an office in Dover?
23    A. Yes. Tatnall Building.

1       SIOBHAN SULLIVAN,
2       the witness herein, having first
3       been duly sworn on oath, was examined
4       and testified as follows:
5          DIRECT EXAMINATION
6 BY MR. WHARTON:
7    Q. Good afternoon.
8    A. Good afternoon.
9    Q. Who do you work for?
10    A. Delaware State Police.
11    Q. How long have you been with the Delaware State
12 Police?
13    A. Just short of 12 years.
14    Q. Right now what is your assignment with the
15 police?
16    A. Executive protection or for the Governor.
17    Q. How long have you been doing that work?
18    A. Little over five and a half years.
19    Q. When did you begin doing that?
20    A. His first election, '92.
21    Q. Was there interruption in your service?
22    A. Yes, February '98 to September '98.
23    Q. You were doing other work for the State Police

1    Q. When he was at one of those building where were
2 you?
3    A. With him. We have an office in both buildings.
4    Q. So if the Governor is at work in the office you
5 are at that office?
6    A. That's correct.
7    Q. You mentioned Anne Marie. You knew Anne Marie
8 Fahey; is that correct?
9    A. Yes, I did.
10    Q. How is it you got to know her?
11    A. I met Anne Marie the first day I joined the
12 Governor's staff Executive Protection. Like I said she
13 was his right-hand person, his scheduling secretary.
14    Q. How closely did you work with-- I mean, I'm
15 talking about you pleural, like the Executive Security
16 Unit, work with her?
17    A. I would say, to compare it, the Governor looks
18 at us as his right-hand person and know his day is going
19 to go well because we are there. He has a lot of trust
20 in us. I would look at Anne Marie as my right-hand
21 person where she is setting my day so my day would flow
22 correctly to the Governor.
23    Q. You had to have a lot of contact with her?

1    A. Yes. One on one.

2    Q. At some point, would you say that you became

3    friendly with her?

4    A. Yes, I did.

5    Q. At some point -- Well, first of all, let me

6    back up. Did you know the defendant?

7    A. Yes, I did.

8    Q. And how was it that you met him?

9    A. Anne Marie Fahey introduced me on an occasion

10   down at Woodburn, which is a mansion to the Governor.

11   They had an event there and Anne Marie introduced me to

12   Tom Capano.

13   Q. Prior to your introduction by her, did you know

14   that they were friends?

15   A. Yes, I did.

16   Q. How did you know that?

17   A. Anne Marie and I used to always talk when we

18   were in the Governor's office. And she was saying she

19   was going to a concert or possibly going to an event

20   which was a pretty high event with the Governor's

21   office. And I would joke around with her, where did you

22   get tickets? Tell me. And she would say Tom Capano

23   bought her the tickets.

1    Q. Do you know whether she considered him a close

2    friend of hers?

3    A. Yes. Throughout our friendship, prior to Anne

4    Marie disappearing, she would say that she looked at Tom

5    Capano as one of her best friends and she would talk to

6    him occasionally.

7    Q. At some point, did she tell you about perhaps,

8    leaving the Governor's office?

9    A. Yes. That was around spring of '95. She had

10   told me that-- Let me go back. It is very stressful in

11   what our jobs are with the Governor between security and

12   executive scheduler. Mine would be stress would be

13   safety-wise, Anne Marie's stress level would be she had

14   to make sure the schedule went -- flowed correctly for

15   the Governor. And we had a lot of stress. We probably

16   have the most stress of anybody in the office I would

17   say. And she had told me that Tom Capano had offered

18   her a job at Louie Capano's office.

19   Q. When did you say that was?

20   A. Spring of '95.

21   Q. Obviously she didn't take that job?

22   A. No, she did not.

23   Q. Did --

1    THE COURT: Can I just take a moment to

2    consult with counsel?

3    THE COURT: Certainly.

4    MR. MAURER: Can we take just a moment, your

5    Honor?

6    THE COURT: Certainly.

7    THE COURT: Mr. Wharton.

8    BY MR. WHARTON:

9    Q. I think what I last asked you about was this

10   job offer Anne Marie told you was being made, or

11   attempted to be made, by the defendant with his brother

12   Louis Capano's business and she did not ultimately

13   accept that job, correct?

14   A. Yes.

15   Q. She stayed with the Governor's office?

16   A. Yes.

17   Q. So you knew she didn't take the job. Did you

18   have a conversation with the defendant himself?

19   A. Yes, I did.

20   Q. How did that conversation get initiated?

21   A. Tom Capano would usually call me on my pager

22   and leave a phone number for me to call him back. And I

23   received a page and returned Tom Capano's call.

