**Page 125**

1    A. I could look at up to ten.

2    Q. Now, if you turn to page two of the plea

3 agreement, and there's a paragraph that begins

4 "fifth". Do you see that? It's on the typed page

5 two.

6    A. Yes, I see it.

7    Q. Would you read that paragraph, please?

8    A. "Government agrees that the statement" --

9    MR. OTERI: I can't hear him.

10    A. "The Government agrees that the

11 statements, information, evidence and testimony that

12 your client provides pursuant to this agreement

13 cannot be used either directly or indirectly against

14 his brother Joseph Capano or his sister Marion."

15    Q. Why did you ask for that term to be put

16 in the plea agreement?

17    A. Because I didn't know if they had said

18 anything or not said anything to get them in trouble,

19 and I was just trying to protect everybody.

20    Q. Then paragraph six, or right after that,

21 it says "The Government will not prosecute Edward

22 Delcollo for unlawful possession of firearms."

23    Who is Edward Delcollo?

**Page 126**

1    A. He's my best friend.

2    Q. Why did you want the Government not to

3 prosecute him?

4    A. Because of me they raided his house.

5    Q. And why would that cause him to be in any

6 harm?

7    A. They found all his hunting guns.

8    Q. Do you know who purchased one of those

9 guns?

10    A. I may have.

11    Q. Are you aware it's illegal to purchase a

12 gun for a convicted felon?

13    A. Yes.

14    Q. Now, other than your attorney, had you

15 discussed -- did you discuss before November 8, 1996,

16 the conversations that you've testified about that

17 you had with your brother Tom? Had you discussed

18 that with anybody other than your attorney?

19    A. Not in detail. I did with my attorney.

20    Q. But had you discussed them with anybody

21 else?

22    A. Yes.

23    Q. Who was the person you discussed them

**Page 127**

1 with?

2    A. My friend Rudy, Rudy Dryden.

3    Q. Had you discussed them with any family

4 members?

5    A. I told my brother Louis.

6    Q. Do you recall when you told your brother

7 Louis?

8    A. I know it was around the holidays. It

9 was chilly out. I remember it was at my house at 7

10 Emma.

11    Q. What holiday season are you talking

12 about?

13    A. I'm not real sure, Mr. Connolly. I know

14 it was chilly out. I can remember what he was

15 wearing. I'm not real sure on the exact dates.

16    Q. Have you ever used cocaine?

17    A. Yes.

18    Q. Have you ever used marijuana?

19    A. Yes.

20    Q. Did you use cocaine and marijuana on a

21 frequent basis in 1995 and '96?

22    A. I did.

23    Q. Has the amount of cocaine you used

**Page 128**

1 affected -- strike that. I'm sorry, I'll withdraw

2 the question.

3    Did the amounts you used change after

4 June 28, 1996?

5    A. It did. I used more.

6    Q. Why?

7    A. Excuse me?

8    Q. Why?

9    A. For me it relieves a lot of stress.

10    Q. About how much cocaine on average were

11 you using in '95 and '96, before June 28, 1996?

12    A. Gram or two a week. Sometimes I would do

13 more; some weeks I would do less. Some weeks I

14 wouldn't do any at all. But on an average, one or

15 two grams a week.

16    Q. How about after June 28th?

17    A. Two to four. But, again, sometimes I

18 would do it; sometimes I wouldn't do it. Sometimes I

19 would do more. Sometimes I would do less. On an

20 average, it increased.

21    Q. Do you know whether you were high on

22 cocaine or any other substance when your brother Tom

23 had the conversations with you that you've testified

**Page 109**

1  had it written down, did you?

2  A. Excuse me, I never told Tom that I had

3  it --

4  Q. That you had written down this alibi?

5  A. I don't know if I did or I didn't.

6  Q. All right. Now, sir -- now, sir, your

7  brother Tom, when was the last time you talked to him

8  before June 28th, that Friday?

9  A. I don't know.

10  Q. Okay. You had not had any meetings set

11  up for June 28th with Tom in advance?

12  A. Oh, no.

13  Q. And Tom had not called you at any time

14  and said be there on the 28th, I'm going to be there?

15  A. No.

16  Q. Matter of fact, Tommy knew you spent most

17  of your time down at the beach during the summer,

18  correct?

19  A. That's correct.

20  Q. He had no way of knowing you were going

21  to be home, correct?

22  A. Yes.

23  Q. Okay. And on the drive down to Stone

**Page 110**

1  Harbor -- by the way, Tommy was driving at about 80

2  miles an hour?

3  A. He was driving fast.

4  Q. And you had to slow him down?

5  A. I think so. I'm not real sure. I'm not

6  real sure about that.

7  Q. He was very agitated and very upset, he

8  was very high strung?

9  A. Yes, at that point I think we both were

10  agitated and upset.

11  Q. He was not the calm, reasoned, rational

12  lawyer that you know?

13  A. That's correct.

14  Q. He was a guy running around like a nut?

15  A. He was very nervous.

16  Q. Now, sir, when you were driving down to

17  Stone Harbor with Tom in the car, you asked Tom what

18  happened and he wouldn't tell you, correct?

19  A. I don't know if that -- I don't remember

20  that. I mean --

21  Q. You don't remember that?

22  A. No.

23  Q. You do remember --

**Page 111**

1  A. Tom has never told me what happened.

2  Q. You do remember that Tom never told you

3  what happened?

4  A. Yes, I do remember that.

5  Q. And you do remember, and you have

6  testified in the past, that you don't know what the

7  motive was for what happened with that lady?

8  A. Yes, that's true.

9  Q. You don't know if there was a weapon

10  involved?

11  A. That's true.

12  Q. You don't know whether her death was

13  intentional?

14  A. That's true.

15  Q. You don't know whether it was just a

16  reckless act that resulted in her death?

17  A. That's true.

18  Q. You don't know whether it was a negligent

19  act?

20  A. That's true.

21  Q. And you don't know whether it was an

22  accident?

23  A. I don't know what happened, Mr. Oteri.

**Page 112**

1  Q. Now, when Mr. Connolly asked you

2  yesterday if Tommy told you that her death was the

3  result of an accident, you said he hadn't told you?

4  A. He did not tell me.

5  Q. He didn't tell you anything?

6  A. That's right. He didn't tell me

7  anything.

8  Q. All right. Now, sir, when you came back

9  in on the 28th from the ocean, you ended up going bar

10  hopping that night, correct?

11  A. Yes, sir.

12  Q. Did you go out with Eddie Delcollo?

13  A. Excuse me?

14  Q. Did you go out with Eddie Delcollo?

15  A. Delcollo.

16  Q. Delcollo?

17  A. Yes, sir.

18  Q. And you did some drinking?

19  A. Excuse me?

20  Q. You did some drinking?

21  A. A lot.

22  Q. You did some drugs?

23  A. I may have.

Page 137

1    A.  I think Tom was more mad about it than I
2  was.
3    Q.  But you were pretty mad, were you not, to
4  suddenly find yourself in the papers accused of being
5  an unfit parent?
6    A.  That's a joke.  I'm not an unfit parent.
7    Q.  But you were upset by it, were you not?
8    A.  You would be too, I think.
9    Q.  Gerry, you are absolutely right.  I would
10  be.  But you were upset?
11    A.  Sure, it's fair to say.
12    Q.  Now, Gerry, do you remember making a
13  phone call and leaving this message on February 9th,
14  1998, to your mother:
15      Mom, this is your son Gerry.  I called
16  you but Katie hung up on me.  Then I called again,
17  and her little asshole boyfriend hung up on me.  You
18  have ten minutes to call me back.  If you don't, you
19  can go fuck yourself.
20      Do you remember making that call to your
21  mother?
22    A.  I was drinking that day, and I remember
23  apologizing afterwards.

Page 138

1    Q.  But you did make the call?
2    A.  I'm not saying I didn't.
3    Q.  And you apologized for it afterwards,
4  correct?
5    A.  It's not nice to talk to my mother like
6  that.  I was drinking and very upset.
7    Q.  And you do things when you're drinking
8  and upset?
9    A.  I made a mistake.
10    Q.  How about the second call, Gerry.  Do you
11  remember this?  Do you remember saying this?
12      Mom, this is your son.  Mom, your son
13  Gerry.  You better fucking call me.  I'm tired of
14  being the bad guy.  If you don't fucking call me,
15  you'll never fucking see me or my wife or my kids
16  again.  What, are you pissed because I told the
17  truth?  Because Joe fucking Hurley couldn't break me
18  down?  As far as I'm concerned, you have three sons.
19  One is a murderer in jail for fucking life, one you
20  hate and that's Louie, and Joey.  Like I said, you
21  can go fuck yourself.  Did you really think that I
22  would go to jail for 12 fucking years?  If you
23  thought I was bad on the stand, God fucking help you

1  if this goes to trial.  I'll think up even more shit
2  to keep my ass out of fucking jail.  And I'll make up
3  fucking shit as I go along to keep Tommy in there for
4  fucking life.  I hate him.  You got ten fucking
5  minutes to call me back or you'll never see my kids
6  again.  I'm not threatening you, but if you don't
7  call me back in ten minutes, you can go fuck
8  yourself.  My number is 561 361-4145.
9      Did you make that call and make that
10  statement, Gerry?
11    A.  I'm sure I did, if you have it on tape.
12    MR. OTERI:  Thank you.  I have no further
13  questions, Your Honor.
14    MR. CONNOLLY:  I have a few questions,
15  Your Honor.
16      First of all, I'd like to at this point
17  move to admit the entire proof positive hearing
18  transcript into evidence.
19    MR. MAURER:  Your Honor, during the lunch
20  hour, could I review it again and take a position?
21    THE COURT:  All right.  Do we need to do
22  that at this time?
23    MR. CONNOLLY:  I'm happy to wait until

Page 140

1  after lunch.
2    THE COURT:  Do you have redirect of this
3  particular witness?
4    MR. CONNOLLY:  I have.  I do have
5  redirect.
6    THE COURT:  And how long do you
7  anticipate it will take?
8    MR. CONNOLLY:  More than five minutes.
9    THE COURT:  All right.  Then we'll take
10  the luncheon recess.  You can take the jury out.  We
11  will reconvene, hopefully, at two o'clock.
12      (The jury left the courtroom at 12:52
13  p.m.)
14    THE COURT:  Would everybody in the
15  courtroom, except the jury, please be seated.  Anyone
16  who is up will be not be admitted back into the
17  courtroom again.
18      Counsel want to make argument on this
19  issue before the luncheon break or afterwards?
20    MR. MAURER:  I'd like, assuming I'm the
21  one, afterwards, Your Honor.
22    THE COURT:  Then I would suggest we meet
23  in chambers at quarter of two.

Page 5

1   A. Yes, I have.

2   Q. And you signed a document?

3   A. Yes, I have.

4   Q. Have you actually gone into court and
5   entered your plea yet?

6   A. No, I have not.

7         MR. WHARTON: Your Honor, I think,
8   without objection, we would offer as the State's next
9   exhibit Mr. Capano's written plea agreement.

10         MR. MAURER: It is without objection,
11   Your Honor.

12         THE COURT: All right. It may be so
13   marked and admitted as State's Exhibit 124.

14         THE CLERK: So marked.

15         (Whereupon State's Exhibit No. 124, Louis
16   Capano's plea agreement, was received into evidence.)

17         THE COURT: Thank you.

18   BY MR. WHARTON:

19   Q. Mr. Capano, let me show you State's
20   Exhibit 124 and ask you to take a look at that. Is
21   that, in fact, the agreement in which you entered
22   with the Federal Government?

23   A. Yes, it is.

Page 6

1   Q. And it indicates that you're going to be
2   entering a guilty plea to a particular crime, does it
3   not?

4   A. Yes, it does.

5   Q. What is that crime to which you're going
6   to be entering a guilty plea?

7   A. Tampering with a witness.

8   Q. Is there a sentence which you -- which
9   the Federal Government is going to recommend that you
10   receive as a result of entering that guilty plea?

11   A. Yes, there is.

12   Q. What is that sentence?

13   A. One year probation.

14   Q. Now, do you have any obligations yourself
15   under that plea agreement?

16   A. Just to tell the truth.

17   Q. And you're required to testify truthfully
18   if called upon by the Government?

19   A. Yes, that's correct.

20   Q. Now, if you do not testify truthfully
21   when called upon to do so by the Government, what do
22   you understand the consequences of that failure to
23   be?

Page 7

1   A. That my agreement would be severed, I
2   suppose, and I could be prosecuted for other crimes.

3   Q. You have testified in front of a Federal
4   Grand Jury, have you not?

5   A. Yes, I have.

6   Q. In connection with this case?

7   A. Yes, I have.

8   Q. How many times have you testified?

9   A. Three times.

10   Q. Was the first one on August the 29th of
11   1996?

12   A. Yes, it was.

13   Q. And the second one was that on October
14   the 8th of 1996?

15   A. Yes.

16   Q. And the last one, was that on November
17   12th of 1997?

18   A. Yes, it was.

19   Q. And each time you testified, did that
20   testimony relate in some fashion to your brother
21   Thomas?

22   A. Yes, it did.

23   Q. Now, is he -- how does he fit in in the

Page 8

1   chronological range of your family, of your siblings?

2   A. He's the oldest brother, the second
3   sibling, second child.

4   Q. Second child. You have a sister who is
5   older than he is?

6   A. My sister Marion is the oldest, then Tom,
7   then myself, my brother Joseph, and my brother
8   Gerard.

9   Q. What is the age difference between you
10   and your brother Thomas?

11   A. Tom and I are two years apart.

12   Q. And between you and Joseph?

13   A. One year apart to the day.

14   Q. How about that.

15         Between Joseph and Gerard?

16   A. I think ten years.

17   Q. How about you and Gerard?

18   A. Eleven years.

19   Q. Okay. He's sort of the baby of the
20   family?

21   A. Yes, he is.

22   Q. I want to direct your attention to July
23   the 30th of 1996. Do you recall -- I misspoke, I saw

**Page 9**

1  the look on your face. I meant June the 30th. My
2  fault. June the 30th of 1996. I'll ask you if you
3  had a conversation or any communication with your
4  brother Thomas on that date?
5      A. Sunday?
6      Q. Yes, that would be a Sunday.
7      A. Tom called me mid-morning at my house and
8  asked me to go over to his house on Grant Avenue,
9  that he wanted to talk to me about something.
10     Q. Did you do that?
11     A. I did.
12     Q. When you got there, who was there?
13     A. Tom was there and his four daughters
14  and -- my four nieces.
15     Q. Did you have a conversation with him?
16     A. Yes, Tom and I went back to an enclosed
17  porch in the back of the house and he then told me
18  about his relationship with Anne Marie Fahey.
19     Q. Did you know that he had had a
20  relationship with Anne Marie Fahey --
21     A. No, I did not.
22     Q. -- before he told you on that date?
23     A. No, I did not.

**Page 10**

1      Q. Did you know that he had had -- had or
2  was having a relationship with anyone at that point?
3      A. No, I did not.
4      Q. You were aware of his marital status at
5  that time?
6      A. I knew he was separated from his wife
7  Kay, but I wasn't aware of any -- any extramarital
8  affairs at all.
9      Q. Did you know Debbie MacIntyre?
10     A. Yes.
11     Q. And how did you know her?
12     A. I'm sorry?
13     Q. How did you know her?
14     A. I've known her for years. She teaches
15  at, or taught at, Tatnall School, and my son Louis
16  the third went there, and I've known her.
17     Q. And you did not know of any relationship
18  between your brother and Debbie MacIntyre?
19     A. None whatsoever.
20     Q. What did he tell you about this
21  relationship with Anne Marie Fahey on June the 30th?
22     A. He told me he had been seeing her for a
23  couple of years, that she was anorexic and bulemic

**Page 11**

1  and suicidal, and that he had ended the relationship,
2  and that he was seeing a psychiatrist with his wife,
3  Kay, and that he had taken her for dinner on Thursday
4  night in Philadelphia and that the police had gone to
5  his house on Saturday in the morning, I guess, Sunday
6  morning, two a.m. or three a.m.
7      Q. During the middle of the night?
8      A. During the middle of the night. And had
9  questioned him about her whereabout's. And since he
10  was the last one to be seen with her, he was
11  concerned that they suspected of him some wrongdoing.
12     Q. Now, this relationship with Anne Marie
13  Fahey, I think you indicated that he said that they
14  had -- they had broken up, or they were not seeing
15  each other?
16     A. Yes, he told me that.
17     Q. But they had dinner on Thursday night
18  previous?
19     A. Right.
20     Q. Did he describe to you what the nature of
21  that relationship with her was at that time?
22     A. He said at that point they were good
23  friends and he had even given her money to seek help

**Page 12**

1  for bulemia, or whatever, and that was the extent of
2  their relationship at that point.
3      Q. Okay. That help that he was referring
4  to, was that psychological help?
5      A. Yes.
6      Q. Did he tell you whether or not his wife
7  Kay knew of this relationship he had with Anne Marie
8  Fahey?
9      A. No, he told me that she did not know, and
10  he did not want her to know. He was seeing a
11  psychiatrist with Kay and they were trying to
12  reconcile their marriage.
13     Q. Well, did he tell you -- you've told us
14  that he told you that he was questioned by the police
15  about Anne Marie Fahey's disappearance?
16     A. Yes, he told me that.
17     Q. What did he tell you -- and then that he
18  told you they had had dinner on Thursday night?
19     A. That's correct.
20     Q. What did he tell you about his activities
21  that night with Anne Marie Fahey?
22     A. He told me that after dinner they had
23  gone to his house, and that while he was upstairs

Page 13

1  using the men's room that when he went downstairs
2  that Anne Marie Fahey had slit her wrists and got
3  blood on the sofa. And I asked him if he had taken
4  her to the hospital, and he said they were
5  superficial wounds and that he had bandaged them up
6  and took her home.
7      Q. Do you recall if he told you when he
8  returned from Philadelphia or when he took her home;
9  either of those two?
10     A. I don't think he ever told me when he
11 returned from Philadelphia. I believe he told me he
12 took her home nine or ten o'clock.
13     Q. Now, these wounds that she sustained, did
14 he tell you whether or not she bled, as a result of
15 those wounds?
16     A. Yes, he said she bled.
17     Q. And where did he tell you that she bled?
18     A. On the sofa.
19     Q. Were you familiar with that sofa?
20     A. No, I was not.
21     Q. To your knowledge -- did you know what
22 room in the house it was in?
23     A. No, I had never been in the house before

Page 14

1  on Grant Avenue. That was the first time.
2      Q. What did he tell you he did with the
3  sofa?
4      A. He told me that he and my brother Gerry
5  put the sofa in one of our dumpsters on Foulk Road
6  and Concord Pike where we were building the First USA
7  space.
8      Q. Where is that in relation to your office?
9      A. We're in the same office complex. It's a
10 hundred yards away from my particular building.
11     Q. And were you familiar with what he was
12 talking about when you refer to those dumpsters?
13     A. Yes, I was.
14     Q. Was there more than one dumpster at that
15 site?
16     A. I believe there were two or three.
17 Probably three.
18     Q. Did he tell you at that time whether or
19 not he had put any other things in the dumpster
20 besides the couch?
21     A. He told me he put some of her personal
22 belongings, like a nightgown and a hair brush,
23 something like that.

