Case 1:06-cv-00058-... Document 32   Filed 12/20/2005   Page 1 of 25

1   the oldest. And then my twins is Doreen 32
2   younger than I am. Joey is three years younger than I
3   am. And then Gerry is 13 years younger than I am.
4   Q. All right. And those children were all
5   raised in your home with your parents with you?
6   A. Yes. Because of the age difference between
7   Marian and Gerry, Marian was off to college when Gerry
8   was born. That sort of thing.
9   Q. Now, what about your education?
10  A. Okay. I attended the local parochial school
11  and then Archmere for high school, Boston College, and
12  then Boston College Law School.
13  Q. And you graduated, I take it, from both of
14  those schools?
15  A. Yes.
16  Q. Okay.
17  A. Do you want the years?
18  Q. What?
19  A. Do you want the years?
20  Q. Doesn't really matter. Long time ago?
21  A. Long time ago.
22  Q. '74; correct, you graduated from law school?
23  A. From law school, yes.

1   probably started
2   about the age of 13 doing not-so-difficult stuff along
3   with my brothers.
4        As we grew older into our teens we literally,
5   you know, did pick-and-shovel work. I dug a lot of
6   ditches. I pushed a lot of concrete, moved a lot of
7   lumber and we all did that. Those are the kinds of
8   jobs that I held.
9   Q. You didn't sit in an office with an adding
10  machine?
11  A. No. Not hardly. If you knew my father you
12  would know that.
13  Q. Okay. Now, sir, at some point you married,
14  did you not?
15  A. Yes, I did.
16  Q. Can you tell us about your marriage and your
17  family?
18  A. Okay. Kay and I met in college. I'm a year
19  older than she is. She said when she was here she was
20  in the nursing school at Boston College and when
21  that -- you know, just basically dated each other
22  until she was finished school and got married in 1972.
23  Q. When she finished school, Tom, where were

1   Q. Okay. The rest of your family, are there any
2   other college degrees in your family?
3   A. In my immediate family?
4   Q. No.
5   A. Just my sister has a Master's degree in
6   counselling. Other than that, no. And among my first
7   cousins on my -- on the Capano side anyway, the first
8   generation born in this country, I think that there
9   are no other college educations except for I have an
10  aunt who was born in this country and she herself is
11  educated and so are her children.
12  Q. Just like the typical Italian family: the
13  rest go out and make money and one goes for an
14  education?
15  A. That's exactly right.
16  Q. Okay. Talk to us -- by the way, at some
17  point you married, did you not?
18  A. Can I --
19  Q. Go ahead.
20  A. Yes, I did. I was going to mention about
21  working.
22  Q. Go ahead.
23  A. My father believed in putting the boys to

1   you? She finished and graduated in '71?
2   A. Yeah. I just -- it's the reason I decided to
3   stay and go to BC Law School. I just finished my
4   first year of law school and she had just graduated
5   from college.
6   Q. And what happened then?
7   A. We were married in 1972 on the day of the
8   Watergate break-in.
9   Q. And what happened after that, do you
10  remember?
11  A. We stayed in Boston. I had two more years of
12  law school. Kay worked as a public-health nurse out
13  on the streets and I went to school. My parents, you
14  know, supported us, paid my tuition.
15  Q. All right.
16       Now, after you graduated from law school, you
17  came back to Wilmington?
18  A. Yes, I did.
19  Q. Correct?
20  A. Yes, I did.
21  Q. Before we talk about your career, your legal
22  career in Wilmington, let's take your family.
23       What happened in your -- with the family

Page 45

1    A. A few.

2    Q. A few. I don't want you to list them all.

3 List three, four, five of them.

4    A. I've been on the Board of Trustees at

5 St. Mark's High School, of Ursuline Academy, of

6 Padua Academy, and Archmere Academy. Very involved in

7 Catholic education.

8       Let's see. I was appointed to two

9 commissions, one by Governor Castle, one by Governor

10 Carper to investigate prisons both after major

11 escapes.

12       I was a board member of the National

13 Conference of Christians and Jews.

14       I was chairman of the Wilmington Parking

15 Authority.

16       I had a lot of activities with the Delaware

17 Bar Association. I was on the executive committee

18 there.

19       I was in charge of what's called the Bench

20 and Bar Committee which arranges meetings of lawyers

21 and judges.

22       I've been a member of -- appointed by the

23 Supreme Court of Delaware to what's called the Supreme

Page 46

1 Court Long-Range Planning Committee.

2       I was also picked to be one of only two

3 laymen -- two lawyers -- excuse me -- who -- on the

4 Ad Hoc Committee about a new courthouse. Of course,

5 what we recommended was ignored.

6       I've been -- I've been in innumerable

7 political committees. I guess I'm required to

8 probably stop here. And -- well, I was very active

9 both in my high school and college alumni

10 associations.

11    Q. Tom, you've heard testimony in this courtroom

12 concerning these coolers that are here (indicating).

13    A. Yes.

14    Q. Is it your testimony concerning --

15    A. I'm sorry. I can't hear you.

16    Q. You've heard testimony as to when and where

17 you purchased them; correct?

18    A. Yes.

19    Q. Can you tell us, Tom, when and where you did

20 buy them?

21    A. Well, I know I bought it at Sports

22 Authority. And the only reason I know the date is

23 because it's been talked about so often. It was

Page 47

1 sometime in April.

2    Q. All right. That's of 1996?

3    A. Correct.

4    Q. Where is the Sports Authority which you

5 bought this cooler located in relation to the home you

6 were living in?

7    A. It's fairly close. It's on Route 202.

8 Across from the Concord Mall on Route 202. It's

9 basically the closest shopping area to where I lived.

10    Q. Okay. And how did you pay for it?

11    A. With my credit card.

12    Q. And when you paid for it with a credit card,

13 you certainly knew that there would be a record of

14 that purchase if you were thinking about that at all?

15    A. Yes.

16    Q. Okay.

17    A. And I heard earlier that I purchased it on a

18 Saturday. Somebody testified to that.

19    Q. Yeah.

20    A. Yeah. Okay.

21    Q. But I mean, Saturday is what?

22    A. I heard the man say it's their busiest day.

23    Q. Okay.

Page 48

1       You went to buy this at a place in the

2 vicinity of the same area where you lived?

3    A. Yes.

4    Q. Paid for it with a credit card?

5    A. Yes.

6    Q. Okay.

7       Did you drive your own car -- your own

8 automobile, car? Did you drive your own automobile?

9    A. I can still understand most of the accent.

10 Yes, I drove my own car.

11    Q. Okay. The car you drove was what?

12    A. A jeep.

13    Q. That's a Jeep Wagoneer type of thing, not the

14 little --

15    A. Jeep Grand Cherokee.

16    Q. Okay. And it's registered to you or one of

17 your corporations?

18    A. No. It was registered -- it was registered

19 just to me, or me and Kay. And her Suburban -- I

20 don't know whether --

21    Q. It wasn't a jeep registered to some mythical

22 corporation?

23    A. No. My name and probably Kay's name.

Page 49

1  Q. Okay. You didn't cover the license plates or
2  anything else?
3  A. No.
4  Q. You didn't wear a disguise?
5  A. No. I was in ordinary clothes.
6  Q. Now, sir, is it fair to say that you made no
7  effort to conceal this purchase?
8  A. Extremely fair.
9  Q. All right.
10  Now, sir, who did you buy -- why you buy
11  this cooler?
12  A. I'm going to repeat basically my brother Joe.
13  My kids -- Gerry is, among other things, just
14  an overgrown kid. And he was very good -- had been
15  very good to my kids in Stone Harbor, in terms of
16  boating and various things with them. And I was very
17  grateful for that. And his kids and my kids, although
18  there's a big age gap, they're particularly close.
19  And so I wanted to do something for them. Like when
20  he first built his house down there I bought something
21  as a house gift. I thought, well, I'm going to have
22  the kids give him this for the 4th of July weekend,
23  which is when we typically start the season. It was

Page 50

1  just for the kids to give him as a thank you and also
2  because Joe had told me and I also knew -- I mean,
3  everybody in the family knew that Gerry was always
4  looking at the next bigger and better thing. In fact,
5  we argued about it.
6  Q. About what bigger and better thing?
7  A. A boat. I mean, a conversation that my
8  brother Joe described at my mother's house, we both
9  lamented the fact that the way he's a spendthrift, and
10  buys all toys nonstop, and I know Joe did and I
11  separately. I think probably even my brother Louis
12  did. We all preached to him, "Stop this. Stop this.
13  You don't need eight or nine jet skis or a collection
14  of six antique Corvettes. Just stop it."
15  Q. Now, I take it that you said you knew he was
16  looking to buy a boat?
17  A. Yeah. I'm sorry. I --
18  Q. It's all right.
19  A. -- apologize for rambling. I do. Yes.
20  Because I knew that he was looking for a new boat.
21  But it really didn't much matter because the boat he
22  had he could also use it there. It was big enough for
23  that.

Page 51

1  Q. Did you know that he had a cooler at that
2  time, smaller, but he had a cooler?
3  A. I'm sure he had coolers, but I don't know
4  how -- I figured, as Joey told me, you can't have too
5  many coolers. He was really into fishing. He was in
6  all these tournaments all the time.
7  Q. Now, sir, in your family, tell us about your
8  tradition of giving or not giving gifts on birthdays.
9  A. My siblings and I do not exchange gifts on
10  birthdays.
11  Q. All right.
12  A. My -- just don't.
13  Q. Okay. Now, you had this cooler from April?
14  A. Yes.
15  Q. You put it in your vehicle and drove it to
16  your home, I take it?
17  A. Yes, I did.
18  Q. Okay. What did you do with it when you got
19  it home?
20  A. I think that I first left it in the half of
21  the garage that I did not use for parking, but I soon
22  moved it because of reasons I'll explain I guess
23  later.

Page 52

1  I put it in the crawl space of the house.
2  The house I was renting at the time again was an older
3  home and it had a crawl space you could almost stand
4  up in. So I put it in the crawl space. It was a
5  finished basement.
6  Q. And how long did you leave it in the crawl
7  space or did you subsequently move it?
8  A. I'm sorry. I didn't hear.
9  Q. Did you subsequently move it from the crawl
10  space?
11  A. Yes.
12  Q. And can you tell us where you put it?
13  A. I didn't move this until June 27th.
14  Q. All right, sir. I obviously misunderstood
15  you.
16  Could you describe for me how far -- the
17  access to the crawl space?
18  A. The crawl space, the owner of the house who
19  was renting it had redone the basement basically on
20  his own and there was a rec room down there and
21  bathroom and laundry and the crawl space was across
22  from the laundry closet. It had louvered doors.
23  You'd just open the door and you would have to jump up

**Page 53**

1 or step up on something. Actually, it didn't come all
2 the way down. Once inside you had to stoop -- not
3 stoop like in a modern crawl space.
4    Q. It was in that crawl space for the next three
5 months?
6    A. Yes, as were a lot of other things.
7    Q. That was my next question.
8       Are there other things stored in the crawl
9 space?
10   A. Yes. Screens. Again, older homes often have
11 encasement windows. You have to take screens in and
12 out. Screens were down there. And the owner of the
13 home is the real handyman. I'm not. So he had a full
14 workbench with all sorts of tools and even cans of
15 paint to match what color the different rooms are.
16   Q. All right.
17      Now, at some point, sir, did you intend to
18 give this cooler to your brother?
19   A. Yes.
20   Q. And when did you intend to give it to him?
21   A. When we went to Stone Harbor 4th of July
22 weekend.
23   Q. Can you tell me, sir, does the 4th of July

**Page 55**

1 do it at my mother's home because, you know, my mother
2 is on the beach side and Gerry is on the bay side. So
3 there are fireworks.
4    Q. Now, sir, at some point you borrowed some
5 money from your brother Gerry?
6    A. Yes.
7    Q. Can you tell us how much money you borrowed?
8    A. I borrowed $8,000. I've heard him reference
9 to the fact in here that the check he wrote was for
10 $8,300. But I borrowed $8,000.
11   Q. Okay. And can you tell us, sir, how that
12 conversation took place? Was it in person? On a
13 phone? How did it take place?
14   A. It was on the phone.
15   Q. Tell us what happened.
16   A. I called him up and said, "How are you fixed
17 for cash?"
18      He said, "Fine."
19      I said, "I need eight thousand bucks for" --
20 "I'll pay you back within a day or two."
21      And he said, "Sure." And he brought me a
22 check, I'd say maybe the next day.
23   Q. Brought you a what?

