1   seems to be pretty clear there is a basis in the
2   record for lessers if it's requested. The only
3   question I had is whether the Court is obligated to
4   give it if nobody asks for it. That's the law in some
5   states.
6       THE COURT: I don't think that is the law in
7   Delaware, but I'm also at a stage if -- if you don't
8   ask for it and persuade me, I believe the testimony is
9   that she had the gun, the gun discharged in her hand,
10  and his only participation was to reach down and hit
11  the gun. I see no criminal culpability to trying to
12  disarm an armed person. And, therefore, if they find
13  it was an accident, they should acquit.
14      MR. MAURER: Unless we can disabuse you of
15  that, then there will be no lessers.
16      THE COURT: That's really where I am.
17      MR. OTERI: We also have to get his
18  permission. He is -- on the record we should state he
19  advised us on numerous occasions we aren't to ask for
20  lessers. So unless we can get his permission to even
21  make that argument, it's -- it's kind of a waste of
22  time.
23      THE COURT: My belief is if the jury believes

1   his story and finds Deborah MacIntyre was there and
2   possessed the gun and was raising the gun and he
3   reached out to hit it, he is entitled to an acquittal,
4   that he committed no crime in attempting to disarm an
5   armed woman, indeed, because he didn't have anything
6   to do with the aiming of the gun or the discharge of
7   the gun. It was totally in her possession at the
8   time. But if you have -- if you wish to make an
9   argument and can persuade me otherwise, then I'm
10  prepared to hear that.
11      MR. MAURER: Okay.
12      MR. WHARTON: As far as I think who -- what
13  the law is in Delaware about who -- the Court's
14  obligation to give lesser included offenses, if either
15  party wants it or doesn't want it, I think there is a
16  couple cases that deal with that. One of them is
17  Roland Daniels I think.
18      MR. MAURER: Roland.
19      MR. WHARTON: Old friend. And just my -- my
20  recollection of it, because it came up in a case I had
21  not all that long ago, was that whichever -- I mean,
22  either side had veto power. Either side gets
23  automatic lesser includeds upon request. It's based

1   upon whether there is a rational basis in the evidence
2   for it.
3       MR. MAURER: I think I agree with that.
4       THE COURT: I'm just making you aware of my
5   view of the evidence now. And I have given some
6   thought to this. The testimony of the defendant was
7   that she had the gun in her possession. And he
8   reached down and tried to stop her from raising the
9   hand -- there is no evidence that he in any way
10  precipitated the discharge of the weapon -- and -- and
11  that she discharged the gun, that it was an accident.
12  And he has no criminal culpability.
13      Again, that's my view of the evidence. And
14  so I have no intention of giving a lesser included
15  offense unless there is a request and a basis for that
16  request.
17      MR. MAURER: Understood.
18      THE COURT: Are there other areas of specific
19  instruction?
20      MR. MAURER: I'm sure, you know, we will be
21  talking about instructions about accomplices and
22  people given immunity. I read your charge a while
23  ago, but I haven't reread it. The main thing I did

1   note was your preliminary finding was murder first
2   degree was the only crime you would charge on. We may
3   request a charge on abuse of a corpse if we can find
4   some authority, to ask you to consider that.
5       THE COURT: As a lesser included?
6       MR. MAURER: As a lesser included.
7       There are a couple interesting cases over the
8   last year or two where there was actually a charge
9   given not in the indictment. I'm trying to remember
10  the name of the case. I'll find it.
11      MR. WHARTON: It expanded the concept of
12  lesser includeds a little bit.
13      MR. MAURER: They really have. It was
14  against my view of what the courts always did, where
15  they charged a charge not actually in the indictment
16  itself. It was a different charge. I'll pull that
17  case before making that request. You're looking at me
18  quizzically, but I know I read that case.
19      THE COURT: I'm looking at you quizzically
20  because somebody ruled that way.
21      MR. MAURER: Actually the Supreme Court.
22      THE COURT: Oops.
23      MR. MAURER: It wasn't Moorehead.

Conf 1/7/99169

Case 1:06-cv-00258-SLR Document 33   Filed 02/20/2007   Page 2 of 27

1    MR. O'DONNELL: You get the first
2    THE COURT: It's going to read, You must not
3    allow your findings to be influenced by the possible
4    consequences of a given verdict. In our system, the
5    duty of the jury is limited to determination of guilt or
6    innocence except as to the charge of murder in the first
7    degree. Your verdict should not be influenced by
8    reflection upon the result thereof. You should not
9    allow the nature of the punishment, or absence thereof,
10   to enter into your judgment.
11   MR. WHARTON: That doesn't make any sense.
12   Result thereof is the result of the hearing which you
13   just referenced and taken out.
14   THE COURT: Well, except they've already been
15   instructed in the beginning. They know that. We're
16   just not dwelling on.
17   MR. CONNOLLY: Just what I would suggest, I
18   think we can all -- well, is just we have the very first
19   sentence. But we delete, In our system the duty of the
20   jury, we delete that sentence as well. We pick up with,
21   Your verdict should not be influenced upon the result
22   thereof.
23   MR. WHARTON: Result thereof doesn't refer to

1    anything now because we've taken out the antecedent to
2    that.
3    MR. CONNOLLY: It would refer to your verdict.
4    If you leave out -- my point would be, to correct the
5    issue Mr. Wharton has spotted, if we have only the first
6    sentence followed by, Your verdict should not be
7    influenced by the reflection of the result thereof,
8    thereof now refers to verdict.
9    THE COURT: Verdict alone.
10   MR. CONNOLLY: Right. No confusion, and we
11   don't bring in the duty of the jury sentence.
12   THE COURT: What about the last sentence in
13   also?
14   MR. CONNOLLY: Yes.
15   MR. MAURER: Yes.
16   THE COURT: First sentence and the last two?
17   MR. O'DONNELL: Right.
18   MR. CONNOLLY: Yes.
19   THE COURT: All right. Have complied with
20   your agreement.
21   MR. MAURER: Thank you, Your Honor.
22   THE COURT: I always like that.
23   MR. O'DONNELL: Then --

1    particularly when it shortens the
2    instruction.
3    Now, are we ready to address the issue of
4    proposed lessers? Anything we have now is ready to go
5    to the printer.
6    MR. O'DONNELL: We can do that.
7    MR. MAURER: My friend from Florida is going
8    to argue this argument.
9    MR. O'DONNELL: Yes. This is a little bit
10   complicated. And hopefully, I think I can present it in
11   about five minutes if I'm not interrupted. If that
12   helps at all.
13   THE COURT: I'll try not to interrupt you,
14   Jack.
15   MR. O'DONNELL: Okay. It seems to me that,
16   well, we know that the indictment charges first degree
17   murder, which is intentional killing as defined by the
18   instructions committed by a voluntary act of the
19   defendant.
20   We know what his testimony is, which is
21   essentially that he did not do that. There's very
22   little direct evidence in this case concerning the
23   events of June 27. State got a few things but, frankly,

1    most of the strength of their case goes more to
2    substantial planning, the premeditation part which is
3    not something the jury decides now than it does to the
4    question of intent.
5    And conversely, we have evidence that falls on
6    the other side. For example, some of the evidence in
7    favor of the State: Debby MacIntyre says she purchased
8    the gun for him; he denies that; the testimony
9    concerning the extortion that comes from various
10   witnesses and has come in different packages; the
11   cooler, whether it was bought for the purpose the State
12   intends or whether it was bought at Joe Capano's
13   suggestion; whether Tom was a jealous maniac or not.
14   We believe that there's substantial evidence
15   in the record to refute the issue of an intentional
16   killing; namely, the purchase of the Jackson Brown
17   tickets, e-mail connecting -- or asking her to save that
18   date in August; that came out in April or May; the fact
19   that Kay Ryan was surprised to see Tom that morning; the
20   fact that there was no plan to see Gerry and, in fact,
21   Gerry and Louie both say it was only pure luck that
22   Gerry was there; normally, he's at Stone Harbor in late
23   June; Susan testified Tom was fine when she saw him

**Page 201**

1   5:30, six o'clock; testimony of various witnesses
2   earlier in the week and on the 27th; Tom was trying to
3   set up a golf game for the 28th; Henry Supinski's
4   testimony that he expected to walk with Tom Capano on
5   the 28th -- all of this evidence cuts against the grain
6   of an intentional killing.
7          We know that under Ward versus State there
8   must be a rational basis in the evidence for you to give
9   lessers.  What the Court indicated last week is that the
10  Court is under the belief at this point that either the
11  jury will come back with a verdict of murder in the
12  first degree or, if they accept Tom's explanation, it
13  was an accident for which he has no criminal
14  culpability.
15         It seems to us, and we are specifically making
16  a request that the Court charge in the following
17  lessers; second degree murder, manslaughter, criminally
18  negligent homicide, and abuse of a corpse.
19         THE COURT: I don't believe abuse of a corpse
20  is a lesser, and for that reason, I mean, I don't think
21  you can find anything within intentional -- within the
22  definition of intentional homicide that involves abuse
23  of a corpse.  This is a separate offense and therefore

