# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

**THOMAS J. CAPANO,** :
:
     Petitioner, :
:
    v. :    Civ. Act. No. 06-58-***
:
**THOMAS L. CARROLL,** :
Warden, and **JOSEPH R. BIDEN, III,** :
Attorney General for the State :
of Delaware, :
:
     Respondents. :

## RESPONDENTS' BRIEF
## IN OPPOSITION TO PETITION
## FOR FEDERAL HABEAS CORPUS

**LOREN C. MEYERS**
Chief of Appeals Division
Del. Bar ID 2210
loren.meyers@state.de.us

**ELIZABETH R. McFARLAN**
Deputy Attorney General
Del. Bar ID 3759
elizabeth.mcfarlan@state.de.us

Department of Justice
State Office Building
820 N. French Street
Wilmington, DE 19801
(302) 577-8500

August 2, 2007

# TABLE OF CONTENTS

**Page**

TABLE OF CITATIONS ............................................................................. ii

NATURE AND STAGE OF THE PROCEEDINGS.................................... 1

SUMMARY OF THE ARGUMENTS........................................................ 2

STATEMENT OF FACTS ........................................................................ 4

ARGUMENT

I.     THE STATE COURTS' CONCLUSION THAT CAPANO WAS
NOT ENTITLED TO ANY INSTRUCTIONS ON LESSER
INCLUDED OFFENSES WAS A REASONABLE
APPLICATION OF RELEVANT UNITED STATES
SUPREME COURT PRECEDENT....................................................... 8

II.    THE STATE COURTS' CONCLUSION THAT FAHEY'S
STATEMENTS WERE ADMISSIBLE WAS NOT AN
UNREASONABLE APPLICATION OF RELEVANT UNITED
STATES SUPREME COURT PRECEDENT .....................................19

III.   CAPANO'S CLAIM OF IMPROPER CROSS-EXAMINATION
BY PROSECUTORS CONCERNING HIS POST-ARREST
SILENCE IS PROCEDURALLY DEFAULTED ............................... 28

CONCLUSION ...................................................................................... 34

## TABLE OF CITATIONS

**Cases**

*Affinito v. Hendricks,* 366 F.3d 252 (3d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Andrews v. Deland,* 943 F.2d 1162 (10th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . 14

*Barefoot v. Estelle,* 463 U.S. 880 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Beard v. Banks,* 124 S.Ct. 2504 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Beck v. Alabama,* 447 U.S. 625 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 8, 11

*Belton v. United States,* 382 F.2d 150 (D.C. Cir. 1967) . . . . . . . . . . . . . . . . . . . . . 16

*Bond v. Fulcomer,* 864 F.2d 306 (3d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Brecht v. Abrahamson,* 507 U.S. 619 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 24

*Bright v. Snyder,* 218 F. Supp. 2d 573 (D. Del. 2002) . . . . . . . . . . . . . . . . . . . 19, 21

*Bryson v. Ward,* 187 F.3d 1193 3 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Bullington v. Missouri,* 451 U.S. 430 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Butler v. McKellar,* 494 U.S. 407 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Calderon v. Coleman,* 525 U.S. 141 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Campbell v. Vaughn,* 209 F.3d 280 (3d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Capano v. Delaware,* 536 U.S. 958 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Capano v. State,* 781 A.2d 556 (Del. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Capano v. State,* 889 A.2d 968 (Del. 2006) . . . . . . . . . . . . . . . . . . . . . . . 1, 26, 32

*Carey v. Musladin,* 127 S.Ct. 649 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Caspari v. Bohlen,* 510 U.S. 383 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

*Caswell v. Ryan,* 953 F.2d 853 (3d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Chadwick v. Janecka,* 312 F.3d 597 (3d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . 16

*Chapman v. California*, 386 U.S. 18 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Coleman v. Thompson*, 501 U.S. 722 (1991) . . . . . . . . . . . . . . . . . . . . . . 28, 30, 31

*Creel v. Johnson*, 162 F.3d 385 (5th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Dawson v. Snyder*, 988 F. Supp. 783 (D. Del. 1997) . . . . . . . . . . . . . . . . . . . . . . . 30

*Dowling v. United States*, 493 U.S. 342 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Dowthitt v. Johnson*, 230 F.3d 733 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . 16

*Doyle v. Ohio*, 426 U.S. 610 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 31

*Driscoll v. United States*, 356 F.2d 324 (1st Cir. 1966), *vacated on other grounds sub nom. Piccioli v. United States*, 390 U.S. 202 (1968) . . . . . . . . . . . . . . . . . . . . . . . 16

*Duncan v. Henry,* 513 U.S. 364 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Early v. Packer,* 537 U.S. 3 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Fahy v. Connecticut*, 375 U.S. 85 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Fischetti v. Johnson*, 384 F.3d 140 (3d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . 9, 10

*Fletcher v. Weir*, 455 U.S. 603 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Fry v. Pliler*, 127 S. Ct. 2321 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 24

*Gattis v. Snyder*, 278 F.3d 222 (3d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . 8, 19

*Gilmore v. Taylor*, 508 U.S. 333 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Graham v. Collins*, 506 U.S. 461 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Harris v. Reed*, 489 U.S. 255 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Hayes v. York*, 311 F.3d 321 (4th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Hogan v. Gibson*, 197 F.3d 1297 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . 15

*Hooks v. Ward*, 184 F.3d 1206 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . 17

*Hopkins v. Reeves*, 524 U.S. 88 (1998) . . . . . . . . . . . . . . . . . . . . . . . 13, 14, 18

*Hopper v. Evans*, 456 U.S. 605 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

*Horn v. Banks,* 536 U.S. 266 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Idaho v. Wright,* 497 U.S. 805 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Jacobs v. Horn,* 395 F.3d 92 (3d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Jenkins v. Anderson,* 447 U.S. 231 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Johnson v. Carroll,* 325 F. Supp. 2d 386 (D. Del. 2004) . . . . . . . . . . . . . . . . . . . . 30

*Johnson v. Carroll,* 369 F.3d 253 (3d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Jones v. Hoffman,* 86 F.3d 46 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Jones v. Johnson,* 171 F.3d 270 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Keeble v. United States,* 412 U.S. 205 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Lawrie v. Snyder,* 9 F. Supp. 2d 428 (D. Del. 1998) . . . . . . . . . . . . . . . . . . . . 29, 30

*Lewis v. Johnson,* 359 F.3d 646 (3d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Lilly v. Virginia,* 527 U.S. 116 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 23

*Lockyer v. Andrade,* 538 U.S. 63 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Mattox v. United States,* 156 U.S. 237 (1895) . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*McCandless v. Vaughn,* 172 F.3d 255 (3d Cir. 1999) . . . . . . . . . . . . . . . . . . . 21, 30

*McCleskey v. Zant,* 499 U.S. 467 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*McLaughlin v. Carroll,* 270 F. Supp. 2d 490 (D. Del. 2003) . . . . . . . . . . 29, 30, 31

*Mitchell v. Esparza,* 540 U.S. 12 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Murray v. Carrier,* 477 U.S. 478 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Ohio v. Roberts,* 448 U.S. 56 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Pennsylvania v. Goldhammer,* 474 U.S. 28 (1985) . . . . . . . . . . . . . . . . . . . . . . . 13

*Pitts v. Lockhart,* 911 F.2d 109 (8th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Price v. Vincent,* 538 U.S. 634 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Rembert v. Dugger*, 842 F.2d 301 (11th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Ring v. Arizona*, 536 U.S. 584 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Robertson v. Johnson*, 234 F.3d 890 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . 15

*Saffle v. Parks*, 494 U.S. 484 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

*Smith v. Digmon*, 434 U.S. 332 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 19, 28

*Smith v. Murray*, 477 U.S. 527 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 33

*Spaziano v. Florida*, 468 U.S. 447 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 18

*State v. Capano*, 2005 Del. Super. LEXIS 69
(Del. Super. Mar. 9, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 26, 31, 32

*State v. Fowler*, 785 P.2d 808 (Wash. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*State v. Long*, 123 A. 350 (Del. Ct. O. & T. 1923) . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Strickland v. Washington*, 466 U.S. 668 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Stringer v. Black*, 503 U.S. 222 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Swanger v. Zimmerman*, 750 F.2d 291 (3d Cir. 1984) . . . . . . . . . . . . . . . . . . . 19, 28

*Sweger v. Chesney*, 294 F.3d 506 (3d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Teague v. Lane*, 489 U.S. 288 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 11

*Trujillo v. Sullivan*, 815 F.2d 597 (10th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . 13

*Trump v. Kearney*, 2003 WL 22769598 (D. Del. Nov. 14, 2003) . . . . . . . . . . . . . . . 29

*Turner v. Marshall*, 63 F.3d 807 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Cady*, 495 F.2d 742 (8th Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Delk*, 586 F.2d 513 (5th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Frady*, 456 U.S. 152 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*United States v. Lane*, 474 U.S. 438 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Moore*, 108 F.3d 270 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . 16

*Villot v. Varner*, 373 F.3d 327 (3d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Wainwright v. State*, 504 A.2d 1096 (Del. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Ward v. State*, 575 A.2d 1156 (Del. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Werts v. Vaughn*, 228 F.3d 178 (3d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

*White v. Carroll*, 416 F. Supp. 2d 270 (D. Del. 2006) . . . . . . . . . . . . . . . . . . 31, 32

*White v. Illinois*, 502 U.S. 346 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Winters v. Williams*, 2006 WL 1788487 (D. Del. June 27, 2006) . . . . . . . . . . 28, 30

## Statutes and Rules

28 U.S.C. § 2254(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 19, 22

28 U.S.C. § 2254(d)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 22

28 U.S.C. §§ 2254(d)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

28 U.S.C. §§ 2254(e)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Del. Code Ann. tit. 11, §206(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Del. Code Ann. tit. 11, §4209(e)(1)u . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Del. Code Ann. tit. 11, §631 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Del. Code Ann. tit. 11, §632 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Del. Code Ann. tit. 11, §635 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

D.R.E. 803(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21, 22

D.R.E. 803(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21, 26

## NATURE AND STAGE OF THE PROCEEDINGS

In December 1997, a Delaware state grand jury indicted petitioner Thomas J. Capano, charging him with having committed first degree murder in the death of Anne Marie Fahey. After a ten-week trial, a Superior Court jury found Capano guilty of first degree murder. Following a penalty hearing, the jury recommended by a vote of 10 to 2 that Capano be sentenced to death. In March 1999, the trial judge sentenced Capano to death. On appeal, the Delaware Supreme Court affirmed the conviction and the sentence, *Capano v. State*, 781 A.2d 556 (Del. 2001), and Capano's ensuing petition for a writ of certiorari was denied in June 2002. *Capano v. Delaware*, 536 U.S. 958 (2002).

Capano, in June 2003, applied for state post-conviction relief. After an evidentiary hearing and briefing, Superior Court denied the motion in March 2005. *State v. Capano*, 2005 Del. Super. LEXIS 69 (Del. Super. Mar. 9, 2005). On January 10, 2006, the state supreme court, on appeal from the denial of Capano's state post-conviction motion, vacated the death sentence and remanded the case for a new penalty hearing. *Capano v. State*, 889 A.2d 968 (Del. 2006). Then, on January 30, 2006, Capano filed the instant petition for a writ of habeas corpus. DI 1. Prosecutors elected not to conduct a new penalty hearing, and on March 2, 2006, a Superior Court judge sentenced Capano to life in prison.[1]

---

[1] In his petition, Capano had contended that the Delaware death penalty statute in effect at the time of his trial and sentencing was facially unconstitutional under *Ring v. Arizona*, 536 U.S. 584 (2002); the Delaware Supreme Court's decision in the post-conviction proceedings to permit a re-trial of the penalty phase violated the Double Jeopardy Clause of the Fifth Amendment; and his trial attorneys were constitutionally ineffective because they did not request limiting instructions concerning Fahey's out-of-court statements, they agreed to a stipulation that admitted Fahey's out-of-court

## SUMMARY OF ARGUMENT

1. Denied: As a preliminary point, to rule in Capano's favor on this claim would be to create a "new" rule on collateral review, a result foreclosed by *Teague v. Lane*, 489 U.S. 288 (1989). In light of Capano's testimony that Fahey's death was an accident (occasioned by MacIntyre), there was no rational basis in the evidence for the jury to acquit him of first degree murder and, in turn, to convict him of a lesser included offense. As a result, the decision of the state supreme court that no instructions on any lesser included offenses were warranted was a reasonable application of *Beck v. Alabama*, 447 U.S. 625 (1980).

2. Denied: The state supreme court's decision that Fahey's out-of-court statements were admissible at trial was not contrary to or an unreasonable application of relevant United States Supreme Court precedent. Fahey's statements reflecting her state of mind were properly admitted under the firmly rooted exception to inadmissible hearsay. Further, in light of Capano's pre-trial stipulation to the admission of prior bad acts evidence included in Fahey's diary, emails and Lynch-Horstmann's testimony, Capano cannot demonstrate actual prejudice from the admission of Fahey's out-of-court statements of facts remembered or believed. *See Fry v. Pliler*, 127 S. Ct. 2321 (2007) (applying *Brecht v. Abrahamson*, 507 U.S. 619 (1993), on collateral review of constitutional errors in state-court criminal trials).

---

statements, and they did not object to the prosecutor's cross-examination of Capano about his pre-arrest and post-arrest silence. DI 1 at ¶ 12. In his brief before this Court, Capano acknowledges that the *Ring* claim and the double jeopardy claim are moot in light of the prosecution's decision not to proceed with a new penalty hearing. DI 26 at 2 n.2. Capano also writes that he is not pursuing the claims of ineffective assistance he advanced in claim 6 of the petition. DI 26 at 2 n.2.

3. Denied: Capano's contention that the prosecutor could not cross-examine Capano about his statement that he maintained his silence until trial to protect MacIntyre is procedurally barred. There was no objection at trial to the questioning, and the state supreme court only considered the claim on appeal for plain error under the provisions of Delaware Supreme Court Rule 8. Under district precedent, Supreme Court Rule 8 is an independent and adequate state ground to preclude federal habeas review. Given his withdrawal of his claim that trial counsel were ineffective in failing to object to the prosecutor's question (DI 26 at 2 n.2), Capano has not established cause for the default. The prosecutor's inquiry on cross-examination elicited a response which directly impeached Capano's direct testimony, an appropriate purpose envisioned in *Doyle v. Ohio*, 426 U.S. 610, 620 n.11 (1976). A fair reading of the record further reveals that defense counsel agreed that admission of the correspondence between Capano and MacIntyre opened the door to impeachment by reference to Capano's post-arrest silence.

## STATEMENT OF FACTS

Thomas Capano, a prominent local attorney, and Anne Marie Fahey began dating in the spring of 1994. The two kept the relationship a secret from most of their friends and family members. Fahey was in love with Capano, but she knew that she could not expect to marry him. By September 1995, when Fahey met Michael Scanlon, she was attempting to end the relationship with Capano. Capano, however, became very upset and continued to pursue the relationship. On her part, Fahey was concerned that Capano would react badly if he learned of her increasingly close ties to Scanlon, Fahey telling her psychiatrist that she felt Capano was controlling her. By April 1996, Fahey thought that she and Capano had established a friendship that she could manage while increasing her involvement with Scanlon. *Capano v. State*, 781 A.2d 556, 583, 619, 621 (Del. 2001).

In the meantime, according to prosecutors, Capano had started to plan Fahey's demise. In February 1996, Capano told two of his brothers, Gerry and Joseph, that he had been threatened by extortionists, and he borrowed $8,000 from Gerry in connection with the extortion effort. Capano later obtained a pistol from Gerry (which Capano returned about a month later) and asked Gerry if he could borrow Gerry's boat if he had to dispose of a body. In April 1996, Capano purchased a 162-quart marine cooler that was later used to dispose of Fahey's body. The following month, Capano had his mistress of 17 years, Deborah MacIntyre, purchase a handgun for him. *Id.* at 583-84, 599-603.

On Thursday, June 27, 1996, Fahey left work at about 4:30 p.m. and went to an appointment with her psychiatrist. Capano and Fahey later had dinner at a Philadelphia restaurant, and Fahey was never seen alive thereafter. Early the next morning, Capano

4

asked Gerry if he could borrow his boat. According to Gerry, when he asked Capano, "Did you do it?", Capano replied that he had. The two agreed to meet later at Capano's house. *Id.* at 584.

When Gerry arrived at about 8:30 a.m., Capano had secured the cooler with a lock and chain which Gerry told him to remove. The two placed the cooler in the back of Capano's sport utility vehicle, and they drove to Gerry's house in Stone Harbor, New Jersey. There, they put the cooler onto Gerry's boat and proceeded to sea. At about 60 miles from the coast, they pushed the cooler over the side. The cooler, however, simply floated and continued to do so even after Gerry shot a hole in it. Gerry eventually maneuvered the boat alongside the cooler but, after giving Capano two anchors, turned away as Capano wrapped Fahey's body in the chain and weighed it down with the anchors. Gerry looked back in time to see part of a human leg sink into the water. He retrieved the cooler from the water, rinsed out the inside, and removed the lid before tossing the cooler and the lid back into the ocean.[2] Back at Capano's house, the two disposed of a bloodstained love seat and rug from the great room of the house; on Saturday, June 29, Capano bought a new rug. *Id.* at 584, 599, 604.

That Saturday night, Fahey did not appear at a family dinner, and after contacting some of her friends and entering her apartment, Fahey's family contacted police. Investigators determined that night that Capano might have information about Fahey's whereabouts and questioned him. Police returned on Sunday afternoon and searched Capano's house. A subsequent search found small spots of blood on a wall in the great room of the house. DNA testing of the blood spots, comparing them with

---

[2] The cooler was later found at sea by a fisherman off the New Jersey coast. *Capano*, 781 A.2d at 599.

blood Fahey had given to a blood bank, showed the spots to be a likely match to Fahey's blood. Federal authorities joined the investigation in the summer of 1996, and several individuals, including Capano's brothers, appeared before a federal grand jury. In October 1997, federal agents executing a search warrant discovered illegal drugs and weapons in Gerry's house, and the following month, Gerry agreed to cooperate with authorities investigating Fahey's disappearance. *Id.* at 582-83, 585.

Capano offered a radically different version of events. Testifying at trial, Capano recounted that after dinner in Philadelphia, he and Fahey stopped at her apartment and from there went to his house to watch television, arriving shortly after 10:00 p.m. According to Capano, Fahey removed her pantyhose because she was hot, then the two sat and watched 'E.R.' in his "great room." Fahey fell asleep and Capano woke her to see the end of the show. After the show ended, Capano checked his phone messages and called MacIntyre. They had an unpleasant conversation relating to MacIntyre's job; Capano said he told MacIntyre not to come over because he had company. Capano returned to the great room, sitting with Fahey on the love seat. *Appendix to Appellant's Opening Brief*, Del. Supr. Ct. Nos. 110 & 149, 1999, at A448-49 (contained in DI 16).

According to Capano, while Capano and Fahey were talking on the love seat, MacIntyre arrived very upset, yelling and saying things like "Who's this?" and "Is this why you couldn't see me?" Fahey got up and put on her pantyhose, asking Capano to take her home. MacIntyre then pulled out a gun from a small bag she had brought with her and threatened to shoot herself; Capano told the jury that he grabbed MacIntyre's arm, but MacIntyre accidentally shot Fahey behind her right ear, killing her instantly. Fahey was lying on the love seat. Capano explained that he and MacIntyre attempted to perform CPR on Fahey, but neither called 911 because he did not really believe that

6

Fahey could be saved. MacIntyre dropped the gun, and Capano took it, as well as the magazine which was in MacIntyre's car. Capano made sure MacIntyre was all right and sent her home about 11:30 p.m. He then cleaned up the blood and put Fahey's body in the cooler he had previously bought. Next, Capano drove to Fahey's apartment, taking a gift for her and some perishable groceries with him. He left those items in her apartment, turned on her air conditioner, and, at 11:52 p.m., dialed *69 on Fahey's phone to see who had last called her. He returned to his house around midnight when he called his law firm in an attempt to establish an alibi. According to Capano, MacIntyre called him about 12:30 a.m., and she returned to help carry the cooler down the stairs, rearrange the furniture, and roll up the bloodstained rug. MacIntyre finally went home about 2:30 a.m. *Appendix to Appellant's Opening Brief*, Del. Supr. Ct. Nos. 110 & 149, 1999, at A449-55 (contained in DI 16); *Appendix to State's Answering Brief*, Del. Supr. Ct. Nos. 110 & 149, 1999, at B133 (contained in DI 16). The next morning, he enlisted Gerry's help in disposing of Fahey's body off the New Jersey coast. *Capano*, 781 A.2d at 585-86.

## I.    THE STATE COURTS' CONCLUSION THAT CAPANO WAS NOT ENTITLED TO ANY INSTRUCTIONS ON LESSER INCLUDED OFFENSES WAS A REASONABLE APPLICATION OF RELEVANT UNITED STATES SUPREME COURT PRECEDENT.

### Exhaustion

In his direct appeal to the state supreme court, Capano presented his claim that the failure to instruct the jury on the lesser included offenses, as he requested, violated the rule set out in *Beck v. Alabama*, 447 U.S. 625 (1980). DI 1 at ¶12. Having presented the claim to the state supreme court on direct appeal, Capano has exhausted state remedies. *See Smith v. Digmon*, 434 U.S. 332, 333-34 (1978).

### Standard of Review

Under 28 U.S.C. § 2254(d), Capano is not entitled to relief unless he can establish that the decision of the state court was contrary to, or involved an objectively unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. *See, e.g., Gattis v. Snyder*, 278 F.3d 222, 228 (3d Cir. 2002). As explained by the Third Circuit, a federal court's consideration under §2254(d)(1) of a habeas petitioner's claim proceeds in two steps. The court "must first identify the applicable Supreme Court precedent and determine whether it resolves the petitioner's claim." *Werts v. Vaughn*, 228 F.3d 178, 197 (3d Cir. 2000). *See Lockyer v. Andrade*, 538 U.S. 63, 71 (2003). To do so, "it is not sufficient for the petitioner to show merely that his interpretation of Supreme Court precedent is more plausible than the state court's; rather, the petitioner must demonstrate that Supreme Court precedent requires the contrary outcome." *Werts*, 228 F.3d at 197. *See Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) ("A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from this Court is, at best,

ambiguous."). Thus, if the Supreme Court has not established "a clear or consistent path" of jurisprudence for state courts to follow, the prisoner is not entitled to relief. *Carey v. Musladin*, 127 S.Ct. 649, 653-54 (2006); *Lockyer*, 538 U.S. at 72. When looking to Supreme Court precedent, the court "must decide the level of specificity at which [it] decide[s] whether the state decision is contrary to, or unreasonably applies, that precedent. . . . Supreme Court jurisprudence addressing §2254(d)(1) has established that determining the 'clearly established' benchmark should be done on a case-specific level." *Fischetti v. Johnson*, 384 F.3d 140, 148 (3d Cir. 2004). Under §2254(d)(1), "the Court views its precedents in their particular factual settings. The touchstone precedents are not to be examined by looking to broad pronouncements or generative principles in the opinion. The 'materially indistinguishable' test presupposes a fact-specific analysis of the Supreme Court case law." *Fischetti*, 384 F.3d at 148 (citing cases).

"If [the court] determine[s] that the state court decision is not 'contrary to' the applicable Supreme Court precedent, then [the court is] required to advance to the second step in the analysis -- whether the state court decision was based on an 'unreasonable application of' Supreme Court precedent." *Werts*, 228 F.3d at 197. In performing this inquiry, the court is "not authorized to grant habeas corpus relief simply because [it] disagree[s] with the state court's decision or because [it] would have reached a different result if left to [its] own devices." *Werts*, 228 F.3d at 197. Instead, the state court's application of Supreme Court precedent must have "resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent." *Werts*, 228 F.3d at 197. And as with the inquiry under the "contrary to" prong of the statute, "in analyzing habeas claims for unreasonable application of the law, the

9

Supreme Court has looked at its own baseline precedents through a sharply focused lens." *Fischetti*, 384 F.3d at 149. The decisions of state and lower federal courts are relevant in assessing the reasonableness of the state court decision at issue, but "cases not decided by the Supreme Court do not serve as the legal benchmark against which to compare the state decision." *Fischetti*, 384 F.3d at 149. Finally, in this context, Supreme Court precedent involving the interpretation of federal statutes is not enough; the relevant body of decisional law is that interpreting the federal Constitution. *Early v. Packer*, 537 U.S. 3, 10 (2002) (Court's holdings on non-constitutional issues are not "relevant to the §2254(d)(1) determination"); *Johnson v. Carroll*, 369 F.3d 253, 259-62 (3d Cir. 2004).

### Argument

Capano was charged with a single count of first degree murder. The defense asked the trial judge to instruct the jury on the lesser included offenses of second degree murder (Del. Code Ann. tit. 11, §635), manslaughter (Del. Code Ann. tit. 11, §632), and criminally negligent homicide (Del. Code Ann. tit. 11, §631). The trial judge decided that there was no basis upon which the jury could find Capano guilty of any of the included offenses, and he denied the defense application. *Appendix to Appellant's Opening Brief*, Del. Supr. Ct. Nos. 110 & 149, 1999, at A513-14 (contained in DI 16). The jury, in addition to being instructed on the elements of first degree murder, was told that if they found Fahey's death to be the result of an accident, then the "defendant would not have had the required mental state to commit the offense charged." The judge also instructed the jury to "consider whether the evidence as to accident raises a reasonable doubt of the defendant's guilt." *Id.* at A529.

