IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

THOMAS J. CAPANO              :        CIVIL ACTION
                             :
         v.                  :
                             :
THOMAS L. CARROLL, et al.    :        NO. 06-58

MEMORANDUM

Bartle, C.J.                                  April 15, 2008

Before the court is the petition of Thomas J. Capano for habeas corpus relief under 28 U.S.C. § 2254.  He alleges that he is in state custody in violation of the Constitution of the United States.

Capano, a prominent Delaware lawyer, was convicted in the Superior Court in and for New Castle County of murder in the first degree of Anne Marie Fahey, the scheduling secretary of the State's then-Governor, Thomas R. Carper.  Judge William Swain Lee sentenced Capano to death upon recommendation of the jury.  State v. Capano, Cr.A. No. 97-11-0720, 1999 Del. Super. LEXIS 541 (Del. Super. Ct. Mar. 16, 1999).  The Supreme Court of Delaware affirmed on direct appeal, and the United States Supreme Court denied Capano's petition for a writ of certiorari.  Capano v. State, 781 A.2d 556 (Del. 2001), cert. denied, Capano v. Delaware, 536 U.S. 958 (2002).  In a subsequent post-conviction proceeding, the state Supreme Court overturned his death sentence and remanded for a new penalty trial.  Capano v. State, 889 A.2d 968 (Del. 2006).  When the State elected not to proceed with that

second trial, Capano was resentenced to life in prison without
the possibility of parole.

                                    I.

        Anne Marie Fahey, age 30, was last seen in public on
Thursday evening, June 27, 1996, while dining at a Philadelphia
restaurant with Capano, age 46, who was then separated from his
wife Kay.  Capano was the managing partner of the Wilmington
office of a large Philadelphia-based law firm and a frequent
participant in the civic and political life of Wilmington and the
State of Delaware.  Previously he had served as a state
prosecutor, City Solicitor for the City of Wilmington, and Legal
Counsel to former Governor Michael N. Castle.

        Fahey's absence from her office on Friday, June 28 did
not cause concern because she was not scheduled to work that day.
It was not until she failed to appear at a family function on
Saturday evening, June 29 that her relatives contacted Wilmington
police to report her missing.  Almost immediately, the police
directed their attention toward Capano.  Around 3 a.m. on Sunday,
June 30, they visited Capano at his home on Grant Avenue in
Wilmington.[1]  He stated in response to their inquiries that he
had not seen or heard from Fahey since dropping her off at her
Wilmington apartment after an uneventful evening on the previous
Thursday, June 27.  The police returned on Sunday afternoon, and

------

1.  After Capano and his wife separated in September, 1995, he
moved out of the family's Wilmington home where his wife and four
daughters lived and into a house on Grant Avenue.

                                  -2-

Capano permitted them a "walkthrough" of his home.  They saw nothing suspicious.  However, they continued to focus on Capano as a suspect when they learned he had been involved in a discreet, on-again-off-again affair with Fahey since late 1994. By mid-July, 1996, the Federal Bureau of Investigation ("FBI") had begun to assist the State and local authorities.  Despite intensive efforts, the investigation proceeded slowly for over a year without the discovery of Fahey, her body, or any murder weapon.

The turning point came in October, 1997 when federal agents raided the Wilmington home of Capano's brother Gerry and found illegal drugs and guns.  The next month, Gerry, facing federal charges, became a cooperating witness.  He told authorities that he had helped Capano dispose of a body in the Atlantic Ocean on Friday, June 28, 1996 and provided them with other incriminating evidence.  In November, 1997, Louis Capano, another brother, began his cooperation with the prosecution as part of a plea agreement.  In February, 1998, Deborah MacIntyre, a long-time paramour of Capano, similarly signed a plea agreement and disclosed to the State significant helpful information.[2]

Capano was arrested on November 12, 1997 and was indicted by the State of Delaware on a single charge of first-degree murder.  In October, 1998, Capano went to trial before Judge Lee and a jury in the New Castle County Superior Court.

---

2.  Gerry, Louis, and MacIntyre each admitted to having initially lied to the Grand Jury and to the authorities.

The trial lasted three and a half months. The State presented a case grounded largely upon circumstantial evidence without the body of Fahey or the murder weapon ever having been found. The prosecutors presented evidence that Capano, as a rejected lover, had a clear motive to kill Fahey, that he had formulated a plan to do so, and that his actions on June 27, 1996 and thereafter reflected a consciousness of guilt.

The evidence at trial revealed that Fahey had begun dating Capano in March, 1994 and that it soon turned into an intimate relationship. Capano, who came from an affluent family and was sixteen years older than Fahey, constantly showered her with expensive gifts. Fahey had had a traumatic childhood and lived from paycheck to paycheck. For several years she had also been suffering from an eating disorder.

Fahey kept the nature of this relationship secret from all but her closest friends, largely because she felt enormous guilt as Capano was married with four daughters. In late 1995, Fahey started dating Michael Scanlan, a young accountant. She began to fall in love with Scanlan and became more and more concerned that he would discover her relationship with Capano. Fahey worried that Capano would disclose her eating disorder to her new boyfriend.

In early 1996, Fahey tried to break off her relationship with Capano even as he continued to pronounce his love for her. Several of Fahey's closest friends testified that between February and April, Fahey frequently complained about his

-4-

controlling, obsessive nature and his overbearing behavior.  Also
during this period, Fahey revealed her troubled and strained
relationship with Capano to her psychiatrist and to her two
psychologists who had been professionally treating her.  On
April 7, 1996, Fahey wrote in her diary that, "I have finally
brought closure to Tom Capano ... what a controlling,
manipulative, insecure jealous maniac."  By mid-to-late April,
Fahey had ended their romantic relationship.  From that point on,
although she and Capano continued to see each other, she
considered him at most to be a friend.

The State introduced circumstantial evidence to prove
that by early 1996 Capano had begun to plot Fahey's death.  Two
of his brothers, Gerry and Joe, testified that in February, 1996,
he told them a story about being threatened by one or more
unidentified extortionists.  Gerry related that in connection
with the supposed extortion, he loaned Capano $8,000 and a
handgun, both of which Capano returned to him by May, 1996.
Significantly, Gerry testified that at some time between February
and May, 1996, Capano asked if he could borrow Gerry's boat if he
needed to dispose of a body.

The State established that on April 20, 1996, shortly
after Fahey had made clear to Capano that she no longer wanted a
romantic relationship, he purchased a large marine cooler even
though he did not own a boat or have any knowledge of or interest
in fishing.  Deborah MacIntyre, Capano's mistress of seventeen
years, provided further crucial evidence.  She testified that on

May 13, 1996, he drove her to Miller's Gun Center in Wilmington where at his request she purchased for him a handgun and ammunition while he waited in the car outside.  She said she returned to the car, gave him the purchases, and never saw the gun or ammunition again.

After presenting its case as to both motive and premeditation, the State introduced evidence that on Thursday, June 27, 1996 and afterward, Capano behaved in a manner consistent with a consciousness of guilt.  On that Thursday, the day of her disappearance, Fahey left work in the Governor's Office at about 4:30 p.m. and met with her psychiatrist, Dr. Neil Kaye.  Sometime thereafter, she and Capano traveled to a restaurant in Philadelphia for dinner.  Their server at the restaurant, who was called as a witness, stated that they "didn't speak to each other at all" and that Fahey looked "haggard and gaunt" and had a "somber" demeanor.