1    Q. He had paged you and you returned his call?

2    A. Yes.

3    Q. And what did he tell you?

4    A. He asked me -- there was different times that

5    Mr. Capano had called me over several occasions and a

6    lot of times he would ask if I wanted to get out and get

7    a beer. It was always when I got done work that night

8    with the Governor. And he knew I coached basketball and

9    wanted me to help his kids, coach them in some

10   basketball. And at that time he wanted to know if I

11   wanted to go get a beer and talk about basketball. I

12   said no, I had a long day, I need to get home. At which

13   time he asked if I had spoken to Anne Marie today. And

14   he said, "She's really mad at me."

15   And I said, "You have to just let her be, Tom."

16   And he goes, "You know I left my wife and I'm

17   just really lonely right now."

18   Q. And did he indicate whether or not they had an

19   argument of some sort?

20   A. Yes. He stated that they had a fight that day

21   and Anne Marie was really mad at him.

22   Q. Did he also indicate to you whether he did, in

23   fact, do anything about trying to get her a job with his

**Page 161**

1  brother?
2      A. When I talked-- We talked about the stress
3  level of the Governor's office. And Tom also talked to
4  me that he offered Anne Marie a job at his brother's
5  Louie's office, and Anne Marie refused to take the job.
6      Q. When did you next see Anne Marie Fahey?
7      A. I know I was off that weekend, so it had to be
8  soon after that. We usually work every couple days
9  after, so it had to be the following week.
10     Q. Do you know if that was before Christmas of '95
11  or after?
12     A. It was before Christmas of '95.
13     Q. Did you tell her about your conversation with
14  the defendant?
15     A. Yes. I always told Anne Marie when Tom Capano
16  would call me. And at that certain time Anne Marie
17  became very upset.
18     Q. What did she tell you?
19     A. When I told her Tom Capano called me and paged
20  me and asked if I had talked to her and he told me that
21  Anne Marie was very upset with him, and I told Anne
22  Marie that, she said, "He is a possessive, controlling
23  maniac. I'm just getting tired of him."

**Page 162**

1          And stormed out of my office and went back to
2  her office.
3      Q. Were you aware of whether or not she was around
4  Memorial Day of 1996, whether she was going away?
5      A. Yes, I was.
6      Q. Where did you understand she was going?
7      A. She was going to the New England area with her
8  boyfriend, Mike Scanlon.
9      Q. Did you have any-- You knew about Mike Scanlon?
10     A. Yes.
11     Q. Did you have any contact with the defendant
12  around that time?
13     A. Yes, I did.
14     Q. Tell us about that contact.
15     A. Once again, I received another page, at which
16  time Tom Capano had called me.
17     Q. Was this while she was away or before she went
18  away?
19     A. While she was away.
20     Q. And he paged you?
21     A. I returned the page, and he asked me if I had
22  talked to Anne Marie, and I said no. And he asked me if
23  I knew where Anne Marie was and I said no. He kept it

**Page 163**

1  lots of and how I was doing. And basically we
2  ended the phone conversation after how I was doing, what
3  was I doing for the weekend.
4      Q. Now, did you talk with Anne Marie after she
5  came back?
6      A. Yes, I did.
7      Q. And did you report to her that Tom Capano had
8  inquired of you about her whereabouts?
9      A. Yes, I did. I told Anne Marie, once again, in
10  our office that Tom Capano had paged me and was asking
11  if I knew where she was or if I have talked with her.
12     Q. What was her response to you?
13     A. At that time, very adamantly said, "He's
14  fucking stalking me."
15         And I tried to calm Anne Marie down. I said
16  Anne Marie there is a charge, there's a crime against
17  that, we can give you protection. We are here for the
18  Governor, but we are also here for the staff and we can
19  provide protection.
20     Q. What was her response?
21     A. At that time I think she felt she could handle
22  it at that time and repeated that she had to end it with
23  Tom Capano.

**Page 164**

1      Q. Do you know when if she got back if she
2  had -- did she tell you she had any concerns when she
3  got back from new England?
4      A. When I told her about him paging me, she stated
5  she was afraid Tom Capano was going to wait for her and
6  she did not want Mike and Tom having a confrontation,
7  she was afraid of that.
8      Q. Did she indicate whether Mike Scanlon knew
9  about her relationship with Tom Capano?
10     A. Throughout our conversations, throughout our
11  relationship with working and Tom Capano came up, she
12  told me she did not tell Mike Scanlon about Tom Capano.
13     Q. Now, did you also talk to her about Mike
14  Scanlon?
15     A. Yes.
16     Q. And what did she tell you about Mike Scanlon
17  how she felt about him?
18     A. She felt very highly of Mike Scanlon. For a
19  time there, the last year, Anne Marie was very down,
20  looked very upset and down. And seemed like when she
21  met Mike Scanlon her life came back into her. She
22  wasn't as down in the office, looking forward to getting
23  together with Mike Scanlon. She felt -- I felt with her