Page 15

1      Q. And that he had done this with your
2  brother Gerry?
3      A. Yes.
4      Q. Now, as of Sunday, he told you that the
5  police told him that Anne Marie Fahey was missing?
6      A. That's correct.
7      Q. Did he tell you whether or not he
8  expected Anne Marie Fahey to appear?
9      A. Yes, he told me that he had given her
10 money and she was planning to take Friday off and
11 that he suspected that she was just away for the
12 weekend at the beach and that she would show up on
13 Monday.
14     Q. Now, this meeting that you had with him
15 on Sunday, who initiated that?
16     A. He did. He called my house.
17     Q. He told you that he expected that Anne
18 Marie Fahey would be back to work on Monday?
19     A. I'm sorry, I was confused. I thought you
20 meant who initiated the meeting at his house on
21 Sunday.
22     Q. That's right.
23     A. He initiated that.

Page 16

1      Q. And he told you that Anne Marie Fahey
2  would be at work on Monday?
3      A. Yes. At the meeting on Sunday he told me
4  that.
5      Q. Right. After that conversation concluded
6  with your brother at his house, did you actually go
7  look at the dumpster?
8      A. Yes, I went up to the job site and I was
9  curious enough to look in the dumpster, and I saw
10 something that could have been a sofa or a chair. It
11 was turned upside down and mostly covered with
12 construction debris, but I did see two legs
13 upside-down, like the leg of a chair, or the leg of a
14 sofa, just about this much.
15     MR. WHARTON: Your Honor, I think without
16 objection, the State would offer this photograph as
17 the next State's Exhibit.
18     MR. MAURER: Agreed, Your Honor. No
19 objection.
20     THE COURT: Thank you, Mr. Maurer. That
21 would be State's Exhibit Number 125. It is admitted
22 without objection.
23     THE CLERK: So marked.

Page 17

1    (Whereupon State's Exhibit No. 125,
2  photograph, was received into evidence.)
3    THE COURT: Thank you.
4  BY MR. WHARTON:
5    Q. Mr. Capano, let me show you State's
6  Exhibit 125. Do you recognize what's depicted in the
7  photograph?
8    A. Yes, I do.
9    Q. What is it in the photograph?
10    A. They're the office buildings that First
11  USA occupies.
12    Q. The actual dumpsters, the location of the
13  dumpsters, is that visible in the photograph?
14    A. No.
15    Q. Where, if you could orient the dumpsters,
16  are they?
17    A. Well, there was a dumpster in the front
18  of this one building on the left side of the picture,
19  but there were -- there were -- there was at least a
20  dumpster or two dumpsters behind the building.
21    Q. The dumpster you looked in, where was
22  that?
23    A. It was behind the building on the left.

Page 18

1    Q. You said you saw something in there. How
2  much of a piece of furniture did you see?
3    A. I really only saw two legs, about this
4  long.
5    Q. Okay.
6    A. And the sofa was upside-down.
7    Q. And you saw two legs. What prevented you
8  from seeing anymore of what was attached to the legs?
9    A. The sofas were covered by construction
10  debris, drywall, things like that.
11    Q. Did you speak with your brother anymore
12  that day?
13    A. Yes, Tom called me later in the day,
14  later in the afternoon, to tell me that when he took
15  his children home to 17th Street where his wife
16  Kay -- where they live, that the police were waiting
17  for him there when he dropped the girls off, and that
18  they wanted to go back to his Grant Avenue house and
19  look through the house and search the house, and he
20  called me, and I recommended at that time that he
21  hire an attorney.
22    Q. Now, did he tell you what he -- what, if
23  anything, to do about that dumpster where he had told

Page 19

1  you he and your brother Gerry had placed the couch?
2    A. He told me to have it dumped on Monday
3  morning.
4    Q. What's that process, I mean when you dump
5  a dumpster?
6    A. Usually the superintendent or somebody
7  who is running the construction job would call the
8  company that -- the garbage company, and they would
9  just come with a truck and basically pull the
10  dumpster out, take it to the landfill, I guess.
11    Q. These dumpsters that we're talking about,
12  I guess dumpsters come in different shapes and sizes.
13  Can you describe this particular type of dumpster?
14    A. I would say that this dumpster was about
15  five feet tall on three sides and opened -- and long
16  and narrow and opened at one end of it.
17    Q. Long and narrow, kind of like, where
18  they're sitting, and open here?
19    A. Right. Up about five feet.
20    Q. Not one of those with the top that sort
21  of --
22    A. No. No.
23    Q. Monday morning did you recall what he

Page 20

1  wanted you to do? Did you have the dumpster pulled?
2    A. Frankly, I had forgotten all about it.
3  It really wasn't a priority. I didn't really see
4  the -- I didn't see the urgency in any of it at all.
5  And Tom called me mid-morning, I don't know, nine or
6  ten o'clock, I don't remember exactly, and told me
7  that she had not shown up for work.
8    Q. "She" would be?
9    A. Anne Marie had not shown up for work, and
10  asked me if I had dumped the dumpsters, and I said,
11  No. He said, Could you get the dumpsters dumped?
12  And I said, Sure, and I did.
13    Q. How did you arrange for that to be done?
14    A. Well, I called Chris Nolan who works for
15  me, and he called Karen Feeney, and Karen Feeney
16  called Shaw Taylor, and Shaw Taylor told Dick
17  Armstrong, and Dick Armstrong told my son Louis the
18  third, who happened to be working there for his
19  college break, and that's what happened.
20    Q. Okay. After you had the dumpster dumped
21  with that chain of people involved in having it
22  done -- is everything that complicated in the
23  developing business?

1    A.  Well, the dumpsters --

2    Q.  That's okay.

3    A.  The dumpsters weren't full.

4    MR. MAURER:  Maybe I should object, so we

5  don't have to get into it.

6    THE WITNESS:  I'm sorry.

7  BY MR. WHARTON:

8    Q.  You said the dumpsters weren't full?

9    A.  Yes.

10    Q.  Okay.  Now, after, or at some point, did

11  you become aware of any significant publicity

12  regarding this dinner your brother had had with Anne

13  Marie Fahey and the fact that she was missing?

14    A.  Yes, within a couple of days publicity

15  was rather great.

16    Q.  And did you have any more conversations

17  with your brother about whether Anne Marie Fahey

18  would appear shortly or soon, or if at all?

19    A.  Yes, Tommy always told me that -- he

20  swore to me that he took her home, that she was

21  probably away.  She used to work in Washington, D.C.

22  with congressmen and that she had friends from all

23  over the country, and that he was sure that she was

---

**Page 22**

1  just an unhappy, troubled woman, and that she was

2  just away, maybe even getting help for her bulemia,

3  whatever, and that she would show up sooner or later.

4    Q.  Did he report to you any purported

5  sightings of Anne Marie Fahey?

6    A.  Yes, one time in particular he told me

7  that she was spotted at the Newark International

8  Airport.

9    Q.  That's in Newark, New Jersey?

10    A.  Newark, New Jersey.

11    Q.  Do you recall going to a meeting with

12  your brother Thomas attended by a number of other

13  people at Mr. Oberly's office?

14    A.  Actually, I think it was at Bart Dalton's

15  office.

16    Q.  Okay.  I'm sorry.  And do you remember

17  some of the people who were there?

18    A.  I believe Bart Dalton was there and Mike

19  Harkins was there, and a fellow named Parkins I think

20  was there, and maybe Brian Murphy, myself.

21    Q.  Mike Harkins is -- who is he?

22    A.  He's a former Secretary of State, and I

23  think he is, I guess his title is -- has something to

---

**Page 23**

1  do with the bridges, the Delaware Memorial Bridges.

2    Q.  Delaware Bay Authority?

3    A.  Yeah, I think he's head of the River and

4  Bay Authority.

5    Q.  Who is Bob Harkins?  You may have said

6  Parkins.  I call him Bob.

7    A.  I don't know what he does now.  He used

8  to work with Tommy when Tom worked for the governor's

9  office.

10    Q.  Would it be fair to say that at least one

11  of the reasons for this meeting was to discuss a

12  public relations strategy for dealing with the bad

13  publicity your brother was getting?

14    A.  That was the purpose of the meeting at

15  the time, yes.

16    Q.  Now, at any time during this meeting did

17  your brother say to the group that had been assembled

18  there that this was an accident?

19    A.  No, he did not.

20    Q.  How long did the meeting last?

21    A.  It lasted an hour or so.

22    Q.  Did you become aware that your brother's

23  home on Grant Avenue had been the subject of a search

---

**Page 24**

1  warrant, the execution of a search warrant?

2    A.  Yes.

3    Q.  Where did your brother live after the

4  institution of that search warrant?

5    A.  He lived at my house.

6    Q.  Did he move in directly after the search

7  warrant?

8    A.  Yes, he did.  I believe he moved in that

9  same night.

10    Q.  Did you also become aware that there were

11  searches being conducted of several dump sites?

12    A.  Yes.

13    Q.  Did your brother ever tell you any

14  objects that might be found during these searches of

15  the dump sites?

16    A.  Well, when they were searching the dump,

17  he told me that he had thrown a gun in the dumpster

18  and that he -- and that he hoped they found it in the

19  dump because it would prove that it had never been

20  shot.

21    Q.  Now, did you know your brother to be

22  someone who possessed guns?

23    A.  No.

Page 153

1  Jim Florio did a stop by because he had an event prior
2  to our event that was being hosted by attorneys.
3      Q. Did Mr. Capano's firm at the time sponsor in
4  any way that fund raiser?
5      A. I have no idea.
6      Q. Or a fund raiser for Governor Florio held
7  around the same time?
8      A. For your first question, did you mean did we --
9  did his firm sponsor our event?
10      Q. Yes.
11      A. No, they did not.
12      Q. Did I hear you correctly say you don't recall
13  who introduced you to Tom Capano?
14      A. No.
15      Q. Could it have been one of the Governors, Florio
16  or Carper?
17      A. It's too long ago to remember.
18      MR. O'DONNELL: Well, I won't ask anymore
19  questions about it.
20      MR. CONNOLLY: No further questions. The
21  witness may be excused.
22      MR. WHARTON: State calls Siobhan Sullivan.
23

Page 154

1      SIOBHAN SULLIVAN,
2      the witness herein, having first
3      been duly sworn on oath, was examined
4      and testified as follows:
5      DIRECT EXAMINATION
6  BY MR. WHARTON:
7      Q. Good afternoon.
8      A. Good afternoon.
9      Q. Who do you work for?
10      A. Delaware State Police.
11      Q. How long have you been with the Delaware State
12  Police?
13      A. Just short of 12 years.
14      Q. Right now what is your assignment with the
15  police?
16      A. Executive protection or for the Governor.
17      Q. How long have you been doing that work?
18      A. Little over five and a half years.
19      Q. When did you begin doing that?
20      A. His first election, '92.
21      Q. Was there interruption in your service?
22      A. Yes, February '98 to September '98.
23      Q. You were doing other work for the State Police

Page 155

1  at that time?
2      A. Yes. Back at Troop 9 in Odessa.
3      Q. What were your responsibilities with the
4  Executive Security Unit as related to the Governor?
5      A. We protect the family as well as the Governor.
6  But the day I would be working with the Governor, I
7  would pick up the Governor at his residence. Knowing
8  his schedule prior to the day before I would pick up the
9  Governor, I would contact Anne Marie who was the
10  scheduler for the Governor and learn about his schedule.
11  So I would have the Governor's schedule ahead of time
12  through Anne Marie. And I would pick up the Governor
13  that day or I would drive and protect him to every event
14  until his duration that night.
15      Q. When he was not at an event, but rather in one
16  of his offices, would you also be at the office?
17      A. I'm sorry, I didn't hear you.
18      Q. Let's say he was not at an event and he was at
19  an office -- He had an office in Wilmington; is that
20  right?
21      A. Yes.
22      Q. And did he also have an office in Dover?
23      A. Yes. Tatnall Building.

Page 156

1      Q. When he was at one of those building where were
2  you?
3      A. With him. We have an office in both buildings.
4      Q. So if the Governor is at work in the office you
5  are at that office?
6      A. That's correct.
7      Q. You mentioned Anne Marie. You knew Anne Marie
8  Fahey; is that correct?
9      A. Yes, I did.
10      Q. How is it you got to know her?
11      A. I met Anne Marie the first day I joined the
12  Governor's staff Executive Protection. Like I said she
13  was his right-hand person, his scheduling secretary.
14      Q. How closely did you work with-- I mean, I'm
15  talking about you pleural, like the Executive Security
16  Unit, work with her?
17      A. I would say, to compare it, the Governor looks
18  at us as his right-hand person and know his day is going
19  to go well because we are there. He has a lot of trust
20  in us. I would look at Anne Marie as my right-hand
21  person where she is setting my day so my day would flow
22  correctly to the Governor.
23      Q. You had to have a lot of contact with her?

Page 157

1  A. Yes. One on one.

2  Q. At some point, would you say that you became

3  friendly with her?

4  A. Yes, I did.

5  Q. At some point -- Well, first of all, let me

6  back up. Did you know the defendant?

7  A. Yes, I did.

8  Q. And how was it that you met him?

9  A. Anne Marie Fahey introduced me on an occasion

10  down at Woodburn, which is a mansion to the Governor.

11  They had an event there and Anne Marie introduced me to

12  Tom Capano.

13  Q. Prior to your introduction by her, did you know

14  that they were friends?

15  A. Yes, I did.

16  Q. How did you know that?

17  A. Anne Marie and I used to always talk when we

18  were in the Governor's office. And she was saying she

19  was going to a concert or possibly going to an event

20  which was a pretty high event with the Governor's

21  office. And I would joke around with her, where did you

22  get tickets? Tell me. And she would say Tom Capano

23  bought her the tickets.

Page 158

1  Q. Do you know whether she considered him a close

2  friend of hers?

3  A. Yes. Throughout our friendship, prior to Anne

4  Marie disappearing, she would say that she looked at Tom

5  Capano as one of her best friends and she would talk to

6  him occasionally.

7  Q. At some point, did she tell you about perhaps,

8  leaving the Governor's office?

9  A. Yes. That was around spring of '95. She had

10  told me that-- Let me go back. It is very stressful in

11  what our jobs are with the Governor between security and

12  executive scheduler. Mine would be stress would be

13  safety-wise, Anne Marie's stress level would be she had

14  to make sure the schedule went -- flowed correctly for

15  the Governor. And we had a lot of stress. We probably

16  have the most stress of anybody in the office I would

17  say. And she had told me that Tom Capano had offered

18  her a job at Louie Capano's office.

19  Q. When did you say that was?

20  A. Spring of '95.

21  Q. Obviously she didn't take that job?

22  A. No, she did not.

23  Q. Did --

Page 159

1  MR. MAURER: Can I interrupt for a moment to

2  consult with counsel?

3  THE COURT: Certainly.

4  MR. MAURER: Can we take just a moment, your

5  Honor?

6  THE COURT: Certainly.

7  THE COURT: Mr. Wharton.

8  BY MR. WHARTON:

9  Q. I think what I last asked you about was this

10  job offer Anne Marie told you was being made, or

11  attempted to be made, by the defendant with his brother

12  Louis Capano's business and she did not ultimately

13  accept that job, correct?