**Page 54**

1 weekend have some particular significance to the
2 Capanos as it relates to Stone Harbor?
3    A. Yes. That's basically when summer starts for
4 us. I mean, yes.
5    Q. Okay. Tell us what that significance is.
6    A. The significance is the 4th of July weekend
7 is -- that's when we begin using the home in Stone
8 Harbor.
9    Q. Okay. That's --
10   A. And we also -- before that we had a house in
11 Wildwood, which is one town over. And it was the same
12 thing there: 4th of July we really got started at the
13 beach. Gerry was an exception to that.
14   Q. Is there some sort of a party that's held
15 there?
16   A. Yes, yes, yes, yes. We always have a 4th of
17 July party. I'm sorry.
18   Q. That kicks off the summer for you people
19 normally --
20   A. Yes.
21   Q. -- with the exception of Gerry?
22   A. Gerry is down much earlier, but he
23 participates in the 4th of July thing. And we usually

**Page 56**

1    A. A check.
2    Q. No. He didn't bring you a check.
3       MR. CONNOLLY: Your Honor, this is leading.
4       MR. OTERI: Strike that. You're absolutely
5 right. I apologize.
6       THE WITNESS: You know what? Yeah. I get
7 confused, too.
8 BY MR. OTERI:
9    Q. You called your brother?
10   A. He gave me the cash. He brought me $8,000 in
11 cash and I paid him back with a check.
12   Q. Let me ask you, sir, this: You called him
13 one day?
14   A. Yes.
15   Q. And your best memory of how soon did you get
16 the money from him?
17   A. It was no more than two days later, possibly
18 one day.
19   Q. How was the money delivered? Where did you
20 meet to get it? Did you pick it up?
21   A. Um, Gerry I guess called me up from the phone he
22 had in his truck and I -- he pulled over and
23 double-parked, or whatever he did, in front of the

**Page 57**

1  office building I worked in. And I went downstairs,
2  out into the street, jumped in his truck -- I
3  remember it was freezing cold -- and got the $8,000.
4  Q. And when you got the $8,000 from Gerry in his
5  truck --
6  A. Yes.
7  Q. -- was there a conversation?
8  A. Yes, surprisingly.
9  Q. All right. Tell us what the conversation was
10 about.
11 A. He was being nosey. Normally if one of us
12 went to the other one we wouldn't ask any questions.
13 We'd just do it.
14 Q. Had you ever done that before, borrowed
15 money, lent money to each other?
16 A. Yes. Sure.
17 Q. Okay.
18 A. And, you know, would always say, "Is there
19 anything, you know, you need? Is there any problem or
20 you need me for anything else?"
21    We'd just say, "No. Thanks for the loan.
22 I'll give it back to you as soon as possible."
23    But in any event, Gerry did ask me that

**Page 58**

1  question -- the basic question of: "Are you okay?
2  You know, are you having any problems?"
3     Then I said, "No, it's fine. I just need the
4  money." And then Gerry being Gerry got into his
5  tough-guy mold and --
6  Q. What did he say to you?
7  A. Well, you know, all sorts of things. I mean,
8  he raised issues of, was I threatened, was I being
9  blackmailed, was I -- did I have gambling debts, was
10 somebody, you know, as I said, blackmailing me. All
11 sorts of possibilities, you know, and I just kept
12 saying, "no," and he kept saying -- you know, Gerry
13 does picture himself as a very tough guy. And to some
14 extent a phrase my brother Joey used -- I don't
15 know -- "a wise-guy wannabe."
16    And so, finally, just to make him stop, I
17 said, "Yeah, yeah, yeah." And I got out of the truck
18 and left, but having told him I would pay him back
19 within a day or two, which I did.
20 Q. Is it fair to say that you never told him you
21 were being extorted?
22 A. Absolutely not. I never told him why I
23 wanted the money. I never told him why.

**Page 59**

1  Q. Now, is that behavior unusual concerning
2  Gerry and your perception of him?
3  A. No. It was typical of Gerry.
4  Q. Okay.
5     Now, at some point your brother Gerry
6  testified he gave you a gun?
7  A. Yes.
8  Q. Okay. Strike that.
9     Before we get to that, at that same
10 conversation when you were talking when you borrowed
11 the money from Gerry --
12 A. Yes.
13 Q. -- did he ever mention anything about
14 bringing people in to straighten a problem out for
15 you?
16 A. Yes.
17 Q. What did he say?
18 A. I mean, he had said often before, you know,
19 "If somebody is bothering you, I'll get somebody to
20 break his legs." It's like a line out of a movie.
21 Q. He said that that day?
22 A. Yeah, but he said it all the time.
23 Q. What did you do when he said it?

**Page 60**

1  A. I laughed.
2  Q. You did not ask him to obtain leg breakers
3  for you?
4  A. No, I did not.
5  Q. Now, at some subsequent time it was that
6  Gerry testified he gave you a gun.
7  A. Yes.
8  Q. Okay. Can you tell us about this gun? What
9  happened?
10 A. Well, first off, it was his idea. Not my
11 idea. I didn't ask for it. But I went along with
12 it.
13 Q. Where were you when this occurred?
14 A. Gerry and his family came to our home for
15 dinner an awful lot on Sundays. And it was just
16 always a lot of fun. Gerry -- my family has a
17 tradition of making homemade wine. Gerry has kept the
18 tradition up, although he doesn't do it the way my
19 grandfather did it.
20    He always brings a gallon of his homemade
21 wine. If anybody is familiar with Dego Red, it packs
22 a wallop. And Gerry would inevitably get very
23 inebriated. His wife always drove home. And at some

1 point two of us -- I had a pool table in the house.
2 We'd go in and shoot with some people and it was after
3 dinner and, you know, I was usually half hit and he
4 was 100-percent hit and that's when it came up,
5 because he raised with me again the issue about the
6 money. And then he told me that I ought to -- you
7 know, I ought to have some protection. I do admit I
8 did tell Gerry it was kind of strange living in a very
9 big house by myself. I mean, I rented a house. It
10 was big enough for all my kids but, you know, I was
11 there most of the time all alone. And unlike the
12 house on 17th Street, it didn't have an alarm system
13 and all I had was a baseball bat. But, you know, I
14 just -- I had told him that once in a while it gave me
15 the creeps and that's when he started on me that I
16 ought to have a gun. I believe my other brothers do
17 and I never owned one and --
18    Q. Have you ever fired a gun?
19    A. You mean --
20    Q. Have you ever fired a handgun?
21    A. No. Never fired one. I had one gun one time
22 in my life.
23    Q. A long gun?

1 around.
2    Q. Now, at some point Gerry had a conversation
3 with you about taking a gun, didn't he?
4    A. I'm sorry. I rambled again.
5       Yes. And he was pretty insistent. And so
6 partly to shut him up and partly because maybe it's
7 not a good idea not to have one, I went up to his
8 house.
9       Gerry, as you heard, is a big game hunter.
10 Shoots everything. And he did. He did not -- it's
11 funny, but you had to be there. I mean, he was
12 insistent I take a shotgun for the reasons that he
13 said. And I said -- and for the exact reasons he said
14 because he didn't want to take anyone but me, the
15 little one you got and he gave me this thing.
16       He said, "This thing ain't going to take
17 anybody down."
18       I said, "Gerry, I don't want no cannon in my
19 house." I don't want one of these other big things
20 that he had. "You know, I want the smallest thing
21 that you got." And he was upset. That's what I
22 took. That's what I took.
23    Q. Did you know how to use that gun?

1    A. Shotgun. It was with a Judge of this
2 Court. We almost got bagged by the wildlife people,
3 too. That was a good 20 years ago.
4    Q. So it's fair to say you're not familiar with
5 the use of handguns?
6    A. No. I've always been afraid of them. I
7 remember when I was a kid, like most kids go rooting
8 around at some point in your -- in places where you
9 shouldn't be, but you're bored. I remember finding a
10 gun that -- a handgun that belonged to my father. And
11 ever since then remembering that fact I never wanted
12 anything like that around my house. First of all, I'd
13 probably shoot myself with it rather than anybody I
14 was aiming at. And, secondly, you know, I had four
15 daughters in the house. I think this is significant
16 enough for me to mention. The house was -- the house
17 on 17th Street was a meeting place. It was a
18 crossroads. I mean, that's why Kay had that Suburban,
19 had to move up from the minivans because it had -- has
20 eight seat belts. Our kids are never alone. It
21 wasn't unusual to come home and find ten kids in the
22 house. It's still that way. So anyhow, I didn't want
23 a gun in the house when there was so many kids

1    A. Yeah. He showed me and then -- I mean, once
2 it's got bullets in it, you pull the trigger.
3    Q. He showed you how to do that, though?
4    A. He -- well, yeah. He showed me how to --
5 where this -- it had like a clip where you would --
6 you know, told me how to put that in and then how to
7 take the safety off and how to shoot it and whatever
8 else he showed me, because I didn't have any
9 experience.
10    Q. You took that gun with you?
11    A. Yes, I did.
12    Q. Do you remember approximately when this was?
13    A. Oh, I'd say it was around -- it was cold. It
14 was around the time of the conversations in the pool
15 room after dinner when the issue he raised with me, if
16 I was in trouble, and then we got talking about things
17 that could possibly -- terrible things that could
18 possibly happen to you to protect yourself against.
19       I should mention here, if I may, that I did
20 have the conversation with him about my children that
21 he described.
22    Q. What conversation?
23    A. Gerry testified that we had a conversation

**Page 65**

1  about my kids that, you know, if anybody hurt them
2  that I would kill them.
3  Q. Tell us about that.
4  A. Well, we had that conversation. I mean, I
5  said that frequently. If I've said it once I said it
6  1,000 times. I mean it. Anybody hurts my kids I kill
7  them.
8  Q. That's an expression that you use?
9  A. No. I mean it.
10  Q. Do you have a specific intent to kill anyone?
11  A. No. That's the way I feel. I feel most
12  fathers feel that way.
13  Q. You did say that to Gerry?
14  A. Sure.
15  Q. You said that to many other people?
16  A. Sure. Gerry said it, too. I mean, it's...
17  Q. Back to the gun.
18  A. Yeah. Sorry.
19  Q. The gun you received sometime either --
20  A. Either February or March.
21  Q. Okay. What did you do with the gun when you
22  received it?
23  A. I hid it.