**Page 202**

1   I'm not going to charge on that as a lesser.
2          Let's address the others.  Excuse the
3   interruption.  I didn't want to waste time on that
4   because I wasn't going to buy it.
5          MR. O'DONNELL: At the end, I would like to
6   throw in two cents to complete the record for appellate
7   purposes on that.
8          It seems to me that the jury could well
9   conclude that Tom Capano's action -- if Tom Capano was
10  to be believed, then his reaching out for the arm of
11  Debby MacIntyre is in fact what caused that gun to
12  discharge, which then becomes the proximate cause of
13  Anne Marie Fahey's death.  It seems that the jury could
14  conclude under the circumstances as he described them it
15  was reckless, that he had an indifference to the risk of
16  what his action might do, which would support second
17  degree murder, or it was plain and simple reckless which
18  would support manslaughter, or that he simply was
19  unaware of the risk of death by doing that because he
20  didn't see a clip in the gun and, therefore, it was
21  negligently culpable.
22         There is one case that's not exactly on point.
23  Well, I've done most of the research.  Gene has given me

**Page 203**

1   all his cases from trying these cases, couldn't
2   find anything directly on point.  I don't know.  This
3   state has one case, Zebrowski versus State, that is
4   analogous in a way.  I got the cite here.
5          Is the Court familiar with that case?
6          THE COURT: No.
7          MR. O'DONNELL: 715 A.2d 75.
8          MR. OBERLY: What page?
9          MR. O'DONNELL: Seventy-five.  In that case,
10  two guys decided to take a semi-automatic handgun after
11  doing drugs and drinking all day and rob the gas
12  station.  One of the defendants, Sarro, S-A-R-R-O, was
13  cut a deal with the State, testified against Zebrowski.
14  He never testifies.  The opinion doesn't tell you
15  exactly what he said.  But the inference there, certain
16  testimony presented in the record comes from his
17  agreement that was admitted with both side's consent.
18  And that is that Zebrowski goes and points the gun at
19  the attendant.  The attendant doesn't move.  Doesn't
20  really comply.  The gun is fired.  The attendant dies.
21         At trial, Zebrowski testifies that Sarro, the
22  other co-defendant, punched the attendant in the mouth
23  which caused him to flinch and the gun accidentally

**Page 204**

1   discharged.  That was his defense at trial.
2          There was evidence also presented by an ATF
3   expert that the trigger pull on that particular gun was
4   12 and a half pounds, substantially more than what we
5   have here, and that Zebrowski was intimately familiar
6   with the use of firearms based on his background and
7   experience, which is the direct opposite of what we have
8   here.  The evidence in the record here I think rather
9   conclusively is that Tom Capano didn't know a damn thing
10  about guns.  That comes from Gerry.  The only
11  distinguishing facts between the two cases was the
12  pointing of the gun.
13         Now, in Zebrowski, the trial court gave
14  instructions on second degree murder and manslaughter,
15  and the issue on appeal was whether it was error to not
16  give criminally negligent homicide.  And the Supreme
17  Court agrees with the trial court that it was not error
18  to do that because of the intentional pointing of the
19  gun which in fact we don't have in this case.  But it
20  seems to me that under those circumstances where the
21  defendant testifies essentially that there was an
22  accident, the Delaware Supreme Court has agreed that it
23  was proper, and I'm requesting the charge for second

1 degree murder and not manslaughter.

2   It seems to me because of the dissimilarity in

3 the facts in this case, the reason for not charging

4 criminally negligent homicide in this case is not

5 present in this case. And therefore, it would be proper

6 for the Court to charge on criminally negligent homicide

7 here as well.

8   The last argument I would make is, although

9 this case I'm not citing for any other reason than the

10 language, is Gates versus State, 424 A.2d 18. It relies

11 on Keeble versus United States, one of the first U.S.

12 Supreme Court decisions along with Beck versus Alabama

13 on lessers; Keeble 412 U.S. 205, that due process, and I

14 would argue under both Delaware and United States

15 Constitution, guarantees a defendant instructions on

16 lesser includeds if the evidence, under any stretch of

17 the evidence, warrants it. And the reason for that is

18 if there's any evidence in the record the jury should

19 not be required to have to choose only between the

20 extremes. And there's an implication that the due

21 process clause of fundamental fairness jumps in at that

22 point.

23   MR. MAURER: Just a moment to consult.

---

Page 206

1   MR. O'DONNELL: One last point is this. Since

2 the State has not presented any direct evidence of what

3 happened that night, including no direct evidence as to

4 whether or not the killing was intentional, the jury is

5 entitled to infer from that that any killing that

6 occurred in that room was not intentional and therefore

7 could have been recklessly indifferent, whatever all the

8 words are in the standard for second degree murder, or

9 reckless pursuant to the manslaughter standard, or

10 criminally negligent pursuant to the criminally

11 negligent homicide standard.

12   You want to jump in here?

13   MR. MAURER: No. I was just going to say that

14 last argument is something we discussed earlier very

15 briefly. We argue that the absence of any direct

16 evidence of what occurred in that room allows the jury

17 to reach a conclusion that if in fact they believe that

18 Tom Capano killed her, evidence of recklessness or

19 criminal negligence is equally plausible to that of

20 intent. And on that basis, which is a separate basis I

21 think than the other request, we're saying if they reach

22 the conclusion that Tom killed her, while there's no

23 direct evidence as to what occurred in the room, and

---

1 the inference that conclusion or one of those conclusions

2 are equally plausible.

3   THE COURT: I understand that argument and

4 I'll give the State a chance to respond to it. My

5 concern here is that there's no question that intent is

6 being proffered by the State in this particular case

7 based upon circumstantial evidence of prior preparation,

8 which, although it is an aggravating circumstance in

9 this case, is a showing of planning and, therefore, the

10 intent to carry out the plan which you've created and

11 the subsequent acts which tend to give some indication

12 of guilt as to what is of course subject to argument.

13 The fact of the matter is that the State's theory

14 produces some evidence of intent, but there isn't any

15 evidence of recklessness or negligence in this

16 particular case. That's not there. And Jack's basic

17 argument is that it may have been reckless or negligent

18 to try and disarm a woman with a gun.

19   I'm sorry, folks. I'll never let that go to

20 the jury. If that's what the State was relying on,

21 you'd have an acquittal right here. If I was going to

22 acquit on it, I sure as heck can't charge it as a lesser

23 included. I don't think there's anything there. If all

---

Page 208

1 we had now was his statement and there was no other

2 evidence to be considered, that's an acquittal. If I

3 accept his testimony, there's no way I'd let that go to

4 a jury. I think if I wouldn't let it as a matter of law

5 — I would rule he was not guilty under those

6 circumstances, there's no way I could charge as a lesser

7 included, gentlemen.

8   MR. WHARTON: Just thought of something we'd

9 like to clear up. And that when we sort of broached

10 this topic before, there was a concern that there may be

11 a division between counsel and the defendant.

12   THE COURT: I was going to get to that. Does

13 that still exist?

14   MR. O'DONNELL: He authorized yesterday us to

15 make a request for lessers.

16   THE COURT: Thank you.

17   MR. WHARTON: That answers that question.

18   At the risk of arguing once the point is won

19 —

20   MR. O'DONNELL: Is this Mr. Oberly or Mr.

21 Wharton or Mr. O'Donnell this afternoon?

22   MR. WHARTON: I only wanted to suggest that I

23 think a fair synopsis of his testimony was that not only

---

**Page 13**

1  corroborated the details of his brother Gerry, the
2  defendant realized that he could not credibly dispute
3  all of that evidence. So he contorted his defense. He
4  tailored it to dispute as little of the evidence as
5  possible. And what we are left with is the ludicrous
6  account of what he gives of what happened on June 27th.
7  And the fact that it is so ludicrous, the fact that it
8  is not credible lends credence to the State's argument
9  that this was a planned killing.
10      Now, this is a murder case. The defendant has
11  been charged with First Degree Murder. Intentional
12  murder. You have to decide whether he intentionally
13  killed Anne Marie Fahey on June 27, 1996.
14      Mr. Wharton, in his opening statement, did not
15  tell you how physically Anne Marie died on June 27th,
16  and we have never tried to prove that to you, and I'm
17  not going to stand here today and tell you we know
18  exactly how Anne Marie Fahey physically died that
19  evening. What we did say we would prove, what we have
20  proved beyond a reasonable doubt is that starting at
21  least as early as February 1996 the defendant took steps
22  to prepare himself for the possibility that he would
23  kill Anne Marie Fahey. And as the months progressed

**Page 14**

1  from February to June he took further steps and
2  ultimately insured that that was not a possibility. He
3  planned to kill her. It was not a perfect plan. He
4  needed somebody to help him dispose of the body in the
5  ocean, and he thought the cooler would sink. It didn't.
6  And that cooler is the ultimate corroboration of Gerry
7  Capano. But despite those two imperfections, he
8  nonetheless planned the killing, and the evidence, as I
9  will discuss it with you, establishes that.
10      Now, I need to review with you some three
11  months of evidence. And we appreciate your patience to
12  date, and I trust that I can rely on that patience as we
13  proceeded this morning. It is important that we
14  discuss -- that we review the evidence. And when you
15  consider all of the evidence in its totality you will
16  see it is an amount of evidence which demands only one
17  verdict, and that's a verdict that I will ask that you
18  return at the end of my closing, a verdict of guilty.
19      Now, I'm a list person and I find it helpful to
20  categorize things in examining them. I suggest to you
21  when you look at the evidence it is very helpful to
22  consider the five categories. These five categories
23  represent the major pieces of evidence that the State