10

On appeal, Capano argued that under state law, the trial judge erred in declining to instruct the jury on the lesser included offenses. *Amended Appellant's Opening Brief* Del. Supr. Ct. Nos. 110 & 149, 1999, at 22-40. In addition, Capano argued that his conviction was invalid under *Beck v. Alabama*, 447 U.S. 625 (1980). *Amended Appellant's Opening Brief*, Del. Supr. Ct. Nos. 110 & 149, 1999, at 22-40. The state supreme court thought otherwise. Based on its review of the evidence, the state court concluded that there was "no rational basis in the evidence to support a charge on any of the lesser included offenses" requested by Capano. *Capano v. State*, 781 A.2d 556, 628 (Del. 2001). *See id.* at 630-32. In addition, Capano's account that Fahey's death was the result of an accident did not support an instruction on any of the lesser included offenses. *Id.* at 632-33. Because there was no basis in the evidence for the instructions on the lesser included offenses, the federal Constitution did not require that the jury be so instructed. *Id.* at 633-34. Capano can not show that the decision of the state supreme court is either contrary to or unreasonably applies Supreme Court precedent, and he therefore is not entitled to relief.

a. Capano's death sentence was vacated in state post-conviction proceedings, and he was sentenced to life imprisonment without parole. Against this backdrop, Capano's argument is that he is entitled to relief under *Beck*, even though his death sentence was vacated and he is serving a life sentence. As a result, Capano's claim is foreclosed by the retroactivity doctrine of *Teague v. Lane*, 489 U.S. 288 (1989). *See Horn v. Banks*, 536 U.S. 266, 271-72 (2002) (retroactivity under *Teague* is distinct issue from analysis required by §2254(d)). Under *Teague*, new constitutional rules of criminal procedure are inapplicable to cases which have become final before the new rule is announced. *See, e.g., Horn*, 536 U.S. at 271. A case announces a new rule if the result was not

dictated by precedent existing at the time the defendant's conviction became final. *See, e.g, Lewis v. Johnson*, 359 F.3d 646, 653 (3d Cir. 2004). In making this determination, federal courts can only rely on Supreme Court precedent. *Lewis*, 359 F.3d at 653. "If, however, the decision did not announce a new rule, it is necessary to inquire whether granting the relief sought would create a new rule because the prior decision is applied in a novel setting, thereby extending the precedent." *Stringer v. Black*, 503 U.S. 222, 228 (1992). Here too, if a new rule would be created, *Teague* requires the court to deny relief.

The *Teague* analysis requires the court to proceed in three steps. "First, the court must determine when the defendant's conviction became final. Second, it must ascertain the 'legal landscape as it then existed,' and ask whether the Constitution, as interpreted by the precedent then existing, compels the rule. That is, the court must decide whether the rule is actually 'new.'" *Beard v. Banks*, 542 U.S. 406, 411 (2004) (quoting *Graham v. Collins*, 506 U.S. 461, 468 (1993) and citing *Saffle v. Parks*, 494 U.S. 484, 488 (1990)). The last step, reached only if the court decides the defendant is asking for a new rule, is to decide if the rule fits within either exception to *Teague*. *Beard*, 542 U.S. at 411. The first step in the analysis here is straightforward: Capano's conviction became final on June 28, 2002 when his petition for certiorari was denied. *See Caspari v. Bohlen*, 510 U.S. 383, 390 (1994).

The Court must then review the state of the law as of that date and ask whether the result sought by Capano -- applying *Beck* to a case in which the defendant's death sentence has been vacated in state court proceedings -- was dictated by then-existing precedent. *See, e.g., Beard*, 542 U.S. at 413; *Graham*, 506 U.S. at 467. The inquiry is not merely whether the "claim" was "predicated" on preexisting precedent or whether

12

the "challenge" was "dictated" by such precedent; it is insufficient that prior decisions "inform, or even control or govern, the analysis of" a defendant's claim. *Saffle*, 494 U.S. at 491; *Butler v. McKellar*, 494 U.S. 407, 415 (1990). Even if one precedent would appear to dictate a particular result if read in isolation, another precedent may be reasonably interpreted to point in the other direction. *See Caspari*, 510 U.S. at 393 (*Pennsylvania v. Goldhammer*, 474 U.S. 28 (1985) and *Strickland v. Washington*, 466 U.S. 668 (1984) "strongly suggested that *Bullington* [*v. Missouri*, 451 U.S. 430 (1981)] was limited to capital sentencing," thus foreclosing on *Teague* grounds application of Double Jeopardy Clause to non-capital sentencing proceeding).

The decision in *Beck* was limited to death penalty cases, and much of the Court's rationale for the decision emphasizes the special risks of error present in capital cases. 447 U.S. at 627, 637-38, 642-43. The Court acknowledged that it had not previously "held that a defendant is entitled to a lesser included offense instruction as a matter of due process" and that "there is a significant constitutional difference between the death penalty and lesser punishments[.]" *Id.* at 637. Moreover, the Court in cases construing *Beck* has stressed the special concern of the *Beck* court with risks of erroneous factfinding in capital cases. *See Hopkins v. Reeves*, 524 U.S. 88, 98-99 (1998); *Hopper v. Evans*, 456 U.S. 605, 609, 611 (1982). *See also Gilmore v. Taylor*, 508 U.S. 333, 342 (1993) (suggesting *Beck* is limited to capital cases). The federal courts of appeals, however, have decided that *Beck* does not apply to a case in which the death penalty is sought, but eventually not imposed. *Creel v. Johnson*, 162 F.3d 385, 389-90 (5th Cir. 1998); *Pitts v. Lockhart*, 911 F.2d 109, 112 (8th Cir. 1990); *Rembert v. Dugger*, 842 F.2d 301, 303 (11th Cir. 1988) (failure to give instruction harmless in light of life sentence imposed); *Trujillo v. Sullivan*, 815 F.2d 597, 600-04 (10th Cir. 1987). Given this line of

13

decisions, the rule being urged by Capano, that *Beck* applies to a case in which the defendant's death sentence has been vacated in state court proceedings, is a "new" rule for purposes of *Teague*. *See Jones v. Hoffman*, 86 F.3d 46, 48 (2d Cir. 1996); *Turner v. Marshall*, 63 F.3d 807, 818-19 (9th Cir. 1995). Moreover, the rule set out in *Beck* is not a "watershed" principle that comes within the second exception to *Teague*. *Andrews v. Deland*, 943 F.2d 1162, 1187 (10th Cir. 1991). Accordingly, Capano's *Beck* claim must be rejected on the basis of *Teague*.

b. In *Beck*, the Supreme Court held that a death sentence cannot be imposed after a jury verdict of guilt of a capital offense, when the jury was not allowed to consider a lesser included non-capital offense and when the evidence would have supported such a verdict. 447 U.S. at 627, 642, 645. Two years later, the Court reiterated in *Hopper* that lesser included offense instructions were only mandated when supported by the evidence. Conversely, if there is no lesser included offense, as the greater and lesser offenses are defined in state law, the defendant has no constitutional entitlement to a lesser included instruction. *Hopkins, supra*; *Spaziano v. Florida*, 468 U.S. 447 (1984).

Capano does not suggest that the state court applied an incorrect legal standard. Indeed, the standard for determining whether the jury must be instructed as to a lesser included offense under Delaware law is identical to that employed by the federal courts. *Compare Keeble v. United States*, 412 U.S. 205, 208 (1973) *with Ward v. State*, 575 A.2d 1156, 1158-59 (Del. 1990) and Del. Code Ann. tit. 11, §206(c). *See Hopper*, 456 U.S. at 611-12 (noting parallel between Alabama state law and federal standard). Moreover, the state court engaged in the correct analysis: it considered whether there was a rational basis in the evidence to acquit Capano of first degree murder *and* to convict him of one of the lesser included offenses. *Capano*, 781 A.2d at 630-33. *Compare Hogan v.*

*Gibson*, 197 F.3d 1297, 1305 (10th Cir. 1999) (state court holding that defendant did not make out *Beck* claim was incorrectly based on conclusion that evidence was sufficient to convict defendant of greater offense). Thus, the decision of the state supreme court is not contrary to Supreme Court precedent.

      c. Capano's complaint must therefore be that the state supreme court unreasonably applied *Beck* in his case.[3] *See* DI 26 at 16 (concurring with respondents' statement of issue). As Capano's argument went in the state court (and goes now (DI 26 at 23-29)), the evidence presented by the prosecution could have created a reasonable doubt as to the commission of the charged offense, and the jury should have been allowed to consider whether Capano acted with some lesser degree of culpability. *See Capano*, 781 A.2d at 630. But the prosecution had presented no evidence of recklessness or criminal negligence. *See State's Answering Brief*, Del. Supr. Ct. Nos. 110 & 149, 1999, at 24-25; *Capano*, 781 A.2d at 630-31. The jury in turn was not free to infer from nothing that Capano acted with a less culpable mental state. *Capano*, 781 A.2d at 630-31. If the jury rejected the prosecution's evidence, e.g., the purchase of the cooler and the pistol, that Capano had planned Fahey's death, the jury could have acquitted him. "But, conviction on any other theory would require pure speculation by the jury concerning the manner of Fahey's death," especially because "there is no evidence" on the point. *Id*. at 631. Because the possibilities that Capano killed Fahey as the result of "some other reckless or negligent act" were only "speculative," there was no

---

[3]There is some question whether "an examination of the sufficiency of the evidence for a lesser included offense instruction" is the resolution of a factual issue or a legal conclusion. *Hogan*, 197 F.3d at 1306. *See Robertson v. Johnson*, 234 F.3d 890, 898 (5th Cir. 2000). Respondents will assume "that the correct approach" is to treat the question "as a conclusion of law." *Hogan*, 197 F.3d at 1306 (citing *Bryson v. Ward*, 187 F.3d 1193, 1210-13 (10th Cir. 1999) (Briscoe, J., concurring)).

basis in the evidence for any lesser included offense instructions on this theory. *Id.*

The conclusion reached by the state supreme court is entirely consistent with the approach of the federal courts of appeals. *See Price v. Vincent*, 538 U.S. 634, 643 n.2 (2003) (citing lower federal and state court decisions to show that state court decision at issue was not unreasonable); *Chadwick v. Janecka*, 312 F.3d 597, 613 (3d Cir. 2002).

> [W]hen the government has made out a compelling case, uncontroverted on the evidence, on an element required for the charged offense but not for the lesser-included offense, there is a duty on defendant to come forward with some evidence on that issue if he wishes to have the benefit of a lesser-included offense charge. To put it another way, while a judge cannot prevent a jury from rejecting the prosecution's entire case, he is not obligated, under these circumstances, to assist a jury in coming to an irrational conclusion of partial acceptance and partial rejection of the prosecution's case by giving a lesser-included offense instruction.

*Driscoll v. United States*, 356 F.2d 324, 327 (1st Cir. 1966), *vacated on other grounds sub nom. Piccioli v. United States*, 390 U.S. 202 (1968). *Accord Dowthitt v. Johnson*, 230 F.3d 733, 757 (5th Cir. 2000) (quoting *Jones v. Johnson*, 171 F.3d 270, 274 (5th Cir. 1999)); *United States v. Cady*, 495 F.2d 742, 748 (8th Cir. 1974). *See United States v. Moore*, 108 F.3d 270, 274 (10th Cir. 1997); *Belton v. United States*, 382 F.2d 150, 155 (D.C. Cir. 1967) ("Here there was no testimony 'fairly tending' to bear on manslaughter-i.e. fairly tending to show that deceased unjustifiably assaulted appellant with a gun, he wrested the gun from her control, and then shot her in the heart. This could only be made out if the jury reached a conclusion as to occurrences not related in the testimony of any witness and obtained by a reconstruction of events." (footnote omitted)); *State v. Fowler*, 785 P.2d 808, 813-14 (Wash. 1990). Contrary to Capano's thinking, that only 11 of the 12 jurors concluded in the penalty hearing that the prosecution had established

16

that Fahey's killing "was premeditated and the result of substantial planning"[4] does not mean that the jury would have convicted him of a lesser degree of homicide than first degree murder if given the chance. *See* DI 26 at 29-30. Instead, the difference between the jury's verdict finding Capano guilty of first degree murder and the jury's vote regarding the statutory aggravator is more easily explained by the distinction between an "intentional" state of mind, required for the commission of first degree murder, and the terms of the statutory aggravator alleged in Capano's case. *See Capano*, 781 A.2d at 674 (rejecting challenge to trial judge's definition of statutory aggravator and noting distinction between "intentional" as used in first degree murder statute and "premeditation" and "substantial planning" as used in statutory aggravator).

The other reason advanced by Capano in the state courts (and now (DI 26 at 18-23)) in support of his request for lesser included offense instructions was "that based on his testimony alone there is a rational basis in the evidence for finding recklessness or criminal negligence." *Capano*, 781 A.2d at 632. Capano's version of events was that he prevented MacIntyre from killing herself. When MacIntyre brandished the pistol, he grabbed MacIntyre's arm, but MacIntyre accidentally fired the gun; the bullet hit Fahey behind her right ear, killing her instantly. *Id.* at 585, 632. According to the state supreme court, "an accident defense is incompatible with recklessness or criminal negligence." *Id.* at 633 & n.255 (citing cases). That is a question of state law which is beyond the scope of federal habeas review. *See Hooks v. Ward*, 184 F.3d 1206, 1231 (10th Cir. 1999). In turn, Capano's testimony failed to set out a rational basis for convicting him of a lesser included offense: as a matter of state substantive criminal law, his account did not establish a culpable mental state. *Capano*, 781 A.2d at 633.

---

[4] Del. Code Ann. tit. 11, §4209(e)(1)u.

Under *Hopkins* and *Spaziano*, therefore, Capano had no constitutional right to lesser included offense instructions on the theory that his version of events provided evidence of recklessness or criminal negligence. The state supreme court accordingly reasonably applied *Beck* when it held that there was no basis to instruct the jury on lesser included offenses.

## II. THE STATE COURTS' CONCLUSION THAT FAHEY'S STATEMENTS WERE ADMISSIBLE WAS NOT AN UNREASONABLE APPLICATION OF RELEVANT UNITED STATES SUPREME COURT PRECEDENT.

### Exhaustion

Capano presented his claim that the admission of Fahey's hearsay statements to her psychotherapists and friends violated his rights under the Confrontation Clause to the state supreme court on direct appeal, thus exhausting state remedies as to this claim.[5] *See Smith v. Digmon,* 434 U.S. 332, 333-34 (1978); *Swanger v. Zimmerman,* 750 F.2d 291, 295 (3d Cir. 1984).

### Standard of Review

Under 28 U.S.C. § 2254(d), Capano is not entitled to relief unless he can establish that the decision of the state court was contrary to, or involved an objectively unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. *See, e.g., Gattis v. Snyder*, 278 F.3d 222, 228 (3d Cir. 2002). "A state court decision is contrary to Supreme Court precedent under § 2254(d)(1) where the state court reached a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts." *Jacobs v. Horn*, 395 F.3d 92, 100 (3d Cir. 2005) (citations and internal quotations omitted). A state court decision is an unreasonable application if the court identifies the correct governing legal rule based on Supreme Court precedent but unreasonably applies it to the facts of the particular case. *Id.* (citations omitted). Moreover, factual determinations

---

[5] To the extent Capano attempts to raise a due process claim regarding the admission of Fahey's statements (*see* DI 26 at 45 n.42), that claim is unexhausted. *See Bright v. Snyder*, 218 F. Supp. 2d 573 (D. Del. 2002).

by state trial and appellate courts are presumed correct absent clear and convincing

evidence to the contrary, and a decision adjudicated on the merits in a state court and

based on a factual determination will not be overturned on factual grounds unless

objectively unreasonable in light of the evidence presented in the state-court

proceeding. *See* 28 U.S.C. §§ 2254(d)(2), (e)(1). *See also Affinito v. Hendricks,* 366

F.3d 252, 256-57 (3d Cir. 2004); *Campbell v. Vaughn,* 209 F.3d 280, 286 (3d Cir.

2000).

## Argument

At trial, the judge allowed the admission into evidence of statements made by the

victim, Anne Marie Fahey, to a psychiatrist, two psychologists, friends, acquaintances,

and, in one instance, her diary. The trial judge admitted the statements pursuant to two

exceptions to the rule against hearsay, D.R.E. 803(3) (state of mind) and D.R.E. 803(4)

(medical diagnosis and treatment). On direct appeal, the Delaware Supreme Court

found that Fahey's statements to her psychotherapists and friends concerning her state

of mind were admissible under the state of mind exception and the Confrontation

Clause. *Capano,* 781 A.2d at 607-17. Fahey's statements to her psychotherapists were

also found to be admissible under the medical diagnosis exception in D.R.E. 803(4) and,

once again, under the Confrontation Clause. *Id.* at 623-27. The court found that

although Fahey's statements to her friends regarding facts remembered or believed

should not have been admitted under the state of mind exception, their admission was

harmless beyond a reasonable doubt because the statements were largely cumulative of

evidence admitted pursuant to stipulation. *Id.* at 617-23. Capano now asserts that the

state courts erred, having incorrectly found the admission of Fahey's out-of-court

statements was not in violation of the Confrontation Clause. DI 1 at ¶ 12.

Although Capano goes to great lengths to challenge the state courts' evidentiary rulings that Fahey's statements were admissible under D.R.E. 803(3) and D.R.E. 803(4) as violative of Delaware legal precedent, the issue here is whether the state courts' evidentiary decisions violated Capano's rights under the federal Confrontation Clause, not whether the state courts correctly interpreted state law.[6] The relevant clearly established law governing whether the Confrontation Clause of the Sixth Amendment barred admission of Fahey's hearsay statements at Capano's trial is *Ohio v. Roberts*, 448 U.S. 56 (1980) and its progeny. *See, e.g., McCandless v. Vaughn*, 172 F.3d 255, 264-65 (3d Cir. 1999). In *Roberts*, the Supreme Court held that the Confrontation Clause allows the admission of hearsay evidence against criminal defendants if it falls within a "firmly rooted hearsay exception" or possesses "particularized guarantees of trustworthiness." 448 U.S. at 66; *see also Lilly v. Virginia*, 527 U.S. 116, 124-25 (1999); *Idaho v. Wright*, 497 U.S. 805, 815 (1990). A hearsay exception is "firmly rooted" if, in light of "longstanding judicial and legislative experience," *Wright*, 497 U.S. at 817, the exception "rest[s] upon such solid foundations that admission of virtually any evidence within [it] comports with the 'substance of the constitutional protection.'" *Roberts*, 448 U.S. at 66 (quoting *Mattox v. United States*, 156 U.S. 237, 244 (1895)). "Established practice, in short, must confirm that statements falling within a category of hearsay inherently 'carr[y] special guarantees of credibility' essentially equivalent to, or greater than, those produced by the Constitution's preference for cross-examined trial testimony." *Lilly*,

---

[6] Capano has not raised a federal due process claim as to the state's evidentiary rulings. *See Bright*, 218 F. Supp. 2d at 578 ("If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court.") (quoting *Duncan v. Henry*, 513 U.S. 364, 366 (1995)) (internal quotations omitted).

527 U.S. at 127 (quoting *White v. Illinois*, 502 U.S. 346, 356 (1992)). In this case, the Delaware state courts correctly identified the *Roberts* standard applicable to Capano's Confrontation Clause claim. *Capano*, 781 A.2d at 616-17 & nn.162 & 165. Thus the state supreme court's denial of the claim was not contrary to clearly established federal law. *See Jacobs*, 395 F.3d at 100.

Moreover, the state courts reasonably applied the rule to the specific facts of Capano's case. *See* 28 U.S.C. § 2254(d)(1). The Delaware Supreme Court decided that Fahey's statements "reflecting her fear of the defendant (that is, her state of mind), but not the memories or beliefs giving rise to that fear" were properly admitted under D.R.E. 803(3). *Capano*, 781 A.2d at 611. Having determined under state law that these statements of Fahey's were admissible under a state of mind exception, the court then looked to "longstanding judicial precedent" to determine that the state of mind exception is "'firmly rooted' for purposes of the Confrontation Clause." *Id.* at 616. The Delaware Supreme Court noted that the state of mind exception was discussed by the United States Supreme Court as early as 1892 in *Mutual Life Ins. Co. of New York v. Hillmon*, 145 U.S. 285; the exception first appeared in Delaware in 1923. 781 A.2d at 617 n.163; *see State v. Long*, 123 A. 350 (Del. Ct. O. & T. 1923). Further, the court considered that the state of mind exception was "recognized in at least forty-four states." 781 A.2d at 617 n.163. *See White*, 502 U.S. at 743 n.8 (finding two hearsay exceptions to be "firmly rooted" where one exception was two centuries old and the other was recognized in nearly four-fifths of the states). Thus, the state courts' determination that Fahey's statements relating to her then state of mind were admissible at trial under a firmly rooted hearsay exception was not an unreasonable application of relevant United

22

States Supreme Court precedent.[7] *See, e.g., Hayes v. York*, 311 F.3d 321, 324-27 (4th Cir. 2002) (finding state of mind exception that also includes factual assertions was not contrary to Supreme Court precedent).

In addition, the Delaware Supreme Court held that any error in admitting Fahey's out-of-court statements of facts remembered or believed was harmless error beyond a reasonable doubt. *Capano*, 781 A.2d at 617-23. The United States Supreme Court established, in *Chapman v. California*, 386 U.S. 18 (1967), the standard for evaluating whether a federal constitutional error can be held harmless. Under *Chapman*, a constitutional error is harmless only if "there is no reasonable possibility that the evidence complained of might have contributed to the conviction." 386 U.S. at 24 (quoting *Fahy v. Connecticut*, 375 U.S. 85, 86-87 (1963)) (internal quotes omitted). Here, the Delaware Supreme Court, referring to *Dowling v. United States*, 493 U.S. 342 (1990) and *Chapman*, concluded that the admission of the disputed statements was "harmless beyond a reasonable doubt because it is cumulative of the stipulated testimony and therefore had minimal prejudicial impact." 781 A.2d at 618-19 & nn.173 & 175. Having correctly identified the relevant United States Supreme Court precedent, the state court's finding of harmless error was not contrary to clearly established federal law. *See Jacobs*, 395 F.3d at 100.

In applying *Chapman*'s harmless error analysis to Capano's case, the Delaware Supreme Court looked to the substance of the testimony stipulated by both parties before trial as being admissible. 781 A.2d at 619. Finding that the stipulated testimony

---

[7] The Delaware Supreme Court also noted that Fahey's statements concerning her fear of Capano also possessed "such 'particularized guarantees of trustworthiness' that their admission does not violate Capano's rights under the Confrontation Clause." *Capano*, 781 A.2d at 617 n.165 (citing *Lilly*, 527 U.S. at 124-25; *Wright*, 497 U.S. at 820-21).

included depictions of Capano as manipulative, controlling and obsessive, as well as descriptions of specific incidents in which Capano exhibited these characteristics, the court determined that the disputed testimony was "largely cumulative of the stipulated testimony." *Id.* at 620. The trial court also instructed the jury to consider Fahey's statements only as to Fahey's emotional state, not as evidence of any actions or state of mind of Capano. *See id.* at 622 n.202 (quoting the trial court's limiting instructions). Ultimately, the state supreme court concluded that any possible error in the admission of Fahey's out-of-court statements could not have affected the outcome of the trial in view of the extensive hearsay evidence to which Capano stipulated at trial. *Id.* at 622. Given this set of facts, a finding of harmless error by the state courts was a reasonable application of the *Chapman* rule.

Moreover, since the filing of the answer to Capano's habeas petition (DI 12), the United States Supreme Court, in *Fry v. Pliler*, 127 S.Ct. 2321 (2007), has clarified the standard under which a federal habeas court should assess the prejudicial impact of constitutional error in a state-court criminal trial. *Fry* makes it clear that the proper standard of review for a federal habeas court is the "substantial and injurious effect" standard recited in *Brecht v. Abrahamson*, 507 U.S. 619 (1993). 127 S.Ct. at 2328. "Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Brecht*, 507 U.S. at 637 (citing *United States v. Lane,* 474 U.S. 438, 449 (1986)). As the Supreme Court has explained: "When the process of direct review-which, if a federal question is involved, includes the right to petition this Court for a writ of certiorari-comes to an end, a presumption of finality and legality attaches to the conviction and sentence. The role of

federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited. Federal courts are not forums in which to relitigate state trials." *Barefoot v. Estelle,* 463 U.S. 880, 887 (1983).

Capano cannot demonstrate actual prejudice from the admission of Fahey's statements of facts remembered or believed. As noted by the Delaware Supreme Court in considering whether the error was harmless under *Chapman,* Capano stipulated to numerous statements of Fahey's in her diary, her e-mail correspondence with Capano, and the testimony of Kim Lynch-Horstmann. *Capano,* 781 A.2d at 619. The stipulated statements were replete with language describing Capano as manipulative and obsessive, including examples of his past behavior exemplifying those traits. *Id.* Moreover, in response to a defense objection that Dr. Kaye (Fahey's psychiatrist) was testifying beyond the scope of Fahey's perceptions, the trial judge instructed the jury to beware that "this particular witness can[not] speak to the intent of Mr. Capano or to anyone else." *Appendix to State's Answering Brief,* Del. Supr. Ct. No. 131, 2005, at B4 (contained in DI 16). At the conclusion of Dr. Kay's testimony, the judge reiterated:

> Members of the jury, I want to remind you of a warning I gave you earlier in response to an objection that was made by the defense.
>
> The purpose of this evidence is to examine the mental state, the emotional state of Anne Marie Fahey, and you are not – it in no way reflects as evidence of any actions or any state of mind on behalf of the defendant.
>
> This deals solely with Miss Fahey, not with Mr. Capano.

*Id.* at B5. Again, prior to the testimony of Jill Morrison, the trial judge gave a lengthy instruction at the request of defense counsel regarding the limited use of her testimony of Fahey's out-of-court statements. *Id.* at B6. The judge specifically instructed the jury

that Morrison's accounts of Fahey's statements "may be considered by you solely for the purpose of determining the state of mind of Miss Fahey at or about the time when the alleged acts occurred." *Id.* There is nothing to indicate that the jury did not apply the limiting instructions to similar testimony by other witnesses. *See State v. Capano*, 2005 Del. Super. LEXIS 69, *23 (Del. Super. Mar. 9, 2005); *Capano v. State*, 889 A.2d 968, 976 (Del. 2006). Because Capano stipulated to admission of prior bad acts evidence included in the diary, emails and Lynch-Horstmann's testimony, he can hardly complain now of actual prejudice as a result of other testimony to the same effect. Any effect the additional testimony may have had on the jury is purely speculative in light of the jury instructions, and thus there was no actual prejudice. *See Calderon v. Coleman*, 525 U.S. 141, 146 (1998) (*Brecht* requires more than "mere speculation that the defendant was prejudiced by trial error; the court must find that the defendant was actually prejudiced by the error").