Capano did not appear at his law office on Friday, June 28 and had cancelled a golf game he had planned with a friend for that day.  According to Gerry, early that Friday morning between 5:30 and 5:45 a.m., Capano, without prearrangement, drove his Jeep Cherokee into the driveway of Gerry's house in Wilmington.  Capano requested to borrow Gerry's boat.  Gerry immediately assumed Capano needed to do so because he had killed his supposed extortionist.  Gerry asked him, "Did you do it?"  Capano nodded affirmatively.  Gerry then agreed that Capano could use the boat but only if Gerry accompanied him since

-6-

Capano had no nautical expertise.  Capano reluctantly agreed.
Because Gerry first had some business matters to take care of,
the two planned to meet at Capano's home in Wilmington later that
morning.

By the time Gerry arrived at Capano's home at about
8:30 a.m., Capano had exchanged his Jeep Cherokee for his
estranged wife's Suburban, which was larger than the Jeep
Cherokee.  Gerry entered Capano's garage where he saw a large
marine cooler covered by a chain and lock.  Although Gerry did
not look inside the cooler, he instructed Capano to remove the
chain and lock to lessen the likelihood of suspicion in the event
that they were stopped by the police.  The two then placed the
cooler into the back of the Suburban.

Capano, accompanied by Gerry, drove the Suburban at a
high rate of speed to Gerry's beach house in Stone Harbor, New
Jersey.  There, the two transferred the cooler to Gerry's boat,
locked it again using the lock and chain, and took the boat with
its cargo to a nearby marina where Capano paid a large sum in
cash to fill the boat's gas tank.  Gerry then piloted the boat
some 60 miles off shore to a location where the ocean was almost
200 feet deep.  At that point, Capano pushed the cooler with its
contents overboard, and when the cooler would not sink, Gerry
shot a hole in it with a shotgun he kept on his boat to kill
sharks.  After the cooler continued to float, Capano pulled it
back onboard.  Gerry placed the boat's two anchors next to Capano
and then moved away toward the other end of the boat.  However,

-7-

he turned around in time to observe an ankle and foot descending into the water.  He also noticed that the anchors, the lock, and the chains were gone.  After the brothers rinsed out the empty cooler, Gerry unscrewed its lid and tossed both parts back into the ocean.  Their mission completed, the two returned to Stone Harbor before driving back that afternoon to Capano's house in Wilmington.

Once back in Wilmington, Gerry helped Capano carry a bloodstained love seat from the "great room" of Capano's house to the garage.  Unable to dismantle the love seat or to cut out the stained portions, they took it in the Suburban to a nearby site where a family business owned in part by their brother Louis was engaged in construction.  They dropped the love seat into a large dumpster where Gerry covered it with construction debris.  Gerry then headed home.

The State corroborated in crucial respects Gerry's account of the events of Friday, June 28.  On July 4, a Delaware fisherman happened to find and retrieve from the ocean a large, lidless marine cooler with bullet holes in it.  He turned it over to the authorities in November, 1997 after a fishing friend brought to his attention a story about the Capano case in the newspaper.  An employee at the marina in Stone Harbor recalled that she had sold a large quantity of gasoline to two men in a boat on the morning of June 28.  The marina records, supporting her story, showed a sizeable cash purchase at about the time identified by Gerry.  The Suburban belonging to Capano's wife was

also seen in Stone Harbor that day.  Significantly, Gerry waived
the attorney-client privilege and allowed his attorney, Edmund D.
Lyons, Esq., to testify.  Lyons produced his notes showing that
Gerry had told him substantially the same story long before the
federal agents had raided Gerry's home and subjected him to the
possibility of prosecution.

          The State put before the jury an analysis showing that
fibers from the rug in Capano's great room on the evening of
June 27 were found in the Suburban.  It produced a receipt dated
Saturday, June 29 confirming that Capano had purchased a new rug
that day.  His housekeeper testified that she noticed the
presence of a new rug and the absence of the love seat when she
next cleaned after June 27.

          The State called Capano's brother Louis as a witness.
On Sunday, June 30, Capano told Louis that Fahey had slit her
wrists at his home, and as a result his love seat was stained
with her blood.  Capano reassured him that she was okay and would
be back to work on Monday.  Capano asked Louis to make sure that
the dumpsters at the construction site were emptied right away
because Capano had disposed of the love seat and some of Fahey's
personal belongings into one of them.  On Monday, July 1, Louis
ordered the dumpsters emptied even though they were not full.

          On July 31, 1996, federal investigators, executing a
search warrant for Capano's home on Grant Avenue, discovered two
small spots of blood on a wall in the great room.  The efforts of
the authorities at DNA matching were initially stymied by the

-9-

absence of a sample of Fahey's blood.  It turned out that Fahey had recently donated blood to the Red Cross.  It was retrieved from Europe where it had been sent and was then compared to the blood found in Capano's home.  DNA testing revealed that the odds of the small blood spots belonging to anyone other than Fahey were 1 in 11,000.

The jury also had before it evidence of Capano's behavior in prison after his arrest in November, 1997 and before his trial.  He had repeatedly written letters to MacIntyre pleading with her to deny the gun purchase on his behalf.  When she refused, he conspired with another inmate to have her house ransacked and burglarized.  He went so far as to provide the entry code for her security system, the location of her valuables, and instructions to destroy particular fixtures and works of art.

Capano took the stand in his own defense at the conclusion of the State's case-in-chief.  He denied that he killed Fahey and put the blame on MacIntyre.  He testified that MacIntyre had accidentally shot and killed Fahey in the great room of his home on Thursday evening, June 27.  According to Capano, after he and Fahey had dinner at a Philadelphia restaurant, they drove back to Wilmington where she stopped briefly at her apartment.  They then proceeded to his home and watched television while sitting on the love seat in the great room.  Fahey had taken off her pantyhose due to the heat.  At some point he retrieved a phone message from MacIntyre, who

wanted to come over to his home.  Capano said that he called her back and told her not to do so.  Nonetheless, using a key Capano had given her, she entered his house around 11:05 p.m. in a jealous rage.  Capano stood up to confront her as Fahey began putting on her pantyhose and shoes.  MacIntyre threatened to commit suicide, exclaiming, "I might as well kill myself.  You deserted me."  Capano related that he then observed her begin to lift her arm and realized she had a gun in her hand.  He grabbed her arm and pushed it down.  The gun MacIntyre was holding thereupon discharged a single time.  Capano testified that Fahey, who was still sitting on the love seat in the act of putting on her shoes, was struck by the bullet directly above her right ear.  He insisted MacIntyre's killing of Fahey was an accident.

Capano took possession of the gun from MacIntyre, who told him she had thought it was unloaded.  He then pulled Fahey to the floor, tried to perform CPR for at least twenty minutes to no avail, and used a flashlight to determine whether Fahey's eyes would dilate.  Capano noted that he took these emergency measures despite knowing almost immediately that Fahey was dead.  He therefore decided not to call 911.  Around 11:30 p.m., he escorted MacIntyre to her car where he observed the gun's magazine.  He took the magazine and sent her on her way home.  He admitted that at this point he began planning a cover-up.

Capano recounted that after MacIntyre left he carried the marine cooler from his garage into the great room.  By 11:45 p.m. that night he had stuffed Fahey's body inside the cooler.