1   A. Throughout my going back throughout my
2 beginning of meeting Anne Marie, that she had a
3 friendship with Tom Capano that -- in the beginning that
4 -- talking with Anne Marie, she said that Tom Capano was
5 her best friend.
6   Q. What about -- I thought you mentioned all the
7 way through June of '96 she indicated he was one of her
8 best friends?
9   A. No. This was just the beginning. I knew her
10 all the way through her disappearance.
11   Q. She didn't say that later on?
12   A. No.
13   Q. And you have no idea of the friendly things
14 they were doing together with each other, the dinners,
15 etcetera, etcetera?
16   A. No, I did not.
17   Q. And you didn't know about the book she gave him
18 to help him understand her eating disorder better on May
19 23rd of '96, did you?
20   A. No, I did not.
21     MR. MAURER: Excuse me, your Honor.
22 BY MR. MAURER:
23   Q. Just one last point, Trooper Sullivan.

1 Consistent with the general statement you have given,
2 April 19, 1996, there was an e-mail from Tom Capano to
3 her, it starts out, "Hey, you. Welcome home. Thanks
4 for the call last night."
5   See that?
6   A. Uh-huh.
7   Q. Does that suggest to you Mr. Capano is thanking
8 Miss Fahey for calling him last night?
9   A. Yes.
10   Q. May 28th of '96 was the date?
11   A. I didn't see the date, sir. Yes, it is.
12   Q. Right around the time that she is telling you
13 that she's afraid he's going to be there waiting for her
14 when she gets back?
15   A. Yes.
16     MR. MAURER: Thank you.
17     THE COURT: Mr. Wharton?
18     MR. WHARTON: No questions.
19     THE COURT: All right. May Trooper Sullivan be
20 excused?
21     MR. WHARTON: Yes.
22     MR. MAURER: Yes.
23     MR. CONNOLLY: Your Honor, the State calls

2     JENNIFER BARTELS-HAUGHTON
3     the witness herein, having first
4     been duly sworn on oath, was
5     examined and testified as follows:
6     DIRECT EXAMINATION
7 BY MR. CONNOLLY:
8   Q. Good afternoon, Mrs. Haughton, where do you
9 live?
10   A. I live in Westford, Massachusetts.
11   Q. I'm going to ask you to please to speak into
12 the microphone.
13   A. Westford, Massachusetts.
14   Q. And how long have you lived in Massachusetts?
15   A. Four years.
16   Q. Did you grow up in Delaware?
17   A. Yes.
18   Q. How old are you?
19   A. I'm 33.
20   Q. And you knew Anne Marie Fahey?
21   A. Yes.
22   Q. And when did you first meet Anne Marie?
23   A. In third grade, 1975.

1   Q. And what kind of relationship did you have with
2 her?
3   A. Very close friends all the way through -- she
4 is my oldest friend.
5   Q. You went to high school with her?
6   A. Yes.
7   Q. Did you go to college together?
8   A. She went to University of Delaware for a short
9 time, but I went to University of Delaware so I visited
10 her at Wesley during college.
11   Q. So you maintained contact?
12   A. Yes.
13   Q. You are married?
14   A. Yes.
15   Q. When did you get married?
16   A. 1991.
17   Q. And at the time you got married were you still
18 close friends with Anne Marie?
19   A. Yes, she was in my wedding.
20   Q. After you got married did you still live in
21 Delaware? Where were you?
22   A. No. I moved to Seattle the same year I was
23 married.

Case 06-v-06053    Document 29    Filed 02/20/2007    Page 34 of 40

1    Q. While you were in Seattle, did you keep in touch
2    with Anne Marie?
3    A. Yes.
4    Q. What was the frequency of your contact with
5    her?
6    A. We used to talk on the phone about once or
7    twice a month while I was in Seattle. And when I came
8    east to visit my parents who used to live in Wilmington,
9    we always saw each other. And once I moved to
10    Massachusetts, we saw each other a little more often,
11    she came up and we still talked on the phone about twice
12    a month.
13    Q. And you moved to Boston in 1994?
14    A. Yes.
15    Q. So let's say in '95, from September of '95 to
16    June of 1996, how many times did you see Anne Marie?
17    A. September of '95 to June of '96 I saw Anne
18    Marie Christmas time in '95 was the only time I saw her.
19    Q. And how often did you speak with her during
20    that period, September of '95 to June of '96?
21    A. Probably two or three times a month.
22    Q. Now, when you saw her in December, that was
23    down in Delaware?