14  A. Yes.

15  Q. She stayed with the Governor's office?

16  A. Yes.

17  Q. So you knew she didn't take the job. Did you

18  have a conversation with the defendant himself?

19  A. Yes, I did.

20  Q. How did that conversation get initiated?

21  A. Tom Capano would usually call me on my pager

22  and leave a phone number for me to call him back. And I

23  received a page and returned Tom Capano's call.

Page 160

1  Q. He had paged you and you returned his call?

2  A. Yes.

3  Q. And what did he tell you?

4  A. He asked me -- there was different times that

5  Mr. Capano had called me over several occasions and a

6  lot of times he would ask if I wanted to get out and get

7  a beer. It was always when I got done work that night

8  with the Governor. And he knew I coached basketball and

9  wanted me to help his kids, coach them in some

10  basketball. And at that time he wanted to know if I

11  wanted to go get a beer and talk about basketball. I

12  said no, I had a long day, I need to get home. At which

13  time he asked if I had spoken to Anne Marie today. And

14  he said, "She's really mad at me."

15  And I said, "You have to just let her be, Tom."

16  And he goes, "You know I left my wife and I'm

17  just really lonely right now."

18  Q. And did he indicate whether or not they had an

19  argument of some sort?

20  A. Yes. He stated that they had a fight that day

21  and Anne Marie was really mad at him.

22  Q. Did he also indicate to you whether he did, in

23  fact, do anything about trying to get her a job with his

Page 161

1    brother?

2        A. When I talked-- We talked about the stress

3    level of the Governor's office. And Tom also talked to

4    me that he offered Anne Marie a job at his brother's

5    Louie's office, and Anne Marie refused to take the job.

6        Q. When did you next see Anne Marie Fahey?

7        A. I know I was off that weekend, so it had to be

8    soon after that. We usually work every couple days

9    after, so it had to be the following week.

10       Q. Do you know if that was before Christmas of '95

11   or after?

12       A. It was before Christmas of '95.

13       Q. Did you tell her about your conversation with

14   the defendant?

15       A. Yes. I always told Anne Marie when Tom Capano

16   would call me. And at that certain time Anne Marie

17   became very upset.

18       Q. What did she tell you?

19       A. When I told her Tom Capano called me and paged

20   me and asked if I had talked to her and he told me that

21   Anne Marie was very upset with him, and I told Anne

22   Marie that, she said, "He is a possessive, controlling

23   maniac. I'm just getting tired of him."

Page 162

1            And stormed out of my office and went back to

2    her office.

3        Q. Were you aware of whether or not she was around

4    Memorial Day of 1996, whether she was going away?

5        A. Yes, I was.

6        Q. Where did you understand she was going?

7        A. She was going to the New England area with her

8    boyfriend, Mike Scanlon.

9        Q. Did you have any-- You knew about Mike Scanlon?

10       A. Yes.

11       Q. Did you have any contact with the defendant

12   around that time?

13       A. Yes, I did.

14       Q. Tell us about that contact.

15       A. Once again, I received another page, at which

16   time Tom Capano had called me.

17       Q. Was this while she was away or before she went

18   away?

19       A. While she was away.

20       Q. And he paged you?

21       A. I returned the page, and he asked me if I had

22   talked to Anne Marie, and I said no. And he asked me if

23   I knew where Anne Marie was and I said no. He kept it

Page 163

1    very short, asked how I was doing. And basically we

2    ended the phone conversation after how I was doing, what

3    was I doing for the weekend.

4        Q. Now, did you talk with Anne Marie after she

5    came back?

6        A. Yes, I did.

7        Q. And did you report to her that Tom Capano had

8    inquired of you about her whereabouts?

9        A. Yes, I did. I told Anne Marie, once again, in

10   our office that Tom Capano had paged me and was asking

11   if I knew where she was or if I have talked with her.

12       Q. What was her response to you?

13       A. At that time, very adamantly said, "He's

14   fucking stalking me."

15           And I tried to calm Anne Marie down. I said

16   Anne Marie there is a charge, there's a crime against

17   that, we can give you protection. We are here for the

18   Governor, but we are also here for the staff and we can

19   provide protection.

20       Q. What was her response?

21       A. At that time I think she felt she could handle

22   it at that time and repeated that she had to end it with

23   Tom Capano.

Page 164

1        Q. Do you know when if she got back if she

2    had -- did she tell you she had any concerns when she

3    got back from new England?

4        A. When I told her about him paging me, she stated

5    she was afraid Tom Capano was going to wait for her and

6    she did not want Mike and Tom having a confrontation,

7    she was afraid of that.

8        Q. Did she indicate whether Mike Scanlon knew

9    about her relationship with Tom Capano?

10       A. Throughout our conversations, throughout our

11   relationship with working and Tom Capano came up, she

12   told me she did not tell Mike Scanlon about Tom Capano.

13       Q. Now, did you also talk to her about Mike

14   Scanlon?

15       A. Yes.

16       Q. And what did she tell you about Mike Scanlon

17   how she felt about him?

18       A. She felt very highly of Mike Scanlon. For a

19   time there, the last year, Anne Marie was very down,

20   looked very upset and down. And seemed like when she

21   met Mike Scanlon her life came back into her. She

22   wasn't as down in the office, looking forward to getting

23   together with Mike Scanlon. She felt -- I felt with her

1 you don't transfer it to anyone. You just hold on to
2 it, and if the F.B.I. shows up with a search warrant,
3 then they're going to seize that anchor, but we're
4 not going to play games with it.
5     There came a time when Gerry told me that
6 he didn't have the anchor; that he had been requested
7 by Tom to turn the anchor over to him or his lawyers
8 so that Tom's lawyers could take a picture of the
9 anchor, and from the memo I guess this was when I
10 learned that Gerry didn't have the anchor even though
11 I had told him to keep the anchor.
12     When I realized that Gerry had turned the
13 anchor over to Tom, I told him in no uncertain terms
14 to get that anchor back, put it right back in the
15 garage where it was he was keeping it and leave it
16 there.
17     Q. Now, between that meeting in June and
18 October of 1997, what was the status of your strategy
19 with Gerry as far as whether you were coming in to
20 speak to the government or whether you were not
21 coming in to speak to the government?
22     A. We went back and forth.
23     Q. You had not made a final decision one way

1 or another?
2     A. Well, Gerry had not made a final
3 decision. In my own mind --
4     MR. O'DONNELL: Objection. I don't know
5 that that's relevant at this point.
6     THE COURT: All right. I'll sustain the
7 objection.
8     Q. You had not committed -- at any rate
9 Gerry Capano had not committed to you unequivocally
10 that he was going to come in.
11     A. True.
12     Q. Were you aware in October that his house
13 was searched?
14     A. I got a rather -- I was told in rather
15 dramatic fashion.
16     Q. How did you become aware?
17     A. I was at my home. It was probably 7:30,
18 8:00 at night. I think I was sitting down to dinner.
19     I got a phone call from Gerry at home
20 which is not necessarily unusual and not that big a
21 deal. I said -- Gerry was on the other end of the
22 line.
23     I said, "How ya doing."

1     He said, "I'm doing great except I'm
2 lying on the floor of my garage with my hands
3 handcuffed behind my back, a gun pointed at my head
4 and thirty F.B.I. agents rummaging through my house."
5     I said, "Oh". That's how I found out.
6     Q. Now, did you meet with him and talk about
7 the ramifications of that search warrant being
8 executed on his house?
9     A. Sure.
10     Q. Were you aware of whether or not any
11 drugs were found during the execution of that search
12 warrant?
13     A. I had been told that, if I have this
14 straight, a small amount of marijuana was found, and
15 perhaps a small amount of cocaine was found in his
16 home or garage, but a very small amount, and that a
17 little bit more, about two grams of cocaine had been
18 found in his truck outside of the home. And we
19 discussed that.
20     Q. Was he arrested?
21     A. He was not arrested. He was detained.
22     Q. Were you aware of whether that publicity,
23 excuse me, whether that discovery of the cocaine and

1 marijuana in his house precipitated any investigation
2 by child protective agencies working for the State of
3 Delaware?
4     A. Yes, I was.
5     I don't remember how quickly, but fairly
6 shortly after the search took place, and the
7 search -- my recollection is there was an article in
8 the newspaper, but I'm not sure about that, but the
9 bottom line is that Child Protective Services became
10 aware that there had been that amount of controlled
11 substances found in and around the home of Gerry and
12 Michele, and they wanted to interview the family to
13 determine whether or not the children were at risk.
14     Q. And were you representing him in that
15 process?
16     A. Yes, sir.
17     Q. Do you know whether they interviewed the
18 family?
19     A. Did they?
20     Q. Child Protective people.
21     A. They did. In my presence, two folks came
22 out from Child Protective and interviewed Gerry and
23 Michele in their home sometime in mid-October or so.

1   No other questions at this time.

2   THE COURT: In view of the voir dire,

3   does the State have any questions on this issue to

4   ask this witness?

5   MR. WHARTON: No.

6   THE COURT: In that case, we can bring

7   the jury in.

8   (The jury returned to the courtroom)

9   THE COURT: Members of the jury, again

10   let me offer my apologies. We have been in session

11   and have been addressing issues that needed to be

12   dealt with outside of the jury's hearing.

13   My apologies for not being able to

14   explain those matters, but those are questions of the

15   law that needed to be resolved.

16   Mr. Wharton, you may continue.

17   CONTINUED DIRECT EXAMINATION

18   BY MR. WHARTON:

19   Q. When we left before the luncheon recess,

20   you told us that initially Gerry told you that maybe,

21   possibly the defendant could have said something like

22   he needed to borrow a boat if he killed someone or

23   something like that. Is that a reasonably accurate

---

1   A. No.

2   Q. Were there any could have's?

3   A. No.

4   Q. Was there any "something like it"?

5   A. No.

6   Q. Was it in any way equivocal?

7   A. No.

8   Q. When was it that you and Gerry decided

9   that you were going to come in and talk to the

10   authorities?

11   A. Pretty much by the end of late October.

12   Q. When did you actually do that?

13   A. Gerry and I came in on a Saturday which I

14   think was the 8th of November.

15   Q. Now, had you had a --

16   A. If I can finish though, two days prior to

17   that on the 6th --

18   Q. That's what I was going to ask you.

19   A. I myself had spoken with Mr. Connolly

20   face to face but without Gerry. I think it was two

21   days before that.

22   Q. That's what I was going to ask you,

23   whether you had had a meeting with Mr. Connolly or

---

1   paraphrase?

2   A. Yes. The only thing more accurate would

3   be if I read it directly from my memo. But it's

4   something like that.

5   Q. And you also testified that you did not

6   press him at that time.

7   A. I did not press him.

8   Q. But at a later occasion you talked to him

9   about that comment.

10   A. A short time later; not the same day.

11   Q. Within a couple of days?

12   A. Probably.

13   Q. And at that time there were no

14   conditions, if you will.

15   A. I said something first, and I then asked

16   him again where are we on this issue, and the

17   response was without condition.

18   Q. Without condition. Were there any

19   maybe's?

20   A. Any what?

21   Q. Maybe's.

22   A. No.

23   Q. Possible's?

---

1   anybody else prior to Gerry and you coming in.

2   A. Yes, I think it was Thursday the 6th.

3   Q. Did you and he discuss the terms of a

4   plea agreement --

5   A. We did.

6   Q. -- that Gerry was prepared to enter into.

7   A. Yes.

8   Q. Or was contemplating entering into.

9   A. Yes.

10   Q. Let me show you State's Exhibit 101 and

11   ask you to take a look at that.

12   A. Yes.

13   Q. Is that the agreement that you and the

14   client and the federal government ultimately entered

15   into?

16   A. Yes, it is.

17   Q. When did you enter into that agreement?

18   A. On the 8th.

19   Q. When you brought your client in with you?

20   A. That's when we signed off on it, on the

21   8th.

22   Q. Now, what does paragraph two require him

23   to do?

---

1    A. On the first page?

2    Q. Yes.

3    A. The paragraph that begins "second"?

4    Q. Yes.

5    A. It required an admission that Gerry was

6 guilty of a technical offense called misprision of a

7 felony. It means knowing about a felony, not

8 disclosing it and concealing it in violation of

9 federal law. He agreed to plead guilty to a

10 violation of the statute that prohibits that.

11    He also agreed not to contest the

12 forfeiture of his white pick-up truck and certain

13 firearms that were seized from his home at the time

14 of the search a month earlier.

15    He agreed that the truck was forfeitable

16 because there was a small amount of drugs found in

17 the truck. He agreed to cooperate fully with the

18 government's investigation into Anne Marie Fahey's

19 death.

20    He agreed to provide complete and

21 truthful statements, information and testimony at

22 trial and other legal proceedings when requested by

23 the government.

Page 162

1    If he did all of that, the government

2 agreed that a sentence of three years probation was

3 the appropriate disposition of his case, meaning if

4 he pled guilty when he pled guilty to the misprision

5 offense, the government would recommend three years

6 probation.

7    Q. What else is in that paragraph?

8    A. Say again?

9    Q. Is there anything else in that paragraph?

10    A. I don't think so. I think I read the

11 whole thing.

12    Q. Paragraph labeled "eighth", what does

13 that agreement require?

14    A. Paragraph eight on the second page, in

15 the event -- this is directed to me. In the event --

16 right?

17    Q. Right.

18    A. If my client Gerry offers testimony

19 materially different from any statements made or

20 information provided to the government by him, in

21 other words, if Gerry were to tell the government

22 A-B-C on one day and later say no, A-B-C isn't true,

23 it's D, E and F, the statements, testimony and

Page 163

1 information given pursuant to the agreement, meaning

2 the first set of statements, may be used to

3 cross-examine him and may be introduced as rebuttal

4 evidence.

5    Q. How about paragraph nine?

6    A. This is a stipulation that Gerry

7 understood that if he made materially false

8 statements to the government or testified falsely at

9 trial or any other legal proceeding, including grand

10 jury proceedings, he would be subject to perjury and

11 obstruction of justice charges.

12    Q. Who is it that determines whether or not

13 his obligations to testify truthfully are met?

14    A. If there was a dispute about whether or

15 not Gerry had testified truthfully --

16    Q. For example, if there was an allegation

17 that he did not testify truthfully at trial or at any

18 other hearings including up to trial.

19    A. If the government were to make that

20 allegation, and in effect, to say to me, "Your deal

21 is off because Gerry didn't do what he promised to

22 do," unless Gerry were to say to me, "That's true, I

23 didn't testify truthfully," if Gerry were to say,

Page 164

1 "No, I did," so there was a dispute there, that

2 dispute would be decided by a judge, either a federal

3 or -- probably a federal judge, but by a judge.

4    Q. Does that determination of whether he

5 testified truthfully ultimately rest with Mr.

6 Connolly?

7    A. No.

8    Q. When you entered into that agreement and

9 he signed that agreement to plead guilty to the

10 misprision of a felony charge, was Gerry then

11 de-briefed by investigators?

12    A. Yes, he was.

13    Q. Was that a lengthy process?

14    A. It started at about 10:00 in the morning

15 and went until about 3:30 or four in the afternoon

16 with a short break for lunch.

17    Q. Were you present for that?

18    A. Yes, I was.

19    Q. At the conclusion of that, in other

20 words, after that multiple hour de-briefing, was

21 there a taped statement made?

22    A. Yes, it was.

23    Q. Let me show you State's Exhibit 78. Do

1    A. I believe it was February 20th.

2    Q. Were you present at that meeting?

3    A. No, I was not.

4    Q. Did you ultimately meet with

5  Mr. Connolly, myself and some other investigators?

6    A. Yes, I did.

7    Q. When was that?

8    A. Friday, February 27th.

9    Q. Was Mr. Bergstrom present?

10   A. Yes, he was.

11   Q. During that meeting and prior to — at

12 the beginning of that meeting I guess, did you reach

13 any agreement with the government about whether or

14 not you were going to face any criminal charges as a

15 result of what you said was your lie under oath on

16 January 28th in the interview and your false

17 statements when you purchased the gun?

18   A. Yes, I did.

19   Q. Was that a written document?

20   A. Yes, it was.

21   Q. Did you sign that document?

22   A. Yes, I did.

23       MR. WHARTON: I would offer this as the

1    Q. — that you had committed prior to the

2  date of the agreement.

3    A. That is correct.

4    Q. Specifically, are you going to be

5  prosecuted for any lies that you told to the federal

6  grand jury when you testified before that grand jury

7  in September of 1996?

8    A. Correct.

9    Q. Are you going to be prosecuted for any

10 lies in that testimony?

11   A. No, I am not.

12   Q. Are you going to be prosecuted for any

13 lies or false statements you made under oath in the

14 January 28th, 1998 interview?

15   A. No, I am not.

16   Q. Are you going to be prosecuted for any

17 false statements you made under oath in conjunction

18 with your gun purchase?

19   A. No, I am not.

20   Q. As a condition I guess of this — let me

21 put it this way. Could you read the first paragraph

22 of the agreement or at least the one labeled "first"?

23   A. The paragraph that begins with "first"?

1  next State's Exhibit, Your Honor.

2       MR. MAURER: Without objection, Your

3  Honor.

4       THE COURT: Without objection, it will be

5  admitted as State's Exhibit 148.