**Page 67**

1  quickly I gave it back to him.
2  Q. Was there something that precipitated the
3  return of the gun?
4  A. Yeah. Again, kids in my house. You know, it
5  was even, you know, when the kids were with me, it
6  wasn't unusual for me to have eight girls spending the
7  night at the house. Sometimes even ten. A lot of
8  children traffic. And I thought uncomfortable with
9  it. I also felt a little more kind of embarrassed
10  about being so afraid like that. So I figured my
11  baseball bat would do.
12  Q. Okay. So you returned the gun to Gerry?
13  A. Yes.
14  Q. Okay. By the way, when you received the gun,
15  how was it packaged, or was it packaged?
16  A. It was not packaged.
17  Q. He handed you a gun?
18  A. No. Wait a minute.
19  (Pause.)
20  I know I was holding it in his house where he
21  keeps his safe. And I still don't understand how the
22  second floor holds that safe. But, anyway, where all
23  his weapons are stored. And I don't -- I don't

**Page 66**

1  Q. Where did you hide it?
2  A. I put it inside one -- sort of like a carry
3  bag and then I put that inside of a suitcase which
4  was -- the house was a three-story house. And so the
5  third floor was a walk-in attic where a lot of things
6  were stored, including the luggage, and that's where I
7  put it.
8  Q. If somebody broke in, it would take you a
9  week to go get the gun, wouldn't it?
10  A. Right.
11  Q. So you stashed it away?
12  A. I didn't really want it. I figured I've
13  always been told that, you know, usually if you don't
14  bother them, they don't bother you and just let them
15  take the televisions and whatnot.
16  Q. At some point did you do something with the
17  gun?
18  A. Yeah. I gave it back to Gerry.
19  Q. And can you give us an idea approximately
20  when that was?
21  A. I know I had the gun for less than a month.
22  I can't tell you whether it was two weeks, three weeks
23  or three-and-a-half weeks. But I know it was pretty

**Page 68**

1  honestly remember whether he gave me something that it
2  would sit in that I then carried out and I just -- my
3  best memory is that it did not, that I just had a
4  handgun. Knowing Gerry it probably sat inside of
5  something. He's very careful with his guns.
6  Q. And when you returned the gun to Gerry, did
7  you tell him you had no further need for it?
8  A. I'm sorry. I didn't hear you.
9  Q. When you returned the gun to Gerry, did you
10  tell him you had no further need for it?
11  A. Correct.
12  Q. What do you mean by that?
13  A. I was -- I never should have taken it in the
14  first place. It was a dumb idea. Too many kids in
15  the house. So I gave it back to him.
16  MR. OTERI: Your Honor, may we break here?
17  THE COURT: All right. We can take the
18  luncheon recess.
19  Please take the jury out.
20  (Jury excused at 1:00 o'clock p.m.)
21  THE COURT: Court will stand in recess until
22  two o'clock.
23  (Thereupon, the luncheon recess was taken at

1 room, which was a signal that Robert hadn't read it.
2 She was quite disappointed about that.
3    Q. Now --
4    A. We talked about her travel plans for the
5 upcoming weekend.
6    Q. Now, sir, at some point, if you can give me a
7 time frame, when did you become sufficiently concerned
8 about her condition to start contemplating an
9 intervention?
10    A. In February.
11    Q. Of what year?
12    A. 1996.
13    Q. And what did you do in conjunction with that
14 intervention?
15    A. I went to her apartment. I was as serious as
16 I could. I put my foot down. And I gave her $25,000
17 in cash, because she said she could never afford it,
18 and she would never bother her family for that and her
19 insurance wouldn't cover it. And I thought, well,
20 this is going to shock her, I mean, you know, if I do
21 something like this.
22    Q. All right. Now, you gave her $25,000 cash?
23    A. Yes.

1    Q. And --
2    A. Do you want to know what she did with it?
3    Q. I was going to ask: Where did you get it?
4    A. Oh, yes. I had made a cash withdrawal for
5 $8,000 and then one for $9,000, and I just felt stupid
6 doing that three days in a row at the same bank with
7 the same lady. That's why I asked Gerry for the
8 $8,000 in cash.
9    Q. You had $8,000, $9,000 and $8,000?
10    A. Right. I also knew there was something about
11 reporting over $10,000.
12    Q. I was about to say you may have felt stupid,
13 but you also knew that if you took more than $10,000
14 they report it to the IRS?
15    A. Yes. I had written a check for $25,000 or
16 something -- I mean, that was going to be a big deal
17 in the bank. I didn't want to draw too much attention
18 to myself.
19    Q. You were actually trying to get cash so your
20 wife and nobody else would know about it and give it
21 to Anne Marie Fahey --
22       MR. CONNELLY: Objection. Leading.
23       MR. OTERI: I'll withdraw the question.

1       THE COURT: Sustained.
2       MR. OTERI: I withdraw it.
3 BY MR. OTERI:
4    Q. Why were you trying to get this cash?
5    A. Well, I did want it to be confidential and I
6 figured showing Anne Marie a check for $25,000 and --
7 you know, I don't know the 25 -- I just figured a
8 hospital is so many bucks a day, 30-day treatments.
9 Why I didn't give her 30 instead of 25, I don't know.
10 But I thought it would, you know, shock her and let
11 her know how serious this was that I was willing to do
12 this because she needed that treatment that badly.
13    Q. And what did Anne do with the $25,000?
14    A. Threw it in my face.
15    Q. What did she say when she threw it at you?
16    A. Well, she was angry at first. And she's just
17 insisting she wasn't going and then she cooled off and
18 I said, "Annie, you have got to do this. You're
19 killing yourself. You know, nobody knows about this."
20 I mean, Robert knew about it and I think Brian, to
21 some extent. But no one else in the family. I said,
22 "This has got to stop. This has absolutely -- I
23 mean, I see you're wasting in front of my eyes."

1       She admitted to me that she needed the
2 residential treatment program. But the thing that
3 drove me nuts was she was very concerned about what
4 people would think of her; her co-workers and her
5 friends and even her family. So I said, "That's
6 ridiculous. You know your family loves you. They're
7 going to support you in this and you know who cares
8 about you."
9    Q. Did you take the money back, the $25,000?
10    A. Not all of it. I took most of it back. I
11 made her keep some of it because she was always broke.
12    Q. How much did you make her keep?
13    A. Probably about 1,000 bucks.
14    Q. So basically she rejected your gift?
15    A. Yes. She rejected the offer to go -- I mean,
16 I left on good terms. She wasn't angry at me at that
17 point. This was -- this was my attempt at shock
18 value.
19    Q. All right.
20       MR. OTERI: Your Honor, this may be a good
21 time to break.
22       THE COURT: All right. We will take the
23 afternoon recess at this time.

---

**PATRICK J. O'HARE, RPR, CSR, OFFICIAL COURT STENOGRAPHER**        Page 142 - Page 145

Page 170

1   A   Yes.  Depending on the occasion, it might be
2   two bottles of wine.
3   Q   This night you only had one?
4   A   Yes.  That was standard.
5   Q   All right.  And --
6   A   Excuse me.  Anne Marie actually had another
7   glass of wine after dinner while I had the liqueur.
8   That's what her choice was.
9   Q   All right.  Now, at some point the check was
10  brought to you by this waitress, correct?
11  A   Yes.
12  Q   What did you do?  How did you pay the check?
13  A   By credit card.
14  Q   That credit card was made out to whom in whose
15  name?
16  A   It was in my name.
17  Q   And what did do you with the credit card when
18  the check was presented?
19  A   I put it -- the check came in a little
20  booklet, so I put the credit card in there with it and
21  passed it over to Annie as I had been doing for quite
22  some time.
23  Q   Why did you pass it to Annie?

Page 169

1   A   Because I'm not real quick in math and she is,
2   again, especially because of all her years working in a
3   restaurant.  What I always tried to do was I wanted to
4   leave a 20 percent tip but I wanted to round it up.  I
5   mean, I wanted to round it off so it was two zeros at
6   the end of the charge.
7   Q   Did you want to leave a 20 percent tip to a
8   waitress who had been a klutz?
9   A   We talked about that.  The reason we did, we
10  figured that we would be punishing the other people who
11  worked there because the tips went into a pool.  So we
12  decided that we'd leave the regular 20 percent.
13  Q   All right.
14  A   And she figured the tip, she signed my name
15  and that was not unusual.  That often happened.
16  Q   That had been done in the past on numerous
17  occasions by Anne Marie for you?
18  A   Yes.  It was even done by Kim Hortsman for me
19  at the Ritz.
20  Q   Now, you left there at some point in the
21  evening, did you not?
22  A   Yes, we did.
23  Q   You had subsequently learned what time you

Page 170

1   left there?
2   A   Yes.  Something like 9:15 or thereabouts.
3   Something like that.
4   Q   Like 9:12?
5   A   Whatever was said.
6   Q   You left there and what did you do?  You
7   walked the length of the restaurant to go out?
8   A   Correct.
9   Q   And what happened?  Where did you go?  What
10  did you do?
11  A   As soon as we came out of the restaurant door
12  we turned to the right.  My car was unblocked so all we
13  had to do was get the keys from the valet.  And, you
14  know, I let her in the car.  And then I got in the car
15  and quite literally the entrance to 95 south is right
16  there.  There's only -- just jumped right on 95 south
17  and drove home.
18  Q   Okay.  And you drove from the restaurant to
19  where?
20  A   To Anne Marie's apartment.  Yes.  Directly to
21  Anne Marie's apartment.
22  Q   Do you have any idea as to about approximately
23  what time you arrived there?

Page 171

1   A   I wasn't watching the clock.  I just figured
2   roughly a half an hour from Philadelphia.  I mean, I
3   know I wasn't driving as fast as usual because we were
4   involved in a very energetic conversation.
5   Q   Tell us what the conversation was on the way
6   home.
7   A   She, Anne Marie, as I said before was a big
8   sports fan.  She was particularly -- Atlanta Olympics
9   were coming up.  She had talked about, boy, if she could
10  only go because she had friends who lived in Atlanta.
11  She would live with them and go to the Olympics.
12      I'm not into the Olympics, but I told her that
13  one of the bond underwriters I knew who worked in
14  Atlanta, he actually worked for a guy named Maynard Turk
15  who used to be the mayor of Atlanta and still had a lot
16  of connections, and my friend had told me and a couple
17  others that, you know, he could get tickets to the
18  Olympics, not necessarily to the premiere events but,
19  you know, to some of that some place.  And I told Anne
20  Marie that and she got all animated and she, you know,
21  she said -- it was typical of her to say when you told
22  her something that was good and instead of saying you're
23  kidding, she'd say, you lie.  And so we talked mostly

Page 174

1  about the Olympics on the way home. And, you know, I
2  said I'd call my friend, you know, the next day and she
3  would check -- she said she would check with her friends
4  who lived down there. So it was mostly a discussion
5  about the Olympics. She was pretty excited.
6      Q  How would you describe her mood?
7      A  She was up. She was animated.
8      Q  Okay. When you got to her apartment --
9      A  Yes.
10      Q  -- you drove directly down 95?
11      A  Yes.
12      Q  Got off at what exit, seven?
13      A  I don't know the number of the exit. I would
14  have gotten off at 202 south. And you come out on
15  Concord Avenue and turn right on Broom Street, go up to
16  Sallies, turn left at 18th Street and to Washington.
17  That was our typical route.
18      Q  And that took you as you say about 30 minutes?
19      A  I suppose.
20      Q  When you got to Anne Marie Fahey's house, what
21  did you do?
22      A  She went inside the house. We had talked
23  about she was awake enough we decided to watch ER

---

1  didn't. The apartment was so hot she just came right
2  back down again. It was getting closer, you know, to ER
3  starting and we had to -- she kept clothes at my house.
4  If she didn't want to wear her dress she could take it
5  off and put on a -- especially this time of year -- a
6  t-shirt, and I made sure I had a pair of I would call
7  gym shorts that were small, men's smalls she could get
8  into them.
9      Q  If you know, did she turn on the air
10  conditioner in her apartment?
11      A  Yes.
12      Q  All right. Did she tell you?
13      A  Well, excuse me. No. I don't believe she
14  did. I don't believe she did.
15      Q  Now, how long was she up in the apartment, do
16  you know?
17      A  It was a very short period of time, excuse me.
18  It was a very short period of time.
19      Q  Did she tell you why she didn't change her
20  clothing?
21      A  Because it was late, later than we thought.
22  She wanted to get settled in comfortably to watch the
23  show and also she knew she could change at my house.