**Page 15**

1  has introduced to show that this was a planned killing.
2  The most important piece of evidence is Gerry's
3  testimony. Gerry's testimony, as we will discuss, is
4  corroborated on virtually every detail that could either
5  be proved or disproved. The only details of Gerry's
6  testimony that could not be corroborated with direct
7  evidence are the conversations he had with the
8  defendant. So you ultimately will have to decide is
9  Gerry or the defendant telling the truth about those
10  conversations. And you will see that the evidence we
11  did introduce makes the defendant's versions of those
12  conversations not believable.
13      The second area of evidence concerns the
14  cooler, the lock and the chain. As I said the cooler is
15  the ultimate corroboration of Gerry. When Gerry came
16  into the Government on November 8th he didn't know we
17  would find the cooler, no one knew, no one expected it.
18  He told a tale that might at first hearing sound beyond
19  the realm of, well, a fantasy, a fantastic tale. He and
20  his brother dumped the cooler out in the ocean and he
21  shot a bullet through that cooler. But it wasn't a
22  fantastic tale. Ken Chubb found the cooler and
23  corroborates what Gerry said. The lock on the cooler --

**Page 16**

1  chain on the cooler, given no background found in his
2  home in 1996.
3      The third area of testimony concerns Deborah
4  MacIntyre's testimony about purchasing the gun.
5      The fourth area, I suggest to you, is the
6  defendant's demeanor on June 28th. We know this from a
7  variety of witnesses and ultimately it was confirmed by
8  the defendant's own testimony. This was a man who was
9  very calm, collected on June 28th after Anne Marie Fahey
10  was killed. That belies any claim that this was an
11  accidental shooting. It belies any claim that the woman
12  he loved threatened to commit suicide on the evening
13  before. It is consistent with somebody who planned a
14  killing and executed it according to his plan.
15      The final area of evidence is really the
16  defendant's testimony itself. It is not credible. His
17  demeanor on the stand is consistent with the person Anne
18  Marie Fahey described to her psychiatrist and
19  psychologist and friends. It is consistent with the
20  person who wanted to control every aspect of Debbie
21  MacIntyre, and it is consistent with the person who
22  would not lie still as Anne Marie Fahey embraced Michael
23  Scanlon.

**Page 17**

1   before discussing those five categories of
2   evidence, what I would like to do is start where we
3   began this trial. We started by learning about Anne
4   Marie Fahey as she existed on June 27, 1996. Then we
5   traced her relationship with Michael Scanlon from 1995
6   through 1996. We looked at the fact that she had broken
7   off the relationship with the defendant in 1995. It is
8   important to start with Anne Marie Fahey because
9   although this is a murder case it is ultimately about
10  control. It is about the defendant wanting to control
11  others. And it is important to understand that Anne
12  Marie Fahey, like Deborah MacIntyre, was especially
13  susceptible to control. If you recall, her psychiatrist
14  testified that in part she sought treatment because she
15  had great difficulty in asserting herself in personal
16  relationships. Her psychiatrist and psychologist
17  described her as an empathetic person who could feel
18  hurt when others were hurt. Who felt guilty and shame
19  for things she wasn't responsible for. This is the type
20  of person who was especially susceptible to a person
21  like the defendant.
22      Anne Marie Fahey was not a perfect person, the
23  State never suggested she was. She had her flaws like

**Page 18**

1   everybody. She wanted to live beyond her means. She
2   had a troubled childhood. She was immature at times.
3   She suffered from an eating disorder. She was carrying
4   on an adulterous affair with the defendant. As I said,
5   she was easily intimidated, she was not assertive. And
6   Tom Capano offered her financial security that she did
7   not have, had never known. He was very generous to her.
8   She confided in him. She appreciated the fact that she
9   could confide in him.
10      But in 1995 things changed. In 1995 she met
11  Michael Scanlon and the change in her views towards the
12  defendant, the fact that she embraced Michael Scanlon
13  are juxtaposed in that April 7, 1996 diary entry. At
14  that point you see where Anne Marie Fahey has come from
15  and where she is going. Whereas she had been with the
16  defendant, she no longer was willing to tolerate what
17  she viewed as his manipulations and control. She saw
18  Michael Scanlon as the first normal healthy relationship
19  she had and expressed in the diary entry her love for
20  him.
21      To get a good view of the overall picture from
22  both Gary Johnson and Michele Sullivan as to Anne Marie
23  Fahey's relationship with Scanlon and with the

**Page 19**

1   defendant, if you recall, Dr. Johnson testified that he
2   had seen Anne Marie in '95 up through January of 1996.
3   Dr. Johnson told us how Anne Marie described a
4   relationship with the defendant, quote, as being
5   characterized by this man pursuing her. Having a
6   great -- wanting a great degree -- deal of control over
7   her life. And as she began to want to pull away from
8   that relationship he was unwilling to let her do so.
9       Doctor Johnson was asked: "What was her
10  attitude towards this relationship?"
11      And his response was: "Well, I would say
12  initially she described it in historical terms that she
13  was quite attracted to this man, but by the time I saw
14  her she described it mostly in terms of feeling very
15  guilty and ashamed of being involved with him. And
16  described it in terms of not being a healthy
17  relationship. And particularly described it as one she
18  wanted to get out of in the context of her finding a new
19  and what seemed like a much healthier relationship with
20  a different man."
21      This is what Anne Marie Fahey told her
22  psychologist.
23      Dr. Johnson was asked: "Was she having any

**Page 20**

1   difficulties in ending it? Was there any difficulties
2   in doing that for her?"
3       Answer: "Yes, there were quite a few
4   difficulties. I mean, she would say she didn't want to
5   see him and find he would continue to send her e-mail or
6   written notes or suddenly appear at places where he was
7   observing her, stalking may be too strong a word but
8   certainly observing."
9       This is from Dr. Johnson so this pre-dates
10  January of 1996.
11      How about Dr. Sullivan? Well, Anne Marie told
12  her that she regarded the large number of phone calls
13  that she was getting, the large number of e-mails,
14  appearing at times where she wasn't ready to greet him
15  in a public place, the fear if she went to someplace
16  socially he might meet her there and persuade her to
17  spend time with him.
18      Other things included, in the past, coming to
19  her apartment uninvited and making his way into the
20  house and making her very frightened in what was going
21  to happen.
22      Anne Marie told Dr. Sullivan that she viewed
23  the defendant's gifts, his references to his daughters

1   the defendant is if he is giving.
2       If you remember Mr. Oteri when he
3   cross-examined Dr. Sullivan.  He asked if people give in
4   order to get?  That is a fair credo for Tom Capano's
5   generosity.  He is giving and he is hurt when Anne
6   Marie rejects his gifts.  And the reason why she rejects
7   the plane ticket is she does view it as manipulation and
8   doesn't want the conditions he attaches.
9       New Year's Eve on the calender, we know, and we
10  know from Michael Scanlon's testimony, Anne Marie spends
11  time with him.  And in January things start to really
12  look bad for the defendant.  If you look on January
13  17th, there is an e-mail -- actually on tab four of the
14  book you have.  Now I'm not going to go through all of
15  the e-mails, I know we have done a lot of that during
16  trial.  But if you have any doubt that these e-mails do
17  not show the manipulation, the refusal to stop pursuing
18  Anne Marie Fahey, I encourage you to read all of the
19  e-mails.  Read them in their entirety, because it is
20  subtle.  Look at the January e-mails and you will see
21  the defendant asking Anne Marie to have dinner with him.
22  He is relentless, he is suffocating, he will not stop.
23  Look at her responses, she doesn't say no, doesn't say

---

1   yes, she ignores the request, that is her way of dealing
2   with things.
3       In January she hadn't started seeing Michele
4   Sullivan, she is still struggling with assertiveness.
5   Her way to deal with Tom Capano is not responding
6   directly to the overtures she doesn't want.  Once in a
7   while she does respond directly and she feels bad.  And
8   if you see this January 17th e-mail, she writes the
9   defendant: "Good morning, Tommy.  I want to apologize
10  for my outbreak last night.  I am sure it must have
11  scared, amongst other feelings, you.  Quite honestly I
12  scared myself last night.  Tommy I had a lot on my mind
13  last night regarding my appointment with Gary Johnson.
14  I know I only talked very briefly about my meeting but
15  it obviously was on my mind.  Right now I need a friend
16  more than anything else.  There was a part of me that
17  just wanted to be alone to think things out clearly.  So
18  when I asked you not to rub my stomach and you responded
19  by saying how much I hurt you, I couldn't take feeling
20  guilty about what had happened along with everything
21  else that I am feeling.  It is my fault, because I was
22  not communicating with you and you didn't know how to
23  respond.  I am sorry for my behavior."