In an alternative holding, the Delaware Supreme Court also found Fahey's statements to her psychotherapists were admissible under the medical diagnosis or treatment exception set forth in D.R.E. 803(4). *Capano*, 781 A.2d at 623. The court noted that "[a]lthough the medical diagnosis or treatment exception of D.R.E. 803(4) has been recognized in its generic form as 'firmly rooted' for purposes of the Confrontation Clause, the exception has not historically been extended to psychotherapists in Delaware." *Id.* at 626 (citations omitted). Relying instead on *Lilly*'s "residual trustworthiness test" (527 U.S. at 136), the court found that Fahey's statements to her psychotherapists possessed "'indicia of reliability' and 'guarantees of trustworthiness' sufficient to satisfy the Confrontation Clause." 781 A.2d at 627. The state court found that Fahey made the statements in a natural manner during therapy

26

sessions with nothing to indicate that she had sinister motives. *Id.* Fahey made similar statements to several psychotherapists and friends with whom she regularly confided. *Id.* & n.219; *see Wright,* 497 U.S. at 821-22 (finding spontaneity and consistent repetition to be relevant factors in considering the reliability of hearsay statements) (citations omitted). Thus, the state courts' conclusion that Fahey's statements, including those of facts remembered or believed, were admissible as having particularized guarantees of trustworthiness was not an unreasonable application of the *Roberts* standard. Because the state courts correctly identified and applied relevant United States Supreme Court precedent, Capano has made out no claim for relief.

### III.  CAPANO'S CLAIM OF IMPROPER CROSS-EXAMINATION BY PROSECUTORS CONCERNING HIS POST-ARREST SILENCE IS PROCEDURALLY DEFAULTED.

#### Exhaustion

Capano asserts that the decision of the Delaware Supreme Court that it was proper for Capano to be cross-examined by prosecutors concerning his post-arrest silence violated his Fifth Amendment right to a fair trial. DI 1 at ¶ 12. Capano presented his claim of improper cross-examination to the Delaware Supreme Court on direct appeal, thus exhausting his state court remedies. *See Smith v. Digmon,* 434 U.S. 332, 333-34 (1978); *Swanger v. Zimmerman,* 750 F.2d 291, 295 (3d Cir. 1984).

#### Standard of Review

After finding that a petitioner has exhausted state remedies, this Court "must then assure itself that a habeas petitioner has complied with relevant state procedural requirements before it can delve into the claim of constitutional error in a state conviction." *Bond v. Fulcomer*, 864 F.2d 306, 310 (3d Cir. 1989). Where "the highest state court 'clearly and expressly' refused to review the merits of the claim due to an independent and adequate state procedural rule, the claim is exhausted but procedurally defaulted." *Winters v. Williams*, 2006 WL 1788487, *2 (D. Del. June 27, 2006) (citing *Coleman v. Thompson*, 501 U.S. 722, 750 (1991) and *Harris v. Reed*, 489 U.S. 255, 260-64 (1989)).

Capano asserts that there is no procedural default because the state supreme court did not explicitly cite Supreme Court Rule 8, the plain error rule. Relying on *Villot v. Varner*, 373 F.3d 327 (3d Cir. 2004), Capano contends that because the state supreme court discussed the merits of his claim, the court did not enforce the procedural rule and

federal habeas review is thus not foreclosed.   DI 26 at 55-57.  The Delaware Supreme

Court, however, explicitly announced that the claim was being reviewed for plain error.

*Capano v. State*, 781 A.2d 556, 646 (Del. 2001).  In fact, the subheading for the claim

reads "IX. Questions Concerning Post-Arrest Silence – No Plain Error." *Id.*  As this

Court explained in *Winters*, "the absence of an express citation to Rule 8 is not

determinative as to whether or not the Delaware Supreme Court reviewed the claim

under the plain error standard." 2006 WL 1788487 at *4.  Moreover, the Court noted

that some discussion of the merits of a claim is necessary to a plain error analysis. *See*

*id.* at *5 (citing cases).  Having stated as much, the decision is clear that the state

supreme court was applying its plain error rule and that was sufficient to constitute a

plain statement under *Harris. See McLaughlin v. Carroll,* 270 F. Supp. 2d 490, 517-18

(D. Del. 2003).

     In this case, Capano failed to object at trial to being cross-examined regarding

post-arrest silence.  In Delaware, a defendant must timely object to alleged errors during

the actual trial in order to preserve the right to raise the issues on appeal. *Trump v.*

*Kearney*, 2003 WL 22769598, *5 (D. Del. Nov. 14, 2003) (citing Delaware cases).

Failure to object to alleged errors constitutes a waiver of the defendant's right to raise

the issue on appeal, and the reviewing court is thereafter limited to reviewing the alleged

error for plain error. *Id.; Wainwright v. State,* 504 A.2d 1096, 1100 (Del. 1986).  The

Delaware Supreme Court clearly explained that "[b]ecause no objection was raised at

trial, we review this claim for plain error." *Capano,* 781 A.2d at 646 (citing *Wainwright,*

504 A.2d at 1100).  The court's consideration of the claim under plain error then does

not constitute a "waiver of the waiver rule." *See Lawrie v. Snyder,* 9 F. Supp. 2d 428,

453 (D. Del. 1998) ("the fact that the Delaware Supreme Court, in applying Rule 8 used

its discretion to review for plain error does not diminish the impact of the court's plain statement that Rule 8 was applicable."); *accord McLaughlin*, 270 F. Supp. 2d at 517. This Court has consistently held that Delaware Supreme Court Rule 8, permitting review only for those questions fairly presented to the trial court, is an independent and adequate state procedural rule which precludes federal review. *See, e.g., Johnson v. Carroll*, 325 F. Supp. 2d 386, 393-94 (D. Del. 2004) (collecting cases); *Lawrie*, 9 F. Supp. 2d at 452-53; *Dawson v. Snyder*, 988 F. Supp. 783, 825 (D. Del. 1997). Thus, Capano's claim of improper cross-examination concerning post-arrest silence is exhausted but procedurally defaulted. *See Winters*, 2006 WL 1788487 at *4-5.

Federal habeas review of Capano's procedurally defaulted claim is in turn unavailable unless he establishes cause for his procedural default in the state courts and actual prejudice, or that a miscarriage of justice will result if the Court refuses to hear his claim. *See Coleman*, 501 U.S. at 750-51; *McCandless v. Vaughn*, 172 F.3d 255, 260 (3d Cir. 1999); *Caswell v. Ryan*, 953 F.2d 853, 861-62 (3d Cir. 1992); *McLaughlin*, 270 F. Supp. 2d at 513. To demonstrate cause for the procedural default, Capano must show that "some objective factor external to the defense" precluded his compliance with state procedural rules. *McCleskey v. Zant*, 499 U.S. 467, 493 (1991); *Murray v. Carrier*, 477 U.S. 478, 487 (1986); *Dawson*, 988 F. Supp. at 805. To establish prejudice in this context, Capano "must show 'not merely that the errors at . . . trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'" *Carrier*, 477 U.S. at 493-94 (quoting *United States v. Frady*, 456 U.S. 152, 179 (1982)); *Dawson*, 988 F. Supp. at 804-05. In an effort to overcome the procedural bar, Capano, in his petition, alleged ineffective assistance of counsel as cause for his procedural default. *See* DI 1. In his

brief, however, Capano jettisons any claim of ineffective assistance of counsel in this context. DI 26 at 2 n.2. Capano has thus failed to allege cause for his procedural default, and the claim can be dismissed on that basis alone. *See White v. Carroll*, 416 F. Supp. 2d 270, 282 (D. Del. 2006). Because Capano cannot establish cause, this Court need not address the issue of prejudice. *See Coleman*, 501 U.S. at 752; *Smith v. Murray*, 477 U.S. 527, 533 (1986); *McLaughlin*, 270 F. Supp. 2d at 501.

### Argument

Prior to trial, Capano never informed authorities that Fahey's killing was an accident as he later described at trial. On direct examination at trial, Capano explained that he had kept silent for more than two years since Fahey's death because he wanted to protect his longtime mistress, Deborah MacIntyre, and his brother, Gerald. *See State v. Capano*, 2005 Del. Super. LEXIS 69, *31-37 (Del. Super. Mar. 9, 2005) (setting forth relevant portion of direct examination). Capano testified at length about why he kept silent before his arrest, during his bail hearing, and during his time in jail awaiting trial. In response to this testimony, the prosecutor, without objection, cross-examined Capano about his pre-arrest and post-arrest silence. Capano now complains that the state courts' rejection of his claim of improper cross-examination regarding post-arrest silence was an unreasonable application of the United States Supreme Court holding in *Doyle v. Ohio*, 426 U.S. 610 (1976). The state courts, finding that Capano had opened the door to this line of questioning, found no plain error as to this claim. *Capano*, 781 A.2d at 649.

In *Jenkins v. Anderson*, 447 U.S. 231 (1980), and *Doyle*, the United States Supreme Court set out the standards regarding the questioning of a testifying defendant about his pre-arrest and post-arrest silence. The Court held that a prosecutor's use of a

testifying defendant's pre-arrest silence to impeach his credibility did not violate the Constitution. *Jenkins*, 447 U.S. at 240; *accord Fletcher v. Weir*, 455 U.S. 603, 604 n.1 (1982). In *Doyle*, the Court held that the use for impeachment purposes of a defendant's post-arrest and post-*Miranda* warnings silence violates the Due Process Clause. 426 U.S. at 619. The Court also noted, however, that use of post-arrest silence to challenge the defendant's testimony as to his behavior following arrest would be permissible because such use would not be an impeachment of the exculpatory story itself. 426 U.S. at 620 n.11. This was the case here.

Capano testified during his direct examination about his desire to protect MacIntyre by not revealing her role in Fahey's death. *See Capano*, 781 A.2d at 647. He tried to demonstrate how he was helping MacIntyre through the introduction of letters he had written her from jail advising her how to handle herself during the criminal investigation. The state courts found that the prosecutor's questions regarding Capano's post-arrest silence properly impeached Capano's testimony that he was protecting MacIntyre, as she had agreed to cooperate with prosecutors. *Id.* at 648-49. Moreover, as noted by the state courts, Capano failed to establish any prejudice from a limited inquiry into a subject he raised during his direct testimony. *Capano v. State*, 889 A.2d 968, 976-77 (Del. 2006); *Capano*, 2005 Del. Super. LEXIS 69 at *38. *Cf. United States v. Delk*, 586 F.2d 513, 516 (5th Cir. 1978) ("[I]f the defendant opens the door to the line of testimony, he cannot successfully object to the prosecution accepting the challenge and attempting to rebut the proposition asserted." (internal quotations marks and citation omitted)). Consequently, Capano has failed to demonstrate prejudice.

Moreover, the miscarriage of justice exception does not apply because Capano has not alleged any facts to establish his actual innocence. *See, e.g., White*, 416 F. Supp.

2d at 282 .   To establish a miscarriage of justice, a petitioner must show that a

"constitutional violation has probably resulted in the conviction of one who is actually

innocent." *Smith*, 477 U.S. at 537. A petitioner establishes actual innocence by proving

that no reasonable juror would have voted to find him guilty beyond a reasonable doubt.

*Sweger v. Chesney*, 294 F.3d 506, 522-24 (3d Cir. 2002). Capano has not alleged that

he is actually innocent, nor has he presented any evidence of his actual innocence.

Thus, he has not demonstrated that a fundamental miscarriage of justice would result

from this Court's failure to review this claim. *Smith*, 477 U.S. at 538 ("In short, the

alleged constitutional error neither precluded the development of true facts nor resulted

in the admission of false ones."). As a result, Capano has made out no claim for relief in

this respect.

## CONCLUSION

The petition should be dismissed without further proceedings.


/s/ **LOREN C. MEYERS**
Loren C. Meyers
Chief of Appeals Division
Del. Bar ID 2210
loren.meyers@state.de.us

/s/ **ELIZABETH R. McFARLAN**
Elizabeth R. McFarlan
Deputy Attorney General
Del. Bar ID 3759
elizabeth.mcfarlan@state.de.us

Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 577-8500

August 2, 2007

LEXSEE 2005 DEL. SUPER LEXIS 69

## STATE OF DELAWARE v. THOMAS J. CAPANO

### Def. ID # 9711006198 (R-1)

### SUPERIOR COURT OF DELAWARE, NEW CASTLE

### 2005 Del. Super. LEXIS 69

### December 17, 2004, Submitted
### March 9, 2005, Decided

**NOTICE:**

[*1]   THIS OPINION HAS NOT BEEN RE-
LEASED FOR PUBLICATION. UNTIL RELEASED,
IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**SUBSEQUENT HISTORY:** Affirmed in part and re-
versed in part by, Remanded by Capano v. State, 2006
Del. LEXIS 1 (Del., Jan. 10, 2006)

**PRIOR HISTORY:** Capano v. State, 781 A.2d 556,
2001 Del. LEXIS 349 (Del., 2001)

**DISPOSITION:**   Defendant's motion for postconvic-
tion is denied.

**COUNSEL:** For Thomas J. Capano, defendant: Joseph
M. Bernstein, Esquire, Wilmington, DE; David A.
Ruhnke, Esquire, Ruhnke and Barrett, Montclair, N.J.

Attorneys for the State of Delaware:   [*2] Loren C.
Myers, Esquire, Department of Justice, Wilmington, DE;
Ferris W. Wharton, Esquire, U.S. Attorney's Office,
Wilmington, DE.

**JUDGES:** Graves, Judge.

**OPINION BY:** Graves

**OPINION**

Pending before the Court is the motion for postcon-
viction relief which defendant Thomas J. Capano ("de-
fendant" or "Capano") has filed pursuant to Superior
Court Criminal Rule 61 ("Rule 61"). This is the Court's
decision on defendant's motion.

PROCEDURAL HISTORY

Following a lengthy jury trial, Capano was found
guilty of murder in the first degree for the murder of

Anne Marie Fahey. Following a penalty hearing, the
jury, by a vote of 11 to 1, found beyond a reasonable
doubt the statutory aggravating circumstance that the
murder was premeditated and the result of substantial
planning. The jury recommended, by a vote of 10 to 2,
that the trial judge find the aggravating circumstances
outweighed the mitigating circumstances. The trial
judge, William Swain Lee, [1] imposed a sentence of death
on March 16, 1999.

> 1   Judge Lee retired from the bench and the case
> was reassigned.

[*3] The Delaware Supreme Court affirmed defen-
dant's conviction and sentence on August 10, 2001. Ca-
pano v. State, 781 A.2d 556, 669 (Del. 2001) ("Capano
II"). [2] Defendant sought certiorari to the United States
Supreme Court. That Court held defendant's petition and
did not act upon it until it released its decision in Ring v.
Arizona, 536 U.S. 584, 153 L. Ed. 2d 556, 122 S. Ct.
2428 (2002). It then denied the petition.  Capano v.
Delaware, 536 U.S. 958, 153 L. Ed. 2d 835, 122 S. Ct.
2660 (2002). The case was returned to Delaware. Subse-
quently, defendant filed his present motion for postcon-
viction relief. Defendant's arguments fell into two cate-
gories which were briefed separately and likewise, are
decided in two parts of this decision. Part One will deal
with all issues involving claims that defendant's trial
counsel were ineffective. Part Two deals with claims that
the imposition of the death penalty is unconstitutional as
to the facts and events underlying his conviction and
sentence.

> 2   The parties refer to this decision as Capano II
> because they refer to the Superior Court's deci-
> sion on a motion for new trial as Capano I. For
> ease of reference, I, too, refer to the decision on
> appeal as Capano II.

[*4] This Court has had the benefit of evidentiary hearings and substantial briefing which the parties completed on December 17, 2004.

## FACTUAL BACKGROUND

No point exists to recite the entire factual basis of the State's case and defendant's case, as the Delaware Supreme Court provided a complete accounting of the relevant facts in its decision affirming the conviction and sentence of defendant for the intentional murder of Ms. Fahey. I adopt the Supreme Court's factual recitation herein.

## PART ONE -- INEFFECTIVE ASSISTANCE OF COUNSEL

Originally defendant based his ineffective assistance of counsel claims on thirty-six (36) separate grounds. The Court, noting the conclusory pleadings, directed that the claims be reconstituted under the requirement that they contain substantive allegations together with allegations of prejudice. On August 4, 2003, defendant filed his amended motion for postconviction relief as to ineffective assistance of counsel. He raised eleven (11) claims, with some claims involving multiple issues.

## THE STRICKLAND STANDARD

Shortly after Ms. Fahey's disappearance, Capano began to assemble his defense team. Ultimately, he chose four attorneys to [*5] represent him at trial. Each was known to defendant and each was a seasoned criminal defense attorney.

Defendant's allegations against these attorneys are based on claims of ineffective assistance of counsel. Therefore, defendant has the burden of establishing (i) a deficient performance by his defense team (ii) which actually caused defendant prejudice. Strickland v. Washington, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984) ("Strickland"). Deficient performance means that the attorneys' representation of Capano fell below an objective standard of reasonableness. Id. at 688. In considering post-trial attacks on counsel, Strickland cautions judges to review the counsels' performances from the defense counsels' perspective at the time decisions were being made. Id. at 689. Second guessing or "Monday morning quarterbacking" should be avoided. Id.

A finding of counsels' deficient performance needs to be coupled with a showing of actual prejudice. Actual prejudice is not potential or conceivable prejudice. "Defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been [*6] different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. Strickland

establishes that "the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result." Id. at 686.

An additional and notable aspect of this case is that Capano is not the normal defense client. He was a successful attorney. He was active in all phases of the decision-making process. [3] The testimony establishes that he was a strong-willed person who was very involved in his case. His attorneys all testified that at times there were difficulties in representing Capano due to differences of opinion between them and Capano as to the approach the defense should take on some issues. Regardless of the friction which may have arisen in having an attorney as a client and having that client actively participating in his defense, including strategy and tactics, I do not find any of Capano's attorneys to have been ineffective.

> 3  I am not applying a different standard to defense counsel because their client was an attorney, but Capano's legal knowledge and his degree of involvement in practically all matters is noteworthy when considering his present allegations.

## [*7] PROCEDURAL BARS

Generally, claims of ineffective assistance of counsel are raised for the first time in a postconviction motion filed pursuant to Rule 61 following a direct appeal as to the trial outcome. Therefore, the procedural bars of Rule 61 would not be applicable. But if issues raised in the Rule 61 motion could have been raised on the direct appeal, but were not, then the defendant must comply with Rule 61 (i)(3) by showing cause for not raising the issue on appeal and actual prejudice. If any issue is procedurally barred it will be addressed in the consideration of that issue.

## CLAIM 1

Defendant alleges his attorneys were ineffective by (a) failing to renew a request for a change of venue following jury selection, (b) failing to seek a gag order, and (c) failing to request sequestration of the jury for the entire trial.

Prior to jury selection, defense counsel made a unique change of venue request. Defense counsel asked that the case be tried in another state. In denying the change of venue motion, Judge Lee noted "if the atmosphere created by media coverage has become so pervasive that it is impossible to obtain an appropriate number of qualified jurors and alternates [*8] that will become apparent at the time of jury selection." There was no ap-

plication for either a gag order or for jury sequestration during the trial.

Based upon the Rule 61(g) affidavits and the hearing testimony, I am satisfied that these claims fail.

The defense engaged an expert to poll the citizens of Sussex, Kent and New Castle Counties to gauge the public attitude concerning this case and Capano individually. The results of this inquiry yielded no significant difference between the counties as to perceptions about Capano. Additionally, Capano expressed a preference to have the case tried in New Castle County. These results, as well as Capano's preference of New Castle County as a forum, were reasonable factors to consider in accepting New Castle County, Delaware as a trial forum.

During jury selection, Capano was involved actively in the selection of jurors. Capano expressed a strong desire to select young women as jurors. His attorneys disagreed with the tactic. The defense team believed it was unwise to seat young women on the jury since the victim of the alleged murder was a young woman. Nevertheless, Capano thought having young women would be helpful and that Capano and [*9] his defense might persuade them. Regardless of these differences, a jury and alternates were selected. Counsel reported that Capano was "happy" with the jury. Venue was no longer an issue.

I find, based upon the thorough *voir dire* conducted by the Court and the fact that the Court was able to obtain an impartial jury, that if the venue motion had been renewed, it would have been denied.

I find the decision not to seek a change of venue to Kent or Sussex County to have been reasonable based on the information counsel had available to them and defendant's own preference. I find that defendant has not established that the New Castle County venue prejudiced him.

Capano's defense team did not seek a gag order at any point in the proceedings. I find Capano's objection to this decision to be disingenuous. Capano directed his attorneys to generate publicity so that his version of events would reach the public and essentially put his "spin" on the story. Counsel followed his directions.

No evidence exists that a publicity battle ensued with the State that prejudiced defendant's rights. It would appear the State did not get drawn into a media campaign. The trial judge carefully warned [*10] the jury to avoid media coverage of the trial and methodically quizzed the jury about any potential media influence. Defendant has not established that his attorneys should have sought a "gag" order and he has not established prejudice.

Finally, I do not fault trial counsel for not seeking to sequester the jury for the entire trial, which was forecast to consume several months' time and the holiday season. Sequestering a jury for such a lengthy period of time would have been unreasonable. The trial judge regularly monitored the jury. Defendant has not shown any prejudice arising from the jury not being sequestered during the trial.

In defendant's final memorandum of law, he acknowledges that trial counsels' decisions were reasonable as to each of the above claims when viewed as to the time these decisions were made.

The complaints raised in Claim 1 are denied.

CLAIM 2

Defendant alleges trial counsel were ineffective when they failed to inform the Court that the prescription medications administered to defendant during trial affected his ability to assist his attorneys.

The Court, State and defense counsel were all aware that Capano was being given medications, including, [*11] but not limited to, anti-anxiety and anti-depressant prescriptions. He voluntarily took these medications. His doctor prescribed the medicines for him. Judge Lee quickly addressed all concerns related to the administration of medicine when it was alleged the Department of Correction was not being cooperative as to when Capano should receive his medications.

During the course of the trial, defendant was examined by his own psychiatrist as well as the State's expert. Both doctors reported that Capano was capable of assisting his attorneys. Nothing in the record indicates that Capano was hindered in any way by the medications he was taking during the trial. Mr. Oberly, who has known Capano for decades, noticed no changes in his personality before, during, or after the trial. Mr. Oberly had no concerns that the medications were affecting Capano's ability to participate in his defense. He felt that throughout the proceedings, Capano was "alert, attentive and in control of his defense".

This is not a case where defendant was forced to take anti-psychotic medications. Capano took the medications his doctors prescribed because he wanted them.

Capano's allegations concern his inefficacy [*12] at trial due to the influence of the medications. The Court finds it noteworthy that Capano's argument is void of any medical or expert testimony discussing the effect of the medications. Nor has Capano suggested a better course of action by his attorneys in regard to his medication.

Capano has failed to show his attorneys did anything wrong. He has not met his burden of establishing that

whatever medication he might have consumed during the trial had a significant, perceptible, negative effect upon his ability to testify and/or communicate effectively with his attorneys. Albrecht v. Horn, 314 F. Supp. 2d 451, 479 (E.D. Pa. 2004). This claim is dismissed.

## CLAIMS 3 and 4

## CLAIM 3

Defendant alleges that trial counsel were ineffective when they failed to request a limiting instruction concerning out-of-court statements attributed to Ms. Fahey.

## CLAIM 4

Defendant alleges that trial counsel were ineffective when they agreed to stipulate to the admissibility of hearsay testimony from several sources: (a) Ms. Fahey's diary, (b) e-mails between defendant and Ms. Fahey, and (c) the testimony of Kim Lynch-Horstman.

Since the defense and the State consider Claim 3 and Claim [*13] 4 collectively, I will rule upon them together.

It is necessary to review the hearsay issues raised and decided on appeal because defendant now is renewing his attack on this hearsay evidence. The pertinent portions of the Supreme Court decision on these issues appear at pages 605-627 of its opinion in Capano II.

On direct appeal, the Supreme Court considered the hearsay attacks comprehensively and exhaustively. The Supreme Court held that the hearsay statements of Ms. Fahey reflecting her fear of Capano were admissible under D.R.E. 803(3) because they focused on her state of mind. But the Court ruled that the trial court erred in permitting the jury to hear the reasons, memories or beliefs giving rise to Ms. Fahey's state of mind. To include descriptions of the events which give rise to a person's state of mind improperly opens this hearsay exception to historical events.

The Supreme Court also considered defendant's argument that Ms. Fahey's state of mind evidence concerning her fear of Capano should not have been presented in the State's case-in-chief. Capano argued that Ms. Fahey's state of mind evidence only should have been presented by the State in its rebuttal phase [*14] of the trial and then only after it was considered relevant based on the defense testimony.

Noting that similar evidence usually becomes relevant based upon the defense evidence and therefore is usually admissible in rebuttal, the Supreme Court held that under the facts of this case, testimony relevant to Ms. Fahey's state of mind helped to prove "(1) that Fahey sought to end her romantic involvement with Capano,

and (2) that Capano was a spurned lover, who therefore had a motive to kill her." Capano II, 781 A.2d at 615. This evidence properly was admitted in the State's case-in-chief for that reason.

The Supreme Court also held that Ms. Fahey's hearsay statements to psychotherapists were admissible under the medical diagnosis or treatment exception to D.R.E. 803(4). In the Supreme Court's analysis of this issue, it noted that what Ms. Fahey reported as to historical events was admissible under D.R.E. 803(4). In other words, the restrictions on the usage of past events to explain one's state of mind under D.R.E. 803(3) are not applicable to D.R.E. 803(4).

The Supreme Court also conducted a harmless error analysis of the admission of the Fahey hearsay as to past events. Ms. [*15] Fahey's hearsay testimony was presented by her psychiatrist, the psychologists, several of Ms. Fahey's friends, e-mails written by Ms. Fahey, and portions of her diary. The Supreme Court's harmless error analysis included an assumption [4] that past events testimony admitted under D.R.E. 803(4), as discussed above, should not have been admitted.

> 4 This assumption put the harmless error analysis in a more favorable perspective as to defendant's argument.

The harmless error analysis the Supreme Court conducted therefore was based upon the stipulation the State and the defense reached that portions of the e-mails between Ms. Fahey and Capano, portions of Ms. Fahey's diary and the testimony of Kim Lynch-Horstman would be admitted regardless of that evidence being hearsay.