Thereafter, he drove at a high rate of speed to Fahey's nearby apartment and dropped off groceries and a gift he had given her that night.  In an attempt to establish a false alibi for himself, Capano, upon returning home, called his law firm's answering machine service at 12:05 a.m., on Friday, June 28.  According to his account, MacIntyre came back to his Grant Avenue house no later than 1:00 a.m.  She helped him roll up the blood-stained carpet in the great room and move the cooler containing Fahey's body into the garage.  Capano later hid the gun and magazine in the cooler with Fahey's body.

MacIntyre's testimony contradicted that of Capano.  She explained she had spoken to Capano on the phone late on Thursday night, June 27, describing him as sounding agitated.  She denied she was at Capano's house at any time that evening or had any knowledge of or involvement in Fahey's death or the ensuing cover-up.  The State presented witnesses who corroborated that MacIntyre arrived at work at a local private school the next morning, Friday, June 28 by 6:45 a.m. and that she seemed completely composed and normal in demeanor.

Capano admitted the accuracy of much of what Gerry recounted.  He acknowledged that he had enlisted Gerry's help on Friday morning, June 28, that he and Gerry had driven the cooler containing Fahey's body to Gerry's house in Stone Harbor and that he had then used Gerry's boat to dispose of Fahey's body and the cooler at sea.  He confirmed Gerry's testimony concerning the disposal of the love seat while adding information unknown to

Gerry.  Capano described how later in the day on Friday, June 28,
when he was alone, he had discarded into a dumpster in New Jersey
the blood-stained rug and the rags he had used to wipe up Fahey's
blood.

On the other hand, Capano denied that Gerry had asked
him on Friday morning, June 28 if he had "do[ne] it" or that he
had nodded in the affirmative.  He stated that he had never
mentioned an extortion plot to Gerry or Joe and had never asked
Gerry prior to June 28 if he could borrow the boat.  As to the
$8,000 he had borrowed from and later repaid to Gerry, it was to
help Fahey pay for inpatient treatment for her eating disorder,
but she refused the money.  The defense presented an expert, Dr.
Carol Tavani, who opined that Gerry's testimony was a classic
case of "confabulation," in which a heavy drug user such as Gerry
unwittingly fills gaps in memory with false memories.  Not
surprisingly, the defense made much of the fact that Gerry as
well as Louis and MacIntyre had originally told the authorities
and the Grand Jury stories unhelpful to the State and had later
worked out favorable plea agreements in return for their
cooperation.

To rebut the State's evidence of motive, Capano
testified that he and Fahey had maintained a sexual relationship
as late as June 22, 1996.  He also attempted to explain away the
State's evidence of planning.  He said that he had bought the
marine cooler in April, 1996, not as a repository for Fahey's
body, but as a gift for Gerry for use on his boat.  He had

-13-

delayed giving the cooler to Gerry with the idea of presenting it to him over the July 4th holiday at the New Jersey shore.  He asserted that MacIntyre bought the gun not for him but rather for her own protection and against his advice.  Finally, as set forth above, he described how MacIntyre had accidentally killed Fahey. He volunteered on direct examination that he had kept silent, not telling anyone for over two years, about the circumstances surrounding Fahey's death because of his overriding desire to protect MacIntyre, with whom he was "deeply in love."

The jury, believing the State's version of events and not Capano's, found him guilty of murder in the first degree. Capano now contends that he is entitled to relief on the basis of several alleged violations of his federal constitutional rights.

## II.

Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which placed restrictions on the power of federal courts to grant habeas corpus relief to state prisoners such as Capano.  See 28 U.S.C. § 2254.  The law took effect on April 24, 1996 and governs all petitions filed thereafter.  Wertz v. Vaughn, 228 F.3d 178, 195 (3d Cir. 2001); 28 U.S.C. § 2254(d).  Capano filed his habeas corpus petition in this court on January 30, 2006.

Under § 2254(a) a federal court may entertain habeas corpus applications from those persons in "custody pursuant to the judgment of a State court and to grant relief only on the ground that they are in custody in violation of the Constitution

-14-

or laws or treaties of the United States." 28 U.S.C. § 2254(a);
Wertz, 228 F.3d at 195-96.  Before relief can be granted,
however, a state prisoner must have exhausted available state
remedies.  See 28 U.S.C. §§ 2254(b)(1)(A), (c).  Exhaustion
requires a petitioner first to present fairly all federal claims
through one complete round of the state appellate review process.
O'Sullivan v. Boerckel, 526 U.S. 838, 845, 847 (1999); Whitney v.
Horn, 280 F.3d 240, 250 (3d Cir. 2002).  To present a claim
fairly, a petitioner "must present a federal claim's factual and
legal substance to the state courts in a manner that puts them on
notice" of the federal claim that is being asserted.  McCandless
v. Vaughn, 172 F.3d 255, 261 (3d Cir. 1999) (citing Anderson v.
Harless, 459 U.S. 4, 6 (1982)).

        In addition, a federal court cannot grant habeas corpus
relief if the judgment of a state court denying relief on a claim
rests on a ground that is independent of the merits of the
federal claim and adequate to support that judgment.  Coleman v.
Thompson, 501 U.S. 722, 729 (1991).  A state procedural rule is
"adequate" to support a state court judgment only if it was
"firmly established and regularly followed" by the state courts
at the time it was applied.  Ford v. Georgia, 498 U.S. 411, 424
(1991).

        Even if a claim is adjudicated on the merits in a state
court proceeding, federal habeas relief is barred unless that
adjudication:

> (1) resulted in a decision that was contrary
> to, or involved an unreasonable application
> of, clearly established Federal law, as
> determined by the Supreme Court of the United
> States; or
> (2) resulted in a decision that was based on
> an unreasonable determination of the facts in
> light of the evidence presented in the State
> court proceeding.

28 U.S.C. § 2254(d). A state court ruling is "contrary to" clearly established Supreme Court precedent for the purposes of § 2254(d)(1) "if the state court applies a rule that contradicts the governing law" as delineated by the Supreme Court, or "if the state court confronts a set of facts that are materially indistinguishable from" a Supreme Court decision and arrives at a different result. Williams v. Taylor, 529 U.S. 362, 405-06 (2000); see Jacobs v. Horn, 395 F.3d 92, 100 (3d Cir. 1995). A state court ruling constitutes an "unreasonable application" of Supreme Court precedent if it identifies the correct governing legal rule from Supreme Court cases but "unreasonably applies it to the facts of the particular state prisoner's case." Williams, 529 U.S. at 407. When making the "unreasonable application" inquiry, we must determine "whether the state court's application of clearly established federal law was objectively unreasonable." Id. at 409. Our Court of Appeals has stated that federal courts may "consider[] the decisions of the inferior federal courts when evaluating whether the state court's application of the law was reasonable." Matteo v. Superintendent, SCI Albion, 171 F.3d 877, 890 (3d Cir. 1999).

The Supreme Court recently clarified the test we must apply before granting relief where we find constitutional error:

> [I]n § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the "substantial and injurious effect" standard set forth in Brecht v. Abrahamson, 507 U.S. 619 (1993), whether or not the state appellate court recognized the error and reviewed it for harmlessness under the "harmless beyond a reasonable doubt" standard set forth in Chapman v. California, 386 U.S. 18 (1967).