1    A. Yes.
2    Q. And would you tell us about, you saw her only
3    once that time?
4    A. No. I saw her twice that time.
5    Q. Twice? And the two occasions were what?
6    A. Once, just my parents had a Christmas party and
7    she came to that, and then we went out to dinner at
8    Toscana's was the second time I saw her while I was in
9    town.
10    Q. Who went to dinner at Toscana that night?
11    A. Just me and Anne Marie.
12    Q. Whose idea was it?
13    A. Anne Marie's. She had a gift certificate and
14    took me out to dinner.
15    Q. How did the dinner go? What did you talk
16    about?
17    A. We talked about a lot of things. We talked
18    about Mike, we talked about her childhood, we talked
19    about I don't know, gee.
20    Q. Let's take Mike for starters. Mike is who?
21    A. It was her boyfriend at the time.
22    Q. Mike Scanlon?
23    A. Yes, Mike Scanlon?

1    Q. Well, you mentioned about your dinner, his dinner
2    around Christmas time in '95?
3    A. Yes.
4    Q. What had Anne Marie told you about Mike
5    Scanlon?
6    A. She had told me in September when she met him
7    and she was real excited about finally meeting someone.
8    And she talked about him every time we talked from that
9    point on, from September on.
10    Q. And you mentioned that you talked about her
11    childhood. You said you grew up with Anne Marie?
12    A. Yes.
13    Q. You understood she had difficult years as a
14    child?
15    A. Yes.
16    Q. And was that kind of something that she shared
17    with you even as an adult, her memories and experiences?
18    A. Oh, yes, uh-huh.
19    Q. Generally, how would you describe her feelings
20    towards her childhood and her referring as a child?
21    A. She thought it was horrible. She had bad
22    feelings about it.
23    Q. Was it something that she liked to share with

1    many people?
2    A. No.
3    Q. After dinner what did you do?
4    A. We sat in her car for a long time. I gave her
5    a Christmas present, and she got very emotional and she
6    cried for a long time in my car.
7    Q. And why was she crying?
8    A. She was crying because she said that she didn't
9    deserve Mike, Mike Scanlon, and there were so many
10    things about her that she hadn't told him and she was
11    really scared she would lose him if she was honest with
12    him.
13    Q. Did she tell you what the things were that she
14    was afraid to share with Mike Scanlon?
15    A. Her anorexia, the fact that she was in therapy,
16    and she told me -- well she had been talking a lot about
17    her dad that night, so I guess I just thought that was
18    the kind of stuff she meant.
19    Q. Is it fair to say that you knew that her
20    relationship with her father was not a good one?
21    A. Yes.
22    Q. Do you recall speaking with her in late January
23    or early February of 1996?

**Page 185**

1    A. Yes.

2    Q. And first of all, what prompted the

3    conversation?

4    A. A specific conversation? Well, her birthday

5    was the end of January, so my husband and I sent her

6    flowers when she turned 30, so she called after that

7    weekend and told me about all the things she had been

8    doing. She had a wonderful weekend. She had the

9    surprise party, she had the gala. She talked about what

10    dresses she was going to wear, and she was thrilled and

11    excited and thought that was the time of her life.

12    Q. From January to May you maintained the two to

13    three times a month contact with her over the telephone?

14    A. Yes.

15    Q. During those conversations did she continue to

16    share with you these confidences about Scanlon and the

17    stresses and problems that you have already alluded to?

18    A. Yeah.

19    Q. And do you recall a conversation in mid may

20    that you had, a rather lengthy conversation?

21    A. Yes.

22    Q. Would you tell us first of all, where was Anne

23    Marie when you had this conversation?

**Page 186**

1    A. She was at work.

2    Q. Tell us about the conversation, what you

3    remember?

4    A. I remember that she got some e-mails from

5    Thomas Capano.

6    Q. This is while she's on the phone?

7    A. While she was on the phone.

8    Q. What did she tell you about the e-mails she got

9    while on the telephone?

10    A. She got upset and she said that this man would

11    not get the hint, that she did not want to be more than

12    friends, and he was bothering her, sending her e-mails

13    and asking her to go out to dinner.

14    Q. Did she describe for you the e-mail at all?

15    A. No.

16    Q. Had she ever spoken with you before about Tom

17    Capano?

18    A. No.

19    Q. Did she tell you that she had had an affair

20    with him?

21    A. No.

22    Q. Did she tell you anything else about him in

23    relation to her?

**Page 187**

1    A. She told me that he had wanted her to leave her

2    job at the Governor's office and go and work for his

3    brother, Louis, and she had interviewed and that she

4    wasn't going to do it she was going to stay in the job

5    at the Governor's office.

6    Q. Do you recall another subject coming up during

7    this conversation?

8    A. Yes.

9    Q. What was that subject?

10    A. She talked a lot about adultery during that

11    conversation.

12    Q. Now, why would she talk about adultery with

13    you?