6       THE CLERK: So marked.

7       THE COURT: Thank you.

8       (AGREEMENT, State's Ex. 148 in Evid.

9  received and marked)

10 BY MR. WHARTON:

11   Q. Miss MacIntyre, let me show you State's

12 Exhibit 148 and ask you to take a look at that. Is

13 that the agreement you entered into with law

14 enforcement?

15   A. Yes, it is.

16   Q. It's dated when?

17   A. February 27th, 1998.

18   Q. By whom is it signed?

19   A. It's signed by Colm Connolly, Ferris

20 Wharton, Thomas Bergstrom and me.

21   Q. Now, as a result of that agreement, are

22 you going to be prosecuted for any crime —

23   A. No, I am not.

1    Q. Yes.

2    A. "First, your client represents that she

3  did not kill or conspire to kill or aid or abet the

4  killing of Anne Marie Fahey. If that representation

5  proves to be false, the government would not be bound

6  by the terms of this agreement."

7    Q. Are those representations true that you

8  made?

9    A. Yes, they are.

10   Q. And if they were not true, could you be

11 prosecuted for anything and everything that you've

12 done?

13   A. Yes, I could.

14   Q. Did you also agree to cooperate with the

15 federal and state authorities in the investigation of

16 Anne Marie Fahey's death?

17   A. Yes, I did.

18   Q. If you could read paragraph fifth?

19   A. "Fifth, your client understands that any

20 statement she makes pursuant to this agreement

21 are —"

22   Q. This letter is addressed to your

23 attorney, Mr. Bergstrom, right?

1  employed?
2      A. Most recently I worked at the Tatnall
3  School.
4      Q. How long did you work at Tatnall School?
5      A. About twelve and a half years.
6      Q. When did that employment end?
7      A. In February of this year.
8      Q. What did you do at the Tatnall School?
9      A. I was an administrator. I ran the before
10 and after-school program. It was called the extended
11 day program, and I also ran the summer program for
12 about five years of that period.
13     Q. Do you know the defendant, Thomas Capano?
14     A. I do.
15     Q. How long have you known him?
16     A. Since about 1977.
17     Q. How did you meet him?
18     A. I believe I met him at a law firm
19 function.
20     Q. Were you married then?
21     A. Yes, I was.
22     Q. To whom were you married?
23     A. David H. Williams.

1      Q. When you say law firm function, what law
2  firm are you referring to?
3      A. Morris, James, Hitchens and Williams.
4      Q. Was your husband employed by that law
5  firm?
6      A. Yes, he was.
7      Q. He was not the Williams at the end of
8  that?
9      A. No; that was his father.
10     Q. Was the defendant employed by that law
11 firm?
12     A. Yes.
13     Q. At some point did you begin a relation-
14 ship with the defendant?
15     A. I did.
16     Q. Was that a sexual relationship?
17     A. Yes, it was.
18     Q. When did that sexual relationship begin?
19     A. In May of 1981.
20     Q. Were you married at the time?
21     A. I was.
22     Q. Was he married at the time?
23     A. He was.

1      Q. Did that relationship continue for a
2  period of time?
3      A. Yes, it did.
4      Q. Would it be fair to say that it continued
5  up through 1996 and 1997?
6      A. Yes, 1997.
7      Q. When you would get together while you
8  were married, where would you get together?
9      A. In a motel usually.
10     Q. Was there any particular motel?
11     A. There was a motel on Route 9 near the
12 Delaware Memorial Bridge. I believe it's called
13 Motel 6.
14     Q. Was there any particular time or routine
15 day when you would get together at Motel 6?
16     A. At that time I'm not sure what day it
17 was, but it was usually the same evening every time.
18     Q. Did it evolve into a particular day of
19 the week?
20     A. Yes. I don't remember what day it would
21 have been; maybe a Wednesday or a Thursday.
22     Q. What were your — how long -- as this
23 relationship continued, were there any break-up's in

1  the relationship?
2      A. Yes.
3      Q. How many?
4      A. One in particular I recall. I cannot
5  recall the year. It would have been in the fall,
6  maybe October. October.
7      Q. How long did that last?
8      A. About five weeks.
9      Q. Who wanted to end it when it ended?
10     A. Tom Capano did.
11     Q. Who wanted to get back together when it
12 got back together?
13     A. I did.
14     Q. Did you and he talk during this time
15 period, talking about pre-1995, did you and Tom
16 Capano talk about the future of your relationship?
17     A. Not really, no.
18     Q. Did he ever talk to you about whether or
19 not he would leave his wife?
20     A. No.
21     Q. Did he have children?
22     A. Yes.
23     Q. Was your relationship public?

**Page 69**

1  there's him to contend with? Afraid, you said of
2  what? Pointless, groundless, hollow noises from
3  Connolly? I've told you a hundred times you have
4  nothing to worry about.
5      "Do I now have to worry about you? I can
6  feel myself getting angry and again feeling the sense
7  of betrayal I felt when you abandoned me at the bail
8  hearing. Do you love me or not? Do you know what
9  love is, Debby?"
10     Q. Skip down to a third of the way from the
11 bottom.
12     A. "You must now prove your love to me.
13 Everything you've done for nearly a month sends the
14 message you don't love me and perhaps never did. I
15 cannot survive with that uncertainty. Ambivalence
16 would be worse than knowing you no longer love me.
17     "There is only one way now for you to
18 prove your love clearly, completely and
19 unequivocally, and also to demonstrate that your act
20 abandoning me when I most needed you was not
21 something you will ever do again.
22     "This is my ultimatum and this is your
23 choice. Me or your lawyer. You cannot straddle the

**Page 70**

1  fence. You must choose between us. If you choose
2  him, please return all my letters for the sake of
3  whatever you once thought of me and write me to
4  explain why you chose him.
5      "I don't really care if you like him.
6  There are other lawyers who will not try to drive a
7  wedge between us. If you choose me, I will gain the
8  strength to survive and endure. I will know your
9  betrayal was an isolated act. I will protect and
10 stand by you forever.
11     "This does not seem to be any big deal.
12 In fact, it should be a no brainer. Lawyers are a
13 dime a dozen. True love is rare. I need you now.
14 He doesn't. And you don't need him. Plus it will
15 take Dave Williams out of the equation which has
16 caused me more pain than you know. To prove that
17 this is no monetary flash of a broken heart --"
18     Q. I think that has "momentary".
19     A. "To prove take this is no momentary flash
20 of a broken heart, I make the same offer to prove my
21 love for you. I will fire Charlie, Joe and Gene to
22 prove you mean more to me than any stranger. In
23 fact, in my case, they are all friends, not

**Page 71**

1  strangers.
2      "I'm imprisoned and will soon be on trial
3  for my life. You have been the victim of rumor and
4  negative press and have no legal concerns and a zero
5  chance of any future legal problems.
6      "What I just said is true regardless of
7  any empty noises Connolly may spread to the press or
8  your new lawyer. Debby, you know Connolly is a liar
9  and cannot be trusted or believed.
10     "So I will sacrifice the services of
11 friends who have been my attorneys for eighteen
12 months, Charlie, thirteen months, Joe four months,
13 Gene, to -- eighteen months Charlie, thirteen months
14 Joe, four months Gene, to demonstrate my devotion and
15 relieve you of any concerns you may have about them,
16 although you have never expressed any.
17     "And Debby, they have never asked me to
18 give them letters I received from you. We talked
19 about you Wednesday night as I told you, and for the
20 second week in a row about your legal situation, at
21 my insistence. After those three experienced
22 Delaware lawyers who are my friends assured me for
23 the second --"

**Page 72**

1      Q. Let me stop you there. Tom Bergstrom,
2  your new lawyer at that time, where did he have his
3  office?
4      A. In Malvern, Pennsylvania.
5      Q. So after he said "those three experienced
6  Delaware lawyers," would you continue reading please?
7      A. "After those three experienced Delaware
8  lawyers who are my friends assured me for the second
9  week in a row that you were in no danger with a teeny
10 tiny possibility that Connolly would threaten you
11 with perjury because of the date we first had sex,
12 after all that, Gene looked at me and said 'you
13 really do love her, don't you,' and I told him I
14 loved you with all my heart despite everything and
15 that I would never let anything happen to you, even
16 if I had to swear under oath that we never had sex
17 until whatever date you needed me to say.
18     "I will give them all up. I will
19 sacrifice the huge amount of money I've already
20 spent. I ask only that you give up someone who is a
21 stranger, not a friend, someone you've known for only
22 a few weeks and met only a few times, someone who
23 cannot have cost you much yet, someone somehow

**Page 73**

1 connected to Dave Williams, someone who wants you to
2 refuse my calls and turn over my letters so he can do
3 whatever he wants with them, someone who doesn't care
4 and probably didn't ask if you loved me, someone who
5 doesn't care about me as my present lawyers care
6 about you.
7      "I'm willing to give up a hundred dollar
8 bill and ask only that you give up a penny.  There is
9 no reason for you to decline if you care about me
10 since this guy obviously wants to cause me harm.  My
11 lawyers mean you no harm and have even done things to
12 help you.
13      "And as a practical matter, if the one in
14 a million possibility happens and Connolly tries to
15 charge you with lying to the grand jury because of
16 your characterization of our relationship, a judge
17 would dismiss the charge even before a jury threw it
18 out.
19      "Your new lawyer could not even represent
20 you because he's not a Delaware lawyer.  The only way
21 he could be involved is if you hire a Delaware lawyer
22 to work with him and thus pay for two lawyers.  We
23 will both find new Delaware lawyers.  You should not

**Page 74**

1 even have to think about this for all the reasons
2 I've listed.
3      "And more important than the reasons is
4 the simple fact that the man you profess to love has
5 asked you to do it because he needs reassurance.  I
6 can't believe you will decline to do it, but if you
7 do, I'll know for certain you do not love me.
8      "What will haunt me, of course, is the
9 question of whether you ever did.  This relationship
10 has not cost you anything.  It demanded something of
11 you."
12      Q.  I'm sorry?
13      A.  "This relationship has never cost you
14 anything."
15      Q.  I think that says "the first time".
16      A.  "The first time it demanded something of
17 you, you were not willing to pay the price.  Now it's
18 demanding something again, and this time with damn
19 good reason, which is of insignificant cost to you.
20      "I've offered to pay a great cost in
21 exchange although you have absolutely no reason to
22 need reassurance.  Do you love me?  If you don't,
23 then I need to know so I may try to recover, although

**Page 75**

1 I doubt I ever will because I will then know that you
2 have lied to me all these years and never truly loved
3 me.  Dave Williams?"
4      Q.  Tab 16.  This is dated when?
5      A.  Thursday, February 26th.
6      Q.  This is the third letter of that date?
7      A.  Correct.
8      Q.  When did you go in to see the government?
9      A.  Friday, February 27th.
10      Q.  Turn to page two and read the highlighted
11 portions which begins at the second paragraph.
12      A.  "Since you know better than anyone the
13 fragile condition of the man you love, I have to hope
14 the choice I asked you to make to give me heart and
15 reassurance was an easy one for you.
16      "I hope you understand why it had to
17 happen now and how utterly crucial it was to me and
18 to us.  It may help me avoid a nervous breakdown.  It
19 may be the tie that truly binds us together.
20      "As I said, I asked you to sacrifice a
21 penny compared to my sacrifice of a hundred dollar
22 bill.  I know it didn't mean much to you or cost you
23 any emotional capital, but it means a great deal to

**Page 76**

1 me and inspires me to fight for us and our future.
2      "Because I am so confident that you chose
3 me, my sanity and my health, my heart, my love, that
4 I'm going to thank you now for your devotion and
5 unconditional love.  I thank you for trusting me
6 again and making your love tangible.  We will win
7 this, Deb.  We will have a future."
8      Q.  If you could turn to the last page of
9 that letter, the PPPS.
10      A.  "Remind me to tell you about my friend
11 Nick Perillo, the guy who has tried to call you for
12 me a few times and may again depending on what
13 punishment I receive.
14      "He has the paper that got confiscated
15 when he slid it back under my door around 9:00 last
16 night when he tried to call but got the machine.  Do
17 you get those messages?"
18      MR. WHARTON:  Your Honor, I notice the
19 time, Your Honor.
20      THE COURT:  We'll take our morning recess
21 at this time and I'll ask the bailiff to remove the
22 jury.  I'll ask the people in the audience to remain
23 seated.

1 (The jury left the courtroom)
2 THE COURT: Court will stand in recess.
3 (At this time a short recess was taken).
4 MR. WHARTON: Your Honor, I think counsel
5 would like to speak with the court at side bar.
6 THE COURT: All right. On the record?
7 MR. WHARTON: Yes.
8 (Side bar conference):
9 MR. WHARTON: Your Honor will recall this
10 morning Mr. Maurer suggested there might be an issue
11 to discuss at side bar prior to the cross-
12 examination, and winding down the direct, I expect we
13 will start the cross-examination before lunchtime.
14 So this is an appropriate time now I guess to bring
15 that up.
16 MR. MAURER: I had a conversation
17 actually with Mr. Wharton and Mr. Connolly about
18 this, and during the course of my examination of Miss
19 MacIntyre, I intend to ask her specifically whether
20 when she went to Grant Avenue in June, the 27th, 28th
21 of '96, whether she had a firearm with her when she
22 went over there and whether she discharged the
23 firearm.

MR. MAURER: Thank you, Mr. Connolly.
2 I'm pretty comfortable with my ethics for the most
3 part at this point.
4 MR. CONNOLLY: I think it's fair for us
5 to put it there.
6 MR. MAURER: I didn't mean to be
7 pejorative when I said that.
8 MR. WHARTON: There are a couple of other
9 issues that may get broached during cross-
10 examination. She has testified or actually she has
11 read some letters in which she makes and breaches
12 some what would otherwise be confidential
13 communications with her lawyer Adam Balick, and
14 perhaps that could be viewed as a waiver of
15 confidential communications to go beyond what is in
16 the letters.
17 I don't know what Mr. Maurer intends to
18 do. I don't think he intends to go into that, but I
19 do think that if that's the case, that reciprocity
20 ought to follow inasmuch as the defendant has made
21 also breaches of confidentiality in his
22 correspondence to Debby so that if we stray beyond
23 what is in the letters with respect to Adam Balick

1 I had wanted to bring that up initially.
2 I anticipated at that time the State might object to
3 that line of questioning and argue that if the
4 defendant doesn't testify I don't have a good faith
5 basis for asking that question.
6 We flushed that out. I don't think that
7 there is an objection to my asking the question and
8 an additional basis which thought I had the basis to
9 ask the question about was the immunity agreement
10 where she makes specific representations that she did
11 not kill, conspire to kill or assist in the killing.
12 MR. CONNOLLY: Judge, just to further
13 flush it out somewhat, as Mr. Maurer just alluded to,
14 we just want it clear that in order for Mr. Maurer to
15 have a good faith basis to ask this question, his
16 client must have provided some kind of account such
17 that if the client were to take the stand at some
18 point and testify differently it would raise ethical
19 concerns.
20 We're very comfortable with Mr. Maurer's
21 ethics, so I just wanted to put it order record to
22 protect ours, not because of anything we think about
23 Mr. Maurer.

1 and Debby MacIntyre, we should be given license to
2 stray beyond communications between the defendant and
3 his lawyers beyond which what appear in the letters.
4 MR. MAURER: I understand the State's
5 position on that and obviously Tom's breached our
6 attorney-client privilege considerably already with
7 the letters that are in. It's not really my intent
8 to cross-examine in that area.
9 THE COURT: That's a substantial issue,
10 and I don't want to make a superficial ruling here
11 because I think there are a lot of problems as to
12 whether you can make a partial disclosure and whether
13 that can be compartmentalized or not, and I'd prefer
14 not to make a decision in that area, but it seems to
15 me at this particular stage -- clearly I hate to fall
16 back on trite sayings, but what's sauce for the goose
17 is sauce for the gander, we know that.
18 MR. WHARTON: It's getting close to
19 Thanksgiving so that may be an appropriate reference.
20 The other issue involves communications
21 she had with Joe Hurley. As the Court is aware, he
22 was the lawyer for Mr. Capano. If we get into -- I
23 understand Mr. Maurer may ask about those

1   communications.

2       That raises a similar sort of related

3   issue in terms of if Mr. Hurley testifies as a

4   defense witness, the scope of cross-examination

5   there. We're not looking for a resolution of that

6   right now but simply to say that this is out there,

7   and I wanted to put our concerns on the record about

8   whether they lead to the waiver of certain work

9   product information.

10      THE COURT: I thought you were going to

11   tell me that Miss MacIntyre was a part of the Capano

12   team and therefore all those communications were

13   privileged.

14      MR. MAURER: If I can just add to that,

15   Joe Hurley interviewed her when he became involved in

16   the case, and he took a statement from her and we

17   have a memorandum of what she told him and that's in

18   some respects inconsistent with what she's testified

19   to here today, and that's the purpose that I want to

20   ask her those questions. We plan to call Joe Hurley

21   as a witness.

22      MR. CONNOLLY: There's another point

23   which I just thought of. We would take the position

1   not only that we get Joe Hurley's interviews of her

2   but Charlie interviewed her too, and we would want

3   Charlie's notes and any notes.

4      It's attorney work product relating to

5   interviews of her, and once you waive it with Joe

6   Hurley, you waive it for everybody.

7      MR. OTERI: That's an expansive

8   interpretation.