---

Page 173

1  together. And we decided to do it at my house because
2  my house was cool and her house was hot as blazes.
3  She's on the third floor. No insulation. The sun beats
4  down on it all day long. So she ran upstairs, took the
5  doggy bag from the restaurant with her, I want to
6  mention that, and said she was probably going to change.
7  She brought something else upstairs. I think she
8  brought some of the -- she was used to me every week
9  giving her her food supply, the things that I learned
10  she would eat. And so I think I had a little Acme bag,
11  plastic bag with some soups and grains and things like
12  that in it and she brought that up as well.
13      Q  Were there any perishables in that bag?
14      A  No. Perishables were in my refrigerator on
15  Grant Avenue.
16      Q  She went up to the apartment with the bag of
17  groceries?
18      A  Right.
19      Q  And the doggy bag?
20      A  Correct.
21      Q  What was she to do in the apartment if you
22  know?
23      A  She was going to change clothes but she

---

Page 175

1      Q  What was the show you wanted to watch?
2      A  ER.
3      Q  She was up in her apartment for approximately
4  how long would you say?
5      A  Certainly no more than ten minutes.
6      Q  Now, she came down from her apartment --
7      A  Uh-huh. Yes.
8      Q  -- dressed as she was when she went up there
9  originally?
10      A  Yes.
11      Q  Got back into your car?
12      A  Yes.
13      Q  What happened from there?
14      A  We drove to my house on Grant Avenue.
15      Q  And about how long did that ride take?
16      A  Well, if you obey all the lights and stop
17  signs it's maybe three minutes, four minutes.
18      Q  Approximately what time did you arrive at your
19  house on Grant Avenue?
20      A  ER had started but just barely.
21      Q  Okay. So that would place it at shortly after
22  ten o'clock?
23      A  That is correct.

Page 178

1   know, at one point I went off and sat on the couch with
2 her and she might lay her head on my shoulder or
3 something like that. And we definitely did do that. It
4 was pretty much how it was going at the end of the show.
5    Q   All right. And you watched the entire show
6 with her?
7    A   Yes. Although Anne Marie, as Anne Marie
8 always did, well, most of the time did, Anne Marie often
9 falls asleep in front of television and never sees the
10 end of an eleven o'clock show because she wakes up so
11 early in the morning. At one point Anne Marie fell
12 asleep and I didn't wake her up. So I saw the entire
13 show and she did not. I did wake her up for the end.
14    Q   Could you move without waking her up? Could
15 you get up or down without waking her up?
16    A   Yes. Yes.
17    Q   The show ends, correct, at eleven o'clock?
18    A   Yes.
19    Q   After the show ends, what did you do?
20    A   Well, I heard the phone ringing some time
21 during the show. I didn't bother answering. I
22 suspected it was Debby because I had told Debby I would
23 probably see her later that evening. And it was not at

---

Page 176

1    Q   What happened? What did you do and what did
2 Anne Marie do when you got back to your house, or you
3 got to your house at Grant Avenue?
4    A   My house was cool enough that --
5    Q   Excuse me, Tom. Where did you park your car?
6 I'm sorry. Where did you place your
7 automobile?
8    A   In the garage.
9    Q   Okay.
10    A   And on that point, my garage was so narrow
11 that if I pulled in it was almost impossible for
12 somebody on the passenger seat to get out. So Anne
13 Marie would get out of the car, as my kids did and
14 anybody did, before I pulled in and then I pull in and
15 she walked in after me.
16    Q   So Anne Marie got out of the car. You pulled
17 into the garage?
18    A   Yes.
19    Q   And you did what then?
20    A   Then we went up those stairs that were
21 depicted and into the great room.
22    Q   All right. What happened when you were in the
23 great room? What did you do?

---

Page 177

1    A   Well, my air conditioner had been on all day.
2 It was very cool. And we watched ER. We watched ER.
3    Q   Did anyone change their clothing or --
4    A   Actually Anne Marie took off her pantyhose
5 just for the sake of being more comfortable. She did
6 not bother changing into any other clothes because it
7 was cool enough. She was comfortable enough.
8    I just took off my suit coat and tie. I
9 didn't need to change into shorts either. We both took
10 off our shoes.
11    Q   Where were you situated while you were
12 watching ER? Who was where?
13    A   We were seated, situated a couple different
14 spots. I typically would sit in the daddy chair.
15    Q   That's the recliner?
16    A   The recliner. I will call it that from now
17 on. And Annie would stretch out as best she could on
18 the love seat. It was a love seat. It was not a sofa.
19 It was not a sleeper couch as some people have said. It
20 was not -- it was big enough for her to lie down on but
21 only with her knees pulled up. You could not stretch
22 out the length of your body. It was not that big.
23    Now, during the course of the TV show, you

---

Page 179

1 all unusual for Debby to come over say eleven o'clock at
2 night and spend the night, especially during the summer
3 when her kids were out of school. And so at the end of
4 the show, and I remember how that show ended, but at the
5 end of the show, I got up to use the powder room and
6 there was a small study across from the powder room, so
7 I checked my voice mail and, sure enough, there was a
8 message from Debby.
9    Q   I'm sorry. Go ahead. Weren't you concerned
10 she would come over?
11    A   No. Because I think -- I mean, what I figured
12 was that, you know, Anne Marie and I might, you know,
13 hang out to the end of the news. Then I might take her
14 home. Sometimes we would both fall asleep. There were
15 literally times when she would wake up at 1;30, two
16 o'clock in the morning and we were both sound asleep,
17 and she would come over and kick me and say come on,
18 Capano, you got to drive me home. Sometimes she did
19 spend the night.
20    Where was I?
21    Q   Talking about the phone call. You went into
22 the --
23    A   I called -- I checked the voice mail, and as I

---

Page 182

1  suspected it was a call from Debby, and I did call her
2  back from the study.  And we had a brief and not
3  pleasant conversation.  She started on her normal
4  Tatnall subject, which was something that always was a
5  red flag before my eyes.  And she said, can I come over
6  now?  And I said not right now, you know.  I've got
7  company.  It will have to be later or something like
8  that.  And I just hung up.
9      Q  About what time was that, Tom?
10     A  The end of ER.  I mean, ER ends at 11.  I went
11  to the men's room and, you know, maybe five after 11,
12  and the call lasted a couple of minutes.
13     Q  And after you made that phone call to Debby,
14  what did you do?
15     A  I went back into the great room and made sure
16  Annie was awake, hadn't fallen asleep again, and we both
17  sort of stretched out on the love seat, and we were
18  actually -- we were just talking about a few things.
19     I knew we both had off the next day and we
20  were talking about that.  And she really did tell me she
21  might be going to the beach with Kim or going to the
22  outlets and talking about my potential golf game, and
23  then I figured I'd be taking her home in the next --

Page 181

1  probably by the end of the news, let's say, or she might
2  decide to stay as long as the beginning of Letterman.
3  But, you know, I was just -- we were winding down the
4  evening.
5      Q  You say you were off the next day?
6      A  Yes.
7      Q  Tell us about that.
8      A  I had planned to take off at least from Monday
9  on, maybe even I decided before that because I had such
10  a rough week, and I knew that I had gotten the bulk of
11  my work done, that, although there were follow-up things
12  to do, I could get other people to do them for me in the
13  office on Friday, and, well, I felt like I deserved and
14  needed a day off.
15     And I first tried to schedule a golf game with
16  Keith Brady and he was going to lawyer school.  And
17  then, as Kathy Dewechter said, I think Dave McBride, who
18  coincidentally called me on Thursday, that Thursday, and
19  she came into the conference room where I was closing
20  this deal for the city and said that he was on the phone
21  about playing golf the next day.  So we made -- Dave and
22  I made tentative arrangements to play golf the next day.
23     Q  If you know, had Anne Marie made plans to take

Page 182

1  the following day off, Friday off?
2      A  Yes.  She clearly had made plans to take the
3  day off, and in so far as what she told me there were
4  two options, either going to the shore with Kimmy or
5  going to the outlets and going shopping.
6      Q  Okay.  Now, it's now five past 11?
7      A  About.
8      Q  You and Anne Marie are in the great room?
9      A  Yes.
10     Q  You're on the love seat?
11     A  Yes.  Actually, yes.
12     Q  And did you see -- you said you stretched out
13  on the love seat?
14     A  No.  Well, we didn't lie down next to each
15  other.  I don't mean to give that impression.  We were
16  sitting right next to each other and stretched out.  Our
17  legs were stretched out straight.
18     Q  Okay.  She had her head on your shoulder?
19         MR. CONNOLLY:  Your Honor, this is very
20  critical.  I don't think itr is appropriate to lead.
21         MR. OTERI:  I understand.
22  BY MR. OTERI:
23     Q  What was her position in relation to you on

Page 183

1  that couch?
2      A  She was to my left.
3      Q  To your left?
4      A  And adjacent to my body.
5      Q  Any parts of her body touch with your body?
6      A  Yes.
7      Q  Describe that for us.
8      A  Pretty much her entire right side.
9      Q  And where was her head if you remember?
10     A  At that point I think she had awakened enough
11  that she was -- her head was just up in a sort of a
12  normal position, and sometimes she would lean over on my
13  shoulder and sometimes look straight.
14     Q  You were not -- were you engaged in any form
15  of --
16     A  No.  No.
17     Q  -- kissing or anything?
18     A  No.  No.  Not that way.
19     Q  All right.  What happened next, sir?
20     A  Well, the next thing I knew Debby MacIntyre
21  was in the room.  She must have entered the front door.
22  She had a key to my house as I had a key to her house.
23  I even had a garage door opener for her house.  And she

Page 184

1 was pretty ballistic at the time.
2    Q  Where did she come from do you know?
3    A  I found out later.
4    Q  How did she come in, do you know, the front
5 door?
6    A  Through the front door with the key she had to
7 my house.
8    Q  She came in through the front door.  Where
9 would you have to go through to get to the great room?
10    A  Come in the front door, down a couple of
11 steps, turn left, go through that narrow hallway through
12 the kitchen, and then into the great room.
13    Q  So do you remember, if you know, where Debby
14 came from then?
15    A  Yes.  I'm sorry.  I didn't understand the
16 other question.  She came -- she had come through the
17 kitchen and had entered the great room from that area.
18    Q  When she came in from the kitchen to the great
19 room --
20    A  Yes.
21    Q  -- where were you?
22    A  On the love seat with Anne Marie.
23    Q  And where did Debby come to, or where did she

Page 185

1 go to?
2    A  We didn't even hear her come in because of the
3 noise of the air conditioner.
4    Q  Did you have the TV on?
5    A  Yes.  And Debby also has a very soft tread.
6 She's a very small lady, and we didn't realize she was
7 there until she started yelling.
8    Q  Where was she standing when first you saw her?
9    A  I heard her before I saw her.  She was yelling
10 as she got closer to the love seat.  And then I saw her
11 standing more or less at the end of the love seat.  And
12 yelling.
13    Q  Okay.  So as she came in, your back would be
14 to her?
15    A  Correct.  Then she came up, came up along my
16 side.
17    Q  What side of the love seat did she come to, if
18 you remember, the right or the left?
19    A  The right side if you're looking at the
20 television.
21    Q  Right.  And what happened when she arrived at
22 that right side of the love seat?
23    A  She got very upset.  She was yelling, who's

Page 186

1 this?  What is this all about?  Is this why you couldn't
2 see me?  And she was, as I kind of noticed during the
3 eleven o'clock call -- Debby held two full-time jobs at
4 Tatnall, which again was a red flag for me -- and she
5 was under an incredible amount of stress.  She had no
6 support at all from the headmaster.  She was -- she also
7 had some other pressures around that time, but
8 particularly from her job.  And so she was snapping out
9 about why I was there with another woman, because as far
10 as she was concerned, you know, basically I was spending
11 all my romantic time with her.  So all this is sort of
12 coming out and I'm trying to say, relax.  Let's slow
13 down.  I mean, Anne Marie and I are friends.
14    Q  Let me interrupt you for a second.
15    A  I'm sorry.
16    Q  That's okay.  When Debby came in, do you
17 remember what she was wearing?
18    A  I know she had on a t-shirt and some kind of
19 shorts and carrying a little something.
20    Q  Was she carrying something?
21    A  Yes.
22    Q  What was that?  Was that something a purse or
23 do you know what it was?