---

1   Anne Marie apologizes to him because she
2   resented the fact that he was rubbing her tummy and she
3   told him so.  That is January 15th.
4       Three days later the defendant has dinner with
5   Anne Marie Fahey and Jackie Steinhoff.  Remember how
6   that dinner was set up?  Anne Marie Fahey kept on saying
7   to Jackie, I'm really not interested.  She wouldn't say
8   no directly she just kept putting it off.  Finally she
9   gave in and they had dinner.  During the dinner Anne
10  Marie Fahey goes to the bathroom and the defendant turns
11  to Jackie Steinhoff and says: "Why does she hate me?"
12  This is a 47 year old man turning to a 30 year old woman
13  asking why her good friend hates him.  I suggest to you
14  that is the first sign where we see kind of an
15  obsession.  Direct evidence of an obsession on the
16  defendant's part for Anne Marie Fahey, that is January
17  20th.
18      On January 26th, Anne Marie has her surprise
19  birthday party, the defendant is not invited.  And you
20  can see in the e-mails when you back to the jury room,
21  you can see him pressing her for what is going on in the
22  upcoming weekend.  He wants to have this birthday dinner
23  with her.  And she doesn't point-blank reject him.

---

1       On January 27th she has the Grand Gala with
2   Michael Scanlon and we heard from Jill Morrison that the
3   defendant -- and the defendant confirmed with his string
4   of calls that he was pestering Anne Marie with a string
5   of phone calls that Saturday.  Anne Marie was distraught
6   by these phone calls, but she had the best night of her
7   life, according to what she told her friends, with
8   Michael Scanlon later that night.  So you can see where
9   this triangle is going.  Anne Marie is going with
10  Michael Scanlon and the defendant is not happy.
11      On February 4th, a week later, we know that
12  Anne Marie Fahey point-blank finally told the defendant
13  she just wanted to be friends.  And remember, we know
14  that was a Sunday, February 4th, we know it because of
15  the later e-mail that we read when the defendant was on
16  the stand.  The next day after she tells him this, he
17  has his daughter send Anne Marie an e-mail.  She has to
18  remind him three days later I just want to be friends,
19  and this is February 7th.  What does he do on February
20  8th?  He again e-mails her, again makes a reference to
21  children, to his being distressed about, if you recall,
22  the events at the Ursuline School on February 8th.  And
23  that's the day he gets $8000 from Gerry Capano.

Case why 06 schw-00058nt have to be a man

1  Capano for $8000 in cash? This is a man who had
2  $156,000 in his checking account that day. There is
3  nothing illegal with cashing a check for $25,000. And
4  you heard the defendant get tripped up on the timing of
5  the checks. He said that he called Gerry after he had
6  cashed the first two checks, but in fact, as we showed
7  with the bank records, he had Gerry cash the check after
8  he had cashed the first check, before the third check
9  came along. So his recollection, or rather his story,
10  about the timing of the checks just doesn't make sense.
11  There is no legitimate reason to try to disguise the
12  money transactions that he did. So why? It just
13  doesn't make sense that he would try to give Anne Marie
14  Fahey $25,000 in cash. He didn't need to give her that
15  kind of money in cash to shock her. Doesn't make sense
16  that he would take $24,000 back from her not deposit it
17  in the bank but keep it in this Grant Avenue house, the
18  security of which he is very concerned about, we are
19  told. Doesn't make sense that he would have $24,000 in
20  cash on him and yet during the next 12 months go to the
21  bank and take out $12,000 in cash during those next 12
22  months. That story doesn't make sense. The only thing

1  that makes sense is getting the $8,000 in cash, as far
2  as it concerns us, is that Gerry now believes that the
3  defendant is being extorted. Gerry believes that there
4  is a legitimate, if you will, reason why the defendant
5  might need a gun, might need a boat, might have to kill
6  somebody. And I say legitimate in quotes. But Gerry
7  thinks now that there is some explanation as to why the
8  defendant is coming to him asking him for the gun,
9  asking if him if he knows somebody who can break some
10  legs, asking him if he could use his boat if he killed
11  somebody.
12  Four days after the defendant approaches Gerry
13  and says I'm being extorted, I need $8000, four days
14  later we have the February 12th e-mail. And if you
15  would look at that. This is on page 40. Anne Marie
16  writes: "Good morning, Tommy." If you go down about
17  five lines, second paragraph she says: "Tommy, you
18  scared me this weekend, starting with Friday and all the
19  calls you placed. It really freaks me out when you call
20  every half hour. I truly understand how fragile you are
21  these days and I feel the same way. But when you keep
22  calling that way it makes me turn the other way and,
23  quite frankly, shut down."

Filed 02/20/2007 Page 8 of 27

1  string of calls, to use her euphemism, harassing. The
2  harassment in her mind. And look what her response is,
3  go a little bit further down. She says: "I'm sorry
4  that I am nothing but a constant disappointment to you
5  these days, it is not fair to you."
6  She is apologizing for him harassing her with
7  phone calls. Just like with the stomach.
8  But it is soon after this call that she begins
9  her counseling sessions with Michele Sullivan and they
10  start working on her ability to be assertive. Two days
11  after this e-mail, she, Anne Marie, celebrates
12  Valentine's Day with Mike Scanlon. And you saw the card
13  in evidence, you can see how moved she was by the
14  flowers he sent, the fact that she kept these
15  memorabilia from Mike Scanlon in the drawer, the
16  tickets, the cards. And we know from Ginny Columbus
17  that a day after Valentine's Day Anne Marie throws the
18  defendant's dozen roses into the trash can. Now we also
19  know that sometime around Valentine's Day, sometime
20  between February 13th and February 16th, the defendant
21  saves in the permanent file, the archives of his
22  computer, all of these e-mails. Why? I submit to you

1  again, this is just like the January 20th comment to
2  Jackie Steinhoff. This is evidence of his obsession.
3  To save all of those e-mails on this day, two to three
4  days after Anne Marie Fahey says please stop, I can't
5  take the harassing calls, you are scaring me. A week
6  after he first approaches Gerry, this is the beginning
7  of the plan.
8  MR. CONNOLLY: Your Honor, I think it would be
9  good to break here.
10  THE COURT: All right.
11  Please take the jury to the jury room.
12  (The jury exited the courtroom at 10:10 a.m.)
13  THE COURT: Court will stand in recess for 15
14  minutes.
15  (Following a brief recess:)
16  (The jury entered the courtroom at 10:25 a.m.)
17  THE COURT: Please bring the jury in.
18  Counsel, I should note while totally entranced
19  by Mr. Connolly's argument, I was reviewing the charge.
20  And I note in the First Degree Murder charge the last
21  line indicated that, "you should find the defendant not
22  guilty" and it should read, "you must find." And I have
23  made that change and that will be in the charges that go

Page 37

1  you have read. And on April 7th, four days after she
2  tells Michele Sullivan about his haunting behavior, she
3  writes in her diary that the defendant -- she has
4  finally been able to bring closure to that relationship.
5  That he is a jealous, manipulative, controlling minute
6  and she is in love with Michael Scanlon. Three days
7  after writing that entry she meets with Dr. Sullivan,
8  this is April 10th. It is April 10th -- it is in the
9  April 10th session when Dr. Sullivan first hears of this
10  kidnapping, that Anne Marie has some fear which she
11  expresses in very vague ways. But she has a fear of
12  being kidnapped by a third party and Dr. Sullivan
13  presses her on this point, by who? And the only name
14  that she gives is Tom Capano. And Dr. Sullivan even
15  presses her for another name. She said could it be
16  somebody else? And she said maybe it is an old
17  boyfriend, but it is a third person hired by somebody
18  else.
19       Now, it is true that Anne Marie point-blank
20  didn't go to Dr. Sullivan and say I believe Tom Capano
21  is trying to kidnap me. But that is consistent with
22  what Dr. Sullivan says about Anne Marie's general way of
23  approaching issues. That if you remember she said she

Page 38

1  was giving a little wisp, give you a little bit and wisp
2  away and you would have to come back to it. But it was
3  enough that Dr. Sullivan recalled it, and asked Anne
4  Marie to act on it. She asked Anne Marie on April 10th
5  to contact the Attorney General's office and report the
6  harassment, the harassing phone calls. So that is April
7  10th.
8       April 15th, if you look in the calenders you
9  will see that Anne Marie wrote for the first time that
10  there was a monthly anniversary, if you will, with Mike
11  Scanlon, April 15th she writes seven month anniversary.
12  She hadn't done that for the first six months. It
13  suggests at this point her feelings for Michael are
14  growing stronger, that she is attaching more
15  significance to the relationship than before, and, in
16  fact, if you follow that calender from seven months
17  until September 15, 1996, you will see that she marks in
18  her calender every month on the 15th that is the
19  anniversary with Michael or Miguel. She is
20  forward-looking in this relationship. So that's April
21  15th.
22       Two days later she meets with Dr. Sullivan.
23  This is April 17th, now we are only 10 days after the