The Supreme Court determined that any possible error arising from the admission of hearsay evidence involving past events under D.R.E. 803(3) or D.R.E. 803(4) was harmless because it was cumulative of, or more of the same as, the hearsay evidence [*16] the jury heard due to the stipulation.

As noted earlier, the Supreme Court's harmless error analysis gave defendant the benefit of the Supreme Court's assumption that past events testimony would not be admissible under the medical diagnosis and treatment exception contained in D.R.E. 803(4). Under this best case scenario for defendant, the Supreme Court found harmless error. Defendant failed to convince the Supreme Court, and he has failed here as well. My analysis of the prejudice prong must track that of the Supreme Court, but I cannot give defendant the benefit of the assumption the Supreme Court considered. In my analysis of prejudice to defendant, I must apply the Supreme Court's decision that the past events maybe considered under D.R.E. 803(4). Capano was unable to convince the Supreme Court even with a favorable assumption. I must

apply the actual evidentiary rulings, including the Supreme Court's finding with regard to D.R.E. 803(4). As would be expected, if he did not prevail on this issue at the Supreme Court, he will not prevail here.

In summary, for Rule 61 purposes, the introduction of past events hearsay caused no prejudice to defendant because (i) it is the same as [*17] was admitted by stipulation of both parties to use as they chose, and/or (ii) it is the same as was found to be admissible under D.R.E. 803(4). [5]

> 5  Thus it would appear that Ground 3 should be procedurally barred as the issue has been previously adjudicated. Superior Court Criminal Rule 61(i)(4). I have reviewed the merits of the argument because of its tie-in to the argument that the stipulation was unnecessary.

With this background, Capano now complains that his lawyers made a huge mistake in agreeing to the stipulation which allowed the jury to be exposed to the e-mails, the diary, and the testimony of Kim Lynch-Horstman.

Both parties acknowledge that this stipulation cut both ways. The hearsay has been categorized as the "bad" hearsay and the "good" hearsay based on its impact on the respective parties' positions.

Capano argues that his attorneys were ineffective for their failure to recognize that he could have kept out the "bad" hearsay while introducing the "good" hearsay through D.R.E. 807 [*18] (formerly D.R.E. 803(24)).

Capano relies upon Demby v. State, 695 A.2d 1152 (Del. 1997) ("Demby") to support his argument that the "good" hearsay would have been admissible. Capano's argument fails because he attempts to push Demby well beyond its holding. In Demby, the Supreme Court ruled that the defendant should have been permitted to use D.R.E. 807 to permit hearsay testimony that another person had admitted to committing the homicide for which Demby was on trial. The Supreme Court found that this inculpatory statement of a third party should have been presented to the jury. What evidence is more important and relevant to a defendant on trial for murder than evidence that another person bragged about shooting the victim? Demby does not stand for the proposition that any and all favorable evidence is admissible under D.R.E. 807. Rather, there is a qualitative difference in self-inculpatory statements by a third party as opposed to Capano's desire to have reconciliation and good relations hearsay evidence put before the jury. The defense would not have obtained a favorable ruling had they tried this tactic. The defense attorneys were mindful of the difficulty and [*19] remoteness of independently getting the "good" hearsay introduced. Therefore, with Capano's

knowledge and agreement, they entered into the stipulation.

I also note that even if the defense somehow got the "good" hearsay introduced without the stipulation, then D.R.E. 106 may have permitted "bad" hearsay evidence to be introduced in order that it be placed in proper "context" for the trier of the facts. A strong argument could be made that "cherry picking" portions of the communications relating to the "good" hearsay, while trying to keep the "bad" hearsay under wraps, would have permitted a presentation of evidence which was misleading, leading to the same result as the stipulation.

Therefore, I do not find that Capano's trial counsel were ineffective for not employing D.R.E. 807 and Demby to introduce the "good" hearsay while keeping out the "bad" hearsay involving the ongoing relationship between Capano and Ms. Fahey.

Was the stipulation objectively unreasonable based upon what defense counsel knew at the time of the stipulation? No. Capano played his cards very close to his chest. He refused to discuss the events of the evening culminating in Ms. Fahey's death with his attorneys. [*20]  It was not until the night before opening statements that Capano told the opening attorney, Mr. Oteri, that he should inform the jury that Ms. Fahey's death was an accident.

Capano's attorneys also knew that the State planned to present the testimony of defendant's brother who aided Capano in disposing of Ms. Fahey's body at sea and helped him conceal other evidence. Capano's lawyers knew the State would be able to corroborate much of this testimony.

To get the jury to accept the theory that Ms. Fahey's death was an accident and that Capano had no reason to kill her, based on their recent rapprochement, defense counsel felt it was necessary to present the jury with Ms. Fahey's positive comments and feelings about Capano. Also, defense counsel knew that if they were able to get the "good" hearsay introduced and the "bad" hearsay followed, it might appear to the jury that they were not being "up front" with the jury.

Finally, Capano claims that if trial counsel had conducted his defense effectively, the "bad" hearsay would have come out in rebuttal as opposed to the State's case-in-chief. Perhaps, but when the jury hears testimony is not as important as the substance of evidence.  [*21] Whether the defense preferred to have "bad" evidence get before the jury in the State's case and then address it in the defense or force the State to introduce it in rebuttal is a trial decision and either tactic can be argued to be reasonable. Defendant can show no prejudice as to this timing complaint.

At the evidentiary hearing, Capano's defense counsel testified that the decision to stipulate to the hearsay evidence was discussed in great detail with Capano. Mr. Oteri noted it was his opinion that a judge never would allow the defense to keep out the "bad" hearsay and admit only "good" hearsay. Mr. Oberly considered and researched this very issue and concluded the same.

Capano was in full agreement with the decision. Trial counsel testified that Capano specifically wanted to enter the stipulation, to allow the admission of positive hearsay, especially the diary evidence and Kim Horstman's testimony. Capano and his defense team entered into the stipulation after weighing the "good" against the "bad". This was a trial strategy decision and Capano was included in this decision.

For all the aforementioned reasons, I find that Capano's attorneys were not deficient in the representation [*22] of Capano when they, with Capano's full understanding and agreement, entered into the hearsay stipulation with the State. Also, as aforestated, Capano was unable to show any material prejudice that resulted from the stipulation.

As to the claim that the limiting instruction was insufficient and should have been given after each witness, I note the following: (1) defense counsel discussed the limiting instruction with each other and defendant; (2) the instruction was given after the testimony of Dr. Kaye and after Jill Morrison, indicating that it was considered on a witness-by-witness basis; [6] (3) Cross-examination was recognized as an effective alternative to a limiting instruction for each witness' testimony; (4) Capano and the defense team wanted the jury to consider this hearsay evidence because the up and down relationship was going well and they were reconciling.

> [6] The Judge instructed the jury that the hearsay evidence was limited to Ms. Fahey's state of mind. He also informed the jury that evidence of any act that could be considered harassing in nature could not be used as evidence that Capano was a bad person and therefore probably committed the offense with which he is charged. Defendant's Appendix Claim 3, pp. 22, 23, 24 [Jill Morrison]; p.136 [Dr. Kaye].

[*23] The defense wanted the jury to consider Ms. Fahey's hearsay statements, not just to reveal her state of mind, but also to conclude that based on their positive feelings for each other, Capano would not have set out to kill her. It would have been counterproductive for defendant to pursue a more stringent limiting instruction as to her state of mind.

The limiting instructions adequately circumscribed the nature of the evidence and the proper use of that evidence by the jury. There is no reason to believe the jury would not have considered all of the instructions as a whole and applied the instruction to similar testimony.

I do not find counsel ineffective for not seeking a limiting instruction for each of these witnesses. Constantly telling the jury that they cannot use the evidence as proof that the defendant is a bad person may become counterproductive.

Finally, Capano's claim lacks a showing of actual prejudice.

I find that Capano has not shown his attorneys to be ineffective as to Claims 3 and 4 nor has he shown any actual prejudice that resulted from their trial decisions. These claims are denied.

CLAIM 5

Capano alleges trial counsel were ineffective because they failed [*24] to make a timely objection to the State's use of letters sent to defendant, in prison custody, which the Department of Correction intercepted and later turned over to the prosecution.

When the history of this issue is explored, one can only conclude that this is a baseless claim. Based upon the transcripts, affidavits and the hearing testimony, it is reasonable to make the following conclusions.

The Department of Correction informs new residents or inmates of its policy that incoming mail may be inspected. There is legal authority permitting the Department of Correction to screen incoming mail, [7] but my resolution of this issue is made on the facts.

> [7]    Thornburgh v. Abbott, 490 U.S. 401, 104 L. Ed. 2d 459, 109 S. Ct. 1874 (1989); Turner v. Safley, 482 U.S. 78, 79, 96 L. Ed. 2d 64, 107 S. Ct. 2254 (1987).

The defense was aware that the State had copies of the incoming mail from Ms. MacIntyre to Capano. The State also had several letters from Capano to Ms. MacIntyre that came into the State's possession [*25] when she mailed these letters back to Capano.

The State made the defense aware that these letters had been intercepted, but had not been examined by the prosecution. The defense wanted copies of the letters. Discussion ensued as to whether, or if, the State turned over the letters to the defense, that could constitute a waiver by the defense of any use of the letters by the State.

This issue was mooted then and remains moot by Ms. MacIntyre's decision to cooperate with the State. With the exception of a few handwritten letters, she pro-

vided the State with copies of her correspondence to Capano.

Although the defense filed a motion to suppress the MacIntyre correspondence, it did not pursue it. After the letters were introduced into evidence, there was some discussion about the motion. It is reasonable to surmise that the suppression motion was not pursued because the defense knew the letters would come in regardless of any objection due to Ms. MacIntyre's cooperation. Also, the defense intended to use her correspondence, hopefully to its advantage.

I do not need to decide if the defense should have pursued the suppression motion because defendant has not pointed to a single letter [*26] which is claimed to have been seized in violation of defendant's constitutional rights, which (1) could and should have been suppressed and (2) caused defendant any prejudice.

This claim fails.

CLAIMS 6 and 7

CLAIM 6

Defendant alleges trial counsel were ineffective in the direct and re-direct examination of defendant.

CLAIM 7

Defendant alleges that trial counsel were ineffective in the cross-examination of defendant.

These claims involve both the preparation for defendant's testimony and issues that arose during his testimony. They are best discussed together.

Defendant generally complains that there was such a breakdown in the client-attorney relationship that a de facto dissolution of the relationship occurred, and trial counsel effectively abandoned Capano. Capano argues this breakdown caused his direct examination and cross-examination to be a "disaster".

Based upon the transcripts, the Rule 61(g) affidavits and the Rule 61 evidentiary hearing, it is clear Capano has a forceful personality. Sometimes accepting, sometimes rejecting the advice of his attorneys, Capano made it clear to his defense team that it was his case, that "It's my life", and that he [*27] was going to be involved.

Capano's failure to communicate candidly with his attorneys caused most, if not all, of the problems of which he now complains. He refused to give his attorneys his account of Ms. Fahey's death until the eve of trial. They had great difficulty in getting their client to open up. His communications with them were in the form of hypotheticals and "what if's". I can find no error on counsels' part for any of the problems in Capano's

direct examination or cross-examination. The evidence leads to but one conclusion. They continuously strived to fulfill their responsibility to zealously defend Capano. It was not due to their lack of effort or a de facto abandonment of their client that created the alleged poor showing by Capano. Capano's piecemeal cooperation with his defense team set the stage for any dissatisfactory showing on his part. He insisted on maintaining control, letting his attorneys know only what he chose to reveal, and setting his own imprudent timeline to make such revelations. His attorneys cannot be blamed for their client's failure to heed their advice or his failure to cooperate with them in a more meaningful way.

Capano knew what he was [*28] doing. His attorneys advised him constantly of the consequences of an unprepared cross-examination. As they expected, Capano's refusal to prepare resulted in a withering cross-examination. His attorneys did not fail him, he failed himself.

Now I shall proceed to the specific allegations of ineffective assistance of counsel arising during Capano's testimony.

(a) Earlier in his career, Capano successfully prosecuted a first degree murder case against "Squeaky" Saunders. The prosecutor questioned Capano about his recollection of matters the prosecutor labeled as similarities between the Saunders' case and his case. He was asked about the cause of death in the Saunders' case -- a rear-entry gunshot about two inches from the ear. He also was asked about the closing argument he gave in that case which referenced the disposal of the victim's body in a tributary of the Delaware River and, but for a set of sluice gates, the body would have disappeared into the ocean, not been located or not found as quickly as it was.

Defense counsel objected to this line of questioning on relevancy grounds. The transcript reflects a discussion that the relevancy was related to the prosecution contention [*29] that there were similarities in the cases. The defense team withdrew the objection.

It would appear that the relevance objection and the Judge's response to the "similarities" adequately addressed the relevancy objection. I am satisfied that the similarities between the two cases made the prosecutor's questions relevant and had the objection not been withdrawn, it would have been denied. I also find that defendant cannot show legal prejudice stemmed from this testimony. The testimony comprised part of the State's argument that Capano knew the importance of forensics and the lack of a body in a murder prosecution.

(b) There was testimony that defendant provided a twenty-five thousand dollar ($ 25,000) loan to Theopalis

Gregory, Esquire. There was no objection to this question at trial and Capano now insists that the loan's admission should have prompted an objection. Capano believes the evidence created an inference that Capano was a "political insider" who used his wealth to gain unfair advantages. To the contrary, defense counsel saw this evidence as helpful to show a specific act of kindness by Capano. I agree that the relevancy of the State's inquiry is remote, but I also note [*30] that this information was helpful in painting Capano as a person who helped his friends. He helped Mr. Gregory. There was testimony he helped Ms. Fahey through numerous acts of generosity. I find no prejudice to defendant in the jury's hearing about the Gregory loan.

(c) Defendant makes a forceful legal argument that his attorneys were ineffective in failing to object to the prosecutor's questioning about his pre-trial silence. The defense notes the differing standards applicable to questions to a testifying defendant about his pre-arrest, pre-Miranda silence, Jenkins v. Anderson, 447 U.S. 231, 65 L. Ed. 2d 86, 100 S. Ct. 2124 (1980), and a defendant's silence post-arrest, Doyle v. Ohio, 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976). The applicable law is not at issue. Capano's present complaints must be denied on the facts. Defense counsel testified defendant's direct testimony opened the door to the State's questions, including pre-arrest and post-arrest silence.

What were the "door opening" responses given in Capano's direct examination that led to the aforementioned cross-examination? That portion of defendant's direct examination is found in the State's [*31] Appendix B34, p. 169, beginning at Line 7.

> Q. You've told us you lied to everybody right up until now. Is that correct?
>
> A. Yes, other than privileged conversations.
>
> Q. Tell us why you have persisted in this lie for so long.
>
> A. Well, in the beginning because I believed my state of mind was that I'd be out of jail after the bail hearing, and that serving three months in jail I deserved it, you know, for what I had done afterwards.
>
> I knew, you know, that eventually I would be charged with some crimes for what happened afterwards.
>
> But as my attorneys, we were all quite confident that I was going to get out on bail, and when it didn't happen, that changed my view, and so I needed to recover from that.

> And I had barely recovered from that when I realized, you know, when Debbie MacIntyre started lying about me, and once that happened, I was crushed emotionally, mentally and acting crazy for a couple of weeks.
>
> By that time we're getting close to the end of April -- excuse me, the end of March. If anybody believes me, after all this publicity and everything else, you know, they were going to believe me now if they weren't going to believe me back in April.
>
> Q. But you --
>
> A. Plus [*32] we were going through -- you didn't get into the case until May, for example. I mean we were going through some switches in attorneys.
>
> Q. You had not told anybody the truth though prior to your arrest for that eighteen months prior to your arrest, correct?
>
> A. Say that again please.
>
> Q. Prior to your arrest on November 12th of 1997, and subsequent to the incident on June 27th, 1996, a period of approximately eighteen months --
>
> A. You mean from the time of the incident until I was arrested. And everything you're asking me is excluding anything that's a privileged conversation.
>
> Q. Right.
>
> A. No, I had not told anyone the truth.
>
> Q. And can you tell us why you had not told anybody the truth during that period of time, sir?
>
> A. Well, I was hoping -- I was selfish, and I was hoping to keep myself from any ramifications, and I was also being true to my word to protect Debbie.
>
> Q. Was there anyone else you were protecting?
>
> A. Gerry.
>
> Q. Now, sir --
>
> A. Tom, please.

Q. In February of 1998, you learned that Deborah MacIntyre did something, is that correct?

A. Yes.

Q. And what was it you learned that she did?

A. I learned that she had agreed to become a witness for the government. [*33]

Q. Did you, subsequent to learning that, go to anyone and tell them the story you've told this jury here?

A. No one who wasn't privileged. [8]

Q. Right.

A. Correct.

Q. Is there a reason -- tell the jury the reason why you didn't tell anyone this story prior to this trial.

A. Well, I'm kind of a confidential person, and I didn't think it was, you know -- it would just sound like sour grapes frankly at the time.

I mean she -- not she, but the slickster from Philadelphia had outwitted us, and I never -- to this day, I still can't believe that Debbie would lie so much. I mean that's not really Debbie who came in here. So --

Q. But sir, you've just been betrayed by a woman you have been protecting for two years.

A. A woman I'm in love with.

Q. Would you not, at that point, go on a roof top and scream, "I'm taking the fall for something she did"?

A. Well, initially as I think I tried to indicate, I was basically out of my mind for a couple of weeks and not thinking rationally.

Then there were the issues regarding changing attorneys and just my mental status and condition. That's when they really had to jack the drugs up.

And so I -- I wasn't going to be making any calls then. [*34] I was just going to be looking to put together a final -- the

final legal team and follow the advice of the four chiefs.

Q. Which was to trust the jury?

A. Yes, which was trust the jury; if you say something now, it will get all just twisted around in the media; just talk to the jury directly.

Q. All right.

Now, sir, you made two statements to the police at the time they came to your house on Sunday morning and again on Sunday afternoon when they searched your house, is that correct?

A. That's correct.

Q. Did you make any subsequent statements to the police?

A. I attempted to.

Q. Can you tell us, sir, when you attempted to?

A. In the month of July.

Q. Tell us what you did and when.

A. My attorneys, like most attorneys, didn't want me to say anything to anybody. I tried twice to communicate that I really did want to speak to the authorities.

At that point it was still a state matter, state and city, and initially the responses were -- and I had certain limitations. I wasn't willing to talk about, you know --

Q. Speak to the mike please, Tom.

A. I was not willing to talk about Anne Marie's confidences, and I wanted to limit the conversation to Thursday night and anything [*35]   about that weekend.

That was rejected. Then I wanted to -- I forget who told me this, but the Fahey family got word to me that they were not concerned about -- not that they were not concerned, but that it was okay with them if I disclosed private matters about Anne Marie if I spoke to the police.

And my response was I'll do that, but I'm not going to get into -- and I rattled off such things as I'm not going to talk about my marriage, I'm not going to talk

about other people I've seen, I'm not going to talk about my taxes, you know.

Just -- I was not going to open myself to a free-wheeling interrogation that had nothing at all to do with what was at hand. And that offer was also rejected.

And then I tried other things as well during the month of July.

Q. What else did you try to do?

A. When Bud Friel came to see me, I asked him to find out if I could call Robert Fahey, and the answer came back no.

I also was still speaking to then Kim Horstman, now Mrs. Lynch, and I asked her to intervene so that I could attempt to speak to again Robert.

I even asked Kim one weekend she was going to the shore, close by to Stone Harbor, maybe Avalon, and I tried to talk her into coming to our [*36] house in Stone Harbor and spending, say, Sunday night going in late on Monday so that the two of us could talk.

I phrased it in terms of -- I wasn't about to say anything over the phone. I phrased it in terms of so we could put our heads together since we were the two people closest to her, and you know, my hope was to begin to establish some communication at least on that personal level before it became the law enforcement level.

And I also -- did I say that I called Robert and left a message?

Q. No, you did not say that.

A. I called Robert Fahey's -- I don't know whether it was his work number or not, I called his number and I left a long rambling message and that I wanted to speak to him, and I never heard back.

I never heard back from Robert or from any of them in that matter. They wrote me a letter at one point, but it was a letter to me that was clearly written by someone else, probably an attorney.

Q. Now, sir, you told us that your attorneys had told you not to speak to anyone.

A. Yes, they did.

Q. Did you, despite that good advice, attempt to speak with a law enforcement official?

A. Yes, I did.

Q. Can you tell us about that, sir?

A. Well, despite what I've already [*37] told you, I also attempted to speak to -- he was a retired law enforcement official . . .

8   It is noteworthy that while Capano may have had privileged communications with others, he did not tell the four attorneys representing him at his trial "the story you've told this jury" until the trial.

Having chosen to address the "silence" issue in his direct examination, the limited cross-examination by the State that followed was not unfair or a breach of Capano's constitutional rights to remain silent, nor did the State create any unfair inferences in its line of questioning. The State's attack went to the credibility of the factual issues Capano raised.

Defendant had a problem with which he was going to have to deal if he testified, and any defense attorney worth his salt knew it. The jury learned that following Ms. Fahey's disappearance, Capano was communicating that he knew nothing about her whereabouts. The jury also learned that he had known about her disappearance and personally had disposed of her body [*38] at sea Once he revealed the accidental shooting of Ms. Fahey and his subsequent conduct, it would have been devastating to his case not to have attempted to explain his initial denials and silence. The decision to raise this issue on direct was a reasonable trial tactic. Defendant does not specifically attack this decision.

Having opened the door to the silence issue, the Defendant can not then have his cake and eat it, too. He can not testify about his silence on direct and then expect his attorneys to successfully object to the limited cross-examination on the same subject.

The defense attorneys were not ineffective for not objecting. No prejudice exists because the jury heard the same subject from defendant on direct.

These claims are denied.

CLAIM 8

Defendant alleges his trial counsel were ineffective when they failed to request a mistrial based on defendant's removal from the courtroom during cross-examination.

During cross-examination, Capano was asked several questions about whether he "used" family members to protect himself. The thrust of the questions was that he used family members to assist him in his concealment of the shooting incident. The prosecutor asked [*39] questions about his sister, his brother Gerry, and his brother Louis.

When the prosecutor asked a similar question about his daughters, defense counsel objected and moved for a mistrial on the grounds that the question implicated Capano's constitutional right not to talk with the authorities. The Court ruled Capano had opened the door on his direct testimony.

When asked the question again, it is apparent even from the cold record that Capano lost his temper in front of the jury.

> A. Absolutely incorrect. You heartless, gutless, souless, disgrace for a human being.
>
> Q. You not only had the opportunity by agreeing --
>
> A. Why don't you explain what you did to my mother. Let's include that as well.
>
> MR. CONNOLLY: Okay, Your Honor, I mean we did nothing to his mother.
>
> THE WITNESS: You did nothing to my mother? That's a lie right there in front of the Court.
>
> THE COURT: Please take Capano out of the courtroom.
>
> THE WITNESS: He's a liar.
>
> (Defendant left the courtroom.)
>
> THE COURT: Well, it just got a little warmer in the courtroom, so we're going to quit early today. I ask the jury to discuss the case with no one, to avoid any contact with any information, [*40] whether it be personal or through the media, and I'll ask you to be back here and ready to go at ten a.m. tomorrow morning.
>
> (The jury left the courtroom at 4:45 pm.)

Defendant now criticizes his defense team for not seeking any relief from the Court since it was obvious that the prosecutor provoked the incident. But the trial judge did not make any findings establishing that the prosecutor deliberately provoked defendant. Judge Lee commented to counsel that he was not "terribly surprised" because matters dealing with Capano's family have "been sensitive to him and brought him close to anger several times, and I'm sure that's not a fact lost on the State. I was surprised that he totally lost it up there, but that just meant it was a good time to stop." (State's Appendix B45/ p. 252). Discussions then took place about a potential apology by Capano to the jury and an appropriate time to do that.

In the Rule 61 motion and the subsequent briefs, Capano does not suggest what "relief" his attorneys were ineffective for not seeking.

At the evidentiary hearing, his attorneys noted that a mistrial would have been difficult to obtain since it was their client who chose to behave badly [*41] in front of the jury. Typically, mistrials are granted for instances of misconduct outside of defendant's control.

Faced with what had occurred, counsel thought the trial judge did the right thing by getting their client out of the courtroom before it got worse.

Finally, the candid comments of his trial counsel are relevant as it appears that Capano was not truly goaded into his bad behavior. One defense attorney testified he told Capano he was "pre-determined to explode". He told Capano that it would happen.

Another of Capano's attorneys testified that "Tom hated Colm [the prosecutor] more than the devil." He also testified Capano knew the State might try to purposely upset him. Capano then used the same words to his trial attorney in describing the prosecutor as he later used on the stand. It would appear that Capano has no one to blame but himself as to his intent to take a swipe at the prosecutor. I am satisfied the attorneys did the best they could to prepare their client and counseled him to maintain his composure.

Counsel were not ineffective for not seeking a mistrial or "failing to seek any relief" to remedy Capano's explosion in front of the jury. This claim is denied.

[*42] CLAIM 9

Defendant claims trial counsel were ineffective in failing to call certain witnesses to rebut the State's "planning" evidence.

(a) Defendant complains that he told trial counsel that Vincent Mondarno gave him a gun in the spring of 1996 and that defendant retained the gun until sometime after Ms. Fahey' s disappearance. The relevance of this information is it raises the issue of why would he have to put Ms. MacIntyre up to buying him a gun if he already had a gun. It would have provided a means of attacking Ms. MacIntyre's testimony.

By affidavit, trial counsel reported as follows: "On 10/22/98 at 8:15 a.m., counsel interviewed Mondarno and was told this was a lie, he never gave Capano a gun."

Counsel reiterated this at the evidentiary hearing. Mr. Oteri testified that Capano told him Vinnie gave him a gun, but Vinnie denied any such transfer.

In his final submission to the Court, Capano now agrees his attorneys were not ineffective. in the decision not to call Mr. Mondarno.