Fry v. Pliler, 127 S. Ct. 2321, 2328 (2007).  Thus, even if we conclude that constitutional error occurred in the state court, we may not grant relief unless the error "had a substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 631.

### III.

The Superior Court judge charged the jury solely with respect to the crime of first degree murder, defined as "intentionally caus[ing] the death of another person."  Del. Code Ann. tit. 11, § 636(a)(1).[3]  Under Delaware law, a person acts intentionally when "it is the person's conscious object to engage in conduct of that nature or to cause that result ...."  Id.

---

3.  We note that this definition is over-inclusive.  An intentional killing committed where "the person acts under the influence of extreme emotional disturbance" is classified as manslaughter under Delaware law.  Del. Code Ann. tit. 11, § 632(3).  Moreover, "[m]any who intend to, and do, kill are not criminally liable at all-those who act in self-defense or with other justification or excuse."  Lawrie v. State, 643 A.2d 1336, 1347 (Del. 1994).

§ 231(a)(1).  The jury therefore had the choice of convicting Capano on this charge or acquitting him.

Capano's first claim for habeas corpus relief asserts that the trial court violated his rights under the Fourteenth Amendment to the Constitution, as established in Beck v. Alabama, 447 U.S. 625 (1980), when it refused his request to instruct the jury on lesser included offenses to the indicted charge of first degree murder.  Because the claim was properly presented to and considered on the merits in the trial court and in the Delaware Supreme Court, Capano has satisfied the exhaustion requirement. O'Sullivan, 526 U.S. at 845, 847.

In Beck, the United States Supreme Court held that in a capital case, the Eighth Amendment to the Constitution as incorporated into the Due Process Clause of the Fourteenth Amendment requires that a jury be given the option of considering lesser included non-capital offenses when the evidence would have supported such verdicts.[4]  447 U.S. at 634-38; Hopper v. Evans, 456 U.S. 605, 611-12 (1982).  As the Supreme Court explained in Schad v. Arizona, 501 U.S. 624, 646 (1991), "Our fundamental concern in Beck was that a jury convinced that the defendant had committed some violent crime but not convinced that he was guilty of a capital crime might nonetheless vote for a capital

---

4.  The Eighth Amendment states, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const. amend. VIII.  The Due Process Clause of the Fourteenth Amendment mandates that no State shall "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.

conviction if the only alternative was to set the defendant free with no punishment at all."  Forcing the jury to make the all-or-nothing choice introduces "a level of uncertainty and unreliability into the factfinding process that cannot be tolerated in a capital case." Beck, 447 U.S. at 643.

Capano asked for jury instructions on three crimes that constitute lesser included offenses to the charged count of first degree murder:  second degree murder, manslaughter, and criminally negligent homicide.  Delaware law defines murder in the second degree as "recklessly caus[ing] the death of another person under circumstances which manifest a cruel, wicked and depraved indifference to human life."  Del. Code Ann. tit. 11, § 635.  Manslaughter means "recklessly caus[ing] the death of another person" or "intentionally caus[ing] the death of another person under circumstances which do not constitute murder because the person acts under the influence of extreme emotional disturbance."  Id. § 632(1), (3).  A person acts "recklessly" "when the person is aware of and consciously disregards a substantial and unjustifiable risk ... [which] will result from the conduct."  Id. § 231(e).  Finally, criminally negligent homicide consists of causing, "with criminal negligence, ... the death of another person."  Id. § 631.  A person acts with criminal negligence "when the person fails to perceive a risk that ... will result from the conduct.  The risk must be of such a nature and degree that failure to perceive it constitutes a

gross deviation from the standard of conduct that a reasonable person would observe in the situation." Id. § 231(a).

Both the Superior Court and the Delaware Supreme Court ruled that Capano was not entitled to instructions on lesser included offenses. Under Delaware law, the jury must be charged on lesser included offenses in capital cases only if "there is a rational basis in the evidence for a verdict acquitting the defendant of the offense charged and convicting the defendant of the included offense." Id. § 206(c). The Delaware Supreme Court explained:

> The State argues that no evidence was presented of recklessness or criminal negligence, and that "the jury was not free to infer a state of mind from nonexistent evidence." Our independent review of the evidence at trial confirms the accuracy of the State's view. There is no such evidence. To permit the jury to find the elements of the lesser included offenses on this record would permit unguided speculation by the jury.

Capano v. State, 781 A.2d 556, 630-31 (Del. 2001). That Court was cognizant of the federal due process issue presented by Beck. It observed that the language of the Delaware statute is drawn almost verbatim from the United States Supreme Court's post-Beck decision in Hopper v. Evans, 456 U.S. 605 (1982). Hopper held that a lesser included offense instruction should be given "if the evidence would permit a jury rationally to find [a defendant] guilty of the lesser offense and acquit him of the greater." Hopper, 456 U.S. at 612. Because the Delaware Supreme Court found no rational basis in the evidence to support Capano's

-20-

desired instructions under Delaware law, it concluded that no such basis existed under the similar federal constitutional standard. Capano, 781 A.2d at 633-34.

Capano, as previously noted, was convicted of first degree murder and sentenced to death by the trial judge on the jury's recommendation. After Capano's death sentence was overturned in a post-conviction proceeding, Capano v. State, 889 A.2d 968 (Del. 2006), he was resentenced to life imprisonment without the possibility of parole. He argues that a rational basis for his requested points for charge did exist in the evidence, namely, that the jury could have found his actions to be criminally reckless or criminally negligent based either on "gaps" in the State's evidence or on his own "accident" account of the events of June 27, 1996. We treat the issue of the sufficiency of the evidence for a lesser included offense instruction as one of law. See, e.g., Hogan v. Gibson, 197 F.3d 1297, 1306 n.6 (10th Cir. 1999).

First, Capano suggests that the jury could have disbelieved certain portions of the State's evidence as to intent, thus leaving gaps as to what actually occurred at Capano's home on the night of June 27, 1996. This is true. Nonetheless, it does not follow that the jury may fill in those gaps with speculation. The record is entirely devoid of any evidence supporting a finding that Capano killed Fahey as a result of recklessness, extreme emotional disturbance, or criminal negligence. It is undisputed that the prosecution's

case was sufficient to establish motive, planning, and consciousness of guilt and to establish an intentional killing by Capano constituting first degree murder.  While the jury was free to disbelieve the State's evidence, it was not free to create a scenario with no factual support to convict on a lesser included charge.  Simply put, the only option other than conviction of first degree murder available to the jury on the record before it was to find that the State had not proven first degree murder beyond a reasonable doubt, either because the State's evidence in and of itself was insufficient or because the jury believed that Fahey had died at the hand of MacIntyre with no culpability on the part of Capano.  Consequently, the jury could only rationally have found Capano guilty of first degree murder or have acquitted him.

        Second, Capano asserts that a jury could have viewed his attempt to prevent MacIntyre from engaging in an apparent suicide attempt as either reckless or criminally negligent behavior on his part.  The Delaware Supreme Court described Capano's testimony as being "confined to an accident scenario that involved no crime on his part."  Again, Delaware law provides that an act is committed recklessly only if the actor "consciously disregards a substantial and unjustifiable risk ...."  An act consists of criminal negligence where a person fails to perceive a risk "of such a nature and degree that failure to perceive it constitutes a gross deviation from the

standard of conduct that a reasonable person would observe in the situation."