14    MR. O'DONNELL: Objection. I don't know how

15    she could know that.

16    MR. CONNOLLY: I will rephrase it. I will

17    rephrase the question.

18    BY MR. CONNOLLY:

19    Q. Did you and Anne Marie -- did you know anybody,

20    who is a member of Anne Marie's family, who had been

21    involved in an adulterous relationship?

22    A. Yes.

23    Q. Had Anne Marie told you about that before?

**Page 188**

1    A. Yes.

2    Q. Did you have a family member whose marriage was

3    affected by an adulterous relationship?

4    A. Yes.

5    Q. And had you and Anne Marie discussed that fact

6    before?

7    A. Yes.

8    Q. Who raised the subject of adultery during this

9    telephone conversation?

10    A. Anne Marie.

11    Q. And describe for us what she said and her

12    demeanor?

13    A. She was almost out of control, furious with a

14    member of her family for being involved in an adulterous

15    relationship and feeling as though lots of people knew

16    about it. And she was just very upset and very verbal

17    about it.

18    Q. Do you recall discussing anything about who is

19    to blame for such kinds of affairs with her?

20    A. Yes, I do.

21    Q. Tell us about that.

22    A. I recall discussing the blame being placed with

23    the person who is married because they take the vows,

Case 1:06-cv-00058-  Document 29  Filed 02/26/2007  Page 36 of 40

1   and the other person not being as much to blame and so
2   forth.
3      Q. Did Anne Marie know what your views of adultery
4   were, your convictions?
5      A. I think so.
6      Q. Had you ever expressed to her before this
7   conversation your reaction to your family member
8   situation and what had occurred?
9      A. Yes.
10     Q. And what had you told her?
11     A. Well, my brother's marriage broke up and we
12   hated my sister-in-law for having had an adulterous
13   affair, so she knew that.
14     Q. Did Anne Marie, during this conversation, at
15   all indicate what the views of her other siblings were
16   about the person in her family that had engaged in this
17   behavior?
18      MR. O'DONNELL: Objection. Hearsay.
19      MR. CONNOLLY: Your Honor, it is not submitted
20   for the truth, it is submitted to know what she
21   understood her siblings would react.
22      THE COURT: I'm going to admit it for that
23   purpose, we have done that consistently. Please

1   understand that we are looking at the mental state of
2   Miss Fahey and this is evidence is produced for that
3   limited purpose only.
4   BY MR. CONNOLLY:
5      Q. Go ahead.
6      A. I'm lost.
7   BY MR. CONNOLLY:
8      Q. Did Anne Marie indicate to you during this
9   conversation what her understanding was about her
10   siblings' views of the fact that a family member had
11   been involved in a adulterous affair?
12     A. She said they were all upset about it and very
13   mad.
14     Q. Now, were you aware that soon after this
15   conversation Anne Marie was to travel to New England
16   with Mike Scanlon?
17     A. Yes.
18     Q. She had talked to you about that?
19     A. Uh-huh.
20     Q. And in fact what was one of the plans, as far
21   as you are concerned, with this New England trip?
22     A. My husband's parents have a home on Martha's
23   Vineyard and we were spending Memorial Day there. She

1   and Michael were supposed to spend some time in Falmouth
2   and were going to come over and visit us for a day on
3   the island.
4     Q. What was the purpose of the trip to Martha's
5   Vineyard to meet you?
6     A. She wanted me to meet Mike.
7     Q. You had never met him before?
8     A. No. His family is in New England and we missed
9   each other at Christmas.
10     Q. Did you, in fact, meet Anne Marie or Mike?
11     A. No, our plans fell through.
12     Q. Was there any particular reason they fell
13   through?
14     A. Yeah. The family home that they were supposed
15   to visit in Falmouth was being used by someone else so
16   they visited his sister's instead, and I believe she is
17   in New Hampshire. Anyway, it was too far away for them
18   to come for a day if they were going to be at his
19   sister's.
20     Q. So it was a scheduling problem?
21     A. It was a scheduling problem.
22     Q. When did you last speak with Anne Marie?
23     A. I last spoke to Anne Marie June 7, 1996.

1     Q. You are able to pinpoint the date, why?
2     A. Because my husband's sister was visiting and my
3   niece took the message that she had called.
4     Q. What did she tell you?
5     A. She called to tell me that another friend of
6   ours from high school had just gotten engaged.
7     Q. Did she talk about Mike Scanlon?
8     A. Yeah, she did.
9     Q. What were her feelings about Mike Scanlon that
10   she expressed to you?
11     A. She talked about marrying him. She talked
12   about who she would like to have in her wedding party.
13   And we talked about a lot about weddings during that
14   phone call.
15     MR. CONNOLLY: No further questions, your
16   Honor.
17     THE COURT: Mr. O'Donnell.
18     CROSS-EXAMINATION
19   BY MR. O'DONNELL:
20     Q. Good afternoon, Mrs. Haughton. I'm Jack
21   O'Donnell. We have never had a chance to talk before,
22   have we?
23     A. No.