9      MR. MAURER: We don't agree with that.

10   There also an interview that Charlie had with her

11   on August 16th of 1996 when Mr. Vaulles was present,

12   an investigator who will also be called to testify.

13   I don't think we have any problem in turning those

14   notes over.

15      MR. OBERLY: In fact, Your Honor, I was

16   the stenographer. I did not conduct the interview.

17   I wrote the notes. Somebody else did.

18      THE COURT: I'm proud that you have that

19   talent.

20      MR. CONNOLLY: You interviewed her first

21   week of July as well.

22      MR. OBERLY: On the telephone.

23      MR. CONNOLLY: If you have notes for

1   that.

2      MR. MAURER: I'm not going to question

3   her about that interview.

4      MR. WHARTON: I'm just saying that that

5   topic raises some work product waiver issues and

6   cross-examination issues if Mr. Hurley testifies.

7      MR. MAURER: We'll see what we are.

8      THE COURT: They have a lot of issues out

9   there.

10      MR. MAURER: I can't not cross-examine

11   her.

12      (Side bar conference ended)

13      THE COURT: Please bring the jury in.

14     (The jury returned to the courtroom)

15      THE COURT: Mr. Wharton.

16      MR. WHARTON: Thank you, Your Honor.

17      CONTINUED DIRECT EXAMINATION

18   BY MR. WHARTON:

19     Q. Miss MacIntyre, the defendant wrote you

20   three letters dated Thursday, February 26th of 1998,

21   the day before you went in to speak to the

22   government. You also wrote him a letter on February

23   26th of 1998, did you not?

1     A. Yes, I did.

2     Q. Would you turn to tab forty please. The

3   first paragraph that's highlighted, could you read

4   that?

5     A. "About me not testifying, yes, it made me

6   look bad and the media took shots at me. What else

7   is new? Yes, my self is damaged, and I may (no did)

8   have lost my job as a result of the publicity.

9      "But I must be open with you. I never

10   could lie, never can lie well about anything and

11   that's been so evident in our relationship. Any

12   little thing you picked up, and that's okay because I

13   think it's a good thing to be honest.

14      "I know you wanted to tell me what to

15   say, but no amount of practice could make it seem

16   real. I knew it when it came out, I didn't blow it,

17   I just didn't lie well".

18     Q. What were you talking about?

19     A. I was talking about the story about the

20   gun.

21     Q. Was that in the January 28th interview?

22     A. Correct.

23     Q. Would you turn to the next page please.

Page 85

1  About the middle of the page there's a highlighted
2  paragraph.
3      A.  "Tomorrow will be a big day for me.  I
4  know you called me tonight while I was out.  I got
5  home at 10:30 p.m. and your last attempt was 10:24
6  p.m."
7      Q.  "Tomorrow will be a big day for me," what
8  are you referring to?
9      A.  The meeting that I had with you on
10  Friday, February 27th.
11      Q.  Go ahead.
12      A.  "I know you called me -- I am wondering
13  if you knew of the media news then.  If I had talked
14  with you, I would have told you I was going to be
15  truthful, that is the only way.  I don't know what
16  the truth will do.  Will it hurt you?  I don't know
17  what the defense case is nor do I know what the
18  prosecution case is.
19          "Today I received a letter from you that
20  was written from the heart and it made me cry for
21  both of us who can't hold onto each other.  You think
22  I have betrayed you.  I have not.  I have told the
23  truth and we must both live with the truth.

Page 86

1          "I know completely for sure without a
2  doubt you love me.  I never doubted your love.  Some
3  letters were horrible and I could not read them.  But
4  some of it was true.  I had been walked over most of
5  my life and by you for sure.  I guess I let the man
6  of my life walk over me more than anyone else.
7          "You can build me up and point out my
8  strengths better than anyone.  When down, I have been
9  encouraged by you, but you can trash me like no other
10  as well.  I'd like to think that I know you better
11  than anyone, but maybe I don't.  Yes, we are one,
12  soul mates.  For me there is no way that can be taken
13  away regardless."
14          "Often I wonder why all this tragedy had
15  to happen.  What happened and why are you involved?
16  Will you ever be able to tell me?  I think not, and
17  that will always keep us apart.  Tom, I hope you are
18  still reading this."
19      Q.  On Friday, February 27th, you testified
20  you came in and spoke to Mr. Connolly and me and
21  other investigators, correct?
22      A.  Correct.
23      Q.  Did you tell us about the gun?

Page 87

1      A.  Yes, I did.
2      Q.  What did you tell us about the gun?
3  Whose idea was it to get the gun?
4      A.  It was Tom Capano's idea to get the gun,
5  for me to purchase the gun.
6      Q.  Is that what you told us on February
7  27th?
8      A.  Yes.
9      Q.  And what you testified on direct
10  examination earlier about the gun, and what you did
11  with it, is that essentially the story you told us on
12  February 27th?
13      A.  That is correct.
14      Q.  The next day and into a couple of days
15  later, you continued that letter, did you not?
16      A.  Yes, I did.
17      Q.  There is a portion after you concluded
18  the February 26th segment of it dated Saturday,
19  February 28th to Monday, March 2nd, 1998.
20          Would you look at the last page there
21  please and there is a highlighted portion.  Would you
22  read that?
23      A.  "It has been good to hear your voice

Page 88

1  again.  Truthfully, I never expected to hear from you
2  again and am curious but pleased that you have called
3  me.  I have also been advised to not write to you, but
4  I have been wanting to do so for a long time.
5          "Our conversation of last night bothered
6  me and I know we got cut off in the end.  I spent
7  most of the night thinking about it.  I am serious in
8  writing that I really don't understand why you would
9  change your lawyers to prove your love for me.
10          "Tom, that does not make sense to me, but
11  worries me as I think you believe that's how you show
12  your love.  That shouldn't be.  For me, changing
13  lawyers is not proving to you that I love you.  I
14  have endured too much emotional torture in the past
15  eighteen months and know I could not mentally or
16  physically make another change without compromising
17  my health.
18          "I am tapped out and can take little
19  more.  Besides, I like him and believe in him.  As
20  you don't know him, you cannot see that.  But if you
21  love me, you will support me for the choices I have
22  made.
23          "You have said or written that you are a

Page 85 - Page 88

1 drowning man and I can really identify with that. I
2 feel like I am drowning too, but not with you. I
3 want so much to preserve in my mind and heart what we
4 have had together.
5 "What has been difficult for me is that
6 few have been able to understand that despite all
7 that has surpassed that I still love you. My
8 therapist asked me today why I feel that way, and I
9 told him that you have always been there for me in
10 times of trouble.
11 "You respect me and my openness and
12 honesty. You are my best friend. You listen well
13 and you love me completely. If all of this is true,
14 then you must understand deep in your heart why I
15 have been so truthful and honest. That is me.
16 "It doesn't mean I don't love you. It
17 hurts more than anything to read some of your words
18 that are written right along with your words of love.
19 I am more than a little confused but know you are way
20 beyond that.
21 "There is nothing I can say or write to
22 you that will convince you that I love you now and
23 forever. If you do love me as you say you do, you

Page 90

1 must trust and believe my words. I have nothing to
2 gain or lose by writing about my feelings for you now
3 as I believe I have lost you too.
4 "I want to believe more than anything
5 that we will both go to our eventual destinies in the
6 future knowing that both of us have been loved and
7 have loved completely."
8 Q. Miss MacIntyre, you told us that you
9 lived on Delaware Avenue. What is the address there?
10 A. 2425 Delaware Avenue.
11 MR. WHARTON: Your Honor, I want to offer
12 this as next State's exhibit and have this next item
13 marked for identification.
14 MR. MAURER: No objection to either
15 document.
16 THE COURT: Thank you, Mr. Maurer. It
17 will be admitted without objection as State's Exhibit
18 149.
19 THE CLERK: So marked.
20 MR. WHARTON: The other item is to be
21 marked for identification.
22 THE CLERK: State's identification G.
23 THE COURT: Whatever you say. State's G

1 for identification, thank you.
2 (PHOTOGRAPH, State's Ex. 149 in Evid.
3 received and marked).
4 (DOCUMENT, State's Ex. G for I.D.
5 received and marked).
6 BY MR. WHARTON:
7 Q. Miss MacIntyre, let me show you State's
8 Exhibit 149 and ask you do you recognize what is
9 depicted in that photograph?
10 A. Yes, I do.
11 Q. What is depicted in that photograph?
12 A. That is my house.
13 Q. Let me show you what's been marked as
14 State's for identification G and ask you to take a
15 look at that. First of all, do you recognize on the
16 front page of that the printing?
17 A. Yes, I do.
18 Q. Whose printing do you recognize it to be?
19 A. Tom Capano's.
20 Q. Would you turn the page please? Do you
21 recognize what's depicted on the second page?
22 A. Yes, I do.
23 Q. What do you recognize that to be?

Page 92

1 A. It's a map to my house.
2 Q. From where to where? Coming from what
3 direction?
4 A. Coming from town to out of town towards
5 Rockford Park.
6 Q. Does that depict the various streets to
7 where your house?
8 A. Yes.
9 Q. Turn to page — is it accurate?
10 A. It is very accurate.
11 Q. Can you turn to the next page please? Do
12 you recognize what's depicted on that page?
13 A. Yes, I do.
14 Q. What do you recognize that page to be?
15 A. A floor plan of the first floor of my
16 home, and a diagram of my alarm box.
17 Q. Is it an accurate diagram of the floor
18 plan of the first floor of your home?
19 A. That is correct.
20 Q. Does it detail — there are certain
21 details on that.
22 MR. MAURER: Your Honor, I understand
23 this is for purposes of identification at this point

Page 5

1 after that, whether it was early summer, spring, late
2 summer, whenever?
3    A  That is correct.
4    Q  But whenever you did it - and I'll show
5 you both of those documents and I guess,
6    MR. MAURER:  Is there any objection to
7 them?  Admissibility?  Okay.
8 BY MR. MAURER:
9    Q  If I could show you both those documents
10 and ask you if in fact if they are the documents you
11 prepared?  And take a minute to look at them.
12    A  Yes, they are.
13    Q  Are they?
14    A  Yes.
15    Q  Thank you.
16    MR. MAURER:  Your Honor, I would like to
17 move both those documents into evidence as --
18    THE CLERK:  1 and 2.
19    THE COURT:  Defendant's Exhibits 1 and 2;
20 is there objection?
21    MR. WHARTON:  No, Your Honor.
22    THE COURT:  Without objections defendant's
23 Exhibits 1 and 2 may be admitted.

Page 6

1    THE CLERK:  So marked.
2    THE COURT:  Thank you.
3    MR. MAURER:  Thank you, Your Honor.
4    (WHEREUPON, documents are received and
5 marked Defendant's Exhibits 1 and 2 in evidence)
6    MR. MAURER:  Thank you, Your Honor.  I
7 apologize; something we needed to discuss.
8 BY MR. MAURER:
9    Q  When is the first time you spoke with
10 the authorities after, according to your testimony,
11 now, as to the purchase of the firearm at Miller's?
12    A  My attorney or --
13    Q  You?
14    A  When I spoke with anybody?
15    Q  I'm sorry.  To the government.
16    A  February 27th, 1998.
17    Q  And when you spoke to the individuals for
18 the government as opposed to your attorney, - and
19 what I'll try to do, if I ask you a question about
20 your attorney I'll refer to him specifically.  Okay?
21 But when you spoke to the government February 27th,
22 that was the first time you did that.  Is that
23 correct?

Page 7

1    A  That's correct.
2    Q  And when you talked to them, in
3 particular, the person who is a witness in the case,
4 and not going to be a witness, was Det. Donovan, is
5 that right?  He was there?
6    A  Yes, he was.
7    Q  He was there?
8    A  Yes, he was.
9    Q  And other individuals were there as well?
10    A  Yes.
11    Q  But I'm focusing primarily on Det.
12 Donovan.  Did you tell Det. Donovan everything that
13 had occurred with regard to the purchase of this
14 firearm?
15    A  Perhaps some specifics had evolved later
16 and I could add them later, but I cannot tell you
17 exactly that I did at that time.
18    Q  Okay.  For example, Mrs. MacIntyre, did
19 you reveal to Det. Donovan at that time that you had
20 gone to the Sports Authority on a prior occasion to
21 purchase a firearm?
22    A  I don't recall.
23    Q  By you don't recall, if you are going to

Page 8

1 use that term, could you tell me exactly what you
2 mean by that?
3    A  I don't know if I had said anything to him
4 about going to Sports Authority at that time, or if I
5 told him later.
6    Q  Why, if you didn't tell him something
7 about that at that time, why would you not have told
8 him that?
9    A  I wasn't asked.
10    Q  You weren't asked?
11    A  Perhaps.
12    Q  You were asked about the purchase of the
13 firearm.  I can represent that to you, on February
14 27th, and you have already indicated to me that you
15 talked about that on February 27th.  Did you not?
16    A  Correct.
17    Q  Okay.  And what you're saying is that if
18 you didn't mention to Det. Donovan on February 27th
19 when you first spoke with him about this purchase,
20 that you had previously gone to Sports Authority, the
21 reason you didn't mention it is because you weren't
22 asked?
23    A  Perhaps if I could see a document about

JEAN PRESTON, Court Reporter

Page 9

1  that meeting I could tell you for sure whether I said
2  anything or not. I don't really remember, Mr.
3  Maurer.
4      MR. MAURER: Your Honor, I don't know if
5  the state will have any objection to this, if I could
6  just take a moment?
7      THE COURT: You may.
8      (WHEREUPON, there is a discussion off the
9  record)
10  BY MR. MAURER:
11      Q    Mrs. MacIntyre, what I'm going to do at
12  this point, with consent, is show you a police report
13  dated February 27 of 1998, prepared by Det. Donovan.
14      First of all, with the understanding you
15  probably have not seen this before, right?
16      A    That is correct.
17      Q    And this police report purports to discuss
18  what you discussed with him on that date. Okay? So,
19  if you would like to take a moment and look through
20  there, first, and then I'll have some questions to
21  ask of you.
22      A    (Witness complies)
23      Q    Have you had an opportunity to read

Page 10

1  through those four pages?
2      A    Yes, I have.
3      Q    And would you agree, understanding these
4  are someone else's notes prepared based on your
5  interview, that there is no mention whatsoever in
6  those notes of your trip to the Sports Authority?
7      A    No, there is not.
8      Q    Okay. So, do you think now, having looked
9  at those notes and having thought about it a little
10  bit that you never mentioned that to Det. Donovan
11  when you spoke him on February 27th?
12      A    That's probable.
13      Q    Okay. And isn't the reason that you
14  didn't mention it at that time because, later, when
15  you talked to Det. Donovan about the purchase of the
16  gun, which I believe was on April 25 of 1998, you
17  told him that you didn't even look at these forms
18  that you signed until after you got out in the car,
19  after the gun purchase.
20      Do you remember saying that to Det.
21  Donovan, later?
22      A    No, I do not.
23      Q    You don't recall saying that to him?

Page 11

1      A    I remember signing them in the store, and
2  yes, looking at the one form very clearly when I got
3  out of the store.
4      Q    But the point of the matter is that when
5  you were talking to Det. Donovan on February 27th
6  about the gun purchase, and the signing of the forms,
7  you knew before you ever went to Miller's, that it
8  was illegal to purchase a gun for someone else,
9  didn't you?
10      A    That is correct.
11      Q    Okay. And today you're saying that.
12  Correct?
13      A    That is correct.
14      Q    Now when you talked to Det. Donovan,
15  however, on the 27th of February, you didn't mention
16  the fact that you had been to the Sports Authority
17  and you didn't mention the fact that the person
18  behind the register told you at that time that it was
19  illegal?
20      A    That is correct.
21      Q    Now, is the reason that you didn't mention
22  it still that you weren't asked? Or did you have
23  some other motive for not mentioning that when you

Page 12

1  spoke with him on the 27th of February?
2      A    No. Many things evolved in this case.
3      Information -- I was very nervous on
4  February 27th.
5      I answered the questions that I was asked,
6  and I was not thinking about the Sports Authority.
7      I was thinking about Miller's Gun Shop.
8      Q    Okay. So, you completely forgot about
9  another trip that you had made to a store in order to
10  purchase a firearm.
11      Is that what you're saying?
12      Or you didn't think about mentioning that?
13      A    I was not thinking about Sports Authority.
14  No.
15      Q    And you weren't asked, so, you didn't
16  bring it up. Is that right?
17      A    That's probable.
18      Q    Now, you testified, or you indicated to
19  Det. Donovan, or did you indicate to Det. Donovan on
20  February 27th, in your interview, that you didn't
21  read the paperwork saying it was illegal to purchase
22  the firearm until after lunch?
23      A    I don't understand the question.