Page 187

1    A  I wouldn't call it a purse.  It was a little
2 -- I don't know if it's straw or what it's made of,
3 something that, you know, a woman might carry around in
4 the summertime for personal stuff.
5    Q  Okay.  And where were you when she got to the
6 right end of the love seat and was hollering?  What did
7 you do?
8    A  Well, first I just was shocked and I turned to
9 her and I said whatever I said, and then I thought to
10 myself, oh, boy, what a situation.
11        And then I was listening to Anne Marie saying
12 to me, you know, Capano, what the hell is this?  And I
13 said -- I was turning to Anne Marie to try to explain,
14 you know, hold up.  And I got up.  I stood up and to
15 face Debby.  And Anne Marie in the background was
16 muttering about, you know, I don't want to put up with
17 garbage like this.  And she actually had gotten her
18 pantyhose from wherever she had thrown them or put them
19 on the table, and she said I want to go and I want to go
20 now.  And she started to put -- I was glancing back and
21 forth between Anne Marie and Debby.  And Annie was in
22 the process of pulling her pantyhose up and getting her
23 shoes.

Page 190

1    Q   You were standing?

2    A   Yes.

3    Q   And Annie was --

4        MR. CONNOLLY:  Objection.  Leading.

5        THE COURT:  sustained.

6  BY MR. OTERI:

7    Q   What was your position, sir, at this time?

8    A   I was standing.

9    Q   Where was Anne Marie in relation to you?

10   A   Anne Marie was to my right and Debby was more

11 or less in front of me, maybe off to the left a little

12 bit.

13   Q   Now, what was Anne Marie doing, if anything,

14 if you know at this time?

15   A   As I said, she was pulling on her pantyhose

16 and, you know, she wasn't screaming at me but she was

17 making it quite clear whatever was going on here was,

18 you know, ridiculous and she wanted no parts of it and

19 she wanted to go home immediately.

20   Q   What was Debby doing?

21   A   Debby was off the wall.  Debby, I had known

22 Debby a long time.  Debby was completely snapped.  She

23 was all red from the neck up.  She was not coherent.

Page 189

1  She was -- I'm trying to explain to her, you know, look.

2  This is not what you're trying to make it out to be.

3  Anne Marie and I are friends.  You know I have female

4  friends.  Stuff like that.

5        She wasn't listening to anything I said.  And

6  she was -- she was starting to cry and she was saying,

7  you know, all these years I've waited for you and things

8  that were -- just didn't need to be said.  I mean, that

9  was the nature of the conversation.

10   Q   How long did this incident take?

11   A   Which incident?  I mean, what part of the

12 incident?

13   Q   From the time she came in until the time

14 you're just telling us about this hollering and --

15   A   From the time she started hollering as soon as

16 she came in into the great room.  Again, it was before I

17 even saw her.  I could hear her, as could Anne Marie.

18   Q   All right.  Did something happen after you

19 stood up and there was --

20   A   Yes.

21   Q   -- this conversation?  Tell the jury what

22 happened?

23   A   Debby shot Anne Marie.  And it was absolutely,

Page 191

1  positively, and certainly accidental.

2    Q   Tell the jury what happened, Tom?

3    A   She had bought this gun which she claims she

4  gave to me, but she had bought this gun in May for

5  self-protection.  And she particularly made a point of

6  having it with her if she went any place at night.

7  Debby frightened very easily.  And so she must have had

8  the damned thing in her little carry thing, and the next

9  thing I know I see the gun in her left hand.  Debby is

10 left-handed.

11       And she's -- Anne Marie even saw it and said,

12 oh my God, like making fun of it.  I couldn't even take

13 it seriously.  She never threatened me; she never

14 threatened Anne Marie.  She basically said things that

15 were suicidal.  You know, that after all this time if I

16 can't have you and if you want somebody younger and

17 prettier and all that sort of stuff, she said I have

18 nothing to live for.  I might as well shoot myself.

19 This is all the talk of somebody who had lost it.  So --

20   Q   Where was the gun while she was doing this?

21   A   The gun was in her left hand which was down.

22 I didn't think it was in any kind of threatening

23 position.

Page 191

1    Q   Not pointed at you or Anne Marie?

2    A   No, no.  Excuse me.  No.  It was not.  And

3  again, I looked in Anne Marie's direction to see how far

4  she was getting, and when I looked back to Debby, the

5  left arm was coming up and I thought, oh my God, she's

6  going to shoot herself.  And so I reached out with my

7  right hand to grab her left hand to pull the gun away

8  from herself.  And as I did that, a shot went off.  And

9  I couldn't believe it.  And she couldn't believe it

10 either.

11       Because, as she told me later, she was really,

12 although she had snapped, she didn't have any -- she

13 didn't have any ammunition in the gun.  She didn't have

14 a clip in the gun.  But she had something, obviously had

15 something someplace in the gun because it came out.  But

16 I know because I looked.  The clip part was empty.

17       Well, you know, after the shot we were both

18 just sort of couldn't believe it.  And, you know, and I

19 didn't hear anything from Anne Marie.  So I looked back

20 to Anne Marie and she was motionless on the sofa.  And I

21 said, no.  This can't be possible.  And I checked her

22 and sure enough she had a head wound on the right side

23 of her head near her ear.  And I thought -- I thought,

Page 192

1  well -- then I became a wreck. Debby became a wreck
2  too.
3       And I started what I knew of CPR, I know the
4  basics, of Anne Marie. I started on the love seat and
5  then I pulled her down to the floor and I tilted her
6  head. I made sure her tongue wasn't blocking anything
7  and at first I couldn't believe that. I mean, I thought
8  she was just going -- sort of like smacked her a little
9  bit in the face, Annie come to, come to. I was acting
10 like she just fainted. And but then I did start CPR.
11      I'm not certified but I think I know the
12 basics of breathing into her mouth and pumping her
13 chest, the heart area. And there wasn't any -- I
14 checked for a pulse; there was none. I checked for
15 breaths; there was none. I checked her eyes. Her eyes
16 were open. There was no reaction. I even got Debby
17 involved in the CPR efforts. You know, that she was
18 straddling Anne Marie and doing what you do in the heart
19 area, and I was the one that was doing the breathing
20 part where you pinch the nose and breathe in.
21      At some point I know I put one of the small
22 pillows under Anne Marie's head, and while Debby was
23 continuing, I jumped up and got the flashlight that was,

Page 193

1  you know, very handy in the kitchen. Brought it back
2  because the lights -- the only -- we didn't have a lot
3  of light in the room at the time. And I used a
4  flashlight to see if there's any reaction, if her pupils
5  would dilate -- or were they opposite of dilate? No.
6  Dilate. And they didn't.
7       Now, I'm in a state of shock. So you got two
8  people in a state of shock and one person who is dead.
9  And we worked on -- we worked on the CPR part as long as
10 we thought there was any chance and came to the
11 realization that there wasn't any chance.
12    Q  Did you call 911 or anybody else?
13    A  No. Most cowardly, horrible thing I've ever
14 done in my life.
15    Q  What did you do after you determined that Anne
16 Marie was dead?
17    A  It was like my whole life flashed before me.
18 If you're in a situation like that you just start --
19 everything is, oh my God. You know you're dealing with
20 the shock of what's happening and you don't believe it.
21 You really and truly don't believe it.
22      And Debby is crying and she's hysterical, and
23 I want to calm her down, and I'm thinking of, as I said,

Page 194

1  my own life flashed before my eyes, and I always thought
2  I was a guy with some guts and I wasn't. And I'm just
3  being selfish too to protect myself and also to protect
4  Debby. And so since I knew the paramedics could not do
5  anything, I knew Anne Marie was dead, I chose not to
6  call the paramedics or the police but to protect myself
7  and to the extent that I could and to protect Debby.
8    Q  So I understand this, Debby had the gun in her
9  left hand?
10    A  Yes.
11    Q  You reached up your right hand, grabbed the
12 gun?
13      MR. CONNOLLY: Your Honor, again, leading.
14      MR. OTERI: Just repeating.
15 BY MR. OTERI:
16    Q  Tell us again, if you would, what happened?
17    A  Debby is left-handed. She was facing me and
18 she put this little thing down. There were tables at
19 each end of the love seat. She put this little thing
20 down again on the table, a round table my sister had
21 given me, and at some point, I didn't see her pull the
22 thing out but I know it's obviously where she got it
23 from. And I don't know.

Page 195

1       What was the rest of the question?
2    Q  What did she do after she pulled this thing
3  out in her left hand?
4    A  Well, what I just described in terms of I mean
5  she was talking about killing herself. I reached with
6  my right arm, you know, to grab her so at least to stop
7  the arm movement and, well, although as I said before,
8  it's true, Debby is very strong, to try to get it down
9  to the ground or at least make her try to drop it
10 altogether. At that time I did not realize that the
11 clip was not in the gun.
12    Q  Did you succeed in gripping her arm?
13    A  I succeeded in gripping her arm but then the
14 shot went off.
15    Q  Now, sir, after you performed the CPR on Anne
16 Marie --
17    A  Yes.
18    Q  -- and you determined she was dead, what did
19 you do next? What time was this if you can give us an
20 estimate?
21    A  This is probably around 11:30, 11:35.
22    Q  What did you do next?
23    A  That half hour seemed like a lifetime. It was

Page 198

```
 1    something.  What am I going to do?  What am I going to
 2    do?  And the first thing I have to do is take care of
 3    Anne Marie's body.
 4           And I went downstairs and I did get the cooler
 5    and it was where I said it was.  I also had the choice
 6    of a brand new -- which was bigger -- the brand new
 7    garbage can but that didn't -- I couldn't bring myself
 8    to, even though we're talking about a corpse, I couldn't
 9    bring myself to do that.  So I brought -- instead of
10    carrying Anne Marie downstairs, I brought the cooler
11    upstairs, and I also brought and I put Anne Marie in the
12    cooler and I wrapped her in a -- we had blankets, cotton
13    blankets in the great room, and I wrapped her in one of
14    those.
15       Q   What was she wearing when you put her in the
16    cooler?
17       A   The same outfit she had worn to dinner.  And
18    she and her shoes were in there and eventually I put the
19    gun in there but not after the lunacy of what happened
20    over the next 15 minutes or so.
21       Q   All right.  How long do you estimate that this
22    took you to get the cooler, put the body in, put her
23    body in it?
```