Page 39

1  diary entry. This is an important time. They again
2  talk about the kidnapping issue. They talk about Anne
3  Marie failing to report anything to the Attorney
4  General's office, but at least she did make a phone call
5  to inquire about it. And then three days later, the
6  defendant buys the cooler. I submit to you the timing
7  is not an accident. Although, we do not have the e-mail
8  so we cannot directly show you harassing behavior on the
9  part of the defendant in March and April, that is what
10  Anne Marie was reporting to her psychologist. She is
11  talking about a kidnapping. Her diary entry which makes
12  crystal clear her views towards the defendant. Mike
13  Scanlon is in this time frame. And this is the time
14  when he purchases the cooler. It is also around the
15  time when he has obtained the gun from Gerry and is
16  returning it. Again, we don't have servitude about that
17  timing, but it is sometime in March that he borrows the
18  gun and sometime around mid April to late April that he
19  returns the gun to Gerry.
20       If you look in Dr. Sullivan's notes, you will
21  see on April 24th Anne Marie indicates she is, quote,
22  unquote, getting closer to Michael. And you can look at
23  her calender and you can again see the events they

Page 40

1  attended in early May, consistent with what Dr.
2  Sullivan's notes indicate.
3       Then on May 8th the defendant takes Debbie
4  MacIntyre to Washington. Now he has been seeing this
5  woman for 15 years. He says he deeply loves her. He
6  has taken her on two trips, both of which are business
7  trips. He is going to legal conferences in Canada and
8  even this May trip is to Washington. But they are
9  clearly a big deal to Debbie MacIntyre, as indicated by
10  her testimony. And if you have any doubt about her
11  feelings look at the letters. The defendant knows that
12  she attached great import to her trip to Canada with him
13  and her trip to Washington. Remember, this is something
14  to think about. Anne Marie Fahey gets The Homestead
15  ritzy resort in West Virginia. Debbie MacIntyre gets to
16  tagalong to a legal conference in Washington and Canada.
17  Anne Marie Fahey gets the Hotel DuPont for lunch, she
18  gets La Famiglia, Villa Di Roma, Panorama. Debbie gets
19  Arners. These are examples of how the defendant vastly
20  treats these women. He is absolutely correct when he
21  refers to Debbie MacIntyre in his letter as a doormat.
22  She is his doormat. And I submit to you it is no
23  mistake that he took her to Washington that weekend,

Page 155

1  is, and that's the same standard they've used in
2  deriving guilt or innocence, but if for some reason
3  the vote came out 10 to 2, then the statute still
4  gives me authority to go ahead and make my own
5  determination. It would be a lovely question on
6  appeal and --
7      MR. MAURER: That's why we're taking this
8  position.
9      THE COURT: Well, I note it, but I think the
10  statute suggests that I have to go through the same
11  process that the jury does and that their findings are
12  only a recommendation to me even on that.
13      I've simply told you that certainly if they
14  found there was no reasonable doubt, that would
15  probably mean it for me, although I don't know what I
16  would do if the vote was 11 to 1. I would love to
17  have this answer sheet come back so I don't have to
18  make any decisions at all and I hope that's the way it
19  comes back. But there are a lot -- the way our law is
20  written, the ultimate authority to answer both of
21  these questions rests with the Judge although they
22  should take it into consideration, the findings of the
23  jury, and give great weight to it.

Page 153

1  been in keeping with my dealings with the press, I
2  will release that, but mask the jury's signature and
3  seal the actual interrogatories. We've kept their
4  names secret this long. If they choose to disclose
5  them, that's up to them, but I'm not going to do it.
6      MR. O'DONNELL: Do you want me to raise it?
7      MR. MAURER: That part's a good starting
8  point.
9      MR. O'DONNELL: With respect to the
10  interrogatories, it's our position that unless the
11  jury unanimously answers yes to question 1, the Court
12  may not impose the death penalty; and the jury should
13  not be required to answer question 2, because the jury
14  would not have found, beyond a reasonable doubt, the
15  existence of a required statutory aggravating factor.
16      MR. WHARTON: I think that's the statute.
17      THE COURT: I think I have to go through the
18  same process and I make the final determination.
19      I'll simply tell you as a practical matter,
20  if they come back with a no there, then I'm certainly
21  not going to overrule their finding, but I think they
22  have to go through the whole process and I have to go
23  through the whole process separately.

Page 154

1      MR. MAURER: What if two of them say no?
2      MR. OBERLY: Suppose there's a 10 to 2 vote;
3  is that beyond a reasonable doubt?
4      MR. WHARTON: That's not what the jury is
5  supposed to do.
6      The jury is supposed to report their vote as
7  to how each one of them thinks that question ought to
8  be answered. They don't have to be unanimous on
9  that. There's no requirement of unanimity. Beyond a
10  reasonable doubt is merely the standard by which they
11  judge whether that has been proven. It doesn't say
12  unanimously find.
13      MR. OTERI: The question says, does the
14  evidence show, beyond a reasonable doubt, the
15  existence of the following.
16      MR. WHARTON: Right. Right.
17      MR. OTERI: That's what they're voting on.
18      THE COURT: Yes, but it does not have to be
19  unanimous. It is not the verdict here.
20      MR. OTERI: It's beyond a reasonable doubt.
21  What is that? You've got to assign a numerical value
22  to it.
23      THE COURT: No, I've instructed them what it

Page 156

1      MR. OBERLY: I understand.
2      MR. WHARTON: No, the statute says the jury
3  is to report to the Court its final vote, stating the
4  number of affirmative and negative votes on each
5  question. If the jury is split on one question, on
6  the first question, that is not a preclusion to going
7  ahead to the next question. That merely tells the
8  Judge that the jury is split on that and makes that
9  recommendation as to the appropriate answer. They
10  don't have to be unanimous on that, on any -- on any
11  question. There is no -- it's not like the old
12  statute where you had to -- the jury had to
13  unanimously agree beyond a reasonable doubt that there
14  was a presence of a statutory aggravator before they
15  could go on to balancing aggravating and mitigating
16  and then going on to unanimously recommending the
17  death. That was the old statute.
18      THE COURT: But I think Charlie and Gene both
19  understand that's what the statute says.
20      The question is whether that may meet
21  constitutional muster, and they've raised that issue.
22      MR. MAURER: I don't know whether that's been
23  resolved by the Supreme Court decisions and we don't

Page 69

1  indicated to you, could speak and not be subject to
2  cross examination. There was nothing to permit him or
3  to -- excuse me -- there was nothing to keep him from
4  taking the stand and testifying on broader issues in the
5  penalty phase; however, had he done that, he would have
6  subjected himself to cross examination. So when he
7  indicated that there were things that he could not talk
8  about, he was right because the allocation is very
9  limited, but had a different form been chosen, those
10  limitations would not have been the same.
11      Mr. Connolly.
12      MR. CONNOLLY: Thank you, Your Honor. Good
13  afternoon.
14      At the outset, I would like to thank you on
15  behalf of the State, Detective Donovan, Mr. Wharton and
16  myself for the extraordinary service that you've
17  performed these last few months. We are mindful, the
18  Court is mindful, defense counsel is mindful of the
19  burdens that you endured, the marathon closing
20  arguments, the scheduling problems. Things don't always
21  go smoothly, and it's really not necessarily anybody's
22  fault, but we do all appreciate what you've done, and I
23  do promise you I will not take up your time for very

Page 70

1  long. I hope to be done in about 30 minutes. And the
2  reason why is because of course we've covered so much
3  already and you have been very attentive, and I don't
4  think it's worthwhile delving into the minutia that you
5  have heard and seen.
6      I want to begin by just recognizing that what
7  is obvious to us today in the late 20th century in
8  America, but really was a novel concept when this
9  country was formed, and that is we are a state; a
10  country that's governed by the rule of law. We're not
11  governed by the decrees of monarchs, we're not governed
12  by the whims of dictators, we're governed by principles,
13  by laws. And the laws are enacted in this state by a
14  legislature which represents the will of the people of
15  the State of Delaware. And your job today is to apply
16  the rules of law as seen fit by the legislature. The
17  fact that we're governed by law is a good thing because,
18  of course, laws apply equally to all, regardless of
19  whether you're poor or rich, what color you are, what
20  gender you are. And that is why we impose so much trust
21  to the form of democracy that we have.
22      Now, you were selected as jurors because both
23  sides and the Court believed that you were capable of

Page 71

1  applying the law without vengeance, not through
2  sympathy, or compassion, but to apply the rule of the
3  law to the facts as you found them.
4      And the law that you have to apply at this
5  stage of the proceeding is really two-fold, two part
6  analysis, which Judge Lee has talked about, both sides
7  have, but I think because everybody is new to this it's
8  good to just quickly review it.
9      The first part of the analysis that you will
10  be conducting is to determine whether the State has
11  proven beyond a reasonable doubt what is called the
12  statutory aggravator. And in this case that is to show
13  that the murder of Anne Marie Fahey was the result of
14  substantial planning and premeditation. That's the
15  first question. And unlike your verdict, as you've been
16  told, you don't have to be unanimous on that. Although
17  you'll be instructed, I'm sure based on what we've all
18  observed, you will discuss the facts, the inferences
19  that would make your analysis for that question or that
20  you would -- you would have to do to analyze that
21  question.
22      Now, the second question you have to answer
23  is, do all of the aggravating factors, including that