(b) Capano complained that trial counsel should have called James Green and Joseph Riley as witnesses to establish that in the spring of 1996, Mr. Riley threatened to expose defendant's relationship [*43] with Linda Marandola and planned to extort money from Capano. Capano alleges this would have offered an explanation as to Gerry Capano's extortion testimony and Capano's need for the boat if he had to "do something" to these people.

Linda Marandola was a person with whom Capano was alleged to have had a romantic relationship. Defense counsel purposely avoided informing the jury of anything involving Ms. Marandola. The attorneys feared that opening the door to that relationship would expose a similarly unhealthy relationship with her as he had had with Ms. Fahey. Defense counsel commented at the evidentiary hearing that the incidents of control and harassment were "eerily similar". One of Capano's attorneys testified that "if Ms. Marandola got in front of the jury, we were dead".

To have called Mr. Green and Mr. Riley to testify about a possible extortion plot concerning Ms. Marandola would have put the entire Marandola episode before the jury.

In his final submission, Capano now agrees his attorneys were not ineffective in their decision not to call Mr. Green and Mr. Riley as witnesses. The Court agrees. This claim is denied.

## CLAIM 10

Defendant alleges trial counsel were ineffective [*44] in failing to make a timely objection to the rebuttal testimony of Robert Fahey as his testimony did not "rebut" anything.

The complaint centers on the testimony of Robert Fahey wherein he read a letter he had sent defendant on July 24, 1996, weeks after his sister's disappearance. The letter sought Capano's cooperation and help in locating Ms. Fahey.

During Capano's direct testimony, he stated that he was making attempts to communicate with the Fahey family during the summer of 1996. He testified as to leaving a long message on Robert Fahey's telephone answering machine. He testified as to receiving a letter but that it "was clearly written by someone else, probably an attorney". (State's Appendix B37/ p. 176)

Therefore, Capano's direct testimony did touch upon his attempted communications with Ms. Fahey's family and he did voice his opinion as to Mr. Fahey's letter. To the extent Capano's testimony was relevant, the Fahey rebuttal testimony was relevant and I find no deficient performance on the part of trial counsel for not making an objection. The motion does not address at all the prejudice necessary to establish under Strickland. This claim is denied.

## CLAIM 11

Defendant [*45] alleges his defense counsel were ineffective in failing to argue certain alleged "mitigating circumstances" to the jury and in failing to request that the jury instructions contain a list of the specific mitigating circumstances upon which the defense relied.

As to the jury instructions, the defense acknowledges in its motion that the penalty phase instructions were nearly identical to the penalty phase instructions which the Delaware Supreme Court formerly approved in Dawson v. State, 637 A.2d 57, 64-5 (Del. 1994). Defendant now complains that the instructions should have listed the alleged "mitigating circumstances". Whether the instructions specifically list the mitigators or not is more an argument of form as opposed to substance. Defense counsel did present substantial evidence over a three-day period which went to mitigation and which addressed why a life sentence was more appropriate than a death sentence. I am satisfied the instructions were legally sound. Defense counsel was not deficient in not seeking more detailed instructions.

Acknowledging substantial mitigation evidence was put before the jury, Capano argues that defense counsel insufficiently argued mitigation [*46] to the jury.

Attacks based on allegations that the attorneys could have "done better" are difficult for Capano to prove. Moreover, Capano must then show that a better performance would have made a difference in the outcome. Closing arguments involve the craft of communication to the jury and the selection of those points that may best influ-

ence the jury as to a party's position. In this case, the thrust of the defense was two-fold. First, the defense strongly attacked the statutory aggravator of substantial planning and premeditation. Then the defense presented evidence "humanizing" Capano by highlighting his good works in the community, his good works in his church, and his service to the public. Counsel also covered his close relationship with his family and the impact upon them if a death sentence was to be imposed. Defense counsel, over Capano's objection, also discussed the impact of a possible death sentence on Gerry and Louis, whose testimony proved integral in the guilt phase. These are all examples of effective representation. To get into "Monday morning quarterbacking" in such an area as the quality of a closing argument is indeed a slippery slope. Overturning a trial [*47] court's outcome on such a subjective issue without clear instances of ineffective lawyering would be wrong.

I am satisfied the legal instructions provided to the jury were proper. I am satisfied that Capano has failed to establish that his attorneys' performances in the presentation of evidence and arguments to the jury during the penalty phase were deficient when applying the Strickland standard of an objective reasonable standard. Finally, Capano has not established any actual prejudice. He has not shown how better instructions and/or a better closing argument would have changed the outcome of his trial. This claim fails.

In summary, Capano has failed to establish any grounds that his attorneys' performances were objectively deficient in a manner that caused him actual prejudice. All claims based upon ineffective assistance of counsel are denied.

## PART TWO -- VALIDITY OF DEATH PENALTY

Defendant argues the death sentence imposed on him is unconstitutional under the Sixth and Fourteenth Amendments of the United States Constitution and Article 1, § 4 and Article 1, § 7 of the Constitution of the State of Delaware. [9] More specifically, he argues as follows. The Supreme [*48] Court's decision in Ring v. Arizona, 536 U.S. 584, 153 L. Ed. 2d 556, 122 S. Ct. 2428 (2002) ("Ring") clarifies that the version of the death penalty under which defendant was sentenced is unconstitutional because the judge and not the jury made the requisite factual finding that a statutory aggravating circumstance existed. This error was structural, and consequently, the death penalty decision was invalid per se. However, even if the error were to be considered harmless rather than structural, the decision must be reversed because a unanimous jury did not render a decision that a statutory aggravating circumstance existed beyond a reasonable doubt.

[9] The pertinent portions of the constitutional provisions are set forth below.

The Sixth Amendment of the United States Constitution provides:

In all criminal prosecutions, the accused shall enjoy the right to a . . . public trial, by an impartial jury of the State and district wherein the crime shall have been committed. . . . .

The Fourteenth Amendment of the United States Constitution provides:

No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

In Article 1, § 4 of the Delaware Constitution, it is provided:

Trial by jury shall be as heretofore.

In Article 1, § 7 of the Delaware Constitution, it is provided:

In all criminal prosecutions, the accused hath a right to . . . a . . . public trial by an impartial jury, . . . nor shall he or she be deprived of life, liberty or property, unless by the judgment of his or her peers or by the law of the land.

[*49] What is at issue in this decision is how the evolving death penalty jurisprudence of the United States Supreme Court as shown in Ring impacts Capano's case. It is not the Delaware Constitution that requires the jury involvement as the Delaware Supreme Court's rulings consistently have recognized the distinction between the guilt phase and the sentencing phase. Therefore, my analysis will be to focus on how the United States Supreme Court's decision in Ring impacts the death penalty sentence of Capano.

In the 1970s, Florida enacted a death penalty statute which gave an advisory role to the jury with respect to the sentencing phase and assigned the role for determining the sentence on the trial judge. Proffitt v. Florida, 428 U.S. 242, 247-48, 49 L. Ed. 2d 913, 96 S. Ct. 2960 (1976). This type of system is referenced as a "hybrid" system. Ring, 536 U.S. at 608 n. 6. The United States Supreme Court addressed this system in Proffitt v. Florida, supra. Defendant therein argued that the imposition of the death penalty under Florida's law constituted cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. [*50] The Supreme Court held that Florida's statute met the constitutional deficiencies identified in Furman v. Georgia, 408 U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726 (1972). Proffitt v. Florida, 428 U.S. at 253. In addressing the system's aspect which allowed for the trial judge to determine the sentence, the Supreme Court stated:

> This Court has pointed out that jury sentencing in a capital case can perform an important societal function, Witherspoon v. Illinois, 391 U.S. 510, 519 n. 15, 20 L. Ed. 2d 776, 88 S. Ct. 1770 (1968), but it has never suggested that jury sentencing is constitutionally required. And it would appear that judicial sentencing should lead, if anything, to even greater consistency in the imposition at the trial court level of capital punishment, since a trial judge is more experienced in sentencing than a jury, and therefore is better able to impose sentences similar to those imposed in analogous cases.

[Footnote omitted.]

Id. at 252.

The Supreme Court addressed Florida's hybrid system again in the case of [*51] Spaziano v. Florida, 468 U.S. 447, 82 L. Ed. 2d 340, 104 S. Ct. 3154 (1984). In that case, the jury recommended a life sentence, but the trial judge imposed a death sentence. Defendant appealed, arguing that the judge's imposition of the death sentence violated the Eighth Amendment, the Double Jeopardy Clause and the Sixth Amendment based on the premise that the capital sentencing decision is one that a jury should make in all cases. The Court ruled:

> In light of the facts that the Sixth Amendment does not require jury sentencing, that the demands of fairness and reliability in capital cases do not require it, and that neither the nature of, nor the

purpose behind, the death penalty requires jury sentencing, we cannot conclude that placing responsibility on the trial judge to impose the sentence in a capital case is unconstitutional.

> . . . We are not persuaded that placing the responsibility on a trial judge to impose the sentence in a capital case is so fundamentally at odds with contemporary standards of fairness and decency that Florida must be required to alter its scheme and give final authority to the jury to make the life-or-death decision. [*52]

Spaziano v. Florida, 468 U.S. at 464-65.

In Hildwin v. Florida, 490 U.S. 638, 104 L. Ed. 2d 728, 109 S. Ct. 2055 (1989), the Supreme Court again faced the issue of whether the Sixth Amendment requires a jury to specify the aggravating factors that permit the imposition of capital punishment in Florida. It held:

> The existence of an aggravating factor here is not an element of the offense but instead is "a sentencing factor that comes into play only after defendant has been found guilty." [Citation omitted.] Accordingly, the Sixth Amendment does not require that the specific findings authorizing the imposition of the sentence of death be made by the jury.

Hildwin v. Florida, 490 U.S. at 640-41.

The next pertinent examination of the death penalty the Supreme Court made was in the case of Walton v. Arizona, 497 U.S. 639, 111 L. Ed. 2d 511, 110 S. Ct. 3047 (1990). The death penalty statute in Arizona, unlike in Florida, did not allow the jury to participate in any manner in the decision of whether life or death should be imposed; only the judge made findings of aggravating or mitigating circumstances, and the judge was required to impose [*53] the death penalty if he or she found that one or more aggravating circumstances existed and that no mitigating circumstance(s) existed to call for leniency. The Supreme Court held that no Sixth Amendment violation occurred with regard to the fact that the jury did not impose the death sentence or make the findings prerequisite to imposing such a sentence. Referring to the Florida decisions discussed above, the Court ruled that the Constitution does not require a jury rather than a judge to make findings of fact with regard to the aggravating factors.

In 1991, Delaware enacted the death penalty statute pursuant to which defendant was sentenced. 68 Del. Laws, ch. 181 (1991) (codified at 11 Del. C. § 4209)(" 1991 statute"). This new statute, which was modeled after Florida's, differed significantly from the old in that it changed the roles of the judge and jury. If a person was convicted of first degree murder, then the process required participation by the jury to determine if any statutory aggravating circumstances existed. The process of determining if a statutory aggravating circumstance exited is referenced as "the narrowing phase"; it was determined during that phase if a [*54] defendant was death eligible. Brice v. State, 815 A.2d 314, 320 (Del. 2003). The jury was not required to be unanimous nor was the jury's decision binding on the judge, who had the final decision as to the sentence. The jury also was to make a recommendation as to the appropriateness of the death sentence by determining whether the aggravating circumstances outweighed the mitigating circumstances. Likewise, this decision by the jury did not have to be unanimous. The sentencing judge, giving all of the jury's findings great weight, then sentenced defendant to life imprisonment without parole or death. The jury's function in the sentencing phase became advisory only, while the judge was given "the ultimate responsibility for determining whether defendant will be sentenced to life imprisonment or death." State v. Cohen, 604 A.2d 846, 849 (Del. 1992) ("Cohen").

In Cohen, the Court examined whether Delaware's hybrid statute violated the right to a jury trial under the United States or the Delaware Constitutions. Defendants conceded "that there is no federal right to the determination of punishment by a jury in a capital case." [*55] Id. at 851. The Court then addressed whether such a right exists under the Delaware Constitution. It ruled as follows at page 852:

> By clear historic and legal precedent this [Article 1, § 4] guarantees the right to trial by jury only as it existed when the common law was imported from England in 1776. Fountain v. State, Del. Supr., 275 A2d 251, 251 (1971); Claudio v. State, 585 A.2d [1278], . . . 1290-91, 1297 [(1991)]. Thus, the jury's historic role was limited to that of a trier of facts, determining guilt or innocence. It had no function in passing sentence. Indeed, any consideration of punishment by the jury was improper. As is obvious, that principle is so deeply rooted in precedent as to be immutable, since this Court has consistently held that, absent express statutory authorization, the jury should not even consider the sentencing consequences which

flow from a guilty verdict. [Citations omitted.] Accordingly, defendants are not guaranteed the right under the Delaware Constitution to have a jury determine punishment in a capital case.

The United States Supreme Court rendered another pertinent decision before the Delaware Supreme Court examined [*56] the constitutionality of the death penalty on Capano's appeal in Apprendi v. New Jersey, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). Therein, the Court examined a New Jersey "hate crime" law which authorized an increase in the maximum prison sentence if the sentencing judge found by a preponderance of the evidence that defendant acted with "'a purpose to intimidate an individual or group of individuals because of race, color, gender, handicap, religion, sexual orientation or ethnicity.'" Apprendi v. New Jersey, 530 U.S. at 469. The majority ruled that the United States Constitution required any fact, other than a prior conviction, which increases the penalty for a crime beyond the prescribed statutory maximum to be submitted to a jury and proved beyond a reasonable doubt. Id. at 490. The Court specifically noted that it was rejecting "the argument that the principles guiding our decision today render invalid state capital sentencing schemes requiring judges, after a jury verdict holding a defendant guilty of a capital crime, to find specific aggravating factors before imposing a sentence of death. [*57] Walton v. Arizona, 497 U.S. 639, 647-649, 111 L. Ed. 2d 511, 110 S. Ct. 3047 . . . (1990)." Id. at 496.

In defendant's case, the jury, by a vote of 11 to 1, found beyond a reasonable doubt the statutory aggravating circumstance that the murder was premeditated and the result of substantial planning. The jury recommended, by a vote of 10 to 2, that the trial judge find the aggravating circumstances outweighed the mitigating circumstances. Judge Lee, giving the jury's verdict great weight, imposed a sentence of death.

On appeal, defendant raised two issues with regard to the constitutionality of the statute. He first argued that his right to a jury trial under the Delaware Constitution was violated because the jury did not unanimously find the existence of a statutory aggravating factor. He also argued the sentencing process violated the Fourteenth Amendment's Due Process Clause because the trial judge could find a statutory aggravating factor without being bound by a jury verdict on the underlying issues of fact.

The Court framed the first argument as whether Article 1, § 4 of the Delaware Constitution "necessarily implies a right to a unanimous jury verdict on all facts.

[*58] " Capano II, 781 A.2d at 669. The Court ruled as follows at pages 669-70:

> The Delaware Constitution guarantees that "trial by jury shall be as heretofore." [490] This phrase incorporates by reference the common law right to trial by jury, and "any analysis of the right to a trial by jury, as it is guaranteed by the Delaware Constitution, requires an examination of the common law." [491] Based on a common law analysis, this Court has previously found that under the Delaware Constitution, "unanimity of the jurors is . . . required to reach a verdict." [492] This jurisprudence relates to the determination of guilt. Undertaking a similar inquiry in State v. Cohen, [493] however, we held that the right to trial by jury under the Delaware Constitution does not guarantee "the right . . . to have a jury determine punishment in a capital case." [494] Instead, the Cohen Court found that "the jury's historic role was limited to that of a trier of facts, determining guilt or innocence." [495]

We therefore conclude that the jury is not required to return a unanimous finding of an aggravating factor in its advisory role during the penalty phase. [*59] Although a jury's advisory report on statutory aggravating circumstances necessarily requires the jury to resolve factual disputes, this exercise is fundamentally different from a jury's fact-finding role in the guilt phase under the common law. [496]

First, as noted earlier, a jury at common law was charged with finding facts only in connection with a determination of guilt or innocence. [497] Here, the jury unanimously determined Capano's guilt beyond a reasonable doubt. By contrast, under Delaware's death penalty statute, a jury makes only recommendations relevant to punishment. Second, a jury's verdict at common law is binding-rather than advisory-as long as its conclusions are rational. [498] Under the Delaware death penalty statute, however, a jury in the penalty phase "functions only in an advisory capacity" and as the "conscience of the community." [499] Put differently, Section 4209 assigns to the trial judge "the ultimate responsibility for determining whether defendant will be sentenced to life imprisonment or death." [500]

Based on these considerations, we conclude that a jury's advisory report under the Delaware death penalty statute does not fit within the jury's [*60] common law role as fact-finder. As a result, the jury's recommendations under Section 4209 are not subject to the unanimity requirement, and Capano is therefore not entitled to a unanimous jury finding as to the existence of a statutory aggravating factor before the trial judge imposes a death sentence.

490  Del. Const, art I, § 4.

491    Claudio v. State, Del. Supr., 585 A.2d 1278, 1298 (1991).

492    Fountain v. State, Del. Supr., 275 A.2d 251, 251 (1971).

493  Del. Supr., 604 A.2d 846, 851-52 (1992).

494  Cohen, 604 A.2d at 852.

495  Id. (emphasis added); see also Apprendi v. New Jersey, 530 U.S. 466, 478-79 & n. 4, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000) (noting that, at common law, "'after trial and conviction are past,' defendant is submitted to judgment' by the court") (quoting 4 W. Blackstone, Commentaries on the Laws of England 368 (1769)).

496  Cf. Spaziano v. Florida, 468 U.S. 447, 459, 82 L. Ed. 2d 340, 104 S. Ct. 3154 (1984) ("The fact that a capital sentencing is like a trial in the respects significant to the Double Jeopardy Clause . . . does not mean that it is like a trial in respects significant to the Sixth Amendment's guarantee of a jury trial."). Capano suggests that Jones v. United States, 526 U.S. 227, 250-51, 143 L. Ed. 2d 311, 119 S. Ct. 1215 (1999) (discussing Hildwin v. Florida, 490 U.S. 638, 640-41, 104 L. Ed. 2d 728, 109 S. Ct. 2055 (1989)), endorses the position that, in making a sentencing recommendation under a death penalty statute similar to Delaware's statute, a jury "necessarily engag[es] in the fact finding required for imposition of a higher sentence." Yet Jones also discusses a more recent case finding that, under the Sixth Amend-

ment, a statute may confer on the trial judge the authority to determine the presence of aggravating factors and to sentence a defendant to death without the benefit of a jury verdict or recommendation. See Walton v. Arizona, 497 U.S. 639, 647-48, 111 L. Ed. 2d 511, 110 S. Ct. 3047 (1990). If a trial judge can make sentencing determinations under Walton and can disregard a jury's recommendation under Spaziano, 468 U.S. at 464-65, there is no reason to think that the jury's recommendation under the Delaware statute constitutes "factfinding required for imposition of a higher sentence." Jones, 526 U.S. at 250 (emphasis added).

[*61]

497 See Cohen, 604 A. 2d at 852.

498 A trial court may never disregard a jury's acquittal and it may disregard a jury's conviction only if no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 99 S. Ct. 2781 (1979), quoted in Davis v. State, Del. Supr., 453 A. 2d 802, 803 (1982) (per curiam); 443 U.S. at 318 n.10 ("The factfinder in a criminal case has traditionally been permitted to enter an unassailable but unreasonable verdict of not guilty.'").

499 Cohen, 604 A. 2d at 849, 856.

500 604 A. 2d at 849. The United States Supreme Court has held that this arrangement is permissible under the Sixth Amendment. See Hildwin v. Florida, 490 U.S. 638, 640-41, 104 L. Ed. 2d 728, 109 S. Ct. 2055 (1989) ("The Sixth Amendment does not require that the specific findings authorizing the imposition of the sentence of death be made by the jury."). Similarly, the Eighth Amendment to the federal constitution does not require that the statute "define the weight the sentencing judge must accord to an advisory jury verdict." Dawson v. State, Del. Supr., 673 A. 2d 1186, 1196 (1996) (quoting Harris v. Alabama, 513 U.S. 504, 512, 130 L. Ed. 2d 1004, 115 S. Ct. 1031 (1995).

[*62] The second issue defendant advanced was based upon the decision in Apprendi v. New Jersey, supra. Defendant argued that Delaware's statute violates the Due Process Clause because it permits the trial judge to find a statutory aggravating factor without being bound by a jury verdict on the underlying issues of fact and it "removes from the jury the assessment of facts that increase the prescribed range of penalties to which defendant is exposed.' Apprendi v. New Jersey, 530 U.S.

at 490(emphasis added)." Capano II, 781 A.2d at 670. The Court concluded there was no violation, and stated as follows, at pages 670-73, in reaching this conclusion:

> But here, the penalty phase did not "increase" Capano's "exposure" to the "prescribed range of penalties." His exposure to the death penalty had already been determined when the jury unanimously returned the verdict of guilt beyond a reasonable doubt of first degree murder.
>
> The New Jersey statute at issue in Apprendi was not a death penalty statute, and the holding in Apprendi does not bear on any issue involved in this case. * * *
>
> \* \* \*
>
> In our view, Apprendi neither explicitly nor implicitly [*63] invalidates the Delaware death penalty statute. First and most important, the Apprendi Court explicitly preserved the line of cases upholding death penalty procedures similar to Section 4209. . . .
>
> \* \* \*
>
> The New Jersey statute that was struck down in Apprendi is also distinguishable from Delaware's death penalty statute. The aggravating factors described in Delaware's Section 4209 do not constitute additional elements needed to establish guilt of a "capital murder" offense that a jury must unanimously find beyond a reasonable doubt. These aggravating factors relate only to the penalty phase where the jury acts as an advisory body to the sentencing judge. The Apprendi Court distinguished an "element" of a crime from a "sentencing factor" according to whether "the required finding exposes defendant to a greater punishment than that authorized by the jury's guilty verdict." [512] As we noted earlier, a conviction at the guilt phase by a unanimous jury under the first degree murder statute constitutes the authorization for the later imposition of the death penalty. [513] Because the finding of an aggravating factor does not "expose defendant to a greater punishment [*64] than that authorized" by a first degree murder conviction, the aggravating factor is not an additional element of the first degree murder offense. [514] In addition, the Delaware statute requires that the trial

judge find aggravating circumstances beyond a reasonable doubt. [515] The New Jersey hate crime statute, by contrast, required a finding by a preponderance of the evidence that the underlying crime was motivated by a desire to intimidate. [516]

Accordingly, we conclude that the death penalty process in 11 Del. C. § 4209 does not violate the right to a trial by jury under the Delaware Constitution and does not violate the Due Process Clause of the Fourteenth Amendment.

512    Apprendi, 530 U.S. at 494.

513    See 11 Del. C. § 636(b) (referring to 11 Del. C. § 4209).

514    Apprendi, 530 U.S. at 494 (emphasis added).

515    See 11 Del. C. § 4209(d)(1)(a).

516    See Apprendi, 530 U.S. at 468-69, 491.

[*65] Defendant filed with the United States Supreme Court a petition seeking a writ of certiorari. While his petition was pending, the Supreme Court issued its decision in Ring. Defendant in Ring, as did defendant in Walton v. Arizona, supra, attacked Arizona's death penalty statute which allowed for a sentence of death to be imposed only if a judge, conducting a separate sentencing hearing, made findings regarding the existence of statutorily enumerated aggravating circumstances. The Arizona statute provided for a judge only procedure, with no jury input at all. Defendant argued this scheme violated "the Sixth Amendment's jury trial guarantee by entrusting to a judge the finding of a fact raising defendant's maximum penalty." Ring v. Arizona, 536 U.S. at 595.

In footnote 4 at page 597, the Supreme Court explains the limited issue before it:

> Ring's claim is tightly delineated: He contends only that the Sixth Amendment required jury findings on the aggravating circumstances against him. No aggravated circumstance related to past convictions in his case; Ring therefore does not challenge [*66] Almendarez-Torres v. United States, 523 U.S. 224, 118 S. Ct. 1219, 140 L. Ed. 2d 350 (1998), which

held that the fact of prior conviction maybe found by the judge even if it increases the statutory maximum sentence. He makes no Sixth Amendment claim with respect to mitigating circumstances. See Apprendi v. New Jersey, 530 U.S. 466, 490-91, n.16, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000) (noting "the distinction the Court has often recognized between facts in aggravation of punishment and facts in mitigation" (citation omitted)). Nor does he argue that the Sixth Amendment required the jury to make the ultimate determination whether to impose the death penalty. See Proffitt v. Florida, 428 U.S. 242, 252, 96 S. Ct. 2960, 49 L. Ed. 2d 913 (1976) (plurality opinion) ("It has never [been] suggested that jury sentencing is constitutionally required."). He does not question the Arizona Supreme Court's authority to reweigh the aggravating and mitigating circumstances after that court struck one aggravator. See    [*67] Clemons v. Mississippi, 494 U.S. 738, 745, 110 S. Ct. 1441, 108 L. Ed. 2d 725 (1990). Finally, Ring does not contend that his indictment was constitutionally defective. See Apprendi, 530 U.S. at 477, n. 3, 120 S. Ct. 2348 (Fourteenth Amendment "has not . . . been construed to include the Fifth Amendment right to presentment or indictment of a Grand Jury'").

The Court determined no reason existed to differentiate capital crimes from all other crimes where a jury must find facts increasing punishment beyond the maximum authorized by a guilty verdict standing alone. It stated: "Capital defendants, no less than non-capital defendants, we conclude, are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." Id. at 589. It held  Walton and Apprendi to be irreconcilable, and ruled:

> We overrule Walton to the extent that it allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty. [Citation omitted.] Because Arizona's enumerated aggravating factors operate as "the functional equivalent of an element of a [*68] greater offense," Apprendi, 530 U.S. at 494, n. 19, the Sixth

Amendment requires that they be found by a jury.

\* \* \*

The right to trial by jury guaranteed by the Sixth Amendment would be senselessly diminished if it encompassed the factfinding necessary to increase a defendant's sentence by two years, but not the factfinding necessary to put him to death. We hold that the Sixth Amendment applies to both.

Id. at 609.