Capano directs us to Hall v. State, 431 A.2d 1258 (Del. 1981), in which the defendant shot his mother between the eyes from a distance of approximately six inches and was charged with first degree murder, second degree murder, manslaughter, and negligent homicide. Despite the defendant's testimony that the gun had accidentally discharged, he was convicted of first degree murder. Capano cites Hall for the proposition that there is such a thing as a "reckless accident," that is, an accident that negates the culpable state of mind for one charge but supports a verdict on some lesser charge. We agree. The facts of Hall, however, are a world removed from those presented here. In this case, Capano, if his testimony is to be believed, never had possession of the firearm, much less pointed it at Fahey. Rather, he attempted to prevent a purportedly suicidal woman from shooting herself. While the facts of Hall offered a rational basis for jury instructions on lesser included offenses, the facts here simply do not.

Capano also cites Henry v. State, 805 A.2d 860, 865 (Del. 2002), in which the defendant, charged with first degree murder, killed his wife by shooting her three times at close range. He argued that he had not intended to kill her and that he was entitled to an instruction on second degree murder because a jury could find that his conduct was reckless under circumstances which manifest a cruel, wicked, and depraved

-23-

indifference to human life rather than intentional.  The trial court rejected that argument, calling the defendant's story "absurd."  The Delaware Supreme Court reversed.  It held that the jury could have believed the defendant's testimony and returned a verdict of second degree murder.  Because Capano's story, even if fully believed, would not have warranted a jury instruction on lesser included charges, <u>Henry</u> is inapplicable.

Finally, Capano cites to <u>Wright v. State</u>, No. 84-2007, 2008 Del. LEXIS 61, at *2 (Del. Feb. 7, 2008).  There, the defendant had engaged in an argument with an acquaintance in a parking lot.  Drawing a handgun, the defendant fired between five and ten shots at the man and killed an innocent bystander in the process.  <u>Id.</u> at *2.  Capano cites the case presumably because the defendant was charged with first and second degree murder despite his protests that the shooting was an accident.  The Delaware Supreme Court held that because the defendant's conduct "could not have fallen below recklessness or criminal negligence," he was not entitled to a jury instruction on accident.  <u>Id.</u> at *15.  It hardly needs saying that the defendant's conduct in <u>Wright</u>, which involved discharging a firearm multiple times in a populated parking lot, bears no similarity to Capano's description of what happened here.

No Delaware precedent called to our attention suggests that Capano, under his rendition of the facts, committed any act which runs afoul of the State's homicide statutes.  The cases referenced by Capano all involve situations where the defendant

-24-

actively possessed a firearm and pointed it toward the victim. See <u>Wright</u>, 2008 Del. LEXIS 61, at *2; <u>Henry</u>, 805 A.2d 860, 862-63; <u>Hall</u>, 431 A.2d 1258, 1258-59.  That was not the situation here.  Accordingly, it was not objectively unreasonable for the Delaware Supreme Court to decide that Capano's alleged attempt to disarm a woman threatening suicide provided no rational basis for a jury instruction on second degree murder, manslaughter, or criminally negligent homicide.  Again, while the jury had the right to disbelieve Capano's story about how Fahey died on the night of June 27, 1996, it may not substitute a different version or draw inferences that have no support in the record.

The Delaware Supreme Court's <u>Beck</u> determination was not an objectively unreasonable application of the law as determined by the United States Supreme Court.  Moreover, to the extent that we must decide whether there was an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding, we find that the Delaware Supreme Court did not make an unreasonable determination.  See 28 U.S.C. § 2254(d)(2).  Consequently, we will deny relief to Capano on the basis of his <u>Beck</u> claim.[5]

_____

5.  The Supreme Court has not addressed the applicability of <u>Beck</u> where a defendant such as Capano has a sentence of death later reduced to life imprisonment.  It may very well be that <u>Beck</u> does not apply to non-capital cases.  See, e.g., <u>Schad v. Arizona</u>, 501 U.S. 624, 646-47 (1991); <u>Bagby v. Sowders</u>, 894 F.2d 792, 796-97 (6th Cir. 1990); <u>Valles v. Lynaugh</u>, 835 F.2d 126, 127 (5th Cir. 1988); <u>Chavez v. Kerby</u>, 848 F.2d 1101, 1103 (10th Cir. 1988); <u>Perry v. Smith</u>, 810 F.2d 1078, 1080 (11th Cir. 1987).  However, in <u>Vujosevic v. Rafferty</u>, 844 F.2d 1023, 1027 (3d Cir. 1988),
                                                    (continued...)

IV.

In his second claim before us, Capano argues that the admission at his trial of certain out-of-court statements made by Fahey violated his right under the Confrontation Clause of the Sixth Amendment to the Constitution as incorporated into the Fourteenth Amendment.  The Confrontation Clause states that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI.  Capano raised this argument at trial and presented it to the Delaware Supreme Court on direct appeal.  He has thus exhausted his state remedies in this regard.  O'Sullivan, 526 U.S. at 845, 847.

Ohio v. Roberts, 448 U.S. 56 (1980), sets forth the clearly established law governing the admission of the hearsay statements in light of the Confrontation Clause.[6]  See, e.g., McCandless, 172 F.3d at 264-65.  In Roberts, the Supreme Court held that the Confrontation Clause allows the admission of hearsay against criminal defendants if the evidence falls within a "firmly rooted hearsay exception" or possesses "particularized guarantees of trustworthiness." 448 U.S. at 66.  A hearsay

5.(...continued)
which was decided prior to Schad, our Court of Appeals held that Beck does apply in non-capital cases.  In light of our holding, we need not decide that issue here.

6.  The Supreme Court partially overruled Roberts when it held that the admission of certain "testimonial" hearsay statements violates the Confrontation Clause.  See Crawford v. Washington, 451 U.S. 36, 68-69 (2004).  It is undisputed that no testimonial statements are at issue here.

exception is "firmly rooted" if "longstanding judicial and legislative experience" has shown that statements admitted pursuant to the exception carry special guarantees of trustworthiness essentially equivalent to those produced by cross-examination.  Idaho v. Wright, 497 U.S. 805, 815 (1990); see White v. Illinois, 502 U.S. 346, 355 n.8 (1992).  Even if a statement does not fall within a "firmly rooted hearsay exception," it may still satisfy the Confrontation Clause if it possesses "particularized guarantees of trustworthiness" such that cross-examination is unnecessary to ascertain the statement's reliability.  Roberts, 448 U.S. at 66 n.9.

Under Delaware law, "[i]n a prosecution for homicide arising out of a marital or romantic relationship, evidence of previous discord between the victim and the defendant is clearly material to issues of motive and intent."  Gattis v. State, 637 A.2d 808, 818 (Del. 1994).  At trial, the prosecution offered testimony in its case-in-chief from numerous witnesses to whom Fahey had described her relationship with Capano and her feelings concerning it.  The State's purpose was to demonstrate that Fahey had ended their intimate relationship over Capano's objection and that he thus had a motive to kill her.