**Page 193**

1     Q. Prior to your testimony here this afternoon,
2  did you talk to any member of the prosecution team, the
3  Government team over here, Detective Donovan, Mr.
4  Connolly, Mr. Wharton?
5     A. Yes.
6     Q. How many times?
7     A. Once.
8     Q. Pardon?
9     A. Twice.
10    Q. Twice. When was that?
11    A. I talked to Mr. Connolly in September and
12 yesterday.
13    Q. September of '98?
14    A. Yes.
15    Q. On the phone?
16    A. Yes.
17    Q. And yesterday in person?
18    A. Yes.
19    Q. And are you presently living in Westford?
20    A. Yes.
21    Q. Massachusetts?
22    A. Uh-huh.
23    Q. Is that a suburb of Boston?

**Page 194**

1     A. Sort of, yeah, uh-huh.
2     Q. And you came down here yesterday specifically
3  to testify in this trial?
4     A. I came down Saturday.
5     Q. You had a couple days with your family while
6  you were here?
7     A. To testify and have my kids visit with their
8  grandparents.
9     Q. But the sole visit was for your testimony
10 today?
11    A. To have my kids visit with their grandparents
12 and to testify.
13    Q. That's always a good reason. When you talked
14 to Mr. Connolly was Detective Donovan there?
15    Q. Yesterday?
16    A. Yes.
17    A. Yes.
18    Q. Did he take notes?
19    A. I don't remember, I think so.
20    Q. Did he discuss with you what was in the notes
21 at all to make sure he was taking it down right?
22    A. Mr. Donovan?
23    Q. Detective Donovan.

**Page 195**

2     Q. How about Mr. Connolly, did he?
3     A. Yes.
4     Q. And you verified some information in the notes?
5     A. Yes.
6     Q. I would have an application to make at this
7  time.
8        MR. CONNOLLY: If I could follow-up on redirect
9  I think that will clarify things.
10       THE COURT: Mr. O'Donnell may have a question
11 that needs to be answered now.
12       MR. CONNOLLY: We can go to side-bar.
13       THE COURT: Side-bar.
14       (The following side-bar discussion was held:)
15       MR. O'DONNELL: I think clearly, based on her
16 answers, there ought to be some Jencks material.
17       MR. CONNOLLY: I'm about to produce the one
18 line of notes that Detective Donovan took, which is
19 going to say her name and may say her date of birth.
20 And as far as -- she thinks he took notes because he
21 wrote that down. I'm asking him to get it, he has some
22 other things on the paper that are totally irrelevant.
23 I will show them to the Court in a second.

**Page 196**

1        I think the last question, did he go over the
2  notes? I think what she thinks -- if you would -- I
3  will get them, and if somebody asks her was she shown
4  any notes or asked to affirm that there was anything on
5  paper, I think you will find the answer would be no.
6  But I will get it.
7        MR. O'DONNELL: It is very extensive Jencks
8  material, your Honor.
9        THE COURT: You have received one line.
10       MR. O'DONNELL: With a date and her name on it.
11       MR. CONNOLLY: That's all there is.
12       THE COURT: I'm willing to accept your
13 representation.
14       (Following a side-bar discussion:)
15       THE COURT: Mr. O'Donnell?
16 BY MR. O'DONNELL:
17    Q. Your first contact with the Government was in
18 September, a telephone conference?
19    A. I think so, yes.
20    Q. And that was with Mr. Connolly?
21    A. Yes.
22    Q. Did you call him?
23    A. No.

1  Q. He called you?
2  A. Yes.
3  Q. That was the first time anyone came in
4  connection with the Government case, right?
5  A. Yes.
6  Q. Let me start with the end of your testimony.
7  As I understand your testimony, Memorial Day weekend of
8  1996 you were spending with your husband at his parent's
9  cottage on Martha's Vineyard?
10  A. Yes.
11  Q. And based on conversations that you had with
12  Anne Marie Fahey before that weekend, you knew that Mike
13  Scanlon and she were coming up to that area?
14  A. Yes.
15  Q. Specifically coming up to Falmouth?
16  A. Yes.
17  Q. And there is a nice little ferry that runs
18  between Falmouth and Martha's Vineyard?
19  A. Yes.
20  Q. Did you say the reason for the trip was so you
21  could meet Mike Scanlon; did you say that?
22  A. I said the reason for the trip over to Martha's
23  Vineyard would be for me to meet Mike.