Page 13

1   Q   All right.  Let me repeat it it.
2        You spoke to Det. Donovan on February
3   27th.  Did you say to Det. Donovan, that you didn't
4   read the paperwork regarding the purchase of the
5   firearm saying that it was illegal, until after you
6   and Tom had had lunch?
7   A   I pulled the paper out of the bag and
8   showed it to him.  I thought I did it as soon as I
9   came out of the store.  I recall that, If I did it
10  after lunch, that's possible as well.  But I remember
11  that specifically.
12  Q   I'm not asking you at this point when you
13  did it or if you didn't do it.  What I'm asking you
14  is whether you have a recollection of telling Det.
15  Donovan that the first time that you looked at the
16  paperwork was after lunch.
17       Do you remember telling him that?
18  A   No, I do not.
19  Q   How many people were in the store at the
20  Miller's purchase?
21  A   I could not tell you that.
22  Q   By the way, back up for just a minute.
23       You did go to Sports Authority.

Page 14

1        You do concede that now?
2   A   I did go to Sports Authority.
3   Q   Do you remember when you went there?
4   A   I believe it was some time in April.
5   Q   April of '96, is that correct?
6   A   Correct.
7   Q   All right.  And when you went to the
8   Sports Authority, did Tom go with you?
9   A   No, he did not.
10  Q   So, you went on your own?
11  A   I went at his request - on my own.
12  Q   Do you understand my question to you was,
13  did you go on your own?
14  A   I did.
15  Q   Okay.  Now, before you went to Sports
16  Authority and you had every intention to make a
17  purchase if that was appropriate at the time, you
18  indicated that you went at Tom's request and he had
19  asked you to do this.  Is that right?
20  A   Yes.
21  Q   Now, and, did you discuss with him how
22  this purchase was going to be made in terms of paying
23  for it?

Page 15

1   A   No.
2   Q   Did he say to you, - make the purchase in
3   cash?
4   A   No.
5   Q   Did he tell you not to use your credit
6   card?
7   A   No.
8   Q   Did he tell you not to use a check?
9   A   No.
10  Q   All right.  Did he tell you specifically
11  what type of gun you were to purchase?
12  A   No.
13  Q   .25 caliber?  .22 caliber?  .38 caliber?
14  None of that?
15  A   No.
16  Q   You said that you purchased bullets at
17  Miller's, correct?
18  A   Yes.
19  Q   Did Tom ask you to buy the bullets?
20  A   No.
21  Q   That was something that you did when the
22  store person suggested that to you, is that right?
23  A   That is correct.

Page 16

1   Q   So, you discussed none of these things
2   according to you before the purchase was made, with
3   Tom?
4   A   Could you say that again, please.
5   Q   You discussed none of the things we just
6   talked about, before the purchase was made, with Tom.
7   How to pay, what to pay with, - cash, check, credit
8   card, what type of gun, what type of bullets.  None
9   of that stuff was discussed.  Is that right?
10  A   We spoke about a type of gunm but not
11  specifically.
12  Q   So the answer to my question then is that
13  none of those things I just asked you were discussed
14  beforehand?
15  A   That is correct.
16  Q   Actually, Mrs. MacIntyre, you were
17  required to sign three documents when you made your
18  purchase of May 13, of 1996.  Is that right?
19  A   That is correct.
20  Q   Okay, and there were three separate
21  documents submitted to you by the salesman that
22  required your signature; is that right?
23  A   Yes.

Page 17

1    Q   And you've seen these in direct
2    examination, correct?
3    A   Yes, I have.
4    Q   And, if I could first go over with you
5    number 136.
6        That is your signature, is it not?
7    A   Yes, it is.
8    Q   Okay.  Now when you made this purchase,
9    it's you and a salesman, right?
10   A   Yes.
11   Q   Talking to each other.  Is that right?
12   A   Correct.
13   Q   Okay.  And the salesman is I guess asking
14   you questions and talking to you about things, and in
15   particular for whom you're purchasing the firearm,
16   right?
17   A   Correct.
18   Q   And he just like you and I are except he
19   is a lot closer to you than at this point, just the
20   two of you are discussing this transaction; is that
21   right?
22   A   That's right.
23   Q   All right.  The salesman gives you the

Page 18

1    form.  And the first one says, "I, Deboray MacIntyre,
2    residing at 2625 Delaware Avenue, hereby affirms,
3    under the penalties of perjury" - and you understood
4    at that time what perjury was, did you not?
5    A   Yes.
6    Q   Just like you understand today what
7    perjury is, right?
8    A   That is correct.
9    Q   And that's basically lying after you take
10   an oath and promise that you won't lie, right?
11   A   Yes.
12   Q   You then say that you're purchasing the
13   following firearm for "my personal, recreational,
14   sporting, target and/or self-defense use; it is not
15   my intention to give this firearm to another person".
16       Is that right?
17   A   That is correct.
18   Q   And on May 13th of 1996 that's what you
19   swore to.  Is that right?
20   A   I did.
21   Q   You now say that that was a lie.  That you
22   weren't buying this gun for yourself but that you
23   were buying it to give to Tom Capano, right?

Page 19

1    A   Yes, that is correct.
2    Q   The second document states, and this is
3    Exhibit 137, with the same date.  Which is a State
4    Bureau of Identification Criminal History Record
5    Check.
6        Now in that document you're told that the
7    making of any false oral or written statement with
8    respect to this transaction is a crime punishable as
9    a feloy.
10       Did you read that in the store?
11   A   Yes.
12   Q   And, nevertheless, that's your signature
13   there.  Is that right?
14   A   That is correct.
15   Q   And you are saying you committed that
16   crime today because today you're saying you bought
17   the gun to give to Mr. Capano is that correct?
18   A   That is correct.
19   Q   And as you're there talking to the
20   beguiled store owner, if you are to be believed now,
21   did you tell that store owner, what you're telling us
22   now, that the words you're putting down on these
23   documents as you spoke face-to-face with him, were

Page 20

1    lies?
2    A   I did not tell him they were lies.
3    Q   So basically talking face-to-face with the
4    store owner about this transaction, you lied to his
5    face?
6    A   I did lie to him, yes.
7    Q   How far was he away from you when you told
8    him this lie?
9    A   Three, four, feet.  Close.
10   Q   Third document.  Again dated May 13th of
11   1998.  By the way, had you ever met this store owner
12   before?
13   A   No.
14   Q   No.  Did you have anything against him?
15   A   No.
16   Q   He was just doing his job, right?
17   A   I suppose so, yes.
18   Q   Once again, on this document which is
19   State's Exhibit 138, you again are advised that you
20   must answer the questions correctly and if you are
21   buying the gun for somebody else you can't do it.
22   Right?
23   A   Yes.

D. MacIntyre 11/19/98 A-131

Page 21

1    Q   Okay. And once again you signed yet a
2  third document in which you say that you're buying
3  the pistol for, who?
4    A   For Tom Capano.
5    Q   No, no, you didn't say that on this
6  document did you?
7    A   Oh I'm sorry; I said I was buying it for
8  myself, yes.
9    Q   You swore three times May 13, 1996 that
10  the gun that you were buying was being bought for
11  whom?
12    A   Myself.
13    Q   And you told us on Thursday, that the
14  reason you would do this for him is because you loved
15  him and you wanted basically to do what he asked you
16  to do. Is that right?
17    A   That's correct.
18    Q   And you loved him so much that you were
19  willing to commit perjury, according to your
20  testimony now, in order to, - and which would
21  jeopardize yourself and your family. Is that right?
22    A   Yes.
23    Q   That's how strong your love for him was,

Page 22

1  right?
2    A   Yes.
3    Q   When is the first time, Mrs. MacIntyre,
4  that you began to think, - I think we talked about
5  this last week, that this gun might have something to
6  do with this case?
7    A   In the January 28, 1998 interview.
8    Q   Now that is not, is it, what you
9  previously told Det. Donovan?
10    A   Excuse me?
11    Q   I said that's not what you told Det.
12  Donovan when you spoke with him before, is it?
13    A   I was questioned as to why I never
14  connected the two. And I struggled why my thoughts
15  to come up with why I had not, and I believe I've
16  given the reason as to why I did not.
17    Q   Okay; I think my question was, is that
18  what you told Det. Donovan?
19    A   Again, I don't remember. I met with Det.
20  Donovan so many times, I cannot tell you
21  specifically.
22    Q   Let me be very specific. You started
23  again, your cooperation on February 27th, right?

Page 23

1    A   That is correct.
2    Q   And then you met with Det. Donovan on
3  March 13th, you may not know the dates, but they're
4  in the police reports, and again on April 25th okay.
5  On April 25 you were asked by Det. Donovan, okay, the
6  same questions that I just asked you. All right?
7  And do you recall telling him at that time that the
8  first time you spoke with the police, you were
9  thinking about the gun and the possibility it had
10  something to do with the case.
11        Do you remember telling him that?
12    A   I don't recall that. That's possible.
13    Q   The first time you spoke with the police
14  was on July 23rd of 1996. Was it not?
15    A   I believe it was.
16    Q   Or thereabouts?
17    A   I believe that's correct, yes.
18    Q   And you don't have a recollection today
19  that that's something that you spoke with him about,
20  or said to him?
21    A   It's possible, yes.
22    Q   All right. Do you remember the day that
23  Tom Capano's house was searched?

Page 24

1    A   Yes, I do.
2    Q   All right. Did you speak with federal
3  agents on that day?
4    A   Yes, I did.
5    Q   In particular, do you recall speaking with
6  Agents Cobb and Desderio?
7    A   Yes.
8    Q   That would have been July 31st of 1996?
9    A   Right.
10    Q   You then spoke with Det. Donovan again
11  before you went before the grand jury, right?
12    A   That is correct.
13    Q   And that would have been according to the
14  police records that we have, September 6th of 1996.
15    A   Correct.
16    Q   You went before the grand jury, September
17  10th of 1996, did you not?
18    A   I did.
19    Q   Okay. And then after going before the
20  grand jury, you met again I think with Agent Alpert
21  and others, on 2/4/97.
22        Do you remember that?
23    A   Yes.

JEAN PRESTON, Court Reporter

Page 21 - Page 24

1 document was made at the exact same time, well, not
2 the exact same time but during that same minute.
3 Right?
4    A   Yes.
5    Q   So that it would be fair to conclude that
6 the conversation that you had with Tom, on June 28,
7 was in fact less than a minute?
8    A   Yes.  Could have been, yes.
9    Q   Not two- to five?
10    A   Could have been a minute, could have been
11 two to five.  I couldn't give you an exact time until
12 you showed me that.
13    Q   When I asked you before, you said it could
14 are been two- to five minutes.  You didn't mention a
15 minute, did you?
16    A   No, I did not.
17    Q   All right.  You have that conversation at
18 approximately 10:31.  And when is the next time you
19 hear from Tom?
20    A   I believe when he arrived at my home that
21 evening.
22    Q   Okay.  Did you talk to him at all in the
23 meantime?

1    A   I don't recall that, no.
2    Q   Okay.  But, in any event, he came to your
3 house that evening at about 11 p.m., right?
4    A   Correct.
5    Q   He stayed overnight at your house, right?
6    A   Yes, he did.
7    Q   And he left the next day at about what
8 time?
9    A   I believe it was noon.
10    Q   That's Friday.  Saturday.
11       So at noon Tom leaves.
12       Now we're on Saturday, June 29th.
13       Now, after seeing him on Saturday and his
14 departing at around noon, you spoke with him next,
15 again, when?
16    A   I believe the next day.
17    Q   So, you don't recall speaking with him
18 again on Saturday?
19    A   I do not.
20    Q   And we then move to Sunday.  And this is
21 when you indicate that he comes to the house at 1
22 o'clock.  Right?
23    A   That is correct.

1    Q   Now, you say that you had not heard of
2 Anne Marie Fahey as of that time.  Is that right?
3    A   That is correct.
4    Q   But when you did find out about her, you
5 were very upset, weren't you?
6    A   Yes, I was.
7    Q   Basically, you say you learned on July 2nd
8 that the man that you waited for, for all those
9 years, and who you wanted to marry, was involved with
10 a younger attractive woman?
11    A   I don't know if those were my words; but.
12    Q   But you learned that?
13    A   Pardon me?
14    Q   But you learned that?
15    A   I learned that.
16    Q   How upset were you?
17    A   I was upset.
18    Q   Angry?
19    A   I was upset.
20    Q   Extremely upset, weren't you?
21    A   Yes, I was.
22    Q   Didn't you in fact find out about Anne
23 Marie Fahey, not on July 2nd, but on June 27th and

1 June 28th?
2    A   No, Mr. Maurer, I never heard of Anne
3 Marie Fahey until July 2nd.
4    Q   Didn't you go to 2302 Grant Avenue on June
5 27th or June 28th with a firearm to visit Tom?
6    A   Mr. Maurer, I never left my property from
7 the time I returned home from the Ardens Swim Club
8 until the next morning when I went to the Tatnall
9 School.
10    Q   Very strenuous about that, aren't you?
11    A   I am.
12    Q   Didn't you have your firearm at Tom
13 Capano's house on June 28th of 1996, where you first
14 learned about him and Anne Marie Fahey?
15    A   No, I did not.
16    Q   And you deny that your firearm discharged
17 that night inside that house, striking her?
18    A   I don't know what happened with that
19 firearm.  I gave that firearm to Tom Capano on May
20 13th.
21    Q   You deny that you discharged that firearm?
22    A   I deny that I discharged that time,.
23    Q   Are you absolutely certain about that?

Page 105

1    A  I'm certainly about that.

2    Q  Are you absolutely certain?

3    A  I'm absolutely certain.

4    Q  Is that what you say when you're sure of

5  something?

6    A  Mr. Maurer, I did not know of Anne Marie

7  Fahey until July 2nd of 1996.

8    Q  Listen to my question, please.

9        You just said that you were absolutely

10  certain that you were not at Grant Avenue on June

11  27th and June 28th, didn't you?

12    A  Correct.

13    Q  And when you say you're absolutely

14  certain, you're telling the truth and it's true,

15  right?

16    A  I'm telling the truth about this, yes, I

17  am.

18    Q  Do you have your statement to the police

19  dated January 28th of 1998, in front of you?

20    A  No, I do not.

21    Q  Okay.  Do we have that here.  Yes, we do,

22  it's with the tape.

23        Would you turn to page 24, please.

Page 106

1        Now, you had told this jury that basically

2  your January 28th statement is a complete lie.

3  Right?

4    A  A lot of it is, yes.

5    Q  And on page 24 you used certain language

6  there to describe things that you talked about.  Did

7  you not?

8    A  Correct.

9    Q  Mr. Connolly said to you, "Did you discuss

10  with Tom Capano your intention to dispose of the gun

11  prior to when you got rid of it?"

12        What was your answer?

13    A  "No".

14    Q  Next question was, "You're very certain

15  about that?"

16        What was your answer?

17    A  "Yes".

18    Q  Mr. Connolly said, "Absolutely certain?"

19        And what was your answer?

20    A  "I am absolutely certain about it".

21    Q  So even though you indicated there that

22  you were absolutely certain about that, it was a lie,

23  wasn't it?

Page 107

1    A  Yes, this was a lie.

2    Q  You were then asked some additional

3  questions, talking about your security system.  Mr.

4  Connolly says where you said, he says, "When did you

5  first tell him," by, "him" I think you meant Tom,

6  "that you had gotten rid of the gun?"

7        Your answer was, "Probably shortly

8  thereafter.  I mean, I did it right away, probably

9  the next day I told him, say Sunday, right"?

10    A  Correct.

11    Q  Mr. Connolly's next question was, "And

12  what was his reaction?"

13        And your answer was what?

14    A  "Got to update your security system."

15    Q  Mr. Connolly then reminded you that you

16  were under oath.  Did he not?

17    A  Yes, he did.

18    Q  And he said, "Are you -- and I want to

19  remind you that you're under oath."

20        Your answer was?

21    A  "Yes".

22    Q  He then asked you, "Are you absolutely

23  certain that Tom Capano never touched that gun?"

Page 108

1        And your answer was, what?

2    A  "Yes, to the best of my knowledge."

3    Q  You're also I take it then, -- strike

4  that.  Let me back up.

5        You were familiar with the furnishings at

6  Grant Avenue, were you not, having been there?

7    A  Yes.

8    Q  And in deed, you had been in that great

9  room several times, had you not?

10    A  Correct.

11    Q  You were familiar with the rug that was on

12  the floor of the great room prior to, sometime in

13  July, when you first noticed it was missing, right?

14    A  That is correct.

15    Q  How big is the great room?

16    A  (No response).

17    Q  Estimate?

18    A  Twenty by twenty, maybe.

19    Q  Did the rug cover the entire room of the

20  twenty by twenty room?

21    A  Most of it.

22    Q  Okay.  Decent size room, decent

23  size rug, correct?