Page 196

```
 1    roughly about a half an hour.  Debby had dropped the gun
 2    and I got possession of the gun.  And I also -- I also
 3    tried to comfort her.  I also got later, when I walked
 4    her to her car, I got the clip that went to the gun.
 5       Q   Where was the clip that went to the gun?
 6       A   I'm sorry?
 7       Q   Where was the clip that went to the gun?
 8       A   In the car.
 9       Q   In Debby's car?
10       A   Yes.
11       Q   Go ahead.  How did you get it?
12       A   Well, I told her to give it to me, and while
13    she as willing to carry the gun around, she didn't want
14    it loaded.  Again, because of kids and she was most
15    concerned when she was out at night alone.  So anyway
16    that's the decision she had come to keep them separate.
17    Keep them close enough so if she needed them she could
18    use them.
19       Q   And you put Debby in her car?
20       A   I tried to comfort Debby.  I told her that,
21    you know, obviously it was an accident, and I told her
22    it was all my fault.  It wasn't her fault.  That if I
23    had been honest with her and told her that I was seeing
```

Page 199

```
 1       A   Five to ten minutes.
 2       Q   Did you eventually leave your Grant Avenue?
 3       A   Yes.
 4       Q   About approximately what time did you do that
 5    do you know?
 6       A   Well, all I know is that the star 69 call that
 7    I've read and you guys told me was at 11:52 I made from
 8    Anne Marie's apartment.  And for some insane reason, I
 9    actually had the gun in my possession, and I put the gun
10    underneath the front seat of my car.
11           And, well, I'd forgotten to mention that I had
12    -- despite what was said on the witness stand, Anne
13    Marie had seen the gift from Talbots.  Once she saw the
14    box from Talbots she knew exactly what it was.  She was
15    very happy.  And she opened it up and she didn't break
16    the gold seal.  She never broke the gold seal.  She
17    looked and confirmed what it was and just gave me a very
18    big smile.  Showed she was very happy.  And I imposed
19    one condition on her.  But I guess I'm beyond that about
20    that outfit.
21           But for some reason I went on.  I think I said
22    I can compartmentalize things.  If you want to call it
23    on automatic --
```

Page 197

```
 1    Anne Marie, and the basis on which I was seeing her,
 2    that she would not have reason to snap.
 3           But, you know, I also knew that Debby had said
 4    earlier she had been dating other people.  She had not
 5    dated anybody since the summer of '95 when it was clear
 6    that Kay and I were going to separate, at least up to
 7    this point and then even after that.
 8       Q   Speak into the mike.
 9       A   She had not been dating anyone.  She had been
10    expecting our relationship to become more permanent in
11    nature.  And she had been expecting that since the
12    summer of '95.
13       Q   Now, it's approximately 11:30.  Is that
14    correct?  Debby has left?
15       A   Approximately.
16       Q   Right.  Debby has left.  What do you do?
17       A   I break down.
18       Q   All right.  And when you say you break down,
19    describe what happened to you?
20       A   I fell apart, and I cried and I screamed at
21    myself, and I punched the wall, and after about five
22    minutes of that, I did something I'm capable of doing.
23    I compartmentalized.  And then just I said I have to do
```

Page 202

1    Q   Will you speak up, please?
2    A   Automatic pilot, that idiot automatic pilot.
3    I felt as though, which in retrospect I didn't need to
4    do of course, I felt as though I had to go to her
5    apartment and bring over the gift and bring over the
6    perishables that were in my refrigerator like the
7    strawberries and the bananas and what else. Anyway, I
8    had something else I thought to bring over with me.
9         I did make that star 69 call. I wanted to
10   find out if I was the last one she had spoken to. And,
11   you know, I forgot star 69. My confusion -- star 69
12   used to tell you a number. Now it just connects you
13   automatically. And I heard a man's voice answer that I
14   didn't recognize, so I realized I was not the last one
15   that had called her, so I put the phone down, put the
16   perishables in the refrigerator.
17        I did go into her room. I did turn her air
18   conditioner on. I did not touch her bed. I did not go
19   through her closet. And her closet, if in fact it was
20   in the condition that some people have described, it's
21   probably because when she got home from the doctor, who
22   was gauging her financially, and going out with me,
23   knowing Anne Marie, she probably wanted to take a shower

**THE COURT:** Counsel in chambers at 9:30
tomorrow morning.
     We'll stand in recess until ten.
     (Court recessed at 4:59 p.m.)

Page 201

1    first and change outfits is my guess. So she was
2    probably in a hurry. I left the gift there. I left the
3    food there. Then I left and went back to Grant Avenue.
4    Q   Was there any kind of a horrible smell in the
5    apartment?
6    A   No. In Anne Marie's apartment? No, not at
7    all. The only thing you could possibly smell was some,
8    you know, good smells from the doggy bag.
9         MR. OTERI: Your Honor, this may be an
10   appropriate time.
11        THE COURT: All right. Members of the jury,
12   you've heard the defendant testify in part today about
13   the incident. I want to again caution you not to
14   discuss this case with anyone, including yourselves,
15   until you've heard all of the evidence in this case,
16   until you've heard the arguments of counsel, and you've
17   been instructed concerning the law.
18        I'm going to excuse you. Again, if you come
19   into contact with any information, please notify the
20   bailiff when you come in tomorrow. Come in at ten
21   o'clock.
22        Please take the jury out.
23        (The jury left the courtroom at 4:59 p.m.)

Page 203

1    NEW CASTLE COUNTY
2    STATE OF DELAWARE
3
4         C E R T I F I C A T E
5         We, Alexis B. Finlan and Jeanne Cahill,
6    Official Court Reporters of the Superior Court, State of
7    Delaware, do hereby certify that the foregoing is an
8    accurate transcript reported by us in the Superior Court
9    of the State of Delaware, in and for New Castle County,
10   in the case herein stated, as the same remains of record
11   in the Office of the Prothonotary at Wilmington,
12   Delaware, and that we are neither of counsel nor kin to
13   any party or participant in said action, nor interested
14   in the outcome thereof.
15
16        WITNESS my hand this      day of
17   1998.
18
19
20   Jeanne Cahill        Alexis B. Finlan
21   Official Court Reporter   Official Court Reporter
22
23

Page 154

1  A. Time frame-wise it's what I would call
2  the 4th of July weekend.
3  Q. Of '96?
4  A. Yes. Their house is about ten blocks
5  away from my mother's in Stone Harbor, so I walked
6  up, and we were sitting I remember on the second
7  floor deck, and Marion was making a very lot of wise
8  observations, as she often does, and Lee was talking
9  to me about talking to the police.
10  I just said, "Well, I don't think I can
11  do that right now." And he said, "Well, you really
12  should." And I told them both that there was someone
13  I was protecting, and I left it at that.
14  Q. You did not tell them who?
15  A. No, I did not, and I did not tell them
16  there were two people. I just said there's someone
17  I'm protecting.
18  Q. You did not tell them what had happened
19  to Anne Marie Fahey?
20  A. Absolutely not.
21  Q. You merely stated that there was someone
22  you were protecting.
23  A. Yes.

Page 152

1  something, so that's why I asked Gerry if he could
2  give me the 8,000 in cash, which he did on the 14th
3  of February.
4  No, no, no, I'm sorry. I wrote him --
5  this is just -- as I understand this sheet of paper,
6  I wrote a check to Gerry payable to Gerry for $8,000
7  apparently dated February 14th. I think that's what
8  this says.
9  MR. OTERI: May we have this marked
10  please?
11  MR. CONNOLLY: No objection, Your Honor.
12  THE COURT: Since there is no objection,
13  it will be marked as Defendant's Exhibit Number 98.
14  THE CLERK: So marked.
15  THE COURT: Thank you.
16  (CHECK, Defendant's Ex. 98 in Evid.
17  received and marked)
18  BY MR. OTERI:
19  Q. Now, Tom, after June 27th, 1996, did you
20  ever tell anyone the truth about what happened that
21  night prescinding from attorneys and attorney-client
22  privileged conversations?
23  A. And prescinding from any other kind of

Page 155

1  Q. Now, sir, from the time of this incident
2  occurring on the 27th, up until today, again
3  prescinding from your attorney-client privilege and
4  other privileged conversations, have you told anybody
5  the whole truth about this matter?
6  A. No.
7  The closest I've done is write things to
8  friends in a hypothetical manner or this is a theory
9  that I've heard, tell me what you think of it. I've
10  never, never, never said to anyone before testifying
11  in this courtroom exactly what happened that was not
12  a privileged conversation.
13  Q. Do you use hypotheticals to mask, to
14  protect the people you're writing to from the --
15  A. That's exactly why I do it, and I even, I
16  think, if not all, in some of the letters I said
17  "Look, I do not want to turn you into a witness about
18  anything, so, you know, please assume that anything I
19  say here is just hypothetical and has nothing at all
20  to do with the real facts of the case."
21  Q. By hypothetical, you mean pretend or make
22  believe?
23  A. Yeah, and I'm asking your opinion about

Page 153

1  privilege too, right?
2  Q. Right.
3  A. No, I never told anyone.
4  Q. Did you ever tell a partial truth about
5  what happened to anyone after that time?
6  A. Around the time of June 27th?
7  Q. No, about what happened on June 27th.
8  Did you ever tell --
9  A. At any time all the way up to now?
10  Q. Right.
11  A. Only in terms of hypotheticals, with
12  theories or alternatives.
13  Q. Did you ever have conversations with your
14  brother-in-law Lee and your sister Marion concerning
15  what happened that night?
16  A. Yes.
17  Q. Did you tell them the total truth?
18  A. No; I only told them basically one thing.
19  Q. What was that?
20  A. Now, this is in Stone Harbor, and I
21  walked up to the house --
22  Q. When is that, do you know, time frame-
23  wise?

**Page 17**

1 Identification M and ask you to take a look at it. Do
2 you recognize that?
3   A. No.
4   Q. Can you read it?
5   A. I see what it says, but I don't recognize it.
6 I have never seen it.
7   Q. That's the trial transcript from the Squeaky
8 Saunders case; correct?
9   A. Sure.
10   Q. And if you would look to page two.
11   A. Page two. This first one starts D-143.
12   Q. Correct. If you would look to line 20, it
13 says, Mr. Capano, the State calls Special Agent Bobby
14 D. Blackburn; correct?
15   A. That's what it says.
16   Q. And then on line 22 it indicates that Special
17 Agent Bobby D. Blackburn began his testimony; correct?
18   A. Yes, it does.
19   Q. And if you turn to page D-144, the next
20 page --
21   A. Yes.
22   Q. -- you are asking the questions during this
23 examination; correct?

**Page 18**

1   A. Yes, I am.
2   Q. And you asked on line nine of page D-144,
3 question, what are your duties with the Federal Bureau
4 of Investigation; correct?
5   A. Correct.
6   Q. And then Special Agent Blackburn answered on
7 line 11, answer, I'm assigned to the FBI Laboratory,
8 which I am presently assigned as instructor in
9 firearms identification at the FBI Academy; correct?
10   A. That's right.
11   Q. And then on the next page, D-145, line 20, in
12 response to one of your questions, Sergeant -- or
13 rather Special Agent Blackburn indicated what firearms
14 identification involves, including the ability to
15 identify bullets, cartridges as having been fired by a
16 particular weapon to the exclusion of all weapons;
17 correct?
18   A. Yes.
19   Q. So having refreshed your recollection, do you
20 recall now whether or not you have, in fact, examined
21 a firearms expert in the past?
22   A. Based on reading that transcript, it is
23 obvious that I have.