Page 72

1  one statutory aggravating factor, outweigh the
2  mitigating factors by what we call a preponderance of
3  the evidence?
4      And that means basically you've got -- if
5  you've got a scale with aggravators and mitigators, the
6  question is do the aggravators just barely outweigh the
7  mitigators? They have to outweigh the mitigator, but
8  they could outweigh them by this. It's not a standard
9  of proof that is as high as beyond a reasonable doubt.
10  And your answers to that question do not have to be
11  unanimous.
12      You'll report your answers to both questions
13  by a tally of the votes. And you represent the
14  conscience of the community in looking at the facts and
15  the law as it applies to those facts. And as Judge Lee
16  explained, and will explain again, the ultimate decision
17  as to what the penalty will be in this case rests with
18  Judge Lee, but he will give great weight to your
19  opinions as expressed through your votes on those two
20  questions.
21      Now, the first question, has the State proven
22  beyond a reasonable doubt that the murder of Anne Marie
23  Fahey was committed as a result of substantial planning

Page 73

1  and premeditation, I'm barely going to touch upon,
2  because it was rather unusual about this case, because
3  we did not have a body, because the only living person
4  who knows exactly what happened at the instant of Anne
5  Marie Fahey's death is Tom Capano. As a result of the
6  absence of all the forensic evidence, the State proved
7  intent by showing the planning that the defendant had
8  engaged in beginning at least as early as February of
9  1996 when he approached Gerry the first time and he
10  continued.
11  So what I'll do is just remind you of some of
12  the categories that I discussed in the closing argument
13  of the guilt phase. The things to look at.
14  First, Gerry's testimony; the conversations
15  with Gerry, making up this extortion in order to make
16  Gerry ultimately not raise questions as to why a boat
17  was needed or why a gun needed to be borrowed, because
18  Gerry was under the impression that there was some
19  extortionist out there threatening his brother, so he
20  was much more understanding as far as providing him with
21  the weapon and as far as at least even entertaining the
22  idea that if some boat was needed to dispose of a body
23  he would.

Page 74

1  Then there was the cooler, the lock, and the
2  chain. We have not heard any -- your verdict
3  establishes this -- we have not heard any rational
4  explanation as to why the defendant bought that cooler,
5  locker, chain other than what the State has submitted to
6  you which is of course he did it because he was planning
7  a murder and he needed to dispose of a body.
8  Then you heard Deborah MacIntyre about
9  purchasing the gun. That again is one of the main
10  things we discussed about planning. We talked about the
11  defendant's behavior on June 28, how calm he was. Think
12  about -- think about the presence of mind to hit star 69
13  from Anne Marie's apartment to place her in the
14  apartment. Somebody was thinking. Think about the
15  planning that had to go into that. Think about the
16  planning that had to go into hitting the 800 number
17  thirteen minutes later back at the defendant's home to
18  create a false alibi. And then think again, the final
19  category I spoke to you in closing was how ludicrous the
20  defendant's story was, how it defies common sense. The
21  fact that it is so irrational, it is so ludicrous points
22  to the fact that there's no rational explanation to
23  account for all the mounds and pieces of evidence that

Page 75

1  we gave you except for the idea that the defendant
2  planned and premeditated this crime. They can't come up
3  with a rational explanation to fit all the pieces of
4  evidence.
5  Now, in his closing during the guilt phase Mr.
6  Oteri suggested to you that whatever plan there was
7  would look like a village idiot, and he raised, for
8  example, the issue of you'd never commit a murder in
9  your own house. But you would. If you really planned
10  something, you would. Because if you take somebody in a
11  car, you run the risk that somebody else may be there.
12  You take them out to the woods, you don't know who is
13  going to be around. The only environment Tom Capano
14  controlled absolutely on June 27th, 1996, was the
15  environment at 2302 Grant Avenue.
16  And think about how close he came to getting
17  away with murder. That shows you how well planned this
18  execution was. Think about it. The only forensic
19  evidence left in the room were pin drop size blood
20  stains. That's how close he came. Think about if we
21  weren't lucky enough to have traced Anne Marie's blood
22  down to the Atlantic Ocean, think about if we had not
23  found the cooler. He thought he was going to get away

Page 76

1  with this. He had a good plan. He thought that he
2  could control the local law enforcement people like he
3  had controlled or had benefited from the Henry Herndons
4  of this world, the Dan Frawleys.
5  Remember, Henry Herndon was the managing law
6  partner of the defendant's firm when that tape you
7  heard, that tape that had to do with Linda Marandola,
8  that tape was played for Henry Herndan and nothing
9  happened. Now, you heard the tape. How could anybody
10  listen to that tape and not think something horrible was
11  going on?
12  Four years later the tape was played for Dan
13  Frawley before the defendant was made city solicitor,
14  nothing happened. He had a track record of getting away
15  with things. It makes sense that he would assume
16  Wilmington police would be involved. You don't have to
17  assume it. He admitted that Wilmington police would
18  have the case. He thought that he could control
19  Wilmington police. Remember, he talked about the daily
20  reports he had. He had his contacts with Harry
21  Manelski.
22  So you need to think, A, that he almost got
23  away with this. But for a lot of luck he wouldn't have

Page 125

1  your role as jurors in the sentencing procedure is,
2  nevertheless, important. You will provide the Court, as
3  the conscience of the community, with an advisory
4  opinion on what the jury believes the evidence has shown
5  with regard to the appropriate penalty in this case.
6  Your answers to the questions provided will be given
7  great weight by the Court in its final determination of
8  the appropriate sentence.
9      Delaware law specifies certain statutory
10  aggravating circumstances, at least one of which must be
11  found to exist beyond a reasonable doubt in order to
12  render death an available punishment. The law also
13  permits you to consider any other aggravating factors
14  not set forth in the statute which may exist in this
15  case. The defense may offer evidence relating to any
16  mitigating circumstances which it contends exists in a
17  particular case.
18      An aggravating circumstance is any factor
19  relating to the crime or to the offender which tends to
20  make the defendant's conduct more serious or the
21  imposition of a penalty of death appropriate, including,
22  but not limited to, the statutory aggravating
23  circumstance. A mitigating circumstance is any factor

Page 126

1  relating to the crime or to the offender which tends to
2  make the defendant's conduct less serious, or the
3  imposition of a death penalty inappropriate. It is
4  within your province as the jury to determine the
5  aggravating and mitigating circumstances which exist in
6  this case and the weight they should be individually
7  accorded.
8      In this case, the State contends the following
9  statutory aggravating circumstance exists:
10      The murder was premeditated and the result of
11  substantial planning.
12      This statutory aggravating circumstance
13  requires a finding of premeditation. In order for a
14  murder to be premeditated, the defendant must have
15  thought about it, considered it, or deliberated about it
16  beforehand. The design to kill must arise from the
17  sedate, deliberative process and not a rash or
18  impulsive, though intentional, act. This statutory
19  aggravating factor also requires a finding that the
20  murder was a result of substantial planning.
21  Substantial planning is planning which is considerable
22  or ample for the commission of the crime.
23      The State has the burden of establishing this

Page 127

1  aggravating circumstance beyond a reasonable doubt.
2      Reasonable doubt is a practical standard.
3      On the one hand, in criminal cases the law
4  imposes a greater burden of proof than in civil cases.
5  Proof that the required statutory aggravating
6  circumstance probably exists is not sufficient.
7      On the other hand, there are very few things
8  in this world that we know with absolute certainty.
9  Therefore, you are not required to find proof that
10  overcomes every possible doubt.
11      Proof beyond a reasonable doubt is proof that
12  leaves you firmly convinced that the circumstance
13  exists. Therefore, based upon your conscientious
14  consideration of the evidence, if you are firmly
15  convinced that -- excuse me -- that the murder was
16  premeditated and the result of substantial planning, you
17  should answer the first question affirmatively. If, on
18  the other hand, you think there is a real possibility
19  for or, in other words, a reasonable doubt that the
20  murder was not premeditated and the result of
21  substantial planning, you must give the defendant the
22  benefit of the doubt by answering the question in the
23  negative.