The Supreme Court issued the Ring decision on June 24, 2002. Capano's pending petition for writ of certiorari included the question of "whether [Delaware's] statutory scheme . . . violates the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment . . . as interpreted by the Court in Apprendi . . . [and] whether Walton . . . should be overruled in light of Apprendi." Defendant's Memorandum in Support of Application to Vacate Death Sentence and Impose Sentence of Life Imprisonment at 2-3. On June 28, 2002, the Supreme Court denied certiorari in Capano's case. Capano v. Delaware, 536 U.S. 958, 153 L. Ed. 2d 835, 122 S. Ct. 2660 (2002).

The Supreme Court has clarified the scope of Ring in a few subsequent [\*69] decisions. In Schriro v. Summerlin, 542 U.S. 348, 159 L. Ed. 2d 442, 124 S. Ct. 2519 (2004), the Court explained that Ring developed a procedural rather than substantive rule. "Ring altered the range of permissible methods for determining whether a defendant's conduct is punishable by death, requiring that a jury rather than a judge find the essential facts bearing on punishment." Schriro v. Summerlin, 124 S. Ct. at 2523. The Court further explained at page 2524:

Ring held that, *because* Arizona's statutory aggravators restricted (as a matter of state law) the class of death-eligible defendants, those aggravators *effectively* were **elements for federal constitutional purposes**, and so were subject to the procedural requirements the Constitution attaches to trial of elements. [Citation omitted.] This Court's holding that, *because Arizona* has made a certain fact essential to the death penalty, that fact must be found by a jury, is not the same as *this Court's* making a certain fact essential to the death penalty. The former was a pro-

cedural holding; the latter would be substantive. [Italics in original; underlined bold added.]

[\*70] The Court also stated that it did not rule in Ring that juries are more accurate factfinders and thereby implicate the fundamental fairness and accuracy of the criminal proceeding. Id. at 2523-24, 2525.

In Blakely v. Washington, 542 U.S. 296, 159 L. Ed. 2d 403, 124 S. Ct. 2531 (2004) and in United States v. Booker, 160 L. Ed. 2d 621, 125 S. Ct. 738, 2005 U.S. LEXIS 628 (2005), the Supreme Court applied the principles set forth in Apprendi and Ring in situations where judges imposed sentences on defendants after the judges, and not the juries, found the existence of facts which called for an increase in prison terms beyond those terms which the juries' decisions authorized.

In United States v. Booker, 160 L. Ed. 2d 621, 125 S. Ct. 738, 2005 U.S. LEXIS 628 (2005), which addressed Federal Sentencing Guidelines, the Court explained its decision in Blakely v. Washington 2005 U.S. LEXIS 629 at \*28:

. . . Our precedents . . . make clear "that the statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by defendant." [Citation omitted. [\*71] ] \* \* \*

\* \* \*

\* \* \* We have never doubted the authority of a judge to exercise broad discretion in imposing a sentence within a statutory range. [Emphasis in original.]

The Supreme Court distinguished Delaware's capital sentencing scheme from Arizona's by referring to it, as well as the systems in Florida, Indiana, and Alabama, as "hybrid" systems. Ring, 536 U.S. at 608 n.6. Although many legal analysts felt comfortable that Ring would not render Delaware's capital scheme unconstitutional, the Delaware Legislature took a conservative approach and modified the statute in order to preclude repeated attacks based on that issue by enacting 73 Del. Laws, c. 423 (2002). The synopsis to Senate Bill 449 explains the nature of the amendment:

This Act will conform Delaware's death penalty sentencing procedures to the new

rule announced by the United States Supreme Court in Ring v. Arizona. It is unclear as to whether the Court's opinion in Ring will be found to be applicable to Delaware's statutory system. However, the uncertainty created by the Supreme Court's ruling in Ring must be resolved promptly to ensure that all pending death penalty case [*72] [sic] will be finally resolved in a constitutional and timely fashion.

This Act will bar the Court from imposing a death sentence unless a jury (unless waived by the parties) first determines unanimously and beyond a reasonable doubt that at least one statutory aggravating circumstance exists. If a statutory aggravating circumstance is found by the jury to exist, the procedures set forth in Delaware's current death penalty sentencing statute will apply. The Court will continue to be responsible for ultimately determining the sentence to be imposed, after weighing all relevant evidence presented in aggravation or mitigation which bears upon the particular circumstances or details of the commission of the offenses and the character and propensities of the offender. The provisions of the Act will apply to all cases and defendants tried, re-tried, sentenced or re-sentenced after its effective date.

Two defendants facing the death penalty who had been indicted before the issuance of the Ring decision and the enactment of the amendment to the death penalty certified questions of law regarding this amended statute to the Delaware Supreme Court in [*73] Brice v. State, 815 A.2d 314 (Del. 2003) ("Brice"). In Brice, the Supreme Court addressed four legal issues posed to it and then went on to "address the issue of structural error, as it relates to both the 1991 version of Section 4209 and the 2002 Statute to the extent the argument has been made that both statutes suffer from that constitutional defect. In essence it is argued that viewed from Ring's perspective, structural error existed in the 1991 statute and the 2002 amendment did not correct it." Brice, 815 A.2d at 323.

The Delaware Supreme Court examined the United States Supreme Court's approach to structural error, noting at page 324:

The presence of a structural defect invalidates the proceeding and requires re-

versal. See, e. g., Sullivan [v. Louisiana], 113 S. Ct. at 2081, 2083. This is so because structural errors are not subject to a harmless error analysis. [10]

10  Before an error is deemed harmless, however, the State must demonstrate "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Chapman v. California, 386 U.S. 18, 24, 87 S. Ct. 824, 828, 17 L. Ed. 2d 705 (1967).

[*74] The Supreme Court stated that prior to Ring, the 1991 statute comported with the United States and Delaware constitutions, as explained in Capano v. State, 781 A.2d at 669-673. The Court then undertook its analysis:

The United States Supreme Court has identified only six instances where structural error exists. See Lucero v. The State of Texas, 91 S.W.3d 814, 816, 2002 Tex. App. LEXIS 7452, at *6 (October 16, 2002) (citing Gideon v. Wainwright, 372 U.S. 335, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963) (total deprivation of the right to counsel); Tumey v. Ohio, 273 U.S. 510, 47 S. Ct. 437, 71 L. Ed. 749, 5 Ohio Law Abs. 159, 25 Ohio L. Rep. 236, 5 Ohio Law Abs. 185 (1927) (an impartial judge); Vasquez v. Hillery, 474 U.S. 254, 106 S. Ct. 617, 88 L. Ed. 2d 598 (1986) (unlawful exclusion of defendant's race from a grand jury); McKaskle v. Wiggins, 465 U.S. 168, 177-78, n. 8, 104 S. Ct. 944, 950-51, n. 8, 79 L. Ed. 2d 122 (1984) (the right to self-representation); Waller v. Georgia, 467 U.S. 39, 49, n. 9, 104 S. Ct. 2210, 2217, n. 9, 81 L Ed. 2d 31 (1984) (the right to public trial); and [*75] Sullivan v. Louisiana 508 U.S. 275, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993) (defective reasonable doubt instruction). Indeed, it appears that the United States Supreme Court employs structural error analysis only when reviewing constitutional errors that occurred during the guilt/innocence phase of the trial. See Arizona v. Fulminante, 499 U.S. 279, 306-307, 111 S. Ct. 1246, 1263, 113 L. Ed. 2d 302 (listing cases where harmless error analysis was appropriate despite the existence of constitutional errors); see

also, Neder, 119 S. Ct. at 1836-37 (holding that failure to instruct on an element of the offense is not structural error); but see Satterwhite v. Texas, 486 U.S. 249, 256-258, 108 S. Ct. 1792, 1797-1798, 100 L. Ed. 2d 284 (1988) (discussing structural error analysis in the course of reviewing a constitutional error that occurred during capital sentencing phase, but ultimately determining that harmless error analysis was appropriate). In other words, there is a difference between the guilt/innocence phase and the sentencing phase in a structural error analysis. [*76] Lockhart v. McCree 476 U.S. 162, 183, n. 18, 90 L. Ed. 2d 137, 106 S. Ct. 1758 (1986) ("The majority in Adams rejected the dissent's claim that there was no plausible distinction between the role of the jury in the guilt/innocence phase of the trial and its role [. . .] in the sentencing phase. "') (quoting Adams v. Texas, 448 U.S. 38, 54, 100 S. Ct. 2521, 2531, 65 L. Ed. 2d 581 (1980)). This Court has also recognized such a distinction. See Capano, 781 A.2d at 669 (citing State v. Cohen, 604 A.2d 846, 851-52 (Del. 1992)).

The argument that there was a structural defect in Delaware's capital sentencing scheme under the 1991 Statute is not supported by Ring. Indeed, implicit in Ring is the finding that the constitutional defect in Arizona's capital sentencing scheme did not amount to structural error. The United States Supreme Court declined to address Arizona's harmless error argument, but in doing so it implicitly suggested that harmless error analysis would be an appropriate inquiry for the Arizona Supreme Court. [*77] Ring, 122 S. Ct. at 2443 n. 7. Moreover, the United States Supreme Court designated Delaware's capital sentencing scheme as a "hybrid system," Ring, 122 S. Ct. at 2442 n. 6, and thus distinguished our system from Arizona's. The holding of Ring is quite simple: Walton is overruled "to the extent it allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty." Ring, 122 S. Ct. at 2443 (citation omitted) (emphasis supplied). Under the 1991 Statute, the jury was involved in the narrowing phase, albeit in an advisory capacity. Therefore, to find structural defect in the 1991 Statute would arguably extend the holding in Ring well beyond its intended scope.

If Ring does not provide the basis for a finding of structural defect, then we must look to the precedent in this area to resolve the issue. As noted above, there are six sets of constitutional errors that amount to structural error, and thus are not susceptible of a harmless error analysis. Therefore, in order to demonstrate that there was a structural defect in Delaware's capital sentencing scheme under the 1991 Statute, one must fit [*78] the purported defect into one of the six categories. For purposes of analogy, the closest analytical category is the defective reasonable doubt instruction at issue in Sullivan v. Louisiana.

In Sullivan, defendant was charged with first-degree murder in the course of committing a robbery. 113 S. Ct. at 2080. Although there was circumstantial evidence connecting defendant to the murder, Defense counsel argued in closing that reasonable doubt existed as to identity and intent. Id. While instructing the jury, the trial judge gave what the State of Louisiana later conceded was an unconstitutional definition of reasonable doubt. Id. Defendant was subsequently convicted and sentenced to death. Id.

The United State Supreme Court began its analysis by noting that "the jury verdict required by the Sixth Amendment is a jury verdict of guilty beyond a reasonable doubt." Sullivan, 113 S. Ct. at 2081 ("It is self-evident, we think, that the Fifth Amendment requirement of proof beyond a reasonable doubt and the Sixth Amendment requirement of a jury verdict are interrelated."). Accordingly, the defective reasonable doubt instruction had the effect of denying defendant [*79] his constitutional right to a jury determination of guilty beyond a reasonable doubt. Id. 113 S. Ct. at 2081-2082 ("T o hypothesize a guilty verdict that was never in fact rendered -- no matter how inescapable the findings to support that verdict might be -- would violate the jury-trial guarantee.")

(emphasis supplied). Because "there [was] no jury verdict within the meaning of the Sixth Amendment . . . there [was] no object . . . upon which harmless-error scrutiny [could] operate." Id. 113 S. Ct. at 2082 (emphasis original). This amounted to structural error because it was impossible to quantify the effect of the constitutional error. Id. 113 S. Ct. at 2083.

Sentences rendered under the 1991 Statute do not suffer from the same constitutional defect. First, defendants sentenced under Delaware's 1991 scheme were not denied a jury verdict of guilty beyond a reasonable doubt. Second, the advisory jury made specific numerical findings as to the existence of statutory aggravating circumstances. We need not hypothesize findings of aggravating factors that were never rendered; rather, the jury's numerical finding is the "object" upon which we may cast the lens of harmless [*80] error review. Because any error under the 1991 Statute does not fit into any of the structural error categories delineated by the United States Supreme Court, [12] harmless error analysis is appropriate. [13]

_____

12  The other categories are similarly unavailing and do not lend themselves to meaningful analysis here: total deprivation of the right to counsel at trial, the unlawful exclusion of members of defendant's race from a grand jury, improper interference with the right to self-representation at trial, and unlawful infringement upon the right to a public trial.

13  It has been argued that a potential Caldwell v. Mississippi, 472 U.S. 320, 105 S. Ct. 2633, 86 L. Ed. 2d 231 (1985), problem exists in that juries under the 1991 Statute were improperly mislead into believing that the ultimate decision on the existence of statutory aggravating circumstances rested with the court. If this argument were accepted, the "object" upon which harmless error analysis would operate -- the numerical vote representing a finding of statutory aggravators -- would arguably be tainted because the jury may have been mislead into believing that its finding on the issue was ultimately meaningless. The holding in Caldwell, however, rested on Eighth

Amendment grounds,  105 S. Ct. at 2639, and not upon a finding of structural error. Further, it could be argued that where the jury is instructed that it found a statutory aggravator by its verdict at the guilt stage, such a "finding" during the narrowing phase is meaningless and thus not a proper "object" upon which to apply harmless error scrutiny. This "what if" scenario premised upon Sandstrom v. Montana, 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979) is too speculative to require comment.

[*81]

Brice, 815 A.2d at 324-26.

This history provides the background for defendant's arguments in this motion. Since Capano's case was pending on direct review at the time Ring was decided and since Ring announced a new procedural rule,  Schriro v. Summerlin, 124 S.Ct. 2526, defendant is able to raise these issues in his postconviction motion pursuant to the miscarriage of justice or fundamental fairness exception set forth in Superior Court Criminal Rule 61(i)(5). [10]

_____

10  As explained in State v. McKamey, Del. Super., Def. ID # 9406017814, Ableman, J. (Nov. 26, 2003) at 15, aff'd, Del. Supr., No. 613, 2003, Holland, J. (April 14, 2004):

> The "miscarriage of justice" or "fundamental fairness" exception contained in Rule 61 (i)(5) is "a *narrow one* and has been *applied only in limited circumstances,* such as when the right relied upon has been recognized for the first time after a direct appeal." [Footnote and citation omitted; emphasis in original.]

Capano argues [*82] that the 1991 statute as applied in his case does not pass constitutional muster under Ring. He argues the jury's verdict is not a verdict at all, but an advisory report as to the statutory aggravating factors. He argues that since the sentencing judge ultimately must find a statutory aggravating circumstance before defendant becomes death eligible, then our sentencing scheme is akin to Arizona's, where the judge, sitting without a jury, makes all of the decisions. Therefore, for the same reasons noted in Ring, our statute is unconstitutional.

As will be more fully explored below, the Delaware Supreme Court has considered the impact of Ring on

Delaware's 1991 version of the death penalty statute numerous times. The only new issue raised in Capano's case is whether the 11-1 finding of a statutory aggravator is unconstitutional. Since the Delaware Legislature has the authority to establish standards for jury involvement in the sentencing phase as opposed to the constitutional requirements of the guilt phase, since that same body has authorized a non-unanimous jury verdict in the narrowing phase, and since neither the United States nor Delaware Constitutions prohibit a non-unanimous [*83] verdict in the sentencing phase, I conclude the jury's finding of a statutory aggravator does not have to be unanimous and the death penalty imposed is constitutionally valid.

Our Delaware Supreme Court noted in Brice, 815 A.2d at 324 n. 11 that "it could be argued that the constitutionality of the 1991 statute was unchanged by Ring." The Court cites to Florida cases as well as an Indiana case in support of this contention. Id. [11]

    11   Therein, Justice Walsh opined:

> Despite the General Assembly's response to Ring, it could be argued that the constitutionality of the 1991 Statute was unchanged by Ring. Ring, 122 S. Ct. at 2442 n.6 (distinguishing the statutes of Delaware, Alabama, Florida, and Indiana from the process utilized in Arizona, and at issue in Ring), and [122 S. Ct. at] 2450 (O'Connor, dissenting) (noting that death row inmates may improperly seize on the Court's decision in Ring and attempt to extend the reasoning to the "hybrid sentencing schemes" of Delaware, Alabama, Indiana and Florida); Cf. Bottoson v. Moore, 833 So. 2d 693, 2002 Fla. LEXIS 2200, *(Fla. October 24, 2002) (upholding death sentence imposed under Florida's pre-Ring statute); King v. Moore, 831 So. 2d 143, 2002 Fla. LEXIS 2199, *(Fla. October 24, 2002) (same); Wrinkles v. State of Indiana, 776 N.E.2d 905, 2002 Ind. LEXIS 802, *Ind. October 15, 2002) (holding that "Ring is not implicated in petitioner's case under any view that the Court might find plausible.").

[*84] Delaware modeled its statute after Florida's, and the courts of this state look to Florida's death penalty jurisprudence in interpreting our death penalty. Garden v. State. 844 A. 2d 311, 314 (Del. 2004).

Florida consistently has concluded its death penalty statute is constitutional and Ring did not render it unconstitutional. The seminal cases of the Florida Supreme Court so concluding are Bottoson v. Moore, 833 So. 2d 693 (Fla. 2002), cert. den., 537 U.S. 1070, 154 L. Ed. 2d 564, 123 S. Ct. 662 (2002) and King v. Moore, 831 So.2d 143 (Fla. 2002), cert. den., 537 U.S. 1069, 154 L. Ed. 2d 563, 123 S. Ct. 662 (2002). Therein, the Florida Supreme Court held its death penalty statute constitutional for several reasons. First, certiorari proceedings in both cases were pending before the United States Supreme Court at the time it decided Ring and that Court did not instruct Florida to reconsider the cases in light of its Ring decision. [12] Second, the United States Supreme Court repeatedly has reviewed and upheld Florida's capital sentencing statute, and it did not overrule any of these prior decisions in reaching its decision in Ring. [*85]

>     12   Similarly, defendant's case was pending before the Court at the time it issued Ring and that Court, being well aware of the nature of Delaware's death penalty statute, Ring, 536 U.S. at 608 n.6, denied Capano's writ of certiorari.

Since rendering those decisions, Florida repeatedly has upheld its statute. The following is a non-exclusive list of some cases where the Florida Supreme Court has considered its statute in light of Ring and where the United States Supreme Court did not thereafter grant certiorari: Chavez v. State, 832 So.2d 730 (Fla. 2002), cert. den., 539 U.S. 947, 156 L. Ed. 2d 637, 123 S. Ct. 2617 (2003); Kormondy v. State, 845 So.2d 41 (Fla. 2003), cert. den., 540 U.S. 950, 157 L. Ed. 2d 283, 124 S. Ct. 392 (2003); Lawrence v. State, 846 So.2d 440 (Fla. 2003), cert. den., 540 U.S. 952, 157 L. Ed. 2d 286, 124 S. Ct. 394 (2003); [*86] Duest v. State, 855 So.2d 33 (Fla. 2003), cert. den., 541 U.S. 993, 124 S.Ct. 2023, 158 L. Ed. 2d 500 (2004).

Two other Florida cases are noteworthy. In Butler v. State, 842 So.2d 817 (Fla. 2003), the trial court instructed the jury that the statutory aggravating circumstance of heinous, atrocious, or cruel had been established by the evidence. The jury recommended death by a vote of 11-1. The judge found one statutory aggravator, that the homicide was especially heinous, atrocious, or cruel. Defendant argued that the jury was deprived of its decision-making role on the issue, but the Florida Supreme Court ruled that since no objection was made, defendant did not preserve the issue for review and it refused to address the issue of whether the jury unanimously found an aggravator. The Court went on to deny

relief on the basis of Ring. In Davis v. State, 859 So. 2d 465, 481, 485-6 (Fla. 2003), the dissenting Justice clarified that the jury did not unanimously find the existence of any of the aggravating circumstances. The trial judge found the existence of three aggravating circumstances and imposed the death penalty. Again, Florida's Supreme Court upheld the [*87] statute.

I agree with the Florida Supreme Court's conclusions that Ring did not render the hybrid death penalty statutes invalid, and I conclude the above-referenced decisions provide support for upholding Delaware's death penalty statute. Moreover, even without Florida's case law, I agree with Justice Walsh's opinion in Brice that Ring had no impact on Delaware's 1991 version of the death penalty statute.

It is helpful at this point to delineate what Ring held and what it did not hold. It held that a judge, "sitting without a jury", could not find an aggravating circumstance making a defendant death eligible. It held that a jury must be involved in the process of considering whether a defendant is death penalty eligible, and that the standard to be applied is beyond a reasonable doubt. Ring did not otherwise define the jury's role. It did not hold that the jury's decision must be unanimous. By considering a statutory aggravator as an element of a greater offense for punishment purposes, the Supreme Court did not make it part of the crime tried in the guilt phase. For example, there is no requirement in the Ring decision that indictments contain the "statutory [*88] aggravating circumstances". It did not rule that the holding was substantive rather than procedural nor did it rule that the jury members were more accurate fact finders and thereby implicate the fundamental fairness and accuracy of the criminal proceedings. Schriro v. Summerlin, 124 S. Ct. at 2524-25.

The United States Supreme Court allowed for the states to legislate their own statutory death penalty so long as those statutes fall within the constitutional parameters established by the United States Supreme Court. See id. at 2524. The process in Delaware allows a judge, sitting with a jury, to impose a penalty of death. In Brice, the Delaware Supreme Court again recognized a difference exists between the jury's role in the guilt/innocence portion of a trial and its role in the sentencing phase in conducting a structural error analysis. Brice, 815 A.2d at 325. See Capano v. State, 781 A.2d at 669. Simply put, the jury's involvement or role in the penalty phase does not have to mirror the jury's involvement or role in the guilt phase. The Delaware Supreme Court held in Brice that the participation of the jury in the narrowing phase, "albeit in an [*89] advisory capacity", precluded a conclusion there was structural defect in the 1991 statute. Brice, supra. Thus, the Supreme Court already considered, and rejected, Capano's structural

error argument. Id. at 323-26. Neither Ring nor other precedent allows for the conclusion that structural error existed in the 1991 statute.

Since Brice found no structural error and since I agree with Justice Walsh that Ring did not impact the constitutionality of the 1991 statute, I conclude the death penalty imposed in defendant's case is valid. However, as the Delaware Supreme Court recognized in Brice, there exists the possibility that Ring may be read to extend the jury's role to the finding of aggravating circumstances during the sentencing phase. Thus, alternatively, I will employ the harmless error analysis Justice Walsh decreed in Brice and "cast the lens of harmless error review" on the specific numerical findings of aggravating factors which the advisory jury made. Brice, 815 A.2d at 326. [13]

> 13   Since Brice, the Supreme Court has had several opportunities to consider death sentences under the 1991 statute and has upheld them all, without harmless error analysis. Cabrera v. State, 840 A.2d 1256 (Del. 2004); Taylor v. State, 822 A.2d 1052 (2003), cert. den., 540 U.S. 931, 157 L. Ed. 2d 237, 124 S. Ct. 345 (2003); Zebroski v. State, 822 A.2d 1038 (Del. 2003), cert. den., 540 U.S. 933, 157 L. Ed. 2d 240, 124 S. Ct. 352 (2003); Swan v. State, 820 A.2d 342 (Del. 2003), cert. den., 540 U.S. 896, 157 L. Ed. 2d 174, 124 S. Ct. 252 (2003); Reyes v. State, 819 A.2d 305 (Del. 2003), cert. den., 540 U.S. 862, 157 L. Ed. 2d 113, 124 S. Ct. 170 (2003); Norcross v. State, 816 A.2d 757 (Del. 2003), cert. den., 540 U.S. 833, 157 L. Ed. 2d 60, 124 S. Ct. 80 (2003). That is reasonable because all of the post-Brice decisions had jury findings that were unanimous as to the statutory aggravators and/or had verdicts in the guilt phase which found the statutory aggravator. In each case, the jury's numerical finding was unanimous and therefore, in each, no need existed to undergo a harmless error analysis on the specific numerical findings of aggravating factors.

[*90]   Capano argues that since the jury was not unanimous in finding the existence of a statutory aggravating circumstance, then the error was not harmless. This argument is and will be unique to Capano's case because all other defendants sentenced to the death penalty under the 1991 statute involved a unanimous jury determination as to the statutory aggravating circumstance(s) and/or the jury's unanimous verdict in the guilt phase which, de facto, established a statutory aggravator, such as a guilty verdict involving the death of two people. The 2002 change to the death penalty requires jury

unanimity in any finding of a statutory aggravator before a defendant becomes death eligible.

Capano's strongest argument is dicta in Cabrera v. State, 840 A.2d 1256, 1272 (2004) ("Cabrera"), that "in Brice . . . [the Court] had held that the Supreme Court's decision in Ring requires a jury to find unanimously and beyond a reasonable doubt the existence of a statutory aggravating circumstance that renders a defendant death eligible'. [Footnotes omitted.]"

First, I emphasize that this statement is dicta; the case did not involve a situation where the Court was addressing [*91] whether a less than unanimous finding of an aggravating factor was constitutional. In Cabrera, the jury convicted defendant, unanimously and beyond a reasonable doubt, of the intentional murder of two people during a single course of conduct. Thus, the nature of the jury's guilty verdict established the statutory aggravating circumstance and consequently, comported with Ring. Cabrera, 840 A.2d at 1273.

Second, the comment is overstated. There is no ruling in Brice or Ring that a unanimous jury is required. In fact, Brice acknowledges the situation where there is no unanimous verdict when it says that the Court "casts the lens of harmless error review" on the specific numerical findings of aggravating factors which the advisory jury made. [14]

> 14  The recent decision of the Supreme Court in Ortiz v. State, Del. Supr. Nos. 494/528, 2003, Holland, J. (January 25, 2005), addressed Ring's impact on the 2002 version of the death penalty. At page 40 of that opinion, the Court inserts the words "jury's unanimous" in the following quote from Brice:
>
> > The maximum punishment is increased by the [jury's unanimous] finding [beyond a reasonable doubt] of the statutory aggravator.
>
> That insertion is of no significance because the Court merely is clarifying what the 2002 statute required: a finding beyond a reasonable doubt by a unanimous jury. The Court was not examining the 1991 statute.