Jill Morrison, Fahey's friend, recounted that Fahey thought that Capano was trying to control her life and that he "was upset ... because she was dating Mike [Scanlan] ...."  Morrison further related Fahey's descriptions of an incident in which Capano climbed Fahey's fire escape and entered her

apartment in an attempt to reclaim gifts and another in which he
parked his vehicle in his garage, with Fahey in the passenger
seat, and locked the car doors as they argued about their
relationship.  Fahey's friend Siobhan Sullivan said that Fahey
called Capano "a possessive, controlling maniac" and later "very
adamantly" said, "He's fucking stalking me."  Other friends
attested to Fahey's statements expressing a desire to end her
relationship with Capano.

     The prosecution called as witnesses a psychiatrist, Dr.
Neil Kaye, and two psychologists, Dr. Michele Sullivan and Dr.
Gary Johnson (collectively, "the psychotherapists"), all of whom
had professionally treated Fahey while she was dating Capano.
Each of them testified as to statements made by Fahey during the
course of diagnosis and treatment.  These statements, like those
made to her friends, included both general descriptions of
Fahey's feelings toward Capano and accounts of particular
incidents involving him.  For example, Dr. Kaye testified that in
June, 1996, "[Fahey] was clear in her mind that she did not want
to have a relationship with Mr. Capano.  She was still fearful of
him, was not convinced that he was ever going to let go ...."
Dr. Kaye further noted that "she was genuinely fearful ... that
harm would come to her if she broke things off ..." and that "she
was trying to find a way to let him down easy ... because she was
worried about rage and anger."

     Similarly, Dr. Sullivan testified that Fahey sought to
end her involvement with Capano because he was "incredibly

controlling and possessive," so much so that Fahey considered him
to be "haunting her" with a plethora of emails, phone calls, and
unexpected visits.  According to Dr. Sullivan, Fahey was
concerned that Capano would have her kidnapped.

Dr. Johnson, like Jill Morrison, related Fahey's
account of the incident in which Capano attempted to reclaim
gifts from Fahey's apartment.  He testified that Fahey was "quite
terrified" because a prominent married man whom she was dating
"had come to her apartment quite late at night ... bolted the
door shut and kept her inside for ... three or four hours during
which time he yelled at her, threatened to expose their
relationship ...."  Dr. Johnson added that Fahey "felt very much
controlled by" the man and that Fahey "began to want to pull away
from that relationship, [but] that he was unwilling to let her do
so."

Significantly, the prosecution introduced a
considerable amount of hearsay evidence by stipulation, including
Fahey's diary, emails between Fahey and Capano, and the testimony
of Fahey's close friend Kim Lynch-Horstmann.  Lynch-Horstmann
stated that in December, 1995, Capano "would e-mail [Fahey] at
work all the time and they were kind of obsessive e-mails."
Fahey told her that Capano would threaten suicide if she tried to
end the relationship.  Further, Fahey felt she might have to move
out of the state to escape Capano's control.  Lynch-Horstmann
repeated Fahey's account of the incident in which Capano climbed
the fire escape:

> [Capano] tried to remove all of the gifts
> that he had given Annie from her apartment
> because he didn't want another man watching
> the TV that he had given her, the clothes --
> seeing Annie wear the clothes that he had
> given her, so he removed a lot of those
> things from her apartment.

Based on what Fahey told her, Lynch-Horstmann recounted that Capano would "attack her insecurities and refer to her as white trash" and tell her "that she should be lucky that he's even going out with her because of who he is and what he could buy and where she came from."

The statements introduced by stipulation from Fahey's emails and diary were similar. For example, in an email message to Capano on February 12, 1996, Fahey wrote: "Tommy, you scared me this weekend, starting with Friday and all the calls you placed. It really freaks me out when you call every half hour ...." In a diary entry dated February 23, 1996, Fahey expressed a fear that "[Capano] would fly off the handle again" and on April 7 recorded that Capano was "a controlling, insecure, jealous maniac ...."

The trial judge overruled Capano's objections to the non-stipulated admission of Fahey's statements to her friends, family, and psychotherapists. Nevertheless, he repeatedly delivered timely and appropriate limiting instructions as to the purpose for which the evidence in issue could be used, that is, to prove that Fahey was attempting to extricate herself from her relationship with Capano and that he thus had a motive to kill her. The judge stressed that the statements were not introduced

to prove the truth of the underlying facts, of Capano's bad
character, or of his state of mind.[7]

On direct appeal, the Delaware Supreme Court first
considered whether Fahey's statements were properly admitted
under Rule 803(3) of the Delaware Rules of Evidence ("D.R.E."),
the "state of mind" exception, which allows the admission of any

> statement of the declarant's then existing
> state of mind, emotion, sensation or physical
> condition (such as intent, plan, motive,
> design, mental feeling, pain and bodily
> health), but not including a statement of
> memory or belief to prove the fact remembered
> or believed ....

This rule is the same as Rule 803(3) of the Federal Rules of
Evidence.  The Court distinguished Fahey's statements describing
her then existing state of mind, such as those indicating she was
afraid of Capano, from her statements of fact or memory that gave
rise to that state of mind, such as her descriptions of his
obsessive behavior.  The Court concluded that Fahey's statements
in the former category were properly admitted in the State's

---

7.  After Dr. Kaye's testimony, the trial court instructed the
jury that, "Members of the jury, I want to remind you of a
warning I gave you earlier in response to an objection that was
made by the defense.  The purpose of this evidence is to examine
the mental state, the emotional state of Anne Marie Fahey ... it
in no way reflects as evidence of any actions or any state of
mind on behalf of the defendant.  This deals solely with Miss
Fahey, not with Mr. Capano."
    Prior to Jill Morrison's testimony, the court also
instructed the jury, "You may not consider the evidence [of
Capano's obsessive behavior] as proof that the defendant is a bad
person, and therefore, probably committed the offense with which
he is charged."

case-in-chief under D.R.E. 803(3) while those in the latter category were not.

The Delaware Supreme Court then addressed whether the admission of these state of mind statements violated the Confrontation Clause under Roberts. It concluded that because D.R.E. 803(3) is a firmly rooted hearsay exception, the statements properly admitted pursuant to the Rule did not give rise to any constitutional infringement. The Court determined, however, that the trial court's admission of Fahey's statements of fact or past events was evidentiary error under D.R.E. 803(3) and also violated Capano's Confrontation Clause right. Nonetheless, the Court decided their introduction to be harmless error beyond a reasonable doubt under Chapman v. California, 386 U.S. 18 (1967) since they were largely cumulative of stipulated evidence.

The Delaware Supreme Court went on to rule that all of Fahey's statements to her psychotherapists, including those containing factual assertions, were admissible under D.R.E. 803(4), which is identical to Rule 803(4) of the Federal Rules of Evidence and allows the following hearsay evidence:

> [s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms or sensations, or the inception or general character of the cause or external causes thereof insofar as reasonably pertinent to diagnosis or treatment.

The Court further reasoned that the statements had sufficient "particularized guarantees of trustworthiness" to satisfy the second <u>Roberts</u> prong.[8]

Capano does not contest that Rule 803(3) is a firmly rooted hearsay exception under <u>Roberts</u>.[9]  Instead, he argues that it was constitutional error to allow the admission of Fahey's statements of past events under D.R.E. 808(3).  The Delaware Supreme Court agreed but concluded that the error was harmless. We must now review the error to determine if it "had substantial and injurious effect or influence in determining the jury's verdict."  <u>See</u> <u>Fry</u>, 127 S. Ct. at 2328; <u>Brecht</u>, 507 U.S. at 631. In doing so, there must be more than "mere speculation that the defendant was prejudiced by trial error; the court must find that the defendant was actually prejudiced by the error."  <u>Calderon v. Coleman</u>, 525 U.S. 141, 146 (1998).