2  Q. Did you know that at no time did Anne Marie
3  Fahey and Michael Scanlon ever discuss wedding plans;
4  were you aware of that?
5  A. What was the question?
6  Q. Were you aware at no time did Anne Marie Fahey
7  and Mike Scanlon ever discuss these wedding plans you
8  say she was talking about to you?
9  A. I guess.
10  Q. You didn't know that, did you?
11  A. I didn't know one way or the other, no.
12  Q. But can I safely assume that you would have
13  assumed that it was like a done deal if she was having
14  these conversations with you about who is in the wedding
15  party and dresses and stuff like that?
16  A. No.  I think girlfriends talk about those
17  things to each other regardless.
18  Q. The impression I got was that you were hearing
19  there was going to be a wedding pretty soon .
20  A. She was hoping.
21  Q. She didn't say that specifically?
22  A. Say what?
23  Q. That she was going to marry him soon?

1  Q. As opposed to the reason of that trip to that
2  area in general?
3  A. Yes.
4  Q. You were not trying to say the only reason they
5  were coming up there so you could meet Mike Scanlon?
6  A. No.
7  Q. Do you know whether there was any other reason?
8  A. He wanted Anne Marie to meet his parents.
9  Q. In any event, because of scheduling
10  difficulties you never got to meet him?
11  A. Right.
12  Q. On June 7th of '96, you had a telephone
13  conference with Anne Marie Fahey?
14  A. Yes.
15  Q. And that was the last time you spoke to her?
16  A. Yes.
17  Q. Is that right?
18  A. Yes.
19  Q. And at that time she was discussing with you
20  her plans to Mary Michael Scanlon, in essence?
21  A. Yes.
22  Q. You were talking about who might be in the
23  wedding party?

1  A. She said he was the one she was going to marry.
2  Q. With respect to Thomas Capano, had you ever met
3  him?
4  A. No.
5  Q. Did I understand you to say that you had one
6  conversation with Anne Marie about Thomas Capano?
7  A. Yes.
8  Q. And that conversation occurred about the middle
9  of May of 1996?
10  A. Yes.
11  Q. Okay.  She never told you about it before that?
12  A. No, never.
13  Q. You didn't know that Anne Marie Fahey and
14  Thomas Capano had had an affair of some substantial
15  duration?
16  A. No,  I did not.
17  Q. Did not know that they had been romantically
18  involved?
19  A. No.
20  Q. Did not know that at one point at least, Anne
21  Marie Fahey considered Thomas Capano her best friend?
22  A. No.
23  Q. Never confided any of that in you, her grade

**Page 201**

1   school girlfriend?
2       A. No.
3       Q. You didn't know that Anne Marie Fahey and
4   Thomas Capano -- and I'm not going to go through all
5   this, and the jury has already heard it -- had been
6   exchanging rather pleasant e-mails for months before the
7   middle of May of 1996?
8       A. No, I did not.
9       Q. You didn't know she had been calling his law
10  firm regularly, if not daily, to speak with him during
11  those months, during some of those months?
12      A. No, I did not know that.
13      Q. And you didn't know that she continued to
14  correspond with him both on the telephone and e-mails
15  after the middle of May and up to June 27th, you didn't
16  know that either?
17      A. No.
18      Q. And, of course, you didn't know she had gone
19  out to dinner with him several times in the month of
20  June?
21      A. Right.
22      Q. She didn't call and confide any of that in you?
23      A. Right.

**Page 202**

1       Q. I take it that when Anne Marie Fahey dropped
2   Thomas Capano's name into this telephone conversation,
3   did you ask her questions about him?
4       A. Yes.
5       Q. And the only thing you got out of her was
6   essentially that he wasn't getting the hint that she
7   just wanted to be friends, in essence? I'm sorry. You
8   said one other thing, that he, in addition to that, that
9   he, Thomas Capano, had arranged for an interview for her
10  with his brother, Louis?
11      A. Yes.
12      Q. You said that too, didn't you?
13      A. Yes.
14      Q. Did I miss anything else or basically those two
15  things were all you said? Did I get that right?
16      A. Yes.
17      Q. Do you know for example, whether or not Anne
18  Marie Fahey ever even went on a job interview with Louis
19  Capano?
20      A. Yes.
21      Q. She told you she did?
22      A. Yes.
23      Q. And she decided not to take the job I guess?