Page 135

1  Q. I asked you if you recalled the defendant said
2  he would not be surprised if we found blood in his
3  house. Since -- At some point, you became a member of
4  the defense team for the defendant. Isn't that right?
5  A. From a legal standpoint, I guess that's
6  correct, yes.
7  Q. Okay. Now, I'm going to show you -- You also
8  testified in front of the Grand Jury March of 1997,
9  didn't you?
10  A. Yes, I did.
11  Q. You testified under oath?
12  A. Yes, I did.
13  Q. I'll show you what I'll have marked as State's
14  for Identification I, and I would ask you to read Lines
15  2 through 5 to yourself, please.
16     Okay. Now I'm going to ask you again. Did
17  the defendant tell you in the summer of '96 that he
18  would not be surprised if blood was found in his house?
19  A. Yes, he did, according to that testimony,
20  which I would stand by.
21  Q. You would stand by this testimony?
22  A. Yes.
23  Q. Now, did he tell you what he thought might

Page 135

1  to testify in front of the Grand Jury with the
2  defendant before you testified?
3  A. Yes. We had lunch on a weekly basis.
4  Q. So he knew you were going into the Grand Jury?
5  A. Yes, he did.
6  Q. And he knew he had told you all these things
7  that would account for blood. Isn't that right?
8  A. Yes, he did.
9  Q. And he knew you were going to be under oath
10  when you testified before the Grand Jury, didn't he?
11  A. Yes, he did.
12  Q. Now, you testified in March of 1997. Do you
13  recall meeting the defendant on July 9, 1996 in your
14  office?
15  A. Yes, I do.
16  Q. What did the defendant say to you when he
17  entered your office?
18  A. We had prearranged the meeting, and he came in
19  to tell me what his side of the story was.
20  Q. How did he appear when he came in?
21  A. He was a little upset.
22  Q. Well, do you recall telling the Grand Jury
23  that he was distraught?

Page 134

1  account for blood in the house?
2  A. Yes, he did.
3  Q. What did he tell you?
4  A. He said, like me, we have four kids, and the
5  kids run around all the time and always get banged up,
6  and that could be a reason for blood. Or Annie had
7  been over there a number of times cooking dinner, could
8  have cut her finger, or hanging pictures up on the
9  wall.
10  Q. This is Annie, Anne Marie Fahey?
11  A. Yes, it is.
12  Q. What else did he tell you could account for
13  the blood in the house?
14  A. That's all.
15  Q. Didn't he say that Anne Marie Fahey was a
16  heavy menstrual bleeder and that would account,
17  possibly, for the blood in his home?
18  A. Yes, he did.
19  Q. Didn't he say she was such a heavy menstrual
20  bleeder she had bled through her clothes on occasion at
21  work and had to leave?
22  A. Yes, he did.
23  Q. Did you discuss the fact that you were going

Page 136

1  A. If that's the word I used, said, distraught,
2  yes.
3  Q. What was he?
4  A. Upset.
5  Q. And what did he tell you?
6  A. He recounted the --
7  Q. Let's go to the beginning of the conversation.
8  What did he say to you?
9  A. He asked me if I wanted to -- If I recall, he
10  asked me if I wanted to know what had happened and what
11  the history of their relationship was, his relationship
12  with Anne Marie.
13  Q. And did he tell you then what happened on June
14  27?
15  A. Yes.
16  Q. Now, what did you do when he's telling you
17  this?
18  A. Listened.
19  Q. And after he told you, what did you do?
20  A. I suggested that we prepare some kind of
21  statement because it had been eight, nine days, and he
22  had not said anything or had not contacted the family,
23  and that we should do those two things. So I prepared

State v. Thomas J. Capano      Condenseit!      November 30, 1998

Case 1:06-cv-00058-***   Document 337   Filed 02/20/2007   Page 31 of 40

Page 139

1 a one-page statement based on what he told me.
2   Q. Did you type it in your computer?
3   A. Yes.
4   Q. Was he in the office when you did it?
5   A. Yes, he was.
6   Q. Did you print it out?
7   A. Yes.
8   Q. Did you give him a copy of it?
9   A. Yes.
10   Q. Did he look at it?
11   A. Yes.
12   Q. Did he appear to read it?
13   A. Yes.
14   Q. What did he tell you about the statement?
15   A. He said it looked pretty good to him, and he
16 would take it to his lawyers and get back to me in the
17 afternoon.
18   Q. By "looked pretty good," what did you
19 understand that to mean?
20   A. That it was accurate.
21   MR. CONNOLLY: Your Honor, at this point, I
22 would move to introduce State's Exhibit 179.
23   MR. MAURER: Without objection, Your Honor.

Page 138

1   THE COURT: Without objection, State's Exhibit
2 179 is admitted.
3   (State's Exhibit No. 179 was admitted into
4 evidence.)
5   THE COURT: You don't have a smaller copy of
6 the exhibit?
7   MR. CONNOLLY: I do. First I'm going to show
8 it to the witness.
9 BY MR. CONNOLLY:
10   Q. Mr. Murphy, I'm going to show you State's
11 Exhibit 179. Do you recognize that?
12   A. Yes, I do.
13   Q. What is it?
14   A. It's the statement I prepared.
15   Q. In fact, you've signed it on the bottom.
16 Isn't that right?
17   A. That's correct.
18   Q. So it's a true and accurate copy of what you
19 prepared?
20   A. Yes.
21   Q. And this is the same statement Mr. Capano
22 looked at and said "looked pretty good"?
23   A. That's correct.

Page 139

1   Q. Did you ever release the statement to the
2 public?
3   A. I'm sorry?
4   Q. Did you ever release the statement to the
5 public?
6   A. No.
7   Q. Now, I'm going to show you State's for
8 Identification -- Let me get it marked State's for
9 Identification J. This is a blow-up of the same
10 statement, isn't it?
11   A. Yes, it is.
12   (State's J was marked for identification.)
13   Q. Now, Mr. Murphy, I'm going to give you back
14 State's Exhibit 179, and I would like you, if you
15 would, to read this slowly for us into the record.
16   A. "Statement by Thomas J. Capano in the
17 disappearance of Anne Marie Fahey, July 9, 1996.
18   "The disappearance of Anne Marie Fahey remains
19 as much a mystery to me as it does to her family and
20 friends. I can only say I share the gut-wrenching
21 emotions of Anne Marie's family, and pray for her safe
22 return.
23   "While I can do nothing to end the speculation

Page 140

1 of the public and press, I can state for the record the
2 pertinent facts of my last meeting with Anne Marie.
3   "I did have dinner with Anne Marie in
4 Philadelphia on the evening of Thursday, June 27. We
5 returned to Wilmington. We drove to her apartment at
6 approximately 10:00 p.m. I walked Anne Marie into her
7 apartment, stayed a few moments, said good night and
8 left. I noticed nothing unusual as I left. That was
9 the last time I saw or spoke to Anne Marie. I then
10 drove home, where I remained until I left for the
11 office the next morning.
12   "While Anne Marie had some problems, there was
13 nothing out of the ordinary in either her conversation
14 or behavior that would lead me to believe anything was
15 amiss. I am at a complete loss to explain what caused
16 her disappearance.
17   "It is difficult to respond as to how others
18 may characterize our relationship. Frankly, the nature
19 of our relationship is and will remain a matter between
20 Anne Marie and myself. What is relevant and important
21 is that Anne Marie and I are good friends and parted
22 company good friends that evening.
23   "I was informed of Anne Marie's potential

Case 1:06-cv-00058-*** Document 31 Filed 02/20/2007 Page 32 of 40

**Page 37**

1 Carpenter, 1-10-96-cv-10 ***
2 Q. I'm going to show you what's been marked or
3 introduced, rather, as State's Exhibit 210. Do you
4 recognize that?
5 A. Yes. That's the invoice for the carpeting
6 that we bought.
7 Q. All right. And now I'm going to show you
8 State's Exhibit 215. Do you recognize that?
9 A. Yes. That's the sample of the carpeting that
10 we gave to you when you called us up and asked us about
11 it.
12 Q. Okay. And basically, you were contacted by
13 the investigators. Right?
14 A. Yes.
15 Q. And you gave that sample to whom?
16 A. To Detective Donovan, I believe.
17 Q. The gentleman seated there?
18 A. That gentleman right over there.
19 MR. CONNOLLY: No further questions,
20 Your Honor.
21 THE COURT: Mr. Oberly?
22 MR. OBERLY: I have no questions.
23 THE COURT: All right. I presume Mr. Marks

**Page 38**

1 may be excused also.
2 MR. CONNOLLY: I don't think we'll be
3 recalling him.
4 THE COURT: Thank you very much, Mr. Marks.
5 You're excused.
6 MR. CONNOLLY: Your Honor, the State calls
7 Ruth Boylan.
8 RUTH BOYLAN, having been called on the part
9 and behalf of the State as a witness, being first duly
10 sworn under oath, testified as follows:
11 DIRECT EXAMINATION
12 BY MR. CONNOLLY:
13 Q. Good morning, Mrs. Boylan.
14 A. Good morning.
15 Q. Mrs. Boylan, in 1996, did you work as a
16 housekeeper for Thomas Capano?
17 A. Yes, I did.
18 Q. How often would you go to clean his home?
19 A. Every other week.
20 Q. And was his home located at 2302 Grant Avenue?
21 A. Yes.
22 Q. What day of the week would you go?
23 A. Monday.

**Page 39**

1 Q. And did you go to his home on June 24, 1996?
2 A. Yes, I did.
3 Q. You're checking your calendar in front of you,
4 I take it.
5 A. Yes.
6 Q. Did you go on July 22, 1996?
7 A. Yes, I did.
8 Q. And that would have been four Mondays later
9 from June 24. Is that right?
10 A. Yes.
11 Q. Now, did you go on July 8, 1996?
12 A. No.
13 Q. Why didn't you go on Monday, July 8, 1996?
14 A. Because Mr. Capano called and said that they
15 had been away for the holiday weekend, and the house
16 did not need to be cleaned.
17 Q. Now, when you went to the house the next time,
18 on July 22, was anything different?
19 A. Yes.
20 Q. What was different?
21 A. The sofa was missing and the carpet had been
22 taken up, and an area rug was there.
23 Q. And in what room were these changes made?

**Page 40**

1 A. Excuse me?
2 Q. In what room of the house were these changes
3 made?
4 A. Well, I would call it a den, and it had a
5 dining area.
6 Q. Was there a dining room table in this room?
7 A. Yes.
8 Q. And was it kind of off of the kitchen?
9 A. Yes.
10 Q. Was it above the garage, if you remember?
11 A. Yes. Well, I don't know that it was over the
12 garage, but it was a floor above the garage.
13 Q. The couch that you said was missing, what did
14 that couch look like?
15 A. It was a deep rose with a pineapple print or
16 motif.
17 Q. And was the motif a different color or was it
18 kind of a solid color?
19 A. Might have been a little lighter.
20 Q. And was the -- What kind of condition was the
21 couch in when you had seen it, let's say, on June 24,
22 1996?
23 A. Very good.

State v. Thomas J. Capano    Condensit!    December 2, 1998

Case 1:06-cv-00058-***   Document 3   Filed 02/20/2007   Page 33 of 40

Page 121

1  Q. And you can't tell us whether the shot that
2  was fired came from the bottom, out the side, or from
3  the side through the bottom. Correct?
4  A. No, sir.
5  Q. You can tell us that it was a bullet that
6  caused it?
7  A. A projectile, bullet, or slug of some sort.
8  MR. OTERI: Nothing else, Your Honor.
9  MR. WHARTON: Nothing further, Your Honor.
10  THE COURT: Mr. Ennis, thank you for your
11  testimony. You're excused.
12  THE WITNESS: Thank you, Your Honor.
13  MR. WHARTON: Kenneth Chubb.
14  KENNETH CHUBB, having been called on the part
15  and behalf of the State as a witness, being first duly
16  sworn under oath, testified as follows:
17  DIRECT EXAMINATION
18  BY MR. WHARTON:
19  Q. Mr. Chubb, good afternoon.
20  Where do you live, sir?
21  A. Elmertown, Pennsylvania.
22  Q. Where is that located?
23  A. Right near Hershey.

Page 122

1  Q. Do you have any connection to Delaware?
2  A. Yes. We've been going to Delaware since
3  1981. We have a place down there and a boat.
4  Q. Where is your place?
5  A. The mailing address is Millsboro, Delaware.
6  It's off of Long Neck Road, in a park called Bay City.
7  Q. That would be near Rehoboth Bay?
8  A. Right off Rehoboth Bay, near Indian River.
9  Q. I think you said you had a boat.
10  A. Yes.
11  Q. Are you a fisherman?
12  A. Yes, I am.
13  Q. How long have you going down to Bay City?
14  A. We've been at Bay City since 1986.
15  Q. Do you know a fellow by the name of Ronald
16  Smith?
17  A. Yes, I do. He has his boat right next to
18  mine.
19  Q. I want to ask you if you can go back to the
20  July 4th weekend of 1996. Were you down at your place
21  during that weekend?
22  A. Yes, we were.
23  Q. Did you go out fishing that weekend?

Page 123

1  A. Yes, we did.
2  Q. You say "we." Who are you talking about?
3  A. I'm talking about my son, his wife, and three
4  children, my wife and I.
5  Q. Did you all go out fishing?
6  A. We all went fishing, right.
7  Q. Let me ask you if, when you were out, over
8  that weekend, you found anything out in the water.
9  A. Yes, I did. In the afternoon, we were
10  finished fishing, and we started back in. I started
11  the engines up, and started to head for home, and my
12  boy said, "I see something floating over there, Dad."
13  He said, "What is that?" I said, "Let's go over and
14  take a look."
15  Q. Where were you? About how far out were you?
16  A. Between 8 and 10 miles.
17  Q. Off Indian River?
18  A. Off Indian River, correct.
19  Q. After your son called your attention to
20  whatever it was that was floating over there, what did
21  you do?
22  A. I pulled alongside this, and he said, "It's a
23  cooler." And I said, "Well, grab ahold of it and pull

Page 124

1  it in the boat."
2  Q. Did he do that?
3  A. Yes, he did. He dumped the water out and
4  pulled it in. It didn't have a lid, and it was missing
5  a handle.
6  Q. What else did you notice about it?
7  A. It had two bullet holes in it. And this sort
8  of amazed us all. We were questioning, wondering why
9  anybody would shoot it. Looked like a brand new
10  cooler.
11  Q. What did you do with it?
12  A. I put it on board the boat, because I had an
13  old one sitting there with the fish in it that was all
14  beat up. It was real old and the bottom was smashed.
15  And I thought, Well, I can take the top off of mine and
16  the handle, and I'll convert this one, and patch them
17  two holes, and I can make myself a nice cooler.
18  Q. Did you bring it into shore?
19  A. Yes, I did. Brought it back into Bay City and
20  docked the boat.
21  Q. Did you see Mr. Smith when you came back in?
22  A. When I docked the boat, I put this cooler over
23  on the dock, and Ron was working on his boat. I said,

J. Capano-Direct

1    subjects that we discussed?

2         A    Yes.

3         Q    And were you under oath at that time as

4    well?

5         A    I'm not sure we discussed anything about

6    Gerry -- or anything else but the cooler.

7         Q    And his interest in boats?

8         A    I'm not sure we discussed that either.  We

9    may have.

10        Q    Whatever is in the transcript is what is

11   there?

12        A    Yes.

13        Q    You were under oath then too?

14        A    Yes.

15        Q    Let's talk a little bit about the cooler.

16   Did you have any conversations in the spring of 1996

17   with your brother Tom relating to his desire to buy a

18   present for Gerry?

19        A    Yes.

20        Q    Tell us about those conversations.

21        A    March, April of '96, I was at my mother's

22   home.  Tom was there.  He expressed a desire to get

23   something for Gerry, a multiple gift, if you would,

1    something that expressed his appreciation for Gerry

2    treating his daughters as well as he had the previous

3    summer, and the anticipation of spending a lot of

4    time at the shore the coming summer.  He wanted to

5    get Gerry something because he assumed his children

6    would be spending a lot of time at Gerry's house,

7    using all Gerry's water toys.

8        Q    Did Tom have anything in particular in mind

9    at that time?

10       A    No.

11       Q    Did you make any suggestions to him?

12       A    Yes.

13       Q    What did you suggest that he buy for Gerry?

14       A    Well, at the time I was involved with the

15   possibility of the construction at the Sports

16   Authority, so I had been on the 202 job where they

17   have the store and looking at their inventory, and we

18   were deciding whether or not we were going to do this

19   job.  And I noticed that they have quite a bit of

20   fishing equipment there, and I suggested to Tom that

21   he go there and purchase something, and a cooler was

22   one of the things that I suggested because Tom has no

23   knowledge of fishing or boating and couldn't possibly

1 THE COURT: Has any member of the jury come
2 into contact with any information concerning this case
3 since we recessed last week?
4 (No response.)
5 THE COURT: There are no affirmative answers.
6 Again, I assure you we have been working this
7 morning.
8 Mr. Oteri.
9 MR. OTERI: Thank you, your Honor.
10 Defense calls Dr. Carol Tavani.
11 ------
12 CAROL A. TAVANI, M.D., having been called on
13 the part and behalf of the Defendant, having been duly
14 sworn according to law, was examined and testified as
15 follows:
16 ------
17 DIRECT EXAMINATION
18 ------
19 BY MR. OTERI:
20 Q. Would you state your full name, please?
21 A. Dr. Carol A. Tavani.
22 Q. And where do you practice, Doctor?
23 A. I practice at Christiana Hospital.

1 Q. And that's in?
2 A. That's in Newark, Delaware.
3 Q. All right.
4 And are you a doctor of -- medical doctor?
5 A. Yes.
6 Q. All right. And where did you receive your
7 education?
8 A. I went to Cabrini College in Radnor,
9 Pennsylvania; then Villanova University, Jefferson
10 Medical College, the Medical Center of Delaware, now
11 Christiana Care Health Systems, and then Jefferson
12 again for residency.
13 Q. All right. And you became a physician in
14 what year, Doctor?
15 A. 1979.
16 Q. And are you licensed in any state?
17 A. Delaware.
18 Q. What year were you licensed in?
19 A. 1979 --
20 Q. Might I suggest '80?
21 A. -- or '80.
22 Q. Okay.
23 A. Internship.