Frances White

**Page 19**

1   Q. So does it make sense to you that a firearms
2 expert could corroborate or establish whether or not a
3 particular weapon had a hair trigger?
4   A. Yes, that makes sense to me.
5   Q. Does it make sense to you that a firearms
6 expert could determine whether or not a particular gun
7 had a defect in it?
8   A. Yes, that makes sense.
9   Q. And so if somebody was claiming that an
10 accidental shooting occurred, a firearms expert could
11 corroborate whether or not a particular gun might have
12 discharged accidentally; correct?
13   A. Yes, but none of those thoughts entered my
14 mind on June 27th. I was in a panic.
15   Q. Well, you were in such a panic that within 20
16 minutes of Anne Marie Fahey dying in your great room,
17 you were sufficiently thinking in a clear fashion to
18 go to her apartment and to leave a gift box and
19 groceries to establish that she had been to her
20 apartment; correct? You testified to that yesterday?
21   A. No, I didn't. I testified that I did those
22 things and that was not clear thinking. That was not
23 the thinking of a clearheaded person. That was a very

**Page 20**

1 stupid thing to do.
2   Q. Well, let's stay away from adjectives for a
3 second. How about you were thinking that you could
4 leave a box and groceries in her apartment and that
5 would corroborate any claim that she had been to her
6 apartment; correct?
7   A. Yes.
8   Q. So at least within 20 minutes of her death,
9 you were thinking that?
10   A. Thinking what?
11   Q. That you could corroborate the claim she had
12 been to her apartment by putting groceries and a
13 Talbots gift box in her apartment.
14   A. Yes.
15   Q. And within 30 minutes of her death or 35
16 minutes, give or take a few minutes, according to your
17 testimony, you were thinking that you could create a
18 false alibi by dialing an 800 number to your voice
19 mail system at work; correct?
20   A. That's right.
21   Q. But you weren't thinking that if you got rid
22 of the firearm, it might make it impossible to
23 corroborate or disprove whether or not that gun

Page 21

1  discharged accidentally or not?

2      A. I don't understand the question.

3      Q. Well, you were thinking of creating a false

4  alibi.

5      A. Yes.

6      Q. You were thinking of putting Anne Marie into

7  her apartment if the police came and questioned you.

8      A. Yes.

9      Q. And you were also thinking that if you got

10  rid of the gun, you would make it impossible to

11  disprove or corroborate what occurred in that

12  apartment; correct?

13      A. No, I don't believe that's the case. I mean,

14  any thinking I was doing that night, as I said, was

15  unclear, the result of panic. And I also have said

16  that it was cowardly and reprehensible. But I wasn't

17  so specific that -- with respect to the gun that I was

18  going through the analysis that you just went through,

19  because that indicates -- you know, that's a clear,

20  very rational analysis. And I was in no condition to

21  do that that night. Basically I wanted to get rid of

22  the gun because I wanted to get rid of the gun.

23      Q. You got rid of the gun for the same reason

Page 22

1  Squeaky Saunders got rid of the gun?

2      A. I have no idea if that's the case.

3      Q. Because you knew that without the gun, it

4  would make it a lot more difficult to prosecute you?

5      A. I knew without the gun it would -- it would

6  make it a lot more difficult to prosecute me or

7  Debbie.

8      I would like to clarify something you asked

9  me yesterday.

10      Q. Well, I haven't asked you a question yet.

11  You'll have an opportunity to do that on redirect when

12  your attorney asks you questions.

13      A. Okay, fine.

14      MR. CONNOLLY: Your Honor, at this point I

15  would move into evidence the closing argument from the

16  Squeaky Saunders' case. That has been provided to the

17  defense.

18      THE COURT: Is there an objection?

19      MR. MAURER: Can I have a minute to consult

20  with Mr. Connolly? May I have a moment?

21      THE COURT: You may.

22      MR. MAURER: Your Honor, could we, in fact --

23  it has been provided prior to trial. Could we, in

Page 23

1  fact, take the same position with regard to this that

2  we took with regard to the other exhibit and have an

3  opportunity to review it? We did not know it was

4  being offered today.

5      THE COURT: Is there any objection to

6  proceeding that way, Mr. Connolly?

7      MR. CONNOLLY: I'm fine with that, Your

8  Honor.

9      THE COURT: Then we will mark it as State's N

10  For Identification. And you may proceed with it and

11  offer it for evidence at a subsequent time.

12      MR. CONNOLLY: Thank you.

13      MR. MAURER: Thank you.

14      (Volume G, State versus Robert Saunders,

15  marked State's For Identification N.)

16  BY MR. CONNOLLY:

17      Q. Now, yesterday you testified that after Anne

18  Marie threw this $24,000 in cash in your face --

19      A. No. Excuse me. She threw it all at my face,

20  the entire amount.

21      Q. After she threw the entire amount in your

22  face, you took approximately $24,000 of it home;

23  correct?

Page 24

1      A. That's right.

2      Q. And you kept it in your closet at Grant

3  Avenue?

4      A. That's right.

5      Q. And you had some of this money on your person

6  when you were arrested on November 12th, 1997. Is

7  that your testimony?

8      A. Money is fungible, Mr. Connolly. I'm not

9  sure whether it was that money or other money. I had

10  money on me, yes.

11      Q. What was your testimony yesterday?

12      A. About?

13      Q. About whether or not you had that money or

14  part of that money in your pocket when you were

15  arrested.

16      A. I don't remember talking about the money in

17  my pocket yesterday.

18      Q. Well, what did you do with the $24,000 then?

19      A. I kept it. I did not put it in the bank. I

20  used it over the course of the next -- until the time

21  of my arrest. I would use it as needed. And there

22  was still -- I hadn't spent it all by the time I was

23  arrested.

Page 100

1   Q. Yet you didn't?
2   A. No, because the Feds were running the
3   show as of that time.
4   Q. That letter is dated July 24th, correct?
5   A. Yeah, which means I probably got it on
6   the 26th, 27th.
7   Q. It was in your briefcase on July 31st
8   when the FBI searched your house, correct?
9   A. I don't remember.
10  Q. Will you accept my word on that?
11  A. I'll accept your representation on that.
12  Q. The letter doesn't talk about the
13  involvement of the federal agencies, does it?
14  A. The letter didn't have to talk about the
15  involvement of the federal agencies. I knew you were
16  in. I knew it was a farce. I knew there was -- you
17  were using this kidnapping, you know, cover, as to
18  why you were in, and the only reason you're in is
19  because the Governor had spoke to the President.
20  Q. Can you name one person who told you
21  before July 31st that the Feds were involved? Name
22  one person.
23  A. I cannot tell you anyone who isn't

Page 101

1   privileged. It was in the paper, I believe,
2   Mr. Connolly.
3   Q. We've already discussed what was in the
4   paper, right? July 6th it says Clinton offers
5   assistance. July 9th it says the FBI is going to
6   provide assistance but that Wilmington was in charge.
7   You knew the Feds participated in state
8   investigations all of the time, right?
9   A. I knew that when the Feds were asked, but
10  you guys weren't asked. You know, you blasted your
11  way in and you took over, and you started talking
12  about kidnapping, which was incredulous and stupid to
13  the point where, I mean, you know, we're not sitting
14  in a Federal Court because there obviously never was
15  any kidnapping. So it was a screen because you're
16  not allowed legally to get involved in local
17  investigation, to take it over in such a fashion.
18  Q. Now, as of late July then, you have
19  refused to go in, notwithstanding an unconditional
20  offer to hear what you have to say?
21  A. I would have nothing to do with you, or
22  your office, or your agents. Boom. Period. At any
23  time.

Page 102

1   Q. And meantime, your world is getting
2   devastated, right?
3   A. Right, my world was collapsing, yes.
4   Q. Your daughters were facing horrible
5   circumstances with all of the publicity, correct?
6   A. Oh, yes, and you --
7   Q. Your career took a hit, correct?
8   A. Yes.
9   Q. And you remained quiet the whole time?
10  A. Yes.
11  Q. And then -- and you have never mentioned
12  at that point that Debbie MacIntyre shot Anne Marie
13  Fahey, correct?
14  A. Of course not. I was protecting her.
15  Q. And then February 27th, 1998, after you
16  are arrested, Debbie MacIntyre signs a cooperation
17  agreement with the Government, right?
18  A. Yes, she does. I didn't hear the date
19  you said.
20  Q. February 27th, 1998?
21  A. Yeah, I don't know if that's the date she
22  signed. I know that's the date she went in. For all
23  I know she had signed it the day before.

Page 103

1   Q. You kept quiet at the bail hearing which
2   preceded this, right? There was a bail hearing in
3   February to decide whether you would stay in jail.
4   You never said she did it, right?
5   A. I never testified.
6   Q. But you never said it through any means.
7   You never told your attorneys, you never did
8   anything?
9   A. No, I was true to my word. I was
10  protecting her.
11  Q. You were protecting her. February 27th
12  she signs a cooperation agreement with the State?
13  A. Yes.
14  Q. And you're in jail?
15  A. Yes.
16  Q. You have -- according to your testimony,
17  it's been horrible conditions that you've endured in
18  jail, right?
19  A. Very terrible.
20  Q. And you don't do anything until March
21  8th, and on March 8th, you write Brian Murphy and you
22  run by him a hypothetical, right?
23  A. Yes, because I would never write to

**Page 13**

1    Q. Okay. And when you indicate the obscured

2   portion of Debby's driveway that was obscured to your

3   view from your second floor, you indicated that it was

4   what portion of the driveway?

5    A. It was the entrance to the driveway going

6   maybe halfway up.

7    Q. Okay. All right.

8      Now, we've depicted generally the garage that

9   you've discussed about. Was your view of the garage

10   unimpeded?

11    A. Yes, it was.

12    Q. And did you have any knowledge at that time

13   as to whether or not there were any floodlights

14   illuminating the driveway as one would drive in?

15    A. Debby has lights in -- on her garage door, at

16   the top of her garage door, in the middle.

17    Q. And as far as the street itself is concerned,

18   I'm just going to use this to put L, as far as the

19   street is concerned, are there any street lights?

20    A. There's a street light in front of our house,

21   I would say, to the left of our -- or to the right of

22   our house.

23    Q. Looking out --

**Page 15**

1   with regard to

2   placing her Jeep in the garage; is that right?

3    A. That's right.

4    Q. Okay. Had you ever witnessed an evening, in

5   terms of your observations, where the Jeep had not

6   been placed into the garage?

7    A. No.

8    Q. You also indicated that you believe Debby had

9   a garage door opener?

10    A. It must be a remote from her car.

11    Q. On what do you base that belief?

12    A. Sometimes Mike and I would be sitting on our

13   front porch and we would see the garage open before we

14   could see Debby's car so we figured it was a remote.

15    Q. All right.

16      Now, the incident that we're about to talk

17   about, can you give us a -- a time of day, if you

18   will, approximately, when the incident we're about to

19   discuss occurred?

20    A. I would say that, to the best of my

21   recollection, it was somewhere between 11:40 and 11:45

22   in the evening.

23    Q. Okay. And how do you place that particular

**Page 14**

1    A. Yes.

2    Q. -- somewhere in this vicinity?

3    A. Yes.

4    Q. So I guess the bottom line of my questioning

5   is, as you looked out your bedroom window in June of

6   1996, do you have any difficulty -- not that it's

7   something that you do normally -- but do you have any

8   difficulty seeing the upper portion of the driveway,

9   the garage and those areas?

10    A. No difficulty.

11    Q. Now, do you recall an incident involving Ms.

12   MacIntyre of a somewhat unusual nature that occurred

13   sometime in June of 1996?

14    A. Yes, I do.

15    Q. Okay. Now, before I ask you about that, I

16   think I already asked you a question -- did you know

17   what type of vehicle she drove back then.

18    A. Um, she drove a black Jeep.

19    Q. Okay. And by the way, did you or did you not

20   know whether Mr. Capano had any relationship with

21   Debby at that time?

22    A. I did not know.

23    Q. Okay. Now, you already indicated that you

**Page 16**

1   time?

2    A. I had watched the evening news, and when it

3   was over, shut off the lights downstairs, went

4   upstairs to the bathroom, got ready for bed, washing

5   face and normal things people do, and, at that point,

6   I went into our second-floor bedroom.

7    Q. Now, you already indicated you had children;

8   is that right?