Page 128

1      You must then weigh and consider the
2  mitigating circumstances and the aggravating
3  circumstances, including, but not limited to, the
4  statutory aggravating circumstance. You must weigh all
5  relevant evidence in aggravation or mitigation which
6  bears upon the particular circumstances or details of
7  the commission of the offense and the character and
8  propensities of the offender. Weighing the aggravating
9  and mitigating circumstances is not a mere counting --
10  excuse me -- is not a mere counting process of X number
11  of aggravating circumstances and Y number of mitigating
12  circumstances, but rather a reasoned judgment as to what
13  factual situations require the imposition of death and
14  which can be satisfied by life imprisonment in light of
15  the totality of the circumstances present. You must
16  then determine whether, based upon a preponderance of
17  the evidence, the aggravating factors outweigh the
18  mitigating factors. The side on which the greater
19  weight of the evidence is found is the side on which the
20  preponderance of the evidence exists, a mere tipping of
21  the balanced scales in favor of one side or the other.
22      You are reminded that you are to base your
23  answers to the questions set forth in the special

Page 137

1 and of course that in and of itself provides support for
2 the argument I made to the jury.
3     THE COURT: Gentlemen, we are where we are. I
4 overruled the objection. The jury is now deliberating.
5 Therefore, this becomes an academic discussion and it's
6 too late in the day for that.
7     We'll stand in recess until the call of the
8 court.
9     (Court recessed at 3:25 p.m.)
10     (Court reconvened at 7:00 p.m.)
11     THE COURT: Please bring in the jury. While
12 we're waiting for Mel to get the jury, it gives me an
13 opportunity to say on the record what I have stated
14 privately in chambers. I really appreciate the
15 professionalism of the lawyers on both sides, the aura
16 of cooperation that is allowing this case to flow
17 smoothly in the courtroom for the most part, and we have
18 confined our differences to sidebar and to chambers.
19 The truth of the matter is that I've grown quite fond of
20 all of you and, though I'm relieved to see this case
21 come to a conclusion, I truly will miss working with you
22 on a regular basis. You've represented the best in
23 professionalism, in ethics, in everything that is good

Page 138

1 about a profession that is often maligned. Again, I was
2 proud to have worked with you.
3     (The jury came into the courtroom at 7:02
4 p.m.)
5     THE COURT: Mr. Foreman, have you completed
6 your recommendation to the Court in the penalty phase?
7     THE FOREMAN: Yes, sir, we have.
8     THE COURT: Would you please -- Mel, would you
9 please bring that recommendation to me?
10     Thank you very much. The interrogatory to the
11 jury are as follows:
12     Does the evidence show beyond a reasonable
13 doubt the existence of the following statutory
14 aggravating circumstance?
15     The murder was premeditated and the result of
16 substantial planning?
17     The yes votes were 11; the no votes were 1.
18     Two, Does the jury find by a preponderance of
19 the evidence, after weighing all the relevant evidence
20 in aggravation or mitigation which bears upon the
21 particular circumstances or details of the commission of
22 the offense and the character and propensities of the
23 offender, that the aggravating circumstances found to

Page 139

1 exist outweigh the mitigating circumstances found to
2 exist?
3     The answers are yes, ten votes; no, two votes.
4 The signature of the jurors are included on this
5 document.
6     Members of the jury, I want to thank you.
7 You've given over three months of your life to this
8 case. There's no real way to express the gratitude of
9 this court and the people of the State of Delaware.
10 You're underpaid and overworked. Welcome to state
11 employment.
12     I want to particularly thank the alternates
13 because you've been here the whole time, shared in the
14 camaraderie that occurred with the jury but did not
15 participate in either of the major decisions made by
16 this jury. As a group you not only have fulfilled your
17 civic duty but you've made a personal contribution to
18 the concept of justice in the State of Delaware.
19     You may have some questions about the
20 confidentiality of the proceedings. Because the case is
21 over, you are free to discuss the case with any person
22 you choose. However, you do not have to talk with
23 anyone about this case if you do not want to. If you

Page 140

1 tell somebody you do not wish to talk about it and they
2 continue to bother you, please inform the Court and we
3 will take measures to protect your privacy. If you do
4 decide to discuss the case with anyone, I would suggest
5 that you treat it with a degree of solemnity so that
6 whatever you say you would be willing to say in the
7 presence of your fellow jurors or under oath in open
8 court in the presence of all of the parties involved.
9 Also, if you do decide to discuss the case, please
10 respect the privacy of the views of your fellow jurors.
11 Your fellow jurors fully and freely stated their
12 opinions in deliberations with the understanding that
13 they were being expressed in confidence.
14     The press has made a request that those jurors
15 who would like to talk to them go outside on the
16 courthouse steps where an area has been prepared. We
17 will see that the appropriate security goes with you.
18 And you don't have to make that decision right now.
19     It's my understanding that I'm going to be
20 meeting with you for a brief period of time after we
21 recess and at that time you can decide what course of
22 action you wish to follow. Understand that for better
23 or worse, your ordeal is not completely over because

STATE'S EX. 18

39

Sunday
4-7-96

Happy Easter! Well, .. another yr. has passed since my last entry and man o'man has a lot happened. I've been through a lot of emotional battles. I finally have brought closure to Tom Capano. What a controlling, manipulative, insecure, jealous maniac. Now that I look back on that aspect of my life; —— I realize just how vulnerable I had become. It hurts me when I think about that year. For one whole year, I allowed someone to take control of every decision in my life. Bob Conner's death hurt me/affected me more than anything. I lost my best friend, mentor, the man w/ the greatest smile ☺ My being after Bob's death became the little girl growing up in a chaotic world. I lost all sense of trust. I thought it would be easier that way.

I have been fortunate enough to find another therapist, Michelle Sullivan. No one will ever take the place of Bob, —— but ... she's pretty damn close. 5 weeks ago I was diagnosed w/ Bulemia. My weight is currently 125 pounds. Pretty skinny, but I

Page 33

want more. My brother Robert is the only sibling that knows anything. most

- 40 -

most likely that will remain the
case. At this point, I'm afraid
to share this news with Michael.
I don't want him to run. I
truly love him, — + I'm afraid
of what he might think of me.
Michael is the most wonderful
person. This is the first "normal"
relationship I've ever had, and
I can't screw it up!

Subject: re: Monday
Author: afahey@gov.state.de.us at Internet
Date:   5/20/96 11:47 AM


I am confused about Victor's.  We never talked about it.  I am leaving on
Thursday after work to go the Cape Cod for Memorail day.  1st question,
Russia, Spain, Thailand, U.S. 2. Sara Lee was real and I believe she is
still alive.  Mrs. Paul not real.  As for Levi Strauss, I am going to say
that he was some legend cowboy.  How am I doin' so far?  I have had a
pretty bad last 2 days.  My weight has dropped 6 pounds, and I nearly
fainted in Chuch yesterday.  I am starting to get scared.  I'll talk to ya
later, someone is here working on my machine.  amf

52

State's Ex. 53  A-183

From tcapano@saul.com, on 5/20/96 2:53 PM:
I thought we had talked about doing dinner again on Thursday but
obviously misunderstood. What's up with the Cape? How about dinner on
Wednesday? You're wrong on the first question. In order: U.S., Russia,
Thailand, Spain. (I'm not sure I believe it). You're right about Sara
Lee and Mrs. Paul but wrong about Levi Strauss (little old Jewish
guy). You did well enough to win in my book. I did hear from one Fahey
this morning; Robert called me but I haven't returned the call yet.
Did you make it to Radnor on Saturday? Who you taking to the Blue
Rocks tomorrow night? Annie, I'm trying to be light but it ain't
working. I'm real worried about the bad couple of days you've had, the
weight loss and nearly fainting in Church. Maybe you should call
Michelle today. Please call me this afternoon or email to let me know
we can talk tonight after Brian Michael's.

State's Ex. 53   A-184

From tcapano@saul.com, on 5/21/96 10:54 AM:
   Good Morning Annie,
   Glad you enjoyed the fax and that you ate well at Debbie's. Don't
   worry about the game tonight but remember you have the tickets for
   next Tuesday as well. I guess Brian did not get your air conditioner
   in for you last night. Your apartment must be unbearable. I'd be glad
   to put it in for you today; just let me know when. I'm worried about
   you. Don't tell me not to because you know I do. Did you call
   Michelle? Probably not. I assume you have an appointment with her
   tomorrow morning and that you intend to keep it. Please be sure you
   give her the $500 tomorrow since you're out of credit. Since you're
   not going to go to the game and won't be here Thursday, could we have
   dinner tonight? It would be good for me and, at the risk of sounding
   pompous, I think you might get something out of it too under the
   circumstances. By the way, I just got in because of the dentist.
   Please call when you can or let me know when I can call you. I'll wait
   to hear from you.

57

State's Ex. 53   A-185

```
Author:  THOMAS CAPANO at Sers-Wilmington
Date:    6/3/96  12:19 PM
Priority: Normal
Receipt Requested
TO: afahey@state.de.us at Internet
Subject: Monday
-------------------------------- Message Contents ----------------------------
```

Hey you. You'll get this after I'm gone but I didn't want the day to
go by without saying hi. I know you're having a rough day and hope it
doesn't make you crazy. Keep your fingers crossed that the rain stops
so we get our round in today. Enjoy your nephew tonight and remember
to tell me tomorrow what Debbie cooked. Please be careful at the gym
and give me a ring if you feel like it tonight. If not, I'll talk to
you tomorrow. How's about dinner Thursday night? Lobster at the
Dilworthtown? You did a great job with Mark yesterday and should be
proud of the way you handled it. AND TAKE YOUR VITAMINS!!!!