[*92]  In the cases of  Taylor v. State, 822 A.2d 1052 (2003), cert. den.,  540 U.S. 931, 157 L. Ed. 2d 237, 124 S. Ct. 345 (2003);  Zebroski v. State, 822 A.2d 1038 (Del. 2003), cert. den.,  540 U.S. 933, 157 L. Ed. 2d 240, 124 S. Ct. 352 (2003);  Swan v. State, 820 A.2d 342 (Del. 2003), cert. den.,  540 U.S. 896, 157 L. Ed. 2d 174, 124 S. Ct. 252 (2003);  Reyes v. State, 819 A.2d

305 (Del. 2003), cert. den.,  540 U.S. 862, 157 L. Ed. 2d 113, 124 S. Ct. 170 (2003); and  Norcross v. State, 816 A.2d 757 (Del. 2003), cert. den.,  540 U.S. 833, 157 L. Ed. 2d 60, 124 S. Ct. 80 (2003), the Supreme Court referenced a finding of a statutory aggravator by a unanimous jury because in each case, the statutory aggravating circumstance which made defendant death eligible also was made by the jury unanimously and beyond a reasonable doubt during the guilt phase.

Similarly, in all the other post-Brice decisions, except for the statement in Cabrera, the Supreme Court merely made a statement of fact: where the jury made a unanimous finding as to an aggravator because that finding was made in the guilt phase, then Ring was satisfied.

Since neither Cabrera [*93]  , nor Brice nor Ring provide authority for requiring a unanimous jury, I look to whether any other law requires it.

The United States Supreme Court has left the decision whether to require unanimous juries to the states. Maxwell v. Dow, 176 U.S. 581, 604-05, 44 L. Ed. 597, 20 S. Ct. 448 (1900). Neither the Sixth Amendment nor the Due Process Clause require a unanimous jury in a criminal case if a state allows for less than a unanimous jury. Apodaca v. Oregon, 406 U.S. 404, 32 L. Ed. 2d 184, 92 S. Ct. 1628 (1972) (Sixth Amendment does not require a unanimous jury); Johnson v. Louisiana, 406 U.S. 356, 32 L. Ed. 2d 152, 92 S. Ct. 1620 (1972) (unanimity is not a federal due process requirement where state law permits agreement of a lesser number of jurors).

In Delaware, a defendant is entitled to a unanimous jury with regard to the guilt phase of the trial. Claudio v. State, 585 A.2d 1278 (Del. 1991); Fountain v. State, 275 A.2d 251 (1971). However, the jury's roles differ between the guilt phase and the sentencing phase. [*94] Capano v. State, 781 A.2d at 669-70; Shelton v. State, 652 A.2d 1, 5-6 (Del. 1995); State v. Cohen, 604 A.2d at 852; Claudio v. State, 585 A.2d at 1305; Gattis v. State, Del. Super., Cr.A. Nos. IN90-05-1017, et al., Barron, J. (Dec. 28, 1995), at 45-8, aff d,  697 A.2d 1174 (Del. 1997). [15] In Delaware, there is no right to a jury determining punishment, except as provided by statute. State v. Cohen, supra; Gattis v. State, supra. Pursuant to Delaware's death penalty statute, a jury finds the existence of aggravating factors beyond a reasonable doubt in the sentencing phase; however, that finding does not have to be unanimous. Capano v. State, supra. The Legislature put the jury into the sentencing process in the 1991 statute, and thereby gave the jury a role in determining the aggravating factors. The Legislature desired to have the input of the jury members and their communities in this most important of all sentencing decisions but the Legislature concluded the death penalty could be imposed

without a unanimous jury finding the existence of a statutory aggravator.

> 15   The Superior Court initially issued its decision in the matter on August 24, 1995. It reissued the decision on December 28, 1995. The reissued decision is identical to the first plus it includes the Court's decision on defendant's motion to reargue.

[*95]  In this case, the statutory aggravator the jury found to exist, beyond a reasonable doubt, by a vote of 11-1 was "premeditation and substantial planning" as set forth in 11 Del. C. § 4209(e)u. There was evidence that over a period of months before murdering Anne Marie Fahey, defendant obtained a firearm, purchased a large cooler and a chain, and made arrangements with his brother to dispose of the body at sea. This constituted strong, substantial evidence to support the premeditation and substantial planning aggravator.

The question then becomes: What number is permissible to constitute a finding by the jury regarding a statutory aggravator? For example, what if the jury had found the existence of the statutory aggravator by a vote of 7-5? Would that have passed constitutional muster? I look to the law addressing the "numbers" requirement in the guilt phase for guidance.

In Apodaca v. Oregon, the Supreme Court upheld a statute which allowed for 10-2 verdicts and in Johnson v. Louisiana, it upheld a statute which allowed for 9-3 verdicts. In [*96]  Apodaca v. Oregon, 406 U.S. at 410-11, the Court explained:

> Our inquiry must focus upon the function served by the jury in contemporary society. . . . . As we said in Duncan, the purpose of trial by jury is to prevent oppression by the Government by providing a "safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge." "Given this purpose, the essential feature of a jury obviously lies in the interposition between the accused and his accuser of the commonsense judgment. As we said in Williams, a jury will come to such a judgment as long as it consists of a group of laymen representative of a cross section of the community who have the duty and the opportunity to deliberate, free from outside attempts at intimidation, on the question of a defendant's guilt. In terms of this function we perceive no difference between juries required to act unanimously and those permitted to convict or acquit

by votes of 10 to two or 11 to one. Requiring unanimity would obviously produce hung juries in some situations where nonunanimous juries will convict or acquit. But in either case, the interest of defendant in having the [*97]  judgment of his peers interposed between himself and the officers of the State who prosecute and judge him is equally well served. [Citations and footnote omitted.]

The same rationale applies to a non-unanimous finding of aggravating factors in the sentencing phase of a Delaware death penalty case. Since here, a jury found, beyond a reasonable doubt, the existence of the aggravator of premeditation and substantial planning by a vote of 11-1, the verdict falls within these constitutional rulings, and I conclude that the 11-1 verdict was harmless error.

Ring requires a jury to participate as to the narrowing phase of sentencing. If the jury declares defendant to be death eligible by finding beyond a reasonable doubt a statutory aggravator, then a judge may consider the death penalty. If the jury does not so find, then life imprisonment without parole must be imposed. Yet, even if the jury declares defendant death eligible, the judge still may find a life sentence appropriate. Thus, while the practical impact of Ring is to require the finding of an additional element (statutory aggravator) by the jury beyond a reasonable doubt, the fact remains that there is a recognition [*98]  that Delaware is a hybrid sentencing state and distinctions remain between the guilt phase and the sentencing phase. There is no requirement that due to Ring's comment of the finding of an aggravator being an element of the offense that the distinction between guilt and sentencing should not continue, and Brice so notes.

Labeling a "statutory aggravator" as an element does not require that it be treated the same as the statutory elements of an offense for the finding of guilt.

In a hybrid system such as Delaware's, the jury is involved and the standard of proof is beyond a reasonable doubt. As noted in Brice at footnote 11, it is logical to argue that Ring did not change the constitutionality of the 1991 statute. Nothing in the Federal Constitution or State Constitution requires a unanimous jury verdict as to the jury's finding of a statutory aggravator. In 1991, the legislature intentionally moved away from the requirement that the jury be unanimous.

Where the 1991 statute and Ring might collide is if a non-unanimous jury verdict was by a vote that fell below a threshold which the United States Supreme Court has determined to be appropriate. In other words,  [*99]  a jury verdict is not constitutionally required to be unani-

mous but there is a floor. Apodaca v. Oregon, 406 U.S. 404, 32 L. Ed. 2d 184, 92 S. Ct. 1628 (1972); Johnson v. Louisiana, 406 U.S. 356, 32 L. Ed. 2d 152, 92 S. Ct. 1620 (1972). Thus, the harmless error analysis must focus on the federal constitutional requirements of a jury. In this case, where the jury found the existence of an aggravating factor by a vote of 11-1, that floor was met, and there was no error. The death penalty stands. This claim fails.

CONCLUSION

For the foregoing reasons, I deny defendant's motion for postconviction relief.

IT IS SO ORDERED.



Not Reported in F.Supp.2d                                                    Page 1

Not Reported in F.Supp.2d, 2003 WL 22769598 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Trump v. Kearney
D.Del.,2003.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
James G. TRUMP, Sr., Petitioner,
v.
Richard KEARNEY, Warden, Respondent.
**No. Civ. 01-109-KAJ.**

Nov. 14, 2003.

James G. Trump, Sr., pro se.
Thomas E. Brown, Deputy Attorney General,
Delaware Department of Justice, Wilmington,
Delaware, for Respondent.

MEMORANDUM OPINION
JORDAN, J.

I. INTRODUCTION

**\*1** Following a jury trial in the Delaware Superior
Court, the petitioner, James G. Trump, Sr. was
convicted of fifteen counts of first degree unlawful
sexual intercourse. He is presently incarcerated in
the Delaware Correctional Center ("DCC") in
Smyrna, Delaware. Trump has filed with the Court
a petition for a writ of habeas corpus, pursuant to 28
U.S.C. § 2254. (D.I.1.) For the reasons set forth
below, the Court will dismiss Trump's petition.
(D.I.1.)

II. PROCEDURAL AND FACTUAL
BACKGROUND

In 1990, Trump moved into Susan Jones' apartment,
and within three or four weeks he began having oral
sex with Jones' nine-year old daughter, Dalya. [FN1]
He resided with Susan and Dalya intermittently
until 1996. During this six year period, Trump was
imprisoned on other charges at the Delaware

Correctional Center from August 29, 1991 to
January 1993. He was then transferred to the Morris
Correctional Center on Level IV work release
confinement from January 1993 until January 1994.

> FN1. The facts are recited from *Trump v.*
> *State,* 753 A.2d 963 (Del.2000). The
> Delaware Supreme Court used
> pseudonyms for the child and her mother.
> *See* Del.Supr. Ct. R. 7(d).

Upon his release in January 1994, Trump returned
to Jones' apartment and resumed performing oral
sex with Dalya. When Dalya turned twelve years
old, Trump began having vaginal intercourse with
her on a continuing basis.

When Dalya was thirteen, she told her mother what
was happening with Trump. Dalya later recanted
her accusations because Trump bought her a stereo
and bedroom furniture. Dalya testified at trial that
the sexual relations with Trump continued until she
was fifteen years old. After Trump left the residence
for good in July 1996, Dalya told her mother about
what had happened. Dalya's mother notified the
police. Trump was indicted on twenty-four counts
of unlawful sexual intercourse in the first degree.

At trial, Dalya's testimony was somewhat imprecise,
but she was subjected to impeachment through
cross-examination. Dalya's testimony was not
corroborated by medical evidence. However, the
State presented the testimony of Trump's co-worker,
Lyons, who testified that Trump admitted to him
that he had sexual relations with Dalya. Trump
denied Dalya's accusations and Lyons' testimony.

The jury convicted Trump of fifteen counts of
unlawful sexual intercourse in the first degree, and
acquitted him of the remaining nine counts. Trump
was sentenced to two hundred and twenty five years
imprisonment.[FN2] He filed a motion for judgment
of acquittal, which the Delaware Superior Court

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 2

Not Reported in F.Supp.2d, 2003 WL 22769598 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

denied.

> FN2. The length of the sentence is set forth in Trump's § 2254 petition.

Trump appealed his conviction and sentence, alleging: 1) the prosecutor's closing argument contained improper vouching; 2) the trial court's admission of evidence regarding prior uncharged sexual acts was prejudicial; 3) the trial court erred in permitting the State to cross-examine him about his statement to police that he intended to lie in a family court proceeding; and 4) there was insufficient evidence to support his conviction. *Trump v. State,* 753 A.2d 963 (Del.2000). The Delaware Supreme Court affirmed Trump's conviction and sentence. *Id.*

*2 Trump filed a motion for post-conviction relief in September 2000. In January, 2001, Trump filed letters with the Delaware Superior Court asking it to dismiss without prejudice his post-conviction motion. The Superior Court granted that request and took no further action on Trump's motion for post-conviction relief. (D.I.3, Ex. A.)

### III. GOVERNING LEGAL PRINCIPLES

#### A. Standard of Review

A federal district court may consider a habeas petition filed by a state prisoner only "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). When the petitioner is in state custody pursuant to a state court judgment, and the claims asserted in the habeas case were previously adjudicated in state court on the merits, then a federal court cannot grant a writ of habeas corpus unless it finds that the state court decision either: (1) was contrary to, or involved an unreasonable application of, clearly established federal law; or (2) was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d).

The Third Circuit requires federal courts to utilize a two-step analysis when applying the § 2254(d)(1) standard. *Matteo v. Superintendent, SCI Albion,* 171 F.3d 877, 880 (3d Cir.1999) (en banc); *see also Werts v. Vaughn,* 228 F.3d 178 (3d Cir.2000), *cert. denied,* 532 U.S. 980 (2001). The first step requires federal courts to identify the applicable United States Supreme Court precedent and then determine whether the state court decision is contrary to clearly established Supreme Court precedent. *Matteo,* 171 F.3d at 888. "Relief is appropriate only if the petitioner shows that the 'Supreme Court precedent requires an outcome contrary to that reached by the relevant state court.' " *Werts,* 228 F.3d at 197 (quoting *O'Brien v. Dubois,* 145 F.3d 16, 24-25 (1st Cir.1998)).

If the federal court concludes that the state court adjudication is not contrary to the Supreme Court precedent, the court must then determine whether the state court judgment rested upon an objectively unreasonable application of clearly established federal law, as determined by the United States Supreme Court. *Id.* at 880. This analysis involves determining "whether the state court decision, evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified. If so, then the petition should be granted." *Id.* at 891. Moreover, "in certain cases it may be appropriate to consider the decisions of inferior federal courts as helpful amplifications of Supreme Court precedent." *Id.* at 890.

#### B. Exhaustion and Procedural Default

When seeking habeas relief from a federal court, a state petitioner must first exhaust remedies available in the state courts. According to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA" ):
An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that -
*3 (A) the applicant has exhausted the remedies available in the courts of the State; or
(B)(i) there is an absence of available State corrective process; or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 22769598 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 3

(ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1). The state prisoner must give "state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel,* 526 U.S. 838, 844-45 (1999). The exhaustion requirement is grounded on principles of comity in order to ensure that state courts have the initial opportunity to review federal constitutional challenges to state convictions. *Werts,* 228 F.3d at 192.

To satisfy the exhaustion requirement, a petitioner must demonstrate that the claim was fairly presented to the state's highest court, either on direct appeal or in a post-conviction proceeding. *See Lambert v. Blackwell,* 134 F.3d 506, 513 (3d Cir.1997) (citations omitted); *Coverdale v. Snyder,* 2000 WL 1897290, at *2 (D.Del. Dec. 22, 2000). If the petitioner raised the issue on direct appeal, then the petitioner does not need to raise the same issue again in a state post-conviction proceeding. *Lambert v. Blackwell,* 134 F.3d 506, 513 (3d Cir.1996); *Evans v. Court of Common Pleas, Delaware County, Pennsylvania,* 959 F.2d 1227, 1230 (3d Cir.1992) (citations omitted).

A petitioner fairly presents a federal claim for purposes of exhaustion by presenting to the state's highest court a legal theory and facts that are substantially equivalent to those contained in the federal habeas petition. *Coverdale,* 2000 WL 1897290, at *2; *Doctor v. Walters,* 96 F.3d 675, 678 (3d Cir.1996). Generally, the petitioner must present the factual and legal substance of the federal claim to the state courts "in a manner that puts them on notice that a federal claim is being asserted." *McCandless v. Vaughn,* 172 F.3d 255, 261 (3d Cir.1999).

Fair presentation also requires that the claim be raised in a procedural context in which the state courts can consider it on the merits. *Castille v. Peoples,* 489 U.S. 346, 351 (1989). However, provided that the petitioner did, in fact, fairly present the federal claim to the state's highest court, the exhaustion requirement is satisfied even if the state court did not actually consider or discuss the federal issue. *See Swanger v. Zimmerman,* 750 F.2d 291, 295 (3d Cir.1984).

A petitioner's failure to exhaust state remedies will be excused if state procedural rules preclude a petitioner from seeking further relief in state courts. *Lines,* 208 F.3d at 160; *Wenger v. Frank,* 266 F.3d 218, 223 (3d Cir.2001); *see Teague v. Lane,* 489 U.S. 288, 297-98 (1989). Similarly, if a state court refused to consider a petitioner's claims for failing to comply with an independent and adequate state procedural rule, the claims are deemed exhausted. *Harris v. Reed,* 489 U.S. 255, 263 (1989); *Werts,* 228 F.3d at 192.

*4 Although the failure to exhaust state remedies may be excused, unexhausted claims are still procedurally defaulted. *Lines,* 208 F.3d at 160. Federal courts may not consider the merits of procedurally defaulted claims unless the petitioner demonstrates either cause for the procedural default and actual prejudice resulting therefrom, or that a fundamental miscarriage of justice will result if the court does not review the claim. *McCandless v. Vaughn,* 172 F.3d 255, 260 (3d Cir.1999); *Coleman v. Thompson,* 501 U.S. 722, 750-51 (1999); *Caswell v. Ryan,* 953 F.2d 853, 861-62 (3d Cir.1992).

The cause and prejudice exception to the procedural default doctrine is two-pronged. As such, if the petitioner does not allege cause for the procedural default, then the federal court does not have to determine whether the petitioner has demonstrated actual prejudice. *See Smith v. Murray,* 477 U.S. 527, 533 (1986).

To demonstrate cause for a procedural default, a petitioner must show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier,* 477 U.S. 478, 488 (1986). A petitioner can demonstrate actual prejudice by showing "not merely that the errors at ... trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.* at 494.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 4

Not Reported in F.Supp.2d, 2003 WL 22769598 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Alternatively, a federal court may excuse a procedural default if the petitioner demonstrates that failure to review the claim will result in a fundamental miscarriage of justice. *Edwards v. Carpenter,* 529 U.S. 446, 451 (2000); *Wenger v. Frank,* 266 F.3d 218, 224 (3d Cir.2001). In order to demonstrate a miscarriage of justice, the petitioner must show that a "constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray,* 477 U.S. at 496. Actual innocence means factual innocence, not legal insufficiency. *Bousley v. United States,* 523 U.S. 614, 623 (1998). A petitioner establishes actual innocence by proving that no reasonable juror would have voted to find him guilty beyond a reasonable doubt. *Sweger v. Chesney,* 294 F.3d 506, 522-24 (3d Cir.2002).

## IV. DISCUSSION

Trump asserts four claims in his habeas petition: 1) there was insufficient evidence to support his conviction; 2) the state court erred by admitting evidence of prior uncharged oral sex with Dalya; 3) the trial court violated Trump's constitutional right to a fair trial by permitting him to be cross-examined about an "irrelevant" Family Court proceeding; and 4) during closing argument, the prosecutor improperly vouched for Dalya's testimony. (D.I.s 1, 2.)

The State correctly acknowledges that Trump exhausted state remedies for claims one, two, and four. The State contends, however, that the claims two and four are procedurally barred from federal habeas review on an independent and adequate state ground. The State also asserts that the state court adjudication of claims one and three do not provide a basis for federal habeas relief under § 2254(d). (D.I.19.) Trump's federal habeas petition is now ripe for review.

A. Claims Two and Four are Procedurally Barred on an Independent and Adequate State Law Ground

**\*5** Trump exhausted state remedies by raising claims two (prior uncharged oral intercourse with

Dalya) and four (improper vouching) in his direct appeal. However, during the actual trial, Trump failed to object to the prosecutor's allegedly improper vouching during his closing argument and he did not object to the admission of testimony regarding the prior uncharged sexual acts. [FN3] In Delaware, a defendant must timely object during the actual trial to improper statements made during closing arguments or to the admissibility of evidence in order to preserve the right to raise these issues on appeal. *Mason v. State,* 658 A.2d 994, 996 (Del.1995), *Robertson v. State,* 596 A.2d 1345, 1356 (Del.1991); *Wainwright v. State,* 504 A.2d 1096, 1100 (Del.1986). Failing to object to these alleged errors constitutes a waiver of a defendant's right to raise the issues on appeal, and the appellate court is thereafter limited to reviewing the alleged errors for plain error. *Mason,* 658 A.2d at 996; *Wainwright,* 504 A.2d at 1100.

> FN3. Although Trump's trial attorney initially objected to the admission of testimony regarding the prior uncharged sexual acts, he later rescinded the objection after hearing the prosecution's reason for such testimony. *Trump v. State,* 753 A.2d 963, 966, 970 (Del.2000).

In the present case, the Delaware Supreme Court clearly explained that it could only review the claims regarding uncharged prior sexual acts and improper evidence for plain error. *Trump,* 753 A.2d at 966 n. 4, 970-71 n. 35. The state supreme court's review of these claims for plain error constituted a plain statement under *Harris v. Reed,* 489 U.S. 255, 23-65 (1969) that it invoked Rule 8 of the Delaware Supreme Court Rules.[FN4] This Court has consistently held that Delaware Supreme Court Rule 8 is an independent and adequate state ground precluding federal habeas review. *See Lawrie v. Snyder,* 9 F.Supp.2d 428, 452-54 (D.Del.1998); *Lazano v. Snyder,* 1996 WL 484832, at \*4 (D.Del. Aug. 12, 1996). Moreover, the Delaware Supreme Court's review under the plain error standard was completely grounded on Delaware law. As such, this Court cannot provide federal habeas review of these claims unless Trump can establish cause for his procedural default and actual prejudice resulting

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                          Page 5

Not Reported in F.Supp.2d, 2003 WL 22769598 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

therefrom, or that a miscarriage of justice will result if the Court refuses to review these claims. *See* 28 U.S.C. § 2254(a); *Coleman v. Thompson,* 501 U.S. 722, 750-51 (1991); *Caswell v. Ryan,* 953 F.2d 853, 860-61 (3d Cir.1992).

> FN4. Supreme Court Rule 8 provides that " only questions fairly presented to the trial court may be presented for review; provided, however, that when the interests of justice so require, the Court may consider and determine any questions not so presented."

Trump does not allege, nor does the record reveal, any cause for his failure to object to the prosecutor's allegedly improper vouching during trial or for his own express waiver of any objection to the evidence regarding uncharged oral intercourse with Delya. Because Trump does not allege cause, the Court does not need to reach the question of prejudice. *See Smith v. Murray,* 477 U.S. 527, 533 (1986). Moreover, Trump has not alleged that a miscarriage of justice will result if the Court refuses to hear these claims. Accordingly, claims two and four are procedurally barred and do not provide a basis for federal habeas relief.

### B. Claim One: Insufficient Evidence

The Delaware Supreme Court reviewed Trump's insufficiency of evidence claim on the merits. As such, the Court must determine whether the Delaware Supreme Court's adjudication of this claim was either contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court precedent. *See* 28 U.S.C. § 2254(d)(1).

**\*6** The "clearly established federal law" governing insufficiency of evidence claims is *Jackson v. Virginia,* 443 U.S. 307 (1979). Pursuant to *Jackson,* a reviewing court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a

reasonable doubt." *Jackson,* 443 U.S. at 319. This standard must be applied "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id.* 324 n. 16; *see Orban v. Vaughn,* 123 F3d 727, 731 (3d Cir.1997). Further, the reviewing court must draw all reasonable inferences from the evidence in favor of the prosecution and presume that the jury resolved all doubts based on conflicting evidence in the prosecution's favor. *See Wright v. West,* 505 U.S. 277, 296-97 (1992) (citing *Jackson,* 443 U.S. at 326).

Under the applicable Delaware law at the time of Trump's trial, a person was guilty of unlawful sexual intercourse in the first degree if: 1) the defendant had sexual intercourse with the complainant; 2) the complainant was less than sixteen years old; 3) the complainant was not the defendant's voluntary social companion; and 4) the defendant's conduct was intentional.[FN5] A person younger than sixteen could not be considered the " voluntary social companion" of someone exercising care or custody over that child. *See* 11 Del. C. Ann. § 761(h) (revised and redesignated in 1998 to § 761(i), (j)).[FN6]

> FN5. This definition is taken from *Trump v. State,* 753 A.2d at 974 n. 50, 51 (citing to 11 Del. C. § 775(a)(4) (repealed 1998)).

> FN6. The conduct that was formerly considered Unlawful Sexual Intercourse in the First Degree is now illegal under § 773 and does not contain the term "voluntary social companion." 11 Del. C. Ann. § 773(a)(6).

At Trump's trial, Dalya testified that Trump had sexual intercourse with her from the time she turned twelve until she turned fifteen. These acts occurred while Trump was living with Dalya and her mother. The State also presented the testimony of Lyons, Trump's co-worker, who testified that Trump told him that he was having sex with Dalya at night. *Trump,* 753 A.2d at 965.

Dalya's testimony alone was sufficient to establish

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 22769598 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

the essential elements of unlawful sexual intercourse in the first degree. *See Hammond v. Snyder,* 2000 WL 1239993, at *4 (D.Del. Aug. 23, 2000). First, Dalya's testimony was sufficient to establish, beyond a reasonable doubt, that the sexual intercourse actually occurred. *See Paullet v. Howard,* 634 F.2d 117, 118 (3d Cir.1980); *Hammond,* 2000 WL 1239993, at *4 (D.Del. Aug. 23, 2000); *Jones v. Snyder,* 1999 WL 33220030, at *3 (D.Del. May 4, 1999). Lyons' testimony provided additional evidence that such sexual intercourse did actually occur.

Second, Dalya's testimony regarding the frequency of the sexual intercourse could lead the jury to reasonably conclude that Trump had the requisite intent to engage in such acts. *See Jones,* 1999 WL 33220030, at *3 (citing *Getz v. State,* 538 A.2d 726, 733 (Del.1998)). Finally, Dalya testified that the acts of unlawful sexual intercourse occurred while she was less than sixteen years old. Trump, Dalya, and Dalya's mother all testified that Trump paid the rent and also provided money to lease furniture during the period of his co-habitation with Dalya and her mother. Given Dalya's age during the continuing offense and Trump's financial support, a rational jury could easily have found that Dalya was not Trump's voluntary social companion. *See* 11 Del. C. Ann. § 761(h)(revised and redesignated in 1998 to § 761(i), (j)).

*7 In short, viewing both Dalya's and Lyons' testimony in a light most favorable to the State, the Court concludes that a rational jury could reasonably conclude that Trump intentionally engaged in sexual intercourse with a child under sixteen years old who was not his voluntary social companion.