The properly admitted evidence presented at trial of Capano's controlling, manipulative, and obsessive nature was legion.  As noted above, many of Fahey's out-of-court statements

---

8.  The Delaware Supreme Court declined to reach the issue of whether, for Confrontation Clause purposes, Rule 803(4) was a "firmly rooted hearsay exception" with respect to statements made to psychotherapists.

9.  The "state of mind" exception to the hearsay rule has a well-established pedigree, having been discussed by the United States Supreme Court as early as 1892 in <u>Mutual Life Ins. Co. of N.Y. v. Hillmon</u>, 145 U.S. 285 (1892).  It has since been codified in both the Delaware and Federal Rules of Evidence.  <u>See</u> Del. R. Evid. 803(3); Fed. R. Evid. 803(3).  Several Courts of Appeals have found it to be "firmly rooted."  <u>See</u> <u>Horton v. Allen</u>, 370 F.3d 75, 85 (1st Cir. 2004).

were introduced by stipulation in the form of Fahey's diary, Kim Lynch-Horstmann's testimony, and the emails between Fahey and Capano. Capano apparently thought some of this information would be helpful to him. Each of these sources of evidence contained both generalized comments on Capano's nature and detailed accounts of specific behavior. They painted Capano in an extremely unflattering light. Capano's negative attributes were also on prominent display in Capano's own writings from prison to MacIntyre, her teenage son, and Susan Louth, another of Capano's former mistresses. His vindictive nature was exemplified by his attempt from prison to have MacIntyre's house ransacked and burglarized, which was described in detail through properly admitted evidence. As such, the wrongly admitted evidence provided the jury with nothing that was not available from other credible, properly admitted sources. We emphasize again that the trial judge gave appropriate limiting instructions, which reduced the likelihood of any prejudice.

Capano relies on United States v. Lopez, in which our Court of Appeals reviewed for harmless error the ruling of the district court which it concluded had erroneously admitted hearsay at trial. 340 F.3d 169 (3d Cir. 2003). There, the Government introduced an out-of-court statement made to a prison official by a nameless tipster that the defendant had contraband in his cell. The Court of Appeals observed that the statement was the only evidence upon which the jury could find that an "invisible, presumably disinterested witness" corroborated the

government's position.  In reversing the conviction, the Court
characterized the inadmissible statement as the "cement" that
held together the jury's verdict.  <u>Lopez</u>, 340 F.3d at 177.  Here,
by contrast, the wrongly admitted evidence was almost entirely
cumulative in subject matter.  The improperly admitted hearsay
statements did not serve to "cement" an otherwise tenuous case.

The erroneous admission of certain of Fahey's out-of-
court statements under D.R.E. 803(3) did not have "a substantial
and injurious effect or influence in determining the jury's
verdict" under <u>Brecht</u>, 507 U.S. at 631.  Thus, we will deny
relief to Capano on that basis.

Capano further contends that his constitutional right
of confrontation was also violated under <u>Roberts</u> by the admission
of Fahey's statements to her psychotherapists under D.R.E.
803(4).  While the Delaware Supreme Court concluded that Fahey's
statements about past events were inadmissible under D.R.E.
803(3), it determined that they were admissible pursuant to
D.R.E. 803(4) and possessed sufficient "particularized guarantees
of trustworthiness" under the second <u>Roberts</u> prong to satisfy the
Confrontation Clause.

The United States Supreme Court has held that the
hearsay exception for "statements made for purposes of medical
diagnosis or treatment," as embodied in the identical Rule 803(4)
of the Federal Rules of Evidence, is firmly rooted for
Confrontation Clause purposes.  <u>White</u>, 502 U.S. at 356 n.8.
While Fahey's psychiatrist, Dr. Kaye, was a physician, Dr.

Sullivan and Dr. Johnson, who also saw Fahey, were psychologists and not medical doctors. The Court has not reached the specific issue of whether Rule 803(4) is applicable or firmly rooted as to statements made to psychologists for purposes of diagnosis or treatment. In any event, the Court has provided ample guidance to suggest that it would not exclude such statements admitted here at least under the second <u>Roberts</u> test.

In <u>Idaho v. Wright</u>, the United States Supreme Court noted that the "particularized guarantees of trustworthiness" required for admission under the Confrontation Clause should be "drawn from the totality of circumstances that surround the making of the statement and that render the declarant particularly worthy of belief." 497 U.S. 805, 820 (1990). A trial court has "considerable leeway" in weighing the relevant circumstances. <u>Id.</u> at 822. The Supreme Court, by way of example, stated that "spontaneity and consistent repetition" and a "lack of motive to fabricate" are permissible factors to consider in examining the totality of the circumstances. <u>Id.</u> at 821-22.

The Delaware Supreme Court cited as persuasive the fact that "Fahey made the statements to her psychotherapists in a natural manner during therapy sessions," with "nothing to indicate that Fahey made the statements under suspicious circumstances or in a manner suggesting that she had sinister motives." The Court considered the "spontaneity and consistent repetition" of the statements and noted "that Fahey made nearly

identical statements concerning her intentions and her emotional
state to a number of her psychotherapists and friends."  In view
of the presence of several Wright factors and the considerable
leeway that must be accorded the trial court, the Delaware
Supreme Court's determination that Fahey's out-of-court
statements to her psychotherapists satisfied the Confrontation
Clause was not an objectively unreasonable application of clearly
established United States Supreme Court precedent.

     As his final argument under the Confrontation Clause,
Capano argues that the Delaware Supreme Court erred in allowing
the introduction of Fahey's statements in the State's case-in-
chief, rather requiring their introduction to be deferred until
the State's rebuttal.  He maintains that such evidence is
unfairly prejudicial when it is not delayed until after a defense
such as accident is raised.  The Delaware Supreme Court
disagreed.  It held that it was relevant to the State's effort to
show that Fahey had sought to end her romantic relationship with
Capano and that he had a motive, as a rejected lover, to kill
her.

     The United States Supreme Court has not addressed
whether under some circumstances statements properly admitted
under Rule 803(3) must, as a constitutional matter, be delayed by
the State until it presents its rebuttal case.  Further, as far
as we know, no holding of any lower federal court espouses
Capano's desired result.  Given the complete lack of clearly
established United States Supreme Court precedent supporting

Capano's position, the Delaware Supreme Court's decision allowing the admission of hearsay statements under Rule 803(3) in the State's case-in-chief does not provide Capano with a basis for relief under 28 U.S.C. § 2254.

In sum, Capano's right to confront the witness against him under the Confrontation Clause was violated by the improper admission of certain hearsay evidence under Rule 808(3). However, in light of the properly admitted evidence which included the voluminous stipulations as well as Fahey's trustworthy statements to her psychiatrist and two psychologists, the violation did not have "a substantial and injurious effect or influence in determining the jury's verdict. See Brecht, 507 U.S. at 631. Accordingly, Capano's claim under the Confrontation Clause merits no relief.

V.