**Page 203**

2       Q. Did she tell you she was even offered a job by
3   Louis Capano?
4       A. Yes, and said an apartment with it.
5       Q. Did she say specifically she saw Louis Capano?
6       A. She said she interviewed for the job.
7       Q. With Louis Capano?
8       A. Yeah.
9       Q. You had known Anne Marie Fahey since third
10  grade?
11      A. Yes.
12      Q. Did you know that since at least 1988 she had
13  been on and off battling anorexia?
14      A. Yes.
15      Q. And did you and her have conversation --
16  discussions about that?
17      A. Yes.
18      Q. Did you know that in order for Thomas Capano to
19  better understand the subject that she provided a book
20  on anorexia to him to read?
21      A. What is your question?
22      Q. That she gave Thomas Capano a book on anorexia,
23  a book from her psychologist, a book so he could better

**Page 204**

1   understand the disease?
2       A. Did I know that?
3       Q. Yeah.
4       A. No.
5       Q. And since you didn't know that, I'm sure you
6   didn't know he read it within a few days and they had
7   conversation about it, she didn't share that either?
8       A. No.
9       MR. O'DONNELL: May I have a moment, your
10  Honor?
11      Thank you, very much. Nothing further.
12      THE COURT: Mr. Connolly?
13      MR. CONNOLLY: Nothing further. And I would
14  ask if the Court would please excuse the witness.
15      THE COURT: Mr. O'Donnell?
16      MR. O'DONNELL: That's fine with us, your
17  Honor.
18      THE COURT: You are excused. Thank you for
19  your testimony.
20      It is time for the afternoon recess. If the
21  jury can be escorted out first.
22      (The jury exited the courtroom at 3:35 p.m.)
23      THE COURT: Stand in recess until the call of

1 the Court.
2 (Following a brief recess:)
3 THE COURT: Please bring the jury in.
4 THE COURT: Mr. Connolly.
5 MR. CONNOLLY: Thank you, your Honor. The
6 State calls Jackie Steinhoff.
7 JACQUELINE STEINHOFF,
8 the witness herein, having
9 first been duly sworn on oath,
10 was examined and testified as
11 follows:
12 DIRECT EXAMINATION
13 BY MR. CONNOLLY:
14 Q. Good afternoon, Mrs. Steinhoff.
15 A. Good afternoon.
16 Q. How old are you?
17 A. Thirty-two.
18 Q. Where do you live?
19 A. In town on Clayton Street.
20 Q. Are you married?
21 A. Yes.
22 Q. When did you get married?
23 A. 1994.

---

1 approximately.
2 Q. You grew up together?
3 A. Yes.
4 Q. Went to high school together?
5 A. Junior high was when we first met, yes.
6 Q. At some point when you were adults did she live
7 with you?
8 A. Yes. She moved into my house on Clayton Street
9 approximately 1992.
10 Q. And the two of you lived together, was there
11 anybody else?
12 A. We had a third roommate her name was Braunlin.
13 Q. The three of you lived together for how long?
14 A. Together the three of us lived probably a year
15 and a half, approximately.
16 Q. When did Annie move out of your Clayton Street
17 home?
18 A. Just before I was married, which was August of
19 '94, she moved out July of '94.
20 Q. Were you able to observe either through time
21 spent in childhood or when you lived with Annie as an
22 adult any unusual habits that she had?
23 A. Unusual? I would just say her analness, if I

---

Page 206

1 Q. And what was your maiden name?
2 A. Binnersly.
3 Q. Do you work?
4 A. Temporary. I work for Placers Employment
5 Agency, just for a short time.
6 Q. What did you do before that?
7 A. I owned a coffee shop, also in town.
8 Q. What was the name of the coffee shop?
9 A. Java Jack's Cafe.
10 Q. Did you know a person named Anne Marie Fahey?
11 A. Yes, I did.
12 Q. As of June of 1996, how would you characterize
13 your relationship with her?
14 A. Very close. She came into the coffee shop
15 quite frequently. Spoke to her practically everyday.
16 She came into the coffee shop once or twice a week. I
17 did catering with her through the Governor's office. We
18 socialized on weekends.
19 Q. She was your best friend, if not one of your
20 best friends?
21 A. She was my dearest friend, yes.
22 Q. How long had you known her?
23 A. It would have been 20 years, 7th grade, 1979,

---

Page 208

1 may.
2 Q. She had a nickname?
3 A. Anal Annie. She was very neat, very
4 particular. She did funny things -- well, funny
5 things -- she was -- she kept her room very clean, made
6 her bed as soon as she got up in the morning, dusted her
7 baseboards. She was overly clean and concerned -- not
8 concerned, but involved in being anal.
9 Q. Dirty laundry?
10 A. She folded her dirty laundry which is
11 unusual -- that is unusual, yes.
12 Q. And you kidded her about this?
13 A. Yes.
14 Q. When she moved out of your apartment, she moved
15 to Washington Street; is that correct?
16 A. Yes.
17 Q. Did you maintain frequent contact with her?
18 A. Yes.
19 Q. And you already mentioned that you spoke with
20 her daily as of June of '96?
21 A. Yes.
22 Q. How long had you been speaking with her on a
23 daily basis?