1 Q. Are you certified by any specialty boards?
2 A. Yes. By the American Board of Psychiatry and
3 Neurology.
4 Q. That's board certification?
5 A. That's board certification. I got that in
6 '85.
7 Q. And how do you get that?
8 A. Well, that consists of a two-day examination,
9 first written, and then after the written exam is
10 passed, there's an oral examination which is given.
11 Q. And you received that in 1985?
12 A. Yes.
13 Q. And are you a Fellow of any kind of --
14 A. Yes. I'm a Life Fellow of the American
15 Psychiatric Association.
16 Q. What does that include? What does that mean?
17 A. That is a distinction. It's rather simple to
18 become a member of one's professional organization,
19 but fellowship demands that you've met certain
20 criteria, that you've had certain honors or
21 distinctions.
22 Q. All right. And are you a Diplomate of any
23 particular organization?

1 A. Diplomate of, again, the APA, the American
2 Psychiatric Association, National College of Forensic
3 Examiners. Several organizations.
4 Q. You are not a forensic psychiatrist, are you?
5 A. No, I'm not.
6 Q. You are a -- what kind of psychiatrist?
7 A. I am an in-the-trenches physician. What I
8 mainly do and what my major expertise is
9 neuropsychiatric difficulties in people who have some
10 disorder of the brain in people who are hospitalized,
11 have medical or surgical problems, problems after
12 surgery, problems after trauma, after head injuries,
13 some insult to the brain, and the pharmacology
14 therein. That's my area.
15 Q. And you -- as you told us you practice at
16 Christiana. Do you practice anywhere else?
17 A. Yes. I spend a good 15 hours a week in the
18 correctional system with Prison Health Services
19 treating the inmates both at Gander Hill and at the
20 women's prison.
21 Q. And you are employed there by an organization
22 that has a contract with Gander Hill?
23 A. I'm employed there by Prison Health Systems.

Page 113

1 was in his own best interests. His thought processes
2 just were not on target.
3     MR. OTERI: Thank you, Doctor.
4     Judge, this may be an appropriate time for
5 lunch.
6     THE COURT: All right. We will take the
7 luncheon recess. According to my watch it's five
8 minutes to 1:00. We will come back at 2:00 o'clock.
9 We will start on time.
10     Please take the jury out.
11     (Thereupon, the jury was excused for lunch.)
12     THE COURT: Court will stand in recess until
13 2:00 o'clock.
14     ------
15     (Thereupon, the luncheon recess was taken at
16 12:55 p.m., and then the proceedings continued as
17 follows at 2:10 p.m.)
18     ------
19     THE COURT: Please bring the jury in.
20     (Thereupon, the jury returned to the
21 courtroom.)
22     THE COURT: Dr. Tavani should resume the
23 stand.

Page 114

1     (Dr. Tavani resumed the stand at 2:10 p.m.)
2     MR. OTERI: Your Honor, may we approach?
3     MR. O'DONNELL: Regarding scheduling.
4     THE COURT: Concerning scheduling?
5     MR. O'DONNELL: Yes, sir.
6     THE COURT: You may come forward.
7     (The following proceedings were held at the
8 bench, out of the hearing of the jury.)
9     MR. OTERI: Your Honor, defendant offers Dr.
10 Tavani's notes subject to a redaction of sorts after I
11 go through them.
12     THE COURT: All right.
13     Mr. Wharton.
14     MR. WHARTON: We don't object to that.
15     THE COURT: All right. So this will be
16 admitted as Defense Exhibit 28 subject to a review by
17 the parties concerning any redactions that need to be
18 made before it goes to the jury.
19     MR. OTERI: Thank you, your Honor.
20     ------
21     (Evidence was marked for identification by
22 the Prothonotary as Defendant's Exhibit Number 28.)
23     ------

Page 115

1     MR. OTERI: Your Honor, the record may
2 indicate that I had to move the podium. My rear end
3 was blocking the witness from the view of the press.
4 I've done what they asked by moving the podium.
5     (Pause.)
6 BY MR. OTERI:
7     Q. All right. Now, Dr. Tavani, are you familiar
8 with a psychiatric term called "confabulation"?
9     A. Yes, I am.
10     Q. And can you tell us what that term means?
11 Define it, if you will.
12     A. Okay. Confabulation is really a rather
13 well-known neuropsychiatric symptom wherein you have a
14 brain that --
15     THE COURT: Just a second. We lost your
16 voice.
17     THE WITNESS: It's falling off.
18     (Pause.)
19     THE WITNESS: Can I be heard?
20     THE COURT: Yes.
21     THE WITNESS: Thank you.
22     MR. OTERI: Can you hear her back there?
23     THE WITNESS: Confabulation is a situation

Page 116

1 that is seen in diffuse organic brain disease or
2 malfunction wherein gaps occur in the memory. Spaces
3 occur almost like holes in Swiss cheese. And what the
4 mind does when these gaps occur is that it -- it tries
5 to fill these gaps in to make some sort of sense out
6 of reality. And the way it does this is, it inserts
7 things that either the person thinks must have been
8 what happened or maybe the person has heard that these
9 things happened or it might have been suggested to the
10 person or even asked as a question. But the person
11 who has these gaps in memory then takes this
12 understanding of what must have been or what was asked
13 of him or her, and the person inserts this into the
14 spaces to fill the gaps. And then this hybrid, if you
15 will, becomes the person's new truth. It becomes the
16 person's new memory.
17     I think that would be a simple explanation of
18 confabulation.
19 BY MR. OTERI:
20     Q. Do alcohol and illicit drugs -- how do they
21 affect the brain and this condition?
22     A. Well, confabulation historically is -- was
23 best known to occur in alcoholics. We have almost 100

Dr. Tavani 12/14/98 A-142

Page 153

1 even said. He doesn't remember most of what he said
2 and he either admits to what he doesn't remember or he
3 says it must have been; I'll believe you if you say
4 so.
5      This is a generality of those three pages,
6 without being -- putting you through the whole
7 recitation, if that's okay.
8      Q. Doctor, is it fair to say you have
9 approximately two more pages of these kinds of
10 examples?
11     A. I couldn't hear the beginning.
12     Q. Is it fair to say that you have approximately
13 two more pages --
14     A. Yes.
15     Q. -- of this kind of --
16     A. Yes. There are two more pages of these
17 kinds.
18     Q. Doctor, after reading these transcripts and
19 making these lists up, do you have an opinion as to
20 whether or not Gerry suffers from confabulation and
21 amnestic disorder?
22     A. He does suffer from confabulation, and he
23 unquestionably suffers from a serious amnestic

Page 154

1 disorder. In fact, he may actually suffer from
2 dementia. I could not definitively say that because I
3 have not personally examined Gerry. I would have to
4 know a little bit more about his mental status
5 specifically. I didn't want to go as far as to say
6 this had progressed into dementia, but it is
7 certainly, at the very least, a severely amnestic
8 disorder with confabulation.
9      Q. Okay. And, Doctor, you had -- in preparing
10 for your testimony here, you had provided to you by
11 the defense team a series of e-mails. Can you take
12 those e-mails out, please, Doctor?
13     A. Sure.
14     (Pause.)
15     I have the e-mails.
16     Q. Okay.
17     Now, Doctor, based upon your study of the
18 e-mails between Anne Marie Fahey and Tom Capano, and
19 vice versa, do you have an opinion based upon a
20 reasonable psychiatric certainty about Tom Capano's
21 states of mind during that period of time, January 1
22 through June 27th?
23     A. Yes, I do.

Page 155

1      Q. All right. What is that opinion?
2      A. Well, in general it can be said that -- with
3 regard to the relationship I assume you're asking me.
4      Q. Go ahead.
5      A. His state of mind, the e-mails indicate a
6 very warm, affectionate, cordial relationship really
7 throughout. The letters that I have date from 7/21/95
8 to 6/27.
9      Q. I would appreciate, Doctor, if you don't
10 refer to the e-mails as letters because we have other
11 letters in this case.
12     A. I'm sorry. The e-mails. The e-mails.
13 They're friendly. They're jocular. They're mutually
14 solicitous. There's mutual caring and concern
15 evident. There's a desire to please each other
16 throughout them. They both express frequent thoughts
17 of each other as well as love which will last forever.
18 There's interest expressed in each other's lives as
19 well as sharing of various intimacies of each other's
20 daily life events. There's mutual solicitation to see
21 each other. There's a statement of Miss Fahey asking
22 like if Mr. Capano is free, 2/1 correspondence.
23     On 2/7 there's a statement wherein she

Page 156

1 expresses her wish that the relationship be platonic.
2 She wants to be just friends. He accepts the limits
3 that she sets and says he will continue to be there
4 for her on her terms.
5      On 2/12 there was one -- there was one
6 negative one. She references an incident where he had
7 been calling very, very frequently, and the details of
8 that are unclear, but it clearly caused her to feel
9 distance since she was able to tell him that.
10 However, then in the same letter she apologizes for
11 her own behavior and she asks where he was the
12 previous night.
13     There's a jocular, affectionate letter on
14 2/13, and then these communications -- the e-mails
15 come to an abrupt halt until the 29th of April and
16 then pick up with the same affectionate tone and
17 poking fun at each other, essentially with resumption
18 of the same dynamics, I would say, and patterns as in
19 the earlier set.
20     And the letters continue through May and
21 those of June '96 begin, on 6/3, with his asking her
22 to dinner and reminding her about matters of self-care
23 and self-nurturance, which did he frequently in these

Dr. Tavani 12/14/98 A-143

STATE VS. THOMAS CAPANO          Condensed!                    DECEMBER 15, 1998

Case 1:06-cv-00058-***   Document 309   Filed 02/20/2007   Page 39 of 40        Page 111

Page 109

1    MR. OTERI:  Okay.  Thank you.
2    (The following proceedings were held within
3 the hearing of the jury.)
4    MR. O'DONNELL:  Based on that, we withdraw
5 the objection.
6    THE COURT:  Thank you.
7 BY MR. WHARTON:
8    Q.  All right.  Now, you're aware, are you not,
9 Doctor, from having reviewed Dr. Bryer's notes that
10 there are things in there that the patient told his
11 doctor, Dr. Bryer, within the context of his
12 psychiatrist/patient relationship which are
13 inconsistent with the notion that Anne Marie Fahey
14 died on June the 27th of 1996?
15    A.  Yes.
16    Q.  Okay.  Specifically when was the first time
17 that Dr. Bryer and the defendant met?
18    A.  It was -- I'll just flip to the date --
19 8/16/96.
20    Q.  Okay.  And in that 8/16/96 note, doesn't he
21 say about halfway down the page there that he denied
22 any involvement in her disappearance as well as any
23 violence towards her?

Page 110

1    A.  Yes, he does.
2    Q.  Okay.  And do you know, do you not, from the
3 representations that have been made in court that he
4 did at least have a role in her disappearance?
5    A.  Yes, I do.
6    Q.  You also know that he attempted to provide
7 Dr. Bryer with an explanation for blood in his
8 apartment or house?
9    A.  Yes, I do.
10    Q.  And that states that they would only have
11 intercourse, he and Anne Marie Fahey, while she was
12 menstruating?
13    A.  Yes.
14    Q.  And that the menstrual blood of Anne Marie
15 Fahey resulting from their intercourse would be what
16 the FBI would find in his house?
17    A.  Yes, he said that.
18    Q.  And are you aware that blood matching Anne
19 Marie Fahey's, at least to the odds of one in 11,000
20 that could be anyone else's, was found on a baseboard
21 and radiator cover?
22    A.  I'm not certain whether I knew that or not to
23 be honest.

Page 111

1    Q.  Okay.  In any event, baseboard and radiator
2 cover are not typical places you would expect to find
3 menstrual blood having been shed as a result of
4 intercourse; correct?
5    A.  I suppose, unless you had it on your hands
6 and you touched something.
7    Q.  Now, also you were aware, were you not, that
8 he told Dr. Bryer that he took Anne Marie Fahey back
9 to his apartment after their night together on the
10 27th and he heard nothing further from her?
11    A.  Yes.  I saw that.
12    Q.  That he initially believes she left for the
13 weekend to collect her thoughts and he now believes
14 she may have been a victim of random violence in her
15 neighborhood or perhaps isolating herself somewhere?
16    A.  Correct.
17    Q.  And that he recognizes that suicide is a
18 possibility but can't explain why her body hasn't
19 turned up.
20    A.  Correct.
21    Q.  Okay.  And this is a meeting -- this was the
22 first meeting he had with Dr. Bryer --
23    A.  Correct.

Page 112

1    Q.  -- which was on August the --
2    A.  16th.
3    Q.  -- 16th of 1996?
4    A.  Correct.
5    Q.  Correct?
6    A.  Correct.
7    Q.  Correct?
8    A.  Correct.
9    Q.  Okay.  Now, on August the 23rd of 1996, once
10 again he's in this conversation with Dr. Bryer and he
11 is the patient and Dr. Bryer is the psychiatrist?
12    A.  Yes.
13    Q.  And he's -- he tells Dr. Bryer that he feels
14 grief over her disappearance, slash, loss?
15    A.  Yes.
16    Q.  Of someone that he cared for deeply about?
17    A.  Correct.
18    Q.  Okay.  Well, he also complains about an
19 intensive interrogation of his 73-year-old mother?
20    A.  Yes.
21    Q.  Do you know if his mother was ever
22 interviewed?
23    A.  Do I know if his mother was ever

1 next witness is.

2     Please bring the jury in at this time.

3     (Jury entered the courtroom at 11:55 a.m.)

4     THE COURT: Mr. Oteri, would you call your

5 next witness?

6     MR. OTERI: Thank you, your Honor.

7     The defense calls Thomas Capano.

8     THOMAS J. CAPANO, having been called on the

9 part and behalf of the Defendant, having been duly

10 sworn according to law, was examined and testified as

11 follows:

12     ------

13     DIRECT EXAMINATION

14     ------

15 BY MR. OTERI:

16   Q. State your name, please, sir.

17   A. Thomas Joseph Capano.

18   Q. Thirty seconds and you wreck things.

19   A. Yeah, I know.

20   Q. How are you feeling? Are you all right?

21   A. No. I don't mean that in any way. I'm

22 perfectly competent to testify. I'm just -- I just

23 mean I'm nervous.

---

**Page 10**

1   Q. Are you on medications?

2   A. Yes, I am.

3   Q. What did you take today?

4   A. Um, Wellbutrin, Xanax, Lomotil and Tylenol.

5 I took that once. I'll take it again at two o'clock.

6   Q. Tom, you heard Dr. Tavani testify here for a

7 couple of days, did you not?

8   A. Yes, I did.

9   Q. You heard her description of you having

10 scattered thoughts and trouble concentrating.

11     Do you have that condition right now?

12   A. Yes.

13   Q. Are you having trouble concentrating

14 answering questions?

15   A. I will.

16   Q. Okay. So that I will take my time and you

17 take your time answering. Don't feel upset at all.

18 If you can't grab a word, just take your time. Okay?

19   A. Yeah.

20   Q. All right?

21   A. I ramble.

22   Q. Okay. We will give you all the time in the

23 world to get concentrated.

---

**Page 11**

2   Q. Tom, I would like you to tell the jury about

3 your background as it concerns your family, your

4 parents. As a kid growing up, what was it like?

5   A. Okay. This is kind of important to me,

6 Ladies and Gentlemen.

7   Q. Tom, can you pick the mike up a little so

8 they can hear you?

9   A. That way (indicating)?

10   Q. Yes.

11   A. I started to say that this part is pretty

12 important to me because I've been portrayed as a

13 spoiled rich kid born with a silver spoon in my mouth.

14     MR. CONNOLLY: Your Honor, we're going to

15 object. We're not going through his life history.

16     MR. OTERI: The defendant is on trial for his

17 life. The Government has painted a saintly picture of

18 Anne Marie Fahey and a demonic picture of the

19 defendant.

20     THE COURT: Background information. I'm not

21 interested in a complete life story.

22     Certainly take that information that you

23 think is relevant and I'll overrule the objection to

---

**Page 12**

1 that extent.

2     I would expect, again, Mr. Capano's responses

3 be in answer to your inquiries, rather than simply an

4 unimpeded presentment to the jury.

5 BY MR. OTERI:

6   Q. Please continue, Tom.

7   A. I come from a blue-collar background. My

8 father was a carpenter. All my uncles were in the

9 building trades. Both of my grandfathers were

10 immigrants. One was a stonemason. One was a

11 bricklayer. Most of my first cousins were in the

12 building trades. I come from a background of people

13 who worked with their hands. My brother Louis did.

14 My dad did go into the business not long before I was

15 born. He said he was always proud of the fact his

16 first job was to build an outhouse. But he, you know,

17 ultimately was fairly successful. I was educated in

18 the local parochial school.

19   Q. Excuse me, Tom. Before you get to that. Do

20 you have brothers and sisters?

21   A. Yeah.

22   Q. Tell us.

23   A. Yes. I have an older sister Marian. And I'm

---

**PATRICK J. O'HARE, RPR, CSR, OFFICIAL COURT STENOGRAPHER**