9    A. Yes.

10    Q. Your children were how old back in June of

11   1996?

12    A. Seven and a half.

13    Q. Okay. Had you made any internal changes in

14   the house with regard to the children that caused you

15   some concern about the traffic on the roadway?

16    A. Yes.

17      In the fall of '95, when the boys had started

18   first grade, we moved them from a second-floor bedroom

19   that they shared to a two -- third-floor bedrooms

20   separating them for the first time.

21      My son, Danny, got the back bedroom, facing

22   19th Street and my son, Reed, was in the front bedroom

23   facing Delaware Avenue.

Case 1:05-cv-00059 Document 32    Filed 02/20/2007    Page 23 of 25

1    Q. Did that cause you any concerns in any way of
2  the placement in particular of your son, Reed?
3    A. Yes. At times, Delaware Avenue's traffic can
4  become noisy, especially in the early mornings with
5  the buses, and maybe on the weekends.
6    Q. All right. Now, we just talked about the
7  timing of the incident. You advised that the best
8  you've been able to pinpoint is somewhere between
9  11:40 and 11:45; is that correct?
10    A. That's correct.
11    Q. And that is in the evening that we're talking
12  about?
13    A. Yes.
14    Q. Okay. And you were in the process of going
15  to bed; is that correct?
16    A. In the process of getting ready to go to
17  bed.
18    The next thing I would do as a habit is shut
19  our bedroom windows and then shut the blinds.
20    Q. Okay. And your bedroom, again, is in the
21  front of your home almost facing directly into this
22  driveway; is that right?
23    A. Yes, it is.

1    Q. Could you, and we're going to go back on the
2  timing of this, but right now, as far as the incident
3  itself is concerned, could you relate to the ladies
4  and gentlemen of the jury what you heard and what you
5  observed with respect to Deborah MacIntyre and her
6  vehicle on that evening?
7    A. As I approached the second-floor window to
8  close it, um, I heard a very -- the sound of a very
9  loud vehicle coming up Delaware Avenue from the area
10  of Trolley Square and I remember feeling two things.
11  One thing was annoyance that it wasn't even July 4th
12  yet and already the street was noisy in the evening,
13  and I wondered if it would awaken my son, Reed,
14  worrying a little bit that maybe we shouldn't have
15  moved him upstairs -- pretty young.
16    Then I saw Debby's black Jeep for a brief
17  moment before the tree in front of our house obscured
18  my view and I heard the car turning, it must have been
19  the tires screeching, and Debby pulled into the
20  driveway very quickly, put on her brakes very hard so
21  that the tires squealed and ended up right in front of
22  her garage.
23    Q. Now, can I stop you for just one second

2    Had you observed her drive in that fashion
3  previous to this incident?
4    A. I have never seen Debby drive like that at
5  all.
6    Q. And I interrupted you at the point where you
7  indicated that the car stopped.
8    Could you proceed?
9    A. The car stopped, like I said, very quickly in
10  front of her garage. The garage door did not open.
11  Debby kind of stumbled out of the car in real quick
12  motion.
13    Q. Let me stop you for just a second, too.
14    When you say she stumbled out of the car,
15  were you in a position at that point to be certain
16  that it was Debby?
17    A. Yes.
18    Q. Any question in your mind about that?
19    A. No.
20    Q. Was there anyone else in the car with her?
21    A. No one else got out of the Jeep.
22    Q. And when Debby got out of the Jeep, did she
23  get out of the driver's side or the passenger's side?

1    A. She got out of the driver's side of the car.
2    Q. All right. Now, as she pulls into the
3  driveway, as the squeal comes up immediately in front
4  of the garage, she then leaves the vehicle; is that
5  right?
6    A. Yes.
7    Q. Okay. Now, prior to her leaving the vehicle
8  that you indicated, did she, as was the normal
9  practice, have the garage door come up?
10    A. Yes, and it did not.
11    Q. So on that particular evening, the garage
12  door did not go up you're saying?
13    A. That's right.
14    Q. Okay. Now, you say that she left the
15  vehicle, sort of stumbled out of the car?
16    A. Yes.
17    Q. Could you see what she was wearing?
18    A. I could see from the light, um, a flash of
19  her hair.
20    I do not recall what she was wearing.
21    Q. Could you ascertain or were you able to tell
22  at that point whether she had anything in her hands?
23    A. No, I could not.

1    Q. All right. Tell me, on what you heard
2    A. When Debby got out of the car in the manner
3  that she did, she, um -- I heard her kind of issue a
4  terrible kind of an anguished sob as she kind of fell
5  out of the car, and then she quickly ran to the side
6  door of her house. And I waited for a couple of
7  moments because I thought something terrible had
8  happened to her, and even though I didn't know her
9  that well, I wanted to make sure no one was following
10  her or that she would come back out. I just waited
11  for a few moments and everything seemed quiet again.
12    Q. Did you remain at the window any further?
13    A. No. I shut the windows and shut the blinds.
14    Q. Okay. Did anything else of significance
15  occur at that time?
16    A. No, not that evening.
17    Q. Did you just go to bed at that point?
18    A. Um, basically, when my husband came in, I
19  related to him that Debby had just come in really
20  upset and, you know, didn't know what had happened to
21  her, but, um, I let him know that it was very
22  upsetting to me to hear her cry like that.
23        And then we did, yes, go to bed.

1    Q. Now, you referred to this as a -- as a cry of
2  some sort. Could you tell us in terms of loudness or
3  muffled or --
4    A. It was loud, and I don't know if this is
5  going to explain it, when somebody has that wrenching
6  sob, that's how I thought of it.
7    Q. Now, you indicated that you mentioned that to
8  your husband; is that right?
9    A. Yes, I did.
10    Q. Okay. And before I go back again to this
11  subject matter, let me just try to ask you a few more
12  questions about the timing, okay?
13    A. Okay.
14    Q. First of all, how did, if you will, how did I
15  or my office become aware of your existence?
16    A. I called you a couple of days before
17  Christmas.
18    Q. Okay. And did -- without getting into the
19  contents of our conversation, did we thereafter have a
20  conversation?
21    A. We spoke twice by phone and then, um, once in
22  a personal interview at my home.
23    Q. Okay. Did you also speak with someone else

2    A. An associate, yes.
3    Q. Okay. All right. And as a result of our
4  conversations, did you do any checking yourself to try
5  to pin down the timing of when your observation took
6  place?
7    A. I knew that it was in June of 1996.
8    Q. Okay. Let me ask you some specific questions
9  maybe to move things along.
10        You said you knew it was in June of 1996; is
11  that correct?
12    A. Yes.
13    Q. Did you find out when your children were -- I
14  won't say released, but when they got out of school
15  that year?
16    A. Yes. Red Clay finished that year late on
17  June 14th.
18    Q. So you were able to determine and we were
19  able to determine that June 14th was the date your
20  children were released; is that right?
21    A. Yes.
22    Q. Now, you've indicated that you're able to
23  pinpoint this incident that you're testifying about as

1  having occurred in June; is that right?
2    A. Yes.
3    Q. All right. How are you able to do that?
4    A. Well, I thought of it in terms of summer, and
5  if you're a mother, you think in terms of summer when
6  your kids are out of school.
7    Q. Okay.
8    A. I also thought of it in terms of having moved
9  my son, Reed, up to the second-floor bedroom the fall
10  before. This would have been his first summer
11  upstairs in the bedroom.
12    Q. All right. Now, as it relates to the first
13  week in July, okay, and I've drawn up something here,
14  which I think is accurate, let me just fill in some
15  dates here.
16        Would you say that this incident occurred
17  closer to the July 4th time frame or closer to the
18  June 14th when the kids got out of school?
19    A. Closer to July 4th.
20    Q. Now, was there something that was done with
21  your children the first week in July that caused you
22  to be able to say that it was or it wasn't that week?
23    A. Yes. The first week of July would have been

State re Gexsdg 106 in 00053 *** Document 32

1 
2      MR. OBERLY: I would prefer -- I don't know
3 how it works. I didn't put anything -- legal advice
4 in there. It's just biographical information which I
5 assume they have. I don't have any real objection.
6      THE COURT: We're a little past the legal
7 advice stage now.
8      MR. OBERLY: There is nothing of that in
9 there.
10      THE COURT: We're, hopefully, winding down.
11      MR. OBERLY: I have no objection. If he has
12 written something there, I guess it's a legitimate
13 concern.
14      MR. OTERI: We would be provided with copies
15 also?
16      THE COURT: Yes. Charlie -- certainly both
17 sides. I think Charlie indicates he already has
18 copies.
19      MR. OBERLY: It should be 50 pages of stuff.
20      MR. OTERI: There is 49 pages. That would be
21 about right.
22      THE COURT: How close to finishing will we
23 get today?

1      MR. CONNOLLY: We will be short today.
2      MR. WHARTON: We have a number of brief
3 witnesses, but we won't be able to complete our case
4 today, unfortunately, because we have a witness or two
5 not available.
6      THE COURT: You'll complete Monday?
7      MR. WHARTON: Yes.
8      THE COURT: I'm trying to look ahead to
9 prepare for jury sequestration. That's my concern.
10      MR. WHARTON: I think we will finish early
11 today and finish our case early Monday.
12      MR. O'DONNELL: Will there be any reason for
13 surrebuttal?
14      MR. WHARTON: Have you seen any yet?
15      MR. O'DONNELL: No. Maybe a little bit, but
16 not much.
17      THE COURT: There may be some surrebuttal is
18 what you're telling me?
19      MR. OBERLY: Possibly. Very short, but there
20 could be.
21      MR. WHARTON: I think all of our witnesses
22 are designed to respond to things clearly that were
23 raised in the defendant's testimony or the defendant's

1 case.
2      THE COURT: Well, but there is always that
3 possibility when you bring a witness in to do that
4 they step into some new area. So that possibility has
5 to be kept open. I will presume then we will try and
6 go to arguments on Tuesday.
7      MR. OTERI: May we have a day, Wednesday,
8 just to kind of pull everything together?
9      MR. WHARTON: We will have a short day
10 today. I don't know what you think about that, but we
11 will have a short day Monday. We will finish
12 certainly I imagine well before lunch.
13      MR. O'DONNELL: We got a charge conference to
14 do at some point, too.
15      MR. OTERI: If we could do it Wednesday,
16 Judge, have a day.
17      THE COURT: The problem is waiting till
18 Thursday to do it. That means it may carry into
19 Friday. And that's a long holiday weekend. That
20 means everybody will have to stand by with beepers
21 waiting for the jury. If they choose to deliberate,
22 they -- they don't even have to deliberate on the
23 weekend. They could just check into a hotel and have

1 a good time. That would be my vote.
2      MR. OBERLY: That would be their vote, too.
3      THE COURT: But there will be bailiffs
4 available at all times and a conference room available
5 for them to -- what I'm saying is I would prefer to
6 put them in a situation where they got brought to the
7 courthouse every day and were asked to deliberate a
8 full day. And that's not going to happen if we go out
9 Thursday or Friday.
10      MR. OTERI: If we get Thursday and Friday
11 in -- oh, no.
12      THE COURT: What I'm saying is that if we can
13 complete Monday, take Tuesday off, I'll let you -- can
14 we do argument and charge in one day? The charge
15 doesn't look long to me. Anybody arguing for lessers
16 here?
17      MR. OTERI: Quite frankly, Judge, that's a
18 problem. We have to resolve it. We think we should
19 be arguing for lessers.
20      THE COURT: What's your basis? I mean, the
21 defense theory is that she shot her.
22      MR. O'DONNELL: I don't have the folder with
23 me. Gene and I looked at the cases last week. It