State's Ex. 53  A-186

# OBERLY, JENNINGS & DREXLER, P.A.

ATTORNEYS AT LAW

800 DELAWARE AVENUE

SUITE 901

P.O. BOX 2054

WILMINGTON, DELAWARE 19899-2054



Charles M. Oberly, III
Kathleen M. Jennings
Lawrence S. Drexler

Lisa B. Borin
Ann-Marie P. Sheely

(302) 576-2000
Fax  (302) 576-2004
E-Mail  OJD@de-law.com

July 9, 1997

Colm F. Connolly
Assistant United States Attorney - DE
Chase Manhattan Centre
1201 Market Street, Suite 1100
P. O. Box 2046
Wilmington, DE 19899-2046

Re: **Thomas J. Capano**

Dear Colm:

I am in receipt of three letters from you dated June 23, 1997. Each deals with a separate issue. I would like to address them as follows:

It is somewhat unclear to me why you have, again, raised the issue of Mr. Capano giving a statement. As you well know, Mr. Capano gave two statements to the Delaware State Police/Wilmington Department of Police during the early stage of the investigation. Mr. Capano also called Anne Marie Fahey's brother, the transcript of which was printed in its entirety by the News Journal on Sunday, June 29, 1997. In addition to that offer, which was rejected by the family at that time, Mr. Capano made two offers to give additional statements. Each was rejected by the Attorney General's Office.

Prior to the FBI or anyone from your office seeking to obtain a statement from Mr. Capano, Federal authorities executed a search warrant on his home. When the contents of the search warrant were made public, it was apparent that the conclusionary statements made in that affidavit precluded any chance for a further interview. The FBI clearly stated its conclusion that it believed Mr. Capano was responsible for a crime. Under these circumstances, no attorney that I have ever met would recommend the client come in and give a statement. Mr. Capano gave two statements, attempted to contact the family, and attempted on two additional occasions to give a statement, which could have been video-taped. His efforts were rejected and, he has

Colm F. Connolly
July 9, 1997
Page 2


been designated as a murderer by the FBI and had his life essentially destroyed.  To suggest that he should come in and speak with you under these circumstances is completely unacceptable and unrealistic.


Very truly yours,

CHARLES M. OBERLY, III

CMO,III/dq

P.S.  I would have responded to these letters sooner, but as you are aware, I was on vacation from June 20 thru July 2, 1997.

# OBERLY, JENNINGS & DREXLER, P.A.

ATTORNEYS AT LAW

800 DELAWARE AVENUE

SUITE 901

P.O. BOX 2054

WILMINGTON, DELAWARE 19899-2054

1996

Charles M. Oberly, III
Kathleen M. Jennings
Lawrence S. Drexler

(302) 576-2000
Fax  (302) 576-2004
E-Mail  OJD@de-law.com

Lisa B. Borin
Ann-Marie P. Sheely

July 22, 1996

Ferris W. Wharton
Deputy Attorney General
c/o Stephen M. Walther, State Prosecutor
Department of Justice
820 N. French Street - 8th Flr.
Wilmington, DE 19801

Dear Ferris:

As you know, I represent Tom Capano, who came to me as a friend of many years. Tom has been a political, professional, and social friend since our days together in the Attorney General's Office in the mid-1970's. Unfortunately, with the single exception of the Philadelphia Inquirer, there has never been a reference to our close relationship and the fact that it would be quite expected for him to seek me out for advice. Tom has been devastated by Anne Marie Fahey's disappearance and the suspicion and innuendo surrounding the fact that he took her to dinner on June 27th and is, as far as anyone knows, the last person to see her.

Contrary to media reports, Tom has been completely cooperative in trying to solve the mystery of Anne Marie's disappearance. On Sunday morning, June 30, 1996 at approximately 3:00 a.m., Tom was awakened at his home by four police officers inquiring about Anne Marie's failure to attend a dinner and her apparent disappearance. Tom spoke to the investigators at length, volunteering detailed information concerning their June 27th dinner. Subsequently, on the same day in the afternoon, the same four police officers confronted Tom as he was returning his children to their mother's home and asked to speak with him again. Tom again complied with the request and returned to his home on Grant Avenue. More questioning ensued along with a request to inspect his residence and his Jeep Cherokee. Tom answered all the questions and without hesitation permitted the officers to walk throughout his house and to inspect his vehicle. He put no limitation on their questions or their search.

STATE'S EX. 255



**009381**

State's Ex. 255  A-189

Ferris W. Wharton
July 22, 1996
Page 2

      Only after two conversations with the police, a search of his home and vehicle and a telephone conversation with Kim Horstmann, wherein she indicated the police were acting like Tom was a suspect, did he come to see me. Since that time, Tom has tried to offer further assistance to help find Anne Marie. On July 8, 1996, Bart Dalton informed you that Tom was, in fact, again willing to speak with the police regarding Anne Marie. He was not, however, willing to violate any privacy interest he justifiably felt existed between Anne Marie and him and believed that nothing occurring before 1996 had any relevance to Ms. Fahey's current whereabouts. Bart also communicated that questions regarding Tom's marital relationship and other relationships he may or may not have had are totally irrelevant to any search for Ms. Fahey. In wanting to protect the privacy of people close to him who can add absolutely nothing to help find Ann Marie , but motivated by his desire to assist the police in locating her. Tom asked that we relay to you his request to speak again to the police.

      For reasons unknown, Tom's offer to speak to the police was rejected with the statement that there can be no pre-conditions to areas of inquiry. We were all shocked and dismayed by that decision. Nevertheless, he then reached out and called Robert Fahey, Anne Marie's brother, and left a message for him. Mr. Fahey never returned the call and the News Journal reported erroneously that Tom had made no effort to contact the family. Moreover, Tom has also spoken at length to Bud Freel and Kim Horstmann, which I am sure you are fully aware, as well as to a third mutual friend in an effort to establish contact with the family. All of his efforts have gone unanswered.

      Despite news leaks and comments that have harmed Tom's reputation and mischaracterized the rejection of his offer to talk to the police, Tom insisted Bart contact you again on July 16th to renew his offer to cooperate, a course of action we advised against. Tom had learned that the Fahey family was willing to waive any privacy interest Tom felt existed regarding his relationship with Anne Marie. With this thought in mind, Tom asked that you be advised that he was willing to talk about any aspect of their relationship from its inception to the night of June 27th when he took her home, including any confidences reposed in him by Anne Marie or insights he had gained into her character and state of mind. Again, Bart stated that Tom was not willing to discuss unrelated aspects of his private life and subject loved ones, especially his four daughters, to embarrassing and/or personal matters having nothing to do with Anne Marie's disappearance. There were no other pre-conditions that would prevent the taking of another statement. We agreed to appear at any location you chose and to have it taped. You stated there was no need to use a video tape since Michael Scanlon was not video-taped. Again, you rejected Tom's offer to speak, stating that every aspect of his life was subject to inquiry, and he could decline to answer specific questions if he so desired.

**009382**

State's Ex. 255  A-190

Ferris W. Wharton
July 22, 1996
Page 3

It is now beyond question that Tom's continued cooperation is sought not to find or learn anything that may be helpful in locating Anne Marie, but for other purposes. Under these circumstances, I am sure you can appreciate the advice we have given Tom. We have advised him in the strongest possible terms that in light of the second rejection, he should not make any further statements, and I request that he not be asked to do so again. Nevertheless, Tom will search his memory regarding Anne Marie, and I will forward to you any information that can provide further insight into this bizarre mystery, including a chronology of their recent contacts.

In closing, I want to state that leaks and comments to the press have unfairly pummeled Tom's reputation and damaged his professional career. He told the police he brought Anne Marie home around 10:00 p.m. or shortly thereafter. Connie Blake, an unbiased witness, told the police that she heard footsteps in Anne Marie's apartment around that time, thus verifying Tom's statement. You already know he was in Philadelphia as late as 9:15 p.m. when the restaurant check was stamped.

We certainly appreciate the pressure placed upon law enforcement in a case such as this. On the other hand, we hope you can appreciate the damage caused to Tom by leaks to the press, unfounded comments, and rumors circulating in the community. Since June 30th, Tom has cooperated and, as noted above, will continue to do so.

Very truly yours,

*Charlie*

CHARLES M. OBERLY, III

CMO,III/dq

009383

State's Ex. 255  A-191

## CERTIFICATE OF SERVICE

The Law Office of Joseph M. Bernstein hereby certifies that on ___2/20/07___, a copy of

the attached ___Appendix to Brief___ was served by

   ( ) First Class Mail

   (X) Hand Delivery

on the following:

Loren C. Meyers, Esquire
Elizabeth R. McFarlan, Esquire
Department of Justice
Carvel State Building
820 N. French Street
Wilmington, DE 19801


_____
Joseph M. Bernstein

## CERTIFICATE OF SERVICE

The Law Office of Joseph M. Bernstein hereby certifies that on _2/20/07_ , a copy of

the attached _Opening Brief_ was served by

    ( ) First Class Mail

    (✗) Hand Delivery

on the following:

Loren C. Meyers, Esquire
Elizabeth R. McFarlan, Esquire
Department of Justice
Carvel State Building
820 N. French Street
Wilmington, DE 19801

_Joseph M B_____
Joseph M. Bernstein