Trump appears to challenge the sufficiency of the evidence on three theories. First, he points to the lack of medical evidence and the lack of witnesses. However, under both Delaware and federal law, a rape victim's uncorroborated testimony is sufficient to support a conviction, even without medical evidence. *Styler v. State,* 417 A.2d 948, 950 (Del.1980); *Collazo v. State,* 719 A.2d 947, at *2 (Del.1998); *Hammond,* 2000 WL 1239993, at *4; *Paullett,* 634 F.2d at 118.

Second, Trump challenges Dalya's credibility by pointing to the fact that she admitted to falsely accusing her biological father of engaging in unlawful sexual intercourse. However, credibility determinations are solely within the province of the factfinder. *Jackson,* 443 U.S. at 319. "A federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume-even if it does not affirmatively appear in the record-that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* at 326. Here, the jury was presented with Dalya's admission that she falsely accused her biological father of the same offense. The jury resolved any negative inference gleaned from such a fact adversely to Trump, and this Court must defer to that resolution.

Finally, Trump asserts that he was in jail "at one point [when] the victim claimed she was raped by petitioner." (D.I.2 at 5.) To support this contention, Trump attached to his habeas petition counts nine through sixteen of the indictment, which, taken as a whole, allege unlawful sexual intercourse from April 1994 through November 1994. (D.I. 3 at Ex. D.)

The Court interprets Trumps argument to be that he could not have engaged in unlawful sexual intercourse from April 1994 through November 1994 because he was in jail during this time. This contention is clearly refuted by the record. At trial, both the defense and prosecution questioned Trump about his period of incarceration. The State also presented the testimony of a person in charge of the state prison records, and the defense cross-examined this individual. Interpreting the testimonies in the broadest possible way, Trump was incarcerated at varying levels from August 29, 1991 through March 8, 1994. Nobody testified that he was incarcerated from April 1994 through November 1994. (D.I. 38, Transcript of Trial Record, July 8 & 9, 1998, at 8-46.) In fact, Trump actually testified that he was released in March 1994. (D.I. 38, Transcript of Trial Record, July 7, 1998 at 53.) Thus, the Court concludes that Trump's present assertion is without merit.

In short, the Court concludes that the Delaware

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                            Page 7

Not Reported in F.Supp.2d, 2003 WL 22769598 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Supreme Court's rejection of Trump's challenge to the sufficiency of the evidence was neither contrary to, nor an unreasonable application of, clearly established federal law. Consequently, this claim does not provide a basis for federal habeas relief.

### C. Claim Three is Procedurally Barred

**\*8** Trump asserts that the trial court committed reversible error by permitting him to be cross-examined about an "irrelevant" family court proceeding. (D.I.s 1, 2.) He contends that the State should not have been permitted to attack his credibility by eliciting his testimony regarding his intent to lie in a custody suit in Family Court. (D.I. 2 at 11, 12.) Trump asserts that this cross-examination deprived him of his constitutional right to a fair trial. (*Id.*)

Because Trump failed to present this evidentiary claim to the Delaware Supreme Court as a federal claim, he did not exhaust state remedies. *See McCandless,* 172 F.3d at 261; *Duncan v. Henry,* 513 U.S. 364, 366 (1995)("If a habeas petitioner wishes to claim a that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court"). A review of Trump's appellate brief reveals that he presented this claim as a violation of state evidentiary rules, merely stating that the matter on which he was cross-examined was "irrelevant" and that such cross-examination violated Rule 608(b) of the Delaware Rules of Evidence. (D.I. 22, Appellant's Op. Br. in No. 534, 1998, at 14-16.) Moreover, the Delaware Supreme Court analyzed the issue in terms of state law, illustrating that it, too, interpreted the claim as only alleging a violation of D.R.E. 608(b). *See Trump,* 753 A.2d at 972-73.

This claim is deemed exhausted, however, because Delaware Superior Court Rule 61(i) bars Trump from seeking further post-conviction relief in the state courts. First, the three-year time period for filing a motion for post-conviction relief has expired.[FN7] Del.Super. Ct.Crim. Rule 61(i)(1). Second, because Trump did not raise this claim on

direct appeal, Rule 61(i)(3) precludes him from presenting it to the state courts unless he demonstrates cause and prejudice. Del.Super. Ct.Crim. R. 61(i)(3). Finally, Rule 61(i)(5) does not render either bar inapplicable because Trump has not alleged a right newly recognized after his appeal. Del.Super. Ct. R. 61(i)(5); *see Boyd v. Garraghty,* 202 F.Supp.2d 322, 331 (D.Del.2002).

> FN7. Trump's conviction became final for purposes of the Rule 61 filing period on June 9, 2000, the date the Delaware Supreme Court affirmed Trump's conviction. *See Jackson v. State,* 654 A.2d 829 (Del.1995). Consequently, Trump had to file any motion for post-conviction relief by June 9, 2003.

Although deemed exhausted, this claim is still procedurally defaulted. As such, this Court cannot review Trump's evidentiary claim absent a showing of cause and prejudice, or that a fundamental miscarriage of justice will result if the Court refuses to review the claim. *See McCandless,* 172 F.3d at 260; *Coleman,* 501 U.S. at 750-51.

Trump has not alleged, and the record does not reveal, any cause for his failure to present this evidentiary claim in federal terms to the Delaware Supreme Court. Because Trump has not demonstrated cause, the Court need not determine if he will suffer actual prejudice. *See Coleman,* 501 U.S. at 752. Moreover, Trump has not alleged that he is actually innocent, and therefore has not alleged that a fundamental miscarriage of justice will result from failure to review this claim. In short, federal habeas review of this claim is unavailable.[FN8]

> FN8. Even if Trump had exhausted state remedies, this claim is without merit. Both federal and state cases interpreting Rule 608 permit specific instances of conduct to be used to impeach a witness' character for truthfulness. *See* Fed.R.Evid. 608(b); D .R.E. 608(b); *United States v. Abel,* 469 U.S. 45, 55 (1984); *United States v. Davis,*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                           Page 8

Not Reported in F.Supp.2d, 2003 WL 22769598 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

183 F.3d 231, 257 (3d Cir.1999); *Weber v. State,* 457 A.2d 674, 680 n. 8 (Del.1983). Because the case against Trump hinged on conflicting testimony, it was appropriate for the jury to hear evidence enabling it to make credibility determinations. *See Trump,* 753 A.2d at 973. The cross-examination regarding Trump's statement to the police that he intended to " tell the Family Court that he was the natural father of a child despite knowing that he was not the father," *Trump,* 753 A.2d at 972, was relevant to Trump's character for truthfulness or untruthfulness. As such, Trump's claim that the trial court's evidentiary error violated his " constitutional right to a fair trial" does not warrant federal habeas relief.

### V. Certificate of Appealability

\*9 Finally, this Court must decide whether to issue a certificate of appealability. *See* Third Circuit Local Appellate Rule 22.2. A certificate of appealability may only be issued when a petitioner makes a " substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A petitioner establishes a "substantial showing" by demonstrating "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel,* 529 U.S. 473, 484 (2000).

Additionally, when a federal court denies a habeas petition on procedural grounds without reaching the underlying constitutional claims, the court is not required to issue a certificate of appealability unless the petitioner demonstrates that jurists of reason would find the following debatable: (1) whether the petition states a valid claim of the denial of a constitutional right; and (2) whether the court was correct in its procedural ruling. *Id.* "Where a plain procedural bar is present and the district court is correct to invoke it to dispose of the case, a reasonable jurist could not conclude either that the district court erred in dismissing the petition or that the petitioner should be allowed to proceed further." *Id.*

The Court concludes that Trump's insufficiency of evidence claim does not provide a basis for federal habeas relief, and that federal habeas review of claims two, three, and four is procedurally barred. Reasonable jurists would not find these conclusions unreasonable. Consequently, Trump has failed to make a substantial showing of the denial of a constitutional right, and the Court declines to issue a certificate of appealability.

### VI. CONCLUSION

For the foregoing reasons, the Court concludes that Trump's insufficiency of evidence claim does not provide a basis for federal habeas relief. The Court also concludes that federal habeas review of Trump's remaining claims is procedurally barred. Furthermore, the Court finds no basis for the issuance of a certificate of appealability. An appropriate order shall issue.

### ORDER

For the reasons set forth in the Memorandum Opinion issued this date, **IT IS HEREBY ORDERED** that:
1. James G. Trump, Sr.'s petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (D.I.1.) is DENIED.
2. The Court declines to issue a certificate of appealability.

IT IS SO ORDERED.

D.Del.,2003.
Trump v. Kearney
Not Reported in F.Supp.2d, 2003 WL 22769598 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d

Page 1

Not Reported in F.Supp.2d, 2006 WL 1788487 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Winters v. Williams
D.Del.,2006.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
Larry WINTERS, Petitioner,
v.
Raphael WILLIAMS, Warden, and Carl C.
Danberg, Attorney General of the State of
Delaware, Respondents.
**No. CIV A. 04-1361-JJF.**

June 27, 2006.

Joseph M. Bernstein, for Petitioner.
Loren C. Meyers, Chief of the Appeals Division,
Delaware Department of Justice, Wilmington,
Delaware. for Respondents.

*MEMORANDUM OPINION*
FARNAN, J.
*1 Pending before the Court is an Application For
A Writ Of Habeas Corpus Pursuant To 28 U.S.C. §
2254 ("Petition") filed by Petitioner Larry Winters.
(D.I.1.) For the reasons discussed, the Court will
dismiss the Petition and deny the relief requested.

### I. FACTUAL AND PROCEDURAL
### BACKGROUND

On the afternoon of July 23, 2003, Officer Donovan
Delaney of the New Castle County police was on
routine patrol in Canby Park. He saw a car parked
in a secluded wooded area down a dirt path
approximately thirty yards from the paved road.
Suspicious, Officer Delaney left his car and walked
down the path to investigate. He could not see
inside the car due to the darkly tinted windows, and
he tapped on the passenger side door. The occupant
of the car rolled the window down. Looking inside,
Officer Delaney saw a young girl in the passenger
seat and an older man behind the steering wheel.

The officer asked the occupants their ages. The girl (
"C.W.") replied that she was seventeen, and the
man replied that he was fifty-three. Officer Delaney
then asked the driver, who turned out to be
Petitioner, to step out of the car. As Officer Delaney
started to walk away from the passenger side of the
car C.W. said, "He's trying to do it to me."

Officer Delaney had called for assistance before
approaching the car, and Officer David Cole arrived
a few moments later. Officer Cole questioned C.W.,
and she told him that she had been walking on
Adams Street in Wilmington when she was
approached by Petitioner in his car. Petitioner asked
her to get into the car, and when she refused, he
opened the passenger door, forced her in, and drove
to the park. Officer Cole asked C.W. no further
questions.

Both Petitioner and C.W. were taken to the county
police headquarters for additional questioning.
There, C.W. admitted to a detective that she was
actually fifteen years old, not seventeen years old,
and that Petitioner had offered her money in
exchange for sex, which she refused. (D.I. 9, State's
Ans. Br. in *Winters v. State,* No.181,2004, at 8.)

In August 2003, the grand jury issued a two-count
indictment charging Petitioner with sexual
solicitation of a child and possession of drug
paraphernalia. A jury trial was held in the Delaware
Superior Court. At trial, C.W. testified that she was
walking along the street when she heard someone
call out, and Petitioner pulled up beside her in his
car. She and Petitioner, with whom she was
unacquainted, held a brief conversation, and she
accepted a ride to her nearby destination. Instead,
Petitioner drove to Canby Park and stopped in the
secluded location where Officer Delaney later
discovered them. Petitioner asked C.W. how old she
was, and she replied that she was seventeen. When
asked why she lied to Petitioner, C.W. replied:
Because, like, when people always ask me my age, I
always be like, I'm 17. They always be like, you

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 1788487 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 2

look like you're 12, and I'm like, No, I'm 17.

While stroking C.W.'s face and legs, Petitioner offered C.W. a couple of dollars to engage in sexual activity, but she refused his advances. The police then arrived. (D.I. 9, App. to Appellant's Op. Br. in *Winters v. State,* No. 181, 2004, at Exh. A-18 to A-19.)

**\*2** Prior to jury deliberations, the Superior Court instructed the jury on the charge of sexual solicitation as follows:
In order to find the defendant guilty of sexual solicitation of a child, you must find that all of the following elements have been established beyond a reasonable doubt:
(1) the defendant requested a child, not yet 16 years of age at the time of the offense, to engage in a prohibited sexual act;
(2) the defendant was 18 years of age or older at the time of the offense; and
(3) the defendant acted intentionally or knowingly.

(D.I. 11, at 4.) The trial court also instructed the jury, in accordance with Del.Code Ann. tit. 11, § 762, that "it is no defense that the defendant did not know the [victim's] age, or that the defendant reasonably believed that the [victim] had reached her 16th birthday." *Id.* The defense did not make any objection to either of the above instructions. The jury convicted Petitioner of sexual solicitation of a child, but acquitted him of the drug paraphernalia charge.

In April 2004, the Superior Court sentenced Petitioner to five years imprisonment at Level V, suspended after one year imprisonment for four years probation at Level III. The Delaware Supreme Court affirmed Petitioner's conviction and sentence. *Winters v. State,* 858 A.2d 961 (Table), 2004 WL 2050311 (Del. Sept. 8, 2004).

## II. APPLICABLE LEGAL PRINCIPLES

Absent exceptional circumstances, a federal court cannot review a habeas petition unless the petitioner has exhausted all means of available relief for his claims under state law. 28 U.S.C. § 2254(b);

*O'Sullivan v. Boerckel,* 526 U.S. 838, 842-44 (1999); *Picard v. Connor,* 404 U.S. 270, 275 (1971). A petitioner satisfies the exhaustion requirement by "fairly presenting" the substance of the federal habeas claim to the state's highest court, either on direct appeal or in a post-conviction proceeding, in a procedural manner permitting the state courts to consider it on the merits. *See Duncan v. Henry,* 513 U.S. 364, 365 (1995); *Castille v. Peoples,* 489 U.S. 346, 351 (1989); *Lambert v. Blackwell,* 134 F.3d 506, 513 (3d Cir.1997). However, if the petitioner exhausted state remedies, but the highest state court "clearly and expressly" refused to review the merits of the claim due to an independent and adequate state procedural rule, the claim is exhausted but procedurally defaulted. *See Coleman v. Thompson,* 501 U.S. 722, 750 (1991); *Harris v. Reed,* 489 U.S. 255, 260-64 (1989).

A federal court cannot review the merits of a procedurally defaulted claim unless the petitioner demonstrates either cause for the procedural default and actual prejudice resulting therefrom, or that a fundamental miscarriage of justice will result if the court does not review the claims. *McCandless v. Vaughn,* 172 F.3d 255, 260 (3d Cir.1999); *Coleman,* 501 U.S. at 750-51; *Caswell v. Ryan,* 953 F.2d 853, 861-62 (3d Cir.1992). To demonstrate cause for a procedural default, the petitioner must show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier,* 477 U.S. 478, 488 (1986). To demonstrate actual prejudice, the petitioner must show that the errors during his trial created more than a possibility of prejudice; he must show that the errors worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.* at 494.

**\*3** Alternatively, if the petitioner demonstrates that a "constitutional violation has probably resulted in the conviction of one who is actually innocent," *Murray,* 477 U.S. at 496, then a federal court can excuse the procedural default and review the claim in order to prevent a fundamental miscarriage of justice. *Edwards v. Carpenter,* 529 U.S. 446, 451 (2000); *Wenger v. Frank,* 266 F.3d 218, 224 (3d Cir.2001). The miscarriage of justice exception applies only in extraordinary cases, and actual

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 1788487 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

innocence means factual innocence, not legal insufficiency. *Bousley v. United States,* 523 U.S. 614, 623 (1998); *Murray,* 477 U.S. at 496. A petitioner establishes actual innocence by asserting " new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial," showing that no reasonable juror would have voted to find the petitioner guilty beyond a reasonable doubt. *Hubbard v. Pinchak,* 378 F.3d 333, 339-40 (3d Cir.2004).

## III. DISCUSSION

In Delaware, a defendant's failure to raise an objection at trial constitutes a waiver of the issue on direct appeal. Del.Super. Ct. R. 30; Del. Sup.Ct. R. 8; *Goddard v. State,* 382 A.2d 238, 242 (Del.1977). Pursuant to Delaware Supreme Court Rule 8 [FN1] and Delaware case law, the Delaware Supreme Court is barred from reviewing such waived issues unless the appellant establishes that the trial court committed plain error. If the error is plain, the Delaware Supreme Court will review the merits of the waived claim. Del. Sup.Ct. R. 8; *Jackson v. State,* 600 A.2d 21, 23 (Del.1991); *Mason v. State,* 658 A.2d 994, 996 (Del.1995); Del. Sup.Ct. R. 8; *Cooper v. State,* 679 A.2d 469 (Table), 1996 WL 313501, at * *2 (Del.1996); *Goddard v. State,* 382 A.2d 238, 242 (Del.1977). Plain error is "error so clearly prejudicial to substantial rights so as to jeopardize the fairness and integrity of the trial process ... [and is a] material defect which [is] apparent on the face of the record [and is] basic, serious, and fundamental...." *Wainwright v. State,* 504 A.2d 1096, 1100 (Del.1986). This Court has consistently held that the Delaware Supreme Court's express application of the plain error standard of review constitutes an independent and adequate state procedural ground barring federal habeas review absent a showing of cause and prejudice. *See Johnson v. Carroll,* 327 F.Supp.2d 386, 393-94 (D.Del.2004) (collecting cases).

> FN1. Rule 8 provides that "[o]nly questions fairly presented to the trial court may be presented for review; provided,

however, that when the interests of justice so require, the Court may consider and determine any question not so presented."

In his sole habeas claim, Petitioner asserts that the United States Supreme Court's decision in *United States v. X-Citement Video, Inc.,* 513 U.S. 64 (1994) renders Delaware's sexual solicitation statute unconstitutional because the statute lacks a scienter requirement as to the element of the victim's age. Petitioner presented the same claim to the Delaware Supreme Court on direct appeal, and he also argued that, due to the unconstitutionality of the solicitation statute, the Delaware Superior Court erred in failing to instruct the jury that the State had to prove Petitioner's scienter with respect to the victim's age.

*4 Both parties agree that Petitioner exhausted state remedies. Both parties also agree that Petitioner failed to raise this issue or object to the relevant jury instruction during his trial, and therefore, Petitioner properly presented the issue to the Delaware Supreme Court for review under the plain error standard. However, the parties disagree with respect to how the Delaware Supreme Court actually reviewed the claim. Respondents contend the Delaware Supreme Court enforced Petitioner's default by reviewing the claim only for plain error, and therefore, federal habeas review is barred absent a showing of cause and prejudice. In contrast, Petitioner contends that the Delaware Supreme Court ignored his procedural default and reviewed the claim's full merits under the "interests of justice exception" to the plain error standard contained in Delaware Supreme Court Rule 8, as evidenced by the Delaware Supreme Court's failure to expressly cite to Rule 8. Accordingly, Petitioner asserts that the Court is not precluded from reviewing the instant claim.

In light of the parties' respective positions, the initial issue for the Court to determine is whether the Delaware Supreme Court's opinion contains an unambiguous or "plain statement" under *Harris v. Reed* that it enforced Petitioner's procedural default. *Harris,* 489 U.S. at 260-64; *see, e.g., Villot v. Varner,* 373 F.3d 327, 336 (3d Cir.2004) (explaining that "[i]f the state court does not actually enforce the procedural rule in question,"

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 1788487 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

the petitioner's procedural default in state court does not preclude federal habeas review). In Petitioner's case, the Delaware Supreme Court began its analysis by explaining that the plain error standard requires the "defect complained of [to] be so prejudicial to substantial rights that it jeopardizes the fairness and integrity of the trial process." *Winters,* 2004 WL 2050311, at *1 (internal citations omitted). The state court then went on to explain that "an error is plain if it is so prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process." *Id.* Finally, citing to *Wainwright v. State,* 504 A.2d 1096, 1100 (Del.1986), the state court explained that "[c]laims of error implicating constitutional rights of a defendant are reviewable not withstanding their nonassertion at trial." *Winters,* 2004 WL 2050311, at *1.

Based on the Delaware Supreme Court's extensive discussion of the plain error standard, the Court does not agree with Petitioner's argument that the failure of the Delaware Supreme Court to cite Rule 8 indicates that the court ignored his procedural default. As noted by the United States Supreme Court, "[w]e encourage state courts to express plainly, in every decision potentially subject to federal review, the grounds upon which their judgments rest, but we will not impose on state courts the responsibility for using particular language in every case in which a state prisoner presents a federal claim." *Coleman,* 501 U.S. at 738-39 (emphasis added). By thoroughly explaining the plain error standard and engaging in a limited discussion of Petitioner's *X-Citement Video* argument immediately thereafter, the Delaware Supreme Court "plainly stated" that the claim should be reviewed under the plain error standard. In these circumstances, the Court concludes that the absence of an express citation to Rule 8 is not determinative as to whether or not the Delaware Supreme Court reviewed the claim under the plain error standard.

*5 Petitioner also contends that the Delaware Supreme Court only rejected his argument after engaging in a full merits analysis of his claim, and therefore, the state court waived his procedural default. However, courts applying the plain error

standard of review have recognized that some discussion of the merits of claim is necessary to the plain error analysis, and that this type of limited discussion is not the equivalent of a merits review. *Hinkle v. Randle,* 271 F.3d 239, 244 (6th Cir.2001) (recognizing a state court's "plain error review as the enforcement of a procedural default"); *Scott v. Mitchell,* 209 F.3d 854, 866-67 (6th Cir.2000) (stating that "plain error analysis is more properly viewed as a court's right to overlook procedural defects to prevent manifest injustice, but is not the equivalent to a review of the merits"); *see also Miranda v. Leibach,* 394 F.3d 984, 992 (7th Cir.2005). In this regard, the Seventh Circuit has explained:

In a similar vein, the Supreme Court recently has explained that, even if the state court's review in applying a procedural rule is "entangled" with the merits, that "entanglement" is not sufficient to compromise the procedural default. Rather, the state court's holding must depend[ ] on a federal constitutional holding in order to open it up for habeas review. Although a state court's review of whether an error is "plain" often entails at least limited review of the merits, that limited review is at most entangled with the merits and certainly not dependent on the merits.

*Rodriguez v. McAdory,* 318 F.3d 733, 736 (7th Cir.2003) (internal citations omitted).

Reviewing the Delaware Supreme Court's analysis in light of these principles, the Court concludes that the Delaware Supreme Court engaged in only a limited analysis of Petitioner's claim so as to determine if the error alleged by Petitioner constituted a plain or "material defect [ ] apparent on the face of the record." *Wainwright,* 504 A.2d at 1100. For example, the Delaware Supreme Court determined, in a cursory manner, that the factual circumstances in Petitioner's case differed significantly from the factual scenario in *X-Citement Video* that the First Amendment principles articulated in *X-Citement Video* "simply" did not apply, and that Petitioner's reliance on *X-Citement Video* was "misplaced." *Winters,* 2004 WL 2050311, at* *2. In the Court's view, these statements demonstrate that the Delaware Supreme Court did not invoke what Petitioner terms "the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 5

Not Reported in F.Supp.2d, 2006 WL 1788487 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

interests of justice" exception to Rule 8. In other words, the Delaware Supreme Court did not view Petitioner's claim as requiring a full merits review. Accordingly, the Court concludes that, for the purposes of federal habeas review, Petitioner's claim is procedurally defaulted.[FN2]

> FN2. In reaching this conclusion, the Court notes that it would be inclined to review Petitioner's claim substantively; however, the Court's review is constrained by the manner in which the Delaware Supreme Court reviewed Petitioner's claim. Because the Delaware Supreme Court engaged in a plain error review of Petitioner's claim, the Court's review of Petitioner's claim is limited to the procedural default analysis.

Having concluded that Petitioner's claim is procedurally defaulted, the Court must determine whether Petitioner has established cause and prejudice or a miscarriage of justice such that a full review of the merits of his claim is warranted. Petitioner does not allege any cause for his failure to raise the instant claim during his trial. In the absence of cause, the Court will not address the issue of prejudice. Further, because Petitioner has not presented new reliable evidence regarding his actual innocence, the Court concludes that review of Petitioner's claim is not necessary to prevent a miscarriage of justice. Accordingly, the Court will deny the Petition as procedurally barred.

### IV. CERTIFICATE OF APPEALABILITY

**\*6** When a district court issues a final order denying a § 2254 petition, the court must also decide whether to issue a certificate of appealability. *See* Third Circuit Local Appellate Rule 22.2. A certificate of appealability is appropriate when a petitioner makes a "substantial showing of the denial of a constitutional right" by demonstrating " that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel,* 529 U.S. 473, 484 (2000). If a federal court denies a habeas petition on procedural grounds without

reaching the underlying constitutional claims, the court is not required to issue a certificate of appealability unless the petitioner demonstrates that jurists of reason would debate: (1) whether the petition states a valid claim of the denial of a constitutional right; and (2) whether the court was correct in its procedural ruling. *Id.*

The Court has concluded that Petitioner's Application For A Writ Of Habeas Corpus Pursuant To 28 U.S.C. § 2254 does not warrant relief. The Court is persuaded that reasonable jurists would not find this conclusion to be debatable, and therefore, the Court declines to issue a certificate of appealability.

### V. CONCLUSION

For the reasons discussed, Petitioner's Application For A Writ Of Habeas Corpus Pursuant To 28 U.S.C. § 2254 will be dismissed and the relief requested therein will be denied.

An appropriate Order will be entered.

D.Del.,2006.
Winters v. Williams
Not Reported in F.Supp.2d, 2006 WL 1788487 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

I hereby certify that on August 2, 2007, I electronically filed Respondents' Brief in Opposition to Petition for Federal Habeas Corpus with the Clerk of Court using CM/ECF which will send notification of such filing to:

Joseph M. Bernstein, Esq.
800 North King Street, Suite 302
Wilmington, DE 19801

/s/ Elizabeth R. McFarlan
Deputy Attorney General
Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 577-8500
Del. Bar. ID No. 3759
elizabeth.mcfarlan@state.de.us