Capano's final claim for relief under 28 U.S.C. § 2254 challenges the prosecution's cross-examination of him at the trial concerning his post-arrest silence at his bail hearing in February, 1998. He asserts that his due process rights were violated under the Fourteenth Amendment to the Constitution. U.S. Const. amend. XIV, § 1. In Doyle v. Ohio, the United States Supreme Court held that "use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving Miranda warnings, violated the Due Process Clause of the Fourteenth Amendment." 426 U.S. 610, 619 (1976); see Miranda v. Arizona, 384 U.S. 436 (1966).

On direct examination, Capano professed that he remained silent for more than two years after Fahey's death, including at his five-day bail hearing that began on February 2, 1998, out of a desire to protect MacIntyre and his brother Gerry. On cross-examination, the prosecutor then sought to impeach Capano on the proffered rationale.  The colloquy during the trial transpired as follows:

> Q:  And then February 27, 1998, after you are arrested, Debbie MacIntyre signs a cooperation agreement with the Government, right?
>
> A:  Yes, she does.  I didn't hear the date you said.
>
> Q:  February 27, 1998?
>
> A:  Yeah, I don't know if that's the date she signed.  I know that's the date she went in. For all I know she had signed it the day before.
>
> Q:  You kept quiet at the bail hearing which preceded this, right?  There was a bail hearing in February to decide whether you would stay in jail.  You never said she did it, right?
>
> A:  I never testified.
>
> Q:  But you never said it through any means. You never told your attorneys, you never did anything?
>
> A:  No, I was true to my word.  I was protecting her.
>
> Q:  You were protecting her.  February 27th she signs a cooperation agreement with the State?
>
> A:  Yes.
>
> Q:  And you're in jail?

A:  Yes.

Q:  You have-according to your testimony,
it's been horrible conditions that you've
endured in jail, right?

A:  Very terrible.

Capano failed to object to this line of questioning at trial.

However, he presented his claim of improper cross-examination to

the Delaware Supreme Court on direct review and thus has

satisfied the exhaustion requirement.  O'Sullivan, 526 U.S. at

845, 847.

The State maintains the Delaware Supreme Court disposed

of Capano's improper cross-examination claim pursuant to Delaware

Supreme Court Rule 8.  The State argues that this ruling

constitutes an independent and adequate state ground which

precludes this Court from granting federal habeas corpus relief.

Coleman, 501 U.S. at 729.  Rule 8 provides:

Only questions fairly presented to the trial
court may be presented for review; provided,
however, that when the interests of justice
so require, the Court may consider and
determine any question not so presented.

The Delaware Supreme Court has interpreted the "interests of

justice exception" contained in Rule 8 to call for "plain error"

review before the Court will excuse default in failing to raise

an issue at the trial level.  "[T]he error complained of must be

so clearly prejudicial to substantial rights as to jeopardize the

fairness and integrity of the trial process." Wainwright v.

State, 504 A.2d 1096, 1100 (Del. 1986).  Our Court of Appeals has

recently held that a finding of no plain error pursuant to

Delaware Supreme Court Rule 8 when the issue has not been preserved below constitutes an independent and adequate state ground which forecloses federal review under 28 U.S.C. § 2254. <u>Campbell v. Burris</u>, 515 F.3d 172, 182 (3d Cir. 2008).

       The Delaware Supreme Court did not specifically reference Rule 8 in deciding on direct appeal Capano's claimed violation of his right to post-arrest silence.  Nonetheless, the heading in the relevant section of its voluminous opinion was "Questions Concerning Post-Arrest Silence - No Plain Error." <u>Capano v. State</u>, 781 A.2d 556, 647 (Del. 2001).  The Court explained that "[b]ecause no objection was raised at trial, we review this claim for plain error."  <u>Id.</u>  It immediately thereafter cited its decision in <u>Wainwright</u>, the case in which it announced that Rule 8 requires "plain error" review where the appellant failed to object at trial.

       While noting Capano's waiver at trial, the Court necessarily proceeded to delve into the merits.  Otherwise, it would not have been able to decide if the Superior Court judge had committed plain error.  There is no doubt that the Delaware Supreme Court reviewed Capano's claim for plain error and found none.  Such review constitutes an independent and adequate state ground for denial of relief.  <u>Campbell</u>, 515 F.3d at 182. Consequently, we are precluded from reviewing this claim in a collateral proceeding under § 2254 unless Capano establishes cause for his procedural default and actual prejudice or shows that a miscarriage of justice will result if we refuse to hear

his claim.  <u>See</u> <u>Coleman</u>, 501 U.S. at 750.  Capano has not alleged
cause for his procedural default and is unable to demonstrate
that a miscarriage of justice will result from our refusal to
hear his claim.

Even if we may review the substance of Capano's claim,
we find it to be meritless.  The United States Supreme Court in
<u>Doyle</u> made clear that cross-examination as to post-arrest silence
is improper only where it is used to "impeach the exculpatory
story."  426 U.S. at 619 n.11.  The Court explained that the use
of a defendant's post-arrest silence to impeach an exculpatory
story disclosed shortly before or at trial would be
"fundamentally unfair because Miranda warnings inform a person of
his right to remain silent and assure him, at least implicitly,
that his silence will not be used against him."  <u>Anderson v.</u>
<u>Charles</u>, 447 U.S. 404, 407-08 (1980).  This rationale is not
applicable here.

In this case, Capano opened the door to a discussion of
his post-arrest silence not only by repeatedly referencing it on
his direct examination but by making it a keystone of his
defense.  He stressed that the motivation for his post-arrest
silence, including his silence at his February, 1998 bail
hearing, was to protect MacIntyre from suffering legal
repercussions for her role in Fahey's death.  Yet, Capano had
also stated on direct examination that he was enormously
disappointed by MacIntyre's failure to testify at the bail
hearing, particularly after he had given her so many detailed

-42-

instructions to follow at that proceeding.  He further described a dramatic and negative shift in the tone of MacIntyre's communications to him beginning on January 28, 1998, a few days before the bail hearing took place.

The State on cross-examination impeached the credibility of Capano's proffered explanation for his continued silence at the bail hearing when his relationship with MacIntyre had noticeably deteriorated by that time and he knew she was no longer willing to be a witness on his behalf.  Under the circumstances, the State's questioning was in no way "fundamentally unfair" and did not infringe Capano's right to remain silent after his arrest.  We conclude that the State's limited cross-examination of Capano regarding his post-arrest silence did not result in a constitutional violation.

In any event, even if there were constitutional error, it did not have "a substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 631. Capano is not entitled to relief on his Doyle claim.

VI.

For the reasons discussed above, Thomas J. Capano has not demonstrated that he is entitled to relief.  Accordingly, we will deny his petition for a writ of habeas corpus under 28 U.S.C. § 2254.  We will not issue a certificate of appealability.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

THOMAS J. CAPANO            :          CIVIL ACTION
                           :
        v.                 :
                           :
THOMAS L. CARROLL, et al.   :          NO. 06-58

ORDER

AND NOW, this 15th day of April, 2008, for the reasons set forth in the accompanying Memorandum, it is hereby ORDERED that:

(1)  the petition of Thomas J. Capano for a Writ of Habeas Corpus under 28 U.S.C. § 2254 is DENIED; and

(2)  a certificate of appealability is not issued.

BY THE COURT:


/s/ Harvey Bartle III
HARVEY BARTLE III          C.J.
SITTING BY DESIGNATION